**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CENGAGE LEARNING, INC.; BEDFORD, FREEMAN & WORTH PUBLISHING GROUP, LLC D/B/A MACMILLAN LEARNING; MACMILLAN HOLDINGS, LLC; ELSEVIER INC.; ELSEVIER B.V.; and MCGRAW HILL LLC, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | **Civil Action No. 24-cv-04274-JLR-BCM** <br><br> <u>**AMENDED COMPLAINT**</u> <br><br> **Jury Trial Requested** |

Plaintiffs Cengage Learning, Inc. ("Cengage"); Bedford, Freeman & Worth Publishing Group, LLC d/b/a Macmillan Learning ("Macmillan Learning"); Macmillan Holdings, LLC ("Macmillan Holdings"); Elsevier Inc. ("Elsevier"); Elsevier B.V.; and McGraw Hill LLC ("McGraw Hill") (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby file their Complaint against Google LLC ("Google"). Plaintiffs Cengage, Macmillan Learning, Elsevier, and McGraw Hill (collectively, "Publishers") assert claims against Google for contributory and vicarious copyright infringement and violations of New York General Business Law Section 349(a). Plaintiffs Cengage, Macmillan Holdings, Elsevier, Elsevier B.V., and McGraw Hill (collectively, "Trademark Plaintiffs") assert claims against Google for direct trademark infringement. Plaintiffs allege as follows on personal knowledge as to matters relating to themselves and on information and belief as to all other matters.

## INTRODUCTION

1.     This lawsuit seeks to address Google's systemic and pervasive advertising of unauthorized, infringing copies of the Publishers' textbooks and educational works.  For years, Google has knowingly facilitated and reaped profits from the sale of infringing works through pirate websites that Google promotes.  The Publishers have reported infringement after infringement to Google, only to have those reports ignored.  Google has continued to advertise infringing works while simultaneously restricting ads for authentic educational works—supporting piracy instead of legitimacy.  Google's conduct violates the Copyright Act, the Lanham Act, and New York's General Business Law, causing immeasurable harm to Plaintiffs.  Now, that harm must be remedied.

2.     The Publishers are copyright holders and leading educational publishers in the United States.  Each year, they publish thousands of valuable educational works that advance learning, including textbooks that are among the most widely used in their fields.  These textbooks bear highly respected, registered trademarks that are owned by the Trademark Plaintiffs.

3.     Not only is google.com the world's most visited website, and Google Search the world's most dominant search engine, but Google is also the world's most dominant provider of digital advertising services.  Google earned over $300 billion in revenue last year, and advertising is how it makes money.  Unfortunately, Google has used its advertising power to undermine legitimate educational publishers and profit from piracy.

4.     The Publishers have long been sending notices of infringement to the agent Google designated to receive such notices.  Each notice identifies hundreds or thousands of specific Google ads for infringing works, including the ad URLs, the infringed copyrighted works, and the pirates' infringing websites to which the ads contain direct links.  The Publishers send Google these notices so Google can take action to stop the piracy.  Google's responses to these notices

have been a circus of failures. Google has failed to remove thousands of ads for infringing works in a timely manner, or at all, and has continued to do business with known pirates – even after the filing of this case. Google has even threatened to stop reviewing all of the Publishers' notices for up to six months simply because the Publishers appropriately re-submitted notices for infringing works that Google previously failed to act upon.

5. Legally, when Google receives the Publishers' notices, and thus becomes specifically aware that it is advertising and directing Google users to infringing websites, Google has an obligation to do something about it. Continuing to advertise and profit from known infringing activity and continuing to do business with known repeat infringers violates the law.

6. Publicly, Google claims that it wants to protect intellectual property, touting itself as "a leader in rooting out and ejecting rogue sites" from its advertising services. But Google's actions do not match its words. Not only has Google failed to independently "root out and eject" repeat infringer pirates, it has disregarded the infringement notices clearly identifying these "rogue sites." Plaintiffs have tried repeatedly to discuss these issues with Google, but Google refuses to take basic steps to resolve them. Thus, despite Plaintiffs' efforts, Google's site remains littered with ads for infringing works.

7. Without Google, the pirate websites it promotes would not be known to consumers (mainly students) looking to purchase the Publishers' works. Consumers find these pirate websites because of Google's ads, not because they know to go directly to them or even find them through a regular search. With names like "mybambinis.shop," "fairystrawberry.com," "dgetkmusicheard.com," and "matchlistcity.shop," this is not surprising. Then, with one click, Google brings consumers directly to pirate websites where they download and purchase infringing copies of the Publishers' works, instead of purchasing the authentic works.

8.      Making matters worse, by using unauthorized images of the Publishers' textbooks, which often contain registered trademarks, Google misleads consumers into believing they are getting a legitimate product at a bargain price, when they are in fact buying an illicit product.  Thus, in addition to its copyright violations, Google's ads practices violate the Lanham Act.

9.      Moreover, Google refuses to allow legitimate sellers like the Publishers to advertise standalone digital books on Google's Shopping platform, but allows such ads from pirate sellers.  As a result, the textbook market is upside down, as the worlds' largest online advertising business advertises ebooks for pirates but rejects ebook ads for legitimate sellers.  Google's practices harm consumers, who are directed to illegal, inferior products.  Google's practice likewise harms the Publishers, whose sales decrease, while the pirates' sales increase.  This deceptive trade practice violates New York law.

10.     Without court intervention, Google will continue willfully infringing the Publishers' copyrights and the Trademark Plaintiffs' trademarks and violating New York law.  To address and remedy Google's persistent and harmful course of conduct, Plaintiffs bring this action.

## JURISDICTION AND VENUE

11.     The claims herein arise under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, as amended, and the Lanham Act, 15 U.S.C. § 1051 *et seq.*, as amended.  The Court thus has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C. § 1121(a).

12.     In addition to pleading violations of federal law, the Publishers allege violations of New York General Business Law Section 349(a).  Plaintiffs' federal and state-law claims are based upon a common nucleus of operative facts.  The entire action commenced by the Complaint constitutes a single case that ordinarily would be tried in one judicial proceeding.  The Court therefore has jurisdiction over the state law claim under 28 U.S.C. § 1367(a).  Exercising

jurisdiction over the state law claim will avoid unnecessary duplication of actions and supports the interests of judicial economy, convenience, and fairness.

13.    The Court has personal jurisdiction over Google pursuant to New York Civil Practice Law and Rules § 302(a)(1), (2), and/or (3).  Google transacts business in New York and/or contracts to supply services in New York, and Plaintiffs' claims arise from or relate to those activities.  Google also has committed tortious acts in New York and/or committed tortious acts outside of New York causing injury to Plaintiffs in New York.

14.    A significant portion of Google's infringement occurs in New York. Google advertises infringing works to New York users and earns revenue when those New Yorkers click on its paid ads.  Google's ads for infringing works also divert New York users to buy books from the pirates' websites instead of from legitimate channels.  In addition, Google advertises for pirates who themselves are located in New York (or inform Google that they are located in New York), including those who have been the subject of the Publishers' infringement notices.  Plaintiffs' claims arise directly from these acts.

15.    These infringements occur on a massive scale in New York because the market for the Publishers' textbooks in New York is enormous.  According to educationdata.org, New York is in the top three U.S. states with the highest number of college students, who are the population most likely to use Google to search for and purchase textbooks.  Hanson, Melanie, "College Enrollment & Student Demographic Statistics," Aug. 31, 2024, https://educationdata.org/college-enrollment-statistics.

16.    Google commits infringements in other states as well, but those infringements are also powered by Google's substantial New York operations.  Google reported that, in 2023, it helped provide $105.94 billion dollars of business activity in New York.  Google has three offices

with over 14,000 employees in New York City, including one that serves as the North American headquarters of Google's Global Business Organization – the part of the company that controls Google's money-making operations, including advertising.  Accordingly, Google's New York offices house numerous employees whose jobs relate to its advertising services.  Among the Google employees in New York are those who work on advertisements for the Publishers' works and/or the pirates' infringing works.

17.     Similarly, Google's practice of allowing ads for digital textbooks from pirates, but not from legitimate publishers, misleads New York purchasers, harms New York purchasers who receive an illegal product, harms New York sellers of legitimate textbooks, and harms the market for textbooks in New York.

18.     Based on the above, Google regularly does or solicits business in New York, derives substantial revenue from interstate commerce through its ads, and expected or reasonably should have expected its conduct at issue to have consequences in New York.  Three Plaintiffs also have their principal place of business in New York, and all Plaintiffs do substantial business there.  Moreover, Google is aware that Plaintiffs have brought multiple copyright and trademark infringement actions in this District against pirates who rely on Google ads to sell infringing works.  Further, multiple employees of Plaintiffs with knowledge of the claims asserted herein are located in New York.

19.     Google also has filed multiple civil cases in this District that it likely could have filed elsewhere.  Those cases were brought against individuals living outside the United States alleging harm occurring "throughout the United States."

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because Google conducts, transacts, and/or solicits business in this District, including business

related to the ads at issue in this case; may be found in this District; tortiously injured Plaintiffs in this District; and/or a substantial part of the acts of infringement or other events and omissions complained of herein have occurred in this District.

## THE PARTIES

21.    Plaintiff Cengage is a Delaware corporation with its principal place of business at 5191 Natorp Boulevard, Mason, Ohio 45040.  Cengage is registered to do business in New York and has a long history of doing so.  Cengage asserts copyright, trademark, and deceptive trade practice claims herein.

22.    Plaintiff Macmillan Learning is a New York limited liability company with its principal place of business at 120 Broadway, New York, New York 10271, and is a wholly owned subsidiary of Plaintiff Macmillan Holdings.  Macmillan Learning asserts copyright and deceptive trade practice claims herein.

23.    Plaintiff Macmillan Holdings is a New York limited liability holding company with its principal place of business at 120 Broadway, New York, New York 10271.  Macmillan Holdings asserts trademark claims herein.

24.    Plaintiff Elsevier is a Delaware corporation with its principal place of business at 230 Park Avenue, New York, New York 10169.  Elsevier asserts copyright, trademark, and deceptive trade practice claims herein.

25.    Plaintiff Elsevier B.V. is a corporation organized under the laws of the Netherlands with its registered office in Amsterdam.  Elsevier and Elsevier B.V. are affiliated companies that share a parent company.  Elsevier B.V. asserts trademark claims herein.

26.    Plaintiff McGraw Hill is a Delaware limited liability company with its principal place of business at 8787 Orion Place, Columbus, Ohio 43240.  McGraw Hill is registered to do business in New York, has a long history of doing so, maintains an office in this District, and for

part of the relevant time period, had its principal place of business in this District. McGraw Hill asserts copyright, trademark, and deceptive trade practice claims herein.

27.    Defendant Google is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043. Google is registered to do business in New York and maintains three offices in this District.

## PLAINTIFFS' COPYRIGHTS AND TRADEMARKS AND THEIR BUSINESSES

28.    The Publishers develop, market, distribute, and sell a wide range of traditional and digital educational content and tools to professionals, educators, and students.

29.    In particular, the Publishers work with authors who are experts in their fields to create and publish textbooks, which are available throughout the United States. The Publishers sell these textbooks to consumers, both directly and through authorized distributors. Only certain licensed distributors are authorized to sell the Publishers' textbooks in digital or ebook form. None of these include the pirates who are selling infringing digital copies of the Publishers' works that Google is advertising ("Pirate Sellers").

30.    In addition to infringing copies of the Publishers' textbooks, the Pirate Sellers sell infringing copies of the Publishers' test banks and solutions manuals, including instructor solutions manuals ("ISMs") (collectively, with infringing copies of the Publishers' textbooks, "Infringing Works"). The Publishers' test banks and solutions manuals are supplemental materials that are tailored to the pedagogical approach of the corresponding textbook. Test banks are sets of questions and typically answers provided to professors and instructors that correspond to sections of the textbook and are often used to create assignments and exams. ISMs provide professors and instructors with answers and solutions to questions contained within the textbook and, in some instances, other guidance on how to use the textbook to teach their courses. Students who obtain copies of test banks and ISMs can use them to cheat and undermine the educational process.

Accordingly, as Google knows, test banks and ISMs should never be sold to students, let alone promoted via Google ads.

31.    The Publishers and their authors invest significant time, money, and creative energy into creating and publishing their works.  Each Publisher expends significant resources in the creation, support, advertisement, and promotion of their textbooks in the United States.  Further, substantial creative efforts go into developing the content of the Publishers' educational works, such as writing and editing content, deciding which content to include and how to present and arrange it, and updating books to reflect developments in the field.

32.    The Publishers (and/or their predecessors) have invested decades of effort building long histories and reputations for publishing works of the very highest quality, which consumers associate with the Publishers and the trademarks under which their works are published.  These trademarks, and the goodwill of the business associated with them, are of tremendous value.

33.    The Publishers own or exclusively control the copyrights in their works or derivative works described in Exhibit A hereto (the "Authentic Works"), along with many others. The relevant copyrights for the Authentic Works are registered with the U.S. Copyright Office. Google has infringed the Publishers' rights in the Authentic Works as described herein.  Exhibit A is a non-exhaustive, representative list that will be updated as this case proceeds.

34.    The Trademark Plaintiffs are the owners and registrants under 15 U.S.C. § 1127 of their respective trademarks described in Exhibit B hereto (the "Marks").  The Marks, which are registered on the Principal Register of the U.S. Patent and Trademark Office, are distinctive indications of origin and may also be incontestable under 15 U.S.C. § 1065.  Like Exhibit A, Exhibit B is a non-exhaustive, representative list that will be updated as this case proceeds.

## GOOGLE ADVERTISES INFRINGING WORKS FOR PIRATE SELLERS

### *Google is an advertising company.*

35.     While the general public may think of Google primarily as a search engine, Google in fact is an advertising business.  As Google makes clear:  "[W]e make the vast majority of our money from advertising."  About Google: How our business works,  https://about.google/how-our-business-works/ (last visited September 12, 2024).

36.     Google's ads have a wide reach because its search engine is so popular.  Google users conduct more than 3 billion searches on Google every day.  Google itself estimates that its market share for general search services in the United States is approximately 90% (and even higher for searches conducted on mobile devices).  Google "crawls" 20 billion websites every day (i.e., scans each site for information to be indexed for the search engine).  According to similarweb.com, a service that tracks website traffic, in March 2024, google.com had over 85 billion total visits, which was more than double that of the next most visited site, youtube.com (which is wholly owned by Google).

37.     When a user enters a query into google.com, Google returns not just organic search results generated by its search algorithm, but also advertisements.  These include text ads.  They also includes ads that are part of Google's Shopping platform and include product images ("Shopping Ads").  Depending on Google's algorithm, which targets Shopping Ads based on users, search terms, and other factors, users typically see Shopping Ads on the first search result page, and can see more Shopping Ads by clicking the "Shopping" tab at the top of the page.  Shopping Ads include sponsored ads, where the merchant pays Google based on the number of times users click the ad ("Paid Ads"), as well as ads that look similar and appear below the Paid Ads on the Shopping tab, for which merchants do not pay Google for clicks ("Free Ads").  Unlike text ads, Shopping Ads are limited to advertisements for the sale of goods.

38.    As Google emphasizes, "[i]n contrast to a text ad, which displays text only, Shopping Ads show users a photo of your product, plus a title, price, store name, and more.  These ads give users a strong sense of the product you're selling before they click the ad, which gives you more qualified leads."    About Shopping ads,  https://support.google.com/google-ads/answer/2454022?hl=en (last visited September 12, 2024).  Of course, Google's Shopping Ads for Infringing Works ("Infringing Shopping Ads") do not use photos of the pirates' products; rather, they use unauthorized photos of the Publishers' own textbooks, many of which display the Marks.  Thus, with Infringing Shopping Ads, this "strong sense of the product" that Google is giving is a bait-and-switch.

### Google's role in advertising its merchants' products is active and extensive.

39.    The purpose of Google's Shopping Ads is clear: "[S]how people the most comprehensive search results for products online," such that "[o]nce someone finds a product they like, we send them to the merchant's website to buy it."  Merchant Center overview video, How Merchant Center works, https://www.google.com/retail/how-google-merchant-center-works/ (last visited September 12, 2024).  The Pirate Sellers rely on Google Shopping Ads to advertise their Infringing Works and gain sales, and Google systematically and repeatedly creates Infringing Shopping Ads to "send" consumers to Pirate Sellers' websites ("Pirate Sites") to buy their infringing products.

40.    Google's advertising platform is not limited in the same way as the old Yellow Pages, which simply printed the ads that businesses supplied and disseminated those ads indiscriminately to the general public.  Google takes an active role in creating ads and targeting the advertising of its merchants' products to the very users who are looking for those products.

41.    Indeed, Google itself creates each Shopping Ad based on information provided by Google's merchants.  As Google explains, Google's "Merchant Center creates these [ads] based

on information you include in your product feed *so you don't need to create the ads yourself*." What makes up a Shopping ad, https://support.google.com/google-ads/answer/6275294 (last visited September 12, 2024) (emphasis added). In fact, Google has developed machine learning technology to help Google create better ads for its Merchants.

42.    After creating a Shopping Ad, Google decides when and where to display it. For example, a merchant does not select the keywords in response to which a Shopping Ad for its product will appear; Google does. Google targets the ad to users Google determines are most likely to buy the product, then arranges the ad, along with other competing ads, on the user's page. Google explains in its "My Ad Center" that it ranks Paid Ads by "advertiser bid and ad quality," with the Publishers and their authorized distributors competing against Pirate Sellers. Google also explains that "ad quality" encompasses the relevance of the ad to the user's search and Google's evaluation of "the website the ad points to." These websites that Google has evaluated for "quality" include the Pirate Sites. Google similarly ranks Free Ads based on "relevance." And Google often ranks both Paid Ads and Free Ads for Infringing Works in close proximity to, or even ahead of, ads for the Publishers' authentic textbooks.

43.    Google's Shopping Ads have numerous features that make the ads effective at generating sales of products. Fundamentally, Google's Shopping Ads allow merchants to target consumers who are looking for a specific product, such as a textbook, at the exact time the consumer is looking for it. That is, Google shows Shopping Ads that Google determines are relevant to a user's search. Shopping Ads thus respond in real-time to the Google user's self-expressed interest. Within a fraction of a second after the Google user types in search terms, Google pulls the ad, determines where to position it on the search results page, and shows the ad to the Google user.

44.    With Paid Shopping Ads, merchants can control how much they spend by specifying items such as the price they are willing to pay for each click on their ad or the amount they are willing to spend on an ad campaign.  Google offers different ad campaigns tailored to merchants' needs, such as campaigns that maximize clicks or conversions within set budgets.

45.    Google's assistance to merchants does not end with the ads themselves.  Google reports to its merchants (often in real-time) the queries in response to which Google has advertised the merchant's products.  Google likewise informs merchants which ads and queries have resulted in clicks from Google users.  Google even offers "conversion tracking," which allows merchants to monitor whether Google users who clicked on an ad ultimately purchased the product, and provides merchants metrics to guide their future ads, such as cost-per-click and cost-per-conversion.

46.    Due to its massive share of the search market in the United States, many merchants view Google ads as having no real substitute from any other advertising platform.

### Google directs users to pirated copies of the Publishers' works.

47.    Google's Infringing Shopping Ads are extremely effective at diverting would-be purchasers of the Publishers' textbooks to buy Infringing Works instead of legitimate copies. When students seeking to purchase textbooks initiate searches for the Publishers' textbooks on google.com, they see not just organic search results and ads for the Publishers' legitimate textbooks, but also ads for pirated textbooks.  Indeed, Infringing Shopping Ads make up a substantial portion of the Shopping Ads these users see, often outnumbering ads for authentic textbooks and often with preferable placement.  Worse, Google's advertisements reflect the Infringing Works' artificially low prices, contributing to all too many Google users purchasing Infringing Works from Pirate Sellers.  And the ads, which reproduce the Publishers' own images

of the textbooks without authorization, are often indistinguishable from legitimate ads. Thus, the problem of Google's Infringing Shopping Ads is massive.

48. The following examples illustrate the enormity of the problem.

49. As shown in Figure 1 below, a search for McGraw Hill's textbook *Anatomy and Physiology: The Unity of Form and Function* returned results where every Paid Ad is for infringing copies of McGraw Hill's works (except one, which is an ad for another publisher's book sold by one of the promoted Pirate Sellers). The Paid Ads even include two ads for infringing copies of McGraw Hill's test bank that corresponds to its textbook, even though the search did not seek test banks. The advertised Infringing Works are sold by Pirate Sellers named "madebook," "LivyLuxe," "Athena Line Store," "Biz Ninjas," "Cheapbok," and "Nardab," all of which have been included in the Publishers' notices of infringement to Google. As with other Pirate Sellers, it is highly unlikely that users could find these "businesses" or their Pirate Sites without Google's Infringing Shopping Ads. The names are not well-known, and the sites typically do not appear in the first several pages of organic search results, if at all. Legitimate sellers of *Anatomy and Physiology: The Unity of Form and Function*, including McGraw Hill, only appear if the user scrolls past the Paid Ads to the organic search results.

**Figure 1:**



50.     The same is true for this search when the user navigates to the "Shopping" tab. There, as shown in Figure 2 below, the second, third, fourth, fifth, and seventh Paid Ads are again for the Pirate Sellers "Cheapbok," "Athena Line Store," "Biz Ninjas," "Nardab," and "Livyluxe," and the eighth Paid Ad is for another Pirate Site named "Shop Hoth."  Unlike in Figure 1 above, on this page, the ad for McGraw Hill's legitimate print textbook available from McGraw Hill's website is displayed, which serves to highlight the price disparity between Pirate Sellers and legitimate sellers.

**Figure 2:**



51.    In most or all cases, Google's Infringing Shopping Ads include images of the Publishers' textbook covers, which neither Google nor its Pirate Sellers are authorized to use to advertise or sell Infringing Works.  Indeed, the Infringing Shopping Ads in Figures 1 and 2 above include unauthorized images of McGraw Hill's textbook covers and all except one display its well-known registered trademark without authorization.  This heightens a student's attraction to the Infringing Works.

52.    Moreover, the artificially low-priced Infringing Works drown out the regularly-priced legitimate works, further funneling students to the Pirate Sites.  Of course, the Pirate Sellers can sell their Infringing Works at such low prices because they did nothing to create or license them; they just illegally made digital copies of the Publishers' works.

53.    Google's Infringing Shopping Ads link users directly to the landing pages on Pirate Sites where users can download the Infringing Works or proceed to purchase them and receive an

email with instructions on how to complete the download.  When users do this, they are making an illegal copy of the Publishers' works.

54.     The Publishers have captured numerous examples of these landing pages selling infringing copies of the Authentic Works and completed numerous purchases of those copies, including purchases made using New York IP and/or physical addresses, all of which confirm they are Infringing Works.  This is not surprising since no Pirate Sellers or Pirate Sites are authorized, licensed distributors of the Publishers' digital textbooks.

55.     Figure 3 below shows the landing page on the Pirate Site mybambinis.shop, where the Pirate Site is selling a pirated copy of Macmillan Learning's textbook *Calculus: Early Transcendentals*, which is available by "INSTANT DOWNLOAD."  The Publishers sent at least ten notices to Google containing 651 infringing URLs concerning this Pirate Seller, but Google continued to advertise the Pirate Seller's Infringing Works.

**Figure 3:**



56.     Google provides another feature that directs users to still more Infringing Shopping Ads.  Users can click the menu above Shopping Ads to open a pop-up window that shows more information about the displayed ads.  When users highlight an Infringing Shopping Ad in the pop-up, often there is an option to click to "See more ads this advertiser has shown using Google," which takes users to the "Google Ads Transparency Center."  But instead of offering the expected transparency that would allow users to determine if the seller is a pirate, the "Transparency Center" shows users other Shopping Ads for other products sold by the seller, the vast majority of which (if not all of which) are also infringing products.  For example, as shown in Figure 4 below, Google leads users to additional Infringing Shopping Ads, including an ad for Cengage's textbook *Calculus* sold by another Pirate Site, american-giant.shop, which is connected to mybambinis.shop, the Pirate Seller promoted in the original ad.

**Figure 4:**



57.     Google's Shopping Ads have additional features that actively direct users to search for and select Infringing Works.  As Google knows, Plaintiffs and their legitimate distributors rarely, if ever, sell their textbooks in PDF form like the Pirate Sellers' infringing PDFs.  However,

when users search on Google for the Publishers' works, Google sometimes provides suggested additional terms to refine their search, which direct them to Infringing Shopping Ads, including a suggestion to add "PDF" as a search term.  As shown in Figure 5 below, the search for Elsevier's textbook *Atlas of Human Anatomy* originally did not result in any Infringing Shopping Ads; however, as shown in Figure 6 below, a simple click on the "PDF button" provided by Google resulted in two Infringing Shopping Ads for the Pirate Sellers "Aarikuma" and "Sama Bookstore," selling pirated digital copies of Elsevier's textbook for a fraction of the price of the authentic textbook.

**Figure 5:**



**Figure 6:**



58.     Another example, as shown above in Figure 7 below, is on the Free Ads page, where users can specifically filter for ebooks.  As discussed below (¶¶ 64–69), Google allows pirates to advertise standalone digital books while restricting legitimate sellers like the Publishers from doing so.  Users can also filter by "Seller," including Pirate Sellers, allowing users to see only listings from those Pirate Sellers.

**Figure 7:**



59.     Further, some results allow users to "Compare Prices" from different sellers, including Pirate Sellers.  As seen in Figure 8 below, which shows a price comparison for Cengage's *Single Variable Calculus: Early Transcendentals*, this feature highlights the price disparity between Pirate Sellers and legitimate textbook sellers, even highlighting the Pirate Site price with a bold "SALE" label, making users all the more likely to purchase their textbook from a Pirate Site.

**Figure 8:**



60.     Google's ads for its Pirate Sellers are particularly effective because Google assures consumers that it takes robust measures to rid its platform of ads for infringing products.  Google tells consumers, "We abide by local copyright laws and protect the rights of copyright holders, so we don't allow ads that are unauthorized to use copyrighted content" or link to "unauthorized sites . . . that capture, copy, or provide access to copyrighted content."  Advertising Policies Help: Copyrights,  https://support.google.com/adspolicy/answer/6018015  (last visited September 12, 2024).  This specifically includes websites that "enable unauthorized . . . sharing, copying, or downloading of . . . e-books."

61.     Similarly, in its Shopping policies, Google professes: "To ensure a safe and positive experience for customers, Google requires that retailers comply with all applicable laws and regulations in addition to our policies."  Google also boasts, "When we find content that violates these requirements, we may block it from appearing.  In cases of repeated or egregious

violations, we may ban you from advertising content with us."  Unsupported Shopping content, https://support.google.com/merchants/answer/6150006 (last visited September 12, 2024).

62.     Google also assures consumers that particular Pirate Sellers have gone through a verification process.  Google often includes labels such as an "Advertiser has verified their identity," as shown in Figure 4, or "Advertiser's identify verified by Google."   In the example in Figure 4, mybambinis.shop is apparently operated by an individual, Dai Minh Trung, who is based in Vietnam.  As Google knows, individuals selling digital textbooks from abroad are often pirates and, as with all Pirate Sellers, are not authorized to create or distribute digital copies of the Publishers' works.

63.     By claiming to subject ads to a review for infringing material, lending its seeming seal of approval to the ads, Google makes its users even more likely to purchase the Infringing Works they find through Google.

***Google disallows certain Shopping Ads for legitimate works but allows ads from Pirate Sellers.***

64.     Google's practice of consistently advertising pirated digital books is egregious by itself.  Its refusal to remove or disable those ads included in the Publishers' notices or to terminate pirate merchants who infringe repeatedly is even more egregious.  But, to make matters worse, Google disallows certain ads for legitimate digital books while allowing those same ads for *pirated* digital books.

65.     Google advertises standalone digital books sold by pirates but does not allow such ads from legitimate sellers like the Publishers.  Thus, a consumer who searches Google for one of the Publishers' textbooks likely sees multiple Shopping Ads for pirated digital copies of that book but no ads for legitimate ebooks.

66.     This, of course, disadvantages legitimate sellers.  The pirated digital books that Google advertises are enticing enough to consumers already, because they are inexpensive and

generally available immediately. But thanks to Google's practice, for standalone digital books, Pirate Sellers don't even have to compete with legitimate ads for digital books, which are generally the least expensive format the Publishers and their authorized distributors sell.

67.    To be clear, Google will show ads for pirated digital books whether consumers confine their searches to ebooks or not. So a consumer who searches Google intending to purchase a physical book typically will see ads for far less expensive standalone digital books sold only by pirates.

68.    And, of course, Google does not disclose to its users that Google is showing them ads from only one portion of the textbook market, and from the illegal portion of the market at that. In fact, Google's policy is to ban ads for all standalone digital books (i.e., ads that advertise an ebook price or lead to a landing page selling only a digital book, other than audiobooks).

69.    Google's backward practice occurs in, and causes harm in, New York. Most literally, Google advertises pirate websites and pirated digital books to users in New York. Users in New York click on Google's ads and purchase those infringing digital books from New York, and some of the pirates themselves are in New York. Further, Google's practice affects the entire textbook market in New York. All New York sellers of textbooks are impacted by Google's practice of allowing ads for pirate standalone digital books but not legitimate ones, including because a New Yorker using Google to find a physical textbook might instead buy a much cheaper pirated digital book, without even seeing an ad for a legitimate ebook.

### *Google has the technology and the authority to remove Infringing Shopping Ads and Pirate Sellers.*

70.    There can be no dispute that Google has the legal right to remove ads that promote infringing content and terminate from Google's platforms the merchants who sell such content. Google's terms of service require merchants to abide by Google's policies. Google Merchant

Center Terms of Service ¶ 3(a) (Oct. 24, 2022) https://merchants.google.com/files/tos/extend/US/5_00_tos.html (linking to Google's policies). Google's policies, in turn, specifically prohibit Shopping Ads that link to sites selling unauthorized copyrighted content and merchants who distribute such content.  Merchant Help Center: Copyrighted content, https://support.google.com/merchants/answer/6150163 (last visited September 12, 2024).  Google also prohibits "[p]romotions that represent you or your products in a way that is not accurate, realistic, and truthful."  Merchant Help Center: Misrepresentation, https://support.google.com/merchants/answer/6150127 (last visited September 12, 2024).

71.    Google also reserves the right to remove advertisements, and to terminate the accounts of any merchants, that violate Google's policies.  "We take action on content that violates our policies," including "suspending accounts for repeat or egregious violations."  Shopping ads policies, https://support.google.com/merchants/answer/6149970 (last visited September 12, 2024).

72.    Likewise, there is no question that Google has the technical ability to terminate merchants who are repeat infringers.  And there is no question that Google has the technical ability to remove or disable individual advertisements.  In fact, on occasion, but not systematically, Google has done just that in response to the Publishers' infringement notices.

73.    Indeed, Google is in a unique position to prevent further infringement by its Pirate Sellers.  First, Google knows its merchants.  To advertise using Shopping Ads, a merchant must create a Google account, Google Ads account, and Merchant Center account.  To do so, a merchant must provide Google with a name, email address, business name, business address, and verified phone number, and be approved for the account by Google.  Google Merchant Center Onboarding Guide, https://support.google.com/merchants/answer/188924 (last visited September 12, 2024). For merchants who use Google's Paid Ads services, Google's business records also contain

information about the merchants' financial accounts. Google has the ability to verify its merchants' identities and, in some cases, reports to users that it has done so, including Pirate Sellers' identities. Google also has the means to communicate directly with its Pirate Sellers, such as through their email addresses or verified phone numbers.

74. Second, Google knows the websites to which its Shopping Ads link. For any merchant selling products through a website, like all of the Pirate Sellers, Google verifies the seller's "authorized ownership" of the website, and "reserves" the website for use with the seller's account "exclusively." Google Merchant Center Onboarding Guide: Verify and claim your store's website, https://support.google.com/merchants/answer/176793 (last visited September 12, 2024).

75. Third, Google reviews each merchant's website landing pages and products to determine whether the merchant should be permitted to use Google's ads services. Before Google launches ads for merchants, it "confirm[s] as eligible" the products being advertised. Google for Retail Overview, https://www.google.com/intl/en_us/retail/ (last visited September 12, 2024).

76. Thus, when the Publishers notify Google that Google is advertising an infringing copy of a Publishers' work, Google is in the unique position to terminate its merchant's advertising accounts and cease providing services to that merchant.

77. With respect to Pirate Sellers who have sold Infringing Works to Google users who found the Pirate Sites through an Infringing Shopping Ad *after* Google learned that the Pirate Site was selling infringing content, Google had the ability to stop the direct infringement entirely. Had Google acted on its knowledge that a particular Pirate Site was selling infringing content, the direct infringements the Publishers allege would not have occurred at all.

78. More broadly, because those looking to purchase the Publishers' works find the Pirate Sites predominantly or exclusively through Google, terminating its Pirate Sellers' accounts

would have had a significant impact on the Pirate Sellers' ability to continue selling Infringing Works at all.

79.    Google's removal of Infringing Shopping Ads and termination of repeat infringers' advertising privileges also would have a significant impact by eliminating or greatly curtailing the reproduction of Infringing Works by Google's users when they make purchases on Pirate Sites promoted by Google.

80.    Indeed, terminating Pirate Sites should be relatively easy for Google.  In addition to Google's obvious technical capabilities, Pirate Sellers commonly operate multiple Pirate Sites. Often in infringement cases, a small group of operators are responsible for a disproportionately large number of infringing websites.  Thus, even though ads for pirated textbooks create an enormous problem for Plaintiffs, it is an easy problem for Google to fix.  Google simply has not done so despite years of Plaintiffs' efforts to work with Google to address the problem.

***Google's advertisements harm Plaintiffs and consumers while benefitting Google.***

81.    It would be difficult to overstate the harm that Google's Infringing Shopping Ads cause Plaintiffs.  Advertising the Infringing Works diverts sales from the Publishers to pirates. And, naturally, the Publishers are not compensated when a Google user purchases a pirated copy of their works.  Because of the size of Google's platform, the scale of these diverted sales is enormous.

82.    But the harm to the Publishers is broader than just lost sales from those who buy books from pirates instead of the Publishers.  The infringing copies that the pirates sell easily can be copied and distributed in perpetuity.  The Publishers generally use Digital Rights Management ("DRM") or other digital security to make their digital works difficult to copy.  But Pirate Sellers unlawfully circumvent these protections and distribute infringing files with no way to prevent their further downstream dissemination.  Indeed, some Pirate Sellers even promote their products as

being free of DRM protections, which Google can see from the landing pages that Google claims to evaluate. For example, as shown in Figure 3 above, the landing pages on mybambinis.shop, a Pirate Site repeatedly promoted by Google, emphasizes that its files have: "No expiration date! No DRM protection."

83.    Because the Pirate Sellers use the same illegal digital copies over and over, there is no limit to the number of times they can sell those copies, and they can charge artificially low prices. Further, those DRM-free files can be copied over and over again by the purchaser and distributed to an untold number of additional students. This viral distribution causes serious harm to the Publishers. Even a single sale from a pirate site can rob the Publishers of multiple subsequent sales.

84.    By diminishing the Publishers' sales, Google's Infringing Shopping Ads also have a ripple effect: they limit the authors' of the works and the Publishers' ability to continue to invest in their publications and the creation of new works that benefit education as a whole.

85.    Further, Google advertises digital copies of the Publishers' textbooks at a fraction of the price of the legitimate digital textbooks, thus diminishing their perceived value and reducing the Publishers' sales.

86.    Further, in addition to textbooks, some students search Google for the Publishers' test banks and ISMs. Test banks and ISMs are provided to professors and instructors who have adopted the Publishers' corresponding textbooks for use in their classes and should not be advertised by Google at all. But when users search Google for test banks or ISMs, they see Shopping Ads that promote and link to these infringing materials. In fact, sometimes when students search Google for *textbooks*, they see Shopping Ads for test banks and ISMs, encouraging them to also purchase these illicit materials to accompany their textbooks.

87.     The promotion and sale of infringing copies of the Publishers' test banks and ISMs encourages and facilitates academic cheating and undermines the integrity of the educational process.  Cheating can also lead to unqualified students entering the workforce—a problem that is particularly heightened in the fields such as medicine and engineering, where qualifications impact health and safety.  Moreover, when these materials are made available to students, their value is compromised, as are potential adoptions by teaching professionals.

88.     Google controls the appearance of its Shopping Ads.  With regard to product images, Merchants either provide Google with a link to a product image for Google to include in an ad, or provide Google with the image itself.  If Google determines the image is suitable for a Shopping Ad, Google obtains the image from the link or the Merchant Center, places it on the ad, and makes adjustments it determines are necessary or optimal, such as "experiment[ing] with the best display options for the format" and employing the "automatic cropping" of images "to focus more on the product."  What makes up a Shopping ad, https://support.google.com/google-ads/answer/6275294 (last visited September 12, 2024).  Here, when Google creates Infringing Shopping Ads for the Pirate Sellers, Google places on the ad an image of a Trademark Plaintiff's textbook.  Often, that image contains a Trademark Plaintiff's registered trademark.  Google then disseminates the ad to prospective purchasers of the infringing product, confusing Google's users into thinking that the ads are for authentic products.

89.     The Trademark Plaintiffs are also not compensated for Google's unauthorized application of the Marks to advertisements used in connection with the sale of Infringing Works. Other than the price, it is difficult for the user to tell the difference between the sources selling the books, especially because they all use identical or nearly identical images of the textbook covers, which often displays copies of the Marks.

90.     Consumers who see a reproduction of the Marks in Shopping Ads are likely to be confused and to believe, incorrectly, that the Infringing Works originate from the Publishers or the Trademark Plaintiffs and that the Pirate Sellers' illicit products are authorized.  This further damages Plaintiffs' reputations and goodwill.

91.     Moreover, many of the pirates are located outside of the United States, making direct infringement actions against the pirates impractical because the pirates' assets are out of reach for United States rightsholders.  Indeed, a sampling of Google's "About the advertiser" pages for Pirate Sellers Google has promoted show those sellers to be located in Vietnam, Morocco, and Hong Kong.

92.     Exacerbating these harms, Google's backward practice of allowing standalone Shopping Ads for digital books from Pirate Sellers but not from legitimate publishers has a transformative effect on the market for all textbooks.  When a consumer searches Google for a textbook, whether seeking a physical book or a digital one, an artificially high portion of the Shopping Ads the consumer sees are for low-priced but pirated digital textbooks without comparable ebooks from legitimate sellers.

93.     Google's deceptive practices harm the Publishers (directly or through their authorized distributors) who advertise legitimate textbooks using Shopping Ads.  Given the irreplaceability of Google's advertising platforms, Google puts the Publishers and other legitimate sellers at a significant disadvantage to Pirate Sellers by prohibiting the Publishers' and other legitimate sellers' Shopping Ads for ebooks but allowing Pirates Sellers' Shopping Ads for infringing digital copies of those books.

94.     Google's deceptive practice also harms all consumers who search for textbooks for sale through Google, many of whom are unwittingly pushed into committing copyright

infringement when they download an unauthorized copy of a Publisher's work.  Additionally, pirated versions of textbooks are often inferior to legitimate ones.  Pirated copies often are of lower resolution, are not compatible with other devices, do not provide access to certain online supplemental materials, and/or do not contain working links.  Sometimes the size of the text cannot be adjusted at the reader's discretion, which is an important accessibility feature of legitimate versions.  Further, authentic ebooks often include automatic updates for events such as new scientific discoveries, recent court decisions, or new business cases.  Pirated copies include no such updates.  Finally, pirated copies possess none of the quality control that an authentic ebook does and may contain missing pages, unreadable text, typos resulting from the use of imperfect text recognition software, or other errors.

95.     But while Plaintiffs and consumers have been harmed by Google's Infringing Shopping Ads, Google has profited.  With Paid Ads, Google earns money each time a user clicks on the ad.  Thus, when users click on an Infringing Shopping Ad, including when users click a Shopping Ad and purchase a pirated copy of the Publishers' works, the Pirate Seller pays Google.

96.     And Google's profits from piracy extend beyond just the revenue Google receives from clicks on pirate ads.  For instance, to price its Paid Ads, Google uses an auction methodology wherein the price charged to the winning bidder is based partly on the bid of the next-highest bidder.  That is, the winning bidder pays a price slightly higher than the bid of the runner-up.  (The full formula that Google deploys is more complicated.  It takes into account elements like Google's prediction of how many users will click on the ad and whether clicking on the ad will make users more likely to click on more ads.  But the basic premise remains that the price the auction winner pays is based in part on the bid of the next highest bidder).  So, when a legitimate seller wins an auction, and a pirate has bid more than the next-highest legitimate seller, the winner will pay a

higher price than if there had been no Pirate Seller. And, Google conducts separate auctions for each ad position on a given search results page. Thus, bids from pirate sellers have multiple opportunities to generate higher revenue for Google and higher costs for legitimate sellers.

97.    Google also financially benefits when users purchase goods advertised through Shopping Ads. Merchants whose Shopping Ads result in conversions are likely to continue advertising through Shopping Ads and to advertise additional products, including through Paid Ads, while high conversion rates are also a draw for new merchants to the platform. At the same time, users who purchase goods as a result of Shopping Ads may be likely to return to the Shopping platform the next time they wish to purchase a product, thus increasing the platform's reach and the likelihood that merchants will pay for ads to reach the larger audience. Further, a Pirate Seller who achieves success with Shopping Ads can increase revenue in Google's other ad platforms, such as retargeted ads (i.e., ads to consumers who have recently visited the merchant's website without making a purchase), display ads (banner ads on other websites), text ads, and ads on Google's other platforms like YouTube. Put simply, the more often Google users buy the infringing products they see advertised on Google Shopping, the more merchants advertise on Google, and the more revenue Google earns.

98.    Moreover, Free Ads, even without a pay-per-click model, financially benefit Google by drawing merchants and consumers to the Shopping platform. Free Ads draw in merchants for Google's advertising business, including Pirate Sellers, by providing them with a way to promote their products for free with the chance they will ultimately pay for the better placed Paid Ads. Google entices merchants to "[a]dd your products and business across Google for free," then, "[w]hen you're ready," "[d]rive sales with paid advertising." Google for Retail: Overview, https://www.google.com/retail/ (last visited September 12, 2024). Free Ads, including ads for

Infringing Works, also draw students and other consumers looking to buy educational works to the Shopping platform by providing them with multiple purchase options, including many options for Infringing Works at prices that are a fraction of the prices for legitimate works.

*For years, the Publishers have sounded the alarm to Google to no avail.*

99.    Beginning on June 11, 2021, and continuing ever since, the Publishers and/or their authorized agents have sent infringement notices to Google identifying specific Pirate Sellers, Pirate Sites, and Shopping Ads advertising Infringing Works.  These hundreds of notices have identified thousands of specific Infringing Works promoted in Infringing Shopping Ads.  They include URLs for the Infringing Shopping Ads and URLs for the landing pages on the Pirate Sites to which the Infringing Shopping Ads link.

100.    The notices Google has received from or on behalf of the Publishers are written communications directed to the agent Google has designated to receive infringement notices.  They contain a physical or electronic signature of a person authorized to act on behalf of the Publishers and a statement made under penalty of perjury confirming such authorization.  The notices include contact information for Google to contact the complaining party, including an email address, telephone number, and physical address.  In addition, the notices contain a statement that the complaining party has a good faith belief that use of the content in the manner complained of was not authorized by the copyright owner, its agent, or the law.

101.    Although the Publishers have been sounding the alarm to Google about the massive problem with Infringing Shopping Ads for years, it has been to no avail.  Indeed, despite receiving notice after notice, Google has continued to advertise specific Infringing Works sold by specific Pirate Sellers identified in the Publishers' notices.  Google has also continued to advertise Infringing Works for Pirate Sellers who have been the subject of repeated notices.  Google did not terminate these repeat infringers' advertising accounts within a reasonable time, if at all.

102.    Several examples illustrate Google's intransigence in responding to Plaintiffs' notices.  For instance, despite receiving at least 46 separate notices over a 14-month period identifying a Pirate Site at matchlistcity.shop (and at least 232 unique Infringing Shopping Ads promoting that seller's Infringing Works and linking to the Pirate Site), Google continued to provide its services to assist and support the pirate's infringement.

103.    By way of another example, despite receiving at least 66 separate notices over a 17-month period identifying a Pirate Site at nardab.com (and at least 451 unique Infringing Shopping Ads promoting that seller's Infringing Works and linking to the Pirate Site), Google continued to provide its services to assist and support the pirate's infringement.

104.    Likewise, despite receiving at least 69 separate notices over an 18-month period identifying a Pirate Site at testbank23.com (and at least 6,829 unique Infringing Shopping Ads promoting that seller's Infringing Works and linking to the Pirate Site), Google continued to provide its services to assist and support the pirate's infringement.

105.    The above examples, and Google's other conduct complained of herein, show that repeat infringers have not faced a realistic prospect of Google terminating their Google Ads or Merchant Center accounts or advertising privileges.  Rather than lose revenue by terminating the accounts of repeat infringers, Google continues to do business with them.

106.    In addition to Google's failure to act as to repeat infringers, Google has failed to expeditiously remove or disable access to specific Infringing Shopping Ads identified in the Publishers' notices, or remove or disable them at all.  Indeed, Google has continued to display thousands of Infringing Shopping Ads weeks after receiving the Publishers' notices identifying them.

107. For example, Google received nine notices identifying an Infringing Shopping Ad for an infringing copy of Cengage's ISM, *Solutions Manual for Calculus: Early Transcendentals,* but ignored at least the first eight notices. Similarly, Google received six notices identifying a Shopping Ad for an infringing copy of McGraw's textbook, *Landmarks in Humanities*, but ignored at least the first five notices and continued to advertise the Pirate Site's other infringing works. In yet another example, Google received five notices identifying a Shopping Ad for an infringing copy of Macmillan Learning's textbook, *Lehninger Principles of Biochemistry,* but ignored at least the first four notices.

108. To make matters worse, when the Publishers sent follow-up notices for Infringing Shopping Ads that Google had not acted on, Google threatened on multiple occasions to stop reviewing *all* the Publishers' notices for up to six months. Google warned: "Please note that if we continue to receive the same duplicative request from you three or more times, we will consider that particular request to be manifestly unfounded. Manifestly unfounded requests may lead us to temporarily stop reviewing your requests for a period of up to 180 days." This creates a catch-22 in which rightsholders would be unable to seek removal of ads linking to infringing content without fear that Google would ignore all notices going forward—a ridiculous dilemma.

109. Even apart from the particularly egregious response described above, Google routinely tells the Publishers to stop sending notices regarding the same infringing content, even when Google has failed to take any action on the noticed ads despite ample time to do so. Google's responses to the Publishers' notices highlight the difference between how Google claims to handle ads-related infringement and what it actually does.

110. Likewise, the Publishers repeatedly have notified Google that Pirate Sites are able to advertise standalone digital books on Google while legitimate publishers are not. In fact, at the

Publishers' urging, Google discussed reversing this practice, i.e., allowing Shopping Ads for standalone digital books from legitimate sellers like the Publishers, while eliminating such ads from pirates.  Instead, Google continues to do just the opposite.

111.     Google also has failed to prevent Pirate Sellers from opening new Google accounts to continue infringing if they are caught.  For instance, the Publishers sent Google at least 22 notices identifying Infringing Shopping Ads for the Pirate Site zestudion.com.  Then, just a few weeks after the last notice, Google began advertising Infringing Works sold by the same Pirate Seller at nearly the same domain, zestudion.net, which has the same email address as zestudion.com.

112.     Several other examples further illustrate Google's permissive approach to Pirate Sellers opening and using new Google accounts for their infringing activities: ebooknew.info and ebooknew.xyz, kingebook.info and kingebook.xyz, and nafassy.com and nafassy.net all used the same base domain simply moving their Pirate Sites to new hosts.  Just as Google continued advertising for the original Pirate Sites despite the Publishers' notices, it continued advertising for the reconstituted Pirate Sites, again, despite the Publishers' notices.

113.     Google has a wealth of information that it obtains from its Pirate Sellers or their account activity (such as registration information, financial information, IP addresses, and email communications), which Google could use to prevent repeat infringement, but Google fails to do so.

### *Plaintiffs have made additional efforts to solve the piracy and Google ads problems.*

114.     In August of 2019, the Publishers brought a case for direct copyright infringement against a group of digital textbook pirates in this District.  All of the defendants relied on Google's advertising services to promote their infringing works online.  In the course of that case, Plaintiffs engaged with Google in an effort to gain compliance with the court's expedited discovery order

and injunctions prohibiting the provision of online advertising, among other services, to support or facilitate the defendants' infringement.

115.    During and following this case, the Plaintiffs also engaged with Google in a broader discussion about the problem of its ads for infringing digital copies of the Publishers' works. Beginning in 2019, and continuing thereafter, Plaintiffs and Google, through their counsel, had multiple discussions about these issues, in which Plaintiffs explained repeatedly why the ads violated Google's own policies and enabled direct infringing activity, and pled with Google to stop the advertising practices that were harming legitimate publishers. Google responded that they were "working on it," but still has failed to correct its conduct.

116.    In the meantime, Plaintiffs brought several additional cases against pirates in this District after the 2019 case (most recently in 2023), in large part due to the continued visibility of those sites through Google's Infringing Shopping Ads.

117.    In total, among the named defendants in the cases Plaintiffs brought were pirates operating 130 pirate websites that relied on Infringing Shopping Ads to sell their infringing works. Not included in this number are the thousands of additional pirate websites that Plaintiffs identified in discovery in these cases—a fact further emphasizing the egregious nature of the pirates' infringement and the overall extent of the problem.

118.    Google, as a third-party, received the injunctions the courts issued in these cases, which made clear that the pirates were not authorized to sell any digital copies of the Publishers' copyrighted works and/or use the Trademark Plaintiffs' trademarks for any purposes, that such activity constitutes willful infringement, and that third-party intermediaries must not aid and abet such activity, including through the provision of online advertising services. Yet Google continued providing advertising services to some of these pirates who were identified in the court's orders

even after receiving notice of them, forcing Plaintiffs to include the pirates in additional infringement notices to Google.

119.    Despite Plaintiffs' efforts to address the infringement of their intellectual property rights by bringing suit against pirate sellers, with each case it became clearer that the problem needed to be addressed by Google.  The pirates are scofflaws who run illegal businesses devoted to piracy and frequently operate from abroad where they can often evade judgment enforcement. Google is a preeminent U.S. company that claims to set the "industry standard" for eliminating "rogue sites" from its advertising services.  Yet, it is principally or entirely through Google that those looking to purchase the Publishers' textbooks, or searching for a copy of their test banks or ISMs (which should not be advertised at all), most commonly find these "rogue sites."  And instead of the Infringing Shopping Ads problem improving, it has only gotten worse.

## CLAIMS FOR RELIEF

### *Count I – Contributory Copyright Infringement (Asserted by the Publishers)*

120.    Plaintiffs repeat and reallege every allegation contained outside of Count I as if fully set forth herein.

121.    The Authentic Works listed in Exhibit A constitute original works and copyrightable subject matter pursuant to the Copyright Act of 1976, and they are protected by registrations duly issued by the U.S. Copyright Office to the Publishers or their predecessors or licensors.  At all relevant times, the Publishers have been and still are the owners or exclusive licensees of all rights, title, and interest in and to their respective copyrights in the Authentic Works, which have never been assigned, licensed, or otherwise transferred to the Pirate Sellers or those who purchase the Pirate Sellers' Infringing Works.

122.    Google is contributorily liable for at least two forms of direct infringement (collectively, the "Direct Infringements").  First, Pirate Sellers have sold infringing copies of the

Authentic Works to Google users who clicked on an Infringing Shopping Ad for a work and purchased the work. None of the Pirate Sellers had authorization or permission from the Publishers to sell the Publishers' works. This activity constitutes direct infringement of the Publishers' exclusive rights under the Copyright Act, 17 U.S.C. § 106. Second, Google users have clicked on Infringing Shopping Ads for infringing copies of Authentic Works have proceeded to purchase infringing copies of the Authentic Works from the Pirate Sites. These Google users reproduce the Authentic Works with no authorization or permission from the Publishers to do so. This activity constitutes direct infringement of the Publishers' exclusive rights under the Copyright Act, 17 U.S.C. § 106. For each of the Authentic Works listed in Exhibit A, the Direct Infringements alleged by Plaintiffs occurred *after* Google learned that the Infringing Shopping Ad at issue advertised infringing content or that the Pirate Seller or Pirate Site at issue was selling infringing content.

123. Based on the Publishers' notices, Google has knowledge of its specific Infringing Shopping Ads and its Pirate Sellers who have been engaged in repeated and flagrant infringement. These notices identify URLs pointing to tens of thousands of Infringing Shopping Ads and the Pirate Sites to which the ads link and through which infringing copies of the Authentic Works are downloaded and sold.

124. Google obtained still further knowledge of the massive problem of its Infringing Shopping Ads from Plaintiffs' other interactions with Google, including with regard to Google's practice of allowing certain ads for pirated digital books but not authentic ones, and the lawsuits Plaintiffs brought against pirates who relied on Google's ads to sell their Infringing Works. Google also has knowledge through its own procedures and monitoring of its advertising services.

125.    Nevertheless, Google has facilitated, encouraged, and materially contributed to the Direct Infringements.

126.    For instance, despite the Publishers' notices, Google has continued to create and disseminate Infringing Shopping Ads for its repeat infringer Pirate Sellers, to actively promote Pirate Sites through such ads, and to provide services to increase the efficacy of those ads.  Google also has continued to display specific Infringing Shopping Ads that it knows advertise infringing products, even though users find the Pirate Sites principally or entirely through Infringing Shopping Ads.  The Infringing Shopping Ads are specifically designed to entice users to visit the Pirate Sites and buy the Infringing Works, which Google promotes at a fraction of the price of the Publishers' legitimate works.  Indeed, for the Direct Infringements at issue in this case, i.e., sales of the Infringing Works to Google users who clicked on an Infringing Shopping Ad for a work and purchased the work, the Google ad was essential to the infringement.

127.    Further, Google materially contributed to the direct infringement described herein by refusing to allow Shopping Ads for authentic ebooks but allowing such ads for digital books from the Pirate Sellers.

128.    Each infringement of the Authentic Works constitutes a separate and distinct act of infringement.

129.    The foregoing acts of infringement by Google have been willful, intentional, and purposeful, in disregard of the Publishers' rights, including because Google was well aware that that the Pirate Sellers were selling Infringing Works but continued to advertise those Infringing Works and promote the Pirate Sites.

130.    Google's actions described herein, which are ongoing, have caused and will continue to cause irreparable injury to the Publishers, for which the Publishers have no remedy at

law.  Accordingly, in addition to damages, the Publishers are entitled to injunctive relief restraining Google from further copyright infringement.

### Count II – Vicarious Copyright Infringement (Asserted by the Publishers)

131.    Plaintiffs repeat and reallege every allegation contained outside of Count II as if fully set forth herein.

132.    The Authentic Works listed in Exhibit A constitute original works and copyrightable subject matter pursuant to the Copyright Act of 1976, and they are protected by registrations duly issued by the U.S. Copyright Office to the Publishers or their predecessors or licensors.  At all relevant times, the Publishers have been and still are the owners or exclusive licensees of all rights, title, and interest in and to their respective copyrights in the Authentic Works, which have never been assigned, licensed, or otherwise transferred to the Pirate Sellers or those who purchase the Pirate Sellers' Infringing Works.

133.    Google is liable as a vicarious copyright infringer for the Direct Infringements described in paragraph 122 above.  Google has the legal and practical right, ability, and responsibility to supervise and control the Direct Infringements described in paragraph 122. Terminating the Infringing Shopping Ads at issue and the advertising accounts of the Pirate Sellers would have prevented the Direct Infringements altogether.  And, more generally, terminating the Infringing Shopping Ads and the accounts of the Pirate Sellers would have stopped or limited the Pirate Sellers' ability to sell their Infringing Works and Google users' ability to download or otherwise reproduce the Infringing Works they purchase, including because Google's ads direct would-be purchasers to the otherwise unknown Pirate Sites.

134.    In addition, Google has a direct financial interest in, and has derived an obvious and direct financial benefit from, the Direct Infringements described in paragraph 122, including because it earned revenue from each of the clicks that led to the Direct Infringements, and from

clicks on paid Infringing Shopping Ads generally. Google likewise benefitted financially when legitimate sellers paid higher prices for clicks on their ads due to competing bids from Pirate Sellers. And by allowing known repeat infringers to use the Merchant Center and continuing to advertise their Pirate Sites and infringing copies of the Authentic Works, Google has profited from revenue it would not have otherwise received.

135.    Moreover, the ability to attract users who will purchase infringing copies of the Publishers' works draws operators of the Pirate Sites to Google's advertising platforms. As Google itself proclaims, and as detailed above, Google's advertising provides the Pirate Sites access to an audience of unmatched size, and provides numerous features that help sell more Infringing Works. That Google allows certain ads from pirate sellers but not from legitimate ones makes Google's platform all the more attractive to pirates. The opportunity to carry out that infringement provides a major draw to Google's advertising platforms. At the same time, access to Shopping Ads for low-cost Infringing Works draws textbook consumers to Google's Shopping platform. As "clicks" from those consumers result in revenue to Google, Google receives a financial benefit by drawing those consumers to its platforms.

136.    Each infringement of the Authentic Works constitutes a separate and distinct act of infringement.

137.    The foregoing acts of infringement by Google have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights, including because Google was well aware that that the Pirate Sellers were selling Infringing Works but continued to advertise those Infringing Works and to promote the Pirate Sites.

138.    Google's actions described herein, which are ongoing, have caused and will continue to cause irreparable injury to the Publishers, for which the Publishers have no remedy at

law.  Accordingly, in addition to damages, the Publishers are entitled to injunctive relief restraining Google from further copyright infringement.

### Count III – Trademark Infringement under 15 U.S.C. § 1114(1)(b) (Asserted by the Trademark Plaintiffs)

139.    Plaintiffs repeat and reallege every allegation contained outside of Count III as if fully set for herein.

140.    At all relevant times, the Trademark Plaintiffs have been and still are the owners of all rights, titles, and interests in and to the Marks listed in Exhibit B, which are valid and protectable trademarks that are registered with the U.S. Patent and Trademark Office.

141.    Since June 2021, Google has infringed the Marks by applying, without the Trademark Plaintiffs' consent, reproductions, counterfeits, copies, or colorable imitations of the Marks to Infringing Shopping Ads intended to be used in commerce in connection with the sale, offering for sale, distribution, or advertising of Infringing Works.  Such use is likely to cause confusion, to cause mistake, and/or deceive the public.

142.    The spurious marks in the Infringing Shopping Ads described herein are identical to and/or substantially indistinguishable from the Marks and thus constitute counterfeit marks pursuant to 15 U.S.C. § 1116(d).

143.    Google has acted willfully and with knowledge, or in reckless disregard of the fact that the Infringing Shopping Ads infringed the Publishers' trademarks.  Google likewise acted with knowledge that the counterfeit marks in the Infringing Shopping Ads are intended to cause confusion, to cause mistake, or to deceive textbook consumers into purchasing Infringing Works.

144.    For instance, Google knows that the Pirate Sellers are not authorized to sell copies of the Publishers' works and that the Pirate Sellers' use of the Marks on infringing copies of the Publishers' works is unauthorized.  Still, Google has continued creating and displaying Infringing

Shopping Ads for Pirate Sellers that contain counterfeit copies of the Marks, even where the Infringing Shopping Ads, or the Pirate Sellers who pay for them, have been the subject of repeated notices from the Publishers.

145.    Google's actions described herein, which are ongoing, have caused and will continue to cause irreparable injury to the Trademark Plaintiffs, including to their reputations, and the goodwill of the Marks, for which the Trademark Plaintiffs have no adequate remedy at law. Accordingly, in addition to damages, the Trademark Plaintiffs are entitled to injunctive relief restraining Google from further trademark infringement.

### Count IV – N.Y. GEN. BUS. LAW § 349(a) (Asserted by the Publishers)

146.    Plaintiffs repeat and reallege every allegation contained outside of Count IV as if fully set forth herein.

147.    Google violated New York General Business Law section 349(a) by engaging in a materially deceptive and misleading practice in New York that is directed at consumers and has injured the Publishers.

148.    As described above, Google has created and disseminated on its Shopping platform ads for infringing digital books sold by pirates while refusing to run ads for legitimate ebooks.

149.    Google directs this deceptive practice to two groups of consumers. The first consumer group is all those New Yorkers who purchase textbooks.  Google's conduct misleads these consumers.  No reasonable consumer searching for a book on Google's website would assume that Google rejects ads from legitimate sellers in the market.  These consumers are harmed when Google misrepresents important information about the market by hiding whole categories of legitimate, high-quality, digital textbooks and promoting instead pirated versions of those books. Moreover, Google diverts these consumers to pirated books that often are of inferior quality to legitimate books.  And, Google's deception often causes these consumers unwittingly to commit

copyright infringement when they download an unauthorized copy of a Publisher's work. This deception of the textbook-buying public in turn harms the Publishers. First, the Publishers are harmed when Google rejects ads for the Publishers' legitimate ebooks. Further, as a result of Google's practice, the Publishers suffer reduced sales, as well as damage to their reputations.

150. Google also directs its deceptive practices at a second group of consumers. That group comprises New York textbook-sellers who, like the Publishers, wish to utilize Google's advertising services for their legitimate digital and physical books. Google's practice likewise is deceptive to this second group of consumers. None of these sellers would expect that Google would allow certain ads from pirates while disallowing those same ads from legitimate sellers. And, again, Google's deceptive practice harms the Publishers. Most simply, Google harms the Publishers by refusing to allow the Publishers (directly or through their authorized distributors) to advertise standalone ebooks. The Publishers are further harmed when consumers, directed by Google to pirate websites, purchase pirated versions of the Publishers' textbooks, reducing the Publishers' sales. The harm is compounded because the pirated textbooks are often inferior to the authentic books, giving consumers a falsely negative impression of the Publishers' works. And Google's practice devalues the textbook market by promoting illicit copies of textbooks at well-below market value.

151. Google's deceptive practices include conduct in New York State as described above.

152. Google's actions described herein, which are ongoing, have caused and will continue to cause irreparable injury to the Publishers, for which the Publishers have no remedy at law. Accordingly, in addition to damages, the Publishers are entitled to injunctive relief restraining Google from continuing its deceptive practice.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment from this Court against Google as follows:

    a.   For judgment on the claims set forth above;

    b.   For a finding that Google willfully infringed the Authentic Works described in Exhibit A;

    c.   For damages pursuant to 17 U.S.C. § 504 in an amount up to the maximum provided by law or proven at trial;

    d.   For a finding that Google willfully infringed the Marks described in Exhibit B;

    e.   For damages pursuant to 15 U.S.C. § 1117 in an amount up to the maximum provided by law or proven at trial;

    f.   For damages from Google's deceptive practices pursuant to New York General Business Law § 349(h);

    g.   For an order pursuant to 17 U.S.C. § 502, 15 U.S.C. § 1116, Federal Rule of Civil Procedure 65(d), and New York General Business Law § 349(h) enjoining Google from further infringements as described herein, and from engaging in deceptive practices as described herein;

    h.   For an award of Plaintiffs' reasonable attorneys' fees pursuant to 17 U.S.C. § 505, 15 U.S.C. § 1117, New York General Business Law § 349(h), and Federal Rule of Civil Procedure 54(d);

    i.   For costs in this action pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117.

    j.   For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Google; and

    k.   For such other and further relief as the Court deems proper.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury of all issues that are so triable.


Dated:  September 16, 2024

Respectfully submitted,

 /s/ Matthew J. Oppenheim
Matthew J. Oppenheim
Michele H. Murphy (*pro hac vice*)
Jeff Kane (*pro hac vice*)
Kevin P. Lindsey
Uriel Lee (*pro hac vice forthcoming*)

OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue NW, 5th Floor
Washington, DC 20016
202-480-2999 telephone
866-766-1678 fax
matt@oandzlaw.com
michele@oandzlaw.com
jkane@oandzlaw.com
klindsey@oandzlaw.com
ulee@oandzlaw.com