**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CENGAGE LEARNING, INC.; BEDFORD, FREEMAN & WORTH PUBLISHING GROUP, LLC D/B/A MACMILLAN LEARNING; MACMILLAN HOLDINGS, LLC; ELSEVIER INC.; ELSEVIER B.V.; and MCGRAW HILL LLC, <br><br>        Plaintiffs, <br><br>   v. <br><br> GOOGLE LLC, <br><br>        Defendant. | **Civil Action No. 24-cv-04274-JLR-BCM** |

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS</u>**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

LEGAL STANDARD........................................................................................................... 4

ARGUMENT ....................................................................................................................... 4

    I.      The Amended Complaint states a claim for vicarious copyright infringement. ............. 4

       A.   Google had a direct financial interest in the Pirate Sellers' infringing activity. ............. 4

          1.  Google received a direct financial benefit from the Direct Infringements. .................. 5

          2.  The opportunity to infringe drew Google users and Pirate Sellers to Google's Shopping platform. ....................................................................................................... 8

       B.   Google declined to exercise its right to stop or limit the Direct Infringements. ........... 11

          1.  The Direct Infringements the Publishers allege are ones that Google controlled....... 12

          2.  Google's ability to remove ads and the Pirate Sellers who pay for them constitutes supervision and control. ............................................................................................. 13

          3.  The Ninth Circuit's decision in *Perfect 10 v. Amazon* is distinguishable and does not address the argument Plaintiffs make here. ................................................................. 15

    II.     Plaintiffs have stated a claim for direct trademark infringement. ................................. 17

    III.    Plaintiffs have stated a deceptive practices claim under New York law. ...................... 20

       A.   Federal copyright law does not preempt Plaintiffs' claim. ............................................ 20

       B.   Federal trademark law does not preempt Plaintiffs' claim. .......................................... 22

       C.   Plaintiffs' allegations state a section 349 claim. .......................................................... 23

          1.  Google's deceptive practices are directed at textbook consumers............................. 24

          2.  Google's deceptive practices are directed at Shopping Ads consumers. .................... 25

    CONCLUSION.................................................................................................................... 27

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*A&M Recs., Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ........................................................................................7, 15

*Arista Recs. LLC v. Lime Grp. LLC*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011) ...............................................................................7, 8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................................4

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................................................4

*BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*,
    No. 2:22-cv-00471, 2023 WL 3436089 (E.D. Tex. May 12, 2023)................................14, 15

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    149 F. Supp. 3d 634 (E.D. Va. 2015) ..................................................................................13

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    881 F.3d 293 (4th Cir. 2018) ...............................................................................................13

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*,
    69 F. Supp. 3d 342 (S.D.N.Y. 2014) ..................................................................................7, 8

*Capitol Records, Inc. v. MP3tunes, LLC*,
    48 F. Supp. 3d 703 (S.D.N.Y. Sept. 29, 2014) ......................................................................8

*Casper Sleep, Inc. v. Mitcham*,
    No. 16-cv-3224, 2016 WL 7188788 (S.D.N.Y. Nov. 17, 2016) ......................................24, 25

*Century 21 Real Estate Corp. v. R.M. Post, Inc.*,
    No. 88-cv-0077, 1988 WL 84741 (N.D. Ill. Aug. 8, 1988)................................................17, 20

*City of New York v. Smokes-Spirits.Com, Inc.*,
    911 N.E.2d 834 (N.Y. 2009) ...............................................................................................23

*Colpitts v. Blue Diamond Growers*,
    527 F. Supp. 3d 562 (S.D.N.Y. 2021) .................................................................................24

*Dial One of the Mid-South, Inc. v. BellSouth Telecomms., Inc.*,
    269 F.3d 523 (5th Cir. 2001) ...............................................................................................17

*Dreamland Ball Room v. Shapiro, Bernstein & Co.*,
    36 F.2d 354 (7th Cir. 1929) ...................................................................................................8

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016) ..................................................................................................11

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    847 F. Supp. 1492 (E.D. Cal. 1994) ......................................................................................8

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996)...........................................................................................6, 8, 15

*Forest Park Pictures v. Universal Television Network, Inc.*,
  683 F.3d 424 (2d Cir. 2012) ............................................................................21

*Gershwin Publ'g Corp. v. Columbia Artist Mgmt., Inc.*,
  443 F.2d 1159 (2d. Cir. 1971) .............................................................5, 6, 7, 11

*Glob. Supplies NY, Inc. v. Electrolux Home Prods.*,
  2022 WL 815795 (2d Cir. 2022) .........................................................................4

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
  277 F. Supp. 2d 269 (S.D.N.Y. 2003) ...............................................................26

*Gucci Am., Inc. v. Hall & Assocs.*,
  135 F. Supp. 2d 409 (S.D.N.Y. Mar. 14, 2001) ...............................................17

*Int'l Code Council, Inc. v. UpCodes Inc.*,
  43 F.4th 46 (2d Cir. 2022) .................................................................................25

*J&J Sports Prods., Inc. v. Enriquez*,
  No. 1:19-cv-2384, 2019 WL 4963108 (E.D.N.Y. Oct. 7, 2019) ...................10, 11

*Jackpocket, Inc. v. Lottomatrix NY LLC*,
  645 F. Supp. 3d 185 (S.D.N.Y. 2022) ...............................................................22

*Leonard v. Stemtech Int'l Inc.*,
  834 F.3d 376 (3d Cir. 2016) ..............................................................................10

*Lynch v. City of New York*,
  952 F. 3d 67 (2d Cir. 2020) .................................................................................4

*Martin v. New Am. Cinema Grp., Inc.*,
  No. 1:22-cv-05982, 2023 WL 2024672 (S.D.N.Y. Feb. 15, 2023).........24, 26, 27

*Merck Eprova AG v. Brookstone Pharms., LLC*,
  920 F. Supp. 2d 404 (S.D.N.Y. 2013) ...............................................................26

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) .......................................................................................4, 15

*Mony Life Ins. Co. v. Monie Fashions, Inc.*,
  No. 03-cv-9604, 2004 WL 875929 (S.D.N.Y. Apr. 22, 2004)............................22

*N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*,
  102 A.D.3d 5 (N.Y. 2012)......................................................................21, 23, 24, 26

*Nikon Inc. v. Ikon Corp.*,
  987 F.2d 91 (2d Cir. 1993) .................................................................................22

*Oswego Laborers' Loc. 214 Pension v. Marine Midland Bank, N.A.*,
  647 N.E.2d 741 (N.Y. 1995) ...................................................................23, 24, 26

*Perfect 10 v. Google, Inc.*,
  416 F. Supp. 2d 828 (C.D. Cal. 2006)................................................................16

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ..........................................................13, 15, 16, 17

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) ..............................................................................11

*Realsongs v. Gulf Broad. Corp.*,
    824 F. Supp. 89 (M.D. La. 1993) ...........................................................................7

*RJ Cap., S.A. v. Lexington Cap. Funding III, Ltd.*,
    No. 10-cv-25, 2011 WL 3251554 (S.D.N.Y. July 28, 2011) .....................................19

*Samara Bros. v. Wal-Mart Stores, Inc.*,
    165 F.3d 120 (2d Cir. 1998) ................................................................................21

*Samara Bros. v. Wal-Mart Stores, Inc.*,
    529 U.S. 205 (2000) ..........................................................................................21

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995) .................................................................................24

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
    316 F.2d 304 (2d Cir. 1963) .............................................................................4, 8

*SmileDirectClub, LLC v. Jacqueline I. Fulop, D.M.D., P.C.*,
    No. 19-cv-9582, 2020 WL 1322838 (S.D.N.Y. Mar. 20, 2020) .............................26

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
    93 F.4th 222 (4th Cir. 2024) ................................................................................7

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
    No. 17-CA-365, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018) .......................14, 15

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
    No. 1:17-cv-365, 2018 WL 1905124 (W.D. Tex. Mar. 28, 2018) ..........................14

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC*,
    No. 19-cv-17272, 2020 WL 5204067 (D.N.J. Aug. 31, 2020)................................14

*U-Neek, Inc. v. Wal-Mart Stores, Inc.*,
    147 F. Supp. 2d 158 (S.D.N.Y. 2001) ..................................................................21

*Warner Recs. Inc. v. Charter Commc'ns, Inc.*,
    454 F. Supp. 3d 1069 (D. Colo. 2020) .......................................................9, 13, 14, 15

*Wiggins v. Weicker*,
    104 F.3d 351 (2d Cir. 1996) ...............................................................................23

*World Wrestling Fed'n Inc. v. Posters, Inc.*,
    No. 99-cv-1806, 2000 WL 1409831 (N.D. Ill. Sept. 26, 2000) .............................18

## STATUTES

15 U.S.C. § 1114(1)...........................................................................................17, 19

15 U.S.C. § 1114(1)(a) .............................................................................................19

15 U.S.C. § 1114(1)(b) ........................................................................................17, 19

15 U.S.C. § 1114(2)(A)-(B);......................................................................................19

17 U.S.C. § 106(1) .....................................................................................................5

17 U.S.C. § 106(3) .....................................................................................................5

N.Y. GEN. BUS. LAW  § 349(h).................................................................................24

iv

**TREATISES**

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:28 (5th ed.)....17

The Law of Electronic Commercial Transactions § 2.17.2..........................................................13

## <u>INTRODUCTION</u>

Google prominently advertises and links its users to infringing copies of Plaintiffs' textbooks sold by online pirates. Although Plaintiffs have notified Google of tens of thousands of such ads and the Pirate Sellers[1] who pay for them, Google has persisted in its infringing behavior, all in the name of making money from ads. Google's "response" to this problem was to adopt a new policy prohibiting the advertisement of all ebooks. But, astonishingly, Google has enforced this policy against *legitimate* publishers, but not against many pirates.

Plaintiffs' Amended Complaint states four critically important claims that address Google's unlawful conduct: Contributory copyright infringement (Count I), vicarious copyright infringement (Count II), direct trademark infringement (Count III), and deceptive trade practices under N.Y. General Business Law (Count IV). Google moves to dismiss Counts II-IV. All of Google's arguments fail.

First, as to Plaintiffs' vicarious copyright infringement claim, Google argues that it received no financial benefit from the direct infringements at issue, and could not supervise and control those infringements. This is factually untrue. Google was paid each time a Google user who purchased an Infringing Work clicked on Google's paid ad for the work. Likewise, Google unquestionably had the right and ability to stop or limit these infringements because Google created the very ads that led to the purchase of these works.

Second, Google's challenge to Plaintiffs' trademark claim misses entirely the statutory provision for printer-publisher liability on which the claim is based. Under the Lanham Act, Google is liable for trademark infringement because Google reproduced Plaintiffs' trademarks when it created ads for Pirate Sellers and applied those marks to its ads.

---

[1] Capitalized terms have the same meaning as in the Amended Complaint.

1

Third, Google's practice of showing ads for pirated ebooks but not legitimate ebooks, and Google's public statement that it doesn't allow any ebook ads, deceive consumers (both textbook buyers and ad buyers) and thus violate New York law. And because that claim involves more than just infringement, it is not preempted by federal law.

The Court should deny Google's motion in full.

## BACKGROUND

The Publishers create some of the most widely-used textbooks in higher education. Amended Complaint, Dkt. 38 ("Compl.") ¶¶ 2, 30. The Publishers sell these textbooks not only in hardcopy form, but also in digital forms. Compl. ¶ 29. Unfortunately, Pirate Sellers regularly make illegal digital copies of these textbooks and sell them over the internet for a fraction of the normal price. *Id.* ¶¶ 2, 29-30, 57, 85. Piracy is a major problem for the publishing industry. *Id.* ¶ 81. Not only does it displace legitimate sales in the first instance, but once an infringing copy is distributed to one customer, it can be copied and disseminated *ad infinitum*, multiplying the loss to Publishers and their authors. *Id.* ¶¶ 81-85.

Google has exacerbated this problem by advertising these Infringing Works through "Shopping Ads" on Google's massively popular search engine. *Id.* ¶¶ 1, 36, 47. When a Google user enters the name of a textbook into Google's search engine, the user often sees not just organic search results and ads from legitimate sellers, but also advertisements for Infringing Works. *Id.* ¶ 47. Google itself creates these ads based on information the pirates provide in Google's "Merchant Center." *Id.* ¶ 41. Unlike organic search results, Shopping Ads include product images, which often include unauthorized reproductions of Plaintiffs' trademarks. *Id.* ¶¶ 88–89. Shopping Ads also include pricing information, which, with Infringing Shopping Ads, are the artificially low price the pirates charge for their stolen works, making their products even more enticing to Google

users. *Id.* ¶ 47. And paid Shopping Ads typically receive prominent placement at the top of the search results page. *Id.* ¶¶ 37–38.

In addition to creating Shopping Ads, Google controls when to show them, i.e., in response to what searches and what customers Google believes are most likely to click the ads. *Id.* ¶ 42. Google also arranges the ads on the user's page, ranking them to determine the order in which they appear. *Id.* For at least Paid Ads, Google's ranking process includes an evaluation of the websites to which the ads link, including Pirate Sites. *Id.*

Making matters worse, Google disallows Shopping Ads for standalone ebooks from legitimate sellers, but allows such ads from pirates. *Id.* ¶¶ 64-65. As a result, a consumer who searches Google for one of the Publishers' textbooks likely sees multiple Shopping Ads for pirated ebooks, but *no* ads for legitimate ebooks. *Id.* ¶¶ 65, 67.

Given the near ubiquity of Google's search platform, Infringing Shopping Ads divert sales from legitimate sellers to Pirate Sellers on a massive scale. *Id.* ¶ 81. At the same time, Google gets paid by Pirate Sellers each time Google users click on Paid Ads for Infringing Works. *Id.* ¶ 95. Indeed, advertising is Google's main source of revenue. *Id.* ¶¶ 35. Google's revenue exceeded $300 billion last year, and Google acknowledges it makes "the vast majority of [its] money from advertising." *Id.* ¶¶ 3, 35.

For years, Plaintiffs have sent Google notices of infringement, hoping that Google would enforce its own policies and stop these infringements, but to no avail. Compl. ¶¶ 99-101, 114-119.

Google moved to dismiss Plaintiffs' original Complaint. Dkt. 28. Plaintiffs amended their Complaint as of right under Rule 15(a)(1)(B), principally adding more infringed works. Dkt. 38. Google filed a near-identical motion to dismiss the Amended Complaint. Dkt. 44 ("Mot.").

Google's motion does not challenge Plaintiffs' claim of contributory infringement.  Google's challenges to Plaintiffs' other claims all fail.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible where "the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  When considering a motion to dismiss, a court is "required to accept all well-pleaded factual allegations in the complaint as true and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff."  *Glob. Supplies NY, Inc. v. Electrolux Home Prods.*, No. 21-674, 2022 WL 815795, at *1 (2d Cir. 2022) (internal quotation and citation omitted).  This assessment "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct."  *Lynch v. City of New York*, 952 F. 3d 67, 75 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

### I.    The Amended Complaint states a claim for vicarious copyright infringement.

Liability for vicarious copyright infringement arises where the defendant has "an obvious and direct financial interest in the exploitation of copyrighted materials . . . .", *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963), and has "declin[ed] to exercise a right to stop or limit" the infringement.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  Here, Google's conduct satisfies both elements.

#### A.    Google had a direct financial interest in the Pirate Sellers' infringing activity.

Plaintiffs' Amended Complaint establishes that Google had a direct financial interest in the Pirate Sellers' infringing activity in at least two ways, either of which is sufficient to satisfy the

financial interest prong.  First, the Pirate Sellers paid Google directly each time Google users clicked on Paid Shopping Ads, including the ads that led to purchases of the Infringing Works. Google thus received a payment in connection with these Direct Infringements, as well as other benefits.  Second, the Infringing Works that Google advertised drew Google users to click on Google's Shopping Ads, and the opportunity to advertise the Infringing Works attracted Pirate Sellers to purchase Google's ads.

*1.    Google received a direct financial benefit from the Direct Infringements.*

Pirate Sellers paid Google each time a Google user clicked on a Paid Ad for an Infringing Work.  Compl. ¶ 95.  Correspondingly, Plaintiffs allege Direct Infringements wherein Google users clicked a Paid Ad, then purchased and downloaded an infringing copy of the Authentic Work from the Pirate Sites.  *Id.* ¶¶ 41, 122, 133.  In all those instances, there was a Direct Infringement by the Pirate Seller and the user.  *Id.* ¶¶ 133; 17 U.S.C. § 106(1), (3).  And in all those instances, Google received a payment from the Pirate Seller.  *Id.* ¶¶ 37, 95.  Google thus "profit[ed] from direct infringement."  *Grokster*, 545 U.S. at 930.

In addition, Google profited from the Pirate Sellers' infringement in other ways.  The more infringing products the Pirate Sellers sell through Shopping Ads, the more the Pirate Sellers advertise, and the more Google profits.  Compl. ¶ 97.  Google thus "has a direct financial interest" in "the infringing activity."  *Gershwin Publ'g Corp. v. Columbia Artist Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d. Cir. 1971).  Similarly, a Pirate Seller who achieves success with Shopping Ads is likely to use Google's other advertising services, including retargeted ads, display ads, and text ads. Compl. ¶ 97.  Further, Google priced its ads through an auction where the price the winner paid was based on the bid of the second-highest bidder.  Where the second-highest bidder was a Pirate Seller, Google earned more even when it ran an ad for a legitimate seller.  *Id.* ¶ 96.  Google thus

earned revenue not just from the actual Direct Infringements, but from the broader operation in which the infringement occurred.

Despite these clear financial benefits, Google argues that the financial interest element is not met because Google earned money from *ad clicks*, not from *infringements*. Mot. 10-13. Google points out that it earned revenue whether the Google user ultimately bought the infringing product or not. Mot. 11-12. And some ads on the Shopping platform, Google argues, promote non-infringing products. *Id.* Both of these arguments fail.

First, as explained above, Google received a payment each time a Google user clicked on a Paid Ad for an Infringing Work. Hence, Google *did* earn a fee from the Direct Infringements committed through Paid Ads because Google users clicked on Google's ads as a first step in their purchase process. Compl. ¶ 95.

Second, to say that Google earned money from the ad clicks, not from the infringement, ignores the obvious: the ads at issue promoted the infringing products. That Google's pricing was tied to the advertisements that led to the infringements, rather than to the act of infringements, does not mean that Google lacked a financial interest in the infringement. Plainly, if Google users did not buy the infringing products, Pirate Sellers would not continue paying Google to advertise them.

Numerous cases make this clear. In *Gershwin*, the Second Circuit found a concert promoter vicariously liable for musicians' performances of copyrighted works, even though the promoter was paid a general fee rather than a fee per-infringing-song. 443 F.2d at 1163. In *Fonovisa, Inc. v. Cherry Auction, Inc.*, the Ninth Circuit found a flea market operator vicariously liable when vendors at the market sold infringing music recordings. 76 F.3d 259, 260 (9th Cir. 1996). The market operator did not receive a commission on each infringing sale; it received a daily rental fee from vendors and an entrance fee from customers. *Id.* at 261, 263. While the

6

market operator's revenue was not pegged to the infringing sales, it nonetheless had a direct financial interest in the infringing activity. *Id*. And in *A&M Recs., Inc. v. Napster, Inc.*, the court affirmed a preliminary injunction, finding that Napster was likely to be found vicariously liable for operating a file-sharing product that was *free*. 239 F.3d 1004, 1010 (9th Cir. 2001). Napster earned revenue from subsequent activities like targeted email, advertising, and direct marketing. *Id.* But the Ninth Circuit nonetheless found that Napster had a financial interest in the infringing activity. *Id.* In each of these cases, the defendant did not earn a percentage on each infringing sale. Yet each court found that the defendant had a direct financial interest in the infringement because the defendant clearly profited from the infringement. *See also Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) ("The financial benefit need not be tied directly to sales of the infringing goods."); *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 358 (S.D.N.Y. 2014) (same); *Realsongs v. Gulf Broad. Corp.*, 824 F. Supp. 89, 92 (M.D. La. 1993) (radio station received a financial benefit when it received a per-minute fee for infringing and non-infringing music). The same is true of Google. Google profited from Pirate Sellers' infringement, even though its revenue was tied to ad clicks rather than product sales.

This caselaw likewise discredits Google's reliance on the Fourth Circuit's decision in *Sony Music Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222 (4th Cir. 2024). That court found that the flat-fee Cox charged for general internet service was not sufficiently tied to the direct infringements its users committed when they used that internet service to exchange pirated music. *Id.* at 232. The above line of cases (including the Second Circuit's decision in *Gershwin*) makes clear that the defendant's revenue need not be pegged to the infringing sales. Moreover, as Google notes, the *Cox* court held that vicarious liability "demands proof that the defendant profits directly from *the acts of infringement for which it is being held accountable*.'" Mot. 14, quoting 93 F.4th at 232

(emphasis added).  Here, Google did profit from the Direct Infringements; Google earned a fee from the Pirate Seller for each click on a Paid Ad that led to a Direct Infringement.  Compl. ¶¶ 37, 95, 122.

Similarly, that some Shopping Ads promote non-infringing products, Mot. 11-12, does not mean that Google lacks a financial interest in those products that *are* infringing.  In *Fonovisa*, only *some* of the 900-plus vendors at the market were committing copyright infringement.  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 847 F. Supp. 1492, 1494 (E.D. Cal. 1994), *rev'd on other grounds*, 76 F.3d 259 (9th Cir. 1996).  Likewise, in a long line of "dance hall" cases, courts found that restaurant and nightclub owners were vicariously liable when bands performing in their establishment committed copyright infringement, even though some of the revenue these establishments earned was for non-infringing activities (e.g., food, drink, music in the public domain).  *Shapiro*, 316 F.2d at 307-308 (collecting cases); *Dreamland Ball Room v. Shapiro, Bernstein & Co.*, 36 F.2d 354, 355 (7th Cir. 1929).  Plaintiffs' allegation of financial benefit easily passes muster on a motion to dismiss.

2. <u>The opportunity to infringe drew Google users and Pirate Sellers to Google's Shopping platform.</u>

Google does not dispute that an alternative way to satisfy the financial interest prong is to show that the "'infringing material acts as a 'draw' to attract subscribers to a defendant's business.'"  *BWP Media*, 69 F. Supp. 3d at 358 (quoting *Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 712 (S.D.N.Y. Sept. 29, 2014); *Lime Grp.*, 784 F. Supp. 2d at 435.  Here, the Pirate Sellers' infringing works act as a draw in two ways: they attract Pirate Sellers to buy Shopping Ads, and they attract users of Google's search engine to click on Shopping Ads.

***First***, the opportunity to infringe attracted the Pirate Sellers to purchase Shopping Ads from Google.  Google argues that Pirate Sellers were drawn to Google not by the opportunity to sell

infringing products, but by the popularity of Google's search engine. But if Google's search engine alone was enough to attract the Pirate Sellers, sellers would not have used Shopping Ads; they would have relied on organic search results or text ads. *Id.* ¶ 37. Pirate Sellers used the Shopping Ads platform because it helped them to sell their infringing products. *Id*. ¶¶ 38-39.

The Amended Complaint details numerous features of Shopping Ads that make them attractive to Pirate Sellers. Shopping Ads are specifically designed to, and do, draw users to click on them. Compl. ¶¶ 37, 39. Shopping Ads often are shown in response to specific searches, so a Shopping Ad for an Infringing Work will be displayed when a user searches for the exact textbook the Pirate is selling. *Id.* ¶¶ 43, 47. Unlike organic search results and text ads, Shopping Ads contain product images that draw users' attention, as well as important information like the price of the product. *Id*. ¶¶ 37-38. They are displayed prominently on the results page to make them more noticeable. *Id.* ¶¶ 37, 49. Google deploys an algorithm as well as machine learning to target Shopping Ads to users Google believes are most likely to click on them. *Id.* ¶¶ 37, 41-42. And often, Google even includes a "PDF" button, which takes users to yet more pirated copies of the works. *Id.* ¶ 57. Beyond these basic elements, Google allows ads for standalone digital books from Pirate Sellers but not from legitimate publishers (a fact conspicuously absent from Google's discussion of the draw theory). *Id.* ¶¶ 64-65. This feature makes Shopping Ads even more attractive to pirates because "for standalone digital books, Pirate Sellers don't even have to compete with legitimate ads . . . ." *Id.* ¶ 66.

Moreover, Google's lax enforcement policies serve as a further draw for pirates. *See, e.g.*, *Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1077 (D. Colo. 2020) (finding that the defendant's "failure to stop or take other action in response to notices of infringement is a draw to current and prospective subscribers.") (cleaned up). As the Amended Complaint details,

despite receiving notice-after-notice of infringement from Plaintiffs, Google has continued to advertise works sold by the Pirate Sellers identified in those notices. Compl. ¶¶ 99-101. Thus, pirates know that Google will in many cases keep advertising their infringing products, even when rightsholders complain. *Id.* ¶¶ 99-105. The number and duration of these notices are often staggering. *See, e.g.*, *id.* ¶ 104 (69 notices identifying 6,289 infringing Shopping Ads from the same Pirate Seller without any action from Google).

*Second*, Shopping Ads draw users from Google's search platform to click on its Shopping Ads. Compl. ¶¶ 97-98, 135. A user who searches for a textbook title could simply click on an organic search result. But Shopping Ads draw users to click on the ad instead. Google again argues that the draw rationale does not apply here because users visit Google not to infringe, but to use its search engine. Mot. 13-15. But this argument confuses what draws users to Google's *search* platform with what draws them to click on *Shopping* ads.

Enticing users already on Google's search platform to click on Shopping Ads is sufficient to establish a financial benefit. It is not necessary that the opportunity to infringe draws Google users to Google's environment in the first place. It is enough that once a user is utilizing Google's environment, the Infringing Works attract her to Google's Shopping Ads, with their prominent placement, product images, and too-good-to-be true prices. Compl. ¶ 47. For example, in *Leonard v. Stemtech Int'l Inc.*, the plaintiff's copyrighted images of stem cells were displayed on a website that sold nutritional supplements. 834 F.3d 376, 382, 384 (3d Cir. 2016). There was no allegation that the photos drew customers to the website. Rather, once potential customers visited the website, the photos gave the nutritional supplements an appearance of legitimacy, drawing customers to purchase the product. *Id.* at 389. The Third Circuit found the financial benefit prong of vicarious liability satisfied. *Id.* Likewise, in *J&J Sports Prods., Inc. v. Enriquez*, a restaurant

10

owner was vicariously liable when his establishment intercepted the broadcast of a boxing match and exhibited it to customers. No. 1:19-cv-2384, 2019 WL 4963108 (E.D.N.Y. Oct. 7, 2019). The infringing content not only attracted patrons to the restaurant in the first place, but "g[o]t them to stay longer" and to order more food and drink once they were there. *Id.* at *4.[2]

The same is true here. All the Shopping Ads features discussed above (pp. 9-10) drew users of Google's (free) search platform to its (revenue-generating) Shopping ads.

Finally, it is worth noting that a draw need not be substantial in order to satisfy the financial benefit prong. *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 99 (2d Cir. 2016) ("[I]nfringing material acts as a 'draw' to attract subscribers to a defendant's business, even if it is not the primary, or even a significant draw.") (internal quotations omitted). The financial benefit Google received easily meets this standard.

### B.    Google declined to exercise its right to stop or limit the Direct Infringements.

The second element of vicarious infringement is that that the defendant "declin[ed] to exercise a right to stop or limit" the "direct infringement." *Grokster*, 545 U.S. at 930. This means that the defendant "ha[d] the right and ability to supervise the infringing activity . . . ." *Gershwin*, 443 F.2d at 1162. This canonical language reveals two crucial distinctions. First, what the defendant must be able to supervise and control is the "direct infringement," *Grokster*, 545 U.S. at 930, i.e., the specific direct infringements that the plaintiff alleges, not some broader swath of infringements in the world at large. Second, the right and ability to supervise and control is present

---

[2] Google relies on *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017) (Mot. 14), but that case actually supports Plaintiffs' argument. There, the Ninth Circuit held that the financial benefit must stem from the particular infringements at issue in the case, not from infringements generally. *Id.* at 673. Here, users were drawn to the Shopping platform by Google's ads for the specific Infringing Works at issue in this case. Compl. ¶¶ 122, 133. Thus, Google did indeed have a financial interest in the specific infringements at issue here.

so long as the defendant can *limit* the direct infringements, even if the defendant cannot stop them entirely.  *Id.* (the defendant is liable if he could "stop *or limit*" the direct infringement) (emphasis added).  Here, Google had the right and ability to stop or limit the direct infringements.

> 1.    *The Direct Infringements the Publishers allege are ones that Google controlled.*

Plaintiffs allege Direct Infringements wherein Google users clicked on Infringing Shopping Ads for infringing copies of Authentic Works, then purchased infringing copies of the Authentic Works from the Pirate Sites *after* Google learned that the Pirate Seller was selling infringing content.  Compl. ¶¶ 41, 122, 133.

If Google had not run Shopping Ads for Pirate Sites' Infringing Works, these Direct Infringements alleged by the Publishers would not have occurred at all.  At the very least, these Direct Infringements would have been limited.  The Amended Complaint alleges as much in detail. "Terminating the Infringing Shopping Ads at issue and the advertising accounts of the Pirate Sellers would have prevented the Direct Infringements altogether.  And, more generally, [doing so] would have stopped or limited the Pirate Sellers' ability to sell their Infringing Works . . . ." Compl. ¶ 133; *id.*  ¶¶ 77, 79.  The Amended Complaint likewise explains why this is so.  In the absence of Google's ads, consumers were unlikely to find the Pirate Sites at all.  *Id.* ¶ 119 ("[I]t is principally or entirely through Google that those looking to purchase the Publishers' textbooks . . . most commonly find these 'rogue sites.'").  The Pirate Sites have names like "mybambinis.shop," "fairystrawberry.com," "dgetkmusicheard.com," and "matchlistcity.shop," so "[c]onsumers find these pirate websites because of Google's ads, not because they know to go directly to them or even find them through a regular search."  *Id.* ¶ 7; *see also id.* ¶ 49 (the sites do not appear in the first several pages of search results, if at all).

12

Thus, Google could have stopped or at least limited the specific Direct Infringements that the Plaintiffs allege.

        2.      <u>Google's ability to remove ads and the Pirate Sellers who pay for them constitutes supervision and control.</u>

Google does not seem to contest that it has the right and ability to remove or refuse ads for infringing products, or to terminate the advertising accounts of the Pirate Sellers who pay for them. Instead, Google argues that this capability does not amount to an ability to prevent the Direct Infringements because even without a Shopping Ad, Pirate Sites might still have sold the infringing products. Mot. 7-10. This argument both misinterprets the law and misconstrues the facts.

***First***, all that is necessary to meet the supervision-and-control element is that the defendant had the power to *limit* the direct infringements. *Grokster*, 545 U.S. at 930 (one "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop *or limit* it . . . .") (emphasis added); *Charter*, 454 F. Supp. 3d at 1078 ("Charter can 'stop or limit' infringement of plaintiffs' works by terminating those users about whom it is notified.") (quoting *Grokster); BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 674 (E.D. Va. 2015), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018)[3] ("If users do not [stop infringing] and Cox terminates them, that also stops *or at least limits* infringement.") (emphasis added); 1 THE LAW OF ELECTRONIC COMMERCIAL TRANSACTIONS § 2.17.2 ("The better view is that it suffices to limit or reduce the amount of infringement from the particular source or cause it to move to a new environment outside the defendant's control."). Google cannot argue plausibly that refusing or removing Infringing Shopping Ads or terminating Pirate Sellers would

---

[3] The district courts in *Warner v. Charter* and in *BMG v. Cox* distinguished those cases from the Ninth Circuit's decision about Google in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007). Plaintiffs discuss the Ninth Circuit's decision in Part I.B.3, *infra*.

not have limited the Direct Infringements. That alone is enough to satisfy the supervision-and-control element.

**Second**, Google argues that to satisfy the supervision-and-control element, Plaintiffs would have to allege that the Direct Infringements "occur[ed] on Google's platform." Mot. 7. *See also* Mot. 9 (arguing for dismissal because Plaintiffs do not "allege that Google has the power to *shut down* the 'Pirate Sites' that allegedly sell infringing copies of Plaintiffs' works.").

Factually, this argument ignores the crucial role that Google's ads played in giving Google the ability to stop or limit the Direct Infringements: Google advertised Infringing Works to potential customers, and those consumers clicked on Google's ads and purchased Infringing Works from Pirate Sellers rather than Authentic Works from Plaintiffs. Compl. ¶¶ 72-79, 122, 133.

Moreover, courts have rejected the very argument Google makes, i.e., the defendant must be able to shut down the infringer altogether. Many vicarious infringement cases involve internet service providers whose subscribers reproduce and distribute pirated music through file-sharing programs. These defendants often argue that since the file-sharing occurs through a third-party platform, terminating the subscriber's internet service would not stop the infringement. But courts reject this argument. *See, e.g.*, *Charter*, 454 F. Supp. 3d at 1078; *BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*, No. 2:22-cv-00471, 2023 WL 3436089, at *7 (E.D. Tex. May 12, 2023); *UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, No. 19-cv-17272, 2020 WL 5204067, at *11 (D.N.J. Aug. 31, 2020); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, No. 17-CA-365, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018), report and recommendation adopted, No. 1:17-cv-365, 2018 WL 1905124 (W.D. Tex. Mar. 28, 2018).

**Third**, Google cannot take refuge in the notion that even if Google had terminated the infringing ads and Pirate Sellers, the Pirate Sellers might have simply sold Infringing Works

through some other channel.  Mot. 7-10.  Courts consistently reject this argument.  *Charter*, 454 F. Supp. 3d at 1078-79 (rejecting internet service provider's argument that "because it cannot stop subscribers from using other forms of internet access to infringe, it has no ability to supervise or control infringing activity."); *Altice*, 2023 WL 3436089, at *7 (rejecting defendant's argument "that its ability to revoke internet access cannot impact a direct infringer's decision to share such content on his or her own device," (internal quotation omitted); *Grande*, 2018 WL 1096871, at *10 (rejecting the defendant's argument "that, even if it terminates subscribers, . . . the subscribers can simply obtain the service from another ISP.").

Indeed, a direct infringer invariably can find some other way to infringe.  The vendors at the flea market in *Fonovisa* could have moved to a market down the street; a Napster or Grokster user could have switched to a different file-sharing service; a file-sharer can always get internet service from a different provider.  If vicarious infringement required that the defendant be able to stop infringement through *all* services, not just the defendant's, no one would ever be liable for vicarious infringement.  Plainly, this is not the case.  Google undoubtedly had the ability to stop or limit the infringements that its platform enabled, which is all that is required to state a claim.

> 3.    *The Ninth Circuit's decision in* Perfect 10 v. Amazon *is distinguishable and does not address the argument Plaintiffs make here.*

Google relies on the Ninth Circuit's decision in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146.  Mot. 8-9.  But the *Perfect 10* court confronted a set of facts readily distinguishable from this case, and did not consider at all the argument the Publishers advance here.

Perfect 10 owned the copyrights to various images.  508 F.3d at 1157.  Third-party websites infringed these copyrights by displaying the images on their sites.  *Id.* at 1169.  As relevant here, in response to a search query, Google would in-line link to the images, i.e., open a window on the user's screen and instruct the user's computer to retrieve the infringing images from the third-

party's website. *Id.* at 1155-56.  Perfect 10 argued that Google was vicariously liable for the third-party websites' infringement. *Id.* at 1170.

On the supervision-and-control prong, Perfect 10 argued that Google had the contractual right and practical ability to stop the third-party websites from displaying Perfect 10's images because some of the websites participated in Google's AdSense program.  *Id.* at 1173.  In that program, Google would place onto the third-party's website an ad promoting some *other* product. *Id.* at 1156; *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 834 (C.D. Cal. 2006).  Perfect 10's theory was that because Google paid the infringing sites to run advertisements, the infringing sites would comply if Google demanded they remove infringing content.  508 F.3d at 1173-74.

This is a far more tenuous argument for control than what Plaintiffs allege here.  In *Perfect 10*, if Google had stopped paying for ads on the infringing sites, it is anyone's guess whether the site would have continued displaying Perfect 10's images.  In the instant suit, Google actually created the ad, then advertised *the infringing product* to prospective customers.  Discontinuing those advertisements would have literally *prevented* the Direct Infringements at issue here.  Compl. ¶ 77.  At the very least, it would have *limited* those infringements.  *Id.* ¶ 78.[4]  Moreover, Google's role in Perfect 10's infringement was far more passive than its role here.  In *Perfect 10*, Google's search results merely linked to the infringing site.  Here, Google actually created the ad for the infringing product and published the ad prominently, often at the top of search results.

More fundamentally, nowhere in either the district court decision or the Ninth Circuit's decision did the *Perfect 10* court consider the argument Plaintiffs assert here: that Google's ability

---

[4] The Ninth Circuit also held that Google lacked the practical ability to control the infringing activity because of a limitation on Google's software.  *Id.* at 1174.  No such issues exist here.  The Amended Complaint alleges, and Google does not dispute, that Google can remove ads from Pirate Sellers identified in Plaintiffs' notices.  Compl. ¶ 72-78.

to stop the particular Direct Infringements alleged here satisfies the supervision-and-control prong. Still less did the *Perfect 10* court consider whether Google could have *limited* the particular infringements that Perfect 10 alleged.

The Amended Complaint states a claim for vicarious copyright infringement.

## II.    Plaintiffs have stated a claim for direct trademark infringement.

Plaintiffs assert a claim for direct trademark infringement under the Lanham Act's provision for printer-publisher liability.  15 U.S.C. § 1114(1)(b).  This provision has long been applied to hold "printers" or "publishers" liable where they run advertisements that infringe trademarks.  3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:28 (5th ed.).  Where the printer-publisher makes a copy of a registered mark, and applies that copy to advertisements that are likely to cause confusion, the printer-publisher is liable.

> Any person who shall, without the consent of the registrant . . . (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to . . . advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant . . . .

15 U.S.C. § 1114(1).  Under this subsection, the defendant is liable even if it ran the advertisement on behalf of another entity.  For example, in *Century 21 Real Estate Corp. v. R.M. Post, Inc.*, the plaintiff sued publishers of telephone directories who published ads for a real estate broker that used the plaintiff's trademark without permission.  No. 88-cv-0077, 1988 WL 84741, at *3 (N.D. Ill. Aug. 8, 1988).  Because the directory publishers reproduced Century 21's mark and applied it to the advertisements, they were liable for direct trademark infringement.  *Id*. at *3.  *See also Dial One of the Mid-South, Inc. v. BellSouth Telecomms., Inc.*, 269 F.3d 523 (5th Cir. 2001) (holding publisher liable for including advertisements from terminated franchisee); *Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409 (S.D.N.Y. Mar. 14, 2001) (expanding printer-publisher claims to

internet service providers); *World Wrestling Fed'n Inc. v. Posters, Inc.*, No. 99-cv-1806, 2000 WL 1409831 (N.D. Ill. Sep. 26, 2000) (holding printing company liable for printing trademarked materials at third party's request).

Google overlooks this provision of the Lanham Act; its motion does not discuss printer-publisher liability.  Instead, Google attempts to criticize Plaintiffs' claim on three grounds.  None has merit.

First, Google argues that because the Pirate Sellers provided Google with the information and images that Google used to create the ads, Google cannot be liable.  Mot. 16-17.  But that is precisely what printer-publisher liability prohibits: copying an image of a trademark and applying that trademark to an ad.  Google itself explains that *Google*, not its ad customer, creates each Shopping Ad.  "'Merchant Center creates these [ads] based on information you include in your product feed so *you don't need to create the ads yourself*.'"  Compl. ¶ 41 (quoting Google.com); *see also id.* ¶¶ 88, 144 (alleging Google created the ads).  As part of that process, Google either retrieved an image of the trademark from a link the Pirate Seller provided and placed a copy of the image in the ad, or took an image of the trademark provided by the Pirate Seller and placed a copy of that image on the ad.  *Id.* ¶ 88.  In either scenario, Google necessarily made a copy of the trademark and applied that copy to an advertisement.  Indeed, Google even "makes adjustments it determines are necessary or optimal, such as 'experiment[ing] with the best display options for the format' and employing the 'automatic cropping' of images 'to focus more on the product.'"  *Id.* (quoting Google.com).  It is impossible to do so without making a copy of the trademark and applying it to the ad.  Nor can Google shield itself from liability by arguing that it generated the ads "automatically."  Mot. 16.  First, to the extent the process is automated, Google itself created

that automation.  Second, the Lanham Act does not create an exception to liability for infringers who reproduce and apply marks "automatically" rather than manually.

Second, Google argues that it is a "mere facilitator of sales," and thus, cannot be liable for direct trademark infringement.  Mot. 16-18.  Here, Google confuses subsection 1114(1)*(b)*, under which Plaintiffs have brought suit, with subsection 1114(1)*(a)*.  If it had any application, Google's "mere facilitator" argument would apply only to a claim under subsection 1114(1)*(a*).  Google cites no instance where the "mere facilitator" principle has been applied to 1114(1)(b), nor are Plaintiffs aware of one.  Indeed, all of the cases Google cites in support of this argument discuss section 1114(1)(a).  Mot. 16-17.  The "mere facilitator" caselaw stems from the subsection (a) requirement that the *defendant* use the mark in commerce.  15 U.S.C. § 1114(1)(a).  But for printer-publisher liability, it is only necessary that the *advertisement* is intended to be used in commerce. *Id.* § 1114(1)(b).  Google makes no argument that its Shopping Ads are not intended to be used in commerce, nor could it.

Lastly, Google argues that it is not liable for *secondary* trademark infringement.  However, the Amended Complaint only includes a claim for *direct* trademark infringement.  Compl. ¶¶ 139-145.  Google's discussion of the "knowledge" element of secondary infringement, therefore, is irrelevant to its motion.  Under printer-publisher liability, knowledge is relevant only to whether damages are available; the injunction Plaintiffs seek is available regardless of Google's knowledge.  15 U.S.C. §§ 1114(1), 1114(2)(A)-(B); *see also RJ Cap., S.A. v. Lexington Cap. Funding III, Ltd.*, No. 10-cv-25, 2011 WL 3251554 (S.D.N.Y. July 28, 2011) (declining to address the availability of a particular remedy at the motion-to-dismiss stage).

Moreover, the Amended Complaint alleges that Google has received hundreds of written notices of the Infringing Shopping Ads, establishing that Google had knowledge the Pirates Sellers

were selling infringing goods.  Compl. ¶¶ 99, 144; *Century 21*, 1988 WL 84741, at *3 (written infringement notices sufficient to give telephone directories knowledge).  Google's argument that Plaintiffs' notices only mentioned *copyright* infringement is of no import.  Plaintiffs' notices informed Google that specific ads were promoting specific Infringing Works.  Google cannot plausibly claim it believed these Infringing Works infringed Plaintiffs' copyrights, but not Plaintiffs' trademarks, particularly where Google's own ads feature images of the textbook covers that display these trademarks.  Compl. ¶¶ 51, 89.  Further, Google has been involved in numerous discussions with Plaintiffs throughout Plaintiffs' cases against pirates, even receiving injunctions "which made clear that the pirates were not authorized to . . . use the Trademark Plaintiffs' trademarks for any purposes . . . ."  *Id.* ¶¶ 114-119.  Thus, while Google's knowledge is not relevant to its motion to dismiss, Plaintiffs have pled such knowledge in any event.

### III.    Plaintiffs have stated a deceptive practices claim under New York law.

For years, Google has refused to create Shopping Ads for standalone ebooks from legitimate publishers, but *has* created such ads for pirates, all while claiming it bans ebook ads from all sellers.  Compl. ¶¶ 64-65, 68.  Google's false statement and confounding practice of hiding from consumers the legitimate segment of the ebook market deceives both textbook buyers and Shopping Ads purchasers who use Shopping Ads to sell their textbooks.  Plaintiffs thus bring a claim for deceptive practices under N.Y. General Business Law section 349.  Google argues that this claim is preempted, and that the Amended Complaint fails to state a claim.  Google is wrong on both issues.

#### A.    Federal copyright law does not preempt Plaintiffs' claim.

Federal copyright law does not preempt Plaintiffs' section 349 claim because the claim requires the additional element of deception.  The Second Circuit has explained that the Act does not preempt a state-law claim where the state-law claim requires an extra element that the

Copyright Act does not. *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 430 (2d Cir. 2012) ("[I]f an extra element is required instead of or in addition to the acts of [infringement] in order to constitute a state-created cause of action, there is no preemption."). A deceptive-practices claim comprises three elements: (1) consumer-oriented conduct that is (2) materially misleading, and that (3) injured the plaintiff. *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 102 A.D.3d 5, 11 (N.Y. 2012). Neither of these first two elements are elements of direct or secondary copyright infringement. Accordingly, the Copyright Act does not preempt Plaintiffs' claim. Indeed, the Second Circuit has held that section 349's requirement for deceptive conduct "constitutes an extra element not required in a copyright infringement claim." *Samara Bros. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir. 1998), *rev'd on other grounds,* 529 U.S. 205 (2000); *see also U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 174 (S.D.N.Y. 2001) (no preemption when plaintiff alleged the "extra element" of intentional deception under section 349).

Google argues that preemption is appropriate because one of the ways Plaintiffs allege that consumers are deceived is that they are tricked into committing copyright infringement. Mot. 19. But that trickery is an act of deception because Google induces users to commit *unknowing* infringement. Compl. ¶ 149. This "extra element" of deception is "not required in a copyright claim." *Samara Bros.*, 165 F.3d at 131. And Plaintiffs' section 349 claim does not depend on this specific form of deception in any event. Plaintiffs allege other ways in which Google deceives consumers: Google prevents consumers from accurately evaluating the textbook market and incentivizes them to purchase inferior versions of ebooks, and Google further deceives a separate group of ad-buying consumers. Compl. ¶¶ 149-50. Thus, the Copyright Act does not preempt Plaintiffs' claim.

B.      **Federal trademark law does not preempt Plaintiffs' claim.**

As to the Lanham Act, section 349 claims are not subject to preemption where, as here, the statute and the Lanham Act "each protect different rights." *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 96 (2d Cir. 1993); *Mony Life Ins. Co. v. Monie Fashions, Inc.*, No. 03-cv-9604, 2004 WL 875929, at *3 (S.D.N.Y. Apr. 22, 2004). Plaintiffs' claim meets this standard. Plaintiffs' section 349 claim seeks to protect consumers' rights not to be deceived and Plaintiffs' rights not to be harmed by such deception. *See* Compl. ¶¶ 149-50. Plaintiffs' trademark claim seeks to protect the goodwill of Plaintiffs' trademarks, including the diminution of the marks by their association with poor-quality infringing products. *See id.* ¶ 145. These are different rights.

Additionally, Plaintiffs' section 349 claim is based on conduct that is distinct from Plaintiffs' trademark claim. Plaintiffs' trademark claim seeks to hold Google liable for advertising infringing products. The deceptive practices claim, in contrast, seeks to hold Google liable not for infringing but for deception, i.e., for advertising products from pirates but not legitimate sellers. Nothing about Plaintiffs' trademark claim speaks to Google's decision to make false statements and exclude legitimate publishers from advertising ebooks. While Google's conduct is particularly egregious because it allows only infringers to advertise standalone ebooks, this claim does not depend on infringement.

Google argues that a section 349 claim requires allegations of "specific and substantial injury to the public interest *over and above* the ordinary trademark infringement" and that Plaintiffs fail to make such allegations. Mot. 20 (quoting *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185 (S.D.N.Y. 2022)). But, unlike in *Jackpocket*, Plaintiffs do allege deceptive acts that are aimed at consumers. Compl. ¶¶ 149-50. And Plaintiffs allege harm distinct from the injuries caused by the trademark infringement, including that textbook consumers cannot make an informed purchasing decision and are unwittingly committing copyright infringement, and that

Shopping Ads consumers are harmed when they cannot advertise standalone ebooks using Shopping Ads while pirate competitors can. *Id.* None of these injuries sound in either copyright or trademark. Plaintiffs' section 349 claim is not preempted.[5]

**C.    Plaintiffs' allegations state a section 349 claim.**

Plaintiffs adequately allege the three elements of a section 349 claim: "'that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *N. State Autobahn, Inc.*, 102 A.D.3d at 11 (quoting *City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009)).[6] First, Google's practice is directed at two groups of consumers: purchasers of textbooks, and purchasers (or would-be purchasers) of Shopping Ads who wish to use Google's platform to advertise the textbooks they sell. Compl. ¶¶ 149-50. Second, Google's practice is deceptive. No textbook consumer expects Google to advertise only a small portion of the textbook market, to flood the market with advertisements for pirated works, or to direct her to a pirated copy of a work. Likewise, no purchaser of Shopping Ads expects Google to advertise standalone ebooks for pirates but not for legitimate sellers, especially considering Google's statement that it does not allow Shopping Ads for *any* ebooks. Third, Google's practice harms Plaintiffs by barring them from advertising ebooks. Compl. ¶ 150. This alone is sufficient, as harm under section 349 need not be pecuniary. *Oswego Laborers' Loc. 214 Pension v. Marine Midland Bank, N.A.*, 647 N.E.2d 741,

---

[5] Google points out that paragraph 8 of the Amended Complaint alleges the same injury as the trademark claim. Mot. 19. But that paragraph alleges injury related to Google's Lanham Act violations; the next paragraph describes the harm from Google's deceptive trade practice.

[6] While the Court should deny Google's motion in full, if the Court does dismiss any claim, the dismissal should be without prejudice. "[E]ven in dismissing a complaint that states no claim on which relief can be granted, the court should normally give the plaintiff at least one opportunity to amend the complaint." *Wiggins v. Weicker*, 104 F.3d 351 (Table) (2d Cir. 1996).

745 (N.Y. 1995). But Google's practice also diverts sales from Plaintiffs to Pirate Sites and exposes consumers to inferior versions of Plaintiffs' books. Compl. ¶ 150.

> 1. _Google's deceptive practices are directed at textbook consumers._

Google first argues that its conduct does not deceive textbook purchasers because, even if those consumers received an inferior book, they also paid a lower price for it, and so "'received the benefit of the bargain despite the alleged misrepresentation.'" Mot. 20-21 (quoting _Colpitts v. Blue Diamond Growers_, 527 F. Supp. 3d 562, 576 (S.D.N.Y. 2021)). Google's analysis fails on at least two grounds.

First, Google confuses the requirement that the deceptive practice be _directed_ at _consumers_ with the requirement that the deception _injures_ the _plaintiff_. _Martin v. New Am. Cinema Grp, Inc._, No. 1:22-cv-05982, 2023 WL 2024672, at *7 (S.D.N.Y. Feb. 15, 2023). Plaintiffs need not show that textbook buying consumers were injured, only that consumers were deceived and that _Plaintiffs_ were injured. _N. State Autobahn_, 102 A.D.3d at 11-21 (section 349 claim not dismissed where "defendants engaged in deceptive conduct which misled customers of the plaintiffs"). Google's reliance on _Colpitts_ thus is misplaced. There, the plaintiff was also a consumer, and the language Google quotes concerns the requirement that the plaintiff be injured, not the element that a consumer be deceived. 527 F. Supp. 3d at 576-78. Moreover, Google concedes, as it must, that a business can bring a section 349 claim when another business deceives the public. _See_ Mot. 22-23; _N. State Autobahn_, 102 A.D.3d at 11-21 (plaintiff repair shops brought section 349 claim for deceptive acts of insurance company aimed at consumers); _Securitron Magnalock Corp. v. Schnabolk_, 65 F.3d 256, 264-65 (2d Cir. 1995) (plaintiff security company brought Section 349 claim for deceptive acts of competitor aimed at consumers). _See also_ N.Y. GEN. BUS. LAW § 349(h) (creating a cause of action for "any person who has been injured by reason of any violation of this section."); _Casper Sleep, Inc. v. Mitcham_, No. 16-cv-3224, 2016 WL 7188788, at

*3 (S.D.N.Y. Nov. 17, 2016) ("it is well established that non-consumers may redress their injuries through § 349 claims.").

Moreover, whether a given consumer paid a fair price for the product she received is a clear question of fact not suitable for resolution on a motion to dismiss. *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46 (2d Cir. 2022) ("[f]act-specific questions cannot be resolved on the pleadings.") (internal quotation marks omitted). For instance, answering this question would require comparing prices paid to the books provided, none of which the Amended Complaint contains. Plaintiffs have alleged that consumers were deceived when they believed they were buying a textbook of publisher-quality and instead received a book of inferior quality. Compl. ¶ 149. This is sufficient at the pleading stage. And in any case, the Amended Complaint alleges that textbook buyers are deceived in two other ways: by Google's hiding a whole category of legitimate textbooks and by causing textbook purchasers unwittingly to commit copyright infringement. *Id.* ¶ 68, 148-149.

2. *Google's deceptive practices are directed at Shopping Ads consumers.*

Plaintiffs likewise have stated a claim of deceptive practices with respect to a second group of consumers: New York textbook sellers who purchase (or wish to purchase) Shopping Ads. Compl. ¶ 150.

Google first argues that Plaintiffs have pled that this group of consumers was *harmed*, but not that this group was *deceived*. Mot. 22-23. While Google's conduct certainly is harmful, it is also deceptive. Google's stated policy is to ban ads for *all* standalone ebooks. Compl. ¶ 68. But in fact, Google allows such ads from pirates while rejecting them from legitimate sellers. *Id.* ¶ 150. No reasonable textbook seller purchasing Shopping Ads "would expect that," despite its stated policy, "Google would allow certain ads from pirates while disallowing those same ads from legitimate sellers." *Id.* This is certainly deceptive.

25

Google next argues that textbook sellers who purchase Shopping Ads do not qualify as a consumer group under section 349. But the textbook sellers that advertise on Google Shopping are consumers of Google's advertising product. Accordingly, these consumers are a segment of the consumer public such that allegations of deceptive acts directed at them are sufficient to support a section 349 claim. Indeed, "[s]ection 349 governs consumer-oriented conduct and, on its face, applies to virtually all economic activity." *N. State Autobahn*, 102 A.D.3d at 11 (internal quotation marks omitted). Here, "the acts [plaintiffs] complain of are consumer-oriented in the sense that they potentially affect similarly situated consumers." *Oswego*, 647 N.E.2d at 745. In *Oswego Laborers*, plaintiff non-profit groups alleged that a defendant bank deceptively withheld interest payments from plaintiffs' accounts. *Id.* at 743-44. The court found that, though the bank's deceptive conduct was directed only at non-profit groups, it was consumer-facing. *Id.* at 745. Similarly, here, Google's practice deceives not just Plaintiffs but all those selling textbooks (whether physical books, used books, or ebooks) in New York who advertise on Google's platform. Compl. ¶ 150.[7]  *See also id.* ¶ 93 (Plaintiffs' authorized distributors also advertise textbooks on Google Shopping).

Defendant cites *Martin* to support its argument that deceptive acts directed at textbook sellers who purchase Google's advertising product are not directed at consumers under section 349. 2023 WL 2024672, at *7-8 Mot. 23. But there, a filmmaker sued a non-profit that maintains a collection of films, including the plaintiff's, alleging that the non-profit's deceptive acts were (1)

---

[7] Defendant relies on *SmileDirectClub, LLC v. Jacqueline I. Fulop, D.M.D., P.C.*, No. 19-cv-9582, 2020 WL 1322838 (S.D.N.Y. Mar. 20, 2020), *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404 (S.D.N.Y. 2013), and *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269 (S.D.N.Y. 2003) to support its argument that Plaintiffs failed to allege consumer-directed conduct. Mot. 22-23. But in all of those cases, plaintiffs alleged only harm to themselves, rather than consumer-directed conduct. Here, Plaintiffs allege deceptive conduct directed at two groups of consumers.

making a digital copy of her film when it was not authorized to do so, and (2) withholding royalty payments for nonpayment of dues. *Martin*, 2023 WL 2024672, at *1-2. This Court dismissed the section 349 claim when the alleged deceptive acts were not "geared to the public at large" because the dispute was actually about "the terms of the agreements that were made between individual members [of the non-profit] and Defendants." *Id.* at *8. Here, none of Plaintiffs' allegations is premised on agreements between Plaintiffs and Defendant; instead, they are premised on Defendant's deceptive statements and acts directed in part at consumers of Defendant's advertising services. Compl. ¶ 150.

Plaintiffs thus have alleged deceptive conduct directed at two groups of consumers (textbook buyers and Shopping Ads buyers), either of which are independently sufficient to state a claim under section 349.

## **CONCLUSION**

This Court should deny Google's motion to dismiss.

Dated:  October 30, 2024                    Respectfully submitted,

                                      /s/ Michele H. Murphy
                                    Matthew J. Oppenheim
                                    Michele H. Murphy (*pro hac vice*)
                                    Jeff Kane (*pro hac vice*)
                                    Kevin P. Lindsey
                                    Uriel Lee (*pro hac vice* forthcoming)

                                    OPPENHEIM + ZEBRAK, LLP
                                    4530 Wisconsin Avenue NW, 5th Floor
                                    Washington, DC 20016
                                    202-480-2999 telephone
                                    866-766-1678 fax
                                    matt@oandzlaw.com
                                    michele@oandzlaw.com
                                    jkane@oandzlaw.com
                                    klindsey@oandzlaw.com
                                    ulee@oandzlaw.com

                                    *Counsel for Plaintiffs*

## <u>CERTIFICATION OF COMPLIANCE WITH<br>WORD LIMIT</u>

The instant brief complies with the word limit in Rule 3(C) of this Court's Individual Rules of Practice in Civil Cases.  According to the word processing system used to prepare it, the brief is 8,749 words in length, excluding the cover page, table of contents, table of authorities, signature block, and this Certification.

/s/ Michele H. Murphy<br>
Michele H. Murphy
