# EXHIBIT A

2025 WL 716678
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

DANIEL ACKERMAN, Plaintiff,
v.
NOAH PINK; APPLE INC.; ACCESS INDUSTRIES, INC.; A.I. FILM PRODUCTION LIMITED; MARV STUDIOS LTD.; MAYA ROGERS; FB COMMISSIONING LTD.; and THE TETRIS COMPANY, Defendants.

23 Civ. 6952 (KPF)
|
Filed 03/06/2025

### OPINION AND ORDER

KATHERINE POLK FAILLA United States District Judge

**\*1** Plaintiff Daniel Ackerman ("Plaintiff") is the author and copyright holder of the non-fiction book, *The Tetris Effect: The Game That Hypnotized The World* (the "Book"). Plaintiff filed the instant action against Noah Pink, Apple Inc., Access Industries, Inc., AI Productions Ltd., Marv Studios Ltd., Maya Rogers, FB Commissioning Ltd., and The Tetris Company (collectively, "Defendants"), alleging that Defendants used Plaintiff's Book — without his knowledge, authorization, or consent — to create the film *Tetris* (the "Film"). Plaintiff brings claims for (i) copyright infringement against all Defendants; (ii) unfair competition against Maya Rogers, The Tetris Company, and Noah Pink; and (iii) tortious interference with business relations against Maya Rogers and The Tetris Company.

Before the Court is Defendants' motion to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth in the remainder of this Opinion, the Court grants Defendants' motion in full.

### BACKGROUND[1]

[1] This Opinion draws its facts from the Amended Complaint ("AC" (Dkt. #43)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See* Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Tal Dickstein ("Dickstein Decl., Ex. [ ]" (Dkt. #47)), namely, a copy of Plaintiff's copyrighted work (Dickstein Decl., Ex. A ("Book")), and Defendants' allegedly infringing work (*id.*, Ex. B ("Film")), which the Court may properly consider on this motion. *See Effie Film, LLC* v. *Pomerance*, 909 F. Supp. 2d 273, 298 (S.D.N.Y. 2012) ("It is well established that courts may take judicial notice of the works at issue in a copyright case.").

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #48); to Plaintiff's memorandum of law in opposition to the motion to dismiss as "Pl. Opp." (Dkt. #55); and to Defendants' reply memorandum of law in further support of the motion to dismiss as "Def. Reply" (Dkt. #57). References to the Film are presented using the convention "[hour]:[minute]:[second]."

### A. Factual Background

#### 1. The Parties

Plaintiff Daniel Ackerman is a technology and video game journalist and the author of the non-fiction Book at issue in this case. (AC ¶¶ 2, 8). Defendants are individuals and companies that contributed to creating and distributing the Film at issue in this case. Defendant Noah Pink, a Canadian citizen, is credited as the screenwriter for the Film. (*Id.* ¶¶ 9-10). Defendant Apple Inc., a Delaware corporation, is the distributor and platform for the Film, which is currently available on Apple TV+. (*Id.* ¶ 11). Defendant Access Industries, Inc., a New York corporation, is a producer of the Film. (*Id.* ¶ 12). Defendant A.I. Film Production Limited (improperly named in this lawsuit as AI Productions Ltd.), a subsidiary of Access Industries, Inc., is a producer of the Film. (*Id.* ¶ 13; *see* Def. Br. 1). Defendant Marv Studios Ltd., an English private limited company, is also a producer of the Film. (AC ¶ 14). Likewise, Defendant FB Commissioning Ltd., an English private limited company, is a producer of the Film. (*Id.* ¶ 15). Defendant The Tetris Company, a Nevada corporation, is the manager and licensor of the *Tetris* brand to third parties. (*Id.* ¶ 16). Finally, Defendant Maya Rogers, a resident of Hawaii and Nevada, is the CEO of The Tetris Company, and an Executive Producer of the Film. (*Id.* ¶ 17).

### 2. Creation of the Book and the Film

 **\*2**  The allegations in the Amended Complaint construct a timeline for the respective creations of the Book and the Film. According to Plaintiff, he began the creative process for his Book between March and April 2014. (AC ¶ 18). He emailed his literary agent, Kristen Neuhaus, a list of non-fiction book ideas, including an idea for a "book on *Tetris* and its association to the Soviet Union and media baron Robert Maxwell." (*Id.* ¶ 19). Throughout April and May 2014, Plaintiff created a "list of the main historical figures [he] would highlight in his book on *Tetris*, and a roadmap as to how numerous characters and events ... would be portrayed in the book," and he drafted an overview, chapter outline, and book proposal that "specifically told the *Tetris* story based on a Cold War thriller with a political intrigue angle." (*Id.* ¶¶ 22-28). In October 2014, trade magazine *Publisher's Marketplace* ran a "blurb" of Plaintiff's book, including its title and a brief synopsis. (*Id.* ¶ 34). By February 2015, Plaintiff had arranged interviews with "some of the key players and characters of the *Tetris* story," including Alexey Leonidovich Pajitnov, who created *Tetris*; Henk Rogers, who secured the rights to distribute *Tetris* for home consoles and handheld devices from the Soviet Union; and Defendant Maya Rogers, Henk's daughter and current CEO of The Tetris Company, which was founded by Henk and Pajitnov. (*Id.* ¶ 35; Book 215-28, 241-42). Plaintiff conducted most of those interviews from April to August 2015. (AC ¶ 36). As part of those meetings, on April 14, 2015, Plaintiff held a conference call with Sean Maggard (who handled public relations for The Tetris Company through public relations company Zebra PR) and Maya Rogers. (*Id.* ¶¶ 35-36, 39).

Plaintiff completed the first draft of the Book in August 2015. (AC ¶ 38). In July 2016, Plaintiff's representatives sent Zebra PR a pre-publication copy of the Book. (*Id.* ¶ 39). Plaintiff alleges that Zebra PR, in turn, provided the pre-publication copy to The Tetris Company and Maya Rogers. (*Id.*). As a result of this series of events, Defendants had knowledge of the Book beginning in 2014 (*id.* ¶ 56), access to a pre-publication copy by July 2016 (*id.* ¶ 39), and knowledge of the Book's publication on September 6, 2016, which was many years before the Film's 2023 premiere (*id.* ¶¶ 52, 56).

On September 1, 2016, The Tetris Company sent a cease-and-desist letter to Plaintiff's agent regarding Plaintiff's pursuit of film and television opportunities for his Book. (AC ¶ 42; Dickstein Decl., Ex. C (the "Cease-and-Desist Letter")). The Cease-and-Desist Letter recites that: (i) The Tetris Company "controls all rights" in the video game *Tetris*; (ii) Pajitnov and Henk Rogers "did not at any time accord [Plaintiff] any right to depict the Book, their life stories, or any of [The Tetris Company-]owned trademarks, copyrights and other intellectual property in connection with any audiovisual works"; (iii) The Tetris Company "has no interest in pursuing any motion picture/television project based on the Book"; and (iv) to the contrary, any such project "would directly conflict with other [The Tetris Company-]sanctioned audiovisual projects, including a project involving the life stories of Pajitnov and Rogers that [was then] under development." (Cease-and-Desist Letter). The letter requested that Plaintiff therefore "cease and desist from any further development or shopping of any audiovisual project based upon the Book." (*Id.*). As a result of the letter, Plaintiff's agent withdrew from pursuing film and television opportunities for Plaintiff. (AC ¶ 43). Further, film and television producers that had shown interest in optioning Plaintiff's Book for a film or television project would not do so unless The Tetris Company would license its IP for the project. (*Id.* ¶ 45). According to Plaintiff, Maya Rogers directed "[T]he Tetris Company [to] refuse[ ] to license any of the *Tetris* intellectual property, such as its name and image, for any motion picture or television project based on [Plaintiff's Book]." (*Id.* ¶¶ 41, 46).

Not only did Defendants prevent Plaintiff from developing his Book into a film; according to Plaintiff, they copied from his Book to produce their own film. In particular, Plaintiff alleges that Maya Rogers, together with Defendant Pink, used the manuscript of Plaintiff's Book to create a screenplay and ultimately turn the Book into a Film, without Plaintiff's knowledge or consent and without any optioning or licensing rights. (AC ¶¶ 39-40, 47). After Plaintiff viewed the trailer for the Film on or about March 23, 2023, Apple and the other Defendants were alerted that there was a "substantial similarity" between Plaintiff's Book and the Film, and in his own cease-and-desist letter Plaintiff demanded that the Film not be broadcast until legal concerns were addressed. (*Id.* ¶ 57). Nevertheless, the Film premiered on March 31, 2023, on Apple TV. (*Id.* ¶ 58).

### 3. The Copyrighted Work: Plaintiff's *The Tetris Effect*
 **\*3**  The copyrighted work at issue in this case is Plaintiff's Book. Plaintiff registered the Book with the United States Copyright Office on September 26, 2016. (AC ¶ 65; Dkt. #1-1).

The 264-page Book is about *Tetris*, a video game created by Pajitnov, a Soviet computer researcher and programmer who was working at the Russian Academy of Sciences (the "RAS"). (*See* Book 30). The Book explains that Pajitnov, after years at the RAS, was able to obtain regular access to his own Electronica 60 computer, a system that was dated at the time but still allowed him to experiment. (*Id.* at 30-31). Pajitnov was "vaguely aware of the growing phenomenon of video games," and thought that he could somehow use computers as a tool to create new puzzles like the ones he enjoyed as a child. (*Id.*). In search of inspiration, he walked the aisles of a famous toy store in Moscow and was drawn to something that was familiar to him: a set of pentomino puzzle pieces. (*Id.* at 32). Over the course of six days, using the alphanumeric keys on his computer keyboard to create makeshift puzzle pieces that he called "Tetrominoes," he created the first version of *Tetris*. (*Id.* at 33).

But that is not where Plaintiff's Book begins. Instead, the Book throws the reader into the February 21, 1989 unauthorized business trip of Henk Rogers, a Dutch video game designer and entrepreneur who was "one of three competing Westerners descending on Moscow nearly simultaneously" in pursuit of "the greatest cultural export in the history of the USSR" — the government-controlled technology, *Tetris*. (Book 3-4). In the first chapter, Plaintiff also introduces the two other competitors: Kevin Maxwell, "the privileged son of a hard-charging UK media mogul[, Robert Maxwell,]" and Robert Stein, "a self-made software magnate with a street hustler's flair." (*Id.* at 6). Setting the stage for this three-way race, the Book informs the reader that the Westerners were travelling "behind the feared Iron Curtain" at a time when "[s]ecret police ears were still everywhere," but foreign money was gaining increased influence. (*Id.* at 4).

The Book tells the story of how the three Westerners were leveraged against each other by Electronorgtechnica ("ELORG"), the state-owned organization controlling Soviet computer software and hardware, and its then-vice chairman, Evgeni Nikolaevich Belikov, in the fierce negotiations for the rights to different versions of *Tetris*, namely, computer, home console, arcade, and handheld rights. (*See* Book 3-12, 129-35, 177-235). But it does not do so in a linear fashion. The narrative jumps around in time, conveying in detail the backgrounds of the individuals and companies that came to be involved in the race for *Tetris*, including Alexey Pajitnov (*see id.* at 13-20, 29-36), Henk Rogers (*see id.* at 21-28, 37-51), Robert Stein (*see id.* at 91-94), Robert Maxwell (*see id.* at 101-10), and Nintendo's Hiroshi Yamauchi, Minoru Arakawa, and Howard Lincoln (*see id.* at 167-75).

With particular respect to Rogers's background, the Book describes his early life, his decision to move to Japan, and his development of the role-playing game, *The Black Onyx*, which became the best-selling computer game in Japan in 1984. (*See* Book 21-28, 37-51). In other chapters, the Book explains how *Tetris* spread around the world *prior* to the three-way race for licensing rights in 1989, largely because Stein, the first person who corresponded with the Soviet Union to try to monetize *Tetris*, had liberally construed the rights he first negotiated from the Soviet Union in his favor and repeatedly acted without prior authorization. (*See id.* 89-99, 109-28, 131-47). In another chapter, the Book provides background on the rivalry between Atari Games and Nintendo, and Nintendo's success with games such as *Mario* and *Donkey Kong*. (*See id.* 167-75, 201-04). Along with that side-story, the Book covers Nintendo's ultra-secret development of the Game Boy — a new kind of handheld gaming console — and shows how the Game Boy became intertwined with *Tetris*. (*Id.* at 167-75). Arakawa, the president of Nintendo of America, showed Rogers a Game Boy prototype. (*Id.* at 168, 170). Rogers pitched the idea that Nintendo should sell *Tetris* in a package with the Game Boy because "mothers, fathers, brothers, sisters," rather than just adolescent and teenage boys, would then pick up the handheld console. (*Id.* at 170-71). But that meant that Rogers would need to acquire the *Tetris* handheld rights on behalf of Nintendo, while others like Maxwell and Stein were also seeking legitimate contracts with ELORG for various *Tetris* rights.

**\*4** Separately, in "bonus" chapters, placed at the end of each of the three parts of the Book, the Book provides information about playing *Tetris* and why it is so addictive to players (s*ee* Book 73-85); the programming behind *Tetris* and other iconic video games (*see id.* at 149-59); and academic and medical research on *Tetris* (*see id.* at 229-35). In a similar vein, small, in-line gray boxes with facts about *Tetris* are scattered throughout the Book. (*See, e.g.*, *id.* at 173 (stating that "[t]he Nintendo World store in New York has on display a Game Boy handheld that was badly burned in a 1990s Gulf War bombing" that "is still powered on and playing *Tetris*")).

As noted, the primary narrative of the Book focuses on how the rights to *Tetris* came to be officially licensed from the Soviet Union during the Cold War and disseminated throughout the world. But it also bounces through time, telling the stories of those who drove the development of video

games in the 1970s and 1980s and the technology available at the time; providing information about *Tetris* gameplay, its effects on users, and its potential medical uses in bonus chapters; and offering an array of *Tetris* facts.

### 4. The Allegedly Infringing Work: Defendants' *Tetris*

The allegedly infringing work at issue in this case is Defendants' Film. The nearly-two-hour motion picture opens with the words "THIS IS BASED ON A TRUE STORY," written in a pixelated font reminiscent of 1980s video games. (Film 0:00:43). The true story is that of Henk Rogers's pursuit of *Tetris*.

The opening scene of the Film depicts Rogers at the Consumer Electronics Show ("CES") in Las Vegas, selling the rights to the video game *Go*. (*See* Film 0:00:53-0:02:06). Rogers's character narrates the scene, explaining that "*Go* didn't go as planned," but that its failure paved the way to the "best thing to ever happen to us" — *Tetris*. (*See id.* at 0:01:29-0:01:46). The next scene reveals that Rogers is not simply narrating a story, but rather is explaining what happened at CES to a bank manager. (*See id.* at 0:02:06). He says that he tried *Tetris* at CES and begins explaining how the game works. (*See id.* at 0:02:06-0:02:19). Rogers then informs the bank manager that, after trying *Tetris*, he licensed the rights to the game in Japan for PC, game consoles, and arcade. (*See id.* at 0:03:40-0:04:01). Indeed, he assures the bank manager that this was a great investment because *Tetris* — "the perfect game," as he calls it — is already a hit in Russia. (*See id.* at 0:03:24-0:03:26, 0:04:04-0:04:09). He delves into its creation by Pajitnov; its growing popularity in Russia, where people were already exchanging floppy disks with the game on them; and Stein's efforts to monetize the game by corresponding with the Soviet Union and selling the distribution rights to the Maxwells. (*See id.* at 0:04:21-0:08:06). Rogers then explains that the day before he came to the bank, he went to Nintendo, where he snuck in to meet with CEO Yamauchi and ultimately declined an offer to sell the rights he had licensed at CES. (*See id.* at 0:08:12-0:10:00).

Rogers asks the bank manager for an additional loan of $3 million to create Nintendo cartridges and arcade machines. (Film 0:11:14-0:11:38). After literally betting his house on the success of the game, explaining the deal to his wife, and showing the game to his children (including Maya Rogers), Rogers is told by Kevin Maxwell that the arcade rights Rogers licensed have been sold to another company operating in Japan. (*See id.* at 0:11:55-0:13:25, 0:15:35-0:16:41). These events are all narrated by Rogers's character and depicted on screen, as the Film moves back and forth in time between the conversation at the bank and the events leading up to it.

*5 The Film also depicts the moment Nintendo revealed the Game Boy to Rogers (*see* Film 0:18:57-0:22:05), as well as Rogers's subsequent attempt to purchase the rights to *Tetris* for handheld devices from Stein, an attempt that was thwarted when it is revealed that Stein plans to cut out Rogers and sell the handheld rights to Atari, Nintendo's rival (*see id.* at 0:22:12-0:28:05), all of which lead to Rogers's decision to go to Moscow on a tourist visa to attempt to get the licensing rights to *Tetris* for handheld devices. (*See id.* at 0:28:06-0:28:41).

The bulk of the Film is dedicated to Rogers's trips to Moscow, including the tumultuous negotiations at ELORG among Belikov, Rogers, Stein, and Kevin Maxwell (*see, e.g.,* Film 0:28:45-0:47:27), and the friendship that Rogers develops with Pajitnov (*see, e.g., id.* at 0:52:37-1:00:46). In addition to portraying those real-life events, the Film also includes a sub-plot involving KGB agents chasing down Rogers, including fictional agent Valentin Trifonov and Rogers's translator, who tries to ensnare Rogers in a "honeypot" scheme. (*See, e.g., id.* at 1:02:37-1:03:40). [2] This sub-plot (spoiler alert) culminates in a car chase through Moscow, with the Film's heroes (Rogers and his backers at Nintendo) getting away with the prize — the handheld, console, and arcade rights to *Tetris*. (*See id.* at 1:39:10-1:47:16).

[2] A "honeypot" or "honey trap" scheme in this context is one in which an individual feigns interest in the target to induce the target to enter into a relationship, in order to obtain information from or influence over the target. *See generally* Rochelle Cooper Dreyfuss & Orly Lobel, *[Economic Espionage as Reality or Rhetoric: Equating Trade Secrecy with National Security](https://...)*, [20 LEWIS & CLARK L. REV. 419, 437 & n.98 (2016)](https://...).

The Film ends with Rogers's reunion with his family; the release of Game Boy in Japan; and Pajitnov's eventual relocation to the United States with his family. (*See* Film 1:47:27-1:51:10). Several "where are they now"-style screens explain that Rogers and Pajitnov went on to found The Tetris Company, of which Maya Rogers later became CEO; Stein continued to license games but never forgot the loss of *Tetris*; Robert Maxwell died under mysterious circumstances

after it was discovered that he had stolen millions from pension funds; and Kevin Maxwell was arrested, declared bankruptcy, and was ultimately acquitted of fraud charges. (*See id.* at 1:51:11-1:51:50). A coda depicts *Tetris* being played, and the fact that "[w]ith over half a billion copies sold, [*Tetris*] continues to be one of the most popular games of all time." (*Id.* at 01:51:52).

**B. Procedural Background**
Plaintiff initiated this action by filing the original complaint on August 7, 2023. (Dkt. #1). That complaint brought claims for copyright infringement, unfair competition, and tortious interference with business relations. It included a so-called "sampling" of "glaring similarities" between the Book and the Film. (*Id.* at 10-14). On December 12, 2023, Defendants requested a pre-motion conference regarding their anticipated motion to dismiss the original complaint, arguing that (i) Plaintiff's copyright infringement claim failed as a matter of law; (ii) his unfair competition claim was preempted by the Copyright Act and failed to state a claim; and (iii) his tortious interference claim was barred by the statute of limitations and failed to state a claim. (Dkt. #30). Plaintiff opposed Defendants' request to file a motion to dismiss. (Dkt. #36).

On January 10, 2024, the Court held a pre-motion conference and ordered the parties to submit a letter informing the Court whether Plaintiff would amend the complaint, and if so, proposing a schedule for the filing of an amended complaint and Defendants' anticipated motion to dismiss. (*See* January 10, 2024 Minute Entry). On January 19, 2024, Plaintiff indicated that he would amend his complaint, after which Defendants would file their motion to dismiss. (Dkt. #40). The Court endorsed Plaintiff's letter and set the briefing schedule for Defendants' motion to dismiss. (Dkt. #41).

**\*6** On February 26, 2024, Plaintiff filed the Amended Complaint, which alleged the same three claims, but included what was styled by Plaintiff as an "exhaustive analysis and examination of the film and book" that "outlines the substantial similarities between the two works." (Dkt. #43). On March 29, 2024, Defendants filed their motion to dismiss the Amended Complaint. (Dkt. #46). On May 17, 2024, Plaintiff filed his opposition to the motion to dismiss. (Dkt. #55). And on June 14, 2024, Defendants filed their reply in further support of their motion to dismiss. (Dkt. #57).

**DISCUSSION**
Plaintiff asserts claims for (i) copyright infringement under the Copyright Act, 17 U.S.C. §§ 106 and 501, against all Defendants; (ii) unfair competition against Defendants Maya Rogers, The Tetris Company, and Noah Pink; and (iii) tortious interference with business relations against Defendants Maya Rogers and The Tetris Company. The Court sets forth the applicable legal standards for a motion to dismiss before assessing each of Plaintiff's claims in turn.

**A. Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**
When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This narrow universe includes "facts stated on the face of the complaint" and "documents appended to the complaint or incorporated in the complaint by reference." *Id.* (internal quotation marks omitted); *accord United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021). In a copyright action, where the disputed works are attached to or incorporated by reference in the complaint, a district court can "consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010); *see also Canal+ Image UK Ltd.* v. *Lutvak*, 773 F. Supp. 2d 419, 427 (S.D.N.Y. 2011) (considering the film and musical at issue in deciding defendants' motion to dismiss even where plaintiff did not attach a copy of the film or musical to its complaint and did not expressly incorporate either work by reference). On this motion, the Court considers the disputed

works that are referenced in and are integral to the Amended Complaint, namely, Plaintiff's Book (Dickstein Decl., Ex. A) and Defendants' Film (*id.*, Ex. B). (*See* AC ¶¶ 1, 2, 52, 59). The Court also considers the Cease-and-Desist Letter sent by counsel to The Tetris Company to Plaintiff, because it is both referred to in and integral to the Amended Complaint. (Dickstein Decl., Ex. C; *see* AC ¶ 42).

**B. Copyright Infringement**

**1. Applicable Law**

**a. Substantial Similarity Analysis**

To state a claim for copyright infringement, "a plaintiff with a valid copyright must demonstrate that: [i] the defendant has actually copied the plaintiff's work; and [ii] the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Peter F. Gaito*, 602 F.3d at 63 (quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999)).[3] As for the first prong, a plaintiff "may prove copying by direct evidence, or by showing that the defendant had access to the plaintiff's work and that the works are similar enough to support an inference that the defendant copied the plaintiff's work." *Hines v. W Chappell Music Corp.*, No. 20 Civ. 3535 (JPO), 2021 WL 2333621, at *2 (S.D.N.Y. June 8, 2021) (quoting *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994)); *accord A&E Television Networks, LLC v. Big Fish Ent., LLC*, No. 22 Civ. 7411 (KPF), 2023 WL 4053871, at *6 (S.D.N.Y. June 16, 2023).

[3] The "idea/expression or fact/expression dichotomy" is the principle that copyright protection applies to expression but does not extend to ideas or facts, because "[t]he primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.' " *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349-50 (1991) (quoting U.S. CONST. art. I, § 8, cl. 8).

*7 When addressing the second prong of the copyright infringement analysis, the Second Circuit has cautioned that "questions of non-infringement have traditionally been reserved for the trier of fact." *Peter F. Gaito*, 602 F.3d at 63. But "where the court has before it all that is necessary to make a comparison of the works in question, it may rule on substantial similarity as a matter of law on a Rule 12(b)(6) motion to dismiss." *King Zak Indus., Inc. v. Toys 4 U USA Corp.*, No. 16 Civ. 9676 (CS), 2017 WL 6210856, at *4 (S.D.N.Y. Dec. 8, 2017) (quoting *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 290-91 (S.D.N.Y. 2012)). That is because, in those circumstances, "only a visual [and aural] comparison of the works," rather than "discovery or fact-finding," is necessary. *Peter F. Gaito*, 602 F.3d at 64; *see also Walkie Check Prods., LLC v. ViacomCBS Inc.*, No. 21 Civ. 1214 (KPF), 2022 WL 2306943, at *6 (S.D.N.Y. June 27, 2022). If the reviewing court "determines that the two works are not substantially similar as a matter of law" based on that comparison — "either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar" — the court "can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not plausibly give rise to an entitlement to relief." *Peter F. Gaito*, 602 F.3d at 63-64 (internal quotation marks omitted).

In the Second Circuit, "[t]he standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.' " *Peter F. Gaito*, 602 F.3d at 66 (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001)). In applying this "ordinary observer test," courts consider whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Id.* (quoting *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995)). But where the works at issue "have both protectible and unprotectible elements, [the court's] analysis must be more discerning" and the court "must attempt to extract the unprotectible elements from [its] consideration and ask whether the protectible elements, standing alone, are substantially similar." *Id.* (internal quotation marks omitted); *accord Lee v. Warner Media, LLC*, No. 23-8067, 2025 WL 516933, at *1-2 (2d Cir. Feb. 18, 2025) (summary order).

At the same time, courts are not "required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable." *Peter F. Gaito*, 602 F.3d at 66. Rather, courts must be "principally guided 'by comparing the contested design's

'total concept and overall feel' with that of the allegedly infringed work.' " *Id.* (quoting *Tufenkian Imp./Exp. Ventures, Inc.* v. *Einstein Moomjy, Inc.*, 338 F.3d 127, 133 (2d Cir. 2003)). That comparison is informed by a court's "good eyes and common sense." *Id.* (quoting *Hamil Am.*, 193 F.3d at 102). Ultimately, the "inquiry necessarily focuses on whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged the elements of his or her work." *Id.* (internal quotation marks omitted).

Finally, " '*scènes à faire*,' which involve 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic' are 'not copyrightable as a matter of law,' " *Effie Film*, 909 F. Supp. 2d at 292 (quoting *Hoehling* v. *Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980)), and therefore do not factor into the substantial similarity analysis. That is because the Second Circuit has recognized that "it is virtually impossible to write about a particular historical era or fictional theme without employing certain 'stock' or standard literary devices." *Hoehling*, 618 F.2d at 979; *see also Walker* v. *Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (finding that "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop," were unprotectable *scènes à faire*).

### b. Historical Works and Works of Historical Fiction

**\*8** "Works of history and historical fiction present unique complexities for substantial similarity analysis." *Effie Film*, 909 F. Supp. 2d at 293. The Second Circuit has previously grappled with those complexities and ruled that historical facts and "interpretation[s] of an historical event ... are not copyrightable as a matter of law." *Hoehling*, 618 F.2d at 978. In *Hoehling*, the Court explained:

> A grant of copyright in a published work secures for its author a limited monopoly over the expression it contains. The copyright provides a financial incentive to those who would add to the corpus of existing knowledge by creating original works. Nevertheless, the protection afforded the copyright holder has never extended to history, be it documented fact or explanatory hypothesis. The rationale for this doctrine is that the cause of knowledge is best served when history is the common property of all, and each generation remains free to draw upon the discoveries and insights of the past. Accordingly, the scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain ... . *[A]bsent wholesale usurpation of another's expression*, claims of copyright infringement where works of history are at issue are rarely successful.

*Id.* at 974 (emphasis added).

As it happens, the claim of copyright infringement in *Hoehling* was unsuccessful. 618 F.2d at 980. The Second Circuit found that "all three authors" — the plaintiff, the author of a book about the Hindenburg (the ill-fated airship constructed in Germany during Hitler's reign), and the defendants, another author and a movie studio — "relate[d] the story of the Hindenburg differently [in each of their works]." *Id.* More pointedly, the Court rejected the plaintiff's claims that specific facts that he had obtained were copied by the defendants, stating that the defendants "*had the right* to avail [themselves] of the facts contained in [plaintiff's] book and to use such information, whether correct or incorrect, in [their] own ... work[s]." *Id.* at 979 (emphasis added) (internal quotation marks omitted). The remainder of the purported similarities were deemed to be "random duplications of phrases and sequences of events." *Id.*

The Second Circuit has since reiterated that where an author's work is "an account of actual events ... proof of infringement [is] more difficult [than in cases involving fiction], because copyright protection in this circuit does not extend to facts or to true events, even if they are discovered through original research." *Walker*, 784 F.2d at 49. "So

long as [subsequent authors do] not appropriate the [prior author's] unique expression of ... facts," they are "free to avail themselves of any facts contained in [the earlier work]." *Id.*

### 2. The Court Dismisses Plaintiff's Copyright Infringement Claim Because There Is No Substantial Similarity Between the Works at Issue

For purposes of this motion, Defendants do not contest that they had access to Plaintiff's Book. (*See* Def. Br. 27 (not disputing Plaintiff's allegation that he voluntarily sent the public relations representative for The Tetris Company a pre-publication copy of the Book)). Rather, they argue that Plaintiff's copyright infringement claim must fail because (i) Plaintiff is seeking to hold Defendants liable for copying facts and events that are unprotectable and (ii) apart from those unprotectable elements, Plaintiff has not identified any substantial similarity between his Book and Defendants' Film. Having conducted a comparison of the full works at issue in this case, the Court concludes, *first*, that the Book contains both unprotectable and protectable elements, and *second*, that Plaintiff's Book and Defendants' Film are not substantially similar. Accordingly, Plaintiff has not plausibly alleged a claim for copyright infringement.

### a. Plaintiff's Book Contains a Mix of Unprotectable and Protectable Elements

**\*9** The Court begins by determining that it must utilize the "more discerning" test in conducting the substantial similarity analysis in this case. Plaintiff describes his Book as "a compelling narrative *non-fiction book* in the style of a Cold War spy thriller," in which he "not only applied the historical record, but also layered [in] his own original research" to tell the story of "*Tetris* and its association to the Soviet Union and media baron Robert Maxwell." (AC ¶¶ 2, 19 (emphasis added)). As a work of non-fiction, the Book necessarily includes unprotectable facts. *See Walker*, 784 F.2d at 49. But even where a work is comprised entirely of unprotectable elements like facts, the "sum total" of the author's "artistic choices ... constitutes a protectable work under copyright law." *Walkie Check Prods.*, 2022 WL 2306943, at \*9 (citing *Yurman*, 262 F.3d at 109 ("Copyright law may protect a combination of elements that are unoriginal in themselves.")). Because Plaintiff's Book is comprised of both unprotectable and protectable elements, the "more discerning" ordinary observer test is the appropriate test to determine whether Defendants' Film is substantially similar to Plaintiff's Book. *See Peter F. Gaito*, 602 F.3d at 66.

### b. There Is No Substantial Similarity Between the Works at Issue as a Matter of Law

Plaintiff's Book and Defendants' Film tell the stories of the same real people and cover, in part, the same time period. Consequently, it is unsurprising that there are similarities between the two works. Indeed, since Plaintiff's Book is a work of non-fiction, Defendants were entitled to use the facts contained in his Book in the making of their Film, so long as they did not copy his unique *expression* of those facts. *See Walker*, 784 F.2d at 49. In conducting the substantial similarity inquiry, the Court must therefore examine whether Defendants misappropriated the way Plaintiff "selected, coordinated, and arranged" the facts in his Book, and "the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *See Effie Film*, 909 F. Supp. 2d at 292 (first quoting *Knitwaves*, 71 F.3d at 1004, then quoting *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)). Under either analysis, the Court finds no substantial similarity.

In arguing that Defendants have infringed his copyright in the Book, Plaintiff provides what he deems to be "an exhaustive analysis and examination of the [F]ilm and [B]ook, which outlines the substantial similarities between the two works." (AC ¶ 59(a)-(mm)). While the Court has carefully reviewed that analysis (along with the works themselves), the Court groups Plaintiff's arguments for ease of analysis, rather than marching seriatim through each of the purported similarities identified by Plaintiff. As explained below, those similarities relate to uncopyrightable material. Further, because the Court's substantial similarity analysis must be "principally guided" by the "total concept and overall feel" of the works as examined by the Court through use of its "good eyes and common sense," *Peter F. Gaito*, 602 F.3d at 66 (internal quotation marks omitted), the Court concludes with a discussion about the overall concept and feel of the works.

### i. Plaintiff's Claims of Similarity

Most of the purported substantial similarities identified by Plaintiff are unprotectable elements because they concern facts, real people, and historical events. (*See, e.g.*, AC ¶ 59(a), (b), (h), (i), (j), (k), (l), (m)). To take one example, Plaintiff argues that the scene in the Film wherein Nintendo's Arakawa introduces Rogers to the Game Boy is substantially

similar to his Book's discussion of the development of the Game Boy and Rogers's exposure to it. (*See id.* ¶ 59(j)). Plaintiff highlights that both works refer to the Game Boy, its revolutionary use of only four standard batteries to provide users with hours of gameplay, and its secret development in Nintendo's lab. (*Id.*; *see* Book 167-75; Film 0:18:57-0:22:05). But Nintendo's development of the Game Boy, and Arakawa's decision to show the Game Boy to Rogers, are facts, as evidenced by Plaintiff's description of those events in his non-fiction Book.

 **\*10**  What is more, the Film does not misappropriate the Book's unique expression of those facts. In the Book, Plaintiff describes the Game Boy as the "secret" of Hiroshi Yamauchi, Nintendo's president, and the "signature creation" of Gunpei Yokoi, and explains that it was being developed in the "depths of Nintendo's oldest idea lab, named R&D1." (Book 167). Plaintiff provides descriptions of Yamauchi and Yokoi, as well as Arakawa, the president of Nintendo of America and Yamauchi's son-in-law, and some of their previous successes, including the *Game & Watch* series, *Donkey Kong*, and the *Mario Bros.* series. (*Id.* at 167-69). The Book goes on to describe that Arakawa, while "[h]osting Rogers in Kyoto ... could not help but offer his friend[, Rogers,] an early look at the Game Boy hardware." (*Id.* at 170). When Rogers saw the Game Boy, "the wheels started turning in his head," because it was unlikely that any competitors had ever considered licensing the rights for *Tetris* for a handheld console like the Game Boy. (*Id.*). In the Book, Rogers pitched *Tetris* to Arakawa and is quoted as saying, "[i]f you want everyone to play, mothers, fathers, brothers, sisters," Nintendo should package *Tetris* with the Game Boy. (*Id.* at 171). Further, the Book discusses how Arakawa was already aware of (and impressed by) *Tetris* when Rogers pitched it for the Game Boy, as Arakawa had seen it months earlier at CES in 1988. (*Id.*). Arakawa had put his "in-house engineers to work producing their own prototype version of *Tetris* to work with the Game Boy hardware" and had begun "forming a plan to find someone outside the company" who could get the handheld rights to *Tetris*. (*Id.* at 174-75). He had also informed Howard Lincoln, Nintendo's counsel, that he planned to ask Rogers "to track down the Russian rights on their behalf." (*Id.* at 175).

By contrast, in the Film, Rogers takes a business trip to Nintendo's offices in Seattle, Washington. (*See* Film 0:19:00). There, Arakawa and Lincoln introduce themselves to Rogers and force him to sign an NDA because they "don't trust [him]." (*Id.* at 0:19:09-0:19:39). Then, Arakawa and Lincoln reveal the Game Boy. (*Id.* at 0:19:45). Rogers asks whether they will package the Game Boy with *Mario* and Arakawa responds, "Yes, it's our best brand." (*Id.* at 0:20:55-0:20:59). Rogers does some quick programming, shows Arakawa and Lincoln *Tetris* on the Game Boy, and tells them, "Gentlemen, if you wanna sell a couple hundred thousand Game Boys to little kids, package them with *Mario*. But if you want to sell millions of Game Boys to absolutely everyone, young and old, around the world, package it with *Tetris*." (*Id.* at 0:21:10-0:22:40). Arakawa and Lincoln look at one another, and then Rogers, and ask him, "[c]an you get us the rights?" (*Id.* at 0:21:57-0:22:04).

While the two works cover the same topic (Nintendo's development of the Game Boy) and the same event (Arakawa's showing Rogers the Game Boy for the first time), the expression of these facts is markedly different in the Book and the Film. The Book provides additional information about the people involved and other games produced by Nintendo, like *Donkey Kong*, which are not discussed or alluded to in the Film. And the Film deviates from the facts presented in the Book by depicting the meeting as having occurred in Seattle, not Kyoto, and making it seem like Rogers introduced Arakawa to *Tetris*, and that the two did not have a preexisting relationship. The Film's portrayal makes Rogers the visionary, playing into its overall narrative that Rogers is the hero, whereas the Book indicates that, with regard to handheld rights for the Game Boy, Arakawa had the master plan to conscript Rogers into acquiring handheld rights on Nintendo's behalf.

Other purported substantial similarities that Plaintiff identifies include the use of Pajitnov's middle name in both the Book and the Film (AC ¶ 59(c)), and the way Robert Stein's character is portrayed (*id.* ¶ 59(g)). But "the prohibition on copyrighting historical facts necessarily extends to control over interpretations of a historical [figure]." 🚩 *Effie Film*, 909 F. Supp. 2d at 310. "The bar for substantial similarity in a character" is especially high "where characters in a disputed work are based on actual historical figures." *Id.* (internal quotation marks omitted). Therefore, the Film's use of Pajitnov's middle name and its accurate-to-real-life portrayal of Stein's appearance do not constitute substantial similarities in the copyright infringement analysis.

Plaintiff attempts to salvage his copyright infringement claim by noting that certain factual events discussed in his Book and portrayed in Defendants' Film were discovered through his original research. (*See e.g.*, AC ¶ 59(a), (j), (ee)).

For example, Plaintiff identifies the section in his Book wherein he describes that Pajitnov invited Rogers to his Moscow apartment after a negotiation session at ELORG, and Pajitnov showed Rogers his original programming work. (AC ¶ 59(ee); Book 185). Plaintiff points out that the Film also depicts the programmers' first meeting and their time together at Pajitnov's apartment. (AC ¶ 59(ee); Film 0:38:25-0:41:08, 0:52:10-0:57:32). In his Amended Complaint, Plaintiff explains that he learned that Rogers was invited to Pajitnov's home through an interview that he conducted with Pajitnov and argues that the Film "uses the scene in a substantially similar wa[y] as depicted in the [B]ook." (AC ¶ 59(ee)). However, the argument fails.

 *11  As previously discussed, factual events are unprotectable elements. That Plaintiff explains how he came to learn of this factual event does not change the analysis. In this Circuit, "true events" are not entitled to copyright protection, "even if they are discovered through original research." See *Walker*, 784 F.2d at 49. Only the expression of a true event is protectable. *See id.* Here, the scene in the Film expresses the factual event differently than in the Book. The Book simply states that Pajitnov and Rogers ended up toasting "their good fortune at meeting each other the traditional Russian way, with vodka." (Book 185). In the Film, Rogers and Pajitnov first spend time together in Pajitnov's apartment, and later drink together at an illegal night club, where they sing and dance to American music and drink with Levi's-jean-wearing Russians who express their desire for freedom. (Film 0:52:10-1:00:43). Whereas the Book expresses the programmers' friendship as being established through Rogers's adoption of a Russian custom, the Film expresses it as a cross-cultural event and extension of American influence in the Soviet Union.

Similarly, Plaintiff claims that the Film's opening scene is substantially similar to Chapter 13 of his Book. (AC ¶ 59(a)). Both the Film and Book portray the Computer Electronics Show in Las Vegas. In the Book, Plaintiff describes a "cacophony of lights and sounds," "[l]ong halls" and "a sea of tents, tables, signs, and booths." (Book 137). Plaintiff claims that "[t]his description of CES from [his Book] was created by [him] for the [B]ook, and is based on his experience from years of going to CES, and what CES was like from [his] own experience and original expression." (AC ¶ 59(a)). Plaintiff highlights that the Film also depicts the "lights and sounds of Las Vegas" and the "interior of the bustling Las Vegas Convention Center during the annual CES." (*Id.*; *see also* Film 0:00:53-0:02:49). But Plaintiff's claim that the Film's CES scene is substantially similar to his Book fails for three reasons. *First*, as with Plaintiff's other claimed similarities, this one arises from a historical fact — CES is an annual show for computer games, and in 1988, *Tetris* was being exhibited there. (*See* Book 137-40). *Second*, the scene in the Film and the chapter in the Book each express the fact differently. In the Book, Rogers is described as being "far from ... knocked out" by his first experience playing *Tetris* at CES. (*Id.* at 139). But, setting to the side his own indifference, Rogers noticed that there was a constant line for the game, and perceived a potential business opportunity there. (*Id.* at 137-40). In contrast, in the Film, Rogers is introduced to the game by his sales representative who has been drawn away from their *Go* sales booth by *Tetris*. (Film 0:01:30-0:02:05). Excited by the game, she urges Rogers to try *Tetris*. Based on that experience at CES, Rogers's character later emphatically describes *Tetris* as "the most beautiful thing [he] had ever seen." (*Id.* at 0:02:50). Both works describe the same factual event (Rogers's trying *Tetris* for the first time), but the Film sets the scene up differently than the Book by utilizing a fictional sales associate character to draw Rogers over to the *Tetris* booth. Further, the Film deviates from Rogers's reported initial reaction, making it seem like Rogers instantly fell in love with the game. *Third*, the "lights and sounds of Las Vegas" are *scènes à faire*; they are stock elements that would typically be used in a work depicting "Sin City."

Finally, as for Plaintiff's claim that the Film is substantially similar to his Book because both employ Cold War themes (*see* AC ¶ 59(n)), the Court finds that the Film's use of Cold War references constitutes unprotectable *scènes à faire*. It would be "virtually impossible" to write or create a film about the monetization of a product coming out of the Soviet Union in the 1980s without including Cold War elements like state surveillance, honeypot schemes, and the like. *See* *Hoehling*, 618 F.2d at 979. Much like the antagonists in the Book and the Film who tried to assert rights over versions of *Tetris* that they did not actually have prior to the ELORG negotiations, Plaintiff is seeking to assert a right to the history of *Tetris*, the real-life people who contributed to its distribution in the West, and its historical association with the Soviet Union and the Cold War, which he cannot do.

### ii. Total Concept and Overall Feel of the Two Works

 *12  Having determined that none of the specific similarities identified by Plaintiff amounts to a substantial similarity between the two works because they concern unprotectable elements, the Court zooms out and more broadly examines

whether there are "similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting" between the works at issue. See *Effie Film, 909 F. Supp. 2d at 292* (internal quotation marks omitted). As discussed, the two works share many of the same characters, plot points, and settings. They both feature Rogers and Pajitnov as major characters and depict the negotiation sessions at ELORG. But the Court finds that the total concept and feel of the works differ substantially.

Plaintiff's work, by its own account, presents "[t]he complex history of *Tetris*" by relying on the historical record and information gleaned from interviews he conducted. (Book 247-49). Told in a third-person narration style, the Book reads like a comprehensive account of the history of the game *Tetris*. The three-way race among Rogers, Stein, and Kevin Maxwell for the rights to license *Tetris* is certainly the overarching story driving the plot forward. That story is presented in a way that is at times suspenseful. But the Book also takes care to provide extensive detail about the real people involved in the race for the rights to *Tetris* and the burgeoning world of videogaming into which *Tetris* was born. Whole chapters are dedicated to providing that background. (*See* Book 13-20 (Chapter 2, describing Pajitnov's background), 21-28 (Chapter 3, describing Rogers's background), 29-36 (Chapter 4, describing how Pajitnov and Rogers each worked to gain greater access to computers throughout their early lives), 37-51 (Chapter 5, describing Rogers's first big gaming success, *The Black Onyx*), 53-71 (Chapter 6, describing Pajitnov's work troubleshooting the early versions of *Tetris*)). The sequence of the Book is therefore sporadic; many of the events do not happen in order. Further, Plaintiff intersperses so-called "Bonus" chapters, which do not advance the story of the race to the Soviet Union for the rights to *Tetris* whatsoever. (*See id.* at 73-85 (Chapter 7, describing the addictive nature of *Tetris*), 149-59 (Chapter 14, discussing *Tetris*'s programming and the mathematics behind it, and comparing *Tetris* to other video games like *Pac-Man*), 229-35 (Chapter 22, discussing the use of *Tetris* as a medical treatment for people with PTSD)). Similarly, the *Tetris* facts interspersed throughout the Book in small gray boxes break up the story and reinforce an informative tone, not unlike a Wikipedia article. (*See, e.g.*, *id.* at 173).

In contrast, the Film is largely confined to the three-way race for the rights to *Tetris*. The tone of the Film is not informative. Rather, it is suspenseful, action-packed, and clearly dramatized. As discussed, the Film begins with Rogers's explanation to a bank manager (a fictional character not mentioned in the Book) of his plan to monetize *Tetris* in Japan. After attending CES and becoming instantly mesmerized by *Tetris*, Rogers thinks he has bought the rights to the game for console and arcade in Japan and is pleading for additional funding to make this venture work. He literally bets his house on it (without first consulting his wife). (*See* Film 0:11:55-0:13:25). The rest of the Film largely proceeds as a linear narrative of the three-way race: Rogers is told by Kevin Maxwell that the arcade rights have been sold to someone else, and then Rogers's offer to buy handheld rights from Stein (in front of Robert Maxwell and Kevin Maxwell) is thwarted, leading Rogers to decide to go to the Soviet Union himself. (*See id.* at 0:15:35-0:28:41). While in the Soviet Union, Rogers is surveilled, threatened, and physically assaulted by members of the KGB. (*See, e.g.*, *id.* at 1:01:32-1:02:06). His translator, a real-life character, is depicted as an undercover member of the KGB, who tries to seduce Rogers to capture a compromising photo of him. (*See id.* at 1:16:40). Back in Japan, Rogers's family is also threatened by members of the KGB. (*See id.* at 1:00:49-1:01:58). As the negotiation sessions at ELORG carry on, Trifonov (a purely fictional character) works in the background to try to steer the *Tetris* rights into the hands of the Maxwell family, because that deal would result in his receiving a large bribe. (*See, e.g.*, *id.* at 0:48:45-0:51:06). The Film culminates in a high-speed car chase through Moscow as Trifonov tries to stop Rogers, Arakawa, and Lincoln from boarding their flight out of the Soviet Union with the worldwide rights to *Tetris* for home consoles and handheld devices. (*See id.* at 1:39:10-1:47:16).

**\*13** Ultimately, the Court finds that Defendants' Film is not substantially similar to Plaintiff's Book and that Plaintiff has failed to allege that Defendants misappropriated the way he selected, coordinated, and arranged the facts in his Book. Where the Book's tone is informative, the Film's is suspenseful and dramatic, at times deviating from the true facts underlying the story and going so far as to invent an entire KGB subplot, which takes up significant screen time, to create that theatrical effect. While the Book jumps through time to provide as much background and context as possible for the people and events it portrays, the Film proceeds largely chronologically. And while the Book breaks up the overarching story to provide general information about the *Tetris* game itself, the Film consistently pushes the three-way-race narrative forward, using KGB threats and violence, car chases, and crescendoing American music to create a fast-paced rendering of the story. Review of both Plaintiff's specific claims of similarity and the full works themselves satisfies this Court that the Film is far from a "wholesale

usurpation of another's expression" that would be actionable in a copyright case involving a historical work and a work of historical fiction. *See Hoehling*, 618 F.2d at 974. Plaintiff's copyright infringement claim is dismissed with prejudice.[4] The Court now turns to Plaintiff's unfair competition and tortious interference claims.

---

[4] The Court has also considered Plaintiff's argument that Defendants' motion to dismiss should be denied because they have not produced the screenplay underlying the Film. (Pl. Opp. 8-10, 16). But such production is not required for the Court to rule as a matter of law on the issue of substantial similarity. In fact, the Second Circuit has stated that "the finally released version of [a] film [is] the best and most relevant evidence on substantial similarity." *Walker* v. *Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir. 1986).

**C. Unfair Competition**

*1. Applicable Law*

"[T]he essence of an unfair competition claim is that the defendant has misappropriated the labors and expenditures of another and has done so in bad faith." *Carson Optical, Inc.* v. *Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 329 (E.D.N.Y. 2014) (alteration in original) (internal quotation marks omitted). But state-law claims are preempted by the Copyright Act when "[i] the particular work to which the state law claim is being applied falls within the type of works protected by the Copyright Act under [17 U.S.C. §§ 102 and 103]," and "[ii] the state law claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." *Nat'l Basketball Ass'n* v. *Motorola, Inc.,* 105 F.3d 841, 848 (2d Cir. 1997) (internal quotation marks omitted). "The first prong of this test is called the 'subject matter requirement,' and the second prong is called the 'general scope requirement.' " *Briarpatch Ltd., L.P.* v. *Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) (quoting *Nat'l Basketball Ass'n,* 105 F.3d at 848).

For a work to meet the subject matter requirement, it "need not consist entirely of copyrightable material ... but instead need only fit into one of the copyrightable categories in a broad sense." *Briarpatch Ltd., L.P.*, 373 F.3d at 305. "The general scope requirement is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Id.* "Even if a claim otherwise satisfies the general scope requirement, a claim is not preempted if it 'include[s] any extra elements that make it qualitatively different from a copyright infringement claim.' " *ML Genius Holdings LLC* v. *Google LLC*, No. 20-3113, 2022 WL 710744, at *3 (2d Cir. Mar. 10, 2022) (summary order) (alteration in original) (quoting *Briarpatch Ltd.*, 373 F.3d at 305). The Second Circuit "take[s] a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim," *Briarpatch Ltd.*, 373 F.3d at 306, and "has broadly precluded unfair competition claims involving misappropriation of a plaintiff's creative works, suggesting as a general position that such claims satisfy the 'general scope' requirement for preemption," *Wnet* v. *Aereo, Inc.*, 871 F. Supp. 2d 281, 292 (S.D.N.Y. 2012).

*2. The Court Dismisses Plaintiff's Unfair Competition Claim Because It Is Preempted by the Copyright Act*

**\*14** Plaintiff claims that Defendants Maya Rogers, The Tetris Company, and Noah Pink "engaged in unfair competition through fraud or bad faith, and misappropriated the labors and expenditures of [Plaintiff] for their own unjust and unlawful gain, and at the expense of [Plaintiff]'s own opportunities." (AC ¶ 84). Further, Defendants Maya Rogers and The Tetris Company are alleged to have "refused to license any *Tetris* IP related to any film or television projects being pursued or related to [Plaintiff's B]ook." (*Id.* ¶ 83).

This claim satisfies the two-prong test for preemption. Plaintiff's Book meets the subject matter requirement because it falls within the type of works protected by the Copyright Act. The general scope requirement is also satisfied, because Plaintiff's unfair competition claim is based on his allegation that Defendants misappropriated his copyrighted work. In *ML Genius Holdings LLC*, the Second Circuit found a similar unfair competition claim preempted. There, the claim was based on an allegation that the defendants had wrongfully copied material from the plaintiff's website. Like the present case, the plaintiff there had also alleged "bad faith," but the Second Circuit found that such allegations did not transform an otherwise equivalent claim. *See ML Genius Holdings LLC*, 2022 WL 710744, at *5. That was because the plaintiff had not alleged that the defendants had misappropriated the fruits of plaintiff's labors through fraud or deception; he had

alleged that they had misappropriated by taking information from plaintiff's public website and later engaged in deceptive behavior. *Id.* The same analysis holds true here. While Plaintiff offers conclusory allegations that Defendants used deception to obtain access to his Book, he also plainly alleges in the Amended Complaint that he voluntarily sent the Book to the PR company for The Tetris Company, and that the Book was released approximately seven years before the Film was released. (AC ¶¶ 39, 52, 56). Accordingly, Plaintiff's unfair competition claim is preempted.

Even if Plaintiff's unfair competition claim were not preempted, it would still be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). "[T]he Court's determination that there is no substantial similarity between the [two works] precludes a finding under New York law ... that the public will be confused as to the identity of the [works], which is necessary for a finding of unfair competition in New York." *Baker* v. *Coates*, No. 22 Civ. 7986 (JPO) (SLC), 2023 WL 6007610, at *22 (S.D.N.Y. July 26, 2023) (internal quotation marks omitted), *report and recommendation adopted*, No. 22 Civ 7986 (JPO), 2023 WL 6289964 (S.D.N.Y. Sept. 27, 2023), *aff'd*, No. 23-7483, 2024 WL 5066467 (2d Cir. Dec. 11, 2024) (summary order). Here the Court has made such a determination. The Court dismisses Plaintiff's unfair competition claim with prejudice.

### D. Tortious Interference with Business Relations

#### 1. Applicable Law

Under New York law, "[t]o prevail on a claim for tortious interference with business relations ... a plaintiff must show that '[i] the plaintiff had business relations with a third party; [ii] the defendant interfered with those business relations; [iii] the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and [iv] the defendant's acts injured the relationship." *16 Casa Duse, LLC* v. *Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quoting *Catskill Dev., L.L.C.* v. *Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)). "Unlike a claim for tortious interference with contract ... a claim for tortious interference with business relations requires a plaintiff to show, as a general rule, that the defendant's conduct ... amount[ed] to a crime or an independent tort." *Id.* at 262 (alteration in original) (internal quotation marks and citation omitted). Finally, "[t]he statute of limitations for tortious interference with business relationships is generally three years." *Gym Door Repairs, Inc.* v. *Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 239 (S.D.N.Y. 2018).

#### 2. The Court Dismisses Plaintiff's Tortious Interference with Business Relations Claim Because It Is Time-Barred

**\*15** Defendants argue that Plaintiff's claim for tortious interference with business relations is time-barred, as Plaintiff alleges that his lawyer withdrew from pursuing film and television opportunities after the Cease-and-Desist Letter was sent to Plaintiff in 2016, and yet Plaintiff did not file suit until 2023. (Def. Br. 28-29). In his opposition, Plaintiff offers no response whatsoever to the argument that this claim should be dismissed, thereby abandoning the claim. *See Wright* v. *City of New York*, No. 23 Civ. 3149 (KPF), 2024 WL 3952722, at *3 (S.D.N.Y. Aug. 27, 2024) (collecting cases for proposition that a plaintiff's failure to respond to an argument for dismissal amounts to abandonment of the claim). In any event, the Court agrees with Defendants that this claim is time-barred. "The time on [a tortious interference] claim begins to run when a defendant performs the action (or inaction) that constitutes the alleged interference. It does not commence anew each time a plaintiff is unable to enter into a contract, unless the defendant takes some further step." *Thome* v. *Alexander & Louisa Calder Found.*, 890 N.Y.S.2d 16, 30 (1st Dep't 2009). Plaintiff has not taken a further step beyond his 2016 cease-and-desist letter.

Further, even if Plaintiff's claim were not time-barred, it would still fail. Defendants' Cease-and-Desist Letter, incorporated by reference in the Complaint, demonstrates that The Tetris Company requested that Plaintiff cease and desist his pursuit of film and television projects because it conflicted with the project the company itself was already pursuing. (*See* Cease-and-Desist Letter). That is not a wrongful purpose. *See Radiancy, Inc.* v. *Viatek Consumer Prods. Grp., Inc.*, 138 F. Supp. 3d 303, 328 (S.D.N.Y. 2014), *as amended* (Apr. 1, 2014) ("[A] trademark owner is entitled to advise others of his trademark rights, to warn others that they or others are or may be infringing his rights, to inform others that he is seeking to enforce his rights through legal proceedings, and to threaten accused infringers and their customers with suit." (internal quotation marks omitted)). Accordingly, the Court dismisses Plaintiff's tortious interference claim with prejudice.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in full. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 716678

---

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.