UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CENGAGE LEARNING, INC.; BEDFORD,
FREEMAN & WORTH PUBLISHING GROUP,
LLC d/b/a MACMILLAN LEARNING;
MACMILLAN HOLDINGS, LLC; ELSEVIER
INC.; ELSEVIER B.V.; and MCGRAW HILL LLC,

Case No. 1:24-cv-04274 (JLR)

                                        Plaintiffs,

                    -against-

**OPINION AND ORDER**

GOOGLE LLC,

                                        Defendant.

---

JENNIFER L. ROCHON, United States District Judge:

Plaintiffs Cengage Learning, Inc. ("Cengage"); Bedford, Freeman & Worth Publishing Group, LLC d/b/a Macmillan Learning ("Macmillan Learning"); Macmillan Holdings, LLC ("Macmillan Holdings"); Elsevier Inc. ("Elsevier"); Elsevier B.V.; and McGraw Hill LLC ("McGraw Hill") (collectively, "Plaintiffs") are leading educational publishers in the United States. At the core of this dispute is Defendant Google LLC ("Google")'s liability for online sellers' use of the Google Shopping platform to advertise infringing digital copies of Plaintiffs' educational works. Plaintiffs Cengage, Macmillan Learning, Elsevier, and McGraw Hill (collectively, "Publishers") assert claims against Google for contributory and vicarious copyright infringement and violations of section 349(a) of the New York General Business Law. Plaintiffs Cengage, Macmillan Holdings, Elsevier, Elsevier B.V., and McGraw Hill (collectively, "Trademark Plaintiffs") also assert claims against Google for trademark infringement. Now before the Court is Plaintiffs' motion to dismiss Counts II, III, and IV of the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6).

For the reasons set forth below, Google's motion is GRANTED in part and DENIED in part.

## BACKGROUND[1]

### I.    Factual Background

Google.com is the "world's most visited website," and its search engine is "the world's most dominant search engine." Dkt. 38 ("Amended Complaint" or "AC") ¶ 3. Google is also "the world's most dominant provider of digital advertising services," earning over $300 billion in revenue in 2023, with much of that revenue deriving from advertising. AC ¶ 3. "According to similarweb.com, a service that tracks website traffic, in March 2024, google.com had over 85 billion total visits" — "more than double that of the next most visited site, youtube.com." AC ¶ 36. The Publishers are leading educational publishers in the United States that publish thousands of educational works, including textbooks, test banks, and solutions manuals. AC ¶¶ 2, 28-30. The Publishers' textbooks bear registered trademarks owned by the Trademark Plaintiffs. AC ¶ 2.

This case centers on Google's "Google Shopping" platform, an online platform, through which third-party merchants advertise products to Google's search-engine users. *See* AC ¶¶ 37-39. "When a user enters a query into google.com, Google returns not just organic search results generated by its search algorithm," but also "ads that are part of Google's Shopping platform and . . . product images ('Shopping Ads')." AC ¶ 37. To view more responsive Shopping Ads, users can click the "Shopping" tab at the top of the Google search results page. AC ¶ 37. Shopping Ads show users a "photo of [the] product, plus a title, price,

---

[1] Unless otherwise noted, the facts stated herein are taken from the Amended Complaint and accepted as true for purposes of this motion. *See Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016).

store name, and more." AC ¶ 38.  No sale or purchase of products, however, takes place on the Google Shopping platform.  Instead, when a user clicks on a merchant's ad, Google "send[s] them to the merchant's website to buy [the product]."  AC ¶ 39 (citation omitted).  Transactions are therefore completed on the merchants' independently operated e-commerce sites.  Merchants pay Google each time a user clicks on their paid Shopping Ad, regardless of whether a final sale is completed.  AC ¶ 37.[2]

To advertise using Google's Shopping Ads, a merchant must create a Google account, a Merchant Center account, and a Google Ads account.  AC ¶ 73.  Google creates Shopping Ads based on information provided by merchants in their product feeds, and has developed machine-learning technology to facilitate that process.  AC ¶ 41.  "Merchants either provide Google with a link to a product image for Google to include in an ad, or provide Google with the image itself."  AC ¶ 88.  Google then "obtains the image from the link or the Merchant Center, places it on the ad, and makes adjustments it determines are necessary or optimal, such as 'experimenting with the best display options for the format' and employing the 'automatic cropping' of images 'to focus more on the product.'"  AC ¶ 88 (alteration adopted) (quoting *What Makes Up a Shopping Ad*, Google Ads Help, https://support.google.com/google-ads/answer/6275294 (last visited May 9, 2025)).  Google decides when and where to display Shopping Ads, including by identifying the keywords that prompt a Shopping Ad to appear, and targets ads to users it believes are most likely to purchase the advertised product.  AC ¶ 42.  Google also ranks paid Shopping Ads based on "advertiser bid and ad quality," including the relevance of the ad to the user's search and Google's evaluation of the website to which the ad links.  AC ¶ 42.

---

[2] The Amended Complaint alleges that Google Shopping also promotes free Shopping Ads, which "appear below the Paid Ads on the Shopping Tab."  AC ¶ 37.

According to Plaintiffs, Google reviews each merchant's website landing pages and products to determine whether the merchant is eligible to use Google's Ads.  AC ¶ 75.  Merchants are expected to comply with Google's terms of service, including Google's policies "specifically prohibit[ing] Shopping Ads that link to sites selling unauthorized copyrighted content and merchants who distribute such content."  AC ¶ 70.  Google "reserves the right to remove advertisements, and to terminate the accounts of any merchants, that violate Google's policies."  AC ¶ 71.

Google's Shopping Platform also attracts illegitimate merchants, including "pirates" (the "Pirate Sellers") "who are selling infringing digital copies of the Publishers' works" (the "Infringing Works").  AC ¶ 29.  This suit arises from the conduct of those Pirate Sellers, and Google's alleged facilitation and promotion thereof.  According to Plaintiffs, Google engages in "systemic and pervasive advertising of unauthorized, infringing copies of the Publishers' textbooks and educational works," AC ¶ 1, including infringing copies of the Publishers' test banks and solutions manuals, AC ¶ 30.  Plaintiffs allege that these low-cost Infringing Works are often of "inferior quality to legitimate books," thereby harming consumers.  AC ¶ 149.  The pirated works "often are of lower resolution, are not compatible with other devices, do not provide access to certain online supplemental materials, and/or do not contain working links."  AC ¶ 94.  Moreover, they lack basic quality controls present in authentic ebooks, and "may contain missing pages, unreadable text, typos," and other errors.  AC ¶ 94.  And because the Shopping Ads often include "unauthorized photos of Publishers' own textbooks, many of which display [their trademarks]," AC ¶ 38, they also "confus[e] Google's users into thinking the ads are for authentic products," AC ¶ 88.  Consumers are therefore misled "into believing they are getting a legitimate product at a bargain price, when they are in fact buying an illicit product."  AC ¶ 8.

Plaintiffs allege that Google's Shopping Ads also have features that "actively direct users to search for and select Infringing Works." AC ¶ 57. For instance, even though Plaintiffs and legitimate distributors "rarely, if ever, sell their textbooks in PDF form," Google allows users to filter search results to capture only those products that are in PDF format. AC ¶ 57. Moreover, on the free Shopping Ads page, Google allows users to filter specifically for ebooks, and to filter by "Seller," including by the Pirate Sellers, thereby "allowing users to see only listings from those Pirate Sellers." AC ¶ 58. Google also has a feature that enables users to "[s]ee more ads this advertiser has shown using Google," which "shows users other Shopping Ads for other products sold by the seller." AC ¶ 56. The "vast majority," "if not all," of the ads related to those posted by Pirate Sellers are "also [for] infringing products." AC ¶ 56. For some search results, Google also has a "Compare Prices" feature, which "highlights the price disparity between Pirate Sellers and legitimate textbook sellers." AC ¶ 59.

Plaintiffs assert that "because those looking to purchase the Publishers' works find the Pirate Sites predominantly or exclusively through Google, terminating [the] Pirate Sellers' accounts would have had a significant impact on the Pirate Sellers' ability to continue selling Infringing Works at all." AC ¶ 78. Plaintiffs contend that, because the Pirate Sellers have names like "madebook," "LivyLuxe," "Athena Line Store," and "Biz Ninjas," "it is highly unlikely that users could find these 'businesses' or their [p]irate [s]ites without Google's Infringing Shopping Ads." AC ¶ 49. Plaintiffs further allege that Google's dominance in the online advertising market is such that merchants have "no real substitute from any other advertising platform." AC ¶ 46.

At some point, Google updated its policies to eliminate the advertising of standalone digital books via Google Shopping. *See* AC ¶ 68. Google's "policy is to ban ads for *all*

standalone digital books (i.e., ads that advertise an ebook price or lead to a landing page selling only a digital book, other than audiobooks)."  AC ¶ 68 (emphasis added).  Plaintiffs assert, however, that this has only compounded the problem.  As a result of Google's policy that presumably Pirate Sellers are skirting, "[p]irate [s]ites are able to advertise standalone digital books on Google while legitimate publishers [who follow the policy] are not."  AC ¶ 110.  Plaintiffs contend that they have sent numerous infringement notices to Google identifying the Pirate Sellers, Pirate Sites, and Shopping Ads advertising Infringing Works.  AC ¶¶ 99, 101.  But "Google has failed to remove thousands of ads for infringing works in a timely manner, or at all, and has continued to do business with known pirates."  AC ¶ 4.

## II.    Procedural Background

Plaintiffs commenced this action on June 5, 2024.  Dkt. 1.  On August 26, 2024, Google filed a motion to dismiss Counts II, III, and IV of the Complaint.  Dkt. 27.  On September 16, 2024, Plaintiffs filed an amended complaint.  *See generally* AC.  The filing of an Amended Complaint mooted Google's prior motion to dismiss.  Dkt. 40.  On September 30, 2024, Google filed a motion to dismiss Counts II, III, and IV of the Amended Complaint.  Dkt. 43; *see* Dkt. 44 ("Br.").  On October 30, 2024, Plaintiffs filed their opposition to Google's motion to dismiss the Amended Complaint, Dkt. 45 ("Opp."), and on November 20, 2024, Google filed its reply, Dkt. 52 ("Reply").

The Court held oral argument on the motion to dismiss on May 15, 2025.  *See* Dkt. 99; Dkt. 104 ("Tr.").  With permission of the Court, Google also provided a supplemental letter addressing a case that Plaintiffs raised for the first time during oral argument.  Dkt. 100.  The Court granted Plaintiffs leave to file a reply to Google's letter, which Plaintiffs filed on May 20, 2025.  *See* Dkts. 102, 103.

**LEGAL STANDARD**

Under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court draws all reasonable inferences in the plaintiff's favor and accepts as true all nonconclusory allegations of fact. *Id.* However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 557 (2007)). Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In considering a Rule 12(b)(6) motion to dismiss, "district courts 'may review only a narrow universe of materials,' which includes 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, matters of which judicial notice may be taken,' as well as 'documents not expressly incorporated by reference in the complaint that are nevertheless "integral" to the complaint.'" *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (alterations and omissions adopted) (quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)). "Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations in the amended complaint.'" *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quoting *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

**DISCUSSION**

Google moves to dismiss three counts of the Amended Complaint. First, Google asserts that Plaintiffs fail to plead a vicarious copyright infringement claim (Count II) because

they have not adequately alleged that Google had the ability to supervise or control the Pirate

Sellers' infringement, or that Google derived a financial benefit from the alleged

infringement.  Br. at 6.  Second, Google asserts that Plaintiffs' trademark infringement claim

(Count III) fails as a matter of law because Plaintiffs have not alleged that Google — rather

than the Pirate Sellers — was responsible for the allegedly infringing marks used in Google's

Shopping Ads.  *Id.* at 15.  Finally, Google moves to dismiss Plaintiffs' New York state law

claim for deceptive business practices (Count IV) as preempted under federal law, and in any

event deficient on the merits.  *Id.* at 19.

The Court addresses these claims and arguments in turn.

## I.    Vicarious Copyright Infringement (Count II)

Google's motion to dismiss does not challenge Plaintiffs' claim for contributory

copyright infringement (Count I), focusing instead on Plaintiffs' assertion in Count II that

Google vicariously infringed the works-in-suit.  Br. at 1.  Even so, it is worth briefly

discussing the doctrinal framework governing secondary liability generally, including the

distinctions between contributory and vicarious liability.

"The Copyright Act does not expressly render anyone liable for infringement

committed by another."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434

(1984).  However, "[t]he absence of such express language in the copyright statute does not

preclude the imposition of liability for copyright infringements on certain parties who have

not themselves engaged in the infringing activity."  *Id.* at 435.  In fact, "[w]hen a widely

shared service or product is used to commit infringement, it may be impossible to enforce

rights in the protected work effectively against all direct infringers."  *Metro-Goldwyn-Mayer*

*Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929-30 (2005).  The "only practical alternative"

may be to proceed against the distributor of the service or product on a theory of secondary

liability. *Id.* at 930; *see also Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1172 (9th

Cir. 2007) ("The Supreme Court has acknowledged that '[t]he argument for imposing indirect

liability' is particularly 'powerful' when individuals using the defendant's software could

make a huge number of infringing downloads every day." (alteration in original) (quoting

*Grokster*, 545 U.S. at 929)).  But "[s]econdary liability for copyright infringement does not

exist in the absence of direct infringement" by another.  *A&M Recs., Inc. v. Napster, Inc*., 239

F.3d 1004, 1013 n.2 (9th Cir. 2001) (citing *Religious Tech. Ctr. v. Netcom On-Line Commc'n

Servs., Inc*., 907 F. Supp. 1361, 1371 (N.D. Cal. 1995)).

Secondary liability takes two distinct forms, both of which are creatures of the

common law: contributory infringement and vicarious infringement.  With respect to the

former, "one who, with knowledge of the infringing activity, induces, causes or materially

contributes to the infringing conduct of another, may be held liable as a 'contributory'

infringer." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc*., 443 F.2d 1159, 1162 (2d

Cir. 1971) (footnote omitted); *see also Grokster*, 545 U.S. at 930 (observing that "doctrines of

secondary liability emerged from common law principles and are well established in the

law").[3]  "[K]nowledge and participation [are] the touchstones of contributory infringement."

*Demetriades v. Kaufmann*, 690 F. Supp. 289, 293 (S.D.N.Y. 1988).

---

[3] *Grokster* held that copyright infringement could also be premised on a theory of inducement.
*See Grokster*, 545 U.S. at 936-37 (holding that "one who distributes a device with the object
of promoting its use to infringe copyright, as shown by clear expression or other affirmative
steps taken to foster infringement, is liable for the resulting acts of infringement by third
parties").  *Grokster*'s inducement standard is best understood as another variant of
contributory infringement.  *See, e.g.*, *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788,
795 (9th Cir. 2007) ("We understand these several criteria to be non-contradictory variations
on the same basic test, i.e., that one contributorily infringes when he (1) has knowledge of
another's infringement and (2) either (a) materially contributes to or (b) induces that
infringement.").

"Vicarious copyright liability," on the other hand, "is an 'outgrowth' of respondeat superior," *Napster*, 239 F.3d at 1022 (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996)), and "may arise only when the defendant had the 'right and ability to supervise that coalesced with an obvious and direct financial interest in the exploitation of copyrighted materials,'" *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 99 (2d Cir. 2016) (alterations adopted) (quoting *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997)). "[V]icarious liability rests not on the defendant's relationship to the direct infringement but rather on the defendant's relationship to the direct infringer." *Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 732 (S.D.N.Y. 1996). "The first element of the test for vicarious liability is satisfied if the plaintiff proves that the defendant had the ability to supervise or control the third parties' infringing activity and failed to do so." *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011). "The second element of the vicarious infringement test requires showing a 'causal relationship between the infringing activity and any financial benefit the defendant reaps.'" *Id.* (alteration adopted) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)).

To be sure, "the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn." *Grokster*, 545 U.S. at 930 n.9 (quoting *Sony*, 464 U.S. at 435 n.14). But as a general matter, "contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement, while vicarious liability is based on the defendant's failure to cause a third party to stop its directly infringing activities." *Amazon.com*, 508 F.3d at 1175.

With these background principles in mind, the Court turns to Google's arguments as to vicarious liability. As noted above, Google asserts that Plaintiffs have not established that Google supervises or controls the alleged infringement or that Google derives a direct

10

financial benefit therefrom.  Br. at 6.  Because the Court finds that Plaintiffs have not alleged that Google supervises or controls the Pirate Sellers, the Court need not reach whether Google has a direct financial interest.

### A.  Google's Ability to Supervise and Control

As stated above, "[t]o state a claim for vicarious copyright infringement, a plaintiff must allege that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity."  *Visa*, 494 F.3d at 802 (footnote omitted).  The Supreme Court stated in *Grokster* that a defendant "infringes vicariously" when he or she "decline[s] to exercise a right to stop or limit" the infringement.  545 U.S. at 930.  "Thus, under *Grokster*, a defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."  *Amazon.com*, 508 F.3d at 1173.

Google argues that because the alleged direct infringement — here, the sale of unauthorized copies of Plaintiffs' works and the reproduction of those copies by purchasers — occurred on third-party websites, "Plaintiffs cannot establish that Google's alleged 'ability to supervise or control' its merchants extends to the infringing activity."  Br. at 7.  Google maintains that its ability to remove the infringing ads and/or terminate the Pirate Sellers' Merchant Center accounts "cannot establish the necessary level of control."  *Id.* at 8-9.  In response, Plaintiffs assert that the appropriate inquiry is whether the defendant can "stop *or limit*" the direct infringement.  Opp. at 11-12 (citing *Grokster*, 545 U.S. at 930).  And, Plaintiffs argue, the "stop or limit" standard is readily satisfied here: Google has the right to terminate the Pirate Sellers' ads, without which "consumers were unlikely to find the Pirate Sites at all," thereby conferring on Google the ability to "stop[] or at least limit[] the specific Direct Infringements that the Plaintiffs allege."  *Id.* at 13.

11

Courts that have applied vicarious infringement principles to the internet shed light on the scope of the governing "supervise and control" standard, and their decisions support why that standard is not satisfied here. *Perfect 10, Inc. v. Amazon.com, Inc*., cited by both parties, addressed similar issues to those at play here. *See generally* 508 F.3d 1146. In *Amazon.com*, the plaintiff, Perfect 10, was the owner of various copyrighted photographic images. *Id.* at 1157. "Some website publishers republish[ed] Perfect 10's images on the Internet without authorization." *Id.* Through its AdSense program, Google had advertising partnerships with some of these websites. *Id.* at 1156; *see also id.* at 1173-74. Under AdSense, Google placed advertisements on participating websites' pages relevant to the webpages' content, and shared resulting revenues with AdSense participants. *Id.* at 1156. Perfect 10 brought copyright infringement claims against Google (and Amazon.com) for automatically indexing the infringing images in its search engine and in-line linking to the infringing images on third-party websites. *Id.* at 1157.

In denying Perfect 10's motion for a preliminary injunction, the Ninth Circuit held that Google could not "stop any of the third-party websites from reproducing, displaying, and distributing unauthorized copies of Perfect 10's images because that infringing conduct takes place on the third-party websites." *Id.* at 1174. In arguing otherwise, Perfect 10 pointed to the fact that, under its AdSense Agreement, "Google reserve[d] 'the right to monitor and terminate partnerships with entities that violate others' copyrights.'" *Id.* at 1173 (quoting *Perfect 10 v. Google, Inc*., 416 F. Supp. 2d 828, 858 (C.D. Cal. 2006), *aff'd in part, rev'd in part sub nom. Amazon.com, Inc.*, 508 F.3d 1146). But the Ninth Circuit found that "Google's right to terminate an AdSense partnership [did] not give Google the right to stop direct infringement by third-party websites." *Id.* at 1173-74. Rather, as the Ninth Circuit underscored, "[a]n infringing third-party website [could] continue to reproduce, display, and

distribute its infringing copies of Perfect 10 images after its participation in the AdSense program ha[d] ended." *Id.* at 1174.

The Ninth Circuit subsequently extended *Amazon.com*'s reasoning to credit card companies that processed payments for allegedly infringing websites. In *Perfect 10 v. Visa International Service, Ass'n*, the Ninth Circuit found that credit card companies could not as a matter of law be held vicariously liable for third-party websites' copyright infringement. *See generally* 494 F.3d 788. The *Visa* court rejected the argument that the credit card companies had the "right and ability to supervise" the infringing activity because they could terminate merchants' participation in their payment networks for illegal activity. *Id.* at 802-03. Citing to *Amazon.com*, the Ninth Circuit observed that:

> Defendants could likely take certain steps that may have the *indirect* effect of reducing infringing activity on the Internet at large. However, neither Google nor Defendants has any ability to *directly* control that activity, and the mere ability to withdraw a financial "carrot" does not create the "stick" of "right and ability" to control that vicarious infringement requires.

*Id.* at 803 (emphases added). Like Google in *Amazon.com*, the court found that the payment processors ultimately "ha[d] no direct role in the actual reproduction, alteration or distribution of the infringing images," and no ability to "take away the tools the offending websites use to reproduce, alter, and distribute the infringing images over the internet." *Id.* at 804. The credit card companies could "only take away the means the websites currently use[d] to sell [the infringing images]." *Id.*

In contrast, the Ninth Circuit reached a different result in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004. There, the Ninth Circuit found that record companies and music publishers established a likelihood of success on the merits of their vicarious infringement claim against Napster, a peer-to-peer file-sharing system. *Id.* at 1024; *see id.* at 1011. Napster's software allowed users to "(1) make MP3 music files stored on individual computer

hard drives available for copying by other Napster users; (2) search for MP3 files stored on other users' computers; and (3) transfer exact copies of the contents of other users' MP3 files from one computer to another via the Internet." *Id.* at 1011.  The infringement — the unlicensed distribution and reproduction of copyrighted music — therefore took place on Napster's system, using Napster's software.  The *Napster* court held that plaintiffs were likely to succeed in their vicarious copyright infringement claim because Napster had the "ability to locate infringing material listed on its search indices" and "the right to terminate users' access to the system" where the infringement took place.  *Id.* at 1024.  As *Visa* underscored in distinguishing *Napster*, "Napster provided users with the tools to enable the easy reproduction and distribution of the actual infringing content," and "also had the right and ability to block user access to its program and thereby deprive particular users of access to their forum." *Visa*, 494 F.3d at 803-04.

These authorities make clear that Plaintiffs here have not pleaded that Google has the right to directly "stop or limit" the Pirate Sellers' infringement.  Plaintiffs' argument hinges on Google's right to withdraw the Pirate Seller's infringing Shopping Ads and to terminate the Pirate Sellers' Merchant Center accounts.  *See* AC ¶¶ 77, 79, 133.  True, doing so might reduce traffic to the infringing websites, and therefore have the "indirect effect of reducing infringing activity." *Visa*, 494 F.3d at 803.  But as in *Visa* and *Amazon.com*, Plaintiffs' theory is effectively one of indirect pressure or assistance: without Google, the Pirate Sellers' websites would have less visibility, making the Pirate Sellers' infringement less profitable.  Like the defendants in *Visa* and *Amazon.com*, Google exercises no control over the infringing Pirate Sellers' third-party websites, where the actual alleged infringement takes place.  And although Google can shut down accounts and take down ads, "[a]n infringing third-party website can continue to . . . distribute its infringing copies" of Plaintiffs' works regardless.

*Amazon.com*, 508 F.3d at 1174. The "inability to directly control the infringing activities of third-party websites" is "evidence" that Google, much like the defendants in *Visa* and *Amazon.com*, "lack[s] the right and ability to control those activities." *Visa*, 494 F.3d at 804 n.16. Unlike *Napster*, Google has no control over the environment in which the infringement — the sale of unauthorized copies of Plaintiffs' works and the reproduction of those copies by purchasers — is conducted, or the tools the offending websites use to effectuate that infringement. It does not approve, monitor, or otherwise engage with the content on the Pirate Sellers' third-party sites. Google can "only take away the means the websites currently use" to advertise infringing products sold on their sites. *Visa*, 494 F.3d at 804; *cf. Fonovisa*, 76 F.3d at 262 (finding vicarious liability adequately pleaded where operator of flea market "controlled and patrolled" premises where infringing vendors had booths and could terminate vendors from market, thereby stopping the infringing sales); *Shapiro, Bernstein & Co v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963) (holding department store owner vicariously liable for infringement because the owner had "the power to police" record seller and seller's employees selling infringing records within its stores).

Admittedly, this case lies somewhere along the spectrum between *Napster*, on the one hand, and *Visa* and *Amazon.com*, on the other. The direct infringement is not taking place on Google's platform, as it was in *Napster*. But Plaintiffs rightfully observe that the argument for control here is also not as attenuated as in *Amazon.com*. In *Amazon.com*, Google's AdSense program bore no relationship to the underlying infringement by Google's advertising partners; it was an entirely separate contractual relationship, involving ads for other products. *See Amazon.com*, 508 F.3d at 1156 (describing AdSense program as an agreement whereby Google placed advertising on AdSense partner's webpages that was "relevant to the webpages' content" and participants shared revenues that flowed from such advertising with

Google).  Here, Google's contractual relationship with the Pirate Sellers has a closer nexus to the underlying infringement — the Pirate Sellers use Google's Shopping Platform and Shopping Ads to further their acts of direct infringement.  And, according to Plaintiffs, "[i]n the absence of Google's ads, consumers were unlikely to find the Pirate Sites at all."  Opp. at 12.  Plaintiffs argue that this, along with Google's terms of use whereby Google has the right to shut down Shopping Ads that violate Google's prohibition on selling unauthorized copyrighted content, is sufficient to create vicarious liability.  *See id.* at 12-13.

Plaintiffs' argument depends, however, on a too-expansive reading of *Grokster*'s "stop or limit" language — that is, *Grokster*'s dictum that one infringes vicariously by "profiting from direct infringement while declining to exercise a right to stop or limit it."  545 U.S. at 930.  Citing to *Grokster*, Plaintiffs assert that the "right and ability to supervise and control is present so long as the defendant can *limit* the direct infringements, even if the defendant cannot stop them entirely."  Opp. at 11-12 (citing *Grokster*, 545 U.S. at 930).  But Plaintiffs read *Grokster* too broadly.  *Visa*, interpreting *Grokster*, cautioned that the "literal power to 'stop or limit' the infringement" does not automatically translate into "sufficient control over the actual infringing activity for vicarious liability to attach."  *Visa*, 494 F.3d at 806.  *Visa* found that a contrary interpretation of *Grokster* would cast the net too wide because "any number of actions by any number of actors" might "have some indirect effect on the infringing activity."  *Id.* at 805.  Google may exert more control over the direct infringement here than it did in *Amazon.com*, but it still does so only indirectly.  In other words, Google's advertising of the infringing products and ability to terminate the Pirate Sellers' ads and accounts may impact the visibility of — and traffic to — the Pirate Sellers' sites, but Google still cannot "directly" control Pirate Sellers' conduct on their third-party websites.  *See Routt v. Amazon.com, Inc*., 584 F. App'x 713, 714 (9th Cir. 2014) (unpublished) ("A defendant has

control over a third party's infringing conduct when the defendant can directly put an end to that conduct."). The fact that "search engines [can] effectively cause a website to disappear by removing it from their search results" is not enough to give rise to vicarious liability. *Visa*, 494 F.3d at 805 (describing Google's lack of liability in *Amazon.com*).[4]

Google's alleged failure to manage its *own* operations to avoid facilitating infringement — thereby purportedly materially assisting the infringement — may speak to contributory infringement, but it does not state a claim for vicarious infringement. Indeed, *Amazon.com* rejected a similar vicarious liability theory as "blur[ring] [the] distinction" between the types of secondary liability. 508 F.3d at 1175. *Amazon.com* observed, in circumstances analogous to the case at hand, that "Google's failure to change its operations to avoid assisting websites to distribute their infringing content" — including its failure to cease linking to third-party infringing sites — "may contribute to contributory liability." *Id.* But such failure did not amount to vicarious liability, which is instead "based on the defendant's failure to cause a *third party* to stop its directly infringing activities." *Id.* (emphasis added). Likewise here, that Google reserves the right to terminate the Pirate Sellers' ads and accounts and that it highlights otherwise relatively obscure websites shows that it "had some power" over the Pirate Sellers — "the way that a company that provides a valued service always has power over the customers who rely on it" — but "that does not turn the [Pirate Sellers] into even loose equivalents of agents or subordinates" for purposes of vicarious liability. *Concord*

---

[4] Plaintiffs argue that, because Plaintiffs notified Google of the specific infringements at issue, Google had knowledge of those infringements and therefore had sufficient control to stop or limit them. Tr. at 16:20-18:1. But Plaintiffs conflate knowledge — as required for contributory infringement — with the ability to ability to control or supervise the infringement required for vicarious liability. In *Visa*, plaintiffs also sent the defendants various notices specifically identifying infringing websites and the Court still found, for the reasons set forth above, that defendants lacked the right and ability to stop or limit the infringement. *See* 494 F.3d at 793, 802-03.

*Music Grp., Inc. v. X Corp.*, No. 23-cv-00606, 2024 WL 945325, at *10 (M.D. Tenn. Mar. 5, 2024); *see also Aimster*, 334 F.3d at 654 (observing that vicarious liability has been extended to copyright cases in which the defendant "bears a relation to the direct infringers that is analogous to the relation of a principal to an agent").

Plaintiffs' cited authorities do not compel a contrary result. Plaintiffs rely heavily on cases holding that internet service providers ("ISPs") exercise the requisite control and supervision over infringing users. Opp. at 14-15. Those cases are inapposite because but for an ISP's provision of internet service, the underlying infringement in those cases could not have taken place: "[w]ithout the internet, individuals cannot upload or download illegal content." *BMG Rts. Mgmt (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 675 (E.D. Va. 2015), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018). For instance, in *BMG Rights Management (US) LLC v. Cox Communications, Inc.*, the court denied the defendant-ISP's motion for summary judgment on the copyright owners' vicarious infringement claim, finding that, "when [the ISP] exercises its contractual right, [the provider] blocks a direct infringer's access to the internet," and "[t]hat individual is thereafter precluded from participation in the infringing activity." 149 F. Supp. 3d at 675; *see also Warner Recs. Inc. v. Charter Commc'ns*, 454 F. Supp. 3d 1069, 1078 (D. Colo. 2020) ("Charter . . . can terminate its users' ability to access the internet through Charter."). This line of cases therefore logically follows from *Napster*'s holding that the "ability to block infringers' access to a particular environment" in which infringement occurs "is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023. Here, Google exercises no control over the environment in which the infringement takes place — the Pirate Sellers' third-party websites.

*Arista Records, Inc. v. Mp3Board, Inc.*, cited by Plaintiffs for the first time at oral argument, does not persuade the Court to hold otherwise. No. 00-cv-04660 (SHS), 2002 WL

1997918 (S.D.N.Y. Aug. 29, 2002). In *Mp3Board*, record companies brought an action for contributory and vicarious copyright infringement against Mp3Board, which operated a website that provided internet users with resources to locate sound recording files from publicly available websites, including pirated copies of the plaintiffs' copyrighted works. *Id.* at *1. In denying the defendants' motion for summary judgment as to vicarious liability, the court found that Mp3Board had "the right and ability to police those who posted links to [its] site, as well as the ability to delete the links themselves from being displayed to users." *Id.* at *11. Plaintiffs' citation to *Mp3Board* is unpersuasive for several reasons. Aside from being somewhat factually distinguishable, *Mp3Board* predates both *Visa* and *Amazon.com*, which, for the reasons set forth above, compel a contrary result. And, in its relatively brief analysis, *Mp3Board* relied on *Fonovisa* and *Napster* in holding that the website operator's ability to remove offending links from its site sufficed to establish vicarious liability. *Id.* at *11. However, in both *Fonovisa* and *Napster*, the defendant had control over the environment in which the infringement was occurring, and could entirely "block infringers' access" thereto. *See, e.g.*, *Fonovisa*, 76 F.3d at 262-63; *Napster,* 239 F.3d at 1023. Mp3Board did not exercise any control or oversight over the third-party websites distributing infringing copies of the plaintiffs' works, and while it could eliminate a means by which users located infringing media files, it could not entirely block users' access to those files. *See MP3Board*, 2002 WL 1997918, at *11. *Mp3Board* therefore stretched the reasoning of *Fonovisa* and *Napster* beyond their facts. The Court declines to do so here.

For the foregoing reasons, Plaintiffs have not adequately pleaded that Google has sufficient ability to control or supervise the Pirate Sellers' infringement, and therefore, Plaintiffs' vicarious copyright infringement claim fails to state a claim.

## II.    Trademark Infringement Claim

The Court turns next to Plaintiffs' trademark infringement claim under 15 U.S.C.

§ 1114(1)(b).  Plaintiffs assert that they are bringing a direct trademark infringement claim

under a printer-publisher theory.  Opp. at 17-20.  As relevant here, the Lanham Act provides:

> Any person who shall, without the consent of the registrant . . . reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(b).

Plaintiffs assert that Google included unauthorized reproductions or copies of

Plaintiffs' trademarks in the Pirate Sellers' Shopping Ads.  According to Plaintiffs, in the

process of creating Shopping Ads, Google "either retrieved an image of the trademark from a

link the Pirate Seller provided and placed a copy of the image in the ad, or took an image of

the trademark provided by the Pirate Seller and placed a copy of that image on the ad."  Opp.

at 18.  Plaintiffs argue that, under either scenario, "Google necessarily made a copy of the

trademark and applied that copy to an advertisement."  Opp. at 18.  Google, on the other hand,

seeks to distance itself from the reproduction and application of the infringing marks in its

Shopping Ads.  According to Google, "[i]t is the Pirate Sellers who copy Plaintiffs'

trademarks and then apply those marks to images that appear in Shopping Ads."  Reply at 7.

Google maintains that its role is limited to "display[ing] the image to which copied

trademarks have *already* been applied by Pirate Sellers."  *Id.* at 7-8.  Based on the allegations

as currently pleaded, and drawing all reasonable inferences in Plaintiffs' favor, the Court finds

that Plaintiffs have stated a claim for trademark infringement under 15 U.S.C. § 1114(1)(b).

That the Pirate Sellers supply Google with the infringing images does not absolve Google of responsibility under 15 U.S.C. § 1114(1)(b).  In *Century 21 Real Estate Corp. of Northern Illinois v. R.M. Post, Inc.*, the publishers of a telephone directory published a advertisement that contained the "Century 21" mark on behalf of a former franchisee of Century 21.  No. 88-cv-00077, 1988 WL 84741, at *1 (N.D. Ill. Aug. 9, 1988).  The court found that the plaintiff had stated a claim under 15 U.S.C. § 1114 against the publisher of the telephone directory.  *Id.* at *2.  That the former franchisee, not the defendant publishers, "continued to use the name 'Century 21' in its advertisements" (and presumably provided such advertisements to the telephone directory), was immaterial to the court's analysis.  *Id.* at *1-2.  Similarly, in *Angie's List, Inc. v. Ameritech Publishing, Inc*., No. 07-cv-01630, 2010 WL 2521722 (S.D. Ind. June 15, 2010), service providers purchased, and defendant AT&T published, advertisements in AT&T's yellow pages that included plaintiff Angie's List's trademarks without plaintiff's consent.  *Id.* at *1.  The court denied AT&T's motion to dismiss plaintiff's direct trademark infringement claim against AT&T under 15 U.S.C. § 1114(1)(b), finding that there were issues of fact about whether there was consumer confusion.  *Id.* at *2-5.  No argument was raised, nor was it suggested, that the statute did not apply to AT&T because it only published the infringing advertisements of others.  Similarly, in *Dial One of the Mid-South, Inc. v. Bell South Telecommunications, Inc*., telephone book publishers were found liable for printing a false listing on behalf of a business.  269 F.3d 523, 525 (5th Cir. 2001).  The Fifth Circuit affirmed the district court's denial of the innocent infringer defense, observing that defendants did "not contest the error in printing the false listing for [the business]" or that they had "knowledge" of the falsity of the listing, and underscoring that the publishers "had notice of the [falsity] and failed to remove the [infringing] reference in the phone books."  *Id.* at 527.  Google's publication of Shopping Ads

that contain infringing material is akin to a yellow book directory publishing an infringing ad designed by a business.

Google rests much of its argument on section 1114(1)(b)'s requirement that the publisher "apply" the mark to an infringement: in Google's telling, Plaintiffs' trademarks have "already been applied" to an image by Pirate Sellers, and therefore, Google is "not 'applying' the trademark to the ad." Reply at 7-8 (emphasis omitted). While there is concededly very little case law on section 1114(1)(b), Google selectively parses the standard and ignores the allegations of the Amended Complaint, without providing *any* cases that have adopted its interpretation of the term "apply." Plaintiffs assert that Google "appl[ied]" the images containing the trademark to Google's Shopping Ads because, as alleged, "Google either retrieved an image of the trademark from a link the Pirate Seller provided and placed a copy of the image in the ad, or took an image of the trademark provided by the Pirate Seller and placed a copy of that image on the ad." Opp. at 18; *see also* AC ¶ 88 ("[W]hen Google creates Infringing Shopping Ads for the Pirate Sellers, Google places on the ad an image of a Trademark Plaintiff's textbook," which "[o]ften . . . contains a Trademark Plaintiff's registered trademark."). Plaintiffs also plead that Google makes adjustments it determines are necessary or optimal, such as "experimenting with the best display options for the format and employing the automatic cropping of images to focus more on the product." AC ¶ 88 (alteration adopted) (citation and internal quotation marks omitted). Plaintiffs point to Google's policy that states that Google uses merchants' content to create the ads so that the merchant does not need to do so. *See, e.g.*, *id.* ¶ 41 ("As Google explains, Google's Merchant Center creates these ads based on information you include in your product feed so you don't need to create the ads yourself." (alteration adopted) (citation, emphasis, and internal quotation marks omitted)). As Plaintiffs state in their Amended Complaint, Google's role in

the paid advertising on its Shopping platform is more active than printing ads in the yellow pages supplied by businesses: "Google takes an active role in creating ads and targeting the advertising of its merchants' products to the very users who are looking for those products." *Id.* ¶ 40.

Even if Google's creation and publication of Shopping Ads are done automatically — as Plaintiffs allege, "[w]ithin a fraction of a second," AC ¶ 43 — Google has cited no cases that suggest that section 1114(1)(b) does not apply to automated processes. Future fact-finding may result in a different liability assessment, but at this stage, Plaintiffs have alleged Google's active involvement in the creation of Shopping Ads using infringing trademarks. The extent to which Google's processes are automated and the ultimate degree of Google's involvement in creating Shopping Ads may also prove relevant to assessing whether Google acted with the requisite knowledge under section 1114(1)(b), or whether an innocent infringer standard under section 1114(2) is met, as discussed further below. *See* 15 U.S.C. § 1114(1) ("Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive."); *cf. Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F. 3d 93, 103 (2d Cir. 2010) (affirming district court's rejection, after bench trial, of direct trademark infringement claim against eBay based on claim that eBay "knew or had reason to know that there was a substantial problem with counterfeit Tiffany [items] being sold on its website" (alteration adopted) (internal quotation marks omitted)). But drawing all inferences in favor of Plaintiffs, as the Court must in this posture, the Court finds that Plaintiffs have pleaded that Google applies reproductions of infringing marks to its Shopping Ads.

Moreover, if there could be no liability under section 1114(1)(b) for those who display infringing paid advertisements on behalf of others, as Google suggests, there would be no

need for section 1114(2)(B), which expressly sets forth an innocent infringer defense for those

publishers:

> Where the infringement . . . complained of is contained in or is part of paid
> advertising matter in a newspaper, magazine, or other similar periodical, or in an
> electronic communication as defined in section 2510(12) of Title 18, the
> remedies of the owner of the right infringed . . . as against the publisher or
> distributor of such newspaper, magazine, or similar periodical or electronic
> communication shall be limited to an injunction against the presentation of such
> advertising matter in future issues of such newspapers, magazines, or other
> similar periodicals or in future transmissions of such electronic communications.

15 U.S.C. § 1114(2)(B). Internet service providers and commercial websites fall with the

definition of electronic communications, *see Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp.

2d 409, 419 n.20 (S.D.N.Y. 2001) (acknowledging that ISPs and commercial websites fall

within the definition of "electronic communication" set forth in the Electronic

Communications Privacy Act and incorporated by amendment in 15 U.S.C. § 1114(2)), and

infringement contained in paid advertising in such mediums is therefore subject to the

innocent infringer defense.

Indeed, in *Hendrickson v. eBay, Inc.*, the plaintiff brought Lanham Act claims against

eBay "premised on a printer-publisher" liability for trademark infringement in connection

with eBay's display of infringing listings on its website. 165 F. Supp. 2d 1082, 1084, 1095

(C.D. Cal. 2001). The court had previously held that "a posting on eBay's website is an

'electronic communication' as defined by Section 2510(12)." Order at 13, *Hendrickson*, 165

F. Supp. 2d 1082 (No. 01-cv-00495), ECF No. 53. In resolving subsequent motions for

summary judgment, the court relied on its previous finding that eBay was an "innocent

infringer" under 15 U.S.C. § 1114(2), *see id.* at 16, and therefore explained that, even if the

plaintiff were to establish infringement, plaintiff's remedy was "limited to an injunction

against the future publication or transmission of the infringing advertisements on eBay's

website," 165 F. Supp. 2d at 1095.  However, the court ultimately found that the need for
injunctive relief was moot because eBay had since "stopped running all the advertisements
claimed to be infringing and it ha[d] no intention of running the identified ads in the future."
*Id.* at 1095.  While the parties have not raised, and the Court need not address, whether the
innocent infringer defense will ultimately apply here, the Court references 15 U.S.C.
§ 1114(2) insofar as the provision helps clarify 15 U.S.C. § 1114(1)(b)'s intended reach.  *See
also Century 21*, 1988 WL 84741, at *3 (noting the applicability of 15 U.S.C. § 1114(2)(b) to
claims of trademark infringement stemming from the publication of infringing advertisements
in yellow pages directory).

    As for Google's assertion that it is no more than a "facilitator of sales" and that courts
"routinely reject claims of trademark liability in similar circumstances," Reply at 9, Plaintiffs
rightly note that Google cites only to authorities discussing liability under section 1114(1)(a),
not section 1114(1)(b).  Liability under section 1114(1)(a) arises when an individual "use[s] in
commerce any reproduction [or] copy . . . of a registered mark in connection with the sale,
offering for sale, distribution, or advertising of any goods or services."  15 U.S.C.
§ 1114(1)(a).  The cases cited by Google turn on whether internet intermediaries can properly
be characterized as making "use" of the mark as a "seller" within the meaning of section
1114(1)(a).  Indeed, the critical question in those cases is "where the alleged infringer . . . falls
on the following spectrum: does it 'avoid liability by acting as a passive facilitator,' or
exercise sufficient control 'over the creation, manufacture, or sale of offending goods, to be
considered akin to a "seller" or "manufacturer" to whom Lanham Act liability applies?'"
*Atari Interactive, Inc. v. Printify, Inc.*, 714 F. Supp. 3d 225, 232 (S.D.N.Y. 2024) (alteration
adopted) (quoting *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 447 (6th Cir. 2021)); *see
also GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 463-64 (S.D.N.Y. 2011)

(observing that a "broker, rather than a direct seller," does not "use" a mark in commerce within the meaning of the Lanham Act, as necessary for direct liability).  For that reason, "passive marketplaces like eBay or Amazon 'that facilitate sales for independent vendors . . . generally escape Lanham Act liability' [under 15 U.S.C. § 1114(1)(a)] while 'parties who design and print trademark-infringing goods typically violate the Lanham Act.'"  *Printify*, 714 F. Supp. 3d at 232 (quoting *Redbubble, Inc*., 989 F.3d at 446).

But that is not the claim alleged here.  Plaintiffs' claim is brought under section 1114(1)(b), which does not require the "use" of the trademark in commerce by the defendant, but instead requires that the defendant "reproduce" or "copy" the trademark by "apply[ing]" the reproduction or copy to "labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce."  15 U.S.C. § 1114(1)(b).  Therefore, unlike section 1114(1)(a), section 1114(1)(b) applies to defendants such as publishers who may not themselves "use" the marks in commerce, but who reproduce and apply infringing trademarks in advertisements intended to be used in commerce.  As discussed above, Plaintiffs have pleaded here that Google applied the infringing marks to the Pirate Sellers' Shopping Ads, and Google has not argued that the Shopping Ads were not advertisements intended to be used in commerce.  Google has not cited to any case finding a defendant not liable under section 1114(1)(b) because the defendant was a passive facilitator of sales that did not make "use" of a mark in commerce, or that even analyzes a section 1114(1)(b) claim under that rubric.

Google nevertheless argues that the "same principles" that apply in the line of § 1114(1)(a) cases "demonstrate why Google is not involved in direct infringement under § 1114(1)(b)."  Reply at 9.  However, Congress has limited liability for publishers with lesser involvement in other ways, including by interposing a knowledge requirement to recover profits or damages under section 1114(1)(b).  *See* 15 U.S.C. § 1114(1) ("Under subsection (b)

hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.").  Moreover, as noted above, where "the infringement . . . complained of is . . . part of paid advertising matter" in various forums, including in an "electronic communication," and the publisher or distributor was an "innocent infringer[]," the registered owner of the trademark may only seek injunctive relief.  15 U.S.C. § 1114(2)(B).  Thus, the Lanham Act itself limits the liability of more indirect actors who engage in displaying or publishing paid infringing advertising on behalf of others without the requisite knowledge.

For the foregoing reasons, the Court finds that Plaintiffs have sufficiently pleaded a trademark infringement claim under Section 1114(1)(b) premised on Google's alleged active creation and publication of infringing Shopping Ads.

## III.    Deceptive Business Practices Claim Under New York Law

Finally, the Court addresses Plaintiffs' claim for deceptive business practices under New York General Business Law ("GBL") section 349, N.Y. Gen. Bus. Law § 349.  Plaintiffs claim that Google violated GBL section 349 when it created and disseminated Shopping Ads for Pirate Sellers on its Shopping platform, "while refusing to run ads for legitimate ebooks." AC ¶ 148.  Google argues that Plaintiffs' deceptive business practices claim fails for two reasons: first, because it is preempted by both the Copyright Act, 17 U.S.C. § 301 *et seq.*, and Lanham Act, and second, because it fails to state a claim in any event.  Br. at 19.  The Court first turns to Google's preemption arguments.

### A.  Preemption

Plaintiffs' deceptive business practices claim arises from Google's policy to ban all digital books from its Google Shopping platform.  AC ¶ 68.  Plaintiffs allege that Google

engages in a "materially deceptive and misleading practice . . . that is directed at consumers and has injured the Publishers" by "creat[ing] and disseminat[ing] on its Shopping platform ads for infringing digital books sold by pirates while refusing to run ads for legitimate ebooks." *Id.* ¶¶ 147-148.  According to Plaintiffs, Google's practice is "directed at two groups of consumers: purchasers of textbooks, and purchasers (or would-be purchasers) of Shopping Ads who wish to use Google's platform to advertise the textbooks they sell."  Opp. at 23 (citing AC ¶¶ 149-150).  Plaintiffs allege that, vis-à-vis purchasers of textbooks, Google's practices are deceptive because Google "misrepresents important information about the market by hiding whole categories of legitimate, high-quality, digital textbooks"; "diverts . . . consumers to pirated books that often are of inferior quality to legitimate books"; and "causes . . . consumers unwittingly to commit copyright infringement when they download an unauthorized copy of a Publisher's work."  AC ¶ 149.  As for textbook sellers, Plaintiffs allege that "no purchaser of Shopping Ads expects Google to advertise standalone ebooks for pirates but not for legitimate sellers, especially considering Google's statement that it does not allow Shopping Ads for any ebooks."  Opp. at 23 (emphasis omitted); *see also* AC ¶ 150.

"Section 301 of the Copyright Act preempts a state law claim if: '(i) the work at issue comes within the subject matter of copyright and (ii) the right being asserted is equivalent to any of the exclusive rights within the general scope of copyright.'"  *Saint-Amour v. Richmond Org., Inc.*, 388 F. Supp. 3d 277, 290 (S.D.N.Y. Mar. 27, 2019) (quoting *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012)).  "The subject matter requirement is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works."  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004).  "A work need not consist entirely of copyrightable material in order to meet the subject matter

requirement, but instead need only fit into one of the copyrightable categories in a broad sense." *Id.* Plaintiffs' textbook and related educational materials satisfy the subject matter requirement. *See, e.g., Briarpatch*, 373 F.3d at 305 ("These categories [of copyrightable works] encompass literary works," (citing 17 U.S.C. § 102(a))); *Pearson Educ., Inc. v. Ishayev*, 963 F. Supp. 2d 239, 246-48 (S.D.N.Y. 2013) (holding that instructors' solutions manuals were derivative works entitled to copyright protection); *see also* 17 U.S.C. § 103(a) (clarifying that the subject matter of copyright includes compilations and derivative works).

The parties' dispute centers on the second prong of the preemption inquiry: the general scope requirement. That requirement is "satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Briarpatch Ltd.*, 373 F.3d at 305. "In other words, the state law claim must involve acts of reproduction, adaptation, performance, distribution or display." *Saint-Amour*, 388 F. Supp. 3d at 290 (quoting *Briarpatch Ltd.*, 373 F.3d at 305). But "[a] state law claim with an 'extra element' beyond mere reproduction, preparation of derivative works, distribution, performance or display, that changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim, survives preemption." *Freeplay Music, Inc. v. Cox Radio, Inc*., 409 F. Supp. 2d 259, 264 (S.D.N.Y. 2005) (quoting *Sharp v. Patterson*, No. 03-cv-08772 (GEL), 2004 WL 2480426, at *7 (S.D.N.Y. Nov. 3, 2004)). To determine whether an action is qualitatively different from a copyright claim, courts consider "what plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Comput. Assocs. Int'l, Inc. v Altai, Inc*., 982 F.2d 693, 716 (2d Cir. 1992) (citation omitted). "An action will not be saved from preemption by elements . . . which alter the action's *scope* but not its *nature*." *In re Jackson*, 972 F.3d 25, 44 (2d Cir. 2020) (omission in original) (quoting *Comput. Assocs.*, 982 F.2d at 717).

To assert a claim under GBL section 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc*., 802 F.3d 289, 300 (2d Cir. 2015) (citation omitted).  Plaintiffs argue that "[f]ederal copyright law does not preempt Plaintiffs' section 349 claim because the claim requires the additional element of deception."  Opp. at 20.  Google disagrees, maintaining that Plaintiffs' section 349 claim is "qualitatively identical to their copyright infringement claims." Br. at 19 (emphasis omitted).  Google argues that, like Plaintiffs' copyright infringement claim, their section 349 claim rests on allegations that "(1) consumers are harmed because Google causes consumers 'unwittingly to commit copyright infringement when they download an unauthorized copy of a Publisher's work' and (2) publishers are harmed because they are deprived of sales when consumers purchase pirated versions of the publishers' textbooks.'"  *Id.* at 19 (quoting AC ¶¶ 149-150).

The Court agrees that Plaintiffs' claims are preempted by the Copyright Act.  To the extent that Plaintiffs allege that Google's policy misleadingly represents to textbook sellers and purchasers that all digital books are banned from its website, the parties agree that Google's stated policy is a neutral policy applicable to all ebook sellers.  Tr. at 35:5-18, 58:11-16, 70:21-24.  The Amended Complaint also states that the policy "ban[s] ads for *all* standalone digital books (i.e., ads that advertise an ebook price or lead to a landing page selling only a digital book, other than audiobooks)."  AC ¶ 68 (emphasis added).  Google's stated policy itself is therefore not the source of any deception.  To the extent, however, that the Plaintiffs allege that deception arises from the *enforcement* (or nonenforcement) of that policy — that is, from the continued advertising of infringing works on the Google Shopping platform notwithstanding Google's stated policy — this theory of deception is "substantively

redundant" of Plaintiffs' copyright claim. *Freeplay Music*, 409 F. Supp. 2d at 264 (citation

omitted). Both Plaintiffs' deceptive business practices claim and their infringement claim

necessarily turn on Google's liability for failing to take down infringing Shopping Ads.

Specifically, Plaintiffs plead that Google's allegedly "deceptive" policy resulted in consumers

"unwittingly" committing copyright infringement — a claim that is the same as Plaintiffs'

assertion that Google contributed to the infringement of Plaintiffs' works by consumers.

*Compare* AC ¶ 94 (describing Google's "deceptive practice" of pushing unwitting consumers

into committing copyright infringement), *with* AC ¶ 122 (alleging Google contributes to

users' unlawful reproduction of Plaintiffs' works). Affixing the label "unwittingly" to the end

of an allegation does not transform what is otherwise a copyright infringement claim into a

deceptive business practices claim. *See, e.g.*, *Saint-Amour*, 388 F. Supp. 3d at 291 (finding

that GBL section 349 claim was preempted where plaintiffs' assertion that "[d]efendants are

deceiving the public by claiming to own [plaintiffs'] copyright . . . is not qualitatively

different than the [p]laintiffs' request for a declaration that the [d]efendants have no valid

copyright"); *Tianhai Lace Co. v. ASOS, PLC*, No. 22-cv-09752 (RA), 2023 WL 3479804, at

*4 (S.D.N.Y. May 16, 2023) (rejecting deceptive business law claim that was "no more than a

copyright infringement claim minimally refashioned with the addition of conclusory

allegations that the infringing conduct was directed at consumers"); *Tianhai Lace Co.*, 2023

WL 3479804, at *3 (collecting cases).

     To the extent Plaintiffs' claim is not preempted by the Copyright Act, it is preempted

by the Lanham Act. As a general matter, the GBL "protects rights not provided by the federal

statute" and therefore "does not conflict with the Lanham Act but rather, it complements it."

*Mony Life Ins. Co. v. Monie Fashions, Inc.*, No. 03-cv-09604 (RJH) (KNF), 2004 WL

875929, at *3 (S.D.N.Y. Apr. 22, 2004) (quoting *Mead Data Cent., Inc. v. Toyota Motor*

*Sales, U.S.A., Inc.*, 702 F. Supp. 1031, 1041 (S.D.N.Y. 1988), *rev'd on other grounds*, 875

F.2d 1026 (2d Cir. 1989)); *see also Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 96 (2d Cir. 1993)

(holding that state law pertaining to anti-dilution was "not preempted by the Lanham Act in

that they each protect different rights").  However, when a claim is based in trademark,

plaintiffs need to show a "specific and substantial injury to the public interest over and above

the ordinary trademark infringement."  *Pulse Creations, Inc. v. Venture Grp., Inc.*, 154 F.

Supp. 3d 48, 58 (S.D.N.Y. 2015) (citation omitted).  Plaintiffs have not done so here.

Plaintiffs' assertion that consumers were diverted to inferior products is not meaningfully

different from the allegation underlying their Lanham Act claim, that is, that consumers were

"misle[d] . . . into believing they are getting a legitimate product at a bargain price, when they

are in fact buying an illicit product."  AC ¶ 8; *see, e.g.*, *Sports Traveler, Inc. v. Advance Mag.

Publishers, Inc.*, No. 96-cv-5150 (JFK), 1997 WL 137443, at *3 (S.D.N.Y. Mar. 4, 1997)

("The courts of this Circuit have held that trademark infringement claims alleging only

general consumer confusion do not threaten the direct harm to consumers that is required to

state a claim under section 349.").

　　　　All that remains of Plaintiffs' GBL section 349 claim is therefore the sparse allegation

that Google provides a misleading representation of the ebook market and therefore hinders

consumers' ability to make "an informed purchasing decision."  Opp. at 21-23.  Plaintiffs

suggest that Google could have lifted its policy to allow advertising from all sellers of ebooks,

given that the Pirate Sellers were somehow evading this policy.  Tr. at 35:25-36:4.  But

Plaintiffs have not cited to any case that requires Google to display ads from all market

participants or else run the risk of "deceiving" the public.  Textbooks from legitimate sellers

(including digital books) are still reflected in the Google Search index.  *See* AC ¶ 49 (showing

that legitimate sellers of McGraw Hill's *Anatomy and Physiology: The Unity of Form and*

*Function* textbook are still captured in Google's organic search results). Google has not made other legitimate products "disappear" from the internet or the marketplace — nor have Plaintiffs made any allegations to that effect. Nor does the AC plead, as Plaintiffs suggested at oral argument, Tr. at 67:10-13, that Google is affirmatively "hiding" or otherwise concealing ads from legitimate sellers.

Plaintiffs cite to *North State Autobahn, Inc. v. Progressive Insurance Group Co.* to argue that practices that constrain a consumer's ability to evaluate the market are inherently deceptive. 953 N.Y.S.2d 96 (App. Div. 2012). But *Autobahn* is readily distinguishable. There, vehicle repair shops alleged that the defendant car insurance companies made misrepresentations regarding plaintiffs' services to claimants who sought to have their cars repaired at plaintiffs' shops, in order to divert claimants to repair shops enrolled in defendants' direct repair program. *Id.* at 99. In denying the defendants' motion for summary judgment, the court found that plaintiffs had sufficiently alleged consumer-oriented conduct, and underscored that section 349 "appli[es] to those acts or practices which undermine a customer's ability to evaluate his or her market options and make a free and intelligent choice." *Id.* at 102. A defendant making affirmatively misleading representations about a subsect of the market is different in kind from Plaintiffs' allegations here. Here, Plaintiffs' assertions amount to little more than a claim that Google has enacted a uniform and neutral policy that, because of the *Pirate Sellers*' conduct, results in only a subset of ebook market participants advertising on the Google Shopping platform. Plaintiffs' allegations therefore do not plausibly establish that Google itself engages in any deceptive practice directed toward either textbook purchasers or textbook sellers.

For the foregoing reasons, Plaintiffs' GBL section 349 claim is preempted by the Copyright Act and Lanham Act, and, to the extent not preempted, fails to allege deception by Google in any event.

## IV.    Motion to Amend

Plaintiffs ask in a footnote that, in the event the Court dismisses any claim, it do so without prejudice to amend.  Opp. at 23 n.6.  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *Veras v. N.Y.C. Dep't of Educ.*, No. 22-cv-0056 (JLR) (SN), 2024 WL 3446498, at *8 (S.D.N.Y. July 17, 2024) (quoting *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018)), *aff'd,* No. 24-1956, 2007 WL 10131754 (2d Cir. Feb. 6, 2025) (summary order).

Plaintiffs have already had an opportunity to amend the Complaint once after a prior motion to dismiss was filed that raised the same infirmities raised herein.  *See* Dkt. 28; *Blackbird Tech LLC v. Argento SC ex rel. Sicura, Inc.*, No. 21-cv-11018 (DLC), 2022 WL 3701084, at *3 (S.D.N.Y. Aug. 26, 2022) (holding that leave to amend was not appropriate where the plaintiff "already had an opportunity to amend its complaint after [defendant] initially moved to dismiss").  Moreover, a plaintiff  "need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).  Plaintiffs have offered no information about what amendments or additions they would assert in a Second Amended Complaint.  *See Gregory ProNAi Therapeutics, Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (summary order) (affirming denial of leave to amend where "plaintiffs sought leave to amend in a footnote at the end of their opposition to defendants' motion to dismiss" and "included no proposed amendments").  Nor did they raise the request for leave to amend at the lengthy oral

argument or provide any further specification therein as to what allegations would be added in a Second Amended Complaint. Therefore, leave to amend is denied.

## CONCLUSION

For the foregoing reasons, Google's motion to dismiss is GRANTED in part and DENIED in part. Counts II and IV of the Amended Complaint are dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 43.

Dated: June 4, 2025
       New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge