IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENGAGE LEARNING, INC.; BEDFORD, FREEMAN & WORTH PUBLISHING GROUP, LLC D/B/A MACMILLAN LEARNING; MACMILLAN HOLDINGS, LLC; ELSEVIER INC.; ELSEVIER B.V.; and MCGRAW HILL LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>GOOGLE LLC,<br><br>*Defendant*. | Case No. 1:24-cv-04274-JLR-BCM |

### ATTORNEY DECLARATION OF SARAH TOMKOWIAK

I, Sarah Tomkowiak, declare that:

1. I am a partner at the law firm Latham & Watkins LLP, counsel for Google LLC in this matter.

2. I submit this declaration in connection with Google's reply in support of its letter motion for a stay pending the Supreme Court's decision in *Cox Communications, Inc. v. Sony Music Entertainment*, No. 24-171, 2025 WL 1787701 (U.S. June 30, 2025).

3. I reviewed the notice data at PL0000543994 and PL0000535577 that Plaintiffs refer to in the attorney declaration of Jeff Kane in support of Plaintiffs' opposition to Google's letter motion to stay, Dkt. 123 ¶¶ 1–2. Based on the metadata associated with these documents and my examination of the same, it appears to me that PL0000543994 and PL0000535577 are exports of a database maintained by Plaintiffs' vendor BCGuardian with data purporting to reflect Google Shopping ads for certain textbooks that the vendor observed and for which it subsequently purports

1

to have submitted infringement notices to Google. The data in these spreadsheets appears to reflect advertisements purportedly observed as early as April 4, 2022 and as late as June 9, 2025. Each row identifies a separate allegedly infringing URL. The data appears to include certain works purported to be owned by a publisher that is *not* a plaintiff in this lawsuit (*e.g.*, row 130 of PL0000543994) as well as works purported to be owned by Plaintiffs but not asserted in this case (*e.g.*, the title referenced in rows 111889, 112478–79, 116453–54, 127123–34, and 142413–14 of PL0000535577).

4. A team at FTI Consulting ("FTI"), whom Google has retained in connection with this matter, conducted an analysis of these spreadsheets, which I reviewed. The below analysis assumes, conservatively and for the limited purpose of responding to Plaintiffs' claims of prejudice, that each one of the advertisements reflected in these spreadsheets in fact reflects an instance of an infringing work by an advertiser on Google's Shopping platform, and that the information contained in these spreadsheets is true and accurate. Google has not, however, verified the completeness or accuracy of these spreadsheets, and neither I nor anyone involved in the analysis has any personal knowledge of how these spreadsheets were compiled.

5. Even with the above assumptions, FTI was not able to replicate Plaintiffs' calculations reflected in their filings regarding this data, because Plaintiffs have not precisely described how they filtered and counted the data in these spreadsheets.

6. FTI observed that there are 155,948 advertisements reflected in PL0000543994 and PL0000535577 after removing advertisements for works owned by the non-plaintiff publisher. 45,414 of these advertisements (29%) are from September 17, 2024 (the date after Plaintiffs filed their amended complaint, Dkt. 38) or later. Of these 45,414 advertisements post-dating Plaintiffs' amended complaint, only 30% (13,559) are connected to one of the 1,239 domains at issue in this

case.[1] 70% of these advertisements (31,855) are connected to *other* domains. The percentage of the notices connected to one of the 1,239 domains at issue in this case is even lower when focusing on Plaintiffs' data from the last few months. For the 21,400 advertisements observed since February 1, 2025, only 1,001 (4.7%) were connected to one of the relevant domains. 95.3% were connected to other domains.

7. These 1,001 advertisements observed since February 1, 2025 are connected to just five of the 1,239 relevant domains (0.4%). And of the over 7,359 works on Plaintiffs' Amended Exhibit A, Dkt. 120, only 17 (0.2%) are represented in one of these 1,001 advertisements observed since February 1, 2025 reflecting a relevant domain.

8. With respect to the ad-level data for both free listings and paid Shopping ads that Google produced to Plaintiffs today (July 22), I understand that the standard retention period for the data sources containing this material is ▮▮▮▮▮.

9. The statements in Mr. Kane's declaration that Google has agreed to conduct monthly collections "*only if* Plaintiffs stipulate to Google's proposed stay," Dkt. 123 ¶ 5 (emphasis modified), and that "Google confirmed during a July 16 meet-and-confer that Google does not agree to perform these data pulls *unless* Plaintiffs agree to a stay," *id.* (emphasis added), are false and materially misrepresent Google's position.

10. By way of background, counsel for Google sent an email to Plaintiffs' counsel on July 3, 2025 asking to meet and confer regarding Google's anticipated motion for a stay. Counsel

---

[1] The 1,239 domains at issue in this case are those in the Domain Spreadsheet provided from Plaintiffs to Google on December 24, 2024 in connection with the parties' discovery dispute regarding so-called "Related Ads Merchants." *See* Dkt. 72 ¶ 1. This Domain Spreadsheet contains "the domains Plaintiffs identified in Digital Millenium Copyright Act notices that Plaintiffs or their representatives sent to Google through September 16, 2024 and that Plaintiffs contend infringe or infringed one or more works asserted by Plaintiffs in Appendix A of the Amended Complaint, Dkt. 38-1." *Id.* This list of domains has been the basis for Google's merchant and offer-level data collections in this case.

for the parties met and conferred a week later, on July 10. During this conferral, counsel for Plaintiffs stated that they could not provide their position on Google's motion. See Dkt. 117.

11. Google filed its letter motion for a stay that evening. See Dkt. 117.

12. Four days later, on July 14, 2025, counsel for Plaintiffs sent Google's counsel an email in which they communicated for the first time that Plaintiffs would be prejudiced by a stay because "important evidence of infringement" in Google's systems would be "lost." Specifically, counsel for Plaintiffs raised a concern regarding Google's database that contains Merchant Center offer data, which is a dynamic production database that contains a massive amount of data, the vast majority of which is irrelevant to this case.

13. As Google had previously explained to Plaintiffs, ongoing collections of Merchant Center offer data is not remotely proportional to the needs of the case. Google has already produced over 1 TB of data and over 10.4 billion entries reflecting the offers associated with the 20,145 merchants associated with Plaintiffs' 1,239 domains. The database in which such offer data is stored is designed such that ensuring *forward-looking* preservation of any further offer data from these merchants would either require Google to undertake the onerous exercise of making fundamental architectural changes to a database in active use by the business or ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. As Google explained to Plaintiffs, that effort is not proportional to the needs of this case, as it is unlikely such efforts will uncover additional relevant data at any meaningful scale. In fact, based on the merchant account data Google has produced in GOOG-CENG-00000703 and GOOG-CENG-00392941, only ▬ of the 20,145 merchants reflect accounts that are not already suspended or retired. Nonetheless, in light of Plaintiffs' asserted concerns about "lost" evidence, counsel for Google sent an email response the next day asking whether, if Google agreed to conduct monthly

4

collections of Merchant Center offer data during the period of the stay (among other agreements not relevant here), Plaintiffs would be willing to stipulate to a stay.

14. Counsel for the parties met and conferred regarding this issue on July 16, 2025. During this conferral, counsel for Plaintiffs asked if Google was conditioning its agreement to conduct monthly collection of Merchant Center offer data on Plaintiffs' stipulation to a stay. In response, I expressly confirmed that Google's offer to conduct monthly collections of Merchant Center offer data was *not* contingent on Plaintiffs' agreement to a stay. I stated that, while Google believed that monthly ongoing collections of such data was not proportional to the needs of the case, for purposes of eliminating the prejudice claimed by Plaintiffs, Google would nevertheless perform those monthly collections during the period of a stay, *regardless* of Plaintiffs' position regarding the proposed stipulation. To be clear, even though Plaintiffs did not stipulate to a stay, Google remains willing to perform those monthly collections during the period of a stay to address Plaintiffs' concerns regarding the "loss" of this (minimally, if at all, relevant) data.

15. Mr. Kane's declaration and the arguments in Plaintiffs' opposition based on his statements also misrepresent Google's position on Plaintiffs' ability to serve Shopping ads for eBooks during the pendency of this lawsuit. Google's counsel has not represented to Plaintiffs' counsel that Google "will not allow [ebook] ads from Plaintiffs while the instant litigation is ongoing." Dkt. 123 ¶ 7 (emphasis removed); *see also* Dkt. 121 at 3. I am unaware of any Google representative making such a statement, either.

16. As part of its "Unsupported Shopping Content" policy, Google currently disallows content containing "eBooks and digital books (not including audiobooks)" in Shopping ads. *See* "Unsupported Shopping Content," Google Merchant Center Help, https://support.google.com/merchants/answer/6150006 (last accessed July 22, 2025).

5

17.   Google is currently conducting a small beta testing program regarding a potential modification of that policy that would allow a small group of legitimate publishers to serve Shopping ads for eBooks. In conversations with Plaintiffs' counsel, my colleagues and I informed them of that beta program, and of Google's decision not to invite Plaintiffs to participate in that beta program because the parties are in active litigation.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed July 22, 2025, in McLean, Virginia

_____
Sarah A. Tomkowiak