

Michele H. Murphy
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.450.5643
michele@oandzlaw.com

July 25, 2025

**VIA ECF**

The Honorable Jennifer L. Rochon
United States District Court for the Southern District of New York
500 Pearl Street, Room 1920
New York, NY 10007

      Re:    *Cengage Learning, Inc. et al. v. Google LLC*, No. 24:cv-04274-JLR-BCM
            Joint Status Report

**Public (Redacted) Version**

Dear Judge Rochon:

      The parties submit this Joint Status Report in accordance with the Court's Civil Case Management Plan and Scheduling Order. Dkt. 110 ("Scheduling Order") ¶ 7(a)(vii).

      On July 14, Plaintiffs filed Amended Exhibit A (copyrighted works) and Exhibit B (trademarks) to the Amended Complaint. Dkt. 120-1, 120-2. The amendment increased the number of copyrighted works-in-suit from 4,313 to 7,359. In Amended Exhibit B, Plaintiffs added three trademarks to the existing twelve trademarks in suit. There currently are two motions pending: Defendant Google's Letter Motion for Stay Pending Supreme Court's Decision in *Cox* (Dkt. 117, 121, 123, 129, 131, 133), and Plaintiffs' Motion to Strike Defendant's Affirmative Defenses (Dkt. 134–35). Google's opposition to the latter is due on August 6, 2025.

      The current discovery schedule is as follows: Except for certain productions for which the due dates have passed, "[t]he parties shall complete their document productions . . . by no later than August 15, 2025." Scheduling Order ¶ 7(a)(ix). The parties have until August 29 to serve interrogatories and requests for admissions. Under the current discovery schedule, fact depositions will begin after the August 15 document production deadline. *Id.* ¶ 7(d). The parties may take up to 20 fact depositions per side, not including those under Rule 30(b)(6). *Id.* ¶ 19. Fact discovery is currently scheduled to close on November 17 and expert discovery closes on March 16, 2026. *Id.* ¶¶ 7(e), 8(c).

      Below, the parties provide their respective positions on the status of fact discovery.

      **I.**      **Plaintiffs' Report**

      In over ten months of discovery, Google has produced fewer than 600 documents, and most of Plaintiffs' discovery requests remain unfulfilled. While Google has produced certain *data* relating to the infringing ads and the infringing merchants, even that production remains incomplete, and much of it was produced far after the Court's previously ordered deadlines.

      This case involves infringement of more than 7,000 copyrighted works and more than 100,000 infringing ads. While subject to Plaintiffs' motion to strike, Google has asserted an affirmative DMCA defense and thus has put at issue more than just Google's infringement of Plaintiffs' works, but its entire program, including its practices for taking down infringing content and for terminating repeat infringers. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) (holding that it was error not to consider the defendant's treatment of infringement notices

Hon. Jennifer L. Rochon
July 25, 2025

from non-party rightsholders). The relevant conduct covers a period of more than five years. There is potential for more than $1 billion in statutory damages alone. Google's production of 600 documents and incomplete and tardy data does not come within driving distance of meeting its discovery obligations for a case of this magnitude. Google has refused to produce entire categories of important documents, and failed to produce documents that it *has agreed* to produce.[1]

As discussed at page 3 below, Plaintiffs request leave to file one consolidated letter motion concerning several of the most pressing discovery issues in the case, to be filed August 5, 2025.

### A. Google has refused to produce important categories of documents and has yet to produce many documents it agreed to produce

Google has refused to produce several categories of critical documents and failed to produce many of the documents it agreed it *would* produce.

*First*, Google has refused to produce several categories of important documents. To take a few examples:

- Google has refused to indicate when its current DMCA policy was put into place. This has made it impossible for Plaintiffs to determine the proper start-date for numerous discovery requests. Fundamentally, Google is attempting to rely on its repeat infringer policy. Google must produce not just the policy, but changes to the policy, and communications about the development and implementation of the policy. None of this can be done without knowing when the policy was adopted.

- Google has refused to gather custodial documents from numerous Google personnel who processed infringement notices from Plaintiffs, or who processed a large number of infringement notices overall. Google likewise has refused to include management-level employees whom Google's own documents list as participating in the escalation process for evaluating infringement notices. Moreover, Google's most recent production contains numerous custodians that have clear relevance, but whom Google failed to identify during the parties' exchange of proposed custodians and search terms. As a result, Google's search for custodial documents returned at most 17,628 documents.[2] Google likewise hid the ball on who the relevant custodians were. For example, Google's counsel represented in multiple meet-and-confers and in writing that Google does not possess organizational charts. That is, of course, absurd for a company the size and wealth of Google. Indeed, a recent production from Google included numerous organizational charts, but for periods that cover only part of the relevant time-frame and for groups that do not include everyone involved in Google's shopping ads and take down processes.

- The Shopping results that Google displays to its users often include buttons or filters that allow the user to narrow the Shopping ads to those advertising ebooks, or textbooks, or products in PDF format. Dkt. 38 ¶¶ 57,58. These features are significant. For example, Plaintiffs generally do not sell their textbooks in PDF format, and until recently, Google

---

[1] Today, less four hours before the parties' agreed-upon filing time for the instant report, Google made a small production of 137 documents. There was not sufficient time before this filing to review this production.

[2] And it is unclear whether it is even that many. The hit report Google shared with Plaintiffs only provided the number of hits for each term; it did not disclose the number of instances in which the same document was returned by more than one search.

Hon. Jennifer L. Rochon
July 25, 2025

- *only* ran ebook ads for ebooks sold by pirate sellers. Thus, these filters effectively narrow the results to infringing content. Google, however, has refused to produce documents concerning these features.

- Google's responses to Plaintiffs' notices indicate that Google will stop reviewing notices from a particular sender if the sender has submitted multiple notices reporting the same landing page. Dkt. 38 ¶ 108. This is significant because Plaintiffs (and likely other rightsholders) appropriately sent notices concerning the same landing page when Google failed to take down ads for that landing page. *Id.* Google, however, has refused to produce data concerning the number of instances in which it stopped processing notices pursuant to this policy.

- Google has refused to produce certain data for the period *after* the September 16, 2024 date of the Amended Complaint (Dkt. 38). ■■■■■■■■■■■■■■■■■■■■■■■■■■

  Google cannot claim to have terminated these merchants, and yet refuse to turn over the records that would show whether it really did terminate those merchants and under what circumstances. Likewise, Google continued advertising infringing copies of Plaintiffs' works, including for the pirates at issue in this case, *after* September 16, 2024. Dkt. 123 ¶¶ 2–3. And Plaintiffs sent thousands of notices concerning these ads. *Id.* Yet so far, Google has cut off its production of notice, ads, and revenue data concerning these pirates at September 16, 2024. This data will allow Plaintiffs to test whether Google did in fact take down the ads and terminate the pirates Google claims to have. Yet Google refuses to produce it.

- Google has refused to produce documents from the tracking system Google uses to log information concerning Google's handling of specific infringement notices. And it is unclear whether Google retrieved documents from a database that it uses to track critical information concerning its merchants.

Plaintiffs have met and conferred exhaustively with Defendant on these and other issues and expect that most or all will be the subject of motion practice. Rather than submitting separate letter motions concerning numerous issues, Plaintiffs request leave to file one 15-page letter motion concerning several of the most pressing discovery issues in the case, to be filed August 5, 2025.

**Second**, Even among those documents Google has *agreed* to produce, Google's productions are woefully incomplete.

- Google has produced *no* documents concerning the number of takedowns/terminations it claims to have executed in its DMCA program overall. This data is critical to test Google's claim that it is entitled to a DMCA safe harbor defense. If Google is permitted to pursue this defense, it will need to show, *inter alia,* that it took down infringing content "expeditiously" after receiving an infringement notice, and that it terminated "repeat infringers" in appropriate circumstances. *See* 17 U.S.C. § 512(d)(1)(C), 512(i)(1)(A).

- For those purported takedowns for which Google *has* produced data, Google has failed to produce any data indicating the date on which Google claims to have executed those takedowns. This data is key to evaluating whether Google took ads down "expeditiously", as it must to obtain safe harbor. *See* 17 U.S.C. § 512(d)(1)(C).

- Google has produced only a handful of custodial documents, and almost no internal

Hon. Jennifer L. Rochon
July 25, 2025

> communications, including almost no instant messages. Given that Google employees likely communicate internally using instant messaging, this raises serious questions about the search methodology.

- Google has produced almost no documents concerning its ban on ebooks. There should be significant documents relating to the decision to adopt this policy, as well as documents relating to its failed implementation.

- Google has produced almost no documents regarding Plaintiffs' trademark claim, including documents to support its own claim that Google does not "copy" or "apply" trademarks to Shopping ads. Dkt. 52 at 7; Dkt. 44 at 16.

- Google has refused even to *preserve* important data concerning the ads it created and ran for the pirates at issue in this case. Dkt. 123 ¶¶ 4–6.

In sum, Google is massively behind in producing documents.

### B. To date, Google has been missing its discovery deadlines

Last March, Plaintiffs sounded the alarm to Google that in six-plus months of discovery, Google had produced only 200 documents. Dkt. 85. Plaintiffs asked Google to agree to certain interim deadlines, to ensure that document discovery would be completed in sufficient time for both sides to review documents and follow up as needed before depositions began. *Id.* When Google refused to do so, Plaintiffs asked the Court to set interim deadlines for Google's productions. At a hearing on March 17, Google made two commitments to the Court. First, Google would meet an existing March 31, 2025 deadline to produce a substantial amount of important data. Second, Google would make "rolling productions" of all other documents in the case, rather than leaving those productions to the last minute. Hr'g Tr. 16:13–14 (Mar. 17, 2025). Based on Google's commitment, the Court did not order interim deadlines but did order Google to make good on that promise and produce documents on a rolling basis, rather than waiting until the end of the document discovery.

> [The Court:] [L]et's say after you get through the March 31 deadline—because we're almost there—and you produce what you've agreed to produce by March 31, between March 31 and the July 1 completion date, will you be producing—and I assume the answer to this is yes—on a rolling basis, so when documents are ready you're going to produce them to plaintiffs, you're not going to wait until the July 1 deadline and produce all the documents; is that correct?
>
> MS. TOMKOWIAK: That's correct.

Hr'g Tr. 14 1–22 (Mar. 17, 2025). *See also* Id. at 23:10–14 (The Court ruling, "I do expect . . . both the plaintiff and the defendant to produce things on a rolling basis, and that has been confirmed by the defendant here that they are doing that, and will do that . . . no document should be withheld until one of the deadlines here or the July 1 deadline.").

Unfortunately, Google has failed to follow through on both of those commitments and make meaningful rolling productions in the four-plus months since the March 17 hearing. First, Google has failed to make meaningful rolling productions. In total, Google produced fewer than 400 documents between March 17 and the instant filing. This is a paltry amount in a mass infringement case concerning more than 7,000 works (Dkt. 120-1), more than 100,000 advertisements, and conduct that spans more than five years. One of the reasons for Google's lack

Hon. Jennifer L. Rochon
July 25, 2025

of production became evident during a recent meet-and-confer when Google defended its lack of production by claiming that discovery is not due until August 15, ignoring their commitment and the Court's Order to produce documents on a rolling basis.

Second, the production Google made on March 31 was materially deficient. Indeed, Google has had to make several supplemental productions in an attempt to fill the gaps its March 31 production left.

- First, by February 7, 2025, Google was supposed to identify the Merchant Center accounts associated with the 1,239 pirates that Plaintiffs identified to Google in December 2024. Dkt. 76 ¶ 1, bullet 3. Instead, Google identified only 35% of the relevant Merchant Center accounts/domain combinations on February 14 and produced the remaining 65% on May 30. And likely many are still missing.

- Second, by March 31, 2025, Google was supposed to produce all the infringement notices it received from any party concerning the 1,239 pirates Plaintiffs identified. Dkt. 76 ¶ 1, bullet 2 (referencing RFP 27). But Google has made four supplemental productions of notices since March 31 and still has not produced all the relevant notices.

- Third, by March 31, 2025, Google was supposed to produce all the advertisements Google showed its users promoting the 1,239 pirates Plaintiffs identified, including the dates those ads were shown. Dkt. 76 ¶ 1, bullet 2 (referencing RFP 36, bullets 4–6; RFP 37 bullets 2–3, 7 (Dkt. 47-1)). But Google did not produce these ads. Instead, it produced a list of "offers", i.e., product information that the pirates provided, from which Google could have created ads. This is not a substitute for ads data. It does not include the dates that Google turned these "offers" into ads and showed them to Google users. The dates on which Google ran an ad are critical to showing whether Google did so after receiving an infringement notice, after it claims to have taken down the ad, and/or after it claims to have terminated the pirate.[4] After Google failed to produce complete data by March 31, the Court required, and Google agreed, to produce it by July 22. Dkt. 76 ¶ 1 (RFP 37, bullet 7); Dkt. 110 ¶ 7(a)(vi). Google waited until July 22; Plaintiffs are reviewing this production.

Google thus failed to meet the March 31 deadline to produce substantial and important data. In the parties' correspondence on Google's lack of productions, Google has tried to rely on its productions supplementing its March 31 production as evidence that Google made rolling productions in accordance with the Court's Order. Each of those productions, however, comprised data that Google was ordered to produce on or before March 31. There can be no serious argument that Google has complied with the Court's order that it made productions "on a rolling basis" and that "no document should be withheld until one of the deadlines . . . ." Hr'g Tr. 23:10–14 (Mar. 17, 2025).

Google's history of missing deadlines has prejudiced Plaintiffs' ability to litigate this case.

---

[3] Google contends that this deadline was actually February 14, but that distinction hardly matters now given that the production was incomplete.

[4] And even as to the "offer" data that Google did produce, Google produced nearly ███████ rows of data on June 2, more than two months after the March 31 deadline. The March 31 and June 2 productions combined included approximately ███████ rows of data.

### C. The Court should deny Google's request for an extension of discovery

At 3:00 PM on the day this filing was due, Google proposed for the first time that discovery be extended by 90 days. The Court should deny Google's request and order Google to produce all remaining discovery by the current August 15 deadline.

Google claims that it is on track to meet the current August 15 deadline, but needs an extension anyway because the additional works Plaintiffs added to the suit involve "new" domains. For all the reasons explained above, Google is not on track to meet the August 15 deadline. And contrary to Google's suggestion, no "new" pirates are implicated by the additional works-in-suit. Each of the works added to the suit were advertised by a domain that was registered to the same Merchant Center account as one of the 1,239 domains Plaintiffs identified to Google on December 24, 2024. Google nonetheless chose not to produce documents concerning those domains. Google wants an extension only because it is not on track to meet the current August 15 deadline. The Court should not reward Google for failing to produce documents on time.

### D. Plaintiffs have met their discovery obligations

Notwithstanding that most of the discovery in an infringement case comes from the defendant (*see Tianhai Lace USA Inc. v. Forever 21, Inc.*, 16-cv-5950 (AJN), 2017 WL 4712632, at *5 (S.D.N.Y. Sept. 27, 2017)), Plaintiffs have provided extensive discovery to Google. Each Plaintiff has responded to 93 separate RFP issued by Google. Plaintiffs started rolling productions on November 14, 2024, and have collectively made 20 productions totaling over 236,000 documents, 870 GB, and 2.6 million pages. Those productions have required significant, time-consuming collection efforts from multiple departments and teams within Plaintiffs' organizations, including pulling and reporting substantial data from complex databases and review efforts prior to production. The productions comprise multiple types of documents, including, without limitation, copyright and trademark registrations; agreements between Plaintiffs and the authors of the works; documents showing Plaintiffs' chain-of-title; notices of infringement that Plaintiffs sent to Google and related data; evidence of Google's ads and pirate sites selling infringing works; Plaintiffs' communications with Google about the pirate sites and Google's support thereof; Plaintiffs' responsive custodial communications that hit on agreed upon search terms;[5] digital copies of thousands of works-in-suit; broad financial data concerning the works; documents regarding Plaintiffs' well-known trademarks, including brand guidelines, research and trademark usage; and documents from other infringement cases that Plaintiffs have brought. Plaintiffs have also begun production of documents relating to the copyrighted works that were added to Exhibit A on July 14. Plaintiffs are well-positioned with respect to the August 15 deadline for their own productions.

The parties have met and conferred on certain issues concerning Plaintiffs' document productions and reached agreement to resolve a number of issues. Google has not raised any issues concerning Plaintiffs' production to which Plaintiffs' response to Google remains outstanding.

Plaintiffs also responded to nine interrogatories that Google propounded. Most of these interrogatories were improper under Local Rule 33.3(a) and (c), including because they are contention interrogatories. The parties met and conferred, and Plaintiffs agreed to amend certain

---

[5] Plaintiffs have run custodial searches using eight search strings across 11 custodians, have started rolling productions of responsive, non-privileged documents, and have been working diligently to complete review and production of custodial documents.

Hon. Jennifer L. Rochon
July 25, 2025

responses within two or four weeks after the close of document discovery. Google has not raised any issues concerning Plaintiffs' interrogatory answers to which Plaintiffs' response is outstanding.

**Google's manufactured concerns about Plaintiffs' discovery are unfounded**. Plaintiffs have produced substantial evidence of direct and secondary infringement. Among that evidence are screenshots of (1) Google's ads for infringing works, (2) pirate site landing pages (i.e., "product pages") to which these ads directly link, and (3) evidence of Plaintiffs' purchases from those product pages ("test buys"). *See* Am. Compl., Dkt. 38, ¶¶ 49–54. Google's statement that these screenshots are "irrelevant" and "junk" is absurd. That some portion relate to Google's pirate customers selling infringing works that were not ultimately included in the case or the works of another rightsholder that sent Google notices for infringing ads does not make them "junk," let alone "improper." Google is attempting to put its whole DMCA program at issue, and evidence of infringement need not be limited to particular asserted works. *CCBill LLC*, 488 F.3d at 1113. The real issue is that Google is misusing an interrogatory in an effort to massively burden Plaintiffs, asking them to reorganize the documents by a method of Google's choosing. Plaintiffs are not required to do so. *See* Fed. R. Civ. P. 34(b)(2)(E). Overall, Plaintiffs produced the landing pages by date and pirate site *and* produced them with metadata that identifies the works; the ads by date with similar metadata (and Google's own data obviously shows the works it advertised); and the test buy documents by work.[6]

There should be no disputed issue concerning Plaintiffs' copyright registration production. Plaintiffs have produced registrations for the works listed in the Amended Complaint and are in the process of producing them for works added on July 14. Moreover, notwithstanding the Second Circuit's holding that when a plaintiff "is the owner of the copyright of both the derivative and pre-existing works, the registration certificate relating to the derivative work will suffice to permit it to maintain an action for infringement," Plaintiffs have agreed to produce the registrations for prior editions of the works-in-suit. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 747 (2d Cir. 1998) (cleaned up). Plaintiffs have also agreed to produce chain-of-title documents necessary to show Plaintiffs' ownership of those prior editions if they list an owner other than a Plaintiff (i.e., how the Plaintiff acquired those rights). This is more than sufficient.

Google improperly issued its interrogatory about Plaintiffs' damages as a premature contention interrogatory. Still, Plaintiffs conferred with Google and agreed to provide extensive information in response at the appropriate time. Plaintiffs' initial disclosures were not deficient on this issue. Plaintiffs may elect to recover statutory damages under 15 U.S.C. § 504(c) at any time before final judgment. And Google ignores that it had yet to produce information regarding the scope of its infringement and revenue that it earned from the pirates (and has yet to produce certain information such as payments the pirates made to Google for advertisements on other Google platforms besides Shopping). *See* Fed. R. Civ. P. 26 Advisory Committee's Notes, 1993 Amendments ("Likewise, a party would not be expected to provide a calculation of damages which . . . depends on information in the possession of another party or person.").

---

[6] Plaintiffs do not understand Google's claim that Plaintiffs should have identified "by beginning bates number" documents regarding infringed works before they filed suit. And Plaintiffs' notices to Google clearly identify their works. Google has long had this information and now also has it in data form from Plaintiffs' production. Plaintiffs have produced substantial information supporting every aspect of their claims.

Hon. Jennifer L. Rochon
July 25, 2025

## II.  Google's Report

When Google conferred with Plaintiffs on July 23 about the content and format of this joint filing, Plaintiffs made clear that their intent was to use this briefing as an opportunity to air a voluminous set of grievances about Google's document productions. They did not, however, preview their plan to request permission to file a 15-page omnibus letter motion concerning their discovery complaints. Google's position is that this "joint" filing should not be treated as a discovery motion, and Plaintiffs' request for a special procedural vehicle to launch a barrage of unspecified discovery complaints, without meaningful conferral, is unwarranted. *See Barbera v. Grailed, LLC*, 2024 WL 4836616, at *2 (S.D.N.Y. Nov. 20, 2024) ("The Court expects parties to obey its individual practices and the Rules of Federal Procedure by seeking to meet and confer to try to resolve discovery issues before seeking the Court's intervention").[7] Ultimately, the discovery disputes that have arisen in this case are entirely ordinary for a case of this size and complexity and require no special procedure. Instead, discovery disputes should be presented through the procedure specified in Rule 2(E) of this Court's Individual Rules of Practice in Civil Cases. Ultimately, Plaintiffs' ever-expanding demands—both with respect to the inflation of existing discovery requests and the addition of information associated with new works and domains— amount to the untenable proposition that Google engage in countless rounds of supplemental discovery at Plaintiffs' whims. While Google welcomes a realistic discussion of whether expanding the scope of discovery is proportional to the needs of this case, any such expansion must be subject to an attendant extension of discovery deadlines and a cutoff for such discovery.

In the context of this joint status report, Google cannot meaningfully review or respond to each of the issues raised by Plaintiffs.[8] However, with the intent of providing the Court with a comprehensive status update, Google provides the following summary of the parties' discovery efforts to date, including the deficiencies in Plaintiffs' own productions and disclosures.

### A. Discovery deadlines should be extended by 90 days, at a minimum, to account for new discovery resulting from Plaintiffs' amendments

Discovery in this case has focused on the particular works asserted by Plaintiffs, as well as the merchant accounts that are alleged to have advertised pirated copies of those works on Google's platform. On December 24, 2024, following a discovery dispute, Plaintiffs provided a list of domains (1,239 total) Plaintiffs had identified in DMCA notices through September 16, 2024 and that Plaintiffs also alleged infringed one or more works asserted in Appendix A of the Amended Complaint. The Court ordered that Google use that list as the basis for a cascading trove of discovery, which Google has produced on a rolling basis since February. *See* Dkt. 72 ¶¶ 1–6; Dkt. 76. Google was prepared to complete document discovery on that original set of works and domains by the existing August 15 deadline.

But this Court recognized, given that Plaintiffs were allowed to amend their complaint to add new works and marks, *see* Dkt. 110 ¶ 6, the scope of that discovery might change. Specifically, at a March 17 hearing regarding Plaintiffs' request for interim discovery deadlines, the Court indicated that this joint status report should focus on whether, as a result of Plaintiffs' amendment

---

[7] Indeed, Plaintiffs have never raised several of the issues Plaintiffs raise in their statement, and Plaintiffs tellingly describe their litany of complaints about Google's productions as "as few examples."

[8] Plaintiffs insisted on providing a lengthy separate statement in this "joint" filing without identifying the issues Plaintiffs planned to raise in advance. The parties ultimately agreed to a mutual exchange of positions (not to exceed 7 pages each) at 3:00 p.m. today, July 25, with a final exchange at 7:00 p.m.

Hon. Jennifer L. Rochon
July 25, 2025

to Exhibits A and B of the Complaint, there would be any additional discovery that would impact the final document discovery deadline. Hrg. Tr. (Mar. 17, 2025) at 26:21–27:8. Google's position is that all discovery deadlines must be extended by a minimum of 90 days to account for the significant additional discovery (the full scope of which remains unknown) that will be required because of Plaintiffs' amendment. *See* Hrg. Tr. (Mar. 17, 2025) at 25:14–22 (recognizing that if Plaintiffs' amendment leads to "an expanded universe of works and merchants," discovery regarding those works and merchants "will still need to be collected").

Plaintiffs amended the Complaint on July 14 to add 3,256 works and three trademarks. *See* Dkts. 120-1, 120-2. Google's counsel wrote to Plaintiffs' counsel on July 15, asking for confirmation that Plaintiffs would not be identifying additional domains as a result of Plaintiffs' amendments. Plaintiffs' counsel responded on July 18 stating that Plaintiffs were "not seeking to add any domains to the 1,239 domains listed in Plaintiffs' December 24, 2024 email" but that "[a]ll of the works included in Amended Exhibit A (Dkt. 120-1) were advertised either by one of the 1,239 domains, *or by a domain related to one of the 1,239 domains*." (emphasis added). Google's counsel wrote back that same day to clarify whether the reference to domains "related to one of the 1,239 domains" meant that one or more domains *not* on Plaintiffs' December 24, 2024 list of domains should be subject to discovery, and requested that Plaintiffs promptly disclose any such domains. Over a week after Google's original request, on July 23, Plaintiffs' counsel finally disclosed that they were, in fact, seeking discovery regarding additional domains. They stated that they would "provide Google with a list of 'Identical Account Domains,'" which they defined as "domains for which Google advertised a work included in Dkt. 120-1, and that are or were part of the same Merchant Center account as one of the December 24th Domains." Plaintiffs explained that they expect Google to "produc[e] the same discovery with respect to the Identical Account Domains as it is with respect to the December 24th Domains" and to "retrieve all the Merchant Center accounts associated with the Identical Account Domains, and conduct the same discovery with respect to those Merchant Center accounts that is conducting with respect to the Merchant Center accounts Google already has identified." Google has yet to receive Plaintiffs' list of so-called "Identical Account Domains," and does not know how many domains are on this list.

Because Plaintiffs' amendments implicate a yet-unknown number of additional domains and merchants, Google requires an extension of fact discovery. In order to pull the information Plaintiffs demand regarding these additional merchants (whether it is 10 or 1,000), Google will need to engage no less than six separate individuals at Google to pull these merchants' (1) associated identifying information and offer data; (2) associated interaction and conversion metrics for their paid Shopping ads; (3) associated interaction and conversion metrics for their free listings; (4) associated revenue information; (5) associated notice data and communications; and (6) associated Google ad account information. Moreover, much of this work must be done serially (i.e., Google must first identify the relevant merchant center accounts, then must collect those merchants' offers, then must use those offers to collect associated metrics). And before Google can produce *any* of the requested information, per internal policy, it will notify the identified merchants and provide 21 days for them to object. *See* Dkt. 73 n.2. Plaintiffs, likewise, have additional discovery obligations regarding the 3,256 new works, including to produce (for each work): (1) the copyright registration; (2) the work itself; (3) chain of title documentation; (4) the allegedly infringing advertisement that led to a sale of the pirated version of the work on a third-party website; (5) evidence that a pirated version of the work was available for sale on the third-party

9

Hon. Jennifer L. Rochon
July 25, 2025

website; (6) the DMCA notice(s) to Google regarding the work; (7) Plaintiffs' sales of the work; and (8) the prior edition(s) of the work excluded from the scope of the asserted work.

Finally, as recently as July 16, Plaintiffs served 17 new requests for production. Google's responses and objections are not even due until August 15.[9] Service of these late-coming discovery requests, too, counsels in favor of extending the document discovery deadline.

### B. Google has met its discovery obligations

<u>For discovery pre-dating amendment, Google is on track to complete productions by August 15</u>. Since January, Google has made twenty unique productions totaling over 60,000 documents and approximately *1.2 terabytes* of data. Plaintiffs' assertion that Google has produced only 600 documents is a gross understatement by any measure. Indeed, just the offer data produced on March 31 and June 2 totals 1,000 documents. Google's productions have included:

- Google's DMCA policies and associated documents;

- Spreadsheets with identifying and account status information for over 20,000 merchant center accounts, including over 1,300 merchant center accounts identified by historical association with a plaintiff domain, via presumptively inaccessible data that Google voluntarily undertook to search,[10] and the full historical log of associated domains for all 20,000 merchant center accounts;

- Identifying and account status information for over 15,000 "Email-Connected" merchants (*see* Dkt. 72), including over 300 accounts identified by association with a historically identified account;

- Data reflecting the content of over ████████ unique offers associated with the set of over 20,000 merchants (totaling over ████████ rows);

- Revenue information for all Shopping ads run by these merchants;

- Metrics reflecting, on a daily basis, the exposure and interaction with over ████████ unique offers;

- Over ████████ unique noticed URLs associated with DMCA notices submitted by any person for Plaintiffs' domains and domains associated with "Email-Connected" merchants, and associated DMCA handling information for each record, including over ████████ noticed URLs associated with Plaintiffs' domains;

---

[9] While Plaintiffs noted by email that "several" of the newly-served RFPs were "issued out of an abundance of caution notwithstanding Plaintiffs' position that many or all of them are covered by Plaintiffs' prior requests and/or the parties [sic] discussions regarding what Google will produce in response to those requests," Google disagrees with that characterization. Many appear to seek new information not called for by any previously served RFPs.

[10] As the Court is aware, Google diverted significant resources between March and June to identify additional Merchant Center accounts that were historically (but are no longer) connected to one or more allegedly infringing domains and pull associated information about those merchants' identities, offers, and corresponding notice data and communications. *See* Dkt. 106 at 3; Hrg. Tr. (May 30, 2025) at 17:3–10. Google's position remains that it was not obligated to undertake these efforts, which required Google to access and collect historical log data, since the parties' stipulated ESI Protocol makes clear that such data is presumptively inaccessible. *See* Dkt. 80 ¶ 2(f)(vi), (ix).

Hon. Jennifer L. Rochon
July 25, 2025

- Hundreds of thousands of pages of notice data and communications associated with all of the DMCA notices described above; and

- Various emails, policies, guidelines, and other documents relating to Google's Shopping platform, including hundreds of documents from the custodial files of seven agreed-upon custodians, and one internal listserv, using nine agreed-upon search terms.

Responding to many of Plaintiffs' discovery requests (which to date total 112 Requests for Production of Documents and 15 Interrogatories[11]) has required navigation of complex, interrelating data sources and custom data pulls—some involving the creation of new, bespoke code—by different teams within Google. Despite the complexity of discovery in this case, Google has hit every interim deadline not subject to an ongoing scope dispute, *see* Dkt. 72 ¶ 4, for the data Plaintiffs have repeatedly claimed is critical to their claims, and then some.

The bulk of Google's data-heavy productions (with respect to merchants identified using the current list of 1,239 domains) are complete. Google is making rolling productions of custodial documents and other discrete collections, and is on track, barring any unforeseen circumstances, to serve remaining productions by August 15. Google also anticipates supplementing its productions through the close of fact discovery to resolve minor issues identified by the parties.

<u>Plaintiffs' complaints about Google's productions are unfounded and exaggerated</u>. As detailed above, Google has produced to Plaintiffs troves of relevant data and engaged with Plaintiffs on dozens of meet and confers and email threads that are collectively hundreds of pages long. Google has gone above and beyond to cooperate with Plaintiffs during the discovery period—including by engaging with Plaintiffs' attorneys to answer dozens of factual questions about the meaning and interpretation of Google's data productions. There can be no legitimate dispute that Google has met and is continuing to meet its discovery obligations, even if Plaintiffs may wish that Google had conducted its searches differently or proceeded with productions in a different manner. *See, e.g.*, *Hyles v. New York City*, 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016) (the standard for discovery is "not perfection, . . . but whether the search results are reasonable and proportional"); *see also Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 2014 WL 584300, at *2 (S.D.N.Y. Feb. 14, 2014) (in large cases, document production can be a "herculean undertaking" for which "no one could or should expect perfection"); *id.* ("All that can be legitimately expected is a good faith, diligent commitment to produce all responsive documents uncovered when following the protocols to which the parties have agreed, or which the court has ordered."). Indeed, Plaintiffs' renewed criticism that it has yet to receive certain information *that is not yet due* is not a legitimate basis for arguing that Google's productions are "woefully incomplete." Again, while Google is unable to address every inaccuracy in Plaintiffs' section, the majority of Plaintiffs' complaints are premature, exaggerated, or in some cases not even raised to Google before today. For example, Google has not "refused to indicate when its current DMCA policy was put into place." The policy first applicable to the alleged infringements (starting June

---

[11] Plaintiffs served their first set of ten interrogatories on February 21, 2025, to which Google provided responses and objections on March 24. On April 18, Plaintiffs issued an "amended" set that modified five of those interrogatories. Google provided supplemental responses to Plaintiffs' first set of interrogatories and responses to Plaintiffs' five "amended" interrogatories on May 19. Because "every interrogatory which is served, and causes a responding party to undertake the burden of preparing and serving objections to the interrogatory, is counted against the numerical 25 interrogatory limit for purposes of Rule 33(a)," *Walker v. Lakewood Condo. Owners Ass'n*, 186 F.R.D. 584, 587 (C.D. Cal. 1999), Google has counted the five amended interrogatories as interrogatories 11–15.

2021) was dated ████████, and Google produced that policy on February 7. That Plaintiffs demand Google's counsel answer when Google's DMCA policy was "put into place" or "created" going back some further unspecified period of time is both nonsensical in the context of an evolving internal policy and not proportional to the needs of this case, as Google has explained. Plaintiffs are also simply wrong that they have *even asked for* data concerning instances in which Google stopped processing notices pursuant to a purported policy regarding duplicate notices. The relevant RFP asked for documents reflecting instances where Google "stopped processing Infringement Notices from a particular sender or rightsholder for any period of time" and Google is in the process of collecting and preparing data in response.

Contrary to what Plaintiffs claim, Google has met every deadline. The basic premise of Plaintiffs' assertion that Google "missed" the March 31 deadline set by Dkt. 76 is that Google failed to identify the full set of relevant merchant center accounts in its February 14 production, and therefore failed to produce all related notice and ads data on March 31. But, as Google has explained, it complied fully with the Court's orders at Dkt. 72, 76 to produce a trove of data associated with merchant center accounts "exactly matching" one of Plaintiffs 1,239 domains and additional data for those connected by a shared email address identifier. The voluntary supplemental productions that Google made after March 31 were to provide Plaintiffs with data regarding *additional* merchants that historically (but no longer) "matched" Plaintiffs' domains. *See* Dkt. 106 at 3.[12] And to the extent Plaintiffs claim that merchant data remains "missing," they ignore Google's confirmation that it has already produced all responsive information it is reasonably able to uncover in its possession, custody, or control. *See Adidas Am., Inc. v. Thom Browne, Inc.*, 742 F. Supp. 3d 352, 365 (S.D.N.Y. July 29, 2024) ("Courts only require . . . that a party conduct a 'reasonable search' for documents in response to a request, not that they boil the ocean to ensure every potentially responsive item is produced) (internal citation omitted)); *see also Carvana, LLC v. IBM Corp.*, 2024 WL 4867092 (S.D.N.Y. Nov. 22, 2024) (denying motion to compel "missing" data that "may be relevant to [plaintiff's] claims where the defendant had "established that it produced all responsive, reasonably accessible documents in its possession, custody, or control"). Google cannot produce what it does not have or cannot reasonably locate. Plaintiffs' other discovery complaints about Google's data amount to little more than issues around the margins.

Plaintiffs' contention that Google's *custodial* document productions to date have been too small also lacks merit. The basis for this contention appears to be speculation, *e.g.*, that Google's search methodology must be flawed because Plaintiffs expected to see more instant messages. But parties "cannot simply rely on speculation" that additional documents might exist, *Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 435 (S.D.N.Y. 2011), and "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for . . . producing their own electronically stored information," *The Sedona Principles, 3rd Ed.*, 19 Sedona Conf. J. 1, Principle 6, 118 (2018). Indeed, as Plaintiffs' allegations rest on "Google's systemic and pervasive advertising of unauthorized, infringing copies" of Plaintiffs' works, Dkt. 38 ¶ 1, Google's custodial

---

[12] Plaintiffs are incorrect that the impression and conversion data Google produced on July 22, pursuant to the Court's order at Dkt. 110, were originally due March 31. That data was requested in RFP 37 bullets 4–5, and the Court's order at Dkt. 76 required only that Google produce documents responsive to RFP 37 bullets 1-3 and 7 by March 31. Furthermore, Google disagrees that the "offer" data Google produced at the end of March was insufficient to meet its obligations under the Court's orders. In any case, that issue was considered and resolved by the Court at Dkt. 110.

Hon. Jennifer L. Rochon
July 25, 2025

documents are not a significant source of information in Google's possession in this case, and Google does not anticipate producing tens of thousands of custodial documents and emails. However, in coordination with disclosures and exchanges with Plaintiffs between January 31 and July 14, 2025, Google has run custodial searches using nine search terms strings across seven custodians (along with one internal listserv) and started rolling productions on April 29, 2025. Google is continuing to review and produce custodial documents. Notably, Plaintiffs' custodial search term custodians and hit counts are on par with Google's—Plaintiffs' total custodial hit count is 15,573 (across 5 plaintiffs). The parties' productions are also similar (five Plaintiffs have produced a little over 200 custodial emails (excluding communications between Plaintiffs' attorneys and Google which were not subject to the custodial exchanges) starting on July 10, while Google has produced over 400 custodial documents, starting on April 29). The parties' completion and review of these productions will reveal if there will be disputes that require court intervention.

### C. Plaintiffs' discovery to date has material deficiencies

Plaintiffs have made 17 productions totaling 236,528 documents. However, to put those numbers in context, by Google's count, all but approximately 2,700 of these documents are ones that Plaintiffs would and should have collected prior to filing their Complaint or reflect junk documents irrelevant to this dispute. For example, among the approximately 230,000 documents in Plaintiffs' productions, nearly 150,000 are screenshot dumps purportedly depicting the Asserted Works for sale on third-party webpages, advertisements of the Asserted Works by pirate sellers on Google's Shopping platform, and documents evidencing Plaintiffs' purchase of the Asserted Works from the pirate sellers. Plaintiffs did not bother to remove from the screenshots they produced ones relating to (1) a publisher that is not a plaintiff in this proceeding and (2) works that have not been included in Exhibit A.[13] Not only was this dump of irrelevant material improper, *see S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 409-10 (S.D.N.Y. 2009) ("[Rule 34] prohibits 'simply dumping large quantities of unrequested materials onto the discovering party along with the items actually sought.'"), it demonstrates why Plaintiffs' productions are not a meaningful comparator for the adequacy of Google's productions. And including all Plaintiff productions, Plaintiffs' total volume of produced documents remains less than half of Google's total volume produced to date.

To make sense of Plaintiffs' document dump, which will only continue to grow with their amendment, Google served interrogatories seeking, *inter alia*, information on a work-by-work basis supporting Plaintiffs' allegations of direct infringement by a third party, which is required to sustain contributory infringement claims. The parties resolved all but two areas of disagreement with respect to Plaintiffs' interrogatory responses.[14] But Plaintiffs still refuse to identify, on a work-by-work basis, (1) the bates number for each document depicting a work in suit on a third party's webpage offering it for sale, and (2) the bates number for each advertisement of a work in suit by a third party on Google's platform that, according to Plaintiffs, led to a sale of that Asserted Work. Although Plaintiffs must have done this work before bringing suit—and must do so to make a

---

[13] Plaintiffs' productions also contain over 50,000 other documents that would have been compiled by Plaintiffs or their vendors in the course of their copyright enforcement efforts, and would have been available to Plaintiffs prior to initiating this lawsuit, including documents reflecting the contents of the works in suit, 4,325 documents reflecting those works' certificates of registration, and removal requests and DMCA notices.

[14] Plaintiffs claim that there are no issues with their RFP or ROG responses outstanding. But they have yet to provide amended responses to Google's first set of RFPs or interrogatories consistent with the parties' compromises.

Hon. Jennifer L. Rochon
July 25, 2025

prima facie claim of contributory infringement for each work—they claim to have no plans to provide it to Google. Google anticipates bringing this discovery dispute to the Court in short order.

Plaintiffs have also failed to produce critical and basic discovery regarding the scope of material claimed by their asserted registrations. The vast majority of Plaintiffs' works in suit are later editions of original textbooks, and Plaintiffs have primarily asserted the copyright registrations that correspond with those later editions. When Google sought clarification from Plaintiffs as to the scope of their infringement claims, Plaintiffs confirmed that they are asserting that third parties who advertised on Google infringed the entirety of each work, including content that may (or may not) be protected by prior registrations. *See* U.S. Copyright Office, Circular 14 (derivative work registrations must exclude material that was "previously registered"). Although proof of registration of the allegedly infringed material is a threshold issue, Plaintiffs initially resisted such discovery and continue to refuse to provide Google with any evidence of precisely what material is covered by each registration. *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 206, 213-14 (S.D.N.Y. 2009) ("[U]nauthorized copying of a derivative work infringes the derivative work itself only to the extent of the newly added material; any infringement of the preexisting material infringes the pre-existing work, rather than the derivative work from which the pre-existing material may have actually been copied."). Plaintiffs also continue to resist Google's requests for discovery that test the presumption of ownership afforded by a copyright registration. *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012) (while a "certificate of copyright registration is prima facie evidence of ownership of a valid copyright," defendants are allowed to "rebut that presumption" with contrary proof). For example, Plaintiffs have refused to produce chain-of-title documents sufficient to show their ownership of prior editions unless the copyright claimant listed on the registration is not one of the Plaintiffs. Absent agreement to produce this information, Google intends to seek court intervention.

Finally, Plaintiffs have failed to provide, in their initial disclosures, "a computation of each category of damages" claimed by Plaintiffs, as required by Rule 26(a)(1)(A)(iii). Although nearly nine months have passed since Plaintiffs served their initial disclosures, Plaintiffs' operative disclosures still provide no computation, nor an articulation of how a computation might be calculated, nor even a single *category* of damages Plaintiffs will pursue. That is insufficient and particularly egregious now, many months into discovery. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006) ("[B]y its very terms Rule 26(a) requires more than providing—without any explanation—undifferentiated financial statements; it requires a 'computation,' supported by documents."). Plaintiffs' ongoing failure prejudices Google's ability to conduct discovery regarding Plaintiffs' damages theories because Google does not know what damages Plaintiffs are seeking, and Google reserves the right to seek all remedies for this deficiency, including seeking to limit Plaintiffs' damages to the statutory minimum. *See Atari Interactive, Inc. v. Redbubble, Inc.*, 546 F. Supp. 3d 883, 888 (N.D. Cal. 2021) (copyright holder may only seek "an award of minimum statutory damages without disclosing any damages calculations"); *cf. Roberts v. Ground Handling, Inc.*, 2007 WL 2753862, at *4 (S.D.N.Y. Sept. 20, 2007) (failure to disclose a theory of damages in Rule 26 initial disclosures "is alone sufficient to preclude [a plaintiff] from submitting evidence of it at trial."). Absent agreement to produce this information, Google intends to seek court intervention regarding Plaintiffs' deficient disclosures as well.

Hon. Jennifer L. Rochon
July 25, 2025

### D. Pending motions

There are two pending motions: (1) <u>Plaintiffs' Motion to Strike</u>: Plaintiffs filed a motion to strike certain of Google's affirmative defenses in its Answer, *see* Dkt. 116, on July 23. Dkts. 134–35. Google intends to oppose Plaintiffs' motion, and will file its opposition on or before August 6; (2) <u>Google's Motion to Stay</u>: On July 24, the Court granted Plaintiffs' motion for leave to file a sur-reply in opposition to Google's Letter Motion for Stay Pending Supreme Court's Decision in *Cox*, but did not set a deadline for Plaintiffs' submission. *See* Dkt. 136. **Google respectfully requests that the Court set a deadline of Monday, July 28 for Plaintiffs' sur-reply**.

Respectfully submitted,

/s/ Michele H. Murphy
Michele H. Murphy
OPPENHEIM + ZEBRAK, LLP
Counsel for Plaintiffs

*/s/ Sarah A. Tomkowiak*
Sarah A. Tomkowiak
LATHAM & WATKINS LLP
Counsel for Defendant