IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENGAGE LEARNING, INC. et al.<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | **Civil Action No. 24-cv-04274-JLR-BCM**<br>*[Redacted]* |

**ATTORNEY DECLARATION OF
JEFF KANE**

1. I am an attorney at the law firm Oppenheim + Zebrak, LLP ("O+Z"), counsel for all Plaintiffs in this matter. I submit this declaration in support of Plaintiffs' Sur-Reply in Opposition to Google's Letter Request to Stay Discovery.

2. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently hereto.

**I.   Google's Practice of Allowing Ads from Other Legitimate Publishers, but Not from Plaintiffs**

3. Google's attorney declaration does not accurately capture what Google's counsel communicated to Plaintiffs regarding Google's practice of allowing ads from some legitimate publishers, but not from Plaintiffs. Google's counsel states: "Google's counsel has not represented to Plaintiffs' counsel that Google 'will not allow [ebook] ads from Plaintiffs while the instant litigation is ongoing.'" Dkt. 131 ¶ 15. But in an email dated June 9, 2025, counsel for Google stated just that. Google's counsel confirmed that Google now allows certain legitimate publishers to advertise standalone ebooks, and stated: "Google has no obligation to include in this test program publishers who have sued, and claim they are entitled to hundreds of millions of dollars

1

in damages from, Google. While the parties are in active litigation, Google is not interested in this type of business relationship with Plaintiffs." Google's counsel continued, "Google is happy to fold Plaintiffs' request into the parties' broader ongoing conversations regarding a resolution of Plaintiffs' lawsuit." A true and correct copy of copy of this email is attached as Exhibit 1.

4. Likewise, Google has not agreed to allow Plaintiffs to advertise their ebooks during any stay, nor to allow such ads from Plaintiffs at any point in the future. Below is a screenshot of Google Shopping ads illustrating this issue. A search for "Lehininger Principles of Biochemistry e-textbook" (Plainitff Macmillan Learning's work) returns an ebook ad for a competing biochemistry title (sold by Pearson, a legitimate publisher) and three ads for pirated ebooks. Macmillan Learning's ad only appears below in a text ad and is for a *physical* book. Google will not allow Macmillan Learning to advertise its lower-priced ebooks, but will allow pirates to do so, and will allow competitors to do so for competing titles.



5. Moreover, Google's counsel tells the Court that the "program" pursuant to which Google is allowing ebook ads from legitimate publishers is 1) a "beta" program, and 2) involves

only "a small group of legitimate publishers . . . ." Dkt. 131 ¶ 17. Google has provided no documentation or other evidence to substantiate either of those claims. After Google filed its declaration, Plaintiffs emailed Google's counsel to request documents supporting these claims. In a July 24, 2025 email, Google refused to provide any such documentation, and likewise has refused to produce such documents in response to Plaintiffs' requests for production on these issues.

### II.     Google's Refusal to Preserve Certain Data Unless the Court Enters a Stay

6.     Google's Reply Letter and Attorney Declaration leave out key information concerning Google's data retention. As Plaintiffs pointed out in their Opposition, Google has informed Plaintiffs that ███████████████████████████████████████████████████████████████████████████████████████████████████████████ In its Reply Letter and Attorney Declaration, Google discusses a different set of data: "ad-level metrics." Dkt. 129 at 3; Dkt. 131 ¶ 8. This data includes the dates that certain "offers" ran as ads but does *not* include the product advertised or the landing page to which the ad linked. To retrieve that information, one must consult the "offer" data. And Google has identified no way to locate the "ad-level metrics" for a given ad other than using the identifying number for that ad from the offer data.

7.     Yet in response to Plaintiffs' concerns that the offer data has not been preserved to date and will not be preserved in the event of a stay, Dkt. 121 at 3, Dkt. 123 ¶¶ 4–6, Google proclaims that the ad-level metrics are retained for ███████ Dkt. 131 ¶ 8. But without the accompanying offer data, these ad-level metrics are of little or no use (if they can be located at all).

8.     Moreover, even as to the retention period for the "ad-level metrics," Google has provided no evidence to support its assertion that the retention period for this data is ███████ .

3

After Google filed its declaration, Plaintiffs asked Google's counsel to provide documentation substantiating this claim or to identify the Google employee on whom counsel relied in making this claim. In an email dated July 24, 2025, Google refused to do so.

9. Google likewise takes liberties with the potential effect of this data loss. First, Google reports that nearly 20,000 of the Merchant Center accounts Google has identified currently are "already suspended or retired." Dkt. 131 ¶ 13. What Google has failed to address is whether this means that offer data from these accounts already has been "purged" pursuant to Google's retention practices. Moreover, that an account is suspended does not mean that Google has stopped running ads for the domain associated with that account. Indeed, whether Google actually stopped running ads for accounts it claims to have suspended is a key issues in this suit.

10. Google likewise contends that Plaintiffs' Attorney Declaration (Dkt. 123) did not accurately capture Google's position on whether it will preserve the offer data. Plaintiffs' Attorney Declaration accurately captured my understanding from Google's July 15, 2025 email correspondence, and from the parties' July 16, 2025 meet-and-confer, namely that Google was conditioning its preservation of offer data on Plaintiffs agreeing to a stay. Google appears now to claim that during the July 16 meet-and-confer, Google in fact meant to convey that Google would also preserve this data in the event that the Court entered a stay over Plaintiffs' objection. This flimsy distinction appears nowhere in the July 15 email from Google's counsel introducing this proposal, certainly was not made clear during the July 16 meet-and-confer, and is barely clear in Google's Declaration. Dkt. 131. In any case, the distinction makes no difference. Google is conditioning preserving this data on a stay being entered; if a stay is not entered, Google refuses to preserve. The facts Plaintiffs conveyed to the Court remain accurate: "[I]ssues concerning

Google's preservation of evidence have come to light only by dint of the progress of discovery," and a "stay thus risks the loss of important evidence." Dkt. 121 at 2.

### III. Google's Continued Infringement

11. Google's Attorney Declaration purports to convey the results of an "analysis" performed by FTI Consulting regarding the notice data reflected in Plaintiffs' PL0000543994 and PL0000535577. Dkt. 131 ¶ 4.

12. Plaintiffs' Attorney Declaration reported more than 16,000 instances in which Plaintiffs sent Google an infringement notice identifying a specific Shopping ad for a particular landing page selling an infringing copy of one of Plaintiffs works, but Google continued to run that advertisement after receiving the notice. Dkt. 123 ¶ 1. All of these 16,000+ instances involved domains at issue in this case. *Id*. Google's Attorney Declaration did not challenge this calculation.

13. Google's Attorney Declaration likewise does not dispute that Google has continued advertising infringing copies of Plaintiffs' works, including as recently as July 7, 2025. Dkt. 123 ¶ 3.

14. Plaintiffs' Attorney Declaration also calculated the number of instances in which Plaintiffs' notice data reflected Google advertising an infringing copy of Plaintiffs' works after the Amended Complaint was filed on September 16, 2024. Dkt. 123 ¶ 2. Google's Attorney Declaration calculates a *higher* number of infringements than Plaintiffs calculated. *Compare* Dkt. 121 at 3 (Plaintiffs stating that Google ran 17,000 such ads since the September 2024 Amended Complaint, 5,000 of which were for one of the 1,239 domains Plaintiffs identified to Google) with

5

Dkt. 131 ¶ 6 (Google calculating it ran 45,414 such ads, 13,359 of which advertised one of the 1,239 domains).[2]

15.  Google's Attorney Declaration mistakenly presumes that any domains other than the 1,239 domains Plaintiffs provided to Google on December 24, 2024 are domains that are not at "issue in this case." Dkt. 131 ¶¶ 6–7. This assumption is unfounded. As Google's data shows, the 1,239 domains that Plaintiffs identified on December 24 are part of the same Merchant Center accounts as ███████████████████. GOOG-CENG-00000703; GOOG-CENG-00392941; GOOG-CENG-00392942. Plaintiffs' notice data reflects thousands of ads for ███████████████████████████████████████████████████████████████

16.  I further understand that Plaintiffs' vendor observed additional Shopping ads for infringing copies of Plaintiffs' works on July 21, 2025, including for pirates at issue in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 30, 2025, in Washington, D.C.

/s/ *Jeff Kane*
Jeff Kane

---

[2] Google's declaration states that "FTI was not able to replicate Plaintiffs' calculations reflected in their filings . . . ." Dkt. 131 ¶ 5. Google leaves out that Plaintiffs provided these calculations to Google on July 22, less than an hour after Google informed Plaintiffs that Google was unable to "replicate" Plaintiffs' numbers.