

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
jkane@oandzlaw.com

August 5, 2025

**VIA ECF**

The Honorable Jennifer L. Rochon
United States District Court for the Southern District of New York
500 Pearl Street, Room 1920
New York, NY 10007

> Re:  *Cengage Learning, Inc. et al. v. Google LLC*, No. 24:cv-04274-JLR-BCM
>       Plaintiffs' Letter Motion for Pre-Motion Conference

[Redacted]

Dear Judge Rochon:

Plaintiffs respectfully submit this letter motion to compel Google to produce six categories of important evidence that Google so far has refused to produce: 1) documents showing whether Google ran ads for pirates Google claims to have terminated, 2) documents concerning filters Google applies to Shopping ads that narrow the results to ads for pirated content, 3) documents concerning Google's policy of refusing to process notices from certain rightsholders under certain circumstances, 4) documents from several important custodians, 5) documents from the database Google uses to track infringement notices and other copyright enforcement issues, and 6) the date that Google's operative DMCA policy was created and put into operation.

Plaintiffs previewed these issues in the parties' Joint Status Report, Dkt. 138, and the Court granted Plaintiffs leave to file one consolidated letter addressing all of them. Dkt. 140. Plaintiffs continue to work with Google on several other key issues, and hope to be able to reach resolutions, but may need to bring some additional issues to the Court in the future.

## I.    Google must produce documents showing whether it ran ads for pirates Google claims to have terminated.

Google claims that in response to Plaintiffs' notices, it eventually stopped advertising many of the pirates who sold infringing copies of Plaintiffs' works. Yet Google refuses to produce the documents that would show whether Google actually did so. Google decided to impose a September 16, 2024 end-date for retrieving certain critical information in this case: the advertisements it ran for the pirates at issue, the infringement notices it received concerning those pirates, and the revenue it collected from those pirates. *See* Dkt. 47-1, Plaintiffs' Requests for Production ("RFP") 27, 28, 33, 34, 37, 38. Yet for pirates that Google claims to have terminated *before* September 16, 2024, Plaintiffs' records show numerous ads that Google ran for those same pirates *after* that date. And Google itself claims ███████████████████████████████ ████████████████████ Google should not be allowed to claim that it terminated pirates at issue in this case, and also be allowed to hide the evidence that shows whether Google actually did so. Google must produce documents showing the advertisements it ran, the infringement notices it received, and the revenue it collected concerning the pirates at issue in this case *after*

Hon. Jennifer L. Rochon
August 5, 2025

September 16, 2024.[1] And because Plaintiffs have observed Google running ads for infringing copies of Plaintiffs' works (including for pirates at issue in this suit) as recently as July 21, 2025 (Dkt. 148 ¶ 16), Google should produce these documents through that date.

### A. Background

Google claims that the safe-harbor(s) of the Digital Millennium Copyright Act, 17 U.S.C. § 512, render Google exempt from damages for Google's secondary copyright infringement.[2] Dkt. 116 at 23. To be eligible for the safe-harbor, Google must have (among other things) "reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of . . . account holders . . . who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). In other words, when a given pirate became a "repeat infringer", Google must have stopped advertising that pirate's products. *Id.* If Google claims to have terminated a pirate, but in fact continued running ads for the pirate, that indisputably bears upon whether Google "reasonably implemented" its DMCA policy, and on Google's eligibility for the safe-harbor.

From the incomplete data that Plaintiffs have now, Plaintiffs already can see that Google in fact *did* advertise after September 16, 2024, domains that it claims to have suspended on or before that date. Indeed, after September 16, 2024, Plaintiffs observed (and sent infringement notices to Google concerning) more than 1,600 ads for domains that Google claims it suspended before that date. Atty. Decl. ¶ 3(a). Equally important, ███████████████████████████████████████████████████████████████. *Id.* ¶ 3(b).

Yet Google has refused to produce data concerning the ads it ran, the notices it received, or the revenue it earned from any pirates for any period after September 16, 2024. In other words, when Google pulled data to take credit for suspensions it claims to have undertaken, it did *not* cut off that data at September 16, 2024. Yet when it pulled the data that would show whether Google really *did* suspend these merchant accounts, it imposed a September 16 cutoff.

### B. Documents showing whether Google advertised the relevant pirates after September 16, 2024 are highly probative.

Documents concerning the ads Google ran, notices it received, and the revenue it earned after September 16, 2024 are relevant to multiple issues. First, for the factfinder to determine whether Google actually *did* suspend the pirates at issue, Google must produce data on the ads it ran for these pirates and the notices Google received concerning these pirates. Google cannot claim that it suspended certain accounts, and yet refuse to produce the data that will show whether Google actually did so. Second, if Google earned additional revenue from these pirates after September 16, 2024, Google should not be allowed to hide that revenue.

Third, that Defendant has continued advertising (and earning money on) infringing copies of Plaintiffs' works for more than a year after Plaintiffs filed this lawsuit is important evidence of Google's willfulness, knowledge, state-of-mind, and of the profound need for deterrence. *See Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986) (considering the need

---

[1] So far, Google has produced two forms of data concerning the ads it ran for the pirates at issue: ████████████████████████████████████████████████████████████████████████████████████████████████████████████ For the avoidance of doubt, Google must produce both forms of data for the period September 16, 2024 through July 21, 2025.

[2] Plaintiffs have moved to strike Google's DMCA defense for failure to provide factual support or cite the particular safe harbor on which it seeks to rely. Dkt. 135 at 4–5.

Hon. Jennifer L. Rochon
August 5, 2025

to discourage the defendant and deter others in evaluating the appropriate amount of copyright statutory damages); *Union of Orthodox Jewish Congregations of Am. v. Royal Food Distributors Liab. Co.*, 665 F. Supp. 2d 434, 436 (S.D.N.Y. 2009) (same for trademark statutory damages).

Fourth, these documents are key evidence of the need for a permanent injunction. Courts often consider evidence of whether a defendant continued infringing after receiving a cease-and-desist letter or being sued.[3] That Google has continued its infringement for such a long period of time makes clear that a permanent injunction is necessary.

### C. The Court did not previously rule on this issue.

During the parties' meet-and-confer on this issue on June 26, 2025, Google took the position that a prior ruling of this Court set a September 16, 2024 cutoff for *all* discovery. This is incorrect; the Court's ruling was not nearly so sweeping.

The Court previously decided only what dates the parties would use to determine the list of pirates about whom Google would be required to produce certain data. *See, e.g.*, Hr'g Tr. 68:19–21 (Dec. 18, 2024) ("[Ms. Tomkoviak:] [W]e have one more dispute, which is whether there should be some cutoff for the domains that we use for this exercise."). The Court ruled only that the *pirates* about whom Google would retrieve certain information had to be included in Plaintiffs' infringement notices sent on or before September 16, 2024. Dkt. 72 ¶ 1 ("Plaintiffs will provide Google with a spreadsheet (the 'Domain Spreadsheet') containing a list of the domains Plaintiffs identified in Digital Millenium Copyright Act notices that Plaintiffs or their representatives sent to Google through September 16, 2024 and that Plaintiffs contend infringe or infringed one or more works asserted by Plaintiffs in Appendix A of the Amended Complaint, Dkt. 38-1."). The Court did *not* rule on a cutoff date that would apply to *all* document production in this case. Indeed, the Court specifically disclaimed ruling on topics like the ones addressed here: "The Court understands the precise scope of these RFPs is the subject of ongoing negotiations by the parties. Those disputes are not now before the Court, and the Court does not take a position on those disputes at this time." Dkt. 72 ¶ 4; Hr'g Tr. 78:5–23 (Dec. 18, 2024). Thus, the Court's prior ruling has no bearing on the cutoff date for the instant discovery. But even if it did, Google has waived any right to rely on a September 16, 2024 cutoff by offering evidence that it terminated some of the pirates in question *after* September 16, 2024.

Therefore, Google must produce documents showing the advertisements it ran, the infringement notices it received, and the revenue it collected from September 16, 2024 through July 21, 2025 concerning the pirates at issue in this case (i.e., all the Merchant Center accounts Google discloses to Plaintiffs as associated with the pirates Plaintiffs identified).[4]

### II.  Google must produce documents concerning its policy of punishing rightsholders

---

[3] *See, e.g.*, *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 637 (S.D.N.Y. 2018) ("Plaintiffs have established the need for a permanent injunction. Evidence presented at trial . . . reveals that Defendants continue to sell counterfeits."); *McGraw-Hill Glob. Educ. Holdings, LLC v. Khan*, 323 F. Supp. 3d 488, 500 (S.D.N.Y. 2018); *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011), ("A plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue infringing its copyright(s).") (quoting *Pearson Educ., Inc. v. Vergara*, No. 09-cv-6832, 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010)).

[4] In addition to the June 26 meet-and-confer, Plaintiffs followed up with a detailed email on June 30 and another email on July 9, and discussed the issue in the July 25 status report. Dkt. 138 at 3. Google did not respond to any of these communications.

Hon. Jennifer L. Rochon
August 5, 2025

**who send follow-up notices when infringing ads are not removed.**

On many occasions, Plaintiffs sent an infringement notice to Google identifying a particular advertisement that promoted an infringing copy of one of Plaintiffs' works, but weeks or more later, Google would still be running the very same infringing ad. Dkt. 123 ¶ 1. Where Plaintiffs observed this, i.e., where they saw than advertisement they had identified to Google as infringing had not been removed after some time, Plaintiffs would send a second (or third, or more) notice to Google, again asking Google to remove the ad. *Id.*

On several occasions, in response to such notices, Google scolded a Plaintiff for sending these follow-up notices, and even threatened to stop processing *all* infringement notices from that Plaintiff.

> We've detected that you have already submitted these URLs through previous requests. We're either working to respond to these URLs or have already responded, and we ask that you not send repeated requests containing the same URLs as this delays our process. Please note that if we continue to receive the same duplicative request from you three or more times, we will consider that particular request to be manifestly unfounded. Manifestly unfounded requests may lead us to temporarily stop reviewing your requests for a period of up to 180 days.

PL0000188745. *See also* PL0000188757 (same); PL0000188783 (same). This apparent practice of refusing to process infringement notices where a rightsholder notifies Google that Google has failed to take down previously-noticed content is significant. To be eligible for the DMCA safe-harbor, Google must "expeditiously" remove infringing content when Google receives a proper infringement notice. 17 U.S.C. § 512(d)(3); 17 U.S.C. §§ 512(c)(1)(A)(iii).[5] If Google makes it a practice to stop processing infringement notices altogether for certain rightsholders (or threatens to do so), Google may not qualify for the safe-harbor. Google's practice is particularly egregious given that often the reason the rightsholder sends a second notice concerning an ad is that Google failed to remove the ad "expeditiously." It would seem that when Google fails to remove an ad, it compounds that failure by refusing to remove other ads.

Accordingly, Plaintiffs requested that Google produce: "documents sufficient to show any instances in which you stopped processing Infringement Notices from a particular sender or rightsholder for any period of time." RFP 74. In response, Google has agreed to produce "documents sufficient to show DMCA notice senders who have been added to an 'abuser' list or otherwise have been subject to a suspension . . . ." Latham 25.06.23 Email. But Google has not explained whether those documents will reflect what RFP 74 seeks: instances where Google stopped processing notices from a rightsholder. Google also has agreed to produce information showing whether Google ever stopped processing *Plaintiffs'* notices. Atty. Decl. ¶ 6. This, too, is insufficient. By seeking an exemption from damages under the DMCA, Google has put its whole DMCA program at issue and must respond to these basic requests. The frequency with which Google carries out its threat to stop processing notices (and indeed even its act of making the threat), bears upon these inquiries. By not processing rightsholders' notices, Google is not taking

---

[5] Google has not identified the subsection of section 512 on which it purports to rely for its DMCA defense. Dkt. 116 at 23 ("Third Defense"). Both subsections (c) and (d), however, require expeditious removal upon receipt of an infringement notice.

Hon. Jennifer L. Rochon
August 5, 2025

the action required under these DMCA safe harbor provisions. Google's practice also speaks to Google's willfulness, its willful blindness, its knowledge, and its intent. *See, e.g., Omega SA v. 375 Canal, LLC*, 984 F.3d 244 (2d Cir. 2021) (affirming district court's finding of defendant's "willful blindness" where "a defendant knows or should know of infringement… [and] decides to take no or little action, it will support a verdict finding liability."); *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 Fed. Appx. 26, 31 (2d Cir. 2013) (affirming district court's decision of "willful blindness" when defendant "was clearly on notice" of infringements).

Plaintiffs also are entitled to understand Google's policies and practices concerning sending such messages to rightsholders and the circumstances under which Google stops processing their notices. In meet-and-confers, Google claimed that this information is burdensome to produce, but Google did not claim that it had actually investigated how the search would be conducted, let alone collected information on burden with any specificity. Atty. Decl. ¶ 5. Plaintiffs' counsel responded by providing a number of suggestions for how Google could conduct its search, ███████████ ████████████████████████████ and searching for the above-quoted and other form language that Google communicates to rightsholders regarding duplicate notices. *Id.* Google did not respond to those suggestions, or report that it had looked into their feasibility. *Id.* And in any event, the approaches proposed by Plaintiffs contradict any burden argument.

Google should be required to produce this highly relevant information.

### III.    Google must produce documents related to ebook Shopping ads filters.

Google's Shopping platform includes four filters that direct users to infringing content or otherwise bear directly on the issues in this case. The "Ebook Link" filter allows the Google user to filter her Shopping results to display results that are ebooks. Am. Compl., Dkt. 38, ¶ 58 and Figure 7. The "Page Link" filter narrows the Shopping ads results to works that are within a certain page limit, e.g., "under 392 pages". *Id.* The "PDF Link" feature filters the Shopping ads results to display products that are available in .pdf form. *Id.* ¶ 57 and Figure 6. And the "Textbook Link" filters Shopping results to display textbooks. Atty. Decl. ¶ 4.

Accordingly, Plaintiffs' RFP 65 requests "[d]ocuments concerning the creation, implementation, and technical capabilities of the following features, or concerning the underlying technology that creates these features: Ebook Link, Page Link, PDF Link, and Textbook Link." Yet Google has refused to produce documents in response to this request.

These features actively direct users to pirated copies of Plaintiffs' works. For instance, as Google knows, Plaintiffs generally do not sell their textbooks in "PDF" format. Am. Compl. ¶ 57. And, until recently, Google only ran ebook ads for ebooks sold by *pirate* sellers. Dkt. 121 at 3. Thus, these "PDF" and "ebook" filters effectively narrow the results to infringing content. Further, that Google has an "ebook" filter in the first place raises questions given Google's failure to execute on its stated policy of *disallowing* ebook ads. If Google has the capability to recognize ebook ads for purposes of this filter, presumably it has the ability to recognize ebook ads for the purpose of banning ads for ebooks. Similarly, the Page Link and Textbook Link features make clear that Google has the capability to recognize Shopping ads that advertise textbooks, and therefore indicate that Google has the capability to restrict those who may advertise those works. To the extent that Google wishes to argue at trial that it did not create an ███████ " for legitimate publishers because doing so was burdensome, these features contradict that argument.

RFP 65 seeks highly relevant information. This case is about Shopping ads for infringing

Hon. Jennifer L. Rochon
August 5, 2025

ebooks, which are sold in unprotected PDF form, enabling their further distribution *ad infinitum*. *See* Dkt. 38 ¶ 83. Plaintiffs narrowed this dispute by agreeing that Google need not produce source code. Instead, Plaintiffs seek documents explaining these features, such as under what circumstances would they appear, whether they were developed for a specific purpose, and whether Google considered eliminating or adjusting them in response to Plaintiffs' or other publishers' infringement notices.

Google has made no argument that producing responsive documents would be overly burdensome. Indeed, given their narrow focus, such an argument would fail. Rather, Google's counsel suggests that Google need not respond to this request because the features may be content-neutral. 25.06.23 Latham Email. Given their nature, that is by no means clear. And even if it were, Plaintiffs are entitled to review documents to test Google's counsel's description.

Google should be required to respond to RFP 65.

## IV.   Google must search the documents of relevant custodians.

Google should be required to add as custodians: (1) Google personnel and agents who reviewed, processed, and took action on infringement notices at issue in this case; (2) management-level Google employees with extensive involvement in Shopping ads; and (3) in-house counsel ███████████████████████████████████████ and possess critical documents concerning Google's knowledge of the very piracy that is the subject of the lawsuit. Without searching these custodians, Plaintiffs will be denied critical discovery.

During the parties' discovery negotiations, Google spent months trying to hide the ball on its relevant custodians. From the very start of the parties' custodial negotiations in January 2025, Google represented in multiple meet-and-confers and in writing that Google did not possess organizational charts. Atty. Decl. ¶ 7. Without providing a single organizational chart or any insight into Google's complicated personnel structures, Google instead imposed the burden on Plaintiffs to find and hunt down who the relevant Google custodians should be. After weeks of delay, Google flatly denied all of Plaintiffs' suggestions, and instead agreed to search for a scant list of 6 custodians on March 7, 2025. As explained further below, Google's discovery tactics have not just been inefficient, but have had a prejudicial and detrimental effect throughout discovery. *See United States v. Boston Sci. Corp.*, No. 11-cv-2453, 2020 WL 968218, at *13 (D. Minn. Feb. 28, 2020) (finding defendant's discovery tactics are harmful and prejudicial when "the laborious process of meeting and conferring just to determine who would be on the custodian list meant that no discovery… was produced until approximately nine months after discovery began" and that "the custodian negotiation effectively used up half of the available discovery period.").

Google's extreme delay in producing documents in this case has prejudiced Plaintiffs' ability to evaluate Google's agreed-upon custodians. *See, e.g.,* Dkt. 138 at 1. As Google finally commences its non-data document productions, Google must uphold its agreement that the custodial negotiation "is without prejudice to either party seeking to modify the custodians/search terms that either side will use as the case progresses," and the Court should order Google to search custodians with critical information. 2025.01.28 O+Z Email; 2025.01.31 Latham Email.

### A.   Google Personnel and Agents Who Processed Infringement Notices

Google has refused to gather custodial documents from Google personnel and agents who processed Plaintiffs' infringement notices, and other notices concerning the pirates at issue in this case. While Google initially claimed "there is only a small group of Google employees

Hon. Jennifer L. Rochon
August 5, 2025

responsible" for performing assessments or suspensions on the notices at issue (Latham 25.02.14 Email), Google's records demonstrate that there were, in fact, *hundreds* of Google personnel and agents who processed, assessed, and tracked the infringement notices at issue in this case. Moreover, these personnel did not passively process and track notices. These agents were ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

   Google must produce these communications. Google cannot attempt to invoke the DMCA safe-harbor and claim it has a satisfactory DMCA program and, at the same time, withhold the documents used by and daily communications amongst the personnel and agents who manually reviewed, escalated, and processed every infringement notice behind the scenes. The limited documents Google has produced so far show Google personnel and agents complaining that ███

██████████████████████████████████████████████████ that Google's employees ███████

█████████████████████████████████ that the █████████

████████████████████████████████ that reviewers ███████████████████

██████████████████████████ that the reviewers ██████████████████████████████

████████████████████████ (*Id*.).

      ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

   Plaintiffs identified 33 individuals that Google's own documents list as processing Shopping notices that Plaintiffs sent regarding the 1,239 pirates Plaintiffs identified to Google in this case. Atty. Decl. ¶ 10. Far from agreeing to include these individuals as custodians, Google refused to provide even the names of these individuals (████████████████████████████

██████████████████). 25.06.23 Latham Email ("As we have confirmed on many occasions, ███████

████████)

   In an attempt to make progress in discovery, Plaintiffs identified just four of these individuals for Google to include as custodians. ████████████████████████████████████████

████████████████████████████

   • ████████████████████████████████████████████████████████

      ████████████████████████████████████████████████████████

      ██████████████

   ■ ████████████████████████████████████████████████████████████

      ████████████████████████████████████████████████████████

      ████████████████████████████████████████████████████████

      ██████████████████████████

Hon. Jennifer L. Rochon
August 5, 2025

- ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████

- █ ████████████████████████████████████████
  ████████████████████████████████████

In addition, Google produced ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████

These four custodians represent a small portion of the ████████████████
who processed notices for the pirates at issue in this case. Moreover, they are targeted, representing
some of the most prolific processors of Plaintiffs' notices and overall notices. Despite numerous
emails and a meet-and-confer, Google has provided no explanation for its refusal to include these
custodians, other than the conclusory statement that "the burden of collecting and reviewing these
████████████████' custodial files outweighs the benefit of any potentially responsive emails they may
have." 25.05.14 Latham Email. Google agreed to include as a custodian one individual who was
involved in the processing of infringement notices, ████████████, but made no representation that
██████████ would have been included on all communications concerning the four custodians above.
Likewise, Google agreed to include a listserv address (trustsafety-shopping-urgent@google.com)
as a custodian. ████████████████████████████████████████████████████
████████████████████████████ Google must include these four individuals as custodians.

**B. Management-level Google personnel**

Google has also refused to include management-level employees who participated
extensively in its DMCA program.

████████████████ : ████████████ is a former member of Google's Trust & Safety Shopping
team. The few communications Google has produced show ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Hon. Jennifer L. Rochon
August 5, 2025

 clearly had an important and leading role during the relevant period in performing quality checks and re-reviews of escalated accounts, building the foundations for a new Google Shopping platform, and owning and drafting important guidelines and training manuals that guided the review process.

That Google did not name ▮▮▮▮▮▮▮ as a custodian in the first place, and has refused to include him since, remains one of the more egregious examples of Google's non-cooperation and concealment throughout the parties' custodial negotiations. Google has said only that the "documents cited by Plaintiffs are clearly insufficient to show ▮▮▮▮▮▮▮ relevance." Latham 25.07.14 Email. The documents described above clearly demonstrate that ▮▮▮▮▮▮ is indeed a relevant custodian.

**Christophe Weibel:** By his own description, Christophe Weibel leads a team that is "*primarily responsible* for implementing policy enforcement on the Google Shopping Platform," Dkt. 59 (emphasis added). In a declaration filed with this Court, Dr. Weibel explained that he has been "employed with Google for over thirteen years", "regularly interfaces with the Merchant Center account infrastructure", and "understand[s] how [merchant account] data is stored, how it can be accessed, and its relationship to data associated with Google Ads accounts". Dkt. 59. As the Court will recall, the Court relied on Dr. Weibel's declaration in holding that an important category of merchant data was too burdensome to produce. Hr'g Tr. 71:19–24 ("[The Court:] With respect to the other categories that plaintiff is seeking, I am persuaded, by the Weibel declaration and other information, that the email identifier is the appropriate identifier . . . .").

Yet Google refuses to include Dr. Weibel as a custodian. In a half-hearted compromise, Google has tried to limit its search of Dr. Weibel's documents to a vague "targeted collection of Mr. Weibel's documents – not a broad custodial sweep – to identify and collect relevant documents in Mr. Weibel's possession…" Latham 25.03.04 Email. However, this limited search of Dr. Weibel's documents (about which Google has not provided any further information) is insufficient. A fulsome custodial search is required for Dr. Weibel. Plaintiffs request Dr. Weibel to be included as a custodian subject to the parties' agreed search terms.

### C. Google's in-house counsel involved in Google's DMCA program

Google's DMCA program requires that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These same two individuals interfaced with Plaintiffs' counsel as far back as 2019 and 2020 regarding the problem of pirated ebooks on the Shopping platform. Yet Google has refused even to *collect and review* these individuals' documents, solely because these individuals are attorneys. 25.02.14 Latham Email (Google refusing to review, or even collect, documents from these custodians because the documents "are *likely* to be privileged") (emphasis added). This is improper. Google cannot claim that it is exempt from damages on the basis that their DMCA program is reasonably implemented, then claim that a key part of its DMCA program is protected by privilege. Google's argument is a classic sword-and-shield fallacy. Google must collect and review documents from Adam Crider and John Caleb Donaldson.

Hon. Jennifer L. Rochon
August 5, 2025



participation in Google's DMCA program means that their communications likely are not privileged to begin with, and even if those communications might have been privileged, that privilege is waived. Deciding whether to terminate a merchant is a business function, not a provision of legal advice. Indeed, this function regularly is performed by non-lawyers. As such, these communications likely are not privileged. *In re Aenergy, S.A.*, 451 F. Supp. 3d 319, 323 (S.D.N.Y. Apr. 3, 2020) ("In light of the two hats often worn by in-house lawyers, communications between a corporation's employees and its in-house counsel though subject to the attorney-client privilege must be scrutinized carefully to determine whether the predominant purpose of the communication was to convey business advice and information or alternatively, to obtain or provide legal advice."); *Menzel v. Roadget Bus. Pte. Ltd.*, No. 24-civ-860, 2025 WL 1065815, at *3 (S.D.N.Y. Apr. 9, 2025) (holding that when documents involve in-house attorneys, who "often perform both legal and business functions," the Court must "scrutinize even more carefully claims of privilege over their communications and do not protect from production documents whose prominent purpose… was to convey business advice and information." (citations and quotations omitted). Google's conclusory contention that communications involving or created by an in-house counsel "must be privileged simply based on his job title runs afoul of New York law circumscribing attorney-client privilege." *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 497 (S.D.N.Y. 2019).

Further, to the extent such communications could have been privileged, Google has waived that privilege by invoking the DMCA safe-harbor as a defense. Google cannot claim that its DMCA program was reasonably implemented, then refuse to produce communications implementing that program. *See United States v. Dish Network, L.L.C.*, 283 F.R.D. 420, 422 (C.D. Ill. June 12, 2012) on reconsideration in part, No. 09-CV-3073, 2012 WL 13012614 (C.D. Ill. July 9, 2012), and enforcement granted in part, denied in part, 83 F. Supp. 3d 812 (C.D. Ill. 2012) (holding that because "Dish's attorneys actively participated in performing monitoring and compliance functions . . . [that] provide part of the basis for its Safe Harbor defense . . . the attorneys' participation in monitoring and compliance are part of the defense and cannot be shielded by claims of privilege."); *see also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications."); *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996) ("[E]ven if the privilege holder does not attempt to make use of a privileged communication[,] he may waive the privilege if he makes factual assertions the truth of which can only be assessed by examination of the privileged communication.").

Here, however, the Court need not determine at this time whether communications involving Mr. Crider and Mr. Donaldson are privileged, it need only hold that Google must collect

Hon. Jennifer L. Rochon
August 5, 2025

and review these communications, and produce those that are not privileged.

**Second**, Mr. Donaldson and Mr. Crider interfaced with Plaintiffs' counsel as early as 2019 regarding the problem of pirated textbooks on Google. Their documents therefore will demonstrate Google's knowledge of this problem from an early date, and will reveal what (if anything) Google did to address it. For example, Mr. Donaldson corresponded with Plaintiffs' counsel in August/September 2019 regarding infringement notices Plaintiffs had sent to Google, so that Mr. Donaldson could, in his words "make sure [the notices are] getting the appropriate attention." PL0000524360. In October/November 2019, Mr. Donaldson corresponded with Plaintiffs' counsel about "extending Google's Copyright Documentation Policy to Google Shopping." PL0000524177.[6] Mr. Donaldson likewise appears to have corresponded with other personnel at Google about whether Google would fix the problem of pirated ads for Plaintiffs' textbooks. PL0000525296 (Mr. Donaldson reporting, in December 2019, that "Shopping counsel . . . is looking into policy fixes" to address the problem of pirate ads). In addition, Messrs. Donaldson and Crider participated in an hour-long call in December 2020 with Plaintiffs' counsel and other Google personnel concerning the problem of Shopping Ads for pirated textbooks. Atty. Decl. ¶ 13. Google must collect and review document from these custodians.

Google's attempt to exclude these in-house counsel as custodians is particularly suspect given a recent court decision admonishing Google for its longstanding abuse of attorney-client privilege. *See United States v. Google LLC*, No. 20-cv-3010, 2024 WL 3647498, at *133 (D.D.C. Aug. 5, 2024) ("Google's outside counsel in this case initially withheld tens of thousands records on the grounds of privilege, which ultimately were re-reviewed, deemed not privileged, and produced to Plaintiffs."). Plaintiffs request that Adam Crider and John Caleb Donaldson be included as custodians.

## V.    Google must search its " ███████████ database.

Plaintiffs request that Google apply the parties' agreed-upon search terms to its "███████████ ("███ database, and produce the full history of all "███████ tickets and any communications in connection with these tickets associated with the Plaintiffs' infringement notices and the infringing merchants at issue in this case.

███████████████████████████
███████████ Latham 25.05.29 Email. From the limited documents Google has produced so far, it is clear that Google employees ████████████████████████████
████████████████████████ (emphasis added). For example, Google's production shows that ████████████████████████ :

- ██████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████

- ██████████████████████████████████
  ██████████████████████████████████
  ████████████████████

---

[6] *See also* PL0000524840 (Mr. Donaldson agreeing, in July 2019, to discuss with Plaintiffs' counsel "the problem of pirate sites using Google Ads to sell infringing PDFs of textbooks.").

Hon. Jennifer L. Rochon
August 5, 2025

- ████████████████████████████████████████████████████████████
  ████████████████████████████████████

However, only some of the discussion posted on the ████████ subsequently is repeated in emails. Atty. Decl. ¶ 15. That is, sometimes the ████ sends a "notification" email copying and pasting a discussion posted on the ████ and sometimes it does not. *Id.*

During the parties' correspondence on this issue, Google has agreed to produce only a small portion of relevant documents from the ████ 1) any email notifications from the ████ that happen to be caught in searches Google already is running, Latham 25.05.29 Email; and 2) ████████████ ████████████████████████████████████████████████ [an email listserv called] ████████████████████████████████████████████, Latham 25.07.10 Email. [7] Neither is sufficient.

First, ██████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████ Yet Plaintiffs have no way of seeing other documents contained in that category. Similarly, ██████████████████████████████
████████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████

██████████████████████████████████). However, because Google has not searched for documents in ██ ██ Plaintiffs cannot see how this request was handled, whether anyone responded, etc. ████████████████████████████████████████████████

---

[7] In addition to exchanging multiple emails on this topic, the parties conducted a meet-and-confer on August 5, 2025.

Hon. Jennifer L. Rochon
August 5, 2025

███████████████████████████████████████ Moreover, unless a given discussion happened to be emailed to one of the custodians Google happens to be searching, Plaintiffs will not know about discussions like these at all.

Second, Google's documents already show how the tools Google employees used to process infringement notices and suspend infringing merchants were ████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████ Thus, even if Google were representing that there was ██████
███████████████████ (which Google is not), there still would be reason to question whether that system was operating properly.

Third, the listserv that Google has agreed to search ███████████████████ is quite limited. Google itself concedes that ████████████████
███████████████████████ Latham 25.03.04 Email (emphasis added).
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████

Google must apply the parties' search terms to the █████████ database, and produce the full history of all ████ tickets and any communications in connection with these tickets associated with the Plaintiffs' infringement notices and the infringing merchants.[8]

## VI.    Google must disclose when its DMCA policy was created and put into operation.

Google has agreed to produce documents concerning the creation and implementation of its DMCA policy. 25.03.05 Latham Email; 25.06.02 Meet-and-Confer; 25.06.07 O+Z Email.[9] And Google agreed to respond to an interrogatory asking it to identify persons "with responsibility for designing [or] developing" its DMCA Policy. *See* Google's Response to Plaintiffs' Amended Interrogatory ("ROG") 1. Yet Google has refused to produce documents showing *when* its DMCA policy was created or put into operation. ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████ *Cf.* GOOG-

---

[8] Due to its wide use, the ████████ likely has documents responsive to multiple of Plaintiffs RFP, including RFP 4 (adverse actions taken against the relevant merchants), RFP 6 (documents concerning the implementation of Google's DMCA policy), and RFP 22 (communications concerning Plaintiffs' notices), RFP 45 (documents concerning Google's "ban" on ebooks). Dkt. 47-1.

[9] For example, Plaintiffs' RFP 63 seeks documents concerning the "creation and development" of Google's ████████████
████████████████████████████████████████. Plaintiffs' RFP 62 requests documents concerning the "creation and development" of the ██████████████ in Google's DMCA policy, which is ████████████████████ Plaintiffs' RPF 6 seeks documents concerning the "development" of Google's DMCA policy.

Hon. Jennifer L. Rochon
August 5, 2025

CENG-00408442 ("Our process and our use of different tools for Google Ads, however, has not been reviewed in the past 10+ years, and we are unsure of its effectiveness, scope and impact."). Yet over the course of two meet-and-confers and several emails, Google has refused to say when its DMCA policy was created and put into operation.

Google's refusal to answer, or to produce documents answering, this basic question has made it impossible for Plaintiffs to determine the appropriate start-date for these discovery requests. Moreover, Google can't have provided good-faith responses to the RFP and interrogatory at issue unless it knows when its policy was created. Google could not have known what time-period to search to find documents concerning the creation of this policy or identify personnel with knowledge about the creation of this policy without knowing when the policy was created. Nor does Google claim that its responses even cover the period when the policy was created. During a June 13 meet-and-confer, Google admitted that the people it named in response to Plaintiffs' Amended ROG 1 were not necessarily the people involved in designing or developing the policy; they were simply people who, at some point from December 2020 onwards, had knowledge about the design and development of the policy. Atty. Decl. ¶ 16.

Google's position is also internally inconsistent. For three RFP seeking documents about the creation and development of its DMCA policy, Google has agreed to use a start-date of January 2020. *See* 25.06.02 Meet-and-Confer; 25.06.23 Latham Email. But for an *interrogatory* seeking the names of personnel with responsibility for designing and developing Google's DMCA policy, Google insists on a start-date of *December* of 2020. *See* Google's Response to Plaintiffs' Amended ROG 1.

Accordingly, Plaintiffs ask the Court to order Google to disclose when its DMCA policy was created and put into operation. Alternatively, Plaintiffs ask the Court to allow Plaintiffs to issue one interrogatory asking Defendant when the operative policy was created and implemented, and to require Google to respond to the interrogatory within three business days.

## VII.   Conclusion

Plaintiffs request that the Court order Google to:

1. Produce documents showing the advertisements it ran, the infringement notices it received, and the revenue it collected from September 16, 2024 through July 21, 2025 concerning the pirates at issue in this case (i.e., all the Merchant Center accounts Google discloses to Plaintiffs as associated with the pirates Plaintiffs identified) in response to, e.g., Plaintiffs' RFP 17, 22, 27–28, 30, 33–34, 36–40 (Dkt. 47–1).

2. Produce documents in response to Plaintiffs' RFP 74 ("documents sufficient to show any instances in which you stopped processing Infringement Notices from a particular sender or rightsholder for any period of time").

3. Produce documents in response to Plaintiffs' RFP 65 (seeking "[d]ocuments concerning the creation, implementation, and technical capabilities of the following features, or concerning the underlying technology that creates these features: Ebook Link, Page Link, PDF Link, and Textbook Link.").

4. Add as custodians, subject to a fulsome custodial search with the parties' agreed-upon search terms:

   a. ████████████ ████████ ████████ ████████ ████████ ████████████ ████████,

Hon. Jennifer L. Rochon
August 5, 2025

             █████████████████████████.

    b.   ████████, Christophe Weibel, Adam Crider, and John Caleb Donaldson.

5. Apply the parties' agreed search terms to Google's ██████ database; produce the full history of all "██████ ("█████ tickets and any communications in connection with these tickets associated with the Plaintiffs' infringement notices and the infringing merchants in response to, e.g., Plaintiffs' RFP 6, 7, 22, and 45 (Dkt. 47–1).

6. Order Google to disclose the date that its operative DMCA policy was created, and the date it was placed into operation in response to, e.g., Plaintiffs' RFP 6 ("documents concerning your policies, practices, and procedures concerning copyright infringement by Shopping Ads Merchants, including all versions and drafts of any… DMCA Policy…").

           Respectfully submitted,

           */s/ Jeff Kane*
           Jeff Kane
           OPPENHEIM + ZEBRAK, LLP

           *Counsel for Plaintiffs*