**Sarah Tomkowiak**
Direct Dial: +1.202.637.2335
sarah.tomkowiak@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

**LATHAM & WATKINS LLP**

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

August 13, 2025

**VIA ECF**

The Honorable Jennifer L. Rochon
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 1920
New York, New York 10007

> Re: *Cengage Learning, Inc. v. Google LLC*, No. 1:24-cv-04274-JLR-BCM
> <u>Defendant's Response to Plaintiffs' Omnibus Discovery Letter Motion (Dkt. 160)</u>

Dear Judge Rochon:

Pursuant to the Court's order (Dkt. 140), Google submits this response.

**I.   The Court Should Reject Plaintiffs' Attempt to Seek Ever-Expanding Discovery Regarding Merchant Accounts and Domains**

Plaintiffs' letter attempts to obscure the fact that they are seeking to revisit an already-decided dispute and explode the scope of discovery under the guise of seeking vague "documents showing whether [Google] ran ads for pirates Google claims to have terminated." Dkt. 160 at 1.[1] The Court should reject Plaintiffs' oblique attempt to obtain this collateral discovery.

**A.   Background and Context**

The precise scope of production of information associated with the domains Plaintiffs accuse of direct copyright infringement, and the Google Merchant Center accounts associated with those domains, has been a subject of intense dispute and negotiation since the very start of discovery. *See, e.g.*, Dkts. 46, 50, 62, 69, 72, 76, 106, 138. Notably, early in the case Plaintiffs brought a discovery dispute regarding the scope of discovery for the Merchant Center accounts implicated by Plaintiffs' claims. *See* Ex. 1 at 6. That dispute required the Court to consider to what extent "Google must provide discovery into whether it terminated an infringer, as opposed to one of an infringer's multiple accounts," as Plaintiffs argued. Dkt. 46 at 1. In resolving that dispute, the Court balanced "the interest of ensuring that the relevance net is cast broadly" with the reality that the existing "discovery is hefty" and "is not meant to be a fishing expedition of any

---

[1] The question of whether plaintiffs can prove contributory infringement liability by pointing to the failure to terminate the accounts of known infringers is exactly the issue that the Supreme Court is deciding in the *Cox Commc'ns v. Sony Music* case. *See* Petition for Writ of Certiorari at i, No. 24-171 (U.S. Aug. 15, 2024) (question presented is whether "a service provider can be held liable for 'materially contributing' to copyright infringement merely because it knew that people were using certain accounts to infringe and did not terminate access"). Thus, Plaintiffs' discovery brief only reinforces why this Court should stay proceedings before deciding whether expanded discovery is appropriate. *See* Dkts. 117, 129.

potential infringement out there at Google." Dkt. 66, Hr'g. Tr. (Dec. 18, 2024) at 72:22–73:10. In so doing, the Court adopted Google's proposal for production of certain information associated with (1) "Domain-Identified" merchants associated with a website "exactly matching" one of the 1,239 domains in a "Domain Spreadsheet" provided by Plaintiffs, and (2) "Email-Connected" merchants connected to the Domain-Identified merchants by common email identifiers. *Id.*; Dkt. 72. The Court further recognized that "[t]here needs to be an end date" for the merchant discovery and "limit[ed] the discovery from the date of the [amended] complaint" in September 2024. Dkt. 66, Hr'g. Tr. (Dec. 18, 2024) at 73:11–20.

Pursuant to the Court's orders at Dkts. 72 and 76, Google identified, and produced account information for, 18,767 Domain-Identified and 15,516 Email-Connected merchant accounts in February. *See* Ex. 1 at 6. Google then used those accounts as the basis for the production of a cascading trove of associated data—reflecting the account status, offer data, ad metrics, revenue information, and notices and notice information—associated with the Domain-Identified (and to some extent the Email-Connected) merchants. *See id.*; Dkt. 138 at 10–11. That discovery failed to satisfy Plaintiffs. Google then voluntarily agreed to go above and beyond its discovery obligations to analyze historical logs (which the parties had agreed at the outset of this case are "presumptively inaccessible" and thus would not be a source of discovery) and provide supplemental discovery regarding an additional 1,378 merchants identified by historical association to one of the 1,239 domains in Plaintiffs' Domain Spreadsheet ("Historical" merchants). *See* Ex. 1 at 6–7. In total, Google produced well over *a terabyte* of data associated with 20,145 Domain-Identified and Historical merchants. *See* Dkt. 138 at 10.

### B. The September 16, 2024 Cutoff Is Proportional to the Needs of the Case

The vast majority of the relevant merchant accounts were suspended by Google prior to September 16, 2024. Declaration of Sarah Tomkowiak ("Atty. Decl.") ¶ 5. Plaintiffs claim that their records show that Google ran numerous ads for these suspended merchants after September 16, 2024. But Plaintiffs' records reflect a much different story, as Google's analysis of those records shows. *See* Atty. Decl. ¶¶ 6–7; *see also* Dkt. 129 at 3 ("[S]ince February 1, 2025, only five of the 1,239 domains relevant to this case were purportedly noticed to have engaged in infringement of *any* of Plaintiffs' works at all, and those domains are alleged to have advertised only 17 of the 7,359 works on Plaintiffs' Amended Exhibit A."); Dkt. 131 ¶¶ 6–7. Out of the 20,145 Domain-Identified and Historical merchants, less than ▮% of these accounts could have possibly been an active account engaged in advertising on the Shopping platform after September 16, 2024. Atty. Decl. ¶ 5. And, indeed, Plaintiffs' own notice tracking spreadsheets reflect only 1,001 total advertisements observed after February 1, 2025, which are connected to only five domains contained in Plaintiffs' list of 1,239 allegedly infringing domains. Dkt. 131 ¶¶ 6–7.[2] There is no reason, other than to harass and burden Google, that Google should need to query its

---

[2] Google's review of additional data provided by Plaintiffs purportedly supporting Plaintiffs' statement further revealed that only 7 of Plaintiffs' 1,239 domains (0.6%) are even represented in this data. Atty. Decl. ¶¶ 6–7. Those 7 domains are associated with fewer than half of Plaintiffs' identified infringing ads in that set, the last of which purportedly occurred over six months ago. *Id.* This data thus does not show that Google is failing to act on alleged infringements identified to it through the DMCA process.

systems for ads, notices, and revenue data through July 21, 2025, as Plaintiffs request.³

An extended date for ads, notices, and revenue data is also not highly probative in the context of this dispute. Google collected total revenue of only approximately ▮▮▮▮▮ for all 20,145 Domain-Identified and Historical merchants between June 2021 and September 2024 (in other words, on average, ▮▮▮ per merchant over that period, and for many merchants, Google collected no revenue at all). Atty. Decl. ¶ 8; Dkt. 159-2 at 4. And because most of these merchants were already suspended or otherwise inactive as of September 2024, additional months of data for the same merchants are unlikely to uncover additional probative discovery.

Plaintiffs' generic recitation of statutory damages factors in the copyright and trademark contexts (and neither of Plaintiffs' authorities examine such factors within the context of contributory copyright infringement or printer-publisher trademark liability) do not stand for the proposition that never-ending discovery is appropriate simply because a defendant continues to operate a platform on which some users engage in bad acts. Indeed, because "[s]tatutory damages should bear some relationship to the actual damages suffered," *Peer Int'l Corp. v. Luna Recs., Inc.*, 887 F. Supp. 560, 568 (S.D.N.Y. 1995), Plaintiffs' own disclosures of their losses, on a work-by-work basis, is much more important and probative evidence for the statutory damages inquiry than whether Google might have continued to receive some small amount of revenue from the small number of bad actors that were not suspended for some period after September 2024. *See Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 144 (2d Cir. 2010) (affirming award of $2,400 in statutory damages based on finding that defendants' profits from infringing sales of the plaintiff's music were meager and that the award did not need to be higher to achieve deterrence).

Plaintiffs' cited law purportedly supporting their need for this evidence "for a permanent injunction" is inapposite. Each one of the cases cited by Plaintiffs is factually dissimilar, involving an infringer that failed to stop acts of *direct* copyright infringement (often after a default judgment).⁴ Courts facing analogous factual scenarios involving online platforms, as here, have exercised restraint for injunctive relief that would prohibit companies offering online platforms from displaying future "false and/or misleading advertisements that may be posted" by users. *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1095 (C.D. Cal. 2001); *see also Wolk v. Kodak Imaging Network, Inc.*, 2011 WL 940056, at *9 (S.D.N.Y. Mar. 17, 2011) (denying preliminary injunction because, *inter alia*, plaintiff's attempt "to shift the burden of finding infringing material

---

[3] Plaintiffs' statement that they have observed "ads for infringing copies of Plaintiffs' works (including for pirates at issue in this suit) as recently as July 21, 2025" is unsupported by any evidence. Dkt. 160 at 2; *see* Dkt. 148 ¶ 16. Plaintiffs' reference to "pirates at issue in this suit" is also nonsensical; there is no list of "pirates at issue in this suit."

[4] *See John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 620, 637 (S.D.N.Y. 2018) (granting permanent injunction against used book sellers that "continue[d] to sell counterfeits" following "an agreement that Defendants would cease importing and selling counterfeit books"); *McGraw-Hill Glob. Educ. Holdings, LLC v. Khan*, 323 F. Supp. 3d 488, 492–93, 500 (S.D.N.Y. 2018) (granting permanent injunction against owners and operators of "multiple illegal online websites and forums to create, store, and sell unauthorized digital copies of Plaintiffs' works" who never made an appearance and were subject to a default judgment); *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 627, 633 (S.D.N.Y. 2011) (granting permanent injunction following default judgment against film promoters that continued to distribute film without authorization following revocation of contract); *Pearson Educ., Inc. v. Vergara*, 2010 WL 3744033, at *1, *7 (S.D.N.Y. Sept. 27, 2010) (recommending default judgment and entry of permanent injunction against individual who "reproduced and sold copies of the plaintiffs' [works] through online sales at websites and forums").

### C. Any Discovery Supplement Must Be Final and the Schedule Extended

With respect to the categories of information Google has already collected and produced for the 20,145 Domain-Identified and Historical merchants, Google is not opposed in theory to conducting a **single** supplemental production of the data it has already collected through some reasonable cut-off date in early 2025,[5] presuming such supplementation is attendant with a reasonable extension of the discovery deadlines. *Cf.* Dkt. 138 at 8–10. However, Google has not offered to do so because there is no reason to believe that a supplemental production of data between September 2024 and a reasonable date in 2025 will be the end of Plaintiffs' demands.

Indeed, after months of Google's inquiries as to whether Plaintiffs will identify additional domains for which they seek discovery, Plaintiffs recently disclosed that they now seek (1) identification of additional Merchant Center accounts that have at any time been connected to any of **over ▮▮▮ additional domains** (beyond the 1,239 that Plaintiffs previously identified), reflecting domains that were at any time associated with the 20,145 Domain-Identified and Historical merchants; and (2) the same trove of discovery for those accounts that Google provided for the Domain-Identified and Historical merchants. *See* Ex. 1 at 9–10; Dkt. 159-2 at 4 (complaining Google has not produced "some or all of the Merchant Center accounts associated with some ▮▮▮ Pirate Sites, which Plaintiffs have requested in discovery"). This could amount to terabytes of data for hundreds of thousands of additional merchants.[6] For instance, if a merchant was associated with one of the 1,239 domains at any point in time, and was *also* associated with ten other domains at various points in time, Plaintiffs' request demands Google treat those ten other domains as though they were on the list of 1,239 domains, and identify any other merchant accounts that might have at any point been associated with *those* ten domains, and produce all associated discovery for those domains—even though there are no allegations whatsoever that those ten domains were associated with any infringing ads. In other words, Plaintiffs demand wide-ranging discovery (to the same extent as the Domain-Identified and Historical merchants) for an unknown number of merchant accounts tied to a significantly larger number of domains, although Plaintiffs have not even confirmed that a single one of these domains has met Plaintiffs' own stated criteria for identification of alleged infringement. *See* Ex. 1.

Significantly, Plaintiffs do **not** claim that all of the approximately ▮▮▮ domains for which they seek additional discovery ran an infringing ad for a work-in-suit.[7] They simply are all

---

[5] Plaintiffs' position on the end date for discovery has itself been a moving target. On June 30, Plaintiffs' proposed an end date of June 9, 2025; now Plaintiffs demand July 21, 2025. Dkt. 160 at 3.

[6] Although Plaintiffs do not expressly refer to this request in their motion, they appear to do so implicitly by asking for documents "through July 31, 2025 *concerning the pirates at issue in this case* (i.e., all the Merchant Center accounts Google discloses to Plaintiffs *as associated with the pirates Plaintiffs identified*)." Dkt. 160 at 3 (emphases added). The "pirates Plaintiffs identified" seems to be a reference to the ▮▮▮ domains on top of the 1,239 domains identified by Plaintiffs in December 2024.

[7] Google's preliminary investigation indicates that only ▮ of the over ▮▮▮ domains were the subject of at least one notice from a Plaintiff in this case. Atty. Decl. ¶ 4.

the domains that Google identified to Plaintiffs in discovery as being historically (at any point in time) connected to at least one of the 20,145 Domain-Identified and Historical merchants. Absent a connection between those domains and an infringing ad, it is irrelevant to the issues in this case whether Google ran advertisements, received DMCA notices, or earned revenue from *other* merchants associated with the additional domains.

It is clear from Plaintiffs' pattern of ever-expanding demands that Plaintiffs see discovery as an opportunity for an unlimited, spiraling investigation into piracy on Google's platform, rather than to get information regarding the relevant merchant accounts that advertised Plaintiffs' asserted works after Plaintiffs sent Google a notice that the domain was selling infringing copies of the asserted works. *See* Dkt. 112, Hr'g Tr. (May 30, 2025) at 9:17–21 (explaining that "the primary way that a work gets into the case is if someone . . . sent a notice about one of these pirates and Google continued running ads for that pirate after the notice, then if they advertise one of our works after that date, we'll add the work to the case"). This is a lawsuit about the alleged infringement of specific asserted works by Plaintiffs, not an investigation into every potential act of infringement by third parties using Google Shopping. *See* Dkt. 66, Hr'g. Tr. (Dec. 18, 2024) at 72:25–73:10. The DMCA does not require that Google proactively investigate for additional infringement by its advertisers and enforce against that infringement. *See* 17 U.S.C. § 512(i)(1)(A). It would be unfair and disproportionate to the needs of this case to impose an obligation on Google to produce discovery into what such a proactive investigation and enforcement system might uncover.

Accordingly, if the Court orders Google to supplement discovery with respect to "the advertisements it ran, the infringement notices it received, and the revenue it collected" for an extended time period, Google requests that the Court order that (1) such supplement should use a date early in 2025 as the cut-off; (2) such supplement should be limited to additional data for the 20,145 Merchant accounts Google has already identified that are associated with the list of 1,239 allegedly infringing domains supplied by Plaintiffs and not for "all" merchants associated with the ▮▮▮▮▮ some domains historically associated with those 20,145 Merchant accounts; (3) such supplement concludes Google's document discovery obligations in this matter with respect to merchant discovery; and (4) all deadlines in the case are extended consistent with the effort required to collect, review, and produce the ordered supplement.

## II. Google Is Already Producing Documents Regarding Duplicate Infringement Notices

Pursuant to Google's Misuse Policy,[8] people who intentionally misuse Google's webforms will be flagged, including when they file multiple requests for the same content to be evaluated. If a pattern of misuse rises to the level of bad faith, Google will stop taking action on requests to remove content.[9] There exists good rationale for this policy, and Plaintiffs cite no authority to support their statement that Google may not qualify for the DMCA safe harbor in this case if it chooses to stop processing infringement notices for certain complainants for valid reasons. (Nor do Plaintiffs point to any evidence that Google, in fact, stopped processing all infringement notices from any Plaintiff). However, notwithstanding the tenuous relevancy of such information, Google

---

[8] *Misuse Policy*, Google, https://support.google.com/legal-help-center/answer/13949470?hl=en (last visited 8.8.25).

[9] *Id.*

has already agreed to respond to Plaintiffs' requests relating to duplicate infringement notices (RFPs 73–74). *See* Atty. Decl. ¶¶ 12–15. In fact, Plaintiffs' motion and supporting declaration appear largely to ignore the email communications sent by Google's counsel on June 23 and July 14 confirming as much. *See id.*; Ex. 2 at 2, 7.

In response to RFP 73, Google has agreed to produce documents sufficient to show the number of instances in which Google responded to an infringement notice with a message requesting the sender not send repeated requests concerning the same URLs (i.e., a message with language matching or similar to the block quote on page 4 of Plaintiffs' motion). Far from ignoring Plaintiffs' "suggestions" for how to search for responsive documents, *see* Dkt. 160 at 5, Google investigated those options, among others, and has agreed to produce the documents that exist in ordinary course and are responsive to this RFP. *See* Ex. 2 at 7.[10]

In response to RFP 74, Google has agreed to produce documents sufficient to show DMCA notice senders ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ or otherwise have been subject to a suspension. *See* Ex. 2 at 7. To the extent Plaintiffs suggest Google is limiting its response to information reflecting whether Google stopped processing *Plaintiffs'* notices only, it is not. *Id.* The ▉▉▉▉▉▉▉▉ is maintained by Google Legal Content Policy and Standards in connection with Google's Misuse Policy, and constitutes the information maintained by Google in ordinary course reflecting whether it has stopped processing DMCA infringement notices from any purported rightsholder.[11] Google is not aware of other responsive documents. *See* Atty. Decl. ¶ 14. Google's Misuse Policy is publicly available, and Google is producing documents reflecting its enforcement of this policy. *See* Atty. Decl. ¶¶ 10–15.

### III. Plaintiffs Are Not Entitled to Discovery Into Content-Neutral Search Features

Plaintiffs' RFP 65 demands discovery into the "underlying technology" and/or "creation, implementation, and technical capabilities" of a product feature that allows Google users to filter their search results using suggested additional search terms. *See* Atty Decl. ¶ 16.[12] In their Motion, Plaintiffs style their request as one for four specific "features" they refer to as the "Ebook Link," the "Page Link," the "PDF Link," and the "Textbook Link," and describe as them "filters that direct users to infringing content." Dkt. 160 at 5. In reality, these are not "links" at all, rather, they are four examples of a dynamic (and completely automated) product filtering capability that applies to all products, regardless of type, available on the Shopping platform. *See, e.g.*, FAC, Dkt. 38, Figs. 5–6 (showing that clicking on the word "PDF" in a search result merely adds the word "pdf" to the user's search). Plaintiffs' misdescriptions of these features seems to rest on a fundamental misunderstanding of how Google's search filtering capability functions, despite counsel's explanation during conferrals and by email that this capability is content-neutral and not

---

[10] Google has no obligation to "report" to Plaintiffs regarding the methodology used to locate documents in response to each RFP. *See* Kane Decl., Dkt. 161 ¶ 5.

[11] RFP 74 asks for documents sufficient to show instances where Google "stopped processing Infringement Notices from a particular sender or rightsholder" for any reason. *See* Atty Decl. ¶ 11.

[12] Plaintiffs claim they seek "documents explaining these features, such as under what circumstances would they appear, whether they were developed for a specific purpose, and whether Google considered eliminating or adjusting them in response to Plaintiffs' or other publishers' infringement notices." Dkt. 160 at 6. This is exemplary of Plaintiffs' practice of propounding specific requests, and then later asking that Google produce different documents.

specifically targeted at eBooks, textbooks, or even books generally. Plaintiffs offer no case law to support their theory that a content-neutral, generally applicable search feature that filters all content—not just pirated content—could constitute evidence of material contribution, willfulness, or any other element of their copyright or trademark infringement claim. *See, e.g.*, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 100 (2d Cir. 2016) (material contribution requires "distribut[ing] a device with the *object of promoting its use to infringe copyright*, as shown by clear expression or other affirmative steps taken to foster infringement" (emphasis added)); *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d. Cir. 2005) ("To prove 'willfulness' . . . the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights."); *Elohim EPF USA, Inc. v. 162 D&Y Corp.*, 707 F. Supp. 3d 372, 400 (S.D.N.Y. 2023) (finding no willfulness where the defendant "*automatically* updated its [karaoke] machines to add new songs on an ongoing basis," and the works in suit "were among the many thousand songs included" in the machines" (emphasis added)).

At any rate, the four examples of filtering that Plaintiffs point to do *not* show that Google is "effectively narrow[ing] [a user's] results to infringing content." Dkt. 160 at 5. For example, the ability to add the word "pdf" to a user search does not mean that the resulting products will be infringing, unprotected PDF copies of copyrighted works. A search for "printable nutrition chart" includes the same PDF filter, and clicking on the PDF filter returns products from Etsy, among other legitimate merchants. *See* Ex. 3 at 3; Ex. 4 at 3–13. More fundamentally, Plaintiffs seem to conflate two distinct concepts: selling eBooks (or textbooks) on Google's Shopping platform, and paying to advertise those eBooks (or textbooks). Because Google's policy has never completely blocked eBooks on the Shopping platform, allowing users to filter by eBook format will not effectively narrow search results to infringing works. While Google's policy does not support eBooks and digital books for paid ads, eBooks have always been permitted as free listings.[13] For this same reason, Plaintiffs' argument that these current "features" somehow bear upon Google's historical ability to engineer an "▮▮▮▮▮" whereby certain legitimate publishers could pay to advertise wholly misses the mark. Plaintiffs' request should be rejected.

## IV. Plaintiffs' Late Demand for More Custodians and Data Sources Is Unreasonable

### A. Google has undertaken a robust custodial collection and review.

Google has, following protracted negotiations over custodians and search terms, run nine search terms over the custodial files of seven agreed-upon custodians, which include email, Google chats, and Google Drive files. Google also agreed to apply search terms to an email alias. In so doing, Google is conducting custodial discovery for more than double the number of custodians as any other party in this case (each Plaintiff only agreed to run search terms over the files of three custodians). And based on search term "hit reports" recently exchanged between the parties,

---

[13] *See Unsupported Shopping Content*, Google Merchant Center Help, https://support.google.com/merchants/answer/6150006?hl=en (last visited Aug. 11, 2025) (listing "eBooks and digital books" as unsupported content, but explaining that the policy "applies to Shopping ads and local inventory ads" only, not free listings); GOOG-CENG-00416118 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); *see also* FAC ¶ 58 & Fig. 7 (showing an example of the eBooks format filter "*on the Free Ads page*." (emphasis added)).

# LATHAM&WATKINS LLP

Google's search terms have resulted in approximately the same number of hits as the search terms ran over five Plaintiffs' *collective* custodial documents. In other words, to level-set, Google's custodial collection and production exceeds that of any other party in this case.

At the outset of this process, Google conducted a good faith inquiry to identify custodians who were likely to have documents responsive to specific requests for production that Google agreed to conduct a search for using custodians and search terms.[14] Google provided its final proposal on search terms and custodians to Plaintiffs on March 7, 2025, **consistent with the parties' agreed-upon schedule for negotiating custodians and search terms**. Atty. Decl. ¶¶ 22–23. As soon as the parties reached an initial agreement on some custodians and search terms this past spring, Google promptly began its custodial document review. Google has continued to engage in negotiations with Plaintiffs regarding additional search terms and custodians in good faith—and has added search terms and custodians. Atty. Decl. ¶¶ 22–23. With each incremental agreed-upon custodian or search term, Google has taken steps to ensure the production of those new documents would be complete by the August 15, 2025 deadline for document discovery.

Plaintiffs' complaints about the timing of Google's initial custodial productions and prejudice ring hollow in light of the following facts: (1) the parties were at an impasse with respect to adding Christophe Weibel, ███████████████████████████ as custodians as of March 28, 2025, Atty. Decl. ¶ 23, and Plaintiffs waited more than four months to bring a motion to compel their documents; (2) Plaintiffs used documents Google had produced prior to or before April 29, 2025 to identify ███████████████████████████████████████████████████████████ as custodians and Plaintiffs never responded to Google's July 14, 2025 correspondence regarding these custodians, Atty. Decl. ¶¶ 23, 25–26;[15] (3) Plaintiffs knew that absent Plaintiffs' agreement to expand their own custodial review, Google would not agree to additional custodians; and (4) Plaintiffs made their first production of documents from agreed-upon custodians and search terms on July 10, 2025, only eight days before Google's first such production. To the extent there is any prejudicial "delay" here, it is of Plaintiffs' own doing. Plaintiffs' unjustified delay itself requires the Court to deny their motion. Fed. R. Civ. P. 26(b)(2)(C)(ii) ("On motion or on its own, the court **must limit the frequency or extent of discovery** otherwise allowed by these rules or by local rule **if it determines that** . . . **the party seeking discovery has had ample opportunity to obtain the information by discovery in the action**." (emphasis added)); *Farb v. Baldwin Union Free Sch. Dist.*, 2007 WL 1300978, at *1 (E.D.N.Y. May 4, 2007) (denying motion to compel when "plaintiffs had five months to raise this issue in a timely fashion and failed to do so").

Google's position remains that discovery from any additional custodians—including those specifically identified by Plaintiffs—is not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). And none of Plaintiffs' arguments support an inference that searching the files of any

---

[14] Plaintiffs neglect to note that despite originally saying that they would be searching for and producing organizational charts or lists of relevant employees, Plaintiffs likewise did not identify any such documents maintained in the ordinary course of business. *See* Atty. Decl. ¶ 21. This meant that Google *also* had to attempt to undertake an independent investigation of each Plaintiff in an attempt to identify additional custodians.

[15] Instead, Plaintiffs asserted in the July 25, 2025 Joint Status Report that "Google has refused to gather custodial documents from numerous Google personnel who processed infringement notices from Plaintiffs, or who processed a large number of infringement notices overall." Dkt. 138 at 2.

**LATHAM&WATKINS**LLP

of these additional custodians would provide unique, relevant information. *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 2020 WL 7383940, at *6 (S.D.N.Y. Dec. 16, 2020) (requiring a party to demonstrate that additional requested custodians would provide unique relevant information). Moreover, even if Plaintiffs could make that threshold showing, any marginal relevance of additional, non-duplicative documents possessed by Plaintiffs' proposed custodians would be outweighed by the cost and burden of collecting, searching, and reviewing their documents at this late stage. *GMO Gamecenter USA, Inc. v. Whinstone U.S. Corp.*, 2025 WL 722853, at *2 (S.D.N.Y. Mar. 5, 2025) (denying in part motion to compel where searching additional custodians would not be "proportional to the needs of the case considering the significant discovery that has already taken place and the likelihood that additional custodians would serve to yield duplicative results"); *Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 2017 WL 2305398, at *3 (S.D.N.Y. May 18, 2017) ("Even if the plaintiffs had cleared the hurdle of showing that the proposed additional custodians had some unique relevant information, discovery of their files would not be warranted . . . . [G]iven the information already produced, the marginal utility of [the information] possessed by these custodians is low" and "the cost of producing it would be substantial."); *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of New York Mellon*, 2018 WL 2215510, at *7 (S.D.N.Y. May 15, 2018) ("[A] party requesting discovery may not be entitled, 'under the rules of proportionality, to every single [relevant] document.'").



. Google directly employs ▓▓▓. As Plaintiffs know, Google ▓▓▓ ▓▓▓ Plaintiffs' only basis for seeking documents from ▓▓▓ ▓▓▓ Dkt. 160 at 7. Based on this and a handful of documents Plaintiffs take out of context and neglect to provide to the Court, they speculate that Google is withholding "daily communications amongst the personnel and agents who manually reviewed, escalated, and processed every infringement notice behind the scenes." *Id.* Not so.

None of the cited documents provide any indication that the custodial files of these four individuals would contain unique, relevant information. Some, e.g., GOOG-CENG-00388319 and GOOG-CENG-00388252, are completely unrelated to ▓▓▓ ▓▓▓. To the extent a cited document ▓▓▓, not a single document evidences that any ▓▓▓ used email or Google Chat to execute their daily tasks such that a search of their custodial files would yield unique, relevant documents. Rather, the cited documents include internal Google emails involving different teams, e.g., GOOG-CENG-00408617, instructions for the use of internal Google tools, e.g., GOOG-CENG-00408700 at -00 to -01, and high-level documents discussing or analyzing various removal workflows, including for other products and non-copyright reasons, e.g., GOOG-CENG-00404594; GOOG-CENG-00405237 at -247; GOOG-CENG-00405292.

Moreover, Plaintiffs identified the legal agent custodians based on a review of ▓▓▓ ▓▓▓, which Google produced to Plaintiffs on March 28, 2025.

**LATHAM&WATKINS**LLP

███████████████████████████████████████████████████
██████████████████████████████████. *See* GOOG-CENG-00000685.
█████████████████████████████████. *See* GOOG-CENG-00000761. Further, the very documents Plaintiffs cite indicate that ████████████████████████
█████████████████ *See, e.g.*, GOOG-CENG-00407977
████████████████. Likewise, GOOG-CENG-00408671 is an email notifying a full-time Google employee, and custodian in this case, that she was tagged in a ████████
█████████████████████████. That document has been produced to Plaintiffs, and the cited email demonstrates how working with Google documents streamlines communication; it happens within the document and comments on the documents—which have already been produced. To the extent someone receives email notifications about comments, those are duplicative of the comments reflected in the document. Moreover, the custodial documents produced by Google and cited by Plaintiffs reflect that to the extent legal agents "escalate[d] concerns" or "request[ed] feedback," those communications are captured in files of the full-time employees that Google has included as custodians. Dkt. 160 at 7. Thus, the "daily communications" Plaintiffs seek have been or will be produced even without a search of the legal agent custodians' emails.

Further, at Plaintiffs' insistence, Google has already agreed to add ████████ ██████████████████████████████████████████████████ as a custodian. Atty. Decl. ¶ 23. Google has already produced 51 documents for which ███████ is a custodian, and only 7 of those are emails and only 2 of those are Google Chats. Atty. Decl. ¶ 24. There's no indication from ████████ produced emails that a search of the legal agent custodians, who she supervised, would yield any relevant, unique documents.

████████████. Plaintiffs argue that Google should be required to search ████████'s documents because he appears on certain communications that touch upon issues tangential to DMCA enforcement. This entirely ignores the requirement of Rule 26 that discovery be proportional to the needs of the case. Google maintains that the burden and expense of searching ████████'s documents outweighs its likely benefit. Google's understanding, based on a reasonable investigation, is that ████████ was not a manager, had no direct reports, and had no direct involvement in processing DMCA infringement notices or DMCA enforcement more generally. Atty Decl. ¶ 27. Google thus has not "concealed" anything. Google has no basis, even considering the documents Plaintiffs cite, to believe that ████████ would have unique, relevant documents that would warrant undertaking a review of his documents.

***Christophe Weibel.*** Mr. Weibel (an individual disclosed and known to Plaintiffs since 2024) is unlikely to have relevant, non-duplicative documents responsive to Plaintiffs' discovery requests that would make a full custodial collection (i.e., running Google's search terms across over three years of custodial data) proportional to the needs of this case. As an engineer, Mr. Weibel is knowledgeable about the systems underlying policy enforcement on the Shopping platform, e.g., the database from which the data in Google's February 14 production was pulled. Based on Plaintiffs' representations during the parties' meet and confer, Google understands Plaintiffs are primarily seeking (1) documents describing the technical engineering details that underlie Google's DMCA systems and processes; and (2) documents reflecting questions and

suggestions about, as well as problems with, those systems during the relevant time period. With respect to (1), this information is not relevant to either party's claims or defenses. With respect to (2), those documents have been collected, reviewed, and produced from files of the agreed-upon custodians. As Plaintiffs concede, Google has not maintained that Mr. Weibel has no responsive documents. To the contrary, Google represented that it intended to conduct a targeted search of Mr. Weibel's documents to identify unique relevant documents in Mr. Weibel's possession (e.g., "final, high-level reports, studies, summaries, or analyses regarding technical approaches generally aimed at addressing copyright infringement on the Shopping platform" in response to Plaintiffs' RFP 8 and "documents reflecting Google's 'cluster enforcement' processes and procedures, including those relevant to the Domain-Identified Merchants" in response to Plaintiffs' RFP 12), and is producing the handful of relevant, non-duplicative documents it has identified this week. Plaintiffs have no support for their speculation that this approach is "insufficient."

*▇▇▇▇▇▇▇▇ and ▇▇▇▇▇▇▇▇▇▇▇▇▇*. As Plaintiffs know, these individuals are in-house counsel at Google and the majority of their responsive and non-duplicative custodial documents are likely to be privileged. And, Plaintiffs have been aware of their involvement in relevant issues for some time—as Plaintiffs note in their letter, ▇▇▇▇▇▇ and ▇▇▇▇▇▇ interfaced with Plaintiffs' counsel as far back as 2019 and 2020 regarding pirated eBooks on Google's Shopping platform. Dkt. 160 at 9. As Google's counsel has explained on numerous occasions, its understanding is that ▇▇▇▇▇▇ and ▇▇▇▇▇▇▇ performed legal, rather than business, functions, including in connection with Google's DMCA policies. However, the critical question for this dispute is not whether all of their communications, or even any particular communication, is "privileged," and Google has not refused to add these custodians on the claim that "a key part of its DMCA program is protected by privilege." Rather, Google has explained that because a large majority of their responsive communications are *expected to be* privileged, and therefore, will require Google to undertake the burden of logging each communication, adding these individuals as custodians would result in a disproportionate burden on Google that outweighs the possibility of finding non-privileged information.[16] *See, e.g.*, *Dale v. Deutsche Telekom AG*, 2024 WL 4416761, at *3 (N.D. Ill. Oct. 4, 2024) (denying motion to add three in-house attorneys as custodians based on the "time-consuming and costly" nature of preparing privilege logs and the predicted dispute regarding the responding party's privilege designations that would require a "time-consuming and burdensome" in camera review of hundreds or thousands of documents); *Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*, 2019 WL 3369659, at *1 (D. Del. July 15, 2019) (affirming special master's determination that "the possibility of finding discoverable information" in an in-house counsel's custodial files was outweighed by the burden of "filtering through the ESI for what is privileged and then cataloging it"). Google also offered that it might be willing add attorney custodians if Plaintiffs were likewise willing to conduct custodial collections from their own in-house counsel responsible for DMCA monitoring, or from Plaintiffs' outside counsel involved in the same conversations with ▇▇▇▇▇▇ and ▇▇▇▇▇▇▇▇ in 2019

---

[16] Unlike Plaintiffs, who have provided Google with a (woefully deficient) "categorical" privilege log that lumps over 500 documents into a dozen or so "categories," (which Google intends to raise to the Court absent Plaintiffs' agreement to supplement the log pursuant to Rule 26), Google's privilege logs have set forth, individually, each document Google has withheld on the basis of an applicable privilege. Atty Decl. ¶¶ 28–29.

and 2020 (a fact underscoring that Plaintiffs themselves already possess relevant communications with these individuals, including those cited by Plaintiffs in their Motion). Plaintiffs declined.

While not entirely relevant to this dispute, to the extent Plaintiffs' motion leaves the Court with the impression that Google has refused to produce communications regarding its DMCA policy, or withheld documents simply because a lawyer is present, that is wrong. As many of the documents Plaintiffs cite reflect, Google has produced or will produce hundreds of documents about its DMCA policy and application, including several dozen communications where attorneys are copied. Google's productions demonstrate that Google is not withholding any communications simply because a lawyer is copied. Instead, it is applying redactions where legal advice is provided, sought, or reflected but leaving non-legal discussions unredacted.

The Court should deny Plaintiffs' request for Google to unilaterally shoulder the additional burden of more custodial discovery, when document discovery has all but closed. If the Court grants any part of Plaintiffs' request, the Court should extend the deadline for document discovery, and all corresponding case deadlines, by several months, permit Google to seek additional custodians based on Plaintiffs' recent custodial document productions, and order that any such corresponding document productions based on the custodians at issue in Plaintiffs' Omnibus Motion will satisfy Google's obligations with respect to custodial discovery. Court intervention that sets boundaries on document discovery is particularly warranted here in light of the fact that within 48 hours of filing their omnibus motion—and just one week before the completion of document discovery—Plaintiffs sent Google an email demanding Google search seven additional custodians' files and seven additional aliases in addition to applying six additional search strings (none of which is addressed in their motion). *See* Ex. 5. Plaintiffs' scorched-earth approach to discovery is inappropriate and disproportional.

### B. There is no basis for requiring a full sweep of any additional data source.

The Court should reject Plaintiffs' request that Google run all of its search terms across the Google Issue Tracker, referred to internally as "████████," and "produce the full history of all '████████' tickets" and communications in connection with those tickets relating to "the infringing merchants at issue in this case." To start, that's not all Plaintiffs are asking for—buried in footnote 8, Plaintiffs note that this system likely has documents responsive to multiple RFPs that go beyond the infringing merchants in this case, "including" RFP 4, 6, 22, and 45, *see* Dkt. 160 at 13 n.8., and in the Conclusion, Plaintiffs ask the Court to order Google to produce documents in response to, "e.g.," RFP 6, 7, 22, and 45, *id.* at 15. In essence, Plaintiffs ask the Court to condone an oppressively burdensome, and in many ways technically infeasible, search across this entire, company-wide system in an attempt to "boil the ocean" for responsive documents. This vastly exceeds Google's discovery obligations. *See Adidas America, Inc. v. Thom Browne, Inc.*, 742 F. Supp. 3d 352, 364-65 (S.D.N.Y. July 29, 2024) ("Courts only require . . . that a party conduct a 'reasonable search' for documents in response to a request, not that they boil the ocean to ensure every potentially responsive item is produced.").[17]

---

[17] Plaintiffs further obscure the full extent of the herculean task that they are asking Google to undertake. On August 7, in the same email that Plaintiffs demanded Google search two *additional* internal systems, Plaintiffs demanded that Google add, among other new search terms, tens of thousands of account and case IDs as search terms to the 1,239

LATHAM&WATKINS LLP

***Relevance and Proportionality***.  The Google Issue Tracker is a tool used across Google to track issues and feature requests for all of Google's products.  Declaration of André Golueke ("Golueke Decl.") ¶ 6.  Within this tool, there are different "components" corresponding to projects, sub-projects, or other groups of issues.  These components can have complex hierarchies, with child components and nested sub-components.  *Id.* ¶ 7.  Issues, commonly referred to as "bugs," are the individual tickets that live within a component, child-component, or sub-component.  *Id.* ¶ 8.  Google Issue Tracker sends worklog updates via email notifications to an issue's subscribers.  *Id.* ¶ 9.  Users whose email addresses are added to the CC field of the issue automatically receive notifications when a change is made.  *Id.*  Accordingly, Google Issue Tracker tickets necessarily contain information that is duplicative of information contained in a subscriber's email notifications.  *Id.* ¶ 10.  Plaintiffs speculate that there "would be reason to question" whether the email notifications from the Google Issue Tracker were "operating properly."  Dkt. 160 at 13.  But, the two documents they cite do not even *mention* the Google Issue Tracker and instead refer to purported issues with *access* to certain tools and *effectiveness* of certain processes.  *See id.* (citing GOOG-CENG-00405292 and GOOG-CENG-00408442).  Neither document shows that there are issues with the Google Issue Tracker notification system.  *Cf. Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 436 (S.D.N.Y. 2011) ("Mere speculation as to the existence of additional documents is insufficient to warrant an order to compel.").

Moreover, Google has already agreed to search for and collect the full history of all Google Issue Tracker tickets associated with emails produced from the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ listserv.  Plaintiffs are thus *going to receive* the full Google Issue Tracker records associated with half the examples they cite in their motion.  *See* GOOG-CENG-00388333, GOOG-CENG-00388209, GOOG-CENG-00413456.  As for Plaintiffs' complaint that this is too "limited" because Google has described the listserv as being "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," Dkt. 160 at 13, they take those statements out of context, and neglect to mention that *they* pushed for including this listserv as a "custodian" in the first place.  *See* Atty. Decl. ¶ 34.  Google noted that the listserv was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in explaining that the listserv was used "for all u▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ng platform, including, for example, illegal or dangerous products, adult content, counterfeit goods, and misinformation."  *See id.* ¶ 35.  But this does not mean that there are not relevant emails sent to the listserv that *are* focused on DMCA and/or copyright issues.  At any rate, Plaintiffs have not shown that significant communications are missing from Google's production.  They point to just three examples of emails mentioning a Google Issue Tracker ticket Google has not already agreed to produce.  As a compromise, Google is willing to search for, collect, and produce Google Issue Tracker records associated Issue Tracker email notifications that Google has or will produce, as well as any Issue Tracker records associated with ticket IDs that Plaintiffs identify in good faith as being relevant based on a review of Google's custodial documents.

***Burden***.  While it is generally feasible for Google to search for, collect, and produce individual Google Issue Tracker records using known ticket IDs (as it has agreed to do), Google cannot simply agree to run the parties' agreed-upon search terms over the entire Google Issue Tracker system.  Two major constraints are (1) that Google Issue Tracker's search tool does not

---

domain names Google has already agreed to run as search terms across Google's custodial files.  *See* Ex. 5 at 3.  Presumably, Plaintiffs want Google to run *all of* these terms across the Google Issue Tracker system as well.

support wildcards or proximity searches, and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Golueke Decl. ¶¶ 13–14. This means that performing a complex search at scale, as Plaintiffs request, is extremely difficult and often not technically feasible. *Id.* ¶ 11. There would be *no* practical way to run many of the parties' agreed-upon searches within the Google Issue Tracker system due to the above-described limitations. *Id.* ¶ 13. Indeed, modifying the search terms to conform with Google Issue Tracker's search limitations, e.g. by converting proximity operators to "AND" connectors, would risk a potentially large over-collection. Moreover, some Google Issue Tracker components are subject to access controls, and search results are limited to components for which the searcher has the right permissions. *Id.* ¶ 12.

For these reasons, Plaintiffs' request is disproportional (and untenably burdensome and technologically infeasible). In the interest of compromise, however, Google will agree to (1) search for, collect, and produce the Google Issue Tracker ticket page for produced custodial documents reflecting Google Issue Tracker email notifications, including GOOG-CENG-00413875, GOOG-CENG-00406691, and GOOG-CENG-00404715; and (2) to the extent not otherwise covered, collect and produce additional relevant Google Issue Tracker records associated with reasonable requests for specific ticket IDs that Plaintiffs identify in good faith in accordance with Section 7(d) of the parties' stipulated ESI protocol (Dkt. 80).

### V. Plaintiffs' Request for Special Treatment of One Fact Question Is Improper

Plaintiffs' demand that Google's counsel answer a factual question subject to multiple meanings regarding "when [Google's] DMCA policy was created or put into operation" outside the context of any properly served interrogatory, document request, or deposition is inappropriate.

*First*, none of the discovery requests Plaintiffs have served demand an answer to the specific question that Plaintiffs now pose. "[T]he Federal Rules of Civil Procedure require that a party seeking discovery first make a discovery request on the adverse party before seeking the intervention of the Court." *Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide,"* 2021 WL 12226273, at *8 (S.D.N.Y. Apr. 20, 2021); *see also Clark v. City of Los Angeles*, 2022 WL 17220036, at *8 ("The Court cannot 'compel' a responding party to produce discovery until the requesting party has propounded a proper discovery request (such as an interrogatory or a request for production, etc.) on the opposing party asking for it in accordance with the Federal Rules of Civil Procedure."), *supra* n.12. RFPs 6, 62, and 63 and Amended ROG 1[18] each seek discovery relating to Google's development and implementation of its DMCA policy during specific time periods (which Google indisputably has produced or will produce, for the relevant time period), but none specifically requests documents regarding *when* Google's DMCA policy was "created or put into operation." *See* Dkt. 47-1 at 9 (RFP 6); Atty. Decl. ¶¶ 37–38 (RFPs 62–63); *id.* ¶ 44 (Amended ROG 1). This alone warrants denial of Plaintiffs' request.

*Second*, Plaintiffs' claim that this question is "basic" is wrong. Dkt. 160 at 14. Indeed,

---

[18] After Google provided responses and objections to Plaintiffs' First Set of Interrogatories and the parties met and conferred, Plaintiffs issued an "amended" set that modified five of those interrogatories, including Interrogatory No. 1. Because "every interrogatory which is served, and causes a responding party to undertake the burden of preparing and serving objections to the interrogatory, is counted against the numerical 25 interrogatory limit for purposes of Rule 33(a)," *Walker v. Lakewood Condo. Owners Ass'n*, 186 F.R.D. 584, 587 (C.D. Cal. 1999), Google has counted the five amended interrogatories as interrogatories 11–15. "Amended" ROG 1 is thus ROG 11.

Google has asked Plaintiffs more than once to clarify what they mean by "when Google's DMCA policy was 'created.'" Plaintiffs have so far declined to provide an answer. *See* Ex. 2 at 1. If Plaintiffs mean when Google's operative DMCA policy, in its current form, was finalized and put into effect, Google, on February 7, 2025, produced a document that provides the answer to that question. *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Perhaps Plaintiffs instead mean to ask when Google first put a DMCA policy in place, or when Google first created the policy that was "updated" in ▮▮▮▮▮▮▮, or when aspects of the operative policy were first created or put into operation. Regardless, these types of factual questions are inappropriate when propounded on Google's counsel during conferral calls or over email.

*Third*, Plaintiffs' argument that it cannot "determine the appropriate start-date for these discovery requests" until Google answers a question they claim should be answered through these RFPs is obviously circular. *See* Dkt. 160 at 14. It is also backwards and contrary to standard e-discovery practices in complex litigation matters (not to mention the Federal Rules). *See Actava TV*, 2021 WL 12226273, at *8. Before documents are collected, reviewed and produced, the parties typically negotiate a "relevant time period" for such collections and productions. Throughout this litigation, Google's position has been that the core time period relevant to this dispute begins in June 2021: this is when Plaintiffs allege that they began sending infringement notices to Google, *see* FAC ¶ 99, and it corresponds with the three-year statute of limitations for copyright claims. *See Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 249 (S.D.N.Y. 2018). In light of Google's operative DMCA policy's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮,[19] Google has agreed to a time period beginning in December 2020 for many of Plaintiffs' discovery requests (including Plaintiffs' interrogatories). In some cases, including in response to RFPs 62 and 63, Google has agreed to go even further back, to January 2020—the start date imposed by Plaintiffs' own RFPs (January 1, 2020). *See* Ex. 2 at 1; Atty. Decl. ¶ 39. Plaintiffs are wrong that the answer(s) to whatever fact question(s) they have regarding when Google's DMCA policy was "created and put into operation" will somehow impact the core time period relevant to this dispute. If, hypothetically, Google first created some version of a ▮▮▮▮▮ DMCA policy 10 or 20 years ago, that would not suddenly render documents regarding Google's implementation of its policy in 2015 or 2005 relevant to Plaintiffs' claims or Google's defenses, nor would it become proportionate for Google to run search terms through another 5 or 15 years-worth of custodial data.

*Fourth*, Plaintiffs' request for permission to serve an interrogatory with a three-business-day response deadline is unjustified. Federal Rule of Civil Procedure 33(b)(2) provides responding parties with thirty days to serve answers and objections to interrogatories unless otherwise ordered. Plaintiffs offer no rationale and cite no case law to support their extraordinary request for a deadline as many as *twenty seven days* shorter than the default. *See Fratus v. Uchi*, 2022 WL 18587792, at *2 (E.D. Cal. Nov. 3, 2022) (denying plaintiff's request for a shorter response deadline where he had "not sufficiently explained" how the additional time would prejudice him). Plaintiffs could have propounded this proposed interrogatory months ago. Dkt. 110. Google should not be forced to bear the burden of *Plaintiffs*' strategy decisions and answer an interrogatory—the precise contours of which remain unknown—within three business days.

---

[19] Under Google's operative DMCA policy, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* GOOG-CENG-00000683.

**LATHAM&WATKINS**LLP

                                                                  Respectfully submitted,

                                                                  */s/ Sarah A. Tomkowiak*

                                                                  Sarah A. Tomkowiak
                                                                  of LATHAM & WATKINS LLP

                                                                  *Attorney for Defendant Google LLC*

cc:      All Counsel of Record (via ECF)