IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENGAGE LEARNING, INC.; BEDFORD, FREEMAN & WORTH PUBLISHING GROUP, LLC D/B/A MACMILLAN LEARNING; MACMILLAN HOLDINGS, LLC; ELSEVIER INC.; ELSEVIER B.V.; and MCGRAW HILL LLC,<br><br>                          *Plaintiffs*,<br><br>v.<br><br>GOOGLE LLC,<br><br>                          *Defendant*. | Case No. 1:24-cv-04274-JLR-BCM |

## ATTORNEY DECLARATION OF SARAH TOMKOWIAK

I, Sarah Tomkowiak, declare that:

1. I am a partner at the law firm Latham & Watkins LLP, counsel for Google LLC ("Google") in this matter.

2. I submit this declaration in connection with Google's opposition and response to Plaintiffs' omnibus discovery letter (Dkt. 160).

**Discovery Requests Regarding Merchant Center Accounts and Domains**

3. Attached as **Exhibit 1** is a true and correct copy of correspondence between counsel for Google and counsel for Plaintiffs between July 14, 2025, and August 12, 2025.

4. A team at FTI Consulting ("FTI"), whom Google has retained in connection with this matter, conducted an analysis of the historical data that Google produced at GOOG-CENG-00392942 ("Historical Log"), which I reviewed. FTI calculated that the Historical Log reflects ▮▮▮ unique domains that do not match Plaintiffs' December 24, 2024 list of 1,239 domains

1

("Domain Spreadsheet"). Of those ▮ domains, FTI identified only ▮ domains that are reflected in Plaintiffs' notice data at PL0000543994 and PL0000535577.

5.  I have reviewed the information Google produced at GOOG-CENG-00000703 ("Domain-Identified" merchants) and GOOG-CENG-00392941 ("Historical" merchants). These documents contain certain account information for the 20,145 Merchant Center IDs for which Google has produced a variety of data. Out of those 20,145 accounts, these documents reflect that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Moreover, for the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

6.  Plaintiffs' attorney declaration claimed that the attorney "counted more than 1,600 instances in which Google claims to have terminated all of the Merchant Center accounts associated with a particular domain by a date prior to September 16, 2024, and yet Plaintiffs' vendor observed an ad for that domain after September 16, 2024." Dkt. 161 ¶ 3.a. On August 10, Plaintiffs provided counsel for Google with a spreadsheet purporting to identify these "1,600 instances" ("August 10 Spreadsheet"). The spreadsheet does not specify the source of the data reflected therein or include any explanation of the methodology Plaintiffs purportedly used to identify that these "1,600 instances." The August 10 Spreadsheet reflects that at least some of the domains identified therein are connected to Merchant Center accounts that Google's data shows were suspended *after* September 16, 2024. *See, e.g.*, GOOG-CENG-00000703 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

2

7. The August 10 Spreadsheet contains columns that can be filtered. Using basic spreadsheet filtering, I determined that only 12 domains are reflected in the August 10 Spreadsheet, and of those, only 7 domains are reflected in Plaintiffs' list of 1,239 domains in the Domain Spreadsheet. Moreover, according to the August 10 Spreadsheet, only 562 of the 1,637 entries in this data are associated with one of those 7 domains from Plaintiffs' Domain Spreadsheet and purport to be on behalf of a Publisher in this case. Of those 562 entries, the last in time date reflected is January 27, 2025.

8. I reviewed the data that Google produced at GOOG-CENG-00404298. This data provides, on a monthly basis, the total "offer cost," if any, associated with all Shopping ads run by the Domain-Identified and Historical merchant IDs in this case between June 2021 and September 2024. The total revenue reflected for the entire period for all Merchant Center IDs is approximately ▮▮▮▮▮▮. There are also only ▮▮▮ unique Merchant Center IDs (of the 20,145 total Domain-Identified and Historical Merchant Center IDs) represented in this data.

**Discovery Requests Regarding Duplicate Infringement Notices**

9. On April 1, 2025, Plaintiffs served on Google their Second Set of Requests for Production of Documents, which included Request for Production ("RFP") Nos. 59–79.

10. RFP No. 73 reads in full, "To the extent not covered by, e.g., RFP 3, documents sufficient to show any instances in which you responded to an infringement notice with a request that the sender of the notice refrain from sending duplicate notices. *See* n.1, *supra*." Note 1 reads, in full: "*See, e.g.*, PL0000188745 ('We've detected that you have already submitted these URLs through previous requests. We're either working to respond to these URLs or have already responded, and we ask that you not send repeated requests containing the same URLs as this delays our process. Please note that if we continue to receive the same duplicative request from you three

3

or more times, we will consider that particular request to be manifestly unfounded. Manifestly unfounded requests may lead us to temporarily stop reviewing your requests for a period of up to 180 days.' *See also* PL0000188757 (same), PL0000188783 (same); Misuse Policy, https://support.google.com/legal-help-center/answer/13949470?hl=en."

11. RFP No. 74 reads in full, "To the extent not covered by, e.g., RFP 3, documents sufficient to show any instances in which you stopped processing Infringement Notices from a particular sender or rightsholder for any period of time."

12. I am a recipient of a 21-page email thread between counsel for Google and counsel for Plaintiffs, with the subject line, "Re: Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage Learning, Inc. v. Google LLC." Attached as **Exhibit 2** is a true and correct copy of the correspondence between counsel for Google and counsel for Plaintiffs, which spans from May 1, 2025 to July 14, 2025.

13. Contained in that thread is an email from my colleague Sara Sampoli to Plaintiffs' counsel on June 23, 2025, in which Ms. Sampoli stated that Google would agree to produce documents sufficient to show DMCA notice senders who have been added to an "███" list or otherwise have been subject to a suspension.

14. I am not aware of any documents maintained in ordinary course, other than the "███" list, which Google is producing, that is responsive to Plaintiffs' RFP No. 74. ███

███

███

15. As reflected in the email thread attached as Exhibit 2, Ms. Sampoli followed up with Plaintiffs' counsel by email on July 14, 2025 stating that Google intended to "produce the

information in Google's possession, custody, or control that is responsive to both RFPs 73 and 74, and do[es] not understand there to be a delta between what Plaintiffs have asked for in the text of their RFPs and what Google is agreeing to provide." Plaintiffs' counsel has not responded to this email.

**Discovery Requests Regarding Content-Neutral Search Features**

16. Plaintiffs' Second Set of Requests for Production also included RFP 65, which reads, in full: "Documents concerning the creation, implementation, and technical capabilities of the following features, or concerning the underlying technology that creates these features.

- Ebook Link
- Page Link
- PDF Link
- Textbook Link."

17. Plaintiffs' Second Set of Requests for Production defined Ebook Link as referring to "a link contained on the Shopping Ads user interface, whereby a Google user can filter her Shopping Ads results to display products that are ebooks." Page Link was defined as referring to "a link contained on the Shopping Ads user interface, whereby a Google user can filter her Shopping Ads results to display works that are within a certain page limit, e.g., 'under 392 pages'." PDF Link was defined as referring to "a link contained on the Shopping Ads user interface, whereby a Google user can filter her Shopping Ads results to display products that are available in .pdf form." Textbook Link was defined as referring to "a link contained on the Shopping Ads user interface, whereby a Google user can filter her Shopping Ads results to display results that are textbooks."

18. Attached as **Exhibit 3** is a true and correct copy of a screenshot captured using PageVault depicting search results for "printable nutrition chart." The screenshot depicts the same suggested "PDF" filter shown in Figure 5 in Plaintiffs' First Amended Complaint ("FAC"). *Compare* Ex. 3 at 3 *with* FAC at 19.

19. Attached as **Exhibit 4** is a true and correct copy of a screenshot captured using PageVault depicting search results for "printable nutrition chart" filtered using the "PDF" filter. The screenshot depicts Shopping ads offered primarily from Etsy, as well as other merchants.

20. During meet and confers that I have attended and on email threads of which I am a recipient, counsel for Google has repeatedly requested that Plaintiffs' counsel provide case law supporting their position that implementing neutral search features could constitute willfulness, material contribution, or any other element of Plaintiffs' copyright infringement claim. These requests include an email from Ms. Sampoli on June 23, 2025. *See* Ex. 2 at 6. Plaintiffs have not responded.

**Plaintiffs' Demand for Additional Custodians**

21. On February 26, 2025, Kevin Lindsey, counsel for Plaintiffs, sent my colleague, Laura Bladow, a letter in response to Google's February 18, 2025 letter concerning Plaintiffs' responses and objections to Google's First Requests for Production. In the February 26, 2025 letter, Plaintiffs stated: "Plaintiffs have diligently searched for the requested organizational charts and determined that they do not maintain such documents listing the departments or individuals responsible for DMCA enforcement or listing the employees involved in identifying potential infringement in the ordinary course of business. In Google's own words, Plaintiffs are not required to 'create custom documents' to respond to these requests. *See* email from S. Sampoli (Nov. 5, 2025)."

6

22. I am a recipient of a 94-page email thread between counsel for Google and counsel for Plaintiffs with the subject line, "Re: Google LLC's Responses and Objections to Plaintiffs' First Set of Requests for Production - Cengage Learning, Inc. v. Google LLC, Case No. 24-cv-4274." That email thread reflects that as of February 5, 2025, the parties had agreed to exchange final planned search terms and custodians on March 7, 2025, based on a series of planned exchanges between the parties of proposed custodians and search terms and corresponding objections over the course of February 2025.

23. I am a recipient of a 63-page email thread between counsel for Google and counsel for Plaintiffs with the subject line, "RE: HC/AEO - Re: Cengage v. Google – Google's Initial Custodian Disclosure." This email chain begins with an email from Google's counsel to Plaintiffs' counsel on January 31, 2025, and ends with an email on July 14, 2025 from Google's counsel to Plaintiffs' counsel.

- This email chain contains Google's final proposal on search terms and custodians, which was sent to Plaintiffs on March 7, 2025, consistent with the parties' agreed-upon schedule for negotiating custodians and search terms.

- This email chain contains an email sent by Jeff Kane, counsel for Plaintiffs, on March 28, 2025, to counsel for Google "follow[ing] up on yesterday's meet-and-confer" and stating, "As to the below issues, the parties are at an impasse. Adding as custodians: Christophe Weibel, . . . , ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

- This email chain contains an email sent by Jeff Kane, counsel for Plaintiffs, on April 14, 2025, requesting Google add ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as custodians based on "[s]everal documents Defendant has produced since March 7."

7

- This email chain contains an email sent by Ms. Sampoli, counsel for Google, on May 14, 2025, agreeing to add ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and declining to add any additional ▇▇▇▇▇ including but not limited to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, as custodians, explaining that "[b]ased on Google's investigation, we believe that the burden of collecting and reviewing these ▇▇▇▇ custodial files outweighs the benefit of any potentially responsive emails they may have."

- The email chain contains an email sent by Jeff Kane, counsel for Plaintiffs on June 9, 2025, stating, with respect to the ▇▇▇▇ "Having received no meaningful engagement from Defendant on these four custodians, Plaintiffs intend to raise this issue with the Court."

- On July 14, 2025, Caroline Clarke, counsel for Google, responded, providing further detail on Google's position that the burden of collecting and reviewing the four ▇▇▇▇ files is not proportional to the needs of the case.

- Plaintiffs never responded to Ms. Clarke's July 14 email.

24. As of the date of this declaration, Google has produced 51 documents for which ▇▇▇ is a custodian, and only 7 of those are emails and only 2 of those are Google Chats.

25. Plaintiffs first asked Google to add ▇▇▇▇ as a custodian on May 19, 2025, in an email with the subject line, "Cengage v. Google – Defendant's Eleventh Production." Google's eleventh production was sent to Plaintiffs on April 29, 2025.

26. The parties also exchanged emails regarding Plaintiffs' request that Google add ▇▇▇▇ as a custodian in the 63-page email thread between counsel for Google and counsel for

Plaintiffs with the subject line, "RE: HC/AEO - Re: Cengage v. Google - Google's Initial Custodian Disclosure." In that email chain, Plaintiffs stated their position on June 9 and Google reiterated its position on July 14, 2025. Plaintiffs did not respond to the July 14, 2025 email.

27. Counsel for Google has undertaken a reasonable investigation of ▮▮▮▮ role and responsibilities at Google. Based on that investigation, I understand that ▮▮▮▮ ▮▮▮▮▮▮▮▮ was not a manager, had no direct reports, and had no direct involvement in processing DMCA infringement notices or DMCA enforcement more generally.

28. On August 1, 2025, Plaintiffs produced a "categorical" privilege log that lumps over 500 documents into a dozen or so "categories."

29. On August 1 and 8, 2025, Google produced privilege logs that set forth, individually, each document Google has withheld on the basis of an applicable privilege.

30. On August 7, 2025, Jeff Kane, counsel for Plaintiffs, sent counsel for Google an email demanding Google search seven additional custodians' files and seven additional aliases in addition to applying six additional search strings. None of these demands are at issue in the present Motion. A true and correct copy of this email is attached as **Exhibit 5**.

**Plaintiffs' Demand that Google Search the Entire Google Issue Tracker System**

31. On June 12, 2025, Plaintiffs served their Third Set of Requests for Production of Documents, which included RFP Nos. 80–95.

32. RFP No. 90 reads, in full: "All documents in the ▮▮ regarding copyright or trademark infringement by the Infringing Merchants, or concerning Plaintiffs' Infringement Notices, including, but not limited to, all comments, information regarding actions taken, details of enforcement stats, and updates Google employees added within the ▮▮ regarding the Infringing Merchants or Plaintiffs' Infringement Notices."

9

33. In Plaintiffs' Definitions for their Third Set of Requests for Production, they defined "███" to mean "the '███████' internal ticketing system used to track bugs, feature requests, and other issues across Google. S. Sampoli 2025.05.29 Email; GOOG-CENG-00388252; GOOG-CENG-00388333."

34. The 63-page email chain referred to above in paragraph 23 contains an email sent by Jeff Kane, counsel for Plaintiffs, on February 7, 2025, to counsel for Google asking "to understand whether Defendant considered including" a list of nineteen potential custodians. One of those potential custodians was the ███████████████████████████ listserv.

35. This email chain also contains an email from Ms. Sampoli, counsel for Google, to Plaintiffs' counsel on March 4, 2025 explaining that this listserv "is not just used for DMCA enforcement efforts, and is used for all urgent Trust and Safety issues on the Shopping platform, including, for example, illegal or dangerous products, adult content, counterfeit goods, and misinformation. Our understanding is that this alias is only rarely used for DMCA and/or copyright purposes. To the extent that it was used for these purposes, however, [Google] agreed to treat this alias as a 'custodian.'"

36. Jeff Kane, counsel for Plaintiffs, responded on March 7, 2025 stating that Plaintiffs "appreciate [Google's] agreement to add the email alias ███████████ as a custodian."

**Plaintiffs' Demand that Google's Counsel Answer a Fact Question**

37. Plaintiffs' Second Set of Requests for Production also included RFP Nos. 62 and 63. RFP No. 62 reads, in full: "To the extent not covered by RFP 6, all documents concerning the creation and development of the ███████████ in the Copyright Strike Policy for Google Ads and Shopping and the Shopping DMCA Strikes Policy, including all versions and drafts, and

all internal communications concerning the rule. *See* GOOG-CENG-00000683 ("███████ ███████.'); GOOG-CENG-00000685 ("███████ ███████.')."

38. RFP No. 63 reads in full, "All documents concerning the creation and development of the ███████ in the Copyright Strike Policy for Google Ads and Shopping and the Shopping DMCA Strikes Policy, including all versions and drafts, and all internal communications concerning the rule. *See* GOOG-CENG-00000683 ("███████ ███████'; GOOG-CENG-00000685 ("███████ ███████')."

39. Instruction No. 1 of Plaintiffs' Second Set of RFPs reads in full, "Unless otherwise specified, the relevant time frame for these Requests is January 1, 2020 through the present."

40. On February 21, 2025, Plaintiffs served their First Set of Interrogatories, which included Interrogatory ("ROG") Nos. 1–10.

41. Instruction No. 9 to Plaintiffs' First Set of Interrogatories reads in full, "Unless otherwise specified, the relevant time frame for these Requests is from June 5, 2020 to the present."

42. ROG 1 reads in full, "State the name of each person with responsibility for designing, developing, or implementing Your Copyright Infringement Policies (including Your DMCA Policies), along with the persons' role at or with Defendant when, and the dates during which, they had such responsibility."

43. Google served its responses and objections to Plaintiffs' First Set of Interrogatories on March 24, 2025. I participated in a meet and confer regarding these interrogatories on April 8, 2025.

44. Following the parties' conferral, Plaintiffs served an "amended" First Set of Interrogatories on April 18, 2025. Plaintiffs' "amendment" modified five of their original ROGs, including ROG 1. A revised Instruction No. 9 reads as follows: "For Interrogatory No. 1, Interrogatory No. 5, and Interrogatory No. 6, the relevant time frame is January 1, 2020 through the present. For all other Interrogatories, the relevant time frame for these Requests is from June 5, 2020 to the present."

45. During meet and confers that I have attended and on email threads of which I am a recipient, counsel for Google has requested that Plaintiffs' counsel clarify what they mean by "when Google's DMCA policy was 'created.'" Most recently, Ms. Sampoli, counsel for Google, asked Plaintiffs' counsel over email on July 14, 2025 to "please let us know" if Plaintiffs' question means the date when Google first developed its policy to suspend a Shopping account that reaches ▇▇▇ in a ▇▇▇▇▇▇ or something else. *See* Ex. 2. Plaintiffs have not responded.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed August 13, 2025, in McLean, Virginia

*/s/ Sarah A. Tomkowiak*
Sarah A. Tomkowiak