# EXHIBIT 2

| | |
|---|---|
| **From:** | Sampoli, Sara (DC) |
| **To:** | "Jeff Kane"; Bladow, Laura (DC); Damle, Sy (DC-NY); Murphy, Brent (DC); Stillman, Alli (NY); Tomkowiak, Sarah (DC); Victorson, Holly (DC); Wetzel, Joe (Bay Area) |
| **Cc:** | Uriel Lee; Kevin Lindsey; Michele Murphy |
| **Subject:** | RE: Google"s Responses and Objections to Plaintiffs" Second Set of RFPs - Cengage Learning, Inc. v. Google LLC |
| **Date:** | Monday, July 14, 2025 2:09:00 PM |

==**This message contains Highly Confidential, Attorneys'-Eyes-Only Material that is subject to a Protective Order.****==

Counsel,

We write in response to your July 1 email regarding RFPs 60-62, 66, 68, 71, 73, 74 and 77.  Where no response is required, we have omitted reference to the RFP.

**RFP 60 and RFP 61:** Your RFPs ask for documents sufficient to show the number of instances in which a ████████████████████████ Shopping Ads account reached the ████████ ██████ but was not suspended, as well as documents concerning whether ████████ ██████████ Shopping accounts should be or were suspended under the DMCA Strike Policy.  In addition to what Google already agreed to produce in response to RFPs 3, 6, 8, 9, 10, 13, and 16, Google *additionally* agreed to provide high-level reports, studies, summaries, or analyses concerning ████████████████████████████████ under Google's Shopping DMCA Strike Policy, to the extent any such documents can be located after a reasonable search.  In connection with these RFPs, Google has agreed to run Plaintiffs' own proposed search term (Search Term 7), which includes the terms ██████████████████████████████████ in the custodial data for its current custodian list.  We fail to see what is deficient about our response.  To the extent you want outside counsel to answer detailed factual questions about what the data we have produced or are producing means, those questions are better directed at fact witnesses with relevant knowledge.

**RFP 62:**  We disagree that your question regarding when Google's "current" DMCA policy was "created" is clear.  To reiterate our response from June 23, to the extent Plaintiffs' question is when Google first developed its policy to suspend a Shopping account that reaches ████████ in a ████ ████████████████, that is a fact question is more appropriately directed to Google's fact witnesses, rather than Google's outside counsel.  To the extent your question regarding when Google's "current" DMCA policy was "created" means something else, please let us know.  Regardless, we have already agreed to run Search Term 9 over our custodial documents between January 1, 2020 and September 19, 2024.  Plaintiffs' RFPs as served call for a time frame beginning January 1, 2020.  *See* Pls.' Second Set of RFPs at 3.  We therefore fail to see what the purported dispute is with respect to this RFP.

Separately, we will be responding in a separate email to your June 9 email regarding custodians and search terms with respect to the appropriate time frame for the other search terms Google has agreed to run.

**RFP 71**: Our position is exactly what we stated on June 23:  In the event that Google attempts to rely on testimony or evidence regarding DMCA notices outside of the Shopping platform at some future point in the litigation, Plaintiffs would be free to make the argument that, by virtue of Google's

discovery positions, Google is foreclosed from offering such evidence or testimony. But Google will not agree, a priori, that it is foreclosed from offering certain evidence or from making certain arguments with respect to *any* topics, including this one, at some hypothetical point in the future.

**RFP 73 and RFP 74**: For clarity, RFP 74 asks for documents sufficient to show instances where Google "stopped processing Infringement Notices from a particular sender or rightsholder for any period of time." It does not ask for documents reflecting whether the reason for any such action was "that the rightsholder sent 'duplicate' notices." We intend to produce the information in Google's possession, custody, or control that is responsive to both RFPs 73 and 74, and do not understand there to be a delta between what Plaintiffs have asked for in the text of their RFPs and what Google is agreeing to provide. If, after receiving Google's production of such documents, Plaintiffs believe Google's production is deficient, Plaintiffs are free to raise the issue then.

**RFP 77**: As we explained in our July 10 email regarding ROG 10, Google will not agree to provide the names or any other personal information of specific third-party TVCs, who are already identified by their usernames in the notice data Google produced on March 28 and 31.

**Sara Sampoli**

**LATHAM & WATKINS** LLP
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.350.5328

---

**From:** Jeff Kane <JKane@oandzlaw.com>
**Sent:** Tuesday, July 1, 2025 6:49 AM
**To:** Bladow, Laura (DC) <Laura.Bladow@lw.com>; Damle, Sy (DC-NY) <Sy.Damle@lw.com>; Murphy, Brent (DC) <Brent.Murphy@lw.com>; Sampoli, Sara (DC) <Sara.Sampoli@lw.com>; Stillman, Alli (NY) <Alli.Stillman@lw.com>; Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Victorson, Holly (DC) <Holly.Victorson@lw.com>; Wetzel, Joe (Bay Area) <Joe.Wetzel@lw.com>
**Cc:** Uriel Lee <ULee@oandzlaw.com>; Kevin Lindsey <KLindsey@oandzlaw.com>; Michele Murphy <michele@oandzlaw.com>
**Subject:** Re: Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage Learning, Inc. v. Google LLC

**\*\*This message contains Highly Confidential, Attorneys'-Eyes-Only Material that is subject to a Protective Order.\*\***

Counsel,

**RFP 60 and RFP 61** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **accounts not suspended)**: You have agreed to run the terms ▮▮▮▮▮▮▮ in Plaintiffs' Search No. 7. However, you have not explained whether Defendant has data on the topic of this RFP: "the number of instances in which a Shopping Ads account or domain reached the ▮▮▮▮▮▮▮▮▮▮ . . . but was not suspended, where the account or domain was ▮▮▮▮▮▮▮▮▮▮▮ . . . ." For example, you have not responded to the questions we discussed during the June 2 and June 3 meet-and-confers and/or in my June 7 email: "whether the spreadsheet containing a list of ▮▮▮▮▮▮▮▮▮▮▮▮▮

accounts (which we understand to be GOOG-CENG-00000757) is cumulative, i.e., whether it contains all accounts that were ████████████ during the relevant period." and "whether Defendant can tell whether the Merchant Center accounts listed in the 0761 spreadsheet are ████████████." Please answer these questions. Stating that counsel "expect[s] that any Merchant Center accounts that were not suspended because the account was ████████████ during the relevant period pursuant to the policy would be reflected in the communications reflected at the ████████████ ████████████ alias," is not sufficient.

We note that the 0703 and 2941 spreadsheets contain a column called ████████████, which we presume indicates whether the Merchant Center account is a ████████████, and contain a column called "suspended" which we presume indicates whether the account was suspended. Thus, it would appear that Defendant is indeed capable of determining whether any of the accounts listed in the 0761 spreadsheet reached the ████████████, but were not terminated because they were ████████████.

**RFP 62 (development of ████████████):** As we have explained several times now, Defendant's refusal to answer the basic question of when the current DMCA policy was created is absurd and is hindering the progress of discovery. Your professed confusion (calling the question "vague" despite its obvious meaning and multiple explanations from Plaintiffs) is plainly counterproductive. Plaintiffs intend to raise this issue with the Court.

On June 9, Plaintiffs sent Defendant a list of all the search terms Plaintiffs have proposed Defendant run, including the date ranges Plaintiffs understood the parties to have agreed to use. All but one of those date ranges begins with January 1, 2020. You have yet to respond to contest any of those dates. Yet you claim in your June 23 email that Defendant did not agree to use January 1, 2020 as a start-date for all of its searches. This is a significant step backwards in what are already unnecessarily protracted negotiations of search terms. Please immediately provide the date ranges Defendant proposes to use for the nine searches listed in my June 9 email.

**RFP 66 (Documents sufficient to show any significant changes made to the Shopping platform since September 16, 2024):**

We disagree with your assessment of Plaintiffs' cases and the law and Defendant's position regarding the a discovery cutoff date, as further detailed in our email from yesterday. However, to make the dispute easier for the Court to resolve should Defendant continue to take these positions, Plaintiffs will issue new RFP seeking more specific information about the Shopping platform, without waiving their right to seek information in response to RFP 66.

**RFP 68 (monetization of Shopping Ads Data):** Plaintiffs understand the parties to be at an impasse, and intend to raise this issue with the Court.

**RFP 71 (fraudulent DMCA notices):** We are confused by your response. Is Google's position that Google can refuse to produce documents concerning fraudulent DMCA notices outside of the Shopping platform, but nonetheless can introduce evidence or testimony at trial concerning fraudulent DMCA notices outside the Shopping platform?

**RFP 73 (times when Defendant asked the sender of a notice not to send duplicate notices) and RFP 74 (instances where Defendant stopped processing notices from a rightsholder):**

You've stated that Google will produce "documents sufficient to show DMCA notice senders who have been added to an 'abuser' list or otherwise have been subject to a suspension . . . ." But you have not explained whether those documents will reflect what RFP 74 seeks: instances where Google stopped processing notices from a rightsholder. Please clarify whether these documents will reflect this. E.g., will the documents that show whether a rightsholder "otherwise ha[s] been subject to a suspension" show whether the reason for the suspension was that the rightsholder sent "duplicate" notices?

Further, as we pointed out in my June 10 email, in the Notice and Response Data Spreadsheets that Defendant produced, there is an entry in column N ("███████████") called "███████████". This appears to correspond to the responses Plaintiffs received containing the language about duplicate notices. Please explain whether Defendant has considered whether this field can be used to locate documents responsive to these RFP.

**RFP 77 (volume of infringement notices handled by Vendors)**:

In my June 10 email concerning Plaintiffs' Interrogatory No. 10, Plaintiffs provided Defendant with the identifiers of 31 ███████████" who are listed in Defendant's documents as having processed infringement notices from Plaintiffs. We asked you to provide the names of these individuals. You have not responded. Please do so. Defendant's cooperation on that ROG may help the parties to reach a resolution on this RFP.

Jeff Kane
**Oppenheim + Zebrak, LLP**
4530 Wisconsin Avenue NW, 5th Floor
Washington, DC 20016
202.499.2940
jkane@oandzlaw.com | www.oandzlaw.com

---

**From:** Sara.Sampoli@lw.com <Sara.Sampoli@lw.com>
**Date:** Monday, June 23, 2025 at 20:15
**To:** Jeff Kane <JKane@oandzlaw.com>, Laura.Bladow@lw.com <Laura.Bladow@lw.com>, Sy.Damle@lw.com <Sy.Damle@lw.com>, Brent.Murphy@lw.com <Brent.Murphy@lw.com>, Alli.Stillman@lw.com <Alli.Stillman@lw.com>, Sarah.Tomkowiak@lw.com <Sarah.Tomkowiak@lw.com>, Holly.Victorson@lw.com <Holly.Victorson@lw.com>, Joe.Wetzel@lw.com <Joe.Wetzel@lw.com>
**Cc:** Uriel Lee <ULee@oandzlaw.com>, Kevin Lindsey <KLindsey@oandzlaw.com>, Michele Murphy <michele@oandzlaw.com>
**Subject:** RE: Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage Learning, Inc. v. Google LLC

==**This message contains Highly Confidential, Attorneys'-Eyes-Only Material that is subject to a ███████████==

==Protective Order.**==

 Counsel,

We write to respond to your June 7 and June 9 emails and to clarify certain points regarding our June 2 and 3 meet and confers.

**RFP 60**: In response to Plaintiffs' June 9 email regarding custodians and search terms, Google will agree to run Search Term 7, which includes the terms ██████████████████████ ██████████████ in the custodial data for its current custodian list. ██████████████████ ████ we expect that any Merchant Center accounts that were "not suspended because the account was ████████████████████████████ during the relevant period pursuant to the policy would be reflected in the communications reflected at the ████████████████ ████████████████ alias.

**RFPs 62**: At our meet and confers, we clarified that we do not intend to exclude from production documents regarding the creation and development of the ████████████ or the ████████████ to the extent such documents exist and are located after a reasonable search.  For clarity, we did not agree to "find out when the policy at GOOG-CENG-00000683 was created."  The question itself is vague.  Presumably, Google has had a DMCA policy for its Shopping platform since that platform was developed.  If your question is when Google first developed its policy to suspend a Shopping account that reaches ████████ in a ████████████████, that question is more appropriately directed to Google's fact witnesses.  We disagree that Google's discovery obligations as they relate to the actual claims and defenses at issue are tied to the specific point in time that Google first developed that approach—which could have been years before the relevant time period.  We agreed only to take back and consider Plaintiffs' position on an appropriate time period for RFP 62 that is proportional to the needs of the case.

The earliest policy at issue in this litigation was updated in Q4 2020.  We will agree to run the following search term ("Search Term 9") for January 1, 2020 to September 16, 2024, in the custodial data for our current custodian list:

- ("████████" or "████████") AND ("restart" OR "re-start" or "reset" or "re-set" or "lookback" OR "look-back") AND ("DMCA" or "strike" or "shopping" OR "pirate")

To be clear, we did not propose extending the time period for all of Google's custodial searches back to January 2020, contrary to your June 9 email concerning custodians and search terms.  We do not believe that a time period that commences a year and a half before the earliest claims Plaintiffs could bring is proportional to the needs of this case or appropriate for all custodial searches.  In an effort to compromise, however, on RFP 62 we will run the above term over additional custodial data going back to January 1, 2020, which should be more than sufficient to capture responsive communications, if any, regarding the development of the Q4 2020 policy.

**RFP 65**: You state that this RFP is not requesting "technical documents containing source code," but by its plain text this RFP requests documents concerning the "creation, implementation, and technical capabilities" of certain "features" by which "a Google user can filter her Shopping Ads results to display" products with certain characteristics, and documents "concerning the underlying technology that creates these features."  Accordingly, this Request squarely targets engineering-level design and implementation documents describing how Google's website works.  This is underscored by your email, which states that you are seeking documents that explain "what causes [these features] to appear" – which is just another way to ask for the underlying technology.  Our position continues to be that the information requested by this RFP is of—at best—marginal relevance to either party's claims or defenses, and that this RFP is overly broad, unduly burdensome,

and not proportional to the needs of this case. We asked Plaintiffs to show us caselaw supporting their position that implementing neutral search features that filter all content—not just pirated content—could constitute willfulness, material contribution, or state of mind, but Plaintiffs have yet to provide any such authority.

**RFP 66**: First, we disagree that the Court's statements regarding the September 16, 2024 cutoff were so limited. While we agree that the discussion was prompted by the parties' dispute regarding identifying allegedly infringing domains, in selecting a cut-off date that coincided with the amended complaint filing date, the Court stated that "[t]here needs to be an end date" and noted that her ruling was consistent with "the typical convention for civil cases." Hrg. Tr. at 73:11-20 (Dec. 18, 2024). *All* discovery must have an end date, and Google's position is that the "typical convention" of setting that end date on the date Plaintiffs filed their amended complaint is appropriate (we note that this is even a few months after Plaintiffs originally filed this lawsuit).

Moreover, none of the cases you cite support your position that Plaintiffs are entitled to discovery into any and all "significant changes" Google made to its Shopping platform that impact *all advertisements* as relevant to whether a permanent injunction should issue against Google for alleged contributory infringement *of specific works*. *Book Dog Books* and *Hounddog Prods.* involved post-complaint evidence of continuing <u>direct infringement</u> by the defendant. *See Book Dog Books*, 327 F. Supp. 3d at 637 (evidence demonstrating that defendant continued to sell counterfeits post-jury verdict); *Hounddog Prods.*, 826 F. Supp. 2d at 631 (referring to the defendant's "ongoing distribution of the film"). And *Khan*, 323 F. Supp. 3d 488, and *Vergara*, 2010 WL 3744033, say nothing about discovery regarding post-complaint evidence at all. Indeed, the Court in both cases ordered a default judgment against the defendants after they failed to appear or respond to the complaint. In *Vergara*, the court "infer[red] from [the] defendant's *default* that it is wiling to, or may continue its infringement." 2010 WL 3744033, at *4 (emphasis added). Plaintiffs have still not cited any authority that stands for the proposition that neutral changes that an online service provider makes to its platform *writ large* are relevant to the standard for permanent injunctive relief, in particular in the context of secondary liability.

**RFP 68**: As Google explained during our conferrals, to the extent that Google monetizes data that it collects from ALL users who click on ALL advertisements from ALL merchants, Google derives this benefit whether or not a particular merchant is advertising an infringing product. Thus, there is no relevance to Defendants' "profits that are tied to infringing conduct." Any connection between hypothetical revenue generated from selling all user data and the specific infringing advertisements at issue in this case is extremely attenuated, making this discovery disproportionate to the needs of this case, no matter what theory of damages Plaintiffs ultimately pursue. *See Lucky Break Wishbone Corp. v. Sterling Jewelers Inc.*, No. 10-4394, 2011 WL 13233570, at *6 (D. Minn. Aug. 23, 2011) (observing courts "have denied discovery requests for a defendant's financial information where the profits the plaintiff is seeking are 'attenuated or distant from the alleged use of the copyrighted [work].'"); Nimmer on Copyright § 14.03 (2025) ("When an infringer's profits are only remotely and speculatively attributable to the infringement, courts deny recovery to the copyright owner."); *Peer Int'l Corp. v. Luna Recs., Inc.*, 887 F. Supp. 560, 568 (S.D.N.Y. 1995) (Sotomayor, J.) ("Statutory damages should bear some relationship to the actual damages suffered."). The connection between the extent to which Google monetizes user data as a general matter is even more attenuated to issues such "willfulness" or "state of mind" with respect to the actual alleged contributory infringement at issue in this case, as such issues are *also* tied to the actual asserted works and alleged infringements. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257,

263 (2d Cir. 2005) ("To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware **of the infringing activity**, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, **the copyright holder's rights**.") (emphases added).  Plaintiffs' continued failure to meet their requirements under Rule 26(a)(1)(A) (iii), *see* H. Victorson Email (Jan. 7, 2025), continues to prejudice Google—here, by failing to timely disclose Plaintiffs' damages theories and then seeking wide-ranging discovery on "whether Google generates revenue by collecting information on the Shopping Ads or Google Ads on which a Google user clicks," Plaintiffs attempt to needlessly explode discovery (and discovery disputes) with their baseless requests. Google reserves all rights.

**RFP 71**:  Your summary of our discussion with respect to this RFP does not reflect Google's position and misstates what we said.  We said that to the extent Google attempts to rely on evidence or testimony regarding DMCA notices outside of the Shopping platform at some future point in this litigation, Plaintiffs <u>would be free to make the argument that</u> Google is foreclosed from offering such evidence by virtue of Google's discovery positions.

**RFP 72**:  In our R&Os, Google agreed to produce non-privileged documents, maintained in the ordinary course of business and located after a reasonable search, sufficient to show procedures or technology Google uses to identify instances where complainants "misuse" Google's copyright infringement notices program.  We confirmed at our conferral that our definition of "misuse" would include instances where the sender filed multiple requests for the same content to be evaluated, consistent with Plaintiffs' RFP and the Misuse Policy to which the RFP cites.  *See* https://support.google.com/legal-help-center/answer/13949470?hl=en.

**RFPs 73-74**:  These RFPs asked Google to produce documents sufficient to show "*any* instances" in which Google (1) responded to an infringement notice with a request that the sender refrain from sending duplicate notices; or (2) stopped processing infringement notices from a particular sender "for *any* period of time."  While you claim that we offered nothing more than "attorney speculation about burden," our position is that asking Google to provide documentation regarding *any* instance where Google responded to a "duplicate" infringement notice or stopped processing infringement notices from *any* sender regarding *any* merchant center account for *any* period of time is not proportional, on its face.  However, in an effort to compromise, we can agree to produce (1) documents sufficient to show the number of instances in which Google responded to an infringement notice with a message requesting the sender not send repeated requests concerning the same URLs; as well as (2) documents sufficient to show DMCA notice senders ███████████ ████████████████ or otherwise have been subject to a suspension, to the extent such documents exist and are located after a reasonable search.

**RFP 75**: Google's position is that this RFP is an unjustifiable fishing expedition and seeks irrelevant information.  Plaintiffs stated at our conferral that any hypothetical use of third-party lists of suspected pirates would be relevant to Google's DMCA safe harbor defense and willfulness.  We don't see how this could be the case, given that the DMCA does not require online service providers like Google to proactively monitor their platforms for copyright infringement.  We asked you to provide case law supporting your position on relevance.  So far, you have not provided any authority.

**RFP 76**:  As a preliminary matter, we've explained on more than one occasion that meet and confers between outside counsel are not depositions.  We are not required to answer questions of fact regarding what yet-to-be produced documents will show or not show regarding the work that vendors were performing for Google.

In response to this RFP, Google agreed to produce documents, kept in the ordinary business and located after a reasonable search, sufficient to show training materials, instruction manuals, and protocols provided by Google to its Vendors for processing Infringement Notices.   Google's position is that Plaintiffs' request for "any . . . reports, summaries, results, feedback, evaluations, assessments or similar documents concerning Vendors and their processing of Infringement Notices or handling of potential terminations of Repeat Infringers" as well as "any internal and external communications" concerning such categories is overly broad and unduly burdensome.  As written, this RFP appears to seek essentially every single document and communication to or from Google's vendors.  As we stated at our conferrals, however, we do not intend to carve out relevant performance reviews, to the extent they exist, from our custodial document productions.

In an effort to compromise, in addition to what Google has already agreed to produce in response to RFP 76, Google can agree to produce documents, to the extent they exist, sufficient to show high-level feedback, evaluations, or assessments regarding a Vendor's handling of copyright infringement notices on the Shopping platform that are kept in the ordinary course of business and are located in the custodial data for our current custodian list.

**RFP 77**:  In response to other RFPs, Google has already agreed to provide high-level metrics on Google's receipt and handling of all DMCA notices during the relevant period as well as detailed notice data regarding the Domain-Identified and Email-Connected Merchants.  Google's position is that Plaintiffs' request for detailed breakdowns of the volume of Infringement Notices and any termination decisions handled during the relevant period, apportioned out by Vendor, is not proportional to the needs of this case (and that Google does not store DMCA case data "by Vendor" or have any automated way of identifying whether a ███████ listed as associated with an infringement notice is employed by Google or a Vendor).  As we have confirmed on many occasions, we decline to provide a list of the ███████ who appear in that field during the relevant time period.

**RFP 79**:  In an effort to compromise, we can agree to produce high-level reports or research, generated in connection with Google's consideration of its Digital Books Shopping Ads Policy or an ███████" during the relevant period, relating to marketing, advertising, and providing services through the Google Shopping platform to the textbook or ebook industry, to the extent such reports are kept in the ordinary course of business and located after a reasonable search.

**Google's General Objections**

Google's "Preliminary Statement":  We agreed that we would comply with Rule 26 with respect to facts or data considered by Google's experts in forming their opinions.

General Objection No. 4:  We agreed that, at this time, Google has not withheld any documents on the basis of third-party confidentiality agreements.

General Objection Nos. 14-15:  As we explained during our conferrals, our objections do not state that any and all Infringement Notices not sent by Plaintiffs are categorically irrelevant.  Indeed, Google has agreed to produce—and has already produced—data regarding infringement notices sent by persons other than Plaintiffs regarding Shopping ads run by the Domain-Identified and Email-Connected Merchants.  But we do not agree that all Infringement Notices sent by persons other than Plaintiffs necessarily *are* relevant or that discovery into such notices is proportional to the needs of this case.  Our objections are intended to preserve Google's burden and proportionality objections with respect to this category of discovery.

**Sara Sampoli**

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.350.5328

---

**From:** Jeff Kane <JKane@oandzlaw.com>
**Sent:** Tuesday, June 10, 2025 10:57 AM
**To:** Bladow, Laura (DC) <Laura.Bladow@lw.com>; Damle, Sy (DC-NY) <Sy.Damle@lw.com>; Murphy, Brent (DC) <Brent.Murphy@lw.com>; Sampoli, Sara (DC) <Sara.Sampoli@lw.com>; Stillman, Alli (NY) <Alli.Stillman@lw.com>; Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Victorson, Holly (DC) <Holly.Victorson@lw.com>; Wetzel, Joe (Bay Area) <Joe.Wetzel@lw.com>
**Cc:** Uriel Lee <ULee@oandzlaw.com>; Kevin Lindsey <KLindsey@oandzlaw.com>; Michele Murphy <michele@oandzlaw.com>
**Subject:** Re: Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage Learning, Inc. v. Google LLC

==**This message contains Highly Confidential, Attorneys'-Eyes-Only Material that is subject to a Protective Order.**==

Counsel,

Further to RFP 72, RFP 73, and RFP 74 below, in the Notice and Response Data Spreadsheets that Defendant produced, there is an entry in column N ("███████████") called "███ ███████████". This appears to correspond to the responses Plaintiffs received containing the language about duplicate notices. (Case no. ███████████ corresponds to PL0000188745, case no. ███████████ corresponds to PL0000188757, and case no. ███ ███████████ corresponds to PL0000188783). This field may be useful in retrieving the information called for by these RFP.

Jeff Kane
**Oppenheim + Zebrak, LLP**
4530 Wisconsin Avenue NW, 5th Floor
Washington, DC 20016
202.499.2940
jkane@oandzlaw.com | www.oandzlaw.com

---

**From:** Jeff Kane <JKane@oandzlaw.com>
**Date:** Saturday, June 7, 2025 at 17:25
**To:** Laura.Bladow@lw.com <Laura.Bladow@lw.com>, Sy.Damle@lw.com <Sy.Damle@lw.com>, Brent.Murphy@lw.com <Brent.Murphy@lw.com>, Sara.Sampoli@lw.com <Sara.Sampoli@lw.com>, Alli.Stillman@lw.com <Alli.Stillman@lw.com>, Sarah.Tomkowiak@lw.com <Sarah.Tomkowiak@lw.com>, Holly.Victorson@lw.com <Holly.Victorson@lw.com>, Joe.Wetzel@lw.com <Joe.Wetzel@lw.com>
**Cc:** Uriel Lee <ULee@oandzlaw.com>, Kevin Lindsey <KLindsey@oandzlaw.com>, Michele

Murphy <michele@oandzlaw.com>

**Subject:** Re: Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage Learning, Inc. v. Google LLC

**This message contains Highly Confidential, Attorneys'-Eyes-Only Material that is subject to a Protective Order.**

Counsel,

We write to follow up on several issues from my May 27 email and from the June 2 and June 3 meet-and-confers.

**RFP 60 (** ███████████ **not suspended)**: This Request asks for the number of instances in which a Merchant Center account reached the ███████████, but was not suspended because the account was "███████████████" account. Plaintiffs tried to determine whether this information can be derived in part from documents Defendant has already produced. If we had a list of all strikes assessed against Merchant Center accounts, and a list of all ███████████ accounts, presumably this information could be derived from those lists.

You again represented that GOOG-CENG-00000761 is ███████████████ ███████. But you did not know whether the spreadsheet containing a list of ███████ ███████ accounts (which we understand to be GOOG-CENG-00000757) is cumulative, i.e., whether it contains all accounts that were ███████████ during the relevant period. You agreed to inquire whether this is the case. Please also explain whether Defendant can tell whether the Merchant Center accounts listed in the 0761 spreadsheet are ███████ accounts.

You argued that Defendant's search of custodial documents obviates in part the need for this RFP. We pointed out that Defendant has not yet agreed to include the terms "███████" and "███████" in its custodial searches.

**RFP 62 (development of** ███████████████ **):**

You clarified that Defendant will produce documents concerning the creation and development of the ███████████ and the ███████████ referenced at GOOG-CENG-00000683, not merely documents concerning the implementation of the rule.

We pointed out that Defendant's existing search-terms do not include terms like "███████" that would capture documents concerning this rule. We suggest Defendant add the following search term:

- ( ███████" or ███████") and ("restart" OR "re-start" or "reset" OR "re-set" or "lookback" OR "look-back")

To determine the appropriate time-period for this search, you agreed to find out when the policy at GOOG-CENG-00000683 was created. The document indicates that it was ███████ ███████, but does not indicate when it was created. As we explained on the call, if the policy was created prior to January 2020, then using January 2020 as the start-date for searches for documents concerning the creation of the policy is not reasonable.

You likewise proposed extending the time period for Defendant's custodial searches to January 2020. Plaintiffs agree that this is sensible (subject to the above question about when the DMCA policy was created).

**For RFP 65**, you continued to argue that documents concerning these features are not relevant. As we've explained before, these features filter Google users' searches to show pirated content. They are clear evidence of Google's willfulness, material contribution, and state of mind. Likewise, how this feature works is relevant to how easy it would be for Defendant to fix it, which likewise goes to willfulness and other issues.

As we clarified on the call, this RFP is not requesting, as you put it, "technical documents containing the source code . . . ." We are simply requesting documents that explain what these features are, what causes them to appear, etc.

We understand the parties to be at an impasse, and intend to raise this issue with the Court.

**RFP 66 (changes to the Shopping platform)** – during the call, Plaintiffs provided several examples of changes to the Shopping platform that they have observed and that this RFP encompasses: 1) an explanation of what free ads are has been removed from the search results page; 2) clicking on a free ad, including ads for pirated works, causes a popup to appear that contains various additional information, including an "About this Product" section (which in the case of Plaintiffs' works appears to include copy from their own websites) and a list of other sites that sell the same work (a "Buy Now" button may also appear, taking the user straight to the checkout page); and 4) when a user searches for a textbook, resulting ads are now sometimes sorted into particular categories, including a category with a specific "ebook" heading.

You argued that conduct post-dating September 16, 2024 (the date of the Amended Complaint) is not relevant. We explained that your argument is incorrect in at least two ways. First, the September 16, 2024 cutoff that the Court previously set was the end-date for what infringing domains Defendant would be required to include for purposes of certain discovery requests. It was not an across-the-board ruling that the relevant period for all discovery ends at September 16, 2024.

Second, conduct post-dating the amended complaint is relevant to whether a permanent injunction should issue restraining the Defendant from further infringement. You expressed skepticism that conduct post-dating a complaint could be relevant to whether a permanent injunction should issue. You are mistaken. Courts do indeed hold that a defendant's continued infringement of a plaintiff's copyright after a complaint is filed weighs in favor of a permanent injunction restraining the defendant from further infringement. *See, e.g.*, *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 637 (S.D.N.Y. 2018) ("Plaintiffs have established the need for a permanent injunction. Evidence presented at trial and in post-trial motions reveals that Defendants continue to sell counterfeits."); *McGraw-Hill Glob. Educ. Holdings, LLC v. Khan*, 323 F. Supp. 3d 488, 500 (S.D.N.Y. 2018) ("In the absence of a permanent injunction, Defendants may continue to distribute unauthorized copies of Plaintiffs' instructor solutions manuals and test banks, thus preventing Plaintiffs from controlling the distribution of their products and recovering associated profits."); *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 633 (S.D.N.Y. 2011), ("A plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue infringing its copyright(s).") (quoting *Pearson Educ., Inc. v. Vergara*, No. 09-cv-6832, 2010

WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010)). In addition, ongoing infringement is relevant to willfulness and damages, including the defendant's state of mind and the need for deterrence. In the year-plus since the original complaint was filed, Plaintiffs have observed and notified Google about thousands of instances of Shopping Ads for infringing products, including products sold by some of the Domain-Identified Merchants and other merchants who have repeatedly been the subject of Plaintiffs' notices. Thus, changes Defendant made to the Shopping platform that impact Google's ads for products that continue to be at issue in this case are plainly relevant.

**For RFP 68** (monetization of Shopping Ads) – You clarified that Defendant's response to RFP 33 and RFP 34 will not include information responsive to RFP 68. You argued that this information is irrelevant. Plaintiffs disagree. Defendant likely derives substantial revenue, both directly and indirectly, by monetizing data on the users who click on Shopping Ads. Defendant likely uses the data it collects on these users to target better Shopping Ads to them, likely sells that same data to other advertisers, and likely uses that data to enhance and/or personalize its search and other advertising platforms. That Defendant is deriving those benefits from the Shopping Ads run for pirate merchants is relevant to Defendant's profits that are tied to infringing conduct, to the need for deterrence, to willfulness, and to state of mind.

Plaintiffs understand the parties to be at an impasse on this issue, and intend to raise it with the Court.

**RFP 71 (Fraudulent DMCA notices)** – You agreed that to the extent Defendant is confining its response to the Shopping platform, Defendant is foreclosed from offering evidence or testimony concerning fraudulent DMCA notices outside the Shopping platform. Likewise, you agreed that to the extent Defendant plans to argue later that Fraudulent DMCA Notices are a consideration in evaluating Google's DMCA policy, Defendant must produce documents concerning Fraudulent DMCA Notices.

**RFP 72 (procedures/technology to identify "misuse" of DMCA notices)**: Plaintiffs' request defined "misuse" to include "instances where the sender of a notice has included the same URL in more than one notice." You confirmed that Defendant will search for and produce documents concerning such instances.

**RFP 73 (times when Defendant asked the sender of a notice not to send duplicate notices) and RFP 74 (instances where Defendant stopped processing notices from a rightsholder)**: You continued to argue that Defendant may limit its response to these RFP to instances in which Defendant stopped processing *Plaintiffs'* notices. The documents called for by this RFP are relevant to Defendant's DMCA program. They also are relevant to liability issues such as willful blindness. Defendant responded to several of Plaintiffs' notices by threatening to stop processing Plaintiffs' notices all together. PL0000188745, 8751; PL0000188757, 8762; PL0000188783, 8790-91 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

Incredibly, you took the position that this practice is a proper subject for a deposition question but not a proper subject for a document request. This not only concedes the relevance of this topic, but is nonsensical. A deposition witness is unlikely to recall in how many instances during the relevant period Google stopped processing infringement notices from a rightsholder

on the basis of duplicate notices. And even if a witness did have that information memorized, Plaintiffs naturally would be entitled to the documents that demonstrate it.

You offered no position on whether Google does, in fact, stop processing infringement notices from rightsholders who send "duplicate" notices.

In support of Defendant's burden objection, you offered nothing more than attorney speculation about burden. We asked whether Latham has inquired of Defendant whether it is burdensome to search for these documents, and you refused to say. You claimed that you did not know how to search for these documents, but refused to say whether you had asked Defendant whether *Defendant* knows how to search for these documents.

You agreed to inquire of Defendant regarding the feasibility of searching for document responsive to this RFP. Plaintiffs suggested several approaches for locating documents responsive to this RFP:

- Most simply, if Google has a mechanism in place to stop the review of infringement notices from certain rightsholders (i.e., if there is a system that places a "hold" on notices from certain rightsholders or causes Google to reject notices from those rightsholders automatically), there may be a record of those actions, as there is a record of other actions.
- There is a field in the data Defendant produced called "███████" (GOOG-CENG-00380265; GOOG-CENG-00380266; GOOG-CENG-00380267; GOOG-CENG-00380268; GOOG-CENG-00380269; GOOG-CENG-00392939, GOOG-CENG-00392940). That field may be used to track whether the rightsholder has sent three or more "duplicate" notices.
- The language used in the emails Plaintiffs received from Defendant are identical. PL0000188745, 8751; PL0000188757, 8762; PL0000188783, 8790-91. Most likely, when a person or system responds to an infringement notice, it selects from a series of prepared responses. There may be a record of which prepared response was selected. Likewise, there may be a similar prepared response informing the rightsholder that Google has stopped reviewing the rightsholders' notices.
- Moreover, Defendant has agreed to produce documents showing whether Defendant ever stopped processing *Plaintiffs'* infringement notices. We asked you to explain how Defendant plans to do so, as that plan may indicate how Defendant could search for such actions among non-Plaintiffs. You refused to explain how Defendant plans to conduct this search.

With respect to RFP 72 specifically, you were unable to say whether Defendant has a database or other collection of records containing the responses that were sent to rightsholders who submitted notices. We asked you to inquire of your client.

Given that Defendant has had these requests for two months, and apparently has done nothing to search for documents responsive to it, Plaintiffs request that Defendant provide an updated position by June 16, 2025. If the parties are not making substantial progress by that point, Plaintiffs will take up this issue with the Court.

**RFP 75 (use of third-party pirate lists)** – Plaintiffs explained that this RFP seeks documents concerning whether Defendant uses lists of suspected pirates prepared by third parties, e.g., the "Infringing Website List" maintained by the Police Intellectual Property Crime Unit in the United Kingdom. This would include third-party lists prepare by law enforcement, industry

groups, etc., that are available publicly or made available to entities like Google that are in a position to address piracy issues.

You asked us to define "utilization". As the RFP itself provides, this word refers to, e.g., Defendant searching its own customer records to see if any of the pirates included on the "Infringing Website List" or other similar lists pay for advertisements on Google's

Please provide Defendant's position on this issue.

**RFP 76 (training manuals provided to vendors)**: We asked you to explain at a high level what work the vendors were performing for Google (e.g., were the vendors simply providing personnel who worked at Google, or was Google outsourcing some of its functions to the vendors). You refused to answer. You predicted that the materials Google plans to produce in response to these RFP will answer this question.

You confirmed that Defendant does not intend to produce "summaries, results, feedback, evaluations, assessments or other similar documents concerning the Vendors". You took the position that even for an evaluation of a vendor employee who is processing infringement notices, an evaluation stating that the employee is making mistakes in processing is not relevant to this case. As we explained during the meet-and-confer, this is facially incorrect. Evaluations of employees or vendors who are performing the very functions for which Defendant is claiming the DMCA defense are relevant to Google's liability and to its DMCA defense.

You explained that Google is including ████████ as a custodian, but declined to represent that ████████ is likely to possess the above documents. Moreover, you stated that to the extent ████████ is copied on "summaries, results, feedback, evaluations, assessments or other similar documents concerning the Vendors," Google still will not produce those documents unless Google deems them to be responsive to RFP 6.

**RFP 77 (volume of infringement notices handled by Vendors)**: you said it was your "understanding" that Google does not keep documents that would contain this information in the ordinary course of business. You then explained, however, that the documents Google has produced so far in this case include (for some notices) the username of the "████████" who processed the notice. You claimed it would be burdensome to pull that information for all notices and then to identify whether each of those legal agents was a vendor personnel or a Google employee. You agreed to inquire of Defendant whether it has a way of identifying whether the "████████" listed as associated with an infringement notice is a Google employee or a vendor. Failing that, we suggest that Defendant provide a list of the ████████ who appear in that field during the relevant period.

**RFP 79 (reports on services for ebook or textbook sellers)**: You did not know (and apparently have not attempted to determine) whether Defendant possesses documents responsive to this request. We explained that the request seeks reports or analyses concerning the textbook or ebook industry, or concerning providing services to the textbook or ebook industry. For example, in forming its "ban" on ebook ads, if Defendant retrieved or compiled any reports on the ebook or textbook industry, e.g. on the size of the market or its growth potential, those reports would be responsive to this request. Likewise, if Defendant compiled a report on how many Shopping Ads involve ebooks or textbooks, those reports would be responsive to this request. Likewise, if Defendant commissioned, purchased, or conducted

studies on the ebook industry in connection with its offering of digital book products on Google Play, those reports would be responsive to this request. You asked what "ecommerce" refers to; we explained that it simply means digital advertising services on Google's platforms.

You agreed to inform Plaintiffs of Defendant's position with respect to this RFP. Please do so by June 13.

**Defendant's General Objections**

With respect to the "Preliminary Statement" in Defendant's objections, you agreed that Defendant must produce documents that its experts rely on, even if Defendant does not consider those documents to be responsive to Plaintiffs' RFP.

With respect to Defendant's General Objection no. 4, you confirmed that Defendant has not withheld any documents on the basis of third-party confidentiality agreements. We reiterated our expectation if Defendant withholds documents on that basis in the future, Defendant will disclose those documents on a log.

With respect to General Objection no. 14 and General Objection no. 15, you clarified that Defendant is not taking the position that all infringement notices not sent by Plaintiffs or involving the Infringing Merchants are irrelevant.


Jeff Kane
**Oppenheim + Zebrak, LLP**
4530 Wisconsin Avenue NW, 5th Floor
Washington, DC 20016
202.499.2940
jkane@oandzlaw.com | www.oandzlaw.com



---

**From:** Sara.Sampoli@lw.com <Sara.Sampoli@lw.com>
**Date:** Monday, June 2, 2025 at 21:25
**To:** Jeff Kane <JKane@oandzlaw.com>, Laura.Bladow@lw.com <Laura.Bladow@lw.com>, Sy.Damle@lw.com <Sy.Damle@lw.com>, Brent.Murphy@lw.com <Brent.Murphy@lw.com>, Alli.Stillman@lw.com <Alli.Stillman@lw.com>, Sarah.Tomkowiak@lw.com <Sarah.Tomkowiak@lw.com>, Holly.Victorson@lw.com <Holly.Victorson@lw.com>, Joe.Wetzel@lw.com <Joe.Wetzel@lw.com>
**Cc:** Uriel Lee <ULee@oandzlaw.com>, Kevin Lindsey <KLindsey@oandzlaw.com>, Michele Murphy <michele@oandzlaw.com>
**Subject:** RE: Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage Learning, Inc. v. Google LLC

Counsel,

We are available between 1:15-2:00pm ET tomorrow.  Please send a Zoom link.

Best,
Sara

**Sara Sampoli**

**LATHAM & WATKINS** LLP
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.350.5328

---

**From:** Jeff Kane <JKane@oandzlaw.com>
**Sent:** Monday, June 2, 2025 4:25 PM
**To:** Bladow, Laura (DC) <Laura.Bladow@lw.com>; Damle, Sy (DC-NY) <Sy.Damle@lw.com>; Murphy, Brent (DC) <Brent.Murphy@lw.com>; Sampoli, Sara (DC) <Sara.Sampoli@lw.com>; Stillman, Alli (NY) <Alli.Stillman@lw.com>; Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Victorson, Holly (DC) <Holly.Victorson@lw.com>; Wetzel, Joe (Bay Area) <Joe.Wetzel@lw.com>
**Cc:** Uriel Lee <ULee@oandzlaw.com>; Kevin Lindsey <KLindsey@oandzlaw.com>; Michele Murphy <michele@oandzlaw.com>
**Subject:** Re: Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage Learning, Inc. v. Google LLC

Counsel,

We are available at the below time to continue the meet-and-confer on the issues listed in my May 27 email.

- Tuesday June 3, 10:15–4:15 ET
- Wednesday June 4, 9:15–12:00 ET
- Thursday June 5, 10:15–4:30 ET

Jeff Kane
**Oppenheim + Zebrak, LLP**
4530 Wisconsin Avenue NW, 5th Floor
Washington, DC 20016
202.499.2940
jkane@oandzlaw.com | www.oandzlaw.com

---

**From:** Sara.Sampoli@lw.com <Sara.Sampoli@lw.com>
**Date:** Tuesday, May 27, 2025 at 20:07
**To:** Jeff Kane <JKane@oandzlaw.com>, Laura.Bladow@lw.com <Laura.Bladow@lw.com>, Sy.Damle@lw.com <Sy.Damle@lw.com>, Brent.Murphy@lw.com <Brent.Murphy@lw.com>,

Alli.Stillman@lw.com <Alli.Stillman@lw.com>, Sarah.Tomkowiak@lw.com
<Sarah.Tomkowiak@lw.com>, Holly.Victorson@lw.com <Holly.Victorson@lw.com>,
Joe.Wetzel@lw.com <Joe.Wetzel@lw.com>
**Cc:** Uriel Lee <ULee@oandzlaw.com>, Kevin Lindsey <KLindsey@oandzlaw.com>, Michele
Murphy <michele@oandzlaw.com>
**Subject:** RE: Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage
Learning, Inc. v. Google LLC

Counsel,

We are available to meet and confer regarding Plaintiffs' Second Set of Requests for Production on
Monday, June 2 at 1pm ET.  Please send a Zoom invitation.

Thanks,
Sara

**Sara Sampoli**

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW | Suite 1000 | Washington, D.C. 20004-1304
D: +1.202.350.5328

---

**From:** Jeff Kane <JKane@oandzlaw.com>
**Sent:** Tuesday, May 27, 2025 2:13 PM
**To:** Bladow, Laura (DC) <Laura.Bladow@lw.com>; Damle, Sy (DC-NY) <Sy.Damle@lw.com>; Murphy,
Brent (DC) <Brent.Murphy@lw.com>; Sampoli, Sara (DC) <Sara.Sampoli@lw.com>; Stillman, Alli (NY)
<Alli.Stillman@lw.com>; Tomkowiak, Sarah (DC) <Sarah.Tomkowiak@lw.com>; Victorson, Holly (DC)
<Holly.Victorson@lw.com>; Wetzel, Joe (Bay Area) <Joe.Wetzel@lw.com>
**Cc:** Uriel Lee <ULee@oandzlaw.com>; Kevin Lindsey <KLindsey@oandzlaw.com>; Michele Murphy
<michele@oandzlaw.com>
**Subject:** Re: Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage Learning,
Inc. v. Google LLC

==**This message contains Highly Confidential, Attorneys'-Eyes-Only Material that is subject
to a Protective Order.**==

Counsel,

We write to schedule a meet-and-confer regarding Defendant's Responses and Objections to
Plaintiffs' Second Requests for Production. We are available at the below dates and times.
Please let us know what works for you.
- Wednesday May 28, 9:15–12:00 ET
- Thursday May 29, 10:15–4:15 ET
- Friday May 30, 10:15–4:30 ET
- Monday June 2, 12:15–4:30 ET

Below is a list of several issues we would like to discuss during our call.

**Specific Objections**

For RFP 60 (███████ accounts not suspended) and RFP 61 (whether to suspend ███████ accounts), Plaintiffs would like to discuss Defendant's contention that this information "is not relevant to any party's claim or defense in this case to the extent it requests documents concerning Merchant Center accounts or domains unrelated to the Merchant Center accounts or Shopping products at issue in this proceeding." Please likewise be prepared to discuss Defendant's limiting its response to "high-level" reports, including whether Defendant expects that data on these exceptions exists.

For RFP 62 (development of ███████████), RFP 63 (development of ██████████), RFP 64 (policies re Google Ads), RFP 71 (Fraudulent DMCA Notices), and RFP 73 (duplicate notices), we understand from Defendant's responses (which state that "accounts other than Merchant Center accounts on the Shopping platform" are not relevant) that Defendant will not be offering evidence from its DMCA program for Google Ads to argue that Defendant should qualify for the DMCA safe-harbor for its Shopping platform.

For RFP 62 (development of ██████████████), Plaintiffs would like to <u>understand</u> what Defendant means by documents "relating to Google's implementation of a ███████ ██████████ . . . ." In addition, please explain Defendant's position on searching for communications regarding this policy.

For RFP 63 (development of ██████████), Plaintiffs would like to understand what Defendant is proposing to produce. Defendant's responses simply says that it intends to produce "documents . . . relating to Google's ████████████████ . . . .".

For RFP 65 (Shopping features), Plaintiffs would like to discuss Defendant's position that these features of its Shopping platform are not relevant, with which Plaintiffs disagree. For example, as Plaintiffs don't sell their works in pdf format like the pirates do, and Plaintiffs and legitimate distributors are banned from advertising ebooks, the PDF Link and Ebook Link features direct users to pirated works. Further, the Page Link and Textbook Link features make clear that Defendant has the capability to recognize Shopping Ads that advertise textbooks, and therefore indicate that Defendant has the capability to restrict those who may advertise those works. Thus, these features are, at a minimum, relevant to Defendant's material contribution to the pirates' infringement, its willfulness, and the unfair competition claim.

For RFP 66 (changes to the Shopping platform) and RFP 67 (changes to URL embedding), Plaintiffs would like to discuss Defendant's refusal to produce documents.

For RFP 68 (monetization of Shopping Ads Data), Plaintiffs would like to discuss Defendant's refusal to produce documents. Defendant's response does not take the position that it does not collect information about the Shopping Ads on which a user clicks, and monetize that information (either to better target Shopping Ads, or to provide information to other advertisers). Numerous sources report Defendant engaging in this kind of data collection and monetization with respect to various platforms. Link; link ("Google monetizes what it observes about people in two major ways: 1) It uses data to build individual profiles with demographics and interests, then lets advertisers target groups of people based on those traits. 2) It shares data with advertisers directly and asks them to bid on individual ads."); link ("Google uses first-party data collected from its products to create detailed user profiles for targeted advertising. While this data is not sold directly, it is monetized through personalized ad targeting.").

For RFP 71 (Fraudulent DMCA Notices), we would like to clarify what Defendant means by "high-level reports, studies, summaries, or analyses concerning Fraudulent DMCA Notices on the Shopping platform." For the avoidance of doubt, to the extent Defendant plans to argue that Fraudulent DMCA Notices are a consideration in forming or implementing its DMCA policy, or otherwise to invoke Fraudulent DMCA Notices as part of its defense in this case, Defendant must produce documents concerning Fraudulent DMCA Notices.

For RFP 74 (instances where Defendant stopped processing notices from a rightsholder), Defendant's proposal to limit its response to instances where Defendant stopped processing *Plaintiffs'* notices is insufficient. Where a rightsholder sends two or more notices concerning the same URL, she almost certainly does so because Defendant has failed to take action in response to the rightsholder's first notice. That Defendant threatens to (or does) stop processing *all* notices from a rightsholder as a result of *Defendant's* failure to take appropriate action calls into serious question whether Defendant's notice-and-takedown and repeat infringer programs comply with the DMCA. Plaintiffs would like to discuss Defendant's position that it will limit its responses to actions taken against Plaintiffs.

For RFP 75 (use of third-party pirate lists), Defendant's response says you are willing to meet and confer. Plaintiffs are prepared to do so.

For RFP 76 (training manuals provided to vendors), please confirm that Defendant's search and production will include the requested internal and/or external communications. Please also explain why your response does not include any summaries, results, feedback, evaluations, assessments or other similar documents concerning the Vendors.

For RFP 77 (volume of infringement notices handled by Vendors), Plaintiffs would like to discuss Defendant's refusal to produce documents. Specifically, Plaintiffs would like to discuss Defendant's objections that the request "includes inaccurate assumptions regarding the responsibilities of Google's Vendors for handling terminations," its objection that the request is "overly broad" because it includes "notices and termination decisions unrelated to the works and marks asserted by Plaintiffs in this proceeding," and that the request "requires Google to analyze documents or information in order to respond to the Request."

For RFP 79 (reports on services for ebook or textbook sellers), Plaintiffs would like to discuss Defendant's refusal to produce documents. We note that Defendant has not taken the position that these reports do not exist. Plaintiffs would like to discuss Defendant's position that reports on advertising services for ebook or textbook sellers "are not relevant to any party's claims or defenses in this proceeding."

**Other Issues:**

Plaintiffs would like to understand this statement from Defendant's "Preliminary Statement": "Google is producing documents without prejudice to . . . such expert's right to rely on documents or information deemed appropriate by that expert in formulating the expert's opinion, whether or not produced in response to these requests." If Defendant's expert is reviewing documents from Defendant, those documents must be produced to Plaintiffs.

Regarding Defendant's General Objection no. 4, please clarify whether Defendant is withholding any documents based on "restrictions of confidentiality imposed by, or pursuant to, agreements between Google and third parties."

General Objection no. 14 objects to the definition of "Infringement Notice" as "overbroad . . . to the extent it calls for documents and communications not sent by Plaintiffs and not related to Plaintiffs' claims." General Objection no. 15 includes similar language regarding the definition of "Plaintiff Infringement Notice." Please be prepared to explain whether it is Defendant's position that only notices sent by Plaintiffs are relevant, and why non-Plaintiff notices would not be relevant to Defendant's DMCA defense.

Regarding General Objection no. 27, Plaintiffs would like to discuss Defendant's restriction of the term "Shopping Ads" to Paid Ads. Narrowing the term "Shopping Ads" in that way would exclude clearly relevant information. For example, the "Ebook Link", "Page Link", and "PDF Link" features all apply to both Paid and Free Ads; limiting Defendant's responses to Paid Ads would leave out important information. Likewise, RFP 60 calls for information on Shopping Ads account or domains that reached the five-strike threshold but were not suspended. Restricting "Shopping Ads" to Paid Ads would not make sense here; Google's DMCA policy does not limit its strike assessments to Paid Ads.


Jeff Kane
**Oppenheim + Zebrak, LLP**
4530 Wisconsin Avenue NW, 5th Floor
Washington, DC 20016
202.499.2940
jkane@oandzlaw.com | www.oandzlaw.com

---

**From:** Sara.Sampoli@lw.com <Sara.Sampoli@lw.com>
**Date:** Thursday, May 1, 2025 at 23:36
**To:** Michele Murphy <michele@oandzlaw.com>, Jeff Kane <JKane@oandzlaw.com>, Uriel Lee <ULee@oandzlaw.com>, Kevin Lindsey <KLindsey@oandzlaw.com>
**Cc:** Sarah.Tomkowiak@lw.com <Sarah.Tomkowiak@lw.com>, Sy.Damle@lw.com <Sy.Damle@lw.com>, Laura.Bladow@lw.com <Laura.Bladow@lw.com>, Holly.Victorson@lw.com <Holly.Victorson@lw.com>, Joe.Wetzel@lw.com <Joe.Wetzel@lw.com>, Brent.Murphy@lw.com <Brent.Murphy@lw.com>, Alli.Stillman@lw.com <Alli.Stillman@lw.com>
**Subject:** Google's Responses and Objections to Plaintiffs' Second Set of RFPs - Cengage Learning, Inc. v. Google LLC

Counsel,

Please see attached for Google's Responses and Objections to Plaintiffs' Second Set of Requests for Production.

Best,
Sara

**Sara Sampoli**

**LATHAM & WATKINS LLP**
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Direct Dial: +1.202.350.5328
Email: sara.sampoli@lw.com
https://www.lw.com

_____

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient.  Any review, disclosure, reliance or distribution by others or forwarding without express permission is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies including any attachments.

Latham & Watkins LLP or any of its affiliates may monitor electronic communications sent or received by our networks in order to protect our business and verify compliance with our policies and relevant legal requirements. Any personal information contained or referred to within this electronic communication will be processed in accordance with the firm's privacy notices and Global Privacy Standards available at www.lw.com.