

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
jkane@oandzlaw.com

August 20, 2025

<u>VIA ECF</u>

The Honorable Jennifer L. Rochon
United States District Court for the Southern District of New York
500 Pearl Street, Room 1920
New York, NY 10007

   Re: *Cengage Learning, Inc. et al. v. Google LLC*, No. 24:cv-04274-JLR-BCM
      Plaintiffs' Consolidated Letter Motion to Compel

**[Redacted]**

Dear Judge Rochon:

  Defendant Google has refused to produce documents concerning five important topics. Plaintiffs ask the Court to compel Google to do so. Otherwise, Plaintiffs will be deprived of key information in this case.

  First, Google refuses to include as custodians several individuals and listservs that Google's own documents show will possess highly probative evidence. These include a custodian who flagged "rampant piracy" among ebook sellers in Shopping ads, a listserv that has the very words "DMCA" and "Shopping" in its name, and an individual whose Google's documents describe as the "Point of Contact" for the "Shopping DMCA Complaints Process."

  Second, Google refuses to add certain common-sense search-terms. These include the name of a program it instituted whereby the pirates identified by legitimate publishers, specifically including two Plaintiffs, would be subject to a "███████" policy.

  Third, for those ads Google claims it removed in response to infringement notices, Google has yet to disclose the dates on which it claims to have made those removals. This information bears upon the issue of whether Google removed ads "expeditiously", as is required in order to qualify for the DMCA safe-harbor. 17 U.S.C. § 512(d)(3).

  Fourth, Google has refused to produce documents concerning its recent reversal of its long-time policy of not allowing ebook ads from legitimate publishers. This program will inform the key factual question of why Google did not do so when legitimate publishers requested it years ago. This also relates to the injunctive relief Plaintiffs seek.

  Fifth, Google has refused to produce documents concerning the revenue it earned from the same pirates at issue in this case for ads on Google platforms other than Shopping. Complete revenue information is important evidence of Google's state of mind, the need for deterrence, and its profits.

   **I.**  <u>**Custodians and Listservs**</u>

  Plaintiffs ask the Court to compel Google to search the documents of recently-discovered custodians and email listservs that appear to be highly relevant.

  As Plaintiffs predicted, Google waited until the very end of document discovery to produce many important documents, including those that were requested many months ago. Dkt. 85. For

Hon. Jennifer L. Rochon
August 20, 2025

instance, although Google still has produced very few custodial documents, Google produced more custodial documents on August 15 (the last day of document discovery) than it had in the previous eleven months. Atty. Decl. ¶ 3. These documents revealed key custodians and search-terms concerning Google's alleged DMCA policy, the Shopping platform, and the ebook ads "ban." Because Google did not disclose these custodians and search-terms when the parties exchanged proposed custodian lists in February 2025, Plaintiffs have been forced to request these new searches in early August, after Google produced the documents that revealed the individuals and terms. Google has refused to add these custodians and terms.

### A. Google must search the documents of recently-discovered custodians.

i. ▇▇▇▇▇▇ & ▇▇▇▇▇▇ 

Plaintiffs understand that Google assigned a Google representative (e.g., sales representative, account manager, or account strategist) as a point-person for issues concerning certain large-volume clients. Atty. Decl. ¶ 4. Two of the Plaintiffs here had such representatives in 2024: ▇▇▇▇ for Cengage and ▇▇▇▇ for McGraw Hill. Atty. Decl. ¶ 5. These Google representatives reportedly flagged to other teams within Google (e.g., Google's Trust & Safety group) problems that their clients faced regarding piracy, copyright infringement, and issues with the "ebook ban." For example, the Google representative for another publisher reported on rampant piracy of that publisher's works. Atty. Decl. Ex. 1 (GOOG-CENG-00413454) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇). It is reasonable to infer that the representative for Cengage and McGraw Hill would have conveyed similar concerns to their colleagues inside Google.

Moreover, in its recently filed motion-to-strike opposition concerning its equitable defenses, Google squarely put its communications with Plaintiffs about piracy at issue. *Compare* Opp., Dkt. 166 at 18 (claiming that "Google engaged in conversations with Plaintiffs to try to work together to prevent . . . infringement," and "[u]nder those circumstances, it certainly is reasonable for Google to believe *its* conduct was not infringing"); *with* Am. Compl., Dkt. 38 ¶ 115 (beginning in 2019, Plaintiffs had discussions with Google in which they "explained repeatedly why the ads violated Google's own policies and enabled direct infringing activity," which Google has "still failed to correct").

During a meet-and-confer on this issue, Google merely hypothesized that the email Plaintiffs identified above may be the only relevant email from these representatives. This speculation is not a basis to refuse to collect documents from these custodians who were assigned to two Plaintiffs. 25.08.19 Meet-and-Confer. ▇▇▇▇ and ▇▇▇▇ are clearly relevant and should be custodians.

ii. Google Email Listservs

Google's recent productions revealed that Google used several email listservs to track and escalate issues concerning particular infringement notices and Google's DMCA process generally. Plaintiffs ask that Google treat six such listservs as custodians.

"▇▇▇▇▇▇", "▇▇▇▇▇▇", "▇▇▇▇▇▇▇▇▇▇": These three listservs were used for escalations of "critical issues". GOOG-CENG-00407407, 7438. Google's documents instruct Google personnel to use these listservs for issues of "Low Urgency", "High Urgency", and "Emergency", respectively. *Id.* The ▇▇▇▇ listserv was also used

Hon. Jennifer L. Rochon
August 20, 2025

to send out weekly reports regarding data on takedowns and counter-notices, "historical" trends of all copyright notices, and processed or removed URLs. *See* GOOG-CENG-00408986; GOOG-CENG-00418145. Another document indicates that "a separate team that does copyright reviews [ ] would be someone from the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇" GOOG-CENG-00413462.

"▇▇▇▇▇▇▇▇▇▇▇▇▇": It appears that the "▇▇▇▇▇▇▇▇▇▇▇▇▇ team was responsible for processing copyright infringement notices in the Shopping platform. GOOG-CENG-00408442. ▇▇▇ used the "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" listserv for discussions about the DMCA process generally, such as how copyright strikes should be tracked (GOOG-CENG-00408468) and what scripted language to use in responses to infringement notices (GOOG-CENG-00408702). The team also appears to have used this listserv for escalations of particular notices. For instance, the listserv is cc'd on an email from Google's ticketing system about complaints regarding ebook ads (GOOG-CENG-00409387); and on a "very escalated" ticket for an infringement notice (GOOG-CENG-00413124).

"▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇": It appears that Google used this listserv to escalate issues or infringement notices to Google's ▇▇▇▇▇▇▇▇▇▇▇▇▇ group. GOOG-CENG-00405084, 5085 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇").

"▇▇▇▇▇▇▇▇▇▇▇▇▇▇": This listserv for the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ team is listed as the primary point of contact in the "Legal Removals team overview for ▇▇▇▇▇▇▇▇▇▇". GOOG-CENG-00405185. Plaintiffs understand that in Google parlance, Shopping ads are a "monetized" product. GOOG-CENG-00405333, 5338.

During a meet-and-confer, Google's counsel replied that documents in one of these listservs would be duplicative as a few of these listservs included one current, agreed-upon custodian. 25.08.19 Meet-and-Confer. However, counsel was unable to address the crucial question of if that custodian had been a member of the listservs for the duration of the relevant time-period for discovery. Without understanding how long this custodian was a part of this listserv, Google's argument about a duplicative custodian fails to ensure that relevant documents would be sufficiently captured. Google should be required to treat all of these critical listservs as custodians.

    iii.   **Other Personnel Involved with Infringement Notices**

Google's recently produced documents also have revealed several key Google employees and team leaders who were responsible for major decisions regarding Google's DMCA program, encompassing the infringements and notices at issue in this case. The following individuals should also be included as custodians.



▇▇▇▇▇▇▇: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. He was the author of a document called "Legal Removals on Monetized Products", which outlined the copyright takedown process within Shopping (GOOG-CENG-00418180), and was also the author of a document that proposed ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Google's productions also reveal ▇▇▇ leading communications regarding multiple DMCA issues within Shopping, including ▇▇▇ tracking/takedown tools, and related vendor agents. *See e.g.*, GOOG-CENG-00418139, 418216.

▇▇▇▇▇▇▇: ▇▇▇▇▇▇ was the Point of Contact ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



██████████████████████████████████████ A document called "Legal Removals team overview for ████████████████████████████████████████████. During a meet-and-confer, Google's counsel explained that searching through ████████'s documents would be duplicative of other custodians' searches; however, these documents show that ████████ had a unique, supervisorial role that differentiated him from other employees. *See, e.g.*, GOOG-CENG-00405333; GOOG-CENG-00404556 (listing ████████████████████████████████████ 25.08.19 Meet-and-Confer. Accordingly, it cannot be assumed that ████████'s relevant communications all copy his subordinates. Rather, it is more likely that he communicated with more senior leadership without doing so.

████████ was also listed as one of two reviewers for a document called "Legal Removals of ████ GOOG-CENG-00408442. The document notes ██████████████████████████████████████████████████████████████████████████████████████████████

████████████████: ████████ the former Global Head of Shopping Policy Enforcement, was listed as the Trust & Safety Shopping Point of Contact for the "Shopping DMCA Complaints Process," obviously a key process in this case. GOOG-CENG-00405084.

████████: A document called "Shopping DMCA Complaints Process (████ ████████ walks Google personnel through Google's procedures for processing infringement notices. GOOG-CENG-00405084, 5085. ████████ is listed as the point of contact for ████████████████████████ in this document. *Id.* ████████ was also involved in various projects, including projects to ████████████████████████████████████████████████████████████████████████████████████████████████████ Plaintiffs have observed vastly different turnaround times for their own notices. Atty. Decl. ¶ 15.

Google did not disclose these custodians (even though the parties discussed these very topics in their conferrals) and should not be permitted to avoid key discovery by excluding them.

The Court should require Google to search these important custodians and listservs.[1]

II. **Search-Terms**

Documents Google recently produced indicate that several new search-terms are required to cover issues that directly impact this case. Google should be required to run the below search-terms across all custodians for the period January 1, 2020 through September 16, 2024.

---

[1] Plaintiffs also requested that Google search two tools that Google claims to use to take down ads and suspend domains: the ████████████████████████ For example, Google's documents describe the ████████ ██████████████████████████████████████████████ GOOG-CENG-00417093. On the day the instant was motion due, Google requested an additional meet-and-confer and shared new information concerning these tools. Plaintiffs will continue conferring with Google on this in hopes of reaching a resolution without the Court's involvement. Reserving all rights, Plaintiffs therefore do not seek relief with respect to these two tools at this time.

Hon. Jennifer L. Rochon
August 20, 2025

### A. Documents Concerning Google's ███ Publishers

Notwithstanding evidence to the contrary, Google claims it generally has a ███ ███ However, documents Google produced in the last month reference a ███ ███ Several documents also reflect that Google personnel claim to apply the ███ to particular domains.[2]

These issues are, naturally, highly relevant to this case. That Google was sufficiently aware of the problem of ads for pirated ebooks to reference ███ speaks directly to Google's knowledge of, and material contribution to, direct infringement. Moreover, as Plaintiffs' have not observed the implementation of any such "███" in Google's responses to Plaintiffs' own notices, Atty. Decl. ¶ 8, it appears Google discontinued and/or did not actually apply such a policy. This speaks to Google's willfulness, material contribution, and the need for deterrence, among other relevant issues.

Plaintiffs, therefore, asked Google to add two search-terms to its document collection:

- ███
- ███

But Google refused to do so. Incredibly, Google claimed that these issues are not relevant. For the reasons explained above, they are highly relevant. Google also claimed that these search-terms are duplicative of other terms Google agreed to search. But the only such term Google could identify is one that includes: [ebook . . . AND ("shopping" OR pirate* OR piracy OR infring* OR "DMCA" OR takedown OR remov* OR escal* OR ███)]. 25.08.19 Meet-and-Confer, referencing Plaintiffs' Search Term 3. Clearly, that search is not targeted to return documents concerning either ███. While a handful of produced documents reference these issues in passing (which alerted Plaintiffs to the issues, as Google never raised them), none of the documents Google produced explain, for instance, the parameters of the ███," what a ███ is, why these supposed policies were implemented, why ███

---

[2] ███

Hon. Jennifer L. Rochon
August 20, 2025

███████████.³ Google must search its documents for these highly-relevant terms.

### B. Search-Terms Regarding Merchant IDs, Case IDs, and Customer IDs

The list of search-terms Google has used so far has only included the 1,239 *domains* Plaintiffs had identified for Google on December 24, 2024. Atty. Decl. ¶ 7. However, Google's recently produced documents make clear that Google personnel do not always refer to merchants by their domain. In order to escalate questions or concerns regarding merchants, Google personnel addressed merchants by Merchant ID (GOOG-CENG-00422952; GOOG-CENG-00423328, "I checked the details of ███████, and did not see ███████ listed as one of the accounts affected by the ███"), Case ID (e.g., GOOG-CENG-00419029, GOOG-CENG-00408617; GOOG-CENG-00405105; GOOG-CENG-00407406), and Customer ID (GOOG-CENG-00000683, 0684).

Oftentimes, an employee may *only* address a merchant by its Merchant Center ID, Case ID, or Customer ID without ever mentioning the merchant's domain ███████████████████████████████████████████████ employee checking in on pending "█████████████████████████████████ without ever mentioning any domains); GOOG-CENG-00429795 (Google Trust & Safety team instructing a reviewer to provide *only* the MCID while escalating an ads concern); GOOG-CENG-00417281 (instructing legal agents to consult and escalate their cases by "always put[ting] a case ID together with the issue type"); GOOG-CENG-00413969 (instructing legal agents to "ensure that you have the Case ID" to "avoid delays in respon[se] to your query"); GOOG-CENG-00417091 (spreadsheet only containing Case IDs and no domains). Thus, if an agent had escalated any concerns, questions, or comments regarding a certain merchant only using the merchant's Merchant ID, Case ID or Customer ID, these crucial communications would not have been captured with Google's current search-terms. Accordingly, Plaintiffs request that Google use the Merchant IDs and Customer IDs associated with the pirates at issue in this case as search-terms, and use Case IDs associated with the notices in this case as search-terms.⁴ Specifically:

- Google should use as search-terms the unique Merchant Center IDs that Google has identified as connected to the 1,239 domains Plaintiffs identified. (I.e., those contained in GOOG-CENG-00000703, GOOG-CENG-00392941, and GOOG-CENG-00392942).

- To the extent Google is not doing so already, Google should use as search-terms the unique

---

³ All of these topics are responsive at least to Plaintiffs' Requests for Production Nos. 6 (documents concerning Google's policies regarding copyright infringement by Shopping ads merchants), 4 (adverse actions against Shopping Ads merchants for copyright infringement), 9 (reports concerning copyright infringement by Shopping Ads merchants), 10 (reports concerning copyright infringement by pirate websites), 14 (documents concerning the effectiveness of Shopping ads policies), and 22 (documents concerning Plaintiffs' infringement notices). Dkt. 47-1.

⁴ This request is responsive at least to Plaintiffs' Requests for Production Nos. 3 (documents identifying and describing each infringement notice Google received and how it processed and responded to each notice), 4 (adverse actions against Shopping Ads merchants for copyright infringement), 17 (all documents describing any circumstances in which you would reject, block, delete, decline to process, or fail to act upon an infringement notice), 22 (documents concerning Plaintiffs' infringement notices), 27 (data, logs, tickets, or information showing each infringement notice); 28 (data, logs, tickets, or other documents concerning Shopping Ads for infringing domains). Dkt. 47-1.

Hon. Jennifer L. Rochon
August 20, 2025

> Case IDs contained in the Notice and Response Data Spreadsheets.[5]
>
> - Google should identify the Customer ID associated with each of the Merchant Center accounts listed in the 0703, 2941, and 2942 spreadsheets.[6] Google should then use these Customer IDs as search-terms, just as it has done for the domain names.

During a meet-and-confer on this issue, Google objected that utilizing these account numbers would result in tens of thousands of search-terms. 25.08.19 Meet-and-Confer. This is unavailing for at least two reasons. First, Google committed copyright infringement on a massive scale. Google's infringement involved a large number of accounts because Google did not properly remove the ads and pirates that Plaintiffs identified. It would be unjust and backwards if a defendant could reduce its discovery obligations simply by increasing the scale of its tort. Second, Google itself created a system that allows pirates to create and operate multiple accounts. Google has chosen to allow pirates to spread their infringements across thousands of Google accounts. Google should not be able to invoke the system Google itself created as the basis for a claim of burden.

Google should be required to use the Merchant Account IDs and Customer IDs of the pirates in question as search-terms, and to deploy the Case IDs for the notices in question as search-terms.

### C. Search-Terms Regarding Google Employees' Objectives and Key Results ("OKRs")

Google's recently produced documents have revealed that working teams and individual employees at Google periodically create documents that state, evaluate, and memorialize their "Objectives and Key Results" ("OKRs"). GOOG-CENG-00405294, GOOG-CENG-00408636, GOOG-CENG-00410938, GOOG-CENG-00404556. These OKR documents reveal, inter alia, a Google employee's or team's goals and objectives, to-do lists, deliverables, proposals, problem and improvement areas, feedback, or step-by-step analysis of how to prep for and achieve their goals and objectives. GOOG-CENG-00424119 (OKR explaining that Google Shopping will ██████████); GOOG-CENG-00405294 (OKR discussing ██████████); GOOG-CENG-00424175 (employee's OKR stating that she ██████████); GOOG-CENG-00416746 (OKR explaining that Google has ██████████); GOOG-CENG-00410938 ("2024 OKRs Mid year Review"). This is *especially* important discovery in light of Google's counsel's contention that Google does not prepare written evaluations of the legal agents who process infringement notices. 25.08.05 Meet and Confer. OKRs will shed light on the true inner workings, procedures, and commentary of Google's DMCA program. These documents must be produced. Plaintiffs thus asked Google to deploy the following search-term:

---

[5] GOOG-CENG- 00380265, GOOG-CENG-00380266, GOOG-CENG-00380267, GOOG-CENG-00380268, GOOG-CENG-00392939, GOOG-CENG-00392940, GOOG-CENG-00403539, GOOG-CENG-00403540, GOOG-CENG-00403541, GOOG-CENG-00403542, GOOG-CENG-00403543, GOOG-CENG-00403544, GOOG-CENG-00403545, GOOG-CENG-00404296 ("Notice and Response Data Spreadsheets").

[6] It is unclear to Plaintiffs whether Google has disclosed the Customer ID for the pirates at issue in this case. In an August 19 meet-and-confer, Google's counsel was unable to say whether Google had done so.

Hon. Jennifer L. Rochon
August 20, 2025

- [("OKR*" OR (Objective* w/2 "Key Results")) AND (removal* or copyright* OR DMCA OR takedown* OR strike* OR infring* OR shopping OR monetize*)]

During a meet-and-confer on this topic, Google's counsel did not even know what OKR documents were, despite Plaintiffs' email description sent nearly two weeks prior to the meet-and-confer. 25.08.19 Meet-and-Confer; 25.08.07 O+Z Email. Nonetheless, Google refused to use this search-term. The Court should order Google to do so.

### III. Google must disclose the dates on which it claims to have taken down infringing ads.

Google must disclose the date on which it claims to have taken down ads in response to Plaintiffs' infringement notices. Google has attempted to assert a DMCA safe-harbor defense in this case. To take advantage of that safe-harbor, a defendant must show that when it received infringement notices, it took down the infringing content identified in the notices "expeditiously". *See* 17 U.S.C. § 512(d)(3). Although the DMCA does not define "expeditiously," on its face, the term implicates the timing of the removal. Thus, if Google did remove an ad after receiving an infringement notice, the length of time it took Google to execute the removal is an important factual issue. *See, e.g., Perfect 10, Inc. v. Google, Inc.*, No. 04-cv-9484, 2010 WL 9479059, at *9–10 (C.D. Cal. July 26, 2010) (holding that a factual dispute as to "how long" it took Google to process infringement notices precluded summary judgment on the DMCA defense). In many instances, Google did not take down ads identified in Plaintiffs' notices at all. But in those instances where Google claims it did, Google must produce documents showing the date it claims to have done so. Despite a meet-and-confer on June 26, 2025 and further email correspondence, Google refused to provide this basic and highly relevant information.

In thousands of instances, Plaintiffs sent Google an infringement notice concerning an ad for a specific pirated work sold by a specific pirate at a specific landing page, only to later observe more ads for that same work at that same landing page, often months after Plaintiffs sent Google the first notice. Atty. Decl. ¶ 9. In those instances where Google claims it did *eventually* take down an ad in response to an infringement notice (from Plaintiffs or from other rightsholders), [7] Google has not identified the *date* on which it claims to have executed these takedowns. Spreadsheets Google produced ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Atty. Decl. ¶ 10. But Google has yet to say whether *any* of these dates are the date that Google claims to have executed the takedown, and if so, which date that is. And Plaintiffs cannot simply assume that one of the dates is the purported takedown date because the dates are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

For months, Plaintiffs assumed that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was the date of the alleged takedown. But in the parties' meet-and-confer,

---

[7] Google's counsel has represented that Google's process is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. That distinction does not appear to impact the instant dispute.

Hon. Jennifer L. Rochon
August 20, 2025

Google's counsel represented that this is not the case. Atty. Decl. ¶ 13. Plaintiffs asked Google's counsel (in a meet-and-confer and subsequently in writing) to either identify in Google's production the field that contains the date Google claims to have removed ads, or to produce documents showing such dates. Google has not done so. Atty. Decl. ¶ 14.

Without knowing the date on which Google claims to have removed each ad, neither Plaintiffs nor the Court will be able to assess 1) whether Google in fact did remove the ad on that date, and 2) whether Google removed the ad "expeditiously."

\* \* \*

Accordingly, Plaintiffs ask the Court to order as follows: 1) for any documents Google already has produced claiming to have removed an ad in response to an infringement notice, Google shall either provide the date on which Google claims to have executed the takedown, or identify where in Google's production that date is reflected; and 2) for any future documents Google produces claiming to have removed an ad in response to an infringement notice, Google likewise shall identify the date on which Google claims to have executed the takedown.

### IV. Google must produce documents concerning its approved publisher program.

Google recently reversed its years-long policy of prohibiting ebook ads for legitimate publishers. Dkt. 148-1. Though its public-facing policy remains that "Shopping ads for content reflecting eBooks . . . are prohibited," Dkt. 129 at 3, Google now *does* advertise ebooks for an undisclosed number of legitimate sellers. Dkt. 129 at 3; Dkt. 150 at 3–4. But Google has said that it will not run ads for *Plaintiffs'* ebooks so long as Plaintiffs continue to assert their rights in this lawsuit. *Id.*; Dkt. 148-1. Had Google allowed legitimate publishers to advertise ebooks sooner, the harm these publishers would have suffered from Google's advertisement of *pirated* ebooks could have been mitigated. Yet for years, Google refused to do so.

Google's course of conduct reflects important evidence of Google's willfulness, the need for and burden of an injunction, and Google's material contribution to infringements. Thus, Plaintiffs appropriately asked Google to produce documents concerning its new approved publisher program,[8] and conducted a meet-and-confer on August 5, 2025. Google, however, refused to produce *any* documents concerning this program. The Court should compel Google to do so.

#### A. Google's approved publisher program is key evidence of Google's willfulness.

A key issue with respect to Google's willfulness is why Google did not create an approved publisher program for Plaintiffs and other legitimate publishers years ago. Had Google done so, it could have at least mitigated the harm from its promoting *infringing* copies of Plaintiffs' and other

---

[8] Plaintiffs' RFP 92 requests: "Documents sufficient to show any programs, policies, or other process pursuant to which any Shopping Merchants were permitted by Google to advertise ebooks or digital books despite Defendant's Digital Books Shopping Ads Policy, GOOG-CENG-00000416, and Unsupported Shopping Content Policy, GOOG-CENG-00000002, 0003, including documents sufficient to show the scope of Shopping Ads Merchants who were invited to participate in such advertising."

Plaintiffs' RFP 93 requests: "Documents sufficient to show any public announcement (or direct communications with Shopping Ads Merchants) concerning any program referenced in RFP 92."

Plaintiffs' RFP 94 requests: "All documents, including any internal or external communications, concerning Defendant's decisions not to include Plaintiffs in any program referenced in RFP 92."

publishers' ebooks. Prior to bringing this suit, Plaintiffs attempted to work with Google to address the problem of mass piracy on its Shopping platform. Dkt. 38 ¶¶ 6, 80. Instead of addressing the issue of pirate ads, Google instituted its ebook "ban," and then continued creating and promoting ads for pirates. *Id.* ¶¶ 9, 65, 68. One or more publisher witnesses will testify at trial that Plaintiffs also asked Google to create an approved publisher program that at least would have allowed ads for legitimate publishers' ebooks. But Google declined to do so.

In fact, documents that Google produced just last month suggest that



That Google *now* has demonstrated an ability to create an approved list speaks to Google's willfulness in refusing to do so for years. It also significantly undermines its arguments that Shopping ads are all "automated." Hr'g Tr. 43:23–44:1, 56:24–57:16 (May 15, 2025). Moreover, Google's creation of an approved list would contradict any narrative that Google might advance concerning the feasibility of doing so. Indeed, any claim Google might make that an approved list was impractical or difficult to implement will need to be scrutinized and tested.

### B. Google's approved publisher program speaks to the need for injunctive relief.

One issue that courts consider in determining appropriate injunctive relief is whether the defendant continued infringing after being notified of the infringement by the plaintiff, and after the lawsuit was filed. Dkt. 160 at 3 n.2 (collecting cases).[9] That Google continued to advertise pirated ebooks and to disallow ebooks ads for legitimate publishers even after this suit was filed naturally speaks to the need for a permanent injunction. That Google has now exacerbated that problem by allowing Plaintiffs' *competitors* to advertise ebooks that compete with Plaintiffs' works,[10] while stating that Google will not allow Plaintiffs into the approved publisher program,

---

[9] In a subsequent filing, Google complained that the cases Plaintiffs cited involve direct infringers. Dkt. 175 at 3. This weak distinction makes no difference, and Google offers no reason that it should. Just as the need for injunctive relief is greater where a direct infringer has continued infringing, the need likewise is greater where the secondary infringer has continued infringing.

[10] Dkt. 148 ¶ 4 (showing a search for one of the Plaintiffs' works returns a Shopping ad for an ebook from one of Plaintiffs' competitors, and three pirated works).

further supports to the need for robust injunctive relief.

Likewise, in deciding whether and what injunctive relief to order, courts consider the "balance of hardships" between the plaintiff and the defendant. *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010). That Google has already created an approved publisher program will demonstrate that the balance of hardships is in Plaintiffs' favor.

### C. Google's motion to stay puts at issue the prejudice Plaintiffs would suffer from Google's continued use of its approved publisher program.

In opposing Google's motion to stay, Plaintiffs pointed out that they will be prejudiced by any stay because Google refuses to include Plaintiffs in its approved publisher program. Dkts. 121 at 3, 150 at 3–4. Google has told Plaintiffs that it will not include Plaintiffs in its program while Plaintiffs are pursuing the instant case.[11] By requesting a stay, Google has put its approved publisher program at issue, as the program bears on the prejudice Plaintiffs will suffer.

Further, in arguing that Plaintiffs will not be prejudiced by a stay, Google claims that its approved publisher program is in fact a "beta program" that is in a "testing" phase, and that the program involves only a "small group of engaged business partners." Dkt. 129 at 3. But Google has provided no documentation for either of these contentions.[12] Google should not be allowed to ask the Court to rely on these contentions, then refuse to provide the documentation that would corroborate or contradict them.

### D. Google's objection is without merit.

Google objected to Plaintiffs' request for documents concerning Google's new approved publisher program. After listing a host of boiler-plate objections, Google suggested that its policy of banning ads for ebooks is no longer relevant because the Court dismissed Plaintiffs' state-law unfair competition claim.[13] This is incorrect. As the Court is aware, one element of Plaintiffs' contributory infringement claim is that Google materially contributed to the pirates' direct infringement. *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Google's "ban" on ebook ads is an important piece of Google's material contribution to the pirates' infringement. In addition to advertising the pirates' infringing ebooks, Google *refused* to allow ebook ads from Plaintiffs. This is a great boon to pirates; it means that pirates do not have to compete with ads for legitimate ebooks. Dkt. 38 ¶¶ 64–66.

Google has no basis to refuse to produce documents concerning its new approved publisher program. The Court should compel Google to respond to Plaintiffs' RFP 92, 93, and 94.

### V. Google must disclose the total revenue it earned from the pirates at issue.

Google should produce data on additional revenue it earned from the pirates at issue in this case. Google produced data on revenue it earned through its Shopping platform for the Merchant

---

[11] Dkt. 148-1 (email from Google's counsel to Plaintiffs' counsel stating, "Google has no obligation to include in this test program publishers who have sued, and claim they are entitled to hundreds of millions of dollars in damages from, Google. While the parties are in active litigation, Google is not interested in this type of business relationship with Plaintiffs.")

[12] After Google made these contentions in its reply letter (Dkt. 129), Plaintiffs asked Google to provide documentation to support them. 25.07.24 O+Z Email. Google refused. 25.07.24 Latham Email.

[13] Google's Response to Plaintiffs' RFP 92, 93, and 94.

Center accounts it has identified to date.[14] But Google has not produced data for revenue it earned from these same pirates on Google's other platforms. For each relevant pirate, Google must, at a minimum, produce revenue data from the "Ads" account(s) connected to the pirate's Merchant Center account(s). This information is relevant to Plaintiffs' damages claims, including as to the deterrence and state-of-mind factors to be considered in awarding statutory damages, and to the revenue Google earned from its infringements, which is one basis of an actual damages calculation. Any purported burden on Google in producing this data is minimal at best.

### A. Background

Google runs ads across various Google and non-Google platforms. Ads can appear on, but are not limited to, surfaces like: Google Search (e.g. results page), Display (e.g. ads that Google places on non-Google websites), Shopping (at issue in this case), Video/Youtube (e.g. bumper ads, in-stream ads, banners), and other surfaces (e.g. ads found on Google Play, Discover, Gmail, and Maps). GOOG-CENG-00408760. Plaintiffs observed ads for infringing copies of their works on Shopping and identified thousands of these ads in notices they sent to Google. Dkt. 38 ¶ 99. But that does mean those are the only ads that Google ran, and profited from, for these pirates. Further, Google Shopping itself is not just limited to the Shopping platform, but "Google Shopping refers to shopping experiences across many Google surfaces, including: Search Results Page (SRP), Shopping.google.com, also known as the Shopping Property or Shopping tab, YouTube, shopping experiences are also known as ShopTube." GOOG-CENG-00410539.

Documents that Google produced just last month indicate that 

Thus, when Plaintiffs and other rightsholders sent Google infringement notices asking Google to remove a Shopping ad for an infringing work, Google naturally had a financial incentive *not* to take down the Shopping ad because doing would reduce Google's revenue from Shopping ads.

### B. Google must disclose the revenue it earned from the relevant pirates for ads on other Google platforms.

Google refuses to produce data concerning revenue it earned from Search ads and other ads that it ran for the pirates at issue. This is improper. Key components of statutory damages are Google's state-of-mind and the need for deterrence. *Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986) (copyright); *Union of Orthodox Jewish Congregation of Am. v. Royal Food Distributors Liab. Co.*, 665 F. Supp. 2d 434, 436 (S.D.N.Y. 2009) (trademark). If Google received $1,000 for running Shopping ads for a particular pirate, but made another $1,000 for running Search ads for the same pirate, a higher statutory damages award is needed to deter Google from continuing to run Shopping ads

---

[14] Plaintiffs dispute that the universe of pirates for which Google produced this revenue data is complete, but that dispute is not before the Court in this motion.

Hon. Jennifer L. Rochon
August 20, 2025

▮

Similarly, should Plaintiffs seek as damages Google's infringing profits, rather than statutory damages, Plaintiffs will be required to show Google's revenues from the infringement. "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b); *see also* 15 U.S.C. § 1117(a). Here, had Google taken down the pirate ads that Plaintiffs identified to Google through infringement notices, as the law required it to do, Google would not have earned revenue either from Shopping ads for those landing pages, ▮ ▮ Thus, Google's production should not be limited to Shopping ads.

Plaintiffs initially asked Google to disclose how much revenue Google earned from the pirates in question across all Google platforms. Dkt. 47-1, RFP 33 and 34. Google objected, and proposed as a compromise that Google would investigate producing any revenue associated with the relevant pirates' "Ads" accounts.[15] 24.10.17 Meet-and-Confer; 24.10.21 Latham Email. Google's counsel explained that this likely would include any revenue from Search ads, YouTube ads, and perhaps other ad products. 24.10.17 Meet-and-Confer. However, Google never followed up on how revenue is earned and shared between Google's various platforms, and ultimately responded counsel "*believes* it will only be able to produce" the revenue that it earned from these pirates on the Shopping platform. 25.03.31 Latham Email (emphasis added).

Plaintiffs therefore ask the Court to order Google to disclose the revenue associated with the Ads accounts for each of the relevant pirates.

### C. Google's claims of burden are contradicted by the record.

Any burden associated with producing this information will be minimal, and certainly outweighed by the importance of this information. Google's counsel has indicated that the revenue from any Search ads (and certain other ads) a pirate ran would be contained in that pirate's "Ads" account. 24.11.19 Meet-and-Confer. During the meet-and-confer process, Google hypothesized that retrieving revenue for the Ads accounts associated with the pirates at issue might be difficult because one Merchant Center account can be associated with multiple Ads accounts, resulting in an unmanageable number of ads accounts to track. 24.12.04 Latham Email. But according to data that Google has now produced, ▮ ▮ *Id.* Thus, the "unmanageable" number of Ads accounts about which Google was concerned has not materialized.

Google further hypothesized that the Ads accounts in question could be connected to multiple Merchant Center accounts, making it difficult to isolate the revenue that is connected to the Merchant Center accounts at issue. Though Google agreed in October of 2024 (and several times since then) that it would investigate whether it would be feasible to produce revenue data concerning these Ads accounts, Google never reported back on the results of that investigation. Atty. Decl. ¶ 17. Thus, Google has not established that its hypothetical concern has come to fruition. And, given that Google presumably used these Ads accounts to retrieve the data about

---

[15] A Google "Ads" account "is used to create and pay for advertising campaigns." Dkt. 59 ¶ 7.

Hon. Jennifer L. Rochon
August 20, 2025

Shopping ads revenue that Google already produced,[16] it seems likely that this problem never arose.

Google should be required to disclose the revenue it earned from the Ads accounts for each of the Merchant Center accounts associated with the pirates at issue in this case (i.e., the Merchant Center accounts listed at GOOG-CENG-00000703 and GOOG-CENG-00392941, and any subsequent Merchant Center accounts that Google identifies, excluding accounts associated with the Email-Connected Merchant accounts).

* * *

Plaintiffs thank the Court for its consideration.

Respectfully submitted,

/s/ *Jeff Kane*
Jeff Kane
OPPENHEIM + ZEBRAK, LLP

*Counsel for Plaintiffs*

---

[16] Google's counsel has represented that in order to run a *paid* Shopping ad, a merchant must create an Ads account and link the account to her Merchant Center account. Dkt. 59 ¶ 7; 24.11.19 Meet-and-Confer; 24.11.25 Email from O+Z to Latham.