**Sarah A. Tomkowiak**
Direct Dial: 1.202.637.2335
sarah.tomkowiak@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

**LATHAM & WATKINS LLP**

August 28, 2025

<u>VIA ECF</u>

The Honorable Barbara C. Moses
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, New York 10007

>   Re:   *Cengage Learning, Inc. v. Google LLC*, No. 1:24-cv-04274-JLR-BCM:
>   <u>Defendant's Response to Plaintiffs' Second Omnibus Discovery Letter Motion (Dkt. 185)</u>

Dear Judge Moses:

Pursuant to this Court's order (Dkt. 182), Defendant Google LLC's ("Google") submits this response to Plaintiffs' second omnibus discovery motion (Dkt. 185).

## I. Plaintiffs' Demand for Additional Custodians and Search Terms at the Close of Document Discovery Is Untimely and Inappropriate.

Plaintiffs moved to compel Google to add eight custodians and run its existing search terms across an additional data source on August 5. *See* Dkt. 160 at 6–13. Just two days after filing that motion (and one week prior to the close of document discovery on August 15), Plaintiffs raised—for the first time—the twelve-plus additional custodians and thousands of additional search terms on which they now move. *See* Declaration of Sarah Tomkowiak ("Atty. Decl.") ¶¶ 17-18. Plaintiffs try to justify their most recent round of belated demands by characterizing their proposed custodians as "recently-discovered" and their proposed search terms as necessitated by "[d]ocuments Google recently produced." Mot., Dkt. 185 at 1, 4. But the documents Plaintiffs cite in support of their motion largely belie those arguments. Rather, despite the parties' engagement in an agreed-upon custodial exchange process, Plaintiffs waited until the parties' custodial document collections and productions were complete to push for another one-sided round of custodial collections, in which Google would collect, host, review, and produce documents from *nine times* as many custodians as any Plaintiff, using *over 30,000* search terms. This lopsided burden is supposedly justified by Plaintiffs' allegation that Google has contributed to copyright infringement directly conducted by third parties of a large number of alleged works in suit—but Plaintiffs' assertion of many works in this case does not mean there must be a proportional increase in custodial documents. Meanwhile, Plaintiffs maintain the incredible position that the fact discovery schedule should remain as is. Plaintiffs' tactical gambit should be rejected.

As Google explained in its opposition to Plaintiffs' first omnibus discovery motion, Google has undertaken a robust custodial collection and review following the parties' agreed-upon

schedule for negotiating custodians and search terms. *See* Dkt. 175 at 7–8. While Plaintiffs refused to include a provision regarding custodians and search terms in the parties' stipulated ESI protocol, the parties subsequently reached agreement to, and did in fact, exchange initial proposed custodians on January 31, 2025 and search terms on February 14, 2025. Atty Decl. ¶ 4. Pursuant to the same agreement, the parties then exchanged final search terms and custodians on March 7, 2025. *Id.* ¶ 5. On that date, Google agreed to collect and run search terms across the files of the following five custodians: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; plus the ███████████████████████ alias. Google also agreed to run six search strings, including, at Plaintiffs' insistence, one including all 1,239 domains accused by Plaintiffs. *Id.* ¶ 7.

While the parties agreed that either side could seek to modify the custodians and search terms "as the case progresse[d]," the parties agreed to "negotiate in good faith to ensure that the custodians/search terms capture the relevant information *while maintaining appropriate limits on discovery*." *Id.* ¶ 10 (emphasis added). Google has honored its part of that commitment. Since March 7, Google has agreed to numerous modifications to its search terms at Plaintiffs' suggestions, has agreed to add three entirely new search strings, and has added two additional custodians: ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *Id.* ¶¶ 8-9; *see also* Dkt. 175 at 8. But as Google repeatedly explained to Plaintiffs, it is neither feasible, nor consistent with the parties' agreement to "negotiate in good faith . . . while maintaining appropriate limits on discovery" for Google to add custodians and search terms every time Plaintiffs find a "new" name or concoct a "new" term they deem interesting. Atty. Decl. ¶ 10. That rings particularly true where, for multiple of Plaintiffs' requests spanning both of their discovery motions, Plaintiffs could have raised disputes with the Court much earlier, but chose to wait until Google's document production was all but complete.

Plaintiffs' demands, across two discovery motions, for over twenty additional custodians and thousands of additional search terms is unjustified. Google has already collected documents from over twice as many custodians as any single Plaintiff. The parties produced custodial documents on roughly the same schedule.[1] All told, Google has produced over 1.2 terabytes of data in this case, *see* Dkt. 138 at 10, including over 2,000 custodial documents (i.e., documents in an individual custodian's name) or from the ███████████████████████ lias. Atty. Decl. ¶ 13. By comparison, after running the parties' agreed-upon search terms over just three custodians per Plaintiff, Plaintiffs have produced a mere 835 custodial documents (the parties' hit reports indicated that their respective search terms hit on approximately the same volume of documents, suggesting that Plaintiffs may have had a lower responsiveness and/or higher privilege withholding rate, and their search terms may have been less effective). *Id.* ¶ 14. There is simply no basis for Plaintiffs' accusation that by "not disclos[ing]" twenty additional custodians and thousands of

---

[1] Plaintiffs complain Google "waited until the very end of document discovery to produce many important documents," Dkt. 185 at 1, but neglect to mention that Plaintiffs, too, made their first custodial production just a week before Google did. *See* Atty. Decl. ¶ 12. They also omit that Plaintiffs' production served on the deadline for document discovery (August 15) included 511 custodial documents—over 60% of their total custodial documents. *Id.* ¶ 14.

additional search terms "when the parties exchanged proposed custodian lists in February 2025," Google somehow failed to honor the parties' agreement or caused Plaintiffs' delay. Dkt. 185 at 2. Discovery is not boundless, and no document review or search strategy will be perfect. Google met its obligations by engaging cooperatively and in good faith with Plaintiffs at every turn. *See Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 2014 WL 584300, at *2 (S.D.N.Y. Feb. 14, 2014) (explaining that "no one could or should expect perfection" from the discovery process and that "[a]ll that can be legitimately expected is a good faith, diligent commitment to produce all responsive documents uncovered when following the protocols to which the parties have agreed, or which a court has ordered"); *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006) ("[T]here is no obligation on the part of a responding party to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations. Rather, it must conduct a diligent search, which involves developing a reasonably comprehensive search strategy.").

For these reasons alone, Plaintiffs' last minute requests for additional custodians and search terms are unreasonable and inappropriate. However, Google separately addresses the topics below.

### A. Plaintiffs' Demand for Additional Custodians Is Unreasonable and Disproportional.

Plaintiffs seek broad discovery sweeps across any name or email address Plaintiffs find interesting in Google's produced documents. That approach is not proportional to the needs of this case, nor does it comport with established best practices and law that the "producing party is best situated to determine its own search and collection methods so long as they are reasonable" and that "it is appropriate to limit collection and review to non-duplicative, relevant information." *Nichols v. Noom Inc.*, 2021 WL 948646, at *2–3 (S.D.N.Y. Mar. 11, 2021) (citing Sedona Principles 6 and 8). Moreover, Plaintiffs possessed sufficient information to identify their proposed additional custodians well before August 7, 2025, but chose not to. For Plaintiffs' request regarding "Google Representatives," for example, Plaintiffs' letter motion and accompanying declaration make clear that Plaintiffs did not learn about the alleged Cengage or McGraw Hill representatives from any Google document at all, and therefore could and should have raised these individuals (along with any purported "representatives" for Elsevier and Macmillan) as custodians when the Parties first began negotiating custodians this past winter. *See* Dkt. 187 ¶ 5. And Plaintiffs *themselves* produced documents reflecting communications with one of the email aliases they now claim they had insufficient notice regarding. *See* PL0000165425 (email to the ▓▓▓▓ alias). For Plaintiffs' remaining nine proposed custodians (which include five additional email aliases they ask Google to "treat" as custodians), Plaintiffs were made aware of them by July 18, 2025 at the latest: Google's July 18 production of approximately 250 documents included at least one document cited by Plaintiffs as support for each of their requested custodians. *See* Atty. Decl. ¶ 12.

### 1. Google "Representatives"

Plaintiffs' description of ▓▓▓▓ and ▓▓▓▓ as "recently-discovered" is disingenuous. To the extent these individuals were, in fact, Google "point-persons" for Plaintiffs

Cengage and McGraw Hill, respectively,[2] Cengage and McGraw Hill have known of their existence since before this case was filed—yet Plaintiffs inexplicably waited until the close of document discovery to raise them. In any event, Plaintiffs fail to explain why Google should separately collect and search custodial documents from these two individuals for a three and a half year time period. Plaintiffs' attorney declaration states only that in 2024 Cengage and McGraw Hill "had account representatives from Google" ▮▮▮▮ and ▮▮▮▮, respectively) and that Cengage and McGraw Hill communicated with them. Dkt. 187 ¶ 5. The declaration does not indicate what either Plaintiff communicated with these representatives about. Custodial documents from individuals who are, by Plaintiffs' own description, "sales representative[s], account manager[s], or account strategist[s]," are unlikely to uncover particularly relevant or salient documents. Plaintiffs point to no reason to believe either individual was dedicated solely to the Cengage or McGraw Hill accounts. Moreover, Plaintiffs offer no reason to believe that these individuals were in fact involved in the investigation or handling of any piracy allegations—nor would it be reasonable to make that assumption, given their sales roles. Indeed, the document cited by Plaintiffs merely hands off a customer complaint to the Trust & Safety team—a team for which Google has already provided numerous associated custodians, including ▮▮▮, ▮▮▮▮, and the ▮▮▮▮▮▮ alias. *See* Dkt. 187-1 (GOOG-CENG-00413454 (forwarding complaint to ▮▮▮▮▮▮ alias)). The communications of sales representatives are therefore unlikely to uncover particularly relevant or salient documents. To the extent Plaintiffs seek "communications *with Plaintiffs* about piracy," Dkt. 185 at 2 (emphasis added), Plaintiffs already possess (and presumably have produced) those documents. *See* PL0000545830 (email between McGraw Hill and ▮▮▮▮ regarding purported pirate site).[3]

### 2. Google Email Aliases

"▮▮▮▮", "▮▮▮▮": Plaintiffs have articulated no basis to believe that any "critical ▮▮▮▮arding Plaintiffs' DMCA notices arose, were escalated to these aliases, and were not already captured by Google's other custodians and searches). Google's production already contains communications involving the aliases most relevant to this dispute, including several thousand emails to and from the ▮▮▮▮ alias (▮▮▮▮@google.com) dating back to 2021. Atty. Decl. ¶ 15. Setting aside that Plaintiffs' *own* p▮▮▮ documents include emails to the ▮▮▮▮ alias, *see, e.g.*, PL0000165425 (showing emails from November 2022 between Plaintiffs' enforcement agent, Corsearch, and the ▮▮▮▮ alias), Plaintiffs have also been aware of the ▮▮▮▮ lias through Google's productions since March. *See, e.g.* GOOG-CENG-00001265 (reflecting email from ▮▮▮▮@google.com); GOOG-CENG-00001267 (same); GOOG-CENG-00001268 (same). With respect to the "▮▮▮▮" alias, current Google custodians, including ▮▮▮▮ and ▮▮▮▮, are members of those listservs. *See, e.g.*, GOOG-CENG-00413894 (listing ▮▮▮▮ as the custodian for a document reading in relevant part, "You received this message because you are subscribed to the Google Groups 'Legal Removals Copyright' group. To unsubscribe from this group . . . send an email to ▮▮▮

---

[2] The sole support for the premise that Google designates "point-person[s]" to certain "large-volume clients" is the say-so of Plaintiffs' counsel Jeff Kane in a declaration. Dkt. 187 ¶¶ 4–5. Mr. Kane does not explain how he gained his "understanding" of how Google handles "large-volume clients."

[3] Plaintiffs are plainly aware that the discussions referenced in Google's opposition to Plaintiffs' Motion to Strike referred to discussions between Plaintiffs' counsel and Google's in-house counsel, not account representatives. Google has produced those discussions in redacted form where needed. *See, e.g.,* GOOG-CENG-00431171.

**LATHAM&WATKINS**LLP

▋+unsubscribe@google.com"); GOOG-CENG-00417993 (listing ▋ as the custodian for a document with the same message). Plaintiffs fail to show that collection from either of these aliases would yield unique, non-duplicative documents and communications. Accordingly, it would not be proportional, at this late juncture, to treat these aliases as "custodians."

"▋": Plaintiffs cite to a single document in support of their position that Google should treat this alias as a "custodian." See GOOG-CENG-00407407. But this document appears to reflect directions for escalating "critical issues" regarding any and all legal removals on many Google products, including those unrelated to copyright or to the Shopping platform. Indeed, the very document Plaintiffs rely on specifies that "[f]or IP specific requests, contact ▋," an alias from which custodians ▋ and ▋ were members and received communications. Plaintiffs fail to explain why any *relevant* "critical issues" would not have been captured by Google's existing custodians.

"▋": Plaintiffs notably omit from their discussion of this alias that existing Google custodians ▋ and ▋ are members of this alias and received emails directed to this alias. See, e.g., GOOG-CENG-00418452 (listing ▋ as the custodian for a document reading in relevant part, "You received this message because you are subscribed to the Google Groups 'LCPS Copyright Team' group. To unsubscribe from this group . . . send an email to ▋+unsubscribe@google.com"); GOOG-CENG-00419849 (listing Mr. Rich as the custodian for a document with the same message). A reasonable search does not require Google to search likely duplicative sources of the same ESI. See *Williams v. NYC Bd. of Elections*, 2024 WL 2125435, at *6 (S.D.N.Y. May 13, 2024) ("Perfection is not the rule, especially with multiple sources of ESI, the tendency for there to be multiple copies of the same email or near-dupes the production of which has no incremental value to the case but exponentially increases the costs of discovery."). That "LCPS used" this alias to coordinate work, Dkt. 185 at 3, does not establish that this alias would be a reasonable and non-duplicative source of ESI.

"▋": As Plaintiffs know, Google has already searched and produced emails from the Trust & Safety alias (▋@google.com), which is the email actually specified in the applicable DMCA policy for ▋ GOOG-CENG-00000685 at -687. The ▋ alias is not listed in the applicable policy document. Plaintiffs omit that the single document they cite to justify their sweeping search was last updated in August 2019, at least a year before the relevant period. GOOG-CENG-00405084.

"▋": As demonstrated by the document cited by Plaintiffs, ▋ is the Legal Removals Monetized team lead, and the point of contact for all such removals. See GOOG-CENG-00405185. Plaintiffs' arguments regarding the relevancy of this alias are speculative at best—Google's documents indicate that this alias could have been used for *any* kind of legal removals globally, including "▋," "▋" ▋ ▋, and ▋" GOOG-CENG-00424464 at -472–73. Running broad search terms over this entire alias would therefore likely result in a disproportionate number of nonresponsive documents. And even if *some* relevant communications were exchanged with this alias, Plaintiffs fail to explain why they would be non-duplicative of the documents and communications already collected and produced from ▋, who has been associated with legal removals for the "monetized" group for the entire

**LATHAM&WATKINS**LLP

relevant period (since at least October 2020). *See* GOOG-CENG-00413138 (listing ▇▇▇ as the custodian for a document reading in relevant part, "You received this message because you are subscribed to the Google Groups ▇▇▇ group"); GOOG-CENG-00405333 at -337 (October 2020 presentation listing ▇▇▇ as "▇▇▇" point of contact ("POC")); GOOG-CENG-00405237 at -260 (presentation from ▇▇▇ dated February 2021 listing ▇▇▇ and ▇▇▇ as POCs for Legal Removals Ads); GOOG-CENG-00405185 (document last updated March 2022 listing ▇▇▇ as "▇▇▇ lead"); GOOG-CENG-00408760 (August 2024 Google Ads LCPS training from ▇▇▇).

### 3. Other Personnel Purportedly Involved with DMCA Notices

Plaintiffs claim that Google's productions revealed "key" non-custodial Google employees who were responsible for "major decisions" regarding Google's DMCA program. Dkt. 185 at 3. Not so. Google long ago disclosed the employees most directly responsible for implementing and enforcing Google's DMCA policies. Plaintiffs want all search terms to be run across additional custodians because they are reflected on emails or other custodial documents that Google has produced. But Plaintiffs fail to show that conducting such broad-ranging searches is likely to uncover non-duplicative, responsive documents. Plaintiffs overstate their cited documents in an attempt to portray their proposed custodians as deeply and uniquely involved in Google's DMCA program, but they are not. And even if they had tangential involvement (which is unclear), a reasonable ESI search does not require canvassing every possible custodian of potentially relevant documents. *See Williams*, 2024 WL 2125435, at *6. Indeed, courts have recognized that, particularly where a party is "a large entity," there will likely be "redundancies in sources of information and custodians." *Raine Grp. LLC v. Reign Cap., LLC*, 2022 WL 538336, at *2 (S.D.N.Y. Feb. 22, 2022). It is not proportional for Google to collect, search, and review custodial data from every individual involved in any work stream at any time to "perfect" the discovery. Plaintiffs have not approached their own custodial collection and production in that manner, either.

▇▇▇ Plaintiffs ignore that ▇▇▇ was *co*-author of the "Legal Removals on Monetized Products" document (GOOG-CENG-00406504) with ▇▇▇—an existing custodian—and collaborated with ▇▇▇ on the document discussing the engineering effort involved in removing infringing Shopping ads (*see* GOOG-CENG-00406514). Plaintiffs have failed to demonstrate why Google should also collect and produce documents from ▇▇▇, when his involvement with relevant activities overlapped with several custodians, including ▇▇▇ and ▇▇▇ in addition to ▇▇▇. Moreover, ▇▇▇ apparent focus on the "Monetized Products" team was not the kinds of legal takedowns relevant to the claims in this case. *See* GOOG-CENG-00404540 row 62 (listing "[m]onetized products, ▇▇▇" for "project area(s) I work on"). Broad searches of ▇▇▇'s custodial documents is not proportional. *See GMO Gamecenter USA, Inc. v. Whinstone US, Corp.*, 2025 WL 722853, at *2 (S.D.N.Y. Mar. 5, 2025) (finding that adding additional custodians was "not proportional to the needs of the case considering the significant discovery that has already taken place and the likelihood that additional custodians would serve to yield duplicative results").

▇▇▇ Plaintiffs argue that all search terms should be run across ▇▇▇'s custodial documents because he was listed as a supervisor of other "Product" team members—one of which (▇▇▇) is already a custodian. But as with ▇▇▇ ▇▇▇'s job focus was

**LATHAM&WATKINS**LLP

not on the kinds of legal takedowns relevant to this case. *See* GOOG-CENG-00404540 row 58 (listing "███████████████████████████████████████████████" for "project area(s) I work on"). And, as with Plaintiffs' other requests, nothing about the documents cited by Plaintiffs indicates tha███ would likely have responsive, non-duplicative documents. Indeed, each document they cite also includes at least one of ████████ or ████████ s either primary owners or co-owners with ████████. *See* GOOG-CENG-00405333 (identifying ████████ at the same organizational level as ████████ and listing ████████ as the point of contact and owner of the presentation); GOOG-CENG-00405185 (listing ████████ as a "[p]rimary POC" for the Legal Removals team and instructing to "CC" ████████ only "if sensitive"); GOOG-CENG-00404556 (strategic goal document also listing ████████ in the same "Working Group"); GOOG-CENG-00408442 (listing ████████ as the "Owner" and ████████ as a "Reviewer"). No document identifies ████████ as an individual who is likely to receive unique, relevant emails. In fact, Plaintiffs misrepresent the content of GOOG-CENG-00405185: that document instructs Google employees to *copy* ████████ on "sensitive" emails *along with* the primary point of contact, ████████. The mere fact that ████████ was more senior than ████████ is not justification for the broad custodial search sought by Plaintiffs. *See In re Morgan Stanley Mortgate Pass-Through Certificates Litig.*, 2013 WL 4838796, at *2 (S.D.N.Y. Sept. 11, 2013) (plaintiffs failed to demonstrate that more senior employees "are likely to be the exclusive holders of responsive documents").

████████ The only document cited by Plaintiffs to support searching all of ████████ custodial files is a single document, "[l]ast updated in August 2019," in which ████████ is listed as the last of four points of contact. GOOG-CENG-00405084. Notably, ████████ an existing Google custodian, is the first point of contact listed for this document. A full search through all documents of an employee who happens to be one of many names listed on one document, which was last updated years before Plaintiffs even filed notices regarding the works in suit, is not proportional under any interpretation.

████████ Plaintiffs point to the same document discussed above with respect to ████████ mes ████████ is mentioned in this document, she is listed secondary to ████████ an existing Google custodian). GOOG-CENG-00405084 at -084-85. Plaintiffs also point to ████████'s name on a weekly agenda document spanning nearly two years for a project team that sought to improve certain tooling and optimize operations with respect to *all* legal removals (not just copyright and trademark). *See* GOOG-CENG-00414184 at -192, -203. ████████ is one of numerous names on this document, also including an existing custodian, ████████. To the extent ████████ was involved in discussions relevant to this case, Plaintiffs offer no reason to believe that Google's searches of other custodians on these documents would not be duplicative of ████████'s documents.

### B. Plaintiffs' Demand for Additional Search Terms Is Unreasonable and Disproportional.

Plaintiffs complain that Google refused, at the close of document discovery, to run thousands of additional search terms across its custodial collections (while simultaneously asking Google to triple the number of custodians for whom Google would collect custodial data and run these terms). Plaintiffs' untimely demand is unreasonable on its face, and even more so when

added to Plaintiff's other requests. *See Farb v. Baldwin Union Free Sch. Dist.*, 2007 WL 1300978, at *1 (E.D.N.Y. May 4, 2007) (denying motion to compel when "plaintiffs had five months to raise this issue in a timely fashion and failed to do so" since "[c]ompelling the discovery now sought by the plaintiffs would only serve to further extend discovery completion in this action").

As with the custodians, the Parties have been negotiating search terms since February 2025. Consistent with the exchanges the Parties negotiated, Plaintiffs previously requested several changes to Google's originally proposed search terms, which Google has considered in good faith, and accepted where reasonable and proportional. *See* Atty. Decl. ¶¶ 8-9. Additionally, Plaintiffs' arguments that they only just became aware that these search terms are necessary rings hollow, as the facts that underlie Plaintiff's requested search terms have been known to them for several months. Plus, Plaintiffs fail to demonstrate that relevant documents are missing from Google's productions such that the additional burden of searching and review (particularly at this late stage) would be justified. *GMO Gamecenter*, 2025 WL 722853, at *2 (denying in part motion to compel where searching additional custodians would not be "proportional to the needs of the case considering the significant discovery that has already taken place and the likelihood that additional custodians would serve to yield duplicative results and other Rule 26 proportionality factors"). After completing its production of custodial documents, Google should not be required to restart its collection, review and production to accommodate Plaintiffs' belated and unsupported requests.

### 1. Documents Concerning Google's ▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ E-book Publishers

Plaintiffs demand that Google run two additional search strings across its custodial documents relating to specific aspects of Google's process for handling infringement notices regarding ebooks. Contrary to Plaintiffs' motion, Google has never argued this topic is not relevant. Indeed, Plaintiffs' motion neglects to mention that at least two of the parties' agreed-upon search strings are designed to capture documents relating to *this very topic*:

> ((ebook* OR e-book* OR "digital book" OR "digital books" OR (digital* w/3 book*) OR "textbook* OR "text book*" OR (solution* w/2 manual*) OR "test bank" OR testbank OR (manifest* w/5 unfound*) OR (duplicat* w/5 (notic* OR "URL"))) AND ("shopping" OR pirate* OR piracy OR infringe* OR "DMCA" OR takedown OR remov* OR escal* OR cluster)).[4]

> ((DMCA OR copyright OR trademark OR (infring* w/3 repeat*)) w/10 (policy OR policies OR process* OR procedur* OR strike* OR practice* OR system OR guideline* OR "▮▮▮▮▮" OR "▮▮▮▮▮" OR reactivat* OR reinstat*)) AND shopping

Plaintiffs fail to explain why these existing strings, which are designed to capture documents that mention broad terms such as (1) "ebook" and "shopping"; (2) "ebook" and "DMCA"; (3) "ebook" and "removal"; or (4) "copyright" near "strike" would not have captured the relevant documents now Plaintiffs seek. The documents Plaintiffs point to in their motion, for example, make clear that this "▮▮▮▮▮▮" policy relates specifically to DMCA notices regarding ebooks. *See* GOOG-

---

[4] The parties negotiated a revision to this search string as recently as July 14, 2025, one month before the close of fact discovery, with Google accepting almost all of Plaintiffs' requested changes. *See* Atty. Decl. ¶ 9.

CENG-00411022. And these documents (along with others Google produced) *do* largely explain "the parameters" of that policy. Dkt. 185 at 5; *see* GOOG-CENG-00424030 ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ '); *see also* GOOG-CENG-00424057 (flowchart directing legal agents to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

Plaintiffs fail to show that running these *additional* e-book related search strings would uncover additional relevant documents, or that the burden of running these additional terms, particularly at this late stage of fact discovery, would be proportional to the needs of the case.

### 2. Search-Terms Regarding Merchant IDs, Case IDs, and Customer IDs

Plaintiffs similarly cannot justify its request now to add search terms related to Merchant IDs, Case IDs, and Customer IDs. Through several meet and confers, Plaintiffs have known for months that merchants are referred to by several IDs, not just their domain name. *See, e.g.,* April 18, 2025 Latham Email. But Plaintiffs failed to raise this issue or suggest ID-level search terms until five months after the parties' exchanges. *Farb*, 2007 WL 1300978, at *1 (denying motion to compel where plaintiffs waited five months before moving to compel).

Plaintiffs now make the unremarkable observation that sometimes Google employees refer to various accounts by their associated account IDs. But the reality that employees of a company may sometimes refer to account numbers does not justify a wide-ranging search for those IDs. Notably, Plaintiffs failed to articulate why an ID-by-ID search would be likely to capture documents *not already captured by* search terms (including all 1,239 relevant domain names) that Google has already run. *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 2020 WL 7383940, at *6 (S.D.N.Y. Dec. 16, 2020) (requiring a party to demonstrate that additional requested custodians would provide unique relevant information). Employees do not reference account or case IDs in a vacuum. *See, e.g.*, GOOG-CENG-00424641 (hitting on two of the parties' agreed-upon search terms relating to "repeat infringement" and "copyright" w/10 "policies"); GOOG-CENG-00429795 (hitting on one of the parties' agreed-upon search terms relating to "piracy" and "shopping"). There is no reason to believe that creating separate searches for IDs will suddenly uncover a new trove of relevant communications. On the contrary, such searches are likely to result in little more than irrelevant communications that have nothing to do with the issues in this case.

Additionally, Plaintiffs fail to acknowledge the burden of adding 20,145 Merchant Center IDs and 7,607 Case IDs as search terms, nor do they articulate how this request is proportional to such burden. In RelativityOne—the platform used in this case—Search Term Reports are limited to queries of 450 characters.[5] Accordingly, just *testing* these terms to attempt to quantify the burden would require breaking up these massive strings into hundreds (at least) of search term "chunks." Particularly given that Google has already produced a massive amount of non-custodial data— totaling over 1TB—associated with these precise Merchant Center and Case IDs, *see* Dkt. 138 at 10, exhaustively searching custodial documents for a potential stray reference to these IDs is beyond disproportionate. *See Blackrock Allocation Target Shares: Series S Portfolio v. Bank of New York Mellon*, 2018 WL 2215510, at *7 (S.D.N.Y. May 15, 2018) ("Courts must 'limit discovery if the request is "unreasonably duplicative," the requesting party has had "ample

---

[5] *Create and Edit Search Term Reports*, RelativityOne, https://help.relativity.com/RelativityOne/Content/Relativity/Search_term_reports/Create.htm (last visited 8.28.25).

opportunity to obtain the information by discovery," or the "burden or expense of the proposed discovery outweighs its likely benefit" considering the needs of the case and the importance of the documents.'") (internal citation omitted). Plaintiffs' allegation that Google must have designed its systems "to allow pirates to spread their infringements across thousands of Google's accounts" for purposes of "reduc[ing] its discovery obligations" is fanciful conjecture, detached from reality, and runs counter to the principle that the producing party is best situated to effectuate its own reasonable searches. *Noom*, 2021 WL 948646, at *2.

### 3. Search-Terms Regarding Objectives and Key Results ("OKRs")

An OKR is a general term used throughout Google that—as Plaintiffs' own cited documents show and Plaintiffs admit—can refer to any number of goals or objectives in a wide variety of contexts. Dkt. 185 at 7. *After* the document production deadline has passed, Plaintiffs now ask for a brand new search string to be run across all of Google's custodians to capture any reference to a goal and a series of generic terms. That request goes far beyond any reasonable bounds of relevance in this case. For example, any document that refers to an OKR and "monetization" or "shopping," in any context, would be captured. The same would be true of any document that refers to an OKR and "takedown," for any reason (e.g., prohibited political or financial content). And because Plaintiffs' proposed term uses an "AND" connector instead of a proximity connector, the OKR referred to in the document may not even relate to the other term in the string (e.g., an "OKR" may be mentioned at the top of a document and a reference to "shopping" may be mentioned at the bottom).

Plaintiffs have not explained what request for production ("RFP") these "OKR documents" (which is Plaintiffs' coined term) would be responsive to. Google has identified no RFP that specifically seeks these types of documents (although to the extent otherwise responsive documents referring to OKRs were captured in custodial searches, Google produced them).

Even putting that deficiency aside, Plaintiffs claim they need this new search string because "Google does not prepare written evaluations of the legal agents who process infringement notices." Dkt. 185 at 7. But searching for an OKR will not magic any such documents into existence. Google has already run its existing search strings targeting shopping and DMCA enforcement across the custodians most involved with that process and produced or logged all responsive documents. Google has also performed targeted collections for responsive documents concerning two contractors Google used for its legal agents, and it has produced those documents. Atty. Decl. ¶ 16. The vast majority of so-called "OKR documents" that could "shed light on the true inner workings, procedures, and commentary of Google's DMCA program"—to the extent any exist—will have already been captured by that process. Adding a new search string to run across all Google custodians, targeted at a term that is used in many contexts across the company, for documents not squarely called for by any RFP, and for which the productions resulting from existing search strings already likely delivered the most relevant documents is not proportional to the needs of this case, particularly at this late juncture.

### C. The Court Should Reject Plaintiffs' Request to Effectively Restart Custodial Collections, Review and Production – Or Make That Process Mutual.

Plaintiffs' demands for twelve or more additional custodians (plus eight in Plaintiffs' first

10

**LATHAM&WATKINS**LLP

omnibus discovery motion) and thousands of additional search terms would effectively restart Google's custodial collection, review, and production. As noted above, Plaintiffs want Google to collect, review, and produce custodial documents for *nine times* the number of custodians of that any one Plaintiff has, and their demand for search terms relating to Merchant IDs, Case IDs, and Customer IDs becomes even more outrageous in the context of Plaintiffs' separate demand that Google conduct expansive discovery on over ▇▇▇ additional domains, in addition to the 1,239 domains that form the basis for the 20,145 Merchant Center IDs and 7,607 Case IDs already at issue in this case. *See* Dkt. 175 at 4–5. Simply put, Plaintiffs' demands seek to explode discovery for one side, *after* document discovery has already closed (and should stay closed, according to Plaintiffs, who apparently believe that Google alone should do a second round of custodial review in parallel with both parties preparing for and conducting depositions). For all of the reasons described above, those demands are wholly unjustified or are, at a minimum, disproportionate.

To the extent the Court is inclined to reopen the custodial collection, review, and production process, however, Google requests that the process be a mutual one. Indeed, the documents that Plaintiffs have produced, including in their largest custodial production on August 15 (the deadline for document discovery), reveal additional relevant individuals that Plaintiffs likewise "did not disclose" during the parties' negotiations and suggest that additional search terms could locate additional relevant custodial documents. Dkt. 185 at 2; *see, e.g.*, PL0000545800 (internal Elsevier email chain discussing how to respond to Google's ebook policy reveals the involvement of Aly Abrams and Frederic Guillaud, who are not currently custodians, but at least one of whom appears on Plaintiffs' privilege log). If custodial document discovery is reopened, *both* parties should be required to engage in another round of custodian and search term negotiations with reasonable limits tied to specific RFPs, with an order that this round will complete the parties' custodial document obligations.

## II. Google Produced All Data Regarding the Take-Down Dates of Complained-Of Ads.

Plaintiffs demand that Google "disclose the date on which it claims to have taken down ads in response to Plaintiffs' infringement notices." Dkt. 185 at 8. As an initial matter, the complained-of ads reflect allegedly infringing material that is **not** hosted by Google—instead, they link to landing pages run by third parties. So Google itself has no infringing material to "take down." Rather, as Plaintiffs acknowledge in a footnote, upon receipt of a DMCA notice, Google's process is to investigate the complained-of URLs, confirm they in fact link to the allegedly infringing content reflected in the notice, and to "delist" the landing page to which the ad links (i.e., remove from Google Shopping and Search results). Dkt. 185 at 8 n.7.

As Plaintiffs admit, Google has produced spreadsheets showing the detailed handling information for each URL complained of by Plaintiffs, including, *inter alia*, fields for ▇▇▇  Atty. Decl. ¶ 21. That is the data that Google maintains in connection with takedowns in the ordinary course. There is nothing further for Google to produce with respect to the specific handling of each noticed URL. Google has also produced numerous other documents reflecting training and other explanatory material for the handling of DMCA notices, including documents that explain when a URL is marked for removal, the URL is removed

from Google results. *See, e.g.*, GOOG-CENG-00417093 at -103, -124. Google's productions thus reflect the information maintained by Google that could be used to assess both (1) the date by which Google "took down" complained-of URLs, and (2) whether "upon notification of claimed infringement," whether Google "respond[ed] expeditiously to remove, or disable access to," such material and whether the notice contained "information reasonably sufficient to permit" Google "to locate that reference or link" to the alleged infringing material. 17 U.S.C. § 512(d)(3).

Plaintiffs' attorney declaration purports to identify "thousands of entries" in Google's DMCA notice data that contain dates for various fields maintained by Google that are "far apart." Dkt. 185 at 8; Dkt. 187 ¶¶10–12. Plaintiffs claim they need Google to clarify "whether any of these dates are the date that Google claims to have executed the takedown" because it is relevant to whether Google acted "expeditiously" with respect to the DMCA safe harbor defense. Dkt. 185 at 8. However, for ▮▮▮ of the complained-of entries by Plaintiffs, the data was associated with a situation in which Google would **not** need to "act expeditiously" to remove or disable access to such link (e.g., because the allegedly infringing link no longer existed, or because Google had not received enough information from the submitter to locate the allegedly infringing material). Atty. Decl. ¶ 30. Moreover, for **all** of the specific entries in Google's notice handling spreadsheets complained of by Plaintiffs, Google's data reflects that the submitter either failed to provide key information regarding the allegedly infringed work, or provided such information in a format that was not easily processed by Google's systems. Atty. Decl. ¶¶ 26-29. In fact, **none** of the entries identified by Plaintiffs contained information about the copyrighted work that was allegedly infringed. Atty. Decl. ¶ 27. Accordingly, these entries appear not to reflect an "effective" notification under the DMCA and therefore would not be subject to any "expeditious" response. *See* 17 U.S.C. § 512(c)(3), (d)(3) (requiring an effective notification to include "[i]dentification of the copyrighted work claimed to have been infringed" and "information reasonably sufficient to permit [Google] to locate" the allegedly infringing material); *Wolk v. Kodak Imaging Network, Inc.*, 2011 WL 940056, at *5 (S.D.N.Y. Mar. 17, 2011) ("[T]he underlying purpose of the notice requirements is to place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright.") (internal quotation omitted). Not to mention, all of these entries complained of by Plaintiffs represent less than ▮▮▮ of all unique entries in those spreadsheets produced by Google—the vast majority of entries in Google's DMCA notice data reflect dates close in time to the submission of the notice. Atty. Decl. ¶ 26. *See In re Frontier Commc'ns Corp.*, 666 B.R. 260, 273 (Bankr. S.D.N.Y. 2025) ("Implementation. . . need not be perfect. Rather, by the terms of the statute, it need only be 'reasonable.'") (internal citation omitted). Accordingly, Plaintiffs' complaints fail to indicate that any party, the Court, or a jury will be unable to reasonably determine from Google's produced data "whether Google in fact did remove the ad" and whether Google's removals were conducted in accordance with 17 U.S.C. § 512.

Notably, Google produced the vast majority of the entries now complained of by Plaintiffs in spreadsheets on March 31, 2025, but Plaintiffs failed to raise this issue with Google until months later. Atty. Decl. ¶ 31. When Plaintiffs' counsel raised this issue to Google's counsel, Google's counsel offered that it believed Plaintiffs' counsel was not correctly interpreting the data field "notification_sent_webmaster_date" in the spreadsheet. *Id*. Plaintiffs' claim that Google's counsel made this "represent[ation]" "for the first time" during a June 26 meet and confer is confusing. Dkt. 187 ¶ 13. Google's counsel did not make any prior "representations" about this spreadsheet—

it simply produced it. When asked, Google's counsel attempted to be helpful to the extent of its knowledge. Indeed, Google's counsel has gone above and beyond in answering Plaintiffs' counsel's questions regarding the data Google has produced, but counsel are not fact witnesses. Atty. Decl. ¶ 31. To the extent Plaintiffs seek further clarification about the meaning of specific database fields or Google processes, demanding that Google's counsel answer factual questions in meet-and-confers is an inappropriate vehicle to obtain those answers. Because Google has produced the data in its possession, custody or control regarding its handling of notices, including the information maintained in ordinary course regarding "takedown" dates, Plaintiffs' request for the production of additional information is moot.

### III. Documents Concerning Google's Recent eBook Beta Testing Are Irrelevant.

As Google has explained repeatedly, it has never had a policy of "prohibiting ebook ads for legitimate publishers." Dkt. 185 at 9. Rather, in May 2021, Google implemented a new policy—which has not been "reversed"—prohibiting all paid (but not free) Shopping ads for ebooks and digital books. *See* Dkt. 175 at 7 n.13. Plaintiffs know this. Plaintiffs' counsel was forced to acknowledge as much during oral argument on Defendants' motion to dismiss Plaintiffs' New York unfair business practices claim premised on this policy. *See* Dkt. 104, Hr'g Tr. (May 15, 2025) at 35:5–18 (The Court: "Am I correct that this policy that you are alleging is just a neutral policy that there shall be no advertising of ebooks on the Google cite, and then the pirates somehow evade that by getting their ads placed, notwithstanding the policy?... [T]he policy itself is not, Google will not allow legitimate publishers to advertise their ebooks, but Google will allow pirates to advertise their ebooks. That's not their policy." **Mr. Kane: "Correct. The written policy is just ebooks are not allowed at all**." (emphasis added)). In fact, at least certain Plaintiffs actively *supported* Google's implementation of this policy in 2021. *See* PL0000545800 (describing the policy as "something Google has moved forward with that [Elsevier] has supported"); PL0000545822 ("Macmillan has been asking Google to address the advertisement and sale of pirated digital works and we're happy Google is taking this step.").

As a threshold matter, Google has already agreed to produce documents relating to the creation of Google's ebook policy and its consideration of modifications to that policy during the relevant time period. In response to RFPs 45 and 79, Google has produced documents and communications concerning Google's policy regarding ebook Shopping ads as well as high-level reports or research, generated in connection with Google's consideration of that policy or an "███████" relating to marketing, advertising, and providing services through the Google Shopping platform to the textbook or ebook industry. Atty. Decl. ¶¶ 32-38; *see, e.g.*, GOOG-CENG-00426568 (reflecting reassessment of Google's ebook policy). As Plaintiffs' own motion acknowledges, Google's produced documents reflect the company's assessment and consideration of an "███████" Dkt. 185 at 10 (citing GOOG-CENG-00407052). Google's produced documents also describe the ███████████████████████████████████████ and explain "why Google did not create an approved publisher program . . . years ago." *Id.* at 9; *see, e.g.*, GOOG-CENG-00429363 (explaining that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"). Even assuming Google's ability to provide advertising space to legitimate textbook sellers during the relevant time period was relevant here (which Google does not concede), Plaintiffs have already received probative documents.

**LATHAM&WATKINS**LLP

  What Plaintiffs seek in their Motion is discovery that lacks any conceivable relevance to the claims and defenses in this case. Specifically, Plaintiffs are upset that four years after Google first determined it could not feasibly implement an "█████████ (whereby certain legitimate publishers would be allowed to advertise ebooks, notwithstanding the general policy that such ebooks are not eligible for Shopping Ads), Google is now beta testing the workability of an "█████" with a small group of engaged business partners, but has excluded Plaintiffs from that beta program.[6] Plaintiffs demand three types of information: (1) the identities of the merchants who were invited to participate in the beta testing program (RFP 92); (2) documents concerning Google's decision not to include Plaintiffs in the beta testing program (RFP 94); and (3) documents sufficient to show public announcements and direct communications with merchants regarding the beta testing program (RFP 93). Plaintiffs fail to offer any justification for *this* information. Plaintiffs' curiosity regarding who Google has invited to participate in this beta program has no bearing on their claims or Google's defenses. Plaintiffs are already aware of why Google decided not to include Plaintiffs in the beta testing program. And their desire to understand how the beta testing program works is undoubtedly driven only by the hope that they can obtain competitively sensitive information through the discovery process.

  In reality, these documents have nothing to do with Google's purported willfulness or the "need for injunctive relief." *See* Dkt. 185 at 9–11. As to willfulness, neither the identities of participants in Google's beta testing program nor communications regarding this 2025 test phase are probative of whether the alleged harm suffered by Plaintiffs from the pirates' circumvention of Google's neutral policy could have been "mitigated" years ago. And it is not clear what "robust injunctive relief" Plaintiffs believe this information will demonstrate a need for. Plaintiffs do not earnestly claim that the beta testing program itself constitutes contributory infringement or that Google should be enjoined from pursuing it; they argue only that the testing program "allow[s] Plaintiffs' competitors to advertise ebooks that compete with Plaintiffs' works." *Id.* at 10. That general observation merely reflects Plaintiffs' disappointment that they were not invited to participate in Google's beta program. But, as a general matter, "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Savory Pie Guy, LLC v. Comtec Indus., Ltd.*, 2016 WL 7471340, at *9 (S.D.N.Y. Dec. 28, 2016) (internal quotation marks omitted); *see also Waldman Publ'g Co. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) (injunctions "should be narrowly tailored to fit specific legal violations" and "should not impose unnecessary burdens on lawful activity"). Google's recent business decisions simply have no bearing on Plaintiffs' copyright and trademark claims or on Google's defenses.

### IV.  Google Has Already Produced the Revenue Data Plaintiffs Demand, and Any

---

[6] Throughout their Motion, Plaintiffs insist on referring to Google's beta testing as an "approved publisher program." *See* Dkt. 185 at 9–11. Presumably, Plaintiffs refuse to refer to "beta testing" because Google has not provided "documentation" to "corroborate or contradict" the sworn declaration of attorney Sarah Tomkowiak offered in connection with Google's reply in support of a stay. *See id.* at 11; *see also* Dkt. 131 ¶ 17. Of course, Plaintiffs offer *no* support—declaratory or otherwise—for their contention that the beta test is a full-blown, permanent "approved publisher program." That is because it is not. Moreover, the purpose of Ms. Tomkowiak's statement in Dkt. 131 ¶ 17 was to correct a misstatement made by Plaintiffs regarding conversations between counsel. *See* Dkt. 123 ¶ 7 ("Google's counsel had stated that Google will not allow such ads from Plaintiffs while the instant litigation is ongoing."); Dkt. 121 at 3 (similar). Ms. Tomkowiak offered a single sentence explaining the beta testing program to contextualize the actual communications that the parties' counsel have had. That Plaintiffs' misstatement necessitated Google to correct the record does not then mean that Plaintiffs are now entitled to discovery into an irrelevant topic.

**LATHAM&WATKINS**LLP

**Additional Data Is Irrelevant.**

Plaintiffs demand that Google "disclose the revenue it earned from the Ads accounts for each of the Merchant Center accounts associated with the pirates at issue in this case (i.e., the Merchant Center accounts listed at GOOG-CENG-00000703 and GOOG-CENG-00392941)." Dkt. 185 at 14. But Google already produced that information. On August 15—five days before Plaintiffs filed the instant motion—Google produced a spreadsheet reflecting Google Ads account data, *including lifetime spend*, for Ads accounts connected, either presently or historically, to the 20,145 Domain-Identified and Historical Merchant Center accounts relevant to this case (i.e., those listed at GOOG-CENG-00000703 and GOOG-CENG-00392941). *See* Atty. Decl. ¶ 45; GOOG-CENG-00419904 (reflecting total revenue of just ▓▓▓▓▓▓ across ▓▓▓▓▓ Ads accounts). Given that revenue from the Ads accounts associated with these 20,145 Merchant Center accounts is the only relief Plaintiffs ask for here, their request is moot and can be denied on that basis alone.[7]

To the extent Plaintiffs demand additional revenue data *beyond* what Google has already produced, such information is clearly irrelevant or at a minimum disproportionate to the needs of this case. As served, RFPs 33 asked for documents sufficient to identify and describe "revenue, payments, fees, and other compensation in connection with each Infringing Merchant and Related Ads Merchant for *any Google platform or services*, including subscriptions, Shopping Ads, Search ads, banner ads, display ads, retargeted ads, and YouTube ads" and RFP 34 asked for documents sufficient to identify and describe "revenues, costs, expenses, profits, and losses concerning *any business conducted* with Infringing Merchants and Related Ads Merchants." Atty. Decl. ¶¶ 39-41 (emphasis added). Given the obvious overbreadth of these RFPs, Google objected to them to the extent they sought information concerning revenue or payments unrelated to the actual infringement alleged. *Id.* ¶¶ 42-43. Google agreed to produce revenue information for Shopping ads run by the relevant Merchant Center accounts during the relevant time period, and on July 1 produced a spreadsheet reflecting all revenue that Google earned from Shopping ads associated with the 20,145 Domain-Identified and Historical Merchants between June 5, 2021 and September 16, 2024. *See Id.* ¶ 44; GOOG-CENG-00404298 (reflecting total revenue of just ▓▓▓▓ ▓▓▓▓▓▓).[8] As detailed above, Google also produced the lifetime revenue received from Ads accounts connected, either presently or historically, with those Merchant Center accounts. Anything additional—including, hypothetically, revenue that Google received from subscription services[9] tied to email accounts also tied to one of the Domain-Identified or Historical Merchants, lacks no conceivable connection to the issues in this case.

---

[7] To be clear, Google does not concede that this Ads revenue is relevant to Plaintiffs' damages claims. *See Peer Int'l Corp. v. Luna Recs., Inc.*, 887 F. Supp. 560, 568 (S.D.N.Y. 1995) (Sotomayor, J.) ("Statutory damages should bear some relationship to the actual damages suffered."); 5 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.03 (2025) ("When an infringer's profits are only remotely and speculatively attributable to the infringement, courts deny recovery to the copyright owner.").
[8] For clarity, the revenue reflected in this spreadsheet is *not* limited to revenue collected from Shopping ads run on the Shopping platform. It includes revenue from all Shopping ads run by the relevant 20,145 merchants, regardless of the surface on which those Shopping ads were run (e.g., Search Results, YouTube, etc.). Atty. Decl. ¶ 44.
[9] To name a few examples, Google offers subscriptions relating to Google Play (its library of apps and games), YouTube, and more. *See* Google Account Help, *Find Your Purchases, Reservations & Subscriptions*, Google, https://support.google.com/accounts/answer/7673989?hl=en&co=GENIE.Platform%3DDesktop#zippy=%2Cadd-a-subscription-service-from-outside-google (last visited August 28, 2025).

LATHAM&WATKINS LLP

                          Respectfully,

                          */s/ Sarah A. Tomkowiak*
                          Sarah A. Tomkowiak (*pro hac vice*)
                          of LATHAM & WATKINS LLP

cc:    All counsel of record (via ECF)