IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENGAGE LEARNING, INC.; BEDFORD, FREEMAN & WORTH PUBLISHING GROUP, LLC D/B/A MACMILLAN LEARNING; MACMILLAN HOLDINGS, LLC; ELSEVIER INC.; ELSEVIER B.V.; and MCGRAW HILL LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>GOOGLE LLC,<br><br>*Defendant*. | Case No. 1:24-cv-04274-JLR-BCM |

**ATTORNEY DECLARATION OF SARAH TOMKOWIAK**

I, Sarah Tomkowiak, declare that:

1. I am a partner at the law firm Latham & Watkins LLP, counsel for Google LLC ("Google") in this matter.

2. I submit this declaration in connection with Google's Response to Plaintiffs' Second Omnibus Discovery Letter Motion (Dkt. 185).

**The Parties' Agreement for Exchanging Custodians and Search Terms**

3. During meet and confers that I attended and on email threads of which I was a recipient during late 2024 and early 2025, counsel for Google and counsel for Plaintiffs discussed how the parties would identify and agree on custodians and search terms for electronically stored information ("ESI"). Part of these discussions included the possibility of addressing custodians and search terms in the parties' ESI protocol, though Plaintiffs objected to that approach.

1

4. Following the parties' discussions, the parties agreed to an exchange schedule for custodians and search terms. My colleague Holly Victorson sent Plaintiffs' counsel an email on January 24, 2025 in a 94-page email thread with the subject line, "Re: Google LLC's Responses and Objections to Plaintiffs' First Set of Requests for Production - Cengage Learning, Inc. v. Google LLC, Case No. 24-cv-4274" proposing an exchange schedule "to allow the parties to consider each others' proposed custodial approaches and conduct exchanges and conferrals regarding the same, and tee up any disputes for the Court in an orderly and timely manner." The parties eventually agreed to the following schedule:

- January 31, 2025: exchange of initial proposed custodians
- February 7, 2025: exchange of objections, comments, and proposed revisions to opposing side's proposed custodians
- February 14, 2025: exchange of proposed search terms as well as any revisions to proposed custodians in light of the opposing side's comments, objections, and revisions
- February 21, 2025: exchange of objections to opposing side's proposed search terms and any further objections, comments, and revisions to opposing side's proposed custodians
- March 7, 2025: exchange of final planned custodians and search terms

5. The parties exchanged their initial lists of proposed custodians on January 31, 2025, and their "final" lists of proposed custodians and search terms on March 7, 2025. These exchanges were made in the email threads described in paragraph 6 below.

6. I am the recipient of a 12-page email thread between counsel for Google and counsel for Plaintiffs with the subject line, "Re: Initial Proposed Custodians - Cengage Learning,

2

Inc. et al v. Google LLC, 24-cv-04274-JLR." This email chain reflects parts of the parties' negotiation of custodians and search terms, beginning with an email from Plaintiffs' counsel, Kevin Lindsey, reflecting their provision of initial proposed custodians on January 31, 2025. I am also the recipient of another email thread, totaling 67 pages, between counsel for Google and counsel for Plaintiffs with the subject line, "Re: HC/AEO - Re: Cengage v. Google - Google's Initial Custodian Disclosure." This email thread begins with an email from my colleague, Holly Victorson, to Plaintiffs' counsel on January 31, 2025 providing Google's initial proposed custodians. This email thread, too, reflects parts of the parties' negotiation of custodians and search terms, including the parties' exchange of "final" planned custodians and search terms on March 7, 2025.

7. In the March 7, 2025 email sent by my colleague, Sara Sampoli, reflecting Google's "final" planned custodians and search terms, Google agreed to collect and run search terms for the following custodians: ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████; as well as the ███████████████ alias. Google also agreed to run six search strings, including one containing terms for 1,239 domains.

8. The same 67-page email thread also includes a May 14, 2025 email from Ms. Sampoli reflecting Google's agreement to add two additional custodians (███████ ██████ and ████████). This email also reflects Google's conditional agreement to modify searches one, three, four, and five and to add searches seven and eight so long as Plaintiffs also agreed to run additional search terms.

9. The final email in the thread is a July 14, 2025 email from my colleague, Caroline Clarke, confirming Google's agreement to run an additional search string (search nine) and to further modify search number three in response to Plaintiffs' suggestions. This email also confirms Google's agreement to modify searches one, four, and five and add searches seven and eight, as Google conditionally agreed to do on May 14, 2025.

10. As part of the parties' agreement regarding the mutual exchange of custodians and search terms, the parties agreed generally, as reflected in an email from Plaintiffs' counsel Jeff Kane on January 28, 2025 in the same thread, that the schedule reflected in paragraph 4 above would be "without prejudice to either party seeking to modify the custodians/search terms that either side will use as the case progresses," but that "[e]ach side [would] negotiate in good faith to ensure that the custodians/search terms capture the relevant information while maintaining appropriate limits on discovery."

11. I am the recipient of two email threads (with the subject lines "Re: Cengage v. Google - Discovery Progress" and "Cengage v. Google - Hit Report") on which the parties exchanged hit counts for the agreed-upon search terms on July 16, 2025. I have reviewed both hit count reports. Based on my review, I believe that the hit count reports indicate that each side's respective search terms hit on roughly the same volume of documents.

**The Parties' Custodial Productions**

12. I am aware of the custodial productions that both Google and Plaintiffs have made in this case. Plaintiffs made their first custodial production of about 150 documents on July 10, 2025. Google made its first custodial production of about 250 documents approximately one week later on July 18, 2025. This production included at least one document cited by Plaintiffs in the instant motion as support for each of their identified proposed custodians (*e.g.*, GOOG-CENG-

4

00407407; GOOG-CENG-00408986; GOOG-CENG-00408442; GOOG-CENG-00405084; GOOG-CENG-00405333; GOOG-CENG-00406504).

13. Google made additional custodial productions on July 25, August 1, August 8, and August 15, 2025. In total, Google produced over 2,000 custodial documents on or before August 15, 2025.

14. Plaintiffs have produced just 835 custodial documents. Of these 835, 511 of them (61%) were produced on August 15, 2025—the final day of document discovery.

15. As part of its production of communications with the Domain-Identified and Email-Connected Merchants, Google produced over ten thousand emails (inclusive of families) to and from the ▮▮▮▮▮ alias (▮▮▮▮▮▮▮▮▮▮) in March 2025. Some of the produced emails date back to 2021.

16. Google has conducted a targeted collection of documents associated with two contractor agencies engaged by Google in connection with the Copyright Ads Removals Workflow. Google produced those documents in its 23rd and 26th productions on August 8 and August 15, 2025.

**Plaintiffs' New Discovery Demands**

17. I am the recipient of an 18-page email thread between counsel for Google and counsel for Plaintiffs with the subject line, "Re: Cengage v. Google - Custodians, Search Terms, Hyperlinked Documents." This email thread begins with an email from Plaintiffs' counsel on August 7, 2025. In that email, Plaintiffs' counsel Jeff Kane wrote, "The documents Google recently produced make clear that additional custodians and search terms are necessary in order to capture relevant documents. Pursuant to the parties' agreement to allow modifications of custodians and search terms as the case progresses (2025.01.28 O+Z Email; 2025.01.31 Latham

Email), Plaintiffs request the below additions to Google's custodial searches." Mr. Kane then identified the aliases, "Google personnel," "Google Representatives," and additional search terms on which Plaintiffs now move.

18. To my knowledge, Mr. Kane's August 7, 2025 email was the first time that Plaintiffs raised to Google any of the proposed custodians or search terms at issue in their motion.

**Data Regarding the Take-Down Dates of Complained-Of Ads**

19. On March 31, 2025, Google produced the spreadsheets at GOOG-CENG-00380267 and GOOG-CENG-00380268, reflecting the DMCA notices received by Google concerning the Merchant Center accounts exactly matching the domains in the Domain Spreadsheet provided to Google on December 14, 2024. *See* Dkts. 72; 76. There are ▮▮▮▮ records across those two documents. On March 31, 2025, Google also produced spreadsheets at GOOG-CENG-00380265 and GOOG-CENG-00380266, reflecting the DMCA notices received by Google concerning the Merchant Center accounts, not already included in the Domain-Identified Merchant accounts, with the same email account identifiers associated with the Domain-Identified Merchant accounts. *See* Dkts. 72; 76. There are an additional ▮▮▮▮ records reflected in those two documents.

20. On May 7, 2025, Google produced supplemental DMCA notice data at GOOG-CENG-00392939 and GOOG-CENG-00392940 for domains that had been identified by Plaintiffs but were not captured under the process prescribed by the Court at Dkt 72. On June 10 and 12, 2025, Google produced nine additional spreadsheets of notice data associated with the "historical" accounts that Google voluntarily agreed to produce to resolve a dispute between the parties. *See* Dkt. 106 at 1, 3.

21. It is my understanding that the fifteen spreadsheets referenced in paragraphs 19 and 20 above ("DMCA Data") show, on a URL-by-URL basis, the data Google maintains in

6

association with its DMCA handling process for each URL requested for takedown. The data includes fields for the Case ID, case created date, allegedly infringing URL, ■■■■■■■■■■■■■■■■■■, asserted copyright information (including ■■■■■■■■■■■■■■■■■■), method of notice submission ("■■■■■■■■") (*e.g.*, email or webform), ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ among other fields.

22. A team at FTI Consulting ("FTI"), whom Google has retained in connection with this matter, conducted an analysis of the DMCA Data, which I reviewed. FTI calculated that there are ■■■■■ unique records reflected across the DMCA Data.

23. On August 21, 2025, Plaintiffs' counsel provided Google's counsel with a file titled "25.08.20 Figures from Atty. Decl.xlsx" ("Plaintiffs' Spreadsheet") which appears to show data purporting to support paragraphs 9, 11, 12, and 16 of the Attorney Declaration of Plaintiffs' Counsel at Dkt. 187. I have reviewed this file.

24. Plaintiffs' Spreadsheet for "¶ 9" contains data that appears to be extracted from Plaintiffs' data associated with the files produced at PL0000535577 and PL0000543994. Although Plaintiffs' Attorney Declaration claims that he "observed more than 3,000 landing page URLs . . . for which Plaintiffs sent an infringement notice, then sent an infringement notice for the same URL thirty or more days later," Dkt. 187 ¶ 9, Plaintiffs have not described how the data in Plaintiffs' Spreadsheet was collected and processed to make that showing. In any case, PL0000535577 and PL0000543994 contain over 156,000 records combined, so these URLs reflect a minority of Plaintiffs' own notice data.

7

25. Plaintiffs' Spreadsheet for "¶ 11" and "¶ 12" contain data that appears to be extracted from Google's DMCA Data. Although Plaintiffs' Attorney Declaration states that he "███████████████████████████████████████████████████████████████████████████████," Dkt. 187 ¶ 11, and that he "███████████████████████████████████████████████████████████████████████████████," Dkt. 187 ¶ 12, Plaintiffs have not described how the data in Plaintiffs' Spreadsheet was collected and processed.

26. The ████ entries identified in Plaintiffs' Spreadsheet for "¶ 12" appear to be entirely duplicative of, and encapsulated in, the ████ entries claimed to be calculated by Plaintiffs and referenced in Plaintiffs' Spreadsheet for "¶ 11." The ████ entries appear to represent less than ██ of the █████ unique records reflected across the DMCA Data.

27. The "█████████" and "█████████" fields for every single entry in Plaintiffs' Spreadsheet for "¶ 11" and "¶ 12" are blank. But that is not the case for all of Google's DMCA Data. For example, ██████████ entries in GOOG-CENG-00380268 contain a value in the "█████████████" field.

28. For the ████ entries in Plaintiffs' Spreadsheet for "¶ 11," only the accused URL reflected in this data potentially hints at what the asserted work might be. But the asserted work is often not obvious on the face of the URL. For example, the URLs reflected in Plaintiffs' Spreadsheet for "¶ 11" include URLs such as:

- ████████████████████████████████████████,
- ████████████████████████████████████████,
- ████████████████████████████████████████, and
- ████████████████████████████████████████.

29. The "▮▮▮▮▮" field for ▮▮▮▮▮ entries (73%) in Plaintiffs' Spreadsheet for "¶ 11" and ▮▮▮▮▮ entries (68%) in Plaintiffs' Spreadsheet for "¶ 12" reflects the value "▮▮▮" or "▮▮▮▮▮."

30. The "▮▮▮▮▮" field reflects the values of "▮▮▮▮▮," "▮▮▮▮," "▮▮▮▮▮," "▮▮▮▮▮▮," or "▮▮▮▮▮" for ▮▮▮▮▮ entries (52%) in Plaintiffs' Spreadsheet for "¶ 11."

31. I am the recipient of an 98-page email thread between counsel for Google and counsel for Plaintiffs with the subject line, "Re: Plaintiffs' Responses and Objections to Defendant's First Interrogatories - Cengage Learning, Inc. et al. v. Google LLC (Case No. 24-cv-04274)." This email thread includes a June 12, 2025 email from Plaintiffs' counsel Jeff Kane attaching "a list of ▮▮▮ instances where Defendant's own Notice and Response Data Spreadsheets indicate that Defendant delisted a Shopping Ad" but for which Plaintiffs claimed no Merchant Center account had been disclosed "that was created prior to the notification date, and suspended after a date seven days prior to the notification date." Google's counsel then discussed this issue in detail with Plaintiffs' counsel during a meet and confer on June 26, 2025. In an effort to help the parties better understand each other's positions and crystallize disputes, Google's counsel explained the basis for Google's belief that Plaintiffs were incorrectly interpreting Google's productions, including articulating counsel's current understanding of Google's DMCA Data. Google's counsel further explained that it could not provide concrete responses to all of Plaintiffs' factual inquiries.

**Documents Concerning Google's Recent eBook Beta Testing**

32. On September 3, 2024, Plaintiffs served on Google their First Set of Requests for Production of Documents, which included Request for Production ("RFP") Nos. 1–58.

33. RFP No. 45 reads in full, "All documents concerning the Digital Books Shopping Ads Policy, including all versions and drafts of such policies, practices, and procedures; all documents concerning the development, implementation, and enforcement of such policies, practices, and procedures; and all internal and external communications concerning such policies, practices, and procedures."

34. Google served its responses and objections to Plaintiffs' First Set of Requests for Production of Documents on October 3, 2024. In response to RFP No. 45, Google agreed to produce "nonprivileged documents, maintained in the ordinary course of business and located after a reasonable search, reflecting Google's actual policies, practices, and procedures concerning removing digital books or ebooks listings from Shopping Ads."

35. The 94-page email thread referenced to above in paragraph 4 contains an email sent by my colleague, Ms. Sampoli, on December 4, 2024, reflecting Google's further agreement to produce "non-privileged documents and communications in its possession, custody and control concerning Google's Digital Books Shopping Ads Policy" in response to RFP No. 45. In that email, Google also agreed to produce "non-privileged draft versions [of that policy], subject to its other objections and reservations, to the extent any are located after a reasonable search."

36. On April 1, 2025, Plaintiffs served on Google their Second Set of Requests for Production of Documents, which included RFP Nos. 59–79.

37. RFP 79 reads in full, "Documents sufficient to show any internal or third-party research or reports related to marketing, advertising, and providing eCommerce services to textbooks and eBooks merchants on the Shopping platform."

38. I am a recipient of a 21-page email thread between counsel for Google and counsel for Plaintiffs with the subject line, "RE: Google's Responses and Objections to Plaintiffs' Second

Set of RFPs - Cengage Learning, Inc. v. Google LLC." This email thread contains an email sent by Ms. Sampoli, counsel for Google, to Plaintiffs' counsel on June 23, 2025, in which Google agreed to produce "high-level reports or research, generated in connection with Google's consideration of its Digital Books Shopping Ads Policy or an '███████' during the relevant period, relating to marketing, advertising, and providing services through the Google Shopping platform to the textbook or ebook industry, to the extent such reports are kept in the ordinary course of business and located after a reasonable search."

39. On June 12, 2025, Plaintiffs served their Third Set of Requests for Production of Documents, which included RFP Nos. 80-95.

40. RFP No. 92 reads in full, "Documents sufficient to show any programs, policies, or other process pursuant to which any Shopping Merchants were permitted by Google to advertise ebooks or digital books despite Defendant's Digital Books Shopping Ads Policy, GOOG-CENG-00000416, and Unsupported Shopping Content Policy, GOOG-CENG-00000002, 0003, including documents sufficient to show the scope of Shopping Ads Merchants who were invited to participate in such advertising."

41. RFP No. 93 reads in full, "Documents sufficient to show any public announcement (or direct communications with Shopping Ads Merchants) concerning any program referenced in RFP 92."

42. RFP No. 94 reads in full, "All documents, including any internal or external communications, concerning Defendant's decisions not to include Plaintiffs in any program referenced in RFP 92."

**Google's Produced Revenue Data**

43. Plaintiffs' First Set of Requests for Production includes RFP No. 33 and 34.

11

44. RFP No. 33 reads in full, "Documents sufficient to identify and describe Google's receipt of revenue, payments, fees, and other compensation in connection with each Infringing Merchant and Related Ads Merchant for any Google platform or services, including subscriptions, Shopping Ads, Search ads, banner ads, display ads, retargeted ads, and YouTube ads. Such documents should specify which Google platform or services they concern."

45. RFP No. 34 reads in full, "To the extent not included in the documents produced in response to Document Request No. 33, documents sufficient to identify and describe Google's revenues, costs, expenses, profits, and losses concerning any business conducted with Infringing Merchants and Related Ads Merchant."

46. In its responses and objections to Plaintiffs' First Set of Requests for Production, Google objected to RFP Nos. 33 and 34 as overly broad, unduly burdensome, and seeking irrelevant information, namely documents concerning Google's revenue from platforms unrelated to the allegations and works asserted by Plaintiffs in this proceeding.

47. The 94-page email thread referenced to above in paragraph 4 contains an email sent by my colleague, Ms. Victorson, on January 24, 2025, reflecting Google's agreement to "search for and produce revenue information for Shopping ads run by the Domain-Identified Merchant Center accounts between June 5, 2021 and September 16, 2024, to the extent such information is ordinarily maintained by Google in the ordinary course of business." Ms. Victorson reiterated Google's position that "any revenue beyond Shopping Ads connected to the Domain-Identified Merchant Center accounts is irrelevant."

48. On July 1, 2025, Google produced a spreadsheet reflecting the cost of offers associated with any of the 20,145 Domain-Identified and Historical Merchants (i.e., the revenue that Google earned from these merchants' Shopping ads) between June 5, 2021 and September 16,

2024.  *See* GOOG-CENG-00404298.  I understand the revenue in this spreadsheet to reflect the revenue Google collected from *all* Shopping ads run by these merchants, not just those run on the Shopping platform "surface."  In total, the spreadsheet reflects that the combined revenue from Shopping ads run by these merchants during the relevant time period is $███████.

49.     On August 15, 2025, Google produced a spreadsheet reflecting various account details associated with the Ads accounts linked (either currently or in the past) to the 20,145 Domain-Identified and Historical Merchants.  *See* GOOG-CENG-00419904.  I understand that Column P of that spreadsheet reflects the lifetime spend (in U.S. dollars) of each of the ███ Ads accounts included in the spreadsheet.  In total, the spreadsheet reflects that the combined lifetime spend of these ███ Ads accounts is $███████.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed on August 28, 2025, in Columbia, Missouri.

*/s/ Sarah A. Tomkowiak*
Sarah A. Tomkowiak

13