# EXHIBIT A
# [Redacted Version of Document Filed Under Seal]

```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
        ----------------------------:

        CENGAGE LEARNING, INC.,      : Docket No.: 24-cv-04274
        et al.,
                       Plaintiffs,   :

               v.                    :

        GOOGLE, LLC,                 : New York, New York

                                     : October 8, 2025

                       Defendant.    :

        ----------------------------:

                         PROCEEDINGS BEFORE
                 THE HONORABLE BARBARA C. MOSES
                 UNITED STATES MAGISTRATE JUDGE

        APPEARANCES:

        For Plaintiff:       OPPENHEIM & ZEBRAK, LLP
                             BY:  MICHELE H. MURPHY, ESQ.
                                  JEFF KANE, ESQ.
                                  YUNYI CHEN, ESQ.
                                  URIEL LEE, ESQ.
                                  KEVIN LINDSEY, ESQ.
                             461 Fifth Avenue, 19th Floor
                             New York, New York 10017

        For Defendant:       LATHAM & WATKINS, LLP
                             BY:  SARAH A. TOMKOWIAK, ESQ.
                                  SY DAMLE, ESQ.
                                  LAURA BLADOW, ESQ.
                                  HOLLY VICTORSON, ESQ.
                                  BRENT MURPHY, ESQ.
                             1271 Avenue of the Americas
                             New York, New York 10020

        Transcription Service: Marissa Lewandowski
                               Phone:  (631) 813-9335
                               E-mail:marissamignano@gmail.com


        Proceedings recorded by electronic sound recording;
        Transcript produced by transcription service
```

```
 1              THE DEPUTY CLERK:  The Court now calls
 2    Cengage Learning, Inc., et al. versus Google LLC,
 3    Case No. 24-CV-4274.
 4              Counsel, please make your appearances for
 5    the record.
 6              MS. MURPHY:  Good morning, Your Honor.
 7    Michele Murphy for the Plaintiffs Cengage,
 8    McGraw Hill, Macmillan Learning, and Elsevier.  I'm
 9    here with my colleague Jeff Kane.  Some of our other
10    colleagues are here as well, Uriel Lee, Yunyi Chen,
11    Kevin Lindsey.  And our client from McGraw Hill,
12    Suzanne Telsey, is with us.  She is permitted to
13    view or hear AEO information under the protective
14    order.
15              THE COURT:  All right, thank you.
16              So, Ms. Murphy and Mr. Kane, you'll be our
17    oralists today, correct?
18              MS. MURPHY:  Correct.
19              THE COURT:  Thank you.
20              MS. TOMKOWIAK:  Good morning, Your Honor.
21    Sarah Tomkowiak of Latham & Watkins on behalf of
22    Defendant Google.  I'm here with my colleagues
23    Sy Damle, Laura Bladow, Holly Victorson, and Brent
24    Murphy, also of Latham & Watkins.
25              I am not personally prepared to address
```

1    each of the 12 issues that are before Your Honor,

2    and so my colleagues may also be speaking today,

3    along with me.

4              THE COURT:  So it will be Ms. Tomkowiak --

5    am I pronouncing your name even close?

6              MS. TOMKOWIAK:  Yes, close.  The W sounds

7    like a V.  So Tomkowiak.

8              THE COURT:  Tomkowiak, and Mr. Damle.

9              MR. DAMLE:  Damle.

10             THE COURT:  Damle.  Okay, great.  Thank you

11   very much.

12             This is our first conference since the

13   district judge referred pretrial matters in this

14   case to me.  I'm hoping to get done by lunch, but as

15   I was saying to my law clerk as we walked in, we're

16   going to have to play that by ear.

17             Let me tell you generally the order in

18   which I propose to take the motions.  I'm going to

19   start with Plaintiffs' August 5th omnibus motion,

20   for which I understand five of the six topics are

21   still live and require decision.  Then I thought I

22   would go to Google's August 5th motion, which has

23   two main topics in it.  Then, going in more or less

24   chronological order, I would go to Plaintiffs'

25   August 20th multipart motion.  And then I would

1    circle back around to the issues raised in the

2    parties' July 25th letter, principally having to do

3    with discovery deadlines going forward.

4           So if that helps you organize your thoughts

5    and who's sitting where, that's fine.  I'm prepared

6    to start with the Plaintiffs' August 5th motion.

7    And whose motion is that for Plaintiff?  Who's going

8    to be addressing the Court on that one?  That's

9    Mr. Murphy?

10          MR. KANE:  I will, Your Honor.  I'm Jeff

11   Kane.

12          THE COURT:  Oh, Mr. Kane, I'm so sorry.

13   You're all new to me.  I'll get better at this as we

14   go along.

15          MS. MURPHY:  I'm Michele Murphy, so it's

16   fun.

17          THE COURT:  Michele, not Michael.  Okay.

18          So, Mr. Kane, I obviously read the

19   arguments in the order in which they were presented

20   in the letter briefing.  So I'm kind of assuming

21   that you're going to take the topics in that order,

22   but warn me if you're not.

23          MR. KANE:  That's fine with me, Your Honor.

24   I can start with Roman I, the data post-dating

25   September 16th, 2024.

```
 1              THE COURT:  Right.  So let me just, at the
 2    very outset, tell you that as far as I understand
 3    the district judge's prior ruling, September 16th
 4    was not meant to be a hard cutoff for everything.
 5    On the other hand, we can't keep doing this forever.
 6    The goalpost can't keep moving.  And I can't keep
 7    having you come back next month and saying, now we
 8    need documents through September of 2025, and the
 9    month after that saying now we need documents
10    through November 2025, et cetera.  So I'm going to
11    be looking to you, and obviously to the loyal
12    opposition as well, to come up with something here
13    which is sensible and proportionate.
14              So what do you propose?
15              MR. KANE:  Yeah, so the July 21st, 2025
16    cutoff that we propose, we envision being the
17    cutoff, you know, generally.  We're not planning to
18    come back and say, well, now we need it through
19    September, as you suggested.  You know, I can't
20    completely foreclose that if something, you know,
21    very unexpected happens.
22              THE COURT:  But the date that you proposed
23    was essentially yesterday at the time you wrote your
24    August 5th letter.
25              MR. KANE:  That's correct.  And the reason
```

1    for that is --

2              THE COURT:  Why do you need it to come up

3    so close?

4              MR. KANE:  So the reason for that is we've

5    continued to see the very pirates who advertised the

6    works in suit in this case continuing to advertise

7    other of Plaintiffs' works on Google's platform,

8    even though Google claims that they've terminated

9    those merchants.  So Google claims to have

10   terminated nearly every pirate at issue in this

11   case.  But what Plaintiffs have seen is that in the

12   months after September 16th, 2024, Google has

13   continued advertising those pirates.  And, in fact,

14   Google itself claims that it terminated hundreds of

15   those pirates after September 16th, 2024.

16             THE COURT:  When after September 16th,

17   2024?

18             MR. KANE:  I believe the last date they

19   claimed to do it is in February of 2025.

20             THE COURT:  Maybe that's a good date for

21   us.

22             MR. KANE:  The problem with using February

23   2025 is, if they claim that they terminated the

24   merchant on, let's just say, February 15th, 2025,

25   what we need to see is, did they actually terminate

```
 1    it?  So we need to see, did they run any ads for
 2    that merchant after that date, did they earn any
 3    revenue from that merchant after that date?
 4         So if they claim they terminated on
 5    February 15th, we need to go some distance after
 6    that to see whether they actually did.  So we saw
 7    ads through July 21st, 2025.  We're willing to
 8    accept that as, you know, just -- even if there were
 9    ads that have continued to run after that, we're
10    willing to use July 21st, 2025.
11         THE COURT:  That's big of you.  If you had
12    written your letter in September, you would have
13    been willing to accept a date in August, right?
14         MR. KANE:  I mean, what we're dealing with
15    here, though, Judge, is that despite us sending
16    hundreds of notices and filing a lawsuit, Google has
17    continued to advertise these pirates.  And we think
18    that's very relevant to a fact finder and to a jury
19    who has to decide damages.  In other words --
20         THE COURT:  I understand your theory, but
21    on the other hand, in order to prove that, in order
22    to support that factual allegation, you don't need
23    every ad that they've ever run at any point in time,
24    right?  You need -- I'm thinking of what your
25    presentation might be at summary judgment or trial.
```

1    You -- you need some showing that these ads kept

2    showing up after the date on which Google claimed to

3    have taken them down.  You don't need every ad on

4    every date.  You need a sample.

5            MR. KANE:  I think it's right to say that

6    we don't need every ad on every date.  When the

7    parties were negotiating this, Google suggested

8    March 31st, 2025 as a cutoff.  We told them that was

9    fine with us.  Google had attached some other

10   conditions to that.  Like they wanted a six-month

11   extension of discovery and they wanted a promise

12   that certain other discovery wouldn't be asked for.

13   We weren't able to do that.  We're perfectly happy

14   with a March 31st cutoff for this.

15           THE COURT:  Okay.  So that's your best

16   offer today, March 31st, correct?  Do we want to

17   stop here?  Because I don't want to go through five

18   or six subtopics in a row and then forget what you

19   said about the first one before I hear from Google.

20   So, anything else you want to tell me about this

21   date issue?

22           MR. KANE:  Just one key thing is that

23   Google provided a list of the merchants they claim

24   to have terminated and the dates on which they claim

25   to have terminated them.  And several of those are

1    after September 16th, 2024.

2              THE COURT:  Okay.

3              MR. KANE:  But they didn't give us the data

4    that we need to verify whether they actually

5    terminated those people after September 16th, 2024.

6              So if Google is going to claim, oh sure, we

7    terminated this guy in February, they have to give

8    us the data that would show whether they actually

9    did.  They have to produce the ads that they ran for

10   that merchant, the revenue that they earned from it,

11   et cetera.  So I just want to --

12             THE COURT:  Well, but the ads that they ran

13   and the revenue they earned would be for the period

14   of time before they terminated them.  It wouldn't

15   show that they terminated them because proof that

16   they had terminated them would be the absence of

17   evidence, correct?

18             MR. KANE:  No, the opposite.  So if they

19   claim to have terminated it on February 15th, 2025,

20   and we see an ad running for it on March 20th,

21   2025 --

22             THE COURT:  Sure.

23             MR. KANE:  -- then we know they didn't

24   terminate the merchant.  So what we need is data

25   after the date they claim to have terminated it.

```
 1              THE COURT:  Which, if Google is telling you
 2      the truth, doesn't exist.
 3              MR. KANE:  Correct.  And that's why this
 4      should be discovery that they should produce.  If
 5      Google is right and they really did terminate these
 6      people, there should be hardly any data after
 7      September 16th, 2024.  They should run the same
 8      search that they --
 9              THE COURT:  I'm a little confused now
10      because you've just offered me a nice end-of-quarter
11      firm, hard cutoff proposal of March the 31st.
12      Granted, if I were to give everybody that date, it
13      wouldn't -- it wouldn't help you in the following
14      instance:  Suppose Google said, oh, we terminated
15      this one on March 15th, that would be too late in
16      the period for you to have good data on whether ads
17      continued running in April or May.
18              Okay.  But the point of a cutoff is to be a
19      cutoff.  A cutoff of March the 31st would give you
20      plenty of room to know whether terminations that
21      supposedly happened in September had or hadn't
22      happened.  It would give you plenty of room to
23      determine whether terminations which supposedly had
24      happened in December had, in fact, been effectuated,
25      et cetera, et cetera.
```

```
 1              So there's no date that would be perfect.
 2     But I don't want us to be in a
 3     difficult-to-administer situation where you have a
 4     cutoff date of X, unless Y, Z, and W, in which case
 5     you get to go this many weeks out or that many
 6     months out.  That's just not workable.
 7              What am I missing here?
 8              MR. KANE:  I think we're on the same page.
 9     I'm just saying, like, the cutoff date needs to be
10     far enough after the claimed suspension date in
11     order for us to be able to tell whether they did
12     terminate the merchants.
13              THE COURT:  And the claimed suspension
14     date, do I understand correctly, is September 2024?
15              MR. KANE:  For most of the merchants, they
16     claim they've terminated it by September 2024.  But
17     there are, I think, ███████████████████████
18     ████████   that they claim to have terminated after
19     September of 2024.
20              THE COURT:  And when do they claim to have
21     terminated those ██ ?
22              MR. KANE:  I think there's ██████████  that
23     are in January -- ████████████  that are in January
24     and February of 2025.
25              THE COURT:  Okay.  And some before that?
```

1    Some November, some December, et cetera?

2         MR. KANE:  Correct, yeah.

3         THE COURT:  March 31st is sounding like a

4    good compromise to me.

5         Why don't I hear from Google on this point,

6    and then I'll hear from you again on the next topic.

7         MS. TOMKOWIAK:  Thank you, Your Honor.

8    Yeah, we think that makes sense to go issue by

9    issue.  And my colleague, Ms. Victorson, is going to

10   handle this one.

11        THE COURT:  Okay.  Oh, wait, somebody else.

12        MS. VICTORSON:  Yes.

13        THE COURT:  You are Ms. Victorson?

14        MS. VICTORSON:  Yeah.  Holly --

15        THE COURT:  Okay.

16        MS. VICTORSON:  -- Victorson for defendant

17   Google.

18        THE COURT:  All right.  You know, I

19   generally have a rule, for future reference, one

20   lawyer per side, per motion.  Because each of these

21   motions is three, four, or five motions, I'm going

22   to treat them that way.  But two caveats.

23        First of all, let's only have one lawyer

24   per side within a topic.  And, second of all, you

25   have to be very forgiving when I can't remember your

1    names because there are a lot of lawyers here.

2              MS. VICTORSON:  Understood.

3              THE COURT:  All right, Ms. Victorson, go

4    ahead.

5              MS. VICTORSON:  Sure.

6              At the top, truly, what Google has asked

7    throughout this process is exactly what I think

8    we're landing on here, which is, just a hard date by

9    which we're going to cut off further productions of

10   this data.  So that's exactly what we're seeking.

11             We -- we proposed the March 2025 date as a

12   potential compromise.  And just to be clear, we did

13   not condition that compromise on a specific

14   extension, but we just want Your Honor to know that

15   what this data requires us to do is essentially go

16   through a cascading set of discovery requests by our

17   client.  So they've asked for a number of different

18   types of data that depend on each other.

19             So first, we have to identify the accounts

20   that are associated with the domains, collect all of

21   that data, then identify -- from that data, identify

22   the additional offers that are associated with the

23   accounts.

24             THE COURT:  The additional offers?

25             MS. VICTORSON:  Offers, yes.  So it just --

1    I just want to make sure we all understand, it just

2    takes some time.  And, understandably, that is why

3    our client does not -- wanted a hard date, and we

4    just don't want to continue to do this in piecemeal

5    fashion.

6         THE COURT:  Now, if I were to settle on

7    March the 31st, I now need to think about what the

8    order actually says so that there's no continued

9    sniping on this point.  Does it apply to specific

10   requests for production?  Does it apply to all

11   requests for production dealing with Google's claim

12   to have terminated specified merchants?  Does it

13   apply to the specific RFPs that are listed in

14   Plaintiffs' August 5th letter motion?

15        MS. VICTORSON:  I believe the data that

16   Plaintiffs are seeking applies to a number of

17   different RFPs.  I think it would make the most

18   sense for the parties to -- if we're agreeing in

19   principle on the date of March 2025, I think it

20   makes sense for the parties, in the first instance,

21   to confer and see if we can agree on the specific

22   language on what needs to be produced.

23        THE COURT:  Normally, I would say that's a

24   great idea, go forth and meet and confer, but you

25   guys don't have a really great track record thus far

1    bringing that home.  So maybe it makes more sense

2    for me to list out a bunch of RFPs to which this

3    date applies and tell you, as I unfortunately must

4    tell you, if you still disagree, try to work it out

5    and come back to me if you have to.

6         MS. VICTORSON:  Yeah, I think that works

7    too.  I believe -- so we have general categories of

8    data that the parties have been referring to in our

9    discussions, and so I believe what -- we agree that

10   this date would apply to are the notice data --

11        THE COURT:  Sorry?

12        MS. VICTORSON:  Sorry, the notice data.  So

13   that's the DMCA notices that have come in with

14   respect to the websites that Plaintiffs have

15   identified.  There are also communications

16   associated with that notice data that would be

17   included in that.

18        Second, there would be the offer data, so

19   that is the offers that are stored in a database

20   that could potentially become an ad at some point.

21   So we would include the offer data.

22        And then there are some statistics, I

23   guess, about the ads that were, in fact, run, so

24   reflecting impressions, clicks, and conversions for

25   ads that were run, connected to the offer IDs in

1    that offer data.

2              And then, finally, there is some revenue

3    data associated with the ads that we would produce.

4    I think those are the general categories that apply

5    to this dispute, but Plaintiffs certainly may have

6    another view.

7              THE COURT:  Well, let me check back with

8    Mr. Kane.

9              Does that sound like the right list to you,

10   Mr. Kane?

11             MR. KANE:  That is the list, I think.  The

12   one thing I would add is that when Plaintiffs send

13   an infringement notice that says, you know, this ad

14   is advertising infringing content, please take it

15   down, Google sends a response that says either we

16   took it down or we're not taking it down.  We should

17   get those responses regardless of when they came in.

18   In other words, if they're producing a notice that

19   someone sent on March 20th, they should produce the

20   associated response.

21             THE COURT:  A deadline is a deadline.

22             MR. KANE:  Okay.  It's just if they --

23             THE COURT:  I just don't want this to keep

24   creeping.

25             MR. KANE:  But yes, those are the

```
 1    categories.  The identifying information for the

 2    merchants, the offer and ads data, the notices, the

 3    revenue, the responses.

 4              THE COURT:  Okay.  I think we're done with

 5    topic number one.  It will be March the 31st.

 6              All right.  Let us move on, I guess, to

 7    topic number three, right?  Topic number two was

 8    resolved?

 9              MR. KANE:  That's right.

10              THE COURT:  Okay.  Are you still up,

11    Mr. Kane?

12              MR. KANE:  This will be Ms. Murphy, Your

13    Honor.

14              THE COURT:  Okay.  Ms. Murphy.

15              MS. MURPHY:  Your Honor, for this topic, I

16    would like to provide a printout of one of the

17    exhibits in the Complaint -- or, excuse me, of

18    images that are in the Complaint with certain figure

19    numbers, just to ground the discussion.

20              THE COURT:  Is this something I already

21    have or something you've whipped up for today?

22              MS. MURPHY:  I have printed it for today,

23    but it is in the Complaint.

24              THE COURT:  In the Complaint.  You

25    better -- you've shown it to Google and then you can
```

1    hand it to -- there we go.  You can hand it to

2    Ms. Kay, my deputy, in just a moment.

3           All right, I have the exhibit.  So we're

4    talking about four filters, right?

5           MS. MURPHY:  Correct.  So, again, these are

6    figures taken directly from the Complaint.  The

7    filters -- as you can see at the top in this

8    exhibit, two of them are applicable.  One is in a

9    red box, it's a PDF.  And the other one is ebook.

10   Also, sometimes there are filters that indicate that

11   something being advertised is a textbook, and there

12   could be one related to the number of pages.

13          THE COURT:  All right.  You're going to

14   have to hold my hand here and walk me through this

15   as if I were seeing it for the first time, please.

16          MS. MURPHY:  Of course, of course.

17          THE COURT:  Tell me what's happening in the

18   real world when somebody sits down to go shopping

19   online.

20          MS. MURPHY:  Yes.  So in this situation, in

21   the real world, it's probably a student, and they

22   need Plaintiff Elsevier's book, *Netter Atlas of*

23   *Human Anatomy*.

24          THE COURT:  And they want to get it as

25   cheaply as they possibly can.

1          MS. MURPHY:  Well, unfortunately, they have

2     a lot of options here.

3          THE COURT:  I see that.

4          MS. MURPHY:  Including very pirated ones.

5     So the student is searching for the title.  They

6     type it into the search bar.  You can see that right

7     at the top.

8          THE COURT:  *Netter Atlas of Human Anatomy*.

9     And Figure 5 shows what comes up without any

10    filters?

11         MS. MURPHY:  Well, it shows what comes up

12    in the first instance, but it does have the filters

13    because they're in the top row, right under the

14    search bar.

15         THE COURT:  PDF.

16         MS. MURPHY:  So it has the PDF filter, as

17    well as the ebook filter in this example.

18         THE COURT:  Why am I not seeing the ebook

19    filter?  I'm just seeing the PDF figure in red.  I

20    mean, I'm seeing the PDF filter with a red bar

21    around it.

22         MS. MURPHY:  On the right, there is also an

23    ebook filter that's just not circled.

24         THE COURT:  So has the user applied these

25    figures -- these filters yet?

1          MS. MURPHY:  That's what will show in the
2     next figure, 6.
3          THE COURT:  Oh, I see.  All right.
4          MS. MURPHY:  Yes.
5          THE COURT:  So Figure 5 shows the filters
6     available, but they haven't been clicked on yet.
7          MS. MURPHY:  Correct.
8          THE COURT:  Okay, got it.
9          MS. MURPHY:  Correct.  Then in Figure 6,
10    the user clicked on the PDF filter in that instance.
11    You can see that that added PDF to the user search.
12    And then the results showed two pirate sites right
13    up front, one selling a pirated copy of the book --
14    it says an ebook right there in the ad.
15          THE COURT:  It says "ebook PDF" on the
16    first one.
17          MS. MURPHY:  Yes, ebook and PDF, both of
18    which aren't allowed -- and I'll come back to
19    that -- for $30.  And next to that, we also have
20    another pirate site selling the book.  And this, if
21    you go click through, this will absolutely be a
22    digital PDF copy for $19.79.
23          THE COURT:  Okay.  And the ones which are
24    not boxed, the ones that are $54 from Walmart and
25    $89 from, I guess, the actual publisher, those are

1    not pirated, correct?

2            MS. MURPHY:  Correct.  Correct.

3            THE COURT:  Are they PDFs?

4            MS. MURPHY:  No.  No.  The publishers and

5    their legitimate distributors do not sell digital

6    books as PDFs.

7            THE COURT:  Then why are they coming up

8    when you apply the PDF filter?

9            MS. MURPHY:  In this instance, I can't

10   answer that for sure.  I don't think applying the

11   PDF filter means necessarily that every single ad

12   you'll see is a PDF, but it certainly targets that

13   search to look for it.

14           So, yes, just to answer that question,

15   though, because it's significant, the publisher's

16   digital books are protected by DRM.  They are not a

17   PDF that can just be then distributed to anybody and

18   everybody who may want a copy.

19           THE COURT:  Right.

20           MS. MURPHY:  They also have additional

21   features, accessibility features, interactive links,

22   certain things that just a static PDF that these

23   pirates sell would not include.

24           THE COURT:  Okay.

25           MS. MURPHY:  Google knows that.  We know

1    from Google's documents that we have reviewed that

2    they understand that PDF copies like this are not to

3    be sold, that they are pirated.

4         THE COURT:  That all PDFs are

5    infringements?

6         MS. MURPHY:  Yes, yes.  Of this nature, of

7    this nature.  Could there be some PDF that actually,

8    like, has protection?  That's possible.  But the

9    PDFs that we're talking about are all pirated and

10   Google knows it.

11        So, first, this begs the question, why is

12   this here?  If they know that -- we've told them

13   that through communications we've had with them and

14   they know it from their own communications -- why is

15   it here?  Why would -- this didn't appear in a

16   vacuum.  So all we're asking for at this phase of

17   discovery is documents that might speak to this.

18        This is relevant to Google's knowledge of

19   its contributions to the infringement.  It's

20   relevant to the material contribution itself.  And

21   so we're entitled to discovery to see what's going

22   on here with this.

23        THE COURT:  Couple of questions.

24        MS. MURPHY:  Yes.

25        THE COURT:  First, you say you asked for

1    this in Request for Production Number 65.

2              MS. MURPHY:  Correct.

3              THE COURT:  And it may be that you've

4    quoted all of 65 here on page 5 of your August 5

5    letter.  We can't find RFPs north of -- let's see,

6    how far did we get -- I think 58 in our file.  Now,

7    that doesn't mean -- we have RFPs 1 through 58 at

8    Document 47-2.  We haven't been able to find

9    anything past that.  If it's somewhere on the

10   docket, we tried.

11             MS. MURPHY:  Okay.  We could certainly

12   provide that.  I know that Your Honor has a very

13   specific rule about including the full --

14             THE COURT:  Including the ones --

15             MS. MURPHY:  -- RFP.

16             THE COURT:  -- that we're arguing about,

17   that's right.

18             MS. MURPHY:  When we did present the letter

19   to Judge Rochon, that same rule didn't apply.  So we

20   may have put this in an attorney declaration or just

21   quoted it in the letter.

22             THE COURT:  Well, I don't think it's

23   attached to the Kane declaration, which is the

24   declaration that goes with this letter.  But I will

25   take your word for it, unless your opponent pops up

1    and disputes it, that you have accurately quoted

2    RFP 65 in your letter.

3                MS. MURPHY:  Yes.

4                THE COURT:  All right.

5                Now, you've explained to me that anything

6    that comes up using the PDF filter is presumptively

7    a pirate.  Why is that true for all four of the

8    filters that you're interested in?

9                MS. MURPHY:  So let me address the ebook

10   filter next.

11               THE COURT:  Okay.

12               MS. MURPHY:  So the ebook filter is

13   relevant because Google has a policy, a

14   public-facing policy that we'll talk about with

15   respect to some of the other issues, that says

16   people can't advertise ebooks in their shopping ads.

17   Now, they don't follow that policy for the pirates.

18   We're obviously seeing that right here on this

19   exhibit.

20               But just for a quick bit of history, when

21   this problem of the pirate ads started to grow and

22   grow, we actually reached out to Google -- this was

23   years ago -- for help.  The publishers talked with

24   Google about what can we do about this situation.

25   We're sending all these notices that ads aren't

1  coming down.  And Google's response was to

2  supposedly just ban ebook ads altogether.

3          THE COURT:  For everybody, legitimate

4  publishers and pirates?

5          MS. MURPHY:  That's what their

6  public-facing policy says on its face.

7          THE COURT:  So where are you supposed to --

8  because I have kids in college and they are required

9  to obtain ebooks for various courses.  Where are you

10 supposed to get your ebooks?

11         MS. MURPHY:  You can still see an ad for a

12 book, but you -- under their policy, the person

13 selling the book is not supposed to be able to

14 advertise at the ebook price.  So that's really

15 important for our publishers, because that's the

16 lowest price.  So you see Elsevier Health -- in

17 these examples, they had to advertise likely at

18 their print price, which is going to cost more.  So

19 the ad itself is not supposed to link to a page

20 where the ebook is being sold.

21         THE COURT:  But Elsevier sells ebooks, yes?

22         MS. MURPHY:  They do.

23         THE COURT:  So I'm a college student.  I

24 want to buy an ebook version of *Netter's Atlas of*

25 *Human Anatomy*.  It exists, it's legit, it's from the

```
 1   publisher, it's not from a pirate.  Where do I get
 2   it?
 3           MS. MURPHY:  You can still get it from
 4   Elsevier.
 5           THE COURT:  But I can't get it through
 6   Google, in theory, if the policy is working as
 7   stated.
 8           MS. MURPHY:  You wouldn't see an ad for the
 9   price.  You wouldn't be able to click through to a
10   landing page on our client's legitimate website
11   where what you see is their ebook.  And that's very
12   much a concern to them.  They want to be able to
13   advertise their ebooks.  They beg to --
14           THE COURT:  But they don't want the pirates
15   to be able to advertise their ebooks.
16           MS. MURPHY:  No, we don't.  We -- we are --
17   you know, Elsevier is a paying customer of Google.
18   They would like to be able to advertise at their
19   ebook price.  Google said, you know what, we're just
20   going to cut all this off, and then proceeded to go
21   ahead and let the pirates through, selling their
22   ebooks, as we see in this example, for years.
23           THE COURT:  So if there is a public-facing
24   policy saying no ebook advertisements, why is there
25   an ebook link?  Yes, I know this is a question for
```

1    Google.  I'm going to ask them in a minute.  But

2    what's your understanding?

3         MS. MURPHY:  That's exactly our question

4    here, Your Honor.  Again, if their policy says

5    they're not supposed to have ebook ads, why is it

6    here?

7         THE COURT:  Now, is their policy that

8    they're not supposed to have ebook ads for any books

9    or just for textbooks?

10         MS. MURPHY:  I believe --

11         THE COURT:  Can I buy the latest beach read

12    in ebook form?

13         MS. MURPHY:  I -- I think it's all -- I'm

14    not 100 percent certain, but I believe the policy

15    refers to digital books and that it excludes

16    audiobooks.

17         THE COURT:  I'm sorry, it ex- --

18         MS. MURPHY:  It says unsupported shopping

19    content is digital books, but not audiobooks.  In

20    other words, I think you could advertise audiobooks,

21    if that makes sense.

22         THE COURT:  But not ebooks, okay.

23         MS. MURPHY:  Yes.  But, again, the presence

24    of this filter is exactly why we need this discovery

25    to understand what's occurring here.  Because if

```
1    Google is saying on the one hand you can't advertise
2    ebooks -- obviously, they're allowing thousands of
3    pirates to do it.  This has been going on for years.
4    And it even goes beyond that.  They have a specific
5    filter that directs the user to it.  So --
6              THE COURT:  All right.  What's your problem
7    with PageLink, which allows someone who doesn't have
8    a lot of tolerance for reading lengthy literature, I
9    guess, to say, I only want short books?
10             MS. MURPHY:  The PageLink and the
11   TextbookLink, I wouldn't say we have a problem with.
12   It's just evidence of the fact that Google has this
13   information about these products.  It's able to
14   organize it in a way that it can provide pages.  It
15   can identify a textbook.
16             And so some of what Google has argued in
17   this case, for example, is this is just completely
18   automated.  We're not responsible for anything going
19   on here.  And so we think those -- we included those
20   filters in our request because we think they could
21   suggest that there's further evidence of what
22   Google -- what information Google has and how it
23   organizes it.
24             THE COURT:  That's a little far afield,
25   don't you think?  I understand your issues with the
```

1    PDF filter and the ebook filter.  I'm not really

2    understanding why the other two filters should, at

3    least even in theory, be within the scope of

4    discovery here just because there might be something

5    interesting in there.

6           If we could back up for a minute to the

7    ebook link and the PDF link, your document request

8    is very broad.  You want to know everything there is

9    to know, or you want documents showing everything

10   there is to know about the "creation,

11   implementation, and technical capabilities" of these

12   features.

13          Have you discussed with Google making that

14   a little more manageable?

15          MS. MURPHY:  Yes, Your Honor, we did

16   discuss this with Google, and we agreed that we did

17   not need to obtain source code.

18          THE COURT:  Well, that's a relief, I'm

19   sure.  What else did you suggest?

20          MS. MURPHY:  We agreed to really focus, I

21   would say, mostly on the creation and implementation

22   part of the request, so we don't need details behind

23   the engineering as to, you know, how from a

24   technical standpoint these filters appear.  And

25   maybe that's source code, maybe it's something else.

1  So we've agreed with them that we are not -- we are

2  willing to compromise by not seeking that.

3          But what we are looking at is, with respect

4  to creation and implementation in particular,

5  documents that would, for example, explain the

6  circumstances of why do these appear, do they have a

7  purpose, and did Google consider doing anything

8  about them as this dispute, you know, even

9  pre-litigation, continued to evolve?  Or, after we

10 sued them, did they say, hey, we need to get rid of

11 these, this is a problem?

12         So if there are any documents discussing

13 the implementation of them from that perspective, we

14 would seek those.

15         THE COURT:  When, if, you know -- and,

16 again, I'm focusing on the PDF and the ebook

17 filters, which I understand your issues with.  When

18 did these filters show up on Google?  When were they

19 created?

20         MS. MURPHY:  I don't know the answer to

21 that for sure, but from our vendor's observation,

22 the PDF filter showed up at some point and was not

23 previously there.  So that was of -- that wasn't a

24 good answer.

25         THE COURT:  I would have known that even if

1    you said --

2              MS. MURPHY:  That wasn't a good answer.

3    Let me try again with that one.

4              THE COURT:  Okay.

5              MS. MURPHY:  I believe -- and this is just

6    from, like, anecdotal observation -- that when we

7    first started sending notices to Google about these

8    pirated books, the PDF filter was not there.

9              THE COURT:  Well, when did you first start

10   sending notices to Google?

11             MS. MURPHY:  We first started sending

12   notices to Google in June of 2021.

13             THE COURT:  So this filter appeared

14   sometime after that, you think.

15             MS. MURPHY:  Correct.  And we brought suit

16   in June of 2024.  And it was before we brought suit.

17             THE COURT:  Okay.  And same for the ebook

18   filter?

19             MS. MURPHY:  The ebook filter, I'm not

20   sure.  I don't know when that appeared.

21             THE COURT:  All right.  And is it your

22   understanding -- and, again, forgive me for asking

23   these basic questions that my own college students

24   would probably know the answer to.  Do these filters

25   appear across Google Shopping or only when you get

1    into the sort of world of books?

2              MS. MURPHY:  I would expect that they

3    appear when somebody is searching for a book.  If I

4    were searching for black boots, I don't think PDF

5    would apply, but --

6              THE COURT:  That was what prompted my

7    question.

8              MS. MURPHY:  Yeah, yeah.

9              So I think, again, that shows why these

10   are -- you know, these are specific, and this

11   request is tailored to the issues that are highly

12   relevant in this case.

13             THE COURT:  All right.  Let me hear from

14   Google on these filters.

15             Who's this?

16             MS. TOMKOWIAK:  Mr. Damle will handle this

17   one, Your Honor.

18             THE COURT:  All right.

19             Mr. Damle.

20             MR. DAMLE:  Thank you, Your Honor.  And

21   thank you for your understanding in allowing

22   multiple of our attorneys on our team to argue

23   before you today.  Really appreciate that.

24             So I think maybe where I'll start is if --

25   we've provided two exhibits.  They are Exhibit 3 and

```
 1    4 to our opposition to the first omnibus motion.
 2              THE COURT:  They are exhibits to your
 3    declaration.
 4              MR. DAMLE:  To our -- yes, to
 5    Ms. Tomkowiak's declaration.
 6              THE COURT:  All right.  The exhibits were
 7    filed under seal, but I have them here.
 8              MR. DAMLE:  Okay.
 9              THE COURT:  Wait, I'm not sure I do have
10    them here.  Exhibit 161-1 has to do with the -- that
11    thing with the funny name, the ████████ .
12              MR. DAMLE:  Your Honor, I believe the
13    docket number is 173-3 and 173-4.
14              THE COURT:  Uh-oh, now I'm in trouble.  All
15    right, give me a minute, if you don't happen to have
16    a copy with you.  173-3 and 4?
17              MR. DAMLE:  Yes, Your Honor.
18              THE COURT:  Okay, just a sec.
19              All right, I'm looking at 3 at the moment.
20              MR. DAMLE:  Okay.  I think 3 is probably --
21    that's good enough.  4, I can explain what 4 is,
22    which is just another view.
23              So here you'll see this is a search on --
24    and this is just to give some more background on how
25    these filters work, which I think is helpful and
```

1    helpful for understanding the burden involved in

2    producing the requested discovery.

3           Here you see a search on the Google

4    Shopping platform for a printable nutrition chart.

5           THE COURT:  I'm looking at something that

6    says "Page Vault" at the top, right?

7           MR. DAMLE:  Yes, correct.  And if you

8    scroll to the next page, that is a --

9           THE COURT:  That's a screenshot.

10          MR. DAMLE:  -- screenshot from a Google

11   Shopping page.  And you can see --

12          THE COURT:  Okay.  So somebody has sat down

13   to go shopping for a printable nutrition chart.

14          MR. DAMLE:  Correct.  And so you'll see

15   here -- you'll see that search term, the search tag

16   at the top.  You'll see a list of them.  It says,

17   "flashcards," "books," and then you'll see "PDF."

18          THE COURT:  I do see that.

19          MR. DAMLE:  Yes.  So the way these features

20   work is, that they're generated algorithmically and

21   automatically, and what they do -- and this is --

22          THE COURT:  So they don't come up when

23   you're shopping for boots.  They do come up when

24   you're searching for something that might be --

25          MR. DAMLE:  That might be in PDF.

```
 1                And the way it works -- and this is public
 2      information.  The way it works is that Google is
 3      looking at other users' searches to try to determine
 4      what are the -- some of the features that people
 5      will search for.  So you ask the question, do these
 6      kinds of tags come up when you're searching for, for
 7      instance, clothing?
 8                So if you search for men's jackets --
 9                THE COURT:  You're not going to get a PDF.
10                MR. DAMLE:  -- you're not going to get a
11      PDF, but Google will know that other people have
12      searched for things like a black men's jacket or a
13      leather men's jacket.  And so it will suggest, based
14      on those past searches --
15                THE COURT:  Relevant filters.
16                MR. DAMLE:  -- relevant -- relevant
17      filters.
18                And so when you click on it, what Exhibit 4
19      shows you is all that's happening is that the search
20      is being rerun with that additional word added in.
21      So you add the word --
22                THE COURT:  As if you had added that term
23      yourself in the search bar?
24                MR. DAMLE:  Exactly correct.  Exactly
25      correct.  And so these search suggestions, really,
```

1    are generated dynamically, generated automatically.

2            THE COURT:  Okay.

3            MR. DAMLE:  And this is a common feature

4    across all of Google's search products.  So, for

5    instance, if you search for my name, "Sy Damle," on

6    Google Images, you will get similar sort of search

7    suggestions that say "Latham & Watkins," my law

8    firm.  You'll see a lawyer tag.  You'll see

9    copyright, because I'm a copyright lawyer.  So

10   you'll see those tags.

11           Now, it's not like anybody at Google has

12   gone in to say, hey, there's this guy named Sy

13   Damle, he is like a copyright lawyer at Latham &

14   Watkins, let's add these tags.  Obviously what's

15   happening is that dynamically they're recognizing

16   that I'm associated with these additional terms, and

17   so they suggest automatically to add those terms in.

18           If you were to click on one of those

19   buttons, "Latham & Watkins," you would see pictures

20   of me in my -- you know, my --

21           THE COURT:  Suit.

22           MR. DAMLE:  -- my suit, exactly.

23           THE COURT:  Yeah.

24           MR. DAMLE:  So that's what's happening --

25   that is what is happening here.

1          THE COURT:  I understand, at a high level,

2    what you're saying, and I understand that the

3    process is dynamic and that there's a bunch of very

4    complicated algorithms that determine what filters

5    come up depending on what you're searching for, and

6    they probably change over time as people's search

7    patterns evolve and so forth.

8          But I do think Plaintiffs ask an

9    interesting question with respect to at least the

10    first two filters, the ebook and the PDF.  And maybe

11    I should pose the question in the form of a why

12    didn't you carve a space out?  If Google has a

13    public-facing policy saying we're not going to

14    permit ebook sales of these textbooks and we're not

15    going to permit PDF sales of these textbooks, then

16    why can't Google also prevent those filters from

17    coming up when a consumer is searching in the

18    textbook space?  Because it does seem to point the

19    consumer to that which Google claims it's trying to

20    discourage, if not prohibit entirely.

21          MR. DAMLE:  So I have a couple of levels of

22    responses.  I'll give you sort of the practical one,

23    and there's a legal point I want to make.  One is,

24    there is nothing illegitimate about searching -- so

25    let's talk about ebooks.  Just to be very clear

1    about what the ebook ban does -- and I don't think

2    that there's any dispute about this -- all the ebook

3    ban does is it bans paid advertisement for ebooks.

4    A lot of listings on Google Shopping are free.  No

5    one pays for them.  You just have your information

6    in Google Shopping, and, you know, if someone

7    searches for your product, it will pop up

8    organically.  And so Google has not banned ebook

9    advertisements for unpaid, or free listings, as we

10   call them, only -- they have only banned paid

11   advertisements for ebooks.

12           So it would be perfectly legitimate, if

13   somebody is searching for an ebook, for that ad to

14   come up.  This has nothing to do with the ban on

15   ebooks.  So that is one reason why it would make no

16   sense to try to have that kind of system in place

17   where you try to say, okay, we're not going to let

18   you search for ebooks because there are

19   circumstances under our own ban where we allow

20   ebooks to be advertised on Google Shopping.  So

21   that's one.

22           The other thing, PDF.  I believe Ms. Murphy

23   said that, invariably, when you search for a

24   textbook in PDF, that it is going to be a pirated

25   textbook.  And that's also not true.  There are a

1    lot of textbooks out there that are free.  I teach

2    copyright law.  I happen to use a Creative Commons

3    copyright law textbook which is available to my

4    students for free in PDF.

5            And so that would be the kind of thing that

6    you should be able to search for.  If you search for

7    "copyright law PDF," you should be able to see the

8    legitimate, free options for those.  And so PDF,

9    again, is another filter that, you know, is

10   appropriate in many circumstances to have, not just

11   in -- and not just in textbooks, in all kinds of

12   books.

13           And so, again, there's no real connection

14   between -- and then the legal point I'd make is that

15   there's no real connection between this entire

16   discussion and the core of what Plaintiffs' theory

17   in this case has been.  We talked about

18   terminations.  The theory that they have in this

19   case is that Google was aware of these particular

20   merchants --

21           THE COURT:  And didn't take them down -- or

22   didn't take them down --

23           MR. DAMLE:  And they didn't take them down

24   after receiving notices.

25           THE COURT:  Right.

1          MR. DAMLE:  This is about something else

2     entirely.  And it's a more attenuated theory that

3     they have.

4          On the flip side, when we think about

5     burden, if I could talk about that for a little bit,

6     because this is a dynamic algorithm, the sort of

7     purported limit they put in place, saying, oh, we're

8     only asking for --

9          THE COURT:  We're not asking for the source

10    code, is what I heard them say.

11         MR. DAMLE:  Right.  We're not asking for

12    the source code, but we're asking for all these

13    documents about the implementation that leads to

14    these PDF -- these tags appearing.  And, again,

15    there's not some decision that's being made because

16    these are dynamic.  There's not some decision that's

17    being made to say, okay, let's have --

18         THE COURT:  No, but there might be -- there

19    might be documents in Google's possession, custody,

20    and control that discuss the intersection of these

21    filters and the pirating problem.  There may well be

22    memos or email or Slack conversations, or whatever

23    the heck people use to talk to each other these

24    days, addressing the very concern that Plaintiffs'

25    lawyers have raised, which is -- and I'll just

1    oversimplify here -- do these filters make it way

2    too easy for a pirate seller?  Not a paid ad,

3    perhaps, but even an unpaid ad.  Do they make it way

4    too easy for the pirates to find their customers?

5    And is it your view that that's simply not an issue

6    in the case at all, because the only issue in the

7    case isn't encouraging piracy, but taking it down

8    fast enough?

9            MR. DAMLE:  No, not at all, Your Honor.

10           And in fact, we have searched for and

11   produced whatever documents we have related to

12   ebooks and shopping and piracy.  So if documents

13   like those existed, they would have come up within

14   our searches, right?  That's a more targeted type of

15   search that we're talking about.

16           THE COURT:  You've run searches, and,

17   obviously, we're going to get to the question

18   whether you've run them across all the right

19   custodians, but you've run searches using terms like

20   "PDF and ebook policies," "free ads," "paid ads,"

21   that kind of thing?

22           MR. DAMLE:  I don't believe we've run "PDF"

23   as a search term.  I don't know that that was even

24   proposed as a search term.  I'd have to go back and

25   look.  So that's not one that we've run, but we have

1    run search terms related to our approach to piracy

2    involving ebooks.  And so there was --

3         THE COURT:  But not involving PDFs.

4         MR. DAMLE:  I think the search terms would

5    have been broad enough to capture that, but --

6    right?  So, I mean, if you're searching for piracy

7    and ebooks and across all the custodians that are

8    involved in this, this is not -- this is not about,

9    like, what is Google's approach to piracy of ebooks

10   in this space.  We've produced a lot of documents

11   about that.  What we haven't done -- what they're

12   asking for now is, for us to search a totally

13   different set of systems about the particular

14   functionality here of these filters.

15        So, you know, I don't know that that's

16   where that kind of information that you're

17   suggesting, Your Honor, is going to turn up.  It

18   would be with the custodians that we've already been

19   searching.

20        So, we have on -- if you look at our --

21   this is our August 28th letter.  This is Docket

22   Number 199.  You can see some of the search terms,

23   it's on page 8.

24        THE COURT:  Hold on.  All right, I'm with

25   you.

```
 1              MR. DAMLE:  You can see some of the breadth
 2    of some of the search terms that we have run here.
 3    This is obviously about a different issue, but it
 4    gives you a sense of how broad --
 5              THE COURT:  This is in the discussion of
 6    the ██████████, I assume?
 7              MR. DAMLE:  Correct, correct, correct.
 8    There's two search terms that we've extracted there.
 9    So conveniently, they're here.
10              THE COURT:  So let me -- I don't mean to
11    cut you off, but it might be helpful for both sides.
12    Let me tell you what I'm thinking about this issue
13    now that you've educated me.  Thank you.  And I
14    apologize that I needed to be educated to come up to
15    speed here.  This may happen more --
16              MR. DAMLE:  So did I --
17              THE COURT:  -- I warn you.
18              MR. DAMLE:  -- believe me.
19              THE COURT:  Here's what I'm thinking.
20    RFP 1 -- and RFP 65, as written, is way too broad
21    and goes well beyond any proportional discovery
22    here.  I think there may be some additional
23    discoverable documents dealing specifically with the
24    first two filters, PDF -- the PDF filter and the
25    ebook filter, particularly as they pop up and are
```

1    implemented in the textbook space.

2            What I think, and I'm not going to say this

3    very -- in a very surgical way, I'm afraid.  What I

4    think the Plaintiffs are probably entitled to -- to

5    the extent that your existing search terms haven't

6    already captured responsive documents, what I think

7    the Plaintiffs are probably entitled to with respect

8    to these two filters, are any internal discussions

9    at Google, whether these internal discussions

10   happened when the filters were being engineered,

11   implemented, created, what have you, or whether

12   these internal discussions happened, you know, in

13   the course of responding to the Plaintiffs'

14   concerns, either prior to or after the filing of

15   this case, as to the effect of these two filters on

16   the piracy problem in the textbook space, whether

17   they inappropriately encourage pirate sellers, and

18   whether Google has given any thought to modifying or

19   tweaking its algorithms in response to that concern.

20           Now, I didn't state that in a way that's

21   going to be easily translatable into three nice,

22   crisp search terms, but this is what I'm sort of

23   fumbling towards as something that might make sense

24   here.  It doesn't sound like the existing searches

25   have necessarily reached these concerns.

```
1              I do think, as I said, 65 as written, is --
2    sprawls all over the place, and I'm not inclined to
3    go there.
4              So let me have Google's response to that,
5    and then I'll hear again from Ms. Murphy.
6              MR. DAMLE:  Your Honor, that would make
7    sense.  You know, we would suggest that we could
8    propose some terms to address that.  I think our
9    terms have swept broadly enough.  You know, just to
10   go back to the PDF point, if you run "PDF" as a
11   search term, it's going to return every .pdf file in
12   somebody's records.  That's -- you know, it's going
13   to --
14             THE COURT:  I understand.
15             MR. DAMLE:  There are challenges with
16   certain terms, but we can take that back and propose
17   a couple of search terms across our existing
18   custodians.  We think our existing custodians -- I
19   know we're going to discuss custodians later
20   today -- they would have any of the documents that
21   address those topics.  I don't think there's a need
22   to go to, you know, engineers that helped build
23   these filters.  They wouldn't have this information,
24   and our existing custodians will be able -- would
25   have anything like that.
```

```
 1              THE COURT:  All right.  Let me hear from
 2     Ms. Murphy then.
 3              MS. MURPHY:  Thank you, Your Honor.  A
 4     couple of points in response.
 5              Just to confirm, PDF is not a search term.
 6              THE COURT:  But I also -- I take
 7     Mr. Damle's point.  It's hard to make PDF a search
 8     term and not make yourself crazy, right?
 9              MS. MURPHY:  I think there would be a way
10     to do it by eliminating from the search if it's
11     .pdf.  So I think that we could take care of that.
12     PDF is critical to this whole --
13              THE COURT:  PDF only without a dot and in
14     connection with certain other terms.
15              MS. MURPHY:  Yeah, perhaps.  You know, I --
16     we certainly wouldn't want a response that includes
17     every .pdf file that Google has.  But I think where
18     Your Honor was going with this is acceptable to the
19     Plaintiffs, focusing on the ebook link and -- or
20     filter and the PDF filter.
21              I am concerned about custodians because I'm
22     not sure at all that the same custodians would
23     capture the documents that we're looking for.
24              THE COURT:  Well, why don't you save that
25     thought for now, because we have a couple of
```

1    categories coming up where you are asking me to

2    include additional custodians.  And when we get

3    there, you can tell me which of those, if any, would

4    be the right custodians for this issue, or if in the

5    next 10 minutes you think of who the custodians

6    should be, you can tell me that, too.

7         MS. MURPHY:  Well, I think part of the

8    problem is we don't know.  We don't know because we

9    don't work at Google.  And that's sort of why we're

10   here with this broader custodial dispute.  But I

11   know Mr. Damle said this is burdensome, we would

12   have to search an entirely different set of systems.

13   So that says to me there might be different people

14   who would have the very types of documents that, if

15   they exist, we would be entitled to see.

16        THE COURT:  All right.  Well, let me take a

17   minute then.

18        Mr. Damle, you did sort of put your foot a

19   little bit over the threshold there.  Where would we

20   get relevant documents from?

21        MR. DAMLE:  I think the statement that I

22   made before was when we were considering the full

23   breadth of their request, which was everything about

24   how these filters work.

25        THE COURT:  Right.  But I'm talking about

1   traditional documents, communications, memos, Slack
2   conversations --
3           MR. DAMLE:  Right.
4           THE COURT:  -- what have you.
5           MR. DAMLE:  Right.  I mean, targeted to the
6   sort of piracy problem and the relation of --
7           THE COURT:  Right.
8           MR. DAMLE:  -- these filters to those
9   piracy problems.  Our existing custodians are the
10  ones who are dealing with the issues that the
11  Plaintiffs have been raising prior to the lawsuit
12  around how to deal with the "piracy problem" on
13  Google Shopping with respect to textbooks, so ...
14          THE COURT:  And remind me.  Until today,
15  how many custodians are in the mix at the Google
16  site?
17          MR. DAMLE:  Apologies, Your Honor.  I don't
18  have it at the front of my --
19          THE COURT:  That's okay.
20          MR. DAMLE:  -- front of my brain.
21          MR. KANE:  I believe it's eight, Your
22  Honor.
23          MR. DAMLE:  Yeah, that sounds right to me,
24  too.
25          THE COURT:  Okay.  That seems a little

```
 1    slim.  And you think those -- you think those eight
 2    are still the right eight?
 3              MR. DAMLE:  Yes, Your Honor.  They are the
 4    ones who would be -- you know, to the extent that
 5    what we're asking about now narrowly is, how has
 6    Google considered -- how have they evaluated the
 7    effect of these filters on piracy?  Have they
 8    considered changing those filters to try to mitigate
 9    piracy?  The seven custodians that we have are the
10    ones at Google that are addressing the -- that have
11    been dealing with the issues around piracy on Google
12    Shopping.
13              THE COURT:  All right.  So I'm going to
14    leave it for now, unfortunately, somewhat vague.
15    You really do not want your Magistrate Judge
16    constructing search terms for you.  You're in
17    trouble if it comes to that.
18              So I'm going to leave it for now that I'm
19    going to allow discovery in this area narrowed, as I
20    just discussed, specifically to the two filters, the
21    PDF filter and the ebook filter, and specifically to
22    documents or communications where Google internally
23    is discussing the effect of these filters on the
24    piracy issues that the Plaintiffs have raised,
25    including -- and I think this is an important
```

1    including -- any discussion of whether and for what

2    reasons the program or the algorithm should be

3    tweaked to address the piracy concerns.

4           And I'm afraid I'm going to have to leave

5    it to the parties for now both to work out what

6    specifically the additional search terms should be

7    and, at least in the first instance, to discuss

8    whether either the existing eight custodians or any

9    custodians that I add onto the list before we get

10   done today are the right custodians for this

11   particular issue.  I don't have a view at the

12   moment, and I certainly don't have enough

13   information at the moment to know the answer to

14   that.

15          It may well be -- I'm speculating here --

16   that you need to add in somebody on the technical

17   side, somebody who actually sits around working on

18   what the algorithms are for the filters.  They may

19   be in touch with the policy people, with the people

20   who are supposed to make sure that Google complies

21   with the copyright laws.  I don't know.  Maybe yes,

22   maybe no.  But I'm going to have to leave it to the

23   parties in the first instance to try and implement

24   that direction.

25          So I think we're done with topic three, in

1    which case we can move on to the first custodian

2    dispute, which is Section 4 of the Plaintiffs'

3    August 5th letter.  Who's up?

4              MS. MURPHY:  Mr. Kane.

5              THE COURT:  Mr. Kane.

6              MR. KANE:  So the first four custodians,

7    Your Honor, are all what Google calls legal agents.

8    These are the people who, literally, when Google

9    receives an infringement notice, read the notice and

10   decide what Google is going to do about it, whether

11   it's going to take down the infringing content or

12   not.  It's important --

13             THE COURT:  I have some very basic

14   questions here.  Okay, so these legal agents, are

15   they Google employees?

16             MR. KANE:  Some are Google employees, most

17   are vendors, meaning Google has contracted out to

18   another company that provides staffing to Google.

19   However, they all have @google.com email addresses.

20             We subpoenaed the vendor companies, and

21   both told us that in this particular space, the

22   personnel that they provide work entirely under

23   Google's umbrella.  So it's not like they hire some

24   other company and the other company does it.  The

25   vendor is simply providing personnel to Google.

1          THE COURT:  Okay.  And at the bottom of

2     page 7, the top of page 8 of your letter, you list

3     out the four legal agents, and you say that ████████

4     ████████████████████████████████████████████████████

5     ████████████████████████████████████████████████████

6     ███████████████████

7          Can you explain to me, in words of one

8     syllable or less, please, what it means for an agent

9     to be the agent for a URL?  Does this -- do the

10    agents get assigned to URLs when the URLs pop into

11    existence or only when somebody receives a notice?

12         MR. KANE:  Yeah.  So what happens is, a

13    rights holder sends a notice to Google, and the

14    notice will say, several Google Ads are advertising

15    infringing content, and they will list several

16    different web page addresses, URLs.

17         THE COURT:  URLs, right.

18         MR. KANE:  The key one for us is the

19    landing page URL, meaning, if you click on the

20    Google Ad, that's the website to which the ad takes

21    you.

22         THE COURT:  Okay.

23         MR. KANE:  So it also lists, like, the URL

24    for the ad itself.  Like, if you put that URL into a

25    browser, it would bring up the Google Ad itself.

```
 1    But the key one is the landing page of the URL.
 2              THE COURT:  The one that you click through
 3    to.
 4              MR. KANE:  Exactly.  So when you click on
 5    the ad, the landing page URL is the website to which
 6    the ad takes you.
 7              THE COURT:  All right.  Now, suppose you or
 8    some other rights holder sends in a notice with
 9    respect -- and lists a landing page URL which nobody
10    has ever complained about before maybe because it
11    was just invented yesterday.  Does a legal agent
12    somehow get assigned to it at that point?
13              MR. KANE:  I don't know how they're
14    assigned, but ███████████████████████████████████
15    ██████████████████████████████.  I don't know
16    whether they -- I don't know whether they have a
17    system for assigning them or if they have a way of
18    making sure that some of them are done automatically
19    or -- I don't know that.
20              THE COURT:  And then does the same agent
21    stick with the same URL if additional complaints
22    come in with regard to that URL?
23              MR. KANE:  █████████████████████████████
24    ███████████████████████  ████████████████████████
25    ████████████████████████████████████████████████
```

1    ████████████████████████████████████████

2    ██████████████████

3            THE COURT:  ██████████████████████

4    ██████

5            MR. KANE:  ██████  ████████████████

6    ████████████████████████████████████████

7    ██████

8            THE COURT:  All right.  Now what does the

9    legal agent actually do?

10            MR. KANE:  That's a good question.  What we

11    understand is that the legal agent ██████████████

12    ████████████████████████████████████████████

13    ████████████████████████████████████████

14    █████████████████████████████████████████

15    █████████████████████████████████████████

16    ██████████████████████████████.

17            THE COURT:  ██████████████████

18            MR. KANE:  ████████ █████████████████

19    ████████████████████████████ ████████████

20    ████████████████████████████████

21    ██████████████████████

22            THE COURT:  Which you don't think they do

23    fast enough?

24            MR. KANE:  Correct.  They have some way of

25    going into Google's system and saying, ████████████

```
 1  ███████████████████████████████████████████

 2  ███████████████████     In other words,     ███████████████

 3  ███████████████████████████████████████████████████████

 4  ███████████████████████████████████

 5          THE COURT:  Okay.

 6          MR. KANE:  So the other thing that the

 7  agents do that is extremely important to this case

 8  is when they take down an ad, ███████████████████████

 9  ███████████████████████████████████████████████████████

10  ███████████████████████████     ██████████████████

11  ███████████████████████████████████████████

12  ███████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████

15          ███████████████████████████████████████████████████

16  ██████████████████████████████     ████████████████

17  ████████████████████████████

18          THE COURT:  Or they have a ████████████

19  ███████?

20          MR. KANE:  Right.

21          THE COURT:  Okay.

22          MR. KANE:  ████████████████████████████████████

23  ████████  If a subsequent --

24          THE COURT:  And we have that database,

25  correct?
```

```
1              MR. KANE:  ███████████████████████
2    ████████████████████       This is --
3              THE COURT:  You have that ████████████?
4              MR. KANE:  -- ███████████████████████████
5    ███████████████████████████████████████████████████
6    █████████████████████████████ .
7              THE COURT:  Like in ███████?
8              MR. KANE:  Yeah.  It's literally an █████
9    ████████████████████████████████████████████████
10   ████████████████████████████
11      ████████████████████████████████████████████████
12   ████████████████████████████████████████████████████
13   ████████████████████████████████████████████████
14   ██████████████████████████████
15             THE COURT:  █████████████████████████████
16   ████
17             MR. KANE:  This is -- this is what they do,
18   Your Honor.  I -- it's inexplicable to me as well.
19             Or ████████████████████████████
20   █████████████████████████████████████████████████████
21   ██████████████████  ██████████████████████████████
22   █████████████████████████████████████████████████████
23   █████████████████████████████████████████████████
24   ██████████████████████████ .
25             THE COURT:  So you have both ██████████████
```

1 ████████████████████████████████████████████████

2 ████████████████████ ?

3          MR. KANE:  Yeah.  So we got the notices for

4 all of the pirates that we identified to Google.  We

5 didn't get them for other notices that other rights

6 holders had sent, not about those pirates.  But

7 that's what the legal agents do.

8          So they're critical both to the portion of

9 Google's defense where they have to take down the

10 infringing ad, as well as to the portion of Google's

11 defense where they have to terminate what the

12 statute calls repeat infringers, the subscribers and

13 account holders who are repeat infringers.

14          THE COURT:  All right.  Now, if you make

15 these folks custodians, what databases of theirs

16 would you have searched?  Their Google.com email

17 addresses?

18          MR. KANE:  It would be their email

19 addresses, any chats they were in, what we would

20 call just sort of custodial documents, meaning, if

21 they had documents on Google Drive or on their

22 computer or whatever -- the documents that are sort

23 of associated with those individuals.

24          THE COURT:  And what do you expect to find

25 in their emails or Google Drives that you're not

1    getting now?

2        MR. KANE:  Yeah, so a couple things.  One

3    is discussion of these particular pirates, so the

4    specific pirates that we identified to Google.  Did

5    they --

6        THE COURT:  Which is?  Give me the number

7    again.

8        MR. KANE:  There are 1,239 domains that we

9    identified to Google.  That boils down to a much

10   smaller number of pirates, because pirates will

11   operate more than one domain.  But we can use 1,239

12   as -- you know, for discussion.

13       THE COURT:  So, in particular, you want to

14   see if these folks, ████████████████████████

15   ████████████████████████, sent an email to

16   their boss about one of your targets?

17       MR. KANE:  Correct.  One of the things

18   we've seen in the production that we have so far is

19   ████████████████████████████████████

20   ████████████████████████████████

21   ████████████  ████████████████████████

22   So we'd be looking to see things like that.

23       THE COURT:  And where are you getting those

24   communications from?  Whose databases?  From what

25   custodians' documents have you found those?

```
1         MR. KANE:  There's a couple.  ███████████
2    ████████████████████████████████████████████████
3    ██████████████████████ ████████████████████████████
4    ████████████████████████████████████████████
5    ████████████████████████████  which we'll get
6    to later.  That's where we've seen most of that.  In
7    fact, it may only be  ██████████████████  where we've
8    seen that.
9         THE COURT:  Well, obviously, what I'm
10   probing you for here is, what's the marginal
11   benefit.  What do you think you're going to scoop up
12   from these folks?  Because adding a custodian means
13   adding a lot of work.
14        What do you think you're going to scoop up
15   from these folks that you're not getting from one of
16   these other sources?
17        MR. KANE:  Yeah.  I think one key thing is
18   these were the people who were actually doing the
19   work.  In other words, they were the ones who were
20   actually taking the infringement notices and
21   processing them.  ████████████████████████████████
22   ██████████████████████████████████████████████████████
23   ██████████████████████████████████████████████████████
24   ██████████████████████  that kind of thing.
25        And it's clear to us from reviewing  ██████
```

1    ██████████      that Google was not following that

2    process.    ██████████████████████████████████

3    █████████████████████████████████████████████

4    ███████████████████████████████████████

5    ███████████      So we want --

6            THE COURT:  Which explains why they didn't

7    take down the ad, presumably.

8            MR. KANE:  Why they didn't take down the ad

9    and why they didn't terminate that domain.  In other

10   words, why they kept running other ads for that same

11   domain, you know, for different functions.

12           THE COURT:  Because it didn't make it into

13   ██████████████████?

14           MR. KANE:  Exactly.  Yeah.

15           THE COURT:  You want to know if these

16   individuals can shed some light on that?

17           MR. KANE:  Did they discuss it with anyone?

18   Did they say, you know, "Oh, I don't understand how

19   I'm supposed to do this," or, "Oh, I didn't do this

20   on a particular domain"?  You know, we'd like to

21   understand, for the folks who were actually doing

22   this, what were they doing.

23           The other thing I would point out about

24   these custodians is all four of them are in India,

25   and so it's very unlikely that we'll be able to take

```
1    their deposition.  So it's all the more important

2    that we get their documents.

3           The other thing I would point out is, as

4    Your Honor --

5           THE COURT:  And you've picked four as a

6    kind of sample set, right?  You're not going to come

7    back to me and say now we need the other ███

8           MR. KANE:  There's a ██████████████████

9    ██████  who processed these notices, at least.  We've

10   picked these four based on they were the ones who

11   processed the most of Plaintiffs' notices or the

12   ones who processed the most notices overall.  So

13   that's why we selected those four.

14          We also selected -- with respect to ████████

15   ████████, they are folks who had actually ██████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████████

20   ████████ ███████████████████████ ████████████████████

21   ████████████████████████████████████████████

22          THE COURT:  Okay.  Now, Google has agreed,

23   as I understand it, to give you an individual ████████

24   ████████████████

25          MR. KANE:  That's correct.
```

```
1            THE COURT:  As well as the

2                                           ██ Who is the

3    ████████████████████████ why do you think

4    she's not sufficient?

5            MR. KANE:  Yeah.  So, the process I was

6    just referring to a minute ago, ████████████

7    ████████████████████████████████████████████

8    ████████████████████████████████████

9    ████████████████████████████████████████

10   ██████████████████████████████████ .

11           THE COURT:  All right.  So that's a

12   sensible custodian.

13           MR. KANE:  Correct.

14           What we want to know is, ██████████████

15   ████████████████████████████████████ what

16   were they doing.  In other words, ████████████

17   ██████████████████████████████████████ █ █

18   ████████████████████████████████████████████

19   ██████████████████████████████ .

20           THE COURT:  Well, who would it be discussed

21   in an email to?

22           MR. KANE:  Perhaps one of the other

23   custodians or perhaps another supervisor at Google.

24   In other words, of the ██████████████████ who did

25   this, they've given us one custodian, and it's an
```

1    appropriate custodian.  But in order to find out how

2    this was actually working, our understanding is that

3    ████████ was in more of a supervisory capacity.  So

4    we think we need people who are actually on the

5    ground processing these notices.

6            THE COURT:  Okay.  And do you have any

7    sense of -- you don't have a hit report, right?  No

8    test runs have been done here.

9            MR. KANE:  Unfortunately, for none of the

10   custodians we're discussing today has Google

11   collected the documents, applied our search terms,

12   and told us how many hits they have.

13           THE COURT:  All right.  So let me hear from

14   Google as to these four custodians.

15           MS. TOMKOWIAK:  Ms. Bladow is going to

16   handle this one, Your Honor.

17           THE COURT:  Okay.  Ms. Bladow, step up.

18           MS. BLADOW:  Good morning.

19           THE COURT:  Can we start with my last

20   question, which is -- because what I'm constantly

21   doing here is proportionality --

22           MS. BLADOW:  Right.

23           THE COURT:  -- what's the -- are you

24   getting enough bang for the buck here.

25           Do you have any sense of what this would

1    entail?

2         MS. BLADOW:  I don't have any hit reports

3    in front of me for these particular custodians, but

4    I do think it would be helpful to take a little bit

5    of a step back here and talk about proportionality

6    overall with respect to all of the additional 14

7    custodians, six additional email aliases, and a

8    number of new search terms that Plaintiffs are

9    seeking today.

10         I think, to start, Google already has more

11    than double the number of custodians as any one

12    plaintiff.  So, from Google's perspective, in terms

13    of proportionality and the size of the case, asking

14    to add these four legal agents is effectively asking

15    us to add a whole new set of custodians that's more

16    than Plaintiffs have done at all.

17         THE COURT:  All right.  This is not

18    persuasive to me.  I saw a version of this in your

19    letter briefing.  I would expect, in a case of this

20    nature, particularly if your affirmative defenses

21    survive the motion to strike -- which is before the

22    district judge, not before me -- that discovery

23    would not be an even playing field in terms of the

24    number of custodians or, frankly, the burden

25    involved.  That's just the way it is sometimes in

```
 1    certain kinds of litigation.

 2              MS. BLADOW:  So, turning to the specific

 3    topic that Plaintiffs are seeking discovery on here,

 4    with digging into the documents of these custodians,

 5    Plaintiffs already have everything that they need to

 6    determine whether or not Google is following its

 7    DMCA policy.  They have the ███████████████████████

 8    ████ ███████████████████████████████ ███████████

 9    ██████████████████████████████████████████████████

10    ██████████████████ █████████████████████████████████

11    ██████████████ █████████████████████████████████

12    ████████████████████████████████████████ --

13              THE COURT:  So it's not exactly ████

14    ████████████████?

15              MS. BLADOW:  Not exactly.  Like, maybe one

16    step up from that.

17              You know, to the extent they're ██████████

18    ██████████████████████████████████████████████

19    ██████████████████████████████████████████████████

20    ██████████████████████████████████████

21    ██████████████████████  We've included the

22    individuals --

23              THE COURT:  And that's ████████ and who

24    else?

25              MS. BLADOW:  So ████████, I believe, is one
```

1    of the vendors' employees that contracts for Google.

2         THE COURT:  Supervisory?

3         MS. BLADOW:  And then, in terms of Google's

4    custodians, we have ████████████████████████

5    ████████████ who, all at different times, were

6    responsible for overseeing the vendors.  So to the

7    extent an issue was escalated to a full-time Google

8    employee, you would see that show up in their

9    documents, which we've already searched.

10        THE COURT:  Okay.

11        MS. BLADOW:  Like we have no reason to

12   believe that the four legal agents that Plaintiffs

13   have identified had any sort of discussions over

14   email about any of these URLs processing notices.

15   Like, our understanding is that those -- there

16   aren't such communications.  And our understanding

17   is that to the extent they're --

18        THE COURT:  Because they're too busy to

19   chat with each other about this kind of thing?

20        MS. BLADOW:  Or they're -- the work that

21   they're doing is all being ████████████████████████

22   ████████████████████████████████████████

23   ████████████

24        THE COURT:  But if that's correct, then

25   you're going to have a very thin hit report, if you

1  had a hit report, right?

2          MS. BLADOW:  In theory.  But the burden of

3  collecting that data and running the hit report, in

4  and of itself, is unnecessary and not proportional

5  when we've already given Plaintiffs everything that

6  they need to evaluate.

7          THE COURT:  Right.  And what is that

8  burden?  What's it going to cost you, either in time

9  or in money, to find out who's right here?  Because

10  this is, by the way, burden -- forgive the

11  awkwardness of the phrase -- it's your burden to

12  establish burden.

13          MS. BLADOW:  Yes, I understand that,

14  Your Honor.

15          I think another point to understand here is

16  that this is information that Plaintiffs have had

17  since April of this year, and they have delayed in

18  bringing this issue to the Court for more than four

19  months.

20          THE COURT:  That was a thought that I had

21  when I was reading the papers.

22          When did Plaintiffs first bring it to you,

23  even informally?

24          MS. BLADOW:  It would have been -- I

25  believe it's in our papers of when we were at an

1    impasse on this issue, but I believe it was this

2    spring.

3              THE COURT:  Hold on.  Let me see what you

4    said about that.

5              MS. BLADOW:  Yeah, so they first requested

6    it from us on April 14th of 2025.

7              THE COURT:  And this is after you added

8    three custodians at the end of March, right?

9              MS. BLADOW:  Correct.

10             THE COURT:  All right.  So they brought the

11   issue to you in April, and then they brought the

12   issue to the Court in August, after previewing it, I

13   think, earlier in August and then getting permission

14   from the district judge to bring this omnibus

15   motion.  That doesn't seem like a -- I've seen much

16   worse.

17             MS. BLADOW:  I think, in terms of the

18   previous deadlines that the Court had set -- the

19   district judge had set completing custodial document

20   discovery by August 15th.  The fact that Plaintiffs

21   waited until 10 days before that deadline to bring

22   this dispute to the Court kind of additionally

23   factors into that overall analysis.

24             And I think -- I think there's a reason the

25   Federal Rules require courts to limit discovery in

1    instances where parties sit on their rights or they

2    sit on a dispute and a delay in bringing it to the

3    Court.

4           THE COURT:  All right.  So I'm inclined

5    to -- I'm inclined to tell you to add these four

6    custodians.  I don't think the delay was

7    unreasonable, under the circumstances.  Perhaps not

8    ideal; I don't want to see this again, but not

9    unreasonable under the circumstances.

10          As I mentioned earlier, the fact that

11   you're going to end up with more custodians that you

12   have to search than any one plaintiff ends up with

13   custodians they have to search doesn't really move

14   me, given the nature of the case.  And while I would

15   be sympathetic to a well-supported burden argument,

16   you haven't made a well-supported burden argument

17   because you really haven't given me anything

18   concrete about either how much time or how much

19   effort it's going to be.

20          I am very concerned, as you know, about

21   setting firm lines and not allowing mission creep to

22   occur.  So I don't want the Plaintiffs to think --

23   even if there is something relevant and interesting

24   in these four, I hope you're not going to come back

25   to me next month or the month after that and say,

1    "Now we need another ▋ of these."  I view -- I
2    appreciate that you chose four -- thank you for
3    that -- and that they're the four ▋▋▋▋▋▋
4    ▋▋ , so to speak.
5            So if something interesting, relevant,
6    admissible, earth-shaking, smoking-gun-like does
7    come up from these four, that doesn't necessarily
8    mean that you get to rinse and repeat with everybody
9    else.  So I just want to make that as clear as I can
10   now.  But I think I'm going to give this one to the
11   Plaintiffs and add these four.
12           MS. BLADOW:  And, Your Honor, I think we
13   would just request that, in general here today, with
14   the continued requests for new custodians, new
15   search terms, new aliases -- there's even a new
16   custodian they just raised as recently as the other
17   week -- we would ask that there be a cutoff for
18   that.  And to the extent that --
19           THE COURT:  You mean a date by which
20   they're not allowed to ask for new custodians?
21           MS. BLADOW:  Correct.  And to the extent
22   that the Court is allowing further custodial
23   discovery to continue, that we be allowed to seek
24   additional custodians from Plaintiffs as well.
25           THE COURT:  Well --

```
 1              MS. BLADOW:  Because we have --
 2              THE COURT:  -- I'm not going to prejudge
 3   disputes that haven't come before me.  You know, for
 4   the parties' guidance -- and I shouldn't have to say
 5   this, and I know I don't have to say this, but I'll
 6   say it anyway -- yes, of course, the Court expects
 7   both parties to act in accordance with Rule 1.  For
 8   one thing, to be as efficient and fair as possible
 9   about this; to keep their eye on the ball; to act
10   diligently, not leave things to the last minute.
11   Bring disputes up earlier rather than later so they
12   can be resolved earlier rather than later.  All of
13   those things.
14              But I'm not going to pre-adjudicate any
15   specific dispute that I haven't seen yet.
16              So let's move on to the ███████████,
17   Mr. Kane.  And, again, please treat me like a
18   third-grader.  Actually, a third-grader would
19   probably already understand the ███████████  Please
20   treat me like a member of the generation that I'm a
21   member of and explain what this ██████████ thing
22   actually is.
23              MR. KANE:  I'm happy to go to the
24   ██████████  I didn't know if you wanted to go in
25   order.  There were a couple of other custodians
```

```
 1    before that in the motion.
 2              THE COURT:  Oh my gosh, you're absolutely
 3    right.
 4              MR. KANE:  ███████████, at the bottom of
 5    page eight.
 6              THE COURT:  No, let's finish out section
 7    four first.
 8              MR. KANE:  Okay.  So, as has been discussed
 9    earlier, at some point in May of 2021, Google
10    decided that they were going to ban all paid
11    Shopping ads for ebooks.  We can see from the
12    documents that ████████████████████, was
13    responsible for supervising the team that would
14    ██████████████████████████████████████████
15    ███████████.
16              So there's a ████████████████████
17    ███████████████████████████████████████████
18    ████████████  And one of those complaints is
19    from one of the Plaintiffs here, McGraw Hill,
20    explaining that pirates were still advertising
21    ebooks despite the ban.
22              In the spreadsheet, ███████████████████
23    ████████████████  And he says that he --
24              THE COURT:  Say that again.
25              MR. KANE:  ██████████████████████████,
```

1   ████████████████████████████.

2         And ████████████████████████

3   ████████████████████████████████

4   ███████████████████████████

5   ██████      So this is the exact problem that this

6   case is about, you know, pirated ads on Google

7   Shopping or ads for pirated ebooks.  And

8   ████████████ was not only aware of it, but claims to

9   ████████████.

10        This is a big deal.  If ███████████████

11  ████████████████████████████████

12  ████████████████████ and claimed that he had done

13  it, he's a very relevant witness to this case.

14        THE COURT:  He's a former employee.

15        When did he leave?

16        MR. KANE:  I want to say it was earlier

17  this year.

18        THE COURT:  So a recent former?

19        MR. KANE:  Yeah.  My colleague tells me

20  it's November of 2024.

21        THE COURT:  And what did Google -- why does

22  Google think he's not relevant?  What did they tell

23  you?

24        MR. KANE:  I think Google's story as to

25  ████████████ is that he wasn't involved in the

1    literal ███████████████. I don't think that's

2    a reasonable objection, because there are a number

3    of different ways that a Shopping ad can be taken

4    down.

5          ████████████████████████

6    ██████████████████████████████████

7    █████████████████████████████████████

8    █████████████████████████████████████

9    ████████████████████. The DMCA

10   process is what's most relevant to Google's DMCA

11   defense, of course. But equally relevant, maybe

12   even more relevant, is the general notion that

13   Google was allowing ads for pirated ebooks and was

14   not removing them. That's the part of the process

15   that ████████████ appears to have been involved in.

16          THE COURT: So tell me a little bit about

17   this process.

18          This is an organic, internally generated

19   process whereby Google tries to do the right thing

20   without getting any complaints from stakeholders?

21          MR. KANE: Yeah. Our understanding is that

22   Google decided it was going to ban all ebooks in

23   response to complaints from companies like our

24   Plaintiffs, and that, as part of that ban, ████████

25   ████████████████████████████████

```
 1  ███████████████████████████████████████
 2  ████████████████     ██████████████████████
 3  ████████████████████████████████████████
 4  ██████████ .
 5          THE COURT:  Okay.
 6          MR. KANE:  And the fact that ████████████
 7  was the sort of supervisor for that process, we
 8  think renders him an important custodian.  He's also
 9  the owner of a document that ████████████████
10  ██████████████████
11          THE COURT:  He's also the owner of a what?
12          MR. KANE:  A document that ████████████████
13  ████████████████████████  Sort of a manual or a
14  presentation.
15          THE COURT:  And you have that?  You have
16  that document?
17          MR. KANE:  We do, yeah.
18          THE COURT:  You got that from some other
19  custodian, presumably?
20          MR. KANE:  Correct.  He was not the
21  custodian of the document.
22          THE COURT:  Okay.
23          MR. KANE:  But he's listed as the owner of
24  the document on the document itself.
25          THE COURT:  Okay.  Tell me about
```

1    Mr. Weibel.

2              MR. KANE:  I don't know whether it's Weibel

3    or Weibel, but --

4              THE COURT:  Well, that was the first thing

5    I wanted you to tell me.

6              MR. KANE:  I've been saying Weibel.

7              THE COURT:  And you've failed already.

8              MR. KANE:  So Mr. Weibel has provided a

9    sworn declaration to Judge Rochon in which he said

10   that he is, quote, "primarily responsible for

11   implementing policy enforcements on the Google

12   Shopping platform."  That alone, it seems to me,

13   should render him a custodian.

14             But even beyond that, there's a document

15   that Google produced that's titled ███████████████

16   ██████  -- or the part of the document is titled

17   ███████████████████████  -- where it says that

18   Mr. Weibel was ███████████████████████████████████

19   ███████████  ██████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ██████

23             Mr. Weibel was said to be actively

24   addressing that issue.  That's a key issue in this

25   case because obviously ███████████████████████████████

1    ██████████████████████████.  We also expect

2    that Google, at some point in this case, will claim,

3    "Well, look, either we shouldn't be liable or

4    damages should be lower because pirates are just

5    sophisticated.  We did our best.  They were able to

6    get around it."

7          If Mr. Weibel is actively addressing

8    ████████, he should have relevant documents as to

9    whether or not that's actually the case.  In other

10   words, whether or not Google was unable to prevent

11   these ads or just simply didn't do it.

12         THE COURT:  And Mr. Weibel -- he's a

13   doctor.  He's a Dr. Weibel.

14         MR. KANE:  I thought he was Dr. Weibel, but

15   in our correspondence with Google, they've been

16   calling him Mr. Weibel.  So I started calling him

17   Mr. Weibel as well.

18         THE COURT:  That's fine.  We'll go with

19   that.

20         Now, Google has offered some compromise

21   with respect to Mr. Weibel.

22         Can you explain that a little bit?

23         MR. KANE:  What they've said is that they

24   are not treating him as a custodian, which I assume

25   means they're not collecting all of his documents

```
 1    and applying our search terms to them, but rather
 2    that they've done what they call a targeted
 3    collection.  Forgive my skepticism.  We don't really
 4    trust that the targeted collection they're doing,
 5    which they haven't explained, is going to be enough.
 6              THE COURT:  And you don't know anything
 7    further about that?
 8              MR. KANE:  We've asked them to explain what
 9    a targeted collection means, and they've told us
10    that that would be improper discovery on discovery,
11    that they're not obligated to tell us.
12              THE COURT:  All right.  Let me hear from
13    Google on these two, and then we'll save the really
14    fun topic, which is the in-house counsel topic, for
15    after that.
16              MS. BLADOW:  All right.
17              THE COURT:  Ms. Bladow.
18              MS. BLADOW:  To start with, Your Honor, I
19    think both documents that Mr. Kane cited are not
20    cited in their letter motion, nor have either of
21    those documents been put in front of the Court, so
22    I'm not sure what exactly he's relying on here
23    today.
24              THE COURT:  Well, the Weibel declaration
25    is --
```

```
 1          MS. BLADOW:  I'm referring to the
 2   Bates-numbered documents, the Excel sheet that he
 3   was referring to, as well as the document he was
 4   referencing with respect to ███████     Nor has that
 5   issue been raised to us as a reason why Mr. Weibel
 6   should be a custodian.
 7          THE COURT:  But you had extensive
 8   discoveries about whether he's relevant, whether his
 9   documents are likely to be relevant, right?
10          MS. BLADOW:  Correct.  And we have
11   applied -- we did a collection of his documents and
12   applied targeted search terms to identify documents
13   responsive to RFPs 8 and 12, ultimately producing
14   about 45 documents to Plaintiffs.
15          THE COURT:  All right.  So when you say
16   you've done a targeted search, it's RFPs 8 and 12?
17          MS. BLADOW:  Yes.  And we -- I believe we
18   communicated to Plaintiffs --
19          THE COURT:  Now I have to check and see
20   what those RFPs were.  Give me a minute.
21          We have a lot of objections in here.
22   Eight:  All documents concerning any technological
23   or other means or mechanisms you considered or
24   implemented to address, limit, or prevent the use of
25   Shopping ads for products that infringe or may
```

```
 1    infringe right holders' copyrights or trademarks.
 2              And the other RFP, again, was?
 3              MS. BLADOW:  RFP 12.
 4              THE COURT:  Twelve:  All documents
 5    concerning your policies, practices, and procedures
 6    used for determining whether the same individual,
 7    group, or business is operating multiple
 8    Shopping-ads-related accounts, and for identifying
 9    related ad merchants.
10              Did you tell Plaintiffs that that's what
11    your targeted search was?  Because they seem like
12    they didn't know that.
13              MS. BLADOW:  My understanding is that we
14    didn't necessarily tell Plaintiffs the exact method
15    or search terms that we applied to Mr. Weibel's
16    documents to return documents responsive to those
17    RFPs, but my understanding is that we communicated
18    to Plaintiffs that those were the RFPs for which we
19    were searching his documents for responsive.
20              THE COURT:  All right.  So it's a subset of
21    the agreed-upon search terms, the ones that you
22    deemed --
23              MS. BLADOW:  Correct.
24              THE COURT:  -- relevant to those two RFPs.
25              All right.  And you came up with a handful
```

```
 1    of documents?

 2            MS. BLADOW:  Correct.

 3            THE COURT:  Okay.  Why didn't you tell the

 4    Plaintiffs which search terms you had applied?

 5            MS. BLADOW:  We're in a little bit of a

 6    "Give a Mouse a Cookie" situation, where every

 7    time --

 8            THE COURT:  In a bit of a?

 9            MS. BLADOW:  "Give a Mouse a Cookie"

10    situation, where every time we tell them something,

11    it's adding more and more and more.  So --

12            THE COURT:  You have young children at

13    home?  You must.

14            MS. BLADOW:  Oh, no.  That's just a common

15    phrase I use.  I have a dog.

16            THE COURT:  Oh.  It's a children's book.

17            MS. BLADOW:  I know, I know.  That's -- but

18    that's -- it's -- it's the best way to kind of

19    phrase the never-ending you give them something, and

20    they ask for more and ask for more and ask for more.

21            THE COURT:  Got it.  Got it.

22            Yeah.  I'm not sure that's a great reason

23    not to give them that information.

24            MS. BLADOW:  I mean, we are where we are,

25    and we have produced responsive documents to RFPs 8
```

1    and 12, which you just read.  I believe those are

2    quite broad RFPs and are -- encompass what they are

3    seeking from Mr. Weibel.

4              THE COURT:  All right.  What about

5    ██████████

6              MS. BLADOW:  As for ████████████ , our

7    understanding is that, to the extent that he has

8    involvement in the ebook ban or ebook advertising on

9    Google, that his relevant documents and

10   communications would be captured by the other

11   custodians that we've already included, who are

12   central to those issues.

13             And so, given that he didn't have any --

14   our understanding is that he wasn't involved in,

15   necessarily, like, █████████████████████████████

16   ████████████████████████ .  We don't believe a

17   search of his documents is reasonable or

18   proportional to the needs of the case.

19             THE COURT:  And, again, you don't have a

20   hit report or a concrete estimate of burden,

21   correct?

22             MS. BLADOW:  No, I do not.

23             THE COURT:  Okay.  Any brief reply on these

24   two, particularly now that you've heard about RFPs 8

25   and 12, with regard to Weibel?

1          MR. KANE:  So, as to the issue you just

2    raised, I don't think 8 and 12 are quite enough for

3    Mr. Weibel.  And the reason for that is, we think

4    that he is extremely knowledgeable about the systems

5    that data -- that Google uses to keep data about

6    this case.

7          So the declaration that he provided earlier

8    in the case had to do with the burden that's

9    involved in or the claim burden that's involved in

10   extracting certain data from Google systems.  So we

11   think he's an engineering or data person and that

12   those two RFPs alone aren't enough.

13         Just one other -- or two other points

14   briefly.  The Excel sheet that they mentioned wasn't

15   included in our letter because it hadn't been

16   produced when we filed our letter.  Our letter was

17   August 5th.  They didn't produce it until

18   August 15th.  I do have a copy today if the Court

19   would like to see it or if the other side would like

20   to see it.

21         The other thing I would just say with

22   ████████████, as I said initially, we think he was

23   extremely involved in ████████████████████████████

24   ████████████████████████████████████.  And I don't

25   think Google has responded to that point at all.

```
 1              THE COURT:  Those you could always take as
 2    deposition.
 3              MR. KANE:  We certainly could.  Depositions
 4    are -- although for him, I'm not sure we can.  One,
 5    he's ████████, and, two, he's a former employee,
 6    so we can't rely on Google to make him available.
 7              THE COURT:  They're both former employees?
 8              MR. KANE:  No.  Mr. Weibel is an
 9    employee -- is a current employee.  I'm sorry, were
10    you asking about --
11              THE COURT:  That's who I thought we were
12    talking about.
13              MR. KANE:  I'm sorry.  I'm talking about
14    ████████████.
15              With respect to ████████████, we think he
16    was extremely involved in the ebook ban and making
17    sure that that ban was effective.  And that's why we
18    think he's an appropriate custodian.  He is in
19    ████████ and a former employee, so I'm not optimistic
20    that we'll be able to depose him.
21              THE COURT:  Right.  But Google has
22    presumably preserved his relevant databases.
23              MR. KANE:  Which is why I think it's even
24    more important to include him as a custodian,
25    because we won't have the opportunity to.
```

1    THE COURT:  Right.  Has he -- to your

2    knowledge, has he retired, moved on to another?

3    MR. KANE:  He is working at Meta, as far as

4    I know.

5    THE COURT:  Oh.  Great.

6    All right.  So I'm inclined to give the

7    Plaintiffs ███████ but to leave the Weibel

8    situation where it is.  That's my tentative, so to

9    speak.  Now, I'll give you each 30 seconds to tell

10    me why I'm wrong.

11    As long as you're still standing up,

12    Mr. Kane, you can tell me that.

13    MR. KANE:  My principal objection is

14    Judge Rochon made a very important discovery ruling

15    in this case, based largely on Mr. Weibel's

16    declaration.

17    THE COURT:  Yes, but it was a ruling about

18    how hard it would be to do stuff, right?

19    MR. KANE:  That's true, but I think what

20    Google is claiming is that this guy knows a lot

21    about how these systems work.  And so, for example,

22    if there's an email that says, hey, takedowns aren't

23    happening appropriately, or they're not happening

24    the right way, we think Mr. Weibel might be one of

25    the recipients of those.

1              Or if there's an email that says, hey, we

2      need data on how many ads have we taken down in the

3      last six months, we think there might be a response

4      from Mr. Weibel that says something like, "Well, I

5      can give you this, but it's not really accurate.  We

6      don't have the data on this."

7              We think he's going to have important

8      information about how this -- how these policies

9      were implemented.  In other words, any kind of,

10     like, self-reporting that Google is doing -- ███████

11     ████████████████████████████████████████████████

12     ███████████████      -- we think Mr. Weibel might have

13     been involved in collecting the actual data that

14     supports those decisions.  So --

15             THE COURT:  Might have, but, you know, he

16     wasn't doing it in a vacuum.  These requests were

17     coming from and being responded to other folks at

18     Google, at least some of whom I suspect are already

19     on your custodian list.

20             MR. KANE:  I think the thing to remember

21     about Google is how large it is.  And what we've

22     seen in the documents we've seen so far is there's

23     quite a bit of confusion about who does what, down

24     to things like someone recognizes a very suspicious

25     merchant and emails one of several listservs and

```
 1    someone says, "No, it's not this listserv; it's this
 2    other listserv," or they email it to one group, and
 3    they say, "No, it's not our group that does that,
 4    it's this other group that does that."
 5            So I wouldn't presume that any of the
 6    relevant documents would have been captured by
 7    the -- I forget if it's seven or eight custodians
 8    that Google has already provided.
 9            THE COURT:  Well, we already have more than
10    seven or eight, because I just gave you four.
11            MR. KANE:  Yeah.  Although the --
12            THE COURT:  On another topic, I understand.
13            All right.  Thirty seconds from Google, if
14    you wish to push back, or can you live with ███████
15    and not Weibel as an additional custodian?
16            MS. BLADOW:  I think we would still object
17    to adding any additional custodians at this point,
18    but that compromise is --
19            THE COURT:  All right.  So you're going to
20    add ███████  as to your custodian list.  We're going
21    to leave Weibel as is, with the partial search
22    having been conducted.
23            All right.  In-house counsel.
24            And I have to tell you, like most district
25    and magistrate judges, yes, I understand that
```

1    in-house counsel wear many hats, including business

2    hats, and may well have many non-privileged

3    communications.  But I also understand that, even if

4    I haven't gotten a specific burden estimate from

5    Google on this one, I know that the burden involved

6    in adding an attorney as a custodian is very high

7    because some human being is going to have to look at

8    every hit to determine whether it's privileged.  And

9    not only that, they're going to have to create a

10   massive privilege log.  And not only that, at some

11   point -- this is the absolute worst -- they're going

12   to ask the magistrate judge to review hundreds of

13   documents in camera to determine whether they belong

14   on the privilege log or not.

15           So that's an enormous burden for a lot of

16   folks.  So that's my a priori.

17           But even before we get to the specifics,

18   now tell me why I should make an exception here.

19           MR. KANE:  I think the reason you should

20   make an exception is because that's precisely what

21   Google was hoping you would do.  What you just

22   described is precisely what Google was hoping you

23   would say someday when someone asks the Court to

24   include these in-house counsel as custodians.

25           So Google's DMCA policy says ███████████

1   ████████████████████████████████████████████████

2   ████  these two attorneys, ██████████  and

3   ████████████████████████████████████████████████

4   ███████████████████████.  In other words, ████

5   ████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ███████████.

9           ██████████████████████████████████

10  ████████

11          THE COURT:  ████████████████████████

12  ████████████████████████████████████████

13  ██████████████████████████████████  Excuse my

14  language.

15          MR. KANE:  The latter.  So Google's

16  documents say that ████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████.

19          THE COURT:  Okay.

20          MR. KANE:  So what Google has built into

21  its DMCA system is ██████████████████████████████

22  ██████████████████████████████████

23  ██████████████████████████████████████.

24          THE COURT:  Okay.

25          MR. KANE:  The reason that that's a big

1    deal is Google is putting forth its DMCA program and

2    saying it's reasonably implemented as its defense in

3    this case.  It's saying, "The reason we shouldn't be

4    liable for any damages is that we have this

5    incredible DMCA program that is supposed to get rid

6    of these pirates."

7         So, if part of that program is ███████████

8    ████████████████████████████████████████████████

9    ███████████████████████████████ which is not

10    necessarily a legal problem -- in fact, it sounds

11    like it's entirely a business problem -- they don't

12    get to hide those documents just because they happen

13    to cc those attorneys.

14         This is a classic sword-and-shield

15    argument.  They don't get to say, "We have a DMCA

16    program that's reasonably implemented," and then

17    hide the implementation documents.

18         THE COURT:  Well, wait a sec.  Right now,

19    though, you're asking me to direct Google to add

20    these two in-house attorneys as custodians.  That is

21    a different question from whether Google is entitled

22    to withhold documents collected from other

23    custodians because they were cc'd to these two

24    attorneys.  I'd like to stick with the custodian

25    question.

1                MR. KANE:  Yeah.  I think that's why they

2     need to be included as custodians, because the part

3     of the process that they were involved in -- they're

4     ████████████████████████████████████████████████

5     ████████████████████████████████████████████████

6     █████████████████████████████████████████████████

7     ██████████████ .

8                So we need to know about this ██████████

9     ██████████ .  In other words, ██████████████████████

10    ████████████████████████████████████████████████████

11    ████████████████████  ██████████████████████████

12    █████████████████████████████████████████████████

13    ██████████████████

14                THE COURT:  Well, I think -- I think you're

15    going a little bit beyond what the documents you're

16    basing your views on actually say.

17                Do you actually have a document that says,

18    ████████████████████████████████████████████████████

19    ████████████████████████████████████████████

20    █████████████████████████████████████████████

21                MR. KANE:  The documents say ████████

22    ████████████████████████████████████████████████████

23    ██████████████████████████████████████████ .

24                THE COURT:  Okay.

25                MR. KANE:  And what that means, Your Honor,

```
 1   is there's this potentially huge ████████████
 2   █████ .
 3               THE COURT:  Potential ██████████
 4               MR. KANE:  Well, it's a ██████████████
 5   that is potentially huge.  If they did this --
 6               THE COURT:  Yeah.  I'm not accepting
 7   your -- I'm not necessarily rejecting it, but I'm
 8   not necessarily accepting your characterization of
 9   what the policy is.  It sounds like a ████████████
10   ████████████████████████████████████████████
11               MR. KANE:  Which is precisely why we need
12   discovery into it.  In other words, maybe it is that
13   this was an occasional thing that happened, and it
14   just wasn't very frequent.  But what Google is
15   trying to say is, not that they don't have to
16   produce documents about that, but that they don't
17   even have to collect and review those documents.  In
18   other words, they're not even collecting documents
19   from █████ and ████████  They're trying to say,
20   "We should not have to treat them as custodians at
21   all."
22               If they take the document --
23               THE COURT:  Well -- sorry to interrupt.
24               MR. KANE:  If they take the documents and
25   review them and they conclude that they're all
```

1    privileged, we'll see what happens.  What they

2    shouldn't be allowed to do is simply not collect

3    from those custodians at all.

4         THE COURT:  To the extent that

5    communications from or to these two individuals are

6    relevant and non-privileged, why do you need to

7    collect from them?  Why aren't you already getting

8    them or not getting them, if they're logged as

9    privileged, from the folks with whom they were

10   communicating?  Those are the folks who already are

11   custodians, right?

12        Isn't -- shouldn't your first -- I hate to

13   tell people what their line of attack should be,

14   but, look, I don't know what you've gotten or

15   haven't gotten.  If you have a huge, lengthy

16   privilege log, which is all communications to or

17   from these guys from your existing custodians,

18   shouldn't you be worried first about whether those

19   are legitimately being withheld on privileged

20   grounds before you sort of go to the mother lode and

21   ask to add these guys as custodians?

22        MR. KANE:  Well, remember that these

23   ████████████████████████████████████████████

24   ████████████████████████████████   So that's the

25   ██████████  folks we were discussing earlier.

```
 1              THE COURT:  Well, but you're going to get
 2    four of them, so you're going to have a sample set.
 3    So you expect to find, perhaps, in these four,
 4    emails or other communications to and from these
 5    in-house attorneys saying, ████████████████████
 6    ████████████████████████████████████████████████
 7    ████████████████████████████████████████████
 8    ████████████████████████
 9              MR. KANE:  Correct.  And we think the most
10    natural place to get that is from the people who are
11    receiving ████████████████████, not from, you
12    know, a sample of the folks who might have been
13    sending ████████████████████.
14              THE COURT:  Do you have any communications
15    to or from these guys in your existing production?
16              MR. KANE:  We do.
17              THE COURT:  All right.  And they have not
18    been withheld on privileged grounds?
19              MR. KANE:  Almost all of them have been
20    withheld on privileged grounds.
21              THE COURT:  So you have them on logs, but
22    you don't actually have the communications?
23              MR. KANE:  Either the communication has
24    been withheld entirely, or you look at the email
25    and, like, you know --
```

```
 1                THE COURT:  And it's redacted?

 2                MR. KANE:  -- there's six emails in it, and

 3     it's all -- almost all of it's redacted.

 4                THE COURT:  Okay.

 5                MR. KANE:  The other point I'd make -- this

 6     is a different reason we need them -- is, when our

 7     clients first started talking to Google about this

 8     problem, which I think was back in 2019, ███████████

 9     and ████████████████ were two of the people --

10                THE COURT:  Communicated directly with you?

11                MR. KANE:  Exactly.  So, obviously, we have

12     their direct communications.

13                THE COURT:  You already have those.  Right.

14                MR. KANE:  What we don't have is, for

15     example, ████████████████ told our clients he was going

16     to make sure that their notices were getting

17     appropriate attention.  We don't know what he did

18     about that inside Google.  Did he email a friend and

19     say, "I told him this, but forget about it"?  Did he

20     email someone and say, "Hey, we really need to take

21     care of this," and then they never did it?

22                In other words, he was actually interfacing

23     with the business, trying to address the problem

24     that our clients had brought to him.  And that was

25     pre-litigation.  It was before anyone had brought a
```

1    lawsuit.

2         THE COURT:  Okay.

3         MR. KANE:  He also -- I was just going to

4    say, he also told our clients that Shopping counsel

5    was looking into policy fixes to address the problem

6    of priority ads.  So, in that sense, he's almost a

7    fact witness, like someone who was communicating

8    with the -- I don't know if it was the engineering

9    folks or the business folks at Google about

10   addressing this problem.  That's what he told us.

11        THE COURT:  I'm not sure I would go with

12   "almost a fact witness."  I mean, you probably had

13   very, very similar conversations with outside

14   counsel after you filed the lawsuit.

15        MR. KANE:  Well, but not for the purpose

16   of, like, fixing the problem inside Google.  In

17   other words, part of Google's defense, I assume, is

18   going to be, "Look, we tried.  You know, we did the

19   ebook ban.  Pirates are sophisticated.  They find

20   ways around it.  What do you want us to do?"

21        If it turns out that Mr. Donaldson emailed

22   someone in 2019 and said, "Hey, this is a big

23   problem, we need to address it," and someone replied

24   and said, "We don't have resources for it at this

25   point," or someone replied and said, "That's not a

1  priority at this point," that's a very relevant

2  email.  We should be getting that.

3          And we know that he was -- we know that he

4  was at least one of the people who was communicating

5  internally at Google about this problem.

6          THE COURT:  Okay.  All right.  I take it

7  Google has not done or said anything to suggest that

8  they're going to make either one of these guys a

9  witness, either on paper with a declaration or

10 potential trial witness?

11         MR. KANE:  No, they -- Google has not said

12 they're going to be calling one of those people as

13 witnesses.

14         THE COURT:  Okay.  So let me hear from

15 Google on these two attorneys.

16         MS. BLADOW:  So, to start by responding to

17 Mr. Kane's first point about the ███████████

18 ███████████████████████████████████████

19 ██████████████████████████████████████████

20 ████████████████████████    And --

21         THE COURT:  These are the ███████████, so

22 to speak?

23         MS. BLADOW:  Yes.  And ███████████████████

24 ████████████████████████████████████████

25 ██████████████████████████.  So that's just a

1    starting point in terms of --

2              THE COURT:  So none of the 1,239 domains

3    are ███████████████████████████████?

4              MS. BLADOW:  Correct.

5              The other point that I want to make sure to

6    make here, is that the personnel who would be

7    ██████████████████████████████████████████████

8    ████   would be two of our existing custodians, ████

9    ████ and ███████████████.

10             THE COURT:  And they're already custodians?

11             MS. BLADOW:  They're already custodians.

12             THE COURT:  And what about the four that I

13   just made you add, the agents?  Do they talk

14   directly with these attorneys?

15             MS. BLADOW:  I don't believe that they do.

16   My understanding is that ██████  interfaces with the

17   supervisors of the vendor, as opposed to the

18   individual agents who are processing the notices.

19             So, to the extent that there is an --

20   sorry, I'm going to take another kind of step back

21   to the bigger picture.  So when we kind of discussed

22   how the legal agents ████████████████████████████

23   ███████████████████████████████████████████████

24   █████████████████████████████████████████████████

25   ████████████████████████████████████████████

```
1   ████████████████████████████████████████████
2   ████████████████████████████████████
3   ████████████████████████████████████████████
4   ████████████████████████████████████████████
5   ███████████████████████████████████.
6           So, to the extent that there are --
7           THE COURT:  By the way, what's the purpose
8   of requiring this extra step, this communication
9   with in-house counsel, ██████████████████████████
10  ████████████████████?
11          MS. BLADOW:  I don't know, Your Honor.
12          THE COURT:  Okay.
13          MS. BLADOW:  The other --
14          THE COURT:  I take it you are not accepting
15  Mr. Kane's characterization that because you are an
16  ████████████████████████████████████████████████
17  ██████████████████████
18          MS. BLADOW:  No, we would dispute that.  I
19  think to the extent -- and it gets a little -- this
20  might get a little more in the weeds and, again,
21  would be a little bit of speculation on my part, but
22  I understand that there are marketplaces, like --
23  for example, like Etsy or even Walmart and Amazon
24  have -- you know, people can go and sell their
25  products on Amazon.  It's not necessarily Amazon
```

1    selling it, but I could have a storefront on Amazon.

2         So, to the extent the initial URL that's

3    coming in ███████████████████████████████████████

4    ██████████████████████████████████████████

5    ████████████████████████████████████

6    █████████████████████████████████████████

7    █████████████████████    █████████████████

8    ██████████████████████

9         ████████████████████████████████████████

10   ████████████████████████████████████████████

11   ███████████████████████████████████████

12   ████████    So I think there's a little bit more

13   complexity in the back end of Google's systems, and

14   this may be part of that, kind of a backstop to make

15   sure that something isn't happening.

16        But, again, that may be some speculation on

17   my part.

18        THE COURT:  Interesting speculation.  Okay.

19        MS. BLADOW:  I think, you know, to the

20   extent there are concerns about what communications

21   were happening based off of communications coming

22   from Plaintiffs and their attorneys before filing

23   this lawsuit and to the extent that Google is going

24   to be asked to search and produce documents from

25   these individuals, we would ask that this -- that we

```
 1   would be able to seek the same from Plaintiffs.
 2            THE COURT:  Say that again.
 3            MS. BLADOW:  We would ask that we would be
 4   able to seek the same from Plaintiffs, that we would
 5   be able to seek their in-house or outside counsel
 6   who was having these conversations, as those aren't
 7   necessarily -- they're taking the position that
 8   these aren't legal conversations but are about
 9   business strategy in terms of trying to solve the
10   problem of piracy on Google.  Then we would ask that
11   that would be kind of equally applied to both
12   parties.
13            THE COURT:  Well, I'm not sure that works
14   as a logical matter, because the Plaintiffs think
15   Google was violating the law; the defendant doesn't
16   accuse the Plaintiffs of violating the law or doing
17   things wrong or failing to adequately police
18   copyright violations.  So that's a -- that's a sort
19   of superficially tempting equivalent that I don't
20   think actually holds up in the real world.
21            That said, I'm still sympathetic to your
22   position on the two attorneys for other reasons.
23            MS. BLADOW:  The other point I just quickly
24   wanted to make was, that we aren't taking a position
25   of sword and shield here, saying that there's some
```

```
 1    part of our process that's protected by privilege.
 2    I think, as I indicated before, we are searching and
 3    we have searched and produced documents from the
 4    individuals who would have been communicating with
 5    the in-house attorneys on these business issues.
 6               THE COURT:  Right.
 7               But you're also redacting or withholding
 8    the substance of at least some of those
 9    communications, right?
10               MS. BLADOW:  Correct.  And to the extent
11    there are questions about specific documents or
12    communications, we'd be happy to have those
13    meet-and-confers with Plaintiffs.
14               THE COURT:  Okay.  I'm inclined against it,
15    Mr. Kane, in part, because I actually think the
16    relevance proposition is not as tight as it might
17    be, particularly given that your 1,239 domains are
18    apparently not associated with ██████████████,
19    ███████████████; in part, because of the generic
20    concerns that I outlined at the beginning of this
21    discussion; and, in part, because you're getting
22    ahead of yourself.  You haven't even seriously
23    addressed the question yet of whether the
24    communications you do know about were properly
25    withheld as privileged, and you want to go to the
```

```
 1    mother lode.  You're running before you walk, I
 2    think.
 3            So I'm inclined to rule against you as to
 4    this category.  If you have something quick to say
 5    that I haven't heard yet, now is your chance.
 6            MR. KANE:  I just want to be clear about
 7    one thing.  As to none of the ████████████
 8    being one of the 1,239 pirates, it's extremely
 9    important to remember in this case, Google is
10    asserting a DMCA defense, which means it's putting
11    its entire DMCA program at issue.
12            THE COURT:  Sure, I understand that.  But
13    parts of its DMCA program are going to be more
14    relevant to you than other parts.  That's number
15    one.
16            And, number two -- I should probably say
17    this now because it's probably going to come up from
18    time to time -- first, yes, I'm very cognizant that
19    that affirmative defense is out there.  Until and
20    unless the district judge says it's stricken, it's
21    part of the case, and it's discoverable just like
22    any other part of the case.
23            But that doesn't mean that the ordinary
24    proportionality concerns of Rule 26 have been thrown
25    out the window.  They haven't been.  So you have to
```

```
 1   be strategic about it.  You have to be surgical
 2   about it.  You have to think about taking
 3   appropriate sampling, so to speak.  I'm using that
 4   in a non-technical sense.  With respect to their
 5   program at large, you don't get to -- simply because
 6   they've asserted the defense, which is part of the
 7   case at the moment, you don't get to audit
 8   everything they've done with respect to every
 9   potentially infringing domain in the history of
10   Google.  Right?
11        MR. KANE:  I don't think that's what we
12   were trying to do, but -- we were trying to explore
13   a particular ██████████ but understood.
14        THE COURT:  Okay.  All right.  So, on this
15   one, I'm afraid it falls on the more burdensome than
16   beneficial side of the line.
17        Now, ██████████  We're there, right?
18   MR. KANE:  Yes.
19        THE COURT:  Okay.  And is that you,
20   Mr. Kane?
21        MR. KANE:  So, just to start with sort of
22   what ████████ is, it's basically a workflow
23   management system.  So, when there are tasks or
24   projects, whether big or small, those projects are,
25   like, raised and tracked and discussed on this
```

```
 1    program called ███████
 2            So, for example, when someone at Google
 3    asks the Trust and Safety group to look into ███
 4    ████████████████████████ -- their
 5    words -- Trust and Safety created a ticket -- a
 6    ██████ ticket, a ███.  Likewise, when someone was
 7    putting together ████████████████████████████
 8    ███████████████████████████████████████████████
 9    ███████████████████████████.
10            And when an employee ████████████████
11    ███████████████████████████████████████████
12    █████████████████████████████████████
13    ██████████████████████████████.
14            What's clear is that when Trust and Safety
15    creates one of these ████, they take all the
16    communications concerning that issue and put them on
17    the ████████  In other words, they take them out
18    of email, they take them out of gChat, and they do
19    it on the ████████
20            THE COURT:  Do they do it only on the
21    ████████  So you think there's stuff on there that
22    you haven't seen otherwise?
23            MR. KANE:  Absolutely.  What the ████████
24    documents say is, "You can track all future updates
25    on the ████  All details regarding this escalation,
```

1    including action taken, details of enforcement

2    stats, et cetera, will be updated on the █

3    itself."  So what we think this is is the actual

4    substantive discussions of the pirates at issue in

5    this case, the DMCA program generally, problems with

6    Google systems.  We think this is where the

7    documents actually are.

8            I hesitate to say this in a long hearing,

9    but I think this is the most important issue that's

10   before Your Honor today.  There's a document where

11   ████████████████████████████████████████

12   ██████████████████████████████████████████████

13   ██████████████████████████████████████████████

14   ██████ ████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████ ██████████████████████████

17   ██████████████████████████████████████

18   ██████████████████████████

19        ████████████████████████████████████

20   ██████████████████████████████████ ████

21   ██████████████████████████████████████████

22   ██████████████████████████████████████████

23   ████████████████████

24           We don't have that.

25           THE COURT:  And the trail for you ends

```
 1   there because you don't have the ███████████

 2           MR. KANE:  Exactly.  We don't have that

 3   ████████  ticket.

 4           We might get comments about the ████████

 5   ticket.  So, sometimes, the █████████ system sends

 6   an email to some of the people who are on the ████

 7   But what we've also seen in Google's documents is

 8   those people can select which emails they want to

 9   see.  They can say, "I only want ones that are

10   designated as important," or "I only want ones where

11   I am the person to whom the ticket is assigned."

12   They can decide how many notifications they want to

13   see.  And so --

14           THE COURT:  How many people are on the

15   ██████████

16           MR. KANE:  It's Google-wide, so it's --

17           THE COURT:  Every single employee?

18           MR. KANE:  On it, meaning, like, ███████████

19   is used across Google.  You're not really on it.

20   When a particular ████ is created, someone can add

21   you to that ticket so that you are part of that

22   ticket.

23           THE COURT:  Let me rephrase the question.

24   For what kinds of things is █████████ used?

25           MR. KANE:  It's used for all sorts of
```

1    things.  It's actually publicly available.  Like,

2    people can put in a ███████ ticket for issues

3    they've noticed in Google.

4            THE COURT:  Like I could?

5            MR. KANE:  You could, yeah.

6            THE COURT:  Okay.

7            MR. KANE:  Relevant to this case, it's

8    being used for all the things we were talking about

9    earlier, including, ██████████████████████████████

10   ████████████████████████████████████████████

11   █████████████████████████████████████████████████████

12   ████████████    So this is really, like, the key

13   database.

14           THE COURT:  If I'm upset at Google

15   because -- I don't know, let me just make something

16   up -- they've dropped my favorite merchant, I could

17   somehow create a ███████ ticket?

18           MR. KANE:  The ██████ system, like, you

19   can create an account and alert Google to things in

20   the Google system, yeah.  As far as I know, it's

21   just from using their website.

22           THE COURT:  So this is a huge, huge, huge

23   endeavor, it sounds like, to run your search terms

24   across this sprawling, multiuse system.

25           MR. KANE:  So we've offered a couple of

```
 1   ways to deal with that.  The first way is it's
 2   pretty obvious.  For ███████ tickets that are
 3   referenced in the production, Google should be
 4   producing the full tickets for all of those.  And
 5   we've given Google a list of those tickets.
 6              THE COURT:  Have you given them a list of
 7   those or -- okay.
 8              MR. KANE:  Yes, we've given Google a list.
 9              THE COURT:  How many tickets?
10              MR. KANE:  There were 42 that were
11   mentioned in emails.  There are some others that are
12   mentioned in Excel spreadsheets, but it's a large
13   number, so we'd have to go a little more carefully
14   and figure out which ones we need.
15              THE COURT:  Forty-two in emails, and you
16   could produce a list -- a complete list?
17              MR. KANE:  Yes.
18              THE COURT:  And you think that would be
19   what?  More dozens?  More hundreds?  More thousands?
20              MR. KANE:  Call it under a hundred.  It's,
21   you know, an estimate.
22              The second thing that we think makes sense
23   is, for each ███████ ticket, there's what they
24   call a component.  So it'll say, for example, ██████
25   █████████████████████████████████████████████
```

1    ████████████.  In other words, there's this,

2    like, system of topics and subtopics that Google

3    creates to make --

4              THE COURT:  Have you given me an exhibit

5    that helps me visualize this?

6              MR. KANE:  Hang on one second.  I believe

7    it is one of them.

8              Yeah.  So Docket 161-1.

9              THE COURT:  Give me a sec.

10             Tamika, I'm not getting the court view

11    here.  I'm getting the public PACER view, which

12    means I can't see it because it's sealed.  We

13    just -- within the court, we just changed how we

14    handle -- I can get it that way?  All right.  Hold

15    on.  Getting technical assistance here.

16             Okay.  I have Exhibit 1.

17             MR. KANE:  Okay.  So if you go to the first

18    page of the actual exhibit, towards the bottom --

19             THE COURT:  Looks like an email.

20             MR. KANE:  Correct.

21             So this is the notification that ████████

22    sometimes sends to people who are associated with

23    the ticket.

24             THE COURT:  All right.

25             MR. KANE:  Kind of on the bottom half of

1    the page, under where it says ████████████.

2                    THE COURT:  Yes.

3                    MR. KANE:  Just under that, it says,

4    "Components."

5                    THE COURT:  Right.

6                    MR. KANE:  ████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ██████████.  So that's like a system of organization

10   that Google has created to sort of organize

11   ████████████ topics topically.  So --

12                   THE COURT:  Right.

13                   So it's a topic tree?

14                   MR. KANE:  Exactly.

15                   So what we suggested to Google is they

16   should do an inquiry to determine what are the

17   components that are most likely to be relevant to

18   this case, and we've given them -- so the -- you can

19   search for components within the ██████████ system.

20   You can put in search terms, and it'll search the

21   title of the topic, as well as a short description

22   of the topic.

23                   So we give them some search terms to run on

24   that, and they can take those components and

25   apply -- they said they couldn't do Boolean or

```
1    certain types of searches, so we gave them a
2    separate list of search terms.  That I think is
3    probably somewhere in the land of where we should be
4    on this.  It's simply too important a database to
5    rely on, "Well, if there happened to be an email
6    that happened to be caught by one of the custodians,
7    then we'll produce that particular ticket."
8              I think we have to at least go to the
9    components that we're able to identify as likely to
10   have responsive documents and apply some search
11   terms to those.  It's simply too important a
12   database to leave to chance -- you know, did this
13   person get an email notification of that ███ was
14   that person a custodian, et cetera.
15             THE COURT:  How long have you and Google
16   been talking about the ████████ as a --
17             MR. KANE:  Oh, gosh.  It's been a while.
18   I'm sorry, I don't have the first date of that.
19             THE COURT:  And did Google offer any
20   compromise?
21             MR. KANE:  The compromise they offered was
22   to search for and to produce the particular tickets
23   that we identified to them.  In other words, the
24   ones that happened to get caught in their other
25   searches.
```

```
 1                THE COURT:  And to produce the entire
 2    ticket?
 3                MR. KANE:  For those particular ticket
 4    numbers?
 5                THE COURT:  Yeah.
 6                MR. KANE:  The problem with that is, as I
 7    said, people can choose how often they want to
 8    receive those notifications.  In other words, it's
 9    not the case that just because there's a ████████
10    ticket that involves someone, they're automatically
11    getting notifications.  And, indeed, from the
12    notifications they had -- I'm sorry, I forget if I
13    said this or not -- we'll have comment six and we'll
14    have comment eight, but we don't have comment seven.
15                THE COURT:  I understand that, which could
16    be for a variety of reasons, some of which you only
17    vaguely understand.
18                MR. KANE:  I mean, I --
19                THE COURT:  But you think that Google,
20    rather than Plaintiffs, should pick the relevant
21    components.  So you know --
22                MR. KANE:  We can give them the components.
23                THE COURT:  -- by now, because you have
24    however many you have -- this one, for example,
25    ██████████████   et cetera, which is on my screen at
```

 1    the moment, gives you the path to the relevant

 2    subtopic.

 3            That's probably one you'd want, right?

 4            MR. KANE:  Correct.  We can certainly give

 5    them the ones we've seen.  What we don't know --

 6    again, we're relying on the sort of happenstance of,

 7    you know, did someone happen to have the ████████

 8    notifications turned on, did that person happen to

 9    be a custodian.  We think Google can have --

10            THE COURT:  Sorry to interrupt.

11            Do you have the table of contents, so to

12    speak?

13            MR. KANE:  We don't.  That's -- we would

14    need Google to search that for us.  And that --

15    we've given Google terms to use -- search terms to

16    use to do that search.  And you can search, like,

17    just in the components.  In other words, you're not

18    searching -- you're searching for component names,

19    essentially.  So --

20            THE COURT:  So, looking at this one, you

21    could drill down from ██████████████████

22    ████████████████████████████████

23    ██████████████████████████████████████

24    ████████████████████████ and just run

25    your search within that sub-sub-sub-universe?

1            MR. KANE:  Correct.  So you can search

2    within the components.  The other thing you can do

3    is you can search for components.

4            In other words, if you're saying, "I want

5    to know a component that has to do with DMCA

6    takedowns," you can do a search in the public

7    version.  It's called Issue Tracker.  You can do a

8    search within Issue Tracker or within ███████  and

9    it'll just give you components that might have to do

10   with DMCA takedowns.

11           THE COURT:  But there's no complete list of

12   components publicly available.

13           MR. KANE:  There may be.  We don't have it.

14   There may be one that Google has.

15           THE COURT:  Okay.  All right.

16           MR. KANE:  My able colleagues have reminded

17   me that this issue first -- we first raised this

18   issue with Google on May 19th.

19           THE COURT:  All right.  Let me hear from

20   Google.

21           MS. BLADOW:  Your Honor, Ms. Victorson will

22   handle this one.

23           THE COURT:  All right.  Ms. Victorson.

24           MS. VICTORSON:  Thanks.

25           So, at the top, I just want to underscore

1    that this is a data source that is generically

2    applicable across Google.  So -- and that's the

3    reason why -- well, one of the many reasons why

4    searching across this particular data source is

5    extremely challenging.

6            I actually want to jump straight to the

7    compromises that the parties have exchanged on.  To

8    be clear, our --

9            THE COURT:  I'm sorry, jump straight to

10   the?

11           MS. VICTORSON:  The compromises that we've

12   been -- the potential compromises that we have been

13   discussing.

14           We have offered to search for and identify

15   and produce -- and, in fact, we already have

16   produced a number of Issue Tracker tickets that are

17   identified by specificity by Plaintiffs.  And this

18   is consistent with the way the parties have agreed

19   to treat similar documents, so, like, linked

20   documents within another Google document, pursuant

21   to the ESI stipulation.  We've completed that

22   already.  Last --

23           THE COURT:  Wait.  You've completed that

24   already, meaning that you've already given them

25   complete ███████ results, so to speak, for the 42

```
 1   tickets that Mr. Kane mentioned?
 2           MS. VICTORSON:  Exactly.  Sorry, I should
 3   have clarified.  For the tickets they have already
 4   identified to us, because they were reflected in
 5   email notifications or other documents that we've
 6   produced.
 7           THE COURT:  And they see now they have more
 8   that they could identify to you?
 9           MS. VICTORSON:  I'm sure they will continue
10   to identify additional ████████ IDs to us.  We've
11   agreed to take those and continue to produce them to
12   the extent that they continue to identify them to
13   us, you know, consistent with principles of
14   proportionality that are reflected in the ESI order.
15   But, to date, we've taken all of their identified
16   tickets, we have found them in the system, and we
17   have produced those.
18           THE COURT:  And you've produced -- I don't
19   know what words to use -- all parts of that ticket?
20           MS. VICTORSON:  Yes.
21           THE COURT:  The whole chain, whatever it
22   may be?
23           MS. VICTORSON:  Yes.
24           THE COURT:  How it ultimately ended up?
25           MS. VICTORSON:  Exactly.
```

```
1                THE COURT:  Okay.
2                MS. VICTORSON:  But Plaintiffs are asking
3      for more.  As of late last night, their latest
4      compromise involved they're now asking us to run 20
5      single-word or maybe two-word search terms across
6      the components -- some unspecified number of
7      components -- that they now want Google to identify.
8                THE COURT:  Is there a public component key
9      that lists all of the components?
10               MS. VICTORSON:  That's a good question.
11     Because this is a brand-new compromise as of last
12     night, we haven't had a chance to confer with our
13     client on that, so I'm not sure.  I'm not sure if
14     there is a publicly available list of the different
15     possible components.
16               But even if there was, that approach is
17     going to be wildly just disproportionate to the
18     needs of the case.  So the types of terms that they
19     asked us to run across the different components are
20     words like "escalate" -- just that word, "escalate."
21     A single word "cluster" -- just that word,
22     "cluster."
23               So, I mean, even within -- even if we're
24     searching within certain components that, you know,
25     Plaintiffs are going to reserve all rights to
```

```
 1    challenge whether we have even selected the correct
 2    components, this is just not a reasonable way to go
 3    about searching.
 4              And, in any case, you know, even if we
 5    identify -- let's say we identify the five most
 6    relevant components, that's going to require
 7    individual searches for each of those 20 terms.  So
 8    someone's going to then have to go into the system,
 9    run individually each one of those terms just
10    because of the way that the system works.
11              THE COURT:  Across the relevant component?
12              MS. VICTORSON:  Yeah.
13              THE COURT:  So let's suppose that the
14    Plaintiffs, taking the tickets that they already
15    have, were able to look at the components that each
16    of the known, relevant ██████████ tickets used and
17    were able to, as you point out, come up with the top
18    five, the ones that we most frequently see, is there
19    a set of search terms?  Maybe the Plaintiffs' first
20    crack at it was not perfect.  But is there a set of
21    search terms that might make sense?
22              It doesn't strike me that running some
23    targeted searches across some targeted component
24    domains is inherently disproportionately burdensome,
25    again, without knowing the specifics.  You've told
```

1    me that the searches have to be run individually,

2    but that doesn't really tell me much in terms of how

3    much time, how much human power, et cetera.

4          MS. VICTORSON:  Yeah.  I mean, the Golueke

5    declaration that we submitted, that's at Docket 177.

6    It does go into some detail in terms of the

7    limitations of the system and the burdens of having

8    to individually search word by word.

9          So, just to be clear, the types of search

10   strings that we have been using to search across all

11   of the custodial collections and doing the email

12   types of searching, those search terms, with, you

13   know, proximity limiters and all of those things,

14   those are not possible within this ticketing system.

15         So, you know, conceptually, would it be

16   possible to have very targeted components and very

17   targeted single-word or few-word terms and run those

18   searches?  Sure.  But I don't understand that is

19   what Plaintiffs are, in fact, asking for.  They're

20   looking for broad -- because they recognize they

21   will have to be limited to simple searches, they are

22   now going to want dozens of searches across dozens

23   of components, which --

24         THE COURT:  So back up for just a minute.

25         The searches have to be simple?  You can't

```
1    do a Boolean-logic search on the system, for some

2    reason?

3              MS. VICTORSON:  That's right.

4              THE COURT:  Why is that?

5              MS. VICTORSON:  Because it was designed

6    that way.  I don't have a much better answer other

7    than that.  You know, this was not a system that was

8    designed for legal discovery.  I don't think they

9    had that in mind when they created it.  And so

10   that's why we submitted the declaration from the

11   department.

12             THE COURT:  So you literally have to do

13   single-word or single-phrase searches seriatim,

14   instead of doing this or this or this or this?

15             MS. VICTORSON:  Yeah.

16             THE COURT:  So that adds some time and

17   trouble but doesn't, in the end, tell me how

18   burdensome it's going to be.  Maybe each one takes

19   10 seconds.  I don't know.

20             MS. VICTORSON:  Yeah.  Our larger point

21   with this was that -- yeah.  I mean, to conduct

22   those searches in a targeted way -- the other thing

23   that's pointed out in the declaration is that ███

24   ███████████████████████████████████████████████████

25   ███████████████████████████████████████████.
```

```
 1    So --
 2              THE COURT:  And that's a system limitation?
 3    You get ██████████?
 4              MS. VICTORSON:  Correct.  So there are just
 5    a number of --
 6              THE COURT:  Have you done any sample
 7    searches?
 8              MS. VICTORSON:  Have we done sample
 9    searches?
10              THE COURT:  Yes.  So, for example, you may
11    not ████████ with respect to any one search.  You
12    may get seven.  You know?
13              MS. VICTORSON:  So with respect to the
14    terms that Plaintiffs have asked us to run, we have
15    not done any sample searches.  But there is a sample
16    search at Paragraph 14 of the Golueke declaration,
17    which kind of walks through the challenges of the
18    result.
19              THE COURT:  I'm sorry, paragraph what?
20              MS. VICTORSON:  Paragraph 14.
21              THE COURT:  We're in 176 or 177?
22              MS. VICTORSON:  177.
23              THE COURT:  Okay.  All right.  Let me see
24    if I read this yesterday and forgot it already.
25    ████████████████████████████████████████████
```

1   █████████  ██████████████████████████

2   ██████████████████████████

3          All right.  And that looks like it was

4   across the entire  ██████████  right, not across a

5   particular component?  Is that how you're reading

6   Paragraph 14?

7          MS. VICTORSON:  Correct.

8          THE COURT:  All right.  "████████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ██████████████     All right.

12          MS. VICTORSON:  So, to be clear, the -- you

13  know, the potential compromise of running across

14  these components or subcomponents, this is not

15  something the parties have been discussing for

16  months.  This is a compromise that Plaintiffs have

17  suggested within the past few days.  So I'm not sure

18  we have completely run down the facts as to what

19  extent that is possible.

20          THE COURT:  Yeah, I think there may be a

21  solution somewhere in there.  What I'm inclined to

22  say -- and, again, recognizing that when you set

23  limits, sometimes it's more important to have the

24  limits than whether the limits are in exactly the

25  right place.

```
 1              But what I'd be inclined to say here is
 2    that in addition to pulling the complete tickets for
 3    all identifiable tickets that Plaintiffs give you in
 4    a reasonably prompt manner -- if you've got more,
 5    now is the time to give them a list; don't wait
 6    until the end of whatever my extended fact discovery
 7    cutoff date is.
 8              I'm inclined to let Plaintiffs sort of give
 9    it a try and see whether there's any there-there
10    with a limited number of domains and a limited
11    number of searches per domain.  And I'm not sure
12    what those numbers should be.
13              And I wonder if I -- I want to say if I can
14    trust you, but that doesn't sound right.  Of course,
15    I trust officers of the court implicitly.  But I
16    wonder how tight a rein I should keep on you, as
17    opposed to saying go forth and negotiate something
18    sensible here.
19              What do you think I should do?
20              MS. VICTORSON:  I will say I'm -- we were a
21    little bit troubled by Plaintiffs' latest proposed
22    compromise, where they're asking us to search for
23    overbroad terms, like "escalate."  But --
24              THE COURT:  Well, that might very well be
25    an overbroad term if you ran it across the entire
```

```
1              ███████  database.  It might be a very sensible
2     term within a particular domain.
3              MS. VICTORSON:  Yeah.  Yeah.  Fair enough.
4     I guess, I suppose I -- again, because we haven't
5     run down these specific facts with, you know -- and
6     the specific ability to search across subcomponent
7     of subcomponent, you know, we're certainly -- you
8     know, if there are a limited number of search terms
9     and a limited number of components, we can certainly
10    take that back.
11             And if that would result in something that,
12    you know, appears to be ████████████████
13    ████  or would be unreasonable in some way, you
14    know, we would certainly want to reserve the right
15    to push back.
16             THE COURT:  And it's maybe not the right
17    term.
18             You said that Plaintiffs recently gave you
19    how many search terms?
20             MS. VICTORSON:  Twenty.
21             THE COURT:  Twenty.  And did they give
22    you -- they didn't give you the domains they wanted
23    you to run it across?
24             MS. VICTORSON:  No.
25             THE COURT:  Okay.  Because they want you to
```

1    tell them what the relevant domains are.  And maybe

2    that needs to be a collaborative process.

3         All right.  Mr. Kane, how do you think I

4    should cabin my instructions here?

5         MR. KANE:  So, what we've done is we've

6    given Google search terms that they should use to

7    locate the correct components.

8         THE COURT:  Oh, these aren't the search

9    terms you want them to run?  These are the search

10   terms you want them to run to see where to run them?

11        MR. KANE:  We've given them both.  So what

12   we first need to do is find what are the components.

13   We've been saying domains, but the components.

14        THE COURT:  And how come you can't tell

15   them that by looking at the tickets that you have

16   and saying, "This is the one that comes up the most

17   often, so this one"?

18        MR. KANE:  We have very few tickets, so, I

19   mean, we can give them the ones that we see in the

20   tickets that we have, but then we're just --

21        THE COURT:  Well, you have 42 so far,

22   right?

23        MR. KANE:  But that's not 42 components,

24   Your Honor.  Some of the tickets have the same

25   components.

```
 1              THE COURT:  Precisely.
 2              MR. KANE:  But we're relying --
 3              THE COURT:  If you only have two -- if all
 4    of the 42 relevant tickets that you have resolved to
 5    the same two domains, Bob's your uncle, right?
 6              MR. KANE:  No, because we have no assurance
 7    that that's any kind of a representative sample.
 8    Like, there's no reason to just assume that the
 9    only -- that the █████████ tickets that we got that
10    Google deemed to be responsive from the particular
11    custodians they were searching at the time
12    represents the universe of ████████ tickets that
13    are relevant to this case.  It's --
14              THE COURT:  Well -- but do you have any
15    reason to believe that they're not a random sample?
16              MR. KANE:  We do, because of the frequency
17    with which Google -- the tickets that we've seen say
18    things like, "We're moving this entire discussion to
19    the ██████   In other words, it may be that these
20    discussions never got onto email because the people
21    didn't have notifications turned on.
22              THE COURT:  You mean, the ones you haven't
23    seen yet never got onto email?
24              MR. KANE:  Exactly.
25              We have no idea what we've gotten, whether
```

1    what we've gotten from Google is representative of

2    what's out there.  So we've given Google terms that

3    they should use to locate the relevant components,

4    and then we've given Google terms to use, once they

5    have those components, to conduct their searches.

6            THE COURT:  Seems like a very lengthy

7    process.

8            MR. KANE:  I mean, if Google wants to say,

9    "We've conducted an investigation, and we think that

10   these are the relevant components," we're happy --

11           THE COURT:  And here's why.

12           MR. KANE:  Yeah.  We're happy to look at

13   that.  What we've typically heard from Google is,

14   "We're not required to tell you how we conducted

15   these searches or how we located these documents."

16           THE COURT:  Well, generally speaking,

17   they're not, but sometimes it makes more sense for

18   them to be proactive here.  It saves everybody

19   time --

20           MR. KANE:  Precisely.

21           THE COURT:  -- and trouble.

22           So, Ms. Victorson, again, I'm looking at

23   this one example that I happen to have on my screen,

24   which is at Docket 161-1, and it looks like a tree

25   to me.  In other words, it looks like, reading from

```
1    the bottom up, the components. ████████████

2    ████████████████████████████████████████████

3    ████████████████████████████████████████████.

4              Is that right?  Am I reading that

5    correctly?

6              MS. VICTORSON:  I think you are reading it

7    correctly.  You know, just to be clear, there's

8    no -- you know, just from looking at this component,

9    it doesn't appear to be limited to the Shopping

10   platform at issue.  So this may -- you know, I can't

11   tell you today because we haven't run the terms,

12   but, you know, running very broad terms across ████

13   ████████████████████████████████████████████

14   subcomponent may still result in --

15             THE COURT:  Well, in a way, that's what I'm

16   trying to figure out.  If I view this as a tree with

17   ████████████████████████████████, then I

18   would think, not knowing anything about this system

19   whatsoever, so it's entirely possible that I'm

20   completely barking up the wrong tree here -- but I

21   would think that running a search across ████████

22   ██████████████████████████████ is going to

23   be huge and probably not very practical or

24   well-targeted.

25             But if you drill down through three or four
```

```
 1    or five or seven layers of subcategories, running

 2    that same search might produce a much more

 3    manageable set of results.

 4         MS. VICTORSON:  Yeah, that may be the case.

 5         THE COURT:  All right.  I hesitate here.  I

 6    like to be specific.  I like to be black-and-white

 7    when I give people discovery orders because it saves

 8    trouble later on.  But I'm just not able to be in

 9    this instance.  I'm not sure I'm able to be more

10    specific than to say, plaintiffs are entitled, in

11    collaboration with defendant, to identify a limited

12    set of domains and ask Google to run a limited set

13    of simplified search terms consistent with the

14    capabilities of the system across those domains.

15         I want both the number of domains and the

16    number of search terms requested in each domain to

17    be reasonable, to be limited.  And I do want the

18    parties to collaborate, which may involve doing some

19    test runs, you know, to make sure that they're doing

20    it the right way, both to identify the most relevant

21    domains or components, as you call them -- I'm using

22    the wrong terms here -- and searches that actually

23    make sense and are going to return something useful

24    and not a bunch of people complaining about issues

25    which have absolutely nothing to do with this case
```

```
1    whatsoever.

2              So help me, both sides.  How can I write

3    that up in a way that doesn't just guarantee that

4    you're going to be back here in two weeks?

5              Mr. Kane?

6              MR. KANE:  I mean, I think what Google

7    needs to do is come up with a list itself of what it

8    thinks the relevant components are.  We can review

9    that.  If there are search terms you want them to

10   use to find the components, we could suggest that

11   they do that, and then we can give them the terms --

12             THE COURT:  Well, I'm not sure that -- I

13   think maybe this should come from both sides at

14   once, honestly, particularly because I don't want

15   this to take months and months and months and months

16   before you even run the first test search.

17             I do think you have it within your

18   capacity, based on the examples you have.  Even if

19   you don't think you have a robust sample set, you

20   have a non-zero sample set and you know within which

21   domains, within which components the relevant

22   tickets that you do have popped up.  That's not a

23   bad way to start.

24             I agree that Google, which knows a whole

25   lot more about ███████  than you do, also should
```

1    put its thinking cap on and say, you know, "We think

2    these five are the most likely to be fruitful," and

3    I think you should talk about it and do some tests

4    and figure out who's right.

5              MR. KANE:  Yeah.  One thing that might help

6    is for the trees that we know about, if they can

7    give us all the components -- the names of the

8    components that are sort of farther in on the tree.

9    What I mean by that is, like, we've got one that's

10   ██████████████████████████████████████████████████

11   ███████████████████████.  If they gave us all the

12   components that are under, say, ██████████████, like

13   if they went back a few steps --

14             THE COURT:  You mean all the components

15   that weren't part of that tree?  You want the table

16   of contents?

17             MR. KANE:  Yes.  But not for, like, the

18   whole ████████████ necessarily, unless they have it.

19   But for -- you know, if we could say to them, "Okay,

20   this one has seven items in the tree.  Give us all

21   the components that are under the third item."

22             THE COURT:  All the branches not taken?

23             MR. KANE:  Exactly, yeah.

24             That might be sort of a simpler way to --

25   or a helpful way to identify some of the relevant

1    components.

2            THE COURT:  Well, I certainly agree that if

3    there's a -- in my mind, if there's a table of

4    contents of that sort -- an index out there,

5    everybody should have it.

6            MS. VICTORSON:  Yeah.  This is the first

7    time we're hearing about this, so I can't tell you,

8    standing here today, whether that is something that

9    is easy to get or not.  We can certainly take that

10   back, if it would be helpful for us to use.  I don't

11   know if it's technically feasible or not.

12           What I might suggest, though, in order to

13   set both temporal and other limits on this activity,

14   is that the parties agree to exchange both top five

15   components, top five search terms that the parties

16   believe, based on the information available to them,

17   would be most likely to target relevant information

18   in this case, and then --

19           THE COURT:  And give you a time limit for

20   working it out.  That's not a bad idea.

21           How long is it going to take Google?

22           MS. VICTORSON:  To suggest top five

23   components and search terms?  I would say --

24           THE COURT:  Five may be a little low a

25   number.

```
 1                    MS. VICTORSON:  Yeah, it depends on how

 2       many terms, I suppose.  We would -- you know, we

 3       would have to investigate.  But, you know,

 4       certainly, you know, within a few weeks or a month,

 5       that would be certainly doable.

 6                    THE COURT:  Mr. Kane?

 7                    MR. KANE:  I don't know how we settled on

 8       five.

 9                    THE COURT:  I'm not -- I'm not there yet.

10       Sounds a little low to me.

11                    MR. KANE:  It could be far more than that.

12       I think it really needs to be --

13                    THE COURT:  We have to start somewhere.

14                    MR. KANE:  So, I mean, we can give Google

15       the ones we know about and we can tell them, look,

16       if you give us all of the branches not taken, as you

17       said, and for particular ones, we can start there.

18       But it's really Google who's in a position to say,

19       look, either here's an index of all the components

20       that are available, or here's the one that we think

21       are relevant.

22                    If they're not able to do that, we've

23       suggested search terms they can use to find them.

24                    THE COURT:  Yeah, I'm not thrilled with the

25       idea of search terms to find domains to search.
```

```
1    That strikes me as -- I don't know.  Again, not my
2    system.
3          All right.  How about this?  Google will
4    promptly -- and by "promptly," I mean when you get
5    back to the office this afternoon -- counsel will
6    promptly inquire with the client as to whether a --
7    I don't know what to call it -- key, index, table of
8    contents, tree showing all the branches and all the
9    twigs, whether can be made available to counsel for
10   both sides.  And, if so, do that immediately, as
11   soon as you put your hands on it.
12         And if it doesn't exist, you know, tell
13   Plaintiffs why it doesn't and what, if anything, is
14   out there that a person can use to figure out how
15   many sub-domains branch off of this one or that one
16   or the other one.
17         So do that first, and then I'm going to
18   give you -- I'm going to put you on a short list,
19   and I'm going to say two weeks from today -- today
20   being the 8th; that would be the 22nd -- I want the
21   parties to exchange their initial lists.  And we'll
22   go to 10, because it's a round number.  Top 10
23   domains and top 10 search terms.
24         Do the Plaintiffs understand how simple the
25   search terms have to be?  I don't want them giving
```

```
1    you search terms that they spent a lot of time
2    thinking about how to make reasonable, only to have
3    you come back and say, "No, no, technically, this
4    one won't work."
5              MS. VICTORSON:  So I think so.  But I just
6    want to flag that if we are going -- if, as a part
7    of the process of figuring out if this is even
8    returning relevant results, is going to require
9    Google to run 10 terms across 10 domains, both from
10   each party, that's going to require 2,000 individual
11   inputs by someone at Google.  Right?  Because it's
12   going to be 10 --
13             THE COURT:  I'm not suggesting that.
14             MS. VICTORSON:  Or sorry, 200.  Not 2,000.
15   But --
16             THE COURT:  I'm not suggesting that.
17   Because, first of all, there may well be a fair
18   amount of overlap.  And, second of all, to the
19   extent there's not overlap, I'm not suggesting that
20   you run all the searches to see which searches
21   you're going to run.  At that point, you're going to
22   meet, you're going to confer, you're going to choose
23   a couple as test cases, and you're going to proceed
24   in an iterative manner.
25             MS. VICTORSON:  Perfect.
```

```
 1              THE COURT:  Okay?
 2              MS. VICTORSON:  Yeah.
 3              THE COURT:  So I think maybe we need to
 4    leave it there for now.
 5              Let me give you one other cautionary note.
 6    If the domains work the way I'm assuming they work,
 7    that there's a top level and then a subcategory and
 8    a sub-subcategory and a sub-sub-subcategory,
 9    obviously -- Mr. Kane, I hope I don't need to tell
10    you this -- you cannot pick as your top 10 domains
11    top-level domains that are going to have a huge
12    amount of irrelevant as well as relevant tickets in
13    them.  You have to drill down to some reasonable
14    level of specificity here, where you actually think
15    this is the sub-sub-subcategory where we're going to
16    find the most relevant stuff.
17              MR. KANE:  Yeah, understood.  And we're
18    happy to do that.  I would say it depends a great
19    deal on the quality of the information Google gives
20    us.  In other words, if they're not able to give us
21    the sort of table of contents that you were
22    describing, it's going to be a lot harder for us to
23    say, "Well, here are the relevant components."
24              THE COURT:  I understand.  And Google, on
25    its end, does have resources in-house to help it
```

1    help you.  I mean, they're going to go talk to the

2    people who actually run this system, presumably, and

3    understand its architecture.

4        And to the extent it's going to make

5    everybody's life easier, you're going to share that

6    information with the Plaintiffs, right?

7        MS. VICTORSON:  Yes.

8        THE COURT:  All right.  So let's leave it

9    at that.  Promptly produce what I'm very

10   inaccurately calling a table of contents, to the

11   extent something like that exists.  Swap your

12   initial lists of 10 and 10 within two weeks.  And

13   promptly thereafter, meet and confer in good faith,

14   running tests as and when necessary, until hopefully

15   you agree on what the program is going to be.  And

16   if you have to come back to me, you'll come back to

17   me.  All right.

18       MS. VICTORSON:  Thank you.

19       THE COURT:  Maybe I should give you an

20   outside limit for when you have to come back to me

21   on this one.  Maybe not.  Maybe not.

22       All right.  So we have one more topic in

23   the first omnibus motion, which is when did the DMCA

24   policy get created.

25       Mr. Kane?

```
 1                MR. KANE:  Yeah.  So this is maybe the
 2      strangest issue we have for you today.
 3                THE COURT:  Yeah.  My first thought when I
 4      read it was, "Why don't you know this already?"
 5                MR. KANE:  It's baffling to me that we
 6      don't.  So Google has agreed to respond to an RFP
 7      asking for documents concerning the creation and
 8      implementation of the DMCA policy.
 9                THE COURT:  Right.
10                MR. KANE:  They've also agreed to identify
11      persons with responsibility for designing or
12      developing the DMCA policy.
13                THE COURT:  Right.
14                MR. KANE:  To respond to either of those
15      discovery requests, we need to know the date on
16      which the operative policy was created and
17      implemented.  I don't know how you can give us the
18      documents concerning the creation and implementation
19      of the policy without knowing when it was created
20      and implemented.
21                THE COURT:  And the only date you have so
22      far is ████████████████████
23                MR. KANE:  That's correct.  And we don't
24      know whether updated means that's when it was
25      first -- yeah.  Okay.
```

```
 1            So the policy currently is it's a
 2   ████████████.  It's on a ████████████
 3   ████████████████████████████████████████
 4   ████████████████████  ████████████
 5   ████████████████  ████████████████████
 6   ████████████████  When did that become
 7   the policy is the question.
 8            THE COURT:  Right.  Did it used to be ████
 9   ████  ████████████████████  When?
10            MR. KANE:  Exactly.
11            And what we know is that it used to be ████
12   ████.  So Google had a policy for which --
13            THE COURT:  Well --
14            MR. KANE:  -- ████████████████████
15   ████████████ --
16            THE COURT:  I'm not sure I would read it
17   quite that way, but --
18            MR. KANE:  Well, they had a -- a feature of
19   the policy previously was ████████████████
20   ████████████████████████████
21   ████████████████████ --
22            THE COURT:  ████████████.
23            MR. KANE:  ████████████████████.
24            THE COURT:  Right.
25            MR. KANE:  -- ████████████████
```

1    ██████████████████████████████████

2    ████████    You just --

3           THE COURT:  And that does not exist in the

4    ███████████  of the policy?

5           MR. KANE:  That is correct.  So --

6           THE COURT:  So has this policy, as you

7    understand it, not been modified since

8    ██████████████? That's almost ███████ ago.

9           MR. KANE:  Google has not given us a

10   document that says it's been modified.  As far as we

11   know, that's the operative policy for the case.

12          THE COURT:  All right.  And how do you know

13   that it was modified in ███████████? Where does

14   it say that?

15          MR. KANE:  The only thing we have is that

16   ████████████████████  on the policy itself.

17          THE COURT:  Which is like somebody typed

18   that, is what you're saying?

19          MR. KANE:  I don't know whether that means

20   a comma -- I don't think someone typed it.  I think

21   it's, you know, built into the document.  I don't

22   know whether that's because someone added a comma or

23   corrected a spelling error or because it actually

24   was created and implemented in ████████████.

25          THE COURT:  Okay.  All right.  So I

1      understand the problem.  And I do think, at least in

2      principle, that to the extent the policy was

3      different in January of 2018, for example, you're

4      entitled to know -- you're entitled to know what the

5      policy was at the times relevant to this lawsuit.

6              So if the policy was different, if there

7      was -- it was version 3.0 between ██████████, it

8      seems to me you should know that; if it was version

9      2.5 between 2017 and 2018, whatever.  I'm giving

10     dates that are probably broader than necessary.

11             But I understand the problem.  I'm not sure

12     I understand why it's a problem.

13             Google, what say you?

14             MS. TOMKOWIAK:  Well, Your Honor, I do

15     agree that it's the strangest issue that's before

16     you today, but for a different reason.

17             THE COURT:  Okay.

18             MS. TOMKOWIAK:  You said that, you know,

19     they're entitled to know what the policy was at all

20     times relevant to this lawsuit.  So I think it's

21     important that we discuss what that time period is.

22             THE COURT:  Okay.

23             MS. TOMKOWIAK:  As Ms. Murphy indicated,

24     they first started sending Google DMCA notices in

25     June 2021.  They filed the suit in 2024.  The

```
 1   statute of limitations period goes back to
 2   June 2021.  Their own document requests ask for
 3   documents that go back to January 1st, 2020, and
 4   we've agreed to provide those.
 5          And so that's what we have provided.  We've
 6   provided the policy as of ██████████ that was in
 7   effect, again, prior to the time that they started
 8   sending these notices.  And I believe we've also --
 9          THE COURT:  So that policy was in effect
10   throughout ████? That's what you're saying?
11          MS. TOMKOWIAK:  It was updated ██████████
12   ████.
13          THE COURT:  Right.
14          So how was it different between ██████████████
15   █████████████? 
16          MS. TOMKOWIAK:  My understanding is that
17   that's the only policy that exists during that time
18   frame at Google.
19          THE COURT:  What do you mean?
20          MS. TOMKOWIAK:  I mean that when we search
21   within that --
22          THE COURT:  If it was update- -- if it was
23   updated in ██████████████, and even if not a
24   single semicolon has been altered since then, but if
25   it was last updated or last modified in
```

```
1    ██████████████, then it was different in ██████████,
2    right?
3              MS. TOMKOWIAK:  I don't think it was.  I
4    think that if it was different, it was prior to
5    ██████████████, because that's the only policy we
6    found within that time period.  So, you know, I
7    don't need to tell you, but typically, and here, the
8    parties agree to a relevant time period, and then
9    you look for the documents within that time period.
10   That's the policy that we found in the time period
11   January --
12             THE COURT:  Well, typically, you look for
13   the policy -- when you're discovering policies, you
14   look for the policy that was in effect during that
15   time period.  So, hypothetically, let us suppose
16   that the prior amendment to the policy happened in
17   July of 2019.  So there was one version in effect
18   between July of 2019 and ██████████████.  I think
19   the Plaintiffs are entitled to that, even if the
20   document is dated 2019, because that's when it was,
21   at that time, last amended.
22             Do you follow me?
23             MS. TOMKOWIAK:  I do, but the thing I'm not
24   following is why they are entitled to something from
25   2019, when they didn't start sending notices until
```

```
 1    June 2021.
 2              THE COURT:  Because, as you told me, for
 3    discovery purposes, we all seem to be going to
 4    January 1, 2020.  There is an argument, I suppose,
 5    for not permitting discovery until 2021, but
 6    discovery broader than admissibility, Rule 26, et
 7    cetera, et cetera, et cetera, we usually give folks
 8    a little bit of a buffer in this regard.
 9              So using January 1, 2020 as the start date
10    for what's discoverable -- look, there's -- in all
11    likelihood, if you haven't changed this thing since
12    ███████████████, if it's been the same since then,
13    there's, in all likelihood, only one other version
14    out there, and it may well have been hardly any
15    different from the ███████████ version.
16              But I think you should go see what was in
17    effect from January 1 through ███████████, and
18    I think you should give it to them.
19              MS. TOMKOWIAK:  If that's the narrow thing
20    that we're being asked to do is to look for the
21    policy that was in place prior to January 1st, 2020,
22    and provide it to them, that might be something that
23    we can do.  That's not, to date, what we've been
24    asked to do.  And I don't think that there is,
25    currently, a request for production or an
```

 1    interrogatory that calls for that information.  But

 2    if that's how Your Honor wants to resolve the

 3    dispute, we can go back and look at the policy.

 4            THE COURT:  Well, that strikes me as a

 5    fairly easy portion of the request.

 6            Now, let me go to the other end.  The

 7    policy that you did produce, the one that they have,

 8    has this ███████████ date on it.

 9            Is it your representation that it has been

10    unchanged since then?

11            MS. TOMKOWIAK:  I believe we have actually

12    produced a version that was ███████████, and I

13    just want to go back and take a look at that, and I

14    suspect that we're breaking for lunch soon or taking

15    some breaks.  So, if we are, we can go back and

16    check that.  But --

17            THE COURT:  I'm getting hungry.  I don't

18    know about you.

19            MS. TOMKOWIAK:  A little bit.

20            THE COURT:  So --

21            MS. TOMKOWIAK:  But we have searched for

22    and produced the policies that have been in effect

23    during the entire time period.  So, yes.

24            THE COURT:  Right.

25            MS. TOMKOWIAK:  If I'm right, then it's

```
 1    ███ , but there has not been -- there's not a policy
 2    that we're withholding on the front end.
 3              THE COURT:  Right.
 4         So I would say, just on sort of basic
 5    principles, they are entitled to a complete version
 6    of each policy or each iteration of the policy that
 7    was in effect starting Jan 1, 2020, through today,
 8    and they're also entitled to know when any
 9    modifications occurred during that period.
10         So, if after 2020, there was only one
11    modification and it took effect on a certain date in
12    ███ , that's fine, as long as they have that date
13    and they know when things changed and what changed
14    on that date.
15              Now, to the extent that the Plaintiffs also
16    want to know -- want to go back into the mists of
17    time and learn a whole bunch about when Google first
18    developed the DMCA policy and who was involved and
19    why Section 2 in its 2012 version said this, that,
20    or the other thing, now I'm having doubts about
21    relevance.  But certainly, they're entitled to know
22    what was actually in effect at all times during a
23    somewhat generous view of the relevant period.
24              So let me hear from Mr. Kane about what he
25    thinks Plaintiffs are entitled to beyond what I've
```

 1    just said.
 2              And, by the way, do you have versions since
 3    ████████████, something with a ████████████, for
 4    example?
 5              MR. KANE:  I don't think I've seen that.  I
 6    can't guarantee that we don't, but I don't think
 7    I've seen that.
 8              THE COURT:  All right.  Well, if you
 9    haven't, and if there is one, you will.
10              MR. KANE:  The distinction I would make is
11    just we want to know when the current policy was put
12    into effect.  So --
13              THE COURT:  The current policy?
14              MR. KANE:  Right.  The one that says
15    ████████████████████.
16              THE COURT:  So I would say ████████████.
17              I mean, why isn't that the answer?
18              MR. KANE:  If it is, terrific.  But all it
19    says is updated.  Like we just want to know, like,
20    is that when it was actually implemented?  Like,
21    they used to have some other policy; now they have
22    this ████████████████████.  Like --
23              THE COURT:  Well, I'm going to give you
24    whatever the preceding -- whatever the preceding
25    iteration was, you're going to get.

```
 1              MR. KANE:  Correct.
 2              THE COURT:  So can compare, and you can
 3    say, "Ah, the ████████████████████████████████
 4    ████████████████████████████████████████."
 5    Whatever it says.
 6              MR. KANE:  Right.  What it may not give me
 7    is, like, what's the date on which the ███████ one
 8    went into effect.  Like, that's what we're trying to
 9    figure out.
10              In other words, when it says updated
11    ███████████████, does that mean it became a policy
12    in ███████████████?
13              THE COURT:  Or did someone write it in ██████
14    and then it sat around for three months before it
15    got approved by the brass?
16              MR. KANE:  Exactly.  Like, we want to know,
17    when did Google's DMCA policy become what it is now,
18    the ██████████████████████████████████████.
19    So that's why we're saying, like, the updated date
20    isn't enough.  We want to know, like, the one that
21    says updated ███████████████ --
22              THE COURT:  What is -- what do you --
23              MR. KANE:  -- did it become a policy in
24    June or -- sorry.
25              THE COURT:  Do you want this as an
```

1    interrogatory response, or do you want them to pull

2    the email where they sent it out to people and said,

3    "Here's our updated policy.  Apply it"?

4        MR. KANE:  An interrogatory response would

5    be fine.  The thing is, we don't know what the

6    relevant time period should be for these requests

7    until we know when that policy was implemented.  In

8    other words, when they respond to a rog that says,

9    "Who are the people who were involved in creating

10   and implementing the policy," we can't give them the

11   relevant time period for that rog if we don't know

12   when the relevant policy was put into effect.

13       THE COURT:  Yeah, I think --

14       MR. KANE:  We're certainly happy to send

15   them a rog that says, "Please tell us the date that

16   this policy was created and put into effect."

17       THE COURT:  All right.  So it sounds like

18   what we're doing here is, to the extent that you

19   have not yet received the actual policy, including

20   each separate modification or iteration from

21   January 1, 2020 to the present, Google will produce

22   them to you.  Google tells me that counsel believes

23   there was a further modification in ██████.  Maybe you

24   already have it.  You just don't have it front of

25   mind.  Maybe you don't have it, and Google will

1      produce it.
2             This may be much ado about nothing.
3      Generally speaking, when a corporate policy says
4      modified on a particular date, that's the date on
5      which the policy went into effect.  Maybe life is
6      different at Google.  I don't know.
7             I don't have a problem with you asking that
8      in an interrogatory, did the policy reflected in
9      document Bates number so-and-so go into effect in
10     ███████████, and, if not, when did it go into
11     effect?  I don't have a problem with that.
12            Does that do it for you, those two things?
13            MR. KANE:  Yes.  As long as, to be clear,
14     we're getting the prior policy, whichever was the
15     one before.
16            THE COURT:  Right.  So, to the extent --
17     and it sounds like there was a different policy.
18     Whether it was only a tiny, little bit different or
19     whether it was materially different, I have no idea.
20     But it sounds like there was a different policy or a
21     different version of the policy in effect prior to
22     ████████████.  You're going to get that one,
23     whatever it is.
24            And if it has -- maybe the date on that one
25     is 2019; maybe the date on that one is 2015.  I have

1     no idea.  Maybe there are two of them.  One of them
2     stated middle of 2019, and one of them stated
3     March 2020.  I don't know.  But you're going to get
4     a complete copy of everything that was in effect as
5     of Jan. 1, 2020 and then forward.
6               And I don't have a problem -- unless
7     Ms. Tomkowiak tells me that I should have a problem
8     that I haven't thought about yet -- with you asking
9     a single interrogatory that says, "As to each of
10    these, did it go into effect on the date that it
11    bears?  If not, when did it go into effect?"
12              Are you okay with that, Google?
13              MR. KANE:  I was just going to ask if we
14    could get a somewhat expedited response to the
15    interrogatory.  That would be helpful, rather than
16    the normal 30 days that parties take.
17              THE COURT:  Well, let me just --
18              MR. KANE:  Sure.
19              THE COURT:  Let me just hear if we're all
20    on the same page here.
21              MS. TOMKOWIAK:  I think we're on the same
22    page in the sense that we will go back and look for
23    the policy that was in effect prior to the policy
24    that was updated in ███████████ .  So whatever was
25    in effect as of January 1st, 2020, that's what we're

1    looking for.  As --

2            THE COURT:  It's possible that you're going

3    to have to look for more than one, if it was updated

4    in March or April or May.

5            MS. TOMKOWIAK:  I'm telling you, I think

6    that's what we've already looked for, because we

7    looked for January 1st going forward.

8            THE COURT:  Oh, I see.

9            MS. TOMKOWIAK:  So it's going to -- yeah.

10           THE COURT:  It's going to be earlier than

11   Jan 1st.  All right.

12           MS. TOMKOWIAK:  That's my -- that's my

13   expectation, because that's the time period in which

14   we were already looking.

15           So I understand that the guidance is and

16   the order is to go back and find the version -- the

17   policy in place prior to the one that was updated in

18   ██████████████ .

19           As for an interrogatory, the Plaintiffs

20   have interrogatories left.  They can use them as

21   they choose.  We will, of course, answer any

22   interrogatory that they propound.  I don't think

23   there's any reason for a special snowflake

24   interrogatory that requires us to answer it in --

25   that's a term I use with my kids.

```
 1                THE COURT:  It's new to me.
 2                MS. TOMKOWIAK:  Yeah.  I don't think
 3       there's any reason for us to answer it on some
 4       expedited basis.  They haven't provided good cause
 5       to default from the 30 days under the rules.
 6                And I just want to be clear that, I mean,
 7       what we're -- the interrogatory that I think we're
 8       answering is when did the policy that we've provided
 9       them, that says updated ████████ at the top, go
10       into effect at Google and that --
11                THE COURT:  Maybe you know the answer.
12       Was it ██████████?
13                MS. TOMKOWIAK:  I think so.  But I would
14       like my -- you know -- you know, I don't want to.
15                THE COURT:  But they want that under oath.
16                MS. TOMKOWIAK:  They want that under oath.
17                THE COURT:  Why do you need that chop,
18       chop, Mr. Kane?  Why can't you wait 30 days for
19       that?
20                MR. KANE:  Because if we get an answer in
21       30 days, that isn't -- it's -- that's, like,
22       Lathamized and where we can't tell what the answer
23       actually is, we'll need to go back to them.  And
24       this case was filed in June.
25                THE COURT:  But that's always true.  I
```

```
 1    mean, whenever you send an interrogatory and get an
 2    answer you don't like, you have to go back to them.
 3         Why is this -- why is this interrogatory
 4    different from all other interrogatories?
 5         MR. KANE:  I think the reason it's
 6    different is they should know this already.  Right?
 7    They responded to a rog that said, "Please tell us
 8    the people who were involved in the creation and
 9    implementation of this policy."  How did they do
10    that if they didn't know when the rog was created
11    and implemented?
12         They responded to an RFP that says, "Give
13    us all the documents pertaining to the creation and
14    implementation of this policy."  How did they do
15    that if they didn't know when the policy was created
16    and implemented?  How did they respond to any of
17    these things if they didn't know when this policy
18    was put into effect?  They shouldn't need 30 days to
19    come up with that answer.
20         THE COURT:  I think you're overthinking
21    this.  I think the answer is going to be ████████
22    ████, and I don't see a need for a special schedule
23    here.
24         Do you consider this question part of the
25    rog that you've already sent, or do you wish to
```

```
1    write a new one to make sure it's clear?
2              MR. KANE:  I certainly like the idea of
3    considering it part of the rog we already sent.
4              THE COURT:  I'm not sure it is, though.
5              MS. TOMKOWIAK:  It is not part of the rog.
6              THE COURT:  Read me -- read me the rog you
7    already sent.  I don't think it is.  I think you
8    have to send a new one.
9              MS. TOMKOWIAK:  It's not.
10             THE COURT:  All right.  Fine.  But to head
11   off any pesky problems about subparts, if you get
12   more than one version, you can use one interrogatory
13   to ask about all of them.  You don't have to use up
14   your precious interrogatories for each different
15   iteration that you get.  Just say, you know, "Did
16   these things go into effect on the date they bear?
17   And, if not, when did they go into effect?"
18             All right.  This brings us, I think, to the
19   close of one of the omnibus motions.  And here it is
20   after 1:00, almost 1:30.  I propose that we take
21   about a half an hour.
22             Ms. K, do I have a 2:00?
23             THE DEPUTY CLERK:  No, Your Honor.
24             THE COURT:  Excellent.  I propose that we
25   take about half an hour.  That will not give you
```

1    time to go out and have a proper lunch.  It will

2    give you time, if you wish, to visit our in-house

3    cafeteria, which is still open, and we'll come back

4    at 10 to 2:00.

5            Does that work for everybody?  Okay.

6            MS. TOMKOWIAK:  Yes.  Thank you.

7            THE COURT:  All right.  So we'll be in

8    recess, and I'll see you soon.

9            (Recess.)

10           THE DEPUTY CLERK:  We're now back on the

11   record in the matter of Cengage Learning, Inc., et

12   al., v. Google, LLC, case number 24-cv-4274.

13           THE COURT:  You don't all have to

14   reintroduce yourselves.  Hopefully, I can remember

15   who you are.

16           All right.  We're going to move on now to

17   Google's omnibus motion at Docket No. 159.  This is

18   a two-parter, as I understand it.  The first part is

19   set up in the form of an interrogatory, but I'm more

20   interested in substance than form here:  Are the

21   Plaintiffs required to match up documents with the

22   works in issue?  And, second, are the Plaintiffs'

23   disclosures adequate, particularly with regard to

24   damages?

25           Ms. Bladow?

1    MS. BLADOW:  Yes, Your Honor.  I'll be

2    handling the interrogatory portion, and my

3    colleague, Ms. Victorson, will be handling the

4    damages disclosures.

5    THE COURT:  Okay.  I'm sorry, I'm looking

6    around for my notepad, which I have left downstairs,

7    so I will take notes on my -- aha -- on this other

8    notepad.

9    Proceed.

10    MS. BLADOW:  So, to start, it's the

11    Plaintiffs' burden to prove infringement, and to do

12    so, they need to connect a couple of different dots,

13    including that, for each work in suit, there was an

14    advertisement that appeared on Google that led to a

15    sale of one of the works in suit.

16    And Google is entitled to know what

17    evidence that Plaintiffs have and plan to use at

18    summary judgment or trial to support their theory of

19    infringement -- effectively, that there was an ad,

20    someone clicked on it, and purchased a book.

21    THE COURT:  Right.  Now, Plaintiffs say you

22    have all these documents, and we don't have to go

23    through and match them up yet.  We don't have to do

24    that until we get to summary judgment.  As I

25    understand it, that's kind of their main argument.

1          MS. BLADOW:  I think my understanding was

2     they weren't necessarily planning to do that at all.

3          But I think it's helpful, kind of, to give

4     Your Honor a little bit of context.  Plaintiffs

5     provided the court with two exhibits in response to

6     our letter.  Those are at Docket Nos. 179-1 and

7     179-2.

8          THE COURT:  Right.  I have those.

9          MS. BLADOW:  And so the first exhibit is

10    what you see when you search Google for a book, and

11    the second exhibit is what Plaintiffs claim is a

12    landing page after clicking on one of those images

13    on the search results page.  And so all that is is

14    evidence of an advertisement.

15         So I have, as Plaintiffs helpfully

16    clarified, almost 250,000 screenshots consisting of

17    searches of Google and landing pages.  And they're

18    asking me to not only match those up, but then also

19    connect that to their theory of direct infringement

20    of a purchase.  And so they indicated they also have

21    screenshots of test purchases, and they did provide

22    us with the beginning Bates numbers for the

23    documentation that they believe encompasses the test

24    purchase.  But that is just --

25         THE COURT:  Now they've done that for each

```
 1    of the 7,000-and-some-odd works, or just for some?

 2              MS. BLADOW:  Only for about 90.

 3              And that documentation, Your Honor, shows a

 4    purchase of a work from a third party's website --

 5              THE COURT:  Right.

 6              MS. BLADOW:  -- but there's no

 7    corresponding ad to Google.  So take, for example,

 8    the work in Exhibit 2, which I believe is "Financial

 9    and Managerial Accounting," published by Cengage.

10    So I cross-referenced with their interrogatory

11    response, which we received --

12              THE COURT:  Now wait a minute.  Exhibit 2

13    here shows a sale from a --

14              MS. BLADOW:  Yes, it's just the landing

15    page.

16              THE COURT:  Okay.

17              MS. BLADOW:  It's just they clicked on an

18    ad, and this is what appeared.

19              THE COURT:  When they clicked through?

20              MS. BLADOW:  When they clicked through.

21    And you'll see this is BrandFly Media -- I don't

22    even know -- Media.com.  That's the website.

23              THE COURT:  Where am I seeing that?

24              MS. BLADOW:  You can see on the last page.

25    There's also a logo at the top of the first.
```

1          THE COURT:  Ah, BrandFly Media.  All right.

2     So that's the pirate seller?

3          MS. BLADOW:  That's the alleged pirate

4     seller.

5          THE COURT:  Alleged pirate seller.  Okay.

6          MS. BLADOW:  And so they provided us with

7     the Bates numbers for the documentation for test

8     purchases for 90 works, and we received those Bates

9     numbers after we filed this motion.

10          But I went and I, before this hearing,

11     cross-referenced the "Financial and Managerial

12     Accounting" title with those 90 works, and I pulled

13     the test purchase documentation for that work, and

14     all it shows is a purchase of the work from an

15     entirely different website, heminder.com or

16     heminder.myshopify.com.

17          THE COURT:  Perhaps they were mistaken.

18          MS. BLADOW:  The metadata for the exhibits

19     they filed is from October of 2023.  The metadata

20     for the screenshots of the test purchase are for

21     2025.  I have no evidence or no indication from

22     Plaintiffs that these correspond to one another.

23          And so the advertisement on Google itself

24     isn't infringement.  The landing page itself also

25     isn't infringement.  It's the end sale.  And so what

1     we're asking them to do is connect all of those dots

2     together and identify what is the ad that you claim

3     appeared on Google that is connected to the act of

4     infringement that you're claiming we contributed to,

5     which is the purchase of the work.

6          THE COURT:  So you actually want three

7     Bates numbers for each work?

8          MS. BLADOW:  Based on what they have

9     produced to us, I would expect to see -- and based

10    on what they have expressed as their theory of

11    infringement, I would expect to see a Bates number

12    for the first time they searched Google for the book

13    and saw the infringing ad.  I'd expect to see the

14    corresponding landing page that they clicked on that

15    then they reported to Google.  They've said that

16    they're only claiming infringement for, like, after

17    they notified Google.  So I'd expect to see a second

18    search for that book where they saw the ad again.

19    And then I would expect to see corresponding test

20    purchase data.

21          THE COURT:  So four?

22          MS. BLADOW:  Yeah.

23          THE COURT:  And the test purchase would be

24    from an alleged pirate site, right?

25          MS. BLADOW:  Correct.  But that corresponds

1    with the infringing ad that they saw.

2              THE COURT:  Well, what do you mean

3    "corresponds with the infringing ad"?  Do they have

4    to have clicked through that exact ad?

5              MS. BLADOW:  Yes.

6              THE COURT:  Why?

7              MS. BLADOW:  Because Google is alleged to

8    have contributed to the infringement by advertising

9    the work.  So if they see the ad and they report it

10   to us and then they later go back to the third-party

11   website without ever going back through Google --

12             THE COURT:  No, but what if there's a new

13   ad on Google which is different from the first ad,

14   but still leads to the pirate site?

15             MS. BLADOW:  That leads to the same URL for

16   the same book?

17             THE COURT:  Right.  No, I understand your

18   point about how you're not liable unless, among

19   other things, you don't take the ad down when they

20   ask you to.  But this sort of strict one-to-one

21   correspondence, I guess I'm not quite where you are.

22             And while we're on the topic, why do they

23   have to, in discovery, identify the Bates number of

24   the original infringe -- allegedly infringing ad

25   before they notified you of it?  Isn't that

1    information contained in the notice?

2              MS. BLADOW:  It -- theoretically, it could

3    be.  But I think --

4              THE COURT:  Well, when they send you a

5    notice, they have to tell you what it is they want

6    you to take down, right?

7              MS. BLADOW:  Right.  I think the broader

8    point is thinking about how they're going to present

9    this to a jury, right, and how they're going to tell

10   their story to a jury.  And of the 250,000

11   screenshots, I don't know which of those match up

12   with which works.

13             I think, as explained in my declaration

14   attached to our motion, it was a document dump, and

15   they conceded -- Plaintiffs have conceded that it

16   was a document dump because they didn't go through

17   and take out nonresponsive documents.  They didn't

18   take out documents for works published by a

19   publisher who's not in this lawsuit.  They didn't

20   essentially clean their production before they gave

21   it to us.

22             THE COURT:  Right.  And you think they're

23   going to do that for summary judgment or trial, but

24   you don't think you should have to scramble and

25   figure out what you're going to do about it at that

1    point without getting that information now during

2    discovery?

3              MS. BLADOW:  Correct.  Because, at this

4    point, I don't have -- at this point, I could file a

5    summary judgment motion that says, "All I have are a

6    bunch of ads and a bunch of test purchases" --

7              THE COURT:  I understand.  And that's what.

8              MS. BLADOW:  "I have no link."  And then

9    I'm waiting for them to come back to me with a link.

10              THE COURT:  So let me recite that back to

11    you in language that resonates with me.

12              Traditionally, when a defendant makes a

13    summary judgment motion -- not always, but in many

14    instances, when a defendant makes a summary judgment

15    motion, particularly as to an element of the

16    Plaintiffs' claim where the element has the burden

17    of proof, the defendant doesn't have to do very much

18    in their opening brief.  They just have to say

19    plaintiff has failed to link up, you know, 7,200 of

20    these 7,359 works, let's say.

21              The plaintiff then has an opportunity in

22    their opposition papers to come back and say, "Here

23    are the other 7,200."  And now the moving party, the

24    defendant, is really in the hot seat because it has

25    14 days to turn around a 10-page reply brief, and

1    it's just heard for the first time what your proof

2    actually is on a work-by-work basis.

3            That's the problem you're worried about,

4    right?

5            MS. BLADOW:  Correct, Your Honor.

6            THE COURT:  All right.  So be more clear,

7    please, because I've heard it shifting a little bit,

8    about what exactly you want.

9            Do you want four Bates numbers for each

10   work, or do you want every Bates number?  Because

11   there may be more than four for some of them; there

12   may be seven or nine or whatever.

13           Do you want them to sort all of their

14   screenshots that relate to the 7,359 works by work?

15           MS. BLADOW:  I want them to identify which

16   Bates numbers they plan to rely on to support their

17   theory of direct infringement for every work.

18           THE COURT:  See, the way you're putting it

19   gets us into the territory I was hoping to avoid

20   here, which is a contention interrogatory.  I know

21   they think it's a contention interrogatory, no

22   matter how you slice it.  But "intend to rely on" is

23   different than just identify each screenshot that

24   matches up to a particular work, which sounds a

25   whole lot less like a contention interrogatory --

```
1    doesn't it -- and more like the sort of thing that
2    maybe they have an obligation to do, even under
3    Rule 34, had you posed it as a request for
4    production and asked them to produce the documents
5    not in the order in which they are ordinarily kept
6    but categorized by request.
7            Then they -- if the Court thought that was
8    an appropriate request, they would have to do that,
9    right?  And that wouldn't be a contention
10   interrogatory.
11           So what do you want?
12           MS. BLADOW:  I think we could live with
13   asking the Plaintiffs to identify, by Bates number,
14   every screenshot for each work.
15           THE COURT:  Okay.  And you think they're
16   going to have to do this anyway, so they might as
17   well do it now so that both sides have the benefit.
18           MS. BLADOW:  Correct.
19           THE COURT:  All right.  Let me hear from
20   Plaintiffs.
21           Whose motion is this?  Ms. Murphy?
22           MS. MURPHY:  I'll start with just a point
23   about the evidence and what Plaintiffs have to show
24   or don't have to show.
25           Nowhere in Google's presentation was there
```

```
1    an acknowledgment that infringement can be proven by
2    circumstantial evidence.  It is not, in fact, going
3    to be our obligation to do exactly what Google's
4    counsel said we have to do.  And we also, for
5    example, are not obligated to have spent the
6    Plaintiffs' money and gone out and done a test
7    purchase for all of --
8             THE COURT:  Spent the Plaintiffs' money?
9             MS. MURPHY:  Yes.  I mean, if the
10   Plaintiffs do a test --
11            THE COURT:  Oh, spent the plaintiffs'
12   money.
13            MS. MURPHY:  Yeah.  If the Plaintiffs do a
14   test purchase, they paid for it, they give money to
15   the pirates that, you know, are undermining --
16            THE COURT:  I take it you have not done
17   7,359 tests purchases?
18            MS. MURPHY:  We have not.  We have not.
19   The landing pages -- and you can see from the
20   exhibit, Docket 179-2, are clear as day what they're
21   selling.  They're selling a copy of our book.  They
22   say, you know, this is a digital copy.  It's in PDF.
23   This is clear what they've done, what the pirates
24   have done.  But I think we'll get to that at summary
25   judgment, and I think your discussion with Google's
```

1  counsel already previewed that.

2        Some of the argument, as far as they're

3  entitled to know what our story will be to the jury,

4  that we have this obligation to prove all of this up

5  now with, you know, step one, step two, step three,

6  three steps forward, that's just not correct in

7  terms of where we are in the procedural posture of

8  this case.

9        So what we've done is we responded to an

10  RFP, and --

11        THE COURT:  Let me stop you there and just

12  roll back the tape for a minute.

13        All right.  I understand your argument,

14  which is we don't actually have to have all of these

15  four data points for each work in issue in order to

16  prove our copyright case.  That may be right; that

17  may be wrong.  I don't have to decide that today.

18        But doesn't it seem like, looking at

19  discovery from a very high level, the purpose of

20  discovery is to prevent a trial by ambush -- or

21  summary judgment by ambush, in this case -- looking

22  at it from that perspective, doesn't it seem like

23  the defendant is entitled to know and is entitled to

24  know not at the very last minute, halfway through

25  summary judgment briefing, which theory -- direct or

1    indirect evidence theory -- you're going to be using

2    for each of these works?

3         Let's suppose, for example, that it turns

4    out that when push comes to shove at summary

5    judgment, they write the motion that I previewed:

6    Plaintiffs have not presented evidence sufficient to

7    show all of these things with respect to each of the

8    7,359 works.  And then you write a brief, a nice,

9    short brief in which you say, "Here's the evidence

10   with respect to 40 exemplar works.  And as for the

11   rest, we're relying on indirect evidence, including

12   the fact that these things were out there, they were

13   being sold, somebody must have bought them."

14        And now, for the very first time, Google

15   has to change its game plan and write a whole long

16   motion about how if this is their view of the law,

17   that that won't cut it, that the Court should grant

18   summary judgment as to each work where you don't

19   have all four data points.

20        I mean, we shouldn't be doing that in the

21   middle of summary judgment briefing, is what I'm

22   getting at here.

23        MS. MURPHY:  And I think the response to

24   that is that Google can absolutely do that now.  The

25   rules contemplate that the Plaintiffs produce

 1    documents as they're kept in the ordinary course of

 2    business, as they're ordinarily maintained.

 3              THE COURT:  Or by category, if that's what

 4    the judge says you have to do.

 5              MS. MURPHY:  And we offered to identify

 6    beginning Bates numbers for screenshots, but the

 7    problem here is we have a whole other layer where

 8    they want us to go in and extract out the asserted

 9    work.  They're not maintained that way.  You have to

10    look at the --

11              THE COURT:  But who decided how to maintain

12    them?

13              MS. MURPHY:  Your Honor, our vendor, the

14    Plaintiffs' vendor that sends notices to Google on

15    the Plaintiffs' behalf, took these screenshots.  So

16    we -- that's how they're maintained.

17              THE COURT:  Maybe they weren't thinking

18    ahead to how this was going to play in discovery.

19              MS. MURPHY:  Well, it's by date, because

20    they send Google a notice every week.  And

21    obviously, there's so many documents because there's

22    so much infringement.

23              THE COURT:  But is it true that some of the

24    documents don't relate to any of the 7,359?

25              MS. MURPHY:  They might, because --

```
 1              THE COURT:  They might.

 2              MS. MURPHY:  -- for example -- I'll show

 3    you.  With respect to Exhibit 1.

 4              THE COURT:  I'm sorry, Exhibit 1 to?

 5              MS. MURPHY:  Exhibit 1 from my declaration,

 6    which is Docket 171-9.

 7              THE COURT:  Hold on.  It's possible.  I do

 8    not have that in front of me at the moment.  Give me

 9    the docket number again.

10              MS. MURPHY:  179-1.

11              THE COURT:  Oh, I do have that right here.

12    Okay.  Thank you.

13              MS. MURPHY:  So, because it shows the ads

14    that are in the search results, there are multiple

15    different books and test banks here, which are

16    depicted in the ads.

17              I'll just take a second, because I'm on it,

18    to explain that a test bank is something that our

19    clients provide for professors' use.  It is not sold

20    at all.  This should never be on -- sold, period.

21              So, if somebody searched for "Financial

22    Managerial Accounting," 15th edition, they might see

23    ads for other books as well, and the vendor took a

24    screenshot of that.

25              So as we understand Google's request --
```

```
 1                THE COURT:  Well, looking at -- sorry to be
 2      picky here, but looking at 179-1, at least my
 3      version, which I'm holding up, doesn't even look
 4      like a complete screenshot.  It looks like a
 5      partial.
 6                MS. MURPHY:  That may be the last page.
 7                THE COURT:  It's the only page I have.
 8      It's a two-page exhibit.  This is the first page.
 9                MS. MURPHY:  I do have a copy of the full
10      exhibit.
11                THE COURT:  Okay.  Do you want to pass it
12      up?
13                MS. MURPHY:  I will.
14                THE COURT:  All right.  Just show it to
15      Google to make sure that they know what I'm looking
16      at.  It's possible that the courtesy copy that you
17      sent in isn't quite identical to what you served.
18                MS. MURPHY:  Apologies if that's the case.
19                THE COURT:  Okay.  Now I'm with you.
20                MS. MURPHY:  So I guess where I'm going
21      with this is there are multiple titles that are
22      shown in the ads.  And as we understand it, Google
23      wants us to go through and put the beginning Bates
24      number for this screenshot for all of the 7,000
25      titles that may be depicted in this multipage
```

1    screenshot.  And this is one of 250,000.

2         So we did indicate in our declaration that

3    we put together some numbers, and that it could

4    easily take five minutes per screenshot to, you

5    know, go through, call out this information that we

6    don't currently have maintained in this manner.

7         And remember that they want us to include

8    it in a verified interrogatory response.  So we

9    then -- you know, we have to check because our

10   client is going to sign that this is verifiable

11   information.

12        So they -- the bottom line is these are

13   just, at the moment, not organized by work, but

14   there is a lot of other information in the case that

15   is.  The notices are key evidence that, of course,

16   the Plaintiffs are relying on in this case.  The

17   notices themselves, we've produced both the notices,

18   which Google already had, and then we've produced

19   the data in spreadsheet form.  Those include --

20        THE COURT:  What do you mean when you say

21   you've "produced the data in spreadsheet form"?

22        MS. MURPHY:  We produced a native version

23   of the data that underlies every single notice we've

24   sent.  So that --

25        THE COURT:  That underlies the notice?

1              MS. MURPHY:  The notice.  But the notice

2    has the works.  So if they -- what they want to be

3    able to discern is which works have we noticed and

4    when, they have that information in spreadsheet

5    form.

6              THE COURT:  I don't hear them complaining

7    so much about the notices.  And you heard me express

8    the idea that maybe they have everything they need

9    with respect to the notices, because they had to

10   come in with the work identified.  It's step two and

11   step three and possibly step four where I think they

12   are at a significant and unfair disadvantage at the

13   moment.

14            They believe that you have to establish as

15   to each of these 7,000-and-some-odd works that,

16   after you received the notice, a bunch of things

17   happened that shouldn't have happened:  That the ad

18   continued appearing on Google; that the landing --

19   that if you click through, it took you to a pirate

20   landing site; and, in Google's world, that you

21   actually made a purchase or can somehow prove that

22   purchases were made from that pirate site.

23            Those are the three pieces where I'm

24   inclined to think that it's your job, not their

25   job -- and it's your job during discovery, not only

1    when you're preparing your exhibits for summary

2    judgment or for trial -- to link up the documents

3    you've produced with the works that are in issue.

4         MS. MURPHY:  If I could go back to a few

5    things Your Honor just said.  For the notice data,

6    and then for Google's own data, they already have

7    that information.  They have the URL for the landing

8    page.  They had to have it because their own ad

9    linked to it.  They have the URL for their own ad.

10    They know which ads they ran, and they know which

11    ads people saw and they clicked on.

12         THE COURT:  So you're suggesting that in

13    order to prepare themselves for summary judgment,

14    they have to look at each of the notices and

15    research each of those works themselves through

16    their own system --

17         MS. MURPHY:  They can.

18         THE COURT:  -- and check for themselves:

19    Did we run this ad after we got the notice?  Did it

20    link to the same URL?

21         And what about the purchase part?  They

22    can't do that, can they?

23         MS. MURPHY:  Some of the sites do utilize

24    conversion tracking, which is a service that Google

25    offers.  And so they have produced data and we think

1    they need to produce more for different domains, but

2    they have produced data with respect to conversion.

3         So they've produce data that shows

4    impressions, which was when the ad was shown;

5    clicks, which is when somebody clicked; and

6    conversions, which is when a purchase was made.

7         THE COURT:  Sales.

8         MS. MURPHY:  So they have all of this.  So

9    this is essentially asking --

10        THE COURT:  But it's your burden.  It's

11   your burden.

12        MS. MURPHY:  It's -- it's our burden to, at

13   this point, produce what we have in the ordinary

14   course of business.  They've asked us in

15   interrogatory.  The rule is very clear.  We can

16   refer to documents, and the obligation is to make

17   them available for when the -- when it would involve

18   the same amount of effort, make them available.  And

19   if the other side wishes to inspect those, create

20   its own compilations or summaries, that's

21   specifically called for in Rule 33(d).

22        THE COURT:  You mentioned Rule 34 a moment

23   ago.  Rule 34(b)(2)(E)(i) says:  A party must

24   produce documents as they are kept in the usual

25   course of business or must organize and label them

1    to correspond to the categories in the request.

2              And, of course, if there's a dispute

3    between the parties as to which of those is

4    appropriate, I'm the tiebreaker, right?

5              MS. MURPHY:  But the request is, for

6    example, all documents related to the notices you

7    sent.  So we can say these screenshots of these

8    Bates numbers are responsive to request -- I'll just

9    call it 40.  That's what the rule would provide.

10   The Rule 34(b) doesn't say, "Now go into your

11   documents and pull out different information and

12   create new Bates numbers for those," which is

13   exactly what they're asking us to do here.  There's

14   a whole other step.  And, again, the burden is

15   enormous.

16             THE COURT:  There's a whole other step,

17   which means you figuring out which of your documents

18   actually support your case.  I -- it's just -- I'm

19   sorry, I'm really having trouble understanding why

20   this isn't your job.

21             MS. MURPHY:  We've produced the documents,

22   and we've also produced metadata that they can use.

23   And we may need an expert to help us.  I mean, this

24   is an enormous amount of evidence.

25             I think the other thing I want to just make

```
1    sure is clear is the notices show what we did, what
2    we saw.  They have a specific URL.  That right
3    there, we could stop.  We could rely on our notices
4    and I submit, we could --
5              THE COURT:  How could you rely on your
6    notices without proof that Google failed to take
7    down the infringing ad and that bad things happened
8    after that?
9              MS. MURPHY:  Oh, of course, that's all --
10   that's all factored into our analysis.  This is --
11   this is like --
12             THE COURT:  How is that factored into your
13   analysis without showing that the ad was still up
14   after?
15             MS. MURPHY:  We didn't put a work in the
16   case if it was not previously noticed to Google and
17   either not taken down or continued to be advertised
18   by a repeat infringer.
19             THE COURT:  Okay.  So you --
20             MS. MURPHY:  But these screenshots don't
21   relate to that.
22             THE COURT:  Right.  So, leaving aside the
23   last step, which is, did you make a test purchase or
24   can you prove that purchases were made, at a
25   minimum, with respect to each of these works:
```

1     Here's your notice.  Google, please take it down.

2            You have an affirmative burden of showing

3     that they didn't; right?  And how are you going to

4     show that?

5            MS. MURPHY:  Because we noticed it again.

6     So, we have a new ad URL.

7            THE COURT:  Okay.  And for each and every

8     one of these 7,359 works, are there at least two

9     notices?

10           MS. MURPHY:  There's either at least two

11    notices, I believe, or a repeat infringer -- someone

12    who should have been terminated from Google's

13    system, therefore shouldn't be advertising pirated

14    works at all -- then advertised the work.

15           THE COURT:  And in those instances, your

16    view is you only need to show the one notice.

17           MS. MURPHY:  I think it depends.  But all

18    of the data shows this, and the URLs are Google's

19    URLs.  They point exactly to Google's ads and the

20    landing pages.

21           And the other thing is that Google says,

22    "Before we'll even have an advertiser in our system,

23    we check the landing pages.  Our algorithm includes

24    the quality of the ad, the quality of the landing

25    page."  So, again, this is why they already have

```
 1   this information.  These screenshots are like icing
 2   on the cake.
 3            It's like insurance.  Oh, we sent this
 4   notice.  We took a screenshot.  This is a pirate
 5   site.  It's BrandyFlyMedia.com selling our book for
 6   $19.99.  We took a screenshot, and we've produced
 7   those exactly as they are maintained.
 8            THE COURT:  Google.
 9            MS. BLADOW:  So I just want to start by
10   addressing what -- to clarify what Google has on
11   Google's systems.
12            So Google has offer data, which is -- at
13   this point, I think we produced in the form of
14   spreadsheets, and it's quite voluminous.  That offer
15   data, so the information that we have about whatever
16   was advertised on Google, was provided to us by
17   these third parties.  So we only have what they
18   input into our system.  So whatever they list as the
19   title, whatever they list as the URL, whatever image
20   they want to link to, we have -- we only get the
21   information that they provide to us.
22            The process, I believe, that Ms. Murphy was
23   referring to in terms of kind of verifying the
24   website is more of a technical piece of the process.
25   It's not -- ███████████████████████████████
```

1     ███████████████████████████████████████

2     ████████████.  The search results are dynamic, so

3     there's nothing at Google that is -- every time

4     someone runs a search in Google, Google doesn't have

5     a screenshot of what the search results were.

6             So to the extent that Plaintiffs' case is

7     that Plaintiffs saw advertisements on Google for

8     their works and they clicked through to the landing

9     page, and based on what they saw on the landing

10    page, they believed it was advertising an infringing

11    work, all we have to understand that is the

12    screenshots that they've produced.

13            THE COURT:  You can't -- you're saying you

14    can't recreate that?

15            MS. BLADOW:  I can't recreate it.  I've

16    tried.  I've tried, Your Honor.  I spent a lot of

17    time trying to recreate and understand and analyze

18    their metadata and understand how they would, on a

19    weekly basis, run searches and try to identify and

20    match things up across the different folders that

21    they used to organize and save these screenshots.

22    And I -- thank you.  I can't.  I can't do it.

23            And even trying to work backwards from --

24            THE COURT:  You're not a computer

25    scientist.  You're a lawyer.

1          MS. BLADOW:  Yes.

2          THE COURT:  Have you asked Google whether

3   they can do it?

4          MS. BLADOW:  I don't believe that we can do

5   it, either.  It's a bunch of screenshots.  And,

6   even, for example, doing what they're asking us to

7   do and look at the notice data spreadsheets that

8   they sent us, the test purchase that I referenced

9   earlier, I did that.  I took the title or the --

10  maybe not the title, but the URL, the

11  heminder.shopify.com, and I searched across five

12  different spreadsheets to try to identify when they

13  noticed it to us and identified one instance of them

14  noticing it to us.

15          And it's not even a Shopping ad.  It's

16  identified as, like, a search or an other ad.  There

17  are different types of ads on Google, and this case

18  has been limited to Shopping ads.  So it's not even

19  a Shopping ad that's at issue.

20          So I can't go and try to line that up with

21  a screenshot if there isn't one.  But I don't know

22  what there is and isn't at this point in their

23  production or what -- what screenshots they're --

24  like I said, what screenshots they're planning to --

25  I know this sounds like a contention interrogatory,

1    but what they're planning to show the jury or what

2    they're going to come back at summary judgment to

3    say, "Here's what our case is based on."

4          And I don't think it's fair either for them

5    to give the Court the same document dump at summary

6    judgment that they gave us and say, "Look, here's

7    250,000 screenshots."

8          THE COURT:  It's in there somewhere?

9          MS. BLADOW:  "It's in there somewhere.

10   This is circumstantial evidence, and here's some

11   test purchases, and we should get to go on to

12   trial."  I don't think that's fair to the Court,

13   either.

14         THE COURT:  Taking a tiny, little side

15   detour just for a minute.  One of the things that

16   Ms. Murphy said to me just a few minutes ago was

17   that she does not believe that Plaintiffs need to

18   provide direct, step-by-step evidence from the

19   notice to the ad reappearing to the test purchase

20   for each and every one of the 7,359 works in

21   question, that she can meet -- the Plaintiffs can

22   meet their burden through -- I think the phrase was

23   indirect -- circumstantial evidence.

24         What's your view on that?

25         MS. BLADOW:  Your Honor, if they want to

1    prove their case through the notices that they sent
2    Google and they don't want to identify the relevant
3    screenshots or test purchases, then I'm happy to
4    have them prove their case in that way.  But then
5    they should be precluded from going back and pulling
6    these screenshots and showing up -- you know, if,
7    hypothetically, their circumstantial evidence
8    survives summary judgment, they should be precluded
9    from showing up at trial and putting any of those
10   screenshots in front of the jury.
11           THE COURT:  Right.  So, refining your ask
12   to me a little bit -- I thought you might be heading
13   in this direction -- you would be content with an
14   order saying either, Plaintiffs, for each of the
15   7,359, or at least so many of them that you're able,
16   match up the screenshots by Bates number with the
17   challenged works, or forever hold your peace.
18           MS. BLADOW:  Yes.
19           THE COURT:  Confine yourself at summary
20   judgment and/or at trial to other evidence.
21           MS. BLADOW:  Correct.
22           THE COURT:  Okay.  Ms. Murphy?
23           MS. MURPHY:  Your Honor, a few things.  One
24   is I do feel like we've gotten very far afield with
25   respect to burden and what this whole exercise is

```
 1    creating.  If we will be ordered to do this, we will
 2    certainly need some time to do it.
 3                THE COURT:  Sure.
 4                MS. MURPHY:  I think --
 5                THE COURT:  Do you have an estimate for how
 6    much time?
 7                MS. MURPHY:  We estimated 20,000 hours.  If
 8    we were forced --
 9                THE COURT:  I don't know how many people
10    you have toiling away, so I don't know how many --
11                MS. MURPHY:  Not that -- not that many.
12    We're a boutique firm.  So, you know, we -- this
13    will take some time.
14                I'm thinking off the top of my head here.
15    If there is a way to do this in a way that it is not
16    verified interrogatory, where we have to have our
17    client go through and verify this and it requires
18    another level of double- and triple-checking, that
19    might be helpful.
20                To the extent that we can utilize what
21    metadata we have, we'd like to be able to do that.
22    We also, you know, would want to make sure that the
23    order is clear that we're not precluded if we miss
24    something at this point.
25                THE COURT:  Right.
```

```
 1              MS. MURPHY:  With 250,000 screenshots and,
 2    as we saw on Exhibit 1, you know, maybe 10 different
 3    books on that page, there's going to be some -- some
 4    human error involved here.  If we later find a
 5    screenshot where we missed something, it wouldn't be
 6    fair at all or consistent with Rule 37 to preclude
 7    us at this point where we're not anywhere near
 8    summary judgment.  It seems like summary judgment
 9    will be briefed well into 2026 at this stage.
10    That --
11              THE COURT:  Well, look, I'm not inclined to
12    make you do this in, you know, three weeks.  I
13    understand it's a significant project.  I also
14    understand, by the way, that you may choose, as a
15    strategic matter -- if I give you an order that says
16    produce or forever hold your peace, you may -- if
17    you're confident that you don't need to do this for
18    each of the works, you may well say, "We're doing it
19    for 100" or "We're doing it for 500, and we are
20    confident in our position that we're not going to
21    need to do it screenshot by screenshot for the
22    remaining works in question."
23              You could certainly, you know, place that
24    bet, if you wished.  But you'd have to abide by the
25    results, obviously.
```

1          MS. MURPHY:  I think it's a difficult bet

2     for us to place because, you know --

3          THE COURT:  Because you don't know what --

4          MS. MURPHY:  This is a very complicated

5     case, as we'll talk about with the damages.  You

6     know, I -- I don't say this lightly.  Like, we

7     really -- we could use an expert's help with this.

8     And we will -- we will get to the point where we are

9     opposing summary judgment or filing our own motion

10    in an appropriate way.  We're not going to document

11    dump on the Court.

12         THE COURT:  That's good to know.

13         MS. MURPHY:  Yeah.  We would -- we wouldn't

14    do that.

15         THE COURT:  Because I'm not reading

16    250,000.

17         MS. MURPHY:  But, as I said, the timing --

18    you know, the timing is such that expert discovery

19    and summary judgment is going to be next year.

20         THE COURT:  I think that's right.

21         So let me fumble my weight towards

22    something that makes sense here.  One of the

23    discretionary powers that I have is to reshape

24    people's discovery requests.  I can turn an

25    interrogatory into a document demand if I feel like

1    that's the efficient way to get the information out,

2    and vice versa.

3         And I take your point about not wanting to

4    have to bring a client representative in and make

5    yet another individual or group of individuals put

6    their eye on all of these pages so that they can

7    sign it under penalty of perjury.  Also, I have a

8    high degree of confidence in the lawyers sitting

9    here as officers of the Court.

10        So what I'm thinking is that the order is

11   going to say something like this:  Plaintiffs are

12   required, with respect to those screenshots, to

13   match them up by Bates number to either all of the

14   7,359 works at issue or as to so many of those 7,359

15   as you can.  I mean, you may not have -- it sounds

16   like you don't feel like you need to have a set of

17   three or four screenshots for each one, and you may

18   not.  But I think the defendant is entitled to know

19   that sooner rather than later.

20        I have no problem -- and I'm going to ask

21   Google in a minute if it has a problem -- if we

22   convert this.  We pretend that it's really 700 --

23   excuse me, 7,359 Rule 34 document requests that ask

24   the plaintiff to identify, by Bates number, the

25   screenshots that match up to them.  And now only

1    lawyers have to sign because now it's under Rule 34.

2             Google, you don't have a problem with that,

3    do you?

4             MS. BLADOW:  No.  That's fine with us.

5             THE COURT:  All right.  So I think that's

6    the way to do it here.

7             With respect to the "or forever hold your

8    peace" part of it, I understand.  All of the lawyers

9    in this room understand that none of us is perfect.

10   And if one or two or three slip between the cracks,

11   allowances will be made.

12            But the reason I would put that language in

13   there is to avoid a situation where you change

14   strategy at some point after delivering these

15   discovery responses and then say, "Well, no, as a

16   matter of fact, we're going to do this a different

17   way, and now I want to prove 400 more."  That I will

18   not tolerate.

19            MS. MURPHY:  Understood, Your Honor.

20            THE COURT:  All right.  Now, how much time

21   do you think you need?  Because you are the

22   plaintiff, and I know that you're anxious to get

23   past where we are now and to get to it, but you have

24   made the case to me that this is going to require

25   some time, and I'm going to give you a reasonable

```
 1   amount of time.
 2            MS. MURPHY:  Would Your Honor mind if I
 3   consulted with my colleague for a moment?
 4            THE COURT:  Go ahead.  You want to just
 5   take a minute and step away from the mic?
 6            MS. MURPHY:  Yes.
 7            (Pause in proceedings.)
 8            MS. MURPHY:  I'm ready when you are, Your
 9   Honor.
10            THE COURT:  Go ahead.
11            MS. MURPHY:  Seventy-five days is what we
12   would request.  We think that would be consistent
13   with our proposal that discovery be extended by
14   three months.  This is a lawyer-matching exercise.
15   It does allow a little bit of time on the back end
16   if Google wants to ask about this in a deposition.
17   If we have it beforehand, we'll provide it
18   beforehand.
19            THE COURT:  All right.  So applying the
20   same principle that I apply when I get fee
21   applications, I'm going to assume that you're asking
22   for a little more time than you really need to get
23   it done.  And I'm thinking 60 days from today.  So
24   that'll be the ruling.
25            I do expect everybody to act reasonably.
```

```
 1    If you get to day 55 and you can't quite bring it
 2    in, you don't need to come back to me for that, if
 3    you can work something out with the other side.  And
 4    obviously, a rolling production is always helpful in
 5    showing good faith and avoiding screaming fits from
 6    your opponent.  So don't wait until day 59 to say,
 7    this is only how far we gotten.  All right?
 8              MS. MURPHY:  Understood.
 9              THE COURT:  All right.  Shall we talk about
10    the plaintiff's relatively recently updated Rule 26
11    disclosures?
12              MS. VICTORSON:  Yes, thank you, Your Honor.
13              So Plaintiffs' damages disclosures, which
14    are disclosures that they were obligated to provide
15    us about a year ago, remain deficient to this day.
16              THE COURT:  So what I should be looking at
17    now is the amended disclosures that are Document --
18    excuse me, Docket 165-32?
19              MS. VICTORSON:  I have Document 159-2.
20    That may also -- it's a document.
21              THE COURT:  Oh, that's because mine is the
22    redacted version.
23              MS. VICTORSON:  Oh, gotcha.  Yeah.
24              THE COURT:  It's probably the same
25    document.
```

```
1              MS. VICTORSON:  Yes, I think it probably is
2     the same document.  So what --
3              THE COURT:  Give me yours again so I can
4     look at it without the black.
5              MS. VICTORSON:  Sure.  It's 159-2.
6              THE COURT:  Hold on.
7              MS. VICTORSON:  That's right.  This is the
8     under-seal version.
9              THE COURT:  Ms. K, help me out again here.
10    This time I don't even have anything to click
11    through.
12             Yeah, so take a look here.  Here's 159-2,
13    right?  But look what happens.  Nothing.  Do you
14    think that's because I already still have this one
15    open?  This was the one I was looking at this
16    morning.  Let's try again.  Don't you hate the way
17    it goes back to Docket Number 1 every time?  Drives
18    me crazy.
19             All right.  So I'm going to look at the
20    redacted version, and hopefully, that's not going to
21    hold us up very much.
22             MS. VICTORSON:  I don't think we're
23    discussing any of the under-seal portions.  And if
24    you look at page two -- I guess it would be page
25    three of the exhibit -- or of the docket version, or
```

```
 1    page two of the disclosures.
 2              THE COURT:  Okay.
 3              MS. VICTORSON:  This is where.
 4              THE COURT:  The computation of each
 5    category of --
 6              MS. VICTORSON:  Exactly.  It says, "See a
 7    computation of each category of damages claimed by
 8    the disclosing parties."
 9              THE COURT:  Okay.
10              MS. VICTORSON:  And here, effectively, all
11    Plaintiffs have done is reserve their right to
12    select the type of damages that they will seek
13    before trial, which is the categories of actual
14    damages or statutory damages.  That's the first
15    paragraph.
16              And then, in the second paragraph, they say
17    they claim defendant's infringement is willful and
18    therefore they are claiming entitlement to damages
19    up to the statutory max of $150,000 for each
20    infringed work.  So --
21              THE COURT:  Although they do give a "for
22    instance" on internal page four.
23              MS. VICTORSON:  On internal page four?
24              THE COURT:  Yeah.
25              MS. VICTORSON:  Yeah.  And their "for
```

1    instance" is -- like, does not actually articulate

2    their theory of what they will say is willful

3    behavior that they will argue at trial.  Instead,

4    this amounts to more complaints about Google's

5    discovery.  And it doesn't actually tell us what

6    Plaintiffs are, in fact, intending to pursue in

7    terms of their theories or methodologies for any of

8    their theories of damages.

9           And this applies to both actual damages and

10   statutory damages, so --

11          THE COURT:  Because actual damages are

12   supposed to bear some reasonable relationship --

13   statutory damages, excuse me, are supposed to bear

14   some reasonable relationship actual damages when you

15   look at various factors.

16          MS. VICTORSON:  Exactly.  Exactly.

17          And so, if Plaintiffs are going to show up

18   at trial and say, "We're entitled, jury, you need to

19   $150,000 per infringed work because of some reason,"

20   we're entitled to know that reason now.

21          THE COURT:  Well, let me say this about

22   that, because you -- with respect to statutory

23   damages you, I think, packed two different

24   categories into your presentation.  One category is

25   information which is really tightly related to

```
1    damages, i.e., sometimes a plaintiff seeks the
2    maximum amount of statutory damages on the theory
3    that we have reason to believe that the actual
4    profits realized by the defendant were even more
5    than $150,000, although we can't quantify it; here's
6    why we think that their actual profits were high,
7    and that's one of the reasons why we should get
8    $150,000.  Right?  We've all heard that argument
9    from time to time.
10            That's fine.  In my book, that -- when you
11   are in a position to make that disclosure, that's an
12   updated automatic disclosure that you make under
13   Rule 26(a)(1).  But there are other arguments that
14   people make in favor, if you're a plaintiff, of high
15   statutory damages, which are less numerical.  For
16   example, you might hear a plaintiff say, "Well, one
17   of the factors is whether they acted willfully,"
18   which is one of the factors, "and here's all the
19   evidence about why we think it was willful."
20            In my view, that's a different kind of
21   disclosure.  That's not a Rule 26(a)(1) disclosure,
22   I don't think.  That is the argument that they make
23   at trial.  That's the argument that they may make at
24   summary judgment.  That's the argument that may come
25   up at some other points, but it's not the argument
```

1    that they have to preview for you now.  It's really

2    a merits argument that has an effect on statutory

3    damages.

4             Do you understand the distinction that I'm

5    drawing?

6             MS. VICTORSON:  I think so, Your Honor.

7    The only thing I would say in response to that is

8    Plaintiffs themselves are invoking the concept of

9    willfulness as the reason why they are claiming

10   entitlement up to $150,000, to the statutory max.

11            I agree with you that, if the reasons why

12   they're going to seek whatever statutory levels they

13   may seek is because of some actual damages that they

14   suffered, they would also be obligated under Rule 26

15   to disclose that to us.  But where -- and, you know,

16   the cases that we cited in our brief are, I think,

17   pretty clear on this.

18            And the *Atari* case out of the Northern

19   District of California actually addressed this exact

20   issue in the context of copyright statutory damages,

21   in that in order to avoid -- for purposes of

22   Rule 26, if the plaintiff does not disclose any

23   basis for why they are seeking statutory damages

24   above the statutory minimum, then they'll be limited

25   to the statutory minimum.

1              THE COURT:  At what point in the case,

2      though, was that decision rendered?  I assume here

3      that folks are going to have damage experts and --

4      at some point.  And that's really the hard stop

5      here.  At some point, if the Plaintiffs are seeking

6      actual damages, they're going to actually have to

7      produce a long and detailed report with a lot of

8      numbers in it and Excel spreadsheets and this, that,

9      and the other thing.

10             MS. VICTORSON:  Yeah.

11             THE COURT:  And clearly, that's

12     put-up-or-shut-up time at the latest.  The question

13     is, you're trying to shove it considerably earlier

14     than that.

15             And what's the case law look like on that

16     front?

17             MS. VICTORSON:  Yeah.  Yeah.  Definitely

18     appreciate that point.  And, to be clear, we

19     totally -- we completely agree that the case law

20     does say, you know, the Plaintiffs do need to update

21     their disclosures as the case goes on and more

22     information needs to be made.

23             THE COURT:  Sure.  But that means different

24     things in different cases.  If this were a personal

25     injury case where someone was trying to collect for

```
 1    their medical expenses, for example, and then they

 2    had to have another operation, they'd have to update

 3    their damage disclosures at that point.  But this is

 4    a little different than that.

 5              MS. VICTORSON:  Yeah.  So maybe it makes

 6    sense.  So we -- and especially after Plaintiffs

 7    filed their notice of supplemental authority about

 8    the Concord v. Anthropic case, we proposed a

 9    potential compromise to this dispute in which

10    Plaintiffs would supplement their initial

11    disclosures to identify the methodologies,

12    computations, and supporting evidence that are

13    currently available to Plaintiffs, understanding

14    that there may be additional discovery that comes

15    out that would support -- and, you know, that there

16    may be, like, specific, more detailed methodologies

17    that would be disclosed eventually by their expert.

18              THE COURT:  You think you're going to get

19    anything different from what you've got right now,

20    though, if I phrased an order in that -- in that

21    fashion?

22              MS. VICTORSON:  Well, I mean, Plaintiffs

23    rejected our proposal, so I don't know.  Maybe we

24    would actually get something.  You know, their

25    rejection of our proposal was promised on their
```

1    contention that they're not obligated to disclose

2    documents or methodologies to support their damages

3    claims.  So -- and so we could not -- you know, we

4    weren't able to find a compromise in that way.

5              THE COURT:  All right.  So walk me through

6    your proposed compromise in a little more detail.

7              What would you have me say?  And you're

8    taking this from which case, again?  *Atari*?

9              MS. VICTORSON:  So, yeah, *Atari* is one.

10   The *Marshall v. Marshall* case, which was an EDNY

11   case, was also based on that, but that was more

12   premised on the actual damages side of the house.

13   But it also -- sorry, let me take that back.

14   Statutory damages was also at issue in that case.

15   And in that case, it was just --

16             THE COURT:  Plaintiffs typically don't

17   decide until they have to at the last minute.

18   That's been my practical experience.  They want to

19   keep all their options open.

20             MS. VICTORSON:  Right.  So they may elect

21   to select statutory damages or actual damages at any

22   time before trial.  But if that's when we're finding

23   out what the basis of what they're going to argue

24   is -- the basis of their actual damages or statutory

25   damages or why they're entitled to statutory damages

```
 1   beyond the minimum, then that's too late.  Right?
 2           We're already materially prejudiced because
 3   we're not able to take discovery on what they plan
 4   to do, like how they plan to show that they're
 5   entitled to those damages.
 6           THE COURT:  Well, I assume you're already
 7   taking or planning to take discovery on certain
 8   components of that.  For example, I assume --
 9   correct me if I'm wrong -- that you are cognizant of
10   the possibility that the Plaintiffs may argue that
11   they have lost a certain amount of profit, and
12   you're looking into what their profits were.  Right?
13           So you're doing that even without them
14   telling you, "This is going to go into our damages
15   analysis."
16           MS. VICTORSON:  Certainly.  But, you know,
17   particularly in light of Rule 26 and the applicable
18   law, not only in the Second Circuit, but in other
19   jurisdictions as well, you know, we shouldn't have
20   to base our discovery based on our guesses of what
21   we think they're going to do.  They should disclose,
22   at least at a high level at this state, how are they
23   going to show actual damages at a general level.
24           You know, I wouldn't expect them to get
25   into the level of what a damages expert would do,
```

1    but at a very high level, how are you going to show

2    that?

3            THE COURT:  So what would this high-level

4    amended Rule 26(a)(1) disclosure look like, in your

5    view?  Would it say something like, "If we elect

6    actual damages, we expect to rely either on our lost

7    profits, and, so far, this is what we know about our

8    lost profits, or we reserve the right to also argue

9    that we are entitled to calculate our damages based

10   on Google's unlawful gain, and here's what we know

11   about that so far"?

12           MS. VICTORSON:  That's exactly the level

13   that I would expect their current disclosures to be

14   at right now.

15           THE COURT:  Okay.  So let me hear from

16   Plaintiffs, unless there's something else you wanted

17   to tell me.  I didn't mean to sidetrack you and

18   get --

19           MS. VICTORSON:  No.  No.  Thank you,

20   Your Honor.

21           THE COURT:  All right.  If it's not clear

22   already, I'll just say for both sides that I'm sort

23   of torn here.  I think what I'm seeing -- the five

24   pages that I'm seeing so far is very, very thin,

25   perhaps disingenuously thin a year in, as we are.

1          On the other hand, I am sympathetic in a

2    complex case like this to the fact that you're not

3    really going to lock in on what your damages are

4    until you and your expert decide what your damages

5    are.  And I don't want to be in a position six

6    months from now to be ruling on a motion to reopen

7    fact discovery because you have a damages theory

8    that the defendants didn't anticipate and didn't

9    take discovery on and they heard about it for the

10   first time in your expert report.

11        So how can we bridge that gap?

12        MS. MURPHY:  I'm struggling a little

13   because what I heard Your Honor say that might be

14   required of the Plaintiffs to disclose, at a high

15   level, the issues discussed, that's what we believe

16   we've done and that we've met our obligations.  I

17   think it would be helpful to break down a few items.

18   And I'm cognizant of this being a long hearing.

19        For statutory damages, that obviously is a

20   statutorily prescribed range completely within the

21   jury's discretion in this case to decide what to

22   award.  I think, on that component, if we can just

23   focus on that, we've put forth the factors.  We've

24   said that we think we're entitled to up to the

25   maximum.  And we've said that --

```
 1              THE COURT:  Right, but that doesn't tell
 2   anybody anything.  You're just reciting what the law
 3   is, which we all know.
 4              MS. MURPHY:  But there's no computation to
 5   do.  There are six different factors.  For statutory
 6   damages, there truly is no computation to do.  We
 7   think we've met our obligations on statutory.  If we
 8   are missing something, you know, of course, I'm open
 9   to it.
10              But we've looked at their cases.  Their
11   cases do not contemplate situations like this one.
12   Of course, in terms of procedural posture, there are
13   cases where it's about to go to trial; the plaintiff
14   produced 300 documents and nothing on damages.  And
15   I think maybe we can move past this, unless you have
16   any questions, because we have produced the
17   underlying documents related to our revenue, related
18   to our profitability.
19              The piece of this that we're struggling
20   with and truly need an economist expert to do is to
21   look at this and go in and figure out what lost
22   sales might be.  It has to be overlaid with this ads
23   data.
24              THE COURT:  That ad data that you don't
25   have yet?
```

1              MS. MURPHY:  We do have it.  We got it on

2    the last possible day that Google was allowed to

3    submit it.  It's 10 million rows, and a row may

4    contain multiple ads because a row is per day.  So

5    to say that this is, you know, complicated and

6    something that we need assistance with is an

7    understatement, and it has to be overlaid with that.

8              So we need -- you know, it's not just how

9    much would we make if we sold this work; it is

10   related to how much did they advertise it.  So we

11   need -- for that piece of it, we really need an

12   economist.  And if we're forced to put a number on

13   it now, it will be wrong and it will be inaccurate,

14   and, quite frankly, we're concerned it will be used

15   against us.

16             It's just not correct to say that we

17   haven't explained at a high level how we're going to

18   do this or what aspects of damages entail.  We've

19   said that we have suffered lost profits.  We've said

20   that, in the digital piracy context, that this

21   involves another layer of viral potential

22   dissemination because of these PDFs that we talked

23   about earlier.  It may not just be a one-to-one

24   sale.

25             THE COURT:  So you've lost more sales than

1    you think you lost?

2              MS. MURPHY:  Right.  I mean, this is --

3    this is, in part, why there are statutory damages

4    for copyright and trademark cases.  They can be

5    difficult to prove, but --

6              THE COURT:  Well, look, if you -- if you

7    made your election now and said we're going to go

8    solely with statutory damages, we'd be having a

9    different conversation.  I'm not --

10             MS. MURPHY:  Yeah.

11             THE COURT:  I wouldn't do that if I were in

12   your position, so I'm not --

13             MS. MURPHY:  Yeah, I think we would.  I

14   think that's why I started with statutory damages to

15   at least put that bucket aside.

16             THE COURT:  But since -- but let's put that

17   bucket aside, because you have not waived your right

18   to actual damages, and actual damages are where the

19   rubber heats -- meets the road here.

20             So is this really all you think you have to

21   do with respect to each and every category that

22   rolls up into actual damages?  You essentially don't

23   have to put any numbers in at all at this point?

24             MS. MURPHY:  Well, we have put numbers in

25   with respect to Google's revenue.  One thing that we

```
 1    offered to do is --
 2              THE COURT:  But this is revenue across the
 3    entire universe of the Merchant Center accounts,
 4    right?
 5              MS. MURPHY:  Correct.
 6              THE COURT:  Okay.  Google says you're going
 7    to have to prove damage on a work-by-work basis.
 8              Do you agree?  Disagree?
 9              MS. MURPHY:  I agree.
10              THE COURT:  Okay.  So have you begun to
11    match up, for example, how much of that ███████████
12    relates to this work, that work, the other work?
13              MS. MURPHY:  I believe that we have that on
14    a spreadsheet.  On that piece of it, it's our burden
15    to show the overall revenue, and then if Google says
16    there should be deductions from that, that's
17    actually -- that shifts to them.
18              THE COURT:  I understand.  But not the
19    overall revenue across 7,000 works; the overall
20    revenue with respect to work 125.
21              Isn't that right?
22              MS. MURPHY:  We could take their own
23    spreadsheet and put in here for, you know, each
24    work, what they've said their revenue is, but they
25    already have that information.  So that wouldn't
```

1    address any of the issues with respect to, you know,

2    them claiming they don't know what we're going to

3    do.  They -- they know more --

4              THE COURT:  Well, it would be a start.  You

5    could say, for example, "With respect to actual

6    damages, we refer you to the numbers in your

7    spreadsheet, and we're going to claim that as your

8    ill-gotten gains."

9              Now, maybe that's too obvious; maybe you

10   figure they already know that.  But that's kind of

11   what early damage disclosures are for, to give them

12   an idea of what's coming down the pike.

13             MS. MURPHY:  We can do that.

14             THE COURT:  Okay.  What about -- and you

15   say you can't even make a stab at your own lost

16   sales yet?  That any number you gave would be wildly

17   at risk of being wrong?

18             MS. MURPHY:  Correct.  We still -- we still

19   need our experts to help us with this.  So, I mean,

20   the, you know, rule contemplates that each

21   requirement will not necessarily apply in each case.

22   And we think this is a textbook example of one where

23   we will absolutely provide this, but it will be

24   through an expert report.

25             THE COURT:  Well, it seems to me, again,

1  that you could do a little better here.  And if the

2  answer is, you know, "Here's how we're going to do

3  it, but we haven't done it yet, so we can't give you

4  a number," I think that is better compliance with

5  the Federal Rules of Civil Procedure than simply

6  saying, "Here are the factors, and we'll tell you

7  later what our damages calculation is."

8          So, for example, with respect to

9  contributory copyright infringement, as you state at

10  the beginning of your amended disclosure, a

11  plaintiff is entitled to damages amounting to either

12  the actual damages suffered by each plaintiff as a

13  result of the infringement and any profits of Google

14  that are attributable to the infringement and not

15  taken into account in computing the actual damages.

16          So it might be helpful if you added another

17  paragraph there and said:  As to the first half, the

18  actual damages suffered by each publisher, we can't

19  tell you yet, and here's why we can't tell you yet.

20  As to the second half, Google's profits, we can tell

21  you that we're going to start with your revenue, and

22  we know what your revenue is because it's in your

23  spreadsheet, and that's as much as we can tell you

24  so far.

25          Now, you've, at a high level, explained

1    what your damages calculation is.  And it probably

2    wouldn't even hurt that much to do that, would it?

3              MS. MURPHY:  We can do that, Your Honor.

4              THE COURT:  And the same for trademark,

5    which is a very similar approach.

6              So what I think I will do at this point --

7    and I don't want you folks at Google to get your

8    hopes up that this is going to be really meaty at

9    this stage.  It's probably not yet.  But you are at

10   least entitled to sort of a status report on how the

11   Plaintiffs are approaching the issue.

12             So I think I will require the Plaintiffs to

13   further amend their damages disclosure.  And maybe

14   the way to say it is, at least with respect to

15   actual damages for both copyright and trademark,

16   with respect to each statutorily permitted category

17   of damages that you're reserving your right to seek,

18   give them a progress report.  "Here's our

19   preliminary calculation."

20             In the case of the defendant's revenues,

21   you could remind them that it's their burden to

22   establish the deductions, but they probably know

23   that already.  And "here's how we're doing so far on

24   what we think our losses are."

25             And if you truly are in the position at

```
 1   present that you can't even begin to give a ballpark
 2   because you're waiting on this, that, or the other
 3   thing, okay, say that.  But when things change and
 4   when you get more information, whether that's in 60
 5   days or 90 days or whenever, you will be expected to
 6   update at that point without waiting for a motion to
 7   compel.  All right?
 8           MS. MURPHY:  I think I'm clear on that.
 9           THE COURT:  I'll try to --
10           MS. MURPHY:  Yeah, I'll look at the
11   transcript.
12           THE COURT:  -- make it a little snappier in
13   my written order.  I think I've written a form of
14   this order a few times in my judicial career, so
15   I'll try to make it clear.
16           And this shouldn't take you very long,
17   right?
18           MS. MURPHY:  Agreed.
19           THE COURT:  Okay.
20           MS. MURPHY:  Not as long as the
21   screenshots.
22           THE COURT:  No, I'm thinking maybe 14 days,
23   maybe two weeks for this little, tiny piece of it.
24           MS. MURPHY:  That's fine, Your Honor.
25           THE COURT:  Okay.  Now, we have now gone
```

1    through the two omnibus motions, right?  I'm not

2    missing any piece of this one, am I?

3              MS. MURPHY:  That's right.

4              THE COURT:  All right.  So we've now gone

5    through the two omnibus motions filed two months ago

6    on August the 5th.  I was intending to continue on

7    through the August 20th motion, but let me check

8    with you folks.

9              I have a hard stop at about 4:30 this

10   afternoon because I have to be uptown early this

11   evening.  What might make sense is for me to turn to

12   the schedule and, to the extent I haven't already

13   given you a due date for these various items that

14   we've already gone over, for me to give you due

15   dates and talk about how far out we're going to

16   extend general discovery deadlines, which means, I'm

17   afraid, I'm going to have to have you come back

18   possibly next week with respect to the August 20th

19   motion.

20             Let me take a quick poll on that.

21             Plaintiffs, do you want to try and get

22   everything done really fast in the next hour, or do

23   you want to set some calendar deadlines and come

24   back a little later?

25             MR. KANE:  I mean, the simplest way would

```
 1    be to just grant all of Plaintiffs' motions, but

 2    yes --

 3             THE COURT:  Not really an option.

 4             MR. KANE:  -- we're fine -- we're fine

 5    coming back next week.

 6             THE COURT:  All right.  Defendant?

 7             MR. MURPHY:  That's fine for us,

 8    Your Honor.  Thank you.

 9             THE COURT:  Okay.  So let me go through and

10    see what I haven't given you a deadline for.

11             With respect to the Plaintiffs' motion,

12    category one, or issue one, I extended the relevant

13    period, if you will, for certain categories of

14    documents to March 31st.

15             Google, how much time do you need on that

16    piece?

17             MS. BLADOW:  Your Honor, let me just confer

18    with my colleagues.

19             THE COURT:  And, by the way, you should

20    keep in mind that I just gave the Plaintiffs 60 days

21    on a fairly substantial project that they have to

22    undertake, and I am the kind of judge who really

23    likes having fewer deadlines rather than more

24    deadlines.

25             MS. BLADOW:  Yeah, Your Honor, one thing
```

1    that's applicable to Google that's not applicable to

2    Plaintiffs is that -- and that we just want to think

3    some more about is that Google has an internal

4    policy, when it produces data about its customers or

5    its merchants, to give notice, and it typically

6    gives 21 days' notice.

7         And so that makes the 60 days to gather six

8    more months of the data, and as my colleague

9    Ms. Victorson referenced, it comes from different --

10   like, it comes from different places within Google.

11   It requires different people to do it, and it's

12   sequential, so it takes steps.  It can't be done

13   necessarily in parallel.  You have to do one thing

14   before you can then do the next thing before you can

15   do the next thing.

16        THE COURT:  Understood.

17        MS. BLADOW:  So I'm concerned that we might

18   need more like three months to accommodate that and

19   to accommodate the notice that we typically provide.

20        THE COURT:  So you want 90 days for the

21   additional documents extending through to the new

22   March 31st end date?

23        MS. BLADOW:  Yeah.

24        MR. KANE:  Could I address that,

25   Your Honor?

```
 1              THE COURT:  Briefly.
 2              MR. KANE:  So two things.  One, there are
 3    no new pirates here.  Google has already provided
 4    notice to these pirates that this data is being
 5    shared.  Now they're just doing it for a longer
 6    period of time.  And they can do that today.  They
 7    can email the same group of pirates and say, "We're
 8    going to be disclosing more of your data," and they
 9    can start the 21-day clock now.
10              The second thing is they've already done
11    this once, so it should be running the same scripts
12    in the same places and just changing the dates.  And
13    remember, they told us that they've terminated all
14    these people, so there shouldn't be a whole lot of
15    data to collect.
16              THE COURT:  Well, hopefully, as each month
17    goes by, there's going to be less and less.
18              MR. KANE:  Right.  I mean, if they're
19    right, there should be very little for them to
20    produce, because they terminated all these people,
21    so there shouldn't be any ads, there shouldn't be
22    any revenue, there shouldn't be any offers.
23              So 90 days sounds to me to be quite --
24    quite more than they need.  I think 30 days should
25    be more than appropriate.
```

1          THE COURT:  How much time did you spend on

2    document production through the prior September

3    date, including the 21-day notice to the merchants?

4          MR. KANE:  I can answer that if --

5          THE COURT:  Do you know?

6          MS. BLADOW:  I believe it was at least

7    three months, but I could be wrong about that.

8          MR. KANE:  They were ordered to do it in

9    December.  It took them until July.  But, I mean,

10   that's why we're so skeptical about it.

11         MS. BLADOW:  Your Honor, this is going to

12   quickly go south here if we're, you know, having a

13   dispute about whether or not we completed our

14   document production on time.

15         THE COURT:  Well, it is --

16         MS. BLADOW:  We dispute that.

17         THE COURT:  If you talk over each other, it

18   is going to go south.

19         Okay.  So Google says they need 90 days.

20   Plaintiff says they should need less than that, but

21   last time they took far more than that, which may be

22   because they weren't working hard enough or may be

23   because it actually does take a long time.

24         I'll give you 90 days, but please consider

25   that written in stone.  I'm going to be very, very

1    resistant to request to further extend that

2    particular deadline.

3         The next item is the RFP 65 issue, which

4    I've narrowed to two filters, the PDF filter and the

5    ebook filter and to traditional documents or

6    communications.  We're not looking at source code or

7    databases that are not written in English words.

8    We're looking at documents or communications

9    concerning the purpose of these filters and their

10   effect on the piracy issues here.

11        How much time, Google?

12        MS. BLADOW:  Well, Your Honor, my

13   understanding is that what you would be asking us to

14   do here is come up with some additional search terms

15   and run them in our existing custodial documents; is

16   that correct?

17        THE COURT:  Well, we've also expanded a

18   couple of custodial categories because you're now

19   going to have a bigger set of databases to run

20   things across.

21        MS. BLADOW:  Right.  So I think that makes

22   that request a little bit more complicated.  So

23   we're going to need to collect -- we're going to

24   need to collect additional data for five new

25   custodians.  And then, next week, you're also going

1    to decide their next motion to add new custodians.

2          THE COURT:  And there is a possibility that

3    that's true, that is true.

4          MS. BLADOW:  There is a possibility that

5    you'll ask us to add more.  And I think this is

6    pretty standard in any discovery.  Like, we don't

7    want to do this twice.

8          If we're going to go through another round

9    of custodial discovery, it is most efficient to know

10   exactly which custodians we're doing this for, get

11   all of their information at once, run all of the

12   search terms through it at the same time, put it in

13   a database, get a team of reviewers to do it.

14         So I would greatly appreciate it if we

15   could not start that exercise until we know the

16   world of custodians for whom we're going to do it.

17         THE COURT:  Well, let's assume you know the

18   world of custodians by the end of next week.

19         Tamika, you need to be looking for when

20   these folks are going to come back next week,

21   because the week after that, I'm on criminal duty

22   and -- it has to be next week.

23         All right.  So you want 90 days, which

24   allows you to not get started until a week or a week

25   and a half from now.

```
 1              And I'm guessing here that on the next
 2     category, which was category four, where I've added
 3     essentially five custodians and you're going to have
 4     to run a bunch of searches across these new
 5     custodians, I'm kind of guessing you're going to
 6     want the same 90 days for those.
 7              MS. BLADOW:  I think so, Your Honor, with
 8     the caveat that one of the items for next week's
 9     discussion is the Plaintiffs' request for us to add
10     tens of thousands of search terms.  And so if
11     Your Honor is --
12              THE COURT:  And you don't want to get
13     started until you know what the verdict is?
14              MS. BLADOW:  That's true.  And if
15     Your Honor is actually -- is inclined to be
16     persuaded that we should have to do that, then we
17     might need more than 90 days.
18              THE COURT:  All right.  As to the
19     ██████████  I've given you some short-term deadlines
20     for the meet-and-confer process.  I don't know that,
21     today, I need to give you any deadlines beyond
22     those.
23              Category six is very modest.  Category six
24     requires Google to turn over what's probably one
25     additional iteration, correct, of the DCMA -- DMCA,
```

1    sorry, policy.  And then as soon as you get the

2    interrogatory, which they're probably going to write

3    after dinner tonight, you'll respond to the

4    interrogatory in 30 days.

5         So why don't we just make that 30 days.

6    From wherever you get the interrogatory, you have 30

7    days to produce the policy and answer the

8    interrogatory.

9         MS. BLADOW:  That sounds fine, Your Honor.

10         THE COURT:  All right.  And that's

11   really -- that doesn't depend on anything else.

12   That's a very separate little project.

13         And then for the two pieces of Google's

14   motion, we already decided 60 days for category

15   number one, which is to match up the screenshots

16   with the works and 14 days for the updated but

17   still, I'm afraid, quite preliminary damages

18   disclosure, right?

19         MS. MURPHY:  I do have one request, which

20   is perhaps on estimating the screenshot time, we

21   should have figured --

22         THE COURT:  You want the same 90 days?

23         MS. MURPHY:  If we could have 90 days.

24   Since they're going to be producing key documents

25   not until then, we really could use that extra time.

```
 1                THE COURT:  It's going to be hard for me to
 2      say no to her on that.
 3                MS. BLADOW:  Unlike the Plaintiffs'
 4      counsel, I'm willing to --
 5                THE COURT:  Oh, don't.
 6                MS. BLADOW:  -- accept that.
 7                THE COURT:  Don't.  Resist.
 8                All right.  Fine.  90 days for that.  But
 9      I'm still holding you to two weeks, to 14 days, on
10      the updated damages --
11                MS. MURPHY:  Understood.
12                THE COURT:  -- disclosure.
13                Now, do you want me to start going through
14      the remainder of your -- I assume we're going to be
15      extending both the overall fact discovery deadlines
16      and the expert discovery deadlines commensurately.
17      But I don't think I need to do that today.
18                Do you think I need to do that today?
19                MS. BLADOW:  No, Your Honor.  We were going
20      to suggest that you do that next week after we
21      understand the full scope.
22                THE COURT:  After we know the full scope.
23                Okay.  So, Tamika, when are these good
24      folks going to come back next week?  And let's set
25      aside someday when we have a couple of hours.
```

```
 1              THE DEPUTY CLERK:  Next Wednesday, we are
 2      available all day.
 3              THE COURT:  Oh, don't tell people that.
 4      They'll take advantage.
 5              THE DEPUTY CLERK:  On Tuesday, we are
 6      available after 12:00.
 7              THE COURT:  In the afternoon.
 8              All right.  Do you want Tuesday afternoon,
 9      the 14th, or do you want Wednesday morning, the
10      15th?  Counsel?
11              MR. KANE:  Tuesday is easier for me.
12              THE COURT:  Tuesday afternoon.
13              Defendant?
14              MS. BLADOW:  Hooray.  Tuesday afternoon is
15      easier for us as well.
16              THE COURT:  All right.  2:00 p.m., Tuesday
17      the 14th, here in Courtroom 28.
18              MS. BLADOW:  Hang on.  Hang on, Your Honor,
19      actually.
20              THE COURT:  Check with your team.
21              MS. BLADOW:  Yep.  Hang on.
22              Okay.  I spoke too soon.
23              Would it be possible to do it Wednesday
24      afternoon?  We have conflicts in the morning.
25              THE COURT:  It's possible for me.
```

```
 1                MS. BLADOW:  Okay.
 2                THE COURT:  Let me go back to Plaintiffs on
 3     this.
 4                MR. KANE:  I think that works, depending on
 5     childcare, but I can tentatively say yes.
 6                THE COURT:  All right.  Is there a hard
 7     stop, childcare-related?  Do you need to pick
 8     somebody up at a certain time?
 9                MR. KANE:  Yeah.  I think --
10                THE COURT:  What time?
11                MR. KANE:  -- my wife can do it.  I just
12     need to check.
13                THE COURT:  We can start at 1:00.
14                Does that help you?
15                MR. KANE:  I'm in D.C., so --
16                THE COURT:  Oh, you have to come up here.
17     I'm sorry.
18                MR. KANE:  I might be able to do this now.
19     Sorry.
20                THE COURT:  Is your firm both in D.C. and
21     here, or are you all in D.C.?
22                MR. KANE:  We're D.C. and here, but I'm in
23     D.C.
24                MR. MURPHY:  Yeah, we're in D.C. as well,
25     Your Honor.
```

```
 1              THE COURT:  Why are you all litigating in
 2    New York?  Well, to put it another way, why did your
 3    clients hire a bunch of lawyers out of D.C.?
 4              I grew up in D.C.  I left.  Now I'm in
 5    New York.
 6              Mr. Kane, are you waiting for your wife to
 7    text you back?
 8              MR. KANE:  I am.  Sorry, Your Honor.
 9              We can say Wednesday, and we'll figure it
10    out.
11              THE COURT:  All right.  We're going to
12    say -- what did we decide?  Wednesday afternoon.
13    That was the preference.  Wednesday at -- I'll split
14    the difference.  Wednesday at 1:30 p.m.
15              Talk to each other on your way out of the
16    courthouse.  If you want to revert back to Tuesday,
17    just call chambers and talk to Ms. K tomorrow
18    morning.  We won't give either of those slots away
19    overnight.  All right?
20              MS. BLADOW:  That's fine.
21              THE COURT:  All right.  So we'll see you
22    next week.  We'll be adjourned.
23
24
25
```

1                      C E R T I F I C A T E

2

3        I, Marissa Lewandowski, certify that the

4   foregoing transcript of proceedings in the case of

5   Cengage Learning, Inc. et al v. Google LLC,

6   Docket #1:24-cv-04274-JLR-BCM, was

7   prepared using digital transcription software and is

8   a true and accurate record of the proceedings.

9

10

11   Signature    *Marissa Lewandowski*  __

12                   Marissa Lewandowski

13

14   Date:        October 10, 2025

15

16

17

18

19

20

21

22

23

24

25