Sarah A. Tomkowiak
Direct Dial: +1.202.637.2335
sarah.tomkowiak@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

November 7, 2025

<u>VIA ECF</u>

The Honorable Barbara C. Moses
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, New York 10007

Re:   Cengage Learning, Inc. v. Google LLC, No. 1:24-cv-04274-JLR-BCM:
<u>Defendant's Response to Plaintiffs' Letter Motion for Discovery Conference (Dkt. 237)</u>

Dear Judge Moses:

Plaintiffs' "discovery" Motion is a motion *in limine* in disguise; it seeks to preclude Google from relying on four business records at summary judgment or trial. Alternatively, Plaintiffs seek to audit Google's response to every DMCA notice Google received over a four-year period. These extraordinary requests are improper.

## I.   The Spreadsheets Are Not "Summaries"

Plaintiffs' motion starts with a false premise: "Google seeks to establish the factual basis for its DMCA defense through several summary spreadsheets . . . ." Dkt. 237 ("Mot.") at 1. Google has not yet identified the evidence supporting its DMCA defense. Plaintiffs will have ample opportunity to challenge the admissibility of whatever evidence Google chooses to rely on at summary judgment or trial. The Court should reject their attempt to bring an evidentiary challenge in the middle of discovery.

Plaintiffs' position is also nonsensical. Plaintiffs claim that the spreadsheets are "summaries" under Federal Rule of Evidence 1006, and Google cannot rely on them because Google has not produced the underlying documents or data. Mot. at 3. But the spreadsheets are unequivocally <u>not</u> "summaries" within the meaning of Rule 1006. *See* Fed. R. Evid. 1006 (referring to summaries admitted to "prove the content of voluminous admissible writings, records, or photographs that cannot be conveniently examined in court"). Exhibit 4 is a dynamic spreadsheet that is maintained in ordinary course. Declaration of Sarah Tomkowiak ("Atty. Decl.") ¶ 17, 19. It is a business record, not a summary of other records. *See* Exs. 5 (GOOG-CENG-00000683) and 8 (GOOG-CENG-00000685). Exhibits 1, 2, and 3 were created by pulling data from databases that Google maintains in ordinary course. Atty. Decl. ¶ 10. The law is clear that "[s]preadsheets produced from computer databases are routinely admitted as business records

under Federal Rule of Evidence 803(6). . . . [T]hey are not 'summaries' as defined in Federal Rule of Evidence 1006." *Larsen v. PTT, LLC*, 2025 WL 278337, at *1 (W.D. Wash. Jan. 23, 2025) (internal quotations omitted); *see also United States v. Gogic*, 2025 WL 3042350, at *10 (E.D.N.Y. Oct. 31, 2025) ("The fact that [information] was extracted from a database into a spreadsheet does not transform it into a 'summary' of the 'original' data."). That Exhibits 1, 2 and 3 were created by running queries during this litigation is irrelevant because the "underlying databases—and thus, the relevant data—were maintained in the ordinary course of business." *Larsen*, 2025 WL 278337, at *2; *Health All. Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 129 (S.D.N.Y. 2007) (rejecting argument that data "culled from the database using a query" during litigation did not qualify as a business record under Rule 803(6)), *aff'd*, 294 F. App'x 680 (2d Cir. 2008).

## II. Plaintiffs' Demand for Every Piece of Data Underlying, Referenced in, or Purportedly Necessary to "Verify" the Spreadsheets Is Baseless

### A. The Parties Reached Agreement on High-Level Metrics

Plaintiffs' recounting of the "meet-and-confer history," *see* Dkt. 238 ¶ 15, omits that Google produced the spreadsheets only after the parties reached a compromise on the appropriate scope of RFPs 3 and 4. Atty. Decl. ¶¶ 3-10. In January, Plaintiffs explained that RFP 3 "calls for . . . things like the *number* of notices Defendant received (on, e.g., a monthly basis), the *number* of notices rejected and reasons for the rejections, and what action Defendant took in response to the notices (e.g., forwarding the notices to the merchant, assessing a strike, termination, etc.)." *Id.* ¶ 5.[1] Shortly thereafter, Google agreed that it would produce "high-level data regarding DMCA notices that it received going back to December 5, 2020." *Id.* ¶ 8.

Plaintiffs treated this dispute as resolved. On February 7, Plaintiffs "confirmed" Google's agreement to "produce data like the *number* of notices [it] received, the *number* of notices rejected and the reasons for the rejections, whether the ad named in the notice was taken down, and what action Defendant took in response to the notices would be included." *Id.* ¶ 7. Consistent with that understanding, during a March hearing, Plaintiffs' counsel described forthcoming productions as including "data on *how many* notices [Google] received, what action they took in response, [and] *how many* terminations they've had." Hr'g Tr. at 9:10–12 (Mar. 17, 2025) (Dkt. 95) (emphasis added). Google produced that data at GOOG-CENG-00419902 (Ex. 1) and GOOG-CENG-00419905 (Ex. 2). Atty. Decl. ¶ 9. This data included the *number* of notices Google received, the *number* of notices that Google rejected, and the *number* of account terminations. Having obtained the exact information that Google agreed to produce pursuant to the parties' compromise, Plaintiffs cannot now fault Google for failing to produce each and every underlying document. Plaintiffs' complaint that Exhibit 1 does not "contain the ads Google ran so that the reader can verify whether Google actually delisted the ads," Mot. at 2, is baseless. No RFP calls for every ad subject to Google's DMCA process. *Id.* ¶ 25.

---

[1] With respect to RFP 4, Google clarified in November 2024 that it would produce documents reflecting adverse actions taken toward the relevant merchants, regardless of whether the adverse action was spurred by a notice from Plaintiffs. Atty. Decl. ¶ 4. Plaintiffs did not raise the substance of RFP 4 again until a meet and confer on September 30, 2025, regarding, *inter alia*, RFPs 96–97. *Id.* ¶ 23.

**LATHAM&WATKINS**LLP

Moreover, as part of its production of documents "reflecting Google's policies, practices, and procedures concerning actions taken by Google in response to copyright infringement notices concerning ads and listings on the Google Shopping platform generally," *id.* 17, Google also produced the Manual Strike Tracker at GOOG-CENG-00439752.C (Ex. 4).[2] Plaintiffs' first—and only—demand for records referenced in or related to the Strike Tracker came on July 16, 2025, when Plaintiffs served RFPs 96 and 97. *Id.* ¶ 18.

B. <u>Plaintiffs' New Demands Are Disproportional</u>

Unsatisfied with the results of their compromise, Plaintiffs now demand: (1) every infringement notice Google received between December 2020 and September 2024 regarding any Google product (e.g., Shopping, Search, Play, Drive), sent by anyone, concerning any domain; (2) documents reflecting Google's response to and the actions taken regarding each of the ▮▮▮ of noticed URLs it received (Atty Decl. ¶ 12); (3) metrics regarding every ad (or presumably any other listing type) subject to those notices; (4) documents regarding every one of the ▮▮▮ of Merchant Accounts suspended for any reason between December 2020 and October 2024; (5) documents regarding every one of the ▮▮▮ of suspension events occurring during that time period; and (6) a host of information about the domains on the Strike Tracker. *See* Mot. at 2; Exs. 1–4.

It is hard to imagine a basis for such exceptionally disproportionate demands other than to harass Google. During the October 8, 2025 hearing regarding Plaintiffs' first omnibus discovery motion, Dkt. 160, Plaintiffs' counsel argued that Plaintiffs were entitled to burdensome discovery because Google was "putting its entire DMCA program at issue." Hr'g Tr. at 103:6–11 (Oct. 8, 2025) (Dkt. 218). The Court rejected this argument, explaining Google's invocation of a DMCA defense did not mean that "the ordinary proportionality concerns of Rule 26 have been thrown out the window. . . . **[Plaintiffs] don't get to . . . audit everything [Google has] done with respect to every potentially infringing domain in the history of Google.**" *Id.* at 103:23-104:10 (emphasis added). Yet, even after that admonition, Plaintiffs are pressing ahead with just that.

Plaintiffs' attempts to justify this enormous undertaking with misleading analyses of the spreadsheets fail. First, there is no basis to doubt that Exhibit 1 is comprehensive. Google's data does not suggest that the 1,239 Plaintiff-noticed domains account for 93% of all noticed Shopping domains. Plaintiffs' conclusion that Exhibit 1 is "missing" Shopping notice data is based on a false premise, *i.e.*, that all of Plaintiffs' notices fall in the "Shopping" bucket. Atty. Decl. ¶ 11. In reality, Google's produced notice data reflects that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶¶ 13. While Exhibit 1 reflects that there were ▮▮▮ URLs noticed under the "Shopping" product during the relevant period, there were ▮▮▮ URLs across the four products represented in Google's produced notice data. *Id.* ▮▮▮ is thus the relevant denominator. Second, Exhibits 2 and 3 do not reflect different totals for the number of suspended Merchant Center accounts. Mot. at 3. Exhibit 2 reflects the number of unique

---

[2] Google originally produced this document at GOOG-CENG-00000761, but reproduced it with updated redactions at GOOG-CENG-00439752.C.

**LATHAM&WATKINS**LLP

suspended Merchant accounts, while Exhibit 3 reflects the number of Merchant Center suspension *events* by reason (including pursuant to the DMCA). *Id.* ¶ 14–15.

### C. Plaintiffs Can Assess Whether Google "Reasonably Implemented" Its DMCA Policy

The 1.5 terabytes of data Google has produced is sufficient to allow Plaintiffs to determine whether Google "reasonably implemented" its DMCA policy. Plaintiffs contend that "[o]ne cannot tell by looking at the [Manual Strike Tracker] whether all of the removals Google claimed to have initiated were ▮▮▮▮▮" Mot. at 2. That's not true— Plaintiffs *can* tell. They can compare the notice data Google produced regarding the 1,239 domains to the entries regarding the subset of those domains (▮) included on the Strike Tracker (or the historical versions of the same). Indeed, Plaintiffs appear to have already done some of this analysis, though Google strongly disputes their conclusions. *See id.* at 4. There is nothing to suggest that the notice data regarding over ▮▮▮▮ URLs, account data for 20,145 merchants, and ▮▮▮▮ rows of offer data Google has already produced is insufficient to evaluate Google's DMCA program. *Id.* ¶ 21.

Google need not produce data regarding *every* infringement notice or *every* "repeat infringer" to qualify for the DMCA safe harbor. While the fact finder cannot *ignore* notices from other rightsholders, *see Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) (remanding after district court "expressly declined to consider evidence of notices provided by [non-parties]"), a defendant is not *required* to present notices from every rightsholder to carry its burden. To the contrary, courts have found a defendant's repeat infringer policy "reasonably implemented" based on handling of the plaintiffs' notices alone. *See, e.g., Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2012) ("When Photobucket received Wolk's take-down notices . . . Photobucket acted to remove the infringing material."), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014); *Rosen v. eBay*, Inc., 2015 WL 1600081, at *8–9 (C.D. Cal. Jan. 16, 2015) (noting plaintiff's "allegations as to the deficiency of eBay's policy amounts only to a complaint that eBay has not provided full documentation of all terminations" and relying on evidence regarding eBay's handling of only plaintiff's notices).

Finally, Plaintiffs speculate that Google's responses to their notices may not be representative of its overall DMCA program but fail to offer any meaningful support. Plaintiffs point to two documents from February and September 2020 for the proposition that Google "attempted to treat Plaintiffs' notices differently." Mot. at 4. But Plaintiffs ignore documents demonstrating that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Atty. Decl. ¶ 26; Ex. A (explaining that the "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). In any event, Plaintiffs are quick to point out that Google bears the burden of proving that it "reasonably implemented" its DMCA policy. To the extent Plaintiffs believe that the evidence Google has produced is insufficient to make that proof (Google disagrees), that is a merits argument they can make later in this case.

\* \* \* \* \*

Plaintiffs' Motion should be denied, and Google should be awarded its reasonable expenses, *see* Fed. R. Civ. P. 37(a)(5)(B).

LATHAM & WATKINS LLP

                                                         Respectfully submitted,

                                                         */s/ Sarah A. Tomkowiak*
                                                         Sarah A. Tomkowiak (*pro hac vice*)
                                                         of LATHAM & WATKINS LLP

cc:    All Counsel of Record (via ECF and e-mail)