IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENGAGE LEARNING, INC.; BEDFORD, FREEMAN & WORTH PUBLISHING GROUP, LLC D/B/A MACMILLAN LEARNING; MACMILLAN HOLDINGS, LLC; ELSEVIER INC.; ELSEVIER B.V.; and MCGRAW HILL LLC,<br><br>                            *Plaintiffs*,<br><br>v.<br><br>GOOGLE LLC,<br><br>                            *Defendant*. | Case No. 1:24-cv-04274-JLR-BCM |

**ATTORNEY DECLARATION OF SARAH TOMKOWIAK**

I, Sarah Tomkowiak, declare that:

1. I am a partner at the law firm Latham & Watkins LLP, counsel for Google LLC ("Google") in this matter.

2. I submit this declaration in connection with Google's Response to Plaintiffs' Letter Motion for Discovery Conference (Dkt. 237).

**Parties' Agreement Regarding High-Level Metrics**

3. In response to RFP Nos. 3 and 4, Google originally agreed to produce "non-privileged documents maintained in the ordinary course of business" concerning "the works and marks asserted by Plaintiffs in this proceeding and actions taken by Google in response to the same" and "reflecting adverse actions taken toward merchants that were the subject of one or more notices received by Google concerning the works and marks asserted by Plaintiffs in this proceeding."

1

4. I am the recipient of a 79-page email thread between counsel for Google and counsel for Plaintiffs from October 3, 2024 through March 21, 2025 with the subject line, "Re: Google LLC's Responses and Objections to Plaintiffs' First Set of Requests for Production - Cengage Learning, Inc. v. Google LLC, Case No. 24-cv-4274." This email thread contains an email from Jeff Kane, counsel for Plaintiffs, sent on November 4, 2024 acknowledging that with respect to RFP No. 4, Google agreed to "produce documents showing strikes assessed against all of the Infringing Merchants, i.e., any Shopping Ads Merchant who was the subject of a notice Plaintiffs sent to Google concerning the works-in-suit, regardless of whether the strike resulted from a notice from Plaintiffs or someone else."

5. I am the recipient of a 62-page email thread between counsel for Google and counsel for Plaintiffs from October 3, 2024 through January 29, 2025, with the subject line, "Re: Google LLC's Responses and Objections to Plaintiffs' First Set of Requests for Production - Cengage Learning, Inc. v. Google LLC, Case No. 24-cv-4274." This thread is related to the thread referenced in paragraph 4. It includes an email from counsel for Plaintiffs, Jeff Kane, sent on January 29, 2025. With respect to RFP No. 3, Mr. Kane stated that "[t]he kinds of data this request calls for are things like the number of notices Defendant received (on, e.g., a monthly basis), the number of notices rejected and the reasons for the rejections, and what action Defendant took in response to the notices (e.g., forwarding the notices to the merchant, assessing a strike, termination, etc.)."

6. On February 4, 2025, counsel for Google met and conferred with counsel for Plaintiffs regarding several requests for production. This conference, which I participated in, was the first time Google and Plaintiffs substantively discussed RFP No. 3. At this conference,

Plaintiffs reiterated their request for "summary data" in response to this RFP and Google agreed to produce high-level data regarding the DMCA notices Google received.

7. The email thread referenced in paragraph 4 includes an email from Plaintiffs' counsel, Michele Murphy, on February 7, 2025 summarizing the parties' positions from the February 4, 2025 meet and confer. With respect to RFP No. 3, Ms. Murphy stated that "Defendant confirmed that it will produce data like the number of notices Defendant received, the number of notices rejected and the reasons for the rejections, whether the ad named in the notice was taken down, and what action Defendant took in response to the notices would be included."

8. On February 12, 2025, my colleague, Sara Sampoli, confirmed that "Google will produce high-level data regarding DMCA notices that it received going back to December 5, 2020." Ms. Sampoli explained that Google expected this data to include "the number of notices received, the number rejected and the reasons for the rejections, whether the ads identified in the notices were taken down, and the actions Google took in response to those notices."

9. On March 17, 2025, the Court held a hearing concerning Plaintiffs' March 4, 2025 motion seeking to impose a production schedule containing interim production deadlines for all document production. *See* Dkts. 85, 87, 94. During this hearing, Jeff Kane, counsel for Plaintiffs, explained that related to Google's DMCA defense, Plaintiffs sought "data on how many notices [Google] received, what action [Google] took in response, [and] how many terminations [Google] had." Hr'g Tr. at 9:10–11 (Mar. 17, 2025).

10. In response to RFP Nos. 3 and 4, and consistent with the discussions between the parties, Google produced several spreadsheets containing data regarding Google's processing of infringement notices and Merchant Account suspensions. That data includes reports of the number of notices Google received and the action Google took in response to those notices (GOOG-

CENG-00419902) (Dkt. 238 Ex. 1), the number of unique Merchant Center accounts delisted (i.e., suspended) (GOOG-CENG-00419905) (Dkt. 238 Ex. 2), and the number of delisting events (i.e., suspensions) by reason (GOOG-CENG-00439755) (Dkt. 238 Ex. 3). I understand that each spreadsheet consists of data queried from databases that Google maintains in the ordinary course of business.

**Google's High-Level Spreadsheets**

11. I have reviewed GOOG-CENG-00419902 (Dkt. 238 Ex. 1) and observed that this spreadsheet reflects data regarding DMCA notices received by Google between December 2020 and September 2024. In order to report infringement to Google, a rightsholder typically completes a form reporting details of the allegedly infringing content. The form is accessible at this link: https://support.google.com/legal/troubleshooter/1114905?hl=en. It contains a menu for selecting the product "where the content [the complainant is] reporting appears." I understand that the "product" field in column B of GOOG-CENG-00419902 reflects the Google product selected by the complainant using the Google form (e.g., if a complainant selected "Shopping," column B will reflect "google_shopping," whereas if a complainant selected "Google Search," column B will show "google_search"). As Shopping ads may appear on multiple Google platforms, my understanding is that the product reflected in column B may show a product other than "google_shopping" but reflect notice data related to a Google Shopping ad.

12. A team at FTI Consulting (FTI), whom Google has retained in connection with this matter, conducted an analysis of the data contained in GOOG-CENG-00419902 (Dkt. 238 Ex. 1), which I have reviewed. FTI calculated the sum of all URLs subject to infringement notices in the "google_shopping" product category and determined that there were ▮▮▮▮▮ URLs noticed. FTI

4

also calculated the sum of all URLs included, across all platforms, and determined there were ▓▓ ▓▓ URLs noticed.

13. FTI also conducted an analysis to understand the volume of data that Google has produced to date. I understand that Google has produced notice data for approximately ▓▓ unique URLs, account data for 20,145 merchants, and over ▓▓ offer records. The notice data that Google has produced includes notices regarding the domains at issue in this matter sent by other rightsholders, as well as notices regarding other domains connected to one of the 20,145 merchant center accounts. I understand that the associated ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ FTI calculated the sum of all URLs included across the ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ reflected in GOOG-CENG-00419902 (Dkt. 238 Ex. 1) and determined there were ▓▓ URLs noticed for those product categories.

14. I have reviewed GOOG-CENG-00419905 (Dkt. 238 Ex. 2) and observed that it contains the total number of unique Merchant Center accounts suspended, by month, from December 2020 through October 2024.

15. I have also reviewed GOOG-CENG-00439755 (Dkt. 238 Ex. 3) and observed that this spreadsheet reflects the total number of delisting *events* (i.e., suspensions) that have occurred by reason, rather than the number of unique *merchant center accounts* that have been suspended. The number of delisting events, as recorded in this document, is greater than the number of unique suspended Merchant Center accounts listed in GOOG-CENG-00419905 (Dkt. 238 Ex. 2).

**Plaintiffs' Request for Production No. 6**

16. On September 3, 2024, in their First Set of Requests for Production of Documents, Plaintiffs included RFP No. 6, which reads in full, "All documents concerning your policies,

practices, and procedures concerning copyright infringement by Shopping Ads Merchants, including all versions and drafts of any Copyright Infringement Policy, DMCA Policy, and Repeat Infringer Policy you have; all documents concerning the development, implementation, and enforcement of any such policies, practices, and procedures; and all internal and external communications concerning any such policies, practices, and procedures."

17.     In response to Plaintiffs' RFP No. 6, Google agreed to produce documents "reflecting Google's policies, practices, and procedures concerning actions taken by Google in response to copyright infringement notices concerning ads and listings on the Google Shopping platform generally." Google produced, among other documents, GOOG-CENG-00000761, Google's Strike Tracker. My understanding is that this document is a tool used by Google's employees and contractors as part of the DMCA program, and is maintained by Google in the ordinary course of business.

18.     On July 16, 2025, one month prior to the end of fact discovery, Plaintiffs served on Google Plaintiffs' Fourth Set of Requests for Production. These requests contained RFP Nos. 96 and 97, in which Plaintiffs, for the first time, requested all infringement notices, all related suspension data and ads data, and all communications concerning suspension for every domain included in the "Shopping" tab of GOOG-CENG-00000761.

19.     I have reviewed GOOG-CENG-00439752.C (Dkt. 238 Ex.4) and confirmed that it is a reproduction of GOOG-CENG-00000761 with updated redactions.

20.     Google also produced ten historical versions of the Strike Tracker at GOOG-CENG-00439609–GOOG-CENG-00439618. These historical versions were collected at six month intervals for the January 1, 2020 to September 16, 2024 period. FTI conducted an analysis of the Strike Tracker and the historical versions of this spreadsheet. I reviewed that analysis and

6

understand that it shows that ▮ of the 1,239 domains at issue in this case are represented in GOOG-CENG-00439752.C (Dkt. 238 Ex.4) or one of the historical versions of this document.

21. I understand that the notice and Merchant Center account data Google has produced contains Case IDs and Merchant Account IDs that can be used to identify notices and ads and offer data corresponding to domains listed in the Strike Tracker.

**Plaintiffs' New Requests**

22. I am the recipient of a ten-page email thread between counsel for Plaintiffs and counsel for Google from July 16, 2025 through October 17, 2025 with the subject line, "Re: Cengage v. Google - Plaintiffs' Fourth RFP to Google." This email thread contains an email from Plaintiffs' counsel, Jeff Kane, to Google's counsel on September 17, 2025, requesting to meet and confer with Google's counsel regarding Google's Responses and Objections to Plaintiffs' Fourth Set of Requests for Production.

23. On September 30, 2025, counsel for Google and counsel for Plaintiffs met and conferred. At this conference, which I attended, counsel for Plaintiffs raised the substance of Google's responses to RFP Nos. 3–4. As far as I am aware, this conference was the first time since November 2024 that Plaintiffs raised the substance of RFP No. 4. *See* paragraph 4 above. Despite the parties' previous compromise regarding high-level DMCA metrics, Plaintiffs disclosed in this September 2025 conference that they were now seeking additional expansive discovery into infringement notices, merchant accounts, and offer and ads data regarding domains other than the 1,239 domains at issue in this matter.

24. On October 2, 2025, in the email thread referenced in paragraph 22 above, Mr. Kane emailed counsel for Google and reiterated Plaintiffs' request for additional productions of "all DMCA infringement notices Google received concerning Shopping Ads merchants for the

period January 2021 through September 2024, and all responses Google made to those notices," "creation and suspension dates for all MCIDs and the associated domains Google claims to have terminated under its DMCA policy," and "offer/ads data concerning all MCIDs associated with each of the domains Google claims to have terminated under its DMCA policy for a period of eight months after the purported termination."

25. I have reviewed all requests for production Plaintiffs have served on Google and observed that no request for production seeks offer and/or ads data for every Shopping ad subject to an infringement notice during the relevant period.

26. Attached as Exhibit A is a true and accurate copy of a document Google produced bearing Bates number GOOG-CENG-00415345. The face of the document is dated November 2020 and titled "LR Product Vertical Monthly Newsletter."

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed November 7, 2025, in McLean, Virginia

*/s/ Sarah A. Tomkowiak*
Sarah A. Tomkowiak