# EXHIBIT A
# [Redacted Version of Document Filed Under Seal]

```
                    UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK

In re:                               :
                                           Docket #24cv4274
CENGAGE LEARNING, INC., et al.,      :

                    Plaintiffs,      :

   - against -                       :

GOOGLE LLC,                          : New York, New York
                                       October 14, 2025
                    Defendant.        :

------------------------------------ :

                    PROCEEDINGS BEFORE
              THE HONORABLE BARBARA MOSES,
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          OPPENHEIM + ZEBRAK, LLP
                         BY:  MICHELE MURPHY, ESQ.
                              JEFF KANE, ESQ.
                              URIEL LEE, ESQ.
                         4530 Wisconsin Ave, N.W., 5th Floor
                         Washington, D.C.  20016

                         OPPENHEIM + ZEBRAK, LLP
                         BY:  YUNYI CHEN, ESQ.
                         461 Fifth Avenue, 19th Floor
                         New York, New York 10017




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

APPEARANCES CONTINUED:

For Defendant:            LATHAM & WATKINS LLP
                          BY:  SARANG DAMLE, ESQ.
                               LAURA BLADOW, ESQ.
                               SARAH TOMKOWIAK, ESQ.
                               HOLLY VICTORSON, ESQ.
                               ROSE JUNG, ESQ.
                          555 Eleventh Street N.W., Suite 1000
                          Washington, D.C. 20004

<u>**INDEX**</u>

**E X A M I N A T I O N S**

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-Direct</u> | <u>Re-Cross</u> |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| <u>Exhibit Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                      PROCEEDING                    4
 2            THE CLERK:   The Court now calls Cengage
 3   Learning Inc., et al. v. Google LLC, case number
 4   24cv4274.  Counsel, please make your appearances for the
 5   record.
 6            MS. MICHELE MURPHY:  Good afternoon, Your
 7   Honor, Michele Murphy, Jeff Kane, Uriel Lee, and Yunyi
 8   Chen with Oppenheim & Zebrak for the plaintiffs.
 9            THE COURT:  Good morning.  I see Ms. Murphy and
10   Mr. Kane are sitting at counsel table.  Will you be the
11   speaking attorneys today?
12            MS. MURPHY:  Yes, Your Honor.
13            THE COURT:  All right, and for Google.
14            MR. SARANG DAMLE:  Good afternoon, Your Honor,
15   Sy Damle, Laura Bladow, Sarah Tomkowiak, Holly
16   Victorson, and Rose Jung from Latham & Watkins on behalf
17   of the defendant Google.
18            THE COURT:  And who will be speaking for Google
19   today?
20            MR. DAMLE:  With your permission we have
21   several attorneys, so --
22            THE COURT:  It's only a two-part motion today.
23            MR. DAMLE:  I believe there are three parts
24   that are going to get argued today, so we've got three
25   of us speaking.  Ms. Bladow will start, Ms. Victorson
```

1                                PROCEEDING                        5

2    will take the second issue, and there's one issue at the

3    end that I'll handle, if that's all right.

4            THE COURT:  All right.  I will prepare myself

5    accordingly.  On today's agenda we have the third filed

6    motion which is to say, well, in my head it was the

7    third motion anyway, filed on August 20 at docket 185.

8    And then, as promised, I'll get back to the discovery

9    deadline extension issue once we've resolved the more

10   substantive discovery issues.

11           So this is plaintiffs' motion to add

12   custodians, list serves, and search terms.  You're

13   right, there is a third section, disclosure of dates for

14   takedowns.  So unless plaintiffs have a different order

15   of attack in mind, we can take those issues in the order

16   in which you briefed them in your moving letter.  And

17   who's on point?  Mr. Kane.  My first question to you,

18   and I'll just give you the question now so you can make

19   sure to address it in your presentation, is why did you

20   make these requests, particularly for the additional

21   custodians and list serves, so late in the day?

22           Google makes what appears to be a serious point

23   that the parties have been negotiating both custodians

24   and search terms for eight or nine months now, starting

25   early in 2025, and although in your moving letter you

PROCEEDING                                    6

1
2    state somewhat vaguely a few times that you're making
3    this request based on recently disclosed information or
4    recently discovered documents, at least as to some of
5    the requests it doesn't seem to me like the information
6    was particularly recently disclosed, particularly, for
7    example, the first two proposed additional custodians,
8    ███ ███████, whose name I'm probably mispronouncing, ██
9    ████████████, and ███ ████████ who obviously were known
10   to the plaintiffs since before the case was brought.  So
11   as we go along, I will be pushing back from time to time
12   on the why so late in the day question.
13         MR. KANE:  Sure, if I could start with that.
14   So there are some cases in which the identity of the
15   relevant individuals is sort of known to the plaintiff
16   before the lawsuit is even filed.  You can imagine, for
17   example, in an employment discrimination case, the
18   plaintiff is going to know while it's their supervisor
19   and maybe that person's supervisor and maybe a human
20   resources person --
21         THE COURT:  Right, but may not know until they
22   get some document discovery who else was involved in the
23   decision to whatever the decision was, fire them,
24   whatever.
25         MR. KANE:  Exactly.  And in this case very few

```
 1                        PROCEEDING                    7
 2  people at Google were known to plaintiffs prior to
 3  filing this lawsuit.
 4            THE COURT:  Yeah, but these two were.
 5            MR. KANE:  Those two were known to plaintiffs.
 6  What tipped us off to those two that they might be
 7  relevance is that we saw an email to another account
 8  representative for a non-plaintiff here for a non-
 9  plaintiff here called Pearson Education, another
10  textbook publisher, in which the sales representative,
11  the account representative for Pearson flagged two other
12  folks internally at Bugle, quote, "████████ ██████ ███
13  ███████ ██ ██ ██████ ███████ ████████ ████████."  So that
14  was what clued us into the notion that these account
15  representatives might have particular discoverable
16  information.
17            It's also, although we started talking about --
18            THE COURT:  And when did you receive that
19  document?
20            MR. KANE:  Hang on one second.
21            (pause in proceeding)
22            MR. KANE:  So we received that on July 18, so
23  about a month before our document discovery was to
24  close.
25            THE COURT:  Okay.
```

```
 1 │
 2 │          MR. KANE:  And I think that's significant in
 3 │ that Google produced about 70 percent of the custodial
 4 │ documents that it ultimately produced on August 15 which
 5 │ was to be the last day of document discovery.  This is,
 6 │ after Judge Rachon specifically instructed Google not to
 7 │ do that, in other words, to make rolling productions as
 8 │ parties generally do in a case.
 9 │          The other thing I would point out is during the
10 │ custodial negotiations Google represented to us that the
11 │ custodians they had identified, which at the time I
12 │ think was seven, would be representative of the relevant
13 │ documents in the case.  And until we started getting
14 │ custodial documents, we didn't feel we were in a
15 │ position to give the Court meaningful information in
16 │ order to challenge that.  We had to get their documents,
17 │ review them, see if there were additional documents that
18 │ seemed relevant, and bring those issues forward.
19 │          And Google has actually taken the position,
20 │ they put this in their papers, that they wouldn't be
21 │ adding custodians unless plaintiffs also agreed to add
22 │ custodians.  So to the extent we were negotiating with
23 │ Google, which we were, Google refused to add custodians
24 │ unless we added custodians at the same time.  As a
25 │ matter of fact, they put in their opposition to this
```

PROCEEDING                                    9

1
2    motion that they, if we got certain custodians, they
3    wanted to add two custodians of ours.  We told them we
4    would add those two custodians if they added two of
5    ours, and they declined.
6            I should point out the custodian negotiations
7    that happened in this case took quite some time to even
8    get started.  For months Google refused to discuss
9    custodians with us unless we agreed in advance on a cap
10   on the number of custodians.  Obviously, we weren't in a
11   position to do that because we hadn't seen Google's
12   documents yet.  And unlike a typical civil case where
13   the universe of individuals is somewhat smaller as to
14   people who were involved in the actual tort that's being
15   alleged, in this case Google has put at issue its entire
16   DMCA program by invoking the DMCA defense.  So the
17   universe of people that are relevant to the claims,
18   relevant to the claims and defenses I should say, is
19   much wider in this case than it is in another case.  And
20   because of that we couldn't possibly know who all these
21   people were until we got more of Google's production.
22           So the --
23           THE COURT:  And, by the way, are you still
24   opposing an extension, a substantial extension of the
25   fact discovery deadline?

PROCEEDING                                10

1

2          MR. KANE:  We've agreed, we said a three-month

3    extension of the fact discovery deadline would be

4    appropriate.  I think it's important to remember that

5    like this was Google's strategy all along.  Their

6    strategy was we'll wait until the very end of document

7    production, produce most of the documents at the very

8    end of the period.  Then we'll say that, when plaintiffs

9    ask for more documents because made an incomplete

10   production, we'll oppose it and say they came in late.

11   We should be rewarding that type of conduct.  Producing

12   70 percent of the documents at the document discovery

13   deadline and then complaining that we waited too long to

14   raise the custodians we're raising I think is just not

15   the way that civil discovery is supposed to proceed.

16         THE COURT:  Let's focus on these two.

17         MR. KANE:  Sure.

18         THE COURT:  You say that the reason you now

19   think that ▇▇▇▇ and ▇▇▇▇ might have relevant

20   documents is that the sales rep for a non-party

21   publisher, a document has come into your possession,

22   presumably through some other custodian, that was

23   authored by a sales rep for a non-party publisher which

24   discussed that that person's client had, quote, "▇▇▇

▇ ▇▇▇ ▇▇ ▇▇ ▇▇▇ ▇▇▇▇▇ "  So now you

```
 1                          PROCEEDING                    11
 2   think maybe ██████████ and ██████████ might have written
 3   similar emails.  Correct?
 4           MR. KANE:  That's what tipped us off that these
 5   people might be relevant custodians.  Once we looked
 6   into them more, we found an email from one of the
 7   plaintiffs here, McGraw Hill, to ██████████████ about a
 8   pirate site that plaintiffs had noticed to Google, they
 9   had sent an infringement notice, but that Google wasn't
10   taking down.  And he also asked --
11           THE COURT:  Wait a minute, that's not a new
12   document.  That's a document in your own possession
13   since it was written presumably.
14           MR. KANE:  Correct.  The document was in our
15   possession.  It's relevance only became apparent to us
16   once we saw the document from Pearson.
17           THE COURT:  I'm not following you.  It was
18   irrelevant previously?
19           MR. KANE:  Not that it was irrelevant.  Just
20   the relevance didn't become apparent to us until we
21   noticed this other document from Pearson.
22           THE COURT:  So one of your clients, one of the
23   plaintiffs did discuss with their sales rep piracy, but
24   you had no reason to believe that anybody else's sales
25   rep discussed piracy with anybody else until you got
```

```
 1                         PROCEEDING                    12
 2   this document from a non-party sales rep?
 3              MR. KANE:  I'm not saying we shouldn't have
 4   seen it.  I just - that only became apparent to us once
 5   we saw the document from Pearson, and we asked, you
 6   know, did we have any account representatives, and it
 7   turns out we did.
 8              THE COURT:  Now, this Pearson email went to who
 9   or went to what?
10              MR. KANE:  The Pearson email?
11              THE COURT:  The one that you identify ending in
12   413454.
13              MR. KANE:  I believe that went to Pearson's
14   account representative.  I can check.
15              THE COURT:  And who was that email written to?
16   I don't have a copy with me at the moment, sorry, so I'm
17   depending on you here.
18              MR. KANE:  So it's two different people.  I do
19   have a copy if you want to review it.  But it's someone
20   named ███ ████████, ██████████████████; an alias called
21   ████████████████████████████@google.com, and that's cc'd
22   to ███ █████, █████████ ████, ██████ ████████, ████████
23   █████, and another lister of ████████████████
24   ███████@google.com.
25              THE COURT:  All right, and how many of those
```

```
 1                        PROCEEDING                    13
 2   recipients are either already custodians or are you
 3   currently asking to be added as custodians?
 4            MR. KANE:  So one of the aliases is
 5   ███████████████████████@google.com.
 6            THE COURT:  That's already?
 7            MR. KANE:  That one is a custodian, yes.
 8            THE COURT:  So why don't you already have any
 9   relevant emails that might have been sent to ██████
10   ████████ from ██████████ and ██████████?
11            MR. KANE:  So a couple of points.  One is that
12   what we see in Google's documents is that there's quite
13   a bit of confusion as to who handles what.  We've seen a
14   number of instances where someone is complaining about
15   some form of piracy, and it gets routed to one group and
16   then routed to another group and then routed to another
17   group.  What we are seeing in the experience of looking
18   at ads and sending notices is that notices aren't
19   getting taken down either expeditiously or at all.  And
20   so what we suspect is that any complaints that ████
21   ████████ and ██████ ███████████ would've shared more broadly
22   at Google might not have gotten to the right people in
23   Trust and Safety, it might not have gotten to that ███████
24   ████████ ██████████ alias.
25            I should also point out with respect to that
```

PROCEEDING                          14

1   particular alias Google told us that that alias is only

2   rarely used for copyright infringement issues or for

3   DMCA issues.

4           THE COURT:  Okay.  So in sum with regard to

5   ████████ and ████████, you think that they might have

6   written emails about piracy because one of their

7   colleagues did, and that if they had written emails

8   about piracy, it might not have gone to the ████ ████

9   alias where it would've already been collected.  It

10  might have gone to some non-custodial group of

11  recipients.

12          MR. KANE:  I would add a couple of things to

13  that.  One is that ████ ████ did receive an email

14  from our clients concerning piracy, and so that gives us

15  more of an indication that she might have likewise

16  raised the issue with her colleagues.

17          THE COURT:  Maybe.  But I'm not sure whether

18  that helps you or hurts you since you knew about that

19  from before you brought this lawsuit.

20          MR. KANE:  I would add that it could've gone to

21  someone who was either low on the totem pole or higher

22  on the totem pole than the existing custodians.  It's a

23  very big company they like to remind me, and it's not, I

24  don't think we should assume that those particular

PROCEEDING                          15

custodians would've gotten this email from ▆▆ ▆▆▆▆▆▆.

            THE COURT:  I understand, and the needle that I
have to thread, of course, as always is bang against
buck or, as the drafters of Rule 26 put it,
proportionality.  And the proportionality analysis gets
– the eye of the needle gets a little smaller as the
weeks and months go by.  The later in the discovery
schedule that someone comes up with a new set of search
terms or a new set of custodians that, unfortunately,
weighs against them in the proportionality analysis
because life is not perfect and you don't get everything
that you want and you're expected to act with diligence
and all of that sort of thing.  I hear what you're
saying that you got a big slug of documents late in the
day, and if you had gotten the documents earlier, you
would have made the demand earlier.

            That said, we can't keep doing this forever.
You're going to get more documents before January 6
based on the decisions that I made last week, and I
certainly don't want this to keep happening.

            So I hear what you have to say about ▆▆▆▆▆▆
and ▆▆▆▆▆▆.  Let's move on, if we can, I'm going to go
through all of the personnel and list serves I think
with Mr. Kane and then give Google an opportunity to

PROCEEDING                          16

2   respond before we switch topics and talk about search

3   terms.  So let's talk about the new list serve addresses

4   that you want to add.

5            MR. KANE:  Sure, so just sort of generally, a

6   number of these involve what we refer to as escalations.

7   Escalations are when someone tries to process an

8   infringement notice or suspend merchant but either has a

9   question about it or wants to discuss something about it

10  or runs into a problem.  In other words, it's exceptions

11  to the policy or situations where the policy may not be

12  operating as it was intended.  That's what we need in

13  order to evaluate how this policy was implemented under

14  the DMCA.  We can obviously see what the policy itself

15  says.  What we want to know is where they're making

16  exceptions, where they're going against (indiscernible)

17  of the policy or there are things that they did in

18  practice that weren't part of this policy and did they

19  encounter problems with how the systems that implemented

20  the policy worked.

21           I would also just point out at the outset

22  Google produced a document that includes more than a

23  hundred different list serves for trust and safety and

24  legal removals alone.  They've agreed to produce

25  documents from only one of those.  We've asked for six

1

2 more.  So we're actually asking for a very small

3 percentage of the list serves that are in that one group

4 that seems to be most relevant to this case.

5      So getting into the specific list serves

6 themselves, the first three – ███████████████ , ███████

7 ██████████████ , and ███████████████████ – we know

8 that these list serves were used to escalate what Google

9 described as critical issues to supervisors at Google.

10      THE COURT:  Now, yes, but in the next sentence

11 you say that the first one was, quote, "low urgency,"

12 that's ████████████  The second one was high urgency, and

13 the third one was emergency.

14      MR. KANE:  That's correct.

15      THE COURT:  So I'm not sure how critical all

16 three of those are necessarily.

17      MR. KANE:  Urgency might refer as sort of time

18 sensitivity as opposed to importance.  In other words,

19 you can have an issue that's extremely important but is

20 not urgent in the sense that it needs to be fixed within

21 the hour.  I wouldn't put too much in that alone.

22      There's also a (indiscernible) called copyright

23 removals that has a page called How To Escalate a

24 Critical Issue to Legal Removals, and it lists all three

25 of those list serves in the way we were just saying.

```
 1                      PROCEEDING                    18
 2           THE COURT:  Okay, and when did you first learn
 3    that these list serve addresses existed?
 4           MR. KANE:  So the latter two, ████████ and
 5    ████████████, those we only learned about, if they
 6    were in prior productions, it was like a vanishing
 7    reference.  We learned about them in between July 18 and
 8    August 15 when we got all of the custodial documents in
 9    this case.  The first one, ████████ --
10           (interposing)
11           MR. KANE:  I'm sorry.
12           THE COURT:  Go ahead.
13           MR. KANE:  The first one, ██████████████,
14    we only knew about because that was the address from
15    which they send responses to infringement notices.  In
16    other words, you send an infringement notice to Google
17    saying this ad is advertising infringing content, please
18    take it down.  Google responses usually and either says
19    we've taken it down or we're not taking it down.
20           THE COURT:   Why didn't you have the ████████
21    list serve address on your lists since January?
22           MR. KANE:  Because we were getting those email
23    separately.  What we didn't know about that address --
24           THE COURT:  What do you mean you were getting
25    those emails separately?
```

1

2          MR. KANE:  There's a separate document request

3   that says give us all of your infringement notices about

4   these pirates and the responses Google made to those

5   infringement notices.  So for the ones that are

6   literally just Google saying this is what we're doing

7   with your notice, we were getting those separately.

8   What we didn't know until we started getting meaningful

9   document, since we started getting custodial documents

10  from Google in July is that that particular address is

11  used for escalations.  In other words, it's a custodial

12  address in addition to just being sort of an address

13  that's used to send those notice responses.

14         THE COURT:  So you knew that you were getting

15  highly relevant emails from this address, but it didn't

16  occur to you that anyone sent anything relevant to those

17  addresses.

18         MR. KANE:  It seemed to us, we didn't have any

19  reason to think that that was anything other than just

20  the address that they used to send these automated

21  notices.  And more to the point, we were getting them

22  through another source.  In other words, we didn't know

23  there were actual custodial documents included in that

24  address.  We knew that it was being used for these

25  responses to notices, but we were already getting those,

```
 1                      PROCEEDING                    20
 2   so we didn't need to include it as a custodian until we
 3   found out that it's used for other things as well.
 4            THE COURT:  Okay, and the other two ███████
 5   and ███████████       you say you didn't know that
 6   essentially that they existed until the July-August time
 7   period.
 8            MR. KANE:  I think we didn't know about them
 9   until July or August.  If we had a reference to it
10   somewhere else in the production, its relevance wasn't
11   clear from that document.  For example, that ███████
12   address was also used to send out weekly reports
13   regarding data on takedowns, counter notices, and
14   historical trends of all copyright notices --
15            THE COURT:  And you know that because you have
16   those reports presumably now, right?
17            MR. KANE:  For a three plus year period, it's a
18   weekly report, we have two reports.
19            THE COURT:  That just happened to come up as a
20   result of your existing custodians and search terms.
21            MR. KANE:  Exactly, yeah.  So the list of,
22   according to Google's documents, contains the weekly
23   reports.  So it would have those reports on a weekly
24   basis for the full period.
25            THE COURT:  All right, why don't we go on to
```

```
 1                        PROCEEDING                      21
 2    the other three, ███████████████.
 3              MR. KANE:  Yes.   ██████ --
 4              THE COURT:  Sorry, yes, thank you.
 5              MR. KANE:  So ██████ which is ████████ ████████
 6    ████████ █████ ████████████ is the team that was responsible
 7    for processing infringement notices and suspending
 8    infringers.  So from the name alone it's a fairly
 9    important list serve.
10              THE COURT:  And when did you find out about it?
11              MR. KANE:  This is another one where we only
12    found out about it I believe in the July, between July
13    18 and August 15.  Or, again, there may have been a
14    reference to it somewhere, but its relevance only became
15    clear from subsequent productions.
16              THE COURT:  Okay.  And what do you expect to
17    find there?
18              MR. KANE:  So what we think this is being used
19    for is, similar to the other ones, escalations about
20    issues that people have encountered with piracy.  So,
21    for example, a Google employee raised an issue about a
22    rights holder who had submitted notices concerning
23    hundreds of shopping ads for pirated e-books which is
24    just what this case is about.  And Buganizer, the system
25    we were discussing last time, some assigns the ticket -
```

```
 1                         PROCEEDING                    22
 2   you can assign a ticket to someone - to this list serve,
 3   ███████████████████████████ --
 4             THE COURT:  Only to this list serve or to this
 5   list serve and some identifiable people?
 6             MR. KANE:  The ██████ was the only assignee.
 7   There may have been, sometimes people are cc'd on it,
 8   you know, the same you would cc someone on an email.
 9   But the █████ list serve was the actually assignee.  It
10   was also, ██████ was added to what Google described as an
11   extremely escalated issue about the notifications that
12   Google sends to pirates whose ads are being taken down.
13   We've also seen the address used to discuss what
14   language to use in response to infringement notices.
15             I should add Google hasn't argued that this
16   list serve is irrelevant.  They've simply speculated
17   that because one of their custodians at one time was
18   included on the list serve, further documents from it
19   would be duplicative.  I don't think that holds up for a
20   couple of reasons.  One --
21             THE COURT:  Can you hold that thought for a
22   minute because I want to circle about Ms. ██████ and Mr.
23   ██████ in a minute.
24             MR. KANE:  Okay.
25             THE COURT:  But so there's shopping DMCA and
```

1

2   then your last one is LR monetized.

3          MR. KANE:  Yeah, we'll do shopping DMCA first.

4          THE COURT:  Right.

5          MR. KANE:  We think this was also used for

6   escalations.  There's a document Google produced that

7   says all appeals in DMCA related cases, case consults

8   concerning the trust and safety shopping groups, trust

9   and safety shopping groups way should be sent to the new

10  email alias, shpping-DMCA@google.com.

11         THE COURT:  As of when?  When was it new?

12         MR. KANE:  The document was in the third

13  quarter of 2019.  We don't know how long that

14  instruction lasted.  But it at least was in operation as

15  of the third quarter of 2019.

16         THE COURT:  Okay.

17         MR. KANE:  It is literally called shopping-

18  DMCA@google.com.  The DMCA program for shopping is

19  Google's principal defense in this case.  Google says

20  they shouldn't have to search this list serve because

21  they're already searching another list serve called

22  ███████████████████████████████, but as I said a

23  few minutes ago, Google's counsel has told us that that

24  list serve, quote, "is only rarely used for DMCA and/or

25  copyright purposes."

And just as to the question you asked about the
date of the list serve, the document that we have says
it was, that it was added in the third quarter of 2019,
but that same document refers to another document from
May of 2021.  So I think we can be confident that it
lasted at least this long.

THE COURT:  At least until 2021, May.

MR. KANE:  Correct.

THE COURT:  All right, and LR monetized.

MR. KANE:  Yeah, so the (indiscernible) Googles
group which is the group that takes down ads or
infringing ads did a presentation for Google sales
representatives instructing them on a few things.  One
was what to do if clients complaint about illegal ads.
Another was how clients can submit, quote, "█ ███████
████ ████ ████ ████ ████ ███ ████ ████ ████ ███
████ ██ ████ ████ ████ ████ ████ ████ ████
████ ████ ██ ██████████." Obviously, those are all very
important issues to this case.

At the end of the presentation it says if your
client has any of these problems, you can escalate them
internally by emailing the address
LRmonetized@google.com.  According to the metadata for
the document, that document was last modified in

PROCEEDING                           25

December of 2022.  So we think this was an important

document for escalations and reports of piracy from

Google advertisers.

          THE COURT:  All right, now Google says that two

of the current custodians, ██ ████ and ███ █████, were

members of several of these list serves.  Why wouldn't

using, why wouldn't it be duplicative as Google argues

to go back and search the whole list serve?

          MR. KANE:  A couple of points.  They have not

said that any of those custodians were members of the

list serve for the entire relevant period.

          THE COURT:  Well, we can find that out.  Maybe

they can answer that question today.

          MR. KANE:  We have certainly asked them, and

they have not told us.

          THE COURT:  All right.

          MR. KANE:  Second, we would expect that if we

were seeing those lists, if they were duplicative, that

we would be seeing emails with those list serves copied

in the custodial emails.  And although we see some, we

don't see very many.

          The other thing I would say is Google's

documents from the, Google's emails from the list serve

say that a person can unsubscribe from the list serve by

1

2  simply emailing another email address.  So it's not as

3  if you're on the list serve, you're on it forever, and

4  there's no way to get off of it.

5          THE COURT:  Well, that's a relief.  Thinking of

6  some of the list serves I've been added to over the

7  years.

8          MR. KANE:  Google hasn't said that they've

9  actually searched these list serves.  In other words,

10 it's not like they said, well, we pulled the emails from

11 that list serve and ran your search terms, and it

12 returned, you know, zero documents or a million

13 documents.

14         THE COURT:  So not test runs have been done.

15 You haven't gotten any hit reports.

16         MR. KANE:  Exactly.  And that's true for all of

17 the custodians we're discussing today in the list serves

18 and all the search terms.

19         THE COURT:  All right.  And then you have a few

20 more names.  You have ██ ████████, ██ █████, ██████

21 ████████, and ███ █████.

22         MR. KANE:  That's correct.  So --

23         THE COURT:  It's a long list you have here.

24         MR. KANE:  So a couple of things, Judge --

25         THE COURT:  You might be thinking about

```
                             PROCEEDING                    27
```

1  prioritizing.  I might ask you at some point to pick the

2  ones you care the most about.  I'm not going to ask you

3  that right this second.  All right, tell me about these

4  guys.

5          MR. KANE:  So ████ ██████ was the policy lead

6  in monetized, which monetized is one of the terms they

7  use for shopping ads and other paid ads.

8          THE COURT:  Right, but the key document that

9  you identify him as the author of, he apparently was the

10  co-author of, correct, with an existing custodian.

11  That's Google's main point here.

12          MR. KANE:  That's correct.

13          THE COURT:  What do you think that ████ ██████

14  did on his own that requires that his data be searched?

15          MR. KANE:  So one of the emails we have from

16  ████ ██████ explains that █ █ ████ ██ ████ █ ███

17  ██ ████ █████ ██████ ████ ██ ████ █ ███ ████ ████

18  ███ ████ █████ ████ ████ ███ █ ████ ██ ████ ████

19  ███ █████ ████ █████ ████ ████ █ ███ ████ ███ ████

20  ███ █████ ██ ████ ████ ██████ ████ ██ ███ ████ ████

21  ███ █████ ████ █████ ████ ██████ ██ ███ ████ ████

22  ███ ████ █ ██ █ ██ ████.  The way this came up is

23  Google has told the rights holder that the content and a

24  notice had been taken down, and the rights holder kept

PROCEEDING                                28

seeing it appearing nonetheless.  So ████ ███████ appears

to be the person who dealt with that issue.

          That's the very issue that our clients

experienced.  We would send infringement notices to

Google, Google would respond and say we've taken the ad

down, and yet we would still see either the ad or ads

from that same pirate domain, and this went on for

years.  So we think ████ ███████ might have information

about exactly why this was happening and how this was

happening.

          THE COURT:  Do you know if these folks are

current Google employees or past Google employees?

          MR. KANE:  I do not know about ████ ███████.

          THE COURT:  What about the two sales reps, are

they still there?  They're your sales reps, you should

know.

          MR. KANE:  Yeah, I'm afraid I don't recall.

          THE COURT:  Okay.  ████ ██████.

          MR. KANE:  So ████ ██████ was the point of

contact for Google's product team, which, according to

Google's documents, handled legal policy implementation

for Google shopping platform.  He's also the reviewer on

a document that notes, quote, "███ ██████ ███ ██ ███

███ ████ ████ ████ ██████ ████ ███ ███ ████

PROCEEDING                                29

1

2  ██ ████████ ████ ████ ████ ████ ████ ████ ████

3  ███ ████ ████████████ ████ ████ █████." He's also

4  listed as the, sorry, Google personnel were instructed

5  to copy ███ ██████ on, quote, "████████ █████████."

6         THE COURT: When was that? When did that

7  instruction go out?

8         MR. KANE: The document stated March of 2022.

9  So squarely within the period.

10         THE COURT: Okay.

11         MR. KANE: It seems to us that ████ █████ was in

12  sort of a supervisory role, so we think that he is

13  likely to have been consulted only on very important

14  matters. He's also on the products teams which is

15  separate from the █████ team or the █████ ██████ team

16  where many of the other custodians are.

17         THE COURT: All right, and he is one of two

18  reviewers for the legal removals of ads document. Who

19  was the other one, if you know? Last paragraph before

20  we get to the next individual.

21         (pause in proceeding)

22         MR. KANE: The other is, I don't know the name,

23  the email address is ████████████ --

24         THE COURT: So not someone who's already a

25  custodian.

```
 1                         PROCEEDING                    30
 2            MR. KANE:  That's correct.
 3            THE COURT:  All right, what do you want to tell
 4   me about ███ ████████?  You've only written about one
 5   sentence there.
 6            MR. KANE:  Yeah, so ████ ███████ was involved in
 7   implementing the ban on e-books.  So he determined what
 8   tag reviewer should apply within Google system
 9   (indiscernible) --
10            THE COURT:  Excuse me.
11            MR. KANE:  In order to designate that the ad
12   was being taken down for the reason of advertising e-
13   books.  Sometime in late 2021 Google started exploring
14   allowing e-book ads again.  They had banned them in May,
15   sort of, quote/unquote, "banned them in May of 2021."
16   Sometime in late 2021 they kicked around the idea of
17   allowing e-book ads again.  And there's a document that
18   lays out in some detail what this would entail, and ████
19   ██████████ listed as the point of contact for trust and
20   safety.
21            And then the email we were discussing a few
22   minutes ago where the Pearson representative flagged
23   rampant piracy, ████ ███████ is added to the chain as the
24   issue keeps getting escalated.
25            THE COURT:  All right, and last but not least
```

1    is █████

2

3          MR. KANE:  Yeah, so we think that ████ ████ had

4    a certain amount of technical expertise, meaning

5    actually implementing the systems that processes notices

6    and took down ads and suspended merchants.  She was

7    involved in a product whose aim was to, quote, "████

8    ████ ████ ████ ████ ████ █ ████ █ ████ ████ ████

9    ████ ████ ████ ████ ████ ████ ████ ████

10   ████ ████     This is a very important issue because one of

11   the things Google has to show in order to obtain the

12   DMCA defense for any particular work that it took down

13   ads expeditiously.  So we think her expertise in that

14   might be enlightening.

15         THE COURT:  Well, you say that she was, quote,

16   "involved in," close quote, that project.  Was she in

17   charge of it, was she a central person?  Was it a team

18   of twenty, a team of two?

19         MR. KANE:  So that part isn't clear from the

20   documents we have.  What we can see is that there are

21   presentations to other folks at Google who will be

22   performing some of these tasks, and ████ ████ is the

23   author and the presenter in those presentations.  So,

24   for example, she's the owner of a presentation called

25   Buganizer for Legal Removals that explains how to use

Buganizer to make, quote, " ██████████ " ██ ████ ████
██ ████ ██████ ████ ████ ████ ██████████ . "

      At one point Google was changing versions in
the system called Cases that they use, which is like if
you send an infringement notice to Google, it's logged
in the Cases system and the response is generated in the
cases system.  They were moving from version 1.0 to
version 2.0.  There's this very long spreadsheet where
they list a whole bunch of issues that are coming up in
the implementation of the new system, and they assign
the issues to different people to work on.  ██ ████ is
the point of contact for more than a hundred of those.
And she, there's a response in the spreadsheet where she
explains what's happening with the issue and how they've
addressed it.

      So we think that she is someone who'll have
particularly important documents on how all these actual
systems worked, which I don't know that we have from any
of the other existing custodians.

      THE COURT:  Okay.  So you're asking for the two
sales reps, you're asking for six list serve addresses,
and you're asking for one, two, three, four additional
individuals.  Have you briefed those issues in what you
consider to be the order of importance or --

PROCEEDING                                33

1

2          MR. KANE:  No, I would not say that.

3          THE COURT:  -- so what is your order of

4    importance?

5          MR. KANE:  I'm sorry, I didn't catch the last

6    part.

7          THE COURT:  So what is the order of importance?

8          MR. KANE:  Could I have a moment to confer with

9    my colleague?

10         THE COURT:  You can.

11         (pause in proceeding)

12         MR. KANE:  So if we were to put them in order

13   of importance, I would say ███ ████████, ███ ████████, ███

14   ███████  the shopping-DMCA --

15         THE COURT:  ████████ --

16         MR. KANE:  Sure.

17         THE COURT:  ████████.

18         MR. KANE:  Yep.

19         THE COURT:  Next.

20         MR. KANE:  ████ ███████.  The shopping-DMCA list

21   serve.

22         THE COURT:  shipping-DMCA, okay.

23         MR. KANE:  The LR monetized list serve.

24         THE COURT:  That's your number five in your hit

25   parade.

```
  1                        PROCEEDING                     34

  2           MR. KANE:  That's correct.  ████ ████.

  3           THE COURT:  Okay.

  4           MR. KANE:  The three list serves, the --

  5           THE COURT:  The other three list serve.

  6           MR. KANE:  Yep.

  7           THE COURT:  Okay.

  8           MR. KANE:  And the two sales reps.

  9           THE COURT:  Okay, thank you.  Let me hear from

 10   Google on these proposed additional custodians, and,

 11   yes, I already know that it's late in the day and that

 12   each new custodian means a lot of work and that I added

 13   five custodians onto your work list last week.  So I am

 14   cognizant of those facts.  Still --

 15           MS. VICTORSON:  You'll save me like five

 16   minutes --

 17            (interposing)

 18           THE COURT:  So if you could sort of get right

 19   to these individuals and specifics, I'd appreciate it.

 20           MS. VICTORSON:  Right.  So I'll just go in the

 21   order of kind of importance laid out in terms of ████

 22   ████.

 23           THE COURT:  Sure.

 24           MS. VICTORSON:  Our understanding is that his

 25   work overlapped with existing custodians, ████ ████  and
```

```
 1                          PROCEEDING                      35

 2   ████ ██████  and  ████ ████████, and our understanding is that

 3   he did not work specifically on intellectual property

 4   related takedowns.  So he --

 5              THE COURT:  You say he overlapped with three.

 6              MS. VICTORSON:  Yes, █████ ████████ ████ ███████, and

 7   ████ ████████.

 8              THE COURT:  Okay, and was that, is that because

 9   they were all members of the same list serve?  Is that

10   because they worked in the same area and tended to copy

11   each other with stuff?  What is your understanding based

12   on?

13              MS. VICTORSON:  Yeah, so my understanding is

14   based on, so █████ is kind of a broad, like Google has a

15   lot of different policies.  There are lot of different

16   reasons why certain ads are not allowed on shopping or

17   it's other platforms.  So, for example, like

18   pharmaceuticals, ammunition, there are all kinds of

19   different policies, counterfeit, copyright.  So the DMCA

20   copyright trademark is just a small piece of what the

21   █████  team works on.  So with --

22              THE COURT:  But it also works on keeping people

23   from selling, I don't know, fentanyl on Google --

24              MS. VICTORSON:  Yes.

25              THE COURT:  -- that sort of thing.
```

```
 1                        PROCEEDING                      36

 2              MS. VICTORSON:  Yeah.  So in trust --

 3              THE COURT:  Thank you, I'm happy to hear that.

 4              MS. VICTORSON:  So ████ ████ ██████ is a

 5   really, it's a broad term, it's a broad, I don't even

 6   know if it's necessarily a department.  But ████ ██

 7   █████ and the █████ teams there are a lot of different

 8   individuals on those teams, and they each have kind of

 9   their own piece of it.  So while --

10              THE COURT:  ████ I'm sorry, you're throwing

11   acronyms.  █████ is ██████ ███████ ███████ ██ ████████?

12              MS. VICTORSON:  Yes.

13              THE COURT:  Okay, thanks.  And that's, in your

14   view, that's sort of the very broad top level --

15              MS. VICTORSON:  Big umbrella, yeah.  And so he

16   shows up on some documents, like related to this case,

17   but our understanding from talking to our client is that

18   he was not working in this specific, on these specific

19   types of DMCA takedowns.  And so to the extent there are

20   relevant documents related to copyright and trademark

21   takedowns, those would be within the custodians that

22   we've already searched.

23              THE COURT:  Because they focused more specific

24   --

25              MS. VICTORSON:  Specifically their day-to-day
```

1

2  is handling copyright and/or trademark.

3          THE COURT:  But you haven't done any test runs

4  to confirm that, right?  You haven't, for example, run

5  your existing search terms across ████ ████████ email

6  data even for some sample period of time to see what

7  turns up.

8          MS. VICTORSON:  Correct.  Google has not

9  undertaken the burden of collecting the documents for

10 these six custodians.  I think, as outlined in our

11 papers, there has to be some end to this.  And so rather

12 than undertaking the burden to collect from these six

13 custodians and run those test searches --

14         THE COURT:  When you make a, when you make the

15 type of argument you're making here, not much to see

16 here, let's move along, or to be more precise, nothing

17 to see here that you haven't probably already gotten

18 from one of the existing custodians, I would have a

19 whole lot more confidence if you had done even a little

20 bit of sample testing to confirm that.

21         MS. VICTORSON:  So it's a double-edged sword,

22 Your Honor.  If I come in and I say this only has ten

23 hits, you're going to tell me, well, go review the ten

24 documents, it's not, that's not that much of a burden.

25         THE COURT:  If it was only ten hits, yes.

PROCEEDING                              38

1

2          MS. VICTORSON:  If it comes up with a thousand

3    hits, you're going to say, well, it looks like they have

4    a lot of potentially relevant documents, go review the

5    documents.  So in terms of we don't view providing a hit

6    report as something that's going to actually help

7    control the burden here.

8          THE COURT:  You're not doing any testing

9    provides your opponents with another set of arguments

10   which I've just mirrored back to you.

11         MS. VICTORSON:  Moving on to ███ ████████, the

12   document that plaintiffs are relying on (indiscernible)

13   that document is an outdated document from August of

14   2019.  He is one of multiple points of contact listed on

15   that document.  The first point of contact listed on

16   that document is ███ ████████ and she is one of our

17   current custodians.  So even though I understand Mr.

18   Kane's making this argument that he's more senior and

19   maybe getting looped into additional documents, there is

20   case law in this district, I believe we cited it in our

21   papers, *In re Morgan Stanley*, that there's no reason to

22   think that a more senior employee is likely to be the

23   exclusive holder of any sort of responsive documents.

24   And our understanding is that we would expect to have

25   seen responsive documents within the custodians that we

```
  1                         PROCEEDING                    39
  2   have already agreed upon, searched, and produced
  3   documents.
  4             THE COURT:  In this case ███████
  5             MS. VICTORSON:  In his case ███ ████████, ████████
  6   ████████.
  7             THE COURT:  Who's she?
  8             MS. VICTORSON:  She is, again, a member of the
  9   █████ team.
 10             THE COURT:  Okay.
 11             MS. VICTORSON:  And she's listed as --
 12             THE COURT:  Is she a member of █████ throughout
 13   the entire relevant period from 2020 forward?
 14             MS. VICTORSON:  I don't know, but I do know
 15   that to the extent – I believe there's a part of it and
 16   then ██████?  I think our understanding is that to the
 17   extent that she did not hold the same position
 18   throughout the entire relevant period, that ████ ███████
 19   took on those responsibilities.
 20             THE COURT:  Okay.  I noticed that you have not
 21   told me thus far, and I'll hear it if you do have
 22   something to tell me, but thus far you have not told me
 23   with respect to either ████████ or ████████ that
 24   plaintiffs knew or should've known who these folks were
 25   and knew or should've known to make the ask in January
```

```
 1                          PROCEEDING                    40

 2   or March or sometime prior to your largest production of

 3   documents in the July-August time period.

 4           MS. VICTORSON:  Yeah, so our, let's see,

 5   ████████  ███████  ████████  ██████  █████  all were known to

 6   plaintiffs.  We produced I believe it was 180 to 250

 7   documents on July 18.

 8           THE COURT:  Yeah, that's pretty recent

 9   actually.  I mean that certainly doesn't allow you to

10   say they should've asked for them in January.

11           MS. VICTORSON:  (indiscernible) January, I mean

12   I would say (indiscernible) for ████  ████████  and ████

13   ██████████  those should've been known to plaintiffs long

14   before they filed this lawsuit given that those were

15   those points of contact at Google.  And so there's no

16   excuse there for waiting to, and then finding a document

17   in our productions and thinking, oh, it might be

18   interesting to go see what they have.

19           THE COURT:  Right.

20           MS. VICTORSON:  As for ████  ██████, as with ████

21   █████████, our understanding is that he did not work on IP

22   takedowns.  We understand that he was senior to one of

23   our existing custodians, ██████  █████████, and that her work

24   would've been, her documents would've captured the

25   relevant documents here.
```

```
 1                          PROCEEDING                    41
 2            THE COURT:  All right, so the three we've
 3   discussed so far, the three that you've discussed with
 4   me so far, ████████  ████████  ███ ████, all of these, as
 5   you unit, were in more senior supervisory positions to
 6   your current custodians?
 7            MS. VICTORSON:  At least ███ █████ and ███
 8   ███████   And then ███ ███████, I don't know if he was a
 9   supervisor to our existing custodians, but he worked
10   alongside them, and our existing custodians are the ones
11   who handled IP takedowns.
12            THE COURT:  Okay.  Plaintiffs identify ████████
13   as policy lead.  I don't know what that means in Google
14   speak.  Does that mean he's in a supervisory position?
15            MS. VICTORSON:  I don't know, Your Honor.
16            THE COURT:  Okay.  All right, so who's next
17   please?  Do you want to go to ███ ████ or do you want to
18   go to the list serves?
19            MS. VICTORSON:  I'll go to ███ ████.  So with
20   ███ ████ they're citing the same outdated August 2019
21   for ███ ████ as they are for ███ ██████, and we have no
22   reason to believe that she had unique documents not
23   already produced.
24            THE COURT:  And where was she on the totem
25   pole?
```

```
 1                        PROCEEDING                    42
 2              MS. VICTORSON:  I don't know, Your Honor.
 3              THE COURT:  Okay.  And, again, I'll just ask
 4     this for everybody.  You haven't done any testing for
 5     any of these list serve addresses or individuals?
 6              MS. VICTORSON:  Have not done any testing for
 7     any of these custodians or list serves.  But with
 8     respect to ████████ and ████████ in addition to the
 9     arguments we've already discussed, I would note that to
10     the extent that these individuals raised issues, I think
11     you would see those in our existing custodians.  Let's
12     see.  In terms of – and the other thing I just wanted to
13     note in terms of Mr. Kane's representation earlier with
14     respect to the two custodians we identified in our
15     opposition is that their offer back to us was that we
16     will give you two if you give us these two, but we're
17     still going to go to the Court on everything else, and
18     Google's looking to kind of resolve all of this.  So
19     there wasn't a deal to be struck there.
20              With respect to list serve --
21              THE COURT:  -- serves, yeah.
22              MS. VICTORSON:  -- we did offer a compromise of
23     searching ████████████ which plaintiffs rejected.
24              THE COURT:  Well, they now tell me at the top
25     of their list for this category are shopping-DMCA and LR
```

PROCEEDING                    43

2  monetized.  You want to talk about those first?

3        MS. VICTORSON:  Yes, we can start with those.

4  The list serves are kind of like an overlapping

5  hodgepodge of list serves, and --

6        THE COURT:  So far you're telling me the same

7  thing there, that it's a big company, that it's

8  complicated, that it was not always clear which list

9  serves --

10        MS. VICTORSON:  Right --

11        THE COURT:  -- the right place to go with this

12  issue, that issue, or the other issue, and --

13        MS. VICTORSON:  Yes.

14        THE COURT:  -- that makes your, that may be,

15  unfortunately for you, it's not the fault of outside

16  counsel obviously, but that may make your discovery life

17  a little more complicated.

18        MS. VICTORSON:  Understood.  With respect to

19  shopping-DMCA, we understand that this is being pulled

20  from like an old outdated document.  I understand Mr.

21  Kane's making representations about the metadata and

22  different things that show that maybe the document was

23  relevant during the relevant period.  The list serve

24  alias that we already have searched is the relevant

25  ███ ██ █████ alias listed in the DMCA policy that

1

2   applies to the period.

3           So I know Mr. Kane made a big deal about other

4   representations that Google made about the list serve

5   we've already searched.  That is the list serve that is

6   listed in the current DMCA takedown policy.  So while we

7   have previously represented that it may not have had a

8   lot of action with DMCA, it is where we would expect

9   kind of those escalations to go.

10          THE COURT:  Plaintiffs used the term, well,

11  actually they're quoting from a document that you did

12  produce, they say, I'm looking at plaintiffs' letter now

13  on page 3 with regard to shopping-DMCA.  They said that

14  they have a document and that in this document it is

15  said, quote, "███████ ██ ██ ███ ███ ███ ████

16  ████ ██ ███ ██ ███ ██ ██ ██ ███ ███

17  ██ ██ ██ ██ ███ ███ ████████."  And

18  you're both throwing around this term a lot, email

19  alias.  Is that just another word for list serve, i.e.,

20  you send it to this email address and it goes to a bunch

21  of people?

22          MS. VICTORSON:  Correct.

23          THE COURT:  Okay.  With respect to LR

24  monetized, so Google has a number of monetized products

25  like shopping ads are not the only monetized products.

PROCEEDING                        45

So searching the LR monetized list serve we think would

be kind of an overbroad search.  ███ █████ was the

team lead for this.  I believe Mr. Kane even referenced

that she was the one giving presentations that reference

list was serve, and she was the point of contact for all

the removals.  And ████ █████ is a custodian.  So to

the extent that there are communications responsive to

plaintiffs' RFPs on the LR monetized list serve, we

would've expected those to have come up in a search of

███ █████████ documents.

        THE COURT:  All right.

        MS. VICTORSON:  With respect to █████████████,

███ █████ and ███ █████ are members of this list serve.

        THE COURT:  For how long?

        MS. VICTORSON:  Unfortunately, we don't know if

it's possible to determine when people were added or

removed from the list serves.  But, again, this is kind

of for ███ █████ and ████ █████, this is their day to

day, they're members of the ████ team, they work on the

copyright and DMCA takedown issues.  To the extent there

were communications that hit on the agreed-upon search

terms and are responsive to plaintiffs' RFPs, we would

have already collected those and produced those to

plaintiffs.

THE COURT:  Well, except what plaintiffs say

here, they said it a couple of times with respect to a

couple of these is that if the overlap were as

substantial as you say you expect it to be, they

would've received more than just a handful.  In your

major productions in July and August, they would've

received more than just a handful of what they now think

were going to or coming from these list serves.  And

relatedly, let me ask you this question.  When you

negotiated custodians with plaintiffs in the early part

of the year, you mostly offered and ultimately

negotiated individuals rather than aliases or list

serves, right?

MS. VICTORSON:  Correct.  List serves are not -

-

(interposing)

THE COURT:  -- with 20/20 hindsight have been

more efficient and saved you some trouble to have put

the list serves out there instead of one or more of the

individuals, and that way if you had had an individual

rotating onto or off of the list serves, it would've

come out in the wash.

MS. VICTORSON:  No, so I think, I mean to the

extent that plaintiffs are learning about these list

PROCEEDING                                    47

serves through the documents, we're also learning about

list serves through the documents.  This isn't a

situation where we have just kind of like a master list

of everything that's super relevant.  We did negotiate

and agree to add one of the list serves early on in the

negotiation process, and in terms of how Google treats

list serves, because of the complexities involved in

collecting and searching from them as well as if these

are list serves where anyone in the company can send an

email and email blast a bunch of people, like they can

have a very large volume of data and documents, and it's

not always a straightforward process to collect and

search those.  So Google does not treat the list serves

as custodians.  And so those are not --

          THE COURT:  With the exception of ███  ██████

██ ██████.

          MS. VICTORSON:  We agreed to search that list

serve, but we don't consider it to be a custodian.

          THE COURT:  What's the difference?

          MS. VICTORSON:  The words I'm using.

          THE COURT:  Well, is there a difference in how

you search a list serve as opposed to how you search a -

-

          (interposing)

PROCEEDING                          48

1

2          MS. VICTORSON:  It is likely there is different

3     systems for like the, like you're pulling a custodian's

4     email inbox versus like whatever the system is that has

5     fuller serve data.

6          THE COURT:  Look, I'm ignorant.  So tell me if

7     I'm misconceiving it.  It seems to me if you have an

8     email address, you have an email address.  Then you look

9     at all the emails coming into that address, and you look

10    at all the emails going out of that address, and you run

11    your search terms and you produce relevant stuff.  What

12    am I missing here?

13         MS. VICTORSON:  It would be great if it was

14    that simple, but I don't think this system is that

15    simple.  And I don't know how it works, but I just know

16    that it's not as simple as like it being like an inbox

17    that you just pull.

18         THE COURT:  All right, is it more burdensome to

19    search a list serve email address than it is to search

20    barbaramoses@ny southern district?

21         MS. VICTORSON:  Yeah, so, for example, the

22    ███████ email alias, as Mr. Kane mentioned, they've

23    been aware of that since before the case started since

24    that was the email address that was sending automated

25    emails to them in response to their takedown notices.

1
2  And so to the extent like a list serve might be

3  something that someone sends an email to to then email

4  blast a bunch of people, these email list serves can

5  also be used for other purposes like sending automated

6  responses.  So, for example, if we were to run our

7  search terms against the removals email, we're going to

8  likely get every single DMCA takedown response that has

9  ever been sent which is incredibly overbroad.  So it's,

10  again --

11          THE COURT:  And that doesn't go to the

12  mechanics of the search.  That just goes to sort of the

13  volume of traffic that the list serve handles.

14          MS. VICTORSON:  That goes to the volume.  I

15  don't have the details on the exact mechanics of pulling

16  these.

17          THE COURT:  Okay.  What else do you want to

18  touch on for me?

19          MS. VICTORSON:  Same with like with ███████

20  and with ██████████████, these are list serves that are

21  for more than just copyright, more than just shopping.

22  So these are really broad buckets of documents.

23          THE COURT:  So you would expect running the

24  search terms would produce an overbroad set of documents

25  that would be highly burdensome to review and weed down

```
 1                        PROCEEDING                    50
 2  because it would include people complaining about –
 3  hopefully this didn't happen in real life – somebody
 4  selling illegal drugs on Google.
 5          MS. VICTORSON:  Correct.
 6          THE COURT:  All right.
 7          MS. VICTORSON:  As for ██████ our existing
 8  custodians, ███ █████ and ███ █████, were members of
 9  this list serve, and as with ████ copyright, we would
10  expect to have already collected and searched relevant
11  documents through collecting and searching their emails
12  and documents.
13          THE COURT:  All right.  And I don't really need
14  to hear more about ██████ and ████████ particularly as
15  the plaintiffs have wisely relegated them to the bottom
16  of their list.  Anything else you want to tell me?
17          MS. VICTORSON:  Your Honor, I think in addition
18  I understand the Court's, I understand the Court's view
19  of the number of custodians that we have.  I think --
20          (interposing)
21          THE COURT:  -- here --
22          MS. VICTORSON:  The other --
23          THE COURT:  That's last week.
24          MS. VICTORSON:  Yes.
25          THE COURT:  You're necessarily going to get the
```

1                          PROCEEDING                    51

2    same --

3           MS. VICTORSON:  We're not necessarily going to

4    be equal, but I do want to note for the Court in terms

5    of burden and proportionality and what Google has

6    already done, and Google is doing a lot more than just

7    custodians.  We're doing a lot of bespoke data pulls,

8    producing over 1.2 terabytes of data.  We agreed last

9    week, in addition to the custodians, to produce almost

10   an additional six months of those data pulls.  And so I

11   just want to make sure that in terms of thinking about

12   what Google is doing and produced in this litigation,

13   that those additional pulls are being taken into

14   consideration, not just our custodians.

15          THE COURT:  So I am taking that into

16   consideration, and, Ms. Victorson, I was sort of waiting

17   for you to bring this up but I'll prompt you because you

18   haven't.  Was Google planning to ask, for example, for a

19   cost sharing order in the event that I make you search

20   more than a minimum number of these new custodians?  You

21   know, that's in my toolbox.  I have it within my

22   discretion to say, okay, plaintiff, you can have one or

23   two or three, but you have to, for example, share the

24   costs on a 50/50 basis.  I've done that from time to

25   time.  I kind of like cost sharing orders when

| | PROCEEDING | 52 |
|---|---|---|

1

2  appropriate because they make the plaintiff and the

3  defendant partners in not going overbroad in making sure

4  that the searches really are the searches they need and

5  not just the searches that are more of a hope and a

6  prayer.

7           MS. VICTORSON:  Your Honor, I think that would

8  be appropriate here.

9           THE COURT:  And how would you figure out what

10  the costs were?  I would not typically in such an order

11  include legal costs as costs.  It would be your vendor's

12  cost basically, and you'd have to provide adequate

13  documentation that it was related to this particular

14  custodian and not to other stuff --

15           MS. VICTORSON:  Correct, we could do that.

16           THE COURT:  -- that they were doing.  How many

17  vendors are you using for your document searches?

18           MS. VICTORSON:  I believe it's a mix of Google

19  has an inhouse team and --

20           THE COURT:  The inhouse team is more --

21           MS. VICTORSON:  An inhouse team with Consilio

22  (phonetic).

23           THE COURT:  With what?

24           MS. VICTORSON:  I believe we have one vendor.

25           THE COURT:  You have an external vendor?

1                              PROCEEDING                          53

2              MS. VICTORSON:  Yes.

3              THE COURT:  And who's that?

4              MS. VICTORSON:  Consilio.

5              THE COURT:  Consilio.  It's a new one to me.

6              MS. VICTORSON:  And FTI, I guess we have two.

7              THE COURT:  Consilio on FCI (phonetic).  All

8    right, well, we'll circle back to that, but I want to

9    give plaintiffs a reply opportunity.  Try to keep it

10   brief please, Mr. Kane, and if you would add on please

11   your thoughts on cost sharing.  And let me just be very

12   candid with what I'm struggling with here.  On the one

13   hand, it does seem to me that some of the plaintiffs'

14   wish list here is just a wish list, a hope and a prayer

15   that there's, that these searches are going to be worth,

16   that the bang is going to be worth the buck, that you're

17   going to, in fact, uncover additional non-duplicative

18   documents that are relevant and that you didn't and

19   couldn't have known to ask for until relatively recent

20   in the game.  So there's a little bit of speculation on

21   your side.

22             On the other side Google hasn't done a great

23   job of explaining to me in, or establishing for me why

24   they're so sure, if they are sure, that the bang is not

25   going to be worth the buck.  So I'm hearing a little bit

PROCEEDING                          54

1
2  of just take my word for it please, Your Honor, from

3  both sides, and that makes my job more difficult and

4  that also makes a cost sharing order actually a little

5  more attractive to me because, as I said, it gives you

6  some shared goals and objectives.  So with that said,

7  you may reply.

8          MR. KANE:  Yeah, a couple of points if I could.

9  One is that for a number of custodians Google is saying

10 that they didn't work on IP specifically.  That's just -

11 -

12          THE COURT:  Right, that they had broader

13 responsibilities which is a problem if true because it

14 means there's going to be a much higher percentage of

15 irrelevant stuff turning up.

16          MR. KANE:  Well, one, I think that's

17 contradicted by the documents Google has already

18 produced.  So, for example, with respect to ██ ██████

19 the document we have, the ██████ ██ ██ ██████ ██████

20 ██████ ██████ ██████ ██████ ██ ██ ██████ ██████

21 ██████ ██████ ██████ ██ ██ ██ ██ ██████

22 ██████ ██████ ██.  So he at least was working on

23 copyright takedowns with respect to that program, that

24 issue which we think is critical to --

25          THE COURT:  But that's not the point.  You're

1

2  making a different point.  You're saying he's got some

3  stuff which is relevant.  What Ms. Victorson is saying,

4  yeah, but that was like one of 18 things he was working

5  on, so 17 of the 18 documents we pulled from this guy

6  are going to be totally irrelevant.

7          MR. KANE:  Well, one, that's --

8          THE COURT:  And it's going to cost us a lot of

9  money to do it.

10          MR. KANE:  One, that's what search terms are

11  for.  I mean you craft the search terms to try to get

12  the relevant documents and to weed out the irrelevant

13  documents.  Second, and if that were the case, Google

14  could've tested that.  They could've run these search

15  terms and seen how many they returned, and they chose

16  not to.  So I don't think we should put the, put a thumb

17  on the scale in favor of the documents being irrelevant

18  when Google has at its disposal those documents and

19  chose not to test them.

20          As to ███ ███████, he's a reviewer on a document

21  that notes our process and our use of different tools

22  for Google ads, however, has not been reviewed in the

23  past plus ten years, and we're unsure of its

24  effectiveness, scope, and impact.  So even if it's the

25  case that he touched a lot of different areas, the fact

PROCEEDING                         56

1

2   that he was touching this one in some ways means he's

3   even more relevant because if a person who's doing a

4   whole bunch of things, if the issue gets escalated all

5   the way to them, that means the issue is much more

6   important.  In a sense it might be that the more senior

7   people are even more efficient search because they

8   would've had fewer sort of day to day emails.

9        THE COURT:  Well, that's assuming that your

10  search terms are as good as you hope they are.  So that

11  if you apply them to senior policy personnel, that they

12  will only produce the documents which are relevant to

13  this case and not a bunch of documents relevant to other

14  issues.

15       MR. KANE:  Yes, but, again, not to repeat

16  myself, but Google could've tested that, and they chose

17  not to.  As to the list serves, I don't know where this

18  argument that list serves are harder to search is coming

19  from.  When we first raised the issue of a list serve in

20  February of 2024, I'm sorry, in January of 2024, Google

21  told us it was impossible to search list serves, they

22  said they couldn't do it.  That was an email from Latham

23  & Watkins on February 14, 2024.  We --

24       THE COURT:  But they - but they are searching

25  ████ ███████████, right?

PROCEEDING                              57

1

2          MR. KANE:  That's correct, clearly it was not

3    impossible.  So I don't think we should just take them

4    at their word that for some reason it's harder to --

5          THE COURT:  I did not hear impossible today.  I

6    heard bigger and hairier.  I didn't hear impossible.

7          MR. KANE:  I didn't either, but I'm saying

8    their story has changed.  Initially, they couldn't do it

9    because it was impossible; now they can't do it because

10   it's hard.  I didn't hear any clear reason that

11   searching an alias is any harder than searching a

12   regular old email address.  I am aware that a

13   distinction that there are some instances where you can

14   have something set up where it's not its own inbox.  In

15   other words, it routes emails but doesn't collect them

16   itself.

17         THE COURT:  It looks like an inbox but it's not

18   really an inbox.

19         MR. KANE:  Right, but Google (indiscernible)

20   that that's the case here, and the fact that they're

21   searching the ██████ ██████ ██████  ██████ list serve

22   indicates that that's not the case here.

23         Just to your last point about cost sharing, I

24   think Google should at least have to provide a hit

25   report before there's any kind of cost sharing

PROCEEDING                                    58

1
2    arrangement contemplated, and I don't think Google has

3    done anything in this case to deserve something as

4    beneficial to defendants as a cost sharing arrangement.

5         THE COURT:  Why do you say it's beneficial to

6    defendants?  It doesn't get them off the hook.

7         MR. KANE:  It's beneficial because --

8         THE COURT:  They pay depending on what the

9    percentage is.  It could be quite a healthy percentage

10   of the costs.

11        MR. KANE:  It's beneficial to them because it

12   reduces their costs by however much, but it reduces

13   their costs.  We --

14        THE COURT:  Right, but it also reduces your

15   temptation, if you were tempted, to simply go for broke

16   and say search everything everywhere all at once if it

17   doesn't cost you anything.

18        MR. KANE:  I think we have been more

19   circumspect than perhaps we're getting credit for and

20   what we're requesting.  Recall that over a hundred list

21   serves just from the ████ ██ ██████ █████ alone,

22   according to Google's documents, and we've asked for

23   only six of them.

24        I'd also point out I don't think Google has

25   done anything on discovery in this case to warrant

PROCEEDING                                    59

1

2    something like that.  In March of 2024, sorry, March of

3    2025 we had received fewer than 200 custodial documents

4    from Google, so this is six months into discovery.  We

5    received data but almost no custodial documents.  We

6    told Google that we thought the parties should agree to

7    an interim production schedule, these documents by this

8    date, these documents by this date.  Google refused, and

9    we brought the issue before Judge Rachon, and Google

10   swore up and down that they were not going to wait until

11   the very end of document discovery to produce their

12   documents.  And Judge Rachon asked them this twice, and

13   based on Google's representation, Judge Rachon ~~denied~~

14   ordered Google to adhere to interim production deadlines

15   but did order them to do what parties are supposed to do

16   in any case which is to make rolling productions.

17   Google, of course, waited until July, a month before the

18   document discovery deadline, to start producing

19   custodial documents and produced 70 percent of its

20   custodial documents on the document discovery deadline.

21   So I think Google has earned the reduced cost of a cost

22   sharing agreement.

23            And just to address Your Honor's question from

24   earlier about which employees are current versus former.

25            THE COURT:  Yes.

```
 1                        PROCEEDING                      60
 2              MR. KANE:  ██████ ████████ is a current employee.
 3    ████ ██████ is a current employee.
 4              THE COURT:  I'll make a note now.  ████████
 5              MR. KANE:  ██████ ████████ is a current employee.
 6              THE COURT:  ████ ██████.
 7              MR. KANE:  Is a current employee.
 8              THE COURT:  And you know this because somebody
 9    just, you'll excuse the expression, Googled them in the
10    last ten minutes?
11              MR. KANE:  We (indiscernible) them, not in the
12    last ten minutes, but when we suggesting these people
13    initially.
14              THE COURT:  Okay.  And who else?
15              MR. KANE:  ██████ ████████ is a former employee.
16    ████ ██████████ and ████ ████████ are both current
17    employees.  We are not sure about ████ ██████.  There's
18    just too many results when we searched --
19              THE COURT:  And the list serves, do you know if
20    they're current list serves?
21              MR. KANE:  That's not something that's evident
22    from the documents that we've gotten from Google.  It's
23    certainly within Google's power to find that out.  They
24    could simply pull the emails and see if there are recent
25    ones.  But from the documents that we've seen they were
```

PROCEEDING                              61

1
2  in operation during the relevant period of this case.

3  Discovery generally has been going back to January 1,

4  2020.

5          THE COURT:  All right.

6          MR. KANE:  Thank you.

7          THE COURT:   Thank you very much.  Let me tell

8  you what I'm prepared to do here, and I will just say in

9  advance that my job is in essence at this stage a

10  proportionality line drawing exercise.  Judge Wang who

11  sits over there might have drawn the line a little

12  further on one side.  Judge Aaron who sits upstairs

13  might have been drawn a little further on the other

14  side.  But what I strive to do is draw the line in a

15  reasonable place.  Given all of the proportionality

16  components that Rule 26(b) instructs me to consider,

17  including the stakes in the case which are high, the

18  showing of likely relevance that the plaintiffs have

19  made which is medium and the counter showing that Google

20  has made as to unlikelihood of relevance and/or burden

21  outweighing relevance which has been not all that

22  impressive.

23          So that said, with respect to the first

24  subcategory which is to say the sales agents ███████

25  and ███████  no.  On this one I am primarily cognizant

PROCEEDING                                    62

1
2  of the fact that the plaintiffs obviously knew who these
3  folks were from before they brought the suit, and I did
4  not find their explanation as to their recent
5  enlightenment concerning the possibility of additional
6  relevant documents that might be obtained from treating
7  these folks as custodians didn't move the needle much
8  for me.  And you made it easier for me because you de-
9  prioritized them in the list of what you want today.  So
10 no on ███████████  no on ███████████
11        With respect to the list serves, I'm inclined
12 to give you your top two choices, which is to say
13 shopping-DMCA and LR monetized.  I note in this regard
14 that you made what I consider a reasonably persuasive
15 pitch that there are likely to be non-duplicative
16 relevant documents obtained from searching these two
17 list serves.  And as to shopping-DMCA, Google has not
18 argued, as it has for some of these other list serves,
19 that relevant documents would overlap with multiple
20 existing custodians.  As to LR monetized, they have
21 argued that there would likely be an overlap with ██████
22 ████████, but they have not argued, as they have with
23 respect to some of the other list serves, that there
24 would also be substantial overlap with ████████ and ████████.
25 So I'm inclined to give you those two but not the

1

2  remaining list serves that you have requested.

3          And, again, not again, but moving to the final

4  list of individuals that you presented to me, if I were

5  you, I might go with ███████ and ██████, but you say that

6  your top two are ███████ and ███████. So if that's your

7  final choice, so to speak, those are the two that I

8  would be inclined to give you at this stage. And I'm

9  trusting in large part, I hope this turns out to be

10 correct, that the overbreadth problem turns out not to

11 be a significant problem because your search terms are

12 well enough drawn that we're not going to get everything

13 that ███ ███████ ever wrote about removals having

14 nothing to do with copyright issues, removals having

15 nothing to do with the issues in this case.

16         So that's where I'm inclined to go because the

17 parties didn't seriously brief or argue it, and I kind

18 of brought it up at the last minute, I'm not inclined

19 today to impose a cost sharing convention, but I want to

20 put it out there in the event that there is a next

21 round, which I hope there will not be, but in the event

22 that there is a next round if it's a result of these

23 searches and productions, one side, likely the

24 plaintiff, comes back to me and says, well, now we need

25 three more custodians or thirteen more custodians, I

PROCEEDING                                64

1

2  want the parties as part of the meet and confer process

3  to think seriously about whether cost sharing would be

4  appropriate to make sure that when they are negotiating

5  how many and what search terms they both have their eye,

6  not just one side has their eye, but they both have

7  their eye on keeping the cost down to a reasonable

8  level.

9       Now, I will briefly, if either side thinks I'm

10 totally off my rocker, I will briefly take pushback on

11 what I have said so far, and then we need to move on to

12 the next issue.  Plaintiffs.  You're still sticking with

13 ███████ and ████████ as your number one and number two

14 choice from that sub-list?

15      MR. KANE:  Yes please.

16      THE COURT:  All right.  Google.

17      MS. VICTORSON:  Your Honor, we'd ask for the

18 opportunity to run a hit report and revisit the cost

19 sharing.

20      THE COURT:  Now you want to run a hit report.

21 All right, how long is it going to take you to do that

22 and are you going to do it on all four of the new

23 custodians I've just identified?

24      MS. VICTORSON:  Correct, with the current

25 search terms as well as any additional search terms you

ordered today.

THE COURT:  All right, and you're going to run it across the entire relevant period or are you going to try and do more surgical sampling, like running it for a month or a quarter or whatever?

MS. VICTORSON:  We'd do the entire period.

THE COURT:  Okay.  And then what are you going to do after you run the hit report?  You're going to ask for an opportunity to meet and confer and convince them that they're wrong?

MS. VICTORSON:  I think ask for an opportunity to meet and confer regarding cost sharing depending on the burden that it imposes on Google.

THE COURT:  Well, loo, of course I cannot prohibit you and I do encourage you to run those hit reports now.  And as is always the case in discovery, regardless of what the magistrate judge just ruled on the existing record, if new information turns up as a result of those hit reports showing, for example, substantial overbreadth problems, I would certainly expect the parties to meet and confer in good faith about, for example, narrowing search terms to avoid that.  I would not expect, for example, plaintiffs to say forget about it, she's already ruled, we're done,

1                              PROCEEDING                          66

2    you just have to produce the documents.

3          So you do have a continuing obligation, even

4    though I will issue a ruling today, as new information

5    presents itself to meet and confer, to be reasonable,

6    and try to make the process proportional.

7          That said, I also want to caution Google,

8    particularly since you chose not to do this homework

9    before today, I want to caution Google not to expect to

10   reopen the entire motion process just because the hit

11   report gives you bad news.  All right.

12          MS. VICTORSON:  Understood.

13          THE COURT:  So with that caution, yes, and do

14   it sooner rather than later.  And we haven't gotten to

15   date setting yet, but I will caution both sides because

16   plaintiff from last week now has some additional work

17   that they have to do.  If I give you a new date for the

18   completion of all fact discovery, I've already given you

19   January 6 for the specific items that we went over last

20   week, but I don't expect a single dump on January 5.

21   That's not helpful.  You need to start putting those

22   documents out there as you process through them.

23   Particularly if you're going to try to renegotiate

24   search terms or costs or what have you, you're going to

25   need an evidentiary basis to do that (indiscernible)

1
2   look, you know, here's what we got just from 2020, here
3   are the problems that we're seeing, and you can't do
4   that without actually doing the work.
5          All right, let's --
6          MR. KANE:  Sorry, Your Honor, can I make one
7   small point?  The previous hit reports we've gotten from
8   Google I don't believe had unique hits.  In other words,
9   it was like this search term returned this many, this --
10         THE COURT:  They didn't de-dupe?
11         MR. KANE:  It wasn't apparent from the hit
12  report that they had.  We just ask that the hit that
13  they generate gives us total hits as well as unique hits
14  so that we can tell which searches are generating the
15  most documents.
16         THE COURT:  Well, you know, I've been out of
17  the game for a while in the sense that I haven't done
18  discovery personally as a lawyer for the last ten years,
19  thank goodness, because I've been on the bench.  So the
20  technology has changed significantly since I was last
21  sitting where you're sitting now.  But my understanding
22  is that, depending on both the systems you're searching
23  and the vendor you're using, it may not always be as
24  easy as pushing a button to determine what your unique
25  hits are.

```
1                          PROCEEDING                        68
2            MR. KANE:  They said in court filings that
3    they're using Relativity, and you can get a unique hit
4    count in Relativity.
5            THE COURT:  If you can, please do it because
6    that, I do take Mr. Kane's point.  All right, we need to
7    move on now to section two of the August 20 letter
8    motion which is search terms.  Is that you, again, Mr.
9    Kane?
10           MR. KANE:  Yes.
11           THE COURT:  Where do you want to start?
12           MR. KANE:  We can go in order with ████ █████
13   and High Confidence Sellers.
14           THE COURT:  Okay.  I understand what the issue
15   with regard to ████ █████.  You now know and you say
16   you learned relatively recently that there was or may
17   have been a ████ █████ █████ for important customers
18   including some of your clients, and you don't feel that
19   ████ █████ discussions were adequately identified and
20   produced as a result of your existing search terms.  So
21   I guess the question is why not?  Because Google says,
22   ah, it would've come up.
23           MR. KANE:  Yeah, so there's a ██████████ ████
24   ████ ████ ███ █████ ██████. ████ █████ ███
25   █████ ███ ███ █████████.  We've learned from
```

1 ██ documents that there is a ████ █████ ███ ██ ████

3 █████████.  We did not get that tab in Google's

4 initial production.  So the documents that Google

5 produced did not find that document.

6          THE COURT:  Did you get that tab after you

7 complained about it?

8          MR. KANE:  We did.

9          THE COURT:  Okay, when did you --

10          MR. KANE:  The reason I --

11          THE COURT:  -- ████ █████ ███?

12          MR. KANE:  Very recently, like within the last

13 month or so.  The reason I bring it up though was not to

14 complain about tardiness, although it was tardy.  The

15 reason I bring it up is clearly their search terms were

16 not recognizing this document.

17          THE COURT:  So what's in the ████ █████ ███?

18          MR. KANE:  We think it's the ████ ██ ███

19 ████████ ███ ████ ████ ██ ███ ██ ████ █ ████

20 ███ ████ ████ ████ ███ ████ ████ ████ ████

21 █████████ █████████ █████████.  What's on what

22 they gave us is our two publishers like our name,

23 Cengage and I think it's Macmillan.

24          THE COURT:  The two plaintiffs who supposedly

25 qualified for the ████ █████ █████.

```
 1                         PROCEEDING                      70
 2           MR. KANE:  Exactly, yeah.  So what it's
 3  supposed to be, what the documents describe it as is
 4  like here's all the domains that have advertised works,
 5  advertised pirated works of these particular publishers.
 6  But instead what I have is just our two names.  But
 7  that's sort of beside what we're discussing today.  My
 8  point is simply that in running their initial search
 9  terms the ███ ██████ ████ did not come up.  They didn't
10  produce it.
11           Likewise, in their initial production, we've
12  asked for the term --
13           THE COURT:  Literally said at the top of the
14  column ████ █████ ?
15           MR. KANE:  It's the name of the ████ █████ ████
16  ██████ .
17           THE COURT:  Okay, point taken.
18           MR. KANE:  It's also not, it's just a
19  screenshot of the document.  It's not the actual
20  document.  But in any case the other search term we've
21  asked for in this category, high confidence, there's
22  supposed to be a list of the high confidence sellers,
23  the ones that are subject to this --
24           (interposing)
25           THE COURT:  -- ████ ██████ .
```

1                          PROCEEDING                          71

2              MR. KANE:  Exactly, yeah.

3              THE COURT:  Go hand in hand.

4              MR. KANE:  Exactly.

5              THE COURT:  But high confidence is problematic.

6      Commonsense tells me high confidence is problematic

7      because people use that phrase all the time about all

8      kinds of things.

9              MR. KANE:  So we said high confidence in the

10     same sentence as e-book or book.  So we're not just

11     saying give us ever document --

12             THE COURT:  High confidence that this e-book

13     will be a best seller.

14             MR. KANE:  I mean is that a phrase someone's

15     going to use at Google?  I mean they're taking down ads

16     in response to notices or not taking them down or

17     they're suspending merchants.  Is someone going to say I

18     have high confidence that this is going to be a best

19     seller?  And would they say it for the e-books

20     specifically?  They'd probably say it for the book.

21             I don't think that's going to generate a huge

22     amount of false hits, but I mean to the point we were

23     making earlier, I mean Google could've done this.  They

24     could've run the search term and said, you know, hey,

25     look, we got a zillion results.  We reviewed, you know,

1                              PROCEEDING                        72

2   a thousand of them, and they were all false positives.

3   They haven't done that.

4          THE COURT:  You want them to do high confidence

5   not just in the same sentence as e-book but also in the

6   same sentence as book.

7          MR. KANE:  Correct, yeah.  So if someone said I

8   have high confidence that this will be a best seller,

9   yes, that would get caught if this book or this e-book,

10  but I wouldn't expect someone at Google to be using a

11  phrase like that.  Someone at the publisher I suppose

12  could be using that.  But I wouldn't think someone at

13  Google would be using that phrase.

14         THE COURT:  But the problem is, thank you for

15  making that point, because when you're searching

16  people's emails, you're searching incoming as well as

17  outgoing.

18         MR. KANE:  Yeah --

19         THE COURT:  And pick up phrases used by the

20  publishers.

21         MR. KANE:  Yeah, I don't know that the

22  publishers would've been emailing Google saying we have

23  high confidence this is going to be a best seller.  The

24  way Google ads work is the publisher puts the offer out

25  there, sets the amount of money that they want to spend

on the ad campaign, and Google runs the ads.  In other

words, it's not like you contact someone at Google and

say, you know, hey, this book's going to be --

THE COURT:  You don't negotiate it you're

saying.

MR. KANE:  Yeah, it's not like you contact

someone at Google and say, hey, this is going to be

huge, we need to run a lot of ads for it.  You just, you

know, input the ad as an offer, set the amount you're

willing to spend on it, and Google's algorithm either

runs it or doesn't.  So I don't think this is going to

generate a lot of false positives.  But to the extent

the Court is concerned about that, I mean Google

could've tested that.  They could've run that search

term across the existing custodians and find out how

many hits it is and reviewed a portion of them and said

that they thought a lot of them are false positives.

They chose not to do that.

I don't think that's a concern with █████

███████.  I just don't think there are a lot of --

THE COURT:  It strikes me as more of a unique -

-

MR. KANE:  Yeah.

THE COURT:  -- phrase.

PROCEEDING                                74

1

2          MR. KANE:  Yeah.  So, and I should say none of

3    the terms that they point to in their letter capture

4    this.  None of them are high confidence or ███████ ███████.

5    And the fact that they didn't return the ██████ ████████ ████

6    and the list of high confidence sellers indicates that

7    those documents are not going to be found by these

8    searches.

9          What we have here is --

10         THE COURT:  When did you first ask about ████████

11    ████████ and high confidence?

12         MR. KANE:  It would've been somewhere between

13    July 18 and August 20.  We only found out about these as

14    a result of a production that we got in between July 18

15    and August 15.

16         THE COURT:  All right.

17         MR. KANE:  Do you want to do all the search

18    terms at once or do you want --

19         THE COURT:  Yeah, I do.

20         MR. KANE:  Okay.  So the second set of terms is

21    the merchant IDs and customer IDs and case IDs that are

22    affiliated with the pirates.  The issue we've run into,

23    so in the initial set of search terms, Google searched

24    for the pirates that are relevant to this case by using

25    their domain name, you know, TestBank23.com, you know,

1
2    whatever the name is.  What we've now seen in Google's

3    documents is that often Google employees refer to these

4    pirates not by their domain name but by these account

5    numbers that they have at Google.  And, in fact, there's

6    a document from trust and safety where they say that

7    they need the merchant center ID in order to investigate

8    the domains that someone is identifying, in other words,

9    someone says can you investigate these domains, and they

10   say you have to give us the merchant center ID.

11            Google hasn't --

12            THE COURT:  Explain to me what a merchant

13   center ID is, what a case ID is.

14            MR. KANE:  Sure.

15            THE COURT:  What a customer ID is and why

16   people seem to need all of these.

17            MR. KANE:  Google will have to tell you why

18   people need all of them, but a merchant center ID is if

19   you had a shopping account, an account on which you run

20   shopping ads, they give you an account number, but you

21   need a separate account for every domain for which you

22   want to run ads.  In other words, if I want the domain

23   testbank23.com and I want to run ads for it, I get a

24   merchant center ID in order to run those ads.  If I then

25   want to run ads for testbank24.com, I need a separate

PROCEEDING                                      76

merchant center ID number in order to run ads for that

merchant account.  So Google created this system in

which one person advertising needs to have multiple

accounts in order to advertise multiple domains.  That's

--

          THE COURT:  Right, so that's a merchant center

ID.  What's a case ID?

          MR. KANE:  So when a rights holder sends an

infringement notice to Google, Google responds and

either says we're going to take the ad down or we won't

take the ad down.  And they give the notice a case ID.

So each of the notices you send has a case ID associated

with it.  So what we have in this case are all of the

case IDs that are associated with notices that were sent

about the pirates at issue.

          THE COURT:  Okay, so I'm guessing that you were

aware, because you're the one who, your clients are the

ones who sent the notices and got responses and so forth

and so on, that you have known all along that when you

sent a notice, you got a case ID assigned.  Why didn't

you ask for case IDs to be searched much earlier in the

game?

          MR. KANE:  We were trying to be reasonable,

Your Honor.  We gave them a list of domains hoping that

PROCEEDING                              77

2    that would uncover the relevant documents.  What we see

3    in the production is there's very little discussion of

4    the actual pirates by domains, and what we've

5    additionally seen is often, when they are discussing our

6    case numbers or our pirates, they don't use the domain.

7    They use the merchant center ID or they use the case ID.

8    So it wasn't evident to us until we started reviewing

9    Google's production that we needed to do a search with

10   the case IDs as opposed to just the domains.  We were

11   hoping that the domains would be enough.

12           Customer ID is one that I --

13           THE COURT:  The problem is I mean the numbers

14   are scary.  You have 1,239 domains, right?

15           MR. KANE:  That's correct.

16           THE COURT:  So does that mean you are now going

17   to have 3,700 roughly new searches run?  Because each of

18   those domains, well, even more.  Each of those domains

19   is going to be associated with how many merchant center

20   IDs, how many customer IDs, how many case IDs?

21           MR. KANE:  There are a total of 20,145 merchant

22   center IDs and a total of unique merchant center IDs.

23           THE COURT:  One thousand one hundred and how

24   many?

25           MR. KANE:  Forty-five.

| 1 | PROCEEDING | 78 |

<pre>
 2          THE COURT:  Merchant center IDs.

 3          MR. KANE:  That's correct, and there's 7,607

 4   case IDs.  We do not know the number of unique customer

 5   IDs because we don't have them from Google.

 6          What I would say about that though is because

 7   these are, so the merchant center ID is like an eight or

 8   nine-digit number.  The case ID is like a ten or twelve-

 9   digit number.  So they're very specific terms.  In other

10   words, there's really no risk of false positives with

11   these.  And they --

12          THE COURT:  This is the merchant ID?

13          MR. KANE:  It's eight or nine, I'm sorry, nine

14   or ten.

15          THE COURT:  And customer IDs, you have some

16   samples?

17          MR. KANE:  I do not know how many digits the

18   customer ID.  I think it's six or seven.

19          THE COURT:  And you don't know how many of them

20   there are.

21          MR. KANE:  How many customer IDs there are, we

22   don't.

23          THE COURT:  (indiscernible) need to be

24   associated with your domains.

25          MR. KANE:  Correct.  We don't have the number
</pre>

PROCEEDING                                79

 1 of customer IDs.

 2        THE COURT:  All right, so you concede, Judge

 3 Moses, it's at least 27,000, 28,000 searches that we're

 4 asking them to run, but your pitch is there's virtually

 5 no risk of false positives because they're long and

 6 specific.

 7        MR. KANE:  Yeah, and to be clear, it's not

 8 separate searches.  You do run search that includes all

 9 the numbers, and you see what comes back.  I mean it's

10 no harder than what they already did in searching for

11 the 1,239 domains.

12        The burden argument that Google has made about

13 this is that they claim that the limit for characters in

14 searching Relativity is 450.  That's not correct.  The

15 limit is 65,000.  If you look at the web page that

16 they're citing for that proposition, what that's talking

17 about is term highlighting.  So in Relative, if you

18 want, the system can highlight certain terms for you so

19 that when you're looking at a document, if the word

20 privilege shows up or if the word infringement shows up,

21 it just automatically highlights it for you.  Four

22 hundred fifty is the maximum number of characters that

23 you can have if you are turning on term highlighting.

24 Like you can't highlight the term, a term that's 451

1                           PROCEEDING                           80

2     characters.  The limit for a search term is 65,000

3     characters which is more than enough for the searches

4     we're asking Google to do here.  Even if it were greater

5     than --

6              THE COURT:  Sorry, go back.  The 450 characters

7     is for what?

8              MR. KANE:  Something called term highlighting.

9     I have a document if you'd like to see it.

10             THE COURT:  I don't know if I want to see it or

11    not.  Try and explain it to me please.

12             MR. KANE:  Yeah, so when you're in Relativity,

13    which is like an interface for reviewing documents, it

14    has this feature where, if you want, any time you bring

15    up a document, if the document includes a certain term,

16    you can highlight that term.  So if I wanted it to

17    highlight every time the word privileged is used or I

18    wanted it to highlight every time the tern infringement

19    is used, Relativity will just automatically highlight it

20    for you.

21             THE COURT:  And the search string for that

22    purpose is limited to 450 characters?

23             MR. KANE:  Exactly.  You can't highlight a term

24    that's more than 450 characters.  But what we're talking

25    about here is how many characters can you have in a

search, and the limit for that is 65,000.  And even if
you exceed the 65,000, you can just run two searches.
It's not like it's, you know, some upper limit on --

THE COURT:  So you would run a search here.
Suppose you wanted to run a search for all of the 20,145
merchant center IDs, you'd just list them all out with
commas in between them?

MR. KANE:  Use an or instead of a comma, but
yes.

THE COURT:  Ors, which would probably come to
less than 65,000.

MR. KANE:  And if it came to more than that,
you would simply run it as two searches.

THE COURT:  But not, right.  All right.  And
this would allow you to run the search, you say, but
wouldn't highlight the hits for you.

MR. KANE:  You could run, turn on highlighting
for any one of those case numbers.  It's just like the
one term that you're highlighting can't be more than 450
characters.  So these terms are anywhere from nine to
fourteen characters.  So you could turn on term
highlighting for all those.  It's just like --

THE COURT:  Any one term.

MR. KANE:  Exactly, yeah.  So the literal term

1
2  that you're highlighting.

3          THE COURT:  For example, I'm just trying to

4  imagine why this makes sense as a practical matter.  And

5  what I'm imagining is, tell me if this is correct, that

6  the highlight feature is designed to help out lawyers,

7  for example, who want to see if a particular paragraph

8  was repeated a million times in a million documents

9  verbatim.  And then you might need 450 characters just

10 to make sure it's the right - all right.

11         MR. KANE:  Correct, yeah.

12         THE COURT:  I'm trying to imagine what life is

13 like for your paralegals.  Okay, fine.

14         MR. KANE:  So what Google has tried to say is

15 they can't do the search because the maximum number of

16 characters they can put in a search is 450.  That's just

17 factually incorrect.  You can do it with as many as --

18         THE COURT:  And if that were true, that

19 would've been a problem for them in searching for the

20 domain names, right?

21         MR. KANE:  Exactly.  When they ran a search for

22 the domain names, it was 16,711 characters, and they

23 were able to run it.  So this --

24         THE COURT:  And it was just domain name one or

25 domain name two or domain name three, etc.

1                          PROCEEDING                        83

2          MR. KANE:  Exactly.  Yeah.  So the argument

3    that they're putting forth on burden as to this is just

4    incorrect.

5          THE COURT:  Okay.  Why don't you know how many

6    customer IDs are out there?

7          MR. KANE:  I don't believe we've gotten the

8    list from Google of the customer ID that's associated

9    with each of the merchant center accounts that are in

10   this case.

11         THE COURT:  Okay.  All right, and, well, I

12   guess that's it for the search terms.  So let me hear

13   from Google on search terms please.

14         MR. KANE:  I'm happy to do whatever the Court -

15   did you want me to do the other term OKR or did you want

16   to do it after?

17         THE COURT:  Well, I guess that does

18   thematically connect.  That's fine.  Tell me about the

19   OKRs.

20         MR. KANE:  Sure.  So OKR is objectives and key

21   results, and this is essentially a document that Google

22   personnel produced for all sorts of things, to list

23   goals that they have, to list projects that they want

24   to, either want to initiate or are initiating and they

25   want to give a progress report, deliverables, proposals,

problems, all sorts of stuff.  So, for example, there's

an OKR explaining that Google shopping will, quote,

"██████████ ███ ████████ ████████ █████ ███████ ████████████."

The document explaining that is an OKR.  There's another

one that says considering foregoing, I'm sorry, there

was a period where they were thinking of returning to

advertising e-books, that they had a ban at one point,

which they still claim to have, and they were

considering reentering the e-book ads market.  The

proposal to do that is an OKR.

Also, Google has taken the position that it

does not do written evaluations of its employees.  So

these OKRs are sort of the closest thing we have to

that.

So what we suggested is that Google use the

term OKR in conjunction with some other terms - removal,

copyright, DMCA, etc.  Google's only response to this is

to say that these things might've been caught by other

searches.  But if we know what the particular term is,

we may as well use the particular term and not some sort

of triangulated term that's attempting to get at it.  So

we think this is a very --

THE COURT:  They also complain about your

actual search term, and they say, for example, that you

PROCEEDING                          85

need to use a proximity connector rather than an and.

MR. KANE:  We'd certainly be willing to do a
proximity connector.  I think you could probably solve
that problem by just getting rid of shopping and
monetize and still do it as an and.  The issue is OKR
might be the title of the document, and the sort of
relevant term from a document might be later.  So if you
use a proximity connector, you might lose a lot of
relevant hits.  In other words, if you name the
document, you know, OKR on takedowns, it might be that,
sorry, if you named it OKR and, then the takedown term
is later in the document, you might not get it.  But we
think this is clearly a relevant form of document that
Google has and that it should be a search term.

THE COURT:  Okay, now let me hear from Google.

MR. KANE:  Thank you.

MS. BLADOW:  Your Honor, the existing search
terms are reasonably tailored to return relevant
responsive, documents responsive to plaintiffs' request
for production.  With respect to the ███ ███████ ███████
search term, I did happen to run a hit report just last
week after our hearing --

THE COURT:  Did you share that with plaintiffs'
counsel?

PROCEEDING                          86

2        MS. BLADOW:  No, because I just got the results

3  of that as well as the review of the documents returned

4  by that about an hour and a half before the hearing.

5        THE COURT:  Well, do tell.

6        MS. BLADOW:  So it, and we ran the search term

7  across the existing custodians, the ████ ████ ████████

8  alias, as well as the five custodians you added at the

9  last hearing.  It produced nine hits.  All of those were

10  previously reviewed, and my understanding is that all of

11  those nine hits were produced.  So there is nothing else

12  to search for, with ████ ████████ ████████, our existing

13  search terms returned all of those documents.

14        THE COURT:  So if I ordered you to run the ████

15  ████████ search, you basically have already done it, and

16  it's not going to cost you another penny.

17        MS. BLADOW:  With respect to the custodians

18  that we previously agreed upon and that you ordered last

19  week, yes.

20        THE COURT:  Right, and what you're saying with

21  respect to the new custodians is you would expect a

22  similar result, i.e., that the existing search terms

23  would do the work for you.

24        MS. BLADOW:  Correct, and so there's no need to

25  add another search term.

```
 1                        PROCEEDING                    87
 2              THE COURT:  On the other hand, adding ████
 3   ██████, would that create any more work for you?  Is
 4   there any burden here?
 5              MS. BLADOW:  And now you see why I didn't bring
 6   a hit report on the other (indiscernible).  Quite
 7   frankly, I don't know and I won't know until we collect
 8   and run search terms.
 9              THE COURT:  Okay.  So that's ████ ██████.  Did
10   you do anything on high confidence?
11              MS. BLADOW:  We did.  I'd note that the within
12   sentence connector is not a term that our system
13   recognizes.
14              THE COURT:  It has to be within a number?
15              MS. BLADOW:  Yes, a number.  We used 15 which
16   is kind of a good approximation for the number of words
17   that would like be in a sentence.
18              THE COURT:  Is it within 15 words or 15
19   characters?
20              MS. BLADOW:  Fifteen words.  So high confidence
21   within 15 of e-book or book.
22              THE COURT:  All right, so I agree that sounds
23   like similar to within sentence.
24              MS. BLADOW:  We have, we reviewed and produced
25   11 documents.  I believe there were two that we produced
```

1                           PROCEEDING                           88
2   and reviewed that were not responsive.  There were only
3   three new hits, all of which were not responsive and not
4   relevant.  So we believe applying the search term --
5              THE COURT:  Across all of the existing
6   custodians.
7              MS. BLADOW:  All the existing custodians.  So
8   we believe applying this search term to any new
9   custodians or list serves would not be proportional to
10  the needs of the case considering the kind of few
11  responsive documents.  So it would be returned by this
12  additional term that are already being returned by the
13  existing term.
14             THE COURT:  What's your response to plaintiffs'
15  counsel's point that the existing search terms somehow
16  failed to result in the production of the ██████  ███████
17  ████ ███ █████  ████████████████? 
18             MS. BLADOW:  So that's incorrect.  Of the nine
19  hits that we got when we ran ██████  ████████ that we had
20  reviewed and produced all nine of those hits, I have the
21  Bates number of the document, GOOGSCNG00411022.
22             THE COURT:  Hopefully Mr. Kane is writing this
23  down; I'm not.
24             MS. BLADOW:  That did come up in the nine hits
25  that were reviewed and produced.

```
 1                       PROCEEDING                    89
```

```
 2              THE COURT:  And that's ███  ████████?

 3         MS. BLADOW:  That's my understanding.

 4              THE COURT:  Okay.  All right.  Now what about

 5    these IDs?

 6         MS. BLADOW:  So plaintiffs have had the list of

 7    these IDs since February and/or March.

 8              THE COURT:  Well, the merchant center IDs and

 9    the case IDs you mean?

10         MS. BLADOW:  They've had the merchant center

11    IDs since February.  There was a supplemental production

12    in May.  They've had the case IDs since February/March,

13    and there were supplemental productions in May/June.  As

14    you noted, they have had their own case IDs since before

15    this lawsuit started.  I don't know if we're on the same

16    page about what customer IDs refers to.  If they're

17    referring to ads account IDs.  My understanding is that

18    there are 10,028 ads account IDs --

19              (interposing)

20              THE COURT:  -- as account ID.

21         MS. BLADOW:  So in order to list your products

22    on Google shopping, you have to have a merchant account.

23    And then if you want to pay Google to advertise and make

24    your listing appear at the top of the page in search

25    results, you'll have to have a separate ads account.
```

1                          PROCEEDING                      90

2              THE COURT:  A-S, as?

3              MS. BLADOW:  Ads, A-D-S.

4              THE COURT:  A-D-S, ads, okay.

5              MS. BLADOW:  So there's over 10,000 of those if

6     that's what plaintiffs are referring to with respect to

7     customer IDs.

8              THE COURT:  Let's just do a quick check here.

9     Is that what you're referring to, plaintiffs?

10             MR. KANE:  I'm not sure because the Google

11    documents say, they refer to it by customer ID, CID, and

12    I don't know if that does mean that they're referring to

13    the ads account ID or if it's a separate account number.

14             THE COURT:  Did you guys talk about this in

15    your meet and confer what a CID was?

16             MR. KANE:  I thought they knew what it was.  So

17    no, I didn't specifically ask, you know --

18             THE COURT:  Is there anything else a CID could

19    be besides this ads account of which there are 10,000

20    plus?

21             MS. BLADOW:  I mean our case IDs, so like I

22    don't, I quite frankly don't know.  I'd have to go back

23    and take a look at whatever documents Mr. Kane's

24    referencing and talk to my client and try to figure out

25    if there's, do kind of a mini investigation on what CID

1    might mean or refer to.

2         THE COURT:  Okay, well, with regard to the ones

3

4    that you have a better handle on, the merchant center

5    IDs and the case IDs, you've made the case that

6    plaintiffs knew that these ID numbers existed and were

7    associated many months ago.  Plaintiffs' argument to me,

8    as I understand it, is, yes, but we didn't realize until

9    the July/August time period when we got this huge bunch

10   of documents from Google that people sometimes, perhaps

11   frequently, use these numbers instead of using the

12   domain names.

13         MS. BLADOW:  Yeah, I --

14         THE COURT:  Is that a fair summary, Mr. Kane?

15         MR. KANE:  Yes, Your Honor.

16         THE COURT:  All right.  So what's your response

17   there?

18         MS. BLADOW:  I don't think that's quite fair.

19   I think in terms of, at least with respect to case IDs,

20   to the extent that they, when they receive an email from

21   Google about a takedown notice that's submitted, my

22   understanding is that the subject line responding to

23   them has the case IDs.  So they know that --

24         THE COURT:  -- asked for it early.

25         MS. BLADOW:  They know that Google's talking

PROCEEDING                                           92

about these in terms of case IDs.  In terms of merchant

IDs, again, it's something that, if they wanted to know,

they could've raised.  I think we made several

representations in this case about the number of emails

we've received from plaintiffs, the number of questions

we've responded to, the length of those email chains.

Mr. Kane has no problem asking us questions.  You know,

if he wanted to know if MCIDs would've been a better,

more fruitful search term, he was, we were happy to have

that conversation months ago.

THE COURT:  And what about the technical aspect

of it?  With respect to, again, let's take the merchant

center IDs.  There are 20,000 plus of them.  What would

it take for you to run it?

MS. BLADOW:  So to be candid, Your Honor, I was

not involved with the drafting of our brief.  So I'm not

familiar with where the 450 character limitation comes

from.  What I can tell you is that I spoke with someone

who is on the Google team running searches perhaps and

providing hit reports and I specifically asked him about

the fact that we ran 1,239 domains of search terms, and

so this doesn't seem to line up with the 450 character

limit.  And he indicated to me that he had been able to

find a workaround for that search term.  So we wouldn't

1  know I guess until we tried to run all of them, and we

2  did, myself and my colleagues did try to run a sampling.

3

4          So I think estimating what we had represented

5  with respect to the 450 character limit was correct.  We

6  did a sampling for merchant IDs, case IDs, and ads IDs

7  of 20 identification numbers of each --

8          THE COURT:  That's how many you could fit into

9  450 characters.

10         MS. BLADOW:  Roughly, or at least, it's

11 probably not exact, we maybe could've added a few more,

12 but that was a good, nice round number to try to run a

13 sample --

14         THE COURT:  You use a sample of, you say --

15         MS. BLADOW:  We did 20, put 20 IDs together

16 into a search string to run, and that took, to create

17 each of those search strings, it took us about ten

18 minutes.  So in terms of the math I think, I was doing

19 this in the car on the way here, and it was about at

20 least 160 hours to try to split all of these up.

21         And with respect to Mr. Kane's point --

22         THE COURT:  That's assuming that you really do

23 have to split it up into 450 character chunks.

24         MS. BLADOW:  Correct.

25         THE COURT:  Which I'm not convinced of.

1

2          MS. BLADOW:  Well, with respect to

3  highlighting, Your Honor, when you're looking at

4  voluminous documents of spreadsheets that have a number

5  of numbers and you're trying to understand why am I

6  looking at the spreadsheet as you're reviewing to

7  determine whether or not a document's responsive to a

8  document request, it's helpful to have the terms

9  highlighted so that you can immediately identify why

10  that document's coming up in your search.  So if you're

11  not able to have that number highlighted, you don't have

12  that additional context.  So, again, I don't --

13          THE COURT:  I understand that, but you wrote or

14  someone on your team wrote in this letter search term

15  reports are limited to queries of 450 characters.  And

16  if that's not true, you should not have said that to me.

17          MS. BLADOW:  But regardless, I think --

18          THE COURT:  And you managed to do, I assume you

19  managed to do the domain names, the one thousand two

20  hundred and whatever.

21          MS. BLADOW:  We did manage to do a workaround.

22  What I will say is like in terms of the volume I think

23  we're still digesting the samples that we ran, but this

24  isn't something that we believe is going to be as

25  fruitful as plaintiffs believe it's going to be.

THE COURT:  Well, plaintiffs have pointed to some exemplar documents that popped up through other means where numbers rather than domain names are used, the domain name isn't used, the number is used.  There are going to be some, right?

MS. BLADOW:  Correct, but I think proportionality doesn't entitle, and there are cases to support this, doesn't entitle plaintiffs to every document under the sun.  And it doesn't entitle them to scorched earth discovery.  There's always going to be more.  It's the mouse and the cookie.

THE COURT:  Do you know how much more in this particular instance?

MS. BLADOW:  My understanding in terms of hit counts, again, I haven't had a chance to review the --

THE COURT:  From your roughly 450 character test?

MS. BLADOW:  Yes, from my test of 20 each.  I believe each had like less than ten documents.  So maybe each ID shows up in one document.

THE COURT:  One unique document not previously produced or one document that plaintiffs might already have because it came up otherwise.

MS. BLADOW:  I don't know, Your Honor.

PROCEEDING                                96

1

2          THE COURT:  You don't know.  Okay.  Shall we

3   move on to the OKRs?

4          MS. BLADOW:  Yes.  So the OKRs in this

5   particular search term, as Your Honor correctly noted,

6   the OKR term is connected with an and connector, and

7   that's wildly overbroad as --

8          THE COURT:  Sure, because if it's a 50-page

9   document that mentions an OKR on page 1 and mentions one

10  of these other terms on page 50, it would pop up.

11         MS. BLADOW:  Correct, and so I mean, again,

12  we'd be happy to discuss a more tailored term that's

13  specific --

14         THE COURT:  You want it to be in the same

15  sentence.  Is within 15 words roughly equivalent to

16  within the same sentence?

17         MS. BLADOW:  I would say so.  I mean I would

18  also say that in general another kind of broad issue

19  with this term is that it's not limited to the kind of

20  product issue in this case in terms of the shopping

21  product on Google as well as plaintiffs' products, the

22  e-books.  And our other search terms that we've used in

23  this case are more appropriately targeted and include a

24  limiter of requiring a document to mention shopping as

25  well as requiring a document to mention books.

PROCEEDING                                    97

1

2          THE COURT:  So how would you write a more

3   surgical search term here?

4          MS. BLADOW:  I would do OKR, probably that

5   first string.

6          THE COURT:  Start the same way, right, you --

7          MS. BLADOW:  Start the same way --

8          (interposing)

9          THE COURT:  -- or objective within two, quote,

10  "key results," close quote.

11         MS. BLADOW:  Yes.

12         THE COURT:  All right, and then you'd have a

13  proximity connector, probably within 15.  And then what

14  would you do?

15         MS. BLADOW:  I would have, I think I actually

16  would do an end and I would do and copyright.

17         THE COURT:  And then do your proximity

18  connector?

19         MS. BLADOW:  No, I'd also do and shopping.

20         THE COURT:  You'd want copyright and shopping

21  to be in the same document with the OKR?

22         MS. BLADOW:  Yes.  As well as and books which I

23  think we have our prior search strings use a permutation

24  of book, e-book --

25         THE COURT:  Now I think you're squeezing it

```
 1                          PROCEEDING                        98
 2  down to something that's not going to be very useful.
 3          MS. BLADOW:  We could stick with books.  But I
 4  would say OKR and copyright and shopping and books would
 5  probably be a more appropriate search term.
 6          THE COURT:  Okay.  Anything else on OKR?  You
 7  haven't done any tests, right, with this one?
 8          MS. BLADOW:  I did run a hit report, and --
 9          THE COURT:  Using the plaintiffs' search
10  string?
11          MS. BLADOW:  Yes.  And the volume was quite
12  high.  I believe in total with family it was between
13  9,000 and 10,000 documents.
14          THE COURT:  And you have that with you?
15          MS. BLADOW:  I have it in my computer.  And a
16  number of the documents had already previously hit on
17  search terms, and I had a colleague review some of
18  those, and that's why we would recommend more limited
19  terms for this.
20          THE COURT:  All right.  Brief rebuttal, Mr.
21  Kane.
22          MR. KANE:  So the document that Ms. Bladow
23  cited as having the ████ ████████ does not have the
24  ████ ████████ ██. Counsel cited Bates end 411022.  ████
25  ████ ████ █ ███████████. It's a document that has a list
```

```
 1                        PROCEEDING                    99
 2   of questions and answers for people who are processing
 3   infringement notices.  It's actually the document that
 4   we cited that says ███ ██████ ████ ██ █████ ██████ █████
 5   ███████ ████████ ██████ █████ ███████ █████ ████ ██████
 6   ██ ██████ ██████ ████████ █████ █████ ███████ █████ ███
 7   ███████ ███ ██████ █████ ██ ████ ██████ █████ ████    It
 8   says ████ █████ █████ █ █████ ███ ██████ █████ ███████
 9   ██████     It's not the ████ █████ █████
10              THE COURT:  Okay, anything else?
11              MR. KANE:  The notion that there are few hits
12   in some of these searches I guess is an indication that
13   Google did not select appropriate custodians or that
14   they still should be running these searches.  As Your
15   Honor indicated, they were asked.
16              As for the merchant center IDs, I just want to
17   be clear, these are literally the pirates who committed
18   the direct infringements who that are at issue in this
19   case.
20              THE COURT:  Yeah, but why didn't you ask
21   earlier?
22              MR. KANE:  For the merchant center IDs?  For
23   two reasons.  One, we saw in the documents that people
24   were actually referring to these not reflect the domain
25   and the merchant center ID but just with the merchant
```

PROCEEDING                                    100

1

2   center ID or just with the case ID.  And, second, we

3   were trying to be reasonable in crafting appropriate

4   search terms.  So we started with the domains which we

5   thought would have the large number of hits --

6           THE COURT:  How many rounds did you think you

7   were going to go here?

8           MR. KANE:  We thought we were going to be

9   getting rolling productions.

10          THE COURT:  No.  What you're saying is, I

11  think, we started with the domain names, and we figured

12  that if that didn't work out, we'd ask for the IDs.

13          MR. KANE:  I don't know if it was quite that

14  literal, but I mean we were hoping that the domain names

15  would be enough, in other words, that the domain names

16  would uncover the relevant documents.  Once we started

17  getting custodial documents from Google in July and we

18  saw that people actually refer to these more commonly by

19  their merchant center account number and not by the

20  domain, we realized that that search wasn't the

21  appropriate search.  It's not as if we had all this

22  information since January.  We had it in July.

23          For the case IDs, what we learned about case

24  IDs was that when Google responds to an infringement

25  notice, it gives the notice a case ID.  We did not see

PROCEEDING                                      101

until we got there custodial documents that people

actually used the case IDs to refer to merchants that

they're taking down or notices that they're using as

opposed to using the domain name itself.

THE COURT:  What about in the notices that you

actually got?  The incoming responses to your notices

that you got from Google, did they identify the problem

by both case ID and domain name or just by the case ID

that Google has signed?

MR. KANE:  The response that we get from Google

has the case ID and then all of the domain names.  So it

has both.  So I mean to the extent that Google's relying

on those to say we should've known about the case IDs,

the emails that we had (indiscernible) domains would've

captured it.

THE COURT:  Okay, and as among case IDs,

merchant center IDs, and customer IDs, once you figure

out whether you're talking about the same thing that

Google thinks you're talking about, how would you

prioritize?

MR. KANE:  Merchant center IDs, then case IDs,

then customer IDs.

THE COURT:  Okay.  All right.  So, counsel, let

me tell you what I'm prepared to do with regard to this

1

2    suite of issues.  I'm inclined to go ahead and require

3    the ████ ██████ search.  It's possible that no new

4    unique hits will turn up, but I think the burden is

5    relatively light here, and the phrase is unique enough

6    so that if, so it's entirely possible that some unique

7    hits will turn up and very little chance of overbreadth

8    than irrelevant stuff turning up.  I'm inclined to

9    require the high confidence search as well for similar

10   reasons, but if they can't do within the same sentence,

11   then I will certainly accept within 15 words as a close

12   approximation of what you asked.

13           I'm going to skip over the ID numbers for a

14   minute.  With regard to the OKRs, we're going to take a

15   ten-minute comfort break, maybe fifteen minutes, because

16   during that break I'm going to require counsel to sit

17   either here or in my jury room which is under the clock

18   behind you.  There's some snacks in there, by the way.

19   And work out a reasonable search string for the, to

20   produce relevant documents starting with OKR but that

21   doesn't produce everything in the world, which I'm a

22   little concerned that plaintiffs' search string would

23   do, and that isn't so chokingly narrow as defendant

24   might be tempted to draft it that nothing turns up at

25   all.

And I'm telling you to do this because you do

not want your magistrate judge to be writing your search

string for you, particularly a magistrate judge who

hasn't done it for ten years or so.  Somebody will end

up being very disappointed if I end up having to write

it, and I'm not sure which side present that would be.

With respect to the ID numbers, I'm really torn

here.  With regard to the case IDs, it seems to me that

plaintiff could and should have figured this out and

asked for case ID searches much earlier in the game.

They knew that case IDs were assigned, and they were

going on a hope and a prayer that every time somebody

talked about a case ID, they also would type out the

name of the domain in question, and I think that, look,

we don't all have a crystal ball, mistakes are made, I

understand that.  Things look much clearer in hindsight

after you've seen the documents than they might have

seemed to you when you're trying to negotiate this ahead

of time.  But this one I think could and should've been

anticipated.

I'm on the fence about the merchant center IDs

in part because I'm not sure who to believe in terms of

the technical ease or difficulty or constructing the

search and getting it done.  And as for the customer ID,

PROCEEDING                                104

the two of you can't even figure out what that is.  So
you need to have a conversation about that during the
comfort break as well.

So when we come back, you will tell me what
you've decided on for the OKR search string.  You'll
give me any additional information that you can with
regard to these various ID numbers.  Hopefully, I'll be
able to make a decision without additional written
submissions.  And then we'll go on to discuss the rest
of our pretrial schedule.  So it's quarter past four.
Shall we reconvene at 4:30?  Google.

MS. BLADOW:  Yes, Your Honor, I just wanted to
clarify.  My colleagues have pulled up the screenshot of
the website for me that we were referencing in our
brief.

THE COURT:  Which website, sorry?

MS. BLADOW:  I believe there's a website --

THE COURT:  The one about the 450 characters?

MS. BLADOW:  Correct, and it said the title of
the page or the section that we were referring to says
(indiscernible) terms and highlight colors, and it says
to add terms to your search report, and it provides
instructions.  And one of the notes on the page to add
terms to your search term report says a single term has

PROCEEDING                                 105

 1  a character limit of 450.  So that's where my colleagues

 2  were getting that from.  It was not – to the extent Mr.

 3  Kane has a different read of it, our reading of it is

 4  that there's a limitation.

 5              THE COURT:  Well, you guys need to chat further

 6  about this and maybe call up your vendors on the phone,

 7  I don't know.  But, again, you are much better suited to

 8  figuring out this particular aspect of things than I am,

 9  and it is, of course, I don't have to tell you this

10  because I already told you this and you know it anyway,

11  it's your burden to show burden, Google, on this

12  particular issue.

13              So we will be in recess, okay, now it's 4:18,

14  until 4:33, and I'll see you back here

15              (Whereupon a recess is taken.)

16              THE COURT:  All right.  So I asked you to talk

17  with each other about a couple of items.  Let's begin

18  with the OKR search string.  Do you have a proposal for

19  me?  Who has a proposal for me?

20              MR. KANE:  We've agreed on a search string.

21              THE COURT:  Excellent.  Do you want to tell me

22  what it is or should I just say that you're going to use

23  the search string that you've agreed on?

24              MR. KANE:  The latter is fine with me.

1

2          THE COURT:  Ms. Bladow.

3          MS. BLADOW:  Correct, Your Honor, I think we

4  would just note and clarify that as with the other terms

5  today that if for whatever reason this revised term

6  doesn't dramatically reduce the hit counts, the parties

7  can still continue to meet and confer on an appropriate

8  term.

9          THE COURT:  With the same caveats I gave you

10  previously.

11          MS. BLADOW:  Correct.

12          THE COURT:  The same cautions I gave you

13  previously.

14          MS. BLADOW:  Correct.

15          THE COURT:  Don't abuse the privilege.

16          MS. BLADOW:  Correct, Your Honor.

17          THE COURT:  All right.  Okay, now have you

18  figured out what a customer ID is?

19          MR. KANE:  It's the ads account ID.  So to run

20  - there are free shopping ads and paid shopping ads.  To

21  run a free shopping ad, you can do it from a merchant

22  center account which is the one we've been discussing.

23  To run a paid shopping ad, you need an ads account.

24          THE COURT:  Okay.

25          MR. KANE:  The ads account has a separate

account ID.  We do have those.  There are 10,028 of

them.  So that's what we're talking about is accounts

that the same pirate controls that are associated with

the same merchant center accounts but that have a

different account number because they're used to run

paid ads.

THE COURT:  Okay, and, Ms. Bladow, do you have

any better clarity on the 450 character issue?

MS. BLADOW:  Yes, Your Honor, our understanding

is that that is a limitation on running the hit report.

And so we'd have to even get a hit report we'd have to

break it.  I think if I'm doing the math right 20,000

plus 7,000 plus 10,000, almost 40,000 different IDs or

numbers, we'd have to break all of those down into

smaller chunks to run hit reports on all of those to

even being to --

THE COURT:  Well, how did you manage then to

run the domain names?

MS. BLADOW:  There was some kind of workaround.

I think that was more on the actual searching.  So

there's a good difference between the hit report --

THE COURT:  So in order to do a hit report,

you're limited, but in order to do a search, you're not.

MS. BLADOW:  I believe so, and there's kind of

1                              PROCEEDING                    108

2  like your early case assessment environment where you're

3  running hit reports and then promoting data into – I

4  don't know, (indiscernible).

5            THE COURT:  Right, which is problematical

6  because burden is your burden.

7            MS. BLADOW:  Correct.  I will note that, to the

8  extent we do have to break this down which I suspect

9  that we will have to do in some degree in order to run

10  this, it did take time to do that.  And so I would ask

11  if the Court is going to order us to do this, that they,

12  the Court implement cost sharing with plaintiffs so that

13  plaintiffs are also bearing the burden of the cost of

14  this fishing expedition.

15            THE COURT:  All right, let me tell you what I'm

16  inclined to do on these IDs.

17            MR. KANE:  Judge, could I make one point?

18            THE COURT:  Quickly.

19            MR. KANE:  The limit for a search is 65,000

20  characters.  If they search for all of the merchant

21  center IDs, that's 195,995 characters.  So they would do

22  four searches, and they'd be done.

23            THE COURT:  Right, but I think Google's point

24  is that before they run that massive set of searches,

25  they would want to run some hit reports so that they can

come back to you and try to talk reason into you if the

hit report shows that this undertaking is going to be

less productive or more costly than you anticipate.

MR. KANE:  Not exactly.  To get the hit

report, you do run the search.  So you would run the

search of these documents.  What I'm saying is you don't

necessarily have to run like a particular hit report.

You can run the search, the four searches, just filter

it for documents you've already reviewed or already

produced, and you would know, okay, those searches

result in X number of additional documents.

THE COURT:  I'm not following you, I'm sorry.

MR. KANE:  There's like a page on Relativity

where you can run a hit report, and that has some sort

of limitation.  You can, but you can also just run the

search in Relativity without running a specific hit

report.

THE COURT:  But if you run the search, do you

have any idea of, A, how many hits you've gotten and, B,

how many of them are unique, for example?

MR. KANE:  You wouldn't know that before

running the hit report either.  It's the same.  The hit

report is running the search and then it's just

categorizing it for you, here's how many new documents,

PROCEEDING                    110

here's how many came from this --

THE COURT:  Well, aren't you going to have to
do that though as part of the review process to make
sure that what you're turning over is, in fact, unique?

MR. KANE:  You can do it without running a hit
report is what I'm saying.  You can run the four
searches and just filter it for documents that you've
already produced.

THE COURT:  Without ever running a hit report.

MR. KANE:  Correct.  You don't have to run a
hit report in order to find out how many new documents
are here.

THE COURT:  All right, so you would run the
search, you would get half a million documents let's
say, hypothetically.  Then you would say filter out
documents that have previously been hit on through other
searches and just give me the new ones.  And now you
would have the universe that maybe human eyes would have
to review?

MR. KANE:  You would filter out documents that
have already been produced or documents that you've
already reviewed, however you wanted to split it, and
you'd know the number, and you'd know which ones those
are, and you'd be able to say, okay, this resulted in an

PROCEEDING                                    111

1

2   additional, whatever it is, thousand documents, ten

3   thousand, whatever it ends up being.

4          THE COURT:  Is he right, Ms. Bladow?

5          MS. BLADOW:  Your Honor, I'm dependent at this

6   point on what my client and my vendor tell me is

7   possible, and our understanding of the website, which

8   Mr. Kane helpfully provided us with a copy of, that says

9   a single term has a character limit of 450 to get the

10  hit report.  So I don't --

11         THE COURT:  And you don't know how you managed

12  to search the 1,200 domain names with this potential --

13         MS. BLADOW:  I believe, my understanding is I

14  believe we did a kind of separate workaround search.  We

15  may have done what Mr. Kane is describing, but in order

16  to get a search, I believe we provided them with a hit

17  report at some point in this case, and in order to

18  provide that, my understanding is that we had to split

19  that search down into a bunch of smaller searches to get

20  the hit count.

21         THE COURT:  So what does the magistrate judge

22  do when she feels that technically the parties are

23  talking past each other and she's not sure what the

24  situation is actually going to be on the ground?  Mr.

25  Kane.

PROCEEDING                          112

MR. KANE:  You can certainly have Google run

the searches and tell us how many unique results show

up.  I mean these are very important documents.  These

are literally documents that mention the pirates who

committed the direct infringements that are at issue in

this case.  It's not a fishing expedition.  We have

literal account numbers for these people.

THE COURT:  And, Ms. Bladow, what do you think

the magistrate judge should do where the parties are

talking past each other technically?

MS. BLADOW:  Your Honor, a number of these

numbers are seven digits, ten digits, the same as phone

numbers.  There's no guarantee that any of these numbers

are actually going to be hitting on the documents that

Mr. Kane is seeking.  And I think the delay here,

particularly with respect to the merchant IDs and case

IDs as well as the ads accounts, it's inexcusable.

THE COURT:  Particularly with respect to all

three categories.

MS. BLADOW:  Yes.  If I want to pick one, it

would be the case IDs.  But it's inexcusable.  And I

think asking Google to undertake, you know, potentially

hundreds of hours to break up search terms to even begin

to assess what the burden here is, unless there's some

PROCEEDING                                    113

2    sort of cost sharing that you're going to order, it's

3    not proportional to the needs of the case.

4         THE COURT:  Well, you're just, unfortunately,

5    what you're saying is not making a lot of sense to me,

6    and I don't mean that to sound harsh.  It may be that

7    your vendor would have to be the person who actually

8    explained it to me in words that I can understand

9    because nobody in this room probably has that technical

10   expertise.  But it seems to me that if you could run the

11   search and filter for documents previously reviewed or

12   previously produced without doing a hit report and,

13   therefore, not being constrained by the 450 characters,

14   you'd have to break it up.  Even if I said yes as to all

15   three of groups of ID numbers, it would be four or five

16   searches.  You could then, maybe, I don't know, you tell

17   me what Relativity can do.  If I ever knew, I'm sure

18   it's changed in the last ten years, you would then have

19   a universe of however many documents you had, hundreds,

20   thousands, tens of thousands, and couldn't you then do

21   some sort of surgical narrow hit report bounded perhaps

22   by time on a sampling basis to get a sense of what

23   you're dealing with here if you still had too many

24   documents for it to be sensible for you to review on an

25   individual basis for privilege and relevance.  What am I

1                          PROCEEDING                    114

2   missing?

3          MS. BLADOW:  I think - I guess I'm confused as

4   to what further narrowing you're proposing we do.

5          THE COURT:  Well, you're making it sound as

6   though the only possible way for you to go about this is

7   to do a hit report first on everything which would take

8   a long time because you'd have to do it in such small

9   chunks.

10          MS. BLADOW:  So you want us to run the term on

11   everything.

12          THE COURT:  Why not?

13          MS. BLADOW:  I don't even know what that looks

14   like, Your Honor, to be honest.  I'm happy to ask to see

15   if it's possible, and if my, if our vendor can do it --

16          THE COURT:  Why would your vendor not be able

17   to do it?

18          MS. BLADOW:  Personally, I don't work in

19   Relativity every day, and all I understand is that they

20   found a workaround to run the domains, and they could

21   see if a similar workaround would work for these IDs.

22   All I can do is ask.  I can't stand here and promise you

23   that it can be done.

24          THE COURT:  All right, so here's what we're

25   going to do.  I'm going to give you the merchant center

1                              PROCEEDING                      115

2    IDs and what you called the customer IDs, what we're now

3    calling the ads account IDs.  So that's a total of about

4    30,000 numbers which will be terms.  I'm not going to

5    give you the case IDs.  You should've thought of that

6    earlier because you had all of these communications to

7    which case IDs were signed, plus which, as a practical

8    matter, since I'm giving you the merchant center IDs and

9    the customer IDs, it's probably highly unlikely that

10   much is going to be missed if you don't get documents

11   that use only the case ID and nothing else.

12            I am so unable to figure out how hard it's

13   going to be for Google to do this based on the

14   information that I have available to me now, that I'm

15   going to do something that I hate to do which is to say

16   I'm going to give you a reasonable period of time, why

17   don't we say 14 days because that is the usual period of

18   time for a reconsideration motion under the Local Civil

19   Rules here, and if in 14 days, Google, you get more

20   clarity on the technical end of things and can explain

21   to me in words that a philosophy major and law school

22   graduate can understand why this is so much worse than I

23   anticipated, I will take that under consideration, and I

24   will at that point consider either modifying or

25   narrowing my order or imposing some form of cost

PROCEEDING                              116

1

2   sharing.  But I warn you, I'm going to need a lot of

3   granular information for that, and I'm probably going to

4   need a declaration or something like that from your

5   vendor or from whoever your liaison is with your vendor

6   who really can lay it out for me and say, well, first

7   we'd have to do this and then we'd have to do this, and

8   this is how we know how much trouble it would be because

9   we have been able to do let's say some limited hit

10  report and this is what it shows.

11          So that's the kind of information I'm going to

12  need from you, and if it turns out that it's merely

13  bothersome and not cataclysmically burdensome, then I'm

14  still going to make you do it.  It's your burden to show

15  burden, as I've said way too many times, and

16  particularly given that you didn't do a very good job of

17  showing burden today, which should have been the date on

18  which the showing was going to be made, I'm to hold you

19  to a relatively high standard.

20          And before you come back to me, this is still

21  within the 14 days, so, you know, start tomorrow, don't

22  start next week, of course, I'm going to require that

23  you meet and confer in good faith with the plaintiffs

24  because I do expect them to be part of the solution here

25  and not just part of the problem.  So if there's further

PROCEEDING                          117

narrowing that can be done or if, for example,

plaintiffs would consider some sampling where you do

this for let's say 10 percent of all of the merchant ID

numbers or you do it for 20 percent of all of the ads

account customer IDs, and the reason I keep coming back

to this idea of sampling is plaintiffs keep telling me

with some force, I understand the argument that as long

as Google's affirmative defense remains in the case,

they have to show, I'm going to give you a Reader's

Digest summary here, that they do a reasonably good job

most of the time at responding promptly and effectively

to piracy complaints from publishers.  But surely that

is the sort of thing that can be demonstrated pro or con

on a sample basis.  It doesn't require that you have

full data for each of the 1,200 and however many domains

at issue.  Am I making any sense to you at all, Mr.

Kane?

          MR. KANE:  Yes, Your Honor.

          THE COURT:  So that might be a way of finessing

this issue, for example, using X percent which would

have to be random I assume.  You couldn't just pick the

ID numbers that you thought were particularly egregious

cases but some sort of sampling might be an effective

compromise here.

So right now the order is merchant IDs, use them to search please even though there are 20,000 of them. Ads account IDs, formerly known as customer IDs, there are 10,000 or so of them, use them but you have 14 days to get a better handle on how hard it is to do those things. Meet and confer with the plaintiff and come back to me if you must. All right, so that will be the rule there.

We have as our next issue I think, and I was little bit confused here because the plaintiff refers to this as Section 3, Google must disclose the dates on which it claims to have taken down infringing ads, and defendant refers to this as Section 2, but luckily I can figure out that you're talking about the same thing. So if I understand – is this still you, Mr. Kane?

MR. KANE:  Yes.

THE COURT:  Okay.  If I understand the issue here, you have a database which has a bunch of dates for each of the pirates in question, and you're not sure what those dates mean.  Is that right?

MR. KANE:  Yeah, I would add a little more to that.  So to qualify for the DMCA safe harbor, Google has to show that it took down infringing content expeditiously.  In other words, it gets infringe --

PROCEEDING                          119

2          THE COURT:  You think has a temporal component

3  to it.

4          MR. KANE:  Exactly, yeah.  So to determine

5  whether Google did so, we need to know the date on which

6  they claim to have taken down any particular ad --

7          THE COURT:  Right, but you're using the term

8  take down, and as Google points out, this is not

9  Google's content.  They use the term delist.  Are you

10  talking about the same thing?

11          MR. KANE:  We are.

12          THE COURT:  Okay, fine.

13          MR. KANE:  What happens mechanically, an ad is

14  shown to a Google user when she conducts a search.  So

15  it's not like there's like a billboard or something that

16  you go and paint over.  To take down the ad, what they

17  do is they prevent the ad from being shown to future

18  Google users, so delist the ad as they say.

19          THE COURT:  Okay.  All right, let's use delist

20  --

21          MR. KANE:  Sure.

22          THE COURT:  -- because it's their word and it's

23  their business.

24          MR. KANE:  Sure.  But the DMCA requirement

25  still stands.  They still have to show they delisted the



```
 1                        PROCEEDING                    120

 2   ad expeditiously.

 3           THE COURT:  Okay.

 4           MR. KANE:  So to know whether they delisted the

 5   ad expeditiously, we need to know the date on which they

 6   claim to have delisted the ad.

 7           THE COURT:  Okay, now they've given you, as I

 8   understand it, this is from your attorney declaration, a

 9   ████ ████ ████.  Presumably that's not it.  A ████

10   ████ ████, a ████ ████ ████, and a ████

11   ████ ████ ████.  And you've asked them what happens

12   on these dates?

13           MR. KANE:  We've asked them whether any of

14   those dates is the date on which Google claims to have

15   delisted the ad, and they've said no.  So we do not have

16   from Google the date on which they claim to have

17   delisted the ad.

18           THE COURT:  Well, what do these dates signify

19   as Google explained it to you?

20           MR. KANE:  So the ████ ████ ████

21   ████ ████ ████ ████ ████ ████ ████ ████

22   ████ ████ ████ ████.  In other words, ████ ████

23   ██ ████ ████ ████ ████ ████ ████ ██

24   ████ ████ ████ ████ ██ ████ ████ ████

25   ████ ████ ████ ████ ██ ██ ██ ████
```

1                          PROCEEDING                        121

2  ██ ██████ ████ ██ ██ ██████ ███ ██ ██ ████████

3  ████ ███████ ██ ███ .

4          THE COURT:  Wait, and they send the

5  notification to who, to the complainer?

6          MR. KANE:  The sender of the notice, yeah.

7          THE COURT:  Okay.

8          MR. KANE:  The rights holder.

9          THE COURT:  So if they send an email which says

10 we delisted it, why isn't that the answer?

11         MR. KANE:  That was my, that was our

12 presumption for months, and then during a meet and

13 confer in June on a related issue, they told us that

14 that's not the case, that the ████████ ███

15 ██ ██████ ██ ██ ████ ██ ████ ██ ███ ████ █

16 ████ ██████ ██ ██ .

17         THE COURT:  Is it the date after which, I mean

18 is it an outside date?  They might have done it a week

19 earlier, they might have done a month earlier, but they

20 sure as heck have done it by the date of that

21 notification.

22         MR. KANE:  Not necessarily because what the

23 ████████ ████ ███ █████ ██████ ███ ██ ████

24 █████ ██ ███ ███ ██ ████ .  In other words, it

25 doesn't always say ███ ███████ ███ ███ ██ ███ .

1                        PROCEEDING                    122

2   So the date is not the ███████ ████ ███████ ███.

3   It's apparently not the ████ ███████ ███ ███ ████

4   ███████ ████ ███ ███████ ███████ ███ as well because

5   we asked them specifically have you already produced

6   this, and they said no.

7           So where we are is, what we said to Google is,

8   look, you need to give us the date on which you claim to

9   have delisted these.

10          THE COURT:  Or presumably, an alternative would

11  be, Google, if you don't know the date, you need to

12  acknowledge that you don't know the date.

13          MR. KANE:  Exactly, yeah.

14          THE COURT:  And then you would make such use of

15  that as you can.

16          MR. KANE:  Exactly.

17          THE COURT:  Okay.

18          MR. KANE:  So Google did not produce, would not

19  produce the date on which they claim to have delisted

20  these.  We met and conferred with them, we filed this

21  motion.  In response to the motion Google claims four

22  times that they've produced everything they have on

23  this.

24          THE COURT:  Well, maybe that's your answer.

25          MR. KANE:  So --

PROCEEDING                                         123

2          THE COURT:  They produced everything they have

3     on this.

4          MR. KANE:  Yep, and we're perfectly fine with

5     that answer.  We just want to be clear they don't get to

6     come back six months from now and say, oh, we found it,

7     it's this other document.  Nor do they get to have

8     someone testify, oh, it's always three days after that

9     date, and they never produced a document to that effect.

10    So we're fine with Google's answer that they don't have

11    this information.  We just want to make sure that

12    everyone is on the same page, that no one's going to get

13    up in a deposition or, you know, a week before summary

14    judgment and say, oh, we found it, here's a spreadsheet

15    that has all the dates.  So as long as we're all clear

16    on that, we agree this issue is resolved.

17         THE COURT:  All right, let me hear from Google.

18    Ms. Victorson, you know, looking at my sign-in sheet –

19    Ms. Bladow, did I call you Ms. Victorson by mistake an

20    hour ago?

21         MS. BLADOW:  Yes.

22         THE COURT:  If I did, I apologize.  Will the

23    real Ms. Victorson please now tell me about the

24    delisting date.

25         MS. VICTORSON:  Yeah, so I think it would be

1                           PROCEEDING                        124

2    helpful to actually first just take a step back and

3    consider how we got here.  The requests that plaintiffs

4    produced asked for, there were a number of requests,

5    but, in general, they asked for documents how Google

6    processed and responded to notices that came in.  And so

7    that's exactly how, what we did and what we searched for

8    and what we produced in response to those notices.  The

9    fact is the ████████ ██ ███ ██████ ████ ████ ██ ███

10   ████████ ███ ███ █████ ████ ████ ████ ██ ██

11   █████████ ███ ███ ████ ███ ████████ ████ ███

12   ███ ████ █████ ██ ████.

13             THE COURT:  Okay, so you do delist when you

14   conclude that it should be delisted, ███ ██ ████ ████

15   ██ ██ ██ █████ ██ ████ ████ ███████.

16             MS. VICTORSON:  Exactly.

17             THE COURT:  Where is that information?

18             MS. VICTORSON:  That is a great question.  It

19   is not stored in connection with all of the typical

20   types of, all the typical data that we have been

21   collecting in this case.  We have been in the process of

22   trying to run down where that data is.  What is becoming

23   increasingly clear is that to the extent we are able to

24   identify that data on a URL by URL basis, and to be

25   clear this is for thousands of URLs over, actually

```
 1                        PROCEEDING                    125
 2   hundreds of thousands of URLs in Google's notice that
 3   it's produced, it's clear that it's going to be some
 4   kind of a ████ ████████ ████████ ████ ████ ████
 5   ████ ██████ ██████ ██████ ██████ ████ ██████ ██████
 6   ██████ ████ ██████ ████ ████ ██████ ██████. Of we --
 7            THE COURT:  Let me just pause you there.  What
 8   do you mean separate and apart from the DMCA process?
 9   You mean separate and apart from the data that you
10   collect for DMCA purposes?
11            MS. VICTORSON:  Correct, correct.  Yes, sorry,
12   so there is ████ ████████ ████ ██████ ██████ ██████ ██████
13   ████ ██████ ██████ ██████ ██ ██████ ██████ ██████ ██████ --
14            (interposing)
15            THE COURT:  And that --
16            MS. VICTORSON:  This is not one of those fields
17   that is included in that data.
18            THE COURT:  Just stepping back for a moment.
19   The database that we've been discussing which has, ████
20   ██████ ██ ██████████ ████ ████████ ████, is that for
21   Google's internal purposes or do you have any regulatory
22   requirement to keep and/or produce that data to
23   regulators?
24            MS. VICTORSON:  I'm not aware of any regulatory
25   requirement to produce that data.  Yeah, standing here
```

PROCEEDING                                     126

1

2   today, I can't tell you for sure why Google included

3   that particular field.

4          THE COURT:  And why it ███████ ████████ █ ████████

5   ███ ████████ █████, for example.

6          MS. VICTORSON:  Sure, yeah, I can't tell you

7   why they did or did not include that field, and, in

8   fact, I think that actually raises a good point in the

9   way that plaintiffs could test the dates by which Google

10  effectuated the delisting of these websites could be

11  effectuated in many different ways besides, you know,

12  Google digging in the dust to try and find an ultimately

13  source for this data --

14         THE COURT:  So how could plaintiffs do it?

15         MS. VICTORSON:  So one is they could look at

16  the ads that were actually run to see if an ad continues

17  to show up and people continue to look at it.  So we

18  have produced data that shows impressions and clicks and

19  conversions for ads.  It's connected to a URL, and so

20  they can search for that URL and that data to see if it

21  shows up after a certain date.

22         THE COURT:  So they'd have to do that by hand

23  URL by URL.

24         MS. VICTORSON:  I mean presumably they could

25  come up with a script that could do it.  I mean I think

```
 1
 2   both sides in this case have technical experts that have
 3   been hard at work analyzing the huge sets of data in
 4   this case.  Like I think, as Ms. Bladow said earlier,
 5   Google has produced over like a terabyte and a half of
 6   data.  So there's just an enormous amount of data to go
 7   through.
 8            THE COURT:  Right.
 9            MS. VICTORSON:  And so both sides have
10   technical experts that have been helping us process that
11   data.
12            THE COURT:  Right.  But plaintiffs make the
13   point, and this resonates with me, that this particular
14   issue goes to the DMCA safe harbor which is an
15   affirmative defense and, therefore, your burden.  So it
16   doesn't seem like it's the right answer to me that the
17   plaintiffs have to go through the 1.5 terabytes of data
18   that you produced and either URL by URL or through some
19   clever forensic script writing sleuthing tease the
20   result out from the data that you have produced.
21            MS. VICTORSON:  Well, in that case we could do
22   the same exercise, right, and I see no reason, it seems
23   like plaintiffs want to prevent Google --
24            THE COURT:  Well, except that I'm not convinced
25   that you haven't already done it and you don't have it
```

1
2  somewhere which you yourself sort of suggested a few
3  minutes ago.  You just haven't figured out where that
4  data is yet.
5          MS. VICTORSON:  So that's a separate issue.  So
6  analyzing the data that has already been produced we
7  could certainly do.  I can tell you right now we have
8  not done that exercise.  But that's something that
9  certainly we could do.  But that's separate and apart
10 from the fact that what we, in an effort to find
11 compromise with plaintiffs, we did agree to investigate
12 whether there are ███████ ███████ ██ ███████ ███
13 ███████ ███████ ██ ███████ ███.  And like I said,
14 finding the right person with this specific knowledge
15 has been a challenge just because the individuals that
16 we have had to work with in this case for all of the
17 other data we have collected don't have personal
18 knowledge about where that might be stored.  But if we
19 do find it, we will produce it.
20         THE COURT:  But now is kind of the time for
21 that, not four months from now.
22         MS. VICTORSON:  Yeah, yeah, I mean I could tell
23 you we have been doing this investigation for about a
24 month now, and we have not, like standing here today, we
25 have not found a particular source.  We've found some

PROCEEDING                    129

1   potential POC leads.

2           THE COURT:  What's a POC?

3           MS. VICTORSON:  Oh, sorry, a point of contact.

4           THE COURT:  Thank you.

5           MS. VICTORSON:  Again --

6           THE COURT:  Go ahead.

7           MS. VICTORSON:  We are searching for it, and if

8   we find it, we will produce it.

9           THE COURT:  Well, at a minimum then, it seems

10  to me, I should give you a fish or cut bait date, don't

11  you think?  Produce that source by a particular date or

12  else you will be precluded thereafter from using it in

13  support of your affirmative defense.

14          MS. VICTORSON:  I mean certainly if we cannot

15  find the evidence, specific evidence to support our own

16  affirmative positions, then I would agree we shouldn't

17  be able to rely on that evidence even if we find it

18  later on.

19          THE COURT:  Because when it comes to summary

20  judgment or trial, assuming that the affirmative defense

21  is still live, you're the one who's going to have to say

22  and the database shows that on average it only took us

23  this reasonable period of time to delist the pirates

24  sites.  That's the presentation you're going to want to

```
 1                          PROCEEDING                    130
 2   make.
 3            MS. VICTORSON:  Yeah, yeah.
 4            THE COURT:  Right.  So how much more time
 5   should I give you?  If you don't have it, you don't have
 6   it.  But plaintiffs need to know one way or the other.
 7            MS. VICTORSON:  Yeah.
 8            (pause in proceeding)
 9            MS. VICTORSON:  So we would request that in
10   line with the allotment of time that you gave plaintiffs
11   to pull together their affirmative data that we would
12   also get the same amount of, 90 days to be able to try
13   and identify the data that we would use.
14            THE COURT:  I don't think so because this is a
15   different kind of problem.  The 90-day periods that I've
16   given both sides for various tasks thus far have to do
17   with known tasks.  We know the documents, where the
18   information is out there, the question is how long is it
19   going to take the various teams and their vendors and so
20   forth to process it, to review it, to spiff it up, to
21   put it in the form of an Excel spreadsheet or whatever,
22   and to produce it to the other side.  Here we have more
23   of a threshold issue, is there going to be evidence on
24   this point or not.  And you've already been looking, you
25   say, for a month to try and figure this out.
```

```
 1                          PROCEEDING                      131

 2              MS. VICTORSON:  That's right.

 3              THE COURT:  So I'm inclined to say 30 days on

 4    this one, at which point the preclusion order would kick

 5    in.  Now that doesn't solve everybody's problem because

 6    let's say we get to 30 days from today and you write

 7    plaintiffs' counsel a letter and say we still haven't

 8    found a database where this information is stored.  Now,

 9    again, assuming that either the district judge has

10    allowed the affirmative defense or you haven't heard yet

11    from the district judge, you're still going to have to

12    sit around on both sides and put your thinking caps on

13    and figure out who's going to pay probably an expert to

14    go through the existing data and try and make some kind

15    of statistical presentation that might work at summary

16    judgment or at trial.

17              But certainly it doesn't make any sense for me

18    to make a decision today that plaintiff has to do that

19    work or defendant has to do that work not knowing

20    whether you actually have the data in some aggregate

21    form that will solve everybody's problem.  So I think 30

22    days seems like a reasonable period of time to fish or

23    cut bait on this issue.

24              MS. VICTORSON:  Okay, and just to be clear, I

25    just want to make sure that the preclusion, Your Honor's
```

preclusion order is clear.  You know, we would seek not

to be precluded from offering other types of evidence to

prove our defense.  So, for instance, like testimony of

a witness or, as you say, expert analysis and testimony.

THE COURT:  Well, generally that is how

preclusion order – I'm not contemplating a subject

matter preclusion order.  I'm contemplating a

documentary evidence preclusion order that, if you don't

come up with it within 30 days, you cannot then at

summary judgment say, well, here's the three-page key

which shows how you do the math based on, you know, some

document which has already been produced or here's the

database or here's the contents of Mr. X or Ms. Y's

flash drive, it turns out that they were keeping this

data all along.  I hope that's not the case.

MS. VICTORSON:  Understood.

THE COURT:  So I wouldn't – if what you're

worried about is, and I'll do this obviously

hypothetically because I have no idea what's really out

there on the ground, but if during the depositions you

have some witness who's having his or her deposition

taken and says, well, you know, I worked in this field

and I was doing a lot of the delistings myself and my

recollection is that I generally got it done within

```
 1                         PROCEEDING                    133
 2   about a week after this other thing happened, no, I'm
 3   not going to preclude that, but I'm not going to let you
 4   back that witness up with documents or data that you
 5   don't produce now.
 6            MS. VICTORSON:  Understood.  So I, and just to
 7   be clear, our current understanding is that the
 8   ████████████ ███ ████ ████ ████ ███ ████ █████ █
 9   ████ ██████ ████ ███ ████ ████ ██████ ██ ████
10   ███ ████████ ████████ --
11            THE COURT:  Right, and what's that
12   understanding based on?
13            MS. VICTORSON:  Our client discussions.  And so
14   what I'm concerned about I think --
15            THE COURT:  I'm sorry to interrupt you but just
16   so I don't lose my own train of thought, Mr. Kane, you
17   have some examples where that is not the case you
18   believe?
19            MR. KANE:  We don't know what is the date that
20   Google claims to have delisted it.  We can see the
21   ████████████ ████ and then --
22            THE COURT:  No, no, no, do you have any
23   examples where you believe that the offending ad was
24   still up after that, what do you call it --
25            MR. KANE:  ████████ ████ █████████ ████.
```

1                            PROCEEDING                        134

2              THE COURT:  Yes.

3              MR. KANE:  Yes, Your Honor, there are thousands

4    of instances in this case where we received something

5    from Google that says we've taken this ad down and we

6    saw the ad subsequently.

7              THE COURT:  Okay, so --

8              MS. VICTORSON:  Well, sorry, Mr. Kane's using

9    imprecise language.  Seeing an ad subsequently after

10   seeing it taken down is a different question as to

11   whether Google delisted a specific URL that came in in

12   connection with a DMCA.

13             THE COURT:  Because the ad might have popped up

14   associated with a different URL?

15             MS. VICTORSON:  Exactly.  Or there are other

16   technicalities I understand that can happen that result

17   in different URLs being associated with similar ads or

18   the same looking ad.

19             THE COURT:  All right, I don't want to stay on

20   this point forever.  To the extent you have a document

21   or a series of documents or a database that you can

22   actually put your hands on to give you the date on which

23   you delisted the challenged, what should I be saying,

24   URLs or domains?

25             MR. KANE:  URLs.

PROCEEDING                              135

           THE COURT:  URLs, you have 30 days to find it,

turn it over, or you can't use it later.

           MR. KANE:  May I be heard as to the time

period, Your Honor?

           THE COURT:  You may be heard.

           MR. KANE:  I don't think it's appropriate for

Google to get what is now a fourth chance to produce

this data.  So we asked for this the first time in

September of 2024.  There are four RFPs that cover it as

well as a fifth RFP that says all documents you plan to

rely on in support of your affirmative defenses.  They

started producing the data to which we're referring in

March of 2025.  We realized on June 26, 2025 that we did

not have from them the date that they claimed to take

the ad down.  We asked during that very meet and confer

you need to either give us this date or direct us to the

documents where it already is.  We followed up with an

email on July 18, we filed this motion on August 20, and

when they responded to the motion on August 20, they did

not say what they said to the Court today which is that

they're going to investigate and try to find this date.

What they said instead is we've produced everything we

have on this.  That should be the end of the matter.  We

followed up with them again on September 25.  It wasn't

1               PROCEEDING                    136

2    until September 25 that they said to us, okay, we're

3    going to investigate and see if we can find this date.

4    So they've had ample time to produce this date.

5          If we should have asked for ████ █████████ and

6    ████ █████████ and if we should've asked for case IDs to

7    be a search term, this is an enormous part of their

8    affirmative defense.  They certainly should've produced

9    this before now.

10          And I just want to be clear about what it is

11   we're talking about.  So there's the DMCA requirement

12   that you have to have a system that is reasonably

13   implemented that terminates repeat infringers.  Google

14   can have the greatest repeat infringer system on the

15   planet and get a ruling that says you get the DMCA

16   defense based on that repeat infringer system, but for

17   any particular ad, if they didn't take the ad down

18   expeditiously, they do not get the DMCA defense for that

19   work.  So they have to do literally ad by ad or notice

20   by notice I should say, URL by URL within each notice,

21   and say here is the data on which we claim to have taken

22   down this ad.  So that's not an expert exercise.  That's

23   Google the data, that's data that Google either has or

24   doesn't.

25          When Ms. Victorson is saying we can find this

PROCEEDING                                137

1

2  out on our own, once we have the date that they claim to

3  have taken it down, we can see did we send a notice

4  about that URL after that date or we can look at

5  Google's ads data and see did they run an ad for that

6  after that date.  What we can't do is figure out what's

7  the date on which they claim to have delisted the ad,

8  and that's something we've been asking about for months,

9  and they have decided not to produce it to us.

10         THE COURT:  Look, if you're right, then you're

11  in the catbird seat, aren't you?

12         MR. KANE:  (indiscernible)

13         THE COURT:  If you're right, then you have

14  nothing to worry about because if they produce the

15  information, they'll do within 30 days, and you can then

16  doublecheck it as you just described.  And if they

17  don't, you're good.

18         MR. KANE:  I just think it should be 14 days

19  and not 30.  This is a fourth chance they're getting.

20  The fact that they said in their opposition papers we've

21  produced everything we have on this, we're done should

22  mean something.  They shouldn't be able to say that to a

23  court and then get bailed out when they realize oh, we

24  really did want to produce that data in the first place.

25         THE COURT:  All right, so I'm going to stick

PROCEEDING                        138

1

2   with the 30 days, and now let us move on to what

3   plaintiff I think calls the approved publisher program

4   and defendant calls the recent e-book beta testing.  Are

5   these the same thing?

6            ATTORNEY:  Yes.

7            THE COURT:  Okay, I can take it that the answer

8   is yes.  All right, Ms. Murphy.

9            MS. MURPHY:  And I guess I'll start with

10  terminology.  Google says in their papers and to us that

11  it's a beta program, that it's limited, there's only a

12  certain number of publishers, we don't know how many

13  involved.  We have no documents whatsoever to back any

14  of that up or to indicate to us what is actually the

15  situation with this program or not which is the very

16  reason that we issued these three tailored RFPs.  This

17  isn't a burden issue.  This is, again, a very specific

18  program, whatever you want to call it.  And we've asked

19  for documents sufficient to show the parameters of the

20  program.  We asked for the scope of those participating.

21  I think Google complained that we wanted to know the

22  individual publishers involved.  We used the word scope

23  on purpose because Google itself had been saying that

24  this was limited.

25            With respect to RFP - I need to put my glasses

```
 1                        PROCEEDING                    139
 2  on --
 3            THE COURT:  Where are your RFPs?
 4            MS. MURPHY:  Okay, yes.  So these are quoted on
 5  page 9, footnote 8 of our letter, docket 185, and they
 6  are similarly quoted in Google's attorney's declaration
 7  --
 8            THE COURT:  92, 93, and 94 are the RFPs.
 9            MS. MURPHY:  Correct.
10            THE COURT:  Okay, great, I'm on the same page
11  with you.
12            MS. MURPHY:  Yes.  So 93 relates to public
13  announcements about the program, and I take it from
14  Google's papers there are none.  They can say otherwise.
15  And then communications about the program and their
16  decision to exclude plaintiffs which I'll get to in a
17  minute.
18            THE COURT:  Okay.
19            MS. MURPHY:  So, again, we all know at this
20  point the cases about e-book ads on Google's platform.
21  These requests are also about e-book ads on Google's
22  platform.  We're seeking basic documents about this
23  approved publisher program that directly speaks to what
24  Google can do to mitigate harm from the pirate ads they
25  run.
```

PROCEEDING                                    140

2      As we explained at the last hearing, the impact

3  of pirate ads on plaintiffs is made worse by the fact

4  that Google does not permit plaintiffs to advertise

5  their own e-books which are typically at the lowest

6  price.  So simply put, the pirates don't have to compete

7  with the plaintiffs' legitimate ads, it's a great boost

8  to their business, and it is our position that this is

9  one of the key ways in which Google has materially

10  assisted the pirate's infringement which is a critical

11  issue in this contributory infringement case.

12      THE COURT:  All right, and Google makes a

13  relevance argument as I understand it, no longer

14  relevant because the state law unfair competition claim

15  is gone.

16      MS. MURPHY:  Yes, that's not correct.  Starting

17  with what I just said that this relates to material

18  contribution and material assistance to the pirates, it

19  also relates to Google's knowledge because this whole

20  consideration of whether to create an approved publisher

21  program is wrapped up in communications between

22  publishers, including our clients, and Google, and the

23  idea of creating and allow list to allow legitimate

24  publishers to advertise is part and parcel of the idea

25  of whether they can address the problem of pirate ads.

2          So you may recall, I believe we discussed it at

3    the last hearing, that when we complained to Google

4    about the problem of pirate ads, Google's decision in

5    May of 2021 was to issue their so-called e-book ban.

6          THE COURT:  Prohibiting paid ads, not

7    prohibiting free ads.

8          MS. MURPHY:  We have learned that since this

9    litigation.

10          THE COURT:  Right, we have --

11          MS. MURPHY:  They didn't tell us that at the

12    time.  We've learned that since this litigation.

13          THE COURT:  Okay.

14          MS. MURPHY:  So we shortly thereafter were

15    looking at the situation started to realize, wait a

16    minute, there's still pirate ads, and, in fact, the

17    problem actually grew and grew.  So we went back to

18    Google and we said something's not working, you know, we

19    can't advertise, but all these pirate ads are getting

20    through --

21          THE COURT:  And then they said because it

22    doesn't apply to free ads.

23          MS. MURPHY:  No, they never said that.  They

24    never said that to us once.  We just have seen it in the

25    documents since.  They just, you know, they talked about

PROCEEDING                                142

1  it a little bit with us, and then we followed up, and

2  they just never did anything.  So we need to know why

3  because this is critical, again, to addressing the

4  overall problem on their ecosystem.  And so now that

5  they have done it in March of 2025 --

6           THE COURT:  And what exactly do you think they

7  did in March of 2025?

8           MS. MURPHY:  In March of 2025 they started

9  allowing some legitimate publishers, we don't know the

10  extent to, we don't know the scope, to advertise e-book

11  ads.  And then when we said to them, well, we see this

12  is going on, we would like to advertise our e-books,

13  again we said this, and we were told no, this is at

14  docket 212-1, an email from Google's counsel, saying no,

15  plaintiffs will not be permitted to do this while they

16  are in active litigation with Google.

17           So Google has made a decision that they will

18  not mitigate the harm that plaintiffs are experiencing.

19  They could, but they won't.

20           THE COURT:  By allowing your clients to

21  advertise --

22           MS. MURPHY:  Right.

23           THE COURT:  -- e-books.

24           MS. MURPHY:  Right.  So that's where we are, I

PROCEEDING                                      143

mean Google offered to fold it into settlement

discussions, but they are we think mixing apples and

oranges, they're citing to antitrust law saying that

they're permitted to do business with whoever they want.

We're not talking about a Sherman Act claim here.  And

even the case they cited, I believe it's called *Savory*

*Pie*, the *Savory Pie* case talks about how you still look

at the reason behind the refusal to deal and that if

there's an absence of a valid business purpose, that it

may provide circumstantial evidence of improper intent.

So that's how it comes in here with respect to

statutory damages.  They jury will be entitled to

consider Google's state of mind.  Under *Bryant v. Media*

*Right Productions Inc.*, 603 F.3d 135 (2nd Cir. 2010),

they're entitled to consider, in addition to infringer's

state of mind, the conduct and the attitude of the

parties.  So we think clearly these documents both with

respect to an affirmative decision to exclude plaintiffs

and with respect to Google's ability to do this in the

first place are highly relevant.

The one other thing I'll add is that after we

went back to Google in 2021 and said, hey, this isn't

working, Google did at that point in time start to

consider an allow list ▓▓ ▓ ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ ▓ ▓▓▓

```
 1                         PROCEEDING                     144
 2   ███████ ██ █████.  Google in its response cites to a
 3   document that does, again, sort of marry together these
 4   two concepts that controlling the ads that are allowed
 5   is potentially helpful to addressing the pirate problem
 6   which goes to what I'm speaking about today.  It also
 7   could be relevant to the argument that they've been
 8   making that, oh, this is all automated, we have no
 9   responsibility for this, when, in fact, they are
10   controlling ads that are allowed to get through.  Let me
11   see if I just missed anything.
12         Oh, the other thing that could very much be the
13   case, we don't know since they have outright refused to
14   produce the documents, is what else could Google be
15   doing to address the piracy problem for these publishers
16   that they've now decided can be in the program.  The
17   email at docket 212-1 states that one of the reasons
18   that Google has decided to affirmatively exclude the
19   publishers is that Google and the publishers in the
20   program are working together to identify and resolve
21   issues that arise during this testing phase.  That could
22   very well mean, you know, working together to deal with
23   pirate ads.  Again, if so, that would be highly relevant
24   to this case.
25         THE COURT:  All right, if you have - I'm sorry,
```

PROCEEDING                                          145

1

2   I've been clicking around.  Wait a minute.  I may have

3   found it.  My computer is not being very helpful.  All

4   right, I have docket 212-1 in hard copy up here.  All

5   right, thank you very much.  Let me hear from Google.

6              MS. MURPHY:  Thank you.

7              MR. DAMLE:  Thank you, Your Honor.  Let me

8   start by saying, you know, just to take on the relevance

9   point, the plaintiffs make the argument that decisions

10  around the e-book ban and allowing pirate e-book vendors

11  onto the shopping platform while disallowing legitimate

12  plaintiffs, that that is their sort of main relevance

13  argument.  And what I would say is we produced actually,

14  if you look at the relevant time period that we're

15  talking about here, we've produced documents related to

16  Google's decision to ban e-books.  So we've produced

17  documents in response to RFP 45 which concern the e-book

18  ban policy and its development, implementation, and

19  enforcement.  We've produced documents from the time

20  period reflecting Google's assessment and consideration

21  of an allow list, describing the technical burden of

22  implementing one.

23              So the plaintiffs have received a lot of

24  documents from the relevant time period which explain

25  why Google did not create an approved publisher program

1                          PROCEEDING                    146

2    years ago.

3              THE COURT:  But now you have and you don't want

4    to disclose any information about that.

5              MR. DAMLE:  We only started this in the second

6    quarter of 2025, and last week we talked about time

7    period by which discovery has to sort of stop.  We've

8    agreed March 2025 was a reasonable cutoff date.  So in

9    March --

10             THE COURT:  That was with respect to categories

11   of discovery which, for the most part, started in,

12   what're we going back to?  January 1 of 2020.  We didn't

13   happen to discuss any categories of discovery that only

14   cropped up more recently.

15             MR. DAMLE:  That's true, Your Honor, but then I

16   would just point you to the question of why would this

17   be relevant and proportional to require us to do

18   discovery all the way to the present.

19             THE COURT:  (indiscernible) make a burden

20   argument.  So when you use the word proportionality with

21   respect to this, you're really just trying to underscore

22   your relevance argument, i.e., it's so irrelevant that

23   even spending five minutes on it is disproportional,

24   right?

25             MR. DAMLE:  Well, it would require us to do an

1
2    entirely new search for a time period that we haven't
3    done any searches for.  That is the main issue because
4    all of the events that are relevant to these RFPs all
5    happened, this is discovery that was served in June of
6    this year.  All of the relevant events happened after
7    March of this year.  We haven't been searching documents
8    from that period of time.  So that opens up a whole new
9    time period of searches and investigations and all of
10   that and collection that we have to do.  So that is a
11   burden.  And the question is is it worth, is the juice
12   worth the squeeze when really the claim is it starts to
13   get very attenuated from their copyright infringement
14   claim which is entirely about what did we do in the past
15   with respect to contributing to these merchants' acts of
16   copyright and trademark infringement.  That is what is
17   at issue in this case.

18           Already the question --

19           THE COURT:  I think the relevance argument, and
20   I'm going to put it a little bit differently than I
21   heard from plaintiffs' counsel.  To analogize to a
22   personal injury case, the relevance argument here is
23   similar to the arguments that you hear about post-
24   accident repairs.  Plaintiff slipped and fell on an
25   allegedly negligently maintained staircase.  After the

PROCEEDING                                    148

plaintiff's accident the landlord came in and fixed up

the staircase and put a non-slip runner on it, whatever.

That's relevant because or it's maybe deemed relevant

for discovery purposes because it shows what the

landlord could've done, arguably should've done, and

whether that juice was worth the squeeze, in other

words, whether that something that a reasonable landlord

should've done before whoever the unfortunate plaintiff

is took a spill.

It may not be admissible because there are

reasons, policy reasons why evidence of after post-

accident repairs are sometimes considered more

prejudicial than probative, but, generally speaking,

it's discoverable.  Why isn't this also discoverable

even though it's recent because it's relevant to what

Google arguably coulda/shoulda done during the period in

question, and we can argue later over admissibility?

MR. DAMLE:  Well, in terms of what we could

have and should have done, whether we had an e-book ban

or not does not go to whether we were contributing to

infringement or not.  This is – the question is are we

allowing legitimate publishers onto our platform or not,

that's a totally distinct question of whether allowing

pirates onto our platform or not.

PROCEEDING                                          149

1

2          THE COURT:  Well, it goes to mitigation of the

3    damage from the piracy, right?

4          MR. DAMLE:  I don't understand how that is

5    because – again, I think this is common ground here.

6    This is an e-book ban that applies to everybody for all

7    paid subscribers, we allow free ads --

8          (interposing)

9          THE COURT:  -- until recently.  Right?

10          MR. DAMLE:  We have allowed as a beta certain

11    publishers to pay for ads on e-books on Google, yes.

12    But when we're talking historically, that was a ban that

13    applied to everybody.  It did not apply just to the

14    legitimate publishers; it applied to everybody.  There

15    are instances where pirates are able to circumvent that.

16    So I'm not exactly sure how allowing legitimate

17    publishers on or not solves the problem of whether

18    pirates can mitigate, can evade our ban or not.

19          THE COURT:  Right, but the argument is that,

20    and, again, I'll put it in non-technical terms that you

21    could've, should've, or had a way to reduce the harm and

22    didn't do it or maybe didn't think of it until 2025.

23          MR. DAMLE:  Again, I'm not exactly sure how

24    allowing publishers or not reduces the harm from piracy.

25    That is something that is, you know, that whether we

allow legitimate publishers or have a blanket ban or not

doesn't change the fact that pirates are able to evade

the ban --

          THE COURT:  I think you're construing, and I

understand why you're doing it, but I think you're

taking a very blinkered look at relevance here.  And

you're saying it's not relevant to this big important

issue in the case, i.e., whether the pirates could be

pirates, and you're not willing to admit that it might

be relevant to other issues in the case like damages,

for example.

          MR. DAMLE:  I understand what you're saying,

Your Honor, and what I would just point you to is,

again, the fact that we have produced a lot of this

information with respect to the historical events in

this case which is what this case is about.  It's about

things that happened in the past.  You know, whether

we're able to now consider an allow list or not, again,

is not particularly relevant the decisions that were

made in the past.  They're able to get documents and ask

questions of our witnesses in depositions about

decisions that were made in the past.  This is all

events that are happening in the second quarter forward.

          THE COURT:  Right, now are there going to be

PROCEEDING                          151

 1
 2    any documents responsive to RFP 93, public
 3    announcements, or were there simply no public
 4    announcements?  Maybe there were direct communication
 5    with shopping ad merchants, I don't know.
 6              MR. DAMLE:  I don't know that there was any
 7    public announcement, but it's the direct communications
 8    with shopping ads merchants.  I believe that there might
 9    be, yes.
10              THE COURT:  Shopping ads merchant --
11              MR. DAMLE:  Well, that would be other
12    publishers who are able to join into the beta program.
13              THE COURT:  Right, the members of the beta --
14              MR. DAMLE:  Correct.
15              THE COURT:  Obviously, you had to have some
16    communication with them to invite them --
17              MR. DAMLE:  Correct, correct.  Correct.
18              THE COURT:  Okay.  As for number 94, documents
19    concerning defendant's decisions not to include
20    plaintiffs, here my own relevance meter is beginning to
21    shut down because you've already told them why you're
22    not including them --
23              (interposing)
24              THE COURT:  -- litigation with them and maybe
25    that's a legitimate reason, maybe that's not a

```
 1                        PROCEEDING                    152
 2   legitimate reason, but plaintiffs haven't given me any
 3   reason to believe that that's not actually the reason.
 4   So I'm not sure there's any more relevance there to be
 5   had.  But I am inclined to require you to produce in
 6   response to 92 and 93 - how big is this program, by the
 7   way?  How many approved publishers are in it roughly?
 8            MR. DAMLE:  Yeah, it's fairly small, Your
 9   Honor, because it is a beta test and, you know, we've
10   explained this to the publishers, and we're just testing
11   out --
12            THE COURT:  Right --
13            (interposing)
14            MR. DAMLE:  ████ ████ █ █████ ████ ████
     █ █████ █████ █████ █████ █████ █████ █████ .
16            THE COURT:  Okay.  Yeah, I mean I'm not sure
17   that I'm interested in requiring you to produce all of
18   the direct communications with all of them.  That seems
19   a bit invasive, among other things, of them.  I am
20   inclined though to require you to produce in response to
21   RFP 92.  I do think it meets the relevance threshold.  I
22   emphasize I am not purporting to make an admissibility
23   decision at this time, and if this is a super secret
24   program that the general public doesn't know about, you
25   may, I'm certainly not precluding you from labeling
```

PROCEEDING                                          153

1
2    things confidential or whatever levels of

3    confidentiality you have in your --

4              (interposing)

5              MR. DAMLE:  -- just on that point, Your Honor.

6    This is extremely commercially sensitive, a commercially

7    sensitive project.  The publishers that are involved in

8    it, you know, they're expecting a certain amount of

9    confidentiality.  I believe that our protective order -

10   can I just confirm one thing?

11             THE COURT:  You have an attorney's eyes only

12   layer in there?

13             (pause in proceeding)

14             MR. DAMLE:  Yeah, so our AEO designation allows

15   one internal in-house counsel to get access to it.  I

16   just want to flag, and it's something that I want to

17   discuss with my client.  I'm not prepared to talk, to

18   sort of make a decision here --

19             THE COURT:  You don't have to make that

20   decision --

21             MR. DAMLE:  Yeah, but I just want to

22   understand, you know, I just want to flag for Your Honor

23   and maybe this is something we can meet and confer about

24   that there may be particular sensitivity for allowing

25   anyone in the companies to see access to certain of

PROCEEDING                                     154

1    these communications with these publishers who are

2    competitors.

3              THE COURT:  There are lots of ways around it.

4    I mean, for example, and I know I'm big on examples and

5    my examples don't always match up with what the reality

6    turns out to be, but the best way I can sometimes think

7    my way through a problem is to at least try and think of

8    what real world situation you need to apply my decision

9    to.  So I can see a situation, for example, where let's

10   suppose you sent out a communication, a standard

11   communication to the 75 invitees into your beta program

12   and you said the same thing to each one of them.  You

13   might want to redact their names.  They might want you

14   to redact the names.  And yet since that email would be

15   necessary to show the scope and the functioning of the

16   program, I might require you to produce at least a

17   version of it, an exemplar version of it for example.

18   So there are lots of ways to skin that cat, and the way

19   I intend to skin the cat is to require you to produce

20   documents responsive to number 92 which has built into

21   it the documents sufficient to show language.

22             So you don't have to produce every single piece

23   of paper that somebody has, or email that somebody has

24   mentioned the program on.  And with respect to 93, I'm

1

2   inclined to require you to produce responsive documents

3   limited to what I think of in my antiquated way as a

4   list serve or an email blast, in other words, something

5   that you sent out either to all invited publishers or to

6   all enrolled publishers discussing the program.  And I'm

7   not going to prejudge now the question of what level of

8   confidentiality you're going to assign to it or whether

9   you can redact customer names, but I'm sensitive to the

10  issue.  So that's something that I would expect the

11  parties to discuss among themselves.  So you have 30

12  seconds now to tell me why I'm wrong.

13          MR. DAMLE:  No, I think that's very reasonable,

14  Your Honor.

15          THE COURT:  All right, now plaintiff,

16  plaintiffs have 30 seconds to tell me why I'm wrong.

17          MS. MURPHY:  Your Honor, I would strongly

18  request that Google be ordered to produce documents in

19  response to RFP 94.  Excuse me, I'm losing my voice.

20  This is the decision not to include plaintiffs.  Judge

21  Rachon in her order denying Google's motion to stay

22  found that a stay would prejudice plaintiffs, quote,

23  "whose works in issue continue to be advertised by

24  pirate sellers on the Google platform and whom Google

25  has excluded from a beta program for e-books while the

PROCEEDING                                  156

1
2   parties are in active litigation."  Docket 191 at 6 to

3   7.

4           Judge Rachon has already found that this is an

5   applicable situation that is impacting the plaintiffs.

6   It's not --

7           THE COURT:  We know that, and we know that

8   Google said yes to some other people and no to you, and

9   we know that they sent you an email saying it's because

10  you're suing us.

11          MS. MURPHY:  Their --

12          THE COURT:  What else do you need to know?

13          MS. MURPHY:  Their counsel sent us that email,

14  but to the extent that there are internal communications

15  within Google that speak to this decision to exclude the

16  plaintiffs --

17          THE COURT:  What do you imagine might be out

18  there that's, A, not privileged and, B, adds to your sum

19  of relevant knowledge?

20          MS. MURPHY:  I'll just, I'll provide an

21  example.  We're not going to include these plaintiffs

22  because they keep sending us so many notices.  They've

23  sent us notices, and if we don't delist, they send us a

24  notice again.  We don't want to deal with them because

25  they, you know, they have so many DMCA notices.  I'm

PROCEEDING                               157

1   just throwing it out there.  Without conducting a

2   search, and this is narrow, you know, there may be no

3   documents, they may be ten.  This is not --

4   

5            THE COURT:  May be privileged because you are

6   after all in litigation.

7            MS. MURPHY:  And they may be privileged.  I

8   mean counsel has gone to great lengths to say this is a

9   business decision.  It says it in the email.  It says it

10  in their brief that this is a business decision --

11           (interposing)

12           THE COURT:  Well, it can be a business decision

13  informed by legal considerations.

14           MS. MURPHY:  You know, we don't know if it's

15  privileged, they'll put it on the log.  But to not

16  include that because that is what really goes to the

17  harm that our plaintiffs are continuing to suffer we

18  think would be an absence and should be included.

19           I did just want to make clear, and I know we're

20  over time, when --

21           THE COURT:  Plus which, by the way, I think

22  come Friday my staff's not getting paid.  So just keep

23  that in mind please.

24           MS. MURPHY:  Okay, if there are pirates ads and

25  then there's no legitimate ads from that publisher for

1

2  their e-books, then that is a much worse situation for -

3  -

4          THE COURT:  All right, so I heard you, and I am

5  not relenting.  I think that the relevance proposition

6  ticks onto the positive side, the pro-production side

7  for 92 and a limited take on 93.  But I don't come out

8  the same way with respect to the why us question.  You

9  know you've been excluded.  If that's illegitimate and

10 harmful, you already know everything that you need to

11 know about that.

12         So I think, if I'm not mistaken, you've already

13 resolved what was Section 5, correct, the total revenue

14 earned from the pirates?

15         MR. DAMLE:  That's correct, Your Honor.

16         THE COURT:  All right, so let's talk discovery

17 dates now.  Now that you know everything that you do and

18 don't have to do, and, by the way, I didn't give you a

19 date for these RFPs.  How much time does Google need to

20 produce the documents that we've just discussed?  And it

21 is narrow, so I hope it's not 90 days.  Mr. Damle.  Oh,

22 you're still discussing.

23         MR. DAMLE:  Sorry, Your Honor.

24         (pause in proceeding)

25         MR. DAMLE:  Sorry, Your Honor, just to clarify,

PROCEEDING                                159

you're asking for our, how long it'll take to produce

everything you've ordered today or just the one that I,

the RFPs about the beta program?

THE COURT:  Well, thank you for clarifying.  In

my mind, although I realize now I didn't say it out

loud, perhaps I better say it outload, I'm assuming that

you're going to ask for and that I'm going to give you

the 90 days which, well, it's a little less than 90 days

now, but the January 6 date that we discussed last week

for the new custodians and list serves that we discussed

earlier this afternoon that was Section 1 in plaintiffs'

omnibus motion, and I guess I assumed that you were

going to ask for and I was going to give you January 6

for Section 2 as well which is ████ ████, high

confidence, and the OKR issue.  As for the merchant IDs

and customer IDs, I've given you a very quick turnaround

date, 14 days, by which you have to come back to me and

complain if you can't get it done, but otherwise I would

be thinking January 6 to get it done.

But with respect to the documents that we just

discussed, the preferred publisher/beta program, it

seems to me that you shouldn't need 90 days.

MR. DAMLE:  Yes, Your Honor, that last category

should take less time I would imagine.

PROCEEDING                              160

1

2          THE COURT:  So can we make that 30 days from

3    today?

4          MR. DAMLE:  Yeah, we can make that 30 days from

5    today, Your Honor.

6          THE COURT:  Okay.

7          MR. DAMLE:  The only thing I'd say about the

8    broader schedule is the, we don't – you know, we have,

9    there's sort of a single pipeline of discovery stuff

10   that happens at the company.  I think today we've now

11   had four different custodians added, so that brings us

12   to a total --

13         THE COURT:  It could've been worse, it could've

14   been twelve.

15         MR. DAMLE:  It could've been, yes, Your Honor,

16   and I appreciate your not making it twelve.  You know,

17   we're talking about 30,000 plus ID numbers requiring a

18   search.  We're not sure, because we can't run these hit

19   counts for reasons explained, how many search results

20   that's going to lead to.  So I'm a little worried and I

21   would not want to come back to you asking for more time,

22   you know, we also have holidays interceding obviously.

23   So I think that we will need more – what's that?

24         THE COURT:  It's always something.  October

25   was, still is, the Jewish holidays.

```
 1                       PROCEEDING                   161
```

```
 2              MR. DAMLE:  Yes, I know.
```

```
 3              THE COURT:  December is another set of
```

```
 4    holidays.  It's always something.
```

```
 5              MR. DAMLE:  Understood, Your Honor.  The other
```

```
 6    thing I will say is the email list serves are more
```

```
 7    complicated to do the searches for.  One of them is sort
```

```
 8    of this relay.  There's not a single inbox, so that's
```

```
 9    the shopping-DMCA.  We checked with our clients during
```

```
10    the break, that one in particular is not, there's not a
```

```
11    single inbox that we can search.  So we're going to have
```

```
12    to --
```

```
13              THE COURT:  So how is it done?
```

```
14              MR. DAMLE:  We're exploring that with the
```

```
15    client right now, Your Honor, and --
```

```
16              THE COURT:  That one's before for another list
```

```
17    serve.
```

```
18              MR. DAMLE:  What's that, Your Honor?
```

```
19              THE COURT:  You did it --
```

```
20              MR. DAMLE:  Yeah, for that list serve, so some
```

```
21    list serves are Google groups.  So there is an inbox you
```

```
22    can search.  So that's true of the LR monetized one, so
```

```
23    I'm not as concerned about that.  The shopping-DMCA one
```

```
24    is not a Google group, it's just a relay that sends
```

```
25    emails out.  So we're still trying to figure out exactly
```

1

2  how we even go about searching that.

3        THE COURT:  Maybe you find somebody who was on

4  it and didn't take themselves off of it for the entire -

5  -

6        MR. DAMLE:  The entire period.

7        THE COURT:  -- and use them as a proxy for it.

8  This is why I'm not a Google engineer obviously.

9        MR. DAMLE:  But I would say I think, you know,

10  we would need at least an additional month beyond what

11  you've given us for January 6 for this additional

12  searches because there's a lot of work here obviously

13  when you had up, you know, what you ordered last week

14  and what you've ordered today.

15        THE COURT:  Well, let's talk about what else we

16  have to reset.  Right now your current schedule, if I

17  understand it correctly, requires you to conclude all

18  fact discovery including fact depositions by November

19  17, one month from now.  You're obviously not going to

20  be able to do that.  You then have expert disclosures

21  beginning December 11 with rebuttal reports January 9,

22  reply reports February 2, and all expert discovery

23  concluded by March 16.  I don't think you have an RFA

24  date in there at present but you want one, right?

25        ATTORNEY:  We've agreed.

PROCEEDING                                            163

2          MR. DAMLE:  Yeah, we resolved that, Your Honor,

3   so we have an agreed upon date.

4          THE COURT:  So let me tell you what I'm

5   thinking because I want to see as little of you as

6   possible, I mean that in the nicest possible way.  You

7   want to see as little of me as possible as well.  What

8   I'm thinking is that I'm going to give you January 6 as

9   the fact, the written, fact written discovery close

10   date, the close date for all written fact discovery,

11   which would include all of the various document

12   productions and interrogatory requirements that I've

13   imposed on you this week and last week except for those

14   which have a built-in shorter deadline.

15          But I'm inclined to give you a relatively more

16   generous amount of time after January 6 to get your fact

17   depositions done, and what that will allow you to do, if

18   you're all working in good faith, if you get near to

19   January 6 and there's a particular category of documents

20   that are proving problematic that Google can't quite

21   manage to get done, you can negotiate a longer date for

22   this category or that category as long as you also get

23   started with depositions to the extent the depositions

24   don't depend on that particular category.  In other

25   words, what I don't want to see happening here is anyone

PROCEEDING                                    164

letting the reasonably satisfactory and the perfect be
enemies of each other.  You're not going to get every
single document you need or want before you have to sit
down and outline or defend your first deposition.

In fact, my own view of life is, frankly,
depositions probably should've started already because
often it's when you take the first or the second or the
third deposition, that you get a much better idea of how
to read the documents that you already have and, God
forbid, how to ask for some category that you still
haven't figured out that you need.  So I don't want to
see a continental divide there between finishing up your
written discovery and getting your fact depositions
done.  So I was thinking of giving you, you know,
another couple of months into March for your drop-dead
date on fact discovery, including fact depositions, and
to give the lawyers in this room some control over when
the switchover occurs between finishing up written
discovery and beginning to take deposition discovery.

So let me hear first from the plaintiff and
then from the defendants whether you think that's a good
idea or a terrible idea.

MR. KANE:  Just a couple of points, Your Honor.
One is this is a somewhat unusual case in that there are

1  40 fact depositions that the parties are permitted to

2  take.

3

4          THE COURT:  That's a lot.

5          MR. KANE:  Plus 30(b)(6) depositions of which

6  we assume there'll be at least five with four plaintiffs

7  and one defendant.  So it might be that the March 6 date

8  should really be an April 6 date --

9          THE COURT:  It might be.

10          MR. KANE:  I'm extremely reluctant to say that.

11  We are the last people who want the discovery schedule

12  extended.  But I don't know that we can take --

13          THE COURT:  Forty deposition in 90 days seems

14  doable, but 40 depositions in 90 days is a lot more

15  doable if you've already done ten of them before you get

16  to January 6.

17          MR. KANE:  Yes, and that was, I think one way

18  we can accomplish that Google issued a number of third-

19  party subpoenas to authors of these textbooks.  They

20  have a theory that we don't really own the works.  Those

21  are depositions that do not depend on any of the

22  documents we've been talking about in these last two

23  hearings.

24          THE COURT:  So you think you should get

25  cracking with those.

PROCEEDING                                166

2      MR. KANE:  If they're taking them, there should

3  be a much earlier date for them to take those

4  depositions.

5      THE COURT:  What about your side, do you have

6  third-party subpoenas out?

7      MR. KANE:  We issued third-party subpoenas to

8  two vendors that Google uses to process infringement

9  notices.  I don't yet know whether we'll be deposing any

10  of those folks.

11      THE COURT:  You don't have their returns yet?

12      MR. KANE:  We do have documents from them.

13  It's just not clear whether we'd want to use a

14  deposition on one of those parties.  The other third-

15  party subpoenas that we'd be issuing would be to former

16  Google employees.  We think the deadline for those

17  depositions should be the same as the deadline for all

18  depositions because those will depend on the kinds of

19  documents we've been talking about --

20      THE COURT:  So third-party fact deponents here

21  may include authors, vendors, and former employees.

22      MR. KANE:  Yes, that's the current list.

23      THE COURT:  Okay.  All right, Mr. Damle, do you

24  have - well, I just heard a bid in effect for the

25  plaintiffs' side for April 6 as the drop-dead date for

1                               PROCEEDING                          167

2  fact discovery.  How do you feel about that?

3          MR. DAMLE:  I think we need to, we will need to

4  bump both those dates, the January 6 date and the April

5  date by a month because we have, in addition to the

6  third-party deponents that Mr. Kane mentioned who are

7  authors of the textbooks, which we've done only in a

8  sample and we may want to, depending on how those go,

9  issue more subpoenas.

10         THE COURT:  Judge Rachon gave you 20 per side

11  or did you negotiate the 20 per side?

12         MR. DAMLE:  I think she ordered it.  We had a

13  dispute about how many to have per side, and she ordered

14  20 per side.

15         THE COURT:  Okay.

16         MR. DAMLE:  There's also third-party subpoenas

17  that we've issued to certain of the plaintiffs' vendors,

18  and we're still, those are BC Guardian, Core Search,

19  Vital Source.  We're still receiving documents from

20  those third parties.  And so we're not in a position to

21  start third-party depositions of those particular

22  witnesses.  And so the number of depositions we can

23  really start right now is fairly limited to just a

24  handful of these authors.

25         THE COURT:  Yeah, but the authors are doable

```
 1                        PROCEEDING                    168

 2   now, correct?

 3           MR. DAMLE:  Yes.  We only have 20 --

 4           (interposing)

 5           THE COURT:  -- how many you want --

 6           MR. DAMLE:  Yeah, depending on how many we want

 7   to use, yes, we could start now.  We have to think about

 8   who, you know, how many of their witnesses do we want to

 9   depose, what other third parties, like their vendors, do

10   we want to depose.  So we may not be using many of

11   those, any of the limited depositions we have on those

12   authors because there are other third-party witnesses

13   that we have to use this one, and there's four, you

14   know, there are four plaintiffs.  There's going to be,

15   30(b)(6) witnesses obviously don't count, but 30(b)(1)

16   witness of four plaintiffs.  So there's going to be a

17   lot of depositions --

18           THE COURT:  What do you mean when you say

19   30(b)(6) witnesses don't count?

20           MR. DAMLE:  I think the way that the scheduling

21   order works is that the 40 that we have don't, 30(b)(6),

22   they're excluded from that count.  So 30(b)(6) witnesses

23   are on top of the 40 --

24           THE COURT:  So you get 20 depositions plus a

25   30(b)(6) of each plaintiff.
```

1                              PROCEEDING                      169

2              MR. DAMLE:  Correct, correct.

3              THE COURT:  And they get 20 depositions plus

4    one 30(b)(6) of Google.

5              MR. DAMLE:  Correct.

6              THE COURT:  Okay.  If that's the deal, that's

7    the deal.

8              MR. DAMLE:  So for all those reasons, given the

9    volume of documents that we are now going to have to go

10   through and produce, and we agree that we'll need at

11   least 90 days for fact witness depositions, and the fact

12   that we can't really, there's only a limited number that

13   we can really start now if we decide to use them.  We

14   think having an extra month --

15             THE COURT:  But what do, what more do you need?

16   Because, remember, you're producing more documents than

17   plaintiffs.

18             MR. DAMLE:  Correct.

19             THE COURT:  What more do you need from

20   plaintiffs before you can profitably take either their

21   30(b)(6) or whoever else you're planning on taking?  Oh,

22   it's the authors.

23             MR. DAMLE:  Well, one of the things for them to

24   provide sort of --

25             THE COURT:  A damages estimate.

1                              PROCEEDING                              170

2              MR. DAMLE:  Well, that, certainly, Your Honor.

3   But also this cataloguing of their evidence --

4              THE COURT:  Correct.

5              MR. DAMLE:  -- their screenshots which they're

6   going to take, that's going - we're not going to get

7   that until January 6.  And so --

8              THE COURT:  You might get it before then.  I

9   mean the plaintiffs certainly don't want to put

10  themselves in a position where they can't yell at you

11  for failing to make a rolling production.  So they're

12  probably going to use their best efforts to make a

13  rolling production.

14             MR. DAMLE:  Yes, the other point that I'd make,

15  Your Honor, is I wish I could say that this was the end

16  of the disputes that the parties have with each other.

17  We have other brewing disputes around custodians

18  including I'm going both ways, frankly --

19             THE COURT:  And this is one of the reasons why

20  I'm anxious for some depositions to start happening

21  because I know in real life that more disputes arise

22  after you take the first few depositions and you learn

23  stuff you didn't previously know or you see documents in

24  a new light that you didn't previously see them in.  And

25  that's why I want this to be an iterative process where

1
2   you don't wait until you think you have every single

3   document that you need and then start taking depositions

4   and go, oh, my gosh, here's all these things I've

5   missed.

6           MR. DAMLE:  Completely agree, Your Honor.  It's

7   a bit of a balance, right, because once we've used a

8   deposition on a particular witness and we get a document

9   at a later time, then we've --

10          THE COURT:  You generally can't call that

11  witness back without compelling circumstances.

12          MR. DAMLE:  Correct.  So there's a bit of a

13  balance in terms of when we decide to sort of kick off

14  those depositions, ensuring that we have what we need in

15  order to put in front of these witnesses particular

16  documents.

17          THE COURT:  Right, and I would say that's even

18  more true for the plaintiffs because plaintiffs have

19  told me a number of times in a number of different ways

20  that they don't understand the data, they're not sure

21  how to read the document.  It may be that some human

22  being has to walk them through certain processes that

23  they don't understand, and if that happens too late in

24  the day, everyone's going to be back in here again – I

25  know you're going to be back in here again for

PROCEEDING                                    172

1

2    something, but I do want to minimize that to the extent

3    possible.

4          MR. DAMLE:  Completely agree, Your Honor, and

5    the last thing I want to come back on is the schedule

6    which is why I think giving the parties just a little

7    bit more breathing room, a one-month addition on the

8    January 6 deadline, given the additional discovery that

9    you've ordered today, and, you know, then we agree with

10   the 90 days --

11         THE COURT:  What category or categories that

12   I've ordered you to produce in particular troubles you

13   in terms of getting it done by January 6?

14         MR. DAMLE:  Yeah, those email list serves in

15   particular are the ones that are concerning to me.  We

16   don't have a good sense of the volume, as I said, the

17   shopping-DMCA one is particularly tricky because it's

18   just a relay.  It's not an email inbox.  LR monetized

19   I'm less concerned about because there is an email

20   inbox.  The ID numbers and searching those and, you

21   know, it's a lot of ors, 20,000 plus another 10,000,

22   that's a lot of potential documents that we have to

23   review.  It's not totally clear to us that all of them

24   are going to be relevant because, you know, there's ten-

25   digit numbers can be phone numbers, as Ms. Bladow said.

2      THE COURT:  I think it's highly unlikely, I'm

3  going to put myself out there, I think it's highly

4  unlikely that you're going to turn up more than glad

5  handful of documents where these folks are saying give

6  me the number for your tailor, I really like the way

7  your suit came out.

8      MR. DAMLE:  Fair enough, Your Honor, but

9  there's still potentially a lot of documents we have to

10  review, and then we also have to review them for

11  privilege because some of these are, you know, they're

12  asking for legal advice with respect to --

13      THE COURT:  Maybe.

14      MR. DAMLE:  And so that --

15      THE COURT:  All right, so you want more time on

16  the, what's the word that you used, the non something or

17  other list serve, the list serve that doesn't have an

18  inbox.

19      MR. DAMLE:  The shopping-DMCA, yes, at least

20  that.

21      THE COURT:  Okay, and then you want more time

22  on the ID numbers.

23      MR. DAMLE:  Yes.

24      THE COURT:  And everything else you think you

25  could get done by January 6.  You hope you could --

PROCEEDING                                    174

1

2          MR. DAMLE:  We hope, we can try our best.

3          THE COURT:  I expect you always try your best.

4    All right, what do plaintiffs have to say about that?

5          MR. KANE:  I don't think we need an extra month

6    for either of those discovery items.  I mean if it

7    really is limited to just – if we're doing January 6 for

8    everything but for those specific categories, the

9    shopping DMCA and the other category, I don't know that

10   that's a huge problem.  I question why it's so hard for

11   Google to pull emails from that particular list serve.

12   But if it's January 6 (indiscernible) those two discrete

13   categories, that's not such a big deal.

14         The date for depositions we think should not be

15   any later than April 6.

16         THE COURT:  That means you're going to have to

17   start before the document production is complete on both

18   sides.  You're going to have to start.  Not just they're

19   going to have to start, you're going to have to start.

20         MR. KANE:  Understood, Your Honor, and I think

21   what goes along with that is Google needs to be

22   producing documents on a rolling basis and not waiting

23   until January 6 to do it.

24         THE COURT:  And you will do the same, correct?

25         MR. KANE:  Absolutely, it's just we have less

PROCEEDING                                175

to produce than they do at this point.

THE COURT:  Okay.

MR. KANE:  I mean to the extent Mr. Damle is

saying we need to build in more time now because there

may be disputes later and Google may be ordered to

produce things, I mean they shouldn't get extra time to

produce things that they haven't agreed to produce yet.

I mean we should be setting a discovery schedule based

on the existing universe of discovery.

THE COURT:  All right, so to the extent I

haven't previously set a shorter deadline, the deadline

will be January 6, 2026 for all of the categories that

we've discussed today with two exceptions:  the

shopping-DMCA list serve and the ID numbers.  I'll give

you another 30 days on that to February 6.  That's a

Friday, February 6 of 2026.  I'm going to hold the fact

deposition close date at April 6 for now.  I am open to

the idea that I may need to extend that one more time,

one more time, but my willingness to do that will be

contingent on whoever – whoever comes before me and

tells me that I need to do that had better have taken

some depositions promptly and before, certainly before

February 6 and hopefully even before January 6 because I

will be looking to that side and saying what have you

PROCEEDING                               176

done to try and move this along.

And I'm going to put a status conference on the
calendar I think for December actually because I think
an earlier check-in would be better than a later check-
in with this fine group of lawyers.  And at the December
status conference you can give me an update what have
you done, how's it going, have rolling productions been
made as to this category, as to that category, have you
taken your first deposition yet, who was it, how many do
you have scheduled for January, etc., etc.  And I can
sort of take your pulse at that point.  So for status
conference, let me go back to 2025, December – (pause) –
it looks like I could do Monday the 15th, correct, Ms.
Kay?

THE CLERK:  Yes, Your Honor.

THE COURT:  Is a good day for me.  I could also
do Thursday the 18th late in the morning, probably 11 or
11:30.  And if you could as a favor to me, if you are
going to make additional motions to compel, you can time
them so that we can deal with them, that your letter
briefs will have been exchanged and so forth and so on,
and we can deal with them at that time.  Do you have a
preference between December 15 and December 18?
Plaintiffs.  I know you have to come up from D.C.

PROCEEDING                                                    177

1

2          MR. KANE:  I do not, Your Honor.

3          THE COURT:  Okay, defendant.

4          MR. DAMLE:  I think we have a slight preference

5    for the 15th.

6          THE COURT:  Fine, let's do it on the 15th, let's

7    start bright and early at 10 o'clock in the morning.  I

8    consider that bright and early.  And I'm going to impose

9    my usual order which is joint status letter one week

10   prior, so that would be December 8.  Now, to the extent

11   that you've already teed up discovery disputes to me in

12   the usual way with a moving letter and opposing letter,

13   you don't need to recapitulate that in your status

14   letter, but you should tell me everything else I want to

15   know in the status letter, how many documents has this

16   side produced, how many documents has that side

17   produced, how many depositions have been, A, taken or,

18   B, noticed, that sort of thing.

19         Typically, on the agenda for a status

20   conference also is have you, do you have anything to

21   tell me with regard to settlement and can I be helpful

22   in that regard.  One of the things that you have

23   available to you, as you know, is a judicially

24   supervised settlement conference.  That would be

25   judicially supervised by me because I am your assigned

1

2  magistrate judge.  Generally speaking, I can only do

3  that once per case because I have too many cases and not

4  enough days in the week.  It is most effective if you

5  want to go that way, and you may not.  Everybody here is

6  well resourced.  You may want to negotiate bilaterally,

7  you may want to go out and retain a neutral who you can

8  work with over an extended period of time which you

9  can't do with me because I don't have enough time.  But

10  if you want to come in for a settlement conference with

11  me, I generally start at 2 o'clock in the afternoon and

12  go until they turn the lights off if necessary which is

13  8 o'clock by the way, that's assuming we have funding by

14  then.  Maybe they'll start turning the lights off

15  earlier, I'm not sure.  And you have to bring your

16  clients with you.

17           But all I need for purposes of the status

18  report is going to be a general update, we're talking

19  settlement, we're not talking settlement, we'd like to

20  come in, we don't want to come in because we're going to

21  go speak to retired judge so and so.  Whatever you're

22  doing, just let me know.  And we can discuss in December

23  whether the dates that I have set today are holding or

24  not holding, and if they're not holding, what the

25  problem is.

```
 1                         PROCEEDING                    179

 2              Now, what about expert discovery, what shall we

 3    do there?

 4              MR. KANE:  We're fine with the same interval

 5    between fact and expert discovery as there was

 6    initially.

 7              THE COURT:  Okay, so let's see what was that.

 8    Where are my notes?  So you had initial expert reports

 9    due a month after the close of fact discovery.  So we

10    will be looking now at May for initial expert reports,

11    May of 2026.  Let me look at the month of May.  We'll

12    stick with the 6th because that way people can remember

13    when things are done.  So affirmative expert reports on

14    May 6.  Rebuttal expert reports on June 8.  The 6th is a

15    Saturday.  Reply expert reports you get three weeks if

16    I'm sticking with the same rubric.  So that would be, I

17    guess that would be June 29.  I'll give you July 1 just

18    so it seems like it's a whole new month.  And then on

19    your prior schedule you only had six weeks to complete

20    expert depositions and all expert discovery after that.

21    You're still good with that?

22              MR. KANE:  Yes, Your Honor.

23              THE COURT:  All right, so that gives you to the

24    middle of August, let's say August 14 which is a Friday

25    for the close of all discovery, including expert
```

PROCEEDING                                  180

1

2   discovery.  Now, do you want me to set an RFA date?

3          MR. KANE:  I believe the parties negotiated a

4   date --

5          THE COURT:  Well, tell me what it is and I'll

6   put it in the order.

7          MS. MURPHY:  Your Honor, it's 45 days before

8   the close of fact discovery.

9          MR. KANE:  Yes.

10          THE COURT:  Serve RFAs 45 days before the close

11   of fact discovery.  Correct?

12          MR. KANE:  Yes.

13          MS. MURPHY:  And interrogatories.

14          THE COURT:  And all --

15          MR. KANE:  Interrogatories.

16          THE COURT:  -- non-Local Civil Rule 33

17   interrogatories or all – you haven't done – you've done

18   some interrogatories.

19          ATTORNEY:  We've done some.

20          THE COURT:  Contention interrogatories.

21          MS. MURPHY:  Well, no interrogatories should be

22   issued after that date.

23          THE COURT:  Okay.  So last date for RFAs and

24   for interrogatories is 45 days prior to, under our

25   current calendar, prior to April 6.  All right, any

PROCEEDING                                    181

other dates you want me to put in there to keep you all

honest?  All right, so I'm going to issue you a revised

scheduling order with these dates in it.  It also be a

Magistrate Judge Moses scheduling order, so it will have

my standard language on things like you can take your

depositions remotely, for example, at the option of the

party noticing the deposition.  It will have my standard

language which hopefully will not come as a shock to

anybody that all discovery requests need to be served

far enough in advance of the applicable deadline so that

the party served has the time specified in the Federal

Rules of Civil Procedure to respond before the deadline.

No sending our subpoenas the night before discovery

closes.  I don't think you will see anything else in my

individual practices that upsets you.  If you do, I'm

sure you'll let me know.

        So anything I've missed?  Plaintiffs.

        MR. KANE:  Nothing from us, Your Honor.

        THE COURT:  Google.

        MR. DAMLE:  Nothing, Your Honor, thank you very

much.

        THE COURT:  Thank you for your patience.  Good

night.

        (Whereupon, the matter is adjourned.)

182

C E R T I F I C A T E

      I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of CENGAGE, et al. v. GOOGLE, Docket #24cv4274, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

              Carole Ludwig

Date:  October 18, 2025