

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
Jkane@oandzlaw.com

November 12, 2025

**VIA ECF**

The Honorable Barbara Moses
United States District Court for the Southern District of New York
500 Pearl Street, Room 740
New York, NY 10007

    Re:    *Cengage Learning, Inc. et al. v. Google LLC*, No. 24:cv-04274-JLR-BCM
            Plaintiffs' Reply ISO Letter Motion for Discovery Conference Regarding Google's Summary Spreadsheets (Dkt. 237)

[Redacted]

Dear Judge Moses,

        Google proposes that it will wait until "summary judgment or trial" to inform Plaintiffs and the Court whether Google will rely on the Summary Spreadsheets. This is, of course, ludicrous. At summary judgment or trial, it will be too late for Google to produce, and for Plaintiffs and their expert to review, the data underlying those summaries, and the evidence that would corroborate or contradict the claims those summaries make.

        The Summary Spreadsheets claim that Google delisted a certain number of ads, and suspended a certain number of merchants. If Google intends to rely on these spreadsheets, Google must produce two categories of documents.

        First, Google must produce the data that underlies these summaries. That is, if Google's database calculated that Google delisted 100 URLs and suspended 25 merchants in October of 2022, Google must produce the database records that list those 100 URLs and those 25 merchants. Google previously has done this for delistings and suspensions involving the pirates who infringed the works-in-suit. Rule 1006 requires Google do the same for the delistings/suspensions Google references in the Summary Spreadsheets.

        Second, Google must produce the documents that will show whether Google did, in fact, delist the ads it claims to have delisted, and suspend the merchants it claims to have suspended. Google does not contest that it needs to produce this information. Instead, Google asks the Court to conclude that the records Google produced concerning its delistings and suspensions of the pirates who infringed the works-in-suit are a representative sample of Google's total delistings and suspensions. This has no merit. In the first place, Google has not even disclosed what is the total number of delistings/suspensions it claims to have made under its Shopping DMCA policy. No one can claim a sample is representative of a whole without knowing the size and characteristics of the whole. Second, Google itself claims that it treated the notices concerning the pirates who infringed Plaintiffs' works differently than notices in its overall program. So, by definition, information on these notices is not representative of the whole.

        If Google does not produce this data, Google should be precluded from using the Summary Spreadsheets at trial.

Case 1:24-cv-04274-JLR-BCM   Document 266   Filed 11/12/25   Page 2 of 5

**O+Z Oppenheim + Zebrak, LLP**
WASHINGTON – NEW YORK

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
Jkane@oandzlaw.com

**I.   Google must produce the data underlying the Summary Spreadsheets.**

Google seeks to use the Summary Spreadsheets as evidence that it delisted a certain number of ads and suspended a certain number of accounts. These numbers were pulled from a database, which calculated the number of delisting or suspension records in that database. Dkt. 252 ¶ 10. That is a classic "summary" or "calculation", for which Rule 1006 requires the proponent to produce the underlying data, i.e., a list of the ads and accounts Google claims to have delisted or suspended.

Google has produced such underlying data before. In connection with the delistings and suspensions Google claims to have undertaken with respect to the pirates who infringed the works-in-suit, Google produced the database output that details those delistings/suspensions. For each URL listed in a notice concerning those pirates, that output lists the date of the notice, the URL listed in the notice, the Google case number, the action Google claim to have taken with respect to that notice.[1] An example of this data is enclosed as Exhibit 3. Likewise, for those pirates who infringed the works-in-suit and whom Google claims to have suspended, Google produced a list of the pirate's accounts, and the date on which Google claims to have suspended them. GOOG-CENG-00000703; GOOG-CENG-00392941. This is the very kind of data that Google queried to calculate the numbers in the Summary Spreadsheets, and it is exactly the underlying data that Rule 1006 requires Google to produce.

The cases Google cites, *Larsen v. PTT, LLC*, No. 3:18-cv-05275, 2025 WL 278337 (W.D. Wash. Jan. 23, 2025) and *United States v. Gogic*, No. 22-cr-493, 2025 WL 3042350 (E.D.N.Y. Oct. 31, 2025), do not say otherwise. Those cases stand for the unremarkable proposition that if a party takes information from a database and reproduces the information in a spreadsheet *verbatim*, that export of data does not render the spreadsheet a summary. *Gogic*, 2025 WL 3042350, at *10 ("The fact that [the data] was extracted from a database into a spreadsheet does not transform it into a 'summary' of the 'original' data."). In *Gogic*, the spreadsheets were transcripts of electronic communications. *Id.* at *1–2, 10. In *Larsen*, the spreadsheets contained lists of individual transactions captured by "neutral third parties". *Larsen*, 2025 WL 278337, at *1–4. The Summary Spreadsheets at issue here do far more. They take the records Google keeps about notices it receives and actions it takes (or doesn't take) and distills them into total numbers. This is the very definition of a "summary" or "calculation", for which the underlying records must be produced.

Google tries to distinguish the Manual Strike Tracker as a "business record" because that document apparently ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. 251 at 1–2. But Google wishes to offer this spreadsheet as a representation of the notices and actions the spreadsheet purports to reflect. Thus, Google is offering the spreadsheet as a summary, and the records underlying it must be produced.

Google has not even attempted to make a showing that producing this data would be burdensome. Google must produce the data underlying the Summary Spreadsheets.

---

[1] Google additionally has been ordered to produce the date on which it claims to have delisted the ad. Dkt. 221 ¶ (c).

2

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
Jkane@oandzlaw.com

## II. Google must produce the documents that will corroborate or contradict its claimed delistings/suspensions.

Naturally, though, Google cannot simply produce a list of the URLs and accounts Google claims to have delisted/suspended, and leave it at that. Google also must produce the records that will show whether Google actually did delist those ads and suspended those accounts. Otherwise, the Summary Spreadsheets are far more prejudicial than probative under Fed. R. Evid. 403. Specifically, where Google claims it delisted an ad or suspended an account, Google must produce the ads it ran concerning that website after the date of the claimed delisting/suspension, so that the factfinder can see whether Google did, in fact, stop running ads for that landing page or account. This is what will show whether Google satisfied the DMCA by expeditiously delisting ads in response to notices and reasonably implementing its repeat infringer program, 17 U.S.C. §§ 512(d)(1)(3), 512(i)(1)(A). As explained in Plaintiffs' opening letter, the data Google has produced so far indicates strongly that Google did not do so. Dkt. 237 at 4.

Had Google established that producing this ads information would be burdensome, the parties could have worked out a sampling protocol, whereby Google would produce a representative portion of these records, rather than all the records. And indeed, during meet-and-confers, Plaintiffs suggested that the parties accomplish this discovery through sampling. Ex. 2 (the sampling framework that Plaintiffs proposed to Google). Plaintiffs remain open to such an approach (provided, of course, that the sample is appropriately constructed and randomized). But Google has rejected it outright. Ex. 1 at 2–5.

Instead, Google takes the position that the information Google produced concerning the pirates who infringed the works-in-suit are a representative sample of Google's actions in its overall DMCA program. This argument ignores basic principles of statistics and common-sense.

**First**, Google has not disclosed what is the relevant population from which a sample would be taken. Google refuses to say what is the full universe of delistings/suspensions Google claims to have undertaken pursuant to its *Shopping* DMCA policy. As Google itself explained to the Court, "There are different types of ads on Google, and this case has been limited to Shopping ads." Hr'g Tr. 183:16–18 (Oct. 8, 2025) (Dkt. 218). Delistings and suspensions outside of the Shopping DMCA program do not support Google's DMCA defense here. Indeed, Google has not even produced the DMCA policies for platforms other than Google Shopping and Google Ads.

Yet Google admits that the Summary Spreadsheets are *not* limited to delistings/suspensions undertaken under the *Shopping* DMCA policy. Dkt. 252 ¶¶ 11–15. The most one can tell in Google's productions so far is that Google claims to have delisted somewhere between ▓▓▓▓▓ Shopping ads, and claims to have suspended somewhere between ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ Atty. Decl. ¶ 3. Google refuses to say how many of these delisting/suspensions were conducted under Google's *Shopping* DMCA policy, as opposed to one of the other numerous DMCA policies Google operates. *Id.* ¶ 4.

Plainly, no one can conclude that any sample is representative of a larger population without knowing the size and characteristics of that population.

**Second**, Google itself claims to have treated Plaintiffs (and ebook publishers generally) differently from other rightsholders. Google's opposition fails to deal at all with the fact that during the relevant period, Google had a policy of banning all ebooks. Dkt. 237 at 4. And Google itself claimed to have made special efforts to address Plaintiffs' notices. Google's documents claim that

3

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
Jkane@oandzlaw.com

it ███████████████████████████████████████████
████████████████████████████████████ Google's response to notices concerning the pirates who infringed the works-in-suit are not representative of Google's actions in its overall DMCA program.

Google has not shown that its proposed "sample" is representative.

### III. It is *Google's* obligation to produce these records.

Google argues that somehow Plaintiffs forever disclaimed any right to discovery into anything more than the information provided in the Summary Spreadsheets. Dkt. 252 at 2–4. Google is wrong on multiple levels.

First, it is *Google* who wishes to rely on these spreadsheets to support *Google's* affirmative defense. Thus, even if Plaintiffs had never issued any RFP concerning these documents, Google still would be obligated to produce them. *Pentair Water Treatment (OH) Co. v. Cont'l Ins. Co.*, No. 08-cv-3604, 2009 WL 3817600, at *2 (S.D.N.Y. Nov. 16, 2009) ("[E]ven without a discovery request, a party must produce 'a copy . . . of all documents . . . that the disclosing party . . . may use to support its claims or defenses . . . .'") (alterations in original, quoting FED. R. CIV. P. 26(a)(1)(A)(ii)).

Here, though, Plaintiffs *did* request these documents. More than a year ago, Plaintiffs requested documents concerning Google's overall DMCA program. Dkt. 238-10 (RFP 3 and 4). During meet-and-confers, Plaintiffs agreed that Google could *start* by producing the overall numbers of claimed notices/delistings/terminations. Atty. Decl. ¶ 5. This way, Plaintiffs reasoned, the parties could determine what discovery Google would provide to substantiate any claims that it delisted ads or suspended merchants. And had Google produced those numbers in reasonable time, the parties could have done that. Google, however, waited until what was then the last day of document discovery to produce the Summary Spreadsheets. And the Summary Spreadsheets do not even disclose the number of claimed notices/delistings/terminations.

As if that weren't enough, Plaintiffs' RFP 55 requested "[a]ll documents supporting, refuting, or otherwise concerning your affirmative defenses . . . ." Dkt. 238-10. Such a request is proper, and requires the defendant to comply. *Pentair*, 2009 WL 3817600, at *2 (requiring the defendant to respond to a discovery request calling for "any documents related to each affirmative defense.").

The "compromise" Google has tried to invent does not rescue it from its obligation to produce the data underlying these spreadsheets. If Google intends to offer these spreadsheets (or any testimony concerning data on its overall DMCA program) Google must produce the data underlying them, and the documents that corroborate or contradict that data.

### IV. Conclusion

The Court should order Google to produce the data underlying the delistings/suspensions calculated in the Summary Spreadsheets (similar to what Google produced at Ex. 3). In addition, the Court should order Google to produce the ads data (or an appropriate sample thereof) that will show whether Google actually did delist these ads and suspend these merchants.



WASHINGTON – NEW YORK

Respectfully submitted,

*/s/ Jeff Kane*
Jeff Kane
OPPENHEIM + ZEBRAK, LLP
*Counsel for Plaintiffs*

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
Jkane@oandzlaw.com