IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENGAGE LEARNING, INC. et al.<br><br>    Plaintiffs,<br><br>    v.<br><br>GOOGLE LLC,<br><br>    Defendant. | Civil Action No. 24-cv-04274-JLR-BCM |

# ATTORNEY DECLARATION OF MICHELE H. MURPHY

1. I am a partner at the law firm Oppenheim + Zebrak, LLP ("O+Z"), counsel for Plaintiffs Cengage Learning, Inc. ("Cengage"), Bedford, Freeman & Worth Publishing Group, LLC d/b/a Macmillan Learning ("Macmillan Learning"), Macmillan Holdings, LLC ("Macmillan Holdings"), Elsevier Inc. ("Elsevier"), Elsevier B.V., and McGraw Hill LLC ("McGraw Hill") (collectively, "Plaintiffs"). I submit this declaration in support of Plaintiffs' Letter Response In Opposition to Google's Letter Motion for Pre-Motion Discovery Conference (Dkt. 273).

2. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently hereto.

3. In the spring of this year, the parties jointly negotiated and agreed to search terms that Plaintiffs would run for the persons designated to be Plaintiffs' custodians. The parties exchanged hit reports on July 16, 2025. Plaintiffs produced non-privileged documents that hit upon these search terms before and on the then August 15, 2025 document deadline. Applying the agreed search terms, Plaintiffs reviewed tens of thousands of documents and evaluated them for responsiveness and privilege. The "15,500 unique document" number concerning Plaintiffs'

1

review in Google's motion (page 3) appears to be based on the number of documents unique to each search term. This is different than the number of documents reviewed.

4.      In addition to custodial documents, Plaintiffs produced over 430,000 non-custodial documents, and reviewed many more. About 284,000 of these documents are screenshots of Shopping ads, pirate site landing pages, and test purchase documents. These are the documents from which the Court ordered Plaintiffs to extract and catalog specific information regarding the works-in-suit as part of an interrogatory response (converted to an RFP-type response). *See* Dkt. 217 at 2-3. This has necessitated a re-review of these documents. The remaining approximately 146,000 non-custodial documents include, without limitation, copyright and trademark registrations, ownership documents, communications regarding and notices to Google and the pirate sites, financial records concerning the works-in-suit and author royalites, copies of the authentic works, and documents regarding the impact of piracy.

5.      The parties agreed that in response to RFPs 16, 18, 19, and 20, which relate to Plaintiffs' IP enforcement and anti-piracy efforts, Plaintiffs could limit their production to documents concerning Google Shopping and the relevant pirates.

6.      RFPs 16, 18, 19, and 20 are quoted below.

   a. RFP 16: All Documents and Communications Concerning Your efforts to enforce Your asserted copyright interests in each of the Asserted Works, Including enforcement of any of the specific exclusive rights identified in 17 U.S.C. § 106.

   b. RFP 18: All Documents and Communications Concerning any notices or notifications of claimed infringement of one or more of the Asserted Copyrights sent by You to Google or the designated agent of Google pursuant to the Digital

Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, Including Communications discussing any actions or inactions taken by Google.

c. RFP 19: All Documents and Communications Concerning any notices or notifications of claimed infringement of one or more of the Asserted Copyrights sent by any Plaintiff to any Third Party, pursuant to the DMCA, 17 U.S.C. § 512, Including the notices themselves.

d. RFP 20: All Documents and Communications Concerning any investigations, analyses, research, audits, reviews, or conclusions performed by BCGuardian Regarding any potential or actual infringement of one or more of the Asserted Copyrights or Asserted Trademarks, Including any notices of infringement drafted, revised, or sent by BCGuardian to Google, its designated agent, or any Third Party on Your behalf pursuant to the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.

7. In a good faith effort to resolve the custodians dispute, Plaintiffs collectively agreed to add five custodians to their existing twelve custodians ("Added Custodians"). At significant expense, Plaintiffs collected the PST/archive files of twelve individuals proposed by Google; their e-discovery vendor ran the agreed upon search terms ("Agreed Terms") and provided hits information; and we reviewed the metadata for the resulting documents, including file names, and reviewed certain individual documents. This collection and review process was time-consuming. We then provided Google's counsel with a substantive response, agreeing to the Added Custodians, and explaining why the remaining individuals are not appropriate custodians. *See* Nov. 5, 2025 email from K. Lindsey, Dkt. 290-3 at 12-14. This November 5th email included hit count information by custodian, which we received from Plaintiffs' e-discovery vendor, and which

excluded documents Plaintiffs have previously reviewed in this case. We do not yet know the extent to which there might be duplication within the hits provided, but given the individuals and different companies involved, we do not expect it would be substantial. We estimate that for the Added Custodians (under the Agreed Terms), this review process will include approximately 2,700 documents. As explained further below, if Plaintiffs were required to add the five custodians that are now at issue in Google's motion ("Proposed Custodians"), we estimate that the review would include another 4,000 documents, which – using a conservative estimate of 10 minutes per document – would require roughly 667 hours.

8.     Google first proposed their expanded search terms (listed in Dkt. 290 ¶ 55) on November 7, 2025, the day after Plaintiffs agreed to the Added Custodians. Google never met-and-conferred with Plaintiffs about these terms. I informed Google's counsel that "a preliminary analysis of these terms suggests that the hits with family would be over 5 million documents (over and above the 100,000+ we have already reviewed) just for the existing custodians." *See* Nov. 11, 2025 email from M. Murphy, Dkt. 290-3 at 7-8. In a follow-up email on November 17, 2025, I informed Google's counsel that Plaintiffs "are still evaluating this, but our information at this point shows that the terms, when run across only the existing custodians before November 6, result in 7 million hits with family and 2.19 million hits without family. This would not even take into any added custodians." Dkt 290-3 at 3. Although Google would not wait to file its motion, we have received hit reports from Plaintiffs' e-discovery vendor and are preparing to send them to Google.

9.     Based on these reports, running the New Terms on the original twelve custodians hits on 7,082,827 million documents with family. Although there is likely some duplication of documents in these results across custodians, the extent of the overlap cannot be determined until the next stage of document review, which would involve even more expense (and the number

would likely still be in the millions). Moreover, documents previously reviewed but deemed non-responsive would need to be re-reviewed, requiring substantial additional time and expense. Even if Plaintiffs were to review a million documents, at 10 minutes per document, that would require roughly 100,000 hours.

10. Based on Plaintiffs' e-discovery vendors' reports, running the New Terms on the Proposed Custodians hits on 503,252 documents with family. This breaks down to: Mr. Hoffine, 42,571 documents; Ms. Powell, 259,805 documents; Ms. Elbe, 72,557 documents; Ms. Harter, 97,078 documents, and Mr. Terzian, 31,241 documents. Further, based on Plaintiffs' e-discovery vendors' reports, running the New Terms on the Added Custodians hits on 241,713 documents with family. This breaks down to: Ms. Abrams, 17,606 documents; Ms. Bradley, 32,333 documents; Mr. Horrer, 53,561 documents; Ms. Chiu, 45,275 documents; and Mr. Dreher, 92,938 documents.

11. Based on Plaintiffs' e-discovery vendors' reports, running the Agreed Terms on the Proposed Custodians hits on 4,042 documents with familyAs explained in Plaintiffs' November 5, 2025 email to Google: Mr. Hoffine's documents include 1,057 non-duplicative documents that hit on the search terms; Ms. Powell's documents include 901 non-duplicative documents that hit on the search terms; Ms. Elbe's documents include 502 non-duplicative documents that hit on the search terms; Ms. Harter's documents include 552 non-duplicative documents that hit on the search terms; and Mr. Terzian's documents include 1,012 non-duplicative documents that hit on the search terms. *Id.* Further, based on Plaintiffs' e-discovery vendors' reports, running the Agreed Terms on the Added Custodians hits on approximately 2,712 documents with family. Dkt 290-3 at 12-14. As explained in Plaintiffs' November 5, 2025 email to Google: Ms. Abrams' documents include 35 non-duplicative documents that hit on the search terms; Ms. Bradley's documents

include 299 non-duplicative documents that hit on the search terms; Ms. Chiu's documents include 449 non-duplicative documents that thit on the search terms; and Mr. Dreher's documents include 1,041 non-duplicative documents that hit on the search terms. *Id.* Additionally, Mr. Horrer's documents include 888 non-duplicative documents that hit on the search terms.

12.     In its motion, Google claims entitlement to information regarding Plaintiffs' "use of Google's products, not limited to Shopping, to advertise Plaintiffs' products and associated costs." Mot. at 3. Aside from the relevance arguments in Plaintiffs' opposition, based on my understanding of Plaintiffs' Google's accounts, Google would have information regarding Plaintiffs' activities and spend on non-Shopping Google platforms. However, Google has not produced such information to support its defenses in this case. Google's counsel (Laura Bladow) also stated in a November 7, 2025 email that "Plaintiffs have put their entire digital marketing and advertising spend and strategy at issue in this case with allegations that there is no adequate substitute for Google Shopping ads." Dkt. 290-3 at 12. Plaintiffs explained that this argument relates to the *pirates*. *See id.* at 7. For instance, In the Amended Complaint, Plaintiffs allege: "Without Google, the pirate websites it promotes would not be known to consumers . . . ."; "[w]ith names like 'mybambinis.shop,' 'fairystrawberry.com,' 'dgetkmusicheard.com,' and 'matchlistcity.shop,' this is not surprising." Dkt. 38 ¶ 7.

13.     ***Cengage*** – Google requested that Cengage add "1-2 digital marketing custodian(s)" as Added Custodians. As Cengage has explained in discovery, Cengage's allegations concerning Shopping ads focus on its legitimate distributors' ads for Cengage's books. Google subpoenaed one such distributor, VitalSource, who complained to Google about pirate ads, and received responsive documents. In an effort to reach a compromise, Cengage said it would investigate whether any digital marketing custodian might have relevant Shopping information. If Cengage

6

identifies such a person, we will inform Google's counsel. Google also requested that Cengage add Dalton Hoffine as an Added Custodian. My understanding is that Mr. Hoffine's current position is Senior Manager, Strategy & Operations, and he was also Channel Strategy & Operations Manager during the relevant time period. My understanding is that these roles involve business-to-business strategic operations, liaising between Cengage and channel partners (e.g., distributors), which does not concern marketing through Google ads. Further, my understanding is that Mr. Hoffine's limited role with Google related to Google as a distributor, i.e., the sale of Cengage's books on Google Books, which is a different platform and business structure from Shopping. On October 2, 2025, we received an email from Google's counsel, Rose-Marie Jung, which includes a reference to a produced document (PL0000770171) to substantiate Mr. Hoffine's inclusion as a custodian. However, the document (an email chain) does not relate to Google.

14.    *Elsevier* – Google requested that Elsevier add Alison Powell as an Added Custodian. My understanding is that Ms. Powell is the Chief Marketing Officer and, in her senior-executive-level role, Ms. Powell lacks direct or day-to-day knowledge of the relevant issues, i.e., her role is broader and higher-level. I further understand that existing custodian Rebecca Miller (VP, Marketing and Excellence) is the key representative involved in Elsevier's Shopping ads for books. Elsevier has also agreed to add Salima Bradley and Aly Abrams as Added Custodians, whom I understand work in marketing/business operations. The two documents that Google referenced to support its request to add Ms. Powell were each clawed back due to privilege issues on November 14 and 17, i.e., before Google filed its motion.

15.    *McGraw* – Google requested that McGraw Hill add Nick Terzian as an Added Custodian. My understanding is that, during the relevant time period, Mr. Terzian's position was Senior Growth Marketing Manager for higher education; that he reported to existing custodian

7

Nick McFadden, Senior Director, Growth Marketing; and functioned as McFadden's support. The two documents that Google references to support its request to add Mr. Terzian also include Mr. McFadden. Dkt. 290 ¶ 50 (referencing PL0000545833 and PL0000544954).

16.    *Macmillan Learning* – Google requested that Macmillan Learning add Susan Elbe and Alanya Harter as Added Custodians. My understanding is that Jennifer Bilello, Director, Performance Marketing & Operations, is the chief custodian of Macmillan's Learning's Shopping ads account and that Jenny Chiu, Website Strategy and Operations Manager, serves as a backup to Ms. Bilello for the Shopping account. I further understand that Ms. Elbe is the Chief Connector, Science, Education, and AI, and previously was the Senior Vice President Global Marketing and that her senior executive-level role is much broader than Ms. Bilello's point-person role. I also understand that Ms. Harter was Director, Digital Marketing, is no longer with Macmillan Learning, and that while she was with the company, Ms. Biello and Ms. Chiu reported to her. Based on our review of documents to respond to Google's request, we located one responsive document between Ms. Elbe and Ms. Harter, who are both on the email chain, on which Ms. Chiu is the sender.

I declare under penalty of perjury that the foregoing is true and correct.

Executed November 24, 2025 in Washington, D.C.

/s/ *Michele H. Murphy*
Michele H. Murphy