IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENGAGE LEARNING, INC.et al., <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Civil Action No. 24-cv-04274-JLR-BCM <br><br> [Filed in redacted form.] |

## DECLARATION OF CHRISTOPHER THOMPSON IN SUPPORT OF PLAINTIFFS' REPLY ISO LETTER MOTION FOR DISCOVERY CONFERENCE (DKT. 295) REGARDING SEARCHING GOOGLE'S BUGANIZER SYSTEM

I, Christopher Thompson, declare under penalty of perjury that the foregoing is true and correct.

1. I have been retained by counsel for Plaintiffs in this matter to respond to Google's claims in the Declaration of Richard Blake Bassett (Dkt. 329) concerning the steps necessary to grant access to certain "components" in Google's Buganizer system. I expect that the burden associated with providing such access would be minimal.

**I.      Experience and Qualifications**

2. I graduated from Vanderbilt University with a Bachelor of Engineering in 2010. I majored in computer engineering and minored in engineering management.

3. I have led the creation of multiple data analytics systems and have extensive experience providing source code review and analysis services on matters regarding a range of technologies. I have consulted on the review and analysis of data in connection with numerous litigation matters including matters related to business records and large-scale data productions. I have attached my curriculum vitae as Exhibit A, which includes all of the publications I have

1

authored in the past 10 years and matters for which I consulted regarding review and analysis of source code. Specifically, I have worked on ten cases against Google, in many of which Google produced significant volumes of data as part of the proceedings.

4. I am currently a Partner at 233 Analytics, LLC. 233 Analytics provides technical analysis in support of litigation and acquisition activities to law firms and other entities. This includes analysis of data productions, software components, network traffic, and other technical systems. I have led teams tasked with analyzing large-scale structured and unstructured data productions in support of legal proceedings. In my role at 233 Analytics, I also provide software development, project management, and technology leadership services to clients in a number of industries including development of mobile applications, API integration, backend services, data processing, machine learning, computer vision, bioinformatics, medical research and ERP-type systems both in a hands-on development capacity as well as in a leadership role overseeing the teams responsible for such tasks.

5. Additionally, I am the Chief Technology Officer at NewsBreak, a company that provides digital shopper marketing solutions to the convenience store industry in the form of digital video and multimedia displayed in brick-and-mortar retail locations as well as fuel dispensing terminals. NewsBreak leverages consumer sales data as well as contextual variables to optimize the advertisements displayed in-store and at fueling locations at convenience stores. As Chief Technology Officer, I am responsible for implementing NewsBreak's suite of data analysis and media processing tools as well as analysis of data consumption, content delivery latency and other key performance metrics. I am also responsible for NewsBreak's overall technology strategy and have personally developed the majority of NewsBreak's custom media distribution and orchestration engine. Moreover, I have been responsible in my role at NewsBreak (along with

many other organizations) with utilizing and maintaining issue tracking systems.

6. As described in my curriculum vitae, I have authored or co-authored many publications relating to computer engineering and software development. I have received peer and community recognition for my publications, including "Best Student Paper Award" for a publication on model-driven engineering in software development and "Best Paper" for a publication on software development. My research publications span a number of topics, including the use of mobile devices in data collection, resource optimization, mobile application development, and source code automation and generation tools. Moreover, the software developed as part of my research was used as the basis for augmented reality gaming research at Vanderbilt.

7. I have worked at 233 Analytics since graduating from college and have consulted on over 100 different cases and matters, as listed in Exhibit A. These matters cover a range of technologies from cellular baseband software to sports video technology, but specifically include topics pertaining to internet tracking and targeted advertising, along with game technology and performance optimization tools.

8. After working on several cases against Google involving Google's web search technologies, digital advertising, advertising technology, and user behavior tracking, as listed in Exhibit A, I have experience in handling Google's data and understanding Google's systems and processes for data searching and retrieval.

II. **Providing access to particular components should be straightforward and simple.**

9. In preparing the instant declaration, I reviewed the Declaration of Richard Blake Bassett (Dkt. 329), as well as materials from Google's website describing the structure and searchability of the Google's Buganizer system, Dkt. 295-1, 295-2, and 295-3. I also reviewed publicly available literature, authored by Google engineers, that references Google's Buganizer

system.

10. In his declaration, Mr. Bassett describes at a high level the process for granting a user access to a Buganizer "component" (i.e., the topical sections into which the Buganizer is organized). Dkt. 329 ¶¶ 8–15. Mr. Bassett explains that some of these components are "access-controlled", such that a user who wishes to view content within those components must be granted access to the component by the component's administrator. Dkt. 329 ¶ 11. Mr. Bassett further explains that "[t]o grant access, the component administrator must manually add the user's email address (or an email address associated with a Google Group the user is in) to the Access Control List ('ACL')."

11. I understand from Mr. Bassett's declaration that Google claims that in order to provide certain discovery that Plaintiffs have requested, Google would need to grant this access to approximately 196 of what Google says are ▇▇▇ components (▇▇▇) in the Buganizer system. ¶¶ 11, 14.

12. Based on my experience and understanding of IT systems and data retrieval, granting access to these 196 components would not be time-consuming or technologically challenging. Requests for access to restricted areas of a company's system, particularly in connection with due diligence or litigation, are very common. For a system of Buganizer's scope, in a company of Google's size, I expect that requests for access to multiple components are routine. For example, a new employee might need to request access to all of the components to which a colleague has access. Or an employee asked to work on a particular project might need to request access to all the components relevant to that project. Moreover, employees may move from one team to another or otherwise transition roles. I therefore expect that Google would have established internal processes for granting access to multiple components, and that those processes would not

4

13. I expect that the "administrators" who Google says would need to provide access to the components at issue here would be able to do so with minimal effort. Nothing in Mr. Bassett's declaration gives any indication that granting such access rights would be cumbersome or time-consuming. Furthermore, publicly available literature authored by Google engineers supports my conclusions. For example, to conduct a study on code vulnerability prediction, Google engineer Keun Soo Yim describes the process that identifies *all* Buganizer tickets associated with a particular publicly disclosed cybersecurity vulnerability.[1] Put simply, this, along with Mr. Bassett's analysis (Dkt. 329 ¶¶ 12–20), confirms that it is possible to query the Buganizer database as a whole.

14. Finally, Mr. Bassett focuses on a "bulk-export function capable of converting the full contents of Buganizer issues into PDF renditions of Buganizer pages." Dkt. 329 ¶ 9. Mr. Bassett explicitly *does not* say that there is no bulk-export function that would otherwise export the *data contained within* the Buganizer system in some other format. Indeed, many similar collaborative systems may not natively support the bulk generation of PDF pages, but do support export to formats more conducive to manging data, such as CSV, JSON, XML, etc.[2] [3]

Executed December 1, 2025, in Nolensville, TN

_____
Christopher Thompson

---

[1] https://arxiv.org/pdf/2405.16655, page 8
[2] https://support.zendesk.com/hc/en-us/articles/4408886165402-Exporting-ticket-user-or-organization-data-from-your-account
[3] https://support.atlassian.com/jira-cloud-administration/docs/export-issues/

5