

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
Jkane@oandzlaw.com

December 10, 2025

**VIA ECF**

The Honorable Barbara Moses
United States District Court for the Southern District of New York
500 Pearl Street, Room 740
New York, NY 10007

      Re:    *Cengage Learning, Inc. et al. v. Google LLC*, No. 24:cv-04274-JLR-BCM
              Joint Update Letter Re Sampling Proposals for Google's DMCA Program

[Redacted]

Dear Judge Moses:

      Pursuant to the Court's Order at Dkt. 361, the parties have continued to confer regarding Plaintiffs' Letter Motion for Discovery Conference Regarding Google's Summary Spreadsheets (Dkt. 237). The conferral did not result in a resolution. Accordingly, below the parties set out their respective proposals below.

      **I.**      **Plaintiffs' Proposal**

      Plaintiffs' sampling proposal seeks to test four things: whether Google actually did delist ads it claims to have delisted, whether Google actually terminated pirates it claims to have terminated, whether Google terminated pirates it *should* have terminated according to its DMCA policy, and the extent to which Google improperly processed Shopping notices as Search (or other) notices. Plaintiffs' proposal address all four of these areas. Google's proposal does not ensure that Plaintiffs will be able to test any of them.

      Generally, Plaintiffs propose that Google provide a list of the infringement notices it received, URLs it claims to have delisted, and pirate websites it claims to have suspended as part of its DMCA program for Shopping Ads. From those lists, Plaintiffs will select a random sample of URLs and pirate websites, and will test whether Google actually did delist the URL or terminate the pirate. For each URL/pirate website in the sample, Google will produce the notices it received concerning that website, its response to those notices, and the ads it ran for that pirate website.

      During a meet-and-confer on December 10, 2025, Google indicated that it would pull its sample only from the [REDACTED]. This makes sense only if Google represents that those [REDACTED] represent the full universe of notices Google claims to have processed as Shopping Ads notices during the period December 2020 through September 2024. Google cannot limit its sample to this smaller universe, then later take credit for its treatment of some larger universe of notices. But so far, Google has refused to make this representation. Accordingly, Plaintiffs have provided two versions of their proposal. Proposal A would apply if Google does in fact make this representation; Proposal B would apply if Google does not. In either case, however, the general approach is the same.

### A. Plaintiffs' Proposal A

Of the ▮▮▮ URLs that Google says were named in infringement notices that Google processed as Shopping Ads notices, Google has produced data concerning approximately ▮▮▮ URLs.[1] This data includes the Case ID for the notice, each of the URLs named in the notice, the date of the notice, the action Google claims to have taken in response to the notice, and several dates associated with Google's decision.[2] If Google claims that the total number of relevant URLs is ▮▮▮, Google should produce that same data for the remaining ▮▮▮ URLs.[3] This is No. 1 in the attached proposal (the "Delisting List").

Plaintiffs will select 10% of the domains for which Google claims to have delisted at least one URL. And Plaintiffs will select 10% of the domains that Google claims to have suspended. For each of these domains, Google will produce the records that show whether Google actually delisted the ads it claims to have, or suspended the domains it claims to have: the infringement notices Google received concerning that domain, Google's responses to those infringement notices, and the ads data for all Merchant Center accounts previously or presently associated with those domains. This is Nos. 1(a), 1(b), and 2 in Plaintiffs' proposal.

Finally, through this motion process, a critical fact that Google failed to explain until now has become clear. Apparently, Google improperly processed nearly ▮▮▮ of Plaintiffs' notices ▮▮▮▮▮▮▮▮▮▮▮▮ as Search notices instead of Shopping notices (even though the notices clearly indicated that they were for Shopping ads). This is a case-altering fact. If true, Google will not qualify for the safe-harbor, and Google's mistreatment of a material number of Plaintiffs' notices speaks directly to liability and willfulness. To address this, Google must produce discovery concerning the extent to which it improperly processed Shopping notices as Search notices in its overall DMCA program. Specifically, Google must produce all notices that contain the word "Shopping" that Google nonetheless processed as notices concerning other platforms. Alternatively, Google could stipulate that the error rate for Plaintiffs' notices likewise occurred in Google's DMCA program generally. Likewise, Google must produce discovery into the procedures (including automated procedures) it deployed that resulted in these errors, and communications related to those errors.

### B. Plaintiffs' Proposal B

Plaintiffs' Proposal B takes the same general approach. For a sample period of ten months, Google will produce a list of the ads it claims to have delisted, and the pirates it claims to have suspended. *See* Ex. 1, Proposal B, No. 2. Google then will produce notice, ads, and offer data so that Plaintiffs can test whether Google actually did delist ads and suspend pirates.

---

[1] The notices concerning the 1,500 pirates who infringed the works-in-suit include approximately ▮▮▮ URLs, but Google apparently claims that many of these were not processed as Shopping notices.

[2] This data is contained in, e.g., Google's GOOG-CENG-00380265 and GOOG-CENG-00380266.

[3] To be clear, this should include all the URLs associated with the ▮▮▮ notices reflected in Dkt. 238-1. I.e., if there are notices with a product of ▮▮▮▮▮▮ that have 0 URLs listed, but for which the notice in fact included URLs, Google must produce data concerning these URLs as well.

Plaintiffs' proposal is a straight-forward, common-sense approach to testing the key features of Google's DMCA program.

### C. Google's proposal is unreliable and fails to test the relevant features of Google's DMCA Program

Google's proposal (Ex. 2) improperly prioritizes Google's convenience over testing the salient features of Google's DMCA program.

First, Google's proposal will not test whether Google delisted the ads it claims to have delisted, or terminated pirates it claims to have suspended. Google proposes selecting 300 domains at random, whether or not those domains had any ads delisted, or were suspended. In other words, under Google's proposal, it may be that only ten (or five or three) of the 300 domains are ones Google claims to have suspended, or that only ten (or two or one) of the 300 domains had any ads delisted. This, of course, would not be a useful test of whether Google delisted ads and terminated pirates, as Google's DMCA policy claims it does.

Google's justification for this approach is two-fold: Google says this will be "not unduly burdensome", by which Google means the approach will be easier for Google. But Google is arguing that its DMCA program for Shopping is sufficiently robust that the program should allow Google to escape up to $1.1 billion in damages. Google wants a factfinder to conclude that Google had an established program of removing ads in response to infringement notices, but doesn't want to provide a list (or indeed, even a tally) of the ads it claims to have removed. Likewise, Google wants a factfinder to conclude that Google terminated repeat infringers, but does not want to reveal even how many such repeat infringers it claims to have terminated, much less provide a list of them. Such a paltry proffer of evidence is not commensurate with the breadth of relief from damages that Google seeks.

Google also claims that starting with 300 "random" domains will allow Google to demonstrate its overall response to infringement notices, rather than focusing on domains it claims to have delisted or terminated. But this overstates the evidence available to the parties. If Google claims it did not delist an ad because Google could not find the landing page to which the ad linked, there likely will be no way for Plaintiffs to reach back in time and find out whether that landing page did, in fact, contain infringing content. Websites like those of the pirates often are not visible years after the fact (and indeed may have been changed regularly by the pirates to avoid detection). If, for example, 295 of the 300 domains that Google "randomly" selects are ones that Google claims it didn't delist because it never found the landing page, Plaintiffs likely will have no way to test whether Google is right.

Second, Google wishes to select its "random" sample itself, with no visibility from Plaintiffs. Indeed, Google does not propose to provide even a list of the notices or URLs from which Google will take its sample. This, of course, is improper.

The Court should reject Google's perfunctory and self-serving proposal.

### II. Google's Proposal

Google has already produced extensive discovery into 20,145 merchant center accounts connected, either presently or historically, to 1,239 domains, and is in the process of collecting additional discovery for roughly 1,000 additional merchants connected to 261 supplemental domains. This discovery includes DMCA notice data on over ▮▮▮▮ URLs, and data about the

Shopping ads subject to those DMCA notices. Google continues to believe that this mountain of discovery and other data already produced by Google is more than sufficient to assess Google's implementation of its DMCA program. *See* Dkt. 251 at 4. As Judge Rochon observed a year ago, the question at the heart of this case is whether Google is liable for *specific infringements* Plaintiffs have identified, not whether "Google [is] facilitating infringement writ large throughout their entire platform." Hr'g Tr. (Dec. 18, 2024) at 11:21-22.

At the December 1 hearing, the Court recognized that Plaintiffs' request for the "full scope of discovery" into "everything else that Google has looked at, gotten an infringement notice about, taken down, or declined to take down over the last four years" was overbroad. See Hr'g Tr. (Dec. 1, 2025) at 46:8-13. However, the Court suggested "*some*" additional discovery "into how Google deals with infringement notices with respect to its Shopping platform from soup to nuts" might be reasonable. Hr'g Tr. at 97:10-13. To comply with the Court's subsequent order that the parties "attempt to resolve or narrow their dispute," Google (while reserving its right to contest the Court's ruling on this issue, depending on its ultimate scope) has proposed a stratified random sample of 300 domains across 10 calendar month periods (the "Sampled Domains"). *See* Ex. 2.

To identify the Sample Domains, Plaintiffs would select 10 months from the December 2020 to September 2024 period. Then, Google (via a random number generator) would randomly select thirty "case IDs" (i.e., the numbers Google uses to track DMCA notices) created in each month where the "product" field is "Shopping" and select the first domain appearing in each of those case IDs. The Sample Domains would thus include 30 new domains from 10 months. For the Sample Domains, Google would collect and produce the same account, notice, offer, and ads data it has produced (or is in the process of producing) for the 1,500 collected domains (the "Collected Domains") for the January 1, 2020 to March 31, 2025 time period. This would include data indicating whether the Sample Domain merchant accounts were suspended, and when.

A. <u>Google's Proposal Is Proportional and Efficient</u>

Google's proposal would provide data sufficient to show "infringement notices received, what happened to them, how they were tracked, how many ads were taken down, whether the relevant website where the ad appeared amassed five strikes or didn't amass five strikes, and consequently whether the website was suspended." Hr'g Tr. at 97:16-20. For each domain, Plaintiffs would receive the full suite of merchant account, notice, offer, and ads discovery for the entire January 2020 to March 2025 time period. Providing this data for 300 additional domains would represent a 20% increase in the number of domains subject to discovery in this case. It is therefore a proportional and appropriate sample number regardless of the "denominator" of Shopping notices processed during that same period. Indeed, at the December 1 hearing, the Court expressed skepticism that "we need to get a precise denominator number" for "the plaintiff[s] to get more detailed discovery [on Google's DMCA program]," anyway. *See* Hr'g Tr. at 97:24-98:2.

Google's proposal focuses on identifying a set of Sample Domains first, and then shifts to leveraging pre-existing workflows developed for the purpose of this litigation to pull the same data over the same time period for the Sample Domains as Google has pulled for the Collected Domains (with the exception of financial data). To be clear, collecting, validating, and producing this volume of data remains a challenging, time-consuming, and burdensome task requiring the coordination

and effort of at least four separate points of contact at Google, none of whom are members of Google's litigation or discovery teams.[4] However, there are significant efficiencies in re-purposing the workflows and scripts Google has created to pull data for the Collected Domains. For instance, implementation of Google's approach could begin immediately. And because Google has already engaged in this exercise on multiple prior occasions, there is a lower risk of follow-on disputes that would require more briefing and court intervention.

B. Plaintiffs' Proposal Is Unjustified, Complicated, Overbroad, and Burdensome

Plaintiffs' proposed approach is not a "sampling" proposal. It is a demand to explode discovery based on a so-called "case-altering fact" that is completely manufactured.[5] That the "product" description for notices concerning Shopping ads is not always "Shopping" was apparent in the notice data that Google produced regarding the Collected Domains in March of last year. It is also something Google has described on multiple occasions, including in Court. See, e.g., Dkt. 259 ¶ 11 ("Shopping ads may appear on multiple Google platforms" and "the "product reflected in column B [of GOOG-CENG-00419902] may show a product other than 'google_shopping' but reflect notice data related to a Google Shopping ad"). Google has not "failed to explain" this fact until now. At any rate, that notices regarding Shopping ads might be described as relating to a non-"Shopping" product in Google's tracking data does not mean that any were "improperly processed" or "mistreat[ed]." Plaintiffs present no evidence that the product "description" is indicative of how the notice was actually processed.

Both of Plaintiffs' proposals are non-starters because they refuse to accept this limitation of how Google maintains its notice data. The first method (Method 1) is contingent on Google confirming that the "total number of Shopping Ads copyright infringement notices it received during the period December 2020 through September 2024" is ▇▇▇. See Ex. 1 at 1. As Google has already explained, it cannot do that because while notices are tracked by "product" description, those descriptions do not always match the ad type. See Dkt. 259 ¶ 11.[6] Plaintiffs' second sampling

---

[4] The first point of contact (POC) pulls the merchant account information associated with the domains and then pulls the merchants' offer data. A second POC pulls the notice data associated with the domains. A third POC uses the unique offer IDs in the offer data to pull the "ads" data (i.e., impression and conversion metrics) for paid Shopping ads and a fourth POC pulls the "ads" data for free listings.

[5] Plaintiffs demand that Google produce all "infringement notices that contain the word 'Shopping,' but were processed as notices concerning other platforms" as well as discovery into procedures "that resulted in Shopping notices being processed as Search notices, and communications related to those errors." Id. Those wholly disproportional demands are not made in good-faith because they expand, rather than "narrow," the parties' dispute and, at any rate, the parties did not meet and confer on them. Plaintiffs sent Google a materially revised "Proposal A" at 7:09 pm the evening of this filing.

[6] While Google does not agree that notices described as "Shopping" represent the *full* universe of Shopping-related notices, Google's proposal utilizes this notice category for the practical reasons that (1) this represents at least a partial universe of Shopping-related notices; and (2) there is no automated way to discern which of the over ▇▇▇ other notices in GOOG-CENG-00419902 also relate to Shopping ads.

method (Method 2) makes no sense for largely the same reason: it requires Google to disclose, on a monthly basis over a 4-year period, the *total* number of Shopping DMCA notices Google received and the *total* number of Shopping ads delisted. Ex. 1 at 2-3. But because notices for Shopping ads are not consistently described as relating to the "Shopping" product, Google cannot provide a definitive number of Shopping DMCA notices received or URLs delisted in response to such notices. The remainder of Plaintiffs' proposal is geared off of those numbers, so Google cannot comply with it.

The next problem is that both methods demand that Google collect and produce far more than necessary to provide a "relatively narrow sample set" of information. Hr'g Tr. at 97:14-15. Before sampling even occurs, Plaintiffs want Google to provide the full list of Shopping URLs (regardless of whether they were delisted, in the case of Method 1) and suspended/terminated "pirates" (a misleading term). Ex. 1 at 1-2. Only then will Plaintiffs unilaterally and non-randomly identify "sample" domains for which to pull additional data. For Method 1, Plaintiffs demand a sample of 10% of the "delisted" URL domains and 10% of the "suspended" domains. For Method 2, Plaintiffs demand, for each of the ten Sample Periods, a varying percentage of the domains (5% of the "delisted" URLs domains and 10% of the terminated domains) (plus a flat 50 domains that have five or more delisted URLs). Plaintiffs offer no statistical (or proportional) justification for needing 5% and 10%. The sample size required to achieve a certain level of confidence (e.g., 95%) and margin of error (e.g., 5%) does not increase linearly with the population size. Demanding a fixed percentage (like 5% or 10%) ignores this, resulting in unnecessary burden. Indeed, 5% or 10% of an unknown population could be associated with a number of domains that exceeds the number of Collected Domains—a result that would be wildly disproportionate.

Finally, rather than use a fixed time period, like Google did, both methods impose bespoke time periods for each domain, for each category of discovery. For example, Google would be required to provide all Shopping DMCA **notices** Google received regarding each sampled "Delisting List" domain "**starting six months prior to the *earliest delisting date* associated with that domain**, through March 31, 2025." Ex. 1 at 1-2; *id.* at 3 (same)*.* But it would be required to provide **ads data** for all Merchant Center accounts currently or previously connected to each sampled "Delisting List" domain **starting six months prior to the *Sample Period***, through March 31, 2025. *Id.* at 2-3; *see also id.* at 3 (requiring Google to pull **ads data** for all Merchant Center Accounts connected to the sampled "Terminated" domains for **the full time period** (January 2020 to March 31, 2025)). Rather than running one script for all sample domains, Plaintiffs' proposal requires dozens or *hundreds* of scripts to account for a complex web of time periods.

Google respectfully requests that the Court either deny Plaintiffs' motion at Dkt. 237 in full or adopt Google's proposal and set a deadline of March 16, 2026 for this discovery.

                                                  Respectfully submitted,

                                                   */s/ Jeff Kane*
                                                   Jeff Kane