**Sarah A. Tomkowiak**
Direct Dial: +1.202.637.2335
sarah.tomkowiak@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200 Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

**LATHAM & WATKINS LLP**

December 16, 2025

**VIA ECF**

The Honorable Barbara C. Moses
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, New York 10007

> Re: *Cengage Learning, Inc. et al. v. Google LLC*, No. 1:24-cv-04274-JLR-BCM: Defendant's Response to Plaintiffs' Letter Motion for Discovery Conference (Dkt. 389)

Dear Judge Moses:

Google writes in opposition to Plaintiffs' Letter Motion for Discovery Conference (Dkt. 389) regarding Google's "verification" process for Google Ads and Merchant Center accounts.

Plaintiffs claim they are entitled to information about Google's process for purportedly verifying "the identities" of merchants that create Merchant Center accounts as well as "the information Google collected" from those merchants as part of that process. Mot. at 1. But Plaintiffs' Motion is based on a false premise. Google's Merchant Center verification process does *not* verify the "identity" of merchants that create Merchant Center accounts. Merchant Center "verification" confirms only that the merchant is the owner of the website associated with the Merchant Center account. No documentation (such as government ID or organization registration documents) is provided to Google as part of this relatively automated process, so Google has no material information to produce beyond what it already has produced (includes a log of website verification events for the Merchant Center accounts associated with the Collected Domains).

Google does do some identity verification for *Google Ads* accounts. However, almost none of the responsive Ads accounts (i.e., those tied to the 20,145 Merchant Center accounts associated with the 1,239 Collected Domains) were ever verified. And even as to the small amount that were, for the reasons set forth below, it would be irrelevant and disproportionate to the needs of this case to collect the information provided to Google as part of that process. Plaintiffs' Motion should be denied.

**I.    Google's Merchant "Verification" Process Does Not Verify Merchant Identities**

Plaintiffs claim that they seek additional information concerning the process resulting in verification of ▮▮▮▮▮▮▮ of the 20,145 Merchant Center accounts associated with the Collected

LATHAM&WATKINS LLP

Domains. Mot. at 2. But they support this request by pointing to information concerning *Ads account* verification, not Merchant Center account verification. Indeed, *all* of the documents Plaintiffs cite to explain the basic contours and purpose of "verification" (at least as Plaintiffs contend it) pertain to Ads account verification. Mot. at 1-2 (citing Exs. 1-2, 4-5 & Dkt. 38 ¶ 56 & Fig. 4).[1]

Merchant Center "verification" is a separate process. When a merchant creates a Merchant Center account,[2] he is instructed to verify and claim his store's website. *See* Declaration of Sarah Tomkowiak ("Atty. Decl.") Ex. A (GOOG-CENG-00000406) at 2. This "verification" process is designed to confirm only that the merchant is "the owner of the website," i.e., that he has the ability to "make edits to [the] website content." *Id.* This is the "verification" status that is reflected for ▮▮▮▮▮▮▮▮ of the Collected Domains' Merchant Center accounts in GOOG-CENG-00000703 and GOOG-CENG-00392941. *See* Mot. at 2 & n.1; Atty. Decl. ¶¶ 6–7.

Plaintiffs are thus simply wrong that "for ▮▮▮▮▮▮▮▮ of the Pirates,[3] Google collected their [*identifying*] information and still provided them with a verification badge[.]" Mot. at 3. Plaintiffs speculate that "Google likely collected a wealth of information concerning these [accounts]," Mot. at 3, but they are wrong. Google's Merchant verification process does not verify the identities of merchants behind Merchant Center accounts, i.e., with "organization registration documents" or "government-issued photo ID[s]." Mot. at 3; Atty. Decl. ¶ 9. As explained above, the verification status for Merchant Center accounts reflected in GOOG-CENG-00000703 and GOOG-CENG-00392941 pertains to website claiming. As a threshold matter, no material "documentation" is provided as part of this type of verification. Instead, the process is more akin to authentication; to complete this automated process, for example, the seller can receive a code to an email address associated with the website he is claiming or add specific HTML code to the website's index page. *See* Ex. A at 2. To the extent Plaintiffs demand that Google produce discovery showing the "documentation and answers to questions" that were provided to Google as part of the website claiming verification process, it is not clear what Plaintiffs hope to receive. Mot. at 3. Google does not read Plaintiffs' Motion to seek the codes or HTML that merchants provided to Google in response to these authentication steps. And if the Motion does seek this

---

[1] The "verification badge" and "about this advertiser" features Plaintiffs refer to all relate to Ads accounts. *See* Mot. at 1, 3 & Exs. 1-2. Ads accounts may be connected to, but are separate, from Merchant Center accounts. *See* Atty. Decl. ¶ 4; *see also* Declaration of Christophe Weibel ("Weibel Decl."), Dkt. 59, ¶¶ 7-8.

[2] Merchants offer Shopping ads through their Merchant Center accounts. While a Google Ads account is required to run paid Shopping ads, only a Merchant Center account is necessary for running free listings. Atty. Decl. ¶ 5; Weibel Decl., Dkt. 59, ¶¶ 5-6.

[3] Plaintiffs' insistence on using the imprecise term "Pirates" (which they define as the 1,500 websites for which Google has or will collect associated data, *see* Mot. at 2) further confuses the issue. Verification is tied to *accounts*, not *domains*. Atty. Decl. ¶ 8. It is false that "▮▮▮▮▮▮" of the 1,239 Collected Domains or 261 to-be collected domains were verified despite them being "engaged in suspicious activity." Mot. at 3. Instead, for ▮▮▮▮▮▮▮▮ of the *Merchant Center accounts* associated with the Collected Domains, the merchant verified that they owned the websites they linked to their Merchant Center accounts—a process which doesn't involve analysis of "suspicious activity." *Id.*

information, Plaintiffs fail to offer any explanation for its relevance.

Further, to the extent Plaintiffs demand that Google produce documents about its *process* for verifying that merchants own the websites they wish to link to their Merchant Center accounts, Google has already done so. *See, e.g.*, Ex. A; *see also* GOOG-CENG-00000421; GOOG-CENG-00380419; GOOG-CENG-00000396. Google has *also* produced a document reflecting a log of website verification events for the Merchant Center accounts associated with the Collected Domains. *See* GOOG-CENG-00419911.

## II. Any Additional Information Regarding Ads Account Verification Is Disproportional

While Plaintiffs first requested information regarding Google's verification of specific Merchant Center accounts, see Dkt. 419-3 at 3 (RFP 101), they have shifted the goal posts. After Google explained to Plaintiffs that verification of Merchant Center accounts does not involve verifying the "identity" of the merchant, Plaintiffs now also demand information regarding Google's verification of the amorphous term "Pirates," which they define as the 1,500 domains for which Google has or will collect associated data. *See* Dkt. 387 (Proposed Order). What Plaintiffs are really asking for (without saying it) is information regarding Google's verification of specific *Ads* accounts. But almost *none* of the Ads accounts that are potentially relevant to this case were verified. In August, Google produced a spreadsheet reflecting information regarding 10,028 Ads accounts associated, either presently or historically, with the 20,145 Merchant accounts tied to the Collected Domains (the "Connected Ads Accounts"). *See* GOOG-CENG-00419904. Of these 10,028 Ads accounts, the data reflects that ▮▮▮▮ (**over** ▮%) were not presently verified.[4] Atty. Decl. ¶ 10.

Plaintiffs demand that Google produce the "[d]ocuments Google received as part of the verification process" and "[a]nswers to questions that Google received" from the 1,500 domains Plaintiffs identified as "having infringed their works." Dkt 387 at 1. To reiterate, Google does not receive documents and answers to questions from *domains*; it receives this information from Ads accounts, which are connected to, but not synonymous with the roughly 20,000 Merchant Center accounts relevant to this case. *See* Atty Decl. ¶ 4. Even setting that issue aside, it is not clear what relevance *the personally identifying and sensitive underlying documents* these advertisers submit have to Plaintiffs' claims or Google's defenses in this case.

Through the advertiser verification process, Google assesses "basic information" about an Ads account's "business and identity." GOOG-CENG-00380363 at -0364 (cited as Ex. 4 to the Declaration of Michele Murphy ("Murphy Decl."), Dkt. 419-4); *see also* GOOG-CENG-00405878 at -6161 (explaining, in an internal slide deck, that advertiser verification means "reviewing advertiser identity and business credentials"). Advertisers may complete verification by providing documents like IRS letters, credit reports, passports, state identification or driver licenses, and

---

[4] Even considering past verification (i.e., where the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), approximately ▮% of the Ads accounts do not appear to have ever been verified. Atty. Decl. ¶ 10.

permanent resident cards.[5]  Per Google's data protection policy, personal data and documents shared during the verification process "**will not be shared with any third party**."[6]  Courts must "weigh the privacy concerns of individual non-parties against the needs of the discovery party." *Abramson v. Flaherty*, 2008 WL 1767070, at *1 (E.D.N.Y. Apr. 15, 2008); *see also* Fed. R. Civ. P. 26 advisory committee's note to 1970 amendment ("[C]ourts have recognized that interests in privacy may call for a measure of extra protection.").  Here, Plaintiffs' minimal need for this sensitive information *on top* of the data Google has already provided about the Connected Ads accounts cannot overcome the privacy concerns associated with such disclosure.

The verification process is not designed to assess whether an advertiser is a "pirate" or intends to advertise copyrighted content, and Plaintiffs do not seriously contend that it is.  Plaintiffs half-heartedly claim that these documents are "important evidence of liability and damages." Mot. at 3.  But they fail to explain how.  They assert vaguely that a cursory review of "the evidence" (what evidence?) "shows that all of the Pirates are engaged in suspicious activity." *Id.*  For one thing, that ipse dixit doesn't explain how this personal information is important proof of liability.  And for another, it is unclear how documentation (such as a driver license) submitted to "verify" a Connected Ads Account would itself be evidence of infringing activity much less Google's knowledge thereof. Plaintiffs also claim that the documents the Connected Ads Accounts submitted for verification "bear upon" Google's DMCA defense.  *Id*.  There is no conceivable relevance of this information to Google's DMCA defense, which requires that Google (1) expeditiously remove the infringing material complained of by Plaintiffs and (2) reasonably implement a repeat infringer policy.  *See* 17 U.S.C. s 512(d), (i).

Plaintiffs also argue that they need the documents and information that Ads accounts submitted to "prove or disprove" Google's supposed speculation that "some of the accounts at issue in this case may have been operated by marketing agencies" and that "Google could have been reluctant to terminate all of the agency's accounts in response to accusations that some of the products the agency advertised were infringing."  Mot. at 4 (citing Hr'g Tr. (Dec. 18, 2024), Dkt. 66, at 26:20–22).  But Google did not make either of those representations.  While Google's counsel noted generally at the December 18, 2024 hearing that "*for instance*, one Ads account can be run by an ad or a marketing agency that has multiple clients that are not related to each other and managing those accounts separately" to explain the many-to-many relationship between Merchant Center accounts and Ads accounts, she did not speculate that marketing agencies might run the pirate accounts at issue here.  Hr'g Tr. at 26: 20–22 (emphasis added).  And neither Google nor its counsel has said <u>*anything*</u> about a purported reluctance to terminate an agency's accounts in response to infringement accusations.  There is thus nothing to "prove or disprove."

Balancing the irrelevance of the requested information against the privacy concerns associated with providing sensitive third-party identifying documents, the discovery sought in

---

[5] Document Requirements for Advertiser Verification, Google, https://support.google.com/adspolicy/answer/9872280?hl=en&co=GENIE.CountryCode%3DUS (last visited Dec. 16, 2025).

[6] *Id.*

**LATHAM&WATKINS**LLP

Plaintiffs' RFPs 101 and 102 is highly disproportional.  Plaintiffs' Motion should be denied.

        Respectfully submitted,

        */s/ Sarah A. Tomkowiak*
        Sarah A. Tomkowiak (*pro hac vice*)
        of LATHAM & WATKINS LLP

cc:    All Counsel of Record (via ECF and e-mail)