**O+Z Oppenheim + Zebrak, LLP**
WASHINGTON – NEW YORK

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
jkane@oandzlaw.com

December 19, 2025

**VIA ECF**

The Honorable Barbara Moses
U.S. District Court for the Southern District of New York
500 Pearl Street, Room 740
New York, NY 10007

      Re:    *Cengage Learning, Inc. et al. v. Google LLC*, No. 24:cv-04274-JLR-BCM
              Plaintiffs' Reply in Support of Plaintiffs' Letter Motion for Discovery Conference Regarding Google's Claim to Have "Verified" Pirates

[Redacted]

Dear Judge Moses,

      Plaintiffs write in support of their Motion for Discovery Conference Regarding Google's Claim to Have "Verified" Pirates, Dkt. 389, and in response to Google's opposition letter, Dkt. 444.

      Google claims to have "verified" ▇ of the 1,239 pirates Plaintiffs identified to Google in December 2024 as having infringed the works-in-suit.[1] Yet Google asks the Court to shield Google from producing documents showing how Google did so. Google has produced few documents concerning what sorts of information and documentation advertisers generally provide in order to become "verified", *no* discovery concerning what Google does to actually verify these documents and information, and *no* discovery on what documentation or information Google received from the pirates who infringed Plaintiffs' works-in-suit.

      Google's opposition feebly tries to argue that this discovery is irrelevant merely because the pirates submitted their verification records through their "Ads" account rather than their "Merchant Center" account. This distinction is of no consequence. A pirate need *both* a Merchant Center account and an Ads account in order to run paid Shopping ads; that verification records are submitted through one account rather than the other does not render this discovery any less relevant. The discovery is quite relevant. It bears on Google's knowledge, state of mind, and need for deterrence, and could refute arguments that Google has made in its own defense.

      Finally, Google's claim that this discovery could implicate privacy concerns is overblown. Much of this information raises no privacy concerns, and the parties can deal with any information that does raise such concerns.

---

      [1] Google has not yet produced data on whether it verified any of the additional 261 pirates about which the Court ordered Google to produce data, Dkt. 359 ¶ 4.

Hon. Barbara Moses
December 19, 2025
Page 2 of 4

### I. Google's distinction between Ads accounts and Merchant Center accounts is of no consequence.

Google spends much of its opposition trying to confuse the Court by offering a flimsy distinction between the verification process for *Ads* accounts (the subject of Plaintiffs' letter), and the separate verification process for *Merchant Center* accounts (which is *not* the subject of Plaintiffs' motion). Dkt. 444 at 1–2. Google tries to suggest that the verification process Google undertakes for Ads accounts somehow is irrelevant to this case. But as Google itself concedes, in order to run paid Shopping ads, a merchant *must* have *both* an Ads account and a Merchant Center account, and the two accounts must be linked together. Dkt 389 at 4 (Plaintiffs' opening letter); Dkt. 447 ¶ 5 (Google declaration). Thus, *all* of the paid ads at issue in this case were run using *both* the particular Pirate's Ads accounts and its Merchant Center accounts. This is why Judge Rochon ordered Google to disclose the Ads accounts associated with the pirates at issue. Dkt. 72 ¶ 4.

The information and documentation that Google collected during the "verification" process for Ads accounts is information Google used to verify the very pirates that Plaintiffs have identified as infringing the works-in-suit in this case ("Pirates"). Google wants the Court to hold that this information should be shielded from discovery simply because the Pirates submitted the information through the Ads account section of Google's interface, rather than through the Merchant Center account section. There is no reason to draw such a distinction. Information Google collected from the very Pirates who infringed the works-in-suit is a proper subject of discovery, regardless of the type of account to which that information was uploaded.

Google next tries to understate the number of Pirates whom Google claims to have "verified." In their opening letter, Plaintiffs reported that ▮▮▮▮▮▮▮▮▮▮ 1,239 Pirates are listed as "verified" in certain Google documents. Dkt. 389 at 1–2. Google now claims that the list of *Ads* accounts that are verified appears in a different document, and that approximately ▮ of those Ads accounts were verified. Dkt. 444 at 3. What Google leaves out is that one Ads account can be connected to multiple Merchant Center accounts. Here, the Ads accounts that were verified by Google represent ▮ of the 1,239 Pirates that infringed Plaintiffs' works, i.e., ▮ of the Pirates about whom Google has produced data.[2] And, indeed, the actual number of "verified" Pirates likely is quite higher, because it is almost certain that many of the 1,239 Pirates were operated by the same entities.

### II. Google must produce documents concerning the process it uses to "verify" advertisers.

Google offers no reason that it cannot provide documents explaining what its verification process entails, e.g., what kinds of documentation and information merchants provide in order to become "verified", and what Google does with that information once Google receives it. Dkt. 389 at § II (discussing Plaintiffs' RFP 102).

Google's public website says that during the verification process, advertisers have to "answer a few questions about the type of organization and who pays for the ads." Dkt. 389 at 2 and n.3. But Google has not disclosed what these question are. Further, Google's productions have

---

[2] Plaintiffs provided the details of this calculation to Google upon serving the instant Reply.

not explained what Google does with the information and documentation that the advertisers provide in order to "verify" it.

### III. Google must produce the information it received from the Pirates, and any records about how it "verified" the Pirates.

Contrary to Google's suggestion, the information and documents Google obtained from the ▇ Pirates that it listed as "verified" are highly relevant to this case.

First, Google's website indicates that the verification process includes requiring the advertiser to answer questions about its "business model," "operational practices," "key relationships with third parties," and "details on products and services." Dkt. 389 at 3. Since a seller of pirated ebooks, by definition, operates under an illegal "business model," lacks legitimate "operational practices," and lacks any "relationship" with the publishers whose "products" she sells, the answers to these questions are highly likely to indicate the seller is engaged in piracy. Often just visiting the website of a pirate (as one attempting to verify the pirate presumably would) makes clear that the website is engaged in piracy. What information and documents Google relied on to label the advertiser "verified" is key to Google's knowledge and state of mind.

Second, Google's website says that Google sometimes requires advertisers to complete the verification process when it observes "suspicious" behavior by the advertiser. Dkt. 389 at 2, citing Dkt. 419-5. If Google deemed any of the Pirates at issue "suspicious," and required them to complete the verification process, what Google learned, and what it did with the information the pirates provided is highly relevant to Google's knowledge, state of mind, and culpability.

Third, this information is relevant to Google's DMCA defense. *Contra* Dkt. 444 at 4. The DMCA requires that Google terminate "subscribers and account holders . . . who are repeat infringers . . . ." 17 U.S.C. § 512(i). Yet Google claims that when it suspends Account X, it has no obligation whatever also to suspend Account Y, even if Account Y is operated by the same "account holder" who operates Account X. Dkt. 393 at 23:11–25:12 (Hr'g Tr. Dec. 1, 2025); Dkt. 57 at 18:2–19:2 (Hr'g Tr. Dec. 4, 2024). Discovery about the information Google collected when it verified these ▇ Pirates likely will shed light on what Google knew about whether and to what extent the pirate websites were related to one another. If, for example, Google "verified" both Account X and Account Y using the same certificate of incorporation for the same entity, that is powerful evidence that Google was aware that the two accounts were in fact the same "subscriber[] or account holder[] . . . ." 17 U.S.C. § 512(i)(1)(A).

Fourth, and relatedly, Google has taken the position that when one account is terminated, terminating linked accounts may not be appropriate where the account is held by a marketing agency that might manage accounts for multiple entities. Dkt. 66 at 17–22 ("[T]he fact that these accounts are linked does not even mean that it is the same actor using those accounts. So, for instance, one Ads account can be run by an ad or a marketing agency that has multiple clients that are not related to each other and managing those accounts separately."). Since the "verification" process requires the advertiser to state whether it is a marketing agency, this discovery will show whether Google's speculation is correct as to any of the Ads accounts at issue here.

Notably, Google does not even attempt to argue that producing this information would be burdensome. Dkt. 444. Thus, its contention that this discovery is "disproportionate" must rest

Hon. Barbara Moses
December 19, 2025
Page 4 of 4

solely on Google's argument that the discovery is irrelevant. For the reasons explained above, this discovery is highly relevant.

### IV. Google's concerns about "privacy" are exaggerated.

Google claims that producing the documentation or information that these Pirates provided to Google would raise "privacy" concerns. Dkt. 444 at 3–4. This concern is overblown.

First, the Protective Order governs the confidentiality of information produced in discovery, recognizes that some such information may raise privacy concerns, and includes provisions to address such concerns. *See* Dkt. 82 ¶ 35 (persons in possession of Confidential Discovery Material will maintain appropriate administrative, technical, and organizational safeguards . . . that protect the security and privacy" of such material").

Second, much of the information and documentation that Google claims to collect raises no "privacy" concerns at all: "organization registration documents . . . like . . . Certificate[s] of Business Incorporation, SEC Filings . . . .", and answers to questions about the advertiser's "business model," "operational practices," "key relationships with third parties," and "details on products and services." Dkt. 389 at 3. Indeed, many of these documents would be public information already, such as corporate filings available online, contact information available on websites.

Third, documents could be redacted if they do not have relevant information, and, if needed, the parties can agree on another workaround.

Finally, and notably, Google does not actually represent that any of the verification documents these Pirates provided *are* ones that raise privacy concerns; Google simply speculates that some of them *might*.

### V. Conclusion

Google must produce documents concerning its process for verifying advertisers, and must produce the documents and information it collected from the Pirates who infringed Plaintiffs' works. A proposed order appears at Dkt. 420.

Respectfully submitted,

*/s/ Jeff Kane*
Jeff Kane