# EXHIBIT A
# [Redacted Version of Document Filed Under Seal]

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CENGAGE LEARNING, INC., et
    al.,
4
                  Plaintiffs,           New York, N.Y.
5
             v.                         24 Civ. 4274 (JLR)(BCM)
6
    GOOGLE LLC,
7
                  Defendant.
8
    ------------------------------x
9
                                        December 1, 2025
10
    Before:
11
                       HON. BARBARA C. MOSES,
12
                                        U.S. Magistrate Judge
13

14                            APPEARANCES

15
16  OPPENHEIM & ZEBRAK, LLP
         Attorneys for Plaintiffs
17  BY:  JEFF KANE
         YUNYI CHEN
18       URIEL LEE

19
    LATHAM & WATKINS, LLP
20       Attorneys for Defendant
    BY:  SARAH A. TOMKOWIAK
21       SARA E. SAMPOLI

22

23

24

25
```

```
 1              THE DEPUTY CLERK:  The Court now calls Cengage
 2   Learning, Inc., et al. v. Google LLC, Case No. 24 Civ. 4274.
 3              Counsel, please make your appearances for the record.
 4              MR. KANE:  Good afternoon, your Honor.  Jeff Kane for
 5   the plaintiffs.  Joining me are my colleagues Yunyi Chen,
 6   Y-U-N-Y-I C-H-E-N and Uriel Lee, U-R-I-E-L L-E-E.
 7              I will argue the motions on the 261 pirates and on the
 8   Google summary spreadsheets.  Ms. Chen will argue the motions
 9   on the redactions to the prior hearing transcripts.
10              THE COURT:  Good morning, Mr. Kane, Ms. Chen, and
11   Ms. Lee.
12              MS. TOMKOWIAK:  Good afternoon, your Honor.  Sarah
13   Tomkowiak, of Latham & Watkins.  I am here with my colleague
14   Sara Sampoli, also of Latham & Watkins, and we are here on
15   behalf of Google.
16              Ms. Sampoli will be addressing plaintiffs' motion at
17   Docket 226.  I will be addressing plaintiffs' motion at Docket
18   237.  And I believe Ms. Sampoli will also be addressing the
19   motions to seal the hearing transcripts.
20              And with your Honor's permission, we have a lot of
21   papers and computers and things that we are looking at; and
22   so, as long as you can hear us, we would appreciate the option
23   of arguing from counsel's table instead of the podium, if
24   that's okay with you.
25              THE COURT:  As long as I can hear you, that's okay
```

1    with me.

2           Let me give you the order of business for this

3    morning.  First a couple of public service announcements, then

4    I thought we would take the sealing motions—which are really

5    redaction motions—with respect to the two transcripts, then

6    the motion filed on October 24, which is at Docket 226, and

7    then we will probably need a break at that point, and then we

8    will come back and take the motion filed on November 3 at

9    Docket 237.

10          So my first public service announcement has to do

11   with docket numbers.  I don't know if you have been keeping

12   track, but since we were last together in this room, there

13   have been approximately 114 new filings in this case—a total

14   of five substantive discovery motion, six motions to seal, two

15   motions to redact the transcripts, and many associated

16   opposition and reply letters.  That is a lot of paper for us

17   to keep track of.

18          So I have two requests for motion practice in this

19   case as we go forward:

20          First, when you file an opposition or a reply brief

21   or letter brief, as the case may be, would you please state in

22   the first paragraph on the first page the docket number of the

23   motion to which you are responding, whether you are opposing

24   it or whether you are submitting a reply in further support of

25   it.  That is how we track motions, by the docket number of the

1    moving paper, whatever the moving paper was, whether it was a

2    notice of motion or whether it was a letter.  That way we can

3    see what goes with what, which is difficult when there are so

4    many pieces of paper flying around.

5          Second, as you know, I request, and you have been

6    attempting, I think, to supply courtesy copies of your motion

7    papers in paper because I am over the age of 45 and

8    consequently read things on paper.  But we are having a little

9    bit of a hard time juggling those mountains of paper, as well.

10   So new rule in this case.  I am going to charge the moving

11   party on whatever the motion or letter motion is, I am going

12   to charge the moving party with submitting a bundled set of

13   courtesy copies on paper when the motion cycle is completed.

14   So after the moving papers have come in, after the opposition

15   papers have come in, all electronically, and after any reply

16   papers have come in, with the reply papers or shortly

17   thereafter, the moving party must submit to the Court a

18   complete set of courtesy copies on paper, including exhibits,

19   unless, of course, the exhibits are so ridiculously bulky that

20   they can only be handled electronically.

21         When appropriate, a tabbed binder would be very nice

22   so that my staff doesn't have to spend its time making these

23   tabbed binders.  If the complete set of motion papers is

24   relatively slim, you can just put them together with some sort

25   of clip.  But the idea is to save us from having to copy

```
1    things, three-hole punch things, tab things, etc., etc., etc.,

2    and also to keep us from spending time trying to figure out

3    what goes with what.  All right?

4            So tell us what docket number you are responding to

5    or supporting and the moving party is now in charge of

6    submitting a bundled set of courtesy copies at the time or

7    shortly after the reply papers are filed electronically.

8            Any questions about that?  Okay.

9            Now, with respect to the transcripts, I understand

10   that the defendant's motion to redact the October 14

11   transcript is unopposed.  Correct?  That is the motion at

12   Docket 223.

13           MR. KANE:  That is right, Judge.

14           THE COURT:  All right.  So that will be granted.  And

15   I think, administratively, what that means is that the

16   complete and unredacted transcript, as currently sitting on

17   the docket under seal, courtesy of the court reporter, will

18   remain under seal.  I will charge the moving party—that would

19   be, I guess, the defendant in this case—with placing on the

20   docket -- well, I guess it is already on the docket as an

21   exhibit, correct, to your motion to redact.  The question is,

22   does it need to go on the docket in some more conspicuous

23   place, where a member of the public or a member of the press

24   might actually be able to find it?

25           Do you have any helpful thoughts in this regard?
```

1          MS. SAMPOLI:  Your Honor, it's your preference.  We

2     are happy to refile it as a separate document if you believe

3     that would be helpful.

4          THE COURT:  We will consult with the Clerk's Office

5     this afternoon and we will see how they want to do it.  But

6     keep an eye on the docket for that because we may ask you to

7     refile it in redacted form.

8          Now, with respect to the defendant's motion to redact

9     the October 8 transcript, which is partially opposed, let me

10    just take a few minutes to go through what I understand the

11    remaining issues are.  Give me a second.

12          (Pause)

13          THE COURT:  All right.  I am keying our conversation

14    now off of the plaintiffs' opposition letter at Docket 248, so

15    that you can follow along at home.

16          The first objection to the redaction request that the

17    plaintiffs raised was whether Google's internal name for its

18    issue tracker system should remain public or should be

19    redacted every time it appears, and I understand that Google

20    has now withdrawn its request for redaction.

21          Correct?

22          MS. TOMKOWIAK:  That is correct, your Honor.

23          THE COURT:  So let the world know that the system is

24    called the Buganizer, and you—"you" meaning defendants—will

25    re-redact the transcript to remove those redactions.

KJC REPORTING & TRANSCRIPTION (848) 459-3124

 1          The second category of disputed redactions is a

 2    series of relatively short words and phrases that Google has

 3    sought to redact having to do with the specific search

 4    limitations of the Buganizer.  I am going to go with Google on

 5    this.  I do think that harm could come to Google, and possibly

 6    to others, as well, if that rather granular information about

 7    what you can and can't search for and how hard it is or

 8    difficult or easy it is to search for things within the

 9    Buganizer/Issue Tracker system were publicly available, so I

10    will go with Google on those designated page and line numbers.

11          The third category are one, two, three, four

12    instances where Google has proposed to redact what seemed to

13    me to be ordinary English phrases, some of them used by me, to

14    designate certain account holders or others.  I am not

15    understanding why those terms need to be redacted.  If it was

16    an error for this Court to characterize certain accounts or

17    merchants in certain ways, that is the Court's error and it

18    certainly doesn't reveal any technical or highly sensitive

19    information that could do harm to Google, in my view.  So I

20    will go with the plaintiffs on those four instances which are

21    all relatively brief.

22          And, finally, that brings us to category four, which

23    the plaintiffs characterize as Google's overly ambitious

24    request to redact certain high-level descriptions of

25    information or procedures that, at a high level, cannot do it

1    any harm.  Let me give you my tentative on the five examples

2    listed in the plaintiffs' letter and if either side really

3    wants to argue about any of those five examples, I will hear

4    from you briefly.

5              Example A, I think the redaction is appropriate.

6              Example B, I think the redaction is appropriate.  So

7    I would go with Google on this.

8              Example C -- I take it back.  I misunderstood my

9    handwriting, and I read it as the opposite of what I intended

10   to say.

11             I think that Example A can be unredacted, Example B

12   can be unredacted, but Examples C, D, and E, I think, should

13   stay redacted as they reveal information which, in the hands

14   of a mischief-making party, could make mischief.

15             So anybody want to fight with me on any of those five

16   examples?  Plaintiff?

17             (Pause)

18             THE COURT:  Plaintiff is thinking.

19             MS. CHEN:  No, your Honor.

20             THE COURT:  Plaintiffs do not wish to fight with me.

21             Google, do you wish to fight with me?  Excuse me.  Do

22   you wish to offer pushback?

23             MS. TOMKOWIAK:  We are happy to accept your Honor's

24   recommendation.

25             THE COURT:  Excellent.  All right.  Let's move on.


KJC REPORTING & TRANSCRIPTION (848) 459-3124

1          So that will be the Court's order with respect to the

2     two redaction motions having to do with the transcripts.

3     Again, we will consult with the Clerk's Office and figure out

4     technically what we want the defendants to do here.  At a

5     minimum, you are going to have to re-redact the October 14

6     transcript.  So you are going to have to put it on the docket

7     somehow.  And we will write you an order and tell you how you

8     are supposed to do that.

9          MS. TOMKOWIAK:  Your Honor, just to -- I believe you

10    meant October 8 there.  I just want to make it clear for the

11    record.

12         THE COURT:  You are going to have to re-redact the

13    October 8 transcript.  The October 14 transcript was the one

14    that was unopposed.

15         Okay.  Let's get to something a little more

16    substantive.

17         This is plaintiffs' October 24 motion.  Let me pull

18    out the right binder here.  There it is.

19         So if I understand the lay of the land here,

20    plaintiffs amended their complaint, in effect, by identifying

21    additional works in suit on July 14 of this year with the

22    permission of the district judge; and, as a result of

23    identifying new works in suit -- and I am skipping over some

24    intermediate steps here, plaintiffs were able to identify 261

25    new "pirate sites" where one or more of the works in suit were

 1    advertised by Google, correct?

 2             MR. KANE:  That is correct, your Honor.

 3             THE COURT:  And now you wish -- you want two things.

 4    First, you want me to order all of the same discovery with

 5    respect to those 261 sites that I -- either Google agreed to

 6    or I previously ordered with respect to the 1,239 sites that

 7    we spent a lot of time discussing back in October, that's one

 8    thing that you want.

 9             And the second thing that you want is revenue

10    information, revenue-only information with respect to a much

11    larger group of what you characterize as pirate sites, 15,000

12    and some -- no, 27,000 and some, where you have not identified

13    one of plaintiffs' works in suit being advertised, but you

14    want the information anyway because it is relevant to, among

15    other things, what remedy would sufficiently deter Google from

16    the misconduct you accuse it of.

17             All right.  My preliminary take on this, but I will

18    listen with an open mind to both sides, is that you get

19    Category A but you don't get Category B.

20             My concern with respect to Category A, what

21    differentiates it from the 1,239 sites that I previously gave

22    you this information on, I understand that Google has raised a

23    number of points in an attempt to distinguish the new sites

24    from the old sites.  The one that gives me pause and the one

25    that I would like you to address yourself to is the fact that,

1    if I understand it, plaintiffs did not send takedown notices

2    to Google with respect to the new sites and plaintiff did send

3    takedown notices to Google with respect to the old sites.  So I

4    will need you to help me work through that.

5          With respect to the 27,000 new sites, I see that as

6    grossly disproportional to the needs of the case, particularly

7    since, if and when you are standing up in front of the jury

8    making a deterrence argument, you can always say, Look at the

9    revenue that Google earned from the 1200 or 1400 sites, where

10   we had works in suit.  You can do the math.  I don't think you

11   need to have Google dig up revenue information for you site by

12   site by site by site by site just in order to make that

13   portion of your jury argument a little more granular.

14         So that is my tentative.  Now, you tell me what I've

15   got wrong.

16         MR. KANE:  Yes.  So I will take what you have called

17   Category A first, if that's all right.

18         The 261 pirate sites, we are not asking for all of the

19   same information that we got for the 1,239.  We have

20   (indiscernible) a bit.  We have asked for notices, responses,

21   ads data, and revenue data.  The ads data includes two

22   types—ads data and the offer data just because that is how --

23         THE COURT:  Let me look at your proposed discovery

24   order here.  I see that, in paragraph 1, you are asking for

25   all infringement notices Google received with respect to those,

```
 1    and, by definition, that would be infringement notices from
 2    other people, right, not --
 3              MR. KANE:  That is correct.
 4              THE COURT:  Okay.
 5              Category two, you want the account numbers of all of
 6    the merchant center accounts presently or previously
 7    associated with them.  That is -- you got that with respect to
 8    the 1200 sites, right?
 9              MR. KANE:  Correct.
10              THE COURT:  And number three, for the period
11    January 1, 2021 to March 31, 2025, which tallies with my
12    ruling in October, you want all of the Shopping ads that
13    Google ran concerning the 261 websites.  Right?
14              MR. KANE:  Correct.
15              THE COURT:  And you have that already for the 1200
16    websites.
17              MR. KANE:  That is correct.
18              THE COURT:  All right.  Thank you for that
19    clarification.
20              MR. KANE:  Sure.
21              What we are not asking for, just to be clear, is for
22    example all of the communications concerning those 261 domains
23    that, you might recall, one of the search terms is a list of
24    all the 1,239 domains.  We have not asked Google to go back
25    and do a search for those 261.  And, likewise, one of the
```

1    search terms is all of the Google account numbers for the

2    1,239 domains.  We have not asked Google to go back and add

3    these additional ones as search terms.  But I just want to be

4    clear that it is -- we have asked for a slightly narrowed

5    version of what we received the first time.

6            As to what these 261 sites are, and your Honor's

7    question about plaintiffs not sending notices about those

8    particular websites, it is important to distinguish between

9    pirates and pirate websites.  So one pirate can operate a

10   hundred pirate websites or a thousand pirate --

11           THE COURT:  Sure, but isn't it also possible -- it

12   may not realistically be the case, but isn't it also possible

13   for one party, who you call a pirate, to operate both legit

14   and non-legit sites?  In other words, it is not a foregone

15   conclusion that every site operated by XYZ is a pirate site.

16           MR. KANE:  I agree that is possible.  I can tell you I

17   have never seen it.  These are pure pirate sites.  I think if

18   there were a legitimate site in the mix, Google would be

19   shouting that from the rooftops.

20           The thing I would point out is these 261 sites are

21   remarkably similar to the 1,239 sites.  They all come from the

22   same Google accounts as the 1,239 and some of them come from

23   multiple accounts.  For example, one of the 261 is in the same

24   accounts as 11 other -- as 11 of 1,239.  Another is --

25           THE COURT:  What do you mean when you say "come from

KJC REPORTING & TRANSCRIPTION (848) 459-3124

1    the same accounts"?

2         MR. KANE:  Yeah, so --

3         THE COURT:  Explain that to me.  Possibly, explain

4    that to me again if you --

5         MR. KANE:  So, one Google account can only be

6    associated with one website at a time, but you can change the

7    website with which it is associated.  So Account No. 102 can

8    be associated with testbank23.com on Monday and then be

9    associated with testbank24.com on Tuesday.  And so all of these

10   261 --

11        THE COURT:  And then on Tuesday what happens to the

12   Monday website?  Does some other account have to be associated

13   with it or does it just disappear?

14        MR. KANE:  No.  It's not that the website itself

15   disappears; it's just that that Google account is no longer

16   running ads for the Monday site.  It is now running ads for

17   the Tuesday site.  And so for all of these 261 sites, they at

18   one time or another were associated with -- were part of the

19   same Google account as one of the 1,239.  And for some of them

20   it is --

21        THE COURT:  At least one of the 1,239.

22        MR. KANE:  Exactly.  For some it's a lot more than

23   one.  So one of the 261 sites is associated with the same

24   account as 11 of the 1,239 sites.  Another one is associated

25   with the same account as 26 of the 1,239 websites.

1            And so what Google is trying to argue is that if

2    plaintiffs send an infringement notice concerning the first 26

3    websites that a particular pirate operates, but they don't

4    send an infringement notice concerning the 27th site --

5            THE COURT:  It's presumably because didn't you see it,

6    right?  The plaintiff didn't notice it.

7            MR. KANE:  That's exactly right.  And the reason for

8    that is two things.  Number one, there is just zillions of

9    them.  There are millions of a in this case alone, so we can't

10   see them all.

11           But, perhaps more concretely, Google targets ads to

12   the Google user who is conducting the search.  So you and I

13   could input a search for the same textbook, and you might see

14   a different ad than I would based on Google's algorithm.  So

15   we can't see every ad that Google runs.  We need the discovery

16   from Google to see what ads do they run for our works in suit.

17           THE COURT:  I take it that you run monitoring -- your

18   clients run monitoring programs in an attempt to see all of

19   these ads.

20           MR. KANE:  That is correct.

21           THE COURT:  You probably have some bank of underpaid,

22   undergraduates somewhere just constantly searching for

23   textbooks to see what pops up.  I don't know.  Maybe you do

24   it --

25           MR. KANE:  It's automated.

```
1              THE COURT:  -- electronically.

2              That's good for the underpaid undergraduates, I guess.

3    Well, Maybe not.

4              But you say it is not a foolproof system.

5              MR. KANE:  Correct.  Nobody could get all of them

6    because, again, Google targets the ads to individual users.

7    So when plaintiffs' vendor searches for these textbooks, it's

8    not going to see every ad that every other Google user on

9    earth would see.

10             THE COURT:  All right.

11             MR. KANE:  Google's claim that we have to send a

12   notice about the 27th website -- so we sent a notice about the

13   pirate, we have sent a notice about 26 of his website, we

14   haven't sent a notice about the 27th one.  That one really has

15   no basis --

16             THE COURT:  Under the DMCA, the notice has to identify

17   the website, isn't that right?

18             MR. KANE:  In order for Google to have an obligation

19   to take down the site under the DMCA, like to qualify for the

20   DMCA safe harbor --

21             THE COURT:  Right.

22             MR. KANE:  -- they have to have received a notice and

23   then had a program where they terminate subscribers and

24   account holders is the term that the DMCA uses who are repeat

25   infringers.  So the DMCA does not say the only thing you have
```

1    to take down is ads that have a -- for websites that are

2    specifically identified to --

3            THE COURT:  No, but the notice itself, this is

4    512(d) --

5            MR. KANE:  Correct.

6            THE COURT:  -- which the district judge has

7    identified as the relevant DMCA safe harbor upon which

8    Google's affirmative defense relies.  Doesn't it have specific

9    rules in it for what the takedown notice has to say?

10           MR. KANE:  Yes.  So there sort of --

11           THE COURT:  It has to identify the website, right?

12           MR. KANE:  Correct.  So there are sort of two parts to

13   this.

14           Under 512(d) is what you have to do when you receive a

15   literal infringement notice that says this particular content

16   is infringing.  Please take it down.  For that notice, you do

17   have to identify the infringing content.  So in this case you

18   would provide either the ad URL or the URL or the landing page.

19           The second sort of category of requirements under the

20   DMCA is that if you receive -- if a particular subscriber or

21   account holder is the phrase that the statute uses is a repeat

22   infringer --

23           THE COURT:  That is what the OSP, that is what Google

24   has to go and do something about if they in fact turn out to

25   be a repeat offender.

1          MR. KANE:  Exactly.  So if Google gets 26 notices or

2    notices concerning 26 of a particular pirate's websites, it is

3    obligated to -- I mean, you know, the statute doesn't define

4    repeat infringer but, for the sake of argument, let's say 26

5    is a repeat infringer.

6          THE COURT:  That's your position.  I understand.

7          MR. KANE:  But they do have to take down the 27th

8    site in the sense that they are supposed to terminate that

9    pirate.  They are supposed to remove all access for that

10   pirate to the platform.  So --

11         THE COURT:  Okay.  So your argument is that, between

12   the fact that your works in suit were advertised on these 261

13   sites and the fact that evidence as to what Google did and

14   didn't do with respect to the 261 sites is highly relevant to

15   the safe harbor affirmative defense, it doesn't matter for

16   relevance purposes that plaintiffs didn't identify the 261

17   sites in their takedown notices.

18         MR. KANE:  That -- yes.  So it is true that it's

19   relevant to the DMCA safe harbor.  It is also relevant to

20   Google's knowledge.  So, for a contributory capital

21   infringement, you need knowledge of the infringement and a

22   material contribution.  If Google had knowledge of the first

23   26 websites that a particular pirate was operating, we think

24   there is a strong enough case that it has knowledge of the

25   27th website.  And if you look at what the Second Circuit has

1    said about this in the *Arista Records* case that we cite, they

2    said, "Contributory infringement liability is imposed on

3    persons who know, or have reason to know, of the direct

4    infringement."  So we would say that the fact that Google new

5    that this pirate was infringing is a reason to know that the

6    27th website is infringing.

7          THE COURT:  All right.  So if I agree with you on

8    what you have said so far, that would give you paragraph 1.

9    That would give you the infringement notices that Google

10   received.  Can you specifically address why you need and/or

11   are entitled to the associated merchant center accounts and the

12   Shopping ads.

13         MR. KANE:  Yeah.  So I will take the ads first.  So

14   we need the ads to see did Google actually take the website

15   down or take the ads for that website down.  In other words,

16   we have said these 261 sites were infringing our works, they

17   should have been taken down pursuant to the notices we sent

18   about the original 1,239.  If Google had actually terminated

19   the infringer, this one would have come down, as well.  We

20   need the ads to see did they actually take it down.

21         We also need the ads to see the evidence of direct

22   infringement.  So, one of the things that Google, I assume,

23   will argue later in this case is that we haven't proven direct

24   infringement; we haven't proven that the people who clicked on

25   these ads actually purchased the work and therefore infringed

1  the copyright.  The more ads Google ran for these works, the

2  more ads Google ran for these pirates, the more clicks that

3  these ads have, the stronger the case for direct infringement

4  becomes.  You can prove --

5       THE COURT:  Because some of those clicks must have

6  been sales?

7       MR. KANE:  Yes.  So you can prove direct infringement

8  in a secondary infringement case with circumstantial evidence.

9  The other piece of data that the ads data will have is what

10  Google calls conversion tracking.  So pirates can sign up to,

11  when someone clicks on an ad, actually track do they

12  ultimately purchase the book.  And so Google will have a

13  record of, you know, a hundred people clicked on this ad and

14  ten of them purchased a book.  I am making the number up,

15  obviously.

16       THE COURT:  That's probably a better than average --

17       MR. KANE:  It may be.  I am just -- you know, for

18  purposes of illustration.

19       So that's the other reason we need the ads is as

20  evidence of direct infringement.

21       It is also important  evidence of material

22  contribution.  So if you are a pirate and Google was running

23  ads for ten of your websites, Google makes a much stronger

24  material contribution if it runs ads for 20 of your websites

25  than if it only runs ads for 10 of them.  So it goes to sort

1    of the extent of Google's infringement.  It makes a big

2    difference whether Google ran a hundred ads or a thousand ads

3    for pirated copies of a particular work.

4            So going back to paragraph 2, the reason you need the

5    account number is basically practical.  In order to get the

6    ads data and the offer data and the conversion data, we need

7    to know the account number.  That's how Google searches for

8    the ads data.

9            THE COURT:  Okay.

10           All right.  What else do you want to tell me?  Do you

11   want to make a pitch for revenue information for 27,000

12   websites?  I'm really not in your corner on this one.

13           MR. KANE:  Okay.  So one thing I would say about the

14   27,000 is we don't know how many additional merchant center

15   accounts that will represent.  In other words, those 27,000

16   merchant center accounts are associated with account numbers

17   we already have -- or, sorry, those 27,000 websites are

18   associated with account numbers we already have.  We don't

19   know whether the other merchant center accounts that are

20   associated with those are three merchant center accounts, 30,

21   or 30,000.  Google knows, but they have refused to tell us.

22           The reason we need the revenue is -- the reason we

23   need the revenue information is it's important to be able to

24   say to a juror:  If Google had done what copyright law

25   requires, which is to say, if they had terminated this

1    infringer once they received, in Google's case, five URLs

2    alleging copyright infringement, Google would have given up X

3    dollars in revenue.  And they shouldn't be told, well, they

4    gave up at least, you know, $7 million in revenue.  If the

5    real number is 11 million and not 7 million, they should be

6    told they gave up -- they would have given up $11 million in

7    revenue.

8            In other words, by not doing what copyright law

9    requires, Google earned X dollars.  We only know what of what

10   the X is presently.

11           THE COURT:  Can you extrapolate from what you do know

12   or are going to get?

13           MR. KANE:  I suspect if an economics expert or a data

14   expert were to do that, Google would under cross-examination

15   say, Well, what basis do you have to say that it's going to be

16   the same rate of purchases or the same rate of revenue for

17   these 261 or these 27,000 as it was for the original I think

18   it is 18,000.  In other words, there isn't like a sound -- I

19   can't guarantee that there would be a sound basis for someone

20   to say, well, you can just assume that it's going to be the

21   same amount of revenue for these sites as it was for the

22   previous ones.

23           Part of the reason for that is we don't know how many

24   new accounts that is.  It is 27,000 websites.  It may be a

25   much smaller number of accounts.  So the burden of pulling

1    this may actually be quite small.  Google could put that issue

2    to rest by simply telling us how many merchant center accounts

3    are implicated by these websites, and they have declined to do

4    that.  So it is very important evidence of the need for

5    deterrence and of the damages that plaintiffs have suffered.

6          THE COURT:  All right.  Let me hear from Google.

7          MS. SAMPOLI:  Thank you, your Honor.

8          And I think I will actually start with the second

9    issue just because I want to address a threshold issue that I

10   think will tie in to our discussion about the 261 domains.

11         So I think that the plaintiffs and Google have a very

12   different understanding of what the DMCA requires Google to

13   do.

14         So Mr. Kane said that the law requires Google to not

15   only terminate the actual account running a certain number

16   of -- a repeat infringing account --

17         THE COURT:  The account identified in the takedown

18   notice.

19         MS. SAMPOLI:  Exactly.  Mr. Kane's position is that

20   Google also has to terminate any other account that is at all

21   connected to that account or domain or somehow connected to

22   the actual person behind the account.  This is a --

23         THE COURT:  Well, I don't think he used quite the

24   terms you used, but I do think his position is that your

25   obligation would extend beyond the URL identified in the

1   takedown notice.

2          MS. SAMPOLI:  Right.  And I think that's what he was

3   saying when he said, if Google had done what the law requires,

4   they would have had to give up X amount of revenue, meaning

5   not just the revenue from the account or domain associated

6   with --

7          THE COURT:  But from all of the other domains run by

8   the same people.

9          MS. SAMPOLI:  Exactly.  So that is a debate that both

10  parties had before Judge Rochon at the hearings last December,

11  and it was something that the parties disagreed about

12  strenuously.

13         And as far as I am aware, I don't believe that

14  plaintiffs have pointed to any case law where a court has held

15  that the DMCA imposes such an obligation to not just terminate

16  the account associated with a notice, but to affirmatively go

17  out and find linked accounts.  That's certainly their position

18  on what the law requires, but I don't believe there is a case

19  that they have identified that holds exactly that.  So we --

20  in fact, there is case law that goes the other way.

21         THE COURT:  Well, let me cut to the chase here.

22         MS. SAMPOLI:  Sure.

23         THE COURT:  Judge Rochon did not decide that

24  question, correct?

25         MS. SAMPOLI:  She did not --

KJC REPORTING & TRANSCRIPTION (848) 459-3124

```
 1              THE COURT:  Expressly.

 2              MS. SAMPOLI:  -- directly decide that question.

 3    But --

 4              THE COURT:  I'm not going to decide that question

 5    today.

 6              MS. SAMPOLI:  Understood.  I do think, though, that

 7    it's necessary to consider in the context of balancing the

 8    relevance against the burden.  And I just want to make that up

 9    front clear that that is not a foregone conclusion.  And I

10    think that Mr. Kane presented it as something that all parties

11    would agree that's what the DMCA requires, and I don't think

12    that is correct.  So I just wanted to make that up front.

13              But otherwise I agree with what you said about the

14    disproportionality and the ability of plaintiffs to make their

15    case without having the exact revenue numbers for all

16    27,000 -- not just 27,000 additional domains, but all merchant

17    accounts associated with those domains.

18              THE COURT:  Okay.

19              MS. SAMPOLI:  So --

20              THE COURT:  So that's the 27,000.  Now --

21              MS. SAMPOLI:  Yes.

22              THE COURT:  -- how about the 261?

23              MS. SAMPOLI:  So, to answer the question you asked at

24    the outset, no, plaintiffs did not send infringement notices

25    about these domains.  And I think that is relevant for a
```

```
 1    couple of reasons.

 2          The first is that plaintiffs' RFPs are tied to the

 3    core of this case is about --

 4          THE COURT:  RFPs, requests for production.

 5          MS. SAMPOLI:  Yes, I'm sorry, plaintiffs' requests

 6    for production are tied to domains and accounts about which

 7    they have sent notices.  So that is a baseline in the requests

 8    for production that I think is a little bit -- was a little

 9    bit lost in plaintiffs' telling of this dispute.

10          THE COURT:  Well, let's look at the requests for

11    production, which I believe I have, correct?

12          MS. SAMPOLI:  Yes.

13          THE COURT:  228-1 is plaintiffs' request and 228-2 is

14    your responses and objections.

15          MS. SAMPOLI:  Yes.

16          THE COURT:  So I did not look carefully at the RFPs

17    until how, but now tell me what I missed.

18          MS. SAMPOLI:  Yes.  So in the definition of

19    "infringing merchant," which is before we get to any of the

20    actual RFPs -- and if you give me a moment, I can give you the

21    page number.

22          THE COURT:  Sure.

23          (Pause)

24          THE COURT:  It's paragraph 23 on page 5.

25          MS. SAMPOLI:  All right.  And now I will be able to
```

 1   follow along with you.

 2          "Infringing merchant" is defined as "any Shopping ads

 3   merchant listed or otherwise identified in a plaintiff

 4   infringement notice."

 5          THE COURT:  Okay.

 6          MS. SAMPOLI:  The same definition more or less

 7   applies to "infringing domain."  "Any website domain named,

 8   listed, or otherwise identified in the plaintiff infringement

 9   notice."

10          THE COURT:  Okay.

11          MS. SAMPOLI:  I think it is clear that these 261

12   domains were not identified by plaintiffs in any infringement

13   notices, so they would have to come in under the definition of

14   related ads merchants.  And this was the topic of the parties'

15   dispute last December.

16          THE COURT:  The missed paragraph 29, as a definitional

17   matter.

18          MS. SAMPOLI:  Yes.

19          THE COURT:  "Means any Shopping ads" -- "the term

20   'related ads merchant' means any Shopping ads merchant that

21   shares with an infringing merchant a common identity, common

22   or related business or website ownership or operation or other

23   similarity that demonstrates a business connection."  Okay.

24          MS. SAMPOLI:  Yes.  And the parties filed a discovery

25   dispute about that definition and all of the RFPs that

1  implicate that definition last December.  Judge Rochon ruled on

2  that motion by plaintiffs in Docket 72.

3         THE COURT:  Which I have.

4         MS. SAMPOLI:  And what she determined is that the

5  scope of discovery into related ads merchants was accounts

6  associated with domains that were identified by plaintiffs in

7  the 1239, so the notice domains.  So she said that any

8  accounts where the domain associated with that account exactly

9  matches one of those domains, plaintiffs would get full

10  discovery into.

11         She also --

12         THE COURT:  You need to tell me exactly where she

13  said this, please.

14         MS. SAMPOLI:  So this is Docket 72 --

15         THE COURT:  Yes.

16         MS. SAMPOLI:  -- paragraph 2.

17         THE COURT:  Paragraph 2.  "Google will identify all

18  merchant center accounts exactly matching the domains in the

19  domain spreadsheet," and the domain spreadsheet is the 1239,

20  correct?

21         MS. SAMPOLI:  Correct, yes.

22         And then, in paragraph 5, on the next page,

23  Judge Rochon orders more limited discovery into accounts where

24  the e-mail account matches the e-mail accounts in the original

25  list of merchants.

```
 1              THE COURT:  Okay.

 2              MS. SAMPOLI:  So at the end of this order,

 3   Judge Rochon writes, "For clarity, the Court does not compel

 4   production of documents or information regarding related ads

 5   merchants or any other linked accounts in response to

 6   plaintiffs' RFPs No. 25 to 27, 29, 31, 33 to 38 and 44 beyond

 7   the documents and information specified in this order."

 8              THE COURT:  Now, at that time, had the plaintiffs

 9   identified domains, that is, websites, where the works in suit

10   were advertised but where no notice of infringement had been

11   submitted by one of the plaintiffs?

12              MS. SAMPOLI:  At that point, no, but --

13              THE COURT:  And now they have.

14              MS. SAMPOLI:  Correct.  Now they have.

15              THE COURT:  And they have done so by dint of a

16   permitted amendment to the exhibits of their complaint.

17   Doesn't that change the landscape of it?

18              MS. SAMPOLI:  I don't think it changes the requests

19   for production that they have served and that they have asked

20   for, which are tied to the notices of infringement.  And I

21   also don't think it maps on to plaintiffs' own theory of the

22   case as they have articulated it throughout this discovery.

23              So, for example, at the hearing on defendant -- or

24   Google's motion to dismiss in May, plaintiffs' counsel, at the

25   hearing, stated, "We are not saying Google has to canvass the
```

```
 1    Internet and find all of the instances wherein someone was
 2    infringing plaintiffs' works.  We are saying they just had to
 3    take down the specific pirate websites that we identified to
 4    them."
 5           So both the requests for production --
 6           THE COURT:  Although I did hear something a little
 7    broader a few minutes ago, if I am not mistaken, as you
 8    pointed out to me when we began today.  Right?
 9           MS. SAMPOLI:  You are going to have to enlighten me.
10           THE COURT:  Sorry.  As you pointed out to me, the
11    plaintiff and the defendant have a difference of opinion as to
12    what Google was required to do, at least for purposes of the
13    DMCA.
14           MS. SAMPOLI:  Correct, but, here, the language was
15    take down the specific pirate websites that we identified to
16    them.
17           THE COURT:  Right.
18           MS. SAMPOLI:  So the pirate websites would be the
19    domains.
20           THE COURT:  Right.  But, obviously, that's not their
21    whole theory of the case.
22           MS. SAMPOLI:  It appears not to be at this point in
23    time.
24           THE COURT:  Right.
25           MS. SAMPOLI:  But then what I will point you to is
```

1  the actual works in suit that were added by plaintiffs in

2  July.  We took a look at the list of domains that they would

3  like to add to the suit and did an analysis and determined

4  that there actually aren't any works in suit that were added

5  in July that are being advertised exclusively by those new

6  domains.  So our position is that they have everything that

7  they --

8      THE COURT:  I'm sorry.  You are saying that, for the

9  261 domains that are in issue today, one or more of the

10  plaintiffs' works in suits were advertised on them.  That is

11  how they got identified.  But there are no works in suit that

12  were advertised only on the new 261 domains.  All of the works

13  in suit were also advertised on one of the 1,239.

14      MS. SAMPOLI:  Correct.

15      THE COURT:  And the relevance of that is?

16      MS. SAMPOLI:  Well, I -- it -- I think it goes to

17  the -- the need for this additional burdensome discovery if --

18  presumably the statutory damages are what are at issue here in

19  reality.  Statutory damages --

20      THE COURT:  Which need not be established with the

21  same precision as actual damages.

22      MS. SAMPOLI:  Correct.  But they are established on a

23  work-by-work basis.  So what matters is the works in suit, not

24  the number of infringements that have occurred.

25      THE COURT:  Well, it is true that statutory damages

1    up to 150,000, if willful, are assessed on a work-by-work

2    basis, but the criteria used in the Second Circuit to

3    determine what the right number is for a statutory damages

4    award includes the scope of the infringement as well as the

5    either actual or, in many cases, estimated revenue that the

6    defendant earned as a result of the infringement.

7         MS. SAMPOLI:  That's right.  There are many --

8    obviously, many factors that go into the statutory damages

9    calculation, but I think our position is that we have already

10    produced discovery with respect to works advertised by these

11    suits to the extent they were included in --

12         THE COURT:  Takedown notice.

13         MS. SAMPOLI:  -- those prior productions, and that

14    the marginal benefit of going through the process of engaging

15    at least four different Google teams and running through the

16    interdependent process of pulling the specific ads -- merchant

17    accounts, pulling all of the offers associated with those

18    merchant accounts, pulling the associated conversion and

19    impressions metrics for those specific offers, and then

20    pulling all of the revenue information, that burden is not

21    justified by the marginal increase in evidence that plaintiffs

22    would be able to point to in support of their case.

23         THE COURT:  Well, we talked in October about the need

24    to present concrete evidence of burden if you are relying on a

25    burdensomeness argument.  So I am looking at your colleague's

1    attorney declaration, at Docket 232, and -- I am not seeing

2    that granularity there.  Am I missing something with respect

3    to the 261 domains?

4              (Pause)

5         MS. SAMPOLI:  If you wouldn't mind giving us one

6    moment.

7              THE COURT:  Sure.

8              (Counsel confer)

9         MS. SAMPOLI:  Your Honor, I think you are correct.

10   It is not in our attorney declaration.  But I would point you

11   to our motion where I believe we walked through the steps that

12   would be required.

13             THE COURT:  Your opposition brief?

14        MS. SAMPOLI:  My apologies.  Yes, the opposition

15   brief.  And that is in -- I can point you to a page number if

16   you give me a moment.

17             THE COURT:  You make the disproportionality argument

18   but, again, I am not seeing granular information—this many

19   hours, this many dollars.

20        MS. SAMPOLI:  No.  You are right.  We certainly don't

21   go into that level of detail.

22             THE COURT:  Okay.  And we did talk about that last

23   time, didn't we?  I think we did.

24             Okay.  Anything else you want to tell me?

25        MS. SAMPOLI:  Yes.  The only other thing that I would

1    point you to is I do think that the relationship to the

2    amendment is a little bit of a red herring.  We asked, right

3    after plaintiffs filed their amendment to the complaint in

4    July, if they planned to identify any additional domains that

5    we -- you know, they would argue we should be providing

6    discovery into, and plaintiffs wrote to us on July 18

7    confirming "at this time, plaintiffs are not seeking to add

8    any domains to the 1239 domains listed in plaintiffs' December

9    24, 2024 e-mail."  They do say, in the next sentence, "All of

10   the works included in the amended Exhibit A were advertised by

11   either one of the 1239 domains or by a domain related to one

12   of the 1239 domains."  But they say, "We are not seeking to

13   add any additional domains."  And --

14          THE COURT:  To their pleading or to the scope of

15   discovery?

16          MS. SAMPOLI:  To the scope of discovery.

17          THE COURT:  All right.  So why don't we stop there.

18          And if you can take that point first, Mr. Kane.

19          MR. KANE:  Yes.

20          So the July 18 e-mail was before we got Google's ads

21   data.  We got the ads data on July 22.  So we needed the ads

22   data to see did they actually run ads for these work -- for

23   our works.  So on July 18, we were not adding works to the

24   suit because we didn't have the ads data yet.

25          THE COURT:  Well, you are still not adding works

```
 1    to --
 2            MR. KANE:  Sorry.  We weren't adding pirate websites
 3    to our requests for discovery because we didn't have the ads
 4    data yet.  In other words, the --
 5            THE COURT:  You had no reason to believe that any
 6    other websites were running ads for the works in suit?
 7            MR. KANE:  We didn't have, I guess, complete
 8    information about the websites.
 9            So what we got on July 22 was ads data that told us,
10    on this date, Google ran an ad for this pirate website and it
11    was clicked on by this many people.  On July 18 we didn't have
12    that data.  What we had on July 18 was offer data which does
13    not reflect whether or not the proposed advertisement from the
14    merchant was actually run as an ad.
15            So the way that this works is if you are a merchant
16    on Google Shopping, you put in what they call an offer, which
17    is, you say, Here is the product I am advertising, here is the
18    price, here is the image I want you to include, here is the
19    URL of the landing page, etc.  Some subset of those Google
20    actually decides to run as ads.  In other words, all sorts of
21    people want to advertise on Google.  Google has an algorithm
22    which decides what ads it is going to run.
23            On July 18, what we had was offer data.  We didn't
24    get the ads data until July 22.  The ads data is what tells
25    us, of those offers, how many of them are actually converted
```

```
1    into ads.  So all we had on July 18 was the offer data and the

2    offer data has a column that says ███████████████████████████

3    ██████████████████████████████████████████████████

4    But it's a random smattering of dates.  It's not like the

5    offer data tells you -- ████████████████████████████████

6    ████████████████████████████████  ███████████████████████

7    ██████████████████████

8            So we couldn't put together the list of 261 websites

9    until we got the ads data.  That's why on July 18 --

10           THE COURT:  You might have said that on July 18 and

11   then we wouldn't be having this argument now.

12           MR. KANE:  Oh, we would still be having it,

13   your Honor.  And the reason I say that is, we told Google on

14   August 15 -- sorry, when we were at the initial conference in

15   this case, actually before we were at the initial conference

16   in this case, our proposed case management order, which was in

17   August of 2024, said we are going to need an extended deadline

18   in order to add works to the suit because we can't see, from

19   what we have now, all of the ads that Google ran for our

20   works.

21           THE COURT:  But, again, you are not adding -- the 261

22   websites don't add works in suit.

23           MR. KANE:  Correct.  But it's the same principle.

24   Like, we couldn't see those 261 websites until we got Google's

25   ads data, and we didn't get that until July 22.
```

1          Google actually asked us, in May, are you going to be

2     adding domains to the suit, but we didn't have that data until

3     July 22 in order to be able to tell Google, yes, here are the

4     261 -- 261 domains.

5          Likewise, we asked Google, when they asked us in May,

6     why do you want to know this?  And they said because if you

7     are adding domains to the suit, we might ask for an extension

8     of discovery.

9               THE COURT:  Right.

10              MR. KANE:  So they --

11              THE COURT:  All right.  Go ahead.

12              MR. KANE:  They were expecting us all along to add

13    works to the suit -- I'm sorry, to add domains to the

14    discovery, our requests.

15         I just wanted to address what Ms. Sampoli said about

16    our RFPs.  So if you look at RFP 27 --

17              THE COURT:  Hold on.

18              MR. KANE:  Sure.  It is Docket 228-1.  It is on page

19    12.

20              THE COURT:  I have it.

21              MR. KANE:  So it says, "All documents concerning

22    infringement notices sent to you by any person concerning any

23    infringing merchants, including data, logs," blah, blah, blah.

24              THE COURT:  But you are not relying on the definition

25    of "related ads merchant," you are relying on "infringing

1    merchant"?

2              MR. KANE:  Correct.  You don't need to get to the

3    related ads merchant definition.

4              THE COURT:  Got it.

5              MR. KANE:  So infringing merchants is a defined term.

6    It refers to "any Shopping ads merchant listed or otherwise

7    identified in a plaintiff infringement notice."  And

8    likewise -- so "Shopping ads merchant" is a defined term.  It

9    refers to "any Google user whose products are advertised in

10   Shopping ads."  So if you take those two together, the RFP is

11   requesting information concerning "any Google user whose

12   products are advertised in Shopping ads who is 'listed or

13   otherwise identified in a plaintiff infringement notice.'"

14             So this is asking for any infringement notices about

15   a pirate whom we have identified in a plaintiff infringement

16   notice.  That is exactly what all of these are.

17             We identified these pirates in the infringement

18   notices by identifying the websites that we were able to see.

19   We can't identify, for example, the Google account number of

20   each of these pirates because the Google account number

21   doesn't appear in the ad.  All we can do to identify the

22   pirate is say here is the ad URL and here is the URL of the

23   landing page.

24             So RFPs are not limited to, as Ms. Sampoli was trying

25   to suggest, pirate websites that are specifically identified

1   in an infringement notice.  There is also just no support for

2   that in the law, as we explained a minute ago with the cite --

3   or a little while ago with the Second Circuit standard for

4   knowledge in contributory infringement is.

5         Just one further point on Docket 72 that Ms. Sampoli

6   was referencing.  As I said, at the initial conference in this

7   case, we explained to Judge Rochon that we were going to need

8   Google's data in order to see how many works we were adding to

9   the suit and, related to that, how many domains we would be

10  adding in discovery.  We hadn't sort of gotten that far yet.

11        But Judge -- Google opposed that because they said,

12  well, then we will have to produce discovery on whatever works

13  you add to the suit.  Judge Rochon agreed with us.  She said

14  you can have an extended deadline to (indiscernible) to add

15  works into the suit, not to add claims or anything like that,

16  but just to add works.

17        In fact, at a hearing on March 17, Judge Rochon

18  specifically directed Google to be prepared to produce

19  additional discovery based on the additional works we

20  identified.

21        So the sentence that Google is referring to in Docket

22  72, paragraph 1, simply refers to the fact that, at the time,

23  all we had from Google was -- all we had for these websites

24  was the notices that we had sent to Google.  In fact, at the

25  time paragraph 1 was issued by the Court -- it was drafted by

```
 1    Google.  At the time it was issued, we had already given

 2    Google the list of the 1,239.  A couple of sentences later

 3    from the one that Ms. Sampoli was referring to, it says,

 4    sorry, "The Court understands plaintiffs provided such domain

 5    spreadsheet to Google on December 24, 2024."  The whole point

 6    of that ruling was to say, look, we have got this list of

 7    1,239.  Here are the things Google is going to produce to

 8    plaintiffs so that plaintiffs configure out what accounts or

 9    websites are related to those 1,239 sites.  We have got that

10    now.  We have got these 261 websites that are part of the same

11    Google accounts as the original 1,239 and that all advertise

12    the works in suit.

13            Judge Rochon did not make some, you know, sweeping

14    merits decision that the only websites for which we could

15    recover damages are ones that are specifically mentioned in

16    infringement notices.  If Judge Rochon were doing that, she

17    would have done so with explanation, not just sort of buried

18    in one sentence that is effectively a background section of

19    the order.

20            THE COURT:  All right.  I think I have had enough

21    information.  I thank both sides for their presentations.  I

22    am not persuaded to change the view that I had on this issue.

23            MS. SAMPOLI:  Your Honor, may I just address, if you

24    are going to order additional discovery for these 261 domains,

25    the time frame for doing so?
```

1            THE COURT:  I was just about to say that I am going

2    to grant the motion to the extent of requiring Google to

3    produce the first three categories of information in

4    plaintiffs' proposed order.  I am not going to -- with respect

5    to the 261 websites.  I am not going to require Google to

6    produce revenue information for the broader set of websites.

7            Now, under my generic scheduling order, at Docket,

8    hold on one second, 222, all document discovery is due

9    January 6 unless I give a specific different date for a

10   specific category.  And you are about to tell me you can't get

11   this done in the next five weeks?

12           MS. SAMPOLI:  Correct.

13           First, our client goes dark in the middle of December

14   and --

15           THE COURT:  Goes dark?

16           MS. SAMPOLI:  Yes.

17           THE COURT:  Google goes dark in the middle of

18   December.  You mean I can't shop?

19           MS. SAMPOLI:  No, you can shop, but their employees

20   do not work.  And we did not explain it clearly in this

21   particular opposition, but we certainly have explained it, I

22   believe, in the January -- July 25 status conference, which I

23   don't have the docket number for right now, my apologies,

24   but --

25           THE COURT:  There are a lot of things on the docket.

```
1              MS. SAMPOLI:  There are.

2              We have explained in some level of detail the steps

3      that need to be taken to pull this additional data, and it is

4      sort of an interlocking process, as I referred to earlier.  So

5      you, first, need to pull the merchant center account

6      information.  Once you have the merchant account numbers, you

7      then can go and pull the offer data.  Then once you have the

8      offer data, you can go pull the conversion and impression

9      metrics and you can pull the finance -- finance data based on

10     the merchant center account information.

11             But there are a lot of -- it's sort of -- you can't

12     do them all at once.  So it needs to be sequenced and staged.

13     In the -- we are working right now to provide the additional

14     data for the original 1239 merchants going from -- through

15     March 2025.  We are still working on that.  We are in the

16     process.  We are he we have produced the offer data.

17             THE COURT:  That you do have a deadline of January 6

18     for.

19             MS. SAMPOLI:  We do, and we will meet this deadline.

20     We have produce the offer data to plaintiffs.  We are now

21     using that offer data to pull the impression and conversion

22     metrics.  But it takes time and it takes different employee

23     times.  It is across four different teams.

24             THE COURT:  What date to you want?

25             MS. SAMPOLI:  We would ask for three months of time.
```

KJC REPORTING & TRANSCRIPTION (848) 459-3124

1    So I guess that would put us at -- December 1, so that would

2    put us to February -- no, March 1.

3            THE COURT:  That seems like way too much time to me,

4    particularly since, under your current schedule, which is an

5    extended schedule, all fact discovery, including fact

6    depositions, are supposed to be done by April 6.

7            MS. SAMPOLI:  In that case, we would propose the -- I

8    believe there is one deadline that goes to February.

9            THE COURT:  There is.

10            MS. SAMPOLI:  We would propose that deadline.

11            THE COURT:  That seems more reasonable.

12            Mr. Kane?

13            MR. KANE:  I would just point out they have done this

14    at least twice.  They did it for the original 1,239 and then

15    for the extend period.

16            THE COURT:  Sure.  But the fact that I raked the

17    leaves last fall doesn't mean I can rake the leaves any faster

18    this fall because they are new leaves.

19            MR. KANE:  Well, with leaves you have to do it all

20    over again.  With this, to do it the first time you write a

21    script.  You say we are going to query these tables, you know,

22    then we are going to query these tables, then we are going get

23    this -- whatever the steps are.  You write a script for all of

24    that to do it in an automated fashion.  It's the only way

25    Google could do this.  So they have got those scripts.  It's

```
1    just a matter of running them for the new 261 websites.

2              THE COURT:  Right.

3              MR. KANE:  It should --

4              THE COURT:  That's why I don't think they need three

5    months, but I will give them two.  February 6.

6              MS. SAMPOLI:  Thank you, your Honor.

7              THE COURT:  We will just leave it at that.

8              All right.  Now we are going to take a break before

9    we come back and talk about the November -- hold on.

10             MR. KANE:  3rd, I believe.

11             THE COURT:  The November 3 motion.

12             Now, my question to you, I do not -- luckily, I do not

13   have a 2:00 this afternoon, so do you want to take a short

14   break, 10, 15 minutes, get a cup of coffee, or would you like

15   me to give you a little longer and you can get a sandwich and

16   come back?

17             Plaintiffs?

18             MR. KANE:  I'm fine with a short break, your Honor.

19             THE COURT:  Defendants.

20             MS. TOMKOWIAK:  Same, your Honor.

21             THE COURT:  I'm going to have to eat a sandwich at

22   some point.  So even a short break may be 20 minutes.

23             All right.  20 minutes, so I will see you at

24   approximately 1:40 and we will be in recess.

25             (Recess)
```

1           THE DEPUTY CLERK:  We are now back on the record in

2    the matter of Cengage Learning, Inc., *et al.* v. Google LLC,

3    Case No. 24 Civ. 4274.

4           THE COURT:  All right.  No need to reintroduce

5    yourselves.

6           Mr. Kane, you have an empty seat at your table.

7    Would one of your colleagues like to come up?

8           All right.  And remind me again whose motion is this

9    for Google?

10          MS. SAMPOLI:  This, too, I will take this one.

11          THE COURT:  All right.  I am glad to see that we have

12   a video screen set up here because you are going to need it if

13   you want to walk me through illustrative points using the

14   various spreadsheets in issue here.  But I have, I guess, two

15   preliminary thoughts that I think it will be helpful to the

16   parties if I share with you now.

17          The first is that I can't really imagine any

18   circumstance under which I would be issuing a preclusion order

19   at this point in time.  We are not even through document

20   discovery, never mind the remainder of fact and expert

21   discovery, and it is not all clear to me whether and to what

22   extent Google intends to use the four spreadsheets at issue as

23   support for its DMCA safe harbor defense.

24          Google also argues, I find persuasively, that these

25   are business records rather than expert summaries subject to

1    Rule 1006 in that they are kept in the ordinary course, etc.,

2    which is an additional reason why any motion to preclude the

3    use of those documents at summary judgment or trial seems

4    extremely premature at this point.

5         The second thing that troubles me here——and you will

6    hit this, Mr. Kane, I'm sure, as soon as you stand up——is, I

7    am not sure exactly what you want.  You are going to need to

8    be very clear with me about that.  I can't believe that you

9    want the full scope of discovery similar to what you have

10   received, either voluntarily or by court order, with respect

11   to the works in suit as to everything else that Google has

12   looked at, gotten an infringement notice about, taken down, or

13   declined to take down over the last four years.  But, in

14   reading your letter briefs, it kind of seems like that is what

15   you want.

16        So do you want to start there?

17        MR. KANE:  Sure.

18        So, Google has produced these summary spreadsheets

19   that say that Google delisted a certain number of ads and

20   suspended a certain number of pirates.  We are not really

21   seeking a preclusion order.  What we are saying is that if

22   Google wants to use these spreadsheets later, they have to

23   produce --

24        THE COURT:  You want a conditional preclusion order.

25   I am not doing that.

1          MR. KANE:  Well, if they want to use these, they have

2     to produce two types of documents.  The first thing they have

3     to produce is the data that underlies these summaries.  So, in

4     other words, if Google did a query in a database and the

5     database said it has records of delisting 100 URLs and

6     suspending 25 merchants in October of 2022, Google has to

7     produce those data records, *i.e.*, a list of those 100 URLs and

8     those 25 merchants.  That's the first thing they have to

9     produce.

10         THE COURT:  So with respect to the delisting

11    spreadsheet, which you submitted in electronic form because it

12    is enormous, you want a list of what?

13         MR. KANE:  So the delisting spreadsheet is on the

14    screen now if you want to take a look at it.

15         THE COURT:  A portion of it.

16         MR. KANE:  So there is a month in Column A.  There is

17    a product in Column B.  There is the action that Google claims

18    to have taken --

19         THE COURT:  And explain to me what those products

20    are, I mean, generically.

21         MR. KANE:  Yeah, these are all Google platforms.  So

22    like Shopping is one of them, Drive is one of them, Search is

23    one of them, Blogger is one of them.  These are all different

24    platforms that Google operates, most of which have different

25    DMCA policies.

```
 1              THE COURT:  Right.  Do you care about anything other
 2    than Shopping?
 3              MR. KANE:  We do not.
 4              THE COURT:  Okay.
 5              MR. KANE:  So Column C is the decision Google claims
 6    to have made with respect to a notice, either ███████████
 7    ███████████████████████  I believe, means --
 8              THE COURT:  What does ██████████████████████████
 9    mean?
10              MR. KANE:  My guess -- ███████████████████████
11    What I think that means is they never acted on the notice, or
12    at least they never --
13              THE COURT:  They turfed it to someone else?
14              MR. KANE:  I'm sorry?
15              THE COURT:  They turfed it?  They said this is
16    somebody else's problem, let legal worry about it?
17              MR. KANE:  No.  I think what it means is there is a
18    tool that Google uses to process infringement notices, and
19    that's probably the tool that they query to get these numbers.
20              THE COURT:  ████████████████████████
21              MR. KANE:  Right.  But, for some reason, these ones
22    that say ██████████████████████ were never put into that legal
23    removals tool.  So, like, if you go over to some of these --
24    let's just filter it.  We will filter Column C for ██████
25    ████████████  They all have cases counts in Column F, so they
```

```
 1    are saying, We got ████████    in December of 2020.  This is
 2    row two.  But they have ████████    Well, that doesn't make
 3    any sense.  You know?  All of these notices and there are ██
 4    ████████████████    So all of these notices had zero URLs in
 5    them?  So I think what the ████████████████ means—and
 6    Google might be able to tell us—are these were just never --
 7    these notices, for some reason, were never uploaded --
 8              THE COURT:  Maybe because the person sending in the
 9    notice ████████████████.
10              MR. KANE:  That's possible.  It's kind of a large
11    number.  I mean, this is ████████████ in Column F.  That
12    seems like a lot.
13              THE COURT:  Not everybody knows how to do it right.
14              MR. KANE:  But, in any case, this is the -- let me
15    just take out the filters.  This is the delisting spreadsheet
16    that we are talking about.  The data that underlies this would
17    look something like this.  This is Docket 265-3.  So this is a
18    spreadsheet that Google provided that pertains just to the
19    pirates who infringed the works in suit here.  But you will
20    notice that whereas the delisting spreadsheet --
21              THE COURT:  (Indiscernible).
22              MR. KANE:  Sorry?  You will notice that --
23              THE COURT:  Show me the pirate --
24              MR. KANE:  Sure.
25              THE COURT:  -- (indiscernible) again.
```

1          Okay.  So it has a case ID, a URL.  All of the issues

2   are copyright because obviously those are your issues.  The

3   platform is not always Shopping, though.  Sometimes it is Web

4   Search.

5          MR. KANE:  Correct.  We --

6          THE COURT:  I thought you --

7          MR. KANE:  Sorry.

8          THE COURT:  I thought you told me a minute ago that

9   you only cared about Shopping.

10         MR. KANE:  So we found this column to be rather

11  unreliable.  A whole bunch of our notices, you know, we can

12  tell is that a search notice or a Shopping notice.  And in a

13  whole bunch of instances, they have it listed as a search

14  notice and it is in fact a Shopping notice.

15         THE COURT:  Okay.  And then Column E is when the

16  takedown notice was received, the infringement notice was

17  received?

18         MR. KANE:  Either when it was received or when Google

19  sort of initially processed it and, you know, gave it a case

20  number.

21         THE COURT:  All right. Column F is who was

22  complaining?

23         MR. KANE:  Correct.

24         THE COURT:  Column G is the e-mail of the complaining

25  person?

```
1              MR. KANE:  That's right.

2              THE COURT:  And what else do we have there?

3              MR. KANE:  M is the decision Google claims to have

4    made, so like --

5              THE COURT:  Remove or not remove.

6              MR. KANE:  -- in Row 4 here.

7              THE COURT:  Okay.

8              MR. KANE:  N is a more fulsome description of the

9    decision.

10             THE COURT:  Like what the reason was?

11             MR. KANE:  Not the reason, just more detail on it.

12   So there is -- like, for remove, there is ███████████ and

13   then there is ██████████████████  As I understand, ██████

14   ███████ --

15             THE COURT:  ████████████████████ means we went to

16   remove it but it was already gone.

17             MR. KANE:  It means they went to remove it but it was

18   not in their search index in the first place.  In other words,

19   Google sort of crawls the Internet and, like, logs a whole

20   bunch of web pages.  And if you -- if you are included in that

21   crawl, Google puts you in an index and your website can

22   potentially be shown in response to searches or, in this case,

23   Shopping ads.  I believe the ████████████████ means they

24   went to the website, it was actually infringing content, they

25   would have taken it down, but it was never in their index in
```

```
1    the first place.  So --
2              THE COURT:  So nobody was ever going to find it.
3              MR. KANE:  They would still have found it through the
4    Shopping ad.  It just it wasn't in -- it wasn't in the search
5    index for someone to find through a regular search.
6              THE COURT:  You are guessing a little bit here, it
7    sounds like.
8              MR. KANE:  That's how Google explained it to us, and
9    we asked what this means.
10             THE COURT:  Okay.  What else?  ███████  means -- I
11   don't know what ███████  means.  Is anything not normal on
12   that spreadsheet?
13             MR. KANE:  Yes.  There is ████████████████████
14   ████████████████████  I don't know what those mean.
15             THE COURT:  Okay.
16             MR. KANE:  The one that is probably most relevant to
17   the issue today is columns M and N here, where they have the
18   actual decision.
19             THE COURT:  All right.
20             MR. KANE:  So -- I was just going to say, whereas the
21   delisting spreadsheet just gives us a number of URLs, this
22   spreadsheet, 268-3, actually tells us -- actually lists out
23   those URLs in Column B here.
24             THE COURT:  And what happened to them.
25             MR. KANE:  Exactly, yes.
```

```
 1              THE COURT:  You want all of that information for
 2    everything on the delisting spreadsheet?
 3              MR. KANE:  So if Google wants to offer the delisting
 4    spreadsheet --
 5              THE COURT:  Yes or no, counsel?
 6              MR. KANE:  Yes, with a caveat.
 7              THE COURT:  Yes.
 8              MR. KANE:  So the caveat is, we are only interested
 9    in infringement notices that Google received that they
10    processed as part of their shopping DMCA policy.  What they
11    have given us here is --
12              THE COURT:  I don't understand that.  I don't
13    understand what -- how that limits --
14              MR. KANE:  Sure.
15              THE COURT:  -- (indiscernible) delisting spreadsheet.
16              And, by the way, the delisting spreadsheet, which was
17    not printed out for me because it is so huge, involves how
18    many infringement notices in total?
19              MR. KANE:  So if you just total the number of notices
20    in the spreadsheet, take off filters, it is ███████████
21    ███████████████
22              THE COURT:  You want for each of ██████████
23    infringement notices all of the information that you have with
24    respect to your infringement notices.
25              MR. KANE:  No.  So it's --
```

```
 1              THE COURT:  Good.  What do you want?
 2              MR. KANE:  Yes.  So if you look at the product column
 3    here, there are a whole bunch of different platforms, App
 4    Engine, Blogger, Drive --
 5              THE COURT:  Right.
 6              MR. KANE:  -- Google Ads.
 7              What this is, it is like every infringement notice
 8    that Google has received with respect to any of its platforms.
 9              THE COURT:  Right.
10              MR. KANE:  So when you go to submit an infringement
11    notice to Google, you can pick which products the infringing
12    content is on.  Is it in the search results?  Is a Shopping ad?
13    Is it on Blogger?  Is it on Drive, YouTube, etc.?
14              THE COURT:  Right.
15              MR. KANE:  Google has only asserted as its defense in
16    this case its DMCA policy for Shopping.
17              THE COURT:  Okay.  So you want to first filter it by
18    Shopping, right.
19              MR. KANE:  Sure.
20              THE COURT:  You just told me that sometimes they get
21    it wrong and sometimes it is something else.
22              MR. KANE:  That's correct.
23              THE COURT:  (Indiscernible) something else.
24              MR. KANE:  So if we look at the ones that are just
25    for Google Shopping, it is only ▮▮▮▮▮ URLs.
```

```
 1              THE COURT:  Okay.

 2              MR. KANE:  And only --

 3              THE COURT:  Of those [REDACTED]        are

 4     filtered for shopping.

 5              MR. KANE:  Correct, except I think the first number

 6     was a bit higher.

 7              THE COURT:  [REDACTED]    was not high enough?

 8              MR. KANE:  That's the number of notices.  Sorry.  I

 9     thought you said a smaller number.  Out of the [REDACTED]

10     [REDACTED]  -- sorry --

11              THE COURT:  So they got [REDACTED]  infringement notices

12     from other people, people beside your clients, with respect to

13     alleged infringement on the Shopping platform.

14              MR. KANE:  No.  Sorry.  We have confused notices and

15     URLs, so let me correct that.

16              For just the Shopping platform it's [REDACTED]  notices.

17     The [REDACTED]  is the number of URLs that are in those notices.

18              THE COURT:  Okay.  Give me the numbers again.

19              For Shopping only, it --

20              MR. KANE:  It is.

21              THE COURT:  [REDACTED]    URLs?

22              MR. KANE:  Correct, [REDACTED]    URLs.

23              THE COURT:  And how many notices?

24              MR. KANE:  [REDACTED]

25              THE COURT:  And that is the universe that you want
```

```
1    what you call backup information on?

2              MR. KANE:  Yes, with the caveat that, like, I don't

3    think that is accurate.  I don't think Google's records in

4    that column are accurate because we sense notices concerning

5    ███████████  So if ours involve ███ --

6              THE COURT:  You don't think you were ████████  of

7    all of the activity out there.

8              MR. KANE:  It is possible, but I doubt it.

9              THE COURT:  I doubt it, too.  I have a feeling Google

10   is going to tell me that you are misreading the data.

11             MR. KANE:  That is certainly possible.

12             But it seems to us that what Google is trying to do

13   is to say that when they assert a DMCA defense for just their

14   Shopping platform, they should get credit for every notice and

15   takedown that they did on every other platform—YouTube,

16   Search, Blogger, Drive.

17             THE COURT:  Well, that might be true if they had

18   produced the delisting spreadsheet to you as part of, let's

19   say, an expert report saying, Here is our DMCA defense.  But

20   my understanding is that these spreadsheets have been

21   exchanged in the ordinary course of fact discovery possibly

22   because Google had a Rule 26(a) obligation to produce them

23   because they may be relevant to the DMCA defense, possibly

24   because, after you didn't get them for a while, you started

25   asking for them.  But be that as it may, we are still in fact
```

```
 1   discovery.  These documents are in the mix.  But I think you
 2   are making a presumption that they are somehow the centerpiece
 3   of a DMCA defense, and I just haven't heard that yet and it is
 4   not up to you to decide what the centerpiece of Google's DMCA
 5   defense is.
 6        MR. KANE:  So we would certainly be delighted for
 7   Google to tell us exactly what they plan to do with this
 8   spreadsheet.  The problem is, if we wait until summary
 9   judgment or trial -- they can't show up with this at trial and
10   then postpone the trial for six months while they give us the
11   underlying data.
12        This is a query in a database.  In other words,
13   someone took the delisting spread -- sorry, someone took the
14   Docket 265-3 that you are looking at, ran a query in a
15   database that pulled from this table or tables and used that
16   to produce the delisting spreadsheet.
17        THE COURT:  That may be, and that may be because this
18   cut is relevant and therefore discoverable during ordinary
19   fact discovery.  But, again, that doesn't make it a Rule 1006
20   summary that would implicate your right to see everything that
21   rolls up into those numbers.
22        And I understand what you are saying with respect to
23   time.  Should it turn out at the conclusion of fact
24   discovery -- well, look, let's be practical here.  As a
25   practical matter, Google is going to have to fish or cut bait
```

1    at the expert discovery schedule stage, isn't it?  It is going

2    to have to have one or more experts who produce reports as to

3    its DMCA affirmative defense, and those experts are going to

4    have to say, look, this is the basis upon which I am opining

5    that it did a good enough job.  I am oversimplifying somewhat.

6    And isn't that really where the rubber is going to  hit the

7    road on how much underlying data you are entitled to?

8            The question for me now, as I conceive it, isn't

9    whether you are entitled to the underlying data because it

10    rolls up to this or that or the other spreadsheet, the

11    question is whether you are entitled, as a matter of fact

12    discovery in general, to some or all of the underlying data

13    that you are looking for.

14            MR. KANE:  Yes.  We could come at it either way.  In

15    other words, Google's affirmative defense is that their DMCA

16    program for Shopping renders them not subject to damages

17    liability.

18            THE COURT:  Got it.

19            MR. KANE:  So it's proper for us to ask——and we have

20    asked——for, for example, how many ads do you claim to have

21    delisted as part of your DMCA program for Shopping?  How many

22    pirates do you claim to have suspended as part of your DMCA

23    program for Shopping?  What Google has produced in response to

24    those requests, which were made in September of 2024, is these

25    spreadsheets.

```
1              THE COURT:  Okay.

2              MR. KANE:  And what we are saying is --

3              THE COURT:  -- that is not enough.

4              MR. KANE:  Correct.

5              THE COURT:  Let's see some backup.

6              MR. KANE:  Correct.

7         And I would say that there are sort of two categories

8    of things that we are asking for.  One is the spreadsheet that

9    we were looking at a minute ago, Docket 265-3, which is just

10   literally the underlying data from this summary, in other

11   words, the Docket 238-1, the delisting spreadsheet, that is

12   just like the totals, the calculation of how many URLs they

13   claim to have delisted as shown in the Docket 265-3

14   spreadsheet.  we need the docket 265-3 spreadsheet for

15   whatever URLs they are claiming to have delisted as part of

16   their Shopping platform.

17             THE COURT:  Which you think is ███████

18             MR. KANE:  According to this, it is ███████

19             THE COURT:  And Docket 265-3 covers how many URLs?

20             MR. KANE:  This is only one of the spreadsheets.  We

21   counted ██████ URLs that are in notices concerning the

22   pirates who infringed plaintiffs' works.

23             THE COURT:  So if you are counting right, they only

24   owe you another ██████ or so.

25             MR. KANE:  If that's the right number.  I really
```

1    would be stunned if that's the right number.

2          THE COURT:  It may be an apples to oranges problem

3    here.

4          MR. KANE:  I don't think so, Judge.

5          THE COURT:  I would have expected to see a little

6    more clarity in the letter briefs on this, but we will hold

7    that thought for a moment.

8          MR. KANE:  So, in addition to producing just

9    literally what's in the 265-3 spreadsheet, Google has to

10   produce the documents that would show whether they actually

11   delisted an ad or suspended a merchant.  So, in other words if

12   Google claims that, on October 25, 2024, they delisted an ad

13   from a certain website, we need to be able to test did they

14   actually do that, and that's where a sampling --

15         THE COURT:  Hold on.

16         MR. KANE:  Sure.

17         THE COURT:  I'm sorry.  I need to keep straight here.

18   Does this relate to the first spreadsheet still, the delisting

19   spreadsheet?

20         MR. KANE:  Yes.  It would apply to both the delisting

21   spreadsheet and the suspension spreadsheet.  It is the same

22   idea.  So if Google says, okay, in October of 2022 we delisted

23   100 ads pursuant to our DMCA policy for Shopping, we need the

24   list of those hundred ads.  That's the first category of

25   documents.

1          THE COURT:  Which is what, landing page?

2          MR. KANE:  Yes, it is the landing page to which the ad

3     links.

4          Then we need some way to test -- we can't just take

5     their word for it that they really did delist these ads

6     because we have seen evidence that they haven't.  We need to be

7     able to test did they actually delist the ad.  That's where I

8     think sampling makes sense and where I think your Honor's

9     observation that we wouldn't do this for every single ad they

10    delisted or every single merchant they suspended, that's where

11    I think the Court is right.

12         We are perfectly happy, once we get, you know, the

13    total population of ads that they claim to have delisted

14    pursuant to their shopping policy in the total universe of

15    pirates they claim to have suspended as part of the DMCA policy

16    for Shopping, we are perfectly happy to look at that and say,

17    okay, does the sampling approach make sense here?  You know, do

18    we take a 10 percent sample or do it some other way.  And we

19    proposed a general sampling framework at Docket 265-2.

20         But those are the two things that they would need to

21    produce, literally just the list of ads they claim to have

22    delisted and the list of merchants who they claim to have

23    suspended.  That is category one.  Category two is some sort of

24    corroborating or contradicting evidence.

25         THE COURT:  Which you would entertain on a sampling

```
 1    basis.
 2              MR. KANE:  Yes.  It may well be that sampling is how
 3    we would have to go depending on what the overall --
 4              THE COURT:  I thought, backing up a minute ago, you
 5    told me you also wanted a list of the actual takedown notices
 6    received.
 7              MR. KANE:  That's what we have in the 265-3
 8    spreadsheet.  So this is, if you look at Column A, that is like
 9    the ID number that they assign to a notice.
10              THE COURT:  Do you want that for everything?
11              MR. KANE:  Yes.  So there is --
12              THE COURT:  (Indiscernible) you want.
13              MR. KANE:  Yes.  So there are two categories of
14    documents --
15              THE COURT:  (Indiscernible) keep up here.
16              MR. KANE:  Sorry.
17              There are two categories of documents we are asking
18    for.  The first category is just a list of the ads they claim
19    to have delisted and the pirates they claim to have suspended.
20    That is category one.  That cannot be done with sampling.  We
21    need the full list.
22              Category two is once we have that list, we need to be
23    able to test did they actually suspend those merchants they
24    claimed to have suspended, did they actually delist those ads
25    they claimed to have delisted.
```

1          THE COURT:  And how would you propose going about that

2     without getting into details about what percent or --

3          MR. KANE:  Sure.

4          THE COURT:  -- (indiscernible) theory or --

5          MR. KANE:  We did a sampling proposal at Docket 265-2,

6     but the basic idea is for the ads that they claim to have

7     delisted, we would take a sample of those at -- of those

8     websites and ask Google to produce the ads data for those

9     websites.  That would allow us to see did they run any ads

10     for -- like, did they run an ad that they claimed to have

11     delisted.  So if they said they delisted it on January 15,

12     once we add the ads, we could see did they in fact run an ad

13     for it on February 1.  So we would do that on a sampling

14     basis.

15          Same with suspensions.  They would give us the list

16     of merchants they claim to have suspended.  We would pick a

17     sample of those and say, okay, give us the ads you ran for

18     that particular merchant.  And we would be able to see if they

19     claimed they had suspend it on February 15, 2024, did they run

20     an ad for that pirate after February 15, 2024.  That part we

21     can do on a sampling basis, you know, presuming that it is a

22     large enough population because we need the sample.

23          But unless we have that, Google is just saying, okay,

24     you know, in the course of three years we delisted whatever it

25     is, 200,000 ads, a million ads, and they are being allowed to

1  just say that without actually offering evidence that they

2  did.

3          THE COURT:  Well, you say they are being allowed to

4  just say that as if someone is going to stand up in trial and

5  say "this is our DMCA defense."  I'm just not sure it is.

6          MR. KANE:  Well, they are going to have to present

7  evidence that they had a --

8          THE COURT:  (Indiscernible) say something, obviously.

9          MR. KANE:  Yes.  They are going to have to say at

10  trial, this is the reason we should get the DMCA defense.

11  Because, remember, it is their whole DMCA program that's at

12  issue here.  It's not confined to our pirates.  So they will

13  have to say, I presume, you know, in the course of this

14  three-year period we received a million notices.  You know, 60

15  percent of the time, we delisted the ad.  30 percent of the

16  time, we couldn't find the content.  10 percent of the time

17  the notice was insufficient.  They can't just give those

18  numbers to the jury without there being some mechanism for

19  plaintiffs to test whether those numbers are accurate.

20          THE COURT:  Understood.  But until we know what

21  numbers they are planning to give to the jury, I don't know

22  what to give you discovery on.

23          MR. KANE:  So it should be just what we just said.  It

24  should be those two categories, all the ads that they claim to

25  have delisted, all the merchants that they claimed to have

```
 1    suspended, and then some sample in order --

 2              THE COURT:  How many ads did they claim to have

 3    delisted?

 4              MR. KANE:  In the delisting spreadsheet -- sorry,

 5    what?

 6              THE COURT:  Go ahead.

 7              MR. KANE:  In the delisting spreadsheet, they claimed

 8    to have suspended          for the Shopping platform.

 9              THE COURT:  And list of pirates suspended?

10              MR. KANE:  Give me one second.  That's --

11              THE COURT:        ?

12              MR. KANE:  We don't have that broken down by -- for

13    just the Shopping platform.  They claim to have done

14    in one of spreadsheets that they provided.

15              THE COURT:  Where did that        -- or that was

16         notices.  And you do or you don't want those

17    notices listed out for you?

18              MR. KANE:  We want the lists, as in what's in the

19    265-3 spreadsheet.  We don't need the literal notices.  We can

20    do that on a sampling basis.  So the literal list of the ads

21    they claim to have delisted, that's the 265-3 spreadsheet.  We

22    do need that.  That's the first category of documents.  Same

23    with the pirates they claimed to have suspended.

24              THE COURT:  I'm sorry.  You have lost me.  I'm sure

25    it is my fault and not yours.
```

```
1              MR. KANE:  It's okay.  So Google at some point is
2    going to say, as part of our DMCA program, we delisted a
3    million ads.  I have picked a number at random.  Plaintiffs
4    need to be able to have some way of cross-examining whoever
5    offers that evidence.  So Google can't just produce a
6    spreadsheet, like what they have done in the delisting
7    spreadsheet, that just says, okay, in October of 2022, we
8    terminated 10,000 -- we delisted 10,000 ads.
9              Likewise, Google at some point --
10             THE COURT:  This is not my problem.
11             MR. KANE:  Sorry.
12             THE COURT:  My problem is still what you want, and
13   throwing around docket numbers is not all that helpful to me.
14             So Google tells you, in one of these spreadsheets,
15   that they have delisted ███████ ads approximately.
16             MR. KANE:  Correct.
17             THE COURT:  Limited to the Shopping platform.  And you
18   don't know how many pirates Google tells you that they have
19   suspended connected to the Shopping.
20             MR. KANE:  Correct.
21             THE COURT:  So let's just focus on the ██████ ads
22   delisted for now.  For each one of those ads, you want the full
23   suite of information that you have now in Docket 265-3 with
24   respect to the 1239?
25             MR. KANE:  We really just need the URL, like the ad
```

KJC REPORTING & TRANSCRIPTION (848) 459-3124

1    itself, the landing page of the ad --

2            THE COURT:  Okay.

3            MR. KANE:  -- the case ID, and what they claim to

4    have done with it, whether they have claimed to have removed

5    it or not removed it or reinstated it or whatever.

6            THE COURT:  You want a portion --

7            MR. KANE:  Correct.

8            THE COURT:  -- of 265-3.

9            MR. KANE:  Correct.

10           THE COURT:  Three columns—the landing page of the

11   ad, the case ID, and the result.

12           MR. KANE:  Correct.  And I guess we would need the

13   date of the result.

14           THE COURT:  So four columns.

15           MR. KANE:  Correct.

16           THE COURT:  And those columns are?

17           MR. KANE:  So it's in the 265-3 spreadsheet.  It's

18   Column A, Column B, Columns M and N is the result, and then --

19           THE COURT:  Does that include the date?

20           MR. KANE:  No.  The date is separate.  It's Columns P,

21   Q, and S.

22           THE COURT:  All right.  So you want Columns A, B, M,

23   N, P, Q, and S for ███████.

24           MR. KANE:  Yes.  If ███████ is the number they are

25   going with.

KJC REPORTING & TRANSCRIPTION (848) 459-3124

```
 1              THE COURT:  That's the number that you say are the
 2    number of ads delisted according to the delisting spreadsheet
 3    filtered for the Shopping platform.
 4              MR. KANE:  Correct.  The number of ads that were
 5    delisted as part of the DMCA program for Shopping, as opposed
 6    to some other platform.
 7              THE COURT:  Okay.  So, first, you want Columns A, B,
 8    M, N, P, Q, and S taken from the spreadsheet at Docket 265-3
 9    for each of those approximately ████.
10              MR. KANE:  Correct.
11              THE COURT:  Second, you say you want a list of the
12    ads deleted.  Is that separate or is that Column A?
13              MR. KANE:  No.  That's Column A --
14              THE COURT:  Okay.
15              MR. KANE:  -- or Column B, rather.
16              THE COURT:  All right.  So you don't separately need
17    a list of the ads deleted.
18              And now you say you want a list of the pirates
19    suspended.
20              MR. KANE:  Correct.  And that is --
21              THE COURT:  What is that going to look like?
22              MR. KANE:  That looks like this.  This is Bates
23    ending 0703.  It is cited on page 2 of our reply brief, I
24    believe.  And this has the merchant ID for the pirate, the
25    website with which the pirate is affiliated, and then, in
```

1  Column P and K, whether Google claims to have suspended the

2  pirate.

3           THE COURT:  All right.  And what columns of the

4  spreadsheet do you want for all of the suspended pirates?

5           MR. KANE:  It would be A and B, which is, like -- I

6  should say A, B, and C, which is, like, the identifier for the

7  pirate; columns P and Q, which is whether they claimed to have

8  suspended it; and I suppose the reason, Column S.

9           THE COURT:  And Column S.  A, B, C, P, Q, and S.  Now

10 show me where this is in your reply papers.

11          MR. KANE:  So on the first page --

12          THE COURT:  On the first page.

13          MR. KANE:  -- it lays out the two categories of

14 documents we are looking for.

15          THE COURT:  Okay.

16          MR. KANE:  And it is what we have just been

17 discussing, a list of the ads they claim to have delisted and

18 a list of the pirates they claim to have suspended.  That is

19 under the (indiscernible) first.

20          THE COURT:  No, no.  I am asking you where I can see

21 the spreadsheet that lists out these various columns.

22          MR. KANE:  Oh.  That is cited -- we didn't attach it

23 to the brief, but it is cited --

24          THE COURT:  You did not attach it.

25          MR. KANE:  Yes.  It is cited at page 2 of our reply

1    brief, which is Docket 264.

2         THE COURT:  You have given it by Bates number?

3         MR. KANE:  Yes.  On page 2, the paragraph that starts

4    "Google has produced."

5         THE COURT:  Bates number ending 703?

6         MR. KANE:  0703, that's right.  The sentence is --

7         THE COURT:  What you are saying to me now is you want

8    the same thing, or at least columns A, B, C, P, Q, and S of

9    the same thing with respect to the pirates suspended.

10         MR. KANE:  Exactly, yeah.  So we are asking for a

11    list of the ads delisted and the pirates suspended and then we

12    would have to do some sort of sample -- I believe it would

13    have to be sampling to test whether they actually delisted or

14    suspended.

15         THE COURT:  We haven't even gotten to the sampling

16    information yet.  This is just what you want for everybody.

17         MR. KANE:  Correct.  And to be clear, when we say

18    "everybody," it is everybody with respect to the DMCA program

19    for Shopping.

20         THE COURT:  For the Shopping.

21         MR. KANE:  Yes.  Not for Web Search or YouTube or

22    anything like that.

23         THE COURT:  Right.  And not to beat a dead horse, but

24    the numbers here are with respect to URLs ███████    And with

25    respect to pirates suspended, you don't know.

```
 1              MR. KANE:  Correct.

 2              THE COURT:  Okay.

 3         Let me hear from Google.

 4              MR. KANE:  My turn?  Okay.

 5         Your Honor, I guess I just want to start where you

 6    started and ask you if you have any further questions for me

 7    on preclusion or FRE 106 -- I think 1006.  I think we laid

 8    that out in our brief, and I know that you said that you were

 9    inclined to agree that preclusion is extremely premature at

10    this time and that these are not FRE 1006 summaries as opposed

11    to business records.

12              THE COURT:  No.  Nothing that I heard from Mr. Kane

13    has moved the needle on that.  I don't -- to be fair, I don't

14    think that's what he was mostly addressing.  But looking at

15    this, not through the lens of a preclusion motion, but just

16    through the lens of an ordinary motion to compel the

17    production of additional documents or data that are relevant

18    to the plaintiffs' claims or the defendant's defenses, such as

19    the DMCA defense, and that are proportional to the needs of

20    the case, yes, whether I agree with Mr. Kane or not that he

21    needs this many columns for this many merchants, I don't think

22    it is too early for us all to begin to ask ourselves what kind

23    of information does Google need to produce with respect to the

24    existence and efficacy of its takedown program beyond the

25    works in suit.
```

```
 1            MS. TOMKOWIAK:  Okay.  Well, your Honor, we have in

 2    fact produced certain information regarding domains beyond the

 3    1239 works -- domains that we have been talking about today,

 4    and I can get to that.

 5            I do just want to point out, though, that when -- we

 6    have not articulated what we are going to rely upon at trial.

 7    We have not yet submitted our expert reports.  We produced

 8    these spreadsheets, and they are business records and they are

 9    themselves evidence of what is reflected therein because the

10    plaintiffs asked for them.  So we produced them because they

11    wanted to know the number of infringement notices that we

12    processed and they wanted to know the number of merchants that

13    we suspended for any reason.

14            And so I don't think that it is fair to say that we

15    have -- in so doing that and agreeing to produce documents

16    where we reserve the right to argue about their admissibility

17    or relevance later, that now we have somehow undertaken an

18    obligation to produce additional data underlying them.

19            With respect to what we need to produce in order to

20    meet our burden to show our affirmative defense of the DMCA

21    safe harbor, our position is that this data is not necessary.

22    We have already produced -- we have produced data relating to

23    almost ▮▮▮▮ domains.  That includes the 1239 domains plus some

24    additional domains that happen to be associated with merchants

25    historically connected to those in this case and then also
```

1   merchants connected to those in this case by e-mail, and that

2   is a product of disputes that we had a long time ago.

3        That  has resulted in us producing information

4   regarding over ███████ URLs.  It has resulted in us producing

5   information for over 20,000 merchants.  It has resulted in us

6   producing ████████████ rows of raw offer data that translates

7   to I think over ██████████ unique offer IDs, and then

8   additional ads data, clicks, impression and conversion data

9   relating to those.

10        So maybe were this a case where there were ten works

11   in suit or 20 works in suit we would suggest that we need to

12   go outside of that to get a bigger picture of our DMCA

13   program.  But it is our position that what we have produced

14   here is, in and of itself, sufficient to evaluate whether we

15   expeditiously responded to takedown notices and whether we

16   reasonably implemented a repeat infringer policy.

17        THE COURT:  Let me make sure I understand what you

18   are saying.

19        MS. TOMKOWIAK:  Sure.

20        THE COURT:  Because I think what I heard you say is

21   that you don't think you need to go beyond the works in suit

22   to establish your affirmative defense.

23        MS. TOMKOWIAK:  No.  I am actually saying that we

24   have -- the discovery that we have produced has started from

25   one of two places—either a domain or a merchant ID which we

1    have found using the domains.  And what I hopefully -- what I

2    tried to articulate, and maybe was not clear, is that we have

3    in fact produced information about domains beyond the 1,239

4    that have been identified by plaintiffs as relating to the

5    works in suit.  So I actually think we have --

6                 THE COURT:  And --

7                 MS. TOMKOWIAK:  -- already done that.

8                 THE COURT:  But those other domains are connected to

9    the 1,239 through what exactly?

10                MS. TOMKOWIAK:  That gets complicated.

11                One of two ways.  So they are either domains that are

12   associated with merchant IDs that were historically connected

13   to the 20,000 merchant IDs connected to the domains in this

14   case or --

15                THE COURT:  Say that again.

16                MS. TOMKOWIAK:  Yes.  One too many "merchant IDs"?

17   Okay.  Let me try it again.

18                They are currently linked domains associated with

19   historically connected merchant IDs.

20                THE COURT:  So two degrees of separation from the

21   1,239 domains.

22                MS. TOMKOWIAK:  Yes.

23                THE COURT:  The same guy or gal is behind them, you

24   think.

25                MS. TOMKOWIAK:  That is ── I mean, we don't know.  I

1    don't have the personal -- I don't have a view on that one way

2    or the other, but that's what we know.

3          THE COURT:  So a couple of high-level observations

4    here, because I think your position comes with some risk.

5          You do have the burden of proof as to an affirmative

6    defense, including the DMCA affirmative defense under Section

7    512(d), which means a number of things.  One of the things it

8    means is that if you have failed to produce in discovery

9    documents upon which, for example, your expert may rely, that

10   may be fatal to the admissibility of your expert's report.

11   And a related risk, of course, is that, should the district

12   court should rule at some time, I think, in the future—I

13   imagine this would be on the district judge's plate—that you

14   cannot carry your burden without providing some insight into,

15   and consequently some discovery concerning, your takedown

16   activities with respect to merchants who, as far as we know,

17   are completely unconnected to the works in suit through either

18   one or two or three degrees of separation, then you would be,

19   to use the technical legal phrase, SOL.  Right?  and those are

20   risks that you are running.

21         MS. TOMKOWIAK:  I -- sorry.  Go ahead.  I didn't mean

22   to interrupt.

23         THE COURT:  But to look at it from plaintiffs'

24   perspective, while plaintiff might, in the end, choose to

25   embrace that view of the world, I mean, I can see a plaintiff

1  making a strategic decision at this point to say, okay, fine,

2  Judge Moses, don't make them produce anything further.  They

3  will regret it down the line.

4         I am not required, for discovery purposes, to

5  determine now whether you are right or wrong with your view

6  that you don't need to go beyond the domains that you have

7  already provided discovery on in order to carry your burden on

8  the defense.  That's right, isn't it?  I don't have to decide

9  that question now.

10        So if there is a reasonable possibility that the

11  affirmative defense cannot be maintained without a broader

12  look at how robust Google's takedown program is, then I am

13  entitled to require you to produce additional discovery into

14  that program at this time, again, unconnected—because I

15  really do think it is unconnected—unconnected to whether the

16  data we are arguing about backs up or doesn't back up or rolls

17  up to or doesn't roll up to the spreadsheets that you

18  produced.  I take your point that these spreadsheets were

19  produced as ordinary fact discovery, not because they

20  represent your position.  But that doesn't end the question

21  for me today as a matter of ordinary fact discovery.

22        Or, to put it another way, why isn't there at least

23  some relevance to be moderated by proportionality concerns?

24  Why isn't there at least some relevance to the question of how

25  Google handles, let's say, a sample of random shopping

1  takedown notices, which are not connected necessarily to the

2  works in suit?

3        MS. TOMKOWIAK:  I mean, I think your Honor actually

4  could -- I hear you to be saying that you are not going to

5  decided today, but I think you could look at the cases that we

6  have cited in our brief and decide that courts, you know, have

7  been able to determine eligibility for the safe harbor based

8  on a defendant's handling of even just infringement notices

9  from just the plaintiffs in those cases.

10        Again, here, we have gone beyond that.  They have

11  notices -- we have given them notices, not just from the

12  plaintiffs, but from other third parties related to these

13  particular domains.

14        So I think what I am saying is just that, you know,

15  we were here before you in October.  I remember you saying

16  that just because we have an affirmative defense under the

17  safe harbor, that doesn't mean they get to audit every single

18  infringing -- potentially infringing act or takedown notice

19  that Google has ever handled in its history.  I think that --

20        THE COURT:  That is still my view, by the way.

21        MS. TOMKOWIAK:  Good.

22        THE COURT:  But that doesn't also mean that the

23  discovery you have provided so far is all discovery you are

24  ever going to be able or required to provide with respect to

25  your takedown program.

```
1              MS. TOMKOWIAK:  I understand.  I think that it
2    just -- if we are all talking about proportionality, you know,
3    I am not going to belabor that the we, too, really did not
4    understand what they were asking for and it seemed like
5    everything, and I still hear Mr. Kane in some respects to be
6    asking for everything.  But if we are talking, again, about
7    what is proportional, it is just our position is that what we
8    have produced, it does go beyond the works in suit.  It is
9    what's proportional.
10             You know, I -- earlier this afternoon, you have
11   ordered us to produce information about another 261 --
12             THE COURT:  261, right.
13             MS. TOMKOWIAK:  -- domains that we would argue,
14   again, is above and beyond what is actually relevant in this
15   case.  And at some point there is just like diminishing
16   returns here, for lack of a better word.  And we only have so
17   much time in this case.
18             Mr. Kane is just incorrect that there is just a script
19   sitting out there at Google and someone -- every time we go
20   back to them, they just press the magic button and spit these
21   things out.  But the things he is asking for are not things
22   that we have necessarily pulled before.  He is making it seem
23   like it is very simple.  It is not.  In every case we have
24   started with specific domains that lead to specific merchant
25   IDs.  Now we are starting from places of different types of
```

```
1    reports that don't have specific merchant IDs in them.  You
2    know, at some point it does -- you know, the burden of doing
3    all of this does outweigh the diminishing relevance of the
4    discovery sought.
5              THE COURT:  At some point.
6              MS. TOMKOWIAK:  Yes.
7              THE COURT:  I agree with you.
8              Now, do you want to address some of the points that
9    Mr. Kane made about how he reads your spreadsheet?  For
10   example, can it possibly be true that the delisting
11   spreadsheet shows only ████████ or so URLs taken down with
12   regard to the Shopping platform, which seems like a low
13   number, given that the plaintiffs themselves are connected to
14   ████████████████████?
15             Did I get those numbers right, Mr. Kane?
16             MR. KANE:  Yes.
17             THE COURT:  He also said that he was unable to tell
18   or maybe hadn't run the program yet—I am not sure which—how
19   many ads were removed connected through the shopping program
20   of the --
21             MR. KANE:  It's how many pirates were delisted as
22   part of the --
23             THE COURT:  Thank you?  How many --
24             MR. KANE:  I'm sorry.  How many pirates were
25   suspended, you know, (indiscernible) terminated.
```

KJC REPORTING & TRANSCRIPTION (848) 459-3124

```
1            THE COURT:  On the suspension spreadsheet, correct?

2            MR. KANE:  Yes.

3            THE COURT:  Okay.

4            MS. TOMKOWIAK:  Yes.  So on the first question, in my

5    declaration --

6            THE COURT:  Hold on.  Let me get to that.

7            MS. TOMKOWIAK:  Can I also, while you are pulling

8    that up, just say that the delisting spreadsheet is the

9    plaintiffs' term for that.  That is not --

10           THE COURT:  What do you call it?

11           MS. TOMKOWIAK:  Well, I was just -- notice

12   spreadsheet might be a better term.  I don't know that -- we

13   created it for purposes of this litigation.  We queried a

14   database and put -- you know, it created this report.  So it's

15   not like something that, you know, came with the title

16   "delisting spreadsheet."

17           THE COURT:  Okay.

18           MS. TOMKOWIAK:  But, anyway, in this spreadsheet I

19   explain, in paragraph 11 of my declaration --

20           THE COURT:  Hold on.  Let me get there.

21           MS. TOMKOWIAK:  It's on page 4.

22           THE COURT:  Go ahead.

23           MS. TOMKOWIAK:  Do you want me to read it into the

24   record?

25           THE COURT:  You say you have reviewed the document,
```

KJC REPORTING & TRANSCRIPTION (848) 459-3124

```
 1    which is not a delisting spreadsheet, in your view.  You have
 2    reviewed the document, and let's see.  What do you say about
 3    it here?
 4             MS. TOMKOWIAK:  Well, what I say is that the product
 5    field in Column B reflects the product that is selected by the
 6    complainant using the Google form.
 7             THE COURT:  So if they say it is Shopping, it shows up
 8    as Shopping.
 9             MS. TOMKOWIAK:  And if they say it is Search, it shows
10    up as Search and Shopping ads can appear on multiple Google
11    platforms.
12             THE COURT:  Okay.
13             MS. TOMKOWIAK:  So it is possible that, you know, some
14    of the product fields that are not Shopping are in fact for
15    Shopping ads.
16             THE COURT:  Okay.  And then in paragraph 11 you say
17    that FTI derived the number ▇▇▇▇▇ URLs noted, right?
18             MS. TOMKOWIAK:  Yes.  Correct.  You are looking at
19    paragraph 13?
20             THE COURT:  I am.
21             MS. TOMKOWIAK:  Okay.
22             THE COURT:  And how does that address Mr. Kane's
23    query, like how come there are only ▇▇▇▇▇ if we accounted for
24    ▇▇▇▇▇ of them?
25             MS. TOMKOWIAK:  Well, I think that what we are saying
```

```
 1    is that -- I think we largely agree on the number when it

 2    comes to what is reflected in this spreadsheet as to Google

 3    Shopping, that it is only a little over ██████ and that is

 4    out of a total of ██████████ you know, URLs on the

 5    spreadsheet.

 6              So I apologize.  I don't think I am following your

 7    question.

 8              THE COURT:  Mr. Kane's point, if I understood it

 9    properly, was, look, Judge, we, plaintiffs, account for

10    ████████ and change, and it just can't be the case -- it

11    doesn't make common sense to say that over █████████ of all

12    of the URLs noticed were noticed by us.  So one of those two

13    numbers has to be wrong.

14              MS. TOMKOWIAK:  Yes.  I am -- yes, I think that's

15    right.  I think that the relevant denominator there would be

16    the ██████████

17              THE COURT:  So you --

18              MS. TOMKOWIAK:  I think that it is --

19              THE COURT:  -- think it's accounted for ████████ out

20    of ████████ --

21              MS. TOMKOWIAK:  I think that ████████ --

22              THE COURT:  -- just on Shopping platform?

23              MS. TOMKOWIAK:  No, across all products.

24              THE COURT:  Okay.  But what about those -- what about

25    complainants who now you say the Shopping column comes up
```

1    because the complainant said, my problem is with the Shopping

2    platform?  Do the plaintiffs here, Cengage, etc., actually

3    represent more than ███████████ of all complainants who sent in

4    notices of infringement with respect specifically to the

5    Shopping platform?  That just doesn't sound sensible to me.

6              MS. TOMKOWIAK:  No, I don't think so.  I think we are

7    in agreement that they don't.  They don't.  I think that their

8    own -- we looked at their own notices and they themselves do

9    not always select the shopping product.

10             THE COURT:  Okay.

11             MS. TOMKOWIAK:  Yes.  So some of them are also

12   Search.

13             THE COURT:  But 50 percent of them? 80 percent of

14   them? 20 percent of them?

15             MS. TOMKOWIAK:  That I don't know.

16             THE COURT:  All right.  I am still left with more

17   questions than answers here.

18             MS. TOMKOWIAK:  Okay.  I mean, I think the -- what I

19   am trying to articulate is that a Shopping ad does not

20   necessarily -- if you fill out the form and you are

21   complaining about a potentially infringing Shopping ad, you

22   might not select the Shopping product category --

23             THE COURT:  Got it.

24             MS. TOMKOWIAK:  -- because that ad might --

25             THE COURT:  And that's true for --

```
 1                MS. TOMKOWIAK:  -- show up on another --
 2                THE COURT:  -- the plaintiffs here as well as for the
 3      rest of the universe.
 4                MS. TOMKOWIAK:  Correct.  So I don't think,
 5      therefore, you can just take the ███ --
 6                THE COURT:  And compare it to ███.
 7                MS. TOMKOWIAK:  -- thousand -- right.
 8                THE COURT:  So maybe -- maybe one way to ask the
 9      question—and this would be a question for Mr. Kane, who may or
10      may not know the answer—of your folks, of the infringement
11      notices that plaintiffs sent in, which you say were about
12      ███████  correct, in total?
13                MR. KANE:      ██████  is the URLs named in notices about
14      the pirates who infringed our works.  So they are not all from
15      us, but they all concern the pirates who infringed our works.
16                THE COURT:  And were they all -- did they all show up
17      with Shopping in the correct column there?  Did all of the
18      complainants select Shopping?
19                MR. KANE:  When we send notices about a Shopping ad,
20      we select the Shopping option.  We can't speak to other rights
21      holders.
22                THE COURT:  Other people who complain about the same
23      URLS may not have done so.
24                MR. KANE:  I suppose that's possible.
25                The issue, though, Judge, is, like, whatever DMCA
```

1    policy Google applied to the notice is what determines

2    which -- you know, whether it is relevant to this case.  In

3    other words, if someone submits an infringement notice as a

4    YouTube notice and Google applies its YouTube DMCA policy,

5    which I believe is a ███████████ not a -- sorry, a

6    ████████████ and not a ████████████, then they

7    don't get to count that notice as part of their DMCA defense in

8    this case.

9          THE COURT:  By the same token, you are not seeking

10    discovery on it.

11          MR. KANE:  Exactly.

12          What Google is trying to say is that the discovery

13    they produced with respect to the pirates who infringed our

14    works is a representative sample of what Google did in its

15    overall DMCA program for shopping.  We can't say that unless

16    we know what the total population is.  In other words, however

17    many URLs they claim to have produced information about—so

18    let's say it is ██████, just for a round number—we don't

19    know whether that is ██████ URLs out of a million URLs, out

20    of two million URLs, out of ten million URLs.  We need to know

21    what the denominator is if we are going to be able to say,

22    okay, what they have produced about our pirates is enough.

23    And that is what Google just fundamentally hasn't told us

24    either in its briefing or at the hearing today.

25          THE COURT:  I'm sorry.  You want to know -- explain

1    what you mean when you say what the denominator is.

2         MR. KANE:  Okay.  So Google is trying to say the

3    discovery we produced about the merchants who infringed

4    plaintiffs' works is enough, we don't need to go any farther

5    than that.  They are trying to say it is a representative

6    sample of what Google did in its overall Shopping DMCA

7    program.

8         THE COURT:  "Representative sample" is your term, not

9    Google's.  I think what you are saying is the only -- the only

10   justification for limiting it would be if that were a

11   representative sample.  That's --

12        MR. KANE:  Correct.

13        THE COURT:  -- the argument you are trying to make.

14   And since you are not convinced it is a representative sample,

15   you conclude, therefore, it is not enough.

16        MR. KANE:  That is exactly right.  And nobody could

17   conclude that it is a representative sample because Google

18   hasn't explained what is the total population.  In other

19   words, they haven't said, We claim that we received X numbers

20   of notices, Shopping ads, DMCA notices during the relevant

21   period.  We claim that we delisted this many ads in total.  We

22   claim that we suspended this many pirates in total.

23        That is the overall population that we would need in

24   order to be able to say, okay, what percentage of that

25   population -- you know, what portion of that population is

1    covered by the pirates who infringed the works in our  case.

2    If we don't have that, we have no way of testing whether

3    the -- what the discovery they produced so far is enough.

4            If the number is -- if it's ▮▮▮▮▮URLs that they

5    have produced and the total number is ▮▮▮▮▮ that may be

6    enough.  We may ask for a tiny sample of ▮▮▮▮▮▮▮ or

7    just for the ▮▮▮▮ because it is not that many.  But if the

8    real number is 10 million or 20 million, it may be far too

9    little.

10           So what Google needs to do in the first instance is

11   tell us what those numbers are.  What are the numbers of ads

12   that they claim to have delisted as part of their Shopping

13   DMCA policy and what are the number of pirates they claim to

14   have suspended as part of their Shopping DMCA policy.

15           THE COURT:  I thought they had already told you the

16   number and now you want the detail.

17           MR. KANE:  They have given us the ▮▮▮▮ number as

18   the delisted.  If they are sticking with that, okay.  For the

19   reasons we have discussed, I just don't -- I don't think that

20   is the right number.  They seem to be saying there was ▮▮▮

21   ▮▮▮▮ which is crazy.

22           THE COURT:  No.  That is not limited to Shopping,

23   right?

24           MR. KANE:  That's what I am saying.  Like, the

25   denominator has to be limited to Shopping -- delistings in the

```
 1    Shopping platform.
 2             Once they tell us how many ads they claim to have
 3    delisted and how many merchants they claim to have suspended,
 4    then we can do some sort of sampling to say -- and we can base
 5    it probably on what they have already produced of, okay, here
 6    is how many -- we need you to produce ads for this many
 7    merchants or ads data for this many pirate websites.
 8             THE COURT:  I'm not happy with either side's position
 9    here.
10             Google.
11             MS. TOMKOWIAK:  Can I --
12             THE COURT:  You may.
13             MS. TOMKOWIAK:  -- make a suggestion?  Okay.
14             So, it sounds like -- well, your Honor just said you
15    are not happy with either side's position.
16             THE COURT:  I am not.  And let me --
17             MS. TOMKOWIAK:  And I take it from your comments that
18    you are looking for a path forward to us producing some more
19    discovery into our platform, albeit not, perhaps, the -- as
20    broad as the plaintiffs would like.  And if --
21             THE COURT:  She is psychic.
22             MS. TOMKOWIAK:  Right.
23             So we --
24             THE COURT:  So let me sharpen that up for you.
25             MS. TOMKOWIAK:  Yes.
```

```
 1              THE COURT:  What is going through my head and now is

 2    going to be shared with you, is I think we ought to be

 3    starting with the notion of sampling, not starting with

 4    everything in the world and then figuring out how much

 5    sampling we need.

 6              It seems to me that maybe we could -- do you have

 7    this data by month? by week? by day?

 8              MS. TOMKOWIAK:  I'm not sure what you mean by "data."

 9              I don't think we are going to be able to figure out,

10    like, how many product categories should have been selected as

11    shopping but weren't by people who filled out the forms.  I

12    don't think that's something that we --

13              THE COURT:  No, and I don't think that Mr. Kane is

14    asking for that either.  I think he is willing—I think—to

15    live with a definition of shopping as it appears in Google's

16    current data.  If somebody wrote in to complain about a

17    Shopping ad but clicked on the wrong button and said it was a

18    YouTube problem, too bad; we are just not dealing with that.

19              Is that correct, Mr. Kane?

20              MR. KANE:  Yes.  Whichever DMCA policy they applied

21    to the notice, like that's what determines which ones are

22    Shopping notices.

23              THE COURT:  But why can't we -- we have to start

24    somewhere.  Why can't we start with one of these spreadsheets,

25    take a random month, for example.  Please be -- I want to be
```

1    clear.  I am not making a ruling here.  I am tossing out an

2    idea.  Take a random month -- or perhaps a narrower slice

3    would make more sense, because I am very sensitive to the

4    burden issue here.  I know that once you take, for example, a

5    URL that's been delisted and you drill down, that's a lot of

6    data that you have to pull up.

7            But why can't we take some relatively random cut,

8    beginning with one of these spreadsheets, confined to

9    infringement notices that self-identify as named at the

10    Shopping platform, and give the plaintiff a peek at the data

11    underlying that month's takedowns, for example, confined to

12    Shopping.  Does plaintiff have any reason -- do plaintiffs

13    have any reason to believe at the moment that, you know, March

14    of 2022 was materially different from January of 2023?

15            MR. KANE:  Our experience in sending notices was that

16    the enforcement by Google did --

17            THE COURT:  Vary?

18            MR. KANE:  -- improve in quality.

19            Sorry?

20            THE COURT:  Did vary over time.

21            MR. KANE:  It did vary over time.

22            THE COURT:  So maybe that's not just a genius idea to

23    pick a single block of time.  But there has to be some way of

24    giving the plaintiff data which is not directly connected or

25    closely connected to the works in suit that gives the

1    plaintiff a peek into how the larger Shopping takedown program

2    was being run that doesn't involve an audit of the entire

3    program for every month and every year and every infringement

4    notice and every URL that was taken down.

5          MR. KANE:  My reaction to that is we really can't

6    take a sample and claim that it is representative or effective

7    or whatever until we know something about the overall

8    population.  In other words, Google would at least have to

9    give us the number.  They would have to say --

10          THE COURT:  What number?

11          MR. KANE:  They would have to say, over the relevant

12    period, we claim that in our Shopping DMCA program we delisted

13    X number of ads and suspended Y number of merchants.  We would

14    at least need that in order to take a sample of -- like if we

15    were going to use sampling to have Google give us the list of

16    URLs they took down and the list of pirates they claim to have

17    terminated --

18          THE COURT:  They have already given you the number,

19    but you want the list.

20          MR. KANE:  I think that is the most direct way to do

21    it, to say give us the list of URLs that you took down and

22    then the parties configure out a sampling protocol for what

23    else Google is going to produce.

24          THE COURT:  Google?

25          MS. TOMKOWIAK:  I am not sure I follow.  I mean, I --

1   this spreadsheet lists URLs.

2          THE COURT:  What spreadsheet are we looking at?  What

3   is up on the screen at the moment?

4          MR. KANE:  This is the delisting spreadsheet.

5          THE COURT:  Okay.  Where are the URLs?  What column?

6          MR. KANE:  There is a count of URLs in Column G.

7          THE COURT:  Right.

8          MR. KANE:  There is a --

9          THE COURT:  But there is not a list.

10         MR. KANE:  Correct.

11         And we don't know -- and after quite a long colloquy

12   with the Court, we don't know what of these URLs they are

13   claiming were suspended pursuant to the Shopping DMCA policy.

14   That is sort of a threshold number that they have to give

15   us—how many URLs do they claim to have delisted as part of

16   their Shopping DMCA policy.

17         THE COURT:  And it's not ██████████  We are going

18   around in circles here.  Is it me?

19         MR. KANE:  I think the issue, Judge, is they don't

20   know.  They are having trouble putting a number on this.  I

21   don't think they know how many URLs they claim to have

22   delisted as part of their Shopping DMCA program.  I don't

23   think they know how many pirates they claim to have suspended

24   as part of their Shopping DMCA program.  And I think that is

25   the, sort of, primary or first roadblock to this discovery, is

1    Google wants to say we should do this on a sampling basis;

2    but, in order to do that, they have to give us the total

3    population.

4            THE COURT:  Judge Moses is thinking they don't want

5    to do it on a sampling basis.

6            MR. KANE:  But in order to do that, you need to know

7    the total population.

8            MS. TOMKOWIAK:  I think that comes from this broad

9    idea that this has to be mathematically representative, and

10   that is not -- what I understand your Honor to be ordering

11   here as --

12           THE COURT:  I haven't ordered anything yet.

13           MS. TOMKOWIAK:  -- much as ordering something

14   proportional.

15           Yes.  No, I understand.  And thank you.  I appreciate

16   that.

17           There is another spreadsheet that we haven't talked

18   about that -- and this is -- what I was thinking is that it

19   does have URLs in it, and I think that that's the fourth

20   spreadsheet, the strike tracker.

21           THE COURT:  Hold on one second.  So that is the one I

22   also don't have on paper.  That is the manual strike tracker?

23           MS. TOMKOWIAK:  Correct.

24           THE COURT:  Do we have a copy of that available

25   electronically?  Here it is.  You have to make it bigger, so I

KJC REPORTING & TRANSCRIPTION (848) 459-3124

```
1   can read it.
2           MR. KANE:  Yes.
3           THE COURT:  All right.  What am I looking at?
4           MS. TOMKOWIAK:  So this is a ███████████████
5   ████████████████████████████████████████████████████████
6   ████████████████████████████████████████████████████████
7   ████████████████.  And although I haven't discussed this
8   with Google, but in -- sitting here and trying to think of a
9   path forward, it might be that if we have to start somewhere
10  and select a sample of URLs that this is the better place to
11  start, given that it actually contains URLs.
12          THE COURT:  Well, it actually contains URLs, but --
13          MS. TOMKOWIAK:  That were processed pursuant to the
14  Shopping policy.
15          THE COURT:  Well, if I understand it -- and there is
16  a very real risk that I don't here, so I will be looking to
17  the parties to correct me, but at least as explained by
18  plaintiffs in their moving letter, this document -- is "manual
19  strike tracker" actually what Google calls it or is that what
20  plaintiff calls it?
21          MS. TOMKOWIAK:  I think that is actually what Google
22  calls it.
23          THE COURT:  All right.  I am going with that.
24          The manual strike tracker tracks ████████████████
25  ██████████████████████████████████████████, correct?
```

```
 1   That's how plaintiffs explain it.  At least if it's accurate,
 2   that's what it is supposed to be doing.
 3          MS. TOMKOWIAK:  I think, generally speaking, that is
 4   correct.
 5          THE COURT:  All right.  But it is kept manually.  It
 6   is kept by human beings.
 7          MS. TOMKOWIAK:  Correct.
 8          THE COURT:  So if the human being is inattentive and
 9   fails to log something properly, it doesn't get on the manual
10   strike tracker.
11          MS. TOMKOWIAK:  Yes.  I think in both spreadsheets
12   there is some element of human inaccuracy, right?  If a human
13   selects the wrong product, for example, in the last one or a
14   human doesn't add it in this one, I don't think that either
15   dataset, unfortunately, is going to be perfect.
16          THE COURT:  All right.  But is it Google's
17   understanding that, leaving aside, perhaps, some unavoidable
18   degree of human error which, as you point out, is always with
19   us, this spreadsheet should list ███████████████████████████
20   ███████████████████████████████████████████?
21          MS. TOMKOWIAK:  Give me a minute, your Honor.
22          (Counsel confer)
23          MS. TOMKOWIAK:  So, I think your Honor asked if this
24   would reflect ████████████████████████████████████████████
25   ██████████████████████████.  Is that right?
```

```
 1            THE COURT:  Well, not somebody, but this is ████████
 2   ████████████████████   ███████████████████████████████
 3   ████████  ███████████████████
 4            MS. TOMKOWIAK:  Yes.  And I think it is meant to
 5   track ████████████████████████████████████████████
 6   ██████████████████.
 7            And, so, theoretically let's say somebody --
 8            THE COURT:  Over ████████████████████████████████
 9   ████████████████████████████████████████████████████
10   ██████████████
11            MS. TOMKOWIAK:  But if they had ██████████████  --
12            THE COURT:  They would.
13            MS. TOMKOWIAK:  -- that also wouldn't lead to --
14            THE COURT:  They would be on the document, but they
15   █████████████████████████████████████████████████████
16            MS. TOMKOWIAK:  Correct.
17            THE COURT:  All right.
18            MS. TOMKOWIAK:  That's my understanding.
19            THE COURT:  So it's probably not the best place to
20   start.
21            All right.
22            MS. TOMKOWIAK:  I'm not sure about that.  I guess
23   it's a little bit difficult to conceptualize it on the fly.
24   But I think --
25            THE COURT:  I understand.
```

```
 1            We are going to have to bring these proceedings to a
 2   close.
 3            Although I had hoped, when preparing for today's
 4   hearing, that I was going to be able to give you a ruling, if
 5   not from the bench, at least based on what I have available to
 6   me now, I find that I cannot do so.  So, instead, I am going
 7   to make the parties, through their counsel, do more work.
 8            It is my general view that the plaintiff is entitled,
 9   not on a Rule 1006 basis, but, rather, on a regular Rule 26
10   relevance versus burden basis, to some discovery, most likely
11   on a sampling basis in order to keep the burden manageable,
12   into how Google deals with infringement notices with respect
13   to its Shopping platform from soup to nuts.
14            In other words, for some, in my view, relatively
15   narrow sample set, I think Google is going to have to produce
16   data showing infringement notices received, what happened to
17   them, how they were tracked, how many ads were taken down,
18   whether the relevant website where the ad appeared amassed
19   ███████████████████████████████████████ and consequently
20   whether the website was suspended.  Plaintiff is not entitled
21   to that.  Plaintiffs are not entitled to that, in my view, for
22   all ███████ or however many the number turns out to be.
23            And I am not even certain -- I think I disagree with
24   Mr. Kane on this.  I am not even certain that we need to get a
25   precise denominator number in order to figure out what an
```

1   appropriate slice or sample would be for the plaintiff to get

2   more  detailed discovery on -- we could, for example, do it on

3   a temporal basis.  Mr. Kane is not crazy about that idea

4   because he thinks the results are going to vary over time.

5   There may be work-arounds to that as well.  Maybe you can take

6   some relatively short slice of time in 2022 and another

7   relatively short slice of time in 2023.  I am making this up

8   as I go along.  Please don't give too much weight to example

9   suggestions that I throw out just as a thinking point.

10          But I think I will require the parties to meet and

11  confer with an eye towards coming up with some compromise

12  along the lines that I have just outlined.  And since I am

13  going to see you on the 15th anyway with regard to a bunch of

14  other motions that were not fully briefed when I scheduled

15  today's proceeding, I hope to be in a position by then to make

16  a final decision, which means you are going to have to get

17  some supplemental materials to me by, I would say, the 10th.

18  I know it is a quick turn around, but I know that we are all

19  anxious to get this show on the road.

20          So I would say, on or before Wednesday, next

21  Wednesday, the 10th, and I would like you to do this in the

22  form of a joint letter, please.  It may well have a

23  plaintiffs' section and a defendant's section——I understand

24  that——but I have a feeling it will be more efficient if you

25  actually have to sit down and put it in a single letter.  Tell

```
1    me if you have been able to agree on a proposal.  I can always

2    dream, right?  And if you can't agree on a proposal, tell me

3    what your respective views are on what would make sense here

4    as a compromise, again, for giving the plaintiff some

5    discovery into how Google's takedown program did or didn't

6    work well with respect to a random sample, "random" meaning

7    not particularly tied to the works in suit, either directly or

8    indirectly, of allegedly infringing Shopping ads.

9              Is that clear enough so that you can start arm

10   wrestling with each other about it, Mr. Kane?

11             MR. KANE:  It is.  Just a logistical question.  The

12   page limit for the joint letter.

13             THE COURT:  You guys are cheating on the page limit

14   anyway because you are attaching all of these declarations

15   which contain additional argument in it.  So, you know, how

16   many exhibits are you going to give me, and then I will tell

17   you how many pages you are going to have in the letter?

18             MR. KANE:  I don't know the number of exhibits.  It

19   will depend on what we agree on or don't agree on.

20             THE COURT:  All right.  Six pages for the letter, and

21   try to keep the exhibits manageable, please.

22             All right?  After all, you are building on letters

23   that you have already written and exhibits that you have

24   already submitted.

25             So I will hear more from you by the 10th and we can
```

```
 1    chat about it, if necessary, on the 15th.

 2              Anything further for today?  I am inclined to grant

 3    the associated sealing motions with respect to the topics we

 4    discussed today.  Anything further?  Mr. Kane?

 5              MR. KANE:  Not from plaintiffs.

 6              THE COURT:  From defendant?

 7              MS. TOMKOWIAK:  No, your Honor.

 8              THE COURT:  All right.  Thank you very much.  We will

 9    be adjourned.

10              (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                       C E R T I F I C A T E

3

4        I, Kristen J. Carannante, certify that the

5    transcript of the digital audio recording of the

6    proceedings in the above-entitled matter is a true

7    and accurate transcription.

8

9

10   Signature   /s/ *Kristen J. Carannante*
                  KRISTEN J. CARANNANTE, RPR, RMR, FCRR
11                (848) 459-3124
                  kjcarannante@gmail.com
12

13   Date:       December 3, 2025

14

15

16

17

18

19

20

21

22

23

24

25