**Sarah A. Tomkowiak**
Direct Dial: +1.202.637.2335
sarah.tomkowiak@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

**LATHAM & WATKINS LLP**

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

January 22, 2026

**VIA ECF**

The Honorable Barbara C. Moses
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, New York 10007

> Re:   *Cengage Learning, Inc. et al. v. Google LLC*, No. 1:24-cv-04274-JLR-BCM
>        Response to Plaintiffs' Letter Request for Discovery Conference (Dkt. 523)

Dear Judge Moses:

Plaintiffs' most recent discovery motion about Google's "treatment of Shopping notices" (the "Motion"), Dkt. 523, revisits an issue the Court has already ruled on and focuses on facts that Plaintiffs have known about since last spring.  The Court should deny Plaintiffs' Motion and keep discovery on track.

### A.   The Court Has Already Determined the Scope of Discovery Into Google's Implementation of Its DMCA Program.

Plaintiffs argue that they need discovery into Google's supposed "erroneous treatment of Shopping notices as Search notices" because "[i]f Google treated [Shopping] notices as Search notices, this likely means that Google did not reasonably implement its repeat-infringer policy under the DMCA safe-harbor," across its DMCA program.  Mot. at 1-2.  Feeling déjà vu?  That's because Plaintiffs already raised this issue to the Court, and the Court has already ruled on it.  *See* Dkts. 237, 251, 264, 361, 402, and 472.

In early November, Plaintiffs moved to compel Google to produce all data underlying certain high-level spreadsheets regarding the notices Google received and merchant suspensions it carried out.  Dkt. 237 (the "November 3 Motion").  Plaintiffs explained that they needed this data in order to evaluate Google's implementation of its "overall DMCA program." *See id.* at 1, 4; *see also* Hr'g Tr. at 64:9-19 (Dec. 1, 2025) (stating that they needed the underlying data because Google's "whole DMCA program" is at issue in this litigation and they need to be able to "test" it).  At the December 1 hearing, the Court ruled that Plaintiffs were entitled to "some discovery . . . into how Google deals with infringement notices with respect to its Shopping platform," *id.* at 97:8-13, and ordered the parties to meet and confer on a sampling proposal, *id.* at 98:10-99:8.

**LATHAM&WATKINS**LLP

Unsurprisingly, the parties did not agree on a sampling proposal and submitted competing proposals. *See* Dkt. 402. Plaintiffs made their complaints regarding Google's purported "mistreatment" of Shopping notices even more explicit in their sampling proposals, arguing that:

> Google must produce discovery concerning the extent to which it improperly processed Shopping notices as Search notices in its overall DMCA program. Specifically, Google must produce all notices that contain the word "Shopping" that Google nonetheless processed as notices concerning other platforms.

Dkt. 402 at 2. Plaintiffs incorporated that request into their sampling "Proposal A," Dkt. 402-1 at 2, and argued at length at the December 15, 2025 hearing that such discovery was necessary to understand Google's implementation of its repeat-infringer policy under the DMCA. *See, e.g.*, Hr'g Tr. at 11:12-20:16, 30:24-31:13, 33:9-19, 67:10-71:21 (Dec. 15, 2025).

After considering the parties' proposals, the Court rejected Plaintiffs' sampling "Proposal A" (and B) and ordered Google to randomly select 300 domains associated with DMCA notices submitted in ten agreed-upon months, and produce discovery regarding the (i) DCMA notices received about those domains; (ii) Merchant Center accounts connected to those domains; and (iii) Shopping ads run by those accounts. Dkt. 472.

Plaintiffs' request effectively seeks to circumvent the Court's prior orders to access the more fulsome discovery they sought before (and were denied). Plaintiffs yet again seek "discovery concerning the extent to which [Google] improperly processed Shopping notices as Search notices in its overall DMCA program," Dkt. 402 at 2, this time starting with all "Shopping" notices submitted to Google's DMCA agent email address. Of course Plaintiffs could have made, but did not make, that specific request in their November 3 Motion or December 10 sampling proposal. Plaintiffs themselves acknowledge that, in response to Plaintiffs' November 3 Motion, "the Court ordered Google to produce discovery on [the same] topic." Mot. at 4. And tellingly, Plaintiffs are relying on the same RFPs (Nos. 3, 4, and 55) that they relied on in that prior dispute. *Compare* November 3 Mot. at 4, *with* Mot. at 4.

Plaintiffs' blatant attempt to relitigate this dispute is improper, and their Motion should be denied on that basis alone. *See Christians of Calif., Inc. v. Clive Christian N.Y., LLP*, 2014 WL 6467254, at *3 (S.D.N.Y. Nov. 10, 2014) ("[P]laintiff's motion is an attempt to relitigate issues that this Court has previously decided and to get the Court to fix mistakes in discovery that are of plaintiff's own making"); *cf. Sahu v. Union Carbide Corp.*, 2010 WL 5158645, at *4 (S.D.N.Y. Dec. 20, 2010) (declining to permit additional discovery under Rule 56(d) where the party's request was "nothing more than a roundabout attempt to obtain information sought in document requests the Court has already denied").

Plaintiffs argue that "discovery into Google's overall DMCA program was delayed" because Google did not produce the high-level metrics spreadsheets at issue in Plaintiffs' November 3 motion until August 15, 2025. Mot. at 4. But Plaintiffs' Motion is not based on any document produced in August 2025 (though Plaintiffs' request would still be untimely if it were). Instead, the documents that Plaintiffs acknowledge form the basis of their Motion were produced between **March and June 2025** (*i.e.*, between seven and ten months ago). *See* Dkt. 402 at 5 (explaining that this purported "issue" "was apparent in the notice data that Google produced

LATHAM&WATKINS LLP

regarding the Collected Domains in March of last year"); Dkt. 525 ¶ 4 n.1 (citing documents Google produced in March, May, and June 2025).

Moreover, the Court expressed skepticism that any further motion on this topic would be timely *over a month ago*. *See* Hr'g Tr. at 83:20-84:5 (Dec. 15, 2025) (stating that Plaintiffs "were not unaware of the issue" and reminding Plaintiffs that, at the time, the parties were "less than 30 days from the date by which documents were supposed to be [produced]"). We are now two weeks past the default deadline for document discovery and barreling towards the close of fact discovery on May 6. Dkt. 539 at 2. At this late stage, the Court should deny Plaintiffs' Motion. *See* Hr'g Tr. at 130:6-19 (Jan. 13, 2025) (explaining the Court's "proportionality calculus" reflects that "the farther along we go, the more hostile the Court is likely to be to what appear to be new document discovery demands that could have or should have been made at an early stage of the case").

### B. Plaintiffs Do Not Need Even More Discovery Into Google's Processing of DMCA Notices Regarding Shopping Ads.

What's even more frustrating than briefing this issue a third time is that Plaintiffs do not even need the additional data that they now demand, for the stated purpose they demand it. They argue that additional notice data is necessary to assess how often Google classified Shopping notices as Search notices. But the data Google has already produced provides more than enough information to assess how Google processed DMCA notices.

Google has already provided extensive discovery into 20,145 Merchant Center accounts connected to 1,239 domains. This includes all DMCA notice data, *regardless of Shopping versus Search (or other) notice classification*, for over 200,000 URLs as well as data concerning the Shopping ads related to those DMCA notices. Plaintiffs concede that for the 1,239 domains for which Google has already produced notice data, "Google has or will produce the evidence Plaintiff[s] seek here." Mot. at 4. Indeed, it is with this very data that Plaintiffs conducted an analysis of Google's purported misclassifications of Plaintiffs' notices as Search, rather than Shopping, notices. The data Google already produced was sufficient to allow Plaintiffs to (1) calculate a purported "error" rate for classifications, and (2) determine what percentage of "misclassified" notices purportedly do not appear on Google's strike tracker. Mot. at 1-2.

What's more, Google's data production is not complete. At Plaintiffs' request and as ordered by the Court, by February 6, 2026, Google expects to produce thousands of additional rows of notice and offer data regarding Merchant Center accounts, Shopping ads, and DMCA notices connected to 261 additional domains that ran ads for works in suit, but *were not noticed by* Plaintiffs. Next, by March 6, 2026, Google expects to produce the same suite of data stemming from 300 randomly selected domains that the Court ordered for the specific purpose of assessing Google's implementation of its DMCA program. *See* Dkt. 472. Plaintiffs argue that a "factfinder needs to know" if Google misclassified notices in its "DMCA program generally." Mot. at 2. But the data Google is currently collecting and producing by February 6 and March 6 will allow Plaintiffs to assess how Google classified notices in its DMCA program generally, including from rightsholders other than Plaintiffs.

*First*, Plaintiffs themselves concede that the 261 additional domains for which Google is producing data were not noticed by Plaintiffs. *See, e.g.*, Dkt. 234 at 1-2. Thus, the data from these additional 261 domains will provide evidence concerning how Google treated notices concerning ebooks submitted by other rightsholders.

*Second*, the discovery Google will produce for the additional 300 randomly-selected domains, Dkt. 472 ¶¶ 1-2, will provide even *more* evidence concerning how Google treated notices submitted by third-party rightsholders, and regarding notices concerning products other than ebooks. Plaintiffs argue that this 300-domain selection does not "obviate[]" the need for more discovery because "[t]he discovery Google is producing regarding its overall DMCA program is being drawn exclusively from notices that were classified as Shopping notices" and therefore "does nothing to address what Plaintiffs seek here." Mot. at 3. That is false. While the 300 *domains* are being selected randomly from notices coded as "Shopping," the Court ordered—and Google will provide—discovery regarding *all* notices Google received concerning these domains, regardless of how they were classified. *See* Dkt. 472 ¶ 5. Plaintiffs' accusation that Google is attempting to "hide" evidence from the factfinder by "limit[ing] discovery to only the notices that it processed correctly" is thus unfounded. Mot. at 4. (Notably, Plaintiffs made the same incorrect argument at the December 15 hearing, *see* Hr'g Tr. at 30:24-31:17, 67:10-70:6.)

Put simply: the data produced in connection with the 300 randomly-selected domains will provide exactly what Plaintiffs seek: "the notices themselves" and "Google's classification of the notice as a Shopping or Search notice" for a set of rightsholders other than Plaintiffs. Mot. at 4. Collectively, the data Google has produced and will produce regarding (i) 1,239 domains noticed by Plaintiffs, (ii) 261 non-Plaintiff-noticed domains that ran works in suit, and (iii) 300 random domains provides more than enough evidence for Plaintiffs to analyze Google's classification and processing of DMCA notices. Any additional discovery is duplicative and disproportionate.

Plaintiffs hypothesize that the "error rate" they have calculated with respect to the treatment of their own notices may not be "emblematic of how Google treated all rightsholders." Mot. at 2. They point to no support or reason to believe Google's "misclassifi[cation]" of Plaintiffs' notices would be any different than notices from other rightsholders. *Id.* at 1. At most, they point to Google's "aware[ness]" of Plaintiffs and the "problem of ebook piracy generally." *Id.* at 2. But Plaintiffs fail to explain why Google's awareness of ebook piracy and Plaintiffs would translate to Google correctly classifying Shopping notices as "Shopping" and not "Search" a higher percentage of the time for Plaintiffs. Plaintiffs' speculation that Google's misclassification, if any, of notices from other rightsholders may be "even worse" is just that—speculation. *Id.* But in any event, Plaintiffs can test that speculation by evaluating the notices from other rightsholders that they are already receiving.

\* \* \*

Google is working to pull a significant amount of data in accordance with the December 2 Order (Dkt. 359) and December 22 Order (Dkt. 472), which should allow Plaintiffs adequately to assess Google's treatment of "Shopping" notices as "Search" notices in its DMCA program. There

LATHAM&WATKINS LLP

is no reason for the Court to reconsider its prior Orders and require Google to produce even more DMCA notice data.[1]  Plaintiffs' Motion should be denied.

                                                                                          Respectfully submitted,

                                                                                          */s/ Sarah A. Tomkowiak*
                                                                                          Sarah A. Tomkowiak *(pro hac vice)*
                                                                                          of LATHAM & WATKINS LLP

cc:     All Counsel of Record (via ECF)

---

[1] Plaintiffs' assumption that it will be simple to search for "shopping" in incoming emails (including attachments) to "the dmca-agent@google.com," Dkt. 527, ignores that emails to dmca-agent@ are routed to a non-custodial system for cataloging DMCA notices rather than an email inbox.