```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
------------------------------:

CENGAGE LEARNING, INC.,        : Case No.: 24-cv-4274

et al.,                        :

                    Plaintiff, :

      v.                       :

GOOGLE LLC,                    : New York, New York

                   Defendant. : December 15, 2025

------------------------------:
```

               TRANSCRIPT OF STATUS CONFERENCE HEARING

              BEFORE THE HONORABLE BARBARA MOSES

                 UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

```
For Plaintiff:         OPPENHEIM + ZEBRAK, LLP
                       BY:  Michele H. Murphy, Esq.
                            Matthew J. Oppenheim, Esq.
                            Danae Tinelli, Esq.
                            Jeff Kane, Esq.
                            Yunyi Chen, Esq.
                            Uriel Lee, Esq.
                       5225 Wisconsin Avenue, NW
                       Washington, DC 20015

For Defendant:         LATHAM & WATKINS LLP
                       BY:  Sarah A. Tomkowiak, Esq.
                            Sarang Damle, Esq.
                            Roberto J. Borgert, Esq.
                            Sara E. Sampoli, Esq.
                       555 Eleventh Street, NW
                       Washington, DC 20004
```


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

       AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              THE DEPUTY CLERK:  The Court now calls
 2    Cengage Learning, Inc., et al. v. Google LLC; Case
 3    Number: 24-cv-4274.
 4              Counsel, please make your appearances for
 5    the record.
 6              MS. MURPHY:  Good morning, your Honor.  I'm
 7    Michele Murphy with Oppenheim + Zebrak, counsel for
 8    all plaintiffs in this case.  I'm here with my
 9    colleagues, Matthew Oppenheim, Jeff Kane, Danae
10    Tinelli, Uriel Lee.
11              THE COURT:  Wait a minute.
12              Okay.
13              MS. MURPHY:  And Yunyi Chen.
14              THE COURT:  All right.  Thank you very
15    much, Ms. Murphy.
16              Ms. Tomkowiak?
17              MS. TOMKOWIAK:  Good morning, your Honor.
18              THE COURT:  Still morning.
19              MS. TOMKOWIAK:  Yeah, still morning.
20              Sarah Tomkowiak, of Latham & Watkins, on
21    behalf of the defendant, Google LLC.  I'm joined by
22    my colleagues, Sarang Damle --
23              THE COURT:  Mr. Damle.
24              MS. TOMKOWIAK:  -- Sara Sampoli and Roberto
25    Borgert.
```

1          THE COURT:  All right.  That's everybody.
2     Thank you very much.
3          Let me give you the order of business this
4     morning and then a few housekeeping notes, and then
5     we'll get down to business.
6          First, I'd like to address the motion left
7     over from last time.  It was a motion originally
8     made by plaintiffs on November the 3rd at Docket
9     237, and I required the parties to meet and confer
10    further.  And we now have two proposals, so I'll
11    take those up first.
12         Second, I thought I would hear some
13    discussion on the November 14th privilege dispute
14    motion this time brought by Google at Docket Number
15    273, where the last motion paper came in on Friday,
16    a letter of response to the sealed Murphy
17    declaration.
18         And then depending on how the time goes, we
19    might take a short recess and come back for the
20    defendant's November 18th motion regarding
21    additional custodians, which was filed at Docket
22    287.
23         And then if we're all still able to argue,
24    and if we have not run out of time -- I have until
25    about 12:30 today -- I will hear argument on the

                AMM TRANSCRIPTION SERVICE - 631.334.1445

1    plaintiffs' November 19th motion regarding the

2    Buganizer at Docket 295.

3            A few housekeeping notes.  There we go.

4            I asked you the last time we were all here

5    for bundled courtesy copies.  I asked the party --

6    the moving party on any one motion to be responsible

7    for bundling all of the papers together in hard-copy

8    form, in a binder or some other appropriate delivery

9    device, and submit it to chambers once all of the

10   motion papers were in so I had everything in one

11   spot.

12           Thank you.  I think you've begun to do

13   that.  My staff tells me that we haven't necessarily

14   gotten that with respect to motions that were still

15   in progress when I made the announcement last time.

16   So on a going-forward basis, that makes my life

17   easier.

18           Second housekeeping request.  Very

19   frequently in this case, you submit -- you file a

20   declaration with multiple exhibits in two versions,

21   a redacted version that gets filed on the public

22   docket and an unredacted version that gets filed

23   under seal.  That's fine.

24           Here's the problem, in your redacted

25   version that gets filed on the public docket,

 1    obviously, you don't include any exhibits which need

 2    sealing.  So the public version of the declaration

 3    may only have half of the exhibits attached.  That's

 4    unavoidable.

 5         The sealed version, however, you've gone

 6    the other way.  You only file the sealed exhibits

 7    with the sealed version of the declaration.  Now,

 8    that makes sense to you, but it's not helpful to me

 9    because in order to read all of the exhibits, my

10    staff now has to print out or otherwise coordinate

11    two different versions of the exhibit, one of which

12    has two different versions of the declaration; one

13    of which has Exhibits A, G and H, and the other one

14    has Exhibits B, C, D, et cetera.

15         So, if you could, please, you have to do

16    one of two things.  You either have to do the

17    correlation for me when you submit your courtesy

18    copies, or what I think makes the most sense is make

19    sure that the sealed version of the document, the

20    sealed version of the declaration, has all of the

21    exhibits attached, even the public exhibits that

22    have already been filed on the public docket.  That

23    is the Court's request.

24         Third, sealing motions.  Almost every other

25    document that you file is accompanied by a sealing

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1   motion.  Here's the problem.  The sealing motion
 2   typically comes in one or two or three or four
 3   docket numbers ahead of the thing you want to seal,
 4   so you are not able, when you file the sealing
 5   letter, to say, I want to seal Docket 337, because
 6   you're not sure it's going to be Docket 337 at the
 7   time.
 8           But we would prefer if you were a little
 9   more precise in your sealing motions.  We get
10   sealing letter motions that say, for example, I'd
11   like to seal the Declaration of Michele Murphy.
12           Okay.  There are 27 declarations of Michele
13   Murphy on the docket so far.  So please say, I would
14   like to seal the -- about the forthcoming
15   Declaration of Michele Murphy dated thus and such a
16   day, which is a response to thus and such a motion
17   made by the other side.
18           That will make our life easier when we go
19   through all these sealing motions and try and figure
20   out what the heck it is that you're trying to seal.
21           All right.  That is it for housekeeping
22   motions.  Now, the reason -- housekeeping notes, I
23   should say.
24           The reason I have so many housekeeping
25   notes for you, ladies and gentlemen, is that you
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    have continued to litigate prodigiously.  Since
 2    December the 1st, in just ten court days, you have
 3    conferred upon me and my staff 80 additional
 4    filings:  Briefs, opposing briefs, letter briefs,
 5    sealing motions, exhibits.  I'm not counting the
 6    exhibits to the declarations, just each declaration.
 7          We're having a little trouble keeping up.
 8    Please remember that you are not my only case.
 9    There are nine lawyers here, and I know you have
10    more back at home that you didn't bring to court
11    today.  There's only one of me plus one law clerk on
12    this case.  I cannot continue spending half of all
13    of my waking hours on this case.
14          And if you genuinely think that discovery
15    in this case is going to continue to require this
16    level of activity, you might want to think about a
17    special master, which you would have to pay for.
18          I'm not requiring you to make that proposal
19    today, but I have done that in the past for cases
20    where discovery threatens to overwhelm the Court's
21    resources.  It's not fair to you if I can't get
22    through all of your motions and also deal with the
23    occasional motion that I get from another case on my
24    docket.  And it's not fair to my staff to ask them
25    to try.
```

1          So with that as just a thought so far, why

2     don't we get to the first issue that I'd like to

3     hear about today, which is your competing sampling

4     proposals.  And as I read through the proposals, my

5     general thought was -- and I'll hear from -- I think

6     I'll hear from the plaintiffs on this first.

7          My general thought was that the plaintiffs

8     are doing it from the wrong direction.

9          If I understand the plaintiffs' DMCA

10    sampling proposal, the plaintiffs -- leaving aside

11    how many months and what percent and all of that

12    sort of thing, the plaintiffs are starting at the

13    end.  The plaintiffs want a list of URLs that Google

14    claims to have delisted and work backward from that.

15         Doesn't that mean that the sample set at

16    the outset is going to be, sort of, the worst

17    offenders, the ones who do end up getting delisted?

18         So is that your motion, Mr. Kane?

19         MR. KANE:  Yes.

20         THE COURT:  All right.  What am I missing?

21         MR. KANE:  So, two things I would say.  One

22    is a threshold issue, and then one is exactly what

23    you just raised.  So I'll start with what you just

24    raised.

25         So what happens is Google gets a notice,

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    and some amount of the time, a large amount of the

2    time, they say this notice is not -- this is not

3    content, we're going to remove because we can't find

4    the infringing content.  We go to the landing page

5    that you say the ad links to, and we don't see

6    infringing content there or we don't see the page at

7    all.

8            What Google wants to do is to start with

9    just 300 random domains.  If you do that --

10            THE COURT:  No, not random domains.  Random

11    domains, if I understand it, that get a takedown

12    notice, right?

13            MR. KANE:  Yeah, the domains mentioned in

14    takedown notices.  Yeah.

15            If you start with that, it's entirely

16    possible that 295 of those never had an ad delisted,

17    or that 200 --

18            THE COURT:  What's the problem with that?

19            MR. KANE:  The problem is we can't test

20    what Google did in that instance.  So if Google

21    says, we never found this content, then the only

22    thing we could do is look for the landing page

23    listed in the notice and see if it still exists.  It

24    is almost certainly not going to exist, especially

25    for stuff that's now four or five -- four years old.

1        THE COURT:  Because of the passage of time,

2   regardless of whether it was infringing or not.

3        MR. KANE:  Exactly.

4        There are some services online that archive

5   older websites.  Very often these sites are not on

6   them.  They're just too obscure and they change too

7   frequently.

8        We also don't know on what date did Google

9   actually look for the website.  So we can't say,

10  like, we know Google looked for it on December 1,

11  2022 so we can find a site that has the archived

12  version of that.

13       THE COURT:  Well, if you know that the

14  takedown notice came in on -- I don't know --

15  November 11, 2021, let's say, isn't there a

16  particular window of time that Google has to have

17  looked for it after that?

18       MR. KANE:  They have to remove it

19  expeditiously.

20       Courts, unfortunately, haven't -- Congress,

21  unfortunately, didn't define "expeditiously," and

22  courts have not done it for them.

23       But we don't know -- just from the date of

24  the notice, we don't know if Google looked at it the

25  next day, a week later, a month later.  In fact, in

 1   the data we've gotten from Google so far, they

 2   sometimes take hundreds of days before they send a

 3   notification to the rights holder that says, we're

 4   taking this ad down or we're not taking the ad down.

 5         The second --

 6         THE COURT:  Hundreds of days meaning, like,

 7   more than a year or meaning some months?

 8         MR. KANE:  Months.  Or even a couple cases,

 9   over a year.  So we -- unfortunately, we can't just

10   assume if they got the notice on November 10, 2022,

11   they acted on it within a week.

12         The second issue is, as I said, sort of, a

13   threshold issue, and that is, what Google is trying

14   to do is take the sample only from those notices

15   where they treated it -- where they treated a

16   Shopping notice as a Shopping notice and not as a

17   Search notice.

18         What we've learned very recently, in the

19   last week, is that for about ■ percent of

20   plaintiffs' notices, it was clearly a Shopping

21   notice.  It says "Shopping" at the top, and it has a

22   link to the Shopping ad, but Google classified it in

23   its system as a Search notice.  That creates a

24   number of problems.

25         The first thing that happens is it -- if

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    Google treated it as a Search notice, they may not

2    have applied their Shopping DMCA policy.  In other

3    words, they may have applied the DMCA --

4              THE COURT:  Strikes policy, for example?

5              MR. KANE:  They may have applied the Search

6    policy, yes.

7              Sorry.  Is that what you said?

8              THE COURT:  The policy regarding the number

9    of strikes, is that what you're referring to?

10             MR. KANE:  Exactly.  Yeah.

11             So Shopping has a ████████████.  They

12   may have applied the DMCA policy for Search.  I

13   don't even know what that is because it's not an

14   issue in this case.

15             Second, if they treated the notice as a

16   Search notice, it may be that they took the content

17   down from the Search platform but not from the

18   Shopping platform.  That's something we would need

19   to be able to test in discovery.

20             And third, it affects liability.  If Google

21   got a notice and -- liability as well as a DMCA

22   defense.  If Google got a notice and treated it as a

23   Search notice, then it didn't reasonably implement

24   its Shopping DMCA program because it didn't attempt

25   to implement its Shopping DMCA policy.  So this is

```
 1    sort of a major threshold issue in the case.
 2              THE COURT:  And you say you discovered
 3    within the last week this problem?
 4              MR. KANE:  That's correct.
 5              So -- well, you may recall from last time,
 6    we issued this discovery request in September of
 7    2024.  Google, unfortunately, didn't respond to it
 8    until August of 2025.
 9              What they gave us was a spreadsheet that
10    did not contain just the notices for the Shopping
11    platform, but for Shopping as well as 64 other
12    platforms.
13              THE COURT:  I recall.
14              MR. KANE:  And so there were something like
15    ████████████████████████████ on it.  The line
16    item for Shopping only had -- sorry -- ███████████
17    ████████████████████████.
18              The line item for Shopping had ████████
19    █████████████████████████.  You may recall that made
20    no sense to us because the notices concerning our
21    pirates were ████████████████.
22              THE COURT:  I recall that discussion.
23              MR. KANE:  So what we learned last week is
24    that those ██████████████████████████████████████
25    ████████████████████████.
```

```
 1            THE COURT:  Because some of them were not
 2   classified as Shopping.
 3            MR. KANE:  Exactly.
 4            So what we need to know is -- well, just
 5   because it says "Shopping" or "Search" on that
 6   particular spreadsheet, did Google, in fact, process
 7   them as Shopping notices or did they process them as
 8   Search notices?
 9            THE COURT:  Okay.  And where do you get the
10   ▮ percent figure from?
11            MR. KANE:  Google gave us a spreadsheet
12   that has, for each URL listed in the notices about
13   our pirates, the URL itself and what they did with
14   it.  Did they remove it?  Did they not remove it?
15            And it has a column that says the product,
16   Shopping, Web Search, Drive, Photo, whatever.
17            So all of our notices are Shopping notices.
18   We know the case IDs for the Shopping --
19            THE COURT:  And ▮ percent of them were
20   treated differently.
21            MR. KANE:  They're listed as Search notices
22   in Google Spreadsheet.
23            THE COURT:  Okay.
24            Now, what does that mean, as you understand
25   it, "listed as Search notices in Google
```

1    Spreadsheet"?

2         Because this is -- was this a spreadsheet

3    that was kept contemporaneously or a spreadsheet

4    prepared for discovery purposes?

5         MR. KANE:  It appears to be data that they

6    extracted from a database, so I presume the data

7    itself was kept in the ordinary course, but they

8    extracted it from a database and produced this

9    spreadsheet for litigation purposes.

10        The problem with this is, if they took ▮

11   percent of our notices --

12        THE COURT:  They may have done the same for

13   everybody else's notices.

14        MR. KANE:  Exactly.  So we've asked Google

15   to explain.

16        THE COURT:  So if you only get -- if we

17   start as Google suggests -- Google suggests that we

18   start -- you start with a sample set of domains

19   selected from -- and I'm quoting from Google's

20   proposal here -- "DMCA notices marked as pertaining

21   to the Shopping products submitted that month."

22        Let me just quickly go over to Google just

23   for a point of clarification.  I'll come back to

24   you, Mr. Kane.

25        Does "marked as pertaining to the Shopping

AMM TRANSCRIPTION SERVICE - 631.334.1445

1  product" mean appearing on that spreadsheet we just

2  heard about as "Shopping"?

3       MR. DAMLE:  I'm happy to clarify it when

4  it's my -- all of this when it's my turn.

5       There's, sort of, two spreadsheets that

6  we're talking about here.  There's also two

7  different requirements under the law that apply

8  differently, which, you know, I can talk about at

9  length.

10       There's one, one spreadsheet, which tracks

11  notices as they come in, and those have a product ID

12  associated with it.

13       THE COURT:  And is that the product ID

14  identified by the party --

15       MR. DAMLE:  Correct.  That --

16       THE COURT:  -- that sends that notice in,

17  or is that a label attached by Google?

18       MR. DAMLE:  It is a -- for notices that are

19  submitted via the web form, it gets filled out by

20  the submitter.

21       THE COURT:  So it's whatever the submitter

22  says it is.

23       MR. DAMLE:  Right.  And sometimes those

24  notices, when they come in outside of the web

25  form -- because we -- Google encourages people to

```
 1    use the web form so that -- because it has all the
 2    data that we need to collect.  When the --
 3            THE COURT:  But sometimes people write you
 4    letters?
 5            MR. DAMLE:  Sometimes people will send a
 6    letter, send an e-mail.
 7            THE COURT:  Okay.
 8            MR. DAMLE:  Then there's -- then that
 9    information is filled out by a Google -- I believe
10    it's a contractor that fills it out, that fills out
11    the different forms.
12            THE COURT:  As best they can figure it out.
13            MR. KANE:  Exactly.
14            THE COURT:  Okay.
15            MR. KANE:  And so that is where we're
16    saying, from that notice spreadsheet form, we should
17    pull out the ones that are marked as Shopping
18    because we know that those ones are Shopping
19    related.  And the goal here is to figure out how did
20    Google generally treat its -- a random selection of
21    merchants, other the ones that they have complained
22    about.
23            THE COURT:  Where the merchants said it was
24    a Shopping problem.
25            MR. DAMLE:  Where the submitter said it was
```

```
 1    a --
 2              THE COURT:  I'm sorry.  Where the submitter
 3    said it was a Shopping problem.
 4              MR. DAMLE:  -- said it was a Shopping
 5    problem, and Google noted it as such.
 6              THE COURT:  All right.  That's more than
 7    your 30 seconds, but thank you.
 8              Go ahead, Mr. Kane.
 9              MR. KANE:  A couple things on that.
10              Almost all of our notices -- in fact, maybe
11    all of our notices went in through e-mail.  And they
12    all very clearly say, both in the e-mail and on the
13    spreadsheet that lists the URLs, this pertains to
14    the Shopping platform.  So for ██ percent of those
15    to be misclassified as Search is a big deal.  That's
16    not a --
17              THE COURT:  Maybe you should use the web
18    form.
19              MR. KANE:  So the problem with the web form
20    is it doesn't allow you to put in, like, multiple
21    URLs, or at least not as many URLs as there are
22    infringements of our works.
23              One notice can contain literally thousands
24    of URLs because that's the scale at which Google is
25    committing this infringement.  And these are -- it's
```

1  four plaintiffs, each sending a notice every week

2  for a period of over three years.

3      THE COURT:  I think, technically, you are

4  now alleging not that Google is committing the

5  infringement, but that Google is contributing to the

6  infringement.

7      MR. KANE:  They're committing secondary

8  infringement.  They're contributing to the direct

9  infringement of the ultimate pirate, yes.

10      But what I was saying is that the scale at

11  which this is happening doesn't allow us to use the

12  web form.  We also would prefer that there be a web

13  form where we can just list all the URLs at once.

14      What we have to do is send them an e-mail

15  that says, "Attached is a spreadsheet listing all

16  the infringements that we detected."

17      THE COURT:  All right.  So in your view of

18  the world, this is where error creeps in.  You send

19  these e-mails and you say "Shopping," but ■ percent

20  of the time, Google doesn't write it down that way.

21      MR. KANE:  I suspect that's where the

22  problem is happening.  We would probably need some

23  sort of discovery, and it can probably be in

24  deposition, as to -- to make sure that, like, when

25  the web form is filled out saying "Shopping," it

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    really is processed as a Shopping notice.

2         But I suspect that's where the error is

3    happening, is when someone submits a notice via

4    e-mail and they say it's a Shopping notice, but for

5    whatever reason, Google processes it as a Search

6    notice or a YouTube notice or whatever.

7         The problem with starting the way Google

8    wants to start is they want to include only the

9    notices that were correctly processed as Shopping

10   notices.  Well, of course, that leaves out all the

11   notices that were incorrectly processed as Search --

12         THE COURT:  Leaves out the ■ percent?

13         MR. KANE:  I'm sorry.  Once more.

14         THE COURT:  Leaves out the ■ percent?

15         MR. KANE:  Exactly.  Yeah.

16         THE COURT:  Okay.  I understand the issue.

17         MR. KANE:  Just one other thing, if I

18   could.

19         The other problem with Google's proposal

20   is, as we were saying a little while ago, those 300

21   domains that Google selects may or may not have been

22   delisted, may or may not have been suspended.  So

23   you, sort of, have to start with 300 domains that

24   were -- whatever the number we settle on is, you

25   have to start with a set of domains that were

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    actually delisted.

2          THE COURT:  I don't understand.  Why?

3          MR. KANE:  So the only thing we can test --

4          THE COURT:  Because what you're trying to

5    test here is how good their program was, right?

6          MR. KANE:  Whether it was reasonably

7    implemented, yes.

8          THE COURT:  Whether their program was

9    reasonably implemented for purposes of the Digital

10   Millennium Copyright Act.

11         MR. KANE:  Yes.

12         THE COURT:  And why does it make sense to

13   go backward from delistings rather than to go

14   forward from complaints?

15         MR. KANE:  Because that's really the only

16   thing we can test.

17         So if Google gets a notice and they say, we

18   couldn't find this content, now, three years later,

19   we can't go back and figure out if that was correct

20   or not.

21         THE COURT:  So there's no way for you --

22   well, presumably, for some of them, they would have

23   ended in delistings.  And for those, you can trace

24   all the way through, right?

25         But you're concerned -- tell me if I'm on

1    the right track here.

2           MR. KANE:  Yep.

3           THE COURT:  You're concerned that if I give

4    you 300 a month, or some other number -- if I give

5    you 300 a month starting from the takedown notice,

6    that only -- I don't know -- 30 of them will end in

7    a delisting and you won't really know why the other

8    270 didn't.

9           MR. KANE:  Exactly.

10          And so what we can test for DMCA purposes

11    is the features of Google's DMCA program that are

12    most important, which is:

13          Did they delist the ad when they said they

14    did?

15          Did they suspend the pirate when they said

16    they did?

17          Did they suspend the pirate when they were

18    supposed to do it?  In other words, when they had

19    gotten &#9608;&#9608;&#9608;&#9608; that they said they would take

20    down, did they then suspend that pirate?

21          Those are the three things we have to be

22    able to test:  Did they delist the ones they said

23    they did?  Did they suspend the people they said

24    they did?  Did they suspend the people they were

25    supposed to?

1          Under Google's, you know, let's just pick
2    300 domains and go with those, we don't know how
3    many of those will have been delisted, how many of
4    those will have been suspended, if any of them were
5    supposed to be suspended.  That's why we can't just
6    start with a set of 300 random domains.
7          THE COURT:  Well, again, it wouldn't be
8    random domains.  It would be random complained-about
9    domains.
10          MR. KANE:  Yes.  A set of 300 domains from
11    the set of domains that were the subject of notices.
12          THE COURT:  So if you start with a
13    delisting and work backwards, you think that will
14    give you some information about whether they did the
15    things they were supposed to do in connection with
16    delisted URLs?
17          MR. KANE:  Exactly.
18          So if they --
19          THE COURT:  But it won't tell you -- it
20    won't tell you how good a job Google did of
21    screening the takedown notices as they came in and
22    figuring out which ones should end in a delisting
23    and which ones should not.
24          You're saying you don't want that
25    information or you can't figure out a good way to

1    get that information that's useful to you.

2         MR. KANE:  There's no way for us to, sort

3    of, go back in time and see, were they correct when

4    they said, we can't find this content?

5         THE COURT:  Does that --

6         MR. KANE:  So --

7         THE COURT:  Okay.  So what are you going to

8    do about that?

9         MR. KANE:  So, really, the test for that is

10   our notices.

11        So with our notices, we do know that, like,

12   the content was there.  In a lot of cases, we have

13   screenshots for them.  But at the very least, we

14   have a vendor who will testify.

15        THE COURT:  All right.  So for purposes of

16   that aspect of whether Google's program was

17   reasonable, you're content to rely on your own

18   universe.  And you're going to, presumably, either

19   argue that it's a big-enough sample set all by

20   itself, or that the Court should feel justified in

21   extrapolating from how Google treated your notices

22   to how Google treats everybody else's.

23        MR. KANE:  Yeah.  We, sort of, have to do

24   that because those are the only ones for which we

25   have the evidence.

1           THE COURT:  Right.

2           MR. KANE:  Google --

3           THE COURT:  But just bear with me.

4           MR. KANE:  Sure.  Sorry.

5           THE COURT:  But with respect to the three

6    questions you ask -- did they delist?  Did they

7    suspend?  Did they delist the associated URLs? --

8    you're telling me your universe, the universe of

9    folks that the plaintiffs complained about is not

10   good enough, and we can't assume and we can't

11   extrapolate.

12          MR. KANE:  Yeah.

13          THE COURT:  How can both of those things be

14   true?

15          MR. KANE:  I think that's so for a couple

16   reasons.

17          Number one, we think that -- they have

18   actually contended that they treated our notices

19   differently than other people's.  In other words,

20   once we started talking to them, which was back in

21   2019 --

22          THE COURT:  They say that they paid more

23   attention to you because you were such a vocal

24   force.

25          MR. KANE:  Because the problem of

                AMM TRANSCRIPTION SERVICE - 631.334.1445

 1    infringement was so large, I would say.

 2         So that's the first thing.  They themselves

 3    claim they treated us differently, so we're likely

 4    not representative of what they were doing in their

 5    whole program.

 6         Also, all of our notices pertain to

 7    e-books.  Google had a special policy for e-books

 8    where they were supposed to be banned entirely.  And

 9    so it may well be, and what we've seen in the

10    documents, is that Google was paying much more

11    attention to e-books and trying to get rid of those

12    ads, outside of just their ordinary sort of DMCA

13    program.  So we can't just take our notices and say,

14    well, that must be representative of the whole.  We

15    have to look at the DMCA program overall.

16         What your Honor is pointing out is, like,

17    we won't know if Google got a notice and said, we're

18    not taking this down, and they were correct in doing

19    so.  You're correct, our sample wouldn't allow for

20    that in terms of the overall DMCA program.

21         Google could do that on its own.  It's

22    their affirmative defense.  They could say, look,

23    we're going to give you the sample you asked for.

24    In addition, we're going to do this other sample to

25    try to test were we correct in telling a particular

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    rights holder we can't find this content.

2          They could do that in addition, but we

3    still need to be able to test the three things we

4    said:  When they claim to have delisted an ad, did

5    they do it?  When they claimed to have suspended a

6    pirate, did they do it?  When they were supposed to

7    suspend a pirate, did they do it?

8          And the way this gets us that information

9    is it gives us the ads data.  In other words, if

10   there's a domain for which they claim to have

11   delisted an ad, once we have the ads data, we can

12   see, did they actually -- did they run any ads for

13   that same landing page after they claimed to have

14   delisted it?  Or if they claim to have suspended a

15   pirate, once we have the ads data, we can say, did

16   they actually run any ads for this pirate whom they

17   claim to have suspended?

18         So that's really the only way to test, kind

19   of, the two salient features of Google's DMCA

20   program, which is delisting ads and suspending

21   pirates.

22         THE COURT:  All right.  Let me ask you now

23   about your proposal, and particularly Proposal A,

24   which you describe as the proposal that you make if

25   Google represents that the universe of copyright

1    infringement notices that it processed as Shopping

2    ads notices during the relevant period is ████

3    notices referencing ████ URLs.

4         I'm trying to do the math here.  For your

5    Proposal A, you say, all right, we'll take all of

6    these months and we will select a sample of

7    10 percent.  That's how many delisted URLs?

8         MR. KANE:  We don't know how many URLs it

9    would be because it's 10 percent of the domains.

10        So the domain is like if the website is

11   testbank23.com/biologytextbook, the domain is the

12   testbank23.com.

13        THE COURT:  Okay.

14        MR. KANE:  So the ████ URLs that are in

15   that spreadsheet, those are URLs.  Those are the

16   testbank23.com/biologytextbook or /physicstextbook

17   or whatever.

18        THE COURT:  Got it.

19        MR. KANE:  So we would take 10 percent of

20   the domain.  So we don't know what that number is.

21   It would be based on about ████ URLs, but we don't

22   know how -- you know, how many domains will be

23   collapsed into those URLs or how many --

24        THE COURT:  You would spread that 10

25   percent over 10 months.  So it would be roughly --

1          MR. KANE:  It's a --

2          THE COURT:  -- 1 percent of the total taken

3  from July and 1 percent from November --

4          MR. KANE:  Right.

5          THE COURT:  -- and 1 percent from the

6  following March and so forth.

7          And how would you figure out how to get

8  10 percent if you don't know how many total delisted

9  domains there are?

10         MR. KANE:  So we were saying 10 percent of

11  each month.  So for that particular month, you would

12  take 10 percent of the domains and you would end up

13  with whatever that works out to over the period.

14         THE COURT:  Just be clear with me.  For

15  each of the 10 months, which is 10 out of 40 --

16         MR. KANE:  40.

17         THE COURT:  -- months --

18         MR. KANE:  Yep.

19         THE COURT:  All right.  So for one quarter

20  of all of the relevant time, you would take -- tell

21  me the mechanics again.

22         MR. KANE:  10 percent of the domains for

23  that month that had a delisting and 10 percent of

24  the domains that had a suspension.

25         THE COURT:  10 percent of the domains that

             AMM TRANSCRIPTION SERVICE - 631.334.1445

1    were delisted that month.

2         MR. KANE:  Yep.

3         THE COURT:  And 10 percent --

4         MR. KANE:  Of the domains that were

5    suspended that month.

6         THE COURT:  -- of the suspended domains

7    that month.

8         And you don't know what those numbers are

9    going to be.

10        MR. KANE:  Correct.

11        THE COURT:  Not for any one month and not

12   for overall.

13        MR. KANE:  We'd only be doing this if

14   Google were to represent -- like, all we're claiming

15   is that the total delistings and suspensions -- the

16   total delistings are the ███████ URLs that we were

17   looking at last time.

18        I now understand Google is saying they're

19   not going to make that representation.

20        THE COURT:  Okay.

21        MR. KANE:  So Proposal A is, sort of, out.

22        What they want to do is say --

23        THE COURT:  From your perspective.

24        MR. KANE:  What they want to do is say,

25   well, when we take the sample, we're going to

                AMM TRANSCRIPTION SERVICE - 631.334.1445

1   exclude all the notices where we incorrectly

2   processed them as Search notices, or we potentially

3   incorrectly processed them as Search notices.  That

4   doesn't make any sense.

5       The population from which we are drawing

6   has to be the total number of Shopping ads notices

7   that they claim to have processed as Shopping ads

8   notices.

9       THE COURT:  Say that again.

10      MR. KANE:  The total population from which

11  we're taking the sample has to be all of the

12  Shopping ads notices that they are claiming to have

13  processed as Shopping ads notices.

14      THE COURT:  Okay.

15      MR. KANE:  The ███████ thing is only if

16  they're actually saying, we're agreeing that that's

17  the universe.

18      THE COURT:  All right.  So walk me through

19  your Proposal B, then.

20      MR. KANE:  Sure.

21      So Proposal B is the same general idea.  So

22  we take 10 months, and for each of those months,

23  Google gives us a list of the ads they claim to have

24  delisted, a list of the pirates they claim to have

25  suspended.

```
 1                We select a sample of those 10 percent of
 2      the ads, 5 percent of the suspended pirates, and for
 3      each of those, they give us the ads data.  That way,
 4      we can see, did they actually delist these ads?  Did
 5      they actually suspend these pirates?
 6                And then to test --
 7                THE COURT:  They would give you a list of
 8      all of the ads actually delisted?
 9                MR. KANE:  Correct.  For each month in the
10      sample.
11                THE COURT:  And when you say "ads"?
12                MR. KANE:  Those are URLs, so --
13                THE COURT:  URLs.  Okay.
14                MR. KANE:  Each ad, if you click on --
15                THE COURT:  Each ad is a -- which --
16      because it says "/biologytextbook," or whatever it
17      says.
18                MR. KANE:  Yeah, exactly.
19                THE COURT:  Okay.  And they would also give
20      you for that month --
21                MR. KANE:  A list of the pilots they claim
22      to have suspended that month.
23                THE COURT:  And you would order up 10
24      percent of those?
25                MR. KANE:  5 percent of those.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                THE COURT:  5 percent?
 2                MR. KANE:  I'm sorry.  10 percent of those.
 3     Yes.
 4                THE COURT:  10 percent of those.
 5                So you would start with, essentially, full
 6     data for 25 percent of the entire universe of
 7     potentially relevant transactions here.  I say 25
 8     percent because it's 10 months out of 40 months.
 9                MR. KANE:  Correct.
10                And the key is it -- going back to this
11     threshold issue, it has to be all the notices that
12     were Shopping notices.  In other words, if they
13     incorrectly processed it as a Search notice, they
14     don't get to exclude it from the sample.
15                THE COURT:  No.  You would still want to
16     see it.
17                MR. KANE:  Exactly.
18                THE COURT:  And trace it through.
19                MR. KANE:  Exactly.
20                And so the final thing in Proposal B is we
21     have to test whether they terminated the domains
22     that they were supposed to terminate.  So we've said
23     they can give us 50 domains that had ███████████
24     ████████, and we can see if they actually suspended
25     them.  So they give us the ads data for those
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    domains, and we would see, did they stop running ads

2    for that domain after the fifth delist.

3            THE COURT:  Now, when you say things like

4    that -- sorry.  That's not helpful to you.

5            When you say things like plaintiffs will

6    identify domains representing 5 percent or 10

7    percent of this, does that mean you get to run your

8    fingers through the list and say, well, that one,

9    that one and that one, or is it random?

10           MR. KANE:  It's random.

11           What we've done in the past is, like,

12   everybody gets on a Zoom call.  We give everything a

13   number, and you use Excel's random-number generator,

14   and you put in "=RAND" and you press "enter," and it

15   gives you the numbers.

16           THE COURT:  All right.  So when you say

17   will identify domains representing 5 percent, you

18   mean ...

19           MR. KANE:  A randomized 5 percent sample,

20   yeah.

21           THE COURT:  A randomized 5 percent sample.

22           MR. KANE:  Yeah.  The only thing that's

23   non-random is if we get back any URLs for which

24   Google has already produced data because --

25           THE COURT:  You would exclude them and take

```
 1    the next one in order.

 2              MR. KANE:  Exactly.  Yeah.  Or just do

 3    another =RAND.

 4              THE COURT:  Okay.

 5              Now, tell me about paragraph 5 of your

 6    proposal.  This is the testing paragraph.

 7              MR. KANE:  Yeah.

 8              THE COURT:  You say, "Plaintiffs will

 9    select 50 domains from the delisting list."

10              Again, randomized?

11              MR. KANE:  Exactly.  Yeah.

12              So what this is trying to test is, did

13    Google suspend pirates when they were supposed to?

14              So their policy is, once we've ████████

15    ████ from a particular domain, we suspend that

16    domain.  We no longer allow the domain to advertise

17    on Shopping.

18              So this is trying to test that.  So they

19    give us 50 domains that had ██████████ delistings,

20    and then we look at the ads data for those 50

21    domains to see did they actually stop running ads

22    for it on the date of the ██████ -- after the date of

23    the ██████████████ .

24              THE COURT:  And you wanted that data from

25    the first day of the sample period, which is what?
```

1          MR. KANE:  We would be picking ten months,
2     so you would --
3          THE COURT:  Oh, depending on what the month
4     was.
5          MR. KANE:  Yeah.  So if the 50 listing was
6     in June of 2023, you know, we only needed the ads
7     data for after that.
8          THE COURT:  All the way through March 31st
9     of 2025, which is the end date we've picked for
10     other purposes.
11          MR. KANE:  Yeah.
12          THE COURT:  Okay.
13          All right.  What else do you want to tell
14     me?
15          MR. KANE:  Just to anticipate one thing
16     that I think Mr. Damle is going to argue.
17          I think Mr. Damle is going to try to say
18     that there are two requirements under the DMCA.  One
19     that you remove ads, one that you terminate repeat
20     infringers.  That's correct.
21          I think he's going to try to say that,
22     therefore, we don't need any discovery into whether
23     Google delisted ads in its overall DMCA program.
24          That's not correct in this case because
25     Google's repeat infringer policy is based on its

```
 1   delistings.  In other words, the situation in which
 2   they're supposed to remove -- to suspend someone or
 3   terminate someone is when they've done ████
 4   ████████, so --
 5            THE COURT:  According to the ████████
 6   ████.
 7            MR. KANE:  Exactly.
 8            So if they're getting the delistings wrong,
 9   they are, almost by definition, getting the repeat
10   infringer policy wrong.
11            So I can respond more if Mr. Damle argues
12   something different, but ...
13            THE COURT:  Do you contend that the DMCA
14   requires the ████████████████?
15            No, you don't, right?
16            MR. KANE:  You have to have a policy for
17   terminating repeat infringers.  It doesn't --
18            THE COURT:  You have to have a policy.
19            MR. KANE:  Yeah.  It doesn't say it has to
20   be ██████████████████████████████████████, but
21   you have to have a policy.  Google's policy is ████
22   ████.  And what they have to --
23            THE COURT:  For shopping.
24            MR. KANE:  I'm sorry?
25            THE COURT:  For Shopping.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MR. KANE:  For Shopping, yes.

 2              And what they have to have done is

 3    reasonably implemented that policy.  So if they did

 4    ██████████████  but didn't terminate them, you know,

 5    then they're not reasonably implementing their

 6    policy.

 7              Likewise, if they were supposed to delist

 8    an ad and didn't, that affects the repeat infringer

 9    policy because that means they didn't count a strike

10    when they should have.

11              THE COURT:  Okay.  Got it.

12              MR. KANE:  Thank you.

13              THE COURT:  Mr. Damle?

14              MR. DAMLE:  Thank you, your Honor.

15              Well, I'm happy to start wherever -- if you

16    have specific questions, otherwise I'm just happy to

17    dive in on some of the points.

18              THE COURT:  Well, I think my first question

19    for you, which plaintiffs' counsel describes as a

20    threshold question, is, if you work forward from

21    takedown notices, which is Google's proposal, but

22    only take down notices that Google treats as related

23    to the Shopping platform, is there going to be a big

24    chunk missing that should have been treated as

25    Shopping?
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. DAMLE:  I don't believe so, your Honor,

2     and let me see if I can explain.  And I'll start

3     with the last point that Mr. Kane addressed.

4          There are two different requirements for

5     the DMCA.  The first requirement is in 512(c) and

6     512(d) that says, upon notification of claimed

7     infringement, the service provider -- in this case,

8     Google -- has to respond expeditiously to remove or

9     disable access to the material that is claimed to be

10    infringing.

11         And it's without question that what that

12    refers to is the material that the plaintiffs are

13    complaining of.  In other words --

14         THE COURT:  The listed URLs.

15         MR. DAMLE:  The URLs that they have

16    notified Google about.  And there's no question that

17    we provided data about the -- the URLs that the

18    plaintiffs complained of.  That's different than the

19    second requirement.

20         So for the first requirement, under 512(c)

21    and (d), that's work-by-work specific.  So, in other

22    words, if Google says, for this particular work, we

23    don't want to take it down, they lose the safe

24    harbor, but only for that work, not generally.

25         There's only a requirement -- and it's

1    across all the different products that they have,

2    that, if you want the safe harbor for a particular

3    work that's complained of, you have to expeditiously

4    take down that material.

5         And so the only relevant information for

6    purposes of asserting -- for that first prong, that

7    first requirement of the DMCA defense, the only

8    requirement that Google has is to show that in

9    response to plaintiffs' notices, that it

10   expeditiously removed the works that were identified

11   in those notices.

12        It's not Google's burden to show that in

13   general it expeditiously delisted anybody else's

14   notices.  That is not a requirement of that first

15   prong of the DMCA.

16        THE COURT:  Okay.

17        MR. DAMLE:  Okay.

18        So now we turn to the second requirement.

19   The second requirement is that we have to have a

20   repeat infringer policy.

21        So let me just -- to pin down the first

22   requirement.  And the evidence that we've put in to

23   demonstrate that we've done that, that's the notice

24   tracking spreadsheets that I mentioned before.

25   Those list, you know, each notice that the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1   plaintiffs have submitted and the action taken on

2   it.  And they're associated with a product.  And as

3   we've discussed, sometimes the product that's

4   associated is Search rather than Shopping, right?

5          THE COURT:  So with respect to the

6   plaintiffs' takedown notices --

7          MR. DAMLE:  Right.

8          THE COURT:  -- you've produced all relevant

9   data flowing from the notices, whether you or

10  anybody else correctly characterize them as Shopping

11  or as Search or as something else.

12         MR. DAMLE:  Correct.

13         And that data -- for purposes of that first

14  requirement, that data will tell you whether --

15  regardless of how it was internally coded, whether

16  the takedown happened quickly or not, right, which

17  is the only requirement that we have to show.  And

18  it's backed up by ads data and offer data that we've

19  already produced with respect to the merchants that

20  they complained of.

21         THE COURT:  All right.

22         MR. DAMLE:  Okay.  So that's the first

23  requirement.

24         THE COURT:  Now, as for the repeat

25  infringer policy?

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MR. DAMLE:  Correct.
 2              So the fact that something was coded
 3    internally on that first notice spreadsheet as being
 4    for Web Search rather than Shopping did not affect
 5    how Google treated that notice for purposes of its
 6    Shopping DMCA policy.
 7              And we can tell this -- and I did this last
 8    night -- because if you look at -- so each notice
 9    has a case ID associated with it, and there's a
10    separate ███████████████     that you discussed
11    last time with my colleague, Ms. Tomkowiak.  It's
12    called a manual strike tracker.
13              That strike tracker is the means by which
14    ███████████████████████████████████████████████
15    █████████████     under its policy to warrant
16    termination.  So that manual strike tracker is a
17    separate ██████████.
18              That manual strike tracker also has case
19    IDs.  And there are case IDs that are listed in the
20    notice spreadsheet that are associated with Web
21    Search.
22              THE COURT:  Back up for a minute.
23              MR. DAMLE:  Sure.
24              THE COURT:  You made a big point of saying
25    to me that with respect to the first prong of the
```

```
 1      DMCA requirement -- namely, that Google act
 2      expeditiously to remove or disable access to the
 3      material claim to be infringing.
 4              MR. DAMLE:  Yes.
 5              THE COURT:  You say, to satisfy that
 6      prong --
 7              MR. DAMLE:  Yes.
 8              THE COURT:  -- you only need to satisfy
 9      that prong with respect to the material identified
10      by these plaintiffs.
11              MR. DAMLE:  Correct.
12              THE COURT:  It is irrelevant to your safe
13      harbor whether you did an equally good job, a worse
14      job, or no job at all with respect to other
15      complainants.
16              MR. DAMLE:  Exactly correct.
17              THE COURT:  Okay.  Now, that's not true
18      with respect to the second prong.
19              MR. DAMLE:  That is correct, your Honor.
20              THE COURT:  So walk me through that.
21              MR. DAMLE:  So with respect to the second
22      prong, we have to have reasonably implemented a
23      repeat infringer policy.
24              THE COURT:  And that's under § 512?
25              MR. DAMLE:  That's § 512(i).
```

```
 1                    THE COURT:  Thank you.
 2                    MR. DAMLE:  For that, yes, we acknowledge
 3      that there is law out there that suggests that we
 4      have -- that --
 5                    THE COURT:  So in order to satisfy your
 6      burden on the affirmative defense under this prong,
 7      there is law out there that says you have to show
 8      that you did a decent job.  I'm being real here.
 9                    MR. DAMLE:  In general.
10                    THE COURT:  In general, not just for --
11                    MR. DAMLE:  Not just with respect --
12                    THE COURT:  -- Cengage and the
13      co-plaintiffs.
14                    MR. DAMLE:  Correct.
15                    There's law out there that says how we
16      treated non-parties to the suit and how we treated,
17      you know, infringers that are not alleged to have
18      infringed any of the works-in-suit -- how we treated
19      them, that is relevant to assessing whether we're
20      entitled to the -- whether we've had a reasonably
21      implemented repeat infringer.
22                    THE COURT:  All right.  So how does your
23      proposal address that section?
24                    MR. DAMLE:  Well, if I could take a step
25      back and just discuss some of the data that we've
```

```
 1    already produced -- I know you talked about this
 2    with Ms. Tomkowiak at length last time, but if I
 3    could just describe it again ...
 4            THE COURT:  This is as a predicate to
 5    explaining to me what your --
 6            MR. DAMLE:  Yes.  If that -- if --
 7            THE COURT:  Hold on.
 8            MR. DAMLE:  Yeah.
 9            THE COURT:  You're not trying to convince
10    me of the point you were trying to convince me of
11    last time --
12            MR. DAMLE:  Absolutely not.
13            THE COURT:  -- which is you've already done
14    enough.
15            MR. DAMLE:  Absolutely.
16            THE COURT:  Right.
17            MR. DAMLE:  Absolutely not.  This is just
18    as a predicate.
19            So we have -- there are, sort of, three
20    buckets now of domains for which we produce data.
21    The first bucket are what we've referred to as
22    domain-identified merchants.  That's the 1,239
23    domains that they identified as being referenced in
24    the notices that they had sent to Google, right?
25    That leads to about 20,000 merchant accounts.
```

1          So those are all domains that were, at one

2     point -- those are all merchant accounts that, at

3     some point in history, were associated with domains

4     that they say were advertising their works.

5          Now, the thing about that is some of those

6     merchants changed domains, may have started

7     advertising other things, were advertising things

8     other than plaintiffs' -- the works-in-suit.

9          So there's some amount of information

10    beyond just what -- the works-in-suit.  There may

11    be -- and we provided notice -- and the information

12    we provided is all notice data, regardless of

13    where -- who was submitting the notice data about

14    that merchant, all the offer data, all the ads data,

15    all the account information, including suspension

16    information for those merchants.

17         THE COURT:  So you say you've provided all

18    notice data, offer data and ads data regarding the

19    1,239 domains and the, roughly, 30,000 associated

20    merchants?

21         MR. DAMLE:  The 20,000, roughly.

22         THE COURT:  Sorry.  20,000.

23         MR. DAMLE:  Yeah.  And account data,

24    including suspension status.

25         And then last time we were here, your Honor

```
1   ordered us to do the same with respect to an
2   additional list of 261 domains --
3           THE COURT:  Right.
4           MR. DAMLE:  -- that they say, at some point
5   in time, advertised --
6           THE COURT:  And that's in process.
7           MR. DAMLE:  -- one of the works-in-suit.
8           And that's in process, and we have a
9   deadline for doing that same thing.
10          And beyond that, in addition, what we
11  provided is -- and this was earlier, at an earlier
12  stage in the case -- merchant accounts that were
13  associated by e-mail address to one of the
14  originally domain-identified merchant accounts.
15          THE COURT:  Say that again.
16          MR. DAMLE:  So merchant accounts can share
17  e-mail addresses across -- you know, everyone can --
18  you can have the same e-mail address for multiple
19  merchant accounts.  So what Judge Rochon had ordered
20  us to produce is, in instances where one of the
21  domain-identified merchants -- that's the 20,000
22  merchants I mentioned, Category 1 -- whenever they
23  had an e-mail address that was the same as an e-mail
24  address as some other merchant in Google's system,
25  we were to go and find out who those merchants were
```

1    and collect the information from them, collect data

2    from them.

3         THE COURT:  All right.  So in addition to

4    the 20,000 merchant accounts directly associated

5    with the 1,239 domains previously or --

6         MR. DAMLE:  Yeah.  There were about ███████

7    of those accounts.

8         THE COURT:  There were ██████ what?

9         MR. DAMLE:  ████.

10        THE COURT:  Of the ones sharing e-mail

11   addresses?

12        MR. DAMLE:  Of the ones that just share the

13   e-mail address.

14        And the thing I want to point out about

15   that -- again, this is just preface for talking

16   about our proposal -- is that those accounts, by

17   definition almost, were not associated with any of

18   the domains that were complained of, that were --

19   that the evidence showed were, at some point,

20   advertising the works-in-suit.  They were just

21   completely different domains by definition because

22   if they were one of the domains that were

23   advertising one of the works-in-suit, we would have

24   captured them in one of the first two categories.

25        THE COURT:  Right.

```
 1            MR. DAMLE:  And so that is, sort of --
 2   we've given data about that set of merchants.  We
 3   called them e-mail-connected merchants.
 4            THE COURT:  And you've given all notice,
 5   offer and ads data for --
 6            MR. DAMLE:  We were ordered by Judge Rochon
 7   to provide just notice data and account suspension
 8   data from which they can see whether -- you know,
 9   how many notices came in, whether -- when you got to
10   ███████████, was it -- you know, that were counted
11   as strikes, were they suspended?  Were they
12   suspended at that time?
13            So it gives them that information.  It
14   doesn't give them the underlying offer or ads data
15   information.
16            THE COURT:  Okay.
17            MR. DAMLE:  Okay.  So then turning to our
18   proposal.  So that's just what's in the case already
19   for them to be able to test the validity --
20            THE COURT:  How is your proposal going to
21   round out the picture here?
22            MR. DAMLE:  So to round out the picture,
23   what we've offered -- and we've made a -- we offered
24   a modification of it in light of some of the
25   concerns that Mr. Kane addressed today -- is to say,
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1   okay, well, we have this category of Shopping
 2   delistings, right, Shopping notices that we have.
 3   We have a full -- you know, we've produced a slice
 4   of them, the ones related to them.
 5          We have the full list.  We can select,
 6   across a 10-month period of time, with the 10 months
 7   to be selected by plaintiffs, 30 domains per month
 8   that are randomly selected using a random number
 9   generator.  If it happens to hit on a domain that
10   we've already pulled the data for --
11          THE COURT:  You go to the next one.
12          MR. DAMLE:  -- we go to the next one.
13          And the further modification that we
14   offered yesterday to plaintiffs was to say -- to
15   account for the concern that maybe --
16          THE COURT:  To account for the ■ percent
17   concern?
18          MR. DAMLE:  No, not the ■ percent concern.
19          So just to talk about that, we have --
20          THE COURT:  No.  Tell me your modification.
21          MR. DAMLE:  Yeah, the modification is to
22   limit the search to notices that were marked
23   pertaining as to the Shopping product and where the
24   action taken was remove.
25          So where Google got a notice for a
```

```
1    particular domain and said, okay, this one is a

2    valid notice.  We can find the, you know, URL, the

3    infringing content.  We're going to remove it.

4         And so that way we're focused on ones where

5    there is actually, you know, a universe of domains

6    where there was at least one valid notice that was

7    submitted and some -- and a removal action taken.

8    And we would take 300 of those.

9         THE COURT:  How is that different?

10        Leaving aside volume, 10 percent versus

11   300, which I believe is a fairly substantial

12   difference.

13        But leaving aside volume, how is your

14   modified proposal now significantly different from

15   plaintiffs'?

16        Plaintiffs say, start with a sample of

17   "domains for which Google claims to have delisted at

18   least one URL."  And you now say, start with domains

19   that were the subject of DMCA notices marked as

20   Shopping, where the ultimate action taken was to

21   delist that domain.

22        Doesn't that, kind of, amount to the same

23   thing?

24        MR. DAMLE:  I don't -- well, I think they

25   are asking for us to, first, provide the full list
```

```
 1   of URLs to them.

 2             THE COURT:  True.

 3             MR. DAMLE:  And then there's going to be a

 4   process of selection.  And it also is embedded in

 5   here, I'll say, an effort to make us, sort of --

 6             THE COURT:  Do more work?

 7             MR. DAMLE:  Well, not do more work, but to

 8   say, oh, well, these are the only ones that are

 9   Shopping delistings.  And we've already discussed

10   that we can't make that representation, that there

11   is -- like, the only ones that are -- only the ones

12   that are marked Shopping are the ones that were

13   Shopping delistings --

14             THE COURT:  Right.

15             MR. DAMLE:  -- because of just the way the

16   data is stored.

17             So I think the problem with their --

18             THE COURT:  If plaintiffs are -- if their

19   statistics are right, that there's a █ percent

20   variance there, and if that holds true across other

21   complainants, then you would think that instead of

22   the total number of URLs being ████, it would be

23   ████ plus another █ percent.

24             It would be ██████████,

25   right?  Maybe.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. DAMLE:  Maybe.  Maybe.

2          The problem is that the data is stored the

3     way the data is stored.  So we don't know what --

4     you know, we can't tell.  And, again, they seem to

5     think that it somehow affects our DMCA defense.

6     They can make that argument if they want.  We

7     disagree with that.

8          The fact is that the data is stored the way

9     the data is stored.  So we can't represent, like,

10    oh, this is all of the Shopping notices that came in

11    because some of the data is stored in a way that

12    does not allow us to back that information out.

13         So we want to just start with the ones --

14    without us having to make any representation that

15    this is the full universe of Shopping takedowns, we

16    want to start with the universe of things -- and I

17    think that's what your Honor suggested last time

18    after a long discussion, that we start with the

19    universe of delistings where the -- where it gets

20    marked as Shopping, and then we go from there.

21         And so our proposal is to take one -- our

22    proposal is quite simple, which is to take -- just

23    take a single sample at that point.

24         You know, theirs is this multistep process

25    that requires, you know, a lot of additional work.

 1    Ours is fairly simple.  For those 300 domains, we're

 2    going to give you all the information about account

 3    information, notice information, ads information,

 4    offer information.

 5         It's a big enough sample.  It's 20 percent

 6    more domains than we've already given them.  That's

 7    enough information.  And these are going to be

 8    random merchants.  That should be enough information

 9    for them to test in general whether --

10         THE COURT:  So it's going to be a total

11    sample set of 300 domains.

12         MR. DAMLE:  Correct.

13         THE COURT:  But just forgive me if I'm

14    sounding dense here.

15         If, under your original proposal, as you

16    submitted it to me last week, plaintiffs pick the

17    months.  Fine.  Pick whatever months you want.

18         And then for each of the selected months

19    under your original proposal, 30 domains will be

20    randomly selected from DMCA notices marked as

21    pertaining to Shopping.

22         MR. DAMLE:  Yes.

23         THE COURT:  Now, you're saying no because

24    it's now a multistep process.  They'll pick 30

25    domains, and you'll check to see if those domains

```
 1   were delisted, right?
 2           MR. DAMLE:  Well, we can --
 3           THE COURT:  If they weren't --
 4           MR. DAMLE:  -- filter easily because we'll
 5   see in -- there are ones where the action taken in
 6   that same spreadsheet is --
 7           THE COURT:  So when you give them -- let's
 8   say the month is January 2021.
 9           MR. DAMLE:  Yes.
10           THE COURT:  When you give them what they
11   can select from for that month, you will give them a
12   list of domains that were the subject of DMCA
13   notices marked as pertaining to Shopping and that
14   were ultimately delisted?
15           MR. DAMLE:  That -- where the action in
16   that spreadsheet was remove.  So, in our view, yes,
17   where it was delisted.
18           THE COURT:  But the notice would have come
19   in during the sample month -- in our example,
20   January 2021 -- and the delisting may have
21   happened -- who knows when?
22           MR. DAMLE:  That would all be reflected on
23   that same spreadsheet.
24           THE COURT:  Right.
25           MR. DAMLE:  And what I'll say is, like, our
```

1   proposal isn't to just hand over all of the domains

2   and let them pick.  We would just randomly select,

3   using a random-number generator --

4          THE COURT:  Sure.

5          MR. DAMLE:  -- the ones that we would give

6   to them.  So it's 30 per month for that 10-month

7   period.

8          So they would just -- and we could do this

9   relatively quickly.  We would just give them, here's

10   the list of additional 300 domains.  And then that's

11   the sample.

12          THE COURT:  So they wouldn't see a list

13   first.

14          MR. DAMLE:  Correct.  Correct.

15          THE COURT:  They would just give you

16   January.

17          MR. DAMLE:  Right.

18          THE COURT:  And you would say, here are

19   the --

20          MR. DAMLE:  They would say, January 2022.

21   And we'd say, here are the 30 for those.

22          THE COURT:  And you would hand them a list

23   of 30 with the associated data, and you would simply

24   represent that the way you got to those 30 was by

25   randomly generating 30 where the action was

```
 1   delisted.
 2           MR. DAMLE:  Exactly.  And -- yes, exactly.
 3           Which strikes us as a very straightforward,
 4   simple way to proceed here.  That gives them a view
 5   into merchants, other than the ones that they have
 6   complained about or that were in any way connected
 7   to the ones that they complained about.
 8           Which, again, for just the limited purpose
 9   of assessing whether we reasonably implemented our
10   repeat infringer policy on top of all of the
11   information we've given about the domains already,
12   that we've already produced, that --
13           THE COURT:  I mean, it would give them an
14   additional sample set, as you point out.
15           Let's see.  You were up to 1,239 plus 261.
16   You were up to a little over 1,500.
17           MR. DAMLE:  Correct.
18           THE COURT:  And this would give them
19   another, roughly, 20 percent.
20           MR. DAMLE:  20 percent more.  Exactly.
21           THE COURT:  And for those 300, you would
22   provide the full suite, correct, of --
23           MR. DAMLE:  Exactly.  Full stack of data.
24           THE COURT:  -- notice, offer and ads data.
25           MR. DAMLE:  Account, notice, offer, ads
```

1    data.  Yes.

2              THE COURT:  Okay.

3         Mr. Kane, doesn't the modified Google

4    proposal get you closer to where you want to be than

5    the original Google proposal?

6              MR. KANE:  It does get us closer, yeah.

7         They would need to do the same thing for

8    suspensions.

9         So what Mr. Damle said is, well, we'll take

10   300 domains that were delisted.  They would also

11   need to take 300 domains that were suspended because

12   just because there was one delisting doesn't mean

13   there was ultimately a suspension.  So they would

14   have to do the same thing for suspensions.

15             THE COURT:  For suspension of the ...

16             MR. DAMLE:  The pirate website.

17        So, in other words, the notice comes in.

18   They say, yeah, we're going to delist this

19   particular landing page.  We won't run ads for that

20   landing page anymore.

21        If they get ███████████, they're supposed

22   to not run any ads for that website anymore.  So not

23   just the particular, you know, testbank23.com slash

24   biologytextbook, but they're supposed to run no more

25   ads for testbank23.com.  So --

```
 1                    THE COURT:  So your add-on to defendant's
 2          modified proposal would be, okay, for each of these
 3          10 months, give us 30 DMCA notices marked as
 4          pertaining to Shopping that resulted in --
 5                    MR. KANE:  Suspensions.
 6                    THE COURT:  Well, they say "removed."  And
 7          you want to add another 300 where the domain was
 8          suspended.
 9                    MR. KANE:  We'd have to agree on a number,
10          but yes, that's the idea, so that we would be taking
11          from a list of ads that were delisted as well as
12          from a list of pirate websites that were suspended.
13                    THE COURT:  Yeah.  Presumably, fewer --
14          there were fewer suspensions of the entire domain
15          than there were individual URLs taken down.
16                    So 300 and 300, that's probably too many,
17          isn't it, for these suspensions?
18                    MR. KANE:  Well, I don't think we know what
19          the right number is until they tell us what the
20          population is.
21                    So Mr. Damle says they don't want to give
22          us a list of the ads they delisted.  Well, that's a
23          problem for a couple reasons.  Number one is, how do
24          we know how they're going to pick these?  I mean,
25          they need to give us the list, give every one of
```

1    those URLs a number, and then we can pick random

2    numbers from there.  I mean, they're going to need

3    the list in order to take the sample anyway, they

4    may as well give it to us.

5         But second, if we don't know the total

6    number of ads that were delisted, you know, if

7    you're the fact finder, you would like to know, are

8    these 300 domains half a percent, 1 percent,

9    3 percent?

10         You know, that makes a difference to you.

11         THE COURT:  Well, okay, you would like to

12    know, but what makes it legally relevant?

13         MR. KANE:  A couple things.  Number one, if

14    they, for example, had 10,000 pirates that they

15    suspended and we only get data on 300 of them, we

16    don't have a statistically significant sample, I

17    would venture.

18         That's potentially a problem if someone is

19    getting -- if an expert is getting on the stand and

20    saying, well, it's hard for me to extrapolate from

21    such a small sample because the sample is so small.

22         In other words, before we can pick a

23    sample, like, before we can select an appropriate

24    sample size, we need to know what's the size of the

25    overall population.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  And from that, you don't need

2     the list, you just need the number.

3          MR. KANE:  Correct.  For purposes of

4     determining the sample size, we would just need the

5     number of Shopping ads that they claim to have

6     delisted and the number of pirates they claim to

7     have suspended.  That would help us find the sample

8     size.

9          To actually select the sample for the

10    months in the sample period, we need the list.

11         THE COURT:  I don't understand that at all.

12    You only need the actual list if you think that

13    Google is going to cheat.

14         MR. KANE:  It's not necessarily that

15    they're going to cheat, it's that we need to make

16    sure that they're drawing from the proper

17    population.  In other words, --

18         THE COURT:  What could you tell?

19         MR. KANE:  If they gave us the list, we

20    would at least know, okay, there's 10,000 pirates on

21    this list.  They're picking 30 of them.

22         THE COURT:  Well, that gets back to the

23    number.  But how would you tell that it's the

24    right -- I'm not following you at all here.

25         Why do you need the actual list of however

1    you would track it by?

2              MR. KANE:  So if they don't give us the

3    list, they're doing it all on their end.  They're

4    just saying, oh, we found the list and we picked 30

5    of them, here you go.

6              THE COURT:  So that gets back to the, we

7    want the list to make sure that Google doesn't

8    cheat, that it's actually doing what it says it's

9    going to do.

10             MR. KANE:  I think that's a fair thing for

11   us to ask for.  If they're going to take such a

12   small sample for such an important issue, I think

13   there should be some transparency built into that.

14             Related to that, there's been quite a lot

15   of confusion here about, like, what is the total

16   population.  So -- because they can't -- they don't

17   seem to want to commit to this ██████ is actually

18   the number of Shopping ads notices we received or

19   Shopping ads URLs that we received.

20             We should have some transparency around,

21   like, what's the population they're using?

22             THE COURT:  Well, let's take Google's

23   proposal as modified, which is, for each month, 30

24   domains randomly selected from DMCA notices that

25   came in that month, right, marked as pertaining to

                 AMM TRANSCRIPTION SERVICE - 631.334.1445

1    the Shopping product and where the action taken was

2    that that ad was removed -- that that URL was

3    removed.

4          So in terms of the sample size issue, what

5    you would want to know is how many candidates were

6    there out of how many did they select randomly those

7    300?  Were there 3,000?  Were there 30,000?  Okay?

8          MR. KANE:  Yes.  Exactly.

9          THE COURT:  But the only reason that you

10   would want the actual list of those 3,000 or 30,000

11   would be to make sure that Google was actually

12   selecting randomly and not somehow putting its thumb

13   on the scale.

14         MR. KANE:  Yeah.  We would just do the

15   random selection together.

16         So there's different ways you can do it.

17   We can send a list of numbers in a locked, you know,

18   spreadsheet, and then we can get on the phone.  They

19   can bring up the list.  We give them the password to

20   unlock it and they, you know, take those numbers.  I

21   mean, I just feel -- we would do it together.  It's

22   not like a -- it's not a particularly cumbersome

23   step.

24         THE COURT:  No.  But it really does strike

25   me as -- in a case like this, given the quality of

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    the counsel on both sides, it strikes me that the

2    least -- the last thing I hope we would need to be

3    worrying about here, and the last thing that we, I

4    hope, would be requiring each side to do in order to

5    guard against is making sure that it's doing

6    something as simple as picking URLs randomly.

7          MR. KANE:  Well, I don't know that they're

8    necessarily saying they would create a list and pick

9    from the list.  I think what they might be trying to

10   do is just, like, pick a notice, pick a URL within

11   the notice, look to see if that URL was delisted,

12   and if it was, they'll take it.  Like ...

13         THE COURT:  Well, what I suggested -- and

14   Mr. Damle is going to explain back to me whether I

15   got it correctly or not.

16         What I thought they were going to do was,

17   you know, they take the -- how many are we going for

18   here?  300 notices.  Their original, unmodified

19   proposal was just, randomly pick 300 notices marked

20   Shopping.

21         Under the qualified, modified proposal,

22   they're only going to give you notices marked

23   Shopping that resulted in the URL being removed in

24   the delisting.

25         So if they took the first 300 and only half

1  of them were removed, then they would have to

2  randomly generate the next batch until they got up

3  to 300 that were removed.

4          That's what, in my head, I thought they

5  were going to do, but Mr. Damle may correct me on

6  that.

7          MR. KANE:  I think what they're saying is,

8  like, they would take the first notice from that

9  month and they would take the first URL.  And if

10  that was delisted, great.  That's their first one.

11          THE COURT:  That would be number 1.

12          MR. KANE:  Right.

13          THE COURT:  Kind of the way you get into

14  Stuyvesant High School.

15          MR. KANE:  Ah, okay.

16          THE COURT:  I'll explain it to you later.

17          MR. DAMLE:  Yeah.

18          THE COURT:  For those of you who have kids

19  who went through that system, I did.

20          Go ahead.

21          MR. KANE:  The problem is, like, that's

22  putting a lot of fortuity on just what's the first

23  notice?

24          The way to do it is, like, here's the list

25  of all the ads that were delisted.  We're going to

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    pick, randomly, 30 or 300, or whatever the number

2    turns out to be.

3         THE COURT:  Here's the list of -- well, to

4    get on the list, you need to satisfy two criteria.

5    You need to have a takedown notice marked as

6    pertaining to the Shopping domain, and the action

7    taken would have to be --

8         MR. KANE:  Remove.

9         THE COURT:  -- removed.

10        All right.  So you're questioning whether

11   they're just going to go through the month from the

12   first day of the month to however many days they

13   need to go through to get 300 or whether they're

14   going to generate the whole month and then pick a

15   random sample of 300.  And you also want to know

16   that's 300 out of how many that would have

17   qualified.

18        MR. KANE:  Exactly.  Yeah.

19        THE COURT:  Okay.

20        MR. KANE:  I think that's --

21        THE COURT:  The third thing you want is you

22   want some other number -- you say another 300, but

23   it's possible that you may be talked out of that --

24   where the qualifier is that the entire domain was

25   suspended.

```
 1              MR. KANE:  Yeah.  We said 10 percent of the
 2    domains.  300 was their number.
 3              But yes, they would do the same thing.
 4    They would give us the list of pirates they claim to
 5    have suspended that month and then give us the ads
 6    for those pirates so we can see did they run an ad
 7    for that pirate after they claimed to have suspended
 8    it.
 9              THE COURT:  Okay.  Got it.
10              MR. KANE:  The other feature of this is
11    that they're saying they want to confine it to the
12    ███████ URLs and just ignore any notices that were,
13    in fact --
14              THE COURT:  They're no longer claiming it
15    was necessary ███████ URLs.
16              MR. KANE:  Well -- but they want to draw
17    the sample from ███████ URLs.  That's the problem.
18              THE COURT:  Because they're marked as
19    Shopping.
20              MR. KANE:  Right.
21              So ███ percent of our notices were Shopping
22    notices.  And they didn't process them as Shopping
23    notices.  They're not part of that ███████ URLs.
24              So what we need to do is have a mechanism
25    to test how many notices did they get that were, in
```

1 fact, Shopping notices that they treated as Search

2 notices.  So I, sort of, think of this in two ways.

3   If they use the web form and the rights

4 holder herself actually selected Search when she

5 should have selected Shopping --

6   THE COURT:  That's her problem.

7   MR. KANE:  -- that's, sort of, out.

8   They correctly processed it as a Search

9 notice because the rights holder told them it was a

10 Search result.

11   If there's an e-mail, as all of our notices

12 were, nearly all of them, and Google -- and it said

13 this is a Shopping notice, but Google processed it

14 as a Search notice, we need discovery into how often

15 that happened.  I suspect the easiest way to do it

16 is just for them to take that --

17   THE COURT:  Well -- but what do you say to

18 Mr. Damle's point that, no, you don't, because that

19 goes to prong one of the DMCA defense.  And the only

20 person who could complain about that would be the

21 rights holder whose takedown notice was incorrectly

22 categorized.

23   MR. KANE:  That's incorrect because prong

24 two depends on prong one.

25   So you're a repeat infringer if you've had

```
 1   ████████ delisted.  If they're getting the delisting
 2   wrong -- so if they're taking a notice for Shopping
 3   and treating it as a Search notice such that they're
 4   not counting it as a strike in Shopping, then you
 5   got your repeat infringer policy wrong.
 6           In other words, if they --
 7           THE COURT:  I'm not sure that's right.
 8           MR. KANE:  It is because -- well, because
 9   if you get ████████████████████████████████████████
10   ████████████████████████████████████, that's a
11   repeat infringer under Google's policy.
12           THE COURT:  Okay.
13           MR. KANE:  So you're supposed to suspend
14   that domain.
15           If you got notices with ████████████████
16   ████████████████████ of them as search notices --
17           THE COURT:  And you didn't suspend them.
18           MR. KANE:  Exactly.  You didn't --
19           THE COURT:  Or you suspended them, but they
20   don't show up on your strike ████████████ because
21   you're not counting them as Shopping.
22           MR. KANE:  Exactly.  You didn't assess a
23   strike against that merchant, and, therefore, you
24   didn't suspend them from the Shopping platform.
25           So the second prong of the DMCA, as you're
```

```
 1   referring to, at --
 2              THE COURT:  Is intertwined with --
 3              MR. KANE:  512(i).
 4              THE COURT:  In your view.  Okay.
 5              MR. KANE:  Depends on 512(d).
 6              THE COURT:  I understand the argument.
 7              MR. KANE:  Okay.
 8              THE COURT:  Okay.
 9              MR. KANE:  With respect to the manual
10   strike spreadsheet that Mr. Damle was talking
11   about -- so there are ████ case IDs that Google
12   labeled as Web Search that are, in fact, Shopping
13   notices.
14              THE COURT:  Give me that number again.
15              MR. KANE:  There are ████ case IDs that
16   Google labeled as Search that are, in fact, Shopping
17   notices.  They told us yesterday they found --
18              THE COURT:  Of yours or in the whole world?
19              MR. KANE:  These are the ones that we know
20   are Shopping notices, so they are ours.
21              THE COURT:  Yours?
22              MR. KANE:  Correct.
23              THE COURT:  Okay.
24              MR. KANE:  They told us yesterday that they
25   found ██ of them in the manual strike tracker.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1    That's ████████.  That's not evidence that

2    they were correctly processing these as Search

3    notices -- as Shopping notices.

4           THE COURT:  So they were mislabeled.  You

5    say ████ were mislabeled as something other than

6    Shopping.  And of those, ██, nonetheless, made their

7    way onto the Shopping --

8           MR. KANE:  ████████.  Yeah.

9           THE COURT:  Interesting.  I wonder how they

10   made their way back.

11          MR. KANE:  That's precisely why we need to

12   start going into this.  Like, did they process them

13   as Shopping notices or not?

14          So if your Honor is sympathetic to Google's

15   argument that we should take the sample from the

16   ██████ that they, you know, called Shopping

17   notices, we still need discovery into how many

18   Shopping notices did they incorrectly treat as

19   Search notices?

20          THE COURT:  Yeah, I'm still not sure I'm

21   with you on that, but I do understand your argument.

22          Okay.  Anything else?

23          MR. KANE:  Okay.  I guess just one point to

24   correct.

25          Mr. Damle said that for all of the
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

 1    e-mail-connected merchants, which is merchants that

 2    share an e-mail address with one of the pirates,

 3    that they gave us the full notice data and ads data.

 4              That's not correct.  They didn't give us

 5    the ads.

 6              THE COURT:  Roughly, ████ with the shared

 7    e-mails?

 8              MR. KANE:  Yeah.  The merchants who share

 9    an e-mail address with the pirates we identified, I

10    don't believe they gave us notice.

11              THE COURT:  Do you know if they gave you

12    all notice data and account suspension -- all notice

13    data and account suspension data?

14              MR. KANE:  They told us --

15              THE COURT:  Is that what you said,

16    Mr. Damle?

17              MR. DAMLE:  Yeah, that is what I said, your

18    Honor.

19              THE COURT:  Okay.

20              That's what he said.

21              MR. KANE:  They told us whether they had

22    suspended the account.  They did not give us the

23    notice data.  I'm 99 percent sure.  And I'm 100

24    percent sure they didn't give us the ads data.

25              THE COURT:  Well, he didn't say they gave

1    you the ads data.

2              MR. KANE:  Yes, but they -- I'm 99 percent

3    sure they didn't give us the notice data for this.

4              THE COURT:  Obviously, I'm not in a

5    position to tell you.

6              MR. KANE:  I'm just -- they're trying to

7    make an argument that, like, they've given us all

8    this stuff.  That's not something they gave us.  I

9    believe they only gave us notice and ads data for --

10             THE COURT:  You believe.  Okay.  Great.

11             Okay.

12             MR. KANE:  I'm almost certain they didn't

13   give us the notice data.

14             THE COURT:  Almost certain.  99 percent.

15   Okay.

16             MR. KANE:  Thank you.

17             THE COURT:  So, Mr. Damle?

18             MR. DAMLE:  Yes.

19             THE COURT:  How are you going to pick the

20   300?

21             Are you going to start with the first

22   notice that came in on the first day of the month

23   and go until you get 300 that satisfy the criteria?

24             MR. DAMLE:  No.

25             THE COURT:  Or are you going to run some

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    kind of search to tell you how many meet those
 2    criteria for the month and then randomly pick 300,
 3    in which case, you would be able to give plaintiff
 4    the total number from which you picked the 300,
 5    correct?
 6            MR. DAMLE:  Yes, we can give the total
 7    number.  This is all the stuff -- all this data
 8    stored in a database.  I assume somebody at Google
 9    could write a script to pull out --
10            THE COURT:  Right.
11            MR. DAMLE:  -- out, sort of, the filter the
12    ones that meet the criteria and then pull out for
13    the months that are selected, the 30 per month,
14    randomly.
15            And yes, we could -- I assume that --
16            THE COURT:  That 300, I think you --
17            MR. DAMLE:  So 30 per month for 10 months
18    is 300 total.
19            THE COURT:  Oh, you're right.
20            MR. DAMLE:  Yeah.
21            I assume that we can provide also what the
22    full universe in those months were.
23            THE COURT:  Do we know whether 30 is
24    1 percent or 10 percent or half --
25            MR. DAMLE:  Of the total number of entries
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

 1   that meet those criteria, yes.

 2          THE COURT:  And why did you settle on 30

 3   per month for a total of 300?  Because it seemed

 4   like a nice number in comparison to the, roughly,

 5   15,000 of --

 6          MR. DAMLE:  1,500.  Yeah.

 7          THE COURT:  1,500.  Sorry.

 8          MR. DAMLE:  Yeah, it was just -- we thought

 9   it was proportional, 20 percent extra domains to do

10   the sort of --

11          THE COURT:  That other people are

12   complaining.

13          MR. DAMLE:  That other people are

14   complaining about to do the kind of test that you

15   suggested that we ought to do.  You had suggested

16   something in the neighborhood of, well, why don't we

17   take one month and just do a deep dive on those?

18          THE COURT:  Well, remember, anything I

19   threw out at our last session --

20          MR. DAMLE:  I understand, your Honor.

21          THE COURT:  -- was just spit-balling.

22          MR. DAMLE:  I understand.  Yeah, I

23   understand.  I understand.

24          THE COURT:  All right.

25          MR. DAMLE:  So we thought something like

```
 1    that would be a, sort of, proportional approach to
 2    testing this proposition, which is, you know,
 3    whether -- not just whether we implemented our
 4    repeat infringer policy reasonably with respect to
 5    the merchants that are already in the case, but
 6    whether we went beyond that and with respect to
 7    merchants that are, you know, sort of not really
 8    connected to the --
 9              THE COURT:  All right.  So that's the point
10    about giving the denominator so that the plaintiffs
11    understand what percent of the potential universe of
12    other people complaining they've got for the sample
13    months.
14              Now, Mr. Kane would like to know not just
15    the number, but he actually wants the whole list so
16    that he can, I think, make sure that you really have
17    given him a randomly selected 30 rather than the
18    first 30 on the first day or some other non-random
19    sample.
20              What say you to producing the list?
21              MR. DAMLE:  Sorry.  Let me just grab some
22    water.
23              THE COURT:  Sure.
24              MR. DAMLE:  I mean, I would just go back to
25    the point that you made, which is, you know, we're
```

1   both repeat players with each other, and there --

2   you know, I don't think there's any reason to think

3   that Google would do anything other than what we're

4   suggesting, which is select randomly.  We're not

5   going to cherrypick the particular entries.

6            You know, I think it's --

7            THE COURT:  Let me ask the question the

8   other way:  What's the downside of producing the

9   list?

10           MR. DAMLE:  You know, I think that it just

11  produces a lot more data that they can, like --

12           THE COURT:  Sure.  And it's going to make

13  them ask a bunch more questions and send a bunch

14  more RFPs.

15           MR. DAMLE:  Exactly.

16           THE COURT:  But that, in and of itself,

17  isn't a good enough reason if it would be helpful in

18  some other way.

19           MR. DAMLE:  See, that's the thing.  I don't

20  think it would be helpful in any other way.  And it

21  creates a risk, as we know from, you know, the

22  number of papers that we've given you, your Honor,

23  that any sort of thing you give them more, they'll

24  ask a bunch of questions about it, there will be

25  disputes about it, and it will go on and on.

1          So I think our approach, which is targeted

2    at giving them, sort of, a reasonable amount of data

3    to do the kind of analysis they want to do into the

4    300 domains, that feels proportional and won't cause

5    a bunch of other questions and disputes down the

6    line.

7          THE COURT:  All right.

8          What say you to Mr. Kane's point, that, in

9    addition to the 30 per month that satisfy the

10   criteria of, one, DMCA notices marked as pertaining

11   to Shopping, and two, action taken was "removed."

12   Mr. Kane also wants another sample set.  I said,

13   another 300.  He's not necessarily buying that

14   number, but he wants another sample set where the

15   action taken was suspension of the domain.

16          MR. DAMLE:  That's a much more challenging

17   issue.  And we don't even -- I don't even

18   understand, really, from his proposal how we would

19   go about doing that because Google does not suspend

20   domains.  Google suspends accounts.  And as we

21   discussed, there's a -- for every domain, there may

22   be many, many, many --

23          THE COURT:  Merchant accounts.

24          MR. DAMLE:  -- different merchant accounts,

25   right?

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              And so whether -- and the other thing I'll
 2     say is those merchant accounts are suspended for
 3     lots of different reasons.
 4              So, for instance, if, you know --
 5              THE COURT:  Not just because of the
 6     ██████████████████████.
 7              MR. DAMLE:  Correct.  Correct.
 8              Many merchants get suspended for, you know,
 9     selling counterfeit goods, which is a trademark
10     issue, not a, you know, copyright issue.  They get
11     suspended because they get complaints about fraud.
12              There's just -- the termination data, the
13     suspension data for merchants is very, very messy.
14     And so even pulling a random sample that makes sense
15     is going to be a real challenge.
16              On the other hand, the 300 domains that we
17     are going to provide them are going to lead to some
18     number of thousands of merchant-centered accounts.
19     We're going to give them, again, the full stack of
20     data.
21              They will be able to see from that 300, in
22     addition to all the other domains that we've given
23     them, right, including -- that they will be able to
24     see, how did we treat those merchants when they got
25     ████████████████?
```

```
 1              THE COURT:  And will the data that you do
 2    give them with respect to the 300 randomly selected
 3    merchants that meet the two criteria that you
 4    proposed in your modified proposal -- will that data
 5    include, ultimately, that, of these 300, 50 were --
 6    the merchant accounts were suspended.
 7              MR. DAMLE:  Yes.
 8              THE COURT:  Or 75 or 3 --
 9              MR. KANE:  Yes.
10              THE COURT:  Or whatever the number turns
11    out to be.
12              MR. DAMLE:  Yes.  It will include
13    termination data.  It will include all the notices
14    that they got.  It will include, you know, when the
15    notices came in, and it will include whether they
16    were terminated and at what date.
17              THE COURT:  All right.  Thank you all very
18    much.
19              Obviously, this is an area where the Court
20    has a great deal of discretion because this is at
21    heart a proportionality issue.  How much extra data
22    are the plaintiffs entitled to regarding how Google
23    treated takedown notices and alleged pirate sites
24    other than those identified in the notices sent in
25    by plaintiffs themselves?
```

 1          After balancing the arguments that I've

 2    heard today -- and I do appreciate that they were a

 3    little different, at least -- well, on both sides, a

 4    little different from what was set forth in the

 5    papers, but that's fine.  Life is like that.

 6          I'm going to go with Google's proposal as

 7    modified, so it's going to be -- for each of the 10

 8    months that the plaintiffs select, it's going to be

 9    30 randomly generated domains where the criteria are

10    subject to DMCA notices that month marked as

11    Shopping.

12          And when I say "marked as Shopping," I

13    guess what I mean is treated by Google as Shopping,

14    which hopefully correlates in a high number of

15    instances to the ones that are marked by the

16    complainant as Shopping.  And second criterion,

17    where the action taken was "removed."

18          In addition to randomly selecting 30 of

19    those for each of the 10 chosen months, I will

20    require Google to give the plaintiffs the

21    denominator for that month, how many potential

22    entries were there that met those two criteria.

23          I don't see any particular reason at

24    present why Google needs to actually turn over the

25    list of all qualifying entries.

            AMM TRANSCRIPTION SERVICE - 631.334.1445

1        And Google will then produce the full suite

2   of data discussed with respect to each of those 30

3   randomly selected examples in each of the 10

4   plaintiff-selected months.

5        And, Google, you're going to write up that

6   proposed order for me, please.

7        MR. DAMLE:  Will do.

8        THE COURT:  Show it to the defendants

9   first -- sorry.  Show it to the plaintiffs first,

10  obviously.

11       And the only thing I want to hear about if

12  the two of you can't agree on wording when the

13  proposed order comes in, which I trust will happen

14  within days of today -- I don't want to hear any

15  more about whether these are -- this is -- whether

16  I've drawn the line in the right place or not.  The

17  only thing I want to hear about is whether the

18  language of the order appropriately and accurately

19  implements the Court's intended ruling.

20       All right.  So that will be the decision

21  with respect to -- oh, gosh, what did we start out

22  with on this one -- what was originally plaintiffs'

23  November 3rd motion that came in at Docket Number

24  237.

25       Okay.  I am ready now to talk about the

```
 1    privilege dispute.  Anybody need to change chairs
 2    for this?
 3              MR. KANE:  I'm sorry.  Could I make
 4    one clarification?
 5              THE COURT:  Sure.
 6              MR. KANE:  We understand what you've ruled
 7    with respect to the sampling, so I'm not quarreling
 8    with that.
 9              We will be seeking discovery on how many
10    Shopping ads notices Google erroneously treated as
11    Search notices.  So I just want to be clear that,
12    like, we've resolved the sampling, but, like, we
13    will be seeking discovery on the separate question
14    because the sample is just from --
15              THE COURT:  Seeking it is one thing,
16    getting it is something else and not today's issue.
17              MR. KANE:  Okay.  I just want to make --
18    your Honor's ruling today hasn't foreclosed that
19    discovery.
20              THE COURT:  Yeah.  I will remind you that
21    we're now less than 30 days from the date by which
22    documents were supposed to be --
23              MR. KANE:  Yeah.  I mean, we just learned
24    this on Wednesday, so ...
25              THE COURT:  You just learned the ██ percent
```

```
 1   on Wednesday.
 2            MR. KANE:  Correct.  Yeah.
 3            THE COURT:  All right.  You may not have
 4   known it was █ percent, but you were not unaware of
 5   the issue.
 6            MR. KANE:  I don't think that's right.
 7   We've been saying for quite some time now, ██████
 8   can't be the right number because ██████ of them
 9   are ours.
10            We only found out on Wednesday that they
11   were saying, no, █████ of those are not yours.
12   That's what clued us into they've actually been
13   processing these as Shopping notices -- as Search
14   notices and not Shopping notices.
15            THE COURT:  Not today's issue.
16            MR. KANE:  Yeah.
17            THE COURT:  And we still have a number of
18   today's issues to get through.  So let me, now, swap
19   out some binders here.
20            MS. TOMKOWIAK:  Your Honor, I will be up
21   next.  Could I please take two minutes?
22            THE COURT:  Sure.
23            Should we all take --
24            MS. TOMKOWIAK:  Well, not -- I'll be up on
25   opposition next.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                THE COURT:  Should we all take two minutes?
 2                MR. DAMLE:  That's fine, your Honor.  Yes.
 3                THE COURT:  Then we better make it five.
 4                MR. DAMLE:  Yeah.  Yeah.
 5                THE COURT:  Because the bathrooms are down
 6    the hall.
 7                Actually, Counsel, there's more bathrooms
 8    through the jury room under the clock there, if
 9    that's of interest to you.
10                Five minutes.
11                (A recess was taken.)
12                THE DEPUTY CLERK:  We're now back on the
13    record in the matter of Cengage Learning, Inc.
14    et al. v. Google LLC; Case Number: 24-cv-4274.
15                THE COURT:  All right.  With respect to the
16    privilege motion filed originally by defendant on
17    November the 14th, I think, at Dockets 273 and 274,
18    let me tell you where I am at on this particular
19    motion.
20                Google argues that the common interest
21    exception to waiver doesn't apply here because the
22    four plaintiffs plus Pearson shared a commercial
23    rather than a legal interest.
24                That appears to be one of the arguments.  I
25    do not think that argument is meritorious.  Every
```

1    legal dispute -- okay, 99 percent of all legal

2    disputes have financial consequences, sometimes very

3    significant financial consequences, and it should

4    not surprise anybody living in the real world that

5    the financial consequences are often what motivates

6    the legal dispute.  That does not render the common

7    interest exception inapplicable.

8         Google next argues that plaintiffs and/or

9    Pearson aren't eligible for the common interest

10   exception because they each own their own copyrights

11   and they each own their trademarks rather than

12   jointly owning any of the individual intellectual

13   property at issue.

14        I don't think that's a requirement, and I

15   don't think that the cases that Google cited

16   indicate that it is.  Certainly, not in a joint

17   litigation situation where a bunch of plaintiffs are

18   making essentially the same claims in parallel with

19   respect to their individually owned intellectual

20   property.

21        Google's third argument is that Pearson

22   destroys the common interest exception or the

23   appearance of Pearson on the cc list means that

24   there has been a waiver of privilege because

25   Pearson's not a plaintiff.

 1          That argument has since been updated with
 2     the sealed declaration of Ms. Murphy and the
 3     December 12th letter responding to that from
 4     Google's counsel, which leads me to, sort of, where
 5     I am now, which is -- is there any -- in its most
 6     recent letter, Google argues, well, okay, but --
 7     there are how many here?
 8          34 withheld documents on the privilege list
 9     that are dated after May 30, 2024, ██████████████
10     ████████████████████████████████████████████████
11     ██████████  that include Pearson, and, therefore, at
12     least turn over those 34.
13          Other than that which I'll hear argument
14     on, I am not inclined to give Google any of the
15     documents that the plaintiffs have designated as
16     privileged.  So I think I probably want to hear
17     first on the question of those 34 documents.
18          I probably want to hear first from the
19     plaintiffs.
20          That's Ms. Murphy, right?  Okay.
21          MS. MURPHY:  Thank you, your Honor.
22          We can't turn over those 34 documents
23     because they pertain to other litigations as well.
24     The content of the documents is --
25          THE COURT:  And as to that other

          AMM TRANSCRIPTION SERVICE - 631.334.1445

1   litigation, you say the co-client or joint interest
2   exception to waiver applies because that's other
3   litigation that Pearson might actually be a
4   plaintiff in.
5           MS. MURPHY:  Correct.
6           THE COURT:  Can you redact?
7           MS. MURPHY:  I don't believe so.  I don't
8   believe so, no.
9           THE COURT:  Because you speak about this
10  litigation and that potential litigation all in the
11  same breath?
12          MS. MURPHY:  Before I respond further,
13  your Honor, could we have a similar instruction to
14  what you provided with respect to the declaration
15  under Federal Rule of Evidence § 502 --
16          THE COURT:  Looking out at the courtroom, I
17  do not see anyone here who is not counsel for either
18  the plaintiffs or the defendants.
19          So I think that's a sensible suggestion.
20  And in order to allow Ms. Murphy, and then later
21  Google, to discuss the issues outlined in
22  Ms. Murphy's sealed declaration freely, I will
23  direct the parties, in the event that the transcript
24  is ordered for today's conference, to redact any
25  discussion of Ms. Murphy's sealed declaration or, I

1  guess, the defendant's response thereto.

2  Understood?

3          Google, you understand?

4          MR. DAMLE:  Yes, your Honor.

5          THE COURT:  And, Ms. Murphy, that satisfies

6  you?

7          MS. MURPHY:  Yes.  Thank you.

8          THE COURT:  Okay.  So now, please, why

9  can't you redact?

10         MS. MURPHY:  Because it's the same data

11 analysis that would apply.

12         So Pearson and the plaintiffs sued the

13 pirates in a series of cases in this district, and

14 part of those joint legal efforts continues to be

15 enforcing those judgments and certain --

16         THE COURT:  And as to which all five have a

17 joint interest in your review.

18         MS. MURPHY:  Correct.  Correct.

19         So I don't think that would solve the

20 problem here, but that is -- there is a very clear

21 reason why just those documents were logged the way

22 they were, and it is a reasonable and sensible one

23 because it actually reflects what is going on with

24 respect to litigation or anticipated litigation.

25         There also is privileged material contained

```
 1    in, I believe, some of them that pertains to a
 2    completely unrelated platform.  So --
 3             THE COURT:  Not Google.
 4             MS. MURPHY:  Correct.
 5             So that would complicate turning over the
 6    information as well with respect to plaintiffs and
 7    with respect to Pearson.
 8             THE COURT:  Okay.
 9             While you're up, the issue that I hadn't
10    touched on yet because I was focused on the joint
11    privilege issue as it relates both to whether there
12    was a joint privilege to begin with and whether
13    Pearson's participation in the communications
14    destroys it.
15             But if I could just turn your attention
16    to -- what's the name of your -- I don't want to
17    call them a vendor.
18             MS. MURPHY:  BCGuardian.
19             THE COURT:  He C. Guardian?
20             MS. MURPHY:  B as in boy.  Yes.
21             THE COURT:  PC as in --
22             MS. MURPHY:  B as in boy.
23             THE COURT:  Oh.
24             MS. MURPHY:  BCGuardian.
25             THE COURT:  Not PC like politically
```

```
 1    correct.  BC like British Columbia.
 2              MS. MURPHY:  Correct.
 3              THE COURT:  Okay.  Which I didn't give you
 4    my thoughts on earlier, but I'll give you my
 5    thoughts on them now.
 6              Obviously, they don't fill the role of an
 7    agent necessary to communicate between attorney and
 8    client in the way that the traditional examples of
 9    translator, for example or, in some cases,
10    accountant do, but I generally agree with Google's
11    approach here, which is that, to the extent what
12    BCGuardian is doing is simply ferreting out or
13    presenting facts which plaintiffs need to show, or
14    may need to show in this case, that the work of
15    BCGuardian has appropriately been turned over in
16    discovery.
17              But to the extent that BCGuardian is, in
18    effect, engaged in strategic conversations with
19    counsel, could go -- in my mind now, I'm imagining
20    these communications.  Maybe counsel is saying, gee,
21    you know, we think you should look at X, Y and Z
22    because we can make the following legal arguments
23    depending on what the facts are.
24              Or maybe BCGuardian is saying, well, you
25    asked me to analyze this particular slice of data
```

1    with regard to this approach, that approach, the

2    other approach.  Which one do you want me to do?

3         Those all feel, to me, very much like they

4    are, in fact, work product and, therefore, within

5    the privilege, even though counsel are not

6    necessarily sitting at their desks in their law

7    firms doing that work themselves.

8         So maybe -- since I'm agreeing with you,

9    Ms. Murphy, I don't know if there's anything you

10   want to add there, but I'll certainly hear from

11   Google on the BCGuardian point as well as the 34

12   documents.

13        MS. MURPHY:  Just to clarify, the documents

14   that we did withhold reflect the type of

15   communication and analysis that your Honor just

16   summarized.

17        THE COURT:  I did it informally, but I was

18   trying to capture what you were arguing in your

19   letter brief.

20        MS. MURPHY:  Correct.  But I do think that

21   with respect to *Kovel*, that for the data analysis

22   piece, that it is essential for the attorneys to

23   understand and then provide that legal advice.  And

24   I think that the post-Kovel cases do extend to

25   investigators and others doing activities that are

1    beyond literal translation.

2            So I would take issue with that.  I think

3    that we have been very careful to draw lines with

4    respect to attorney-client and work product

5    documents that involve BCGuardian.  But, you know,

6    quite often, they -- I am personally asking them to

7    conduct an analysis and report back to me so I can

8    figure out how to advise my clients.

9            So that is part of it.  There also is the

10    strategic piece as well.  So ...

11            THE COURT:  You're sending them out to see

12    if they can help you with this theory or that

13    theory?

14            MS. MURPHY:  Essentially, yes.  Yes.

15            And then as to, like, just the pure facts,

16    it's important to ground this in the notices.

17            So BCGuardian does send the notices of

18    infringement to Google on the plaintiffs' behalf.

19    Google has all of that information.  So in terms of

20    those facts, there's really nothing else that they

21    wouldn't already have.

22            THE COURT:  How many BCGuardian

23    communications in total were withheld on privilege

24    and/or work product grounds?

25            I guess you labeled everything that was

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    withheld, both privilege and work product, right?
 2              MS. MURPHY:  Not everything.
 3              THE COURT:  Not quite everything?
 4              MS. MURPHY:  Not quite everything.
 5              I would have to ask a colleague to give me
 6    that number.  We do have the spreadsheet up, but I
 7    don't know off the top of my head.
 8              THE COURT:  I can't read the spreadsheet on
 9    paper because it's too tiny.  I have to pull it up
10    on my computer.
11              MS. MURPHY:  It's too tiny for me, too.  I
12    have a printout that is useless, but would you like
13    us to check that?
14              THE COURT:  Maybe you can check on that
15    while I'm hearing from Google.
16              All right.  Anything else you want to tell
17    me?
18              MS. MURPHY:  Not right now, but I would
19    obviously like the opportunity to respond.
20              THE COURT:  Okay.
21              MS. MURPHY:  Okay.  Thank you.
22              THE COURT:  All right.  Mr. Borgert?
23              MR. BORGERT:  Thank you, your Honor.
24              Understanding your Honor's inclination on
25    the common interest issue, just two quick points on
```

1    that.

2         One, we do believe that, given the

3    circuit's rulings that privileges are to be narrowly

4    construed, and that rule applies also to the common

5    interest privilege, that plaintiffs' decision to

6    organize themselves -- that the way they have would

7    essentially be an extension and breaking new ground

8    on the common interest doctrine.  And understanding

9    the Court's inclinations, I would just like to point

10   for the record -- the case is *Carnegie* --

11        THE COURT:  Are you referring now

12   specifically to including someone who turns out not

13   to be a current plaintiff in the group?  In other

14   words -- or would you be making this exact same

15   argument to me if we were only talking about the

16   four named plaintiffs in all these communications?

17        MR. BORGERT:  So I guess those are slightly

18   different.  The core argument here is, we cited at

19   least four District Court cases in which the courts

20   held that there was no common interest simply

21   because there was no shared ownership rights.

22        Those were *Carnegie* --

23        THE COURT:  And in those cases, starting

24   with *Carnegie* --

25        MR. BORGERT:  Yep.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  Were the four entities that

2     claimed a common privilege, co-plaintiffs or

3     co-defendants?  And were the communications among

4     them and their litigation, Counsel?

5          MR. BORGERT:  No, your Honor.  But in

6     the --

7          THE COURT:  I think that makes a

8     difference, don't you?

9          MR. BORGERT:  I think, because this is such

10    a novel situation, it was not surprising to us that

11    there wasn't something exactly on point.  I would,

12    however, point you to the case *In re California Bail*

13    *Bond*, which is a -- I don't recall if it was

14    Northern District or Central District of California.

15    But that case did apply the *U.S. v. Schwimmer* case,

16    which is the Second Circuit authority on the common

17    interest doctrine.

18         And there, what that court held was, even

19    though plaintiffs had same counsel -- these were all

20    defendants.  Even though they all had the same

21    counsel, with respect to the communications at

22    issue, they were making the same arguments -- and it

23    was essentially the same case just split up among

24    the different insurance, the bail bond insurers --

25    that that wasn't enough because they had no

1    overlapping interest.

2          And the reasoning there, which you also see

3    in cases like *Pereira*, which is from this circuit,

4    is that a ruling as to one plaintiff's infringement

5    actually does not have any implication as to the

6    other plaintiffs.

7          Now, this is maybe a little academic, but

8    the common interest doctrine, even the co-client

9    doctrine, arose in the context of criminal defense,

10   where you would have maybe conspiracy case or an

11   aiding and abetting case, where it really did matter

12   whether or not liability or a particular factual

13   finding was found as to one defendant.

14          THE COURT:  But the existence of a

15   conspiracy count was not necessary to the

16   application of the privilege in the criminal

17   context, was it?

18          You could have two defendants who were

19   charged with -- I don't know -- let's say robbing a

20   bank, and let's say the conspiracy count dropped out

21   for some reason or another at the indictment stage.

22   These things sometimes happen.

23          MR. BORGERT:  Yeah.

24          THE COURT:  But the two alleged bank

25   robbers were represented by the same criminal

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    defense counsel.

2              Would you argue in that case that there was

3    no joint privilege?  I don't think so.

4              MR. BORGERT:  No.  Exactly.  Because, right

5    there, you're still involved in the same underlying

6    act.

7              THE COURT:  Even though one could be guilty

8    and the other could be innocent.

9              MR. BORGERT:  Right.  Because they were

10   both involved in the same underlying act, and the

11   liability stemmed from that, the same robbery, so

12   it's --

13             THE COURT:  Okay.  Let me give you a

14   hypothetical example.

15             MR. BORGERT:  Yeah.

16             THE COURT:  Let's take some of the great,

17   groundbreaking civil rights litigation over the past

18   several decades.  Let's say there's a class action

19   brought by all of the women employed by XYZ

20   Corporation who claim that they're only paid

21   87 cents to the dollar the comparable male employees

22   are paid.  And there are three or four named

23   plaintiffs, and one of them works in the Milwaukee

24   office and one of them works in the Chicago office,

25   and one of them is a junior vice president and one

1    is a senior vice president.

2            Would you say -- even though they're all

3    represented by the same litigation counsel and were

4    prior to litigation as they were developing their

5    litigation strategy, would you say that they have no

6    joint privilege because each woman really only wants

7    her own paycheck to be comparable to the men's?

8            MR. BORGERT:  No.  I don't think so.  And

9    the reason is because it sounds here like there

10   would still be a particular action from which all of

11   this liability --

12           THE COURT:  And isn't that true here as

13   well?  Aren't each of the plaintiffs claiming to

14   have been injured by the same alleged deficiencies

15   in, among other things, Google's implementation of

16   its ███████████████, for one thing, and in the

17   way that Google responds to takedown notices?

18           MR. BORGERT:  No.  I don't think so, your

19   Honor, and for similar reasons that my colleague,

20   Mr. --

21           THE COURT:  I haven't heard any argument

22   from the plaintiffs, and I certainly don't expect to

23   hear any argument from the plaintiffs that, well,

24   Google injured Cengage by doing X, Y and Z and

25   injured -- what's the second named plaintiff here --

            AMM TRANSCRIPTION SERVICE - 631.334.1445

1    by doing A, B and C.

2            That's not the plaintiffs' case.  The

3    plaintiffs' case is very much like the case of the

4    women who are suing my fictional corporation here,

5    that they were sure they each owned different

6    copyrights, different trademarks, but they claim

7    they were all injured in the same ways pursuant to a

8    common course of conduct by Google.

9            MR. BORGERT:  No.  I think in the

10   hypothetical with respect to the class -- that class

11   action, if the class action -- right, the law builds

12   in requirements for the class action: numerosity,

13   commonality, et cetera.  So assuming that something

14   got to the class stage, I think you would already

15   have had a finding that there were common issues at

16   that case.  Whereas --

17           THE COURT:  Do you need a quote finding

18   that there are common issues?  Isn't it enough for

19   me to say, obviously, there are common issues here?

20           I mean, do you see a world in which

21   Plaintiff Number 1 gets a ruling that Google

22   contributorily infringed its copyrights and

23   Plaintiff Number 2 doesn't?

24           MR. BORGERT:  Yes.

25           THE COURT:  I can see a world -- hold on.

```
 1              I can see a world in which the percentages
 2      are different or the gravity of the harm is
 3      different or the damages are computed differently,
 4      but can you really see a world in which you did just
 5      fine by Plaintiff Number 1, but you're liable to
 6      Plaintiff Number 2 here?
 7              MR. BORGERT:  Yes, your Honor.  And that's
 8      because each plaintiff has to separately prove
 9      infringement of a specific work, which they've done.
10      You know, they provided the Exhibit A, I think, that
11      lists out who owns what.
12              The damages point, your Honor, is exactly
13      right.  They may have different damages.  The
14      defenses that Google may bring against one plaintiff
15      may succeed.  There may be other issues as to
16      another plaintiff.
17              THE COURT:  Excellent point.
18              I don't recall off the top of my head that
19      Google articulated any defenses that apply to less
20      than all plaintiffs.  Did you?
21              MR. BORGERT:  Not off the top of my head,
22      your Honor.
23              THE COURT:  Not --
24              MR. BORGERT:  But --
25              THE COURT:  -- right?
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MR. BORGERT:  The material -- so going to
 2    the expeditious removal, it could be, just for the
 3    sake of a hypothetical, that Google expeditiously
 4    removed all of McGraw Hill's.  It is infringing
 5    material.
 6              THE COURT:  Theoretically possible that the
 7    data would shake out that way, but I think that's a
 8    rather remote theoretical possibility.  It's not the
 9    way the case has been pleaded by the plaintiffs.
10    It's not the way the case has been defended by
11    Google.
12              Do you have anything else?
13              MR. BORGERT:  Yes.  Just, I guess, to close
14    out this, I would say that this would be an
15    expansion of the common interest doctrine because
16    plaintiffs are using it offensively in how they've
17    organized themselves to conduct their cases.  I
18    understand we're probably not going to see eye to
19    eye on that, so I will move on to Pearson.
20                               ███████████████ Pearson ████
21    ███████████████████████████████████████████████
22    ███████████████████████ post May 30th --
23              THE COURT:  After May --
24              MR. BORGERT:  -- 2024.
25              But the way the common interest works is
```

1     the common interest is the exception to waiver, and

2     that exception only applies if the parties are fully

3     aligned, right?  That's what the co-client cases

4     say.  That's what the common interest cases say.

5             ████████████ Pearson, ████████████████

6     █████████████████████████, essentially waives

7     privilege as --

8           THE COURT:  I don't understand that

9     argument at all.  It's very common in the real

10    world, when a case is being prepared, when plans are

11    being made to litigate -- and, obviously, a case

12    like this, this is not something that happens in a

13    week or two weeks.  There's a long runway before you

14    follow the -- excuse me -- file the complaint.

15           It's pretty common for part of that process

16    to be, okay, who are going to be our plaintiffs in

17    this case?  It happens in securities fraud

18    litigation all the time.  It happens in IP

19    litigation, as here.

20           Heck, it happens in FLSA litigation,

21    minimum wage cases:  Am I going to use the busboy,

22    the waitress or the bar back as my named plaintiff

23    here?  Or maybe all three.  Or maybe two.  And all

24    three of them -- the busboy, the waitress and the

25    barback -- may well be meeting and conferring with

1    counsel in the lead-up to the litigation while

2    counsel determines, among other things, who are my

3    best plaintiffs?

4             MR. BORGERT:  Yeah.

5             THE COURT:  I don't see a problem here.

6             MR. BORGERT:  ████████████████████████

7    May 30, 2024, █████████████████████████████

8    ██████████  Pearson ███████████████████████

9    ██████████████████████.

10             THE COURT:  Sure.  Now, we're down to the

11    34 documents.

12             MR. BORGERT:  Yes.  Sorry.  And that's

13    where I was -- that's where I'm headed.

14             So as to those 34 documents, the common

15    interest privilege cannot apply because ██████████

16    ████████████████████  Pearson ███████████████████

17    ██████████████████████████████.

18             THE COURT:  With respect to this case.  But

19    what we just heard from Counsel is all five of them

20    remained aligned with respect to other potential

21    litigations; therefore, the anticipation of

22    litigation prong kicks in and that the discussions

23    of those other potential litigations are too

24    interspersed with whatever the discussion was

25    regarding this litigation to allow for redaction, as

         AMM TRANSCRIPTION SERVICE - 631.334.1445

1  a practical example.

2  ████████████████████████████████████

3  ████████████████████████████████████

4  ████████████████████████████████████

5  ████████████████████████████████████

6  ████████████████████████

7          MR. BORGERT:  ████████████████████

8  ████████████████████████████████████

9  ████████  ████████████████████ --

10         THE COURT:  What they're saying about

11  this --

12         MR. BORGERT:  About this lawsuit that

13  includes a party who is not aligned, who is not

14  within the common interest, who is not a co-client

15  as to this litigation.

16         So, yes, we think redaction would be

17  acceptable if --

18         THE COURT:  If it can be done.  Some --

19         MR. BORGERT:  If it can be done, right.

20         And if it's not, then I think a sampling of

21  5 to 10 of those 34 for in camera review would be

22  another option.

23         THE COURT:  I wasn't going to bring that

24  up.  I was wondering how long it was going to be

25  before somebody here brought that up.

```
 1              MR. BORGERT:  Oh.  Well, your Honor, if
 2    they're saying they can't redact, I mean, clearly
 3    there is at least some component of these materials
 4    that are not privileged.  And just saying, oh, it's
 5    too interspersed -- I mean, obviously, I understand
 6    that's going to be plaintiffs' position, but doing
 7    five to ten, I think -- my understanding of what
 8    these are, are that these are very -- there's, like,
 9    ██████████████████████████.  And counsel can correct
10    me if I'm wrong.  So --
11              THE COURT:  Your what weekly update?
12              MR. BORGERT:  EPEG.  So this --
13              THE COURT:  Oh, the name of the group.
14              MR. BORGERT:  Yeah, it's not like a trade
15    associate -- this -- I think they called it a
16    non-juridical entity.
17              THE COURT:  Club.
18              MR. BORGERT:  Yeah, the club, the publisher
19    club.
20              So whatever updates there are -- I mean,
21    it's very possible that it could be Cengage
22    litigation:  Bullet, bullet, bullet.  Next future
23    litigation:  Bullet, bullet, bullet.  In which case,
24    then --
25              THE COURT:  In that case, I would expect
```

1    Ms. Murphy to have said, yeah, we can redact.

2         MR. BORGERT:  Yeah.  And, you know, it's 34

3    documents.  I don't -- we'll see if -- I don't know

4    if she has them all at the top of her head, but if

5    it is impossible to redact, I think just looking at

6    a couple of them for in camera review would be

7    appropriate.

8         THE COURT:  Okay.

9         And now tell me, if you would, your

10   thoughts on BCGuardian.

11        MR. BORGERT:  Yeah.  So, your Honor, we

12   agree, obviously, with your Honor's assessment of

13   BCGuardian not qualifying for *Kovel* because they

14   are --

15        THE COURT:  Did I say that?  I don't recall

16   having said that.

17        MR. BORGERT:  Oh.  Well, maybe I'm -- I

18   don't mean to over overstep, your Honor.

19        We don't believe that BCGuardian qualifies

20   as *Kovel* precisely for the questions that you posed

21   to opposing counsel, which is they are not

22   facilitators.  They are not translators.  What they

23   are doing is they are going outside of the clients

24   to get information from -- I don't know -- the web,

25   the external world, and bring them back.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          There are cases that we cited, like

2     *Durling*, which involved Papa John's and a similar

3     type of investigative effort outside of the company

4     that held that that was not covered under *Kovel*

5     because going out and gathering information is not

6     what *Kovel* is really all about.

7          Opposing counsel mentioned that there are

8     some cases applying *Kovel* to investigators.  As you

9     pointed out in our brief, those investigators were

10    investigating things within the company.

11         So the *Gucci* case, for example, the

12    investigator at issue was an in-house counsel of --

13    I think it was an affiliate.  But what that person

14    did was interviewed Gucci employees and provided

15    that information to counsel.

16         So as to BCGuardian falling under -- you

17    know, what side of the line is it?  It's clearly --

18         THE COURT:  Why does it matter whether the

19    investigator is investigating the plaintiffs'

20    personnel or investigating facts outside of the

21    plaintiff?

22         MR. BORGERT:  Well, I think it matters for

23    *Kovel*.  It may not matter as much for the attorney

24    work product.

25         THE COURT:  Right.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                MR. BORGERT:  Right.  So --

 2                THE COURT:  Which is the defendant's -- the

 3      plaintiffs' strongest point here, right?

 4                If this stuff qualifies as work product,

 5      which, as we know, does not have to be written by an

 6      attorney --

 7                MR. BORGERT:  Yep.

 8                THE COURT:  -- and which can only be

 9      waived, it's hard to waive -- it's not hard to waive

10      work -- it's harder to waive work product than to

11      waive attorney-client privilege.

12                In order to waive work product, in order

13      for you to establish that plaintiff has waived work

14      product, you would have to establish that they have

15      allowed that work product to fall into the hands of

16      someone who's not aligned with them, and surely

17      BCGuardian is about as aligned with them as they

18      could possibly be.

19                MR. BORGERT:  Yeah, BCGuardian is 100

20      percent.

21                The issue -- one of the issues we have with

22      claiming that BCGuardian's work is attorney work

23      product is that, from the best we can tell, is what

24      BCGuardian really is doing is putting together these

25      infringement reports, is going out, it's scanning,
```

1   and it's providing that data to plaintiffs.

2           And if we look -- we cited the ████████

3   ████████████████████████████ ██████████████

4   ████████████████████████████

5   ██████████████████████████████

6   ████████████ .

7          THE COURT:  ██████  ████████████████

8   ████████████████████████████████████████

9   ██████████

10         MR. BORGERT:  Yeah, so it has to do with

11   whether or not litigation is concretely anticipated.

12         So we cited the case *Rubies*, which

13   involved, like, a similar function for a -- I think

14   it was a costume company who was investigating

15   Amazon.  And there what the Southern District in

16   New York held was, this is just your routine

17   brand-protection work.  And that's not something

18   that gets the benefit of attorney-work-product

19   protection, precisely for the reason that privileges

20   and protections are to be narrowly construed.  And

21   this is something that, like, is just an ordinary

22   company function.

23         THE COURT:  Well, look, everybody in your

24   position quotes the many cases that stress that

25   attorney work product and privilege are to be

```
 1    narrowly construed because they're an exception to
 2    the general rule that you get discovery of
 3    everything.
 4              MR. BORGERT:  Yeah.
 5              THE COURT:  Everybody in the plaintiffs'
 6    position on this particular motion quotes the other,
 7    many cases that talk about how sacred the
 8    attorney-client privilege is and how the work
 9    product protection, especially core work product,
10    having to do with attorney work product, is
11    absolutely essential to the American legal system as
12    we know it.  So ...
13              MR. BORGERT:  Let me point it in a
14    different direction, then.  And I think it's just
15    going back to the point that routine IP protection
16    efforts are not related to litigation.
17              THE COURT:  Why do you think that they are
18    withholding routine product policing?
19              MR. BORGERT:  Sure.  So one example -- we
20    cited this in Docket 338, paragraph 18, the withheld
21    document.  Just some more background on this.  In
22    our opening brief, we pointed out that plaintiffs
23    had apparently either provided or produced materials
24    that appear on their log to us already, either
25    before the litigation or as part of their discovery
```

1    productions.  Plaintiffs had no response to that.

2         So in the reply, we found another example

3    at Docket 338, paragraph 18, in which we pointed out

4    that plaintiffs had withheld a document called

5    ██████████████████████████████████ which is

6    on row 1059.

7         THE COURT:  Hold on.  I now have to find

8    Docket 338.  It's in here somewhere.

9         MR. BORGERT:  It's the Supplemental

10   Declaration of Sarah Tomkowiak.

11        THE COURT:  Tomkowiak's Declaration.  Just

12   a sec.

13        All right.  Now, you say paragraph 18?

14        MR. BORGERT:  Yes.

15        THE COURT:  Hold on.  I'm with you.

16        MR. BORGERT:  Okay.

17   ███████████████████████████

18   ████████████████████████████████

19   ████████████████████

20   ██████████████████████████████████

21   ██████████████████████████

22   ██████████████████████████

23        THE COURT:  ████████████

24        MR. BORGERT:  ██████  ███████████████

25   ██████████████████████████.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1              THE COURT:  ████████████████████
2   ████████████ .
3              MR. BORGERT:  Yeah.
4              THE COURT:  Yeah.
5              MR. BORGERT:  That one.  And --
6              THE COURT:  That's a personal opinion and
7   is not a legal conclusion.
8              MR. BORGERT:  And so we looked at that
9   document, and it just looks like the other
10  spreadsheets that plaintiffs have provided as to
11  Google.  And so it just didn't -- I mean, it didn't
12  strike us as anything that was privileged.  We sent
13  it to opposing counsel because we have to do this
14  meet and confer for sealing.  Opposing counsel
15  didn't claim that was privileged.  And so to the
16  extent these are the same documents, we think
17  privilege has clearly been waived.  And even --
18             THE COURT:  If it's the exact same
19  document, yes, privileged.
20             MR. BORGERT:  Well, right.  We don't know.
21  But I guess the --
22             THE COURT:  And if you want me to issue an
23  order saying, plaintiffs, look over your log
24  carefully, and if you've inadvertently logged as
25  privileged something that you've actually already
```

1    produced, take it off your log, please.  That's

2    fine.  But --

3              MR. BORGERT:  Yeah.  And just the last

4    point here that ties it all together is this is the

5    type of document that BCGuardian created for Google.

6    ██████████████████████████████████████████████

7    ████████████

8          ██████████████████████████████████████████

9    ███████████████████████████████████████████

10   ███████████████████████████████████████████████

11   ███████████████████████    ███████████████████

12   ████████████████████████████████████████████████

13   ███████████████████████████████████████████████

14        ████████████████████████████████████████████

15   ███████████████████████████████████████████████

16   ████████████████████████████████

17             THE COURT:  I think you're asking too much

18   of all these folks who are involved in these

19   communications.  The work product doctrine does

20   require that the work have been done in anticipation

21   of litigation.  It doesn't require that every

22   product manager, vice president and other non-lawyer

23   personnel involved in the project use the phrase

24   "anticipation of litigation" on every relevant

25   e-mail that they send.

```
 1              I mean, I am entitled, I think, to take a
 2      somewhat broader view than that, and, if otherwise
 3      appropriate, to credit the declaration of the
 4      attorneys who are directing the effort as to whether
 5      they were directing it towards routine surveillance
 6      efforts or whether they were directing it towards
 7      filing, well, this lawsuit or some other lawsuit.
 8              MR. BORGERT:  Yeah.  And I think, even on
 9      that point, your Honor -- and opposing counsel may
10      correct me.  But I recall looking through the
11      declarations filed by the in-house attorneys at
12      plaintiffs and litigation counsel, and I don't think
13      I saw anything that said BCGuardian created these
14      materials in anticipation of litigation.  The
15      closest they get to saying was, we have filed
16      litigation based on the evidence that BCGuardian has
17      collected.
18              THE COURT:  And you're suggesting that that
19      phrasing may have been due to the fact that, when
20      they did it, they didn't know yet whether it was
21      going to result in litigation.
22              MR. BORGERT:  Exactly, your Honor.
23              And just because it potentially might
24      result in litigation, if they're doing it and if
25      it's created in the same -- like, let's say we're
```

1    not in litigation world.  BCGuardian puts together a

2    report that looks like ABC, and then we're in

3    litigation world and BCGuardian puts together the

4    same report that looks like ABC.  Because it was

5    prepared in the same way, regardless of whether or

6    not litigation applied, work-product protection does

7    not attach to it.

8         THE COURT:  Because work-product protection

9    does not apply to routine business documents that

10   would have been prepared in the same way and in the

11   same manner with or without litigation.

12        MR. BORGERT:  That's exactly right.

13        THE COURT:  That's Second Circuit law,

14   sure.  But I'm not sure you've established that any

15   of the withheld documents here fall into that

16   category.

17        MR. BORGERT:  I think we have, simply

18   because we know that these reports were being

19   created before litigation, like two -- you know,

20   years before litigation.

21        We've seen the reports.  They don't strike

22   us as --

23        THE COURT:  The ones that aren't being

24   withheld.

25        MR. BORGERT:  The ones -- well, we've -- so

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    what they've produced --
 2            THE COURT:  The problem is you've gotten a
 3    lot of routine business or research documents that
 4    would have been prepared the same way with or
 5    without litigation.
 6            MR. BORGERT:  Right.  Right.
 7            And we've seen that -- there's a screenshot
 8    that we put in, I think, the same docket, 338, that
 9    shows this Excel sheet, and it shows the entries to
10    Google.  And then, at some point, it stops, and it
11    switches --
12            THE COURT:  What exhibit is that?
13            What exhibit is the screenshot?
14            MR. BORGERT:  Sorry?
15            THE COURT:  Is it -- you want me to look at
16    the -- oh, the one that you put in after
17    paragraph -- no.
18            If you want me to look at the screenshot,
19    tell me where it is.
20            MR. BORGERT:  I just know it's in Docket
21    338.  I don't have a different one.
22            THE COURT:  Okay.
23            MR. BORGERT:  ██████████████████████
24    ████████████████████████████████████████████
25    ████████████████████████████████████████████
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1      ████████████████████████████████████████
2      ████████████████████████████████████████
3            And so those just simply don't appear to be
4      attorney work product or anything really relating to
5      litigation at all.
6            THE COURT:  Well, I would -- I can't really
7      follow your argument unless I know what you're
8      telling me about.
9            I'm paging through the exhibits to that
10     declaration, but that's probably not a good use of
11     my time.
12            MR. BORGERT:  Oh, sorry.  It's not -- it's
13     not the exhibits.  It's within the declaration
14     itself.
15            THE COURT:  Okay.  Well, the only thing
16     that I see interlineated is at the end of paragraph
17     20, ████████████████████████████; is that right?
18            That's the heading at the top.
19            MR. BORGERT:  Yes, your Honor, Exhibit
20     paragraph 20 is the one.
21            THE COURT:  That's the image?
22            MR. BORGERT:  Yes.
23            THE COURT:  It's very small print.  Give me
24     a moment.
25            All right.  And your point here is that the
```

1    first three lines, you have full information on.

2    And then the lines towards the bottom of the chart

3    are labeled "Redacted as Privileged."

4            MR. BORGERT:  That's correct.

5            THE COURT:  Okay.  And you want to know

6    what changed.

7            MR. BORGERT:  Yeah.  To us, there seems to

8    be no discernible explanation for why that is

9    withheld as BCGuardian work product while the stuff

10   above the line is not.

11           THE COURT:  Okay.

12           MR. BORGERT:  So I guess on the BCGuardian

13   stuff, your Honor, the points that we would stand on

14   are that it does not appear to be made in

15   anticipation of litigation.  ███████████████████████

16   ████████████████████    ████████████████████████████

17   ████████████████████████.

18           And even if it is somewhat related to

19   litigation, without conceding that point, I think it

20   still stands that there's no evidence at all on the

21   record that BCGuardian created this because of

22   litigation or that BCGuardian's work product changed

23   because of litigation.  That is to say, its output,

24   even after a case commenced, remained the same.

25           THE COURT:  Thank you.

1          MR. BORGERT:  Thank you.

2          THE COURT:  Ms. Murphy?

3          MS. MURPHY:  Thank you, your Honor.  Where

4     should I start?

5          THE COURT:  Why don't you start at the end.

6          MS. MURPHY:  Okay.

7          THE COURT:  With regard to BCGuardian, what

8     I understand Google to be arguing is that while they

9     appreciate that you have produced some BCGuardian

10    work product, they believe you've drawn the line too

11    aggressively and that there is other BCGuardian work

12    product which is of the same general tenor as that

13    which was produced, which should be characterized as

14    routine surveillance or research work, and that you

15    haven't adequately established that everything that

16    you've withheld from BCGuardian, in fact, was

17    prepared or created in anticipation of litigation

18    and wouldn't have been prepared or created the same

19    way anyway.

20          Is that fair, Counsel?

21          MR. BORGERT:  Yes, your Honor.

22          THE COURT:  Great.  So that's --

23          MS. MURPHY:  Sure.

24          THE COURT:  Next point.

25          MS. MURPHY:  I'm happy to address that.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1              I will just say that, again, we went
2     through this methodically.  We have withheld
3     documents that were prepared in anticipation of
4     specific litigations if we said "work product" on
5     the log.  So it may not be this --
6              THE COURT:  If it says "work product" on
7     the log, you're representing to me that either on
8     the document or through some external identification
9     mechanism, you would be able to say, yeah, they did
10    that because of this lawsuit or because of some
11    other lawsuit we were thinking about bringing.
12             MS. MURPHY:  Correct.  Correct.
13             Unless there's human error because it is a
14    343-page log, I can represent to you that that was
15    our process and that there are documents that touch
16    multiple litigations -- that's why we listed
17    multiple case numbers -- and that these so-called
18    reports were prepared for litigation.
19             I appreciate that Google's counsel does not
20    have the same insight into what's actually in these
21    documents --
22             THE COURT:  Great.  I'm just wondering why
23    should I take Ms. Murphy's word for it, I guess?
24             MS. MURPHY:  Yeah, I understand that.
25             So a few things.  First of all, I think
```

 1   there was a suggestion that some of the wording in
 2   the in-house counsel's declaration was an aha
 3   moment.  That certainly is not the case.  That was
 4   not intended at all.  That document and all of our
 5   pleadings -- or our filings in this matter talk
 6   about how BCG has been retained by Oppenheim &
 7   Zebrak, how they are an antipiracy specialist firm
 8   that specifically prepares litigation-ready
 9   evidence.  They are not just a routine vendor that
10   sends notices and that's all they do.
11          The plaintiffs do have a few of those, and
12   those notices have been produced.  So I think that
13   my own declaration talks about BCGuardian.  There
14   are other places within the in-house counsel's
15   declarations that speak to BCGuardian and what it
16   does and how it provides this litigation-based
17   evidence and helps all of us, the lawyers, interpret
18   the claims.
19          THE COURT:  All right.  Do you have any
20   numbers for me?
21          MS. MURPHY:  Yes.
22          So there are approximately 900 total
23   documents involving BCGuardian.
24          THE COURT:  Withheld on privilege and/or
25   work-product grounds.

```
 1              MS. MURPHY:  Correct.

 2              THE COURT:  And 34 post-May 30th Pearson

 3    documents withheld on privilege or work-product

 4    grounds, and, in your view, not easily redactable.

 5              MS. MURPHY:  Correct.  I can provide a

 6    little bit more insight into that number, if that

 7    would be helpful, going back to the larger group.

 8    ████████████████████████████████████████

 9    ████████████████████████████████████████

10    and so that is why there is a large number.

11              Google's --

12              THE COURT:  Talking about the BCGuardian

13    data now.

14              MS. MURPHY:  Correct.  Correct.

15    ████████████████████████████████████████

16    ████████████████████████████████████████

17    ██  ██████████████████████████████████

18    ████████████████████████████████████████

19    That by no means makes them routine.  They are for

20    these purposes that I am describing now.  But there

21    is a large number.

22              There are approximately, I think, 400 of

23    those and then there's another 283 where the same

24    type of information is attached to an e-mail that

25    somebody at Oppenheim & Zebrak, either an
```

1  attorney -- I think some are myself -- or one of my

2  colleagues sent to our clients where this BCGuardian

3  information was included and then other legal advice

4  concerning other litigations.

5       THE COURT:  So as to those, you would argue

6  that the cover e-mail is attorney-client privileged

7  even if the attachment could not independently be

8  with it.

9       MS. MURPHY:  Correct.  Correct.

10       And those -- the cover e-mail touches a

11  number of different legal matters, none of which

12  are -- most of which are not relevant to this case.

13  ██████████████████████████████████████████

14  ██████████████████████  ███████████████████████

15  ███████  ██████████████████████████████████████

16  █████████████    ███████████

17       THE COURT:  ████████████████████████  █

18  ████████████

19       MS. MURPHY:  ████████████    █████████

20       So this is where we are.  The 34 Pearson

21  documents, █████████████████████████████████████

22  █████████, so I do not see a way to practically

23  redact it, and I do not think Google's counsel has

24  shown at all that there is a reason for an in camera

25  review.  Their general statements about what BCG

1  does are not based in fact at all, and they're not
2  acknowledging the extensive evidence that we have
3  put in about this.
4          And they're not really paying attention to
5  the fact that we have gone through and we have
6  redacted.  So for BCG communications, we're not
7  necessarily withholding the whole thing.  We're
8  taking out the part that reflects the attorney
9  analysis.
10         THE COURT:  Are you telling me -- well, let
11 me back up.
12         The way Google's Counsel and I were
13 discussing it -- and this may have been my choice of
14 words -- at the outset was in terms of when did
15 BCGuardian's routine efforts turn into anticipation
16 of litigation?
17 ████████████████████████████████
18 ████████████████████████████████
19 ████████████████    ██████████████
20 █████████████████████████████████
21 ████████████████████████
22 ██████████████████████████
23 █████████████████████████████████
24 ███████████████████████████
25 ███████████████████████████

1　████████████████████████████████████

2　██████████████████████████████████

3　██████ .

4　　　　　Am I overstating your position?

5　　　　　MS. MURPHY:  No.  I don't think so.

6　　　　　So with respect to these reports, which I

7　think -- what this line of discussion focuses on,

8　from the first report on the log, they were prepared

9　for litigation, including some of these cases

10　against the pirates.  So there's no --

11　　　　　THE COURT:  Not necessarily for this

12　litigation, but --

13　　　　　MS. MURPHY:  Yeah.  There might be some

14　outlier where we only marked it attorney-client

15　privilege.  But just with respect to the bulk of

16　these documents that we're discussing, they are work

17　product with respect to, you know, different

18　litigations.

19　　　　　THE COURT:  All right.  And can you point

20　me -- what's the docket number of your declaration

21　on this point, or the date?  One or the other.

22　　　　　MS. MURPHY:  For which point, your Honor?

23　The Pearson issue or --

24　　　　　THE COURT:  The Pearson issue, yeah.

25　　　　　I'm sorry.  No.  My mistake.

```
 1           The general setup with BCGuardian and the
 2   anticipation-of-litigation point.
 3           MS. MURPHY:  One moment.  Let me see if I
 4   can also find a paragraph.
 5           THE COURT:  Possibly 305.  You have an
 6   attorney declaration at Docket 305, which you filed
 7   on November the 21st.
 8           MS. MURPHY:  It should be in -- it should
 9   be in there.
10           THE COURT:  Okay.
11           And you start talking about BCGuardian at
12   paragraph 9.
13           MS. MURPHY:  Yes.
14           THE COURT:  ███████████████████████
15   ████████████████████████████████████
16   █████████████████████████████████████████
17   ████████████████████████████████████████
18   █████████
19           MS. MURPHY:  Let me check one other thing,
20   your Honor.
21           THE COURT:  Sure.
22           You do say that this case and some other
23   cases "have been based on evidence collected by
24   BCGuardian."
25           But Google's point is, I think, that's not
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    enough to establish the anticipation-of-litigation
 2    point because you have to have anticipated
 3    litigation when BCGuardian did the work, not just
 4    look back later and said, oh, we can use this in
 5    this litigation that we've decided to file.
 6              MS. MURPHY:  But as it so happens, with
 7    respect to the timing of this case, we had already
 8    filed the pirate suits.
 9              THE COURT:  You had already fired ...
10              MS. MURPHY:  Filed the pirate -- the suits
11    against --
12              THE COURT:  The other -- the preliminary.
13              MS. MURPHY:  -- the pirate in this
14    district.  So it wasn't meant to be an intentional
15    omission.  Perhaps, you know, it was self-evident to
16    us because we did explain those suits.
17              THE COURT:  When did you first file the
18    suits against the individual pirates?
19              MS. MURPHY:  August of 2019.
20              THE COURT:  And the BCGuardian documents
21    that you've withheld, those 900 total, how far back
22    do they date?
23              MS. MURPHY:  That, I don't know, but we can
24    check the Excel because I cannot read the printout.
25              August of 2019.
```

1          THE COURT:  Okay.  Anything else you want

2     to tell me?

3          MS. MURPHY:  I just want to be sure that,

4     with respect to BCGuardian, the outcome both

5     considers the attorney-client privilege with respect

6     to what we directed them to do concerning the

7     analysis and work product for the reasons that --

8          THE COURT:  No.

9          MS. MURPHY:  -- I've explained today,

10    they're certainly, you know, saying that we used

11    evidence in this litigation.  Doesn't mean that what

12    they were collecting in terms of that same evidence

13    was for another litigation.  And I think we even

14    said in the client's declarations that we had

15    originally sued the pirates.  And because of

16    Google's failure to respond to the notices, repeated

17    failure, that is what resulted in this case.

18         THE COURT:  All right.

19         MS. MURPHY:  So both can be true.

20         THE COURT:  Very quickly, and then we'll

21    wrap this up.

22         MR. BORGERT:  Okay.

23         I guess I did not hear anything from

24    opposing counsel that -- the biggest piece of

25    evidence we have is the ███████████.  And if

1   you look at the ███████████████████████████,
2   which is Docket 275-8, just reading from it, you
3   know, it says, "████████████████████████████
4   █████████████████████████████████████████████
5   ███████████████████
6   ██████████████████████████████████████
7   █████████████████████████████████████
8   █████████████████████████████████████████████
9   ███████████████████████████
10  ██████████████████████████████████████████████
11  ███████████████████████████████
12  ████████████████████████████████████████████
13          THE COURT:  What docket number is this?
14  I'm sorry.  I'm trying to follow along here at home.
15          MR. BORGERT:  I have it at 275-8.
16          THE COURT:  That would be Exhibit 8?
17          MR. BORGERT:  Exhibit 24.
18          THE COURT:  Nah.
19          MR. BORGERT:  This goes back to that
20  declaration.
21          THE COURT:  Oh, wait.  I'm looking at the
22  wrong place.
23          MR. BORGERT:  It's probably because Exhibit
24  24 was filed under seal, so it got the hyphen-8
25  number.

```
 1               THE COURT:  I may not be able to find it
 2   because of that.
 3               MR. BORGERT:  Okay.
 4               In any case, the project history
 5   paragraph --
 6               THE COURT:  Hold on.  Hold on.
 7               My staff has actually found me a path here.
 8               All right.  Exhibit 24, Statement of Work
 9   filed under seal.  I am with you.
10               MR. BORGERT:  Okay.  So if you look to that
11   paragraph titled ███████████████████████
12               THE COURT:  Yes.
13               MR. BORGERT:  It says, ████████████████
14   ████████████████████████████████████████████
15   ██████████████████████████████████████████████
16   ███████████████████████████████████████████████
17   ██████████████████████████████████████████████
18   ██████████████████
19               THE COURT:  ██████████████████
20               MR. BORGERT:  █████
21            ████████████████████████████████████
22   ███████████████████████████████████████████████████
23   ██████████████████████████████████████████████
24   ███████████████████████████████████████████████████
25   ██████████████████████████████████████████
```

1    ███████████████

2           █████████████████████████████

3    ███████████████   ████████████████

4    ████████████████████████████████████

5    ██████████████████████████████████

6    ██████████████

7           ████████████████████████████

8    ████████████████████████████████████

9    ███████████████████

10          THE COURT:  ████████████████

11   ███████████████████████████████████

12   ████████████████████████████████

13   █████████████████

14          MR. BORGERT:  ██████████████

15   █████   ██████████████████████████

16   ████████████████████████████████████

17   ██████████████████████████████████

18   ███████████████

19          THE COURT:  And let me just interject here

20   before I forget, that since we're discussing a

21   sealed document, if and when you order a copy of the

22   transcript of today's proceeding, this portion of

23   the discussion should also be redacted.

24          MR. BORGERT:  Understood, your Honor.

25          ██████████████████████████████


        AMM TRANSCRIPTION SERVICE - 631.334.1445

1    █████████████████████████████████████████

2    ████████████████████████████████████████████████

3    ██████████████████████████

4         █████████████████████████████████

5         THE COURT:  ███████████████████

6         MR. BORGERT:  █████████████████████████

7         ██████████████████████████████████████████████

8    ██████████████

9         THE COURT:  ██████████████████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ██████  █████████████████████████████████████████

13   █████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ██████

16        ██████████████████████████████████████████

17   ██████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ███████████████████████████████████████

20        ██████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   █████████████████

24        MR. BORGERT:  Understood, your Honor.

25        I guess the record is what it is on that

         AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1   point.
 2            THE COURT:  Yeah.
 3            MR. BORGERT:  So I'll just make two last
 4   points then wrap up.
 5            The first is that counsel has admitted that
 6   they've produced some of this material to us
 7   already.
 8            THE COURT:  I don't think that's an
 9   admission.  I think that's --
10            MR. BORGERT:  They've just -- I don't know.
11   They agree with us.
12            THE COURT:  You both agree on that.
13            MR. BORGERT:  Yeah, so we agree on that.
14            You know, the scope of what has been
15   produced that's on the log and what's been produced
16   that's not on the log, I think we will have to have
17   some follow-up conversations with them about.
18            But it does strike me that, especially
19   Mr. Kane, today, said that plaintiffs' vendor is
20   going to testify in this case, which would, of
21   ██████████████████████████████████████████████████
22   ███████████████████████████
23            THE COURT:  ███████████████████████████████
24   ███████████████████████████
25            MR. BORGERT:  ██████████████████████████████
```

1    great.  What a country.

2         But to the extent they are going to be

3    testifying, and they are going to be in the position

4    where we're going to have to probe their case,

5    whether or not they did find evidence of direct --

6         THE COURT:  They're going to be testifying

7    as an expert.  You'll get expert disclosures at the

8    appropriate time.

9         MR. BORGERT:  Yes, your Honor.  And so to

10   the extent they are withholding materials from their

11   investigations that are related to the subject

12   matter for which they're being put forth as -- which

13   I think is going to be direct infringement, the test

14   purchases, all that.  We do think plaintiffs aren't

15   able to use work product as the sword and shield

16   that they would be trying to do.

17        THE COURT:  But this is premature.  If you

18   are entitled to withhold something as privileged and

19   you later come to a point in your litigation where

20   you have to fish or cut bait, whether it's, you

21   know, defense of counsel -- advice-of-counsel

22   defense or what have you, you make that decision

23   then, you don't make it now.

24        MR. BORGERT:  Well, I guess we would say

25   they have already put it at issue.  They've done

```
 1    it -- like, their evidence of direct infringement is
 2    BCGuardian's work.  And so I think we're entitled to
 3    probe its processes, the work product it did that
 4    maybe didn't make it into the complaint.  Why not?
 5    Did they find issues with their methodologies,
 6    et cetera?
 7         THE COURT:  You believe that you're
 8    entitled to see everything BCGuardian did.  This is
 9    sort of a -- coming at the tail end of your
10    argument, but a very aggressive one.
11         You're saying, well, gee, even if this
12    stuff would ordinarily qualify as privileged or work
13    product, we actually get to see all of it because
14    they've used some of it, and we get to see the -- we
15    need to see the part they don't want us to see.
16         MR. BORGERT:  Yeah.  It's not that they
17    used some of it.  It's, you know, they've made
18    allegations in their complaint.  Paragraph 99 of
19    Docket 38 references the notices that BCGuardian
20    provided.  They've produced hundreds of --
21         THE COURT:  Obviously, you've seen all of
22    the notices because they were sent to you.
23         MR. BORGERT:  Right.
24         And they've produced hundreds and thousands
25    of, like, the screen captures and the test purchase
```

 1    information and all of that.  And I think we are

 2    entitled to probe, well, what is this that we were

 3    seeing and what are we not seeing and what went into

 4    producing this set?  Because that goes to -- they

 5    have to show direct infringement.  If BCGuardian is

 6    their only evidence of direct infringement, that is

 7    something that we are entitled to attack.

 8         THE COURT:  I don't think that's today's

 9    argument.

10         MR. BORGERT:  Okay, your Honor.  It is in

11    the briefing if you would like to consider it at a

12    later time.

13         THE COURT:  So --

14         MR. BORGERT:  Just a request, your Honor.

15    We would ask for the in camera review of five to ten

16    of the Pearson documents.  We also think it would be

17    appropriate to review perhaps five of the withheld

18    BCGuardian documents to determine whether or not

19    these are ordinary-course documents or prepared in

20    anticipation of litigation.

21         THE COURT:  Here's what I'm willing to do.

22         Thank you, both, very much for your

23    argument.  I appreciate privilege issues are

24    difficult.  They are often subtle.  And here,

25    there's a very big universe of subtle arguments and

1     individualized decisions that have been made.

2          I am generally going to deny Google's

3     motion.  I generally find that plaintiffs have

4     adequately supported their privilege and their

5     work-product designations.  I recognize that the two

6     areas where potentially reasonable minds could

7     differ are with respect to some of the BCGuardian

8     documents, not the communications between BCGuardian

9     and plaintiffs' law firm, which are going to qualify

10    for attorney-client privilege, most likely, in

11    addition to work product.

12          But where the rubber hits the road is going

13    to be research that BCGuardian has done, work that

14    they've done pursuant to their Statement of Work,

15    where the question is going to boil down to was this

16    done in anticipation of litigation?

17          However, I don't think that in camera

18    review of documents in that universe is going to

19    help because it may not be apparent from the face of

20    the document itself.  So if I were to do the work

21    with regard to those documents, I would not just

22    have to review a particular document or a particular

23    sample set of documents.  I would undoubtedly have

24    to review six or eight or twenty documents around it

25    to figure out whether plaintiffs appropriately

1    designated this particular document work product

2    that was prepared in anticipation either of this

3    litigation or of one of the pirate lawsuits.  So I

4    don't think it's helpful for me to do that.

5         The question of the 34 remaining disputed

6    documents that went to Pearson after May 30th of

7    2024 is a more manageable in camera project because

8    whether those documents can appropriately be

9    redacted or not is something that I should be able

10   to tell from the face of the document.

11        So there are 34 of them.  20 percent would

12   be 6.8 documents.  We'll round down to 6.

13        Plaintiffs, pick three and send them to me

14   for in camera review by e-mail.

15        Defendants, pick another three.  Obviously,

16   you'll have to do that based on the information on

17   the logs.  You don't get to see them in order to

18   pick them, but pick the ones you think look

19   suspicious.  I will review six, and I'll let you

20   know.  Other than that, the defendant's motion is

21   denied.

22        Now, I told you I had to break at 12:30.

23   It's now 1 o'clock.  I still have to do the thing

24   that I was supposed to do at 12:30, so I would

25   propose that we take a half-an-hour recess at this

```
 1   point.  And if you are still available and willing,
 2   we can come back at a few minutes past 1:30 and
 3   hopefully get through at least one more motion.
 4   Today, this would be the additional custodians.  And
 5   if we can get to the fourth motion that I had hoped
 6   to get to today, we'll do that as well.  Deal?
 7              Everybody's nodding.
 8              Okay.  So we will, once again, be in recess
 9   until, let's say, 1:35.
10              (A recess was taken.)
11              MS. MURPHY:  We're now back on the record
12   in the matter of Cengage Learning, Inc. et al. v.
13   Google LLC; Case Number: 24-cv-4274.
14              THE COURT:  All right.
15              Counsel, we are on to Google's motion to
16   compel plaintiffs to add custodians and expand
17   search terms.  The moving letter was filed in two
18   versions at Dockets 287 and 288 on November the
19   18th.
20              I'll hear from Google first.  Whose motion
21   is this for Google?  Ms. Tomkowiak.
22              Two things I'd like you to address along
23   with anything that you think you should address.
24              One is, what makes you think you're
25   actually missing relevant and responsive documents?
```

1          You've given me a lot of statistics.

2     They've only produced this many.  They've only

3     produced this portion of the hits, which, at best,

4     it seems to me, are mildly suggestive of the

5     proposition that you're putting before me, which is

6     that, because of the low number and the low

7     percentage, you must have been deprived thus far of

8     relevant and responsive documents, as opposed to the

9     alternative explanation, which is this is just what

10    there is out there.

11         So that's one issue that I'm concerned

12    about.

13         The second issue that I'm concerned about

14    is the relevance case that you're making.  It's not

15    always clear to me -- although you make a better

16    effort in your reply letter, but it's not always

17    clear to me what you think you're going to get

18    that's relevant and producible from any one proposed

19    additional custodian or from any one search string.

20         And I guess there's a 2A, which is, I think

21    we had a little chat, either last time or the time

22    before, about the dangers of asking any judge,

23    including this judge, to review your search strings

24    for you because everybody in this room -- other than

25    my law clerk and my deputy sitting directly in front

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1   of me, everybody else in this room has a much better
 2   handle on how those search terms do or don't map
 3   onto the issues and the documents in the case than I
 4   do.
 5          So with that caution, I guess, just
 6   repeated, what would you like to tell me?
 7          MS. TOMKOWIAK:  Sure, your Honor.
 8          Well, I think I actually have some good
 9   news that will make today's proceedings a little bit
10   more efficient.
11          The parties, since this motion was filed
12   and fully briefed, have continued to work through
13   these issues.  The plaintiffs have since agreed to
14   add certain custodians, and they sent us a
15   counterproposal on search terms, which we've
16   responded to.
17          And so I spoke to counsel for the
18   plaintiffs during the break.  Ms. Murphy and I
19   spoke, and we agreed that it would be appropriate
20   for your Honor to not resolve the motion today, and
21   instead defer it to give us a little bit more time
22   to see if we can reach an agreement on our own.
23          THE COURT:  That would be fine.
24          MS. TOMKOWIAK:  Okay.
25          THE COURT:  But just tell me, you say you
```

1    have reached agreement on some additional

2    custodians?

3          MS. TOMKOWIAK:  Correct.

4          THE COURT:  Just tell me who they are and

5    I'll cross them off my list so I know you can't

6    double-back and change your mind on them next time.

7          MS. TOMKOWIAK:  Okay.  So Cengage has

8    agreed to add Jen Baker.  And I don't think that --

9          THE COURT:  Wait.  That's not on the list.

10         MS. TOMKOWIAK:  No.  So that was in

11    response to a request for one or two digital

12    marketing custodians.

13         THE COURT:  So they gave you the name of

14    Ms. Baker?

15         MS. TOMKOWIAK:  Yes.

16         THE COURT:  Okay.  As your digital

17    marketing person.  All right.

18         MS. TOMKOWIAK:  Elsevier agreed to add

19    Alison Powell.

20         THE COURT:  Okay.

21         And you agreed to drop Rampuria in return,

22    correct?  That was your offer?

23         MS. TOMKOWIAK:  Yes.

24         THE COURT:  Okay.

25         MS. TOMKOWIAK:  If I can just have a minute

1    on Macmillan.  I know that they have agreed to add

2    three custodians, but --

3            THE COURT:  Three?  Well, they had already

4    agreed to add Horrer, H-O-R-R-E-R, and Chiu, I

5    think, C-H-I-U.  At least that's what the letters

6    told me.

7            MS. TOMKOWIAK:  Yeah.  And I believe that

8    there was one more.

9            THE COURT:  Okay.

10           Plaintiffs?

11           MS. MURPHY:  I can jump in if that's

12   helpful, Sarah.

13           MS. TOMKOWIAK:  Yeah, that would be great.

14           MS. MURPHY:  There was a separate

15   negotiation going on concerning custodians, and so

16   it was in that context that we agreed to add an

17   additional person for Macmillan.

18           THE COURT:  Does that person have a name?

19           MS. MURPHY:  Sarah Hillman.

20           THE COURT:  Hillman.  Okay.

21           MS. MURPHY:  We had previously agreed to

22   add Jenny Chiu --

23           THE COURT:  Right.

24           MS. MURPHY:  -- who was discussed in this

25   motion.  And we had previously agreed to add Simon

1    Horrer.

2          THE COURT:  Right.

3          MS. MURPHY:  So that should be the three

4    for Macmillan.

5          THE COURT:  Okay.

6          And then what about McGraw Hill?

7          MS. TOMKOWIAK:  And then for McGraw Hill,

8    Nick Terzian is still in dispute, being discussed.

9          THE COURT:  What about Johns and Kuhn?

10          MS. TOMKOWIAK:  So Johns and Kuhn are the

11    subject of our separate motion that we've filed

12    relating to plaintiffs' destruction of their ESI

13    following their departures.

14          THE COURT:  But they were also the subject

15    of this motion.

16          MS. TOMKOWIAK:  They were the subject of

17    the motion in the sense that we asked for them to be

18    custodians.

19          THE COURT:  Right.

20          MS. TOMKOWIAK:  And we were told that they

21    can't be custodians because --

22          THE COURT:  They can't be custodians

23    because they don't have their data and documents

24    anymore.

25          MS. TOMKOWIAK:  Correct.  That hasn't

1    changed.

2            THE COURT:  So we're moving Johns and Kuhn

3    from this motion to future motion?

4            MS. TOMKOWIAK:  Yes.

5            THE COURT:  All right.

6            And you say you've also reached agreement

7    on certain expanded search terms that would be run

8    across all custodians, the old ones and the new

9    ones; is that right?

10            MS. TOMKOWIAK:  I wouldn't say -- and

11    Ms. Murphy can speak to it from her perspective.

12            I wouldn't say that we've reached an

13    agreement.  I would say that we have significantly

14    narrowed the gap between the search terms that we

15    proposed.  And I think maybe with another round or

16    two back and forth, we could come to an agreement on

17    a reasonable set of search terms that would apply to

18    both the original custodians and any new custodians

19    that have already been added or that, you know,

20    still are left in this motion that plaintiffs agreed

21    to add as a result of those conversations.

22            THE COURT:  Okay.  So that's fine.  We will

23    set aside the November 18, 2025 letter motion filed

24    by Google for now.  Don't let me leave the bench

25    this afternoon without making a date for our next

1    conference at which we can take that up if we still

2    need to take that up.

3        All right.  So that brings us to the

4    Buganizer, I believe.  This is plaintiffs' motion

5    filed on November the 19th at Docket 295.

6        So whose motion is this for plaintiff?

7        Mr. Kane, this is one where I did not come

8    to the bench knowing what I wanted to do, so you can

9    try to convince me that I want to do what you want

10   me to do.

11       MR. KANE:  So, basically, the problem with

12   the prior approach, which was to search based on

13   components rather than on people -- the problem with

14   that approach is it only accounts for 7 of the 18

15   custodians who are at issue in the case and only 9

16   of the 20 search terms that are at issue in the

17   case.

18       So, as you might recall, what the Court was

19   hoping Google would be to do was to provide an

20   index, for lack of a better word, a list of the

21   potentially relevant components that Google would

22   search.

23       THE COURT:  Right.

24       MR. KANE:  Google said they were unable to

25   do that, and they didn't really offer any

1    alternative.

2            And so what plaintiff said is, we went

3    through the Buganizer tickets that were in the

4    production so far, identified what seemed to us to

5    be promising components, and asked Google, give us

6    either the subcomponents to those or the prior

7    components to those.  So --

8            THE COURT:  "Higher" meaning?

9            MR. KANE:  Higher up in the tree.  Yeah.

10           The problem is that all came from Google's

11   productions as of October 8th, when we last spoke

12   about this.

13           That production contains a very small

14   portion of what Google ultimately will be producing

15   in the case.  It's only 7 of the 18 custodians.

16   It's only 9 of the 20 search terms.  And even within

17   the documents that we had received by October 8th,

18   we had identified about 42 Buganizer tickets that

19   were referenced in that production but weren't

20   produced.  And as of when Google gave its list of

21   components and when we gave ours, we didn't have

22   those 42 tickets, so we couldn't even see what

23   components were in those.

24           So all the components that Google has

25   offered and all the ones that we've been able to

1    offer because they're the only ones we know about

2    are ones that came from an incomplete set of

3    custodial productions.  So that's a serious

4    limitation on what Google has produced.

5         We can get around all of this by skipping

6    the component part.  We've now learned Google can

7    search not just by component, but by custodian.  In

8    other words, you can say, give me all of the

9    Buganizer tickets on which this person appears,

10   either as a reporter or an assignee or a cc.

11        THE COURT:  Are those the three possible

12   roles?  Reporter?

13        MR. KANE:  Assignee.

14        THE COURT:  "Assignee" meaning the person

15   who's tasked to get this done?

16        MR. KANE:  Exactly.

17        THE COURT:  And third?

18        MR. KANE:  The cc, carbon copy.

19        THE COURT:  Which could mean who knows

20   what.

21        MR. KANE:  Well, I'm glad you asked that.

22        So what we did is, we looked at the 65

23   Buganizer tickets where we can see the reporter and

24   the assignee.  And what we noticed is in 62 of those

25   tickets, so almost all of them, someone other than

```
 1    the reporter or the assignee is sending a message.
 2              So, in other words, this ticket is created.
 3    Someone says, I've noticed these suspicious
 4    merchants, can someone please look into them.
 5              There's a reporter and an assignee.
 6              THE COURT:  That's not the reporter
 7    that's -- I'm sorry.  Common sense tells me that
 8    would be what the reporter does.
 9              MR. KANE:  Correct.  That's what the
10    reporter does.  They create the ticket and say, I've
11    noticed these merchants.  Can someone please look
12    into them.
13              THE COURT:  That is the reporter?
14              MR. KANE:  Yep.
15              THE COURT:  All right.
16              MR. KANE:  Someone is assigned to do it, so
17    that's the assignee.
18              THE COURT:  Okay.
19              MR. KANE:  But within the ticket, there are
20    messages from various people, including the people
21    in the cc field.  So the --
22              THE COURT:  May well be people that the
23    assignee liaised with to try and get the assignment
24    done.
25              MR. KANE:  Exactly.  Or people who are
```

1     weighing in on what the assignment should be or how

2     it should be done or who should be tasked with it or

3     anything like that.

4          So, in other words, when we hear "cc," we,

5     sort of, think of an e-mail where there's a "to" and

6     a "from" and a "cc."  And the person in the cc

7     field, at least for that message, is not the one

8     sending the message.  In the Buganizer, that's not

9     the case.  The people in the cc field are sending

10    messages.  And --

11         THE COURT:  They're still identified as a

12    "cc"?

13         MR. KANE:  Correct.  When we look at those

14    65 tickets, in 62 of them, someone who's not the

15    reporter or the assignee, including the cc, is

16    sending messages.

17         THE COURT:  Okay.  So the cc is sending

18    messages sometimes -- a lot of times.

19         MR. KANE:  Correct.  Yeah.

20         THE COURT:  All right.

21         MR. KANE:  So what we suggested is, rather

22    than trying to say, well, we've got a subset of the

23    custodians, so let's use those to see what subset of

24    the components they mention in their documents, and

25    then we'll try to come up with a list of components

1    and search from there, it's much easier to just say,

2    we've already all agreed on a set of 18 custodians

3    and a set of search terms.  We can just apply the

4    same -- because we can just use the same custodians

5    to search the Buganizer tickets.

6            So they would look for all Buganizer

7    tickets in which those 18 people are the reporter,

8    the assignee or the cc.  Then they would apply

9    search terms that we can negotiate.  We were pretty

10   close anyway on search terms for this when we were

11   doing it the other way.

12           They would apply search terms, and they

13   would produce whatever documents hit on the search

14   terms.

15           THE COURT:  Isn't that going to get you --

16   I mean, just off the top of my head, the Buganizer

17   isn't just for the Shopping platform and not just

18   for the issues that concern you in this case.

19           Isn't that going to get you a whole

20   avalanche of irrelevant documents?

21           MR. KANE:  So a couple things:

22           One, that's what the search terms are for.

23   So the search terms would be designed to focus in on

24   just as they were for everything else in this case.

25   They were designed to focus in on the issues that

1    are relevant to this case.

2            And second, Google could have easily taken

3    the search terms either that they suggested or that

4    we suggested --

5            THE COURT:  And done this in the first

6    place.

7            MR. KANE:  Done this.  They could have done

8    it for all 18 custodians.  They could have done it

9    for 3 of them.  They claim that some of the

10   components are access control.  They could have done

11   it for the ones that aren't access controlled.  They

12   could have done exactly the hypo you're suggesting.

13           THE COURT:  How about the components are

14   access controlled?

15           MR. KANE:  As in you got to e-mail someone

16   from IT and say, I need access to this component,

17   then they will give you access to it.

18           They could have run those as test searches.

19   And, in fact, when we were last before your Honor on

20   this, your Honor directed Google to run test

21   searches, if necessary, in order to find the correct

22   places to search.

23           THE COURT:  Okay.

24           MR. KANE:  Google didn't do that, so I

25   think they've missed their chance to say, well, this

1   is going to capture a bunch of irrelevant documents

2   because they could have just run these search terms

3   and seen if it was an unreasonable number of

4   documents.  For whatever reason, they chose not to

5   do that.

6         So I think the much more sensible approach

7   than trying to agree on a list of components that is

8   necessarily going to be limited by the information

9   we got from Google, which wasn't much, I think it's

10  much more sensible to just say, let's take these 18

11  custodians, apply search terms, and Google can

12  produce the documents.

13        THE COURT:  Just to be clear, we know who

14  the custodians are you're asking for on this motion.

15  They're the 18 existing custodians.

16        MR. KANE:  Correct.

17        THE COURT:  You have reason to believe that

18  all 18 of them touched the Buganizer?

19        MR. KANE:  What we've seen in the documents

20  so far is that when there is discussion of piracy or

21  of the DMCA, there is very often a message that

22  says, we are taking this out of e-mail and putting

23  it on the Buganizer, like, we're no longer going to

24  correspond about this via e-mail, we're going to do

25  it all in the Bug.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          Google has described this as a sweeping,

2     like, large system that's used for all sorts of

3     things.

4          THE COURT:  Right.

5          MR. KANE:  So I think we can sensibly

6     assume that everyone at Google is touching the

7     Buganizer in some fashion.

8          In other words, I don't think there's any

9     representation even from the other side of, like,

10    well, we think five of these people wouldn't have

11    used the Buganizer.  But, I mean, if that's the

12    case, there just wouldn't be any -- no documents

13    would be returned by that custodian, right?  They

14    would do the search.

15         THE COURT:  Well, no, my question was a

16    little more -- I thought it was a little more

17    focused than that.  I'll try to phrase it more

18    precisely.

19         The reason you, sort of, got onto this

20    track in the first place is that you have, from some

21    of the 18 custodians, documents where they're

22    chatting with somebody about an infringement issue,

23    some other subset of that which is relevant to this

24    case, and they say, okay, let's take this out of

25    e-mail and do it on the Bug.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1            So those individuals, you have reason to
 2   believe, not only touched the Bug, but touched the
 3   Bug with regard to a relevant topic.  But I'm
 4   guessing -- you tell me -- that you don't have that
 5   for all 18 custodians.
 6            MR. KANE:  So --
 7            THE COURT:  So as to the ones who don't
 8   have that, even if they "touched the Bug," which is
 9   kind of a creepy phrase -- even if they so called
10   touched the Bug, they might not have touched the Bug
11   about anything relevant to this case.
12            MR. KANE:  Right.
13            So a couple things:  We do see the other 11
14   custodians -- not all of them, but at least some of
15   the other 11 custodians showing up in Buganizer
16   tickets that we have in either the cc field or the
17   reporter field or the assignee.
18            THE COURT:  Oh, that's right.  So it's 7 of
19   the 18, you have this connection.
20            MR. KANE:  Exactly.  For the other 11, we
21   don't have their custodial productions yet.  And so
22   it may be that they have several notification
23   e-mails from Buganizer for tickets that they're on.
24   We just -- we haven't gotten those productions yet.
25   We may have gotten --
```

1          THE COURT:  The seven where you do have a

2     custodial production, is there something you can

3     point to -- an e-mail, a text message -- that points

4     you to the Buganizer?

5          MR. KANE:  Oh, yeah.  There's a -- when a

6     ticket is created in Buganizer or when a message is

7     sent pertaining to a ticket, Buganizer sends a

8     notification e-mail to the people who are in the

9     report or assignee, cc field, and so that's how we

10    got onto the Buganizer in the first place.

11         Google never told us about it when we

12    started our discussions about custodians and search

13    terms, but that's how we knew that the Buganizer was

14    an issue in the first place.

15         The problem is we don't know how reliable

16    those notification e-mails are.  In other words,

17    someone can turn off notifications.  Someone could

18    have deleted them, and Google's never given us their

19    document retention policy, so we don't know whether,

20    if they deleted the notification e-mail, it has been

21    included in the production.  But that's how we know

22    that the -- that's how we expect that the other

23    18 -- the other 11 custodians are going to have

24    Buganizer documentation.  We've seen them in the

25    documents we've seen so far.

```
 1            THE COURT:  When are you due to get the
 2    production from the other 11?  Soon, I would think.
 3            MR. KANE:  They're due January 6th.  Yes.
 4            The other thing I would point out about
 5    just, kind of, the way this is unfolded is, when we
 6    put together each side's respective list of
 7    preferred components, google hadn't even given us a
 8    description of what these components are and what
 9    they do.  They declined to provide that to us.  So
10    even for the ten that they picked as their preferred
11    components, they didn't say to us, well, this is
12    what the component is and here's what it's used for.
13            We learned from our own research that
14    Google -- the Buganizer system has, for many of its
15    components, a description, just a written
16    description of what that component is for.  Google
17    declined to search those descriptions, which you can
18    do.
19            In other words, you can search not for
20    tickets, but for components.  Google declined to do
21    that, and they declined to provide the descriptions
22    until after each site had already given its list of
23    top ten components.
24            Even when they did that, they only provided
25    the description field for about half of the
```

1    components at issue.  And even when they did that,

2    there were a hundred of those that were blank in the

3    description field.  So we're really operating with

4    very little information about what these components

5    are and what they're for.

6              THE COURT:  So --

7              MR. KANE:  The --

8              THE COURT:  Okay.  Didn't mean to interrupt

9    you.

10             MR. KANE:  That's okay.  I was just going

11   to say that Google's answer to this is that it would

12   be burdensome to search by custodian instead of by

13   components, but unfortunately they really haven't

14   given us any substantiation for that claim.  What

15   they've said is that those 18 custodians are on a

16   total of 859 components.

17             But that really doesn't tell us anything

18   for a couple reasons:  One, they haven't applied

19   search terms.  So it may be that once you apply

20   search terms, it's not 859, it's 159 or 59.

21             Second, just because a component is

22   associated with a particular custodian, that doesn't

23   tell us how many documents there are within that

24   component.

25             In other words, it might be that 859

1    components leads to 1,859 documents.  It could be

2    that it leads to 859 documents.  We just don't know.

3         Again, Google could have done this.  They

4    could have done a test search that told us for five

5    custodians or, for that matter, for all of them,

6    here's how many documents it returns.  They declined

7    to do that.  So as the Court has observed, it's

8    Google's burden to establish burden, and they

9    certainly haven't done that in this case.

10        The other element Google has pointed to

11   with respect to burden is that some of these

12   components, as we mentioned a little while ago, have

13   access controls; i.e., you need permission in order

14   to view the contents of the components.

15        THE COURT:  Need access from someone else

16   within Google, someone at a higher level or in a

17   different department.

18        MR. KANE:  Yeah.  An IT department or

19   something has to give you access to the components.

20   Google claims that that's burdensome, but, again,

21   they haven't given any --

22        THE COURT:  What part do they claim is

23   burdensome?

24        MR. KANE:  They claim --

25        THE COURT:  -- through past those

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    guardrails?  Is that the burdensomeness part?

2           MR. KANE:  They claim that getting someone

3    at Google to give you access to that component is

4    burdensome.

5           THE COURT:  You mean for purposes of the

6    search?  I'm not following.  Maybe they'll explain

7    it to me.

8           MR. KANE:  Maybe they will.  But the way I

9    understood it is that, like, you can do the search.

10    You can see, like, what components these people are

11    associated with.

12           In order to see the actual components

13    themselves, you need access from an IT department or

14    whatever.  They're claiming that getting access to

15    the components from the IT department is burdensome.

16    They've given no reason that that should be the

17    case.

18           We submitted a declaration from our data

19    expert who has both maintained and used these

20    systems in big companies like this, and he said that

21    those kinds of requests are "routine" and that it

22    should be able to be done with minimal effort.  And

23    that only makes sense.

24           You know, a new employee joins the company.

25    She needs access to all the same components that her

1    colleague has.  This is a request that they should

2    be able to handle.  This is Google, after all.  So

3    we don't think that Google has substantiated its

4    claim of burden.

5         So we think the most sensible path forward

6    is simply to search the Buganizer by these

7    individuals rather than by components.

8         THE COURT:  And you have your list of

9    custodians because it's the same custodians.  And

10   you say you are negotiating but don't yet have a

11   final list of the search terms that you would apply.

12        MR. KANE:  Yep.  We had exchanged initial

13   lists.  We sent a revised proposal based on Google's

14   list on October 31st.  We haven't heard back from

15   them.  We were pretty close anyway.  I don't think

16   the search terms are what's going to be -- or what's

17   going to be -- are what's going to hold us up.

18        THE COURT:  And are these the same search

19   terms that you would have used on the relevant

20   components if it had gone the way you thought it was

21   going to go?

22        MR. KANE:  Exactly.  We haven't done a

23   separate set of search terms for searching it this

24   way.  We would just use the same ones.

25        THE COURT:  All right.

```
 1                Let me hear from Google.  Whose motion is
 2    this?
 3                MS. SAMPOLI:  This is mine, your Honor,
 4    Sara Sampoli.
 5                THE COURT:  And what did Mr. Kane just say
 6    that, in your view, is wrong, totally wrong, or
 7    absolutely, completely wrong?
 8                MS. SAMPOLI:  In my view, there are --
 9                THE COURT:  Or right, for that matter.
10    Maybe you agree with him on something.
11                MS. SAMPOLI:  There are a few things that I
12    thought weren't quite accurate.
13                THE COURT:  Very diplomatic.
14                MS. SAMPOLI:  The first thing I want to
15    touch on is the issue of access controls.
16                THE COURT:  Okay.
17                MS. SAMPOLI:  So I heard Opposing Counsel
18    say that it wouldn't be burdensome because you can
19    just ask someone in IT to grant you access.  That's
20    not quite how it works.
21                My understanding is that each component has
22    an administrator who's not someone in the IT
23    department.  It's someone who has a business
24    function at the company and they are in charge of
25    granting access to specific components.
```

```
 1            So it's not as simple as saying, hey, IT
 2   department.  There are -- I believe it's 159
 3   access-controlled components within that -- that
 4   number is not quite right, but it's something like
 5   150.  Sorry.  It's 191 access-controlled components
 6   within --
 7            THE COURT:  Within the 859 components that
 8   these folks touched?
 9            MS. SAMPOLI:  Exactly.  890 -- sorry.  196
10   of the 859 are access controlled.  So it's not as
11   simple as going to someone in IT and saying, hey,
12   grant me access to all 196.  You have to go to
13   individual component administrators and request
14   access to each -- potentially, each one.  It may be
15   possible to request access from the same individual
16   for related components if they have the same
17   administrator.
18            But, at any rate --
19            THE COURT:  But now I'm confused.  And
20   forgive me if this question sounds very basic.
21            You need access for a different reason than
22   an onboarded Google employee might need access.  You
23   need access so that you can search these
24   components --
25            MS. SAMPOLI:  Correct.
```

```
 1              THE COURT:  -- either by custodian or what
 2      have you.
 3              But wouldn't you need that even if the
 4      negotiation had gone the way I anticipated it would
 5      go last month and you were searching by component?
 6              Some of those components would be access
 7      controlled, right?
 8              MS. SAMPOLI:  That's right.
 9              THE COURT:  Okay.
10              What am I missing here?  You're going to
11      have to do it either way.
12              MS. SAMPOLI:  That's right.  You're going
13      to have to do it either way, but the difference is
14      scale.  So, for example, in Google's proposal for
15      top ten high-level components, that included --
16              THE COURT:  You would only do ten, let's
17      say.
18              MS. SAMPOLI:  Well, it's ten -- we didn't
19      go to the bottom-level component.  So including all
20      of the subcomponents that fall further down on the
21      tree, it totaled 121 components.
22              THE COURT:  Okay.
23              MS. SAMPOLI:  Within those 121, 18 were
24      access controlled.  That's a much more manageable
25      process than it is to gain access to 196 of the 859.
```

1          And, again, I agree with Opposing Counsel,

2     that it's not -- the actual act of saying, yes,

3     grant access, is not burdensome.

4          THE COURT:  Well, what's the burdensome

5     part?

6          MS. SAMPOLI:  The burden is going to each

7     separate administrator, and you're relying on a

8     human being to do this.  It's -- speaking with our

9     client, it's not as simple as one day you ask and

10    the next day you get it.  You have to --

11         THE COURT:  But what does this mean?

12         This means, at worst, of these -- I'm

13    sorry.  How many?  196 access controlled.  Let's

14    suppose there are 150 administrators in the

15    aggregate controlling these 196.

16         I mean, don't you -- I'm imagining how this

17    would go.  You talk to your contacts in the general

18    counsel's office, and your general counsel sends out

19    an e-mail to -- or somebody working for your general

20    counsel.  Your general counsel may be too important

21    for that -- sends out an e-mail to 150 people and

22    says, our outside attorneys and their discovery

23    vendor need access to the following components,

24    right?

25         I mean, it's not like you personally have

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    to travel to California and trudge around the

2    building and talk people into it.

3         MS. SAMPOLI:  No.  It's true.  It's just

4    that the higher the number of separate

5    administrators, the longer it's going to take to get

6    the access just from ...

7         THE COURT:  And once they give you access,

8    your vendor can go and do whatever your vendor does,

9    presumably.

10        MS. SAMPOLI:  No.

11        THE COURT:  Wait.  Google does it themself?

12        MS. SAMPOLI:  So the way it works -- so to

13   take a step back, Buganizer is not a custodial data

14   source.  It's managed by component, and it's not

15   designed for routine collection and discovery.

16        So to collect individual -- to collect

17   tickets, you have to first get a list of all of the

18   tickets that hit on a search term.  You can't do

19   that until you get access to all of the components

20   because you can't search across access-controlled

21   components.

22        Once you have the list of all of the --

23        THE COURT:  All right.  So your first step

24   is to get access to the control components, and now

25   you have access to all 859 if you do it plaintiffs'

1    way.

2            MS. SAMPOLI:  Correct.

3            THE COURT:  All right.  Great.  You have

4    access to 859 components over here, and you have

5    your list of search terms over here.

6            MS. SAMPOLI:  Correct.

7            THE COURT:  Then what happens?

8            MS. SAMPOLI:  So then hopefully the

9    searches are manageable.  We can't know that until

10   we get access.  But assuming they are, then you have

11   a list of your hits.  You need the URL for each

12   individual ticket that hits on a search term.  Then

13   you use that list of URLs.

14           THE COURT:  Hold on.  You say you get a

15   list of hits, meaning not just the --

16           MS. SAMPOLI:  Search results.

17           THE COURT:  Not just the number, but you

18   know where each document is.

19           MS. SAMPOLI:  Yeah.  You get a --

20           THE COURT:  Except in this case the

21   document is at a URL.

22           MS. SAMPOLI:  Yes.

23           So then you take the URLs and you have to

24   feed the URLs through an internal tool that Google

25   has called ████████, where it renders --

                AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                   THE COURT:  Do they have a person in charge
 2       of making up names for things like the Buganizer and
 3       the -- tell me that name again.
 4                   MS. SAMPOLI:    ███████████.
 5                   THE COURT:  Yeah.  That's a nice one.
 6                   MS. SAMPOLI:  Yeah.  Well --
 7                   THE COURT:  I hope that person is well
 8       paid.
 9                   MS. SAMPOLI:  So you feed the URLs through
10       ███████████, which renders each individual URL as a
11       web page, and it takes a snapshot of the web page at
12       the time it takes the snapshot as it exists then.
13       Then you get -- a PDF has been rendered of the URL.
14                   THE COURT:  Which your discovery vendor can
15       deal with.
16                   MS. SAMPOLI:  Then you can feed the PDFs
17       into the -- like Relativity, for example.  But it's
18       a quite manual process, which is distinct from
19       exporting a custodial file, like, from someone's
20       e-mail and just importing it into --
21                   THE COURT:  Well, it does -- it's a couple
22       more steps.
23                   MS. SAMPOLI:  Yeah.
24                   THE COURT:  But those steps sound to me
25       like they can be automated.
```

```
 1              MS. SAMPOLI:  Unfortunately, that's not our
 2    understanding of how it works.  It's certainly --
 3              THE COURT:  I mean, you don't have to have
 4    someone sitting in front of a monitor, taking a
 5    screenshot of every URL, do you?
 6              MS. SAMPOLI:  You -- if ███████ works,
 7    you do not have to.
 8              THE COURT:  Exactly.
 9              MS. SAMPOLI:  But there are times when
10    ████████ does -- it fails, and you have to do it
11    manually.  But assuming it works, you do not have to
12    individually screenshot each and every -- yeah.
13              Anyway, I think where I want to take a step
14    back is discuss plaintiffs' claim at the beginning
15    that they can't know what all the relevant
16    components are.
17              THE COURT:  Right.  Their complaint writ
18    large is, well, Judge, we tried to do it the way we
19    were all planning to do it back on October the 9th
20    when we were all right here and discussing it, but
21    Google wouldn't or couldn't give us information
22    about what's in the various components.
23              MS. SAMPOLI:  Yeah.  And I don't think that
24    we need to get into the parties' different
25    understandings of what the negotiations were.  But
```

1    to be clear, plaintiffs proposed this alternative

2    proposal in the very first e-mail that was sent

3    after the hearing.  So we didn't really get anywhere

4    in the context of the component-based proposal that

5    your Honor ordered the parties to negotiate before

6    they switched to something else.

7          And that's something that we've encountered

8    a few times in this litigation.  And it's, frankly,

9    a little bit frustrating to have spent so much time

10   and energy to try to make the proposal that your

11   Honor ordered us to make work, work, and to be told

12   at the last -- you know, that we're switching

13   course, and even though it's the proposal that

14   plaintiffs themselves wanted at the last hearing.

15          THE COURT:  It is.  It was their ask.

16          MS. SAMPOLI:  So -- but setting that aside,

17   what I heard their chief complaint being is that

18   because we've only -- we haven't finished our

19   custodial productions yet, they can't know all of

20   the components that the full set of 18 custodians

21   are on.

22          I believe we've solved that, at least in

23   part, by providing, after briefing on this motion

24   closed, what we proposed providing in our final

25   section of our opposition, our proposed compromise,

1   which was to provide the list of the 431 components

2   for which the 18 custodians are either reporters or

3   assignees, along with their descriptions.

4          And it's also -- it's -- just as an aside,

5   it's not true that Google refused to provide the

6   descriptions.  In fact, we agreed to provide it.

7   And the very next day, plaintiffs said, no, we don't

8   think that that will be adequate.

9          So we have tried at every step to provide

10  what's within -- we can provide about these

11  components.  We can't -- there's not much we can do

12  if component descriptions are blank, but we have

13  provided the list of the 431 components where the

14  custodians are either assignees or reporters.

15         THE COURT:  So if I understand plaintiffs'

16  problem with that, I mean, it's nice that it gets

17  859 components down to 431 components, but it only

18  includes custodians named as reporters or assignee,

19  not custodians named as cc's, which Mr. Kane's pitch

20  to me was, those are important.

21         MS. SAMPOLI:  Our position on that would

22  be, while it's certainly true that custodians may be

23  named as people in the cc field, their involvement

24  in a ticket is necessarily less important than the

25  person who's listed in the assignee --

1         THE COURT:  Why are they necessarily less?

2         MS. SAMPOLI:  Well, they're not the person

3    who reported it, and they're not the person who's

4    been assigned the ticket.  But if your Honor is --

5         THE COURT:  It could be the person who's

6    directing the assignee what to do.

7         MS. SAMPOLI:  It's certainly possible.  And

8    if your Honor is inclined to consider that an

9    important field, we're happy to provide the list of

10    the 859 components where the custodians are

11    reporters, assignees, or in the cc field, along with

12    the descriptions of those components.

13         At that point --

14         THE COURT:  As a means of narrowing it

15    further --

16         MS. SAMPOLI:  As a means --

17         THE COURT:  -- not as a means of searching

18    them all, which is what the plaintiff wants you to

19    do.

20         MS. SAMPOLI:  Right.

21         That would instead be as a means of moving

22    forward with the component-based approach that your

23    Honor suggested the parties --

24         THE COURT:  Okay.

25         Well, if I understand the objection to

1    that -- and please jump in if I'm not -- you know,

2    if I'm not following the bouncing ball here.

3        But my understanding with regard to the 859

4    is, okay, those are the ones that we know about so

5    far, but you haven't finished your custodial

6    production yet, there may be more.

7        MS. SAMPOLI:  Well, this would actually be

8    a list of every single component that any of the 18

9    custodians are --

10        THE COURT:  Even if you haven't finished

11    producing those custodians' records?

12        MS. SAMPOLI:  Correct.  This list comes

13    from Buganizer, not from the custodial productions.

14        THE COURT:  Okay, okay, okay.

15        So you would provide a list of the 859,

16    sort of, potential target components, and you would

17    provide how much description with regard to the 859?

18        MS. SAMPOLI:  So there's a field in

19    Buganizer where Googlers can write a description for

20    the component.  I don't know, off the top of my --

21        THE COURT:  Is it like Wikipedia?  Does it,

22    you know, change when new people write new stuff?

23        MS. SAMPOLI:  To --

24        THE COURT:  You don't know.

25        MS. SAMPOLI:  Sitting here today, I don't

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    know how -- you know, who writes or how often they

2    get updated, but they're internal descriptors for

3    the component.

4            THE COURT:  Okay.

5            MS. SAMPOLI:  And it's something that

6    plaintiffs asked us to provide, and we agreed to

7    provide it, and then -- but then, you know,

8    plaintiffs filed their motion and things took a

9    different direction.  But this is information that

10    they have requested.

11            THE COURT:  All right.  So if I understand

12    it correctly, really, the difference between

13    plaintiffs and Google at this point is plaintiffs

14    say, just Search all 859 with our search terms and

15    also by custodian.  We're not interested in

16    documents in those components that don't involve the

17    custodian as one thing or another: reporter,

18    assignee, cc.

19            And Google says, that's still too big a

20    universe.  We'll give you the list of 859, but we

21    still want to work with you to narrow it down to

22    what?  Some reasonable number?

23            MS. SAMPOLI:  I think our proposal would be

24    ten components.  Certainly not the lowest-level

25    component, but ten relatively --

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                THE COURT:  How many levels are there?
 2                MS. SAMPOLI:  It depends on what component
 3      you're talking about.  It's a very customizable
 4      system.  So there are some components that only have
 5      two or three levels, and there are others that have
 6      many, many more.
 7                So you can see, actually --
 8                THE COURT:  Let me ask it a different way.
 9                At the top level -- you know, animal,
10      vegetable, mineral -- how many?
11                MS. SAMPOLI:  I don't know at the top
12      level.  I know that there are  ████████  total
13      components, approximately, within the Buganizer
14      system, but I don't know how --
15                THE COURT:  And some of them go down three
16      levels and some go down 30 levels.
17                MS. SAMPOLI:  Yes.  Yeah.
18                THE COURT:  But when you say, we want to
19      narrow it down, ideally, to ten, I'm trying to
20      figure out at what level would those ten be?
21                MS. SAMPOLI:  Not necessarily the same
22      level.  It would be at --
23                THE COURT:  That's up for negotiation,
24      you're saying.
25                MS. SAMPOLI:  Yes.  And if you look,
```

```
 1    actually, at my colleague, Ms. Tomkowiak's
 2    declaration at Docket 331 --
 3              THE COURT:  Hold on.  Give me a minute.
 4              MS. SAMPOLI:  Actually, that is not the
 5    right one.
 6              THE COURT:  That's not the right one.
 7              327, perhaps?
 8              MS. SAMPOLI:  No.  I'm actually talking
 9    about the declaration of Richard Bassett.  And --
10              THE COURT:  329.
11              MS. SAMPOLI:  Yes.
12              And if you go to paragraph 12 --
13              THE COURT:  All right.  I am --
14              MS. SAMPOLI:  Or sorry.  Paragraph 18.  My
15    apologies.
16              THE COURT:  Paragraph 18 of Bassett.
17              Bassett says, "I was asked to calculate how
18    many components and subcomponents fall within the
19    following components."
20              MS. SAMPOLI:  Yeah.  So this is the list of
21    top ten components that Google provided to
22    plaintiffs, and some of them are, sort of, bottom
23    level and others are higher level.
24              THE COURT:  Bottom level meaning that there
25    are a whole bunch of arrows.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MS. SAMPOLI:  Right.  Meaning that there's

2     nothing below.  There are no subcomponents below

3     them.  So examples of that are the second-to-last

4     bullet and the third-to-last bullet.

5          THE COURT:  Second to last.  And how can we

6     tell that?  Oh, I see.  Because it doesn't say,

7     including all subcomponents.

8          MS. SAMPOLI:  Correct.  But there are

9     others, many of the others, that include

10    subcomponents.

11         THE COURT:  Okay.

12         MS. SAMPOLI:  So our proposal would be that

13    just the parties work together to come up with a

14    reasonable list of components, whether they be

15    bottom level or midlevel, that would capture the

16    relevant documents.

17         But if your Honor is inclined to go with

18    plaintiffs' proposal, we would ask that you provide

19    some limitation on it because I think what we tried

20    to explain at the last hearing, and I think your

21    Honor was on the same page with us on, is -- this is

22    something that can be extremely burdensome.  It's a

23    huge system.

24         And I think what you ordered was that the

25    parties negotiate a limited number of components and

1      a limited number of searches.  This should be

2      targeted discovery.

3              We have tried to work with plaintiffs to

4      find a path forward that gets them a reasonable

5      number of the most relevant components.

6              THE COURT:  Well, in reconstructing my own

7      thought process, which is always a bit risky, I

8      think I intentionally, in my written order dated

9      October the 9th, used the phrase "top 10 components"

10     and "top 10 search terms" to convey the idea that I

11     wasn't necessarily drawing a hard line at the number

12     10, but that I was hoping the parties would get

13     somewhere in that vicinity.

14             MS. SAMPOLI:  Right.  That the parties

15     would be able to find the most relevant components.

16             But if you're -- if --

17             THE COURT:  So your idea is, all right, we

18     tell them about the 859.  We give them the internal

19     description.

20             Are you also going to, as part of this

21     negotiation process, tell them things like how many

22     hits within each component?

23             MS. SAMPOLI:  Once we narrow -- so one of

24     the issues is --

25             THE COURT:  You're not going to start off

                AMM TRANSCRIPTION SERVICE - 631.334.1445

1    that way.

2           MS. SAMPOLI:  One of the issues is

3    negotiating components and search terms at the same

4    time because you --

5           THE COURT:  Right.

6           MS. SAMPOLI:  -- don't know how many.  You

7    haven't gotten access yet to the access-controlled

8    components.

9           But once we decide on a list of components,

10   we can then request access and then provide hit

11   counts.  But I'm glad you --

12          THE COURT:  And if the hit counts surprise

13   you, if there's no "there" there, you would

14   presumably say, well, that's not a good component.

15   Let's pick another one.

16          MS. SAMPOLI:  Certainly, that's an option.

17          But I'm glad you brought up search terms

18   because I heard Opposing Counsel say that the

19   parties are close on search terms.  I don't think

20   that that's our understanding of where the parties

21   are.

22          THE COURT:  Well, that's somewhat

23   disappointing to me because I think the search term

24   negotiation is independent of whether you are

25   searching by custodian or searching by component.

```
1              MS. SAMPOLI:  Well, I disagree with that
2    because I think something that your Honor said
3    earlier was, you know, if you're not narrowing by
4    component and you're, instead, searching every
5    single component that a particular custodian has
6    some role on --
7              THE COURT:  There's going to be a lot of
8    irrelevant stuff.
9              MS. SAMPOLI:  Right.
10             And so our position would be, if your Honor
11   is inclined to go with plaintiffs' proposal, there
12   should be some limitations on it.  And the parties
13   would necessarily need to negotiate more targeted
14   search terms to make sure that we're not grabbing
15   all of this irrelevant information.
16             THE COURT:  And to be fair, I think
17   Mr. Kane was at least gesturing in that direction.
18   He said, don't worry, Judge, we can negotiate search
19   terms that don't retrieve a whole bunch of totally
20   irrelevant documents.
21             MS. SAMPOLI:  Theoretically, that's
22   certainly possible.
23             But if you -- again, something that we
24   actually -- we proposed to plaintiffs just before
25   they filed their motion was a variation on their
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1   custodian-based proposal.  That's in Docket 331-1 at
 2   pages 6 to 7.
 3              THE COURT:  331.
 4              MS. SAMPOLI:  331-1.
 5              THE COURT:  Are you sure about that?
 6              MS. SAMPOLI:  I believe so.  But it's
 7   Exhibit A to Ms. Tomkowiak's Declaration filed under
 8   seal.  It's a long e-mail thread.
 9              THE COURT:  Hold on.  Let me -- 327, right.
10   That's what I thought.
11              MS. SAMPOLI:  Interesting.  Okay.
12   Apologies for that.
13              THE COURT:  Exhibit A to what I think of as
14   Docket 327.  Probably because you filed it in two
15   versions.
16              MS. SAMPOLI:  Yes.  I believe that, in my
17   packet, I have the public version, and that's why
18   it's not matching up.
19              THE COURT:  Aha.
20              MS. SAMPOLI:  Apologies.
21              THE COURT:  So you led me astray.  I always
22   look at the sealed version because it's more
23   complete.
24              MS. SAMPOLI:  And in the future --
25              THE COURT:  All right.  Hold on.
```

1          Exhibit A.  All right.  Long e-mail.  I see

2     it.

3          MS. SAMPOLI:  Yes.  So pages 6 to 7.

4          THE COURT:  Oh, my gosh.

5          All right.

6          MS. SAMPOLI:  On page 7, we proposed a

7     modification to plaintiffs' proposal.  So we

8     proposed limiting to assignee and reporter.  It

9     sounds like you're not inclined to go in that

10    direction.

11         THE COURT:  I mean, I think leaving out the

12    cc is potentially problematic.

13         MS. SAMPOLI:  We understand.

14         THE COURT:  That doesn't strike me as a

15    good way to narrow things down.

16         MS. SAMPOLI:  But we would ask that, at a

17    minimum, we try to limit this to -- not all of the

18    18 custodians, but some subset.  We're talking

19    about -- like, 18 custodians is a very large number.

20    A lot of them have overlapping roles.

21         So I'm thinking of two in particular, for

22    example, Mr. ███████████ and Mrs. ████████████.  They

23    both work on the same team.  I don't think it's

24    necessary for us to delve into this extra process

25    for all 18 of the custodians, given the overlapping

1     roles that they have.  And the reason I don't think

2     it's necessary is going back to what Google has

3     already agreed to and has been producing for these

4     Buganizer records.

5             So Mr. Kane said that the reason they found

6     out about Buganizer in the first place is because

7     there were references to the Buganizer, and there

8     are those e-mail notifications saying there's been a

9     new comment on this Bug.

10            Our understanding is that this is very --

11     it's very common for there to be extensive overlap

12     between what's in custodial files and what's in the

13     Buganizer because of this e-mail notification

14     system.  You're automatically added as an e-mail

15     recipient.  If you're in the reporter, assignee, cc

16     field, you only get taken off if you actively make

17     the decision to get taken off.

18            THE COURT:  Which presumably you would only

19     do if you were no longer interested in the

20     conversation.

21            MS. SAMPOLI:  Presumably.

22            But for all of those e-mail notifications

23     that are within Google's productions, we've already

24     agreed to and have been producing the ticket that's

25     associated with them.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  So you're suggesting, I think,

2     that there -- you've already produced the Buganizer

3     tickets that are going to be the most relevant.

4          MS. SAMPOLI:  That's been our position.

5     That was our position in October, and it's our

6     position now.

7          We recognize that the Court has ordered

8     additional discovery into the Buganizer system, but

9     we would urge you to keep the discovery, the

10    additional discovery, targeted, given what we've

11    already agreed to produce.

12         And it's not just the e-mail notification

13    associated tickets.  We're also agreeing to produce

14    additional relevant tickets that are referenced,

15    either by link or by name, by Bug issue number

16    within e-mails and other documents.

17         So we're already doing this existing

18    process for finding what we would consider to be the

19    most relevant Bugs.  We are now discussing a

20    supplemental, supplemental process that we believe

21    should be narrow and targeted, consistent with your

22    Honor's order from October.

23         THE COURT:  All right.  Mr. Kane?

24         MR. KANE:  So if I could start with what

25    Google is arguing about, burden, really, the only

1    thing they pointed to is these access controls.

2    And --

3           THE COURT:  No.  They said, if I recall,

4    first, we have to get access, and then we have to

5    run searches.  But before we can process the hits,

6    there's an extra step that we wouldn't need to take

7    if we were searching an e-mail database or a more

8    conventional database.  We have to use this other

9    product with a cute name -- what's it called?

10          MR. KANE:  ███████████.

11          THE COURT:  -- ███████████, and hope that it

12   works to actually produce PDF copies of all of the

13   hit-upon URLs.

14          Did I get that right, Ms. Sampoli?

15          MS. SAMPOLI:  Yes, your Honor.

16          THE COURT:  So there's an extra step in

17   there.

18          MR. KANE:  But everything you just said,

19   except for the access controls, they have to do

20   whether we do this by a custodial search or by a

21   component search.  Indeed, even the access control

22   they have to do whether we do this by a component

23   search or a custodian search.

24          THE COURT:  Yes.  But if I get you to

25   narrow the components down to 10 or 20, then that's

1    a lot less people that they have to ask for access

2    control for.

3           MR. KANE:  They haven't said how many

4    administrators it is.  So they're saying it's 196

5    components.  They haven't said that that's 196

6    administrators or two.  It could be three people for

7    all we know.  All of these are in --

8           THE COURT:  I'm not that worried about the

9    process of sending out an e-mail and asking for

10   access control.

11          MR. KANE:  Yeah, I agree.

12          So with respect to the access controls, I

13   really don't think they've established any kind of a

14   burden.  Everything they're describing about how

15   this is done is something they're going to have to

16   do whether it's a component-based search or a

17   custodian-based search.

18          I'd also say they're focused on PDFing

19   these.  It may well be that there's another way to

20   extract this, other than PDFing the entire ticket.

21   In other words, the data might be kept in, like, a

22   CSV format or another format where they can extract

23   that without actually having to PDF each page.

24          The point that I made about the

25   notification e-mails -- Google, so far, has not been

```
 1   producing all the tickets that are associated that
 2   are in the custodial productions.  They have been
 3   waiting for us to say, here are the tickets that are
 4   referenced that we think are relevant.  So they
 5   haven't been doing what Ms. Sampoli was describing.
 6           We also don't know what happens to these
 7   notification e-mails if someone deletes them.  In
 8   other words, you get a notification that says, hey,
 9   there's a new message for you in the Bug, if they
10   delete that e-mail, does that mean it's gone
11   forever?  Does that mean it's been --
12           THE COURT:  You're not confident that
13   you're -- Ms. Sampoli suggested that since the
14   e-mail notification system is automatic and pretty
15   good, you're already getting most of what you're
16   interested in.  And you're saying, I have no
17   confidence that that's true, that it's both
18   automatic and doesn't have exceptions like people --
19   I don't know -- turn off their notifications.
20   People delete it because they've already read it.
21   Whatever.
22           MR. KANE:  Exactly.
23           The other point I would make is just a
24   practical one.  If we search by components, we have
25   to agree on the components.  We have a --
```

```
 1              THE COURT:  Which is what I told you to do
 2    two months ago.
 3              MR. KANE:  Which is what we attempted to
 4    do, but I think your Honor's ruling --
 5              THE COURT:  But I take Ms. Sampoli's point,
 6    that you abandoned that process pretty quick.
 7              MR. KANE:  I disagree with that.  We
 8    certainly suggested this as a better alternative
 9    right away, once we found out about it.  But we went
10    through the process of trying to identify the
11    components with Google, and Google was extremely
12    uncooperative.
13              For example, we asked them, can you tell us
14    how -- if an employee at Google wants to find the
15    component that they should be using for a particular
16    matter, how do they do it?  They wouldn't tell us
17    that.
18              At the time we were searching for these
19    components, they hadn't even produced all the
20    Buganizer tickets that we had identified to them.
21              THE COURT:  Now, they --
22              MR. KANE:  So we weren't even -- and now
23    they have, but when we were putting together this
24    list, they weren't doing that.
25              For none of the components that Google has
```

1     identified, and for that matter, for none of the

2     ones that we've identified, have they provided,

3     like, this is what the component is, and this is

4     what it does.  They've given us the descriptions.

5          THE COURT:  They're now offering to do that

6     for 859.

7          MR. KANE:  They're offering to give us the

8     descriptions, but they did that for 431 of them

9     after we had gone through this process of trying to

10    rerun components, and 100 of them were blank.  I

11    don't know how many of them will be blank in the

12    next round if they give us the remaining 450 or

13    whatever it works out to.

14         They wouldn't tell us anything about how

15    they put their component lists together.  In other

16    words, they gave us these 10.  They didn't say,

17    here's the 10, and here's why we picked these, and

18    here's why we think this is the right list.

19         And we don't know whether any of the

20    custodians that are already included -- in other

21    words, the ones that the top 10 list came from,

22    whether any of those opted out of the notification

23    e-mails or just deleted their notification e-mails.

24         THE COURT:  I'm sorry.  Say that last part

25    again.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1              MR. KANE:  The list that Google put
2    together was based on the seven custodians that were
3    present at the time and the 9 of 20 search terms
4    that were present at the time.  And they came from
5    the notification e-mails that we had seen in the
6    production.
7              So all -- it may be all of those
8    notification e-mails -- it may be that that only
9    represents a third of the ones that people actually
10   were sent.
11             THE COURT:  -- that that only represents
12   the ones that people didn't delete, in other words.
13             MR. KANE:  Exactly.  Yeah.
14             So we really have very little confidence
15   that the component list that Google has put together
16   is, in fact, the most relevant components.
17             THE COURT:  But you have confidence in the
18   859.
19             MR. KANE:  Because that's all the
20   components that these 18 custodians, the ones that
21   everyone has decided are the relevant people --
22   those are all the components that those 18 people
23   have tickets associated with.  And so I think it's
24   much easier to be confident in that list than it is
25   in a list of components that was created through
```

1    this, sort of, amorphous, "nobody really knows how

2    they got there" process.

3         THE COURT:  What about Ms. Sampoli's

4    alternative suggestion that, if they have to search

5    all 859 identified components, then surely you don't

6    need all -- is it 18 or 19?  I can't remember.

7         MR. KANE:  18.

8         THE COURT:  -- 18 custodians because some

9    of them are duplicative?

10         MR. KANE:  I think if they were going to

11    make that case, they would have to have run some

12    sort of test search.

13         In other words, they would have to have

14    said, you know, look, we did the 18 custodians for

15    those components that aren't access controlled.  It

16    was X number of documents.  That's too many.  We

17    need different search terms or we need whatever.

18         I don't think they should be able to come

19    in and say it's going to be too -- like, predict

20    it's going to be too burdensome to do this for 18

21    custodians when they can run that search and find

22    out how many documents it is.

23         The other point I would make is just one of

24    fairness.  Google has made the decision as an

25    organization to put important communications into

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    this platform that they claim is difficult to

2    search.  I don't think they should be rewarded by

3    not having to produce relevant documents from that

4    system.

5        This is not a company that lacks for

6    resources, and it's certainly not a company that

7    lacks for an ability to create a system that is

8    easily searchable.

9        THE COURT:  I disagree with you on that

10   point.  Neither Google nor any other company in the

11   United States is required to organize itself

12   internally for business purposes in a manner that

13   will be most efficient when it's later in major

14   litigation.  And absent some showing that it

15   designed the Buganizer system the way it did in

16   order to foil future plaintiffs' lawyers, which I

17   think would be a very hard argument to make given

18   that it's been around for quite a while -- absent

19   that kind of argument, the burden argument, I think,

20   simply is what it is.

21       Google is entitled to base its burden

22   argument on its systems as they exist.  And you

23   don't get to say, Judge, reject their burden

24   argument because if they had done something

25   differently 10 years ago, it would be less

1    burdensome.

2          MR. KANE:  Well, remember, it's two

3    decision points:  It's what kind of a system do you

4    build when you build Buganizer?  And two, what do

5    you use it for?

6          And what we've seen in the e-mail traffic

7    is people are saying, take this communication off of

8    e-mail and put it into Buganizer.  We're removing

9    this conversation from the e-mail.

10          THE COURT:  Well, all of this gets you to

11    relevance, okay, but relevance is step one.  I have

12    to balance relevance against burden.  And all I'm

13    saying is that, for burden purposes, I take the

14    Buganizer as I find it, and I don't balance burden

15    in an alternative world in which Buganizer was

16    engineered differently.

17          MR. KANE:  Okay.  I do think it makes a

18    difference that they're using it in a way that is

19    taking important stuff and taking it off of the more

20    searchable system and putting it onto the less

21    searchable one, but I understand we haven't

22    convinced you of that.

23          THE COURT:  Well, again, you don't have an

24    argument, at least I haven't heard it from you, that

25    they're doing this on purpose to foil future

1    generations of plaintiff lawyers.

2         MR. KANE:  Courts have admonished Google

3    for this type of behavior before where they've made

4    an attempt to conceal communications from -- so they

5    can't be uncovered for purposes of litigation.

6         THE COURT:  All right.  I think we're

7    getting a little far afield.

8         MR. KANE:  Okay.

9         I would just point out that I think it

10   means something that they never told us about

11   Buganizer in the first place.  They waited for us to

12   see it in their documents.

13        If what they're arguing now is we should

14   engage in another round of negotiations to figure

15   out a way to make the component-based search work, I

16   think they have to respond and say they could have

17   identified this as a possibility much earlier in the

18   process.

19        We all sat here on October 8th and tried to

20   come up with a way of searching this system that

21   would be usable.  Google obviously knew that its

22   system can be searched by custodian.  Google chose

23   not to offer that as a solution.  I don't think they

24   should be allowed to go back now and say, well,

25   we're just doing the thing that plaintiffs asked us

1  to do as --

2       THE COURT:  Well, if Google didn't give you

3  the idea -- you say you came up with it right

4  away -- how did you come up with it?

5       MR. KANE:  There is a publicly available

6  web page that says the Buganizer can be searched

7  this way.  Google has pointed to -- said that --

8  well, in their opposition to our motion, they

9  attached a declaration, and in that declaration was

10  a link.  And if you go to that link, you can see

11  that you can search it by custodian.

12       THE COURT:  Right.  So they weren't hiding

13  it, but they didn't put it in front of your face.

14       MR. KANE:  Exactly.

15       And I would also point out, when we were

16  doing our discussions about ESI collection, you

17  know, months ago in this case, this was not a source

18  of ESI that Google identified to us.  And I think

19  there should be some consequence for that lack of

20  candor.

21       I'm happy to answer any other questions,

22  but that's what I have.

23       THE COURT:  Let me hear briefly again from

24  Google, Ms. Sampoli.  And we had this conversation

25  either last time or the time before about your

AMM TRANSCRIPTION SERVICE - 631.334.1445

1  burden when you're making a burden argument.

2          MS. SAMPOLI:  Yes.  And --

3          THE COURT:  And, again, what I have not

4  heard from -- I have heard a sort of narrative

5  description of why it would be challenging to do the

6  custodian-linked search across all 859 components,

7  but what I haven't heard is it's going to take us

8  this much time and require this many paralegals and

9  cost us this much money.

10         MS. SAMPOLI:  I take your point, your

11 Honor.  I think it's hard because of the access

12 control issue for us, at the outset, to be able to

13 put concrete numbers on it because we don't know how

14 many documents are going to be returned because --

15         THE COURT:  Right.  Which is -- which makes

16 your argument difficult on a number of dimensions.

17         MS. SAMPOLI:  Understood.

18         But I think that we proceeded in this

19 particular dispute following on from the last one

20 where we understood your Honor to be recognizing

21 that there was some amount of burden associated with

22 such a large system.

23         We've done our best in the short time

24 that's allotted to respond to motions to compel.  To

25 put together our burden argument, we submitted two

1    declarations from employees at Google to explain the

2    process of searching Buganizer, the issue with the

3    access-controlled components, the number of

4    components that exist within the system, the

5    organizational structure of those components.  We

6    also submitted a declaration from someone in

7    Google's discovery team who spoke about the process

8    of ███████████ .

9         So we believe that we have met our burden

10   to demonstrate burden.  But just to take a step back

11   for a second, we still -- just to be clear, our

12   disposition going into the last hearing was that

13   Buganizer need not be separately searched at all.

14   We do not view it as a source of ESI fitting within

15   the ESI protocol, but we honored your Honor's ruling

16   at the last hearing and have attempted to negotiate

17   in good faith the component-based approach.

18        If your Honor is inclined to stick with the

19   component-based approach, we would urge you to not

20   go above something like 10.  As we've explained, our

21   top 10 list had 121 components and subcomponents.

22   That's still a large number to search across.  So

23   increasing to something like 20 could get us even

24   beyond, for example, the -- you know, close to or

25   beyond the 859 that are associated with the

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    custodians in this case.  So if you're going to

 2    stick with the component-based approach, we --

 3            THE COURT:  Wait, wait.  You're saying 20

 4    is almost 859?

 5            MS. SAMPOLI:  We don't know.  But it's

 6    possible that given the number of subcomponents and

 7    what the parties end up negotiating, it could go --

 8            THE COURT:  Of these 859, are some of them

 9    on the same tree, if I'm using the right --

10            MS. SAMPOLI:  Yes.

11            THE COURT:  Like, Component Number 38 is a

12    high-level component that has a bunch of

13    subcomponents, and Component Number 125 is one of

14    those subcomponents?

15            MS. SAMPOLI:  Yes.  So that's why the 859

16    number is, sort of, apples to apples with the 121.

17    That's as opposed to the top 10.

18            So if you go with the component-based

19    approach, we would urge you to stick with something

20    like 10 to keep it manageable.  If your Honor is

21    inclined to go with a custodian --

22            THE COURT:  Well, the lower number I give

23    you, the higher on the tree the plaintiff is going

24    to want.

25            MS. SAMPOLI:  Understood.  But I anticipate
```

1    that being the case no matter whatever number you

2    give.

3            But if you, instead, proceed with a

4    custodian-based approach, we would urge you to put a

5    limitation on it, on the number of custodians, just

6    to simply keep this process manageable.  We are at

7    the close of fact discovery.

8            We are already producing certain Buganizer

9    documents.  This is, sort of, a supplemental,

10   supplemental step on top of the custodial discovery

11   that the parties have been working on for over a

12   year at this point.

13           THE COURT:  And we are now less than three

14   weeks away from your January 6th document production

15   deadline, which seemed very reasonable back in

16   October when I gave it to you.

17           Mr. Kane, you understand they're not going

18   to make January 6th with respect to whatever I

19   decide here today about the Buganizer, right?

20           MR. KANE:  Well, it depends how many

21   documents it is, your Honor.  If they search the 859

22   and it's 1,000 documents, January 6th is doable.

23           That's why this is, sort of, farcical that

24   they're coming in, making this burden claim and not

25   actually saying, this is how many documents it is.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    I mean, they didn't try.  They didn't do it for one

2    custodian.

3         THE COURT:  Well, for one thing, you

4    haven't finished negotiating search terms with them

5    on an 859-component basis if it's going to be done

6    by custodian, right?

7         MR. KANE:  Yeah.

8         THE COURT:  That's correct, isn't it?

9         MR. KANE:  Our last iteration was October

10   31st, and they haven't responded to it.  We're happy

11   to keep negotiating search terms with them, but, I

12   mean, they could have used the ones we gave them.

13   They could have used their own and said, look, this

14   will give you an idea.  Here's the 18 custodians.

15   With these search terms, it's X number of documents.

16        THE COURT:  Before I get back to that,

17   Ms. Sampoli, one of the things that Mr. Kane said to

18   me a little while ago was that when you -- when

19   Google did provide for certain components, their

20   names and the internal description, a bunch of them

21   didn't actually have any internal description, a

22   hundred and -- I can't remember what number you gave

23   me.

24        MR. KANE:  It was 100 of the 431.

25        THE COURT:  100 of the 431?

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. KANE:  Yes.

2          THE COURT:  So how is it going to help the

3    plaintiff to have the internal descriptions for all

4    859 if 200 of them are blank?

5          MS. SAMPOLI:  We have to take the Buganizer

6    data --

7          THE COURT:  As it is.

8          MS. SAMPOLI:  -- as it exists.

9          But I would say that, in addition to the

10   descriptors, we still also have the custodial

11   documents that contain these references to Buganizer

12   trees or contain the e-mail notifications to trees.

13         So I think we would have to cobble together

14   information from multiple sources, but I don't think

15   it's -- you know, I think it's something that is --

16   there's enough information to allow us to identify,

17   and going back to your Honor's order from October,

18   the "most relevant components."

19         I don't think that your -- the end goal

20   of -- and correct me if I'm wrong, your Honor, but

21   my understanding was that the end goal of the order

22   from October was not to identify every single

23   potentially relevant component.  It was to find a

24   list of the most relevant components so that the

25   parties could proceed with targeted discovery into

1 this additional system.

2     THE COURT:  That's correct.

3     The problem is, if I tell you to go back to

4 the negotiating table, so to speak, with a little

5 more information -- namely, the names of all 859 and

6 the internal descriptions of -- I don't know --

7 maybe 600 of them, maybe 700 of them, whatever --

8 I'm afraid you're just going to be back here in two

9 months and you're going to be at the same place you

10 are now.  That concerns me.

11     So let me tell you what I'm thinking about

12 doing.  This definitely falls into the rough-justice

13 category where neither side gets what it thinks it

14 deserves.

15     I am thinking of directing Google to search

16 on a custodian-by-custodian basis across all of the

17 859 components identified thus far, but to limit the

18 plaintiffs to half of the custodians they're

19 interested in.  9 out of 18, they get to pick.

20     Both sides, no doubt, would think that's

21 unfair, but perhaps it's equally unfair to both

22 sides, which is not a bad compromise in situations

23 like this.

24     That doesn't solve the search-term problem

25 because you're still going to need to come to

1    closure on what the appropriate search terms are to

2    make sure that, even across nine custodians, you're

3    not getting dreck.

4             Ms. Sampoli?

5             MS. SAMPOLI:  I only wanted to make one

6    clarification, that if the number is reduced to nine

7    custodians -- which we would be happy with -- it

8    would not be 859 components at that point because

9    that's the number of components --

10             THE COURT:  All right.  So the plaintiffs

11    would tell you which custodians --

12             MS. SAMPOLI:  And then we would tell --

13             THE COURT:  -- they thought were the most

14    important, and then you would --

15             MS. SAMPOLI:  Yeah.

16             THE COURT:  -- tell them how many

17    associated components there were.

18             Mr. Kane?

19             MR. KANE:  That's fine with us, your Honor.

20    We can give you the nine now, if you would like, or

21    we can just give it to Google.

22             THE COURT:  Wait.  It's not me you have to

23    give them to, it's Google.

24             All right.  So here's what I'm going to do:

25             Plaintiff gets to name nine custodians.

```
 1    Google, as quickly as possible, responds with how
 2    many components we're now dealing with.  And I need
 3    to give you, I think, a deadline to come to terms on
 4    terms, to come to terms on the search terms, because
 5    I don't want to be doing this in March.  As it is,
 6    I'm fairly sure we're going to go past January the
 7    6th.
 8              But can I do this -- and I know that
 9    everybody is starting to, you know, pack up for
10    their ski trips and go to their holiday parties and
11    all of that sort of thing.
12              Can I tell you either agree on search
13    terms -- you know, a week from today is already the
14    22nd, and I'm losing people's attention at that
15    point, I realize that.  Particularly people with
16    school-age children because now they're out of
17    school and you have to deal with them.
18              But what I'd like to do, if you're up to
19    it, is say, look, you have a week to -- you'll give
20    the names today.
21              Google will very quickly turn that around,
22    I imagine by tomorrow, and say, okay, this is how
23    many components we're now dealing with.  And I'll
24    give you a week to either figure out search terms or
25    not.  And if you can't, I'll decide them for you,
```

```
 1   and you'll both be very unhappy about that.
 2           Is that manageable, plaintiff?
 3           MR. KANE:  Yes, your Honor.
 4           THE COURT:  Defendant?
 5           MS. SAMPOLI:  Yes, your Honor.
 6           THE COURT:  All right.  So nine custodians,
 7   all of the components that those custodians touch
 8   on, search terms by the 22nd.  Write me a letter no
 9   later than 9 o'clock in the morning on the 23rd.
10   You can write it before that, if you want, and say
11   either, Judge, you're off the hook, we've agreed on
12   search terms, it shall be done, or you'll report
13   that plaintiffs want this list and defendant wants
14   this list, and then you will have to wait to see
15   what horrible decision I make as to the appropriate
16   search terms.
17           All right.  Now, when will I see you next?
18   I think probably not before Christmas.
19           Don't you think not before Christmas?
20           MS. TOMKOWIAK:  Your Honor, can I ask one
21   question with respect --
22           THE COURT:  Ms. Tomkowiak?
23           MS. TOMKOWIAK:  With respect to the other
24   motion that we deferred today on our search terms
25   and custodians --
```

1          THE COURT:  Yes.  That one, you want to
2     come back on sooner?
3          MS. TOMKOWIAK:  No.  I was just going to
4     perhaps suggest that we give you a similar report on
5     the 22nd.
6          THE COURT:  Good idea.  By 9 o'clock in the
7     morning on the 23rd.
8          MS. TOMKOWIAK:  I mean on the 23rd.  Yes.
9          THE COURT:  And it can certainly be sooner
10    than that.
11         All right.  So you have two things due to
12    me on the 23rd or sooner: a report on search terms
13    with regard to the Buganizer project and a report on
14    whether you have managed to resolve your remaining
15    disputes with regard to Google's request for
16    additional plaintiff custodians and search terms.
17         Now, you have a few Other motions backed up
18    that you need to come in and talk to me about, and
19    you may also need to come in and talk to me further
20    about the custodian and search -- the defendant's
21    custodian and search term motions.
22         So I think we need to be looking at
23    January, which is -- ah, Nina, apparently I'm logged
24    into CEO under your password.  Would you step up
25    here and re-log in, please.  I won't look.

1           Excuse me a moment until I can look at my
2      calendar.
3           (Pause in proceedings.)
4           THE COURT:  Okay.  Now we can look at
5      January, which is not a great month for me.
6           Looks like I could see you on the 5th.
7           Is that correct, Tamika?
8           THE DEPUTY CLERK:  Yes, your Honor.
9           THE COURT:  It's my first availability in
10     January.  I could give you a morning appointment.
11     Next -- oh, I also have the 6th.  Look at that.
12          No, I don't have the 6th.  Sorry, I spoke
13     too soon.
14          So it's the 5th or potentially the
15     afternoon of the 8th I have time.  And then the
16     following week also looks terrible.
17          I could see you early in the morning on
18     Monday the 12th.  By "early," I mean 9.  But I have
19     another case coming in at 11, and we tend to run
20     long on this case.
21          And then after that, my next
22     availability -- huh.  That's bad.  The 19th is
23     Martin Luther King Day.  I could probably see you in
24     the afternoon of the 20th.
25          All right.  Those are my best shots.  What

1    date would you like to pick?  And we'll see how many

2    motions we can get through on that date.

3              MR. KANE:  January 5th works for

4    plaintiffs, your Honor.

5              THE COURT:  January the 5th.

6              Google?

7              MS. TOMKOWIAK:  That date is not actually

8    great for us, your Honor.  Apologies.

9              I think you --

10              THE COURT:  Well, one thing we could do is

11    set January 5th for a limited number of things and

12    not try to cram.

13              MS. TOMKOWIAK:  Yeah, I think the problem

14    is there's some travel back that Sunday, and it's --

15    it was actually, kind of, difficult to get here last

16    night, and so I have a feeling that it just might --

17              THE COURT:  Yeah, that's probably why I

18    have time available on Monday the 5th --

19              MS. TOMKOWIAK:  Yeah.

20              THE COURT:  -- because everybody else said

21    the same thing.

22              MS. TOMKOWIAK:  Just worried that folks

23    wouldn't make it.

24              THE COURT:  Yeah.  I'm trying to decide

25    whether to break my Friday rule for you.  I try not

1    to hold discovery conferences or motion arguments on

2    Friday.

3            Nina --

4            MS. TOMKOWIAK:  Did you say the 8th was the

5    other date you said that week?

6            THE COURT:  8th in the afternoon, which

7    means 2:00 o'clock.

8            Mr. Kane?

9            MR. KANE:  That works for plaintiffs.

10           THE COURT:  All right.

11           Google?

12           MS. TOMKOWIAK:  Yeah, we can make that

13   work.

14           THE COURT:  All right.  So let's make a

15   date for 2:00 o'clock on Thursday, January the 8th.

16   And at some point between now and then, after I've

17   read through the remaining motion papers and you've

18   reported to me on these issues, I'll issue a

19   housekeeping order telling you what I think we're

20   going to get to on January the 8th.

21           Because January the 8th is two days after

22   your document production deadline.  Why don't you go

23   ahead -- as I've done in the past, why don't you go

24   ahead and give me a joint status letter the day

25   before, January 7th, and in that, please tell me

1      what you were and weren't able to get done by

2      January the 6th, as well as any developments on the

3      open motions.  Okay?

4              MS. TOMKOWIAK:  I have a question, one more

5      question.

6              THE COURT:  You have a question?

7              MS. TOMKOWIAK:  Yeah.

8              So with respect to the motion that was

9      heard earlier today regarding the sampling

10     exercise --

11             THE COURT:  Yeah.

12             MS. TOMKOWIAK:  -- that will not be done by

13     January 6th.

14             Should we just provide you with an update

15     on January 7th, and then we can see where we're at

16     and set a deadline at that time?

17             THE COURT:  Certainly you should provide me

18     with an update.  Do you have any sense now for how

19     long it will take?

20             MS. TOMKOWIAK:  Right now, no.  I mean, I

21     know that, I mean, it --

22             THE COURT:  It was your proposal, more or

23     less.

24             MS. TOMKOWIAK:  Yeah.  No, understood.  I

25     mean, I -- so we need to get the months, right, from

1    the plaintiffs.  I assume that they can do that

2    fairly quickly.

3         I know that for the 261 additional domains

4    that we, you know, were ordered to provide

5    information for a couple of weeks ago --

6         THE COURT:  That I did you hold you to

7    January 6th, if I'm not --

8         MS. TOMKOWIAK:  No.  I believe you --

9         THE COURT:  Oh, no.  I gave you February

10   for that.

11        MS. TOMKOWIAK:  You gave us until February

12   6th.  That was tight, but we're working on it.  And

13   I think, as we mentioned at the last hearing, we're

14   going to lose a significant number of folks for two

15   weeks, you know, around the holidays.  So I think

16   we're going to need, you know, March.

17        I mean, I just -- there's this -- we have

18   a -- you know, we have a policy to provide notice to

19   the affected merchants.  Specifically, we provide 21

20   days' notice as a matter of course.  We've done that

21   at every iteration in this case.  It's just an

22   iterative process that can't be done in parallel.

23        THE COURT:  All right.

24        MS. TOMKOWIAK:  We've laid that out in our

25   briefs.  It's -- you know, you get one piece of data

1   before you can get the other, before you can get the

2   other.

3          THE COURT:  Right.  Bring me up to date on

4   all of these topics on January the 7th.  All right?

5          MS. TOMKOWIAK:  Okay.

6          THE COURT:  And for today, we'll be

7   adjourned.

8

9                          0o0

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AMM TRANSCRIPTION SERVICE - 631.334.1445

1

2

3                    C E R T I F I C A T E

4

5        I, Adrienne M. Mignano, certify that the

6    foregoing transcript of proceedings in the case of

7    Cengage Learning, Inc. v. Google LLC;

8    Docket #24CV4274 was prepared using digital

9    transcription software and is a true and accurate

10   record of the proceedings.

11

12

13   Signature   _Adrienne M. Mignano_____

14                ADRIENNE M. MIGNANO, RPR

15

16   Date:       December 19, 2025

17

18

19

20

21

22

23

24

25