```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
------------------------------:

CENGAGE LEARNING, INC.,        : Case No.: 24-cv-4274

et al.,                        :

                  Plaintiff, :

     v.                        :

GOOGLE LLC,                    : New York, New York

                 Defendant. : January 13, 2026

------------------------------:
```

         TRANSCRIPT OF STATUS CONFERENCE HEARING

          BEFORE THE HONORABLE BARBARA MOSES

             UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

```
For Plaintiff:          OPPENHEIM + ZEBRAK, LLP
                        BY:  Michele H. Murphy, Esq.
                             Lauren Bergelson, Esq.
                             Danae Tinelli, Esq.
                             Jeff Kane, Esq.
                             Yunyi Chen, Esq.
                        5225 Wisconsin Avenue, NW
                        Washington, DC 20015

For Defendant:          LATHAM & WATKINS LLP
                        BY:  Sarah A. Tomkowiak, Esq.
                             Laura Bladow, Esq.
                        555 Eleventh Street, NW
                        Washington, DC 20004
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

     AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE DEPUTY CLERK:  The Court now calls

2    Cengage Learning, Inc., et al. v. Google, LLC; Case

3    Number 24-cv-4274.

4          Counsel, please make your appearances for

5    the record.

6          MS. MURPHY:  Good afternoon, your Honor.

7    Michele Murphy, with Oppenheimer & Zebrak, for the

8    plaintiffs.  I'm here with my colleagues, Jeff Kane,

9    Danae Tinelli, Lauren Bergelson and Yunyi Chen.

10          THE COURT:  Good afternoon.

11          MS. TOMKOWIAK:  Good afternoon, your Honor.

12          Sarah Tomkowiak and Laura Bladow on behalf

13    of defendant, Google -- of Latham & Watkins LLP, I

14    should have said.

15          THE COURT:  Good morning -- sorry --

16    afternoon.

17          We have a slimmed-down crowd here today, I

18    see.  I think that's good for the sake of

19    efficiency.

20          Let me note preliminarily that it's been

21    about a month since our last conference.  I

22    apologize for having to postpone from last week to

23    this week, but I am now fully recovered, and I

24    appreciate your indulgence.

25          Since our last conference, on December the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    15th, only one new discovery motion was filed,

2    although there are still several pending that we're

3    not going to quite get to today.  53 new filings,

4    however, in total, hit the docket since December the

5    15th.

6            What we hope to get through today, not

7    necessarily in this order, are as follows:

8            Whether to extend the current discovery

9    deadlines, and if so, for how long.  Whether the

10    plaintiffs were entitled to withhold, on privilege

11    and/or work-product grounds, the 34 documents that

12    remained in dispute after our last conference,

13    specifically the e-mails dated after May the 30th,

14    2024 that included one or more Pearson personnel as

15    recipients.

16            The defendant's November 18, 2025 motion to

17    compel plaintiffs to add custodians and search

18    terms.  That motion has been narrowed, but not

19    completely resolved, as I understand it.

20            Plaintiffs' December the 5th motion for a

21    preclusion order with regard to delisting dates.

22    And last, but not least for today, defendant's

23    December the 5th, 2025 motion to compel the

24    plaintiffs to produce additional documents regarding

25    their DMCA enforcement and strategy efforts.

1          Tell me now if I think we have different

2     items on today's agenda than you think we have.

3          Plaintiffs?

4          MR. KANE:  The only thing I would point

5     out, your Honor, just with respect to the first

6     item, the discovery deadlines, that there is a

7     dispute as to whether the general discovery deadline

8     should be extended.  There were two specific

9     deadlines that were also raised in the joint letter,

10    one of which is the deadline for Google's discovery

11    into its overall DMCA program.

12         At the previous hearing, you had asked

13    Google how long they wanted to produce that

14    information.  They didn't know, and you asked them

15    to get back to the Court.  So that one is in there,

16    as well as Google has asked for an extended deadline

17    for the Buganizer discovery that the Court ordered.

18         So within your first category, there's

19    those two specific disputes.

20         THE COURT:  Thank you.

21         And to further add a little flesh to it, in

22    terms of the general extension question, my

23    understanding is that the plaintiffs say 30 days;

24    the defendants say 90.

25         Is that right?  Am I remembering that

1    correctly?

2            MS. TOMKOWIAK:  Yeah, that's right, your

3    Honor.

4            THE COURT:  Okay.

5            MS. TOMKOWIAK:  And I would just add that

6    we also agree with your agenda with the -- the only

7    thing I would like to add is that -- and this might

8    depend on which order you take up these items, but

9    we would like to consider an interim deadline for

10   the parties to make new document requests.  We think

11   that might help speed this case along.

12           THE COURT:  Okay.  Well, in terms of the

13   order, I'm going to -- I'm going to save the first

14   topic for last; that is, I'm going to go through the

15   substantive issues first, and then we'll circle back

16   around to discovery deadlines and what needs to be

17   extended and related topics like that.

18           Let me turn first to the question of the 34

19   documents.  And this is really my issue, not yours.

20   You are not arguing about this anymore.  You have,

21   as directed, submitted six sample documents --

22   plaintiffs picked three, defendant picked three --

23   out of the 34 documents in the category that

24   remained contested after my privilege ruling in

25   December.

1          And by the way, before I forget this, I
2   note that the plaintiffs -- I think it's the
3   plaintiffs who did this -- recently proposed in
4   their various redaction proposals that the name
5   Pearson be redacted from the public record with
6   respect to, among other things, this particular
7   privilege dispute.
8          I don't really see any basis for doing
9   that.  The underlying letter briefing used the name
10  of Pearson as the fifth member of the -- let me
11  see if I get this right -- EPEG.
12         That's the right nomenclature, right?
13         MR. KANE:  Yes, your Honor.
14         THE COURT:  Educational Publishers --
15  remind me.
16         MR. KANE:  Enforcement.
17         THE COURT:  -- Enforcement Group.  That's
18  it.  EPEG, Educational Publishers Enforcement Group.
19  And I doubt it's any secret in the industry who the
20  five members of that group are, so I'm inclined,
21  with respect to the various sealing requests and
22  redaction requests in front of me, not to keep that
23  name under wraps.
24         I'm on the fence about keeping under wraps
25  either the date of May 30, 2024 or the reason why

                AMM TRANSCRIPTION SERVICE - 631.334.1445

 1    that's a significant date.  I'm inclined to think
 2    that there's nothing super confidential about that,
 3    but I haven't reached a final decision on it.
 4          Anyway, let me get to the merits of the
 5    discovery dispute.  I've carefully reviewed the six
 6    sample documents, which consist of six e-mail
 7    communications between O & Z on the one hand and
 8    representatives of all five publishers plus
 9    BCGuardian on the other hand.  And I've also -- and
10    three of the sample documents consist of the
11    attachments to those e-mails, which are Excel
12    spreadsheets prepared by BCGuardian.  I have
13    concluded that they were all properly withheld from
14    production based both on the attorney-client
15    privilege and on the work-product doctrine.
16          I will be issuing a written memorandum and
17    order that more fully outlines my analysis of these
18    issues, but for the parties' guidance, let me just
19    hit on a couple of things.
20          I'm persuaded, among other things, that
21    O & Z has jointly represented all five publishers --
22    that is, the four plaintiffs in this case plus
23    Pearson -- in connection with a variety of
24    interconnected legal efforts to combat the
25    counterfeiting of their educational books and

 1    related materials.

 2         Those efforts include multiple lawsuits,

 3    not just this lawsuit in which Pearson is not a

 4    plaintiff, but also the so-called "pirate" lawsuits,

 5    several of which had not been concluded and were

 6    still ongoing in May, June, July and August of 2024,

 7    which is the date range of the documents that are

 8    now in issue.

 9         Even as to the pirate lawsuits which had

10    been concluded by that date, most, if not all of

11    them, were concluded with the entry of a permanent

12    injunction against further infringing activities,

13    which gave all five of these publishers and their

14    counsel a joint interest in ██████████████████

15    ████████████████████████

16         The attachments to the e-mails, as I

17    mentioned, were reports prepared by BCGuardian,

18    specifically infringement reports.  These are

19    detailed, multi-sheet Excel spreadsheets.

20         I note that BCGuardian was engaged by

21    counsel, by O & Z, to conduct evidence collection

22    and analysis at the direction of counsel.  I note

23    that all of the anticounterfeiting actions brought

24    by the four publishers in this case and by Pearson

25    as a co-plaintiff in many of the pirate suits, those

1    actions were brought based upon evidence collected

2    by BCGuardian.

3         Now, the infringement reports that I

4    reviewed set out some of that evidence and some of

5    that analysis prepared by BCGuardian; likewise, the

6    cover e-mails from O & Z to the client group with a

7    cc to someone at BCGuardian.

8         The cover e-mails summarize the

9    "highlights" of those infringement reports,

10   including by way of example only, because it's an

11   obvious example, XXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXX

13        Looking first at the attorney-client

14   privilege issue, I feel quite confident that the

15   presence of Pearson as a recipient of those e-mails

16   does not destroy the attorney-client privilege

17   because Pearson and the other four publishers --

18   that is, the four who are plaintiffs here -- were

19   joint clients of O & Z, and the e-mails conveyed

20   information and analysis that was relevant not only

21   to this action, but also to other lawsuits in which

22   Pearson was a co-plaintiff.

23        And I want to be clear here about something

24   that I may not have been sufficiently clear about

25   last December, and that is this:  When I consider

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    the question whether Pearson destroyed -- whether

2    Pearson's presence on these communications destroyed

3    the attorney-client privilege, I don't look at it

4    through the lens of the so-called common interest

5    doctrine, which is a doctrine under which the

6    attorney-client privilege is not lost, even though

7    it may -- a privileged communication may be

8    disclosed to someone outside of the attorney-client

9    relationship.

10         You don't, in my view, get to the question

11    of the common privilege unless you have a

12    communication going to a non-client of the relevant

13    counsel.  Here, all of these communications were

14    between O & Z and its five clients.

15         And there is a nice case from the Southern

16    District -- *Jordan (Bermuda) Investment Company v.*

17    *Hunter Green Investors Limited*, 2005 Westlaw

18    525447 -- which explains that the common interest

19    doctrine "describes a limited exception to the rule

20    that the attorney-client privilege is waived when a

21    protected communication is disclosed to a third

22    party or that party's counsel," but that the

23    doctrine is "not relevant."  Whereas here, the

24    communications at issue involve joint clients of the

25    same counsel and are subject to the attorney-client

1    privilege itself.

2              And that is the lens through which I have

3    looked at the sample documents, the sample e-mails,

4    submitted to me, as well as the broader question

5    that we discussed last December as to whether

6    Pearson's presence somehow destroyed what would

7    otherwise be a confidential attorney-client

8    privilege.

9              Even if Pearson ▨▨▨▨▨▨▨▨▨▨▨▨▨

10   ▨▨▨▨, with respect to the communications that I

11   looked at, because they're dated after May 30,

12   2024 -- which I don't believe is the case for the

13   reasons I just explained.

14             But even if we look at it through the lens

15   of the common interest doctrine rather than the

16   attorney-client privilege itself, I would come to

17   the same conclusion, that the privilege was not

18   waived because the privilege is not waived by

19   disclosure of a communication to a party that is

20   engaged in a "common legal enterprise with the

21   holder of the privilege."

22             That's a quotation from *Schaeffler v. The*

23   *United States*, 806 F.3d 34 at 40, Second Circuit

24   2015.  And I think that standard is clearly met

25   here.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          I will note as well, because this was a

2    matter of interest during our discussions on

3    December the 15th, there was a question raised, a

4    sensible question raised by Google, whether either

5    the e-mails or the attachments could be redacted.

6    ██████████████████████████████████

7    ██████████████████████████████████

8    ███████████████████████ Rather, the e-mails

9    and the attachments ███████████████████

10   ██████████████ and explain, as I mentioned, the

11   "highlights" of the underlying data in a manner

12   which appears to me to be more broadly relevant to

13   ██████████████████████████████████

14   ███████████████, but cannot be teased out

15   sentence by sentence or paragraph by paragraph to

16   separate potentially privileged materials from

17   potentially non-privileged materials.

18         Let me spend just a moment talking about

19   the work-product doctrine, where the question, the

20   key question, a key question, always is, was the

21   material prepared in anticipation of litigation?

22         I think that the infringement reports, the

23   BCGuardian infringement reports, were, in fact,

24   prepared under counsels' direction "with an eye

25   toward litigation," which is how the Second Circuit

1    looks at that factor, the anticipation-of-litigation

2    factor.

3         That's a quotation from Adlman -- *United*

4    *States v. Adlman*, 134 F.3d 1194.  And the pin cite

5    is 1196.  That's Second Circuit 1998, an oldie but

6    goodie.

7         It's clear to me from the face of the

8    documents themselves that they would not have been

9    prepared, at least not in the same form, had the

10   joint clients not been engaged under counsels'

11   direction in combating counterfeiting through a

12   coordinated campaign which included both ongoing

13   litigation -- the pirate suits that I mentioned --

14   and potential future litigation.

15        And I'll just highlight here again that the

16   ongoing litigation, even the cases ▟▟▟▟▟▟▟▟▟▟

17   ▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟

18   ▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟▟ by counsel with the

19   assistance of BCGuardian.

20        And last, but not least, I will return to a

21   point that I think I made in December, namely, that

22   the work-product doctrine is less easily waived than

23   the attorney-client privilege.

24        Generally speaking, in order to waive the

25   work-product doctrine, you have to make disclosure

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    to an adversary or to a third party where "the

2    disclosure substantially increases the opportunity

3    for potential adversaries to obtain the

4    information."

5            That's from the *Strougo* case, 199 F.R.D. at

6    522.

7            Sorry.  Let me give you the full cite:

8    *Strougo v. BEA Associates*, 199 F.R.D. 515, Southern

9    District of New York, 2001.

10           Here, Google has not suggested, and I don't

11   think could suggest in good faith, that disclosure

12   of these infringement reports to Pearson

13   "substantially increased the opportunity for

14   potential adversaries to obtain the information."

15   Everybody was on the same side here.

16           Consequently, even if Pearson's presence

17   constituted a waiver of the attorney-client

18   privilege, it would not constitute a waiver of the

19   work-product doctrine.

20           And for these reasons, assuming that the

21   remaining 28 documents are similar to the six

22   exemplar documents that I reviewed, I conclude that

23   they were properly withheld on privilege grounds.

24           Now, I hope to get that written order out

25   this week, but I make no promises.  I'll do the best

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    that I can.

2         What I'd like to turn to next is the motion

3    that I know the parties have been trying very hard,

4    and succeeding to some degree, in narrowing, namely,

5    the motion that defendant originally made on

6    November the 18th at Dockets 287 and 288 regarding

7    additional publisher custodians and publisher search

8    terms.

9         Google, which lawyer has this motion?

10        Okay.  First, can you just confirm for me

11   where I think we are on it, Ms. Bladow?

12        If I understand the status update letters

13   correctly, you've agreed on the custodians.  It's

14   going to be Ms. Elbe from Macmillan and Mr. Terzian

15   for McGraw Hill, but you're not quite seeing eye to

16   eye on the search terms; is that right?

17        MS. BLADOW:  Correct.

18        THE COURT:  Excellent.  So we don't have to

19   talk about the custodians anymore.

20        Tell me what the issue is with regard to

21   the search terms.  And, in particular, tell me, if

22   you would, where in the record I can find the

23   compromise search terms that aren't quite doing the

24   trick.  I'm not sure I have those.

25        MS. BLADOW:  I don't think we have

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    necessarily provided you with --

2              THE COURT:  Well, that would explain it.

3              MS. BLADOW:  -- a copy of our negotiations.

4    Our negotiations have been ongoing.

5              Kind of, to take a step back and to zoom

6    out a little bit and level set here, we don't

7    necessarily need you to write search terms.  I think

8    you've cautioned us about that before.

9              THE COURT:  I tried to warn you off of ever

10   asking me to do that.

11             MS. BLADOW:  Yeah.

12             And although we have reached a compromise

13   with respect to the vast majority of the initially

14   requested terms, and we were able to reach a

15   compromise with respect to custodians, we have some

16   concerns and we think it would be helpful for the

17   Court to provide some guidance to the parties with

18   respect to the appropriate scope of discovery here,

19   in particular, with respect to one of the search

20   terms.

21             During the parties' negotiations, the

22   dispute was whether "Google" and "Shopping" limiter

23   should be added to the term.  And Google's position,

24   as outlined in our papers, is that limiting

25   discovery to just documents that discuss Google

1    Shopping is overly narrow and is missing documents

2    that are essential to enabling Google to build its

3    defense to plaintiffs' theory of damages.

4        And so just, kind of, by way of example,

5    if, say, the source of piracy or the source of the

6    pirated e-books is not coming from Google but coming

7    from another Internet service provider or another

8    entity --

9        THE COURT:  Let's say, by way of example,

10   Bing, for example.

11       MS. BLADOW:  Correct.

12       -- if, you know, the same pirate is

13   advertising on Bing and the same pirate is

14   successful or there are other sales on Bing and, for

15   whatever reason, plaintiffs aren't competing on Bing

16   or advertising on Bing in the same way that they're

17   doing on Google, like, those advertising efforts and

18   piracy-enforcement efforts are relevant to

19   understanding this theory of, you know, lost profits

20   and lost sales.

21       THE COURT:  I'm a little lost here.

22       MS. BLADOW:  Okay.  Yeah.

23       THE COURT:  Can you make that more concrete

24   for me?  Can you give me an example of --

25       MS. BLADOW:  Yes.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                    THE COURT:  -- some document or category of
 2       document --                    _____
 3                    MS. BLADOW:  Yes.
 4                    THE COURT:  -- that you think you should
 5       get but won't get --
 6                    MS. BLADOW:  Yep.
 7                    THE COURT:  -- if the search terms are
 8       limited, as the plaintiffs' propose?
 9                    MS. BLADOW:  Yes.
10                    So, for example, Exhibit D to my reply
11       declaration, if you have that ...
12                    THE COURT:  I think I have your reply
13       declaration.  That was 346; is that right?
14                    MS. BLADOW:  Yes.  And so then --
15                    THE COURT:  And 348, depending on whether
16       we look at it under seal or --
17                    MS. BLADOW:  Yeah.  So the sealed version
18       of Exhibit D is at 346-2.
19                    THE COURT:  Okay.  I think I have that.
20                    This is the ████████████████████████████
21       ██████████████████
22                    MS. BLADOW:  Yes.
23                    THE COURT:  Okay.
24                    MS. BLADOW:  And this chain is generally
25       discussing █████████████████████████████████████████
```

                 AMM TRANSCRIPTION SERVICE - 631.334.1445

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5       ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

7  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8  ▓▓▓▓▓

9       THE COURT:  We're on the page with Bates

10 number ending 6336?

11       MS. BLADOW:  6736.

12       THE COURT:  6736.  Thank you.

13       All right.  I'm on the page.

14       MS. BLADOW:  If you see the privilege

15 redactions --

16       THE COURT:  I do.

17       MS. BLADOW:  -- and then you go one, two,

18 three lines under that --

19       THE COURT:  I do.

20       MS. BLADOW:  -- it says, ▓▓▓▓▓▓▓▓▓▓

21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

23 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25       THE COURT:  All right.  Someone has to tell

1   me what a WCN number is.

2           MS. BLADOW:  I can't answer that for you,

3   but what I can tell you, our understanding of this

4   is that ██████████████████████████████████████

5   ████████████████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████

8                   ████████████████████████████████

9   ██████████So to the extent plaintiffs are trying to

10  hold Google responsible for all of the downstream

11  sales of these unprotected digital copies of the

12  books,████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████ as opposed to other

15  downstream -- the sale -- like the sale of it on

16  Google, for example.

17          THE COURT:  I am still not sure I am

18  following.

19          Are you saying that plaintiffs should be

20  suing ███████, not Google, and that that's a defense

21  to their claims against you?

22          MS. BLADOW:  No, that's not what I'm

23  saying.  What I'm saying is that plaintiffs' damages

24  theories emphasize lost profits and lost sales,

25  saying that they have lost profits or lost sales to

1    the pirate sellers who are advertising on Google.

2         THE COURT:  But they're going to have to

3    make that showing based on Google data, aren't they?

4         If they can't tie whatever their damage

5    estimate is to things that have happened on Google,

6    then they won't succeed.

7         MS. BLADOW:  To the extent they're planning

8    to extrapolate from what's happening on Google and

9    say -- which they do in their -- both in their

10   complaint and in their third-amended initial

11   disclosures to talk about the downstream -- they're

12   not just seeking each sale that was made.  They're

13   not just seeking lost profits from that sale by that

14   pirate seller.  Their damages theory is much broader

15   than that, saying that the book that was sold can be

16   subsequently redistributed.

17        So there's -- it's not just a one for one,

18   a pirate seller sold a book advertising through

19   Google Shopping, but they're extrapolating from that

20   to say, oh, Student A purchased from this pirate.

21   Student A turned around and loaned -- sent the PDF

22   to Student B.  We should get damages for that lost

23   sale as well.

24        THE COURT:  I think it's highly unlikely

25   that anyone is going to be able to effectively,

1  through discovery or otherwise, present admissible

2  evidence of how many Student A's loaned their

3  purloined economics textbook to how many Student

4  B's.

5          I mean, where are we going with this?

6          MS. BLADOW:  I think where we're going with

7  this is, for example, Cengage has produced a handful

8  of documents that reflect XXXXXXXXXXXXXXXXX

9  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10          THE COURT:  Right.  This is -- really,

11  we're now tiptoeing up to -- maybe tiptoeing over

12  the line between this motion and --

13          MS. BLADOW:  And the next motion.

14          THE COURT:  -- the next motion.

15          MS. BLADOW:  There's a little bit of

16  relation between the two.  And to clarify, the

17  difference is, here, we just want an adequate search

18  of custodial data.  And it's clear by way of another

19  example that there are other forms of advertising,

20  including using Google Search, right?

21          To the extent they're saying they lost

22  sales because they were disadvantaged by Google's

23  e-book ban on Shopping ads and that's a theory of

24  harm that they're bringing, there are other forms of

25  advertising that are a substitute for that.  So to

1    the extent they've limited the documents they're

2    producing to us to digital advertising documents

3    related to Google Shopping, we're missing the chunk

4    of documents that relate to their overall ad spend,

5    their overall return on ad spend and the -- like,

6    the -- you know, whether they actually lost any

7    sales to that policy.

8         THE COURT:  I'm sure that plaintiffs'

9    counsel will clarify this for me in a moment, but it

10   kind of sounds to me that if I agreed with you, we

11   would be really multiplying the scope of discovery

12   here, possibly by orders of magnitude, and you would

13   be getting whatever discovery you would normally be

14   getting through your agreed-upon custodial searches

15   with respect to the Google channel, which is

16   directly at issue here.

17        You would be getting for everything.  You

18   would be getting for Bing.  You would be getting for

19   Amazon.  You would be getting for -- let me just

20   make this up by way of example -- some college

21   website where -- which connects graduating seniors

22   with rising juniors who need purloined copies of

23   their textbooks, et cetera.

24        MS. BLADOW:  Well, yes, because their

25   enforcement efforts are also relevant, right?

```
1          So if they're enforcing -- to the extent
2    they're saying that Google Shopping ads are the
3    problem and they're putting all of this effort into
4    Google Shopping ads, but it turns out that where
5    they're really losing sales is to pirates on Bing or
6    other sources on the Internet, that's not connected.
7          THE COURT:  Right.  But the way to do that,
8    it seems to me -- and, again, I think this is the
9    next motion, not this one, although there is
10   overlap -- isn't the way to do that to make sure to
11   be rigorous about requiring the plaintiff to tie
12   whatever their damage estimates are to stuff that
13   actually happened on Google and not permit them any
14   kind of sleight of hand like, oh, well, there's a 4X
15   downstream effect or some such thing?
16          Whereas what you're proposing to do, I
17   think as it relates to damages, is to give Google
18   discovery into all of the harm and damage and
19   infringement that these publishers have suffered in
20   the universe so that when you later hear what their
21   damage estimate is vis-à-vis Google, you can say,
22   well, it's a lot smaller, isn't it?  Google's a lot
23   smaller of a problem than whatever, Amazon, Bing.  I
24   don't know what the other channels are.
25          I'm not sure that that is a proportional
```

1    way in which to conduct discovery where plaintiffs

2    here have the burden of proof of tying their damages

3    to defendant's conduct.

4         MS. BLADOW:  Right.  But absent discovery

5    into those enforcement efforts and the sales and the

6    advertising efforts, there's no way to say what

7    portion of Google -- what portion of piracy or what

8    portion of the problem is attributable to Google.

9         THE COURT:  Well, that's Google's problem,

10   isn't it?  If the only thing Google comes up with at

11   trial is, we've lost a bazillion dollars to Internet

12   piracy, that doesn't even get in front of the jury

13   if they can't tie it to Google.

14        So to the extent you are asking for

15   modifications of search terms that would generally,

16   with respect to all otherwise relevant electronic

17   searches, take off the limitation that plaintiffs

18   seek to maintain to Google Shopping, I'm not

19   inclined to go with Google on this.

20        Am I missing something?  Or maybe I should

21   hear from plaintiff on this, and then I'll give you

22   a chance to come back.

23        MS. BLADOW:  I mean, there could be a

24   potential way to narrow this in terms of looking at,

25   say, one or two other platforms, or looking, for

1    example, in terms of one specific document that

2    plaintiffs are currently refusing to produce, which

3    is a ████████████████████████████████████████

4    ████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ████

7         THE COURT:  I'm not sure that helps with

8    the basic philosophical problem here, which, in my

9    view, is that since Google has the burden of

10   proof -- sorry -- since publishers have the burden

11   of proof, both as to liability and as to damages,

12   it's their obligation in the first instance to tie

13   the harm that they allege to Google.  And until and

14   unless plaintiffs were to foolishly try to pin all

15   of the harm in the universe that they've ever

16   suffered from infringement on Google, which I trust

17   they're not going to do, this sort of -- I don't

18   know -- comparative harm or contributory harm issue

19   that you would like to explore, I just don't see

20   it's relevant, and I see the burden as enormous

21   because it would so dramatically expand the scope of

22   discovery here.

23        Let me hear from the publishers.  Whose

24   motion is this, counsel?

25        Ms. Murphy?

1    MS. MURPHY:  Yes.  Thank you.

2         Your Honor is exactly right, that expanding

3    these search terms and philosophically expanding

4    discovery in this nature would take this case off

5    the rails.

6         Plaintiffs have made no secret of the fact

7    that protecting their copyrights and trademarks is

8    important to them or that piracy and digital piracy

9    is a problem, but plaintiffs have made no

10   affirmative issues or put forth no affirmative

11   issues concerning piracy on any other platform

12   whatsoever.

13        This case is about Google Shopping.  It's

14   always been about Google Shopping.  Even with

15   respect to Google Search, which I think was one of

16   the last things that Google's counsel mentioned,

17   Google itself has objected to dozens of discovery

18   requests on the basis that they don't -- that for

19   their own discovery, that they don't pertain to

20   Shopping.  We've discussed this with your Honor in

21   various arguments concerning plaintiffs' motions to

22   compel.  So even Google has said the case is about

23   Google Shopping.

24        There really would be no way to do this

25   comparative analysis whatsoever.  It would literally

1    be a mini trial to look at a different platform and

2    see, what notices did plaintiffs send to them?  What

3    responses did they get?  Were plaintiffs involved in

4    evaluating those notices?  You know, what's happened

5    with regard to those?  Were -- you know, were they

6    valid?  Were they not valid?  You couldn't get to

7    the point where you would be able to discern any

8    relevant information from this exercise.

9            The discussion, I think, at the beginning

10   of Counsel's argument really just made no sense to

11   me about the origination of where a pirated file

12   might start.

13           I just want to point out for the record

14   that there wasn't any evidence that I'm aware of

15   based on what she was saying with respect to where

16   the vast majority of books online come from.

17           But that being said, what happened here is

18   that the pirate, who is a customer of Google, has a

19   PDF file that is a pirated file.  It doesn't matter

20   where they got it because we observed them selling

21   that file, and more importantly, we observed a

22   prominent ad on Google promoting that, and we told

23   Google about it.  And Google, in many, many

24   instances, didn't take it down or didn't do anything

25   about that pirate.

1    So for this case to, then, delve into this

2    other rabbit hole of where, you know, it is Amazon's

3    Kindle program where this Pirate A got the file,

4    that, in no way, absolves Google of what happens

5    later and what we're actually complaining about in

6    this case.

7    Same thing if, you know, the pirate is

8    selling the illegal copies of these textbooks on a

9    different platform.

10    THE COURT:  And some of them do, right, as

11    you believe that some of these pirates use multiple

12    platforms?

13    MS. MURPHY:  Some of them do.

14    I mean, one thing I'll say is, this is an

15    advertising case so it's, sort of, more defined

16    here.  We're talking about, like, did they

17    advertise?  And, you know, did Google promote this?

18    So that model isn't necessarily, like, out

19    there on that many platforms, but it could be.  But

20    the pirates themselves, they might have multiple

21    websites.  They might go onto Reddit and say, hey,

22    come to my website students.

23    You know, that could be -- we could send a

24    notice to Reddit, for example.  We could send

25    notices to a number of different platforms,

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    marketplaces, et cetera.  That -- you know, again,

2    that doesn't tie back to what plaintiffs are arguing

3    happened in this case.

4         I mean, just to even talk about burden for

5    a second, the -- what is in the record -- your Honor

6    asked about the search terms -- was when Google

7    filed its motion, which they didn't confer with us

8    about.  So, honestly, this motion has been a little

9    bit chaotic, but --

10         THE COURT:  I'm sorry.  This particular

11    motion, the one that was originally filed in

12    November of 2025?

13         MS. MURPHY:  Correct.

14         THE COURT:  I think you've been doing

15    nothing but meeting and conferring since November.

16         MS. MURPHY:  After they filed.

17         THE COURT:  Ah.

18         MS. MURPHY:  So yeah.  Your Honor asked

19    what was in the record.

20         THE COURT:  Yes.

21         MS. MURPHY:  And there is a hit report in

22    the record, just so you know.  I think it's ...

23         THE COURT:  And tell me about that.

24         MS. MURPHY:  Docket 346-1, my colleague

25    tells me.

1          THE COURT:  Well, let's see if I have

2   Docket 346-1.

3          Is that Bladow Exhibit C by any chance?

4          MS. MURPHY:  Yes.

5          THE COURT:  Excellent.

6          MS. MURPHY:  Yes.

7          THE COURT:  According to my crack chambers

8   staff, I have that.  Let me turn to it now.

9          All right.  I have that.

10         MS. MURPHY:  So we -- basically, we had

11  added up these numbers.  And at the time, I think we

12  were into the hundreds of thousands of documents.

13         THE COURT:  So just to be clear, what I'm

14  looking at, the first page, the search term in the

15  upper left-hand corner is Google's proposed search

16  term that would remove the limiter to Google

17  Shopping?

18         MS. MURPHY:  This was what they proposed

19  when they filed their motion, so they have --

20         THE COURT:  Right.  So it's evolved a bit

21  since then.

22         MS. MURPHY:  It's evolved.  So this is what

23  it has evolved to as of last night at, like, 10:00

24  p.m.

25         Let me get this right.  So for their Search

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1   String 1, there would be 70,862 hits.  And that's --
 2            THE COURT:  7,000 -- sorry.
 3            MS. MURPHY:  862 hits -- 70,000.
 4            THE COURT:  70,000 --
 5            MS. MURPHY:  Yeah.
 6            THE COURT:  -- as compared to, it looks
 7   like -- 220-, 240-, 300- -- about 400,000 as set
 8   forth in the hit report I'm looking at now, the old
 9   hit report.
10            MS. MURPHY:  I don't have the total, but
11   that seems right.  I think -- but for purposes of
12   today, it does make sense to say, okay, where are
13   we?
14            THE COURT:  Yes.
15            MS. MURPHY:  And that is without family.
16            So we have -- in our ESI protocol, we have
17   to automatically produce -- and, of course, we have
18   to review for privilege -- attachments, so the
19   attachments will at least double that.
20            So this is for one search string.  And we
21   have already -- from what we have agreed to do
22   because we really did want to try to narrow this, if
23   not resolve it -- we take seriously what your Honor
24   has said about working together to deal with search
25   terms disputes.
```

1          We've agreed to most of their search
2     strings.  This is really down to 1 and 2.  And with
3     that alone, there's 13,000 hits, not including
4     family.
5          THE COURT:  I'm sorry.  Say that number
6     again.
7          MS. MURPHY:  13,000.
8          THE COURT:  What -- I'm sorry.  You just
9     said there were 70,000.  Now, there are 13,000.  I'm
10    missing something.
11         MS. MURPHY:  Those -- yes.  I apologize.
12    Those are the ones that we've agreed to do.
13         THE COURT:  Ah.  So your proposed
14    compromise would involve 13,000 additional
15    documents, not counting families; is that right?
16         MS. MURPHY:  Correct.
17         THE COURT:  And their proposed compromise,
18    Google's proposed compromise as of last night, would
19    involve 70,000 new documents across these various
20    custodians, not including families.
21         MS. MURPHY:  More or less.
22         THE COURT:  More or less.
23         MS. MURPHY:  I mean, it's possible a hit
24    could be on two documents, but even accounting for
25    that, we -- you know, plaintiffs believe --

1    especially because if you look at the terms we even

2    agreed to, we have issues with respect to, you know,

3    should we even have to be producing this at this --

4              THE COURT:  So that was the two competing,

5    compromised versions on Search String Number 1.

6    What about Search String Number 2?

7              MS. MURPHY:  Well, Search String 2, there

8    weren't two competing ones.  I'm sorry.

9              Search String 1, Google made a proposal.

10   We tried multiple different ways.  We ran different

11   searches.  Even when we added "Google" or "Shopping"

12   at the beginning of Search Term 1, we were still, I

13   think, close to 100,000 hits.

14             THE COURT:  So --

15             MS. MURPHY:  20,000 hits.

16             THE COURT:  So Search Term 1 is a different

17   problem.  Search Term 1 is not this, do we include

18   "Google" as a limiter -- "Google Shopping" as a

19   limiter?

20             MS. MURPHY:  Yes and no.  So --

21             THE COURT:  You know, it's very hard for me

22   to make my way through this motion when I literally

23   don't have -- and I know why you didn't put them in

24   front of me, because I keep telling you not to put

25   search terms in front of me.  But you're asking me,

```
 1   nonetheless, to make a decision on search strings
 2   that I haven't seen, so it's, sort of, "a rock and a
 3   hard place" problem.
 4            MS. MURPHY:  Understood.
 5            I mean, it's not our motion, but -- well,
 6   you know, point well taken.  Let me back up and try
 7   to be a little bit more clear.
 8            THE COURT:  Okay.
 9            MS. MURPHY:  Search String 1, let's just
10   focus on that.
11            THE COURT:  All right.
12            MS. MURPHY:  So Search String 1 started off
13   with around 400,000 hits -- this is not me doing
14   exact math -- and then Google agreed to revise it.
15   And where we are today with Google's position is
16   70,000 hits, not including family -- over 70,000,
17   but I'm going to use round numbers.
18            THE COURT:  And this is the one that does
19   or does not have a plaintiff compromise --
20            MS. MURPHY:  This one does not technically
21   have a plaintiff compromise.
22            THE COURT:  Whereas Search String 2 --
23            MS. MURPHY:  It did at some point.
24            THE COURT:  Okay.
25            MS. MURPHY:  But if I could just, you know,
```

```
 1    finish with Search Term 1 ...
 2              THE COURT:  Sure.
 3              MS. MURPHY:  What I was explaining is that
 4    we -- this search term is so broad.  I mean, you can
 5    see from the one that's in the record, it hasn't
 6    changed that much.  It's a kitchen-sink search term.
 7    And for a publisher, you know, again, that
 8    authorized --
 9              THE COURT:  How did this one start?  Search
10    String 1 is the one that started as what?
11              MS. MURPHY:  "Enforce" with the asterisk.
12              THE COURT:  "Enforce, asterisk" or
13    "infringe, asterisk," et cetera?
14              MS. MURPHY:  Yeah.
15              THE COURT:  That one?
16              MS. MURPHY:  You know, each element of this
17    has words that are broad.  And even the words that
18    are more specific are going to have a lot of hits
19    because of what these publishers do.
20              THE COURT:  All right.  So Search String 1
21    began as paragraph -- the search string set forth in
22    paragraph 55(a) of Ms. Bladow's declaration in the
23    original set of motion papers.
24              MS. MURPHY:  Correct.
25              THE COURT:  Okay.
```

```
 1              MS. MURPHY:  Okay.

 2              THE COURT:  I am now oriented.

 3              MS. MURPHY:  So -- and what I was trying to

 4    explain is that plaintiffs did attempt to revise

 5    this search term.  So even if we took Google's last

 6    iteration but put "Google" or "Shopping" at the

 7    front, we're looking at 20,000 hits.

 8              So we did not make that proposal.  We kept

 9    explaining this isn't workable.  You know, even

10    putting aside the fundamental disagreement over why

11    this should be here -- whether this should be here

12    in the first place.

13              THE COURT:  All right.

14              MS. MURPHY:  Okay.

15              THE COURT:  So they started with Search

16    String Number 1, started with 400,000 hits.

17    Google's current proposal, you tell me, would

18    generate -- did generate 70,000 hits, even if you

19    put the additional limiter of "Google" -- was it

20    "Google" or "Google Shopping" at the front?

21              MS. MURPHY:  No.  Their proposal still

22    doesn't have that limiter.  They --

23              THE COURT:  No.  But you, at one point,

24    floated that --

25              MS. MURPHY:  That would be --
```

```
 1                THE COURT:  -- thought experiment, right?
 2                MS. MURPHY:  Correct.  That would --
 3                THE COURT:  That would bring it to 20,000.
 4                MS. MURPHY:  Correct.
 5                THE COURT:  All right.  Got it.
 6                MS. MURPHY:  Okay.  So Search String 2, at
 7      one point, before we had agreed --
 8                THE COURT:  Search String 2 began as what
 9      in the Bladow declaration?
10                MS. MURPHY:  "Practice."
11                THE COURT:  So 55(c)?
12                MS. MURPHY:  It's a combination of names.
13                THE COURT:  "Practice, asterisk."
14                MS. MURPHY:  Oh, my colleague tells me it's
15      now a combination of B and C.
16                THE COURT:  Combination of B and C.  All
17      right.
18                MS. MURPHY:  Okay.
19                THE COURT:  All right.  At least I know
20      generally where I am on the map.
21                MS. MURPHY:  So Search String 2, we had
22      gone back and forth with Google, again, attempting
23      to resolve this.
24                Before we agreed to add Search Strings 3 to
25      12, which is now done -- and, again, that's 13,000
```

1    hits, and it's, you know, probably 30,000 with

2    family that we're already agreeing to do, and we're

3    going to do it, hopefully -- you know, certainly by

4    the time that your Honor tells us to do it, but

5    we'll talk about the date.

6              THE COURT:  By January 6th, which was last

7    week.

8              MS. MURPHY:  Yeah.

9              Okay.  So that is resolved.  So for 2, we

10   were looking at Google's Search String 2 has 4,800

11   hits.

12             THE COURT:  4,800?

13             MS. MURPHY:  Yes.

14             THE COURT:  Google's compromise proposal.

15             MS. MURPHY:  Correct.

16             THE COURT:  Okay.

17             MS. MURPHY:  But, you know, two things

18   about it:  First of all -- again, I'm not just --

19   we're not just looking at this in isolation.  We've

20   already substantially compromised.  I mean, second

21   of all, there is the whole theoretical point about

22   is this relevant anyway?

23             I will mention the family here because I

24   don't know if Google will raise it.  Right now, the

25   hit report shows 64,000 for the family.

              AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  All right.  But as to Search

2     String 2, there's also a plaintiff compromise

3     proposal, right?

4          MS. MURPHY:  There was, but there is not

5     currently, and I'll explain why.

6          But just to finish the thought, if it does

7     come up on this family issue, there is one or two

8     employees for one of the plaintiffs that use Slack

9     to communicate, and sometimes the files associated

10    with that will overrepresent; in other words, like,

11    they might be multiple files in -- a single file in

12    reality and then other multiple files.

13         So when we started negotiating with them

14    recently, we pretty much dropped this, which we

15    shouldn't because, out of 64,000, there's certainly

16    going to be probably half that, at least, for family

17    hits, but I'm just explaining it in case it comes

18    up.  So I focus mostly on the documents with hits,

19    but we also have this family issue.

20         We don't agree that Search Term 2 should be

21    run at all because, again, we feel like this is

22    something that we have addressed.  There are other

23    arguments in 3 through 12.

24         THE COURT:  I'm sorry.  I have to interrupt

25    you.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1           MS. MURPHY:  Yeah.

2           THE COURT:  I have completely lost my place

3    in your dance card here.

4           MS. MURPHY:  Okay.

5           THE COURT:  Take it from the top.

6           MS. MURPHY:  Okay.

7           THE COURT:  There are, as I understand it,

8    two search strings still in issue between the

9    parties, which --

10          MS. MURPHY:  Correct.

11          THE COURT:  -- counsel have been referring

12   to as Search String 1 and Search String 2.

13          MS. MURPHY:  Yes.

14          THE COURT:  I understand that Search String

15   1 began way back in the distant past, in November,

16   as the search string set forth in paragraph 55(a) of

17   the Bladow declaration.

18          I understand that Search String 2 began way

19   back when as paragraphs 55(b) and (c) of the Bladow

20   declaration, but they've merged since then over the

21   course of the parties' negotiations.

22          MS. MURPHY:  Correct.

23          THE COURT:  I am still not sure I

24   understand.  As to each of these contested search

25   strings, I want to know, is there now only one

AMM TRANSCRIPTION SERVICE - 631.334.1445

1  version on the table or are there two?  And I want

2  to know the hit report numbers for all versions that

3  are on the table.

4          MS. MURPHY:  Okay.  For 1 and 2, there's

5  only one version --

6          THE COURT:  What do you mean, "for 1 and

7  2"?

8          MS. MURPHY:  For Search String 1 and Search

9  String 2 --

10          THE COURT:  Yes.

11          MS. MURPHY:  -- there's only Google's

12  version on the table.

13          THE COURT:  There's only Google's proposal

14  on the table.

15          MS. MURPHY:  Correct.

16          THE COURT:  All right.  And for Search

17  String 1, Google's proposal, you say, in its current

18  iteration, would return 70,000 hits, not counting

19  families, and that even if it were further limited

20  to "Google Shopping," it would return 20,000 hits.

21          MS. MURPHY:  Correct.

22          THE COURT:  All right.  And as for Search

23  String 2, formerly known as 55(b) plus 55(c), you

24  say that Google's compromise proposal would return

25  4,800 hits -- 4,800 -- but that there may be a -- an

1   unusually large family component there.

2            MS. MURPHY:  Correct.  It's 64,000 on the

3   hit report.  I suspect it's not 64,000, but it's in

4   the tens of thousands.

5            THE COURT:  Okay.

6            MS. MURPHY:  That would be my guess without

7   having literally done this document review.

8            THE COURT:  See, I was under the impression

9   from Ms. Bladow's presentation that there were

10  actually two competing proposals on the table with

11  respect to Search String Number 1 and that the

12  difference between them was this limitation to

13  "Google Shopping."

14           Ms. Bladow, did I misunderstand you?

15           MS. BLADOW:  Your Honor, that's Search

16  String 2, and I had represented to the Court that

17  that was a prior compromise proposal, trying to

18  provide some context for the broader dispute.

19           THE COURT:  I didn't understand you, then.

20  All right.  My apologies.

21           All right.  Ms. Murphy, go ahead.

22           MS. MURPHY:  I talked at the beginning

23  about the floodgates that would open if we expanded

24  discovery to, sort of, all of plaintiffs' antipiracy

25  and Internet piracy writ large.

```
 1           We haven't talked too much about marketing,
 2    but that's another issue that I think Google relied
 3    on in bringing this motion initially.  And Google's
 4    counsel did raise the issue in her presentation of
 5    how they also felt that they would need to get broad
 6    categories of documents into plaintiffs' marketing,
 7    so let me just take a minute to put some context on
 8    that.
 9           THE COURT:  And this relates to Search
10    String 2?
11           MS. MURPHY:  This relates to ...
12           (Discussion held off the record.)
13           MS. MURPHY:  Yes.
14           THE COURT:  Okay.
15           MS. MURPHY:  Sorry.  Sometimes I need a
16    little helper.
17           Okay.  So as I was saying, plaintiffs are
18    very large publishers.  They publish textbooks.
19    They publish digital textbooks, which is at issue in
20    this case.  They also publish print --
21           THE COURT:  Lots of other things.
22           MS. MURPHY:  -- which print is not at issue
23    in this case.  It keeps coming up in a lot of their
24    papers, but it's not at issue.  They publish
25    courseware.  They publish things for professors.  So
```

1    they have, you know, a vast catalog, and they market

2    in a variety of ways.

3         They market digitally, online, through

4    Google.  Google is, you know, certainly the dominant

5    search engine.  I think they have at least 90, if

6    not 94, percent of the market.  So when you're

7    talking -- you know, if we say in our papers, in the

8    complaint, Google has this large market share,

9    that's well known.  That's not disputed.

10        So they advertise on Google.  They have

11   whole departments that work with universities to

12   advertise the work to universities.  They work

13   directly with professors and instructors to market

14   to them.  They have their own student store.  So a

15   lot of these search terms could hit on that.  They

16   have a website where they sell directly to students.

17        So, again, I refer to it as opening the

18   floodgates as we go down this path to say that

19   plaintiffs have now somehow put their entire ad

20   spend at issue in this case, that they've put their

21   various advertising practices at issue in this case,

22   they certainly haven't.  It's not relevant.  It

23   wouldn't pertain to any legitimate defense that

24   Google could raise.

25        I think we've talked about how this

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    comparison just -- it wouldn't work, and so we just

2    want to be clear that we also don't think taking

3    discovery in that direction is appropriate.

4              THE COURT:  Okay.  Thank you.

5              Any reply from Google?

6              MS. BLADOW:  Okay.  Your Honor, I want to

7    start with where we left off with marketing

8    documents.

9              So the search terms that the parties have

10   been able to reach a compromise on generally pertain

11   to rights management and digital marketing

12   practices.

13             So we've been able to reach a compromise on

14   narrowing the search terms.  Our concern is that

15   when plaintiffs are reviewing the 13,000 documents

16   plus family, that they're not marking as responsive

17   the documents --

18             THE COURT:  Sorry.  What 13,000 documents

19   plus family?

20             MS. BLADOW:  The documents that hit on the

21   newly agreed-upon search terms that the parties

22   reached --

23             THE COURT:  The ones that you have agreed

24   upon.

25             MS. BLADOW:  That we have agreed on, yes.

1    But they're not marking as responsive and producing

2    to Google the relevant documents, the documents that

3    may not exact -- explicitly say "Google Shopping

4    Spend" or "Google" specific to the Google Shopping

5    ads.  But --

6        THE COURT:  I want to focus you, Counsel.

7    The motion which is before me now, what's left of

8    it, is a motion to require plaintiffs to deploy two

9    additional search strings for purposes of their

10   custodial search.

11       MS. BLADOW:  Yes.

12       THE COURT:  Not to tell plaintiffs how to

13   review the results of agreed-upon search strings.

14       Where are we going here?

15       MS. BLADOW:  So Google would ask the Court

16   to not necessarily craft its own search term, but

17   provide some direction for the parties to continue

18   negotiating these two search terms.

19       THE COURT:  And what direction do you have

20   in mind?  Because this is already, you know, our

21   second run at a motion that was made in December --

22   in, sorry, November.

23       I was happy to send you home in December

24   when you said you wanted to negotiate further, but,

25   you know, we're not going to keep doing this.

 1              MS. BLADOW:  Understood.

 2              If you would like to resolve it, I think --

 3    and if the Court's view is that these terms should

 4    be limited by "Google" or "Shopping," then that's an

 5    option that the Court has to apply to the latest set

 6    of terms.  We weren't even aware that plaintiffs had

 7    run and applied such a limiter to the terms that we

 8    proposed last night.

 9              THE COURT:  Well, they did it with -- as I

10    understand it, they did it with respect to your

11    current iteration of compromise Search String Number

12    1.

13              MS. BLADOW:  Correct.

14              THE COURT:  That got it down to 20,000

15    hits.  I can't -- I didn't make a note of this.

16              Did they also do it with respect to your

17    current iteration of proposed Search String Number

18    2?

19              MS. BLADOW:  Yes.

20              THE COURT:  Ms. Murphy?

21              MS. MURPHY:  Yes, we did before we agreed

22    on 3 through 12.

23              THE COURT:  Okay.  And what was that

24    number?

25              MS. MURPHY:  One moment.

```
 1              1,917.  Let me see the family.

 2              THE COURT:  Not counting families.

 3              MS. MURPHY:  Family is 5,720, which looks

 4    like a normal number.  That does not appear to have

 5    that unique file situation.

 6              THE COURT:  All right.  I now have a

 7    complete set of statistics.

 8              Back to you, Ms. Bladow.

 9              MS. BLADOW:  Yeah, so I think what we're

10    ultimately looking for here is an appropriate search

11    of custodial documents.  We only have maybe 1,000

12    custodial documents.  Even once plaintiffs added 10

13    additional custodians, that yielded only a handful

14    of additional documents, so our concern is that

15    there are responsive documents that are being missed

16    and that these search terms, even if the Court's

17    inclined to limit them to "Google" or "Shopping,"

18    are proportional to the needs of the case, given the

19    amount in dispute and the issues on which these

20    search terms would return responsive documents.

21              THE COURT:  All right.  Thank you very

22    much.

23              With respect to the motion now before me,

24    which was originally made on November the 18th at

25    Docket 7 -- sorry -- 287 and 288, I want to commend
```

1    both sides for resolving many of the issues that --
2    that were originally presented to the Court in that
3    motion, in particular, for resolving the portion of
4    the motion asking the Court to order the plaintiffs
5    to designate additional custodians.
6        I also want to commend the parties for
7    resolving most, if not all, of the portion of the
8    motion asking the Court to require plaintiffs to
9    deploy additional search strings.
10       The matter -- the portion of the motion
11   left for me today is both narrow and, frankly, to
12   the Court, opaque because, as presented to me today,
13   Google is asking me to order the plaintiffs to
14   deploy two proposed additional search terms which
15   have been negotiated, and Google is now recommending
16   to me, I guess, its most recent form of Search Term
17   Number 1 and Search Term Number 2, which I've never
18   seen, or suggesting in the alternative that I order
19   the plaintiffs to deploy an even more narrow version
20   of Search Term Number 1 or Search Term Number 2 with
21   an additional modifier or limiter to "Google" or
22   "Google Shopping."  I heard it both ways.
23       The bottom line is it is the -- before we
24   get to the question of burden and proportionality,
25   it's the moving party's basic obligation to convince

1    me of relevance, and I'm not persuaded that these

2    additional search terms, as described to me in

3    concept here, are well designed to obtain evidence

4    which is relevant to the claims and defenses in this

5    action, so I am going to have to deny the motion.

6            This is, of course, without prejudice to

7    Google's demands.  If there are any other as-yet

8    unadjudicated demands floating around out there to

9    specific documents which may implement -- sorry --

10   which may implicate some of the issues that we

11   address today, since I haven't seen Search Term

12   Number 1 or Search Term Number 2 as presently

13   conceived by the defendant, and I certainly am not

14   in a position to say that Document X or Document Y

15   or Document Z would or would not have been hit on by

16   one of these search terms, you know, I'm not in any

17   position to make a broad ruling that affects any

18   motions, other than the motion which is right before

19   me, which is, insofar as the remaining issue on this

20   motion is the current version of Search Term Number

21   1 and the current version of Search Term Number 2.

22   Google has not persuaded me to compel plaintiffs to

23   deploy those search terms.

24           Let us turn, if we can, to the preclusion

25   order motion.  Let me switch binders here.

1           This is plaintiffs' December the 5th

2    motion, which was filed in two versions, sealed and

3    unsealed, at Dockets 370 and 371.

4           I think -- I see this is going to be

5    Mr. Kane's argument on behalf of the plaintiff, but

6    before you speak, Mr. Kane, let me say that having

7    reviewed the parties' submissions on this, I'm not

8    at all convinced that any further order is required.

9    We know what happened.

10          I issued an order back in October directing

11   Google to produce documents regarding delisting

12   dates, the dates on which it delisted URLs, by

13   November 13th or be precluded thereafter from

14   "introducing or relying on any newly identified or

15   newly produced documents or data for that purpose."

16          November the 13th has now come and gone.

17   Google produced only one new document, as I

18   understand it, addressed to that question.  So I

19   tend to agree with Google here, that my prior order,

20   my October the 15th order, was self-effecting that

21   nothing new is required.

22          And I will just state, I know lawyers can't

23   help themselves, but both of the forms of proposed

24   order presented -- the plaintiffs' proposed order at

25   Docket 372 tries to take a couple of extra bites at

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    the issue by having me talk about what testimony may

2    or may not now be precluded as a result.

3          And Google's proposed order at Docket 397

4    tries to take an extra bite by having me explicitly

5    say that I'm not precluding Google from offering

6    certain kinds of testimony.  I think silence may be

7    golden here.

8          All right.  With that said, Mr. Kane ...

9          MR. KANE:  So I think it's the "or relying

10   upon" in your Honor's order that could use a bit of

11   clarification.

12         So here's what it is that we're concerned

13   about:  That Google will come back a month from now

14   in a deposition, six months from now at summary

15   judgment, and say, you know, on further

16   consideration, that date we gave you back in March

17   of 2025, before this motion had even been filed,

18   turns out that was the date of the delisting.

19         So let me explain what I mean by that.

20         You'll recall that, under the DMCA, a

21   service provider, when it receives a valid notice of

22   infringement, has to "expeditiously" remove the

23   infringing content.  So --

24         THE COURT:  And you don't think they did it

25   very expeditiously.

1          MR. KANE:  That's correct.

2          But in order for a fact finder to evaluate

3     that, they need to know, what's the date that Google

4     claims it delisted a particular ad?

5          So we filed a motion saying, Google, please

6     tell us, for all the ads that pertain to the now

7     1,500 pirates -- pirate websites that advertise the

8     works-in-suit, what's the date you claim to have

9     delisted those ads?

10         Google responded to that motion by saying,

11    we don't have that information.  We've given you

12    everything we have.  We said, that's fine, but

13    you're precluded from coming back later and saying,

14    oh, it turns out we do know the date.

15         And when the hearing happened, Google

16    changed its mind and said, actually, we would like

17    90 days to see if we can figure out what those dates

18    are.

19         THE COURT:  Fine.

20         MR. KANE:  The Court gave Google 30 days.

21    What it produced was, at best, a partial account of

22    the delisting dates.  It's only ████ or so -- it is

23    less than ████ URLs Google says --

24         THE COURT:  It is URL by URL?

25         MR. KANE:  There are less -- there are

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    fewer than ████ URLs in the file they produced.

2    Google has told the Court there are ████████████

3    ██████████ of URLs that they delisted pertaining to

4    these 1,500 pirate websites, so it's a tiny slice of

5    the relevant URLs.

6            THE COURT:  Okay.

7            MR. KANE:  Google has produced nothing

8    saying -- and what Google said at the hearing is,

9    one of the reasons we need this extra time is we

10   want to determine whether one of the dates we've

11   previously given plaintiffs, which is the

12   ████████████████████████████, whether that date

13   is, in fact, the date of the delisting.

14           And your Honor asked them specifically,

15   like, where is this information?  Do you have the

16   date that this occurred?  And they said, we think it

17   might be -- we think that might be, kind of, the

18   last possible date.

19           And what your Honor said at the hearing

20   was, that what Google couldn't do is, if it didn't

21   produce a document saying so -- come back and say,

22   oh, here's a document that has, sort of, the key of

23   telling you, oh, it is this other date that we gave

24   you.

25           What you -- what your Honor said was, "I'm

         AMM TRANSCRIPTION SERVICE - 631.334.1445

1    contemplating a documentary evidence preclusion

2    order that, if you don't come up with it within 30

3    days you cannot, then, at summary judgment, say,

4    well, here's the three-page key which shows you how

5    to do the math based on, you know, some document

6    which has already been produced."

7        That's exactly what we're concerned about,

8    that Google --

9        THE COURT:  Fine.  Don't you have the

10   record you need?

11       MR. KANE:  I don't think so.  We have it

12   certainly with respect to the document.  They

13   certainly can't show up with a document that says,

14   here's how you can figure it out based on some other

15   spreadsheet that we gave you.

16       What we're concerned about is them trying

17   to circumvent that order by having someone testify

18   to it instead.

19       THE COURT:  Don't you think that's a bridge

20   we should cross when we come to it rather than

21   trying to anticipate now all of the sneaky ways in

22   which you are concerned that Google might try to get

23   around the self-effecting preclusion order?

24       MR. KANE:  The trouble is, Google has

25   already taken the position several times that that's

1    not the correct date.  So when we filed this motion,

2    the original motion asking them to tell us the

3    delisting dates, they did not say, we already gave

4    it to you, it's this date from this spreadsheet.

5         When the Court directly asked them, what is

6    this date, they did not say, we already gave it to

7    you, it's this date over here.

8         In response to the most recent motion, the

9    December 5th motion, they did not say, it's this

10   date we already gave you.

11        In the 30 days the Court gave them, until

12   November 13th, to produce documents, they did not

13   produce a document that says, it's this other date

14   we already gave you.

15        What we're trying to prevent is being

16   surprised at summary judgment or in deposition by

17   someone saying, actually, we've changed our mind, it

18   is that date.

19        So I think the clarification that we're

20   asking for is for the Court to say Google cannot

21   offer testimony about delisting dates.  That is,

22   sort of, a back-ended way of saying, oh, it's the --

23   the relevant document is this other one we gave you.

24   I think Google has had multiple chances to make that

25   representation and has declined to do so.

```
 1              THE COURT:  There's a word for this, not so
 2    much in litigation, but maybe it's applicable here.
 3    The word is -- phrase is "mission creep."  I think
 4    what I'm seeing here is some mission creep on the
 5    part of the plaintiffs.  And in response, I'm seeing
 6    some mission creep on the part of Google as well in
 7    terms of its proposed alternative form of order.
 8              I really don't see either -- number one, I
 9    don't see the need for any further order at this
10    stage of the case.  You've barely begun taking
11    depositions, right?
12              You haven't taken party depositions yet.
13              MR. KANE:  That's correct.
14              THE COURT:  No one has, obviously,
15    submitted any summary judgment materials yet.  And I
16    think you are trying to anticipate and get some
17    pre-testimony guardrails from the Court as to what
18    kinds of testimony might or might not run afoul of
19    the order which I have already issued, and I don't
20    think that is a helpful or useful exercise in the
21    absence of any actual testimony.
22              MR. KANE:  Okay.  If that's your Honor's
23    position, what we would ask for is simply a
24    clarification from the Court that any documents
25    concerning delisting dates were due on January 6th.
```

1          In other words, there will be a dispute
2     somewhere down the line where someone will testify
3     something about delisting dates, and we will be
4     arguing, look, Google, because you didn't produce
5     any documents about this, you can't offer testimony
6     about it.
7               THE COURT:  On --
8               MR. KANE:  We simply want it to be clear --
9               THE COURT:  On October the 15th, at Docket
10    221, in paragraph -- let's see what paragraph this
11    was.
12          On page 3, I said -- this is the entire
13    thing, one slim paragraph:  "If Google possesses
14    documents or data sufficient to identify the date on
15    which it delisted each of the challenged domains, it
16    must produce those documents or that data no later
17    than November 13, 2025.  Google will be precluded
18    thereafter from introducing or relying upon any
19    newly identified or newly produced documents or data
20    for that purpose.  Consequently, November 13th
21    having come and gone, Google is now precluded from
22    introducing or relying upon newly identified or
23    newly produced documents or data for the purpose of
24    identifying the dates on which it delisted any of
25    the challenged domains."

1              I don't think that requires further
2    clarification.  I thought it was pretty clear.
3              MR. KANE:  All we're trying to prevent is
4    from Google coming in and saying, we have testimony
5    that is not tied to the particular -- to the
6    delistings of the particular URLs in this case and
7    trying to set --
8              THE COURT:  Okay.  But we don't know what
9    they're going to say or how close to the line
10   they're going to try to walk, right?  I --
11             MR. KANE:  Well --
12             THE COURT:  -- I think that's next month's
13   problem, not this month's problem.
14             MR. KANE:  Okay.  They did say to the Court
15   in their proposed order -- this is at the bottom
16   of --
17             THE COURT:  Yeah, I'm not doing that
18   either.
19             MR. KANE:  Okay.
20             THE COURT:  They're trying to do the same
21   thing.
22             MR. KANE:  Understood.
23             THE COURT:  Do I want to hear from Google
24   on this?
25             MS. TOMKOWIAK:  Your Honor, I was taught

1      when you're perceived that you are winning a motion,

2      you probably shouldn't try to convince the Court

3      otherwise.  So --

4              THE COURT:  Right.

5              MS. TOMKOWIAK:  -- we fully agree.  We

6      would be happy to rip up both of the proposed

7      orders.  And we agree that your previous order is

8      clear.  We understood it.  We understand it.  It's,

9      you know, self-effecting in and of itself.  We

10     understand it, and we intend to comply with it.

11             THE COURT:  All right.  So plaintiffs'

12     December 5, 2025 motion for a further preclusion

13     order is denied as unnecessary.  The Court does not

14     deem any further order or "clarification" required.

15             Let me propose that we take a little break

16     at this point, a short one.  If I say five minutes,

17     that will be ten, so why don't I try to make an

18     honest woman of myself and say ten and try to keep

19     it to ten, and then come back to discuss the

20     defendant's December 5th motion regarding the

21     publisher's DMCA enforcement efforts.  And then

22     before we leave this afternoon, we'll talk

23     scheduling.

24             All right.  So we'll be in recess for ten

25     minutes.

```
 1                (A recess was taken.)

 2           THE DEPUTY CLERK:  We're now back on the

 3      record in the matter of Cengage Learning, Inc., et

 4      al. v. Google LLC; Case Number: 24-cv-4274.

 5           THE COURT:  All right.  For our last

 6      written motion of the day, we have the defendant's

 7      December 5, 2025 discovery motion originally filed

 8      at Docket 376.

 9                If I understand the issues properly --

10      which I may not, but we'll find out -- the defendant

11      seeks essentially to enforce a discovery compromise

12      reached a year ago under which the plaintiffs agreed

13      to provide, as relevant here, two categories of

14      documents:  The first concerning studies or research

15      with respect to the infringement of their works; the

16      second, documents relating to the strategy or

17      effectiveness of their DMCA enforcement efforts,

18      limited -- this was the deal, as I understand it at

19      the time -- limited to enforcement efforts on Google

20      Shopping.

21                Defendant now takes the position that the

22      plaintiffs have not adequately complied with what

23      they said they were going to do.  And the defendant,

24      as I understand it, blames plaintiffs' -- what

25      defendant believes to be plaintiffs' overly
```

1    aggressive withholding on privilege grounds as the

2    primary culprit for why the documents that the

3    defendant thought it was going to get have not been

4    produced.

5        So, Ms. Bladow, what am I missing there?

6        MS. BLADOW:  I believe that framing is

7    generally our view of this motion as well.

8        In terms of -- I would, kind of -- I think

9    about this motion in terms of the two separate parts

10   of the motion.  So with respect to the first part,

11   what we're asking the Court to order is a kind of a

12   search of non-custodial documents.

13       We're not necessarily asking for new search

14   terms or new custodians here, but asking for a

15   search for these documents without this overly

16   narrow limitation of documents touching on Google

17   Shopping.

18       THE COURT:  So the first category as

19   described in your moving letter is "documents

20   reflecting studies or research concerning

21   infringement of plaintiffs' asserted works and

22   plaintiffs' works generally."

23       That's your shorthand.

24       MS. BLADOW:  Yes.  And that first

25   category --

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  And you say that only Cengage

2     has actually come up with anything.

3          MS. BLADOW:  Correct.

4          THE COURT:  Okay.  And what do you want the

5     plaintiffs to do in order to carry through with what

6     they told you they would do a year ago?

7          MS. BLADOW:  So they told us that they

8     would search for -- they would limit these to

9     documents related to Google Shopping.

10         THE COURT:  These two categories?

11         MS. BLADOW:  Correct.

12         And we want plaintiffs to search for

13    documents not just related to Google Shopping.  Or

14    if they don't have these types of documents, then,

15    you know, they should be ordered to produce this,

16    kind of, broader view of documents by a date

17    certain.  If they have them, they have them; if they

18    don't, they don't.

19         THE COURT:  I'm sorry.  Let me make sure I

20    understand you.

21         So you're no longer happy with the

22    limitations that were discussed last year.

23         MS. BLADOW:  Right.  Because the

24    limitation -- it appears that the limitations that

25    were imposed on these two categories, only one of

1    the four plaintiffs has any responsive documents.

2    So to the extent there are, right, studies or

3    research about infringement or document -- like,

4    high-level documents reflecting the strategy or

5    effectiveness of their DMCA efforts, we believe that

6    those are relevant, again, to building our defense.

7         And these -- as opposed to a custodial

8    search using search terms, this is a non-custodial

9    search.  The documents we have from Cengage were not

10   produced from a custodial file.

11        To the extent they have these types of

12   documents in their possession that aren't touching

13   on Google Shopping specifically, we want them to

14   have to produce those documents by a date certain.

15        THE COURT:  Okay.  Let me make sure I'm

16   following along here at home.

17        The first thing you want is you want the

18   plaintiffs to perform a non-custodial search for

19   "documents reflecting studies or research concerning

20   infringement of plaintiffs' asserted works and

21   plaintiffs' works, generally," not limited to Google

22   Shopping.

23        MS. BLADOW:  Correct.

24        THE COURT:  That's a pretty big ask, isn't

25   it?

1          MS. BLADOW:  Well, our understanding is

2     that they found the Cengage documents that they

3     produced in non-custodial files, and so these --

4          THE COURT:  Not the non-custodial versus

5     custodial part of it.  It's the "why do you get all

6     this" part of it that is giving me pause.

7          As we touched on in a preliminary manner

8     earlier this afternoon --

9          MS. BLADOW:  Right.

10         THE COURT:  -- this is a case about Google

11    Shopping.  It's not a case about whether the

12    plaintiffs have been injured by misconduct on -- to

13    use as a hypothetical example, misconduct that takes

14    place on Bing or --

15         MS. BLADOW:  Right.

16         THE COURT:  -- the effectiveness of its

17    antipiracy program as it relates to Bing or how much

18    money its lost through Bing.

19         MS. BLADOW:  It might be helpful to take a

20    look at a copy of plaintiffs' complaint just to

21    ground the discussion of relevance in their

22    allegations.  And I have a copy for the Court, if

23    that would be helpful, as well as one for opposing

24    counsel.

25         THE COURT:  That would be fine.  If it

1    doesn't weigh too much, you can hand it up.

2            Thank you.

3            MS. BLADOW:  So for Category 1, I want to

4    start with paragraph 78 of plaintiffs' complaint --

5            THE COURT:  Okay.

6            MS. BLADOW:  -- which asserts that those

7    looking to purchase the publishers' works find the

8    pirate sites predominantly or exclusively through

9    Google.  It makes similar allegations in paragraphs

10   7, 15, 119, 126 and 133 of their complaint.

11           We're entitled to discovery to test that

12   allegation, whether or not those looking to purchase

13   the publishers' works actually do predominantly or

14   exclusively find those sites through Google.

15           THE COURT:  Well, that is a much narrower

16   and more surgical question and would produce a much

17   narrower and more surgical discovery demand than the

18   one you're asking me to compel them to respond to

19   now.

20           MS. BLADOW:  Okay.

21           THE COURT:  I don't know that you ever

22   served that narrower, surgical demand tied to

23   paragraph 78.  Did you?

24           MS. BLADOW:  I believe we did.

25           THE COURT:  And did you make a motion on

1    it?

2            While you're looking, let me, sort of,

3    share a high-level thought with you.

4            I have presided, as you can imagine, over a

5    number of infringement cases, copyright and

6    trademark infringement cases.  I recently did one --

7    I mention it only because it's top of mind -- where

8    a particular manufacturer was suing a particular

9    online marketplace where various pirates were

10   alleged to be selling counterfeit copies of, in this

11   case, physical goods:  Clothing, accessories, that

12   sort of thing.  And in these complaints -- and I see

13   a lot of these complaints because, just like the

14   publishers here brought a series of pirate suits,

15   manufacturers tend to bring suit after suit after

16   suit every time they notice some new counterfeiter

17   or other infringement going on.

18           Of course, there are a few paragraphs of

19   lofty rhetoric in the complaint saying, this is a

20   terrible problem.  This is a big problem.  Worldwide

21   counterfeiting has increased this much since this

22   date, what have you, sort of, by way of background,

23   but that doesn't give the defendants in those cases

24   carte blanche to do discovery into all of the

25   infringement, all of the counterfeiting, all of the

1      bad things which have been inflicted by all of the

2      dishonest citizens of the world on this particular

3      plaintiff.

4             You really need to tie your discovery

5      demands to -- not the rhetoric in the complaint, but

6      as Rule 26(b)(1) says, the claims and defenses in

7      the case.

8             MS. BLADOW:  Okay.  So looking at paragraph

9      47, which alleges that --

10            THE COURT:  We're going to 47 now.  Give me

11     a minute.

12            MS. BLADOW:  -- alleges that infringing

13     Shopping ads are extremely effective at diverting

14     would-be purchasers of the publishers' textbooks to

15     buy infringing works instead of legitimate copies.

16            We served a discovery request, RFP 56,

17     seeking all documents and communications concerning

18     your contention that Google's infringing Shopping

19     ads are extremely effective at diverting would-be

20     purchasers of the publishers' textbooks to buy

21     infringing works instead of legitimate copies.

22            Presumably, counsel had a factual basis for

23     making that allegation, and yet I have seen none in

24     their discovery.

25            THE COURT:  Okay.  But that's not the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    subject of the motion you have before me today.

2            MS. BLADOW:  That is the subject.

3            THE COURT:  Show me.  Draw me the

4    connection, please, because --

5            MS. BLADOW:  It's the documents reflecting

6    studies or research concerning infringement of

7    plaintiffs' asserted works.  If our client --

8            THE COURT:  Yes, but paragraph 47 --

9            MS. BLADOW:  If these ads are so effective

10   at diverting them --

11           THE COURT:  But paragraph 47, counsel,

12   doesn't say the world is extremely effective at

13   diverting; it says Google's infringing Shopping ads

14   are extremely effective at diverting.  So doesn't

15   that tally with the limitation that the plaintiffs

16   have insisted upon?

17           MS. BLADOW:  No, because it's generally

18   what is the purchasing behavior?  What is the

19   purchasing behavior of the people who are shopping

20   for their works?  And that the behavior pattern

21   of --

22           THE COURT:  Well, you are expanding and

23   interpreting the plaintiffs' complaint so as to

24   justify your expanded vision of discovery.  That's

25   not the way it works.

1          The motion before me started with a set of

2    RFPs that were served over about a year ago.

3          MS. BLADOW:  I mean, if we want to go back

4    to what they agreed to do a year ago and provide

5    documents reflecting studies or research concerning

6    infringement of plaintiffs' asserted works or works

7    generally with respect to Google Shopping, we don't

8    have any for three of the four plaintiffs.

9          THE COURT:  Right.  And you think that's

10   because they're being overly aggressive with

11   their -- I think you think that's because --

12         MS. BLADOW:  Correct.

13         THE COURT:  -- they're being overly

14   aggressive with their privilege log, right?

15         MS. BLADOW:  Correct.

16         THE COURT:  I'm certainly willing to hear

17   that, but to the extent your motion is asking me --

18   and it is, in part.

19         To the extent your motion is asking me, in

20   January of 2026, to rule that the limitation that

21   plaintiffs imposed and that you've lived with for a

22   year now -- the limitation that plaintiffs imposed a

23   year ago limiting their responses to the subject

24   RFPs to documents relating to Google Shopping -- to

25   the extent you're asking me to tell them to take

1   that limiter off and give you everything they've got

2   with regard to their monitoring, their enforcement,

3   their research, et cetera, regarding infringement

4   across all channels, I don't see a basis for doing

5   that.

6        MS. BLADOW:  I think that to the extent

7   that where we're disagreeing is where I see factual

8   allegations in a complaint that should be supported

9   by something, other than plaintiffs' attorneys'

10  say-so where you see rhetoric.  I think that may be

11  the disconnect.

12        THE COURT:  Well, again, discovery is

13  bounded by the claims and defenses in the case.  And

14  I'm asking myself, and I'm sure you've asked

15  yourself as well, how is this going to be relevant

16  at trial?

17        What is it going to be submitted for?

18        MS. BLADOW:  Again, it's relevant to

19  damages, causation.

20        To the extent they plan to show up at trial

21  and make these same lofty statements, Google is

22  entitled to documents that rebut that.  Even to the

23  extent that plaintiffs have high-level documents

24  that are not specific to Google Shopping that

25  they're withholding just because they're not

AMM TRANSCRIPTION SERVICE - 631.334.1445

1     specific to Google Shopping, like, those are the

2     documents that we're looking for.

3            THE COURT:  All right.  So let's do a

4     thought experiment.

5            Paragraph 47 of the complaint, which you

6     pointed me to a moment ago, alleges that Google's

7     infringing Shopping ads are extremely effective at

8     diverting would-be purchasers of the publishers'

9     textbooks to buy infringing works instead of

10    legitimate copies.

11           Now, if any one of these publishers has a

12    study sitting in a desk drawer somewhere that

13    somehow manages to track or draw some conclusions

14    about how effective Google's infringing Shopping ads

15    are at diverting would-be purchasers of the

16    textbooks to go to pirate sites instead, sure.  That

17    strikes me -- assuming that you asked the correct

18    question in one of your RFPs, that strikes me as

19    something that comes within the scope of relevance

20    here.

21           But let's suppose that the only thing

22    Google actually has -- I'm sorry -- the only thing

23    plaintiffs actually have sitting in their desk

24    drawer is some high-level academic study about -- I

25    don't know -- consumer behavior, generally, and you

1      know, whether consumers prefer to buy cheap products
2      compared to expensive products, even if they're a
3      little dicey.  Do you get all that, do you think?
4           Obviously, this is a hypothetical example
5      that I'm making up.
6           MS. BLADOW:  No, I think it's still tied to
7      infringement.  It's not necessarily every study
8      reflecting consumer behavior, but to the extent that
9      it's tied to consumer behavior with respect to
10     infringing copies of plaintiffs' works, that is
11     something that we --
12          THE COURT:  Now, suppose our hypothetical
13     study which was prepared by Professor XYZ, marketing
14     professor, whatever, says, you know, consumers would
15     rather buy cheap products compared to expensive
16     products.  And this goes for college students as
17     well, particularly because they tend to be, kind of,
18     poor.  And, therefore, applying basic principles of
19     psychology, I, Professor So-and-So, think that an ad
20     offering a pirate copy of an economics textbook
21     would be attractive to a college student who is
22     trying to take Econ 101.
23          MS. BLADOW:  No, I think the limiting
24     principle here is "plaintiffs' asserted works or
25     their works, generally."  And the example you've

```
1    just given is like a general consumer study not tied
2    to their asserted works or their works.
3             THE COURT:  Right.  Right.
4             MS. BLADOW:  So to the extent the
5    consumer --
6             THE COURT:  So now give me an example of
7    something you think you are entitled to but that
8    you're not getting because of Google's -- sorry --
9    plaintiffs' insistence that this category of
10   discovery be related to Google Shopping.
11            MS. BLADOW:  So general studies or research
12   concerning the infringement of these particular
13   works or their works, generally -- to the extent
14   there's some study saying, our works are infringed X
15   time.  Here's the proportion of e-books that are
16   infringing -- for example, ████████████████████████
17   ████████████████████████████████████████████████
18   ████████████████████████████████████████████████
19   ████████████ -- those types of studies or research
20   concerning the infringement of their works is
21   something that we are entitled to.
22            THE COURT:  You're not convincing me that
23   there's a category of documents out there that come
24   within Rule 26(b)(1) and that you're unfairly not
25   getting because Google wishes to limit its
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    production in these two categories to documents

2    pertaining to you; that is, to Google Shopping.

3        MS. BLADOW:  So what we have seen in the

4    two to four documents we have from Cengage is that

5    these plaintiffs do have data and analysis of

6    infringement of their works.  The handful that we

7    have from Cengage --

8        THE COURT:  Well, I'm sure they do because,

9    as we've discussed in many other contexts, they

10   monitor, they follow, they have folks out there,

11   BCGuardian, looking at what's happening on this

12   platform, what's happening on that platform, what's

13   happening on this marketplace, what's happening on

14   the other marketplace.

15       Isn't this just your newest theory as to

16   why you want to see the data from Bing as well as

17   the data from Google Shopping?

18       MS. BLADOW:  No.  It's where we were

19   searching for custodial documents given the lack of

20   custodial productions.

21       Here, we're asking for plaintiffs to

22   confirm that they've actually done a thorough search

23   for these studies that are relevant to Google being

24   able to mount a defense to their allegations of

25   harm, and it shouldn't be limited to research

1     studies that maybe include the word "Google" in it.

2     So the only documents we have from Cengage are ones

3     that include the word "Google" in them.  There are

4     likely others that maybe do not specifically address

5     Google or discuss Google, but may talk about the

6     asserted works, generally -- asserted works or

7     plaintiffs' works, generally, and we're entitled to

8     that information.

9            THE COURT:  All right.  What else would you

10    like to tell me?

11           Do you want to discuss the privilege

12    issues?

13           MS. BLADOW:  Yes.

14           So this dispute is distinct from the prior

15    dispute.  Whereas the prior dispute was focused on

16    plaintiffs' waiver of privilege by sharing documents

17    with third parties, this dispute concerns whether

18    the documents are privileged in the first instance.

19           I recognize that your Honor's earlier

20    ruling today may apply to some of these categories,

21    but not necessarily all of these categories.

22           THE COURT:  Three, I think.  Yeah.

23           Okay.  Go ahead.

24           MS. BLADOW:  So starting with the first

25    category, there are about 413 documents on

1    plaintiffs' log that are e-mails titled ██████████

2    ████████████████████████████████

3            We've received --

4            THE COURT:  I happen to have the privilege

5    log right here.  You want to point me to an example

6    that we can look at together?

7            I think you're the right person to ask

8    because it's your declaration, and you -- you're the

9    one who went through the privilege log and put these

10   categories together, right?

11           MS. BLADOW:  Correct.

12           I am looking through my declaration to

13   identify a row number.

14           THE COURT:  Sure.  Good idea.

15           MS. BLADOW:  So it --

16           THE COURT:  Ah.

17           MS. BLADOW:  Row 11.

18           THE COURT:  Uh-oh.  The row is the far

19   left-hand column?

20           MS. BLADOW:  I believe so.

21           THE COURT:  All right.  I'm looking at row

22   11, I think.

23           MS. BLADOW:  There -- we may also be

24   referring to the -- there are, like, specific

25   numbers for -- do you have two rows of numbers next

         AMM TRANSCRIPTION SERVICE - 631.334.1445

1    to each other on the far left?

2            THE COURT:  I do not.  I'm looking at

3    the -- I hope I'm looking at the right thing.

4            I'm looking at what I understand to be

5    plaintiffs' fifth privilege log, filed on the docket

6    as 305-1.

7            I hope I'm looking at the correct

8    iteration.  It's dated November 19th of 2025.

9            MS. BLADOW:  Yeah.  So, I believe, row 11.

10           THE COURT:  So what I have is row 11 --

11           MS. BLADOW:  You have --

12           THE COURT: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16           MS. BLADOW:  Yes.

17           THE COURT:  Am I looking at the right

18    thing?  Okay.

19           MS. BLADOW:  Yep.  Yes.

20           THE COURT:  All right.

21           MS. BLADOW:  That's an example of one of

22    these documents.

23           THE COURT:  Okay.

24           MS. BLADOW:  So BCGuardian has produced

25    e-mails containing the same title, and they've

1    generally provided those in redacted form.  We've

2    reviewed the documents, and they don't appear to

3    contain privileged information.

4        The only information that's redacted in

5    those e-mails are factual information, the results

6    of BCGuardian's monitoring, including ██████████

7    ██████████████████.  And based on our review of

8    those documents, plaintiffs are inappropriately

9    withholding these similar communications that

10   contain only factual details.  Even if there's some

11   portion of the e-mails that contain legal analysis,

12   BCGuardian's production makes it clear that that

13   analysis could likely be redacted.

14       THE COURT:  Well, there is substantial

15   overlap here, it looks like to me, between the item

16   that we're looking at and the exemplars that I

17   reviewed in camera in connection with the last

18   privilege motion.

19       I understand that one of the issues that

20   was present then is not present now, namely, the

21   presence of Pearson as a possible trigger of a

22   waiver.  But the underlying questions are the same,

23   aren't they, including whether BCGuardian's work

24   qualifies for the attorney-client privilege --

25   sorry -- for the attorney-work-product doctrine, and

1    secondly, whether e-mails from O & Z discussing

2    BCGuardian's work is both privileged because it's

3    confidential and discusses legal strategy matters

4    and is also protected by the work-product doctrine

5    because all of this stuff was done in support of the

6    plaintiffs' antipiracy campaign, which includes, as

7    a significant component, both the pirate lawsuits

8    and planning for and now pursuing this lawsuit as

9    well, right?

10          That's going to be the argument of

11   plaintiffs', I assume.

12          Plaintiffs?  Hello, plaintiffs.

13          MS. MURPHY:  Correct.

14          THE COURT:  All right.

15          And look, unquestionably, these BCGuardian

16   documents are going to include a lot of facts and,

17   unquestionably, they're going to be "routine" in the

18   sense that I'm sure they did certain things on a

19   regular basis -- weekly, monthly, whatever -- that

20   was part of their job.

21          But I'm not sure that the -- that either of

22   those factors takes either the BCGuardian work or

23   the e-mails discussing the BCGuardian work out of

24   either the attorney-client privilege or the

25   work-product doctrine.

1          Now, I say that, obviously, not having

2    looked at examples of all of the different kinds of

3    BCGuardian documents with different titles.  It's

4    possible that some of them may be less litigation

5    oriented than others.  I can't say, as I sit here

6    today.

7          But my concern is that Google has taken,

8    with regard to BCGuardian's work, you know, what I

9    think of as a very -- ah, reasonably aggressive

10   position that, basically, none of this could

11   possibly be protected by the work-product doctrine

12   because, look, they do it every week or they do it

13   every month and the reports are full of facts.  And

14   I just don't think that gets you where you need to

15   go.

16          MS. BLADOW:  Well, factual information,

17   even if it's work product collected in the course of

18   an investigation to initiate a litigation, is not

19   protected.  It's the analysis of it.

20          THE COURT:  No, that's not true, actually.

21          It still may be protected by the

22   work-product doctrine.  The work-product doctrine

23   does not require that the document contain legal

24   analysis, it just requires that it be prepared in

25   anticipation of litigation.

```
 1              MS. BLADOW:  Moving to the next category,
 2     there are about 270 documents on plaintiffs' log
 3     that are e-mails titled ████████████████
 4              Plaintiffs have --
 5              THE COURT:  Sorry, which category is this?
 6              MS. BLADOW:  The 270 documents with e-mails
 7     titled ██████████████████
 8              THE COURT:  270.  I'm sorry.  I'm looking
 9     at your moving letter, and you say -- I thought your
10     first category was the 164 documents asserting only
11     the attorney-client privilege, which we were not
12     doing just then.
13              Your second category was the 25 documents
14     described as EPEG planning presentations.  I think
15     you're looking at a different list of categories
16     than I am.  Are you going off of your declaration?
17              MS. BLADOW:  Both my declaration and the
18     motion.
19              So I say, to start, plaintiffs fully
20     withhold approximately 1,975 documents.  Of these
21     documents, 413 are e-mails with the subject line
22     ████████████████████████████████████████████████
23     ██████
24              So that's the first category we just talked
25     about.
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          THE COURT:  Ah, okay.  I'm with you now.

2     Thank you.

3          MS. BLADOW:  And then 270 are e-mails with

4     the subject line ▨▨▨▨▨▨▨▨▨▨▨

5          THE COURT:  Right.

6          MS. BLADOW:  Plaintiffs have produced at

7     least one e-mail with this title which we've

8     reviewed, and the e-mail does not contain privileged

9     information, analysis or strategy, and merely shares

10    copies of BCGuardian's research which I believe was

11    withheld.  I have copies of that.

12         THE COURT:  You have a copy of the one that

13    you did see?

14         MS. BLADOW:  Yes.

15         THE COURT:  All right.  I've just received

16    a copy of a document labeled with the Bates number

17    ending 5153; is that right?

18         MS. BLADOW:  Yes.

19         THE COURT:  And this is an October 28, 2021

20    e-mail from someone at McGraw Hill; is that right?

21         MS. BLADOW:  Yes.

22         THE COURT:  To folks at -- what is

23    Corsearch.com?

24         MS. BLADOW:  Corsearch is another one of

25    their enforcement vendors.

1    THE COURT:  Okay.  So here is ▓▓▓▓▓▓▓▓▓▓

2    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5    Do we have the spreadsheets?

6    MS. BLADOW:  No.  I believe those were

7    withheld.

8    THE COURT:  I see.

9    MS. BLADOW:  And so the subject line here

10   is the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓with a date.

11   What we are saying is that this e-mail was

12   produced.  It clearly doesn't contain any privileged

13   information.  I think we would dispute that the

14   attached documents are privileged or work product.

15   THE COURT:  All right.  So your working

16   assumption is that these -- I assume there's a

17   series of them probably every week.

18   Your working assumption is that the ▓▓▓▓

19   ▓▓▓▓▓▓▓▓▓▓ should not be withheld --

20   MS. BLADOW:  Correct.  There are about --

21   THE COURT:  -- whether attached to e-mails

22   or whether standing alone.

23   MS. BLADOW:  Correct.  There are about 270

24   e-mails with this subject line or similar on the

25   log.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              THE COURT:  Okay.
 2              And I take it that these ▨▨▨▨▨▨
 3   ▨▨▨▨▨, some of them include marketplaces other
 4   than Google and some don't; is that right?
 5              Or do they all look like this one, as far
 6   as you know?
 7              MS. BLADOW:  I don't know because they've
 8   been withheld.
 9              THE COURT:  Okay.  But this one, insofar as
10   the e-mail correctly identifies it, deals with
11   Google and with another platform, right?
12              MS. BLADOW:  Correct.
13              THE COURT:  All right.  So that's the 270
14   e-mails.
15              MS. BLADOW:  So then the next category of
16   documents -- it will be the next paragraph of my
17   motion -- are the attached Excel sheets.
18              By our count, there's about 754 of those
19   that are purporting to summarize the results of
20   BCGuardian's monitoring and enforcement runs --
21              THE COURT:  Right.
22              MS. BLADOW:  -- which I understand may be
23   covered by your prior ruling.
24              THE COURT:  Well, if they're the same type
25   of document, I think they would be.
```

1          MS. BLADOW:  Let's see.

2          THE COURT:  Keeping in mind again that what

3     I found with respect to the ones that I reviewed in

4     camera were that they were prepared at the direction

5     of counsel in anticipation of litigation making them

6     work product.

7          This may or may not be a good time for me

8     to just remind counsel on both sides of the aisle

9     here that materials withheld as attorney-client --

10    well, more likely, attorney -- materials withheld as

11    under the work-product doctrine often lose that

12    status when we get into expert discovery because

13    once a party decides they want to use that data to

14    support their damages analysis or some other expert

15    report that they're preparing, and they give that

16    data to their expert, now they have to give it to

17    the other side as well.  But we're not there yet.

18         MS. BLADOW:  Correct.

19         I want to touch on a handful of, kind of,

20    other high-level documents that are covered on the

21    fourth page of our motion, in particular, the second

22    set of documents that are described as ▪▪▪▪▪▪▪

23    ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

24    ▪▪▪▪▪▪▪

25         We haven't received an explanation of how

1    ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ could possibly reflect

2    legal analysis such that they should be withheld.

3    And based on the log descriptions we have, it

4    appears that they're being -- these types of

5    documents are being withheld because they're

6    attached to e-mails between an attorney-client, but

7    not necessarily because those documents themselves

8    are privileged.

9            THE COURT:  So these documents consist of a

10   cover e-mail plus some attachment?

11           Maybe you could give me an example.

12           Declaration, paragraph 13.  Let's see what

13   you say in your declaration, paragraph 13.

14           MS. BLADOW:  So rows 354, 356, 358 ...

15           THE COURT:  Let's start with 3- -- what did

16   you say?  354?

17           MS. BLADOW:  354.

18           THE COURT:  Let's see.  I am rapidly losing

19   my eyesight, but it's not completely gone.

20           354.  All right.  I'm there.

21           354 is a -- the unified title is ▨▨▨▨

22   ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ correct?

23           MS. BLADOW:  Correct.

24           THE COURT:  All right.  Let's see what

25   plaintiffs say about this.

```
 1           They say ▨▨▨▨▨▨▨▨▨▨▨▨▨▨
 2  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
 3  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
 4  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
 5  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
 6  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
 7  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
 8  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
 9  ▨▨▨▨▨▨▨▨▨▨▨▨▨▨
10           So the plaintiffs here are taking the
11  position that whatever's in that planning document
12  includes, among other things, planning for these
13  litigations, I guess.  That's how I read it.
14           And you think that's not true?
15           MS. BLADOW:  At least, it contains
16  information that's not necessarily privileged or a
17  work product.
18           THE COURT:  All right.
19           MS. BLADOW:  Perhaps a better example would
20  be row 756.
21           THE COURT:  Hold on.
22           756.  All right.
23           MS. BLADOW:  So that --
24           THE COURT:  This is the ▨▨▨▨▨▨▨▨▨▨
25  ▨▨▨▨▨▨▨▨▨▨ docs?
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

 1          MS. BLADOW:  Correct.

 2          THE COURT:  Okay.  And according to the

 3   plaintiffs, again, in the same language that we've

 4   seen before, this concerns enforcement of copyright

 5   and trademark rights, et cetera.

 6          You know, I don't know what this document

 7   is, obviously, but, sort of, a likely speculation,

 8   easy speculation for me to make, would be, hey,

 9   here's a copy of the press release that we're going

10   to issue when we file our next pirate suit.

11          Wouldn't that make it work product?

12          MS. BLADOW:  Not necessarily if it's, say,

13   the final copy of a press release that they issued.

14   That would be public information.

15          THE COURT:  Yeah, but you would already

16   have that if it's a final copy of a press release

17   that they issued.

18          MS. BLADOW:  If they properly did their

19   privilege review, we would, but I don't -- I don't

20   know.  That's why we're asking for in-camera review

21   of a sampling from each of these categories.

22          THE COURT:  Well, speaking of in-camera

23   review, let's suppose, hypothetically, that I called

24   for in-camera review of this particular document and

25   it turns out that the cover e-mail says, here's our

1     proposed press release for this lawsuit that we're

2     going to file tomorrow, and attached is a proposed

3     press release.

4            Now, am I, Judge Moses, supposed to go out

5     and figure out for myself whether this is the final

6     copy or whether a semicolon was changed to a

7     paragraph between that copy and the one which is, in

8     fact, released as a press release a day or two days

9     later?

10           I mean, what's my job here?

11           MS. BLADOW:  I think to evaluate if the

12    e-mail was sent or received with the purpose of

13    seeking legal advice or advancing litigation.

14           THE COURT:  That's the privilege analysis,

15    but we have to pay attention to work product as

16    well.

17           MS. BLADOW:  Right.  So reviewing it and

18    assessing whether or not, in your view, it's work

19    product.

20           THE COURT:  Right.  Which it sounds like,

21    based on what you just told me about whether a draft

22    press release is or isn't work product, would

23    require that I go out and find the final press

24    release and compare.

25           MS. BLADOW:  I don't necessarily think

1  that's true.  I think, based on the e-mail -- the

2  cover e-mail exchange, and to the extent there are

3  track changes in the document, you can understand

4  whether or not it's a draft or it's final or what

5  the state of it is.

6          THE COURT:  Okay.  What else do you want to

7  tell me?

8          MS. BLADOW:  Rows 387 and 388.

9          THE COURT:  All right.  387.

10         Ah, we're going backwards.  That's okay.

11         387 and 388.  All right.  I'm there.

12         MS. BLADOW:  So these are documents that

13  are described as including --

14         THE COURT:  ████████████████  Yes.

15         MS. BLADOW:  ██████████████████████████

16         And to the extent that they -- EPEG Group

17  isn't solely focused on bringing litigation against

18  large companies.  Presumably, there's some planning

19  in there and budgeting that's not necessarily work

20  product in anticipation of litigation or protected

21  by the attorney-client privilege.

22         THE COURT:  Okay.  So let's -- let's

23  suppose, hypothetically, that the ████████████

24  ██████████████████████████  include -- obviously,

25  I haven't seen these, so I'm speculating about what

          AMM TRANSCRIPTION SERVICE - 631.334.1445

1    they are.  But let's, sort of, think about what's a

2    likely -- think about what you're anticipating we're

3    going to see here.

4          Let's suppose that it's a presentation

5    which says, okay, here's the money that we're going

6    to spend on our antipiracy campaign in -- what year

7    is this for?  2023.

8          We're going to spend this many millions of

9    dollars suing the pirates:  Lawyer fees, consulting

10   fees, whatever.  We're going to spend this many

11   million dollars on our PR firm, which is going to

12   engage in various nonlegal efforts.

13         We're going to spend this many millions of

14   dollars lobbying Congress to tighten up the rules,

15   and we're going to spend this many million dollars

16   trying to come up with -- I'm totally making this up

17   now -- trying to come up with new technology to

18   encrypt our textbooks so that they're harder to rip

19   off.

20         You would say that only the part dealing

21   with the litigation budget would be work product, I

22   assume, correct?

23         MS. BLADOW:  Correct.

24         THE COURT:  Okay.  Now, as for the rest of

25   it, what is it relevant to?

```
 1          MS. BLADOW:  It's relevant to the
 2   enforcement activities that the plaintiffs are
 3   undertaking.  As part of statutory damages, that
 4   analysis considers not just the defendant's conduct,
 5   but also plaintiffs' conduct and their efforts or
 6   lack thereof in enforcing their copyrights.
 7          THE COURT:  Explain that to me because, as
 8   far as I know, there's no contributory negligence or
 9   comparative negligence doctrine or similar in
10   copyright or trademark infringement.
11          MS. BLADOW:  So, your Honor, it's on the
12   log, so presumably plaintiffs can see that this
13   document is responsive.  Just because the privileged
14   content might be --
15          THE COURT:  I understand.  And my suspicion
16   is because there's a litigation budget in there
17   somewhere, but I'm -- I'm speculating.
18          MS. BLADOW:  But just because the
19   litigation -- like, just because some portion of it
20   may be redactable doesn't mean that the rest of it
21   shouldn't be produced.  And just because the --
22   like, what might be responsive is being redacted
23   doesn't mean that the rest of it shouldn't be
24   produced.
25          THE COURT:  Well -- so now we have two
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    concepts frequently deployed in federal discovery

2    disputes which may be in opposition to one another

3    here.  One is the concept that you don't get to

4    redact for relevance, generally speaking, right?

5            If a portion of a document is relevant and

6    responsive to a legitimate discovery request, the

7    general rule is that the party who gets that request

8    has to produce the whole document and can't x out

9    the portions that are irrelevant unless he has some

10   other reason for x-ing out those portions, like

11   they're privileged or they're highly confidential or

12   they involve trade secrets or this, that and the

13   other thing.

14           So that's one concept.  But the other

15   concept is you're generally not entitled to get

16   irrelevant documents which are not responsive to a

17   discovery demand that falls within the bounds of

18   Rule 26(b)(1).  And here, it sounds like you're

19   saying that, even if the only relevant thing in the

20   whole document is withholdable on privilege grounds,

21   we still get to see the other 90 percent of the

22   totally irrelevant document because, you know, it's

23   not a trade secret.

24           Does that sound right?

25           MS. BLADOW:  I believe that's consistent

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    with a number of ESI protocols I've seen and worked

2    on.  So I think it's to the extent that plaintiffs

3    are withholding responsive documents that are not

4    actually privileged, they should be produced.

5             THE COURT:  Sure.  I mean, as a general

6    proposition --

7             MS. BLADOW:  All that, yeah.

8             THE COURT:  -- we can all agree on that.

9             All right.  I'm just not sure you've made

10   an adequate case that the plaintiffs are doing it

11   wrong, that they are improperly withholding, as

12   either privilege or work product, documents that

13   they don't have a legitimate basis for so

14   withholding.

15            Let me hear from plaintiffs on that.  And I

16   also -- I want to hear from plaintiffs to the extent

17   you have anything to add as to why you should

18   broaden your non-custodial search on these two broad

19   topics to include documents not touching, relating

20   or explicitly mentioning Google Shopping.

21            MS. MURPHY:  I'll start with that.

22            Plaintiffs' view is that we absolutely

23   should not be required to broaden our search.  I

24   think I covered a lot of the issues already in the

25   discussion of the last motion as to why this would

1     open floodgates to discovery that isn't relevant.

2     And --

3          THE COURT:  Well, to make defendant's

4     argument for them on this point, they are not

5     arguing in this instance that you generally have to

6     produce documents in response to all of their

7     discovery demands, regardless of whether they have

8     anything to do with Google Shopping.  They are tying

9     this to these two specific categories.

10          MS. MURPHY:  But they are incredibly broad

11     categories.  I think their description of them

12     speaks for itself.  And that's exactly why the

13     plaintiffs negotiated a compromise with them that

14     was solidified in February of last year.  I found

15     out that they had decided to go back on that the day

16     they filed this motion.

17          So we have been operating under that

18     principle because it is the right principle.  It

19     targets what's relevant in this case about Google's

20     conduct on its Shopping platform.  Plaintiffs' DMCA

21     enforcement efforts, plaintiffs' analysis of piracy

22     unrelated to Google's Shopping platform isn't an

23     issue in the case, but this was an extensive back

24     and forth, and we agreed on this approach, and then

25     Google decided that they no longer agreed, and

1    that's how we ended up here.

2            You know, they have not been able to

3    support these sweeping requests with any description

4    of, you know, again, what would be relevant in this

5    case, let alone justifying the burden, because it's

6    not -- even if this isn't custodial or search-term

7    based, it's not as if these are crafted in any way

8    to make them workable.

9            THE COURT:  Well, they're pretty broad.

10            MS. MURPHY:  Correct.

11            I'm happy to address what was raised about

12    the complaint, if your Honor would like me to do so.

13            THE COURT:  Sure.  Paragraph 47, for

14    example, whether Google's infringing Shopping ads

15    are extremely effective at diverting?

16            I mean, that actually expressly references

17    Google's Shopping ads, not other platforms, but --

18            MS. MURPHY:  Yes, and I think your Honor

19    pointed that out.

20            So, again, we did -- to the extent they

21    exist, we did agree to produce documents concerning

22    Google's Shopping ads.  You know, obviously, there's

23    background in a complaint, but if you read the

24    complaint as a whole, in terms of Google's ads, we

25    speak a lot about how they're featured at the top of

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    the webpage, how they include a copy of our own

2    clients' textbook covers.

3         That goes to effectiveness drawing the

4    consumer to them.  We speak about how the prices are

5    low.  So this doesn't speak to, did plaintiffs go

6    out and do a study to figure out, you know, what is

7    the traffic to Google's website?  This is talking in

8    general about the effectiveness of these ads, again,

9    as background.

10        And I think one of the other paragraphs

11   that was cited talked about consumers finding them

12   from Google.  And I think if you look at, for

13   example, paragraph 7 of the complaint --

14        THE COURT:  Seven?

15        MS. MURPHY:  Seven.

16        And I believe this is one that counsel

17   listed.  She had a list at one point that I didn't

18   quite catch all of them.  But we're talking about

19   the names of these sites, and this is a theme

20   throughout:  Mybambinis.shop, fairstrawberry.com,

21   matchlesscity.shop, ggetkmusicheard.com.

22        The point being these are not bookstores.

23        THE COURT:  These are not websites that you

24   would think you could purchase a textbook from

25   unless somebody pointed you there.

```
1              MS. MURPHY:  Correct.  Correct.
2              So unless you have any other questions
3    about the complaint, I don't think there's too much
4    more to say on it.  The -- Google's taking it out of
5    context.  I agreed 100 percent that in terms of,
6    like, what is actually at issue with the claims,
7    what they are seeking --
8              THE COURT:  What about the privilege point?
9    If you want to, turn to that --
10             MS. MURPHY:  Sure.
11             THE COURT:  -- for a moment.
12             Google -- this is not the first time.  May
13   not be the last time.  Google thinks you're over
14   withholding for privilege and work product, and
15   Google thinks that you're withholding a lot of stuff
16   for privilege and work product, which is more in the
17   nature of routine surveillance, which shouldn't be
18   withheld in the first place.
19             And then the additional argument which I
20   heard today, which is maybe the one you can address,
21   is, to the extent a document is logged at all -- the
22   only reason it shows up on the log is because some
23   portion of it is privileged, but only a portion of
24   it is privileged -- shouldn't you redact that
25   portion and produce the rest, even if the rest deals
```

1    with, let's say, a different marketplace or some

2    other topic that is not directly responsive to the

3    defendant's discovery demands?

4         MS. MURPHY:  I don't believe so because it

5    would -- it's only responsive with respect to the

6    information about Google.  And so it -- to the

7    extent that it's on the log, you know, just

8    hypothetically, we're talking with our clients about

9    the claims in this case and then we're obviously

10    doing a lot of work with them, each one of our

11    e-mails is not siloed into a single topic.

12         If we're also saying, hey, we have a call

13    next week, I do not think that we should have to go

14    through, painstakingly, 2,000 documents to apply

15    redactions so that they can see non-relevant

16    information, I'm not aware of any authority

17    suggesting that we would have to do that.

18         Completely understand, if there's a

19    document that contains non-relevant information and

20    relevant information, that the general rule is you

21    don't redact for relevance, but that's not what's

22    happening here.  The documents are being withheld

23    because they're privileged to the extent that they

24    talk about Google or they talk about the pirate

25    suits.  So I don't understand why, you know, the

1    burden of us doing that would be justified for no

2    reason.

3           THE COURT:  So in your view, that general

4    rule that you don't redact for relevance -- or

5    responsiveness, as it's sometimes phrased -- would

6    not apply or should not apply where everything which

7    is responsive is properly withheld as privileged.

8           MS. MURPHY:  I think that's right.

9           THE COURT:  I wonder if there's any case

10   law on that.

11          MS. MURPHY:  I'd like to provide an example

12   because I think it will ground it in the actual

13   context.

14          Google raised one of the issues.  They took

15   a lot of cherry-picking of the words and then tried

16   to make arguments based on that, but they asked for

17   an in-camera review of all e-mails on the log that

18   have the words ████████████████  Okay?

19            ███████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████

22   █████████████████████████████████

23   ████████████████████████████████████████████

24   ██████████████████████████████████

25   ████████████████████████████

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          So in that example, I think there would

2    be -- 99 percent of that e-mail would be privileged

3    to begin with.  But maybe it says at the bottom, you

4    know, we're having a meeting next week.

5          Why would it make any sense for us to go

6    through and redact that whole thing to then produce

7    the one sentence that is not technically privileged

8    and not relevant anyway?

9          THE COURT:  Well, is this a proportionality

10   argument?  Because certainly there are a number of

11   documents in the record where you have redacted the

12   privileged portions, sometimes requiring, I imagine,

13   painstaking line by line review and produced the

14   non-privileged portion, including some stuff which

15   may be completely off topic and irrelevant in the

16   non-privileged portions.

17         MS. MURPHY:  But I think that goes to the

18   first principle more where you can't redact across

19   the document for non-relevance, but you can redact

20   for privilege.  So these are -- again, these are on

21   here because they deal with our legal advice to our

22   clients about this case or the pirate suits.

23         Again, I do also want to point out the ESI

24   protocol requires us to log attachments, regardless.

25   So a lot of these are -- you know, are attachments

1      that are privileged, unless they weren't, and then
2      we produced them.  But they -- the attachment itself
3      may have no relevance whatsoever.
4             But I do want to make sure that I address
5      these categories of documents, but I was trying my
6      best to keep up.  Please stop me if I fail to ...
7             THE COURT:  I'll ask Google's counsel to
8      stop you if you --
9             MS. MURPHY:  Okay.
10            THE COURT:  -- get it wrong, and then she
11     can correct me as well.
12            MS. MURPHY:  Okay.
13            Google's counsel provided a copy of an
14     e-mail ending in Bates number 5153.  Those are the
15     last four digits.
16            THE COURT:  I have that at the bench.
17            MS. MURPHY:  So --
18            THE COURT:  And this is something,
19     obviously, that was not withheld as privileged.
20            MS. MURPHY:  The e-mail wasn't withheld.  I
21     think that she was focusing on the fact that the
22     subject matter said, ████████████████████████████
23     and said, obviously, that's not privileged.
24            First of all, it absolutely is privileged.
25     But what actually happened in this is that our

           AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    client who forwarded something to Corsearch deleted
 2    the XXXXXXXXXXXXXX
 3              THE COURT:  So you're saying that --
 4              MS. MURPHY:  It's not on here.
 5              THE COURT:  -- although it's still carrying
 6    that subject identifier, the XXXXXXXXX itself
 7    was not forwarded.
 8              MS. MURPHY:  Correct.
 9              THE COURT:  Okay.  What was forwarded?  It
10    says, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11    XXXXXXXXXXXXXXXX
12              MS. MURPHY:  The spreadsheets are work
13    product.
14              THE COURT:  All right.
15              MS. MURPHY:  And it was forwarded to their
16    vendor that was within the zone of confidentiality.
17              THE COURT:  So you're saying that the
18    spreadsheets were withheld as work product and that
19    the XXXXXXXXXXXXXXXXXX was, in fact, not
20    forwarded at all.
21              MS. MURPHY:  Correct.
22              THE COURT:  What else do you want to tell
23    me?
24              MS. MURPHY:  The monitoring and enforcement
25    reports, those are the same or very similar
```

```
 1    structure to what your Honor reviewed in camera.  I
 2    think there was a comment that BCGuardian had
 3    produced something that Google believed was similar.
 4         BCGuardian did not produce reports like the
 5    ones that your Honor reviewed in camera.  They might
 6    have had an internal document that was, you know,
 7    based on what they were doing without discussing it
 8    with us or without our request for the analysis that
 9    they provide.  So that may have been produced by
10    BCGuardian, but it's not the same thing.
11         I believe the Excel documents are the same
12    as well.  They were in two different categories, but
13    as far as I could follow, that is the same or a
14    comparable report.
15         Counsel talked about what really was not a
16    single category -- it was a catch-all -- where she
17    raised some questions about an e-mail because it had
18    the word ████████ in the subject line.
19         THE COURT:  Uh-huh.
20         MS. MURPHY:  Or --
21         THE COURT:  We looked at an example of --
22         MS. MURPHY: ████████████████████████
23    ████████████████████████████████████████
24    ████████████████████████████████████████
25    ████████████████████████████████████
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2          I'm happy to answer any questions about

3  that.  I mean, this is a -- this is sort of --

4  without veering into revealing privileged

5  information ...

6          THE COURT:  Right.  I mean, you're in a

7  delicate position.  And I don't want to rely on

8  something which is not quite evidence either, so I

9  take what you've told me in the last few minutes,

10 sort of, as background.  But as we know, the

11 privilege log has to stand or fall on what's written

12 on the privilege log, not what counsel is able to

13 tell me about what they did in order to make their

14 decisions.

15          But let me see if there's anything else

16 that Google wants to respond with, and then I think

17 we'll wrap it up.

18          MS. MURPHY:  Sure.

19          And I will just say with respect to the log

20 that we focused on the document title names, but

21 there's these substantial other columns to the right

22 that describe what the legal context is and often

23 identify particular litigations.  Thank you.

24          THE COURT:  Okay.

25          Ms. Bladow?

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MS. BLADOW:  Your Honor, if you have any

2     other questions, I'm happy to answer them.

3          THE COURT:  Thank you.  I appreciate your

4     efficiency.

5          I want to thank, again, both sides for

6     their presentation.  I realize that when a lot of

7     documents are withheld on privilege or work-product

8     grounds it is difficult for the party which is not

9     getting those documents to believe, often, that they

10    were properly withheld.  And in some cases, of

11    course, they weren't.

12         But it is the moving party's burden in the

13    first instance to convince me that there's enough

14    suspicion here that the magistrate judge should

15    start looking at these documents in camera.

16         And it's also the moving party's burden to

17    convince magistrate judge that looking at it in

18    camera is going to actually permit a decision one

19    way or the other, rather than simply leading to a

20    second set of questions or inquiries that the

21    magistrate judge can't answer without further

22    evidence.

23         So in this instance, with respect to the

24    privilege issues raised by Google, I just don't

25    think that Google has met the burden necessary to

1      make a magistrate judge privilege review either

2      necessary or likely helpful here.

3           Turning back to the -- really, what was the

4      first issue tucked into this particular motion,

5      which is whether plaintiffs should be required to

6      broaden their non-custodial document search and

7      production with respect to the two categories at

8      issue to include documents which are not tied to or

9      related to Google Shopping.

10          Again, I am not persuaded by Google that

11     the broadened searches that Google proposes would

12     come within the basic confines of Rule 26(b)(1), so

13     the defendant's motion will be denied.

14          Now, we have several motions that we're not

15     going to get to today.  Perhaps I should set a date

16     for the next conference, and then we should either

17     talk about discovery extensions right now, or we

18     should put that issue on the agenda for our next

19     conference.

20          By our calculation in chambers, we have

21     three additional motions coming up.  The defendant's

22     motion filed initially on December the 5th at

23     Dockets 379 and 380 under Rule 37(e), claiming that

24     McGraw Hill failed to preserve relevant and

25     producible ESI.

```
 1              We have plaintiffs' motion made on December
 2    the 9th, at Dockets 386 and 389, to compel Google to
 3    produce additional information concerning its
 4    verification process regarding merchants associated
 5    with the pirate accounts.  At least that's what I
 6    understand it on my first pass through the relevant
 7    letters.
 8              And last but not least, we have plaintiffs'
 9    December the 7th motion, filed at Dockets 455 and
10    457, seeking additional searches of a particular
11    individual's documents.
12              Am I missing any motions?
13              MR. KANE:  Not from plaintiffs, your Honor.
14              THE COURT:  All right.  So when do you-all
15    want to come back and chat about those?
16              Do you want to try and find some time later
17    this month, or should we be looking at early
18    February?
19              MR. KANE:  Other than tomorrow, I'm free.
20              THE COURT:  Other than tomorrow, Mr. Kane
21    can do it.
22              Defendant?
23              MS. TOMKOWIAK:  Not so much, but what is
24    your court's availability?
25              THE COURT:  That's a good question.
```

1          All right.  You're not coming back this

2    week because this week is spoken for.

3          Next week is the 19th.  It's a short week.

4    I want to make it show me the week.

5          There we go.  I could -- no, I really

6    couldn't.  Nope.  That's not happening.

7          The week of January the 26th, I could see

8    you.  I would set it for afternoon again, 2:00,

9    either on Monday the 26th or on Wednesday the 28th.

10          And the week of February the 2nd, I have

11    morning or afternoon time available on the Monday,

12    February the 2nd, and I have morning time available

13    on February the 4th.

14          What's your preference, folks?

15          MR. KANE:  January 26th would be best for

16    us.

17          THE COURT:  Plaintiff has picked January

18    26th.

19          Google?

20          MS. BLADOW:  Yeah.  And just to make it

21    difficult, January 28th would be best for us.

22          THE COURT:  Plaintiff, can you do the 28th?

23          MS. TOMKOWIAK:  I know that February 2nd is

24    out.

25          MR. KANE:  We can do the verification

1      motion and the ███████ motion, the custodian

2      motion, on the 28th.  I don't think we can do Docket

3      379 on the 28th.

4                THE COURT:  That's the Rule 37(e)?

5                MR. KANE:  Correct.

6                We could also just do them on --

7                THE COURT:  I don't want to do two separate

8      dates here if I can possibly avoid it.

9                MR. KANE:  We can also just do them on

10     February 2nd, I think.

11               MS. MURPHY:  They can't do February 2nd.

12               MR. KANE:  Oh, okay.

13               MS. MURPHY:  February 4th.

14               THE COURT:  All right.  So plaintiff says

15     they can do all three on, what, February 2nd or

16     February 4th?

17               MR. KANE:  Either of those would work.  Our

18     preference would be the 2nd, but either works.

19               THE COURT:  Ms. Tomkowiak?

20               MS. TOMKOWIAK:  Your Honor, the -- just the

21     one issue is that the -- two of the attorneys who

22     are handling these motions are not here with us.

23               THE COURT:  So you don't know their

24     schedules.

25               MS. TOMKOWIAK:  I have -- yeah.  I have

              AMM TRANSCRIPTION SERVICE - 631.334.1445

1    one, like, day I know just doesn't work, but I would

2    like to check with them if at all possible.

3           THE COURT:  All right.  Let me do this:

4    Let me pencil you in for Monday, February the 2nd --

5           MS. TOMKOWIAK:  Okay.

6           THE COURT:  -- at 10:00 in the morning for

7    all three.  And that gives you enough time to check

8    with your colleagues and check your calendars.  And

9    if that proves to be a problem, chat with each

10   other, see what you can work out.  Let Ms. Kay, my

11   deputy, know as soon as possible, and we'll try to

12   accommodate you.  But for now, why don't we say

13   February the 2nd?

14          Now, in the meantime, should I be deciding

15   on extension of discovery deadlines today, or should

16   I be awaiting the outcome of that last set of

17   motions, Mr. Kane?

18          MR. KANE:  I think with respect to overall

19   discovery deadlines, it probably makes sense to wait

20   for those motions.

21          I would say with respect to the deadline

22   specifically for Google's discovery on the overall

23   DMCA program and the Buganizer, it would be best to

24   decide those today.

25          THE COURT:  Okay.  Remind me what the

AMM TRANSCRIPTION SERVICE - 631.334.1445

1  current rule is, please.

2         MR. KANE:  So the general document

3  discovery deadline is January 6th.

4         THE COURT:  Unless I gave a different

5  deadline for a specific project.

6         MR. KANE:  Precisely.

7         With respect to Google's discovery into the

8  overall DMCA program, when your Honor ordered the

9  discovery last month, you asked Google to propose a

10 date for a deadline for the discovery.  They were

11 unable to do so.  You had asked them to come back.

12        At the hearing on that, when Google was

13 advocating for the approach that the Court

14 ultimately adopted, Google said, "We could do this

15 relatively quickly."  We would just give them --

16 here's the list of additional 300 domains, and then

17 that's the sample.

18        So you'll recall they're taking a sample of

19 the notices they received in their overall DMCA

20 program and producing various information about it.

21 So there's sort of --

22        THE COURT:  This is the order that I signed

23 on December the 22nd, right?

24        MR. KANE:  That's correct.

25        THE COURT:  It doesn't have a production

1   date in it.

2           MR. KANE:  Exactly.

3           So there's, sort of, two deadlines to

4   decide on this order.  One is the date on which

5   Google is going to disclose the 300 domains that

6   they have randomly selected.  The second is the date

7   on which they're going to produce the information

8   about those 300 domains.  So --

9           THE COURT:  I take it neither of those

10  things has happened yet.

11          MR. KANE:  That's correct.

12          So with respect to the -- just selecting

13  the 300 domains, we think the deadline for that

14  should be January 15th, in two days from now.

15          As I said a second ago, when Google

16  proposed this approach to the Court, it said, we

17  could do this relatively quickly.  They also said in

18  their written filing, implementation of Google's

19  approach can begin immediately.

20          Google's asking for January 31st, which is

21  a Saturday, so it would really be February 2nd.

22  That is seven weeks from when the Court ordered this

23  discovery at the hearing on December 15th.  That's

24  not relatively quickly.

25          They admitted at the hearing that they have

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    "the full list of shopping notices" that they need

2    to pick these 300 domains, so there's no reason that

3    they should need seven weeks to do so.  We had

4    initially proposed January 12th yesterday, but we're

5    only here today.

6            THE COURT:  Here we are.

7            All right.  Let me hear from Google.

8            How much time do you really need?  Because

9    I did have in my head -- not understanding your

10   technological constraints, whatever they may be.

11           But in my own head, based on what I

12   understood the project was and based on your

13   assurances that you could get this done quickly, I,

14   kind of, thought that first step would be a matter

15   of days, not weeks.

16           MS. TOMKOWIAK:  Yeah, it turns out it's not

17   so simple, your Honor.  So I think we had a couple

18   things that came up.

19           First of all, we had that conference on

20   December 15th, and I think we previewed this, but

21   pretty promptly thereafter, most folks at Google

22   took off time for the holidays.  I appreciate --

23           THE COURT:  Now, they're back.

24           MS. TOMKOWIAK:  They're back.  But I'm just

25   saying, like, we -- there's that period of time

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    where we -- you know, we lost folks for two to three

2    weeks, and we, as lawyers, weren't able to compel

3    them to work on these things.

4           And so when they got back, we sat down and

5    talked about how this would work.  To do this, you

6    first have to come up with the list of domains

7    because your order is clear that we're supposed to

8    be selecting domains, not URLs, which is how the

9    data is maintained, so we have to do that first.

10           And then the sampling protocol needs to be

11    internally validated by Google's data scientists.

12           THE COURT:  Well, you certainly want to be

13    able to defend that it was random.

14           MS. TOMKOWIAK:  Correct.  Correct.

15           So their process for something like this is

16    they have internal data scientists who need to

17    validate that the process that they're running will,

18    in fact, generate a random sample.

19           And then as we -- oh, and then -- sorry.

20    Never mind.  Then the next -- the rest of my notes

21    are getting to the rest of the data.

22           So, for those reasons, we suggested the end

23    of the month.  I didn't appreciate January 31st fell

24    on a Saturday.  We could probably make it January

25    30th.  But to do this and to do it right, we just

1    need more time, and it turns out that, you know, the

2    lawyers didn't quite appreciate just how much time.

3          THE COURT:  And now let's go to the second

4    hop because the question ultimately is, when are the

5    plaintiffs going to get the information that you

6    need to provide to them?

7          Once the 300 domains are identified and the

8    data with respect to those domains is provided, now,

9    when will Google provide the documents set forth in

10   paragraph 5 of my December 22nd order:  The

11   copyright infringement notices, merchant data, et

12   cetera?

13         MS. TOMKOWIAK:  So we had proposed March

14   6th.  That's actually a tighter deadline than all of

15   the other deadlines that Google has been ordered.

16         THE COURT:  Yeah, but you know what you are

17   doing now because you have done this before.

18         MS. TOMKOWIAK:  It just doesn't -- we know

19   what we're doing, but it's still -- it's like

20   saying, like, okay, I've done the drive from D.C.

21   To New York, but it still takes the same amount of

22   time no matter how many times you do it.

23         THE COURT:  No.  It takes less time because

24   you know what exits to avoid and which bathrooms at

25   which rest stops have the shortest lines; isn't that

1    true, counsel?

2         MS. TOMKOWIAK:  You know, I actually hate

3    road trips, so I don't know.  But it just -- what I

4    was going to say, though, is that every time --

5    every other time we've done this, we have been

6    ordered to do it in approximately two months.  Maybe

7    because we know which exits to take, we are

8    proposing March 6th.  That's actually less time than

9    we've ever, you know, given ourselves to try to pull

10   this data.  I think that's more than reasonable, and

11   so that's what we would propose.

12        THE COURT:  All right.  I'm going to give

13   Google the deadlines that they proposed:  Friday,

14   January 30, not Saturday, January 31st, please, for

15   stage one, and March 6 for stage two.  And when we

16   come back in February and we talk about overall

17   discovery deadlines, you will now have the full

18   landscape and you will know where all of this fits.

19        All right.  Is there anything further for

20   today, plaintiffs?

21        MR. KANE:  Just one other item regarding

22   the discovery schedule.

23        With respect to depositions, Google's

24   position has been that -- we've noticed, I think, 15

25   fact depositions.  Google's position has been that

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    they won't schedule any of those until we send them,

2    like, a final, non-amendable, you know, "cross my

3    heart and hope never to add anything" 30(b)(6)

4    notice.

5           THE COURT:  Yeah, I saw that in your status

6    letter, but explain it to me.  I want to make sure I

7    understand it.

8           They won't schedule any depositions, even

9    individual-named depositions, because -- and I'm

10   assuming I understand the logic here -- because it

11   may turn out that Witness X is one of our 30(b)(6)

12   witnesses, and we don't want them to come back

13   twice.

14          MR. KANE:  Correct.

15          So what we've offered to do is give them a

16   preliminary 30(b)(6) topic list.  I presume that

17   will cover 95 percent of what we ultimately will

18   have on a 30(b)(6) notice so that Google can

19   determine whether any of their fact witnesses will

20   also be 30(b)(6) witnesses and schedule accordingly.

21   We just can't give them a -- you know, a promise

22   never to add topics to the list because there's

23   additional discovery that's yet to be --

24          THE COURT:  You have yet to take the first

25   party discovery -- the first party deposition,

1    right?

2            MR. KANE:  Correct.  Something could come

3    up in a fact deposition that ultimately needs to

4    become a 30(b)(6) topic.  So we're happy to give

5    them, you know, as complete a list as we can at this

6    point, we just can't promise that we'll never add

7    topics to it.  And we think that's what makes the

8    most sense so that we can start scheduling fact

9    depositions.

10            THE COURT:  Is that an accurate description

11   of Google's position, counsel?

12            MS. TOMKOWIAK:  Not -- no.

13            THE COURT:  Okay.  What is Google's

14   position?

15            MS. TOMKOWIAK:  So our position is that, to

16   the extent somebody is going to be deposed in both a

17   fact-witness capacity and a 30(b)(6) capacity, they

18   should only be deposed once.

19            THE COURT:  Well, we all strive for that.

20            MS. TOMKOWIAK:  We all strive for that, but

21   that's what makes -- especially in a case where

22   there's going to be up to 40 depositions taken, and

23   when some of these folks are located abroad and so

24   people will be traveling to -- you know, if we can

25   figure out how to make it work, Google has offered

1    to voluntarily produce certain witnesses, even

2    though there are processes for seeking depositions

3    in these foreign countries.  We're not going to do

4    that twice.  That makes no sense.  That's really a

5    waste of the lawyers' time and the witnesses' time.

6         THE COURT:  Okay.  But what is -- in terms

7    of the interplay between the plaintiffs' Rule

8    30(b)(6) notice -- and I take Mr. Kane's point, it

9    seems unreasonable -- if this is what you're really

10   asking -- maybe it's not.

11        But if this is what you're really asking,

12   it does seem unreasonable to say that a lawyer has

13   to finalize their Rule 30(b)(6) notice before any

14   party depositions have actually been taken.

15        MS. TOMKOWIAK:  I guess I don't understand

16   what -- they have -- the topics that they have

17   identified in discovery so far have been so broad

18   and many of them so irrelevant, I can't possibly

19   think of what topics Mr. Kane couldn't add to a

20   30(b)(6) deposition notice right now.

21        THE COURT:  So what is your position as to

22   the interplay of their Rule 30(b)(6) notice and your

23   ability to -- or willingness to schedule fact

24   depositions?

25        MS. TOMKOWIAK:  That the parties should

1    exchange 30(b)(6) deposition notices.  And I'm not

2    saying it's cross our heart and hope to die, but

3    there should be some assurances that these are

4    final, based on what we know now, barring some

5    unforeseen thing.  Fine.  But I don't think both

6    sides should get the opportunity to just reserve the

7    right to add ten new topics at some later date that

8    could require us to bring back somebody to sit for a

9    second deposition.  So I think that there should

10   be --

11            THE COURT:  But how can you -- how can you

12   ask a party to send you a nearly final Rule 30(b)(6)

13   notice when they have not yet taken deposition

14   number one?

15            MS. TOMKOWIAK:  I've done it that way in

16   multiple cases, your Honor.  I've taken 30(b)(6)

17   depositions at the outset.

18            THE COURT:  Well, maybe you're better at it

19   than they are.

20            MS. TOMKOWIAK:  Maybe.

21            THE COURT:  I think that that's a very high

22   bar, I really do.

23            MS. TOMKOWIAK:  I truly have done it that

24   way.  I understand that people have differing views

25   of when to take 30(b)(6) depositions, but it's

1  worked in other cases.  The parties exchanged

2  30(b)(6) deposition notices.  They're usually very

3  broad.  It's usually --

4         THE COURT:  And then there's usually lots

5  of yelling -- sorry, lots of meeting and conferring

6  between the parties as to this topic is way

7  overbroad.  We don't understand what you mean by

8  this topic.  You can't possibly be serious.  This is

9  irrelevant, et cetera, et cetera.

10        MS. TOMKOWIAK:  Correct.  I just think that

11 would help -- once the --

12        THE COURT:  And that process itself often

13 results in significant changes to somebody's Rule

14 30(b)(6) notice.

15        MS. TOMKOWIAK:  Yes, it could.  Or people

16 decide to limit it or say --

17        THE COURT:  Yeah.

18        MS. TOMKOWIAK:  -- okay, we're only going

19 to seek testimony as to this narrower --

20        THE COURT:  Or we rewrite something because

21 it wasn't clear.

22        MS. TOMKOWIAK:  Sure.

23        So I just think that we should get started

24 with that process.  It would be helpful to do that.

25 We're not saying that we won't schedule a single

```
 1    fact-witness deposition right now.  There could be
 2    somebody that is -- has no possibility of being a
 3    30(b)(6) deposition.
 4          I just -- our position is, people should be
 5    deposed once.  These are, for the most part, not
 6    high-level, you know, managers.  Like, they're
 7    lower-level employees who have day jobs.  We're
 8    already, kind of, burdening them a lot with all of
 9    these discovery requests.  It just -- it seems like,
10    for the efficiency of the parties and the
11    witnesses --
12          THE COURT:  All right.  When are you two
13    prepared to exchange your good-faith, draft 30(b)(6)
14    notices?
15          MS. TOMKOWIAK:  We can be prepared
16    relatively soon.
17          THE COURT:  Mr. Kane?
18          MR. KANE:  We could do the 27th -- I'm
19    sorry.  The -- January 30th.
20          THE COURT:  I'll have the parties exchange
21    their good-faith, draft 30(b)(6) notices no later
22    than Friday, January the 30th.  I think it would be
23    a mistake for me at this point to try and guess what
24    disputes are going to come up thereafter.  So I'm
25    not going to pre-litigate what happens if, on the
```

1    one hand, plaintiff changes one word; on the other

2    hand, plaintiff adds four new paragraphs.  One hopes

3    that this process will be helpful to both sides in

4    scheduling.

5          Obviously, should it turn out that a draft

6    was not submitted in good faith, if somebody was

7    trying to sandbag somebody, there will be

8    consequences for that, but I think the only helpful

9    thing I can really do here is say, exchange your

10   good-faith, draft Rule 30(b)(6) notices and promptly

11   commence scheduling party depositions thereafter.

12   We just don't want to be waiting any longer on that.

13         MS. TOMKOWIAK:  Thank you, your Honor.  I

14   have one other thing to raise as well.

15         THE COURT:  Okay.  Were we done with new

16   agenda items from the plaintiff?

17         MR. KANE:  The other item was the deadline

18   for Buganizer discovery.

19         THE COURT:  Oh, right.

20         MR. KANE:  So we think that this -- this

21   was ordered on December 22nd.  We think that the

22   deadline should be February 6th.

23         Defendant has asked for March 6th.  Kind of

24   remarkably, they've not provided a count of how many

25   documents they're claiming they need to review.  For

1    all we know, it's ten documents, and yet they're

2    asking for what would now be the latest deadline in

3    the case.

4            So your Honor instructed the parties to

5    agree on a list of search terms.  We largely did so.

6    Google tried to reserve the right, because they

7    hadn't run any of the terms, to say, well, if it

8    returns too large a number, we're going to come back

9    and ask for different terms.

10           They still apparently have not found out

11   how many documents this is, so I think the deadline

12   should be --

13           THE COURT:  That was going to be my first

14   question.

15           MR. KANE:  Pardon me?

16           THE COURT:  That was going to be my first

17   question to Ms. Tomkowiak.

18           MR. KANE:  I think the deadline should be

19   February 6th.

20           THE COURT:  All right.  Google, what

21   remains to be done for Buganizer?

22           MS. TOMKOWIAK:  So I know the Court was

23   skeptical that it would take us some time to gain

24   access to all of the access-controlled components,

25   but it, in fact, has.  So we've gained access to

1    almost all of them, but not quite.  So I don't have

2    the numbers in front of me today.  And I wouldn't

3    have the final numbers anyways because we don't have

4    access yet to the remaining components.

5          But we propose March 6th --

6          THE COURT:  Do you have a ballpark for the

7    components that you do have access to?

8          MS. TOMKOWIAK:  What I can say is that I

9    don't anticipate coming back to the Court and asking

10   for a modification based on what we've seen so far.

11         THE COURT:  You are confident that if I

12   give you March the 6th, it will be done?  As

13   confident as a lawyer can be.

14         MS. TOMKOWIAK:  Okay.  As confident as I

15   can be sitting here today without knowing what I

16   don't know.  How's that for a lawyer caveat?

17         THE COURT:  All right.  March the 6th.

18   Please don't ask me for a later date thereafter.

19         All right.  So that's plaintiffs' 1, 2, 3.

20         And, Ms. Tomkowiak, you have something to

21   bring to my attention as well?

22         MS. TOMKOWIAK:  Yes, your Honor.

23         As I raised at the outset of the hearing,

24   we, Google, thinks it might be helpful for the Court

25   to set an outside date by which the parties will

1    issue any requests for new categories of documents

2    or data.

3              I understand that asking for a deadline for

4    discovery motions is probably unlikely to be

5    granted.  Things come up.  We'll be taking

6    depositions.  Someone will think something went, you

7    know, wrong in a deposition, so I am not going to

8    ask you to do that.

9              However, at some point, continuing to do

10   all of this document discovery in parallel is really

11   impeding our ability to move forward with

12   depositions.  There's, kind of, a constant moving

13   target and constant, well, we reviewed your

14   documents, and now we're interested in this new

15   category of documents.

16             THE COURT:  Yep.

17             MS. TOMKOWIAK:  And I just -- it would be

18   helpful to have a deadline by which to, like, make

19   those new requests, you know, again, barring some --

20   like, I could see a one-off situation where you're

21   at a deposition and someone --

22             THE COURT:  And somebody tells you about

23   some category that you hadn't thought about before.

24             MS. TOMKOWIAK:  Yes, correct.

25             But I just -- that, you know, I fear that,

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    like, these requests and then, thus, these motions

2    are going to go on in perpetuity throughout the

3    fact-discovery period.  And at some point, it's

4    going to get challenging to do that and take and

5    defend almost 40 depositions.

6         THE COURT:  I understand, but I'm not sure

7    that I have a fix for that, other than saying that I

8    will do what all trial judges, I think, do,

9    presiding over a lengthy -- unfortunately, lengthy

10    and complex discovery period, which is the farther

11    along we go, the more hostile the Court is likely to

12    be to what appear to be new document discovery

13    demands that could have or should have been made at

14    an early stage of the case, as opposed to new

15    discovery demands which are legitimately being made

16    late because of something learned at a deposition or

17    for some other good reason.  I mean, that's part of

18    the proportionality calculus that I would bring to

19    bear with respect to any one of these.

20         So other than cautioning both sides, you

21    know, not to wait until the last minute to ask for

22    something you should be asking for now or that you

23    should have asked for last month, I'm not sure that

24    there's any more formal order that I can issue that

25    would really curb the kind of abuses that you're

```
 1    concerned about.  If I see abuses, I'll deal with
 2    them.
 3              Anything else from the defendant?
 4              MS. TOMKOWIAK:  No.
 5              THE COURT:  All right.  Thank you, all,
 6    very much.  A written order will issue, but at this
 7    point, not until tomorrow.
 8              We will be adjourned.
 9
10
11
12
13                          0o0
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2

 3

 4                    C E R T I F I C A T E

 5

 6        I, Adrienne M. Mignano, certify that the

 7   foregoing transcript of proceedings in the case of

 8   Cengage Learning v. Google; Docket #24CV4274 was

 9   prepared using digital transcription software and is

10   a true and accurate record of the proceedings.

11

12

13   Signature  _____
                   Adrienne M. Mignano

14              ADRIENNE M. MIGNANO, RPR

15

16   Date:      January 15, 2026

17

18

19

20

21

22

23

24

25

           AMM TRANSCRIPTION SERVICE - 631.334.1445
```