# EXHIBIT A

# [Redacted]

```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                                :
                                           Docket #24cv4274
CENGAGE LEARNING, INC., et al.,       :

                     Plaintiffs,      :

   - against -                        :

GOOGLE LLC,                           : New York, New York
                                        January 20, 2026
                     Defendant.       :

------------------------------------ :

                    PROCEEDINGS BEFORE
              THE HONORABLE BARBARA MOSES,
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          OPPENHEIM + ZEBRAK, LLP
                         BY:  MICHELE MURPHY, ESQ.
                              JEFF KANE, ESQ.
                              URIEL LEE, ESQ.
                              DANAE TINELLI, ESQ.
                         4530 Wisconsin Ave, N.W., 5th Floor
                         Washington, D.C.  20016

                         OPPENHEIM + ZEBRAK, LLP
                         BY:  YUNYI CHEN, ESQ.
                         461 Fifth Avenue, 19th Floor
                         New York, New York 10017
```

```
Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Email:   Transcription420@aol.com
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES CONTINUED:

For Defendant:                    LATHAM & WATKINS LLP
                                  BY:  SARANG DAMLE, ESQ.
                                       ROBERTO BORGERT, ESQ.
                                  555 Eleventh Street N.W., Suite 1000
                                  Washington, D.C.  20004

                                  LATHAM & WATKINS LLP
                                  BY:  CAROLINE CLARKE, ESQ.
                                  1271 Avenue of the Americas
                                  New York, New York 10020

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|

None

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|

None

```
 1                    PROCEEDING                    4
 2            THE CLERK:   The Court now calls Cengage
 3   Learning Inc., et al. v. Google LLC, case number
 4   24cv4274.  Counsel, please make your appearances for the
 5   record.
 6            MS. MICHELE MURPHY:  Good afternoon, Your
 7   Honor, Michele Murphy with Oppenheim & Zebrak for the
 8   plaintiffs.
 9            THE COURT:  And who do you have with you today?
10            MS. MURPHY:  I have Jeff Kane, Uriel Lee,
11   Yunyi Chen --
12            THE COURT:  Wait, raise your hand if you're not
13   sitting at counsel table when Ms. Murphy introduces you.
14   Ms. Lee.
15            MS. MURPHY:  Danae Tinelli.  And, Your Honor,
16   today, we would like to request permission to have three
17   speakers.  We understand that is not typical, but Ms.
18   Lee would like to argue the motion concerning the
19   custodian ████████  ████████ (phonetic).
20            THE COURT:  Okay.
21            MS. MURPHY:  And she is a junior associate, so
22   it would be helpful if she could get this experience,
23   and this will be her first argument.
24            THE COURT:  All right, I have no problem with
25   that.  And who else do you want as a speaker today?
```

```
 1                        PROCEEDING                   5
 2            MS. MURPHY:  Myself and Mr. Kane.
 3            THE COURT:  Okay.  And for Google, a smaller
 4   crew today.
 5            MR. SARANG DAMLE:  That's right, Your Honor.
 6   Sarang Damle for Google.  I'm joined today by Roberto
 7   Borgert, who's to the left of me, and then --
 8            THE COURT:  No, I think she's behind you.
 9            MR. DAMLE:  Roberto --
10            THE COURT:  Okay, sorry.
11            MR. DAMLE:  Yeah, sorry, Mr. Borgert is to the
12   left of me and behind me is Caroline Clarke.
13            THE COURT:  All right, and how many speakers do
14   you have?
15            MR. DAMLE:  The three of us will be speaking.
16            THE COURT:  All right, well, let me give you my
17   proposed order of events this afternoon.  I'd like to
18   start with the defendant's motion filed on December 5
19   for Rule 37(e) sanctions, and then go to plaintiffs'
20   motion filed on December 9 with regard to Google's
21   verification process.  And then probably take a break,
22   and then come back and do plaintiffs' motion filed on
23   December 17 with regard to Mr. ███████  █████.  And
24   scheduling going forward.
25            So if we are going to start with the Rule 37(e)
```

 1

 2  motion, that is going to be who for the plaintiff?

 3          MS. MURPHY:  That will be me, Your Honor, for

 4  the plaintiff.

 5          THE COURT:  Okay, that's Ms. Murphy.  And who

 6  for the defendant?

 7          MR. DAMLE:  That'll be Mr. Borgert for us, Your

 8  Honor.

 9          THE COURT:  Okay.  So let me get the right

10  binder out, and, by the way, I would like to compliment

11  counsel on both sides for the extremely high quality of

12  binders that I have been – no, really, it makes a

13  difference, I mean that quite sincerely.  I appreciate

14  the effort, and it has made my life and my staff's life

15  easier.

16          Now, with respect to the spoliation motion, let

17  me just set the table a little bit.  Where, as here, a

18  party is seeking Rule 37(e)(1) sanctions not Rule

19  37(e)(2) sanctions, there are essentially two elements

20  that the moving party must establish.  First, that the

21  opposing party failed to take reasonable steps to

22  preserve ESI, electronically stored information, that

23  should've been preserved in anticipation of litigation.

24  And, second, that there was prejudice to the moving

25  party.  If both of those conditions are met, the Court

```
 1  |
 2  | may under Rule 37(e)(1) order such measures that are no
 3  | greater than necessary to cure the prejudice.  There are
 4  | additional requirements if more severe sanctions are
 5  | sought under Rule 37(e)(2), but I do not understand that
 6  | to be the ask here.  Is that correct, Mr. Borgert?
 7  |         MR. BORGERT:  Yes, Your Honor, we're only
 8  | seeking 37(1).
 9  |         THE COURT:  I have substantial doubts as to
10  | whether Google has met its burden as to either of the
11  | two elements that it is required to establish under the
12  | Rule 37(e)(1) framework.  Assuming, arguendo, that the
13  | plaintiff, the relevant plaintiff, did anticipate
14  | litigation at the time that these two witnesses, Coons
15  | and Johns (phonetic), departed the company, that does
16  | not in the corporate setting, in my view, necessarily
17  | lead to the conclusion that the publisher was required
18  | to preserve their ESI.
19  |         In the case of an individual plaintiff, for
20  | example, I know you both read my Karsh opinion because
21  | you cited it, in the case of an individual plaintiff,
22  | obviously this doesn't come up.  In the case of a very
23  | small company where everybody or at least all of the
24  | senior management can reasonably be expected to be
25  | witnesses in the case, this doesn't very frequently come
```

PROCEEDING                                    8

1
2    up, but where as in this case, the opposing party,
3    McGraw Hill, is a large corporation with, someone I'm
4    sure will give me the answer here, hundreds, maybe
5    thousands of employees, it is the moving party's burden
6    to establish not just that litigation was anticipated
7    but that the would-be plaintiff knew or should have
8    known that these folks in particular were likely to be
9    if not custodians at least relevant witnesses whose
10   emails should have been preserved.  So I am uncertain on
11   that score.

12          As to the second element, the prejudice
13   element, I am also unsure as to whether Google has met
14   its burden because it has not been suggested to me that
15   relevant emails from either Johns or Coons would be
16   obtainable only from their own email accounts.  The
17   nature of the projects that they were working on, the
18   projects that Google deems relevant here, all seem to
19   have been, have entailed collaborative internal
20   communications, in particular communications with
21   McFadden who is already a custodian.  So I don't think
22   that Google has made a showing that any relevant emails
23   from either Johns or Coons were actually lost or
24   couldn't be retrieved in some other way, and if Google
25   has not made that showing, then we don't get to the

```
 1                         PROCEEDING                    9
 2   question of what the appropriate sanctions are.
 3            So I guess you'd better start, Mr. Borgert, and
 4   tell me where I'm wrong.
 5            MR. BORGERT:  Sounds good.  Your Honor, would
 6   you prefer that I go to the podium or --
 7            THE COURT:  Sure, whatever you prefer.
 8            MR. BORGERT:  Thank you, Your Honor.  So I
 9   think you accurately described the three elements that
10   we have to show, and so just to start, with the first
11   point on the anticipation of litigation, so Google's
12   position that plaintiff McGraw-Hill here was
13   anticipating litigation against us is not something that
14   we've conjured out of thin air.  It's something that we
15   took directly from plaintiffs' privilege log where they
16   say that they were withholding documents --
17            THE COURT:  No, I understand that, and I used
18   the phrase that I used, assuming, arguendo, deliberately
19   because I understand that there's some dispute here over
20   what litigation they were anticipating at what time, but
21   I'm not sure that's your biggest problem.
22            MR. BORGERT:  Okay, yeah, I just wanted to go
23   in order.  As to McGraw-Hill being required to preserve
24   the files of Angela Johns and Fred Coons, these two
25   individuals, which we know from the declaration of Nick
```

PROCEEDING                    10

1

2  McFadden, worked in McGraw-Hill's marketing department.

3  Now, that is important because this case, and I think

4  plaintiffs would agree here, is fundamentally about

5  plaintiffs' e-book marketing on Google Shopping, true,

6  but also with respect to how they have been allegedly

7  harmed by the infringement that they claim to have

8  happened.

9          THE COURT:  Well, I think the plaintiffs would

10  describe what this case is about a little differently

11  than you did.  They would describe this case as being

12  about what Google did or failed to do.  But I certainly

13  agree with you that one of the elements of this case as

14  to which the publishers have the burden is to show

15  damages.

16          MR. BORGERT:  That's exactly right, Your Honor.

17  And what we know from the documents that we do have

18  relating to Ms. Johns and Mr. Coons is that in 2021 and,

19  well, 2022, they were analyzing the effect of two

20  things. ███████ ███████ ███████ ███████ ███████ ███████ ███████

21  ███, and we know that from documents, for example, at I

22  think it's 379-10 in which I believe it's ███████ ███████

23  ███████ ███████ ███ ███████ ███████ ███████ ███████ ███████ ███████

24  ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████

25  ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████

```
 1                        PROCEEDING                    11
```

2  ████████ ████████ ████████ ███ ████. Ms. Johns in

3  another document that we provided is ██████ █ ██████

4  ████████ ██ ████ ████ ████ ███ ████ ██ ██ ████.

5  And these folks and these documents are relevant because

6  when it comes to expert testimony and damages,

7  plaintiffs are going to have to show under either their

8  statutory damages or actual damages theories how they

9  were causally harmed by the alleged infringement in this

10  case.

11           THE COURT:  So let me, if I might, sharpen up

12  my inquiry to you for a moment.  I already told you that

13  we can assume, arguendo, that litigation was anticipated

14  at the time that these folks left or I understand their

15  accounts were actually deleted sometime even after that.

16  So that's fine.  What if we also assume, arguendo, that

17  at least some documents sent, some communication sent to

18  or from Ms. Johns and some communications sent to or

19  from Mr. Coons are going to be relevant, at least within

20  the broad scope of relevance for discovery purposes

21  under Rule 26(b).

22           The legal question I guess for you is is that

23  enough?  Does a huge corporation, sometime before it's

24  even finished drafting its complaint and sharpening up

25  what its claims are and certainly before it sees what

1

2  the defenses are is it obligated for 37(e) purposes to

3  predict who among its hundreds or possibly thousands of

4  employees is going to end up having even a handful of

5  documents that turn out to be within this broad scope of

6  relevance, is that enough under 37(e) to say aha, turns

7  out that this person had relevant documents and you

8  didn't preserve them?

9         MR. BORGERT:  Well, Nick McFadden's declaration

10 attests that Ms. Johns and Fred Coons were the

11 individuals within the marketing department that worked

12 with plaintiffs' vendor to place ads on Google Shopping

13 and other websites.  Now, remember, at this time McGraw-

14 Hill's also engaged in those pirate lawsuits that

15 involved pirates on Google's --

16        THE COURT:  Individual pirate.

17        MR. BORGERT:  The individual pirates, right.

18 But those were also related to Google, Google Shopping.

19 And so I guess I do find it unlikely that McGraw-Hill

20 who would already been engaged in lawsuits concerning

21 Google Shopping is anticipating a lawsuit against Google

22 about Google Shopping would somehow decide reasonably

23 that the folks who are in charge of working with the

24 outside vendor to place ads and analyze performance on

25 Google Shopping don't have relevant data, particularly

PROCEEDING                              13

1
2  where these folks are also analyzing the effects on

3  Google's actions on McGraw-Hill's revenue and profits

4  which goes to statutory damages and actual damages.

5        THE COURT:  Well, it only indirectly goes to

6  statutory damages.  You asked for statutory damages

7  when, among other things, you can't exactly calculate

8  your lost profits --

9        MR. BORGERT:  Lost revenues I think are a

10  factor to consider when determining statutory damages

11  under the law.

12        THE COURT:  Agree.  All right, so anything else

13  on the first element which is whether McGraw-Hill had an

14  obligation to preserve these two email accounts?

15        MR. BORGERT:  No, I think the damages points,

16  both under statutory and actual, the causation points

17  that we discussed, that these folks were really in the

18  weeds and had the best day-to-day knowledge of the

19  effects of Google Shopping ads and also there is an

20  email that we submitted in which Ms. Johns is ████████

21  ████ ████ ███ ██████ ███ ██████ ███████, I mean one

22  document that ██ ██████ ███ ███ ██████ ████ ████ ██

23  ██ ███ ████ ██████ ██ ██████ █████ ██████ ████ ████

24  ██████ ██████.  So not even something that caused more

25  traffic to come to Google Shopping.  And just one last

```
 1                          PROCEEDING                    14

 2  point on --

 3          THE COURT:  Which email are you pointing me to

 4  now on exhibit what --

 5          MR. BORGERT:  I think it's --

 6          THE COURT:  -- to your supporting declaration?

 7          MR. BORGERT:  Yeah, I think it's 379-8.  Let me

 8  see if I can find it.

 9          (pause in proceeding)

10          MR. BORGERT:  Yeah, so this is docket 379-9.

11          THE COURT:  9, okay, well, the one thing that

12  you didn't do in preparing my courtesy copies here is

13  you didn't leave the headers on.  So give me an exhibit

14  letter, A, B, C.

15          MR. BORGERT:  H.

16          THE COURT:  H, all right.  I have exhibit H.

17  That's a February 4, 2022 email at 9:34:47 p.m.  The top

18  one.

19          MR. BORGERT:  Yes.

20          THE COURT:  Okay, I'm with you now.

21          MR. BORGERT:  Yes, so here at the very bottom

22  of the thread, on Bates number ending 95078, ██ ███

23  ███████ ████ ████ ██████ ██████ █████ ██████ ██████

24  ███ █████ █████ ██████ █████ ██████ ██████ ███████

25  ██████ ███ █████ ██████ ████ ██████ ██████ ██████
```

PROCEEDING                    15

██████ ██████ ██████ ██████ ██████ ██████ ██ ██ ██████

██████ ██████ ██ ██ ██ ████ ██████ ██████ ██ ██████

██ ██████ ██ ██ ████ ██████ ██████ ██████ ██

██████ ██████ ██████ ██████ ██████ ████ ██████

██████ ██ ██████.  And so I think between her and Fred

Coons these are the folks that are really in the weeds

on this and have the most day-to-day interaction.

And one last point on this, Nick McFadden

testified that though he and Ms. Johns had the same

title, they had different roles and he --

THE COURT:  And they didn't have the same title

at the same time, right?  I was a little unclear about

that.

MR. BORGERT:  My understanding, and Ms. Murphy

can, of course, correct me, is that they did have, they

were basically at the same level, but they had different

roles.  And Mr. Coons did not report to Mr. McFadden.

He reported to Ms. Johns.  So to the extent there's a

concern that maybe Mr. Coons sent emails to Mr. McFadden

and so the ESI is not irretrievably lost, it does seem

more than likely, and I believe the standard is that the

evidence plausibly suggests there was lost relevant ESI,

that --

THE COURT:  There may have been, may have been,

PROCEEDING                         16

obviously because we don't know what we don't know, you

think there may have been some emails between Johns and

Coons that didn't go to anybody else?

MR. BORGERT:  Right, between Mr. Coons and his

direct supervisor Ms. Johns.  I think that is, at least

based on what we have so far, a plausible reading of the

evidence based on the structure of McGraw-Hill's

marketing department.

THE COURT:  Sounds a little speculative to me.

Okay, what else do you have for me?

MR. BORGERT:  Well, on that point I think it is

speculative because that is the record that we have, and

the standard isn't that we have to show the precise

content of missing files.  It's the plausibly suggest

standard.

THE COURT:  I understand that.  I guess that's

the question is this is a plausible suggestion as

opposed to speculation.

MR. BORGERT:  Yeah.  Well, we, of course,

submit that it is, particularly because we haven't seen

that many communications with Mr. Coons or Ms. Johns on

them.  Really, what we have provided is the, we looked

through plaintiffs' productions, and there's ten or so

documents are what we have seen.  If they were more

PROCEEDING                              17

2  communicative with folks outside of that direct line of

3  authority, we would have expected to see more.

4       THE COURT:  All right.  So I think let's stop

5  there for now, and I'll let you know if I want to hear

6  more from you about what the remedy should be if there

7  were a violation.  But let me give plaintiffs or really

8  McGraw-Hill in this instance an opportunity to respond

9  on these points.  Ms. Murphy.

10      MS. MURPHY:  Thank you, Your Honor.  Let me

11 start with McFadden.  I don't quite follow what counsel

12 for Google was trying to extract from Mr. McFadden's

13 declaration, but it's quite clear that he was the one

14 who was developing these strategies with respect to

15 marketing campaigns in the digital realm which would've

16 included Google Shopping.  And so he explains that to

17 the extent that this speculative theory about what these

18 people may have done including being the ones with the

19 most knowledge and in the weeds which is not correct at

20 all.  He dispels that, and he says that if these two

21 individuals were doing anything with respect to the e-

22 book ban, it would've been for him.  So I just want to

23 set that --

24      THE COURT:  And I take it that's a sort of

25 indirect way of him saying something I don't think he

PROCEEDING                        18

came directly out and said is any relevant emails would

have me on the chain.

MS. MURPHY:  Correct.

THE COURT:  All right, now, he also says that

Ms. Johns actually reported to somebody else, somebody

named Stacey Hansbury.

MS. MURPHY:  Correct.  Ms. Johns reported to

Stacey Hansbury, and --

THE COURT:  Has anyone looked at her emails for

relevant communications with Johns?

MS. MURPHY:  Yes, and let me get to that in one

moment.  So Ms. Hansbury was the senior vice-president

of Global Customer Experience.  So she was quite high up

in this hierarchy.  And there are a handful of

documents, at least one that I can recall, that are

attached as an exhibit to Google's motion that include

Ms. Hansbury.  For what it's worth, we tried multiple

ways to resolve this motion, and we did agree to add her

as a custodian, and Google rejected --

THE COURT:  Now did that happen or was that

sort of a condition --

MS. MURPHY:  No, Google rejected that proposal.

So we agreed to add her and another individual, Nicole

Wheeler.  Several of the documents that Google attaches

PROCEEDING                          19

1

2  deal with an issue related to McGraw-Hill's own product

3  pages on their website, and I think there was some

4  speculation that that might be highly relevant to this

5  matter.  It's actually not.  Again, it relates to

6  McGraw-Hill's own sales and advertising of their

7  legitimate works.

8          So in any event, Ms. Wheeler oversaw that

9  project.  So when they're discussing that in the

10  documents, that's what it relates to.  But it brings me

11  to a larger point which is I really haven't heard

12  anything because there is none about unique relevant

13  information being kept by these individuals.  They were

14  working on --

15          THE COURT:  I think we just heard Google's

16  theory on that which I'm going to paraphrase and

17  Google's counsel will tell me if I'm not paraphrasing it

18  accurately.  The pitch, as I understand it, was, look,

19  Judge, we know that they wrote and received relevant

20  emails because we have some of them.  The way we got

21  those was through different custodians, McFadden

22  primarily.  Isn't it plausible that they also wrote

23  additional relevant emails that McFadden wasn't on and

24  those may have been lost?  Is that the argument?

25          MR. BORGERT:  Yes, Your Honor.

 1
 2          THE COURT:  That's the argument.

 3          MS. MURPHY:  The plausibility has to go to the

 4    relevance, to the claims and defenses in the case, for

 5    us to get to the point where plaintiffs would be

 6    sanctioned over this.  So I think it makes sense to

 7    focus on that rather than who reported to who.  The

 8    issue that they were working on relates to advertising

 9    of McGraw-Hill's legitimate works.  And so the case is

10    about Google's advertising of pirated works and --

11          THE COURT:  Sure, but you have to show that

12    Google's advertising of pirating works undercut or

13    damaged your sales of legitimate works.

14          MS. MURPHY:  Each time there's a pirate sale,

15    that undercuts a legitimate sale.  So that --

16          THE COURT:  Of course, I mean that's sort of

17    the res ipso locutor part of your argument, but when it

18    comes time to suggesting either actual damages or more

19    likely a high statutory damages figure, you have to put

20    a little more meat on that bone.

21          MS. MURPHY:  I don't think that we have to show

22    that we were advertising on Google.  For example, if a

23    pirate sells a book, that sale undercuts revenue that

24    the plaintiffs could've gotten in several ways.  It

25    might've been through advertising on Google, but it

PROCEEDING                    21

1

2  could've been through one of their distributors.  It's

3  by definition a sale that is outside of the legitimate

4  stream of commerce.

5        So our own legitimate advertisements on Google

6  are not the issue, but even to the even to the extent

7  that they play some role in this, we have produced data.

8  So that's really – if we want to focus on like where

9  would this information be housed, we have produced data

10  that show our advertising spend on Google, the number of

11  clicks that we receive, the number of impressions, and

12  the number of conversions.  So to the extent that these

13  people along with a team, and Your Honor was right that

14  they work in teams, and you can tell this from the

15  emails because they say, hey, team, and all the people

16  that are either custodians or we've offered to include

17  as custodians to resolve this are in these teams.

18        And, again, I need to bring it back to the fact

19  that McFadden was in charge of this.  So if they were

20  doing anything with regard to looking at Google or the

21  e-book banner pirates, that was for him.  And he has

22  included that.

23        There's a discussion about the title.  He did I

24  believe have the same title as Ms. Johns at the same

25  time --

PROCEEDING                              22

1

2          THE COURT:  At the same time.

3          MS. MURPHY:  -- but titles as we know in a

4    corporate setting don't drive the reality of what's

5    happening.  Again, he was in charge of this program with

6    respect to Google, and so if she was doing anything, she

7    was reporting to him on it, and that's shown in the

8    documents.

9          THE COURT:  Do you happen to know off the top

10   of your head how many employees this publisher had at

11   the relevant time?

12         MS. MURPHY:  About 4,850 globally.

13         THE COURT:  Okay, and --

14         MS. MURPHY:  Well, that's current – I should

15   clarify, I apologize.  That's currently.  I could ask

16   for in the 2022-23 timeframe, but it's in the several

17   thousands.

18         THE COURT:  Okay.  I don't think the outcome of

19   this motion is going to hinge on the precise number.  I

20   just wanted to get a sense of the order of magnitude

21   here, for which I thank you.

22         With regard to the potential replacement

23   custodians which I understand were discussed in the

24   parties' negotiations but agreement was not reached, do

25   I correctly understand that you offered Ms. Hansbury who

PROCEEDING                                         23

1

2    was Johns' supervisor, Ms. Wheeler who we discussed a

3    moment ago, and did you also offer Nick Terzian or was

4    that a separate proposed deal?  I'm a little confused

5    there.

6              MS. MURPHY:  Yes, Mr. Terzian is now a

7    custodian.  He was actually in the relief that Google

8    seeks in their motion.

9              THE COURT:  Right.

10             MS. MURPHY:  He was the one that they asked

11   for, and so we have --

12             THE COURT:  You made him a custodian --

13             MS. MURPHY:  We made him --

14             THE COURT:  -- make him a custodian for this

15   purpose.

16             MS. MURPHY:  Well, originally we offered to do

17   that too.  There's been a variety of different

18   discussions amongst counsel, but he was additionally the

19   subject of Google's motion to compel additional

20   custodian and search terms, and so through that process

21   we made him a custodian.  And we do know that between

22   Mr. McFadden and Mr. Terzian there are over a thousand

23   if not more documents that we will be reviewing with the

24   new search terms.

25             The other issue is that some of those search

PROCEEDING                                        24

1

2  terms that we agreed to touch upon these issues, so

3  that's another reason why there is not any plausible

4  expectation that Google will be prejudiced in any way.

5  And, more importantly, I think Google has not explained

6  how they will be prejudiced.  In Google's counsel's

7  presentation and in their briefing, they never say what

8  they think these individuals speculatively or not could

9  have said in their communications that would undermine -

10 -

11         THE COURT:  I understand that, but I also take

12 Mr. Borkett's (phonetic) point, Borgert, you know,

13 generally it takes me at least three or four discovery

14 conferences before I can pronounce somebody's name

15 correctly.  I apologize.  But I take his point that

16 it's, you know, it's very hard to say exactly what's in

17 the documents that you think have been spoliated.  There

18 are certain cases, not this case, in which there may be

19 sufficient clues from the documents which do exist, but

20 I'm not sure it's fair to ask Google to be more specific

21 than it has been which is to say essentially there could

22 be other documents kind of like these that didn't go to

23 McFadden that would be relevant at least for purposes of

24 discovery.

25         MS. MURPHY:  Well, I think, first of all, Ms.

1

2  [sic] Fadden said that's not the case, that if they were

3  doing anything --

4          THE COURT:  He did say that.

5          MS. MURPHY:  -- like that, that it would've

6  gone to him.  I do also think that the characterization

7  of the documents is overstated, as set out in our

8  opposition.  For example, one of the documents that we

9  were looking at, ███ ████ ██ ██████ ████ ██████ ████████

10  ████████ ████ ████ ██████ ██████ ████ ██████████ ████ █

11  ████ ████ ████ ██████ ████ ████████ ██████████ ████ ████

12  ████████.  And I think that one of the other analysis

13  referenced, it specifically says that it was done for

14  Mr. McFadden.  So this all points to what plaintiffs

15  have explained about how these individuals really are

16  not people who would've been custodians in the first

17  instance and especially with a large corporation.  I

18  think that's really a good way to look at it.  Nobody

19  would've ever thought at McGraw-Hill we need to preserve

20  the files of these two people because they were not part

21  of the key operation that was involved in what

22  ultimately became the claims in this case.  So I think

23  that's another thing to keep in mind.

24          And all of the cases that Google cited with

25  respect to plausible relevance have very different

1

2   situations where it is a single plaintiff and it's an

3   employment and these are all the individuals who are

4   relevant to the facts that resulted in the claim.

5   There's a video camera of a specific, you know, incident

6   at a prison.  It's clear that that could've had a better

7   angle.  So I just, I didn't see anything whatsoever in

8   the cases that involved a situation like this where

9   there literally are thousands of employees, and these

10  folks were not involved in what became the claims in

11  this case.  One moment.

12          (pause in proceeding)

13          MS. MURPHY:  The other thing I noticed as I was

14  preparing is Google didn't cite a single RFP in their

15  motion for what these individuals supposedly would've

16  had unique relevant information to respond to, and I'm

17  hard pressed to find one.

18          THE COURT:  Well, I wonder if that's fair at

19  this point because the parties have negotiated

20  extensively search terms and custodians sort of based on

21  the scaffolding provided by the RFPs, but aren't I

22  entitled at this point to reason that if something comes

23  up as a result of the negotiated search terms from a

24  negotiated custodian, that it's responsive to one or

25  more of the RFPs?

| 1 | PROCEEDING | 27 |

2          MS. MURPHY:  I think that the documents

3    produced still have to be responsive to RFPs.

4          THE COURT:  Sure.

5          MS. MURPHY:  And --

6          THE COURT:  But you produced the documents that

7    Google is pointing to as exemplars of relevant and

8    producible documents that were to or from Coons or

9    Johns.  So not only did they get hit on, but they got

10   reviewed by plaintiff and produced.  So aren't I

11   entitled to assume that at least the nine or so

12   documents that they attached to their letter motion are,

13   in fact, responsive and, therefore, that other documents

14   like them would be?

15         MS. MURPHY:  I understand your point, and so I

16   do understand your point, but, again, in a situation

17   where Google has come to the Court and said that you

18   should sanction McGraw-Hill for not preserving these

19   files --

20         THE COURT:  Do you think they have to go back

21   to first principals and say these documents were

22   responsive to RFP 17 or whatever?

23         MS. MURPHY:  I think they need to be relevant,

24   and I think if you look at their RFPs, they're not.  So

25   I do think that's a significant issue, again, because

```
 1                        PROCEEDING                        28

 2   we're in a sanctions --

 3           THE COURT:  Did you make this point in your

 4   opposition brief?  I don't recall it.

 5           MS. MURPHY:  I don't think we made it, and I

 6   wish we would've, but I'm making it now because I guess

 7   that's part of the argument.  So there is an RFP that is

 8   extremely broad that talks about all marketing efforts

 9   that the parties negotiated for plaintiffs to produce

10   specific data, and I think that is important to, you

11   know, support my point that if anybody really wanted to

12   look at what did the publishers spend on Google, what

13   was their return, what ads were they running?  How were

14   they outranked by pirates?  That's all in the data, and

15   plaintiffs have produced what they agreed to produce

16   through extensive negotiations with Google.

17           So I am hard pressed to find anything that

18   these two individuals who were, again, working on making

19   sure that, with the vendor, that some ads got placed.

20   They weren't in antipiracy, they weren't evaluating

21   piracy, they were not dealing with the core issues in

22   this case, and they were there for a very short period

23   of time on top of that.  So they were not considered --

24           (interposing)

25           THE COURT:  -- in the other, right?  That was
```

```
 1                        PROCEEDING                    29
 2   their tenure --
 3            MS. MURPHY:  Correct, correct.  They were not
 4   considered key players.
 5            The anticipation of litigation issue, I know
 6   that Your Honor said let's assume that, you know, that
 7   it had attached at this point --
 8            THE COURT:  You don't want me to make that
 9   assumption.
10            MS. MURPHY:  The issue is with respect to,
11   again, like if this went to any particular claim, I
12   think no one has talked about the New York deceptive
13   trade practices claim that was dismissed.  So we did
14   make a point that if you look at our privilege log,
15   there's no date that you could attach to when that was
16   anticipated.  And I think that's a really important
17   issue as well because the allegations in our complaint
18   that if you were going to take them and say, you know,
19   the plaintiffs are saying something about the e-book ban
20   and how that impacted them, those are very largely tied
21   to that claim that was dismissed, and Google's trying to
22   have it both ways.
23            THE COURT:  Right, so to flesh out your
24   argument there, it would be to the extent that these
25   documents fall within a claim that we anticipated
```

1  litigating at the time.  That claim was a claim which

2  has since been dismissed, and, therefore, you would

3  continue.  Google can't in effect bootstrap 37(e)

4  sanctions even under subsection 1 with respect to a

5  document which in the current procedural state are not

6  relevant to the claims or defenses of the parties.

7  MS. MURPHY:  That's correct.  I think it's also

8  correct that there's nothing to show that we anticipated

9  litigation of that issue --

10 THE COURT:  Ah --

11 MS. MURPHY:  -- at the time --

12 (interposing)

13 THE COURT:  -- maybe I misunderstood your --

14 MS. MURPHY:  Yeah.  But it's twofold.  I think

15 your point was the point I tried to make a little bit

16 earlier, and this is a separate point which is that

17 there's nothing to show that we anticipated that

18 particular claim during the time that these individuals

19 were employed or during the retention period following

20 that.  And it is different, and, again, because, you

21 know, our claims with respect to copyright and trademark

22 infringement are, you know, what this case is now about,

23 and these individuals have nothing to do with that.  So,

24 and Judge Rachon found that that claim was preempted.

```
 1                        PROCEEDING                      31
 2            THE COURT:  Got it.  All right, any reply
 3   argument?
 4            MR. BORGERT:  Yes, Your Honor.  So I'll start
 5   with that last point about the deceptive practices
 6   claim.  It's true that claim was dismissed, but those
 7   same allegations are incorporated into the copyright and
 8   the trademark claims that are still in the case.
 9            THE COURT:  Can you be more specific with me?
10   What allegations are you referring to?
11            MR. BORGERT:  I think it starts with paragraph
12   64 of the amended complaint.
13            (interposing)
14            MR. BORGERT:  Just for the record, it's just
15   noting that.  Plaintiffs say that the e-book ban which
16   Google undertook to try to solve this problem of e-book
17   piracy by saying, okay, well, then there's no e-books at
18   all on our website and, you know, various actors,
19   including the plaintiffs, try to get around that rule.
20   They say that was like an egregious act by Google that
21   evidences our support for these pirates and is part of
22   our willfulness in letting piracy flourish across the
23   web.  Those allegations are incorporated into their
24   copyright and their trademark claims.  So it's not as if
25   that was just solely relating to the New York deceptive
```

1  practices act; those are definitely part of the

2  copyright and the trademark claims.  That's in their

3  complaint, they didn't amend, their complaint they

4  didn't move to amend the complaint to extricate those

5  allegations.  So I mean we read the pleadings, it's in

6  the case.

7  

8          The point about the privilege log not going

9  claim by claim, that's just not in the privilege at all.

10 So that was kind of a surprise to us.  There's no entry

11 that says anticipation of litigation for a copyright

12 claim or anticipation of litigation for a trademark

13 claim.  And I think --

14          THE COURT:  And, frankly, I don't think I've

15 ever seen a privilege log that parsed it out that fine.

16          MR. BORGERT:  Right.

17          THE COURT:  And I've seen a lot of privilege

18 logs.

19          MR. BORGERT:  Of course.  And so, yeah, we just

20 didn't see that as necessary, but then also going back

21 to the context point, I mean the plaintiffs McGraw-Hill

22 was already engaged in copyright lawsuits against

23 various pirates, and some of those were --

24          THE COURT:  Sure, but be careful here because I

25 think there's quite possibly an interesting law review

PROCEEDING                           33

1  question that hasn't been written up yet whether, if the

2  plaintiff anticipates litigation A but fails to preserve

3  documents which were relevant both to litigation A and

4  litigation B, whether the opposing party in litigation B

5  has standing to complain about that.

6          MR. BORGERT:  Yeah, and I believe, I don't want

7  to get bogged down on this, I believe we did cite a case

8  actually that addresses this point in our opening brief

9  relating to, I think it was an environmental cleanup

10  site in New York from the early 2010s and then later the

11  party was found to have spoliated, even though they

12  should've known that there was going to be a follow-on

13  action, but that's in the briefing.  It's in our first

14  brief.  I do want to note, we've been talking about

15  whether or not the size of the spoliator, the party that

16  failed to take reasonable measures --

17          THE COURT:  Right, do you think size matters?

18          MR. BORGERT:  No, I don't, and we cite a case

19  in the briefing, it's a mail-in case, and I think this

20  case is actually very instructive.  It involved two

21  large companies, there was an acquisition, files were

22  lost, they were deleted, and there what the judge did

23  the judge took a very measured approach.  I can provide

24  the name for you of the case if you'd like.  Let me see

1  if I can find it.

2          (pause in proceeding)

3          MR. BORGERT:  It's *Government Employees Health*

4  *Association v. Actelion Pharmaceuticals Ltd.*, 343 F.R.D.

5  474 (D. Md. 2023).  And this was one of those cases that

6  involved big companies.  I don't know how many employees

7  specifically they had, but I mean even there the court

8  found that relevant ESI was not preserved, and it

9  entered an order saying that the trial judge would

10  ultimately be able to craft an instruction to the jury

11  depending on how things shake out.

12          We think an order like that is appropriate here

13  because we don't yet know the effect of the deletion of

14  these files on expert testimony, and that's probably

15  where the rubber's going hit the road.

16          THE COURT:  Were I, were I to find spoliation

17  sanctions appropriate here, I would not at this stage of

18  this case take it upon myself to tell the trial judge

19  what instructions or information should or should not be

20  given to the jury at the time of trial.  I think that

21  would be unwise.

22          MR. BORGERT:  Yeah, and that's not what the

23  District Court of Maryland did.  I mentioned in this

24  order it's up to the trial judge to decide what kind of

```
 1                          PROCEEDING                    35
 2  instruction would be appropriate at the time.
 3            THE COURT:  Okay.  Anything else for me?
 4            MR. BORGERT:  The last point on the McFadden
 5  declaration, I just want to raise, you know, in
 6  paragraph 8, which I think counsel was alluding to, Mr.
 7  McFadden states that Coons, that he did not believe that
 8  Coons performed meaningful revenue analysis concerning
 9  the e-book ban, and to the extent he did, and I don't
10  recall any that would've been for me.  We provided a
11  document at 379-10 which is exhibit I.
12            THE COURT:  Is that the one you showed me a
13  minute ago?
14            MR. BORGERT:  No, this is a different one.
15            THE COURT:  That's H; this is I.  Okay.
16            MR. BORGERT:  Yeah, and I think this is one of
17  those, if you had to look at one, this is the one we
18  would ask that you look at closely.
19            THE COURT:  But this one also went to Hansbury.
20            MR. BORGERT:  So this one, yeah, you can --
21            THE COURT:  And McFadden.
22            MR. BORGERT:  Correct.  Mr. Consenza to
23  Hansbury on a Friday morning, and just looking at this,
24  this does look like meaningful revenue analysis, and Mr.
25  Coons even says, ███ ████ ███ █████ ████ ████ ████
```

PROCEEDING                                        36

██████  ████  --

          THE COURT:  Stacey is Ms. Hansbury.

          MR. BORGERT:  Ms. Hansbury, correct.  "████

████████████████████████████████████████████████████

██████████████████████████████████████████████████,"

which indicates to us that ████  ████  ████  ██████

████████████████████████████████████████████████████

██████.  So he sends that to Ms. Hansbury who

supervised Ms. Johns and then Ms. Johns, of course,

supervised Mr. Coons.  So that's one direct line.  And

then he just forwards it to Mr. McFadden.  So this I

think is inconsistent with Mr. McFadden's statement that

if Mr. Coons was doing this at all, which it does appear

that he was, it would've been at Mr. McFadden's

direction or for him.  I mean just forwarding the email

it seems more of like a thought you should know rather

than here you go, boss.

          THE COURT:  Thank you very much.

          MR. BORGERT:  Thank you.

          THE COURT:  I'm going to deny the motion, and

I'll tell you why.  Taking it sort of from the bottom

up.  Did this particular plaintiff have an obligation to

preserve relevant evidence in anticipation of this

litigation?  I am going to assume, for purposes of

PROCEEDING                          37

today's decision that McGraw-Hill did have that

obligation, assuming without deciding I guess is the

judicial phrase that judges use in situations like this.

But Google has not persuaded me that that obligation

extended to the preservation of the email accounts of

these two individuals, Coons and Johns, and here I do

think that size matters, corporate size matters.  I do

think that a corporation's obligation to preserve

relevant evidence is not unbounded and does not run from

the C suite all the way to the janitor in a thousand

person or 4,000 person organization.  That like all

things involving discovery, the question is going to be

were reasonable efforts made, and the moving party here,

Google, does have the burden of proof on this as it does

on all issues when it is seeking sanctions, and Google

has not persuaded me that. based on what McGraw-Hill

knew at the time these accounts were deleted, that it

had an obligation specifically or that it knew or

should've known specifically that these two individuals'

accounts should have been preserved.

       Now, that's enough to deny the motion, but I

will go on to the next step which is was there

prejudice, and, again, I find that even if McGraw-Hill

had an obligation to preserve these two accounts

PROCEEDING                                    38

specifically, Google has not persuaded me that its

failure to do so has resulted in prejudice to Google

primarily because these folks were clearly working in a

collaborative team environment, I think it plausible

that Mr. McFadden who is a custodian and/or Mr. Terzian

who has also been added as a custodian received copies

of any and all relevant emails that would otherwise have

been unearthed from the Coons and the Johns account had

they been preserved.

Now, can anyone in this room guarantee that

there wasn't a relevant email that went just from Coons

to Johns or just from Johns to Coons?  Of course not.

By the very nature of the enterprise when we're looking

at spoliation, nobody can be a handed percent sure of

what's not out there.  But, again, it's Google's burden

by a preponderance standard as in all civil matters

unless a different standard is specifically prescribed

by rule or by case law, and I cannot find here that

Google has met that standard.

And just to cap it off because I do want to be

complete here, in the event that I found otherwise, that

is, in the event that I found that 37(e)(1) sanctions

were appropriate, what I would be inclined to do under

those circumstances is require that Terzian be

PROCEEDING                              39

designated as an additional custodian which apparently

has happened anyway as the result of negotiation on

other matters between the clients, and I would not

prescribe any time of trial sanction, any instruction,

for example, to the jury.  I would simply, were I to

impose sanctions, I would simply say I'm not doing that

now, but this is without prejudice to Google bringing it

up again at the time of trial.  But that is now in my

view not relevant, this is a hypothetical, because

cannot find for Google on either the first step or the

second step necessary.

          So for those reasons the motion is denied.

          Should we go on to the verification motion?

Tell me who's arguing that.  That's Mr. Kane.  I see

that because he's standing up.

          MR. DAMLE:  And that'll be me for Google, Your

Honor.

          THE COURT:  Okay, Mr. Damle.

          MR. DAMLE:  Yes.

          THE COURT:  All right.  Give me a sec to get to

the right place in my notes.  So I need you to help me

out here, Mr. Kane, keeping in mind that you are most

likely spending all or nearly all of your time on this

case, and I can't do that.  I would like you to help me

```
 1                          PROCEEDING                    40

 2   out here in explaining what you understand the

 3   relationship to be between the verification process

 4   which I understand is a Google ads process and the

 5   Google Shopping platform which is the focus of your

 6   claims.

 7            MR. KANE:  Yep.  So in order for a merchant to

 8   run a paid shopping ad, so a shopping ad that the

 9   merchant pays a fee to Google for, they'd have to have

10   two types of accounts.  They have --

11            THE COURT:  They have to have a merchant center

12   account.

13            MR. KANE:  That's correct.  And they have --

14            THE COURT:  They have to have an ads account.

15            MR. KANE:  That's correct.

16            THE COURT:  That's not true to run so-called

17   free ads, right?

18            MR. KANE:  That is correct.  For free ads you

19   just need a merchant center account.

20            THE COURT:  Okay.

21            MR. KANE:  So for all of the ads in this case

22   that were paid ads, which is a huge number of the ads in

23   this case, the merchant had to have both accounts.  They

24   couldn't run --

25            THE COURT:  Okay, so I understand that for a
```

PROCEEDING                    41

1

2 large number of the merchants relevant to this case they

3 had an ads account.  But why does it matter to this case

4 what Google did or didn't do with respect to their ads

5 account?

6          MR. KANE:  The distinction between the ads

7 account and the merchants center account is basically

8 meaningless because the same person operates both

9 accounts.  In other words, if someone's running a paid

10 shopping ad, they have both a merchants center account

11 and an ads account.  The merchants center account isn't

12 any more relevant than the ads account is.  In order to

13 run all of the paid ads in this case, the merchant had

14 to have both accounts.

15          What Google is trying to do is say, oh, because

16 when a person submits these verification documents or

17 answers these verification questions, because they're

18 doing it in the Google ads portion of the interface,

19 it's somehow irrelevant.

20          THE COURT:  Well, they're saying more than

21 that.  I think they are making a relevance argument as I

22 understand it.  But they're also saying that the process

23 for verification on the Google ads side wasn't what you

24 think it is.  This is not where people have to submit

25 their certificates of incorporation or their driver's

PROCEEDING                          42

```
 1                          PROCEEDING                  42

 2   license or what have you.  This is where people merely

 3   have to establish that they have the right to edit their

 4   associated website.

 5           MR. KANE:  That's not correct.  So --

 6           THE COURT:  That is what Google says, right?

 7           MR. KANE:  Not exactly.  So there are two types

 8   of accounts, as we said.  There's a merchant center

 9   account and an ads account.  Each of them has its own

10   verification process.  So there's a verification process

11   for the merchant center account and a separate one for

12   the ads account.  With respect to the verification

13   process for the merchant center account, all it is is

14   confirming that you do actually control the website that

15   you're advertising.  I think there's some sort of --

16           THE COURT:  That's the so-called automated

17   process.

18           MR. KANE:  I believe it is automated, yeah.  I

19   think the way it works is they give you some sort of

20   code that you embed into the website, and that's what,

21   you contract that and it can confirm that you control

22   the website.

23           THE COURT:  Okay.

24           MR. KANE:  We are not seeking discovery into

25   that verification process.  That's the verification
```

 1

 2  process for merchant center accounts.  So you can

 3  basically ignore that for purposes of this motion.

 4         THE COURT:  And the reason you're not

 5  interested in that information is it's not particularly

 6  relevant to anything in this case.

 7         MR. KANE:  It wouldn't really help us.  We're

 8  not challenging that the people advertising these did,

 9  in fact, operate the websites.  It wouldn't really be

10  germane to this case.

11         THE COURT:  Okay.

12         MR. KANE:  There's a separate verification

13  process for the Google ads accounts, and that's the

14  process whereby the merchant actually submits

15  documentation about their person or organization where

16  they actually answer questions about what they want to

17  do or what their organization does.  That's the

18  verification process about which we're seeking

19  discovery.

20         And so the way that one works is Google claims

21  that it verifies certain advertisers.  So when a user

22  sees an advertisement for an infringing copy of a

23  textbook, they can click on the name of the merchant in

24  the ad, and the little box appears with a little badge

25  that says advertiser's identity verified by Google.  So,

1

2   in other words, someone looking at the very shopping ads

3   that are at issue in this case sees the verification.

4   As part of that process Google requires the merchant to

5   submit various things.  It requires them to submit,

6   answer questions about its business model, operational

7   practices, key relationships with third parties, and

8   details on products and services.

9          THE COURT:  Are there any questions about are

10  you violating the copyright or the trademark laws, any

11  questions about are your products counterfeits?

12         MR. KANE:  So Google has not shared with us

13  specifically what the questions are.  Those are just

14  sort of topics that they say are involved.  That's one

15  of the things we're seeking in this motion is what do

16  you actually ask these merchants and how do they reply.

17  They also ask for official documentation that shows the

18  legal name, trademark name where applicable, address,

19  and the supporting documents related to their business

20  operations.  So, in other words, they've got a whole

21  bunch of information about the merchants that are

22  verified.

23         Out of the 1,239 pirate websites about which

24  Google has produced information, ████ of those were

25  listed as verified, about ██ percent.  So, in other

PROCEEDING                                45

words, when someone clicked on one of their shopping

ads, if they clicked on the merchant's name, they would

see the little badge that says advertiser's identity

verified by Google.

THE COURT:  Okay, so I think you're saying a

couple of different things to me.  One is we'd like to

know if that verification process involves anything

designed to make sure that they weren't violating other

people's copyrights or trademarks which would be

relevant if it turns out to be the case.  And, number

two, I'm guessing you have a fallback theory which is,

even if the process has nothing to do with trademark or

copyright compliance, we still are entitled to a bunch

of discovery about it because that little badge saying

verified helped these folks sell their wares.

MR. KANE:  We certainly would like to know if

there are any direct questions about copyright

infringements.  Google's description of it does say it's

supposed to provide documentation about their trademark

name.  So if someone is selling --

THE COURT:  Trademark name, that's not quite

the same thing.

MR. KANE:  Well, if they're selling

(indiscernible) textbook and they aren't able to submit

PROCEEDING                                    46

documentation that they (indiscernible) mark, that might

mean something.  But the more important way in which

this is relevant is it's very relevant to Google's

knowledge.  So take, for example, the questions about

the merchant's business --

THE COURT:  Can I just back you up a minute --

MR. KANE:  Yeah, sure.

THE COURT:  -- because remember it's harder for

me than it is for you, I mean just finding my way

through facts.  You say of the roughly 1,200 pirate

websites at issue here, █ percent were verified, but

it's not the website that's verified, right?  What's

verified?

MR. KANE:  So Google allows you to have

multiple accounts over time that are associated with the

same website.  So what they verify is the merchant

center account, or in its case the ads account, but

those ads accounts are associated with █ of the 1,239

pirate websites.  And remember it's the Google user, the

person viewing the ad doesn't see the account.  It

doesn't say, you know, ads account number 1, 2, 3, 4, 5.

What the Google user sees is the pirate website.  It

sees, you know, the landing page to which the website

links.  So it doesn't really make much difference that

what they're actually, that the verification is

submitted through the ads account as opposed to through

the domain.

THE COURT:  So walk me through it.  In the

attachments to your moving letter, where can I find this

little verification badge?

MR. KANE:  So it's docket 420-1 at the third

page.

THE COURT:  420-1.

MR. KANE:  I'm sorry, 419-1.

THE COURT:  I'm sorry, you were right the first

time and I was wrong.  419-1.  All right, so the third

page, what am I supposed to be looking at here?

MR. KANE:  So what's happened is someone has

clicked on a shopping ad, they've clicked on the name of

the merchant's --

THE COURT:  Clicked on Your (indiscernible)

Today, Choices in a Changing Society?

MR. KANE:  That's what the ad is for.  They

clicked on the name of the merchant.  So the Blue Rain

there at the bottom, they clicked on that to get to the

my ad center.

THE COURT:  Blue rain?  Where's Blue Rain?

MR. KANE:  So there's that box that says Your

```
 1                       PROCEEDING                  48
```

 2  Health Today, Choices in a Changing Society.

 3              THE COURT:  Ah, yes.

 4              MR. KANE:  At the bottom of that it says Blue

 5  Rain.

 6              THE COURT:  All right, that is the --

 7              MR. KANE:  That's the merchant who ran that

 8  advertisement, the Google merchant who ran that

 9  advertisement.  If you go a little further down,

10  underneath where it says about this advertiser.

11              THE COURT:  So when it says about this

12  advertiser, it means about Blue Rain.

13          MR. KANE:  Correct.

14              THE COURT:  All right.

15              MR. KANE:  So below about this advertiser it

16  says advertiser identity verified by Google, and there's

17  a little picture of a person with a checkmark.

18              THE COURT:  Yes.

19              MR. KANE:  That's the verification badge.

20              THE COURT:  But then it says that the

21  advertiser is not Blue Rain; the advertiser is Papaya

22  Group Company Ltd.  Explain that to me.

23              MR. KANE:  That's the name of the company.  So

24  Blue Rain it might be like the website or it might be

25  like merchant name.  Papaya Group Company Ltd. is the

```
1                           PROCEEDING                      49
2    name of the company behind that website or that merchant
3    name.
4              THE COURT:  And Papaya Group Ltd. is in Hong
5    Kong according to the --
6              MR. KANE:  According to this, yeah.
7              THE COURT:  Okay.  So Papaya Group Company Ltd.
8    is supposed to be, as you understand it, the real name,
9    the legal name of the merchant?
10             MR. KANE:  That's correct.
11             THE COURT:  Okay.
12             MR. KANE:  So a Google user sees this
13   indication that they're verified.  That is part of our
14   argument, like one of the ways this is relevant is it's
15   part of the Google's material contribution to the
16   infringement.  So it might be that one clicks on the ad
17   and thinks, mmm, is this a legitimate website?  I'm not
18   sure it is.  But if it's been verified by Google, maybe
19   that's what prompts them to actually put in their credit
20   card number and purchase the book.  So that is part of
21   our argument.
22             THE COURT:  But in order to click on Your
23   Health Today, Choice in a Changing Society, Sixth
24   Edition, where are you here?  Are you on Google Shopping
25   or on Google ads?
```

PROCEEDING                          50

1

2        MR. KANE:  You're in Google Shopping.  So sort

3   of behind, like in the background of that My Ad Center

4   box, those are a series of Google Shopping ads.  So

5   someone has clicked on the one that's Your Health Today,

6   Choosing in a Changing Society or Choice in a Changing

7   Society.  They clicked on the merchant's name, and this

8   is what comes up.  So you are in a shopping ad still

9   when you're doing this.

10        THE COURT:  All right, I'm still a little, I'm

11   having a little trouble making the leap you want me to

12   make between Google verifying that the seller's name is

13   Papaya Group Company and that the seller is in Hong Kong

14   and Google somehow promoting infringing content.

15        MR. KANE:  So it's relevant in a handful of

16   ways.  The first is the one you're anticipating, that

17   party of Google's material contribution to the

18   infringement is that they lend legitimacy to the seller

19   when they say that they verify the seller's identity.

20   In other words, if you click on one of these ads and you

21   get to the landing page and you think I'm not sure this

22   is legitimate, this might be some sort of a scam or it

23   might be illegal --

24        THE COURT:  Exactly.  Well, two different

25   things.  To me, putting my consumer hat on, taking my

PROCEEDING                        51

judge hat off and putting my consumer hat on, if I saw

something like this, my first thought would be this

tells me that it's a real company in the sense that if I

put my credit card in, I'm actually going to get

something.  I'm not going to be ripped off.  But it does

not suggest to me that what I'm getting complies with

the United States Copyright & Trademark law.

MR. KANE:  Okay, so that it seems to me is a

merits question.  So if Google wants to say at the

merits stage, you know, it's not material that they told

them the identity was verified because nobody pays

attention to that anyway or it only goes as far as Your

Honor was indicating, that that it seems to me is an

argument they have to make at the merits stage.  I don't

think it's a basis to say we don't get discovery into

it.

But that's only one of the ways in which these

materials are relevant.  It's also very relevant, I

would say that the more important way that it's relevant

is to Google's knowledge.  So take, for example, Google

says they ask questions about the merchant's business

model and operational practices.  So two of the websites

that are at issue here that Google verified are

aliensstory.com and walletsformen.com.  So if those

PROCEEDING                                52

websites applied to be verified and said to Google our

business model and operation practices are that we write

the publish immunology textbooks and Google said sounds

good to us, you're verified, I think a jury's entitled

to know that.  Because Google's going to argue to the

jury, gee whiz, folks, how could we have known that

these people were pirates?  We have no idea.  We're just

operating this huge company.

Likewise, take the question Google asks about

relationships with third parties.  Two other websites

that Google verified are lollipopshop.com and

hocity.shop.  if those websites applied for verification

and said we are authorized distributors of McGraw-Hill's

nursing test banks, test banks for nursing exams, and

Google said sounds good to us, you're verified, that's

something the jury should know when Google turns around

the says we didn't know that these people were pirates.

So that's --

THE COURT:  And what if it turns out that you

get to peek under the hood in terms of what Google

actually asked these folks and Google doesn't ask those

questions?  Google just wants to know are you duly

incorporated and did you pay your taxes.  I'm making

this up, hypothetically.

```
 1                        PROCEEDING                      53
 2          MR. KANE:  At a minimum, in order for Google to
 3   say that, they need to produce the first thing we asked
 4   for which is to tell us what are the questions you asked
 5   the merchants and what do you do with that information.
 6   So at a minimum we need that discovery in order to get
 7   to sort of the hypothetical world that you're positing.
 8          If it turns out that there's really nothing
 9   useful in there, I think there's still an argument that
10   it's relevant because Google says that it does this when
11   it determines that a merchant is suspicious.  In other
12   words, if it determines that a merchant account is
13   suspicious because of activities it's doing or because a
14   flag comes up in its system --
15          THE COURT:  What does suspicious mean in this
16   context though?
17          MR. KANE:  It can be any number of things.  It
18   can be that they're selling branded materials.  It can
19   be that there was a flag on a related account if
20   somebody operated multiple accounts and another account
21   was flagged for something.  It could be that the, it
22   could be any number of things.  But when the account is
23   flagged - I'm sorry, it could be that the name of the
24   account is the same as the name of another account, that
25   they're flagged because the name is suspicious.  It
```

PROCEEDING                          54

1

2  could be that the quality of the landing page is low.

3  Google has various things they do to measure the quality

4  of the landing page to which the ad links.  It could be

5  that that has some sort of indication that there might

6  be malicious activity.  So it could be any number of

7  things.

8          THE COURT:  And is this an automated flagging

9  process?

10         MR. KANE:  I don't know - I would imagine that

11  there's some sort of automation involved.  I don't know

12  how much because we haven't gotten discovery into this.

13  But if Google determines that the account is suspicious,

14  Google will require the merchant to go through this

15  verification process.  It's required to answer questions

16  about its business operations, its relationship with

17  third parties.  They're required to submit documentation

18  --

19         THE COURT:  As to that, you have some very high

20  level information, publicly facing information about

21  what that process entails, but you want the details.

22         MR. KANE:  Exactly, yeah.  The other way in

23  which this is relevant to Google's DMCA defense, so, as

24  you recall, the DMCA requires Google to have a program

25  that terminates, quote, "subscribers and accountholders

PROCEEDING                        55

who are repeat infringers."  The position that Google

has taken consistently in this case is that suppose

account X and account Y are operated by the same person

and account X reaches the ███████ ████████ to be

terminated under Google's DMCA policy, Google's position

is that they can just terminate account X, they don't

have to terminate account Y.

          Well, the verification documents would be very

revealing on that score.  If someone came in and said

this ads account is associated with 500 merchant center

accounts and I'm submitting the same documents to verify

all 500 of those merchant center accounts, well, there's

a good case that when Google found out that one of those

500 accounts was infringing, it should've terminated all

500.  In other words, if you are the judge or perhaps

the jury who's being asked to decide, you know, when

Google finds out that account X is infringing, does it

also have to terminate the related account Y, one of the

things you want to know is what would Google have to do

to figure out that they're related.  Do they have to go

sleuthing around or is it just already available to

them?  Yet, as part of the verification process, the

same ads account was verified as being associated with

500 merchant center accounts, then they should be

PROCEEDING                                    56

terminating all 500 of the merchant center accounts.

THE COURT:  I'm not sure I travel with you
across all of those steps.  Take your logic, I
understand what you're saying.

MR. KANE:  Okay.  The other way in which it's
relevant is Google has said that one of the reasons we
don't terminate both account X and account Y is that
account X and account Y could both be operated by a
marketing agency.  They could be completely separate --

THE COURT:  Clients.

MR. KANE:  Yeah, they could be separate
companies and one of them is infringing but one is not.
But one of the questions that Google supposedly asks is
are you a marketing agency.  So this discovery would
just tell us were any of these accounts marketing
agencies or not.

If we sort of zoom out, like Google collected a
whole bunch of information from the very pirates who ran
the very ads about which this case was filed, and
they're trying to hide all of that information.  There's
really no justification for saying we're not producing
any of that information.  I'm sure Google would like to
not admit that they knew a whole lot about these
infringing merchants and decided not to terminate them

1
2  at all or until much later, but that's information the
3  jury is very much entitled to have.
4        THE COURT:  Let me ask you a process question
5  now.  When did this come up?  It is getting later and
6  later and later in the discovery schedule, and this you
7  have not made the case that you couldn't figure this out
8  until December of 2025.
9        MR. KANE:  We've been asking for this for quite
10  some time.  This was a months' long meet and confer
11  process.  The original --
12        THE COURT:  When did it start?
13        MR. KANE:  I'm sorry, I'd have to go back and
14  look.  It goes back at least as far as October if not
15  earlier than that.  The original RFP that asked for this
16  I think was in our first RFP, but if nothing else, it
17  was RFP 101.
18        THE COURT:  (indiscernible) it was – hold on –
19  you've given me Google's responses.  You've given me
20  Google's responses and objections to plaintiffs' fourth
21  set of requests actually.  You've given me that at 419-
22  3.  So did you ask for this for the first time in your
23  fourth set?
24        MR. KANE:  I believe the fourth, request in the
25  fourth set says something like to the extent not covered

PROCEEDING                        58

 1 by such and such a request.

 2              THE COURT:  Is it --

 3              MR. KANE:  So 101 says to the extent not called

 4 by RFP 36.

 5              THE COURT:  Right, which you haven't given me,

 6 at least not on this round.

 7              MR. KANE:  Yeah, that is in the record.  Hang

 8 on one second.

 9              THE COURT:  And 36 would've been in your first

10 set?

11              MR. KANE:  That's correct.

12              THE COURT:  And the fourth set went out when?

13 You didn't give me the signature page so I can't see the

14 date.

15              MR. DAMLE:  Your Honor, I can help answer some

16 of this.  I was actually prepared to talk about some of

17 it and --

18              THE COURT:  Okay --

19              (interposing)

20              MR. DAMLE:  -- and Mr. Kane can check me on it.

21              THE COURT:  We can hold until --

22              (interposing)

23              MR. KANE:  It's July 16, 2025 was the fourth

24 RFP.

```
 1                        PROCEEDING                    59
 2            THE COURT:  All right, what else do you want to
 3   tell me?
 4            MR. KANE:  So just one thing.  RFP 36 that you
 5   asked about is --
 6            THE COURT:  The original RFP.
 7            MR. KANE:  Yeah.  That's information about the
 8   infringing merchants.  So this is certainly information
 9   about the infringing merchants.  In fact, it's
10   information that the RFP 35 --
11            THE COURT:  You didn't send an RFP saying give
12   me all the information you have about all of these
13   merchants.
14            MR. KANE:  It's, I mean something like that.
15   RFP 35 is information provided to you by the infringing
16   merchant.  So that's much more specific and probably
17   much more germane to this.
18            THE COURT:  Maybe you should've cited that in
19   your fourth set.  Okay.  And the fourth set went out
20   when?
21            MR. KANE:  July of 2025.
22            THE COURT:  All right.  So in terms of this
23   specific RFP which really focused on the information
24   you're asking for in the current motion, it was July of
25   2025.
```

PROCEEDING                           60

 1

 2          MR. KANE:  Yes, although I think it's fairly

 3     read to be included in RFP 35 which was September of

 4     2024.  That's information provided to you by the

 5     infringing merchants.

 6          THE COURT:  That's a very broad ask.  I don't

 7     know that I would've connected the dots.

 8          MR. KANE:  I mean I'm not sure it is.  This is

 9     literally documentation that the infringing merchants

10     turned over to --

11          THE COURT:  I understand, I get that.  Okay,

12     what else do you want to tell me?

13          MR. KANE:  So really the only reason that

14     Google offers for not producing this information in

15     their opposition brief is the notion that some of this

16     might be sensitive information.  So a couple of points

17     on that.  One is there's quite a robust protective order

18     in this case.  It's at docket 82.  It's 24 pages long.

19     And that's, of course, designed to make sure that

20     sensitive information doesn't get sort of out into the

21     world.  So it requires that we can't show the

22     information to anyone who's not authorized to see it

23     under the protective order, and it requires that we only

24     use the information for purposes of this litigation.  So

25     that's quite a substantial protection.

```
 1                      PROCEEDING                    61
 2            The other thing I would point out is for ■
 3  percent of these merchants that Google verified, you
 4  know, the ones that are at issue in this case, ■
 5  percent of those Google suspended either for copyright
 6  infringement or some other violation.  So almost all of
 7  these are accounts that are websites that Google had
 8  decided had done something so egregious that they
 9  shouldn't be allowed to operate on the platform anymore.
10            That has to mean something.  In particular, I
11  don't think anyone has a strong privacy interest when
12  they submit documents for the purpose of committing an
13  act that is illegal.  In other words, these pirates all
14  submitted their documentation so that they could
15  continue selling copyright infringing works.  As I said,
16  ■ percent are the ones that Google itself concluded
17  should be suspended.  So I don't think they have
18  anywhere near the privacy interest that sort of an
19  ordinary legitimate businessperson has.  In other words,
20  if you submitted a driver's license because you want to
21  buy a house, you know, you submit it to a mortgage
22  company, you have a strong privacy interest in your
23  driver's license not being shared with other parties.
24  If you submit a driver's license for the purposes of
25  obtaining a fraudulent mortgage, you have far less of a
```

```
 1                        PROCEEDING                    62
 2   interest in --
 3           THE COURT:  And what about the ▆ percent that
 4   Google did not take down, are those ▆percent going to
 5   sue Google?
 6           MR. KANE:  I don't think they have a claim
 7   against Google --
 8           THE COURT:  Divulging their personal
 9   information after, according to Google, promising not
10   to.
11           MR. KANE:  These are all pirates, to be clear,
12   that we've observed running ads for infringing copies of
13   the work.  So our position is a hundred percent of them
14   were obtaining this verification for purposes of
15   committing an illegal act.
16           THE COURT:  Right, but Google's argument, as I
17   understand it, is a contractual one.  They received this
18   information based on a promise not to divulge it.  Now,
19   your answer to that may be, well, they're not divulging
20   it voluntarily.  They'd be divulging it pursuant to a
21   court order, so that gets them off the hook.
22           MR. KANE:  That's certainly one argument.  I
23   think any promise you make not to divulge something is
24   subject to, if a court order is made to you, I'm going
25   to have to.  But the other thing I would say is Google
```

PROCEEDING                    63

1

2    has terms of use which is also a contract between Google

3    and the pirate, and the terms, as you say, if you

4    violate any of our terms of use, we can kick you off of

5    the platform.  The pirates are all ones --

6         THE COURT:  -- say we can turn over your CEO's

7    driver's license?  Probably not.

8         MR. KANE:  But I don't know that the claim that

9    they won't turn this information over is actually in the

10   terms of use.  In other words, what Google pointed to in

11   its opposition letter was just a sentence on its website

12   that says we won't share your information with anyone

13   else.  That to me is not a contract.  If it were in the

14   terms, if they were pointing to the terms of use or

15   something, then there might be a contractual claim.

16        THE COURT:  All right, so if you would please

17   again review the numbers for me.  Plaintiffs are telling

18   me that of the roughly 1,200 pirate websites at issue in

19   this case, ██ percent or ███, was that the number you

20   gave me?

21        MR. KANE:  That's correct.

22        THE COURT:  Were associated with ads accounts

23   that were verified by Google.  So it's those ads

24   accounts that you want to know what they submitted to

25   get themselves verified.

```
 1                        PROCEEDING                   64
 2              MR. KANE:  We would certainly want those --
 3              THE COURT:  And is it ███ ads accounts or is it
 4    many more ads accounts?
 5              MR. KANE:  It's ███ pirates websites that gets
 6    you about --
 7              (interposing)
 8              MR. KANE:  -- about ███, I think it's ███ ads
 9    accounts which gets you to about ████ merchant center
10    accounts.  What I would add to that, Your Honor, is
11    first there's 261 pirate websites about which Google has
12    not yet produced information --
13              THE COURT:  You're still working on that,
14    right?
15              MR. KANE:  Right, so we don't know how many of
16    those had an ads account that was verified.  The other
17    thing I would say is it may be that some of the other
18    roughly ████ ██ ██ ███ ███ ██ pirate websites
19    submitted verification documents and were not verified.
20    To the extent Google has those documents, we think those
21    should be included.  In other words, it should be the
22    ███ that were at some time verified --
23              THE COURT:  And anybody else who swung and
24    missed.
25              MR. KANE:  Exactly.  I mean they should
```

PROCEEDING                                65

1

2  basically take the 1,500 and give us, you know, anything

3  that any of those 1,500 submitted because --

4          THE COURT:  For purposes of verification.

5          MR. KANE:  Correct.  Because, of course, we

6  don't know whether the one spreadsheet on which we're

7  basing this is accurate.  We may get into a deposition

8  and find out, oh, the cutoff date was six months prior -

9  -

10         THE COURT:  Depositions, forgive me for

11  interrupting, but I think when we were last together, I

12  exhorted both sides to start actually scheduling

13  depositions.  Has anything happened on that front?

14         MR. KANE:  So what we decided is, so we sent 15

15  notices, notices for 15 fact depositions.  Google told

16  us they wouldn't hold any fact depositions unless we

17  gave them a final 30(b)(6) notice --

18         THE COURT:  Yes, but I resolved that and said

19  each side had to serve the other with their good faith

20  30(b)(6) not quite a hundred percent final draft.

21         MR. KANE:  That's correct, and Your Honor

22  ordered that those were due January 30 --

23         THE COURT:  So we're not there yet.

24         MR. KANE:  -- so I presume that --

25         THE COURT:  It seems like so much time has

```
 1                       PROCEEDING                        66

 2  passed.

 3          MR. KANE:  It was only a week ago I'm afraid.

 4          THE COURT:  All right, so that hasn't happened

 5  yet, all right, thanks.

 6          MR. KANE:  That's correct.

 7          THE COURT:  Now, what else do you want to tell

 8  me about this motion?  Sorry to distract you.

 9          MR. KANE:  That's okay.  The other thing I

10  would point out, just with respect to Google's claim

11  that there's a privacy interest here, most of this

12  information would not actually be sort of private.  What

13  they said they asked for is organization registration

14  documents like certificates of business incorporation

15  and SEC filings.  All or most of that might well not be

16  private at all; it might even be public --

17          THE COURT:  Most of these guys are not going to

18  have SEC filings I wager.

19          MR. KANE:  I agree.  They might have

20  organization registration documents, but those would be

21  public, there wouldn't be a privacy interest.  You might

22  have to pay for them but they would be public.

23          THE COURT:  All right.

24          MR. KANE:  The questions about the advertiser's

25  business model or its operational practices or its key
```

PROCEEDING                        67

1
2  relationships with third parties, none of that is like
3  sensitive information to the point that there's a
4  privacy interest.  The protective order is more than
5  enough.
6           THE COURT:  Oh, I think you'll get an argument
7  on that.
8           MR. KANE:  For those answer the protective
9  order is certainly enough.  I think the only area where
10 they have something of a case is like a driver's
11 license, but for that you can easily add like a view-
12 only platform or even there, I mean the protective order
13 itself --
14          THE COURT:  Remind me, does your protective
15 order have a second super-duper confidential or
16 attorney's eyes only lawyer in it?
17          MR. KANE:  It does, yeah.  So all that can be
18 marked AEO, and as I said, this is all documentation
19 that's coming from people who are committing an illegal
20 act.
21          THE COURT:  All right, I am - I'm not cutting
22 you off, but I think I'm ready to hear from the other
23 side if you're, unless there's something you think I'm
24 missing here.
25          MR. KANE:  I'll save it for reply I guess.

```
 1                          PROCEEDING                      68
 2              THE COURT:  All right.  Mr. Damle.
 3              MR. DAMLE:  Thank you, Your Honor.  Let me
 4   start with the sort of point you raised about when this
 5   all sort of came to a head.  The answer is that, and I
 6   pulled our email chains because I anticipated you asking
 7   this based on your comments from the last hearing.  This
 8   came to a head back in July of 2025, July 18.  So I have
 9   a chain that's quite long, 78 pages, and I have a copy
10   if it would be helpful for you, Your Honor, but I can
11   also just read from it.
12              So this was - just to set the table in terms of
13   the history of this particular dispute.  They served
14   their first, as Mr. Kane said, they served RFPs 35 and
15   36 which he mentioned in September 2024, and then there
16   was a lot of discussion about whether that RFP
17   encompassed issues around identity verification.  And so
18   we had conversations during that time, and then leading
19   up to the summer of last year, they served these two
20   additional RFPs --
21              THE COURT:  101 and 102.
22              MR. DAMLE:  -- 101 and 102 which they expressly
23   said were, in their view, you know, issued out of an
24   abundance of caution, notwithstanding their position
25   that they were already covered by their earlier RFPs.
```

1
2   So that was in July.  And then on July 18 we had a
3   further meet and confer and reached impasse.  In this
4   email from Mr. Kane to the team on July 18 of 2025, he
5   identifies issue 6:  information used to, quote, "verify
6   merchants."  He discusses sort of RFP 36 and information
7   required.  He makes this argument that he made today
8   about, you know, the knowledge of these pirates allows
9   Google readily to tell when different accounts are
10  controlled by the same entity and allows Google to tell
11  that these are pirate merchants, right, the same
12  argument about relevancy here he's discussing today.
13              THE COURT:  One of them.
14              MR. DAMLE:  Right.  To the extent that
15  merchants provide identifying information like this to
16  Google, that information is called by other RFPs, and
17  then he concluded on that issue by saying plaintiffs
18  understand the parties to be at an impasse and intend to
19  raise this issue with the Court.
20              THE COURT:  And date of that email --
21              MR. DAMLE:  That was July 18 of 2025.
22              THE COURT:  And then when did it next come up?
23              MR. DAMLE:  I don't know when the – well, I
24  believe that leading up to the, you know, after that, we
25  have obviously there's a lot of discovery disputes that

PROCEEDING                              70

1
2  happened.  They raised 15 other discovery issues in the

3  meantime, didn't prioritize this.  I think this came up

4  in the lead-up to their filing of the motion that's now

5  before you in December.  So they raised it again.

6         THE COURT:  They raised it again --

7         (interposing)

8         MR. DAMLE:  But this is something that they

9  could've raised --

10        THE COURT:  Hold on.  They raised it again in

11 November, they raised it again in January, they raised

12 it again --

13        MR. DAMLE:  I don't remember – I don't know

14 exactly when they raise it again, but we know that the

15 parties were very clearly at an impasse on this issue in

16 July 2025 --

17        THE COURT:  Well --

18        MR. DAMLE:  There was a lot of briefing that

19 happened after that where they could've raised this

20 issue.  And that affects us in various ways that I can,

21 the fact that this is coming so belatedly affects us in

22 various ways that I'm happy to discuss.

23        THE COURT:  All right, now to the merits.

24        MR. DAMLE:  To the merits.  So I think it's

25 helpful for me to start by just explaining the

PROCEEDING                          71

relationship between the domains and the merchant center

accounts and the ads accounts because I think that's

where your questions started.  So as we've discussed

before, there are roughly 1,200 different domains --

            THE COURT:  Twelve hundred and thirty-nine.

            MR. DAMLE:  Twelve hundred and thirty-nine

domains that they have said at one point advertised

infringing works.

            THE COURT:  Not counting the additional 200 and

some that --

            MR. DAMLE:  Correct, correct.  We'll start with

that just to keep things simple.  That 1,239 domains are

associated with about 20,000 different merchant center

accounts over time.  So the merchant center accounts can

get closed down, they can get reopened associated with

that same domain.  So we're talking 20,000 different

merchant center accounts.

            Now, there's a many to many – so that's just

the merchant center account.  Mr. Kane is correct that

in order to run a paid shopping advertisement on the

shopping platform, you also need an ads account

associated with it.  That ads account, all it does is it

helps pay for the ad.  The actual information about the

thing that is being sold is kept with the merchant

center account.  So the ads account is just a way to pay

for the paid ads.

There's a many to many relationship between a

merchant center account and an ads account.  A merchant

center account can be associated with multiple ads

accounts, and by the same token an ads account can be

associated with multiple merchant center accounts.  So

there's not this sort of fixed one-to-one relationship

between a particular domain and a particular merchant

center account and a particular ads account.

And, in fact, if you look at the merchant

center accounts that – I have it here somewhere.  If you

look at the merchant center accounts that are at issue,

the 20,000 or so merchant center accounts, they are

also, those merchant center accounts are also associated

with ███████ other domains that are not at issue in this

case, that are not said to have committed infringement.

So those merchant center accounts, because the merchant

center account can be associated with different domains

over time, at different points in time, those merchant

center accounts, those 20,000 merchant center accounts

were associated with other domains --

THE COURT:  That are not accused --

MR. DAMLE:  That are not accused of

PROCEEDING                          73

infringement in this case.

THE COURT:  Okay.

MR. DAMLE:  Okay?  And so when you take all of
those different 20,000 merchant center accounts and look
at all across time as far back as we've collected, you
find that they're associated at different points in time
to 10,000 or so, I think we have the number in our
brief, around 10,000 ads accounts.

Now, of those 10,000 ads accounts, we've
provided all this data, this is where all this data's
coming from in the spreadsheet that's at Bates number
ending 904.  We refer to it in our brief.  Of those
10,000 ads accounts, around ██ of them went through
verification at all.  And that's what the data
indicates, that's what will be explained to the
plaintiffs.

THE COURT:  And of those ██, I'm just making
sure I'm doing apples to apples, I'm not at all
convinced that I am, of those ██ that went through a
verification process, I think Mr. Kane told me that ██
of them are relevant to this case.

MR. DAMLE:  I think that ██ of them went to,
were actually verified.  Now, I don't know whether
they're relevant to the case because it's very possible,

PROCEEDING                          74

if not likely, that the ███ads accounts were paying for

ads for domains other than the 1,239 domains accused in

this case because of this complicated relationship

between merchant accounts and domains and ads accounts.

Because at any given point in time, right, because

there's not this fixed one-to-one relationship between

domain and merchant and ads account, that ads account

could've been used – I'll give a hypothetical.

        So there's a merchant center account that maybe

selling infringing goods and non-infringing goods.  And

they may be using one ads account that's verified for

just selling the non-infringing goods, and they're using

a different ads account that's not verified for selling

the infringing goods.  That's certainly a possibility.

Or at different points in time, a particular merchant at

time period A was using an unverified ads accounts when

that merchant account was associated with one of the

1,239 domains, and then at time B, when the merchant

center account cleans up its act and is now advertising,

you know, non-infringing goods, other goods entirely,

that at that time they're associated with a verified ads

account.  That's certainly a possibility.

        Because what we've done is we've sort of

collected like a dragnet all of the ads accounts that

PROCEEDING                    75

1

2  have ever been associated with any of these merchant

3  center accounts regardless of whether those merchant

4  center accounts were - and the merchant center accounts

5  that we've gathered, because this is what the plaintiffs

6  have asked for, the merchant center accounts we've

7  gathered have been merchant center accounts that at some

8  point in time were associated with one of the infringing

9  domains, which is why you get that 20,000 merchant

10 center accounts that were associated with a total of

11 over 30,000 domains.  Remember, there's only 1,239

12 domains here.

13         THE COURT:  And what you verify is the merchant

14 center account, correct?

15         MR. DAMLE:  There's two different

16 verifications.  Mr. Kane explained that accurately.

17 There's a verification - and actually, throughout a lot

18 of this proceeding, we had been under the impression

19 that what they were asking for was information about how

20 we verify the merchant center account which is all we do

21 is --

22         THE COURT:  Now Mr. Kane says we don't care

23 about that.

24         MR. DAMLE:  Now he says we don't care, and, in

25 fact, their opening brief to this Court, when it says,

1

2    oh, ███ ██ the merchant center accounts were verified,

3    what they're talking about is that sort of verification

4    that he says now they don't care about.  Right.  So

5    there's that verification.  Can you edit your website

6    which can involve like including the code, as Mr. Kane

7    explained.

8            THE COURT:  All right.

9            MR. DAMLE:  Then there's this separate

10   verification --

11           THE COURT:  Separate verification --

12           MR. DAMLE:  -- that happens for ads accounts.

13   I want to just be very clear about the verification that

14   we believe is actually at issue in this case.  The kind

15   of verification that we believe is at issue in this

16   motion is identity verification.  Are you who you say

17   you are?  It's a very basic identity, and --

18           THE COURT:  And that's what the little badge

19   means?

20           MR. DAMLE:  And it says that explicitly, it

21   says identity verified by Google.  Advertising identity

22   verified by Google.  Their RFPs, 101 and 102, asked

23   about identity verification.  101 says to the extent not

24   called for by RFP 36, documents concerning all the

25   information provided to you by the infringing merchants

PROCEEDING                          77

and seeking verification of their identity from Google.
So we're talking about identity verification, are you
who you say you are.

We've provided the data that says, again, we're
talking about ■ percent of ads accounts that are in this
case.  No necessary connection to any of the advertising
domains at the time.  We've already provided the data
that shows were they verified or not verified.  There's
a flag that says identity verified, identity
(indiscernible) verified, true or false.  So they
already know the fact of verification.  They already
know the information, identity information that was
provided by the --

THE COURT:  How do they know the identity
information that was provided?

MR. DAMLE:  Well, they know what the
identification, they know in our system what we put in,
what is entered into our system.

THE COURT:  Be more specific.

MR. DAMLE:  So if the corporation name for the
advertiser is Papaya whatever --

THE COURT:  Using the example I looked at with
Mr. Kane --

MR. DAMLE:  Exactly.

1

2          THE COURT:  Well, obviously, you --

3          MR. DAMLE:  So in our database it'll say that

4    name.  It'll say the, you know, business name is Papaya

5    Group or whatever the name was.

6          THE COURT:  And the location is Hong Kong.

7          MR. DAMLE:  And it'll say the location is Hong

8    Kong, and it'll say --

9          THE COURT:  Are you saying that every piece of

10   information you got during the verification process

11   though is reflected in the badge that the consumer sees?

12         MR. DAMLE:  Well, the relevant identity

13   information that we're checking based on, again, the

14   public documents that we've produced, the identity

15   information, who, you know, is your name what you say it

16   is and are you located where you say you're located,

17   that is reflected, that's all we're checking.  So they

18   may be providing documents like, you know --

19         THE COURT:  Articles of incorporation.

20         MR. DAMLE:  -- articles of incorporation, I

21   don't know what it would be in Hong Kong --

22         THE COURT:  Certificates, whatever.

23         MR. DAMLE:  Whatever it would be.  If it's an

24   individual, their driver's license or passport page.

25   Maybe those will have been provided, but we would've,

1

2     all we will have done is check the identity, yes, you

3     are who you say you are.

4            THE COURT:  So if you could turn to document

5     419-5, which was submitted as an exhibit to the

6     plaintiffs' moving letter here.  It's conveniently

7     behind tab 7 of my courtesy copy notebook.  This, as I

8     understand it, is what Google says to the public about

9     what this process entails.  Is that right?

10           MR. DAMLE:  Yes, this is for identity

11    verification, yes.

12           THE COURT:  Which is what you --

13           MR. DAMLE:  Which is not the only kind of

14    verification that Google does, it --

15           THE COURT:  Right, but this the verification

16    which, as you read the plaintiffs' motion, is what they

17    want.

18           MR. DAMLE:  So some of the documentation I will

19    say mixes up two different kinds of verification.  One

20    is – and this is the first time we've heard what they're

21    asking for.  In their brief they cite to a YouTube video

22    which talks about business operations verification.  So

23    Mr. Kane spends a lot of time talking about quoting from

24    that video, saying things like, you know, we check your,

25    Google will engage in, what's the terms he used,

 1

 2  operational practices, key relationships with third

 3  parties, details on products or services, and then links

 4  below this page 3 of their opening brief to Google ads

 5  business operations verification process.

 6          That was something that never came up actually

 7  on our meet and confers.  This is the first time we've

 8  ever seen this website.  And so a lot of what we were

 9  focused on was the process of identity verification

10  which is what's reflected in the data, the actual data

11  says identity was verified, true or false.

12          THE COURT:  So you're saying that the document

13  I'm looking at now, 419-5, is not about the identity

14  verification process?

15          MR. DAMLE:  It's in part about the identity

16  verification process, but I believe there are elements

17  of it that also discuss the separate process of business

18  verification which --

19          THE COURT:  Okay, but this is your document.

20          MR. DAMLE:  Correct, correct, correct.

21          THE COURT:  Plaintiffs didn't make this one up.

22          MR. DAMLE:  I agree.

23          THE COURT:  And if Google can't keep straight

24  what its verification processes are for different

25  purposes --

```
 1                        PROCEEDING                      81

 2             MR. DAMLE:  Again, Your Honor, like we can keep

 3    them straight.  There's two, my point is identity

 4    verification is one kind of verification that occurs.

 5             THE COURT:  Well, you're telling me that.

 6             MR. DAMLE:  Yes.

 7             THE COURT:  But where's the support for that?

 8             MR. DAMLE:  Well, that was what their request

 9    was for.  The request was for how do you verify

10    someone's identity.  I showed you what we actually

11    display to the public is just identity verified by

12    Google.  And the data that we produced is labeled, the

13    relevant – where we're getting this ███ different ads

14    accounts that have been verified, the way we get there

15    is by looking at a field that's labeled identity was

16    verified.  So, again, the entire conversation that we've

17    had from their RFPs, 101 and 102, to the data that we

18    produced, to the actual exhibits that they are showing

19    you that say what Google is doing is verifying the

20    identity.

21             THE COURT:  All right, what else do you want to

22    tell me?

23             MR. DAMLE:  If you have questions about this

24    document, I'm happy to answer them.  I just wanted to

25    make that clear that there are these two separate kinds
```

PROCEEDING                    82

1    of verification.  We've only ever been talking about the

2    identity verification --

3

4         THE COURT:  Well, if I look at RFP 102 which is

5    at document 419-3, it says that plaintiffs want

6    documents sufficient to show Google's processes and

7    procedures concerning, quote, "obtaining, verifying, and

8    displaying identifying information for the product

9    seller in connection with the Google ad transparency

10   center, e.g., HTTPS."  Now, they do use the term

11   identifying information for the product seller, but then

12   that HTTP address, is that the document we were looking

13   at a moment ago that --

14        MR. DAMLE:  Yeah, so the --

15        (interposing)

16        MR. DAMLE:  So what Mr. Kane showed you, that

17   sort of pop-up that you saw for Papaya Group Company

18   Ltd. --

19        THE COURT:  That's the HTTP address?

20        MR. DAMLE:  I don't know whether that's the,

21   exact what this HTTP address takes you to is something

22   that looks like this, but that is the --

23        THE COURT:  I don't think so.

24        MR. DAMLE:  No, it's --

25        THE COURT:  I think he may have been pointing,

```
 1                         PROCEEDING                    83
 2   if anything, to what's been reprinted at 419-5.  I don't
 3   know that, I'm guessing because there is no URL on it.
 4   But my point to you, Mr. Damle, is I'm not sure that 101
 5   and 102 in particular are as limited to what you're now
 6   describing as the identity verification process as you
 7   believe them to be, and it may well be, as is often the
 8   case in cases like this, because when the plaintiffs
 9   wrote these RFPs, they didn't know as much as they know
10   now having heard a lot back from Google as to the
11   different kinds of processes.  They may have been vague
12   by intention or they may have been vague because they
13   didn't know enough to be more precise at the time.
14            Why don't you tell me about this other broader
15   process that involves more than are you who you say you
16   are?
17            MR. DAMLE:  Yeah, so, Your Honor, to be candid,
18   because the very first time we even had, understood that
19   what they were seeking was, you know, whatever is
20   referred to in this YouTube video, right, they never
21   showed us this YouTube video during our meet and confer
22   process, never asked us --
23            THE COURT:  Which I haven't watched by the way.
24            MR. DAMLE:  And we watched it after this brief
25   came in.  We didn't know that they were asking us for
```

PROCEEDING                              84

information about our business operations verification.

And so, candidly, we haven't done a lot of investigation

into what that process entails because that was not

something that was ever teed up in the meet and confer

process prior to filing this brief.  This brief, again,

we went through this process – and if you look at what

they're asking for, right, what they're asking for in

terms of the information we collect from the pirates

were things about, you know, the official documentation

that shows their legal name, trade name, address, and

other supporting documents.  So we just haven't had the

opportunity to really meaningfully meet and confer about

the business operation verification process.  So,

unfortunately, I don't have answers for you about how

that works.

            THE COURT:  All right, what else do you want me

to know?

            (pause in proceeding)

            THE COURT:  And I note, the reason I'm flipping

through pages is I was looking at the plaintiffs'

proposed order which is also a little bit unsatisfactory

in terms of what they're looking at.  Plaintiffs want me

in paragraph 1 to order Google to search for and produce

documents responsive to 102, at a minimum documents

1

2  regarding, quote, "Google's process for verifying

3  advertisers," close quote.  I don't know what that means

4  anymore.

5         MR. DAMLE:  Neither do I, Your Honor.  The

6  other thing I'll say is, you know, just go to the

7  relevance point if I may, you know, so just a couple of

8  things that they've said they need to, they want to

9  argue.  One is Google verified these ads accounts, and

10  these ads accounts were in some indirect fashion

11  associated with domains that were engaged in

12  infringement.  And that was contribution to copyright

13  infringement.  So what I would say to that is we've

14  already given them the information of whether we

15  verified somebody or not, right, that's in the data

16  itself.  So they have what they need in order to make

17  that argument.  I don't think that's a correct argument,

18  but if they want to make the argument that the

19  verification of those ███ ads accounts somehow

20  constituted material contribution or inducement to

21  infringement, I don't understand why they need anything

22  more.  That data is there.

23         THE COURT:  Well, because they want to make

24  another argument.  They want to make an argument based

25  on what they may find out you actually got from these

folks, and they want to make an argument that you

received information that should have prompted you to be

more proactive.

MR. DAMLE:  So if what they're saying is that

we got, again, focusing on the identity documents.  So

the other argument they say is if Google knew that, you

know, account X and account Y were the same, had the

same identity, that they, you know, that they would've

had to implement their repeat infringement policy in a

particular way.  I would say, again, that's something

that the data provides.  The data includes the verified

identity information, the name of the business, their

location.  And so if they want to make an argument that

these two different accounts are actually run by the

same company and you can tell that you knew that because

they're both verified, that's an argument that they can

make based on the data.  With respect to that, I don't

understand why they need anymore, why they need the

underlying documents that may have been submitted by

that particular ad accountholder, those ads

accountholders to Google to make that argument because

the data itself indicates what the contact information

is, what the identity is for all the ads accounts.  So

it doesn't seem necessary for me for that reason as

```
 1                          PROCEEDING                      87
 2   well.
 3          So those were the two that I heard being the
 4   main reasons they want this information, and it strikes
 5   me that they didn't, that given that those are their two
 6   main arguments, I don't understand why they need the
 7   further discovery beyond what we've already given them.
 8          THE COURT:  All right, let me ask Mr. Kane a
 9   few questions.  Let me begin with just a factual
10   question.  You say, you said to me earlier this
11   afternoon and you repeat this number in your reply
12   brief, that Google claims to have verified ███ of the
13   1,239 pirates identified not counting the last.  Where
14   does that ███ number come from?
15          MR. KANE:  Okay, so what Google allows pirate
16   websites to do is to establish multiple accounts that
17   all run ads for --
18          THE COURT:  This is a technical question.
19          MR. KANE:  I'm sorry.
20          THE COURT:  Where can I find that number, ███?
21   Is it on a document, is it on a spreadsheet, is it in an
22   interrogatory?
23          MR. KANE:  We provided it, so that it comes
24   from a spreadsheet that Google gave to us.  So they gave
25   us --
```

PROCEEDING                           88

1

2        THE COURT:  Do I have that spreadsheet?

3        MR. KANE:  No, we didn't provide that to the

4   Court.  We provided it to Google simultaneously with the

5   filing of the reply brief.  But it's the spreadsheet

6   ending in 9904.  And what it is it's a list of ads

7   accounts with an indication as to whether the ads

8   account has been verified or not.  So as we've

9   explained, one ads account can support multiple merchant

10   center accounts.  And so if you take the ads accounts

11   and you say, okay, these are all the merchant center

12   accounts that are associated with that ads account, and

13   then you say what are the websites with which those

14   merchant center accounts are associated, you get to ██

15   of the 1,239 domains.

16        THE COURT:  Okay.

17        MR. KANE:  In other words --

18        THE COURT:  I understand the logic, but I'm

19   taking your word for it at the moment.

20        MR. KANE:  I don't think they're challenging

21   the ██ number.

22        THE COURT:  Well, it's just that when Mr. Damle

23   was up, he kept giving me different numbers.

24        MR. KANE:  So what --

25        THE COURT:  ██, etc.

```
 1                        PROCEEDING                    89
 2              MR. KANE:  What Mr. Damle is going is trying to
 3    take just the number of ads accounts themselves, in
 4    other words, there's 10,000 or so ads accounts that are
 5    associated with these 1,239 pirates, and he's saying ███
 6    I think was his number of those ads accounts were
 7    verified.  If you take the ads accounts that were
 8    verified and match the up to the pirate websites with
 9    which they're associated --
10              THE COURT:  You get ███.
11              MR. KANE:  -- it's ███, exactly.
12              THE COURT:  Now, the kind of verification that
13    you are talking about, based on the examples that you
14    have submitted to me as attachments to your opening
15    letter brief do appear to be what Mr. Damle was
16    referring to as identity verification.  In fact, to use
17    the example that you helpfully walked me through at
18    document 419-1, what this page says is advertiser
19    identity verified by Google, not anything else.  Same
20    with 419-2.  And you didn't give me any examples of any
21    other or different kind of verification.  Is your motion
22    aimed at what Mr. Damle refers to as identity
23    verification or at something else?
24              MR. KANE:  So what we want to know is what does
25    the merchant provide to Google in order to get that
```

1                           PROCEEDING                        90

2    little badge --

3            THE COURT:  At identity verification.

4            MR. KANE:  Exactly.  Google is not telling us

5    for the first time these things that you put in the

6    brief are a separate verification process.  If Google

7    has some other verification process to which it

8    subjected these pirates, I agree we should meet and

9    confer about that, and they can tell us what their

10   position is.  What we want in this motion is --

11           THE COURT:  Identity verification.

12           MR. KANE:  -- in order for that badge to

13   appear, what did the merchant or pirate website provide

14   to Google.  If it is the case, as Mr. Damle is

15   surprising us now in saying, that there is some separate

16   verification process to which these merchants, these

17   pirate websites were subjected, we are going to ask for

18   discovery into that.  But I'm not able to say --

19           THE COURT:  Somehow I'm not surprised to hear

20   you say that.

21           MR. KANE:  Well, I mean if they --

22           THE COURT:  It doesn't mean you're going to get

23   it at this stage.

24           MR. KANE:  I'm literally learning this as you

25   are.  If it turns out there's some entire --

PROCEEDING                              91

1

2          THE COURT:  Yes, but it does sound like there

3    was at least a several months hiatus there between July

4    and much more recently after you declared the parties at

5    impasse on this issue and before you started talking

6    again.

7          MR. KANE:  Well, we did meet and confer about

8    RFP 101 and 102 which are the sort of more specific

9    versions of it.  We didn't reach an impasse on that

10   until November 25, 2025.  We filed the motion in

11   December of 2025.  So that was much more closely

12   following the meet and confer.  The thing I want to

13   point out about timing is just what Google does if

14   there's a hundred things that they're supposed to

15   produce, they produce ten of them, and when we file

16   motions on items 11 through 25, they say, my God, Judge,

17   look at what they're subjecting the Court to, leaving

18   out that they've not produced documents on items 26

19   through 100.  So their attempt to sort of cast us as not

20   bringing these things soon enough really is contradicted

21   by their conduct during meet and confers.

22          But to get back to the substance, one of the

23   reasons we need these things is I suspect, when we see

24   these documents that the pirates provided, it's going to

25   be pretty obvious that they're pirates.  I'm not saying

PROCEEDING                                    92

1

2  they're going to be written in crayon, but I think it's

3  going to be pretty obvious that like in the way that

4  they answer these questions and the documentation that

5  they provide, that these are not legitimate websites.

6  In particular, if part of the verification process is

7  visiting the pirate's website, I think it's going to be

8  pretty clear, it's pretty clear from all of these sites

9  it's a pirate website.

10         THE COURT:  Well, it doesn't sound - if what

11  Mr. Damle tells me is true or substantially true, if I

12  order Google to, as a first step, search for and produce

13  further non-privileged documents responsive to

14  plaintiffs' RFP 102, construing the request consistent

15  with the way you've written this motion, as the identity

16  verification process and not some other verification

17  process, in other words, what has to happen for that

18  badge to go on, it sounds to me like what you're going

19  to get back, which may be a piece of code, I'm not sure,

20  is going to be something technical and unsatisfactory to

21  you, a means of having the advertiser establish that

22  they can edit the website that they're associated with.

23         MR. KANE:  No.  Those are two separate things.

24  So there's the merchant center verification which is

25  what you're describing, just a proof that you are able

PROCEEDING                              93

1

2  to operate the website.

3          THE COURT:  But you think identity verification

4  involves more meat and potatoes.

5          MR. KANE:  Exactly.  That's when we think

6  they're answering these questions and providing the

7  documentation that verifies their identity.  Part of the

8  difficulty here, Judge, is we've asked for sort of two

9  things.  One is just tell us what the process is, like

10  what are the questions you ask --

11          THE COURT:  And the second is show us

12  everything you've got.

13          MR. KANE:  Exactly.  Because they've refused to

14  give us the first thing, it's harder for us to say what

15  they're going to produce with respect to the second

16  thing.  In other words, because we don't know what

17  questions they ask, because we don't know what documents

18  they require, it's hard for me to say, well, for sure

19  we're going to get something in step two that tells us a

20  meaningful amount about the pirates.

21          THE COURT:  All right.

22          MR. KANE:  But based on what they've told us

23  about the process, I think we are --

24          THE COURT:  I think I've heard enough to make a

25  decision, but I don't want to cut you off if there's

1

2  something you're dying to tell me.

3          MR. KANE:  Just the one other point I would

4  make is the other thing that Google hasn't told us is

5  not just like what's the documentation that the merchant

6  presents and what's the questions that the merchant

7  answers but what does Google do with that information.

8  In other words, we know they do something because

9  sometimes they reject the verification, but when a

10 merchant submits articles of incorporation or when they

11 answer a question about their business operations, what

12 is Google's process to verify the merchant.  Is there a

13 checklist someone fills out?  Is it automated and if so,

14 like what is the automation looking for?  If we had all

15 of that, then we would know for sure did they get, was

16 there something that the merchant provided to Google

17 that gave Google knowledge that this was an infringing

18 pirate.

19          THE COURT:  Got it.  Thirty seconds if you want

20 them, Mr. Damle.

21          MR. DAMLE:  Yeah, just on the numbers, Your

22 Honor.  He sort of says, okay, there's ███ ads accounts

23 that were verified out of the 10,000, and he traces it

24 back to ███ domains that are at issue.  They're also

25 associated with a ton of other domains that are not at

PROCEEDING                              95

1

2    issue.  So I just wanted to make sure that point was

3    clear.  There's no real clear connection between those

4    ███  and any infringement that's happening in this case.

5           And in terms of the documents that are about

6    the process for identity verification, we provided our

7    public information which describes what we're --

8           THE COURT:  Not the public information he

9    wants; it's the non-public information.

10          MR. DAMLE:  I'm not certain there's going to be

11   much more beyond that.  It's just like look at this

12   document, look at this document.  So I sort of don't

13   know what he's getting out of this given, again, going

14   back to my relevance point, the points he says he wants

15   to make can be made with the data we've already

16   provided.

17          THE COURT:  Thank you both very much.

18          MR. DAMLE:  Thank you, Your Honor.

19          THE COURT:  Plaintiffs' December 9 discovery

20   motion regarding the verification documents filed at

21   dockets 386 and 389 will be granted in part.  I will

22   require Google to search for and produce further non-

23   privileged documents sufficient to show, they don't have

24   to produce every single email out there, sufficient to

25   show Google's process for performing identity

PROCEEDING                        96

verification of advertisers, in other words, what you

need to get that little badge that says your identity is

verified, including, A, documentation Google requires

advertisers to submit, B, questions if any Google

requires them to answer, and, C, analyses, I'm not going

to say policies, that's too broad, analyses or

procedures that Google applies to that information in

order to determine whether to give out that little badge

or not.

So that's essentially with some minor

modifications the first paragraph of the proposed

discovery order submitted by the plaintiffs.  I'll

rewrite to hopefully make it a little clearer, but I

wanted to give you my oral cut on it today.  So that

will be the order with respect to dockets 386 and 389.

Is it time for our afternoon break?  I think it

is time for our afternoon break.  Let's try to keep it

to ten minutes.  I know I say that every time, but I'm

trying to.  All right, we'll stand in recess.

(Whereupon, a recess is taken.)

THE CLERK:  We're now back on the record in the

matter of Cengage Learning Inc., et al. v. Google LLC,

case number 24cv4274.

THE COURT:  Hold on, I'll give you a moment to

1

2   reassemble.

3           (pause in proceeding)

4           THE COURT:  All right, everybody ready?  Sorry,

5   we should've given you a little more warning.  So I'm

6   now ready to hear argument on plaintiffs' December 17

7   motion regarding Mr. ███.  The motion was filed at

8   docket 455, and this is Ms. Lee's motion, correct?  I

9   wonder if you might begin, Ms. Lee, by just clarifying

10  for me exactly what's being argued about here.  In your

11  moving letter brief, dated December 17, on page 3, I see

12  a list of seven proposed search terms for Mr. ███.  And

13  I understand that 1 through 3 were created specifically

14  for Mr. ███, and 4, 5, 6, and 7 are terms that are

15  already being used with other custodians.  Correct?

16          MS. LEE:  Yes, Your Honor.

17          THE COURT:  Okay.  Defendants, however,

18  complain that some of these search terms were

19  communicated to them for the first time in this moving

20  letter.  So if you could  give me a little bit of a

21  timeline here and tell me when plaintiffs first asked

22  for each of these search terms to be run across Mr.

23  ███'s data.

24          MS. LEE:  Yes, Your Honor.  So Mr. ███ ███,

25  we asked Google if he could be a full custodian in

```
 1                          PROCEEDING                      98
 2   October of last year.
 3              THE COURT:  And they said no.
 4              MS. LEE:  And they said no.  And we had six
 5   meet and confers after that to try to narrow these
 6   search terms.  Google had provided several hit reports
 7   of the brand portal and several other search terms, but
 8   they had only provided the hit reports for their
 9   suggested search terms.  And so we crafted with Google's
10   proposal our proposed search terms in November, and
11   these are the --
12              THE COURT:  November of 2025?
13              MS. LEE:  Yes.  So these are the first and
14   second search terms that are --
15              THE COURT:  You're saying that search term
16   number 1, which is a long string --
17              MS. LEE:  Yes.
18              THE COURT:  -- and search term number 2, which
19   is a short string involving ██████████ were proposed in
20   November of 2025.
21              MS. LEE:  Yes.
22              THE COURT:  In these exact words?
23              MS. LEE:  So, I'm sorry, Your Honor, number 2
24   was actually a proposed search from Google, and so they
25   had provided the hit reports, and that was their
```

```
 1                        PROCEEDING                    99
 2   proposed search, but they, although they gave us the hit
 3   reports, they did not agree to search number two either.
 4             THE COURT:  And when did Google propose number
 5   2?
 6             MS. LEE:  Your Honor, that was also in November
 7   of 2025.
 8             THE COURT:  Okay.  So you're saying you
 9   proposed number 1, the long one, in November of 2025,
10   and Google proposed number 2, the short one, in November
11   of '25?
12             MS. LEE:  Yes.
13             THE COURT:  And does ████████, is that a Harry
14   Potter reference by any chance?
15             MS. LEE:  So that appears, according to
16   Google's documents, to have been a suggested name of
17   brand portal.  It seems like that name is no longer used
18   for brand portal, but it is, it was a suggested
19   consideration before they called it brand portal.
20             THE COURT:  That was the ██████  ████ if I
21   remember correctly.
22             MS. LEE:  Yeah.  Yes.
23             THE COURT:  Okay.  What about number 3, which
24   is the AAP search string?
25             MS. LEE:  Yes.
```

```
 1                        PROCEEDING                      100
 2           THE COURT:  Who proposed that and when?
 3           MS. LEE:  So this AAP search string is actually
 4   just a small portion of plaintiffs' original search
 5   terms from back in March of 2025.  What had happened was
 6   that we realized that we did not receive certain
 7   communication regarding the AAP communications from Ms.
 8   ██████  ████ who is a current custodian.  But we
 9   understood Mr. ██████  ████ to have been involved in
10   these AAP communications, but in an effort to try to
11   understand why Ms. ████████  ████ did not have those
12   communications, we narrowed our existing search terms of
13   the AAP search string and proposed number 3 so that we
14   could figure out what had happened there.
15           THE COURT:  And when did you first communicate
16   search string number 3 as a potential search term for
17   Mr. ████ to Google?
18           MS. LEE:  I understand we proposed that also in
19   November of 2025 or perhaps early December of 2025.
20           THE COURT:  The reason I'm asking these
21   questions, I'm sure this won't come as a surprise to
22   you, is that Google tells me - hold on, let me get to
23   the right document here.
24           (pause in proceeding)
25           THE COURT:  Google tells me that some of these
```

```
 1                        PROCEEDING                    101
 2   document demands, although I'm not sure I can map, some
 3   of these search strings rather, although I'm not sure I
 4   can map which one is which, they're reading for the
 5   first time when they got your letter motion.
 6            MS. LEE:  Your Honor, that is incorrect.  We
 7   have presented these, there are correspondence, multiple
 8   correspondences from October to December.  Again, we
 9   have first asked him to be a full custodian back in
10   October --
11            THE COURT:  Right, and if I understand
12   correctly, there was an agreement reached at that time
13   that he would not be a full custodian.
14            MS. LEE:  Yes.
15            THE COURT:  And Google I'm sure is going to
16   tell me in a minute that Google thought that that was
17   the end of it as far as Mr. ████ was concerned.
18            MS. LEE:  I'm sure they might, but in the
19   series of six meet and confers for the four months,
20   there was a lot of negotiations on what exactly Mr. ████
21   and what exactly are the search terms that would be
22   appropriate to get his documents for.  And so although
23   the communications about Mr. ████ being a full custodian
24   Google might've believed that was stopped in October of
25   2025, we had consistent communications with them with
```

PROCEEDING                           102

1  which search strings would best work, what kind of terms

2  would be overinclusive, underinclusive.  But they

3  refused to provide any hit reports besides the search

4  terms that they only chose.  We tried to have more

5  dialogue with them even up until a day before we filed

6  our letter motion, and yet they still refused to provide

7  more information on these search terms.

8          THE COURT:  Now, search string number 1, the

9  long one --

10         MS. LEE:  Yes.

11         THE COURT:  You tell me that there is a hit

12 report, in fact, there are two hits reports for two

13 versions of this search string, one of which returned

14 159 hits and one of which returned over a thousand hits.

15 Which version am I looking at here on page 3 of your

16 letter motion, the one that returned 159 or the one that

17 returned a thousand?

18         MS. LEE:  Your Honor, our search term number 1,

19 Google has not provided a hit report.  The reason we got

20 those numbers is if you actually take a look on docket

21 456, page number 3, those are the four --

22         THE COURT:  This is Mr. Kane's --

23         MS. LEE:  Yes, I'm sorry, this is Mr. Kane's

24 attorney declaration.  On page 3, number 12, you will

PROCEEDING                                    103

 1
 2   see that there are four search terms that Google
 3   provided hit reports for.
 4            THE COURT:  Got it.
 5            MS. LEE:  And these are the only hit reports
 6   that we have received.  Google only has agreed to search
 7   the very last one, and that is brand within two portal
 8   and digital book or e-book or e-book, and that came out
 9   with a total of 153 documents.  We created our search
10   string because we believed that that was way too
11   targeted and narrowed.  We then, after we got these hit
12   reports, asked Google to run our search term and
13   consider our proposed search term which Google has
14   denied or refused to provide hit reports for.
15            THE COURT:  Okay.  So of these four that were,
16   that are listed in Mr. Kane's declaration, which have
17   hit counts with them, it looks like the only one which
18   is actually on your current list of seven that you want
19   is the ███████  one.
20            MS. LEE:  Yes, Your Honor.
21            THE COURT:  And everything else is not quite on
22   your list.
23            MS. LEE:  Not quite on our list.
24            THE COURT:  Okay.  So you touched on the
25   question when you provided these requested search

1    strings and you've touched on the question of whether

2    you waited too long.  You say this has been a continuous

3    process, and you keep trying to talk sense into them,

4    and you couldn't, so you had to make a motion.  Now you

5    should probably go back to first principles and tell me

6    what you think these documents are going to be relevant

7    to.

8            MS. LEE:  Yes, Your Honor, so Google's own

9    documents have revealed that Mr. ████ had a leading role

10   in what we learned is the ███ █████████ █████████ team,

11   and this ███ █████████ █████████ team, among various

12   other projects, we found that they were in charge of

13   monitoring the ████ █████████ of pirate sellers and re-

14   disapproving terminated merchants.  Now --

15           THE COURT:  And you say that this group and Mr.

16   ████ in particular oversaw three projects that are of

17   particular interest to you, one in 2021, the attempt to

18   ban ads for e-books entirely; two, project ██████ or

19   maybe that was one of its early names but was, the

20   concept was to reallow paid ads on the shopping platform

21   but only for legitimate publishers, right, and that

22   didn't come to fruition; and, three, some discussions

23   that you believe were had between Google and AAP in 2022

24   that were aimed at creating some sort of white list for

```
 1                          PROCEEDING                    105
 2   legit, again for legit publishers of e-books.  Right?
 3            MS. LEE:  Yes, Your Honor.
 4            THE COURT:  Okay.  As to the third, you're a
 5   member of AAP, all of your clients are members of AAP.
 6   Have you asked them?
 7            MS. LEE:  Yes, Your Honor, and we have actually
 8   produced that communication within our last productions
 9   to Google because we still were unable to locate that
10   communication in Google's production.
11            THE COURT:  I'm sorry, you produced it but
12   Google hasn't produced it.
13            MS. LEE:  Google has not produced it.
14            THE COURT:  Well, but what else do you think is
15   out there?
16            MS. LEE:  We are looking for the internal
17   communications that Google had been discussing and what
18   was going on in trying to create this white list but
19   then why was it also deprecated and de-prioritized as
20   well.  That AAP communication was just one example that
21   we had where we knew that it was not just plaintiffs
22   that were sending notices and alarming Google of this
23   rampant piracy on shopping.  In fact, there are this AAP
24   association that was also sending and asking for either
25   an allow list and telling Google that there was piracy
```

1

2  on the Google shopping platform.  And we produced this

3  document to Google in light of here is an example of

4  some of the communications that we're looking for, and

5  we understand that you have been thinking of a white

6  list of our publishers.

7           And, in fact, this was a development that had

8  occurred within the last six days.  Google's counsel

9  actually emailed plaintiffs' counsel, and I have a copy

10 of the correspondence if you'd like to take a look, but

11 we learned for the first time that our existing

12 custodians do not have these AAP communications because

13 they deleted those emails.

14          So Google in their reply have said that we have

15 enough custodians, we have Ms. ██████ █████ and we have

16 Mr. █████ ███████.  So why do you need Mr. █████ ████

17 as well?  And in doing so we asked them, but Ms. █████

18 ███ and Mr. ███████, you produced al your documents on

19 January 6, we still don't have these AAP communications.

20 Six days ago we received as to this AAP communication,

21 this email, these two particular custodians, Ms. █████

22 and Mr. ███████ did not have a copy of this email in

23 their files which was received over two years before the

24 commencement of this litigation when there was no

25 obligation to preserve this email.

1

2         THE COURT:  And we know that those two

3  custodians would've received it?  It was an email that

4  they were copied on?

5         MS. LEE:  They were very clearly copied on,

6  yes.

7         THE COURT:  And Mr. ███ was as well.

8         MS. LEE:  And he was as well, yes.

9         THE COURT:  Were there any actual meetings on

10 this topic by Zoom or in person?

11        MS. LEE:  There appears to have been.  Google

12 produced just one screenshot of a meeting, of this

13 meeting that occurred with the AAP.

14        THE COURT:  And was Mr. ███ present, if you

15 know?

16        MS. LEE:  He was, yes.

17        THE COURT:  And you know that how?

18        MS. LEE:  Oh, he was invited as like --

19        (interposing)

20        MS. LEE:  -- as the list, but we received no

21 other documentation about this meeting, any follow-up

22 notes, any correspondence with the AAP itself.

23        THE COURT:  Okay, and Mr. ███ do I understand

24 correctly, is no longer at Google?

25        MS. LEE:  Yes, he is a former employee.

1

2          THE COURT:  And when did he leave, if you know?

3          MS. LEE:  We understand him to have left

4  sometime in 2025, so just last year.

5          THE COURT:  Okay.  And his emails, I'll just

6  jump ahead and ask Google, his emails have been

7  preserved?

8          MS. CLARKE:  Yeah, I mean just to be clear, all

9  the custodians' documents were preserved pursuant to

10  Google's document retention policy.

11          THE COURT:  Okay.  All right.  So your pitch to

12  me, Ms. Lee, is that these documents are relevant, that

13  it looks like we can't get them from other custodians,

14  and that you don't think it should be, I'm making up

15  something now that you haven't said yet, but tell me if

16  I'm correctly anticipating your argument, that you see

17  no reason why this should be particularly burdensome but

18  if it is burdensome, it's Google's responsibility to

19  give a hit count which they haven't done.

20          MS. LEE:  Yes, Your Honor.

21          THE COURT:  It's amazing how I can now predict

22  what lawyers are going to say.  All right, what else do

23  you want to tell me?

24          MS. LEE:  Your Honor, I did also want to

25  mention that we had asked for Mr. ████ to be a custodian

PROCEEDING                          109

1

2   not just starting in October but going back as far as

3   September of 2024 in our, excuse me, October of 2024,

4   and we asked him to formally be a custodian in February

5   of, or March of 2025.  And Google's response to not

6   including Mr. ███ as a custodian even back then was

7   that his documents would be duplicative of Ms. ██████

8   ██████, and so there's no reason to include him.

9           THE COURT:  Right, and now you're saying, well,

10  that might've been true if she hadn't deleted all those

11  emails.

12          MS. LEE:  Yes, Your Honor.

13          THE COURT:  All right, and who's arguing this

14  for Google?  And you are Ms. Clarke?

15          MS. CLARKE:  Yes.

16          THE COURT:  Okay.  Go ahead.

17          MS. CLARKE:  Thank you, Your Honor.  Just first

18  going back to the timeline of this dispute, I just

19  wanted to correct a few things.  So it's correct that

20  (indiscernible) aware of Mr. ███ starting from October

21  2024.  The parties went through normal custodian

22  negotiations in the spring of 2025, and there were

23  several custodians who were discussed as potential,

24  quote, "AAP custodians" --

25          THE COURT:  And he was in the mix.

```
 1                         PROCEEDING                    110
 2              MS. CLARKE:  He was in the mix.  We agreed – so
 3    there were four that they proposed.  We agreed to add
 4    Ms. ████   Based on our knowledge at the time, we
 5    believe that she would have all the documents, or
 6    substantially all the documents that Mr. ████ would
 7    have, including the other two, and the other two AAP
 8    custodians.
 9              THE COURT:  Who were the other two, remind me
10    again?
11              MS. CLARKE:  So we have Mr. ████ ████ who
12    actually Google has voluntarily agreed to add since the
13    October hearings.  Unrelated to this dispute, we just,
14    you know, we're trying to take issues off the table.
15    And I believe the fourth was Mr. ████ ████.
16              THE COURT:  Hold on.
17              MS. CLARKE:  He's not currently a custodian.  I
18    don't know if he's mentioned in any of the briefing.
19              THE COURT:  I don't see – yes, ████ ████,
20    right?
21              MS. CLARKE:  Correct.
22              THE COURT:  Okay, he did end up being a
23    custodian?
24              MS. CLARKE:  He is not a custodian, but two of
25    the four are now custodians.
```

```
 1                          PROCEEDING                    111
 2           THE COURT:  ████  and  ████████
 3           MS. CLARKE:  Yeah, so we had those
 4   negotiations.  Plaintiffs definitively agreed in Spring
 5   of 2025 with Google's proposal to go forward with Ms.
 6   ████, and we hadn't really discussed this issue until
 7   October of 2025 when plaintiffs raised Mr. ████ again.
 8   Simultaneously, they had also raised the issue of the
 9   gaps in, alleged gaps in our AAP document production.
10   So we said that we would look into this.  We looked at
11   what potential search terms we could offer in a targeted
12   way for Mr. ████, and we made a proposal to plaintiffs
13   on adding what was existing search term 5 which, as Ms.
14   Lee said, that's part, that's actually a larger search
15   term string than what their current search term --
16           THE COURT:  All right, with reference to their
17   moving document, with their list of seven --
18           MS. CLARKE:  Yeah, so, sorry, I have a
19   breakdown because we --
20           THE COURT:  Give me the map.
21           MS. CLARKE:  Yeah, their list has different
22   numbering than what the parties have been using.  So
23   number 3 on their list is a revised version of search
24   term 5 which is what we had offered to do for Mr. ████
25           THE COURT:  Okay.
```

MS. CLARKE:  It also offered our own brand
portal search term.  This was another issue that
plaintiffs had raised to us saying, you know, we think
this brand portal exists, we think the documents are
relevant, we don't see many of them.  Google disagreed
that this is relevant.  We explained to them that the
brand portal was a very short-term initiative that
Google was exploring for all of its tools, not just
Google Shopping, and it was not targeted for copyright
infringement at all.  We were – it was a tool that
Google was exploring in several ways.  As the name
suggests, it was a way for Google to track brand.  So,
for example, on the airline, to make sure that the
proper airline was being advertised or listed on one of
its ads.

So it was a very large-scale process, and we
explained that to plaintiffs, but we didn't think there
were many relevant documents related to brand portal
that relate to this issue.  However, we did agree to a
search term that I think Ms. Lee had pointed you to.  It
was the last one on that list of hit counts that we had
provided in the 153 documents.

THE COURT:  Okay, the one in Mr. Kane's
declaration.

```
 1                        PROCEEDING                      113
 2            MS. CLARKE:  Correct.
 3            THE COURT:  Okay, but --
 4            MS. CLARKE:  And --
 5            THE COURT:  -- plaintiffs want longer search
 6   string --
 7            MS. CLARKE:  And they want the Project
 8   ███████████  just to correct the record, we've gone back
 9   and forth on this, so I don't think Ms. Lee was trying
10   to misrepresent, but that was originally a plaintiffs'
11   proposed search term.  Google said that we didn't
12   understand that.  This was a term that was used
13   frequently for this project, so we had said that we
14   wouldn't do it.  We did still run that hit count to see,
15   and as you saw, there were only nine hits which I think
16   supports Google's position that this is not a phrase
17   that was used frequently for brand portal, but --
18            THE COURT:  But it also supports plaintiffs'
19   argument this this is not a big deal.  Just look at them
20   and turn them over, which --
21            MS. CLARKE:  Sure, but I guess our argument
22   would be that, you know, Google's tried to be very
23   reasonable here.  We didn't say you can't have anything
24   for brand portal.  We did give them a targeted search
25   term that we thought would be reasonable given what they
```

                              PROCEEDING                    114

 1
 2    explained to us what they were looking for, limiting it
 3    to e-books in this situation.
 4         THE COURT:  Right.  Is Google still willing,
 5    and this is not at all clear to me, of the four search
 6    terms that you did run hit counts on which appear as
 7    part of paragraph 12 of Mr. Kane's declaration, what if
 8    anything is Google willing to do here?
 9         MS. CLARKE:  So our original offer was to do
10    the last search term which is what we proposed, the 153.
11    We told plaintiffs that, that we would do that in the
12    original search term 5.  Plaintiffs rejected that offer
13    and filed this motion.  So our position now is that our
14    fact discovery has, the document discovery has closed
15    for us.  We made this offer in November.  We actually
16    told plaintiffs this, we actually said, you know, we
17    need to resolve this so that we can like put these
18    documents into the queue with our current document
19    reviewers and get it done.  Now, it would be extremely
20    burdensome for Google to have to reopen that to have to
21    produce these again.
22         And just one other thing I wanted to just
23    correct in terms of the timeline.  Ms. Lee kept saying
24    that we didn't provide hit counts.  So what happened
25    after we made the offer of adding search term 5,

```
 1                    PROCEEDING                    115
 2   plaintiffs came back to us I think --
 3            THE COURT:  (inaudible)
 4            MS. CLARKE:  I know, I'm sorry.
 5            THE COURT:  Search term 5 is actually --
 6            MS. CLARKE:  Number 3 in their list.
 7            THE COURT:  Number 3 in their list.
 8            MS. CLARKE:  Yes.  A revised version of number
 9   3.  They revised search term 5 to get to number 3.  I
10   know, I'm sorry.  I have a chart that is in my notes.  I
11   should've created a copy for you.
12            THE COURT:  (inaudible)
13            MS. CLARKE:  I know, I'm sorry.  So we, after
14   that plaintiff said we're not going to do any of this,
15   we're going to move to add another full custodian.
16   Sorry, actually before that, they said you need to add
17   him with search terms number 3 through 7 which don't
18   correlate to this list.  We said that's too burdensome.
19   They said, okay, we're just going to move to add him as
20   a full custodian.  Plaintiff never --
21            THE COURT:  But they're not seeking to add --
22            MS. CLARKE:  I understand but she's, Ms. Lee
23   has made a big point about us not providing hit counts.
24   They never asked us to run number 4 on their list,
25   number 6 on their list, or number 7 on their list
```

1

2    specifically.

3          THE COURT:  Did they ask for number 5 on their

4    list?

5          MS. CLARKE:  Yes, number 5 they had asked for.

6          THE COURT:  And when did they ask for that and

7    when did you say no?

8          MS. CLARKE:  They asked for that I believe it

9    was December 2.  We said that was going to be too

10   burdensome because it was among many search terms that

11   they requested, almost adding in as a full custodian,

12   and then the next day they told us we're just going to

13   move to add him as a full custodian, or two days later.

14   It was in a very short period.

15         THE COURT:  Okay.  Going back to Ms. Lee for a

16   minute, in this list of seven on page 3 of plaintiffs'

17   moving letter brief, search string number 4 has, it says

18   at the end of it, our ST2.  What does that mean?

19         MS. LEE:  That is our current search term

20   number 2, Your Honor.

21         THE COURT:  Your current search term number 2.

22         MS. LEE:  Yes, that is --

23         THE COURT:  What does it mean?

24         MS. LEE:  That's run across all custodians.

25         THE COURT:  Ah.  So our ST2 means this is what

```
 1                      PROCEEDING                117
 2   has already been run across generally.
 3             MS. LEE:  Yes.
 4             THE COURT:  Got it.  All right.  Thank you for
 5   that public service announcement.  All right, go ahead,
 6   Ms. Clarke.
 7             MS. CLARKE:  Yes, Your Honor.  So if we've
 8   gotten the history straight, I'll go into more of the
 9   merits just in terms of the search terms and Mr. ████
10   So just looking at these search terms in general that
11   they proposed, you know, Your Honor, you listed three
12   things that you believed that plaintiffs were looking
13   for for Mr. ████   I think it's clear, even just on the
14   face of these search terms, that they're much broader
15   than what you would need to find any of these documents.
16   And, in fact, the documents, the search terms that
17   Google had offered, which, again, are a revised version
18   of number 3, an expanded version of number 3, and a more
19   limited version of number 1 but one we think that is
20   appropriate, the brand portal search term that we had
21   talked about earlier.
22             We believe that most of these search terms are
23   significantly broader than would be needed for what they
24   say that they're looking for, and Google's been very
25   reasonable in offering to close these alleged gaps in
```

 1
 2    their production even though we don't agree that they're

 3    there, but we were willing to run those before then.

 4    Now, we think it's plaintiffs are kind of coming back

 5    for a double dip because our other point here is that

 6    plaintiffs should've moved for search terms or full

 7    custodian many, many months ago.  They had all this

 8    information, they knew that Mr. ███ had at least some

 9    involvement with AAP discussions.  That's why he was

10    considered an AAP custodian back in March 2025.  They

11    didn't move, they didn't ask for any search terms.

12    Instead, they asked for several other custodians in

13    their August omnibus motions to compel which were argued

14    in October.  Your Honor, you granted several custodians

15    during that hearing --

16              THE COURT:  Then you negotiated a few more.

17              MS. CLARKE:  And we negotiated one more, and

18    two of those custodians, as shown by the documents that

19    plaintiffs cite here, overlap in role, in responsibility

20    with Mr. ███  So, for example, Mr. Sajeen Padiats

21    (phonetic), whose name you might recall from October,

22    you ordered us to add several of the documents that

23    plaintiffs cite in their motion include Mr. Padiats.

24    Now, if plaintiffs had added Mr. ███ to their original

25    motions, you probably would've required them to choose a

PROCEEDING                                    119

1

2  limited number of, maybe, potentially would've asked

3  them to choose among a limited number of custodians

4  again, plaintiffs might have had to decide between Mr.

5  Padiats or Mr. ███████   Now they're trying to get both.

6        THE COURT:  Let's - this might be helpful to

7  me.  There are, as I mentioned, sort of three topic

8  areas where the plaintiffs say not only that ███████ has

9  relevant documents but that ███████ has relevant documents

10 that the existing custodial searches are not sufficient

11 to turn up.  We talked about the AAP project, and it

12 sounds like that's where Google is, I'm not sure I want

13 to use the word concede, but Google is willing to

14 contemplate particularly since your existing custodians

15 may not have retained all relevant documents, Google is

16 willing to contemplate running a targeted search on Mr.

17 ███████  database with respect to that.  Is that fair?

18        MS. CLARKE:  Yeah, I'd say it's fair that we

19 were willing to do that as part of a compromise to not

20 bring this before the Court.  Now, you know, the parties

21 have briefed to this issue, and like I said, we've let

22 go of our document review team.  So it would be more

23 burdensome at this point.  But yes, that was the

24 compromise we were willing to make was to add a search

25 term to address that issue.

PROCEEDING                                      120

1

2          THE COURT:  And that would be, looking at all

3   of the potential search terms now in front of me, that

4   would be plaintiffs' number 3.

5          MS. CLARKE:  Correct.  What Google had offered

6   was an expanded version of that which was our original

7   search term 5, but it overlaps between the two.

8          THE COURT:  And I don't have that.

9          MS. CLARKE:  Yeah, I understand.

10          THE COURT:  Nobody has put that in front of me.

11   So the only thing that's in front of me as a candidate

12   to fill this niche right now would be plaintiffs'

13   proposed search term number 3.  Okay.

14          Moving backward in time, plaintiffs also make a

15   pitch that they should get documents from Mr. ████

16   relevant to what you describe as a short-lived project

17   that didn't go very far that at one point was called

18   Project ██████ and at another point was called the

19   Brand Portal Project, is that right?

20          MS. CLARKE:  Correct, Your Honor.  So brand

21   portal is what it was called internally at Google.

22   Plaintiffs pointed to one document that suggested

23   Project ██████ as a name, but we just don't understand

24   that to be (indiscernible) used.  So brand portal is the

25   correct term.  Basically what this was was it was an

PROCEEDING                          121

initiative that would largely mimic the tools that

Google already had and still has to identify the correct

seller of items, the correct brand, but it making it

into a more streamlined process, creating a portal that

would make it a little bit easier to understand and to

submit.  So it was --

          THE COURT:  Right.  But in terms of search

strings that might be used to get at these documents,

you've run hit counts on two potential search strings,

one of them is brand within two of portal and that

returns 993 documents not counting group, right?

          MS. CLARKE:  Correct.

          THE COURT:  And you think that was the sort of

official name for this project, Brand Portal, and then

you also ran a hit count on project within two of

██████████  spelled in various different ways, and got

nine.  So those are our two choices, well, actually I

suppose --

          MS. CLARKE:  Yeah – sorry, Your Honor, if I

might comment.  So those first two were plaintiffs'

suggestions in the first instance.  We told them that

the first one specifically was too broad because it hit

on so many documents.  So we proposed the last one in

that list, brand within two to portal and digital book

```
 1                         PROCEEDING                    122

 2   or e-book or e-book.

 3            THE COURT:  Okay.  So that would also be a way

 4   of slicing the same onion, if I can mix my metaphors.

 5            MS. CLARKE:  Yes.

 6            THE COURT:  Okay.  And then backing up further

 7   to 2021, plaintiffs say they're interested in Mr. █████

 8   documents to the extent that he worked on an attempt to

 9   ban all ads for e-books.  What are the candidates there?

10            MS. CLARKE:  So I don't want to speak for

11   plaintiffs on which search terms they intended that for

12   because we did not, like I said, we didn't discuss these

13   search terms among the parties.  Our position is that

14   it's not appropriate to add any specific search terms

15   for this issue.  We've already run several search terms

16   including some that are on this list across other

17   custodians.  We've produced hundreds of documents

18   relating to the e-book ban.  Plaintiffs have known about

19   the e-book ban for a very long time.  It's been the

20   subject of lots of discovery disputes, and it's not

21   appropriate for them to now ask for additional documents

22   for Mr. █████ when they could've asked for him as a

23   custodian or for search terms earlier.

24            THE COURT:  Okay.  All right, what else do you

25   want to tell me?
```

PROCEEDING                           123

1

2          MS. CLARKE:  I think the last thing I just

3     wanted to make clear was the document that plaintiffs

4     received from the AAP directly.  So we don't know how

5     plaintiffs received that document, but to the extent

6     that they do believe that there is a larger gap in

7     production, they obviously are receiving documents

8     directly from the AAP.  Our position remains --

9          THE COURT:  But Ms. Lee explained to me, and I

10    credit this point, that while they're interested in the

11    communications between the AAP and Google, they're also

12    interested in what Google was saying internally about

13    those communications.

14         MS. CLARKE:  Yes, I understand.  I just wanted

15    to make clear that, you know, they have another channel

16    for those, for some of those documents.  We have

17    produced some documents related to AAP discussions.  We

18    were willing to run the narrow, the search term that we

19    offered here for the AAP documents.  If Your Honor were

20    inclined to grant anything, we think it would just be

21    what we had originally offered which was the original

22    search term 5 --

23         THE COURT:  Which I haven't seen.

24         MS. CLARKE:  Correct.

25         THE COURT:  What I have seen is plaintiffs' 3

PROCEEDING                                    124

1

2  on page 3 of their moving letter brief, and I have no

3  way of figuring out from eyeballing that whether it's

4  going to be burdensome, not burdensome, better or worse

5  than what you're describing to me as your number 5 or

6  anything else about it other than it has AAP in there.

7  So it sounds like it's on the right track.

8           MS. CLARKE:  Yes, Your Honor.  I do have the

9  hit count for search term 3 or number 3 on that list if

10  it would be helpful.

11          THE COURT:  Oh, what is it please?

12          MS. CLARKE:  It's 280 documents with families.

13          THE COURT:  And when did you do that search

14  term?

15          MS. CLARKE:  In advance of this hearing, and,

16  again, it was not to hide the ball from plaintiffs.  We

17  understood that they were moving forward with their

18  motion to add Mr. ████ as a custodian.  They told us

19  that on December 4.  They said they were planning to

20  file any day.  They didn't file this motion for another,

21  at least a week, and we never, the parties never

22  discussed again.  And actually, in our last

23  correspondence which I believe we submitted as an

24  exhibit, we did say if the parties determine not to go

25  forward with your motion to add Mr. ████ as a full

1                         PROCEEDING                    125

2    custodian, we're happy to share hit counts with you and

3    discuss further, and plaintiffs did not take us up on

4    that.

5              THE COURT:  Well, it sounds like these weren't

6    the most efficient negotiations in the world, that both

7    sides were, at least to some extent, talking past each

8    other.  But that may be inevitable in a large-scale

9    litigation with multiple teams of attorneys and a lot of

10   motions being made at the same time, not always by

11   exactly the same people.

12             All right, do you have anything further for me,

13   Ms. Lee?

14             MS. LEE:  Yes, Your Honor.

15             THE COURT:  Go ahead.

16             (pause in proceeding)

17             MS. LEE:  Your Honor, I did want to emphasize

18   the fact that each of these search terms we really

19   worked hard to like narrow and target these as much as

20   possible.  Within the last several weeks we received two

21   documents from Google that specifically highlight Mr.

22   ████████  ████████  role, not just within the ads integrity

23   shopping team but also within brand portal, that clearly

24   state that they were considering copyright infringement,

25   trademark infringement, and brands which is also related

PROCEEDING                          126

1

2  to our case for brand portal.  It was a cross-functional

3  very large team, we understand, but we cannot just have

4  that narrowed brand portal e-book search term.  That is

5  just way too inclusive to just the e-books.  Brand

6  portal, again, was a sprawling project that was meant to

7  aim, and Google's documents I have a copy of these, show

8  that it was meant to target copyright infringement,

9  trademark infringement, and brands, all three which is

10 relevant to this case.

11         And so that's why we had to expand search term

12 1 to include copyright infringement, to include white

13 list and trademark and counterfeit because it wasn't

14 just a small project that was considered and then

15 deprioritized.  It was hitting every single issue that

16 is in issue at this case.  I also did --

17         THE COURT:  Look at all those ors.  This is

18 going to retrieve an enormous number of documents.

19         MS. LEE:  And we are happy to speak with Google

20 to narrow the search term, but it just simply can't be

21 that we can just follow Google's search term for just e-

22 book and brand portal.  That is too inclusive.  And --

23         THE COURT:  Well, they have digital book in

24 there as well.

25         MS. LEE:  And digital book.  But e-book and

```
 1                          PROCEEDING                      127
 2   digital book won't hit on the copyright infringement and
 3   trademark infringement that brand portal very clearly
 4   said that it was meant to target.
 5             I also did want to speak a little bit more on
 6   why search terms 4 through 7 are also needed.
 7             THE COURT:  Well, before you get more
 8   generally, we've discussed search strings that would be
 9   specifically aimed at the brand portal, a/k/a Project
10   ██████████  We've discussed search strings that would be
11   specifically aimed at AAP discussions.  On your list of
12   seven here, which string or strings is well tailored to
13   retrieve relevant documents relating to Mr. ████████
14   involvement in 2021 to ban e-book ads?
15             MS. LEE:  Your Honor, I would say that search
16   terms 4 through 7 are the search terms --
17             THE COURT:  All of those.
18             MS. LEE:  Yes.  And I wanted to --
19             THE COURT:  Have you made – if you haven't yet,
20   I'll give you the opportunity now, to explain to me why
21   it's insufficient to have the results of those same
22   search terms run across all the other custodians.
23   You've explained to me in the case of the AAP that
24   documents from other custodians weren't retained.  Okay.
25   That might be a good reason to bring Mr. █████ in.  But
```

```
 1                        PROCEEDING                    128
 2   you haven't made that argument with respect to 4 through
 3   7.
 4            MS. LEE:  Yes, Your Honor, and that actually
 5   goes back to the issues of the ███ ██████████ ██████████
 6   team and the fact that they were in charge of ██████████
 7   ██████████, monitoring pirate sellers and the ██████████
 8   ██████████ of pirate sellers and re-disapproving
 9   terminated merchants.  Now, I did want to emphasize that
10   re-disapproving terminated merchants means that the ████
11   ██████████ ██████████ team, after they terminate a pirate
12   seller, they mention that they can manually reapprove
13   that pirate seller.
14            THE COURT:  Well, you said re-disapprove.  You
15   mean reapprove, right?
16            MS. LEE:  No, and so then the ███ ██████████
17   ██████████ team --
18            (interposing)
19            THE COURT:  Yeah, then we found out that
20   specifically within the e-book context that they were
21   now re-disapproving these already once terminated
22   merchants.  And so we need to get information about this
23   and how did this come across, and they specifically
24   write that it came up with ██████████ ██████████ e-book
25   merchants which is why --
```

PROCEEDING                            129

 1
 2            THE COURT:  I'm sorry, this - have I heard this
 3   before?
 4            MS. LEE:  This argument?  It is in our letter
 5   brief, and I think I quickly alluded to this in the
 6   beginning.
 7            THE COURT:  All right.  All right.
 8            MS. LEE:  It is both in our letter motion and -
 9   -
10            THE COURT:  And why would this be, why do you
11   need Mr. ████ for this as opposed to everybody else
12   who's a custodian?
13            MS. LEE:  Because none of our other custodians
14   were in the ███ ██████████ ██████████ team, and Mr. ██████
15   was not just one member of that team.  He was, in fact,
16   a leader of the ███ ██████████ ██████████ team.  There's a
17   document that Google produced the day before Christmas
18   Eve, December 23, that specifically, it's a hundred-page
19   document and it says this newsletter was organized and
20   created by Mr. ██████████ ██████.  And that specifically
21   states all of these also projects that the ██████ team was
22   in charge of, and going back to the ██████ ██████████ of
23   pirate merchants, the ██████ ██████████ ██████████ team was
24   also involved in monitoring pirate sellers that were
25   missed in the e-book ban.  So Google's documents, and we

```
 1                      PROCEEDING                    130
 2   cite to this, show that his team had found out that
 3   several missing, several pirate sellers had passed
 4   through their e-book ban and were able to sell despite
 5   their ban.  Mr. ██████ and his team were in charge of
 6   trying to find out what happened, like why was there
 7   ██████ ████████ of these pirate sellers, specifically
 8   within the e-book space.
 9           And with this information that's exactly why we
10   decided to include 4, 5, 6, and 7 of plaintiffs' search
11   terms because this issue is not related to just brand
12   portal.  In fact, this is within the entire shopping
13   platform.  This goes to the tools that Google used,
14   their special programs, and if we include just the brand
15   portal search terms, we won't get information about this
16   ██████ ████████ and re-disapproving that Mr. ██████ was
17   specifically in charge of.
18           THE COURT:  But you didn't craft any specific
19   search terms for Mr. ██████ in particular on this issue.
20   Rather, you went back to the well, so to speak, and
21   said, mmm, which of our previously negotiated search
22   terms which go to much broader than the process you just
23   described would be appropriate for Mr. ██████
24           MS. LEE:  And, Your Honor, we would be happy to
25   speak with Google on what search terms would be
```

```
 1                          PROCEEDING                   131
 2   appropriate, but Google refused to do any additional
 3   searches besides their 153 brand portal search term and
 4   their search term about the AAP.  And they refused to
 5   even, we tried even a day before we filed this motion,
 6   again, are you willing to do any additional searches for
 7   Mr. ███████  and their position had remained those two
 8   only.
 9             THE COURT:  All right.  Thank you both very
10   much.  This obviously is an area where I have enormous
11   discretion because I am required at this point to
12   balance in a holistic manner not only the traditional
13   Rule 26(b) factors, relevance and proportionality, but
14   also burden and also timing.  Was the motion made when
15   it should've been made?  Were the plaintiffs as surgical
16   as they should've been given how late in the day the
17   motion was made and so forth?
18             And consequently, I am going to grant the
19   motion in part as follows:  With respect to the AAP
20   issue, I am going to require Google to run plaintiffs'
21   search term number 3, the one that I learned this
22   afternoon had a 280 hits.  Is that right, am I
23   remembering that number correctly?
24             MS. CLARKE:  Correct.
25             THE COURT:  Okay.  With respect to the brand
```

```
 1                          PROCEEDING                    132
 2   portal/█████████ project, I am going to require Google to
 3   run plaintiffs' term number 2, the one that had nine
 4   hits, and Google's term number 4, the one that had 153
 5   hits.
 6            With respect to the earliest in time issue that
 7   plaintiffs described to me as a topic of interest for
 8   Mr. ██████ that is his participation as a member of the
 9   ████ ██████████ ██████████ group in an attempt to ban all e-
10   book ads in 2021 and then to work with that as time
11   passed, I don't have in front of me a search string that
12   I can in good conscience require Google to run.  I am
13   not going to require Google to run plaintiffs' 4, 5, 6,
14   and 7 which I think would likely return an enormous
15   number of documents and are overbroad, particularly in
16   context.  Google is coming to me late in the day and
17   saying, okay, we have specific reasons for needing to
18   add this guy, Mr. ██████ not as a general custodian but
19   with respect to specific topics, but plaintiffs have not
20   presented me with something narrow, tailored, and
21   specific enough to match up with the first topic that
22   they have presented to me.
23            So I am going to leave it with those three
24   search strings that I just outlined, and that will be
25   all of the relief I am granting on this particular
```

```
 1                          PROCEEDING                    133

 2   motion.  Google, how much time are you going to need for

 3   this to review those hits and produce relevant and non-

 4   privileged documents?  I'm asking you this obviously as

 5   a lead-up to the conversation we're about to have about

 6   timing more generally.

 7            MS. CLARKE:  Your Honor, I think, so today's

 8   the 20th.  I think we'd need until at earliest March 6 to

 9   be able to do that.

10            THE COURT:  All right, Google wants until March

11   6.  Now, who is going to be speaking to me more

12   generally about the calendar?  Plaintiff, who's that's

13   going to be?

14            MR. KANE:  I think it'll be me, Your Honor.

15            THE COURT:  That's going to be you, okay.  And

16   for defendant?

17            MR. DAMLE:  That'll be me, Your Honor.

18            THE COURT:  All right.  So right now, remind

19   me, what's due on February 6 and what's due on March 6.

20            MR. KANE:  So Google's is ordered to run as a

21   search term all of the merchant center account numbers

22   and ads account numbers that are associated with the

23   pirates.  That's due February 6.  The Buganizer

24   (phonetic) information --

25            THE COURT:  Google, you're on track for that,
```

```
 1                         PROCEEDING                      134

 2    correct?

 3              MR. DAMLE:  Yes, Your Honor.

 4              THE COURT:  Okay.  That's the new merchant

 5    accounts.  Buganizer, go ahead.

 6              MR. KANE:  Buganizer discovery's due March 6.

 7              THE COURT:  And, Google, you're on track for

 8    that, right?

 9              MR. DAMLE:  Yes, I believe so, Your Honor.

10              THE COURT:  Okay, go ahead, Mr. Kane.

11              MR. KANE:  There's one custodian, that's the

12    list serve shopping-DMCA@google.com.  That's due

13    February 6.

14              THE COURT:  All right.

15              MR. DAMLE:  We're on track for that one too,

16    Your Honor.

17              THE COURT:  You're on track.  Google generally

18    tells me they're on track for all their current

19    deadlines, is that right?

20              MR. DAMLE:  Yes, correct.  Yes.

21              THE COURT:  Except the one I just gave you

22    today.

23              MR. DAMLE:  Exactly.

24              THE COURT:  All right, go ahead, Mr. Kane.

25              MR. KANE:  The discovery into Google's overall
```

```
 1                        PROCEEDING                    135
 2   DMCA program is due March 6.  There's an intermediate
 3   deadline of January 30 for Google to disclose the 300
 4   domains that it has randomly sampled.
 5             THE COURT:  Okay.  It's coming back to me now.
 6             MR. KANE:  That is all I remember as being
 7   outstanding.
 8             THE COURT:  All right, and did I give you a
 9   date for substantial completion of document discovery or
10   did we go straight to the completion of all fact
11   discovery?
12             MR. KANE:  The date for the document discovery
13   was January 6.
14             MR. DAMLE:  Yeah.  That's --
15             THE COURT:  That would be --
16             MR. DAMLE:  Correct.  These stragglers,
17   correct, Your Honor.
18             THE COURT:  And what's our fact discovery
19   deadline at present?
20             MR. DAMLE:  I believe it's April 6, Your Honor.
21             THE COURT:  Including depositions?
22             MR. DAMLE:  Correct.
23             THE COURT:  All right, that's going to be a bit
24   tricky.  So what is plaintiffs' proposal please?
25             MR. KANE:  So what we would say is that the
```

PROCEEDING                                    136

document discovery deadline should remain January 6, and
the Court can do what it has done previously which is if
there's particular things that are ordered, the Court
can set a deadline.

        THE COURT:  For example, new searches that I
just required Google to conduct today.  Obviously, they
didn't get those done by January 6.

        MR. KANE:  Correct, so the Court can set
appropriate deadlines, you know, as those things come
up.  What we would suggest is to move all of the other
deadlines, so like the deadline for fact discovery, the
deadline for extra depositions, summary judgment, etc.,
by 30 days to accommodate, you know, documents that are
coming in.

        THE COURT:  (inaudible)

        MR. KANE:  Correct.

        THE COURT:  What about plaintiffs' obligations?
Does plaintiff have any obligations that at the moment
is worried about meeting?

        MS. MURPHY:  Yes, Your Honor, there are two
obligations that we think we could use a small extension
of time for, and it would still comport with what we're
proposing overall.  One is the project of matching the
hundreds of thousands of screenshot to works

PROCEEDING                                137

1    (indiscernible).  We have --

2              THE COURT:  Your current deadline is --

3              MS. MURPHY:  Friday.  It's --

4              THE COURT:  This Friday?

5              MS. MURPHY:  It's the 23rd.  That was based on

6    one extension.  Unfortunately, we heard from our vendor

7    who is assisting us with this, what has turned out to be

8    quite a large project that they are not on track to

9    complete it by Friday.  So given that it appears we are

10   moving toward some extension without jumping to the end

11   issue, we would like to request until February 6 to

12   complete that.

13             THE COURT:  All right.

14             MS. MURPHY:  In the --

15             THE COURT:  You have a due date of February 6

16   at the moment, if I recall correctly, for some new

17   search terms.

18             MS. MURPHY:  It's not docketed, but it was part

19   of what we had discussed with Google.  The only

20   complicating factor was that was before we then agreed

21   to add some additional custodians and search terms to

22   partially resolve their motion on that point.  So if the

23   Court is inclined to move the discovery schedule by a

24   month and given that Google has so many outstanding

PROCEEDING                          138

1    requests that are due on March 6, we would like to move

2    that date to March 6 as well.

3

4         THE COURT:  So you'd like March 6 to complete

5    all of the search terms you have to run across all of

6    your current custodians.

7         MS. MURPHY:  Right, the new search terms.

8         THE COURT:  Okay.  You have 24 custodians, is

9    that right?

10        MS. MURPHY:  Correct.

11        THE COURT:  Okay.  Google, how do you feel

12   about giving plaintiffs February 6 for their matching

13   project and March 6 for the new search terms?

14        MR. DAMLE:  So with respect to the matching

15   project, I mean, you know, we've worked collaboratively,

16   and they had a deadline that the asked for of January 6,

17   and we agreed to give them until January 23 to do it --

18        THE COURT:  And now they want another couple of

19   weeks.

20        MR. DAMLE:  And now – presumably they've made

21   some progress, and so if there is – and it's going to be

22   a lot of data for us to analyze.  So what we've asked

23   them is if they could provide whatever information,

24   whatever matching they've completed by this Friday and

25   then we can get the full set by February 6, we'd be okay

PROCEEDING                                        139

with that.  That would at least give us a little bit of

runway to start to get our hands around.

THE COURT:  About what you're looking at.

MR. DAMLE:  Exactly.

THE COURT:  All right, Ms. Murphy, can you make

a rolling production?

MS. MURPHY:  The issue with the rolling

production is that the process that's going on right now

relates to quality checking.  So we could make a rolling

production on Friday, but we'd have to be without

prejudice to correct it because that's what's ongoing.

So it doesn't seem to be that useful to me --

THE COURT:  You can't take a chunk of the

documents and put them first in line for quality

checking, quality control?  I mean I take Google's point

that they need to understand what they're looking at so

that when they get the majority of your documents, they

know what to do with them.

MS. MURPHY:  I understand that.  I actually

don't think it's that complicated in terms of what

they're going to be looking at.  They're going to look

at a Bates number with a screenshot, and it will say

what work (indiscernible) depicted on the screenshot.

So they could picture what they're going to get.  The

PROCEEDING                                     140

issue is just trying to make sure that that's correct
with the enormous amount of screenshots and a large
number of works (indiscernible).

          THE COURT:  All right, so I'll give plaintiffs
February 6 for that due date but don't ask me to push it
back any further please.

          MS. MURPHY:  I understand, thank you.

          THE COURT:  All right.  And --

          MR. DAMLE:  With respect to the March 6
deadline, you know, if fact – I think we would be okay
with that.  One thing I wanted to confirm is that for
the Buganizer request that we also have until March 6.
I believe that's the case right now.

          THE COURT:  I think you may already have March
6.

          MR. DAMLE:  Yeah, okay.  So I don't have an
objection to that.  I worry a little bit about the
effect on the overall schedule --

          THE COURT:  Okay, done.

          MR. DAMLE:  Yeah.

          THE COURT:  So March 6 for the new search
terms.  Now, let's talk about the overall schedule.
Plaintiffs have proposed that I extend the fact
discovery deadline to May 6 which is only two months

PROCEEDING                    141

1

2    after March 6, and I know that the parties are

3    contemplating a lot of depositions which means that you

4    either have to start taking depositions shortly.  When

5    are you swapping your 30(b)(6)'s, the end of this month?

6              MR. DAMLE:  Correct.

7              THE COURT:  So you either have to start taking

8    depositions in February which is what I am pushing you

9    to do or else your entire deposition program is going to

10   be crammed into two months, March and April and the

11   first week of May.  And I know, because I've seen this

12   movie before, that once you start taking depositions,

13   new issues are going to come up.  Someone's going to

14   mention a document or a program or a database or another

15   witness that the other side hadn't heard of yet, and

16   people are going to be asking for things.  So I'm

17   worried, you're worried too, right, Mr. Damle?

18             MR. DAMLE:  I am, I am, Your Honor, and, you

19   know, we're looking at pretty substantial productions on

20   both sides on March 6.  And so we're a little

21   constrained in terms of even starting depositions.  I

22   completely hear you, and we've already started third-

23   party depositions.

24             THE COURT:  You need to unconstrain yourself.

25   You need to get going.

```
 1                    PROCEEDING                    142
 2          MR. DAMLE:  I understand, Your Honor.  And
 3   there certainly is ones we can stage and figure out who
 4   comes first and all of that, so we can certainly do
 5   that.
 6          THE COURT:  I mean at a minimum – who is
 7   planning on taking third-party depositions here?
 8          MR. DAMLE:  We're already started third-party
 9   depositions, yeah --
10          (interposing)
11          THE COURT:  You're already started that, all
12   right.
13          MR. DAMLE:  I believe we've done three --
14          THE COURT:  Are plaintiffs taking third-party
15   depositions?
16          MR. KANE:  We might be taking one third-party
17   deposition.
18          THE COURT:  Well, don't sit on it.
19          MR. KANE:  One thing that would help
20   tremendously, Judge, is the Buganizer documents are
21   documents that we're going to need in order to take a
22   bunch of these depositions because those are for purpose
23   of discussion --
24          THE COURT:  Well, you hope so.  You don't know
25   yet.
```

PROCEEDING                                    143

1

2          MR. KANE:  Well, I strongly suspect we will.

3     But it's basically custodial documents for nine

4     custodians.  So it's going to be difficult for us to

5     take those nine custodians without the Buganizer

6     documents.  If we moved the deadline for the Buganizer

7     documents up, that that would allow us to start taking

8     depositions much sooner.

9          THE COURT:  I don't think I'm going to be

10    moving deadlines up, if by up you mean earlier at this

11    point.  Have you ever, other than in Judge Rackoff's

12    courtroom, have you ever seen that happen?

13         MR. KANE:  If what Your Honor's concerned about

14    is starting depositions earlier, that's the way to make

15    it happen is to --

16         THE COURT:  Well, that's not a tool I'm going

17    to use at this point.  I don't think it's fair to the

18    parties as a general matter.  So I'll go ahead and I'll

19    extend the fact discovery deadline to May 6 as

20    requested.  That's a Wednesday.  But the question is how

21    am I going to keep tabs on all of you between now and

22    then and hopefully straighten out problems before

23    they've festered and little problems have turned into

24    big problems.  I know you have one more discovery motion

25    in the pipeline which I haven't read yet because it's

```
 1                         PROCEEDING                    144

 2   not yet fully briefed.  Remind me, whose motion is it?

 3             MR. KANE:  It's plaintiffs' motion, Your Honor.

 4             THE COURT:  And what do you want this time?

 5             MR. KANE:  You may recall Google received a

 6   whole bunch of shopping notices that instead of

 7   processing those shopping notices, it processed them as

 8   search notices.  So we're trying to --

 9             THE COURT:  I generally recall that, and you're

10   seeking discovery as to why that happened?

11             MR. KANE:  More seeking discovery to how

12   frequently it happened, is it something that was unique

13   to plaintiffs or is it, you know, I think it's a ██

14   percent error rate or ██ error rate that we saw with

15   plaintiffs.  Did that apply across rights holders

16   generally?

17             THE COURT:  Well, so I should probably hear

18   that motion sooner rather than later because if there

19   are yet more documents to be produced, they should be

20   produced sooner rather than later.  When is that motion

21   going to be fully briefed?

22             MR. KANE:  The opposition's due Thursday, so

23   the reply will be due Monday, I guess it's the 26th.

24             THE COURT:  All right, so we're looking at

25   February.  Let me take a look here.
```

1
2          (pause in proceeding)
3          THE COURT:  Monday, February 9 I have time.
4    Let me see if I have anything earlier than that.  Ms.
5    Kay, look at the week before that.  Ah, here we go.
6    Looking at the week of February 1, Monday is not
7    possible.  It looks like I have morning time on
8    Wednesday the 4th.  Do you agree, Ms. Kay?
9          THE CLERK:  Yes, Your Honor.
10         THE COURT:  Is that too soon or should we go
11   for February 4?
12         MR. KANE:  Either the 4th or the 9th works for
13   me.  I have a slight preference for the 9th.
14         THE COURT:  Google.
15         MR. DAMLE:  I think we have a preference for
16   the 9th as well, Your Honor.
17         THE COURT:  Fine.  February 9.  I could see –
18   status conference?
19         THE CLERK:  Yes.
20         THE COURT:  That shouldn't take long.  I could
21   try to see you at 11.  It's just going to be one motion,
22   right?
23         MR. KANE:  That's correct.
24         THE COURT:  I can try to see you at 11 and get
25   you out while it's still lunchtime or I could have you

```
 1                          PROCEEDING                    146
 2    come in at 2 as you've been doing the last couple of
 3    times.  Plaintiffs, your preference.
 4             MR. KANE:  Either works.  I have a slight
 5    preference for 11.
 6             THE COURT:  I do too.  What about Google?
 7             MR. DAMLE:  That's fine for us, Your Honor.
 8             THE COURT:  All right, so I'll see you at 11
 9    o'clock on Monday, February 9.  I'll hear argument on
10    what I hope is the last motion in the current series at
11    least until you start taking depositions.  And why don't
12    you submit to me a letter a couple of days prior, maybe
13    Thursday the 5th.  Obviously, if you've narrowed any of
14    your disputes, reached any compromise, tell me then so
15    there are parts of the briefs I may not have to read.
16    And if there's anything else in the nature of status
17    that you want me to know about at that point, tell me
18    that as well.
19             All right, anything else for today from
20    plaintiffs' side?
21             MR. KANE:  I guess the only thing that we think
22    might speed things up is if we could have the January 6
23    document discovery deadline hold for any subpoena,
24    document subpoenas to third parties, in other words,
25    there are a whole bunch of obviously authors of the
```

1  7,000 some odd works in this case.  Google has

2  subpoenaed a handful of those.  We think the period for

3  subpoenaing authors should be closed now.  They've had

4  these lists of works some of it since September and the

5  rest of it since July.

6       THE COURT:  Let me make sure I understand what

7  you're saying.  You're saying, Google, don't send out

8  anymore author subpoenas, you're done.

9       MR. KANE:  Correct.

10       THE COURT:  Google, are you planning to send

11  out any more author subpoenas?  That's fact discovery.

12       MR. DAMLE:  Potentially for depositions at

13  least.  We have a lot of depositions that we're able to

14  take, you know, there may be --

15       THE COURT:  These are among the third-party

16  depositions you're planning on taking.

17       MR. DAMLE:  Correct.  Correct.  We've taken

18  three - there may be more that we want to take as well.

19  It would be, you know, we haven't gotten a ton of, I'm

20  not sure why the third parties are a concern.  We

21  haven't gotten a ton of documents from third parties.

22  So if there's a document subpoena that goes along with

23  it, it's not going to be like the party subpoenas --

24       THE COURT:  You're saying, Judge Moses, we

PROCEEDING                                    148

1

2  won't send out any document, only subpoenas --

3       MR. DAMLE:  Correct.  It'll be --

4       THE COURT:  But we should be able to attach a

5  document request to a testimonial subpoenas.

6       MR. DAMLE:  Correct.

7       MR. KANE:  The problem with this is these are

8  like individual humans.

9       THE COURT:  Right.

10      MR. KANE:  I mean they have to go through own

11 Gmail accounts to try to find --

12      THE COURT:  But you don't have standing to make

13 that argument.  That's not your problem.

14      MR. KANE:  We do represent four of the six

15 authors that they've subpoenaed so far.  So we'll likely

16 represent the others.  The problem is that Google has

17 known about these authors since we filed the complaint.

18 There are some they've known about since a little later

19 in July that we've added.  We're perfectly fine with

20 saying that all we're asking for is document subpoenas,

21 that they shouldn't be able to send more document

22 subpoenas.  If they want to send a testimony subpoena

23 without attaching a document subpoena, I guess that's

24 fine.  We hit the deadline for - if the general deadline

25 for document discovery is remaining January 6, that

PROCEEDING                    149

should include third-party document subpoenas too --

THE COURT:  Don't you think it's a little unfair for you to be telling me this on January 20?

MR. KANE:  If the way Your Honor interprets the Court's prior orders, all document discovery was due January 6, then it's probably already decided --

THE COURT:  To be perfectly candid, when we talked about January 6 as being the default deadline, I did have in mind party discovery, not third-party discovery.  I probably didn't say that, but that was the context in which we were having those discussions.

So let me do this which I think I can do without damage to Google because you pretty much offered me this, no more document only subpoenas.  I'm not going to prohibit Google from sending subpoena seeking both testimony and documents, but I will caution Google, as I have cautioned all of you, don't wait until the last minute.  Give these folks plenty of runway.  I take Mr. Kane's point that, depending on who the author is and what's in the document request, which I haven't seen, there may be some time required to comply, and there's no reason to drop those requirements on somebody at the last minute.

MR. DAMLE:  Completely understood, Your Honor.

1                          PROCEEDING                          150

2          MR. KANE:  Can I make one point?  I did look

3   back at Your Honor's order from October 15 --

4          THE COURT:  What did I say?

5          MR. KANE:  All document discovery, including

6   productions of documents by parties and non-parties,

7   must be --

8          THE COURT:  Really?

9          MR. KANE:  -- completed by January 6.

10          THE COURT:  I said that, did I?

11          MR. KANE:  So we are there.

12          THE COURT:  All right, well, no more document

13   only Rule 45 subpoenas.  Thank you for bringing that to

14   my attention.

15          MR. KANE:  Sorry --

16          THE COURT:  No sorry, you're keeping me honest.

17          MR. KANE:  Well, I was going to ask, so are

18   they allowed to issue a testimony for subpoenas that

19   says we want documents too, or a subpoena for testimony

20   that we want documents too?

21          THE COURT:  I think so.  I think in the

22   context, and particularly given how March, excuse me,

23   January 6 has slipped for big chunks of documents from

24   both sides including some documents that weren't even

25   requested until December, I think it would be unfair for

```
 1                          PROCEEDING                      151
 2    me to tell Google that they can't send out a deposition
 3    subpoena with an attached document request to a third
 4    party.  But I will, again, caution Google don't wait to
 5    the last minute.
 6              MR. DAMLE:  We won't, Your Honor.
 7              THE COURT:  All right.  Anything else?
 8              MR. KANE:  We'd just ask for the same, if we
 9    decide to send a subpoena to a third party for
10    testimony, that we can attach a document subpoena.
11              THE COURT:  Same rule but don't wait to the
12    last minute.
13              MR. KANE:  Understood.
14              THE COURT:  Anything from Google?
15              MR. DAMLE:  No, Your Honor.
16              THE COURT:  All right, we'll be adjourned.
17    Thank you all very much.
18              (Whereupon, the matter is adjourned.)
19
20
21
22
23
24
25
```

152

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of CENGAGE, et al.

v. GOOGLE, Docket #24cv4274, was prepared using digital

transcription software and is a true and accurate record

of the proceedings.




Signature_____*Carole Ludwig*_____

                Carole Ludwig

Date:   January 23, 2026