```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                        Docket #24cv4274
CENGAGE LEARNING, INC., et al.,   :

                  Plaintiffs,     :

   - against -                    :

GOOGLE LLC,                       : New York, New York
                                    January 20, 2026
                  Defendant.      :

----------------------------------- :

                    PROCEEDINGS BEFORE
                THE HONORABLE BARBARA MOSES,
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:         OPPENHEIM + ZEBRAK, LLP
                        BY:  MICHELE MURPHY, ESQ.
                             JEFF KANE, ESQ.
                             URIEL LEE, ESQ.
                             DANAE TINELLI, ESQ.
                        4530 Wisconsin Ave, N.W., 5th Floor
                        Washington, D.C.  20016

                        OPPENHEIM + ZEBRAK, LLP
                        BY:  YUNYI CHEN, ESQ.
                        461 Fifth Avenue, 19th Floor
                        New York, New York 10017
```

Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Email:   Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES CONTINUED:

For Defendant:                  LATHAM & WATKINS LLP
                                BY:  SARANG DAMLE, ESQ.
                                     ROBERTO BORGERT, ESQ.
                                555 Eleventh Street N.W., Suite 1000
                                Washington, D.C.  20004

                                LATHAM & WATKINS LLP
                                BY:  CAROLINE CLARKE, ESQ.
                                1271 Avenue of the Americas
                                New York, New York 10020

## <u>INDEX</u>

### <u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> |
|---|---|---|---|---|
| None | | | | |

### <u>E X H I B I T S</u>

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir<br>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                      PROCEEDING                        4

 2              THE CLERK:   The Court now calls Cengage

 3    Learning Inc., et al. v. Google LLC, case number

 4    24cv4274.  Counsel, please make your appearances for the

 5    record.

 6              MS. MICHELE MURPHY:   Good afternoon, Your

 7    Honor, Michele Murphy with Oppenheim & Zebrak for the

 8    plaintiffs.

 9              THE COURT:   And who do you have with you today?

10              MS. MURPHY:   I have Jeff Kane, Uriel Lee,

11    Yunyi Chen --

12              THE COURT:   Wait, raise your hand if you're not

13    sitting at counsel table when Ms. Murphy introduces you.

14    Ms. Lee.

15              MS. MURPHY:   Danae Tinelli.  And, Your Honor,

16    today, we would like to request permission to have three

17    speakers.  We understand that is not typical, but Ms.

18    Lee would like to argue the motion concerning the

19    custodian ██████████ (phonetic).

20              THE COURT:   Okay.

21              MS. MURPHY:   And she is a junior associate, so

22    it would be helpful if she could get this experience,

23    and this will be her first argument.

24              THE COURT:   All right, I have no problem with

25    that.  And who else do you want as a speaker today?
```

```
 1                       PROCEEDING                    5
 2            MS. MURPHY:  Myself and Mr. Kane.
 3            THE COURT:  Okay.  And for Google, a smaller
 4   crew today.
 5            MR. SARANG DAMLE:  That's right, Your Honor.
 6   Sarang Damle for Google.  I'm joined today by Roberto
 7   Borgert, who's to the left of me, and then --
 8            THE COURT:  No, I think she's behind you.
 9            MR. DAMLE:  Roberto --
10            THE COURT:  Okay, sorry.
11            MR. DAMLE:  Yeah, sorry, Mr. Borgert is to the
12   left of me and behind me is Caroline Clarke.
13            THE COURT:  All right, and how many speakers do
14   you have?
15            MR. DAMLE:  The three of us will be speaking.
16            THE COURT:  All right, well, let me give you my
17   proposed order of events this afternoon.  I'd like to
18   start with the defendant's motion filed on December 5
19   for Rule 37(e) sanctions, and then go to plaintiffs'
20   motion filed on December 9 with regard to Google's
21   verification process.  And then probably take a break,
22   and then come back and do plaintiffs' motion filed on
23   December 17 with regard to Mr. ███████.  And
24   scheduling going forward.
25            So if we are going to start with the Rule 37(e)
```

```
 1                         PROCEEDING                    6
 2  motion, that is going to be who for the plaintiff?
 3             MS. MURPHY:  That will be me, Your Honor, for
 4  the plaintiff.
 5             THE COURT:  Okay, that's Ms. Murphy.  And who
 6  for the defendant?
 7             MR. DAMLE:  That'll be Mr. Borgert for us, Your
 8  Honor.
 9             THE COURT:  Okay.  So let me get the right
10  binder out, and, by the way, I would like to compliment
11  counsel on both sides for the extremely high quality of
12  binders that I have been – no, really, it makes a
13  difference, I mean that quite sincerely.  I appreciate
14  the effort, and it has made my life and my staff's life
15  easier.
16             Now, with respect to the spoliation motion, let
17  me just set the table a little bit.  Where, as here, a
18  party is seeking Rule 37(e)(1) sanctions not Rule
19  37(e)(2) sanctions, there are essentially two elements
20  that the moving party must establish.  First, that the
21  opposing party failed to take reasonable steps to
22  preserve ESI, electronically stored information, that
23  should've been preserved in anticipation of litigation.
24  And, second, that there was prejudice to the moving
25  party.  If both of those conditions are met, the Court
```

1

2  may under Rule 37(e)(1) order such measures that are no

3  greater than necessary to cure the prejudice.  There are

4  additional requirements if more severe sanctions are

5  sought under Rule 37(e)(2), but I do not understand that

6  to be the ask here.  Is that correct, Mr. Borgert?

7           MR. BORGERT:  Yes, Your Honor, we're only

8  seeking 37(1).

9           THE COURT:  I have substantial doubts as to

10  whether Google has met its burden as to either of the

11  two elements that it is required to establish under the

12  Rule 37(e)(1) framework.  Assuming, arguendo, that the

13  plaintiff, the relevant plaintiff, did anticipate

14  litigation at the time that these two witnesses, Coons

15  and Johns (phonetic), departed the company, that does

16  not in the corporate setting, in my view, necessarily

17  lead to the conclusion that the publisher was required

18  to preserve their ESI.

19           In the case of an individual plaintiff, for

20  example, I know you both read my *Karsh* opinion because

21  you cited it, in the case of an individual plaintiff,

22  obviously this doesn't come up.  In the case of a very

23  small company where everybody or at least all of the

24  senior management can reasonably be expected to be

25  witnesses in the case, this doesn't very frequently come

1

2  up, but where as in this case, the opposing party,

3  McGraw Hill, is a large corporation with, someone I'm

4  sure will give me the answer here, hundreds, maybe

5  thousands of employees, it is the moving party's burden

6  to establish not just that litigation was anticipated

7  but that the would-be plaintiff knew or should have

8  known that these folks in particular were likely to be

9  if not custodians at least relevant witnesses whose

10 emails should have been preserved.  So I am uncertain on

11 that score.

12         As to the second element, the prejudice

13 element, I am also unsure as to whether Google has met

14 its burden because it has not been suggested to me that

15 relevant emails from either Johns or Coons would be

16 obtainable only from their own email accounts.  The

17 nature of the projects that they were working on, the

18 projects that Google deems relevant here, all seem to

19 have been, have entailed collaborative internal

20 communications, in particular communications with

21 McFadden who is already a custodian.  So I don't think

22 that Google has made a showing that any relevant emails

23 from either Johns or Coons were actually lost or

24 couldn't be retrieved in some other way, and if Google

25 has not made that showing, then we don't get to the

```
 1                         PROCEEDING                    9
 2  question of what the appropriate sanctions are.
 3            So I guess you'd better start, Mr. Borgert, and
 4  tell me where I'm wrong.
 5            MR. BORGERT:  Sounds good.  Your Honor, would
 6  you prefer that I go to the podium or --
 7            THE COURT:  Sure, whatever you prefer.
 8            MR. BORGERT:  Thank you, Your Honor.  So I
 9  think you accurately described the three elements that
10  we have to show, and so just to start, with the first
11  point on the anticipation of litigation, so Google's
12  position that plaintiff McGraw-Hill here was
13  anticipating litigation against us is not something that
14  we've conjured out of thin air.  It's something that we
15  took directly from plaintiffs' privilege log where they
16  say that they were withholding documents --
17            THE COURT:  No, I understand that, and I used
18  the phrase that I used, assuming, arguendo, deliberately
19  because I understand that there's some dispute here over
20  what litigation they were anticipating at what time, but
21  I'm not sure that's your biggest problem.
22            MR. BORGERT:  Okay, yeah, I just wanted to go
23  in order.  As to McGraw-Hill being required to preserve
24  the files of Angela Johns and Fred Coons, these two
25  individuals, which we know from the declaration of Nick
```

```
 1                        PROCEEDING                    10
 2   McFadden, worked in McGraw-Hill's marketing department.
 3   Now, that is important because this case, and I think
 4   plaintiffs would agree here, is fundamentally about
 5   plaintiffs' e-book marketing on Google Shopping, true,
 6   but also with respect to how they have been allegedly
 7   harmed by the infringement that they claim to have
 8   happened.
 9            THE COURT:  Well, I think the plaintiffs would
10   describe what this case is about a little differently
11   than you did.  They would describe this case as being
12   about what Google did or failed to do.  But I certainly
13   agree with you that one of the elements of this case as
14   to which the publishers have the burden is to show
15   damages.
16            MR. BORGERT:  That's exactly right, Your Honor.
17   And what we know from the documents that we do have
18   relating to Ms. Johns and Mr. Coons is that in 2021 and,
19   well, 2022, they were analyzing the effect of two
20   things. ███████████████████████████████████
21   ███, and we know that from documents, for example, at I
22   think it's 379-10 in which I believe it's ███████████
23   ████████████████████████████████████████████████
24   █████████████████████     █████████████████████████
25   ███████████████████████████████████████████████████
```

```
 1                        PROCEEDING                    11
 2  ██████████████████████████████.  Ms. Johns in
 3  another document that we provided is ███████████
 4  ███████████████████████████████████████
 5  And these folks and these documents are relevant because
 6  when it comes to expert testimony and damages,
 7  plaintiffs are going to have to show under either their
 8  statutory damages or actual damages theories how they
 9  were causally harmed by the alleged infringement in this
10  case.
11          THE COURT:  So let me, if I might, sharpen up
12  my inquiry to you for a moment.  I already told you that
13  we can assume, arguendo, that litigation was anticipated
14  at the time that these folks left or I understand their
15  accounts were actually deleted sometime even after that.
16  So that's fine.  What if we also assume, arguendo, that
17  at least some documents sent, some communication sent to
18  or from Ms. Johns and some communications sent to or
19  from Mr. Coons are going to be relevant, at least within
20  the broad scope of relevance for discovery purposes
21  under Rule 26(b).
22          The legal question I guess for you is is that
23  enough?  Does a huge corporation, sometime before it's
24  even finished drafting its complaint and sharpening up
25  what its claims are and certainly before it sees what
```

1

2  the defenses are is it obligated for 37(e) purposes to

3  predict who among its hundreds or possibly thousands of

4  employees is going to end up having even a handful of

5  documents that turn out to be within this broad scope of

6  relevance, is that enough under 37(e) to say aha, turns

7  out that this person had relevant documents and you

8  didn't preserve them?

9        MR. BORGERT:  Well, Nick McFadden's declaration

10  attests that Ms. Johns and Fred Coons were the

11  individuals within the marketing department that worked

12  with plaintiffs' vendor to place ads on Google Shopping

13  and other websites.  Now, remember, at this time McGraw-

14  Hill's also engaged in those pirate lawsuits that

15  involved pirates on Google's --

16        THE COURT:  Individual pirate.

17        MR. BORGERT:  The individual pirates, right.

18  But those were also related to Google, Google Shopping.

19  And so I guess I do find it unlikely that McGraw-Hill

20  who would already been engaged in lawsuits concerning

21  Google Shopping is anticipating a lawsuit against Google

22  about Google Shopping would somehow decide reasonably

23  that the folks who are in charge of working with the

24  outside vendor to place ads and analyze performance on

25  Google Shopping don't have relevant data, particularly

```
 1                           PROCEEDING                    13
 2   where these folks are also analyzing the effects on
 3   Google's actions on McGraw-Hill's revenue and profits
 4   which goes to statutory damages and actual damages.
 5           THE COURT:  Well, it only indirectly goes to
 6   statutory damages.  You asked for statutory damages
 7   when, among other things, you can't exactly calculate
 8   your lost profits --
 9           MR. BORGERT:  Lost revenues I think are a
10   factor to consider when determining statutory damages
11   under the law.
12           THE COURT:  Agree.  All right, so anything else
13   on the first element which is whether McGraw-Hill had an
14   obligation to preserve these two email accounts?
15           MR. BORGERT:  No, I think the damages points,
16   both under statutory and actual, the causation points
17   that we discussed, that these folks were really in the
18   weeds and had the best day-to-day knowledge of the
19   effects of Google Shopping ads and also there is an
20   email that we submitted in which Ms. Johns is ████████
21   ████████████████████████████████████████, I mean one
22   document that ███████████████████████████████████
23   ████████████████████████████████████████████
24   ████████████████     So not even something that caused more
25   traffic to come to Google Shopping.  And just one last
```

```
 1                         PROCEEDING                    14

 2   point on --

 3            THE COURT:  Which email are you pointing me to

 4   now on exhibit what --

 5            MR. BORGERT:  I think it's --

 6            THE COURT:  -- to your supporting declaration?

 7            MR. BORGERT:  Yeah, I think it's 379-8.  Let me

 8   see if I can find it.

 9            (pause in proceeding)

10            MR. BORGERT:  Yeah, so this is docket 379-9.

11            THE COURT:  9, okay, well, the one thing that

12   you didn't do in preparing my courtesy copies here is

13   you didn't leave the headers on.  So give me an exhibit

14   letter, A, B, C.

15            MR. BORGERT:  H.

16            THE COURT:  H, all right.  I have exhibit H.

17   That's a February 4, 2022 email at 9:34:47 p.m.  The top

18   one.

19            MR. BORGERT:  Yes.

20            THE COURT:  Okay, I'm with you now.

21            MR. BORGERT:  Yes, so here at the very bottom

22   of the thread, on Bates number ending 95078, ██████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████
```

```
 1                        PROCEEDING                      15
```

2 ████████████ ████████████████████████████ ████████████

3 ████████████████████████████████ ████████████████████████

4 ████████████████████████████████████████████

5 ██████████████████████████████████████████████████████

6 ████████████████████████  And so I think between her and Fred

7 Coons these are the folks that are really in the weeds

8 on this and have the most day-to-day interaction.

9        And one last point on this, Nick McFadden

10 testified that though he and Ms. Johns had the same

11 title, they had different roles and he --

12        THE COURT:  And they didn't have the same title

13 at the same time, right?  I was a little unclear about

14 that.

15        MR. BORGERT:  My understanding, and Ms. Murphy

16 can, of course, correct me, is that they did have, they

17 were basically at the same level, but they had different

18 roles.  And Mr. Coons did not report to Mr. McFadden.

19 He reported to Ms. Johns.  So to the extent there's a

20 concern that maybe Mr. Coons sent emails to Mr. McFadden

21 and so the ESI is not irretrievably lost, it does seem

22 more than likely, and I believe the standard is that the

23 evidence plausibly suggests there was lost relevant ESI,

24 that --

25        THE COURT:  There may have been, may have been,

1
2  obviously because we don't know what we don't know, you

3  think there may have been some emails between Johns and

4  Coons that didn't go to anybody else?

5        MR. BORGERT:  Right, between Mr. Coons and his

6  direct supervisor Ms. Johns.  I think that is, at least

7  based on what we have so far, a plausible reading of the

8  evidence based on the structure of McGraw-Hill's

9  marketing department.

10        THE COURT:  Sounds a little speculative to me.

11  Okay, what else do you have for me?

12        MR. BORGERT:  Well, on that point I think it is

13  speculative because that is the record that we have, and

14  the standard isn't that we have to show the precise

15  content of missing files.  It's the plausibly suggest

16  standard.

17        THE COURT:  I understand that.  I guess that's

18  the question is this is a plausible suggestion as

19  opposed to speculation.

20        MR. BORGERT:  Yeah.  Well, we, of course,

21  submit that it is, particularly because we haven't seen

22  that many communications with Mr. Coons or Ms. Johns on

23  them.  Really, what we have provided is the, we looked

24  through plaintiffs' productions, and there's ten or so

25  documents are what we have seen.  If they were more

1                              PROCEEDING                              17

2   communicative with folks outside of that direct line of

3   authority, we would have expected to see more.

4            THE COURT:  All right.  So I think let's stop

5   there for now, and I'll let you know if I want to hear

6   more from you about what the remedy should be if there

7   were a violation.  But let me give plaintiffs or really

8   McGraw-Hill in this instance an opportunity to respond

9   on these points.  Ms. Murphy.

10           MS. MURPHY:  Thank you, Your Honor.  Let me

11  start with McFadden.  I don't quite follow what counsel

12  for Google was trying to extract from Mr. McFadden's

13  declaration, but it's quite clear that he was the one

14  who was developing these strategies with respect to

15  marketing campaigns in the digital realm which would've

16  included Google Shopping.  And so he explains that to

17  the extent that this speculative theory about what these

18  people may have done including being the ones with the

19  most knowledge and in the weeds which is not correct at

20  all.  He dispels that, and he says that if these two

21  individuals were doing anything with respect to the e-

22  book ban, it would've been for him.  So I just want to

23  set that --

24           THE COURT:  And I take it that's a sort of

25  indirect way of him saying something I don't think he

```
 1                         PROCEEDING                    18
 2    came directly out and said is any relevant emails would
 3    have me on the chain.
 4              MS. MURPHY:  Correct.
 5              THE COURT:  All right, now, he also says that
 6    Ms. Johns actually reported to somebody else, somebody
 7    named Stacey Hansbury.
 8              MS. MURPHY:  Correct.  Ms. Johns reported to
 9    Stacey Hansbury, and --
10              THE COURT:  Has anyone looked at her emails for
11    relevant communications with Johns?
12              MS. MURPHY:  Yes, and let me get to that in one
13    moment.  So Ms. Hansbury was the senior vice-president
14    of Global Customer Experience.  So she was quite high up
15    in this hierarchy.  And there are a handful of
16    documents, at least one that I can recall, that are
17    attached as an exhibit to Google's motion that include
18    Ms. Hansbury.  For what it's worth, we tried multiple
19    ways to resolve this motion, and we did agree to add her
20    as a custodian, and Google rejected --
21              THE COURT:  Now did that happen or was that
22    sort of a condition --
23              MS. MURPHY:  No, Google rejected that proposal.
24    So we agreed to add her and another individual, Nicole
25    Wheeler.  Several of the documents that Google attaches
```

1
2  deal with an issue related to McGraw-Hill's own product

3  pages on their website, and I think there was some

4  speculation that that might be highly relevant to this

5  matter.  It's actually not.  Again, it relates to

6  McGraw-Hill's own sales and advertising of their

7  legitimate works.

8          So in any event, Ms. Wheeler oversaw that

9  project.  So when they're discussing that in the

10 documents, that's what it relates to.  But it brings me

11 to a larger point which is I really haven't heard

12 anything because there is none about unique relevant

13 information being kept by these individuals.  They were

14 working on --

15         THE COURT:  I think we just heard Google's

16 theory on that which I'm going to paraphrase and

17 Google's counsel will tell me if I'm not paraphrasing it

18 accurately.  The pitch, as I understand it, was, look,

19 Judge, we know that they wrote and received relevant

20 emails because we have some of them.  The way we got

21 those was through different custodians, McFadden

22 primarily.  Isn't it plausible that they also wrote

23 additional relevant emails that McFadden wasn't on and

24 those may have been lost?  Is that the argument?

25         MR. BORGERT:  Yes, Your Honor.

```
 1                        PROCEEDING                    20

 2            THE COURT:  That's the argument.

 3            MS. MURPHY:  The plausibility has to go to the

 4   relevance, to the claims and defenses in the case, for

 5   us to get to the point where plaintiffs would be

 6   sanctioned over this.  So I think it makes sense to

 7   focus on that rather than who reported to who.  The

 8   issue that they were working on relates to advertising

 9   of McGraw-Hill's legitimate works.  And so the case is

10   about Google's advertising of pirated works and --

11            THE COURT:  Sure, but you have to show that

12   Google's advertising of pirating works undercut or

13   damaged your sales of legitimate works.

14            MS. MURPHY:  Each time there's a pirate sale,

15   that undercuts a legitimate sale.  So that --

16            THE COURT:  Of course, I mean that's sort of

17   the res ipso locutor part of your argument, but when it

18   comes time to suggesting either actual damages or more

19   likely a high statutory damages figure, you have to put

20   a little more meat on that bone.

21            MS. MURPHY:  I don't think that we have to show

22   that we were advertising on Google.  For example, if a

23   pirate sells a book, that sale undercuts revenue that

24   the plaintiffs could've gotten in several ways.  It

25   might've been through advertising on Google, but it
```

could've been through one of their distributors.  It's

by definition a sale that is outside of the legitimate

stream of commerce.

So our own legitimate advertisements on Google

are not the issue, but even to the even to the extent

that they play some role in this, we have produced data.

So that's really – if we want to focus on like where

would this information be housed, we have produced data

that show our advertising spend on Google, the number of

clicks that we receive, the number of impressions, and

the number of conversions.  So to the extent that these

people along with a team, and Your Honor was right that

they work in teams, and you can tell this from the

emails because they say, hey, team, and all the people

that are either custodians or we've offered to include

as custodians to resolve this are in these teams.

And, again, I need to bring it back to the fact

that McFadden was in charge of this.  So if they were

doing anything with regard to looking at Google or the

e-book banner pirates, that was for him.  And he has

included that.

There's a discussion about the title.  He did I

believe have the same title as Ms. Johns at the same

time --

PROCEEDING                        22

1

2          THE COURT:  At the same time.

3          MS. MURPHY:  -- but titles as we know in a

4    corporate setting don't drive the reality of what's

5    happening.  Again, he was in charge of this program with

6    respect to Google, and so if she was doing anything, she

7    was reporting to him on it, and that's shown in the

8    documents.

9          THE COURT:  Do you happen to know off the top

10   of your head how many employees this publisher had at

11   the relevant time?

12         MS. MURPHY:  About 4,850 globally.

13         THE COURT:  Okay, and --

14         MS. MURPHY:  Well, that's current – I should

15   clarify, I apologize.  That's currently.  I could ask

16   for in the 2022-23 timeframe, but it's in the several

17   thousands.

18         THE COURT:  Okay.  I don't think the outcome of

19   this motion is going to hinge on the precise number.  I

20   just wanted to get a sense of the order of magnitude

21   here, for which I thank you.

22         With regard to the potential replacement

23   custodians which I understand were discussed in the

24   parties' negotiations but agreement was not reached, do

25   I correctly understand that you offered Ms. Hansbury who

PROCEEDING                                    23

1
2    was Johns' supervisor, Ms. Wheeler who we discussed a

3    moment ago, and did you also offer Nick Terzian or was

4    that a separate proposed deal?  I'm a little confused

5    there.

6             MS. MURPHY:  Yes, Mr. Terzian is now a

7    custodian.  He was actually in the relief that Google

8    seeks in their motion.

9             THE COURT:  Right.

10            MS. MURPHY:  He was the one that they asked

11   for, and so we have --

12            THE COURT:  You made him a custodian --

13            MS. MURPHY:  We made him --

14            THE COURT:  -- make him a custodian for this

15   purpose.

16            MS. MURPHY:  Well, originally we offered to do

17   that too.  There's been a variety of different

18   discussions amongst counsel, but he was additionally the

19   subject of Google's motion to compel additional

20   custodian and search terms, and so through that process

21   we made him a custodian.  And we do know that between

22   Mr. McFadden and Mr. Terzian there are over a thousand

23   if not more documents that we will be reviewing with the

24   new search terms.

25            The other issue is that some of those search

1

2  terms that we agreed to touch upon these issues, so

3  that's another reason why there is not any plausible

4  expectation that Google will be prejudiced in any way.

5  And, more importantly, I think Google has not explained

6  how they will be prejudiced.  In Google's counsel's

7  presentation and in their briefing, they never say what

8  they think these individuals speculatively or not could

9  have said in their communications that would undermine -

10  -

11        THE COURT:  I understand that, but I also take

12  Mr. Borkett's (phonetic) point, Borgert, you know,

13  generally it takes me at least three or four discovery

14  conferences before I can pronounce somebody's name

15  correctly.  I apologize.  But I take his point that

16  it's, you know, it's very hard to say exactly what's in

17  the documents that you think have been spoliated.  There

18  are certain cases, not this case, in which there may be

19  sufficient clues from the documents which do exist, but

20  I'm not sure it's fair to ask Google to be more specific

21  than it has been which is to say essentially there could

22  be other documents kind of like these that didn't go to

23  McFadden that would be relevant at least for purposes of

24  discovery.

25        MS. MURPHY:  Well, I think, first of all, Ms.

```
 1                        PROCEEDING                    25
 2  [sic] Fadden said that's not the case, that if they were
 3  doing anything --
 4            THE COURT:  He did say that.
 5            MS. MURPHY:  -- like that, that it would've
 6  gone to him.  I do also think that the characterization
 7  of the documents is overstated, as set out in our
 8  opposition.  For example, one of the documents that we
 9  were looking at, ████████████████████████████████████
10  ████████████████████████████████  ████████████████████
11  ████████████████████████████████████████
12  ████████████       And I think that one of the other analysis
13  referenced, it specifically says that it was done for
14  Mr. McFadden.  So this all points to what plaintiffs
15  have explained about how these individuals really are
16  not people who would've been custodians in the first
17  instance and especially with a large corporation.  I
18  think that's really a good way to look at it.  Nobody
19  would've ever thought at McGraw-Hill we need to preserve
20  the files of these two people because they were not part
21  of the key operation that was involved in what
22  ultimately became the claims in this case.  So I think
23  that's another thing to keep in mind.
24            And all of the cases that Google cited with
25  respect to plausible relevance have very different
```

PROCEEDING                                26

situations where it is a single plaintiff and it's an
employment and these are all the individuals who are
relevant to the facts that resulted in the claim.
There's a video camera of a specific, you know, incident
at a prison.  It's clear that that could've had a better
angle.  So I just, I didn't see anything whatsoever in
the cases that involved a situation like this where
there literally are thousands of employees, and these
folks were not involved in what became the claims in
this case.  One moment.

          (pause in proceeding)

          MS. MURPHY:  The other thing I noticed as I was
preparing is Google didn't cite a single RFP in their
motion for what these individuals supposedly would've
had unique relevant information to respond to, and I'm
hard pressed to find one.

          THE COURT:  Well, I wonder if that's fair at
this point because the parties have negotiated
extensively search terms and custodians sort of based on
the scaffolding provided by the RFPs, but aren't I
entitled at this point to reason that if something comes
up as a result of the negotiated search terms from a
negotiated custodian, that it's responsive to one or
more of the RFPs?

```
 1                          PROCEEDING                    27

 2               MS. MURPHY:  I think that the documents

 3      produced still have to be responsive to RFPs.

 4               THE COURT:  Sure.

 5               MS. MURPHY:  And --

 6               THE COURT:  But you produced the documents that

 7      Google is pointing to as exemplars of relevant and

 8      producible documents that were to or from Coons or

 9      Johns.  So not only did they get hit on, but they got

10      reviewed by plaintiff and produced.  So aren't I

11      entitled to assume that at least the nine or so

12      documents that they attached to their letter motion are,

13      in fact, responsive and, therefore, that other documents

14      like them would be?

15               MS. MURPHY:  I understand your point, and so I

16      do understand your point, but, again, in a situation

17      where Google has come to the Court and said that you

18      should sanction McGraw-Hill for not preserving these

19      files --

20               THE COURT:  Do you think they have to go back

21      to first principals and say these documents were

22      responsive to RFP 17 or whatever?

23               MS. MURPHY:  I think they need to be relevant,

24      and I think if you look at their RFPs, they're not.  So

25      I do think that's a significant issue, again, because
```

PROCEEDING                          28

1

2   we're in a sanctions --

3          THE COURT:  Did you make this point in your

4   opposition brief?  I don't recall it.

5          MS. MURPHY:  I don't think we made it, and I

6   wish we would've, but I'm making it now because I guess

7   that's part of the argument.  So there is an RFP that is

8   extremely broad that talks about all marketing efforts

9   that the parties negotiated for plaintiffs to produce

10  specific data, and I think that is important to, you

11  know, support my point that if anybody really wanted to

12  look at what did the publishers spend on Google, what

13  was their return, what ads were they running?  How were

14  they outranked by pirates?  That's all in the data, and

15  plaintiffs have produced what they agreed to produce

16  through extensive negotiations with Google.

17         So I am hard pressed to find anything that

18  these two individuals who were, again, working on making

19  sure that, with the vendor, that some ads got placed.

20  They weren't in antipiracy, they weren't evaluating

21  piracy, they were not dealing with the core issues in

22  this case, and they were there for a very short period

23  of time on top of that.  So they were not considered --

24         (interposing)

25         THE COURT:  -- in the other, right?  That was

their tenure --

          MS. MURPHY:  Correct, correct.  They were not considered key players.

          The anticipation of litigation issue, I know that Your Honor said let's assume that, you know, that it had attached at this point --

          THE COURT:  You don't want me to make that assumption.

          MS. MURPHY:  The issue is with respect to, again, like if this went to any particular claim, I think no one has talked about the New York deceptive trade practices claim that was dismissed.  So we did make a point that if you look at our privilege log, there's no date that you could attach to when that was anticipated.  And I think that's a really important issue as well because the allegations in our complaint that if you were going to take them and say, you know, the plaintiffs are saying something about the e-book ban and how that impacted them, those are very largely tied to that claim that was dismissed, and Google's trying to have it both ways.

          THE COURT:  Right, so to flesh out your argument there, it would be to the extent that these documents fall within a claim that we anticipated

PROCEEDING                                         30

1

2    litigating at the time.  That claim was a claim which

3    has since been dismissed, and, therefore, you would

4    continue.  Google can't in effect bootstrap 37(e)

5    sanctions even under subsection 1 with respect to a

6    document which in the current procedural state are not

7    relevant to the claims or defenses of the parties.

8         MS. MURPHY:  That's correct.  I think it's also

9    correct that there's nothing to show that we anticipated

10   litigation of that issue --

11        THE COURT:  Ah --

12        MS. MURPHY:  -- at the time --

13        (interposing)

14        THE COURT:  -- maybe I misunderstood your --

15        MS. MURPHY:  Yeah.  But it's twofold.  I think

16   your point was the point I tried to make a little bit

17   earlier, and this is a separate point which is that

18   there's nothing to show that we anticipated that

19   particular claim during the time that these individuals

20   were employed or during the retention period following

21   that.  And it is different, and, again, because, you

22   know, our claims with respect to copyright and trademark

23   infringement are, you know, what this case is now about,

24   and these individuals have nothing to do with that.  So,

25   and Judge Rachon found that that claim was preempted.

```
 1                    PROCEEDING                       31
 2            THE COURT:  Got it.  All right, any reply
 3   argument?
 4            MR. BORGERT:  Yes, Your Honor.  So I'll start
 5   with that last point about the deceptive practices
 6   claim.  It's true that claim was dismissed, but those
 7   same allegations are incorporated into the copyright and
 8   the trademark claims that are still in the case.
 9            THE COURT:  Can you be more specific with me?
10   What allegations are you referring to?
11            MR. BORGERT:  I think it starts with paragraph
12   64 of the amended complaint.
13            (interposing)
14            MR. BORGERT:  Just for the record, it's just
15   noting that.  Plaintiffs say that the e-book ban which
16   Google undertook to try to solve this problem of e-book
17   piracy by saying, okay, well, then there's no e-books at
18   all on our website and, you know, various actors,
19   including the plaintiffs, try to get around that rule.
20   They say that was like an egregious act by Google that
21   evidences our support for these pirates and is part of
22   our willfulness in letting piracy flourish across the
23   web.  Those allegations are incorporated into their
24   copyright and their trademark claims.  So it's not as if
25   that was just solely relating to the New York deceptive
```

1  practices act; those are definitely part of the

2  copyright and the trademark claims.  That's in their

3  complaint, they didn't amend, their complaint they

4  didn't move to amend the complaint to extricate those

5  allegations.  So I mean we read the pleadings, it's in

6  the case.

7

8          The point about the privilege log not going

9  claim by claim, that's just not in the privilege at all.

10 So that was kind of a surprise to us.  There's no entry

11 that says anticipation of litigation for a copyright

12 claim or anticipation of litigation for a trademark

13 claim.  And I think --

14         THE COURT:  And, frankly, I don't think I've

15 ever seen a privilege log that parsed it out that fine.

16         MR. BORGERT:  Right.

17         THE COURT:  And I've seen a lot of privilege

18 logs.

19         MR. BORGERT:  Of course.  And so, yeah, we just

20 didn't see that as necessary, but then also going back

21 to the context point, I mean the plaintiffs McGraw-Hill

22 was already engaged in copyright lawsuits against

23 various pirates, and some of those were --

24         THE COURT:  Sure, but be careful here because I

25 think there's quite possibly an interesting law review

PROCEEDING                    33

1
2    question that hasn't been written up yet whether, if the
3    plaintiff anticipates litigation A but fails to preserve
4    documents which were relevant both to litigation A and
5    litigation B, whether the opposing party in litigation B
6    has standing to complain about that.
7              MR. BORGERT:  Yeah, and I believe, I don't want
8    to get bogged down on this, I believe we did cite a case
9    actually that addresses this point in our opening brief
10   relating to, I think it was an environmental cleanup
11   site in New York from the early 2010s and then later the
12   party was found to have spoliated, even though they
13   should've known that there was going to be a follow-on
14   action, but that's in the briefing.  It's in our first
15   brief.  I do want to note, we've been talking about
16   whether or not the size of the spoliator, the party that
17   failed to take reasonable measures --
18             THE COURT:  Right, do you think size matters?
19             MR. BORGERT:  No, I don't, and we cite a case
20   in the briefing, it's a mail-in case, and I think this
21   case is actually very instructive.  It involved two
22   large companies, there was an acquisition, files were
23   lost, they were deleted, and there what the judge did
24   the judge took a very measured approach.  I can provide
25   the name for you of the case if you'd like.  Let me see

1                    PROCEEDING                    34

2    if I can find it.

3              (pause in proceeding)

4         MR. BORGERT:  It's *Government Employees Health*

5    *Association v. Actelion Pharmaceuticals Ltd.*, 343 F.R.D.

6    474 (D. Md. 2023).  And this was one of those cases that

7    involved big companies.  I don't know how many employees

8    specifically they had, but I mean even there the court

9    found that relevant ESI was not preserved, and it

10   entered an order saying that the trial judge would

11   ultimately be able to craft an instruction to the jury

12   depending on how things shake out.

13         We think an order like that is appropriate here

14   because we don't yet know the effect of the deletion of

15   these files on expert testimony, and that's probably

16   where the rubber's going hit the road.

17         THE COURT:  Were I, were I to find spoliation

18   sanctions appropriate here, I would not at this stage of

19   this case take it upon myself to tell the trial judge

20   what instructions or information should or should not be

21   given to the jury at the time of trial.  I think that

22   would be unwise.

23         MR. BORGERT:  Yeah, and that's not what the

24   District Court of Maryland did.  I mentioned in this

25   order it's up to the trial judge to decide what kind of

```
 1                        PROCEEDING                      35
 2   instruction would be appropriate at the time.
 3           THE COURT:  Okay.  Anything else for me?
 4           MR. BORGERT:  The last point on the McFadden
 5   declaration, I just want to raise, you know, in
 6   paragraph 8, which I think counsel was alluding to, Mr.
 7   McFadden states that Coons, that he did not believe that
 8   Coons performed meaningful revenue analysis concerning
 9   the e-book ban, and to the extent he did, and I don't
10   recall any that would've been for me.  We provided a
11   document at 379-10 which is exhibit I.
12           THE COURT:  Is that the one you showed me a
13   minute ago?
14           MR. BORGERT:  No, this is a different one.
15           THE COURT:  That's H; this is I.  Okay.
16           MR. BORGERT:  Yeah, and I think this is one of
17   those, if you had to look at one, this is the one we
18   would ask that you look at closely.
19           THE COURT:  But this one also went to Hansbury.
20           MR. BORGERT:  So this one, yeah, you can --
21           THE COURT:  And McFadden.
22           MR. BORGERT:  Correct.  Mr. Consenza to
23   Hansbury on a Friday morning, and just looking at this,
24   this does look like meaningful revenue analysis, and Mr.
25   Coons even says, "███████████████████████████████
```

```
 1                        PROCEEDING                      36

 2  ███████████ " --

 3          THE COURT:  Stacey is Ms. Hansbury.

 4          MR. BORGERT:  Ms. Hansbury, correct.  " ██

 5  ████████████████████████████████████████████████████

 6  ████████████████████████████████████████████████ ,"

 7  which indicates to us that ██████████████████████████

 8  ███████████████████████████████████████ ███████████

 9  █████████     So he sends that to Ms. Hansbury who

10  supervised Ms. Johns and then Ms. Johns, of course,

11  supervised Mr. Coons.  So that's one direct line.  And

12  then he just forwards it to Mr. McFadden.  So this I

13  think is inconsistent with Mr. McFadden's statement that

14  if Mr. Coons was doing this at all, which it does appear

15  that he was, it would've been at Mr. McFadden's

16  direction or for him.  I mean just forwarding the email

17  it seems more of like a thought you should know rather

18  than here you go, boss.

19          THE COURT:  Thank you very much.

20          MR. BORGERT:  Thank you.

21          THE COURT:  I'm going to deny the motion, and

22  I'll tell you why.  Taking it sort of from the bottom

23  up.  Did this particular plaintiff have an obligation to

24  preserve relevant evidence in anticipation of this

25  litigation?  I am going to assume, for purposes of
```

PROCEEDING                          37

today's decision that McGraw-Hill did have that

obligation, assuming without deciding I guess is the

judicial phrase that judges use in situations like this.

But Google has not persuaded me that that obligation

extended to the preservation of the email accounts of

these two individuals, Coons and Johns, and here I do

think that size matters, corporate size matters.  I do

think that a corporation's obligation to preserve

relevant evidence is not unbounded and does not run from

the C suite all the way to the janitor in a thousand

person or 4,000 person organization.  That like all

things involving discovery, the question is going to be

were reasonable efforts made, and the moving party here,

Google, does have the burden of proof on this as it does

on all issues when it is seeking sanctions, and Google

has not persuaded me that. based on what McGraw-Hill

knew at the time these accounts were deleted, that it

had an obligation specifically or that it knew or

should've known specifically that these two individuals'

accounts should have been preserved.

        Now, that's enough to deny the motion, but I

will go on to the next step which is was there

prejudice, and, again, I find that even if McGraw-Hill

had an obligation to preserve these two accounts

specifically, Google has not persuaded me that its
failure to do so has resulted in prejudice to Google
primarily because these folks were clearly working in a
collaborative team environment, I think it plausible
that Mr. McFadden who is a custodian and/or Mr. Terzian
who has also been added as a custodian received copies
of any and all relevant emails that would otherwise have
been unearthed from the Coons and the Johns account had
they been preserved.

Now, can anyone in this room guarantee that
there wasn't a relevant email that went just from Coons
to Johns or just from Johns to Coons?  Of course not.
By the very nature of the enterprise when we're looking
at spoliation, nobody can be a handed percent sure of
what's not out there.  But, again, it's Google's burden
by a preponderance standard as in all civil matters
unless a different standard is specifically prescribed
by rule or by case law, and I cannot find here that
Google has met that standard.

And just to cap it off because I do want to be
complete here, in the event that I found otherwise, that
is, in the event that I found that 37(e)(1) sanctions
were appropriate, what I would be inclined to do under
those circumstances is require that Terzian be

PROCEEDING                    39

designated as an additional custodian which apparently

has happened anyway as the result of negotiation on

other matters between the clients, and I would not

prescribe any time of trial sanction, any instruction,

for example, to the jury.  I would simply, were I to

impose sanctions, I would simply say I'm not doing that

now, but this is without prejudice to Google bringing it

up again at the time of trial.  But that is now in my

view not relevant, this is a hypothetical, because

cannot find for Google on either the first step or the

second step necessary.

            So for those reasons the motion is denied.

            Should we go on to the verification motion?

Tell me who's arguing that.  That's Mr. Kane.  I see

that because he's standing up.

            MR. DAMLE:  And that'll be me for Google, Your

Honor.

            THE COURT:  Okay, Mr. Damle.

            MR. DAMLE:  Yes.

            THE COURT:  All right.  Give me a sec to get to

the right place in my notes.  So I need you to help me

out here, Mr. Kane, keeping in mind that you are most

likely spending all or nearly all of your time on this

case, and I can't do that.  I would like you to help me

PROCEEDING                                    40

out here in explaining what you understand the

relationship to be between the verification process

which I understand is a Google ads process and the

Google Shopping platform which is the focus of your

claims.

MR. KANE:  Yep.  So in order for a merchant to

run a paid shopping ad, so a shopping ad that the

merchant pays a fee to Google for, they'd have to have

two types of accounts.  They have --

THE COURT:  They have to have a merchant center

account.

MR. KANE:  That's correct.  And they have --

THE COURT:  They have to have an ads account.

MR. KANE:  That's correct.

THE COURT:  That's not true to run so-called

free ads, right?

MR. KANE:  That is correct.  For free ads you

just need a merchant center account.

THE COURT:  Okay.

MR. KANE:  So for all of the ads in this case

that were paid ads, which is a huge number of the ads in

this case, the merchant had to have both accounts.  They

couldn't run --

THE COURT:  Okay, so I understand that for a

```
 1                           PROCEEDING                    41
 2   large number of the merchants relevant to this case they
 3   had an ads account.  But why does it matter to this case
 4   what Google did or didn't do with respect to their ads
 5   account?
 6           MR. KANE:  The distinction between the ads
 7   account and the merchants center account is basically
 8   meaningless because the same person operates both
 9   accounts.  In other words, if someone's running a paid
10   shopping ad, they have both a merchants center account
11   and an ads account.  The merchants center account isn't
12   any more relevant than the ads account is.  In order to
13   run all of the paid ads in this case, the merchant had
14   to have both accounts.
15           What Google is trying to do is say, oh, because
16   when a person submits these verification documents or
17   answers these verification questions, because they're
18   doing it in the Google ads portion of the interface,
19   it's somehow irrelevant.
20           THE COURT:  Well, they're saying more than
21   that.  I think they are making a relevance argument as I
22   understand it.  But they're also saying that the process
23   for verification on the Google ads side wasn't what you
24   think it is.  This is not where people have to submit
25   their certificates of incorporation or their driver's
```

license or what have you.  This is where people merely

have to establish that they have the right to edit their

associated website.

       MR. KANE:  That's not correct.  So --

       THE COURT:  That is what Google says, right?

       MR. KANE:  Not exactly.  So there are two types

of accounts, as we said.  There's a merchant center

account and an ads account.  Each of them has its own

verification process.  So there's a verification process

for the merchant center account and a separate one for

the ads account.  With respect to the verification

process for the merchant center account, all it is is

confirming that you do actually control the website that

you're advertising.  I think there's some sort of --

       THE COURT:  That's the so-called automated

process.

       MR. KANE:  I believe it is automated, yeah.  I

think the way it works is they give you some sort of

code that you embed into the website, and that's what,

you contract that and it can confirm that you control

the website.

       THE COURT:  Okay.

       MR. KANE:  We are not seeking discovery into

that verification process.  That's the verification

PROCEEDING                                      43

process for merchant center accounts.  So you can

basically ignore that for purposes of this motion.

        THE COURT:  And the reason you're not

interested in that information is it's not particularly

relevant to anything in this case.

        MR. KANE:  It wouldn't really help us.  We're

not challenging that the people advertising these did,

in fact, operate the websites.  It wouldn't really be

germane to this case.

        THE COURT:  Okay.

        MR. KANE:  There's a separate verification

process for the Google ads accounts, and that's the

process whereby the merchant actually submits

documentation about their person or organization where

they actually answer questions about what they want to

do or what their organization does.  That's the

verification process about which we're seeking

discovery.

        And so the way that one works is Google claims

that it verifies certain advertisers.  So when a user

sees an advertisement for an infringing copy of a

textbook, they can click on the name of the merchant in

the ad, and the little box appears with a little badge

that says advertiser's identity verified by Google.  So,

1  in other words, someone looking at the very shopping ads

2  that are at issue in this case sees the verification.

3  As part of that process Google requires the merchant to

4  submit various things.  It requires them to submit,

5  answer questions about its business model, operational

6  practices, key relationships with third parties, and

7  details on products and services.

8      THE COURT:  Are there any questions about are

9  you violating the copyright or the trademark laws, any

10  questions about are your products counterfeits?

11      MR. KANE:  So Google has not shared with us

12  specifically what the questions are.  Those are just

13  sort of topics that they say are involved.  That's one

14  of the things we're seeking in this motion is what do

15  you actually ask these merchants and how do they reply.

16  They also ask for official documentation that shows the

17  legal name, trademark name where applicable, address,

18  and the supporting documents related to their business

19  operations.  So, in other words, they've got a whole

20  bunch of information about the merchants that are

21  verified.

22      Out of the 1,239 pirate websites about which

23  Google has produced information, ■■■ of those were

24  listed as verified, about ■ percent.  So, in other

PROCEEDING                                    45

words, when someone clicked on one of their shopping

ads, if they clicked on the merchant's name, they would

see the little badge that says advertiser's identity

verified by Google.

THE COURT:  Okay, so I think you're saying a

couple of different things to me.  One is we'd like to

know if that verification process involves anything

designed to make sure that they weren't violating other

people's copyrights or trademarks which would be

relevant if it turns out to be the case.  And, number

two, I'm guessing you have a fallback theory which is,

even if the process has nothing to do with trademark or

copyright compliance, we still are entitled to a bunch

of discovery about it because that little badge saying

verified helped these folks sell their wares.

MR. KANE:  We certainly would like to know if

there are any direct questions about copyright

infringements.  Google's description of it does say it's

supposed to provide documentation about their trademark

name.  So if someone is selling --

THE COURT:  Trademark name, that's not quite

the same thing.

MR. KANE:  Well, if they're selling

(indiscernible) textbook and they aren't able to submit

PROCEEDING                                46

documentation that they (indiscernible) mark, that might

mean something.  But the more important way in which

this is relevant is it's very relevant to Google's

knowledge.  So take, for example, the questions about

the merchant's business --

          THE COURT:  Can I just back you up a minute --

          MR. KANE:  Yeah, sure.

          THE COURT:  -- because remember it's harder for

me than it is for you, I mean just finding my way

through facts.  You say of the roughly 1,200 pirate

websites at issue here, ▇ percent were verified, but

it's not the website that's verified, right?  What's

verified?

          MR. KANE:  So Google allows you to have

multiple accounts over time that are associated with the

same website.  So what they verify is the merchant

center account, or in its case the ads account, but

those ads accounts are associated with ▇ of the 1,239

pirate websites.  And remember it's the Google user, the

person viewing the ad doesn't see the account.  It

doesn't say, you know, ads account number 1, 2, 3, 4, 5.

What the Google user sees is the pirate website.  It

sees, you know, the landing page to which the website

links.  So it doesn't really make much difference that

```
 1                        PROCEEDING                    47
 2   what they're actually, that the verification is
 3   submitted through the ads account as opposed to through
 4   the domain.
 5            THE COURT:  So walk me through it.  In the
 6   attachments to your moving letter, where can I find this
 7   little verification badge?
 8            MR. KANE:  So it's docket 420-1 at the third
 9   page.
10            THE COURT:  420-1.
11            MR. KANE:  I'm sorry, 419-1.
12            THE COURT:  I'm sorry, you were right the first
13   time and I was wrong.  419-1.  All right, so the third
14   page, what am I supposed to be looking at here?
15            MR. KANE:  So what's happened is someone has
16   clicked on a shopping ad, they've clicked on the name of
17   the merchant's --
18            THE COURT:  Clicked on Your (indiscernible)
19   Today, Choices in a Changing Society?
20            MR. KANE:  That's what the ad is for.  They
21   clicked on the name of the merchant.  So the Blue Rain
22   there at the bottom, they clicked on that to get to the
23   my ad center.
24            THE COURT:  Blue rain?  Where's Blue Rain?
25            MR. KANE:  So there's that box that says Your
```

```
 1                        PROCEEDING                    48
 2   Health Today, Choices in a Changing Society.
 3               THE COURT:  Ah, yes.
 4               MR. KANE:  At the bottom of that it says Blue
 5   Rain.
 6               THE COURT:  All right, that is the --
 7               MR. KANE:  That's the merchant who ran that
 8   advertisement, the Google merchant who ran that
 9   advertisement.  If you go a little further down,
10   underneath where it says about this advertiser.
11               THE COURT:  So when it says about this
12   advertiser, it means about Blue Rain.
13               MR. KANE:  Correct.
14               THE COURT:  All right.
15               MR. KANE:  So below about this advertiser it
16   says advertiser identity verified by Google, and there's
17   a little picture of a person with a checkmark.
18               THE COURT:  Yes.
19               MR. KANE:  That's the verification badge.
20               THE COURT:  But then it says that the
21   advertiser is not Blue Rain; the advertiser is Papaya
22   Group Company Ltd.  Explain that to me.
23               MR. KANE:  That's the name of the company.  So
24   Blue Rain it might be like the website or it might be
25   like merchant name.  Papaya Group Company Ltd. is the
```

| 1 | PROCEEDING | 49 |

name of the company behind that website or that merchant

name.

THE COURT:  And Papaya Group Ltd. is in Hong

Kong according to the --

MR. KANE:  According to this, yeah.

THE COURT:  Okay.  So Papaya Group Company Ltd.

is supposed to be, as you understand it, the real name,

the legal name of the merchant?

MR. KANE:  That's correct.

THE COURT:  Okay.

MR. KANE:  So a Google user sees this

indication that they're verified.  That is part of our

argument, like one of the ways this is relevant is it's

part of the Google's material contribution to the

infringement.  So it might be that one clicks on the ad

and thinks, mmm, is this a legitimate website?  I'm not

sure it is.  But if it's been verified by Google, maybe

that's what prompts them to actually put in their credit

card number and purchase the book.  So that is part of

our argument.

THE COURT:  But in order to click on Your

Health Today, Choice in a Changing Society, Sixth

Edition, where are you here?  Are you on Google Shopping

or on Google ads?

PROCEEDING                          50

1

2          MR. KANE:  You're in Google Shopping.  So sort

3    of behind, like in the background of that My Ad Center

4    box, those are a series of Google Shopping ads.  So

5    someone has clicked on the one that's Your Health Today,

6    Choosing in a Changing Society or Choice in a Changing

7    Society.  They clicked on the merchant's name, and this

8    is what comes up.  So you are in a shopping ad still

9    when you're doing this.

10         THE COURT:  All right, I'm still a little, I'm

11   having a little trouble making the leap you want me to

12   make between Google verifying that the seller's name is

13   Papaya Group Company and that the seller is in Hong Kong

14   and Google somehow promoting infringing content.

15         MR. KANE:  So it's relevant in a handful of

16   ways.  The first is the one you're anticipating, that

17   party of Google's material contribution to the

18   infringement is that they lend legitimacy to the seller

19   when they say that they verify the seller's identity.

20   In other words, if you click on one of these ads and you

21   get to the landing page and you think I'm not sure this

22   is legitimate, this might be some sort of a scam or it

23   might be illegal --

24         THE COURT:  Exactly.  Well, two different

25   things.  To me, putting my consumer hat on, taking my

PROCEEDING                              51

1

2  judge hat off and putting my consumer hat on, if I saw

3  something like this, my first thought would be this

4  tells me that it's a real company in the sense that if I

5  put my credit card in, I'm actually going to get

6  something.  I'm not going to be ripped off.  But it does

7  not suggest to me that what I'm getting complies with

8  the United States Copyright & Trademark law.

9          MR. KANE:  Okay, so that it seems to me is a

10  merits question.  So if Google wants to say at the

11  merits stage, you know, it's not material that they told

12  them the identity was verified because nobody pays

13  attention to that anyway or it only goes as far as Your

14  Honor was indicating, that that it seems to me is an

15  argument they have to make at the merits stage.  I don't

16  think it's a basis to say we don't get discovery into

17  it.

18          But that's only one of the ways in which these

19  materials are relevant.  It's also very relevant, I

20  would say that the more important way that it's relevant

21  is to Google's knowledge.  So take, for example, Google

22  says they ask questions about the merchant's business

23  model and operational practices.  So two of the websites

24  that are at issue here that Google verified are

25  aliensstory.com and walletsformen.com.  So if those

PROCEEDING                    52

1  websites applied to be verified and said to Google our
2  business model and operation practices are that we write
3  the publish immunology textbooks and Google said sounds
4  good to us, you're verified, I think a jury's entitled
5  to know that.  Because Google's going to argue to the
6  jury, gee whiz, folks, how could we have known that
7  these people were pirates?  We have no idea.  We're just
8  operating this huge company.
9  
10         Likewise, take the question Google asks about
11  relationships with third parties.  Two other websites
12  that Google verified are lollipopshop.com and
13  hocity.shop.  if those websites applied for verification
14  and said we are authorized distributors of McGraw-Hill's
15  nursing test banks, test banks for nursing exams, and
16  Google said sounds good to us, you're verified, that's
17  something the jury should know when Google turns around
18  the says we didn't know that these people were pirates.
19  So that's --
20         THE COURT:  And what if it turns out that you
21  get to peek under the hood in terms of what Google
22  actually asked these folks and Google doesn't ask those
23  questions?  Google just wants to know are you duly
24  incorporated and did you pay your taxes.  I'm making
25  this up, hypothetically.

```
 1                         PROCEEDING                      53

 2          MR. KANE:  At a minimum, in order for Google to

 3   say that, they need to produce the first thing we asked

 4   for which is to tell us what are the questions you asked

 5   the merchants and what do you do with that information.

 6   So at a minimum we need that discovery in order to get

 7   to sort of the hypothetical world that you're positing.

 8          If it turns out that there's really nothing

 9   useful in there, I think there's still an argument that

10   it's relevant because Google says that it does this when

11   it determines that a merchant is suspicious.  In other

12   words, if it determines that a merchant account is

13   suspicious because of activities it's doing or because a

14   flag comes up in its system --

15          THE COURT:  What does suspicious mean in this

16   context though?

17          MR. KANE:  It can be any number of things.  It

18   can be that they're selling branded materials.  It can

19   be that there was a flag on a related account if

20   somebody operated multiple accounts and another account

21   was flagged for something.  It could be that the, it

22   could be any number of things.  But when the account is

23   flagged – I'm sorry, it could be that the name of the

24   account is the same as the name of another account, that

25   they're flagged because the name is suspicious.  It
```

PROCEEDING                          54

could be that the quality of the landing page is low.

Google has various things they do to measure the quality

of the landing page to which the ad links.  It could be

that that has some sort of indication that there might

be malicious activity.  So it could be any number of

things.

THE COURT:  And is this an automated flagging

process?

MR. KANE:  I don't know - I would imagine that

there's some sort of automation involved.  I don't know

how much because we haven't gotten discovery into this.

But if Google determines that the account is suspicious,

Google will require the merchant to go through this

verification process.  It's required to answer questions

about its business operations, its relationship with

third parties.  They're required to submit documentation

--

THE COURT:  As to that, you have some very high

level information, publicly facing information about

what that process entails, but you want the details.

MR. KANE:  Exactly, yeah.  The other way in

which this is relevant to Google's DMCA defense, so, as

you recall, the DMCA requires Google to have a program

that terminates, quote, "subscribers and accountholders

PROCEEDING                    55

2   who are repeat infringers."  The position that Google

3   has taken consistently in this case is that suppose

4   account X and account Y are operated by the same person

5   and account X reaches the ███████████████████ to be

6   terminated under Google's DMCA policy, Google's position

7   is that they can just terminate account X, they don't

8   have to terminate account Y.

9           Well, the verification documents would be very

10  revealing on that score.  If someone came in and said

11  this ads account is associated with 500 merchant center

12  accounts and I'm submitting the same documents to verify

13  all 500 of those merchant center accounts, well, there's

14  a good case that when Google found out that one of those

15  500 accounts was infringing, it should've terminated all

16  500.  In other words, if you are the judge or perhaps

17  the jury who's being asked to decide, you know, when

18  Google finds out that account X is infringing, does it

19  also have to terminate the related account Y, one of the

20  things you want to know is what would Google have to do

21  to figure out that they're related.  Do they have to go

22  sleuthing around or is it just already available to

23  them?  Yet, as part of the verification process, the

24  same ads account was verified as being associated with

25  500 merchant center accounts, then they should be

PROCEEDING                               56

1   terminating all 500 of the merchant center accounts.

2           THE COURT:  I'm not sure I travel with you

3   across all of those steps.  Take your logic, I

4   understand what you're saying.

5           MR. KANE:  Okay.  The other way in which it's

6   relevant is Google has said that one of the reasons we

7   don't terminate both account X and account Y is that

8   account X and account Y could both be operated by a

9   marketing agency.  They could be completely separate --

10          THE COURT:  Clients.

11          MR. KANE:  Yeah, they could be separate

12  companies and one of them is infringing but one is not.

13  But one of the questions that Google supposedly asks is

14  are you a marketing agency.  So this discovery would

15  just tell us were any of these accounts marketing

16  agencies or not.

17          If we sort of zoom out, like Google collected a

18  whole bunch of information from the very pirates who ran

19  the very ads about which this case was filed, and

20  they're trying to hide all of that information.  There's

21  really no justification for saying we're not producing

22  any of that information.  I'm sure Google would like to

23  not admit that they knew a whole lot about these

24  infringing merchants and decided not to terminate them

at all or until much later, but that's information the

jury is very much entitled to have.

THE COURT:  Let me ask you a process question

now.  When did this come up?  It is getting later and

later and later in the discovery schedule, and this you

have not made the case that you couldn't figure this out

until December of 2025.

MR. KANE:  We've been asking for this for quite

some time.  This was a months' long meet and confer

process.  The original --

THE COURT:  When did it start?

MR. KANE:  I'm sorry, I'd have to go back and

look.  It goes back at least as far as October if not

earlier than that.  The original RFP that asked for this

I think was in our first RFP, but if nothing else, it

was RFP 101.

THE COURT:  (indiscernible) it was – hold on –

you've given me Google's responses.  You've given me

Google's responses and objections to plaintiffs' fourth

set of requests actually.  You've given me that at 419-

3.  So did you ask for this for the first time in your

fourth set?

MR. KANE:  I believe the fourth, request in the

fourth set says something like to the extent not covered

PROCEEDING                              58

1

2  by such and such a request.

3          THE COURT:  Is it --

4          MR. KANE:  So 101 says to the extent not called

5  by RFP 36.

6          THE COURT:  Right, which you haven't given me,

7  at least not on this round.

8          MR. KANE:  Yeah, that is in the record.  Hang

9  on one second.

10         THE COURT:  And 36 would've been in your first

11 set?

12         MR. KANE:  That's correct.

13         THE COURT:  And the fourth set went out when?

14 You didn't give me the signature page so I can't see the

15 date.

16         MR. DAMLE:  Your Honor, I can help answer some

17 of this.  I was actually prepared to talk about some of

18 it and --

19         THE COURT:  Okay --

20         (interposing)

21         MR. DAMLE:  -- and Mr. Kane can check me on it.

22         THE COURT:  We can hold until --

23         (interposing)

24         MR. KANE:  It's July 16, 2025 was the fourth

25 RFP.

```
 1                        PROCEEDING                      59
 2           THE COURT:  All right, what else do you want to
 3   tell me?
 4           MR. KANE:  So just one thing.  RFP 36 that you
 5   asked about is --
 6           THE COURT:  The original RFP.
 7           MR. KANE:  Yeah.  That's information about the
 8   infringing merchants.  So this is certainly information
 9   about the infringing merchants.  In fact, it's
10   information that the RFP 35 --
11           THE COURT:  You didn't send an RFP saying give
12   me all the information you have about all of these
13   merchants.
14           MR. KANE:  It's, I mean something like that.
15   RFP 35 is information provided to you by the infringing
16   merchant.  So that's much more specific and probably
17   much more germane to this.
18           THE COURT:  Maybe you should've cited that in
19   your fourth set.  Okay.  And the fourth set went out
20   when?
21           MR. KANE:  July of 2025.
22           THE COURT:  All right.  So in terms of this
23   specific RFP which really focused on the information
24   you're asking for in the current motion, it was July of
25   2025.
```

PROCEEDING                                  60

1

2          MR. KANE:  Yes, although I think it's fairly

3   read to be included in RFP 35 which was September of

4   2024.  That's information provided to you by the

5   infringing merchants.

6          THE COURT:  That's a very broad ask.  I don't

7   know that I would've connected the dots.

8          MR. KANE:  I mean I'm not sure it is.  This is

9   literally documentation that the infringing merchants

10  turned over to --

11         THE COURT:  I understand, I get that.  Okay,

12  what else do you want to tell me?

13         MR. KANE:  So really the only reason that

14  Google offers for not producing this information in

15  their opposition brief is the notion that some of this

16  might be sensitive information.  So a couple of points

17  on that.  One is there's quite a robust protective order

18  in this case.  It's at docket 82.  It's 24 pages long.

19  And that's, of course, designed to make sure that

20  sensitive information doesn't get sort of out into the

21  world.  So it requires that we can't show the

22  information to anyone who's not authorized to see it

23  under the protective order, and it requires that we only

24  use the information for purposes of this litigation.  So

25  that's quite a substantial protection.

```
 1                        PROCEEDING                    61
 2              The other thing I would point out is for ▇
 3    percent of these merchants that Google verified, you
 4    know, the ones that are at issue in this case, ▇
 5    percent of those Google suspended either for copyright
 6    infringement or some other violation.  So almost all of
 7    these are accounts that are websites that Google had
 8    decided had done something so egregious that they
 9    shouldn't be allowed to operate on the platform anymore.
10              That has to mean something.  In particular, I
11    don't think anyone has a strong privacy interest when
12    they submit documents for the purpose of committing an
13    act that is illegal.  In other words, these pirates all
14    submitted their documentation so that they could
15    continue selling copyright infringing works.  As I said,
16    ▇ percent are the ones that Google itself concluded
17    should be suspended.  So I don't think they have
18    anywhere near the privacy interest that sort of an
19    ordinary legitimate businessperson has.  In other words,
20    if you submitted a driver's license because you want to
21    buy a house, you know, you submit it to a mortgage
22    company, you have a strong privacy interest in your
23    driver's license not being shared with other parties.
24    If you submit a driver's license for the purposes of
25    obtaining a fraudulent mortgage, you have far less of a
```

```
1                            PROCEEDING                       62
2    interest in --
3              THE COURT:  And what about the █ percent that
4    Google did not take down, are those █ percent going to
5    sue Google?
6              MR. KANE:  I don't think they have a claim
7    against Google --
8              THE COURT:  Divulging their personal
9    information after, according to Google, promising not
10   to.
11             MR. KANE:  These are all pirates, to be clear,
12   that we've observed running ads for infringing copies of
13   the work.  So our position is a hundred percent of them
14   were obtaining this verification for purposes of
15   committing an illegal act.
16             THE COURT:  Right, but Google's argument, as I
17   understand it, is a contractual one.  They received this
18   information based on a promise not to divulge it.  Now,
19   your answer to that may be, well, they're not divulging
20   it voluntarily.  They'd be divulging it pursuant to a
21   court order, so that gets them off the hook.
22             MR. KANE:  That's certainly one argument.  I
23   think any promise you make not to divulge something is
24   subject to, if a court order is made to you, I'm going
25   to have to.  But the other thing I would say is Google
```

```
 1                          PROCEEDING                    63
 2   has terms of use which is also a contract between Google
 3   and the pirate, and the terms, as you say, if you
 4   violate any of our terms of use, we can kick you off of
 5   the platform.  The pirates are all ones --
 6             THE COURT:  -- say we can turn over your CEO's
 7   driver's license?  Probably not.
 8             MR. KANE:  But I don't know that the claim that
 9   they won't turn this information over is actually in the
10   terms of use.  In other words, what Google pointed to in
11   its opposition letter was just a sentence on its website
12   that says we won't share your information with anyone
13   else.  That to me is not a contract.  If it were in the
14   terms, if they were pointing to the terms of use or
15   something, then there might be a contractual claim.
16             THE COURT:  All right, so if you would please
17   again review the numbers for me.  Plaintiffs are telling
18   me that of the roughly 1,200 pirate websites at issue in
19   this case, ██ percent or ██, was that the number you
20   gave me?
21             MR. KANE:  That's correct.
22             THE COURT:  Were associated with ads accounts
23   that were verified by Google.  So it's those ads
24   accounts that you want to know what they submitted to
25   get themselves verified.
```

PROCEEDING                                    64

1

2          MR. KANE:  We would certainly want those --

3          THE COURT:  And is it ███ ads accounts or is it

4   many more ads accounts?

5          MR. KANE:  It's ███ pirates websites that gets

6   you about --

7              (interposing)

8          MR. KANE:  -- about ███, I think it's ███ ads

9   accounts which gets you to about ████ merchant center

10  accounts.  What I would add to that, Your Honor, is

11  first there's 261 pirate websites about which Google has

12  not yet produced information --

13         THE COURT:  You're still working on that,

14  right?

15         MR. KANE:  Right, so we don't know how many of

16  those had an ads account that was verified.  The other

17  thing I would say is it may be that some of the other

18  roughly ████████████████████████ pirate websites

19  submitted verification documents and were not verified.

20  To the extent Google has those documents, we think those

21  should be included.  In other words, it should be the

22  ███ that were at some time verified --

23         THE COURT:  And anybody else who swung and

24  missed.

25         MR. KANE:  Exactly.  I mean they should

PROCEEDING                    65

1
2    basically take the 1,500 and give us, you know, anything
3    that any of those 1,500 submitted because --
4              THE COURT:  For purposes of verification.
5              MR. KANE:  Correct.  Because, of course, we
6    don't know whether the one spreadsheet on which we're
7    basing this is accurate.  We may get into a deposition
8    and find out, oh, the cutoff date was six months prior -
9    -
10             THE COURT:  Depositions, forgive me for
11   interrupting, but I think when we were last together, I
12   exhorted both sides to start actually scheduling
13   depositions.  Has anything happened on that front?
14             MR. KANE:  So what we decided is, so we sent 15
15   notices, notices for 15 fact depositions.  Google told
16   us they wouldn't hold any fact depositions unless we
17   gave them a final 30(b)(6) notice --
18             THE COURT:  Yes, but I resolved that and said
19   each side had to serve the other with their good faith
20   30(b)(6) not quite a hundred percent final draft.
21             MR. KANE:  That's correct, and Your Honor
22   ordered that those were due January 30 --
23             THE COURT:  So we're not there yet.
24             MR. KANE:  -- so I presume that --
25             THE COURT:  It seems like so much time has

PROCEEDING                                    66

1

2  passed.

3          MR. KANE:  It was only a week ago I'm afraid.

4          THE COURT:  All right, so that hasn't happened

5  yet, all right, thanks.

6          MR. KANE:  That's correct.

7          THE COURT:  Now, what else do you want to tell

8  me about this motion?  Sorry to distract you.

9          MR. KANE:  That's okay.  The other thing I

10  would point out, just with respect to Google's claim

11  that there's a privacy interest here, most of this

12  information would not actually be sort of private.  What

13  they said they asked for is organization registration

14  documents like certificates of business incorporation

15  and SEC filings.  All or most of that might well not be

16  private at all; it might even be public --

17          THE COURT:  Most of these guys are not going to

18  have SEC filings I wager.

19          MR. KANE:  I agree.  They might have

20  organization registration documents, but those would be

21  public, there wouldn't be a privacy interest.  You might

22  have to pay for them but they would be public.

23          THE COURT:  All right.

24          MR. KANE:  The questions about the advertiser's

25  business model or its operational practices or its key

PROCEEDING                          67

1

2  relationships with third parties, none of that is like

3  sensitive information to the point that there's a

4  privacy interest.  The protective order is more than

5  enough.

6              THE COURT:  Oh, I think you'll get an argument

7  on that.

8              MR. KANE:  For those answer the protective

9  order is certainly enough.  I think the only area where

10  they have something of a case is like a driver's

11  license, but for that you can easily add like a view-

12  only platform or even there, I mean the protective order

13  itself --

14              THE COURT:  Remind me, does your protective

15  order have a second super-duper confidential or

16  attorney's eyes only lawyer in it?

17              MR. KANE:  It does, yeah.  So all that can be

18  marked AEO, and as I said, this is all documentation

19  that's coming from people who are committing an illegal

20  act.

21              THE COURT:  All right, I am - I'm not cutting

22  you off, but I think I'm ready to hear from the other

23  side if you're, unless there's something you think I'm

24  missing here.

25              MR. KANE:  I'll save it for reply I guess.

```
 1                        PROCEEDING                    68
 2              THE COURT:  All right.  Mr. Damle.
 3              MR. DAMLE:  Thank you, Your Honor.  Let me
 4     start with the sort of point you raised about when this
 5     all sort of came to a head.  The answer is that, and I
 6     pulled our email chains because I anticipated you asking
 7     this based on your comments from the last hearing.  This
 8     came to a head back in July of 2025, July 18.  So I have
 9     a chain that's quite long, 78 pages, and I have a copy
10     if it would be helpful for you, Your Honor, but I can
11     also just read from it.
12              So this was – just to set the table in terms of
13     the history of this particular dispute.  They served
14     their first, as Mr. Kane said, they served RFPs 35 and
15     36 which he mentioned in September 2024, and then there
16     was a lot of discussion about whether that RFP
17     encompassed issues around identity verification.  And so
18     we had conversations during that time, and then leading
19     up to the summer of last year, they served these two
20     additional RFPs --
21              THE COURT:  101 and 102.
22              MR. DAMLE:  -- 101 and 102 which they expressly
23     said were, in their view, you know, issued out of an
24     abundance of caution, notwithstanding their position
25     that they were already covered by their earlier RFPs.
```

PROCEEDING                      69

So that was in July.  And then on July 18 we had a
further meet and confer and reached impasse.  In this
email from Mr. Kane to the team on July 18 of 2025, he
identifies issue 6:  information used to, quote, "verify
merchants."  He discusses sort of RFP 36 and information
required.  He makes this argument that he made today
about, you know, the knowledge of these pirates allows
Google readily to tell when different accounts are
controlled by the same entity and allows Google to tell
that these are pirate merchants, right, the same
argument about relevancy here he's discussing today.

          THE COURT:  One of them.

          MR. DAMLE:  Right.  To the extent that
merchants provide identifying information like this to
Google, that information is called by other RFPs, and
then he concluded on that issue by saying plaintiffs
understand the parties to be at an impasse and intend to
raise this issue with the Court.

          THE COURT:  And date of that email --

          MR. DAMLE:  That was July 18 of 2025.

          THE COURT:  And then when did it next come up?

          MR. DAMLE:  I don't know when the – well, I
believe that leading up to the, you know, after that, we
have obviously there's a lot of discovery disputes that

PROCEEDING                                      70

1

2    happened.  They raised 15 other discovery issues in the

3    meantime, didn't prioritize this.  I think this came up

4    in the lead-up to their filing of the motion that's now

5    before you in December.  So they raised it again.

6              THE COURT:  They raised it again --

7              (interposing)

8              MR. DAMLE:  But this is something that they

9    could've raised --

10             THE COURT:  Hold on.  They raised it again in

11   November, they raised it again in January, they raised

12   it again --

13             MR. DAMLE:  I don't remember - I don't know

14   exactly when they raise it again, but we know that the

15   parties were very clearly at an impasse on this issue in

16   July 2025 --

17             THE COURT:  Well --

18             MR. DAMLE:  There was a lot of briefing that

19   happened after that where they could've raised this

20   issue.  And that affects us in various ways that I can,

21   the fact that this is coming so belatedly affects us in

22   various ways that I'm happy to discuss.

23             THE COURT:  All right, now to the merits.

24             MR. DAMLE:  To the merits.  So I think it's

25   helpful for me to start by just explaining the

1   relationship between the domains and the merchant center

2   accounts and the ads accounts because I think that's

3   where your questions started.  So as we've discussed

4   before, there are roughly 1,200 different domains --

5            THE COURT:  Twelve hundred and thirty-nine.

6            MR. DAMLE:  Twelve hundred and thirty-nine

7   domains that they have said at one point advertised

8   infringing works.

9            THE COURT:  Not counting the additional 200 and

10   some that --

11            MR. DAMLE:  Correct, correct.  We'll start with

12   that just to keep things simple.  That 1,239 domains are

13   associated with about 20,000 different merchant center

14   accounts over time.  So the merchant center accounts can

15   get closed down, they can get reopened associated with

16   that same domain.  So we're talking 20,000 different

17   merchant center accounts.

18            Now, there's a many to many – so that's just

19   the merchant center account.  Mr. Kane is correct that

20   in order to run a paid shopping advertisement on the

21   shopping platform, you also need an ads account

22   associated with it.  That ads account, all it does is it

23   helps pay for the ad.  The actual information about the

24   thing that is being sold is kept with the merchant

PROCEEDING                              72

center account.  So the ads account is just a way to pay

for the paid ads.

There's a many to many relationship between a

merchant center account and an ads account.  A merchant

center account can be associated with multiple ads

accounts, and by the same token an ads account can be

associated with multiple merchant center accounts.  So

there's not this sort of fixed one-to-one relationship

between a particular domain and a particular merchant

center account and a particular ads account.

And, in fact, if you look at the merchant

center accounts that — I have it here somewhere.  If you

look at the merchant center accounts that are at issue,

the 20,000 or so merchant center accounts, they are

also, those merchant center accounts are also associated

with ███████ other domains that are not at issue in this

case, that are not said to have committed infringement.

So those merchant center accounts, because the merchant

center account can be associated with different domains

over time, at different points in time, those merchant

center accounts, those 20,000 merchant center accounts

were associated with other domains --

THE COURT:  That are not accused --

MR. DAMLE:  That are not accused of

                              PROCEEDING                          73

1

2   infringement in this case.

3            THE COURT:  Okay.

4            MR. DAMLE:  Okay?  And so when you take all of

5   those different 20,000 merchant center accounts and look

6   at all across time as far back as we've collected, you

7   find that they're associated at different points in time

8   to 10,000 or so, I think we have the number in our

9   brief, around 10,000 ads accounts.

10            Now, of those 10,000 ads accounts, we've

11   provided all this data, this is where all this data's

12   coming from in the spreadsheet that's at Bates number

13   ending 904.  We refer to it in our brief.  Of those

14   10,000 ads accounts, around ███ of them went through

15   verification at all.  And that's what the data

16   indicates, that's what will be explained to the

17   plaintiffs.

18            THE COURT:  And of those ███, I'm just making

19   sure I'm doing apples to apples, I'm not at all

20   convinced that I am, of those ███ that went through a

21   verification process, I think Mr. Kane told me that ███

22   of them are relevant to this case.

23            MR. DAMLE:  I think that ███ of them went to,

24   were actually verified.  Now, I don't know whether

25   they're relevant to the case because it's very possible,

PROCEEDING                          74

1

2    if not likely, that the ██ ads accounts were paying for

3    ads for domains other than the 1,239 domains accused in

4    this case because of this complicated relationship

5    between merchant accounts and domains and ads accounts.

6    Because at any given point in time, right, because

7    there's not this fixed one-to-one relationship between

8    domain and merchant and ads account, that ads account

9    could've been used – I'll give a hypothetical.

10           So there's a merchant center account that maybe

11   selling infringing goods and non-infringing goods.  And

12   they may be using one ads account that's verified for

13   just selling the non-infringing goods, and they're using

14   a different ads account that's not verified for selling

15   the infringing goods.  That's certainly a possibility.

16   Or at different points in time, a particular merchant at

17   time period A was using an unverified ads accounts when

18   that merchant account was associated with one of the

19   1,239 domains, and then at time B, when the merchant

20   center account cleans up its act and is now advertising,

21   you know, non-infringing goods, other goods entirely,

22   that at that time they're associated with a verified ads

23   account.  That's certainly a possibility.

24           Because what we've done is we've sort of

25   collected like a dragnet all of the ads accounts that

PROCEEDING                          75

1   have ever been associated with any of these merchant

2   center accounts regardless of whether those merchant

3   center accounts were – and the merchant center accounts

4   that we've gathered, because this is what the plaintiffs

5   have asked for, the merchant center accounts we've

6   gathered have been merchant center accounts that at some

7   point in time were associated with one of the infringing

8   domains, which is why you get that 20,000 merchant

9   center accounts that were associated with a total of

10  over 30,000 domains.  Remember, there's only 1,239

11  domains here.

12          THE COURT:  And what you verify is the merchant

13  center account, correct?

14          MR. DAMLE:  There's two different

15  verifications.  Mr. Kane explained that accurately.

16  There's a verification – and actually, throughout a lot

17  of this proceeding, we had been under the impression

18  that what they were asking for was information about how

19  we verify the merchant center account which is all we do

20  is --

21          THE COURT:  Now Mr. Kane says we don't care

22  about that.

23          MR. DAMLE:  Now he says we don't care, and, in

24  fact, their opening brief to this Court, when it says,

```
 1                        PROCEEDING                     76
 2   oh, ████     the merchant center accounts were verified,
 3   what they're talking about is that sort of verification
 4   that he says now they don't care about.  Right.  So
 5   there's that verification.  Can you edit your website
 6   which can involve like including the code, as Mr. Kane
 7   explained.
 8              THE COURT:  All right.
 9              MR. DAMLE:  Then there's this separate
10   verification --
11              THE COURT:  Separate verification --
12              MR. DAMLE:  -- that happens for ads accounts.
13   I want to just be very clear about the verification that
14   we believe is actually at issue in this case.  The kind
15   of verification that we believe is at issue in this
16   motion is identity verification.  Are you who you say
17   you are?  It's a very basic identity, and --
18              THE COURT:  And that's what the little badge
19   means?
20              MR. DAMLE:  And it says that explicitly, it
21   says identity verified by Google.  Advertising identity
22   verified by Google.  Their RFPs, 101 and 102, asked
23   about identity verification.  101 says to the extent not
24   called for by RFP 36, documents concerning all the
25   information provided to you by the infringing merchants
```

PROCEEDING                              77

and seeking verification of their identity from Google.

So we're talking about identity verification, are you

who you say you are.

          We've provided the data that says, again, we're

talking about █ percent of ads accounts that are in this

case.  No necessary connection to any of the advertising

domains at the time.  We've already provided the data

that shows were they verified or not verified.  There's

a flag that says identity verified, identity

(indiscernible) verified, true or false.  So they

already know the fact of verification.  They already

know the information, identity information that was

provided by the --

          THE COURT:  How do they know the identity

information that was provided?

          MR. DAMLE:  Well, they know what the

identification, they know in our system what we put in,

what is entered into our system.

          THE COURT:  Be more specific.

          MR. DAMLE:  So if the corporation name for the

advertiser is Papaya whatever --

          THE COURT:  Using the example I looked at with

Mr. Kane --

          MR. DAMLE:  Exactly.

```
 1                        PROCEEDING                        78
 2              THE COURT:  Well, obviously, you --
 3              MR. DAMLE:  So in our database it'll say that
 4    name.  It'll say the, you know, business name is Papaya
 5    Group or whatever the name was.
 6              THE COURT:  And the location is Hong Kong.
 7              MR. DAMLE:  And it'll say the location is Hong
 8    Kong, and it'll say --
 9              THE COURT:  Are you saying that every piece of
10    information you got during the verification process
11    though is reflected in the badge that the consumer sees?
12              MR. DAMLE:  Well, the relevant identity
13    information that we're checking based on, again, the
14    public documents that we've produced, the identity
15    information, who, you know, is your name what you say it
16    is and are you located where you say you're located,
17    that is reflected, that's all we're checking.  So they
18    may be providing documents like, you know --
19              THE COURT:  Articles of incorporation.
20              MR. DAMLE:  -- articles of incorporation, I
21    don't know what it would be in Hong Kong --
22              THE COURT:  Certificates, whatever.
23              MR. DAMLE:  Whatever it would be.  If it's an
24    individual, their driver's license or passport page.
25    Maybe those will have been provided, but we would've,
```

PROCEEDING                          79

1    all we will have done is check the identity, yes, you

2    are who you say you are.

3

4            THE COURT:  So if you could turn to document

5    419-5, which was submitted as an exhibit to the

6    plaintiffs' moving letter here.  It's conveniently

7    behind tab 7 of my courtesy copy notebook.  This, as I

8    understand it, is what Google says to the public about

9    what this process entails.  Is that right?

10           MR. DAMLE:  Yes, this is for identity

11   verification, yes.

12           THE COURT:  Which is what you --

13           MR. DAMLE:  Which is not the only kind of

14   verification that Google does, it --

15           THE COURT:  Right, but this the verification

16   which, as you read the plaintiffs' motion, is what they

17   want.

18           MR. DAMLE:  So some of the documentation I will

19   say mixes up two different kinds of verification.  One

20   is – and this is the first time we've heard what they're

21   asking for.  In their brief they cite to a YouTube video

22   which talks about business operations verification.  So

23   Mr. Kane spends a lot of time talking about quoting from

24   that video, saying things like, you know, we check your,

25   Google will engage in, what's the terms he used,

PROCEEDING                           80

1

2   operational practices, key relationships with third

3   parties, details on products or services, and then links

4   below this page 3 of their opening brief to Google ads

5   business operations verification process.

6           That was something that never came up actually

7   on our meet and confers.  This is the first time we've

8   ever seen this website.  And so a lot of what we were

9   focused on was the process of identity verification

10  which is what's reflected in the data, the actual data

11  says identity was verified, true or false.

12          THE COURT:  So you're saying that the document

13  I'm looking at now, 419-5, is not about the identity

14  verification process?

15          MR. DAMLE:  It's in part about the identity

16  verification process, but I believe there are elements

17  of it that also discuss the separate process of business

18  verification which --

19          THE COURT:  Okay, but this is your document.

20          MR. DAMLE:  Correct, correct, correct.

21          THE COURT:  Plaintiffs didn't make this one up.

22          MR. DAMLE:  I agree.

23          THE COURT:  And if Google can't keep straight

24  what its verification processes are for different

25  purposes --

```
 1                         PROCEEDING                    81
 2             MR. DAMLE:  Again, Your Honor, like we can keep
 3    them straight.  There's two, my point is identity
 4    verification is one kind of verification that occurs.
 5             THE COURT:  Well, you're telling me that.
 6             MR. DAMLE:  Yes.
 7             THE COURT:  But where's the support for that?
 8             MR. DAMLE:  Well, that was what their request
 9    was for.  The request was for how do you verify
10    someone's identity.  I showed you what we actually
11    display to the public is just identity verified by
12    Google.  And the data that we produced is labeled, the
13    relevant - where we're getting this ██ different ads
14    accounts that have been verified, the way we get there
15    is by looking at a field that's labeled identity was
16    verified.  So, again, the entire conversation that we've
17    had from their RFPs, 101 and 102, to the data that we
18    produced, to the actual exhibits that they are showing
19    you that say what Google is doing is verifying the
20    identity.
21             THE COURT:  All right, what else do you want to
22    tell me?
23             MR. DAMLE:  If you have questions about this
24    document, I'm happy to answer them.  I just wanted to
25    make that clear that there are these two separate kinds
```

1

2  of verification.  We've only ever been talking about the

3  identity verification --

4         THE COURT:  Well, if I look at RFP 102 which is

5  at document 419-3, it says that plaintiffs want

6  documents sufficient to show Google's processes and

7  procedures concerning, quote, "obtaining, verifying, and

8  displaying identifying information for the product

9  seller in connection with the Google ad transparency

10  center, e.g., HTTPS."  Now, they do use the term

11  identifying information for the product seller, but then

12  that HTTP address, is that the document we were looking

13  at a moment ago that --

14         MR. DAMLE:  Yeah, so the --

15         (interposing)

16         MR. DAMLE:  So what Mr. Kane showed you, that

17  sort of pop-up that you saw for Papaya Group Company

18  Ltd. --

19         THE COURT:  That's the HTTP address?

20         MR. DAMLE:  I don't know whether that's the,

21  exact what this HTTP address takes you to is something

22  that looks like this, but that is the --

23         THE COURT:  I don't think so.

24         MR. DAMLE:  No, it's --

25         THE COURT:  I think he may have been pointing,

PROCEEDING                                83

1
2   if anything, to what's been reprinted at 419-5.  I don't

3   know that, I'm guessing because there is no URL on it.

4   But my point to you, Mr. Damle, is I'm not sure that 101

5   and 102 in particular are as limited to what you're now

6   describing as the identity verification process as you

7   believe them to be, and it may well be, as is often the

8   case in cases like this, because when the plaintiffs

9   wrote these RFPs, they didn't know as much as they know

10  now having heard a lot back from Google as to the

11  different kinds of processes.  They may have been vague

12  by intention or they may have been vague because they

13  didn't know enough to be more precise at the time.

14          Why don't you tell me about this other broader

15  process that involves more than are you who you say you

16  are?

17          MR. DAMLE:  Yeah, so, Your Honor, to be candid,

18  because the very first time we even had, understood that

19  what they were seeking was, you know, whatever is

20  referred to in this YouTube video, right, they never

21  showed us this YouTube video during our meet and confer

22  process, never asked us --

23          THE COURT:  Which I haven't watched by the way.

24          MR. DAMLE:  And we watched it after this brief

25  came in.  We didn't know that they were asking us for

1                              PROCEEDING                        84

2   information about our business operations verification.

3   And so, candidly, we haven't done a lot of investigation

4   into what that process entails because that was not

5   something that was ever teed up in the meet and confer

6   process prior to filing this brief.  This brief, again,

7   we went through this process – and if you look at what

8   they're asking for, right, what they're asking for in

9   terms of the information we collect from the pirates

10  were things about, you know, the official documentation

11  that shows their legal name, trade name, address, and

12  other supporting documents.  So we just haven't had the

13  opportunity to really meaningfully meet and confer about

14  the business operation verification process.  So,

15  unfortunately, I don't have answers for you about how

16  that works.

17          THE COURT:  All right, what else do you want me

18  to know?

19          (pause in proceeding)

20          THE COURT:  And I note, the reason I'm flipping

21  through pages is I was looking at the plaintiffs'

22  proposed order which is also a little bit unsatisfactory

23  in terms of what they're looking at.  Plaintiffs want me

24  in paragraph 1 to order Google to search for and produce

25  documents responsive to 102, at a minimum documents

```
 1                           PROCEEDING                        85
 2   regarding, quote, "Google's process for verifying
 3   advertisers," close quote.  I don't know what that means
 4   anymore.
 5              MR. DAMLE:  Neither do I, Your Honor.  The
 6   other thing I'll say is, you know, just go to the
 7   relevance point if I may, you know, so just a couple of
 8   things that they've said they need to, they want to
 9   argue.  One is Google verified these ads accounts, and
10   these ads accounts were in some indirect fashion
11   associated with domains that were engaged in
12   infringement.  And that was contribution to copyright
13   infringement.  So what I would say to that is we've
14   already given them the information of whether we
15   verified somebody or not, right, that's in the data
16   itself.  So they have what they need in order to make
17   that argument.  I don't think that's a correct argument,
18   but if they want to make the argument that the
19   verification of those ███ ads accounts somehow
20   constituted material contribution or inducement to
21   infringement, I don't understand why they need anything
22   more.  That data is there.
23              THE COURT:  Well, because they want to make
24   another argument.  They want to make an argument based
25   on what they may find out you actually got from these
```

 1
 2  folks, and they want to make an argument that you

 3  received information that should have prompted you to be

 4  more proactive.

 5          MR. DAMLE:  So if what they're saying is that

 6  we got, again, focusing on the identity documents.  So

 7  the other argument they say is if Google knew that, you

 8  know, account X and account Y were the same, had the

 9  same identity, that they, you know, that they would've

10  had to implement their repeat infringement policy in a

11  particular way.  I would say, again, that's something

12  that the data provides.  The data includes the verified

13  identity information, the name of the business, their

14  location.  And so if they want to make an argument that

15  these two different accounts are actually run by the

16  same company and you can tell that you knew that because

17  they're both verified, that's an argument that they can

18  make based on the data.  With respect to that, I don't

19  understand why they need anymore, why they need the

20  underlying documents that may have been submitted by

21  that particular ad accountholder, those ads

22  accountholders to Google to make that argument because

23  the data itself indicates what the contact information

24  is, what the identity is for all the ads accounts.  So

25  it doesn't seem necessary for me for that reason as

PROCEEDING                                87

well.

So those were the two that I heard being the
main reasons they want this information, and it strikes
me that they didn't, that given that those are their two
main arguments, I don't understand why they need the
further discovery beyond what we've already given them.

THE COURT:  All right, let me ask Mr. Kane a
few questions.  Let me begin with just a factual
question.  You say, you said to me earlier this
afternoon and you repeat this number in your reply
brief, that Google claims to have verified ███ of the
1,239 pirates identified not counting the last.  Where
does that ███ number come from?

MR. KANE:  Okay, so what Google allows pirate
websites to do is to establish multiple accounts that
all run ads for --

THE COURT:  This is a technical question.

MR. KANE:  I'm sorry.

THE COURT:  Where can I find that number, ███?
Is it on a document, is it on a spreadsheet, is it in an
interrogatory?

MR. KANE:  We provided it, so that it comes
from a spreadsheet that Google gave to us.  So they gave
us --

```
 1                        PROCEEDING                    88
 2              THE COURT:  Do I have that spreadsheet?
 3              MR. KANE:  No, we didn't provide that to the
 4    Court.  We provided it to Google simultaneously with the
 5    filing of the reply brief.  But it's the spreadsheet
 6    ending in 9904.  And what it is it's a list of ads
 7    accounts with an indication as to whether the ads
 8    account has been verified or not.  So as we've
 9    explained, one ads account can support multiple merchant
10    center accounts.  And so if you take the ads accounts
11    and you say, okay, these are all the merchant center
12    accounts that are associated with that ads account, and
13    then you say what are the websites with which those
14    merchant center accounts are associated, you get to ███
15    of the 1,239 domains.
16              THE COURT:  Okay.
17              MR. KANE:  In other words --
18              THE COURT:  I understand the logic, but I'm
19    taking your word for it at the moment.
20              MR. KANE:  I don't think they're challenging
21    the ███ number.
22              THE COURT:  Well, it's just that when Mr. Damle
23    was up, he kept giving me different numbers.
24              MR. KANE:  So what --
25              THE COURT:  ███, etc.
```

```
 1                    PROCEEDING                    89
```

```
 2         MR. KANE:  What Mr. Damle is going is trying to
 3  take just the number of ads accounts themselves, in
 4  other words, there's 10,000 or so ads accounts that are
 5  associated with these 1,239 pirates, and he's saying ███
 6  I think was his number of those ads accounts were
 7  verified.  If you take the ads accounts that were
 8  verified and match the up to the pirate websites with
 9  which they're associated --
10         THE COURT:  You get ███.
11         MR. KANE:  -- it's ███, exactly.
12         THE COURT:  Now, the kind of verification that
13  you are talking about, based on the examples that you
14  have submitted to me as attachments to your opening
15  letter brief do appear to be what Mr. Damle was
16  referring to as identity verification.  In fact, to use
17  the example that you helpfully walked me through at
18  document 419-1, what this page says is advertiser
19  identity verified by Google, not anything else.  Same
20  with 419-2.  And you didn't give me any examples of any
21  other or different kind of verification.  Is your motion
22  aimed at what Mr. Damle refers to as identity
23  verification or at something else?
24         MR. KANE:  So what we want to know is what does
25  the merchant provide to Google in order to get that
```

1

2  little badge --

3          THE COURT:  At identity verification.

4          MR. KANE:  Exactly.  Google is not telling us

5  for the first time these things that you put in the

6  brief are a separate verification process.  If Google

7  has some other verification process to which it

8  subjected these pirates, I agree we should meet and

9  confer about that, and they can tell us what their

10  position is.  What we want in this motion is --

11          THE COURT:  Identity verification.

12          MR. KANE:  -- in order for that badge to

13  appear, what did the merchant or pirate website provide

14  to Google.  If it is the case, as Mr. Damle is

15  surprising us now in saying, that there is some separate

16  verification process to which these merchants, these

17  pirate websites were subjected, we are going to ask for

18  discovery into that.  But I'm not able to say --

19          THE COURT:  Somehow I'm not surprised to hear

20  you say that.

21          MR. KANE:  Well, I mean if they --

22          THE COURT:  It doesn't mean you're going to get

23  it at this stage.

24          MR. KANE:  I'm literally learning this as you

25  are.  If it turns out there's some entire --

PROCEEDING                        91

1

2          THE COURT:  Yes, but it does sound like there

3     was at least a several months hiatus there between July

4     and much more recently after you declared the parties at

5     impasse on this issue and before you started talking

6     again.

7          MR. KANE:  Well, we did meet and confer about

8     RFP 101 and 102 which are the sort of more specific

9     versions of it.  We didn't reach an impasse on that

10    until November 25, 2025.  We filed the motion in

11    December of 2025.  So that was much more closely

12    following the meet and confer.  The thing I want to

13    point out about timing is just what Google does if

14    there's a hundred things that they're supposed to

15    produce, they produce ten of them, and when we file

16    motions on items 11 through 25, they say, my God, Judge,

17    look at what they're subjecting the Court to, leaving

18    out that they've not produced documents on items 26

19    through 100.  So their attempt to sort of cast us as not

20    bringing these things soon enough really is contradicted

21    by their conduct during meet and confers.

22          But to get back to the substance, one of the

23    reasons we need these things is I suspect, when we see

24    these documents that the pirates provided, it's going to

25    be pretty obvious that they're pirates.  I'm not saying

PROCEEDING                                92

1  they're going to be written in crayon, but I think it's

2  going to be pretty obvious that like in the way that

3  they answer these questions and the documentation that

4  they provide, that these are not legitimate websites.

5  In particular, if part of the verification process is

6  visiting the pirate's website, I think it's going to be

7  pretty clear, it's pretty clear from all of these sites

8  it's a pirate website.

9        THE COURT:  Well, it doesn't sound – if what

10  Mr. Damle tells me is true or substantially true, if I

11  order Google to, as a first step, search for and produce

12  further non-privileged documents responsive to

13  plaintiffs' RFP 102, construing the request consistent

14  with the way you've written this motion, as the identity

15  verification process and not some other verification

16  process, in other words, what has to happen for that

17  badge to go on, it sounds to me like what you're going

18  to get back, which may be a piece of code, I'm not sure,

19  is going to be something technical and unsatisfactory to

20  you, a means of having the advertiser establish that

21  they can edit the website that they're associated with.

22        MR. KANE:  No.  Those are two separate things.

23  So there's the merchant center verification which is

24  what you're describing, just a proof that you are able

1

2    to operate the website.

3              THE COURT:  But you think identity verification

4    involves more meat and potatoes.

5              MR. KANE:  Exactly.  That's when we think

6    they're answering these questions and providing the

7    documentation that verifies their identity.  Part of the

8    difficulty here, Judge, is we've asked for sort of two

9    things.  One is just tell us what the process is, like

10   what are the questions you ask --

11             THE COURT:  And the second is show us

12   everything you've got.

13             MR. KANE:  Exactly.  Because they've refused to

14   give us the first thing, it's harder for us to say what

15   they're going to produce with respect to the second

16   thing.  In other words, because we don't know what

17   questions they ask, because we don't know what documents

18   they require, it's hard for me to say, well, for sure

19   we're going to get something in step two that tells us a

20   meaningful amount about the pirates.

21             THE COURT:  All right.

22             MR. KANE:  But based on what they've told us

23   about the process, I think we are --

24             THE COURT:  I think I've heard enough to make a

25   decision, but I don't want to cut you off if there's

PROCEEDING                          94

something you're dying to tell me.

MR. KANE:  Just the one other point I would

make is the other thing that Google hasn't told us is

not just like what's the documentation that the merchant

presents and what's the questions that the merchant

answers but what does Google do with that information.

In other words, we know they do something because

sometimes they reject the verification, but when a

merchant submits articles of incorporation or when they

answer a question about their business operations, what

is Google's process to verify the merchant.  Is there a

checklist someone fills out?  Is it automated and if so,

like what is the automation looking for?  If we had all

of that, then we would know for sure did they get, was

there something that the merchant provided to Google

that gave Google knowledge that this was an infringing

pirate.

THE COURT:  Got it.  Thirty seconds if you want

them, Mr. Damle.

MR. DAMLE:  Yeah, just on the numbers, Your

Honor.  He sort of says, okay, there's ███ ads accounts

that were verified out of the 10,000, and he traces it

back to ███ domains that are at issue.  They're also

associated with a ton of other domains that are not at

PROCEEDING                                95

issue.  So I just wanted to make sure that point was

clear.  There's no real clear connection between those

█ and any infringement that's happening in this case.

          And in terms of the documents that are about

the process for identity verification, we provided our

public information which describes what we're --

          THE COURT:  Not the public information he

wants; it's the non-public information.

          MR. DAMLE:  I'm not certain there's going to be

much more beyond that.  It's just like look at this

document, look at this document.  So I sort of don't

know what he's getting out of this given, again, going

back to my relevance point, the points he says he wants

to make can be made with the data we've already

provided.

          THE COURT:  Thank you both very much.

          MR. DAMLE:  Thank you, Your Honor.

          THE COURT:  Plaintiffs' December 9 discovery

motion regarding the verification documents filed at

dockets 386 and 389 will be granted in part.  I will

require Google to search for and produce further non-

privileged documents sufficient to show, they don't have

to produce every single email out there, sufficient to

show Google's process for performing identity

PROCEEDING                                96

verification of advertisers, in other words, what you

need to get that little badge that says your identity is

verified, including, A, documentation Google requires

advertisers to submit, B, questions if any Google

requires them to answer, and, C, analyses, I'm not going

to say policies, that's too broad, analyses or

procedures that Google applies to that information in

order to determine whether to give out that little badge

or not.

        So that's essentially with some minor

modifications the first paragraph of the proposed

discovery order submitted by the plaintiffs.  I'll

rewrite to hopefully make it a little clearer, but I

wanted to give you my oral cut on it today.  So that

will be the order with respect to dockets 386 and 389.

        Is it time for our afternoon break?  I think it

is time for our afternoon break.  Let's try to keep it

to ten minutes.  I know I say that every time, but I'm

trying to.  All right, we'll stand in recess.

        (Whereupon, a recess is taken.)

        THE CLERK:  We're now back on the record in the

matter of Cengage Learning Inc., et al. v. Google LLC,

case number 24cv4274.

        THE COURT:  Hold on, I'll give you a moment to

```
 1                        PROCEEDING                     97
 2   reassemble.
 3              (pause in proceeding)
 4        THE COURT:  All right, everybody ready?  Sorry,
 5   we should've given you a little more warning.  So I'm
 6   now ready to hear argument on plaintiffs' December 17
 7   motion regarding Mr. ████.  The motion was filed at
 8   docket 455, and this is Ms. Lee's motion, correct?  I
 9   wonder if you might begin, Ms. Lee, by just clarifying
10   for me exactly what's being argued about here.  In your
11   moving letter brief, dated December 17, on page 3, I see
12   a list of seven proposed search terms for Mr. ████.  And
13   I understand that 1 through 3 were created specifically
14   for Mr. ████, and 4, 5, 6, and 7 are terms that are
15   already being used with other custodians.  Correct?
16        MS. LEE:  Yes, Your Honor.
17        THE COURT:  Okay.  Defendants, however,
18   complain that some of these search terms were
19   communicated to them for the first time in this moving
20   letter.  So if you could  give me a little bit of a
21   timeline here and tell me when plaintiffs first asked
22   for each of these search terms to be run across Mr.
23   ████'s data.
24        MS. LEE:  Yes, Your Honor.  So Mr. ██████,
25   we asked Google if he could be a full custodian in
```

PROCEEDING                                98

```
 1  October of last year.

 2           THE COURT:  And they said no.

 3           MS. LEE:  And they said no.  And we had six

 4  meet and confers after that to try to narrow these

 5  search terms.  Google had provided several hit reports

 6  of the brand portal and several other search terms, but

 7  they had only provided the hit reports for their

 8  suggested search terms.  And so we crafted with Google's

 9  proposal our proposed search terms in November, and

10  these are the --

11           THE COURT:  November of 2025?

12           MS. LEE:  Yes.  So these are the first and

13  second search terms that are --

14           THE COURT:  You're saying that search term

15  number 1, which is a long string --

16           MS. LEE:  Yes.

17           THE COURT:  -- and search term number 2, which

18  is a short string involving ███████, were proposed in

19  November of 2025.

20           MS. LEE:  Yes.

21           THE COURT:  In these exact words?

22           MS. LEE:  So, I'm sorry, Your Honor, number 2

23  was actually a proposed search from Google, and so they

24  had provided the hit reports, and that was their
```

```
 1                      PROCEEDING                    99
 2   proposed search, but they, although they gave us the hit
 3   reports, they did not agree to search number two either.
 4             THE COURT:  And when did Google propose number
 5   2?
 6             MS. LEE:  Your Honor, that was also in November
 7   of 2025.
 8             THE COURT:  Okay.  So you're saying you
 9   proposed number 1, the long one, in November of 2025,
10   and Google proposed number 2, the short one, in November
11   of '25?
12             MS. LEE:  Yes.
13             THE COURT:  And does ███████, is that a Harry
14   Potter reference by any chance?
15             MS. LEE:  So that appears, according to
16   Google's documents, to have been a suggested name of
17   brand portal.  It seems like that name is no longer used
18   for brand portal, but it is, it was a suggested
19   consideration before they called it brand portal.
20             THE COURT:  That was the ██████████ if I
21   remember correctly.
22             MS. LEE:  Yeah.  Yes.
23             THE COURT:  Okay.  What about number 3, which
24   is the AAP search string?
25             MS. LEE:  Yes.
```

```
 1                           PROCEEDING                    100
 2              THE COURT:  Who proposed that and when?
 3              MS. LEE:  So this AAP search string is actually
 4    just a small portion of plaintiffs' original search
 5    terms from back in March of 2025.  What had happened was
 6    that we realized that we did not receive certain
 7    communication regarding the AAP communications from Ms.
 8    ████████████  who is a current custodian.  But we
 9    understood Mr. ████████  to have been involved in
10    these AAP communications, but in an effort to try to
11    understand why Ms. ████████  did not have those
12    communications, we narrowed our existing search terms of
13    the AAP search string and proposed number 3 so that we
14    could figure out what had happened there.
15              THE COURT:  And when did you first communicate
16    search string number 3 as a potential search term for
17    Mr. ████  to Google?
18              MS. LEE:  I understand we proposed that also in
19    November of 2025 or perhaps early December of 2025.
20              THE COURT:  The reason I'm asking these
21    questions, I'm sure this won't come as a surprise to
22    you, is that Google tells me - hold on, let me get to
23    the right document here.
24              (pause in proceeding)
25              THE COURT:  Google tells me that some of these
```

1
2   document demands, although I'm not sure I can map, some
3   of these search strings rather, although I'm not sure I
4   can map which one is which, they're reading for the
5   first time when they got your letter motion.
6           MS. LEE:  Your Honor, that is incorrect.  We
7   have presented these, there are correspondence, multiple
8   correspondences from October to December.  Again, we
9   have first asked him to be a full custodian back in
10  October --
11          THE COURT:  Right, and if I understand
12  correctly, there was an agreement reached at that time
13  that he would not be a full custodian.
14          MS. LEE:  Yes.
15          THE COURT:  And Google I'm sure is going to
16  tell me in a minute that Google thought that that was
17  the end of it as far as Mr. ███ was concerned.
18          MS. LEE:  I'm sure they might, but in the
19  series of six meet and confers for the four months,
20  there was a lot of negotiations on what exactly Mr. ███
21  and what exactly are the search terms that would be
22  appropriate to get his documents for.  And so although
23  the communications about Mr. ███ being a full custodian
24  Google might've believed that was stopped in October of
25  2025, we had consistent communications with them with

PROCEEDING                                    102

1   which search strings would best work, what kind of terms

2   would be overinclusive, underinclusive.  But they

3   refused to provide any hit reports besides the search

4   terms that they only chose.  We tried to have more

5   dialogue with them even up until a day before we filed

6   our letter motion, and yet they still refused to provide

7   more information on these search terms.

8             THE COURT:  Now, search string number 1, the

9   long one --

10            MS. LEE:  Yes.

11            THE COURT:  You tell me that there is a hit

12  report, in fact, there are two hits reports for two

13  versions of this search string, one of which returned

14  159 hits and one of which returned over a thousand hits.

15  Which version am I looking at here on page 3 of your

16  letter motion, the one that returned 159 or the one that

17  returned a thousand?

18            MS. LEE:  Your Honor, our search term number 1,

19  Google has not provided a hit report.  The reason we got

20  those numbers is if you actually take a look on docket

21  456, page number 3, those are the four --

22            THE COURT:  This is Mr. Kane's --

23            MS. LEE:  Yes, I'm sorry, this is Mr. Kane's

24  attorney declaration.  On page 3, number 12, you will

1

2    see that there are four search terms that Google

3    provided hit reports for.

4            THE COURT:  Got it.

5            MS. LEE:  And these are the only hit reports

6    that we have received.  Google only has agreed to search

7    the very last one, and that is brand within two portal

8    and digital book or e-book or e-book, and that came out

9    with a total of 153 documents.  We created our search

10   string because we believed that that was way too

11   targeted and narrowed.  We then, after we got these hit

12   reports, asked Google to run our search term and

13   consider our proposed search term which Google has

14   denied or refused to provide hit reports for.

15           THE COURT:  Okay.  So of these four that were,

16   that are listed in Mr. Kane's declaration, which have

17   hit counts with them, it looks like the only one which

18   is actually on your current list of seven that you want

19   is the ███████  one.

20           MS. LEE:  Yes, Your Honor.

21           THE COURT:  And everything else is not quite on

22   your list.

23           MS. LEE:  Not quite on our list.

24           THE COURT:  Okay.  So you touched on the

25   question when you provided these requested search

PROCEEDING                    104

strings and you've touched on the question of whether
you waited too long.  You say this has been a continuous
process, and you keep trying to talk sense into them,
and you couldn't, so you had to make a motion.  Now you
should probably go back to first principles and tell me
what you think these documents are going to be relevant
to.

        MS. LEE:  Yes, Your Honor, so Google's own
documents have revealed that Mr. ██████ had a leading role
in what we learned is the ██████████████████ team,
and this ████████████████ team, among various
other projects, we found that they were in charge of
monitoring the ████████████ of pirate sellers and re-
disapproving terminated merchants.  Now --

        THE COURT:  And you say that this group and Mr.
████ in particular oversaw three projects that are of
particular interest to you, one in 2021, the attempt to
ban ads for e-books entirely; two, project ████████ or
maybe that was one of its early names but was, the
concept was to reallow paid ads on the shopping platform
but only for legitimate publishers, right, and that
didn't come to fruition; and, three, some discussions
that you believe were had between Google and AAP in 2022
that were aimed at creating some sort of white list for

legit, again for legit publishers of e-books.  Right?

MS. LEE:  Yes, Your Honor.

THE COURT:  Okay.  As to the third, you're a member of AAP, all of your clients are members of AAP. Have you asked them?

MS. LEE:  Yes, Your Honor, and we have actually produced that communication within our last productions to Google because we still were unable to locate that communication in Google's production.

THE COURT:  I'm sorry, you produced it but Google hasn't produced it.

MS. LEE:  Google has not produced it.

THE COURT:  Well, but what else do you think is out there?

MS. LEE:  We are looking for the internal communications that Google had been discussing and what was going on in trying to create this white list but then why was it also deprecated and de-prioritized as well.  That AAP communication was just one example that we had where we knew that it was not just plaintiffs that were sending notices and alarming Google of this rampant piracy on shopping.  In fact, there are this AAP association that was also sending and asking for either an allow list and telling Google that there was piracy

PROCEEDING                                    106

on the Google shopping platform.  And we produced this

document to Google in light of here is an example of

some of the communications that we're looking for, and

we understand that you have been thinking of a white

list of our publishers.

         And, in fact, this was a development that had

occurred within the last six days.  Google's counsel

actually emailed plaintiffs' counsel, and I have a copy

of the correspondence if you'd like to take a look, but

we learned for the first time that our existing

custodians do not have these AAP communications because

they deleted those emails.

         So Google in their reply have said that we have

enough custodians, we have Ms. ███████████ and we have

Mr. ████████████ .  So why do you need Mr. ████████████

as well?  And in doing so we asked them, but Ms. ████████

██████ and Mr. ████████ , you produced al your documents on

January 6, we still don't have these AAP communications.

Six days ago we received as to this AAP communication,

this email, these two particular custodians, Ms. ████████

and Mr. ████████ , did not have a copy of this email in

their files which was received over two years before the

commencement of this litigation when there was no

obligation to preserve this email.

1

2        THE COURT:  And we know that those two

3  custodians would've received it?  It was an email that

4  they were copied on?

5        MS. LEE:  They were very clearly copied on,

6  yes.

7        THE COURT:  And Mr. ███ was as well.

8        MS. LEE:  And he was as well, yes.

9        THE COURT:  Were there any actual meetings on

10  this topic by Zoom or in person?

11        MS. LEE:  There appears to have been.  Google

12  produced just one screenshot of a meeting, of this

13  meeting that occurred with the AAP.

14        THE COURT:  And was Mr. ███ present, if you

15  know?

16        MS. LEE:  He was, yes.

17        THE COURT:  And you know that how?

18        MS. LEE:  Oh, he was invited as like --

19        (interposing)

20        MS. LEE:  -- as the list, but we received no

21  other documentation about this meeting, any follow-up

22  notes, any correspondence with the AAP itself.

23        THE COURT:  Okay, and Mr. ███, do I understand

24  correctly, is no longer at Google?

25        MS. LEE:  Yes, he is a former employee.

```
 1                         PROCEEDING                    108
 2              THE COURT:  And when did he leave, if you know?
 3              MS. LEE:  We understand him to have left
 4    sometime in 2025, so just last year.
 5              THE COURT:  Okay.  And his emails, I'll just
 6    jump ahead and ask Google, his emails have been
 7    preserved?
 8              MS. CLARKE:  Yeah, I mean just to be clear, all
 9    the custodians' documents were preserved pursuant to
10    Google's document retention policy.
11              THE COURT:  Okay.  All right.  So your pitch to
12    me, Ms. Lee, is that these documents are relevant, that
13    it looks like we can't get them from other custodians,
14    and that you don't think it should be, I'm making up
15    something now that you haven't said yet, but tell me if
16    I'm correctly anticipating your argument, that you see
17    no reason why this should be particularly burdensome but
18    if it is burdensome, it's Google's responsibility to
19    give a hit count which they haven't done.
20              MS. LEE:  Yes, Your Honor.
21              THE COURT:  It's amazing how I can now predict
22    what lawyers are going to say.  All right, what else do
23    you want to tell me?
24              MS. LEE:  Your Honor, I did also want to
25    mention that we had asked for Mr. ████ to be a custodian
```

```
 1                      PROCEEDING                   109
 2   not just starting in October but going back as far as
 3   September of 2024 in our, excuse me, October of 2024,
 4   and we asked him to formally be a custodian in February
 5   of, or March of 2025.  And Google's response to not
 6   including Mr. ████ as a custodian even back then was
 7   that his documents would be duplicative of Ms. ██████
 8   ████, and so there's no reason to include him.
 9             THE COURT:  Right, and now you're saying, well,
10   that might've been true if she hadn't deleted all those
11   emails.
12             MS. LEE:  Yes, Your Honor.
13             THE COURT:  All right, and who's arguing this
14   for Google?  And you are Ms. Clarke?
15             MS. CLARKE:  Yes.
16             THE COURT:  Okay.  Go ahead.
17             MS. CLARKE:  Thank you, Your Honor.  Just first
18   going back to the timeline of this dispute, I just
19   wanted to correct a few things.  So it's correct that
20   (indiscernible) aware of Mr. ████ starting from October
21   2024.  The parties went through normal custodian
22   negotiations in the spring of 2025, and there were
23   several custodians who were discussed as potential,
24   quote, "AAP custodians" --
25             THE COURT:  And he was in the mix.
```

```
 1                      PROCEEDING                    110
 2           MS. CLARKE:  He was in the mix.  We agreed – so
 3  there were four that they proposed.  We agreed to add
 4  Ms. ███.  Based on our knowledge at the time, we
 5  believe that she would have all the documents, or
 6  substantially all the documents that Mr. ███ would
 7  have, including the other two, and the other two AAP
 8  custodians.
 9           THE COURT:  Who were the other two, remind me
10  again?
11           MS. CLARKE:  So we have Mr. ████████ who
12  actually Google has voluntarily agreed to add since the
13  October hearings.  Unrelated to this dispute, we just,
14  you know, we're trying to take issues off the table.
15  And I believe the fourth was Mr. █████.
16           THE COURT:  Hold on.
17           MS. CLARKE:  He's not currently a custodian.  I
18  don't know if he's mentioned in any of the briefing.
19           THE COURT:  I don't see – yes, ██████,
20  right?
21           MS. CLARKE:  Correct.
22           THE COURT:  Okay, he did end up being a
23  custodian?
24           MS. CLARKE:  He is not a custodian, but two of
25  the four are now custodians.
```

```
 1                       PROCEEDING                    111
 2            THE COURT:  ███  and  ███.
 3            MS. CLARKE:  Yeah, so we had those
 4    negotiations.  Plaintiffs definitively agreed in Spring
 5    of 2025 with Google's proposal to go forward with Ms.
 6    ███, and we hadn't really discussed this issue until
 7    October of 2025 when plaintiffs raised Mr. ███ again.
 8    Simultaneously, they had also raised the issue of the
 9    gaps in, alleged gaps in our AAP document production.
10    So we said that we would look into this.  We looked at
11    what potential search terms we could offer in a targeted
12    way for Mr. ███, and we made a proposal to plaintiffs
13    on adding what was existing search term 5 which, as Ms.
14    Lee said, that's part, that's actually a larger search
15    term string than what their current search term --
16            THE COURT:  All right, with reference to their
17    moving document, with their list of seven --
18            MS. CLARKE:  Yeah, so, sorry, I have a
19    breakdown because we --
20            THE COURT:  Give me the map.
21            MS. CLARKE:  Yeah, their list has different
22    numbering than what the parties have been using.  So
23    number 3 on their list is a revised version of search
24    term 5 which is what we had offered to do for Mr. ███
25            THE COURT:  Okay.
```

PROCEEDING                                    112

1

2          MS. CLARKE:  It also offered our own brand

3     portal search term.  This was another issue that

4     plaintiffs had raised to us saying, you know, we think

5     this brand portal exists, we think the documents are

6     relevant, we don't see many of them.  Google disagreed

7     that this is relevant.  We explained to them that the

8     brand portal was a very short-term initiative that

9     Google was exploring for all of its tools, not just

10     Google Shopping, and it was not targeted for copyright

11     infringement at all.  We were – it was a tool that

12     Google was exploring in several ways.  As the name

13     suggests, it was a way for Google to track brand.  So,

14     for example, on the airline, to make sure that the

15     proper airline was being advertised or listed on one of

16     its ads.

17          So it was a very large-scale process, and we

18     explained that to plaintiffs, but we didn't think there

19     were many relevant documents related to brand portal

20     that relate to this issue.  However, we did agree to a

21     search term that I think Ms. Lee had pointed you to.  It

22     was the last one on that list of hit counts that we had

23     provided in the 153 documents.

24          THE COURT:  Okay, the one in Mr. Kane's

25     declaration.

```
 1                      PROCEEDING                    113
 2              MS. CLARKE:  Correct.
 3              THE COURT:  Okay, but --
 4              MS. CLARKE:  And --
 5              THE COURT:  -- plaintiffs want longer search
 6    string --
 7              MS. CLARKE:  And they want the Project
 8    ███████, just to correct the record, we've gone back
 9    and forth on this, so I don't think Ms. Lee was trying
10    to misrepresent, but that was originally a plaintiffs'
11    proposed search term.  Google said that we didn't
12    understand that.  This was a term that was used
13    frequently for this project, so we had said that we
14    wouldn't do it.  We did still run that hit count to see,
15    and as you saw, there were only nine hits which I think
16    supports Google's position that this is not a phrase
17    that was used frequently for brand portal, but --
18              THE COURT:  But it also supports plaintiffs'
19    argument this this is not a big deal.  Just look at them
20    and turn them over, which --
21              MS. CLARKE:  Sure, but I guess our argument
22    would be that, you know, Google's tried to be very
23    reasonable here.  We didn't say you can't have anything
24    for brand portal.  We did give them a targeted search
25    term that we thought would be reasonable given what they
```

1                          PROCEEDING                      114

2   explained to us what they were looking for, limiting it

3   to e-books in this situation.

4            THE COURT:  Right.  Is Google still willing,

5   and this is not at all clear to me, of the four search

6   terms that you did run hit counts on which appear as

7   part of paragraph 12 of Mr. Kane's declaration, what if

8   anything is Google willing to do here?

9            MS. CLARKE:  So our original offer was to do

10  the last search term which is what we proposed, the 153.

11  We told plaintiffs that, that we would do that in the

12  original search term 5.  Plaintiffs rejected that offer

13  and filed this motion.  So our position now is that our

14  fact discovery has, the document discovery has closed

15  for us.  We made this offer in November.  We actually

16  told plaintiffs this, we actually said, you know, we

17  need to resolve this so that we can like put these

18  documents into the queue with our current document

19  reviewers and get it done.  Now, it would be extremely

20  burdensome for Google to have to reopen that to have to

21  produce these again.

22           And just one other thing I wanted to just

23  correct in terms of the timeline.  Ms. Lee kept saying

24  that we didn't provide hit counts.  So what happened

25  after we made the offer of adding search term 5,

PROCEEDING                                    115

plaintiffs came back to us I think --

        THE COURT:  (inaudible)

        MS. CLARKE:  I know, I'm sorry.

        THE COURT:  Search term 5 is actually --

        MS. CLARKE:  Number 3 in their list.

        THE COURT:  Number 3 in their list.

        MS. CLARKE:  Yes.  A revised version of number
3.  They revised search term 5 to get to number 3.  I
know, I'm sorry.  I have a chart that is in my notes.  I
should've created a copy for you.

        THE COURT:  (inaudible)

        MS. CLARKE:  I know, I'm sorry.  So we, after
that plaintiff said we're not going to do any of this,
we're going to move to add another full custodian.
Sorry, actually before that, they said you need to add
him with search terms number 3 through 7 which don't
correlate to this list.  We said that's too burdensome.
They said, okay, we're just going to move to add him as
a full custodian.  Plaintiff never --

        THE COURT:  But they're not seeking to add --

        MS. CLARKE:  I understand but she's, Ms. Lee
has made a big point about us not providing hit counts.
They never asked us to run number 4 on their list,
number 6 on their list, or number 7 on their list

1  specifically.

2  THE COURT:  Did they ask for number 5 on their

3  list?

4  MS. CLARKE:  Yes, number 5 they had asked for.

5  THE COURT:  And when did they ask for that and

6  when did you say no?

7  MS. CLARKE:  They asked for that I believe it

8  was December 2.  We said that was going to be too

9  burdensome because it was among many search terms that

10 they requested, almost adding in as a full custodian,

11 and then the next day they told us we're just going to

12 move to add him as a full custodian, or two days later.

13 It was in a very short period.

14 THE COURT:  Okay.  Going back to Ms. Lee for a

15 minute, in this list of seven on page 3 of plaintiffs'

16 moving letter brief, search string number 4 has, it says

17 at the end of it, our ST2.  What does that mean?

18 MS. LEE:  That is our current search term

19 number 2, Your Honor.

20 THE COURT:  Your current search term number 2.

21 MS. LEE:  Yes, that is --

22 THE COURT:  What does it mean?

23 MS. LEE:  That's run across all custodians.

24 THE COURT:  Ah.  So our ST2 means this is what

has already been run across generally.

MS. LEE:  Yes.

THE COURT:  Got it.  All right.  Thank you for that public service announcement.  All right, go ahead, Ms. Clarke.

MS. CLARKE:  Yes, Your Honor.  So if we've gotten the history straight, I'll go into more of the merits just in terms of the search terms and Mr. ████.  So just looking at these search terms in general that they proposed, you know, Your Honor, you listed three things that you believed that plaintiffs were looking for for Mr. ████.  I think it's clear, even just on the face of these search terms, that they're much broader than what you would need to find any of these documents. And, in fact, the documents, the search terms that Google had offered, which, again, are a revised version of number 3, an expanded version of number 3, and a more limited version of number 1 but one we think that is appropriate, the brand portal search term that we had talked about earlier.

We believe that most of these search terms are significantly broader than would be needed for what they say that they're looking for, and Google's been very reasonable in offering to close these alleged gaps in

PROCEEDING                               118

their production even though we don't agree that they're

there, but we were willing to run those before then.

Now, we think it's plaintiffs are kind of coming back

for a double dip because our other point here is that

plaintiffs should've moved for search terms or full

custodian many, many months ago.  They had all this

information, they knew that Mr. █████ had at least some

involvement with AAP discussions.  That's why he was

considered an AAP custodian back in March 2025.  They

didn't move, they didn't ask for any search terms.

Instead, they asked for several other custodians in

their August omnibus motions to compel which were argued

in October.  Your Honor, you granted several custodians

during that hearing --

         THE COURT:  Then you negotiated a few more.

         MS. CLARKE:  And we negotiated one more, and

two of those custodians, as shown by the documents that

plaintiffs cite here, overlap in role, in responsibility

with Mr. █████.  So, for example, Mr. Sajeen Padiats

(phonetic), whose name you might recall from October,

you ordered us to add several of the documents that

plaintiffs cite in their motion include Mr. Padiats.

Now, if plaintiffs had added Mr. █████ to their original

motions, you probably would've required them to choose a

                              PROCEEDING                        119

 1
 2   limited number of, maybe, potentially would've asked
 3   them to choose among a limited number of custodians
 4   again, plaintiffs might have had to decide between Mr.
 5   Padiats or Mr. ███.  Now they're trying to get both.
 6         THE COURT:  Let's - this might be helpful to
 7   me.  There are, as I mentioned, sort of three topic
 8   areas where the plaintiffs say not only that ███ has
 9   relevant documents but that ███ has relevant documents
10   that the existing custodial searches are not sufficient
11   to turn up.  We talked about the AAP project, and it
12   sounds like that's where Google is, I'm not sure I want
13   to use the word concede, but Google is willing to
14   contemplate particularly since your existing custodians
15   may not have retained all relevant documents, Google is
16   willing to contemplate running a targeted search on Mr.
17   ███ database with respect to that.  Is that fair?
18         MS. CLARKE:  Yeah, I'd say it's fair that we
19   were willing to do that as part of a compromise to not
20   bring this before the Court.  Now, you know, the parties
21   have briefed to this issue, and like I said, we've let
22   go of our document review team.  So it would be more
23   burdensome at this point.  But yes, that was the
24   compromise we were willing to make was to add a search
25   term to address that issue.

```
 1                      PROCEEDING                    120
 2            THE COURT:  And that would be, looking at all
 3   of the potential search terms now in front of me, that
 4   would be plaintiffs' number 3.
 5            MS. CLARKE:  Correct.  What Google had offered
 6   was an expanded version of that which was our original
 7   search term 5, but it overlaps between the two.
 8            THE COURT:  And I don't have that.
 9            MS. CLARKE:  Yeah, I understand.
10            THE COURT:  Nobody has put that in front of me.
11   So the only thing that's in front of me as a candidate
12   to fill this niche right now would be plaintiffs'
13   proposed search term number 3.  Okay.
14            Moving backward in time, plaintiffs also make a
15   pitch that they should get documents from Mr. ████
16   relevant to what you describe as a short-lived project
17   that didn't go very far that at one point was called
18   Project ██████ and at another point was called the
19   Brand Portal Project, is that right?
20            MS. CLARKE:  Correct, Your Honor.  So brand
21   portal is what it was called internally at Google.
22   Plaintiffs pointed to one document that suggested
23   Project ██████ as a name, but we just don't understand
24   that to be (indiscernible) used.  So brand portal is the
25   correct term.  Basically what this was was it was an
```

PROCEEDING                    121

1
2  initiative that would largely mimic the tools that
3  Google already had and still has to identify the correct
4  seller of items, the correct brand, but it making it
5  into a more streamlined process, creating a portal that
6  would make it a little bit easier to understand and to
7  submit.  So it was --

8          THE COURT:  Right.  But in terms of search
9  strings that might be used to get at these documents,
10  you've run hit counts on two potential search strings,
11  one of them is brand within two of portal and that
12  returns 993 documents not counting group, right?

13          MS. CLARKE:  Correct.

14          THE COURT:  And you think that was the sort of
15  official name for this project, Brand Portal, and then
16  you also ran a hit count on project within two of
17  ████████, spelled in various different ways, and got
18  nine.  So those are our two choices, well, actually I
19  suppose --

20          MS. CLARKE:  Yeah - sorry, Your Honor, if I
21  might comment.  So those first two were plaintiffs'
22  suggestions in the first instance.  We told them that
23  the first one specifically was too broad because it hit
24  on so many documents.  So we proposed the last one in
25  that list, brand within two to portal and digital book

PROCEEDING                    122

1   or e-book or e-book.

2          THE COURT:  Okay.  So that would also be a way

3   of slicing the same onion, if I can mix my metaphors.

4          MS. CLARKE:  Yes.

5          THE COURT:  Okay.  And then backing up further

6   to 2021, plaintiffs say they're interested in Mr. █████

7   documents to the extent that he worked on an attempt to

8   ban all ads for e-books.  What are the candidates there?

9          MS. CLARKE:  So I don't want to speak for

10   plaintiffs on which search terms they intended that for

11   because we did not, like I said, we didn't discuss these

12   search terms among the parties.  Our position is that

13   it's not appropriate to add any specific search terms

14   for this issue.  We've already run several search terms

15   including some that are on this list across other

16   custodians.  We've produced hundreds of documents

17   relating to the e-book ban.  Plaintiffs have known about

18   the e-book ban for a very long time.  It's been the

19   subject of lots of discovery disputes, and it's not

20   appropriate for them to now ask for additional documents

21   for Mr. █████ when they could've asked for him as a

22   custodian or for search terms earlier.

23          THE COURT:  Okay.  All right, what else do you

24   want to tell me?

MS. CLARKE:  I think the last thing I just

wanted to make clear was the document that plaintiffs

received from the AAP directly.  So we don't know how

plaintiffs received that document, but to the extent

that they do believe that there is a larger gap in

production, they obviously are receiving documents

directly from the AAP.  Our position remains --

THE COURT:  But Ms. Lee explained to me, and I

credit this point, that while they're interested in the

communications between the AAP and Google, they're also

interested in what Google was saying internally about

those communications.

MS. CLARKE:  Yes, I understand.  I just wanted

to make clear that, you know, they have another channel

for those, for some of those documents.  We have

produced some documents related to AAP discussions.  We

were willing to run the narrow, the search term that we

offered here for the AAP documents.  If Your Honor were

inclined to grant anything, we think it would just be

what we had originally offered which was the original

search term 5 --

THE COURT:  Which I haven't seen.

MS. CLARKE:  Correct.

THE COURT:  What I have seen is plaintiffs' 3

PROCEEDING                                    124

1

2    on page 3 of their moving letter brief, and I have no

3    way of figuring out from eyeballing that whether it's

4    going to be burdensome, not burdensome, better or worse

5    than what you're describing to me as your number 5 or

6    anything else about it other than it has AAP in there.

7    So it sounds like it's on the right track.

8                MS. CLARKE:  Yes, Your Honor.  I do have the

9    hit count for search term 3 or number 3 on that list if

10   it would be helpful.

11               THE COURT:  Oh, what is it please?

12               MS. CLARKE:  It's 280 documents with families.

13               THE COURT:  And when did you do that search

14   term?

15               MS. CLARKE:  In advance of this hearing, and,

16   again, it was not to hide the ball from plaintiffs.  We

17   understood that they were moving forward with their

18   motion to add Mr. ████ as a custodian.  They told us

19   that on December 4.  They said they were planning to

20   file any day.  They didn't file this motion for another,

21   at least a week, and we never, the parties never

22   discussed again.  And actually, in our last

23   correspondence which I believe we submitted as an

24   exhibit, we did say if the parties determine not to go

25   forward with your motion to add Mr. ████ as a full

```
 1                        PROCEEDING                    125
 2   custodian, we're happy to share hit counts with you and
 3   discuss further, and plaintiffs did not take us up on
 4   that.
 5              THE COURT:  Well, it sounds like these weren't
 6   the most efficient negotiations in the world, that both
 7   sides were, at least to some extent, talking past each
 8   other.  But that may be inevitable in a large-scale
 9   litigation with multiple teams of attorneys and a lot of
10   motions being made at the same time, not always by
11   exactly the same people.
12              All right, do you have anything further for me,
13   Ms. Lee?
14              MS. LEE:  Yes, Your Honor.
15              THE COURT:  Go ahead.
16              (pause in proceeding)
17              MS. LEE:  Your Honor, I did want to emphasize
18   the fact that each of these search terms we really
19   worked hard to like narrow and target these as much as
20   possible.  Within the last several weeks we received two
21   documents from Google that specifically highlight Mr.
22   ███████   ██████   role, not just within the ads integrity
23   shopping team but also within brand portal, that clearly
24   state that they were considering copyright infringement,
25   trademark infringement, and brands which is also related
```

PROCEEDING                                  126

1    to our case for brand portal.  It was a cross-functional

2    very large team, we understand, but we cannot just have

3    that narrowed brand portal e-book search term.  That is

4    just way too inclusive to just the e-books.  Brand

5    portal, again, was a sprawling project that was meant to

6    aim, and Google's documents I have a copy of these, show

7    that it was meant to target copyright infringement,

8    trademark infringement, and brands, all three which is

9    relevant to this case.

10        And so that's why we had to expand search term

11   1 to include copyright infringement, to include white

12   list and trademark and counterfeit because it wasn't

13   just a small project that was considered and then

14   deprioritized.  It was hitting every single issue that

15   is in issue at this case.  I also did --

16        THE COURT:  Look at all those ors.  This is

17   going to retrieve an enormous number of documents.

18        MS. LEE:  And we are happy to speak with Google

19   to narrow the search term, but it just simply can't be

20   that we can just follow Google's search term for just e-

21   book and brand portal.  That is too inclusive.  And --

22        THE COURT:  Well, they have digital book in

23   there as well.

24        MS. LEE:  And digital book.  But e-book and

PROCEEDING                    127

1   digital book won't hit on the copyright infringement and
2   trademark infringement that brand portal very clearly
3   said that it was meant to target.
4
5          I also did want to speak a little bit more on
6   why search terms 4 through 7 are also needed.
7          THE COURT:  Well, before you get more
8   generally, we've discussed search strings that would be
9   specifically aimed at the brand portal, a/k/a Project
10  ████████████  We've discussed search strings that would be
11  specifically aimed at AAP discussions.  On your list of
12  seven here, which string or strings is well tailored to
13  retrieve relevant documents relating to Mr. ████████
14  involvement in 2021 to ban e-book ads?
15         MS. LEE:  Your Honor, I would say that search
16  terms 4 through 7 are the search terms --
17         THE COURT:  All of those.
18         MS. LEE:  Yes.  And I wanted to --
19         THE COURT:  Have you made - if you haven't yet,
20  I'll give you the opportunity now, to explain to me why
21  it's insufficient to have the results of those same
22  search terms run across all the other custodians.
23  You've explained to me in the case of the AAP that
24  documents from other custodians weren't retained.  Okay.
25  That might be a good reason to bring Mr. ██████ in.  But

```
 1                       PROCEEDING                    128
 2   you haven't made that argument with respect to 4 through
 3   7.
 4              MS. LEE:  Yes, Your Honor, and that actually
 5   goes back to the issues of the ███████████████████
 6   team and the fact that they were in charge of ███████
 7   ███████, monitoring pirate sellers and the ██████
 8   ████████ of pirate sellers and re-disapproving
 9   terminated merchants.  Now, I did want to emphasize that
10   re-disapproving terminated merchants means that the ████
11   ███████████████████ team, after they terminate a pirate
12   seller, they mention that they can manually reapprove
13   that pirate seller.
14              THE COURT:  Well, you said re-disapprove.  You
15   mean reapprove, right?
16              MS. LEE:  No, and so then the ████████████████
17   ██████████ team --
18              (interposing)
19              THE COURT:  Yeah, then we found out that
20   specifically within the e-book context that they were
21   now re-disapproving these already once terminated
22   merchants.  And so we need to get information about this
23   and how did this come across, and they specifically
24   write that it came up with █████████████████████ e-book
25   merchants which is why --
```

```
 1                        PROCEEDING                      129
 2              THE COURT:  I'm sorry, this - have I heard this
 3   before?
 4              MS. LEE:  This argument?  It is in our letter
 5   brief, and I think I quickly alluded to this in the
 6   beginning.
 7              THE COURT:  All right.  All right.
 8              MS. LEE:  It is both in our letter motion and -
 9   -
10              THE COURT:  And why would this be, why do you
11   need Mr. ████  for this as opposed to everybody else
12   who's a custodian?
13              MS. LEE:  Because none of our other custodians
14   were in the ████████████████ team, and Mr. ██████
15   was not just one member of that team.  He was, in fact,
16   a leader of the ████████████████ team.  There's a
17   document that Google produced the day before Christmas
18   Eve, December 23, that specifically, it's a hundred-page
19   document and it says this newsletter was organized and
20   created by Mr. ██████████.  And that specifically
21   states all of these also projects that the ████ team was
22   in charge of, and going back to the ██████████████ of
23   pirate merchants, the ██████████████████ team was
24   also involved in monitoring pirate sellers that were
25   missed in the e-book ban.  So Google's documents, and we
```

PROCEEDING                                    130

1
2  cite to this, show that his team had found out that
3  several missing, several pirate sellers had passed
4  through their e-book ban and were able to sell despite
5  their ban.  Mr. ████ and his team were in charge of
6  trying to find out what happened, like why was there
7  ████████████████ of these pirate sellers, specifically
8  within the e-book space.
9        And with this information that's exactly why we
10 decided to include 4, 5, 6, and 7 of plaintiffs' search
11 terms because this issue is not related to just brand
12 portal.  In fact, this is within the entire shopping
13 platform.  This goes to the tools that Google used,
14 their special programs, and if we include just the brand
15 portal search terms, we won't get information about this
16 ████████████████ and re-disapproving that Mr. ██████ was
17 specifically in charge of.
18        THE COURT:  But you didn't craft any specific
19 search terms for Mr. ████ in particular on this issue.
20 Rather, you went back to the well, so to speak, and
21 said, mmm, which of our previously negotiated search
22 terms which go to much broader than the process you just
23 described would be appropriate for Mr. ████.
24        MS. LEE:  And, Your Honor, we would be happy to
25 speak with Google on what search terms would be

```
 1                      PROCEEDING                    131

 2   appropriate, but Google refused to do any additional

 3   searches besides their 153 brand portal search term and

 4   their search term about the AAP.  And they refused to

 5   even, we tried even a day before we filed this motion,

 6   again, are you willing to do any additional searches for

 7   Mr. ████, and their position had remained those two

 8   only.

 9            THE COURT:  All right.  Thank you both very

10   much.  This obviously is an area where I have enormous

11   discretion because I am required at this point to

12   balance in a holistic manner not only the traditional

13   Rule 26(b) factors, relevance and proportionality, but

14   also burden and also timing.  Was the motion made when

15   it should've been made?  Were the plaintiffs as surgical

16   as they should've been given how late in the day the

17   motion was made and so forth?

18            And consequently, I am going to grant the

19   motion in part as follows:  With respect to the AAP

20   issue, I am going to require Google to run plaintiffs'

21   search term number 3, the one that I learned this

22   afternoon had a 280 hits.  Is that right, am I

23   remembering that number correctly?

24            MS. CLARKE:  Correct.

25            THE COURT:  Okay.  With respect to the brand
```

```
 1                        PROCEEDING                    132
 2  portal/██████ project, I am going to require Google to
 3  run plaintiffs' term number 2, the one that had nine
 4  hits, and Google's term number 4, the one that had 153
 5  hits.
 6            With respect to the earliest in time issue that
 7  plaintiffs described to me as a topic of interest for
 8  Mr. ████, that is his participation as a member of the
 9  ████████████████████████ group in an attempt to ban all e-
10  book ads in 2021 and then to work with that as time
11  passed, I don't have in front of me a search string that
12  I can in good conscience require Google to run.  I am
13  not going to require Google to run plaintiffs' 4, 5, 6,
14  and 7 which I think would likely return an enormous
15  number of documents and are overbroad, particularly in
16  context.  Google is coming to me late in the day and
17  saying, okay, we have specific reasons for needing to
18  add this guy, Mr. ████, not as a general custodian but
19  with respect to specific topics, but plaintiffs have not
20  presented me with something narrow, tailored, and
21  specific enough to match up with the first topic that
22  they have presented to me.
23            So I am going to leave it with those three
24  search strings that I just outlined, and that will be
25  all of the relief I am granting on this particular
```

PROCEEDING                                    133

motion.  Google, how much time are you going to need for
this to review those hits and produce relevant and non-
privileged documents?  I'm asking you this obviously as
a lead-up to the conversation we're about to have about
timing more generally.

          MS. CLARKE:  Your Honor, I think, so today's
the 20th.  I think we'd need until at earliest March 6 to
be able to do that.

          THE COURT:  All right, Google wants until March
6.  Now, who is going to be speaking to me more
generally about the calendar?  Plaintiff, who's that's
going to be?

          MR. KANE:  I think it'll be me, Your Honor.

          THE COURT:  That's going to be you, okay.  And
for defendant?

          MR. DAMLE:  That'll be me, Your Honor.

          THE COURT:  All right.  So right now, remind
me, what's due on February 6 and what's due on March 6.

          MR. KANE:  So Google's is ordered to run as a
search term all of the merchant center account numbers
and ads account numbers that are associated with the
pirates.  That's due February 6.  The Buganizer
(phonetic) information --

          THE COURT:  Google, you're on track for that,

```
 1                        PROCEEDING                    134

 2  correct?

 3           MR. DAMLE:  Yes, Your Honor.

 4           THE COURT:  Okay.  That's the new merchant

 5  accounts.  Buganizer, go ahead.

 6           MR. KANE:  Buganizer discovery's due March 6.

 7           THE COURT:  And, Google, you're on track for

 8  that, right?

 9           MR. DAMLE:  Yes, I believe so, Your Honor.

10           THE COURT:  Okay, go ahead, Mr. Kane.

11           MR. KANE:  There's one custodian, that's the

12  list serve shopping-DMCA@google.com.  That's due

13  February 6.

14           THE COURT:  All right.

15           MR. DAMLE:  We're on track for that one too,

16  Your Honor.

17           THE COURT:  You're on track.  Google generally

18  tells me they're on track for all their current

19  deadlines, is that right?

20           MR. DAMLE:  Yes, correct.  Yes.

21           THE COURT:  Except the one I just gave you

22  today.

23           MR. DAMLE:  Exactly.

24           THE COURT:  All right, go ahead, Mr. Kane.

25           MR. KANE:  The discovery into Google's overall
```

```
 1                          PROCEEDING                    135

 2   DMCA program is due March 6.  There's an intermediate

 3   deadline of January 30 for Google to disclose the 300

 4   domains that it has randomly sampled.

 5              THE COURT:  Okay.  It's coming back to me now.

 6              MR. KANE:  That is all I remember as being

 7   outstanding.

 8              THE COURT:  All right, and did I give you a

 9   date for substantial completion of document discovery or

10   did we go straight to the completion of all fact

11   discovery?

12              MR. KANE:  The date for the document discovery

13   was January 6.

14              MR. DAMLE:  Yeah.  That's --

15              THE COURT:  That would be --

16              MR. DAMLE:  Correct.  These stragglers,

17   correct, Your Honor.

18              THE COURT:  And what's our fact discovery

19   deadline at present?

20              MR. DAMLE:  I believe it's April 6, Your Honor.

21              THE COURT:  Including depositions?

22              MR. DAMLE:  Correct.

23              THE COURT:  All right, that's going to be a bit

24   tricky.  So what is plaintiffs' proposal please?

25              MR. KANE:  So what we would say is that the
```

1  document discovery deadline should remain January 6, and

2  the Court can do what it has done previously which is if

3  there's particular things that are ordered, the Court

4  can set a deadline.

5         THE COURT:  For example, new searches that I

6  just required Google to conduct today.  Obviously, they

7  didn't get those done by January 6.

8         MR. KANE:  Correct, so the Court can set

9  appropriate deadlines, you know, as those things come

10  up.  What we would suggest is to move all of the other

11  deadlines, so like the deadline for fact discovery, the

12  deadline for extra depositions, summary judgment, etc.,

13  by 30 days to accommodate, you know, documents that are

14  coming in.

15        THE COURT:  (inaudible)

16        MR. KANE:  Correct.

17        THE COURT:  What about plaintiffs' obligations?

18  Does plaintiff have any obligations that at the moment

19  is worried about meeting?

20        MS. MURPHY:  Yes, Your Honor, there are two

21  obligations that we think we could use a small extension

22  of time for, and it would still comport with what we're

23  proposing overall.  One is the project of matching the

24  hundreds of thousands of screenshot to works

PROCEEDING                              137

(indiscernible).  We have --

THE COURT:  Your current deadline is --

MS. MURPHY:  Friday.  It's --

THE COURT:  This Friday?

MS. MURPHY:  It's the 23rd.  That was based on one extension.  Unfortunately, we heard from our vendor who is assisting us with this, what has turned out to be quite a large project that they are not on track to complete it by Friday.  So given that it appears we are moving toward some extension without jumping to the end issue, we would like to request until February 6 to complete that.

THE COURT:  All right.

MS. MURPHY:  In the --

THE COURT:  You have a due date of February 6 at the moment, if I recall correctly, for some new search terms.

MS. MURPHY:  It's not docketed, but it was part of what we had discussed with Google.  The only complicating factor was that was before we then agreed to add some additional custodians and search terms to partially resolve their motion on that point.  So if the Court is inclined to move the discovery schedule by a month and given that Google has so many outstanding

```
 1                           PROCEEDING                    138
 2   requests that are due on March 6, we would like to move
 3   that date to March 6 as well.
 4             THE COURT:  So you'd like March 6 to complete
 5   all of the search terms you have to run across all of
 6   your current custodians.
 7             MS. MURPHY:  Right, the new search terms.
 8             THE COURT:  Okay.  You have 24 custodians, is
 9   that right?
10             MS. MURPHY:  Correct.
11             THE COURT:  Okay.  Google, how do you feel
12   about giving plaintiffs February 6 for their matching
13   project and March 6 for the new search terms?
14             MR. DAMLE:  So with respect to the matching
15   project, I mean, you know, we've worked collaboratively,
16   and they had a deadline that the asked for of January 6,
17   and we agreed to give them until January 23 to do it --
18             THE COURT:  And now they want another couple of
19   weeks.
20             MR. DAMLE:  And now - presumably they've made
21   some progress, and so if there is - and it's going to be
22   a lot of data for us to analyze.  So what we've asked
23   them is if they could provide whatever information,
24   whatever matching they've completed by this Friday and
25   then we can get the full set by February 6, we'd be okay
```

PROCEEDING                                139

1

2   with that.  That would at least give us a little bit of

3   runway to start to get our hands around.

4          THE COURT:  About what you're looking at.

5          MR. DAMLE:  Exactly.

6          THE COURT:  All right, Ms. Murphy, can you make

7   a rolling production?

8          MS. MURPHY:  The issue with the rolling

9   production is that the process that's going on right now

10  relates to quality checking.  So we could make a rolling

11  production on Friday, but we'd have to be without

12  prejudice to correct it because that's what's ongoing.

13  So it doesn't seem to be that useful to me --

14         THE COURT:  You can't take a chunk of the

15  documents and put them first in line for quality

16  checking, quality control?  I mean I take Google's point

17  that they need to understand what they're looking at so

18  that when they get the majority of your documents, they

19  know what to do with them.

20         MS. MURPHY:  I understand that.  I actually

21  don't think it's that complicated in terms of what

22  they're going to be looking at.  They're going to look

23  at a Bates number with a screenshot, and it will say

24  what work (indiscernible) depicted on the screenshot.

25  So they could picture what they're going to get.  The

PROCEEDING                              140

issue is just trying to make sure that that's correct

with the enormous amount of screenshots and a large

number of works (indiscernible).

THE COURT:  All right, so I'll give plaintiffs

February 6 for that due date but don't ask me to push it

back any further please.

MS. MURPHY:  I understand, thank you.

THE COURT:  All right.  And --

MR. DAMLE:  With respect to the March 6

deadline, you know, if fact - I think we would be okay

with that.  One thing I wanted to confirm is that for

the Buganizer request that we also have until March 6.

I believe that's the case right now.

THE COURT:  I think you may already have March

6.

MR. DAMLE:  Yeah, okay.  So I don't have an

objection to that.  I worry a little bit about the

effect on the overall schedule --

THE COURT:  Okay, done.

MR. DAMLE:  Yeah.

THE COURT:  So March 6 for the new search

terms.  Now, let's talk about the overall schedule.

Plaintiffs have proposed that I extend the fact

discovery deadline to May 6 which is only two months

```
 1                          PROCEEDING                    141

 2   after March 6, and I know that the parties are

 3   contemplating a lot of depositions which means that you

 4   either have to start taking depositions shortly.  When

 5   are you swapping your 30(b)(6)'s, the end of this month?

 6             MR. DAMLE:  Correct.

 7             THE COURT:  So you either have to start taking

 8   depositions in February which is what I am pushing you

 9   to do or else your entire deposition program is going to

10   be crammed into two months, March and April and the

11   first week of May.  And I know, because I've seen this

12   movie before, that once you start taking depositions,

13   new issues are going to come up.  Someone's going to

14   mention a document or a program or a database or another

15   witness that the other side hadn't heard of yet, and

16   people are going to be asking for things.  So I'm

17   worried, you're worried too, right, Mr. Damle?

18             MR. DAMLE:  I am, I am, Your Honor, and, you

19   know, we're looking at pretty substantial productions on

20   both sides on March 6.  And so we're a little

21   constrained in terms of even starting depositions.  I

22   completely hear you, and we've already started third-

23   party depositions.

24             THE COURT:  You need to unconstrain yourself.

25   You need to get going.
```

PROCEEDING                                    142

1

2          MR. DAMLE:  I understand, Your Honor.  And

3   there certainly is ones we can stage and figure out who

4   comes first and all of that, so we can certainly do

5   that.

6          THE COURT:  I mean at a minimum – who is

7   planning on taking third-party depositions here?

8          MR. DAMLE:  We're already started third-party

9   depositions, yeah --

10          (interposing)

11          THE COURT:  You're already started that, all

12   right.

13          MR. DAMLE:  I believe we've done three --

14          THE COURT:  Are plaintiffs taking third-party

15   depositions?

16          MR. KANE:  We might be taking one third-party

17   deposition.

18          THE COURT:  Well, don't sit on it.

19          MR. KANE:  One thing that would help

20   tremendously, Judge, is the Buganizer documents are

21   documents that we're going to need in order to take a

22   bunch of these depositions because those are for purpose

23   of discussion --

24          THE COURT:  Well, you hope so.  You don't know

25   yet.

```
 1                          PROCEEDING                      143
 2              MR. KANE:  Well, I strongly suspect we will.
 3    But it's basically custodial documents for nine
 4    custodians.  So it's going to be difficult for us to
 5    take those nine custodians without the Buganizer
 6    documents.  If we moved the deadline for the Buganizer
 7    documents up, that that would allow us to start taking
 8    depositions much sooner.
 9              THE COURT:  I don't think I'm going to be
10    moving deadlines up, if by up you mean earlier at this
11    point.  Have you ever, other than in Judge Rackoff's
12    courtroom, have you ever seen that happen?
13              MR. KANE:  If what Your Honor's concerned about
14    is starting depositions earlier, that's the way to make
15    it happen is to --
16              THE COURT:  Well, that's not a tool I'm going
17    to use at this point.  I don't think it's fair to the
18    parties as a general matter.  So I'll go ahead and I'll
19    extend the fact discovery deadline to May 6 as
20    requested.  That's a Wednesday.  But the question is how
21    am I going to keep tabs on all of you between now and
22    then and hopefully straighten out problems before
23    they've festered and little problems have turned into
24    big problems.  I know you have one more discovery motion
25    in the pipeline which I haven't read yet because it's
```

PROCEEDING                    144

1

2  not yet fully briefed.  Remind me, whose motion is it?

3          MR. KANE:  It's plaintiffs' motion, Your Honor.

4          THE COURT:  And what do you want this time?

5          MR. KANE:  You may recall Google received a

6  whole bunch of shopping notices that instead of

7  processing those shopping notices, it processed them as

8  search notices.  So we're trying to --

9          THE COURT:  I generally recall that, and you're

10 seeking discovery as to why that happened?

11         MR. KANE:  More seeking discovery to how

12 frequently it happened, is it something that was unique

13 to plaintiffs or is it, you know, I think it's a ██

14 percent error rate or ██ error rate that we saw with

15 plaintiffs.  Did that apply across rights holders

16 generally?

17         THE COURT:  Well, so I should probably hear

18 that motion sooner rather than later because if there

19 are yet more documents to be produced, they should be

20 produced sooner rather than later.  When is that motion

21 going to be fully briefed?

22         MR. KANE:  The opposition's due Thursday, so

23 the reply will be due Monday, I guess it's the 26th.

24         THE COURT:  All right, so we're looking at

25 February.  Let me take a look here.

PROCEEDING                                    145

1
2          (pause in proceeding)
3          THE COURT:  Monday, February 9 I have time.
4     Let me see if I have anything earlier than that.  Ms.
5     Kay, look at the week before that.  Ah, here we go.
6     Looking at the week of February 1, Monday is not
7     possible.  It looks like I have morning time on
8     Wednesday the 4th.  Do you agree, Ms. Kay?
9          THE CLERK:  Yes, Your Honor.
10         THE COURT:  Is that too soon or should we go
11    for February 4?
12         MR. KANE:  Either the 4th or the 9th works for
13    me.  I have a slight preference for the 9th.
14         THE COURT:  Google.
15         MR. DAMLE:  I think we have a preference for
16    the 9th as well, Your Honor.
17         THE COURT:  Fine.  February 9.  I could see –
18    status conference?
19         THE CLERK:  Yes.
20         THE COURT:  That shouldn't take long.  I could
21    try to see you at 11.  It's just going to be one motion,
22    right?
23         MR. KANE:  That's correct.
24         THE COURT:  I can try to see you at 11 and get
25    you out while it's still lunchtime or I could have you

```
 1                        PROCEEDING                    146
 2   come in at 2 as you've been doing the last couple of
 3   times.  Plaintiffs, your preference.
 4           MR. KANE:  Either works.  I have a slight
 5   preference for 11.
 6           THE COURT:  I do too.  What about Google?
 7           MR. DAMLE:  That's fine for us, Your Honor.
 8           THE COURT:  All right, so I'll see you at 11
 9   o'clock on Monday, February 9.  I'll hear argument on
10   what I hope is the last motion in the current series at
11   least until you start taking depositions.  And why don't
12   you submit to me a letter a couple of days prior, maybe
13   Thursday the 5th.  Obviously, if you've narrowed any of
14   your disputes, reached any compromise, tell me then so
15   there are parts of the briefs I may not have to read.
16   And if there's anything else in the nature of status
17   that you want me to know about at that point, tell me
18   that as well.
19           All right, anything else for today from
20   plaintiffs' side?
21           MR. KANE:  I guess the only thing that we think
22   might speed things up is if we could have the January 6
23   document discovery deadline hold for any subpoena,
24   document subpoenas to third parties, in other words,
25   there are a whole bunch of obviously authors of the
```

1  7,000 some odd works in this case.  Google has

2  subpoenaed a handful of those.  We think the period for

3  subpoenaing authors should be closed now.  They've had

4  these lists of works some of it since September and the

5  rest of it since July.

6       THE COURT:  Let me make sure I understand what

7  you're saying.  You're saying, Google, don't send out

8  anymore author subpoenas, you're done.

9       MR. KANE:  Correct.

10      THE COURT:  Google, are you planning to send

11 out any more author subpoenas?  That's fact discovery.

12      MR. DAMLE:  Potentially for depositions at

13 least.  We have a lot of depositions that we're able to

14 take, you know, there may be --

15      THE COURT:  These are among the third-party

16 depositions you're planning on taking.

17      MR. DAMLE:  Correct.  Correct.  We've taken

18 three - there may be more that we want to take as well.

19 It would be, you know, we haven't gotten a ton of, I'm

20 not sure why the third parties are a concern.  We

21 haven't gotten a ton of documents from third parties.

22 So if there's a document subpoena that goes along with

23 it, it's not going to be like the party subpoenas --

24      THE COURT:  You're saying, Judge Moses, we

1   7,000 some odd works in this case.  Google has

2   subpoenaed a handful of those.  We think the period for

3   subpoenaing authors should be closed now.  They've had

4   these lists of works some of it since September and the

5   rest of it since July.

6        THE COURT:  Let me make sure I understand what

7   you're saying.  You're saying, Google, don't send out

8   anymore author subpoenas, you're done.

9        MR. KANE:  Correct.

10       THE COURT:  Google, are you planning to send

11  out any more author subpoenas?  That's fact discovery.

12       MR. DAMLE:  Potentially for depositions at

13  least.  We have a lot of depositions that we're able to

14  take, you know, there may be --

15       THE COURT:  These are among the third-party

16  depositions you're planning on taking.

17       MR. DAMLE:  Correct.  Correct.  We've taken

18  three - there may be more that we want to take as well.

19  It would be, you know, we haven't gotten a ton of, I'm

20  not sure why the third parties are a concern.  We

21  haven't gotten a ton of documents from third parties.

22  So if there's a document subpoena that goes along with

23  it, it's not going to be like the party subpoenas --

24       THE COURT:  You're saying, Judge Moses, we

PROCEEDING                                    148

 1
 2    won't send out any document, only subpoenas --
 3            MR. DAMLE:  Correct.  It'll be --
 4            THE COURT:  But we should be able to attach a
 5    document request to a testimonial subpoenas.
 6            MR. DAMLE:  Correct.
 7            MR. KANE:  The problem with this is these are
 8    like individual humans.
 9            THE COURT:  Right.
10            MR. KANE:  I mean they have to go through own
11    Gmail accounts to try to find --
12            THE COURT:  But you don't have standing to make
13    that argument.  That's not your problem.
14            MR. KANE:  We do represent four of the six
15    authors that they've subpoenaed so far.  So we'll likely
16    represent the others.  The problem is that Google has
17    known about these authors since we filed the complaint.
18    There are some they've known about since a little later
19    in July that we've added.  We're perfectly fine with
20    saying that all we're asking for is document subpoenas,
21    that they shouldn't be able to send more document
22    subpoenas.  If they want to send a testimony subpoena
23    without attaching a document subpoena, I guess that's
24    fine.  We hit the deadline for – if the general deadline
25    for document discovery is remaining January 6, that

PROCEEDING                              149

1

2  should include third-party document subpoenas too --

3         THE COURT:  Don't you think it's a little

4  unfair for you to be telling me this on January 20?

5         MR. KANE:  If the way Your Honor interprets the

6  Court's prior orders, all document discovery was due

7  January 6, then it's probably already decided --

8         THE COURT:  To be perfectly candid, when we

9  talked about January 6 as being the default deadline, I

10 did have in mind party discovery, not third-party

11 discovery.  I probably didn't say that, but that was the

12 context in which we were having those discussions.

13        So let me do this which I think I can do

14 without damage to Google because you pretty much offered

15 me this, no more document only subpoenas.  I'm not going

16 to prohibit Google from sending subpoena seeking both

17 testimony and documents, but I will caution Google, as I

18 have cautioned all of you, don't wait until the last

19 minute.  Give these folks plenty of runway.  I take Mr.

20 Kane's point that, depending on who the author is and

21 what's in the document request, which I haven't seen,

22 there may be some time required to comply, and there's

23 no reason to drop those requirements on somebody at the

24 last minute.

25        MR. DAMLE:  Completely understood, Your Honor.

```
 1                        PROCEEDING                        150

 2              MR. KANE:  Can I make one point?  I did look

 3    back at Your Honor's order from October 15 --

 4              THE COURT:  What did I say?

 5              MR. KANE:  All document discovery, including

 6    productions of documents by parties and non-parties,

 7    must be --

 8              THE COURT:  Really?

 9              MR. KANE:  -- completed by January 6.

10              THE COURT:  I said that, did I?

11              MR. KANE:  So we are there.

12              THE COURT:  All right, well, no more document

13    only Rule 45 subpoenas.  Thank you for bringing that to

14    my attention.

15              MR. KANE:  Sorry --

16              THE COURT:  No sorry, you're keeping me honest.

17              MR. KANE:  Well, I was going to ask, so are

18    they allowed to issue a testimony for subpoenas that

19    says we want documents too, or a subpoena for testimony

20    that we want documents too?

21              THE COURT:  I think so.  I think in the

22    context, and particularly given how March, excuse me,

23    January 6 has slipped for big chunks of documents from

24    both sides including some documents that weren't even

25    requested until December, I think it would be unfair for
```

```
 1                        PROCEEDING                    151

 2   me to tell Google that they can't send out a deposition

 3   subpoena with an attached document request to a third

 4   party.  But I will, again, caution Google don't wait to

 5   the last minute.

 6            MR. DAMLE:  We won't, Your Honor.

 7            THE COURT:  All right.  Anything else?

 8            MR. KANE:  We'd just ask for the same, if we

 9   decide to send a subpoena to a third party for

10   testimony, that we can attach a document subpoena.

11            THE COURT:  Same rule but don't wait to the

12   last minute.

13            MR. KANE:  Understood.

14            THE COURT:  Anything from Google?

15            MR. DAMLE:  No, Your Honor.

16            THE COURT:  All right, we'll be adjourned.

17   Thank you all very much.

18              (Whereupon, the matter is adjourned.)

19

20

21

22

23

24

25
```

152

C E R T I F I C A T E

         I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of CENGAGE, et al.

v. GOOGLE, Docket #24cv4274, was prepared using digital

transcription software and is a true and accurate record

of the proceedings.


Signature_____*Carole Ludwig*_____

                    Carole Ludwig

Date:   January 23, 2026