

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
jkane@oandzlaw.com

February 24, 2026

**VIA ECF**

The Honorable Barbara Moses
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007

> Re:   *Cengage Learning, Inc. et al. v. Google LLC*, No. 24:cv-04274-JLR-BCM
> Plaintiffs' Letter Motion for Discovery Conference re Addressing Gaps in Google's Productions

[REDACTED]

Dear Judge Moses,

We represent all Plaintiffs in this matter. Google's productions to-date have suffered from multiple problems: Google produced hardly any documents on important topics, twice deployed the wrong search-terms, apparently deleted known, relevant documents, and missed hundreds of relevant documents in its initial review. Google's pattern of mistakes calls into question the completeness of Google's productions. To address these problems, the scope of many of which cannot be determined, three forms of relief are appropriate: Google should (1) produce its document and data retention policies; (2) produce a hit report regarding all search-terms and custodians, and identify all sources and databases the Google searched; and (3) deploy two additional custodians.

**I.   Relevant documents have been lost and Google made errors in its review.**

Google's productions reveal that Google committed multiple errors in its collection and review of documents, and that Google deleted relevant documents.

First, Google has produced almost no documents concerning important areas of the case. For example, Google had a ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Dkt. 238-5. But where the infringement notice came from certain ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Dkt. 185 at 5. The Court thus ordered Google to deploy certain search-terms on all custodians: ["high confidence" /15 ("ebook*" or "book*")] and ["zero strike" or "zero-strike"]. Dkt. 221(b)(i), (ii). But Google's productions since the Court's October Order contained *no* documents for the "high confidence" term, and hardly any discussion of the ▬▬▬▬▬▬▬▬▬▬ For example, it does not contain the ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. GOOG-CENG-00414653, 46544.

Similarly, the Court ordered Google to search the more than 30,000 Merchant Center and Ads Account numbers of pirates at issue in this case across all custodians. Dkt. 221 at 2. Google produced at most 29 documents pursuant to that Order. Declaration of Attorney Jeff Kane ("Decl.")

¶ 6. And Google produced only eighteen documents (with family documents) from ▨▨▨▨▨, whom the parties had agreed would be a full custodian *in lieu* of other relevant custodians.

Second, it appears that Google has deleted emails, either through a document retention policy, or otherwise. A third party, the American Association of Publishers ("AAP") produced an email chain between AAP and Google concerning ebook piracy on Google Shopping, and the consideration of creating an allow-list for legitimate publishers to advertise ebooks. Decl. ¶ 7. The chain contains three of Plaintiffs' search-terms and involves two custodians (▨▨▨▨▨▨▨▨ ▨▨▨▨▨▨▨). Yet Google did not produce this document. When Plaintiffs inquired as to why, Google reported that the email was not preserved pursuant to Google's document retention policy. 26.02.13 and 26.01.14 Latham Emails. Google, however, refuses to produce its document retention policy. 26.01.23 Latham Email. Thus, there is no way to know how many other relevant documents were deleted.

Third, Google admitted that it does not retain records of all of the ads that its merchants run. Rather, "unused and stale [ads] data, or data connected to a user that has deleted their Merchant Center account, is purged from that database after 30 days." 25.07.08 Latham Email. This means that Google may not have records of all of the times ran ads for infringing copies of the works-in-suit.

Fourth, more than 500 documents that Google produced *after* August 15, 2025 should have been produced *on or before* August 15, 2025. By June 2025, the parties agreed on a set of custodians and search-terms that Google would deploy and produce by August 15, 2025. Dkt. 110 ¶ 7(a)(ix). After that deadline passed, the Court ordered Google to produce documents resulting from additional search-terms and custodians. Dkts. 217, 221, 359, 441. But more than 500 documents in Google's productions *after* August 15, 2025 hit on search-terms and custodians that were due *on* August 15. Decl. ¶ 3. More than a month after Plaintiffs identified this issue, Google vaguely claimed that its "vendor" used the wrong date range and failed to "add[]" certain documents "to the review set …." 25.02.23 Latham Email. Despite claiming this was an "isolated" incident, Google admitted that an additional "100 responsive, non-privileged documents" were not produced at all. *Id*.

Fifth, Google twice ran the wrong search-terms. The parties agreed in July 2025 that Google would run the following term:

> (exception* OR ) w/10 **(suspen\* OR remov\* OR escalat\* OR (manifest\* w/5 unfound\*) OR** DMCA OR "Digital Millenium Copyright Act" OR (notice* AND copyright)) AND shopping

2025.06.09 O+Z Email; 25.07.14 Latham Email (emphasis added). But when Google ran its search-terms to review documents, Google omitted the bolded portion above. 25.12.04 Latham Email. Likewise, the Court ordered Google to deploy the search-term ["zero strike" OR "zero-strike"]. Dkt. 221 ¶ (b). Instead, Google ran the terms ["zero strike *policy*" OR "zero-strike

*policy*"]. 25.11.14 Latham Email.[1] Google has never provided an explanation for this discrepancy. Decl. ¶ 4.

## II.     Google should produce its document and data retention policy and hit reports.

Most simply, Google should produce any document or data retention policies in effect during the period January 1, 2020 through March 31, 2025 to which relevant documents or data would have been subject. Google's apparent deletion or failure to retain the AAP email, its practice of "purg[ing]" ads data, and the gaps in Google's production, indicate that important documents were not retained. In order for Plaintiffs and the Court to understand the possible scope of lost evidence, Google must produce its document retention policy.

Similarly, Google should produce a hit report for each custodian and search-term it ran pursuant to Court orders or agreement with Plaintiffs, as well as a list of the sources Google searched. *See CBF Industria De Gusa S/A v. AMCI Holdings, Inc.*, No. 13-cv-2581, 2019 WL 3334503, at *17–18 (S.D.N.Y. July 15, 2019) (ordering defendant to disclose all sources and custodians of information collected, number of documents collected, and number of documents from each source and custodian after plaintiffs identified "specific examples of defendants' deficient production."). This will allow the parties to evaluate the extent to which the existing custodians or search-terms simply were not the relevant, and the extent to which documents hit on those terms but Google deemed them non-responsive.

## III.    Additional custodians are needed to address these gaps.

To begin addressing these gaps, Plaintiffs request that Google add two custodians from Google's Engineering department: a custodian from Google's ▮▮▮▮ team, an ▮▮▮▮▮▮▮▮.

Engineers are critical in implementing Google's DMCA policy and Google's ban on ebooks throughout Shopping ("Ebook Ban"). Indeed, Engineering often was even more involved in these issues than was Trust & Safety, where most of Google's current custodians sit. GOOG-CENG-00468131 ("▮▮▮▮…") (emphasis added); Dkt. 475 at 2 (Google admitting that Trust & Safety "▮▮▮▮▮▮") (emphasis added). Importantly, Google's Engineering teams did their own reviews and approvals/disapprovals of infringing Shopping ads and infringing URLs, separate from Trust & Safety's review. *See* GOOG-CENG-00478812 ("▮▮▮▮▮▮"); GOOG-CENG-00466814 ("▮▮▮▮▮▮"). Engineering is also responsible for ▮▮▮▮

---

[1] Additionally, Google reported at the October 14 hearing that the *incorrect* "zero strike policy" search-term returned only nine hits. Hr'g Tr. 85:21–86:9 (Oct. 14, 2025) (Dkt. 223). But running that term just against the documents Google had *produced* through that date returns *ten* hits. Decl. ¶ 4.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX GOOG-CENG-00418050.

Despite the importance of Google's engineers, no engineers are full custodians. All Google has done is run "targeted" searches on one individual, Christophe Weibel. Accordingly, adding two such custodians is a prudent approach to filling some of the gaps in Google's productions.

### a. XXXX Custodian

First, Google should deploy a custodian from its XXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXX team. Google's documents show that XXXX played a critical role in processing Plaintiffs' infringement notices, terminating the pirates at issue, and developing the structure of the Shopping platform.

The XXXXXXXXXXXXXXXXXX is perhaps the most important tool used for Shopping; Google uses it to remove infringing Shopping ads. Recently-produced documents show that the XXXX is "owned by the XXXX team …." GOOG-CENG-00600119. Importantly, however, recently-produced documents *also* revealed that both the XXXX and the XXXX team suffered from a myriad of problems, including "XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX," and "XXXXXXXXXXXXXXXXXXXXXXXXXXXX" leading to "XXXXXXXXXXXXXXXXXX" GOOG-CENG-00477908.

Further, Google's XXXXXX team started showing "XXXXXXXXXXXXX" (GOOG-CENG-00434790), noting that "XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX" (GOOG-CENG-00477908). That XXXXXX had these problems with XXXX, which had one of the most important roles in implementing Google's DMCA policy, is all the more reason that a custodian from XXXX is appropriate.

### b. XXXXXXXXX

Mr. XXXX led the Ebook Ban, led Google's efforts to monitor XXXXXXXXXXX accounts, and was heavily involved in Google's efforts to create an allow-list of book publishers.

First, Mr. XXXXX himself stated that he played a leading role in the "XXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXX", highlighting his leadership of the "eBook category exit" as one of his top "accomplishments". GOOG-CENG-00474866, at 4901. Mr. XXXXX was one of, if not *the*, main go-to engineering leads for the bugs, questions, and issues regarding the Ebook Ban. GOOG-CENG-00462654 ("XXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXX"); GOOG-CENG-00475826 ("If it is, since ebooks are disallowed on Shopping Ads, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX"); GOOG-CENG-00474140 (in a chat titled "XXXXXXXXXXXXXXXX", Google full-time employees ask XXXXXXXXXXXXXXX Is it possible to do an account-level analysis of merchants who are engaging in the type of behavior we're trying to stop vs. 'good' actors?").

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX accounts throughout Shopping, including XXXXXXXXXXX accounts and merchants with "XXXXX". GOOG-CENG-00462654 ("XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXX"); GOOG-CENG-00462654, at -462739 ("XXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX").

███████████ also was involved in Google's attempts to create an allow-list of book-publishers from as late as 2021. *See* GOOG-CENG-00604236 (███████████ as the "█████" who "█████████████████████████████████████"). Indeed, ███████ team was assigned to create the allow-list that Google had discussed with AAP. GOOG-CENG-00604236. Google has represented that Google's prior attempts to create allow-lists were abandoned because they were "█████████████." Dkt. 475 at 3. ████████, as one of the lead engineers that worked on the Ebook Ban, should have the documents that support or contradict Google's claim.

Plaintiffs conferred with Google twice regarding additional custodians from Google's engineering teams, and conferred concerning Google's document retention policy and hit-reports. Decl. ¶ 5. Google refused to search for or consider any additional searches or custodians. 26.02.02 Latham Email.

### IV. Conclusion

Google should: (1) produce Google's document and data retention policies; (2) produce a hit-report regarding all search-terms and custodians and identify the sources Google searched; and (3) deploy two additional custodians.

Respectfully submitted,

*/s/ Jeff Kane*
Jeff Kane