

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
jkane@oandzlaw.com

March 3, 2026

**VIA ECF**

The Honorable Barbara Moses
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007

      Re:    *Cengage Learning, Inc. et al. v. Google LLC*, No. 24:cv-04274-JLR-BCM
            Plaintiffs' Reply in Support of Plaintiffs' Letter Motion (Dkt. 650) for
            Discovery Conference re Addressing Gaps in Google's Productions

[Redacted]

Dear Judge Moses,

      Plaintiffs write in support of their Motion for Discovery Conference regarding Addressing Gaps in Google's Productions, Dkt. 650 ("Mot."), and in response to Google's opposition letter, Dkt. 692 ("Opp.").

      Google's Opposition fails to overcome the significant problems in Google's production. And Google fails to show that the remedies Plaintiffs have proposed are not appropriate responses to these problems.

      **I.**    **Google fails in its attempt to rewrite its history of mistakes and deletions.**

      Plaintiffs' Motion identified five categories of mistakes in Google's collection and review of documents, and its deletion of important documents or data. Mot. at 1–2. Google's Opposition tries to rewrite this history. But the record disproves Google's story.

      First, Google makes *no* attempt to explain why it produced almost no documents concerning its [redacted] and hardly any documents from its search of the more than 30,000 Merchant Center account numbers and Ads Account ID numbers of the 1,500 pirates at issue. Compare Mot. at 1 ("First") with Opp. at 3–4. Google's Opposition does not contest that it produced only 29 documents that hit on these account numbers, and offers no reason that a proper production would contain so few documents about these 1,500 pirate websites.

      Second, Google failed to produce the AAP email, even though the email hits on multiple custodians and search-terms. Mot. at 2 ("Second"). Googles' discussion of this email, Opp. at 3 ("First"), misses the point entirely. Google focuses on whether Google was obligated to retain this email. Setting aside whether Google doth protest too much, Plaintiffs' request for Google's document retention policy does not depend on Google having committed some misconduct. Plaintiffs request the policy so that Plaintiffs can understand what other documents may have been deleted. Google's production contains significant gaps, Mot. at 1, and even Google does not deny that at least one important document was not retained. Producing Google's document retention policy will allow the parties to understand the potential scope of lost evidence.

Third, Google's arguments about its ads data, Opp. at 3 ("Second"), are similarly misguided. It is clear that significant ads data is missing from Google's production. Mot. at 2 ("Third"). Google itself acknowledged that there were more than ▓▓▓ URLs for which Plaintiffs observed ads (and that Plaintiffs listed in infringement notices) that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. 25.09.23 Latham Email. And Google itself explained that one reason that not all ads are reflected in Google' ads data is that "unused and stale offer data, or data connected to a user that has deleted their Merchant Center account, is purged from that database after 30 days." 25.08.25 Latham Email; 25.07.08 Latham Email. Given the importance of Ads data to this case, it is reasonable for Plaintiffs to ask Google to produce the policy(ies) pursuant to which much of the data that might show Google's unlawful conduct was "purged" from Google's systems.

Fourth, Google does not contest that it missed more than 600 documents in its review for its August 15, 2025 production. Mot. at 2 ("Fourth") (500 documents that Google missed initially, plus another 117 documents that Google produced as late as February 26, 2026); Opp. at 4 ("Third"). Google's convenient claim that the "vendor error" that caused this problem "did not impact any other aspect of its review," Opp. at 4, is of little comfort.

Fifth, Google twice ran the wrong search term. Mot. at 2 ("Fifth"). The first time, Google omitted several words from an agreed-upon search-term. *Id.* In its opposition, Google says it didn't run the wrong search term, then in the very next sentence admits that it "accidentally applied an older version of Search Term No. 7, rather than a subsequent modification agreed to by the parties." Opp. at 4.[1] While this is, of course, an admission that Google ran the wrong search-term, it is also misleading. Plaintiffs proposed their Search Term No. 7 on March 25, 2025. That term remained consistent from then on. Plaintiffs listed it again in emails on April 14 and June 9. Google confirmed the term on June 23, 2025, and again on July 14, 2025. 25.06.23 Latham Email; 25.07.14 Latham Email. Yet when Google ran its hit report dated July 16, 2025, Google reverted to using a term it had proposed on March 7, 2025 (*four months* prior to the date of the hit report).

Likewise, Google ran the search-term "zero strike *policy*" instead of the Court-ordered term "zero strike". Mot. at 2–3. In its opposition, Google pretends that rather than running the wrong search-term, it merely misreported the term it ran in an email. Opp. at 4. In actuality, Google not only ran the wrong term in its search, but reported the results of the incorrect term to the Court during the October 14, 2025 Discovery Hearing. Google acknowledged as much in writing. In a December 3, 2025 email to Plaintiffs, Google wrote, "Please see attached for the hit counts for: (1) the search terms we ran prior to the October 14th hearing across the then-existing custodians, which Ms. Bladow shared with the court (see Oct. 14 Hr'g Tr. 85:18-86:9)." Ex. 1. The hit report Google attached then lists the *incorrect* term: ["Zero-Strike *Policy*" OR "Zero Strike *Policy*"] (emphasis added). Ex. 2. This was not a mere "email drafting mistake," Opp. at 4. Google ran the wrong search-term, reported the hits from that term to the Court, and only corrected this error because Plaintiffs discovered it. And Google's opposition does not address at all (as Google has failed to do for months) why the number of hits it claims were returned by the "zero strike policy"

---

[1] Google also says that "[t]he parties later discovered this discrepancy . . . ." Opp. at 4. As Google well knows, *Plaintiffs* discovered this discrepancy, not "[t]he Parties." Decl. ¶ 3. Further, the reason Plaintiffs did not discover this discrepancy sooner was because Google's counsel refused to share the hit reports it referenced during the October 14, 2025 Discovery Hearing when Plaintiffs requested those hit reports immediately after the hearing. Decl. ¶ 3(a).

search (nine hits) is lower than the number of hits that result from running that term across Google's *produced* documents (ten hits). Mot. at 3 n.1.

Further, Google exaggerates the extent of its discovery to-date. Google's claim to have produced 20,000 custodial documents is overblown by at least a factor of two. More than 11,000 of these documents are nearly-identical one-page auto-notifications all saying that Google was running the same "sweep" for ebook pirates.

Google's opposition does nothing to justify the numerous problems with its production. To begin to remedy these problems, Google should produce its document retention policy, a detailed hit report, and deploy two additional custodians.

II. **Adding two custodians is an appropriate step in responding to the problems with Google's discovery.**

In its Opposition, Google, albeit inadvertently, explains precisely why additional custodians are needed to remedy its production deficiencies: Google says both custodians' roles overlapped with existing custodians. Opp. at 3. Although Plaintiffs have presented documents demonstrating that both custodians would possess unique documents, the very fact that Mr. ▇▇ and a ▇▇ custodian have roles and communications that overlap with several existing Google custodians is *exactly* why these custodians are needed to address Google's production deficiencies. For example, Google attempts to explain that Mr. ▇▇ role overlaps with ▇▇ and ▇▇. Opp. at 2. But Plaintiffs have made it very clear that there is evidence that Google has deleted emails involving those *exact* custodians: ▇▇ and ▇▇. Mot. at 2.

As another important example, less than six days ago, Google produced 117 documents that Google claims it hadn't produced previously because of an issue with Google's "vendor." Decl. ¶¶ 4–5. These documents show that documents from Mr. ▇▇ and a ▇▇ custodian will fill in gaps left by documents that were missing from other custodians. For example, Google has produced hardly any documents about the appeal process Google undertakes to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. See Dkt. 625 at 1–2. A document produced for the first time on February 26 shows that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ in fact was the team primarily in charge of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ like the Plaintiffs in this case. *Id.*, at -1148.

Importantly, these February 26 documents not only shed light into the further relevance and importance of ▇▇▇ role in Google's implementation of its DMCA program, but also presented the ▇▇▇ personnel who would be most appropriate as ▇▇▇ custodians. *See generally*, Ex. 4 (GOOG-CENG-00621152), Ex. 6 (GOOG-CENG-00600919). Plaintiffs request that the Court order either ▇▇▇ or ▇▇▇ as the additional ▇▇▇ custodian.

Lastly, in a desperate attempt to tag on any complaint it can think of, Google claims that Plaintiffs did not confer with Google regarding the requested relief. This is incorrect. Plaintiffs discussed the issues of including Mr. ▇▇▇, custodians from Google's engineering departments, and adding a custodian from the ▇▇▇ group in multiple meet-and-confers and countless correspondences. *See* Dkt. 652 ¶ 5. Further, Google claims that "Plaintiffs agreed that Google would add ▇▇▇ as a custodian in lieu of Mr. ▇▇▇ and others." That is also false. As Google's counsel's *own attorney declaration* acknowledges (Dkt. 692-1 ¶¶ 9, 11), Plaintiffs agreed to drop their request for a different custodian, ▇▇▇, in exchange for adding ▇▇▇ Dkt. 692-1, ¶11 Attorney Declaration of Sarah A. Tomkowiak ("The parties agreed that Google will include ▇▇▇ as a custodian, in exchange for which Plaintiffs will withdraw their request for Google to add ▇▇▇ as a custodian."). Plaintiffs did *not* drop their requests for Mr. ▇▇▇. And subsequent productions have shown that Mr. ▇▇▇ will fill some of the gaps in Google's productions.

Google's claim, Opp. at 4–5, that they were surprised by Plaintiffs' motion is puzzling. The parties discussed these exact issues during meet-and-confers. Mot. at 5. And Plaintiffs described their forthcoming motion in detail at the February 9 hearing: Plaintiffs explained that 500 documents that should have been produced on August 15 weren't produced until January 6, that the AAP email had been deleted, and that Google ran the wrong search term twice; and that as a remedy, Plaintiffs would be seeking an additional custodian and Google's document retention policy. Hr'g Tr. 20:6–23:8 (Feb. 9, 2026). It is one thing for Google to feign surprise about a motion that the parties discussed in a meet-and-confer. It is amazing for Google to do so when the discussion also is on the record in a Court hearing.

### III. Conclusion

The Court should order Google to produce its document retention polices, to produce a detailed hit report, and to deploy two additional custodians.

Respectfully submitted,

*/s/ Jeff Kane*
Jeff Kane