**Sarah Tomkowiak**
Direct Dial: +1.202.637.2335
sarah.tomkowiak@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

**LATHAM & WATKINS LLP**

March 5, 2026

**VIA ECF**

The Honorable Barbara Moses
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, New York 10007

Re: *Cengage Learning, Inc. et al. v. Google LLC*, No. 24-cv-04274-JLR-BCM
Letter Response to Plaintiffs' Status Update re Google's Selection of 300 Domains for Testing (Dkt. 702)

Dear Judge Moses:

Google respectfully submits this letter in response to Plaintiffs' "status update," filed Monday, March 2, 2026, regarding the list of 300 sample domains (Dkt. 702).

Google has encountered unforeseen complications related to the sampling exercise ordered by the Court at Dkt. 472. Those complications include the presence in the original 300-domain sample of: (1) 31 marketplace domains tied to ▬▬▬ of merchant center accounts; (2) an internal Google domain (googleadservices.com) that is not itself a third-party merchant site; (3) 2 domains tied to accounts with over ▬▬▬ offers; and (4) domains tied to European merchant center accounts subject to European data privacy regulations (including merchants who have objected to the disclosure of their data). While Google has been working diligently to identify and find solutions to these complications, each of them has led to false starts in Google's data collection process and has made complying with the Court's order as written—and by the March 6 deadline– exceedingly challenging. In light of these complications, Google respectfully requests a conference with the Court to discuss a path forward.

**Background**. The Court ordered Google to pull data regarding 300 domains randomly selected from DMCA notices received by Google. *See* Dkt. 472. The purpose of this sample was to give the Parties another set of data, in addition to the data already produced relating to the 1,500 so-called pirate domains, from which to evaluate Google's implementation of its DMCA policy "from soup to nuts." Dkt. 494, Hr'g Tr. at 97:10–13 (Dec. 1, 2025). The Court arrived at the 300-domain sample after considering the Parties' respective sampling proposals and adopting Google's, which was intended to reflect a modest "20 percent more domains" beyond the 1,500 domains already subject to "soup to nuts" discovery. Dkt. 569, Hr'g Tr. at 54:5–6 (Dec. 15, 2025); *see also id.* at 80:17–81:11. Google made this proposal because it expected this exercise to be a

cabined data pull, similar to what Google has already done for the 1,500 so-called pirate domains, on a *smaller* scale.

**Complications**. Against this backdrop, Google provides the following update regarding the specific complications it has encountered pulling data for the 300 randomly selected sample domains. Unfortunately, the sample has proved to be a massive undertaking involving volumes of data that dwarf the discovery Google has produced about the 1,500 domains. Proceeding with the sample as originally contemplated is infeasible and vastly disproportionate to the needs of this case.

*First*, after Google wrote, ran, and validated a computer script to return 300 randomly selected domains from DMCA notices, Google identified 31 "marketplace" domains (including amazon.com, ebay.com, and etsy.com) within the sample. In total, these 31 domains are associated with over ▓▓▓ merchant center accounts. By comparison, the 1,500 so-called pirate domains are associated with just 21,121 merchant center accounts. Google provided the full list of 300 domains (including the 31 "marketplace" domains) to Plaintiffs on January 30, consistent with the Court's order at Dkt. 510 ¶ 5. But it flagged for Plaintiffs that it anticipated needing to replace these "marketplace" domains to address the burden and infeasibility of producing the comprehensive suite of associated data for these domains called for by the Court's sampling order. *See* Dkt. 472 ¶ 5. Google provided Plaintiffs with the list of proposed replacement domains on February 20. Despite expressing openness to this approach at the February 9 hearing, *see* Dkt. 611, Hr'g Tr. at 7:5–14 (Feb. 9, 2026), Plaintiffs have since rejected Google's proposal. *See* Dkt. 702.

Plaintiffs now suggest that they need data about these "marketplace" domains because otherwise the factfinder will be "deprive[d]…of evidence of whether Google actually did implement its ▓-strike policy." *Id.* at 2. But this argument rests on a false premise. First, this case is not about how Google treated "marketplace" domains. Domains like Amazon.com, ebay.com, and etsy.com are not within Plaintiffs' list of 1,500 at-issue domains. Moreover, the sample data was never intended to be the only discovery that Google would produce relating to the implementation of its DMCA policy. Indeed, Google has produced thousands of custodial documents, after running multiple search terms over the files of 15 custodians and 3 email aliases, relating to Google's development and implementation of its DMCA policy for Shopping. Some of these documents even discuss Google's handling of DMCA notices for "high confidence sites" and "marketplace" domains. *See, e.g.*, GOOG-CENG-00471839 at -71844; GOOG-CENG-00416952 at -16953. Google maintains that replacing the "marketplace" domains with the new domains it identified on February 20 (or simply dropping these domains from the sample entirely) is the most reasonable and proportional path forward.

*Second*, the original 300-domain sample also included an internal Google domain, googleadservices.com. Google has also proposed replacing this domain, since it is not itself a merchant website. As Google has explained to Plaintiffs, this domain is used for ad redirects; while a complainant might report that a Shopping ad is visible at a googleadservices.com URL, that URL would redirect to a third-party website. Despite the Court's suggestion that Google's replacement plan was reasonable, *see* Dkt. 611, Hr'g Tr. at 11:20–22 (Feb. 9, 2026) (The Court:

**LATHAM&WATKINS**LLP

"[Googleadservices.com is] probably not actually a domain that you want. You'll get better information from a real domain."), Plaintiffs have not accepted Google's proposal regarding this complication, either.

*Third*, Google has faced challenges regarding the volume of data associated with even the non-marketplace domains, too. As Google has explained before, *see, e.g.*, Decl. of Sarah Tomkowiak (Dkt. 232) ¶ 15, pulling data regarding merchant center accounts, ads accounts, DMCA notices, Shopping listings, and impression and conversion data (*see* Dkt. 472 ¶ 5) requires coordination between four separate teams and cannot be done concurrently. After Google shared the list of sample domains with Plaintiffs on January 30, Google first pulled merchant center account information and notice data for the 268 domains not in dispute. Then, once it had the merchant center account IDs, Google began pulling offer data. At this point, Google ran into a new complication: the offer data for these merchants was far larger than expected—so large, in fact, that Google was having trouble pulling it and sharing it with counsel. In total, the ▮ merchant center accounts connected to the 268 not-in-dispute domains were associated with ▮ ▮ unique offers. Upon investigation, Google learned that accounts associated with just two of the 268 domains were responsible for approximately ▮ of the ▮ implicated offers. For context, the offer data for the 21,121 so-called pirate merchants in this case (associated with 1,500 domains) implicates approximately ▮ unique offers. Given the overwhelming number of offers associated with these two specific domains (▮ and ▮), Google has proposed removing them from the sample, as well. Without those two domains, the number of unique offers associated with accounts tied to the remaining 266 domains is still approximately ▮ (or 83% of the total number of unique offers for the 1,500 so-called pirate domains, compared to 224% with the additional two domains). This remains disproportionately large (far larger than originally anticipated for a pull of 20% of the number of at-issue domains in this case), but it is at least feasible.[1]

*Fourth*, and finally, Google learned that ▮ of the 266 domains are tied to ▮ merchant center accounts run by merchants located in the European Union. Following Google's standard notification regarding the planned production of associated merchant data, several EU-based merchants responded with unequivocal objections, expressly withholding consent for the release of their information. Google has reviewed this issue and determined that the release of these accounts' data implicates various European data protection laws, including GDPR. Google understands, however, that this court has ordered the production of this information and will be in a position to begin producing data regarding European merchant accounts (minus data for merchants who have submitted objections, which Google would separately like to discuss with the Court) by March 16.

**Conclusion**. Given these serious complications, and despite its diligent efforts, Google is unable to complete its production of sample data by the March 6 deadline. Google will produce the high-level infringement notice data for the 266 domains that are not in dispute by tomorrow.

---

[1] The notice data associated with the 266 remaining domains is very large, as well. These domains are tied to ▮ unique cases and ▮ noticed URLs during the January 2020 to March 2025 time period.

**LATHAM&WATKINS**LLP

It has collected Merchant Center and Ads account information associated with these same 266 domains and expects to be able to produce it (with the Court's permission, omitting the data for which European users have submitted objections) by March 16. Google respectfully requests until March 30, 2026 to complete its production of infringement notice documents and communications, offer data, and impression and conversion data for these 266 domains (again, minus for European users who have objected, subject to the Court's approval). Google respectfully requests a conference with the Court to discuss an appropriate path forward with respect to the remainder of the sample, which Google maintains has ballooned far beyond a supplemental sample, and veered into complex areas of Google's DMCA enforcement that are not at issue in this case, making this aspect of the sampling exercise an "apples to oranges" comparison to Google's enforcement of Plaintiffs' notices.

Respectfully submitted,

*/s/ Sarah A. Tomkowiak*
Sarah A. Tomkowiak (*pro hac vice*)
of LATHAM & WATKINS LLP

cc: All Counsel of Record (via ECF)