# EXHIBIT A

# [Redacted]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------:

CENGAGE LEARNING, INC.,          : Case No.: 24-cv-4274

et al.,                          :

                  Plaintiff, :

     v.                          :

GOOGLE LLC,                      : New York, New York

              Defendant. : February 9, 2026

------------------------------:

TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE BARBARA C. MOSES

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          OPPENHEIM & ZEBRAK, LLP
                        BY:  Jeff Kane, Esq.
                        4530 Wisconsin Avenue NW
                        Washington, DC 20016

For Defendant:          LATHAM & WATKINS LLP
                        BY:  Sarang Damle, Esq.
                             Jennifer Ferrigno, Esq.
                        555 Eleventh Street NW
                        Washington, DC 20004

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

1          THE DEPUTY CLERK:  The Court now calls

2   Cengage Learning, Inc. et al. v. Google, LLC; Case

3   Number: 24-cv-4274.

4          Counsel, please make your appearances for

5   the record.

6          MR. KANE:  Good afternoon, your Honor.

7   Jeff Kane, from Oppenheim and Zebrak, for all

8   plaintiffs.

9          THE COURT:  Mr. Kane.

10          MR. DAMLE:  Good morning, your Honor.  Sy

11   Damle, from Latham & Watkins, for Google, and I'm

12   joined by Jennifer Ferrigno from my firm.

13          THE COURT:  Mr. Damle.  Ms. Ferrigno.

14          Where's your supporting cast?

15          MR. DAMLE:  We have the thin crowd today.

16          THE COURT:  Well, you're all welcome.

17          I should warn you that I have a couple of

18   law students here who have just started their

19   spring-term internship with me.  I told them to

20   expect a spirited argument on complex and

21   sophisticated discovery issues, but perhaps we are

22   all to be disappointed.

23          What have you resolved?

24          MR. KANE:  Judge, Google has agreed to make

25   a stipulation that renders the discovery motion that

        AMM TRANSCRIPTION SERVICE  -  631.334.1445

1    was on the calendar for today moot.

2            THE COURT:  And they're going to stipulate

3    that they're not going to argue that they did any

4    better for other rights holders than for the

5    plaintiffs; is that it?

6            MR. KANE:  That is basically the gist.

7            So we might say the error rate with respect

8    to plaintiffs' notices was ■ percent, meaning ■

9    percent of the time it was a Shopping notice, but

10   they treated it as a Search notice, incorrectly.

11           They might quarrel with the number.  They

12   might say, well, it's not ■, it's ■ percent.  But

13   what they're not going to do is say, oh, actually,

14   we did a much better job with notices other than

15   yours.  You know, there's this other universe of

16   notices where the error rate was only ■ percent or

17   something.

18           So that's the gist of the stipulation.

19           THE COURT:  Mr. Damle, is that the gist of

20   it, as you understand it?

21           MR. DAMLE:  That is the gist.  Obviously,

22   we disagree with, you know, the characterization of

23   anything that we did as being erroneous, but, you

24   know, the basic gist of the stipulation is that

25   we're going to treat the notices that we've produced

                AMM TRANSCRIPTION SERVICE  -  631.334.1445

```
 1    in this case and -- or that what we will be
 2    producing in this case is representative of the
 3    universe of notices.
 4            THE COURT:  All right.  Well, that sounds
 5    quite sensible, and that will resolve the motion at
 6    Docket Number 523.  You're going to submit a written
 7    stipulation in short order, I trust?
 8            MR. DAMLE:  Sure, we can do that.
 9            MR. KANE:  Yes.
10            THE COURT:  All right.
11            MR. KANE:  We did agree on language we can
12    file with the Court.
13            THE COURT:  That's fine.  See if you can
14    get that in by tomorrow so I don't forget to clean
15    up that docket item.
16            But while I have you here, Counsel, there
17    were a couple of other issues that you highlighted
18    for me in your joint status letter, your February
19    5th joint status letter, so I thought it might be
20    worth our while to ask, first of all, what was
21    produced the next day?
22            Discovery was due on February 6th, and you
23    wrote the joint status letter on February the 5th.
24    So it was plaintiffs' deadline, correct?
25            At least one of the deadlines was
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    plaintiffs' deadline on February --

2              MR. KANE:  Yes.  Both sides had deadlines

3    on February 6th.

4              THE COURT:  Yes.  All right.  So did both

5    sides meet those deadlines?

6              MR. KANE:  So plaintiffs produced the

7    screenshot exercise that was due on that day.  We

8    have not had -- Google did make a production on the

9    6th.  We have not been able to go through it in the

10   subsequent couple of days, so I'll have to rely on

11   them to report to the Court.

12             THE COURT:  Well, I will presume, until I

13   hear otherwise, that Google appropriately met its

14   deadline.  And if you feel otherwise, I'm sure

15   you'll let me know.

16             MR. KANE:  Yes.  There was a January 30th

17   deadline that, unfortunately, Google did not meet.

18   That was for -- you might recall, with respect to

19   Google's overall DMCA program.

20             THE COURT:  Well, that was the sampling,

21   the 300, right?

22             MR. KANE:  That's correct.

23             THE COURT:  And if I understand it

24   correctly -- and I think I may actually understand

25   it correctly -- we'll find out.

```
 1              The idea was it was going to be a random
 2    sample that was going to mathematically add up to
 3    300.  But of those 300, a small number, which I now
 4    can't recall --
 5              MR. KANE:  It's 30 --
 6              THE COURT:  -- 31 or 32 -- Google, when it
 7    drew the random names out of the hat, the random
 8    names were for marketplace domains like eBay.  And
 9    Google said, really, that's not what makes sense
10    here, and proposed to substitute others; is that
11    right?
12              MR. KANE:  That's correct.  So that was
13    with respect to --
14              THE COURT:  Did you work that out?
15              MR. KANE:  Not yet.  We're waiting for
16    Google to get back to us.
17              So with respect to 31 domains, the issue
18    was as you described, Google told us if you use the
19    marketplace domain, it's just a crazy number of
20    notices that we'd have to produce.
21              What we told them is, can you give us a
22    breakdown of which domain is which?  In other words,
23    they told us it was ███████████ notices.  We said,
24    but it's 31 domains.  We said, can you break it
25    down?
```

```
 1                THE COURT:  I see.
 2                MR. KANE:  It might be that Amazon is ███
 3      ███████ of them or something.
 4                THE COURT:  I see.
 5                MR. KANE:  So we're waiting for Google to
 6      get back to us on that.
 7                What we think makes sense is, in the
 8      interim, Google should select the 31 domains with
 9      which they would replace those.
10                THE COURT:  The runner-up domains, so to
11      speak?
12                MR. KANE:  Exactly.  So that once we reach
13      a resolution on the 31, they can, you know, slot in
14      the next 31.
15                THE COURT:  That seems sensible.
16                I don't know if you've already done that,
17      perhaps, Mr. Damle.
18                MR. DAMLE:  No.  This is something that
19      was, sort of, breaking over the weekend, so we
20      haven't had a chance to talk with our client.
21                I agree, it sounds sensible.  We just are
22      trying to work with our client on just the process
23      of pulling those, you know, those additional 31.
24                THE COURT:  Yeah.  I mean, it is Google's
25      proposal to substitute those 31 domains with normal
```

AMM TRANSCRIPTION SERVICE  -  631.334.1445

```
 1   domains --
 2              MR. DAMLE:  Yes.  Yes.  Yes.  Yes.
 3              THE COURT:  -- so you should have them
 4   lined up and ready to go.
 5              MR. DAMLE:  But we can do that within the
 6   next day or two.
 7              THE COURT:  All right.  Can we talk
 8   about --
 9              MR. KANE:  I'm sorry, Judge.  That was 31
10   of the 32 domains.
11              THE COURT:  Oh.  What was the 32nd?
12              MR. KANE:  The 32nd domain is called, like,
13   googleadservices.com.  And what they told us is that
14   there couldn't have been an ad running on that
15   domain.  But the selection criteria that Google used
16   was that they were only going to use the domain if
17   it was logged in Google's system as having had an ad
18   removed.
19              So if Google's position is that that was an
20   error, then that should be part of the sample, and,
21   you know, a Google witness should have to say, well,
22   yeah, something went wrong there.
23              So for the 32nd domain, our position is
24   that should remain in the sample.
25              THE COURT:  The 32nd domain is called what?
```

1          MR. KANE:  I believe it's

2     googleadservices.com, but let me double-check.

3          THE COURT:  So it's a Google entity, a

4     Google domain?

5          MR. KANE:  Correct.

6          THE COURT:  I'm not sure that's what you

7     were looking for, Mr. Kane.  I'm not sure that's

8     what you expected or what you wanted.

9          MR. KANE:  It's not what we expected, but

10     part of the point of a random sample is to see,

11     like, what comes up.  And I suspect what Google is

12     trying to say is, well, there couldn't have been an

13     ad on that domain because that domain doesn't

14     support ads.  But if that's the case, that's part of

15     the sample.  They claim to have removed something

16     that they couldn't have removed if there wasn't --

17     if their position is there couldn't have been an ad

18     there.

19          In other words, it's --

20          THE COURT:  Mr. Damle?

21          MR. DAMLE:  I guess I'm not recalling that

22     we -- exactly how we drew the sample.  Again, it's

23     something I think we're still continuing to discuss

24     with the plaintiffs.

25          Again, you know, our understanding is that

1    googleadservices.com is not a domain with which --

2    it's a Google domain, it's not one that an external

3    ad can be associated with.  So, you know, we don't

4    know whether it's something --

5            THE COURT:  So it's not -- I mean, I guess

6    that's the -- that was my thought process.  It's

7    part of Google, so ...

8            MR. DAMLE:  I think what may be happening

9    here -- because we're drawing these from notices,

10   right, and so it may be that there are some notices

11   where, you know, it's a redirect type of situation,

12   where it first lands on Google --

13           THE COURT:  Hang on one second, Mr. Damle.

14           Am I the only one hearing that echo when

15   Mr. Damle speaks into the microphone?

16           MR. DAMLE:  Yeah, I'm hearing it too.

17           THE COURT:  Yeah.  Why don't you take the

18   podium mic and just pull it over to the table and

19   see if that solves your problem.

20           MR. DAMLE:  Okay.

21           THE COURT:  If it reaches.  Almost.

22           MR. DAMLE:  Okay.  Is that better?

23           THE COURT:  I think that is better.

24           And we'll get our crack audiovisual team in

25   here this afternoon.

```
1                MR. DAMLE:  So I think what -- I think we

2      are still, you know, sort of -- I think what may be

3      happening -- and I don't know for sure, but what may

4      be happening is that it's a -- you know, because

5      these are notices that are being submitted by, you

6      know, just people on the Internet --

7                THE COURT:  Rights holders.

8                MR. DAMLE:  Rights holders.  Right.  They

9      may be selecting, you know, one domain rather than

10     another domain.  It may be like a redirect domain

11     where it first goes to a Google server and then gets

12     redirected to an external server.

13               So I think this is one where we can still

14     continue to talk about it.  But, again, I don't

15     think that -- at least as far as we know, this is

16     not something that we actually have ads for these

17     domains.

18               THE COURT:  Well, you two see if you can

19     work it out.  It just seems to me off the top of my

20     head, Mr. Kane, that it's probably not actually a

21     domain that you want.  You'll get better information

22     from a real domain.

23               MR. KANE:  If it is a redirecting

24     situation, as Mr. Damle suggests, they should have a

25     record of to where it was redirected, and that's the
```

1    domain they should use.

2            THE COURT:  Now we're getting really fancy.

3            All right.  See if you can work it out.

4    You know where to find me if you can't.

5            Can we speak for a moment about

6    depositions.  I read in your joint status update

7    letter that the parties are working to schedule the

8    depositions of plaintiff witnesses.  Those are going

9    to happen in March and April.  But Google is

10   resisting scheduling depositions of Google

11   witnesses.

12           Is that still the case?

13           MR. DAMLE:  I don't believe we're resisting

14   scheduling Google witnesses.  I think we have some

15   concerns about the scope of their 30(b)(6) notice,

16   and so --

17           THE COURT:  Understood.  But those are not

18   the same issue.

19           MR. DAMLE:  Understood, your Honor.  We are

20   working to get availability of our witnesses, and so

21   that is definitely happening.  And I think we

22   have -- we'll just have to, you know, kind of, work

23   in parallel with scheduling the witnesses and

24   figuring out what the actual topics are.  So that's

25   something that we're working on.

```
 1            THE COURT:  All right.
 2            And lastly, unless there are issues that
 3   the parties wish to take up with me, can you give me
 4   an update, please, on whether, and if so, what
 5   further discovery motions are likely to land on my
 6   doorstep?
 7            Mr. Kane?
 8            MR. KANE:  Sure.  So there are a couple.
 9            The first one is regarding Google's
10   privilege assertions, and there are basically two
11   issues there.  One is, under the DMCA, they have to
12   show that they've reasonably implemented a repeat
13   infringer program, a program to terminate repeat
14   infringers.
15            It's clear from Google's documents that
16   Google's in-house counsel are part of that process.
17   There are certain ███████████████████ where
18   Google's in-house counsel ████████████████
19   ██████████████████████.  And there is
20   an appeal process whereby a merchant who has been
21   suspended for copyright infringement can be
22   reinstated.  That ████████████████████████
23   ████████████████████.
24            So there are a number of documents in
25   Google's privilege log that appear to be documents
```

AMM TRANSCRIPTION SERVICE  -  631.334.1445

1   for which in-house counsel are actually implementing

2   Google's DMCA policy.  So the motion basically says

3   that those documents are not privileged and should

4   be turned over.

5           THE COURT:  And they're not privileged

6   because, in your view, in-house counsel are acting

7   in a business rather than a legal capacity?

8           MR. KANE:  That's part of it, but more to

9   the point, I think it's a classic, sort of,

10  sword-and-shield argument.  In other words, they're

11  trying to say we reasonably implemented our DMCA

12  policy, but the -- excuse me.  But the documents

13  that show them implementing that policy, i.e.,

14  ██████████████████  to it or reinstating people who

15  have been suspended pursuant to the policy, are

16  being withheld on the basis of privilege.

17          The analogy would be if you're trying to

18  show that you complied with a particular regulation

19  and, like, that's, you know, your burden to show,

20  you're asserting a defense on that basis, you can't

21  then refuse to produce the documents that are the

22  implementation of that program.

23          THE COURT:  Well, I'm not sure it's that

24  black and white, the classic sword-and-shield

25  situation where courts routinely require a party to

AMM TRANSCRIPTION SERVICE  -  631.334.1445

1    fish or cut bait, either assert the defense and give

2    up the privilege or retain the privilege and drop

3    the defense is the advice-of-counsel defense.

4    Because, by definition, if you're asserting the

5    advice-of-counsel defense, everything that you need

6    to support that defense is going to be to or from a

7    lawyer or otherwise implicate a privilege issue.

8            Here, the DMCA defense is, of course, very

9    broad.  It has a lot of moving parts.  And what you

10   seem to be saying is, well, the in-house lawyers are

11   involved in one piece of it.

12           So I'm just thinking out loud here.  Is

13   that enough to waive the privilege?

14           MR. KANE:  I think it's a lot like the

15   advice-of-counsel defense because what they're

16   saying is, we took this policy and implemented it in

17   a reasonable fashion.  But an important part of that

18   implementation was conducted by in-house counsel.

19           So to the extent that in-house counsel were

20   actually implementing Google's DMCA policy, to the

21   extent that they were the ones saying okay, we are

22   going to ███████████████████, or we are going

23   to reinstate this merchant even though she reached

24   the ████-strike threshold, that, I think, is not

25   privilege, or at least the privilege -- if it was

1    ever privileged in the first place, the privilege

2    has been waived by virtue of asserting the DMCA

3    defense.

4            In other words, they shouldn't get to say

5    hey, we've got this phenomenal DMCA program, we

6    terminate repeat infringers left and right.  But

7    we're not going to show you the documents that

8    involve us ███████████████████████████████

9    ████████  or reinstating people after they have been

10   terminated pursuant to the policy.

11           That, I think, is where the privilege

12   argument goes a little too far.

13           THE COURT:  Mr. Damle, do you have any

14   preliminary thoughts on this issue?

15           MR. DAMLE:  Very preliminarily, I think

16   we -- you know, the point that you make is the

17   correct one, which is this isn't, you know, we're

18   relying on the advice of counsel, so we're injecting

19   the advice of counsel into the case.

20           You know, to the extent -- so to the

21   extent -- our position is, to the extent we're

22   withholding things as privileged, it is because they

23   are properly privileged, they involve legal advice.

24           THE COURT:  And in your view of the world,

25   they just happen to be relevant to the DMCA defense?

        AMM TRANSCRIPTION SERVICE  -  631.334.1445

```
 1            MR. DAMLE:  Correct.  If, as part of the
 2   process, lawyers are providing legal advice as to
 3   the requirements of the DMCA and what -- I think
 4   that would be something that's plainly privileged,
 5   even though we are asserting, you know, reasonable
 6   implementation.
 7            You know, to the extent they want to ask
 8   questions of our witnesses about the facts that
 9   occurred, obviously, facts are not privileged, but
10   we're not -- you know, in terms of what we're
11   withholding, you know, we're withholding things
12   that, you know, are properly privileged.
13            THE COURT:  Are you withholding things that
14   say ███████████████████████████, or are
15   you withholding things that say in analyzing this
16   under section so and so of title such and such?
17            MR. DAMLE:  Yeah, with apologies, I don't
18   have it at the front of my head, everything that
19   we've withheld on our logs, so I can't answer that.
20   But certainly, you know, from talking to the team,
21   that's my understanding, is that it is -- there are
22   documents that embody legal advice.
23            THE COURT:  That actually contain the
24   communications seeking or providing legal advice?
25            MR. DAMLE:  That's my understanding, yes,
```

AMM TRANSCRIPTION SERVICE  -  631.334.1445

1    of what we were told.

2            THE COURT:  Because, as you say, facts are

3    not privileged.  And if a relevant fact is that

4    in-house attorney Mr. X said yes to this one and no

5    to that one, that, you would agree, would not be

6    privileged, right?

7            MR. DAMLE:  I guess it's hard for me to

8    answer that as a blanket matter without having seen

9    all the documents and, kind of, understanding

10   exactly how the process works, so I wouldn't want to

11   concede away anything.  But, you know, the general

12   principle of facts not being privileged, I certainly

13   agree with.

14           THE COURT:  All right.  So that's one issue

15   that I may or may not have to look at more closely.

16           MR. KANE:  I can give you one distinction

17   if that helps, or we could -- if a person at Google,

18   a Google employee is reviewing an infringement

19   notice and has a legal question and asks a lawyer,

20   that's not what we're seeking here.

21           What we're saying is, like, the actual

22   process that Google is supposed to undertake is that

23   ████████████████████████████████████████

24   ████████████████████████████████████████

25   ███████████████████████████, or when someone is

        AMM TRANSCRIPTION SERVICE  -  631.334.1445

1    appealing a suspension, ████████████████████

2    ████████████████████.

3              It's when the actual, like, prescribed

4    process is for in-house counsel to perform the

5    function, that's where we think Google has gone too

6    far in asserting privilege.

7              We agree if it's just someone says, I'm not

8    sure if this is fair use, I'm not sure if this is

9    infringing, that kind of thing.  If it's a one-off

10   asking for legal advice, that can be privileged.

11   But where the actual process that they're putting

12   forward as being the thing that gets them the

13   exemption from damages, if that process is performed

14   by in-house counsel, that can't be privileged.

15   That's the distinction we're making.

16              THE COURT:  Right.

17              Perhaps the better analogy would be to the

18   field of employment discrimination, where there is

19   an affirmative defense that an employer can assert,

20   that they have a reliable and effective program by

21   which employees can report harassment and

22   discrimination and that sort of thing.

23              And there's a lot of case law out there in

24   that area of the law as to whether and to what

25   extent the employer waives the attorney-client

1    privilege when the attorneys are running that

2    program.

3             All right.  Well -- so I'll pencil that in

4    on my calendar.

5             And is there another issue, Mr. Kane?

6             MR. KANE:  Yeah.  So there have been some

7    issues with Google's document production.  There

8    were over 500 documents that were contained in the

9    January 6th production that should have been in the

10   August 15th production.

11            In other words, the custodians and search

12   terms that were agreed upon for the August 15th

13   production would have turned up these 500 or so

14   documents, but we only got them in --

15            THE COURT:  Are they being turned over now

16   along the lines of, oops, forgot about these, here

17   they are?  Or are they being turned over now because

18   they also are responsive to a more recent discovery

19   obligation?

20            MR. KANE:  Some of them might also be

21   responsive to an additional custodian who was added

22   or an additional search term that was added.  But

23   the point is, like, they were also responsive to the

24   prior set of custodians and search terms, and so

25   they should have --

```
 1              THE COURT:  So you are wondering why you
 2     didn't get them in August.
 3              MR. KANE:  Exactly.  So we've asked Google
 4     this and they haven't told us.
 5              The second issue is, there's two instances
 6     in which Google use the wrong search term:  One was
 7     a court-ordered search term, one was one that the
 8     parties had agreed on.  We were able to figure this
 9     out but Google refused to, sort of, go back and
10     review documents that hit on the revised search --
11     on the correct search terms but had also hit on
12     prior search terms.
13              And the third issue is, we know that some
14     e-mails were deleted.  There was an e-mail we got
15     from a third party that included multiple custodians
16     and search terms that are part of the set that is to
17     be searched that Google didn't turn over.
18              When we pointed this e-mail out to them and
19     asked why it wasn't produced, Google said the e-mail
20     had been deleted.  I don't know if it was deleted by
21     a person or by just a document retention process.
22              So we're concerned that the documents we've
23     been getting from Google -- that there are issues
24     with Google's process for reviewing documents.
25              THE COURT:  Well, if it's a deletion issue,
```

1    it's not the process for reviewing documents.  What

2    that implicates is either the process -- the

3    automatic processes for retaining data or individual

4    practices.

5            As we all know, you know, there's more than

6    one way to lose a relevant e-mail.  You can lose a

7    relevant e-mail because the servers automatically

8    delete people's accounts 30 days after they depart

9    the company or what have you.  You can also lose a

10   relevant e-mail because Mr. X or Ms. Y just didn't

11   feel like keeping it and put it in their trash and

12   double-deleted it before they left the company.

13           So you don't know what you're dealing with

14   here, I imagine, yet.

15           MR. KANE:  So Google has refused to give us

16   their document retention policy, so we're not sure

17   to what extent this is just ordinary, you know,

18   documents get deleted.

19           Some of these people are -- some of the

20   people who are the existing custodians are current

21   employees, so it wouldn't have been an issue of an

22   employee's e-mails getting deleted after she left

23   the company.

24           THE COURT:  Sometimes people do that

25   without leaving the company.

```
 1              MR. KANE:  Sure.
 2              So we're still talking to Google about
 3   this.  What we think is a sensible solution is a
 4   couple things:  One, for Google to turn over its
 5   document retention policy, but two, to add a
 6   custodian who we think might fill in some of the
 7   gaps for documents that either were deleted or
 8   weren't caught in the review process.
 9              THE COURT:  Joy.  Another custodian.
10              MR. KANE:  But we think that given the
11   issues we've had with Google's document production,
12   we need to find some way of addressing this.
13              So I don't know if that will become a
14   motion, but that's, sort of, a current issue.
15              THE COURT:  And, Google, are you planning
16   to make a motion on this clawback issue or on
17   anything else that you want to warn me about now?
18              MR. DAMLE:  Yeah.  So I think there are,
19   sort of, three issues I would raise, your Honor.
20   One is, you know, we've talked a lot about Google's
21   productions.
22              You know, we have some significant concerns
23   about the pace of productions from the plaintiffs.
24   You know, during a meet and confer we had last week,
25   we were given -- you know, we were told that because
```

1  they were given until March 6th to complete their

2  custodial productions that we shouldn't expect to

3  see anything until then effectively.

4          And so what I would say is, you know, in

5  the same way that I think your Honor admonished

6  Google to, you know, engage in rolling productions,

7  which we have been, we would ask that plaintiffs

8  also, you know, produce documents to us on a rolling

9  basis.

10         You know, some of these include custodians

11 and search terms we agreed to months ago, so this

12 isn't just the delta that we --

13         THE COURT:  Are you telling me, Mr. Damle,

14 that I somehow managed not to say that at any point

15 to plaintiffs over our last however many

16 conferences?

17         MR. DAMLE:  I recall very vividly you

18 saying it to us, your Honor.  I don't recall whether

19 it was made clear to the plaintiffs that that was

20 their obligation as well.

21         THE COURT:  Well, if I didn't make it --

22 say it in an even-handed manner, I'm sure that was

23 oversight on my part because that's obviously the

24 better practice.

25         Would you agree, Mr. Kane?

        AMM TRANSCRIPTION SERVICE  -  631.334.1445

```
 1              MR. KANE:  Certainly.

 2              I was not on the meet and confer that

 3   Mr. Damle is referring to, and I expect he was not

 4   either.  So I don't know exactly what my colleagues

 5   said, but I suspect it was not that we wouldn't be

 6   making rolling productions.  We've been doing that

 7   throughout the case and producing documents as soon

 8   as they're ready.

 9              THE COURT:  Okay.  Don't hold back.

10              And tell me a little more about the

11   clawback issue.

12              MR. DAMLE:  Yeah.  So, your Honor, there

13   were two documents that were produced in this case

14   and that they were -- they were used fairly

15   extensively in this case, that the --

16              THE COURT:  By which side?

17              MR. DAMLE:  Produced by the plaintiffs.

18              THE COURT:  Yes, but you said "used

19   extensively."

20              MR. DAMLE:  And used extensively by Google,

21   and, you know, they're on the record in this case.

22   We told plaintiffs in November that we intended to

23   use those two documents in a reply motion to a

24   discovery motion.  We met and conferred about those

25   documents, among others.  We filed excerpts of those
```

1    documents under seal in November. And so we believe
2    that those documents are not properly withheld as
3    privileged for the --
4            THE COURT: When did plaintiffs first
5    request to claw them back?
6            MR. DAMLE: It was January 8th, your Honor.
7            THE COURT: It was January. And they were
8    produced sometime in 2025?
9            MR. DAMLE: 2025. And we actually notified
10   plaintiffs in November of 2024 that we were planning
11   on introducing them as exhibits to one of the briefs
12   that we filed.
13           THE COURT: So produced in 2024, it sounds
14   like.
15           MR. DAMLE: Sorry. 2025. 2025. I --
16           THE COURT: Right. And you had let them
17   know in November. And you let them know in November
18   because these documents bore some indicia that they
19   might have been unintentionally turned over?
20           MR. DAMLE: No. We were attaching them
21   to -- because, you know, we have a process by which
22   we --
23           THE COURT: Because of the confidentiality
24   stip.
25           MR. DAMLE: Exactly.

1          THE COURT:  Okay.  And you say they didn't

2    put their hand up until January.

3          MR. DAMLE:  Correct.

4          THE COURT:  Mr. Kane?

5          MR. KANE:  With apologies, your Honor, I do

6    not know enough about this issue to tell you what

7    our position is.  I'm sure our position is that it

8    was appropriately clawed back, but I just -- I'm

9    afraid I'm not familiar with this one.

10          THE COURT:  All right.

11          Anything else from Google?

12          MR. DAMLE:  The third issue is, we've

13    disclosed an expert to the plaintiffs on --

14          THE COURT:  Yes.  An expert whose name is

15    secret, apparently.

16          MR. DAMLE:  His name is Kenneth Crews.  And

17    so he is a -- we want to use him to, sort of, opine

18    on the academic publishing industry and the

19    relationship between academic publishers and

20    professors at universities and the relationship

21    between the work that those professors do and their

22    universities.

23          So he's, you know, well qualified for that.

24    And we've -- the plaintiffs have objected to us

25    disclosing confidential material to this expert

1    because of past engagements that he had.

2            THE COURT:  They're afraid he'll leak their

3    stuff to the wrong people?

4            MR. DAMLE:  You would have to ask the

5    plaintiffs what exactly their concern is.  It

6    doesn't seem like a very -- really significant

7    concern.

8            So that's one that we're continuing to work

9    on with the plaintiffs, but it may be one -- given

10   the expert discovery deadline, we may need to come

11   back to you.

12           THE COURT:  C-R-U-Z?

13           MR. DAMLE:  It's C-R-E-W-S.

14           THE COURT:  C-R-E -- oh, that kind of

15   Crews.  Kenneth Crews.  I'm just going to -- forgive

16   me -- Google him.

17           American copyright scholar and librarian;

18   that Kenneth Crews?

19           MR. DAMLE:  Correct.

20           THE COURT:  Okay.  He's got a Wikipedia

21   entry.  He must be important.  That was, sort of, a

22   joke.

23           MR. KANE:  Or he authored his own Wikipedia

24   page.

25           THE COURT:  Don't get me started.

```
 1              All right.  So when does that issue need to
 2     get resolved either by the parties or by the Court?
 3              MR. DAMLE:  I think it needs to get
 4     resolved in the next couple weeks in order for him
 5     to get access to the materials that he needs to
 6     start --
 7              THE COURT:  Get up to speed.
 8              MR. DAMLE:  -- start reporting -- you know,
 9     putting together his report.
10              THE COURT:  Do you have any preliminary
11     thoughts on this?
12              MR. KANE:  It seems like -- we've been
13     talking about this for a few weeks now.  It seems
14     like we're close to a resolution, so I'm hoping that
15     we can resolve this one.
16              The problem is this particular expert was
17     involved in two things that are problematic.  One is
18     he negotiates author agreements on behalf of authors
19     with publishers.  And what he wants access to in
20     this case is the author agreements between our
21     authors and our publishers.
22              And the second is he was involved with some
23     amount of scanning of copyrighted works.  So there
24     are some pirate --
25              THE COURT:  Scamming with an "M"?  Or is
```

1   it --

2            MR. KANE:  Scanning with an "N" as in

3   Nancy.

4            So there are some pirate libraries where

5   people literally scan thousands and thousands of

6   books and put pirated copies of them online.

7            THE COURT:  Right.

8            MR. KANE:  He apparently gave advice to a

9   company that was doing that, which is obviously not

10  in the interest of our clients.

11           What we've been trying to, sort of, suss

12  out --

13           THE COURT:  That sounds like it could be

14  impeachment material, but I'm not sure how it

15  renders him unable to receive confidential

16  information.

17           MR. KANE:  So that one wouldn't be the

18  basis for, like, a *Daubert* challenge, necessarily.

19  The issue is the protective order requires experts

20  to disclose folks for whom they've worked in the

21  last certain amount of time, and he is refusing to

22  say who this party was.

23           THE COURT:  Huh?

24           MR. KANE:  So what we've been trying to

25  suss out from Google is why the author -- why this

AMM TRANSCRIPTION SERVICE  -  631.334.1445

1  expert needs the author agreements.

2          So what we presume this expert is going to

3  try to say -- Google has this, sort of, convoluted

4  theory that when a university professor authors a

5  textbook, she does so in the course of her

6  employment as a university professor, and so the

7  work is a -- what the Copyright Act might call a

8  "work for hire," and, therefore, it's actually the

9  university that owns the copyright.

10          It's a silly argument for a lot of reasons,

11  not the least of which is collective bargaining

12  agreements and IP policies usually say the

13  professors own the copyright or the works they

14  create, unless some exception applies, like a

15  substantial use of university resources or a grant

16  from the institution or something like that.

17          THE COURT:  I was always under the

18  impression, untutored and unresearched impression,

19  that universities had to let their professors retain

20  or claim the copyright so that they can make the

21  residuals, because otherwise the professors would go

22  to some other university which would let them do

23  that.

24          MR. KANE:  There is that practical element

25  of it.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

```
 1              The, sort of, conceptual element of it is,
 2    you know, a very important part of the university
 3    culture is academic freedom.  And so it's
 4    considered, like, very fundamental that the author
 5    has to own the copyright to her work because it's
 6    her work.  The university -- if the university
 7    suddenly owned the copyright, they could dictate
 8    where it's published or what the content of it is or
 9    that kind of thing.
10              The reason I bring this up is that one of
11    the sticking points here is the author agreements
12    that this expert wants to see.  I don't know why he
13    needs to see these author agreements.
14              So his argument is going to be, you know,
15    the transfer of ownership from the publisher to the
16    author -- or, sorry, from the author to the
17    publisher is invalid because the author never owned
18    it in the first place.
19              Well, he can see two, you know, redacted
20    author agreements and just confirm, yeah, there is a
21    purported transfer from the author to the publisher.
22    I don't know why he needs to see all, several
23    thousand, of these author agreements in unredacted
24    form.
25              But, as I said, I think we're getting close
```

1    to a resolution on this, so I'm hopeful we can

2    resolve it.

3            THE COURT:  All right.  Well, keep me

4    posted.

5            Did you have another two cents you wanted

6    to --

7            MR. DAMLE:  Yeah, just on the work-for-hire

8    point, just because he started getting into

9    substance, and I thought in case you might find it

10   interesting, you know, there are ways in which

11   universities can transfer copyrights that they may

12   own back to a professor, right.

13           THE COURT:  Sure.

14           MR. DAMLE:  But the Copyright Act says --

15           THE COURT:  We just heard about it.

16           MR. DAMLE:  The Copyright Act says it has

17   to be a signed writing.  Has to be a signed writing.

18   The Copyright Act is very clear about that.

19           And so, you know, the point that we are

20   making is all fine, if that's what the university

21   wants to do.  Where is the signed writing that

22   transfers that copyright that is *ab initio* owned by

23   the university as the employer of the professor that

24   transfers those rights back to the author?  And so,

25   as a technical matter of copyright law, if you don't

AMM TRANSCRIPTION SERVICE  -  631.334.1445

```
 1   have that, then just a chain-of-title question
 2   arises.  That's our point.
 3            THE COURT:  All right.  But you would -- if
 4   you're thinking, well, gee, somewhere down the road,
 5   I'm going to argue that these publisher plaintiffs
 6   don't actually own all these copyrights, it's the
 7   ab initio part that you glossed over very quickly.
 8            Are you suggesting to me that in the
 9   absence of any other facts, that when Professor X
10   who is tenured at University Y writes a textbook
11   that's a work for hire, wouldn't it depend on a
12   whole bunch of fact-specific issues?
13            Did he type in his office or did he type in
14   his spare bedroom at home, for example?
15            MR. DAMLE:  Absolutely.  Absolutely.  And
16   this is the reason why we've subpoenaed individual
17   professors to ask them questions about the manner in
18   which they engaged in their -- the creation of their
19   textbook.
20            THE COURT:  Okay.  But if there's a signed
21   writing, that would be moot, right?
22            MR. DAMLE:  If there were a signed writing
23   back from the university to the professors --
24            THE COURT:  Right.
25            And what about -- to pick up Mr. Kane's
```

```
 1    point, what about if it's not in an individual
 2    contract, but it's in some kind of collective
 3    bargaining agreement or some kind of university
 4    policy or some such thing?
 5              MR. DAMLE:  I think it would depend on what
 6    that is, and that certainly would be something that,
 7    you know, Mr. Kane could point to, if there was one,
 8    if it qualified as a signed writing or not.  I don't
 9    know.
10              THE COURT:  All right.  I understand the
11    issues.  Thank you both very much.
12              I want to remind you -- I'm sure that you
13    have this date tattooed on the inside of your
14    eyelids, that your fact discovery deadline is May
15    the 6th.  And that's the 6th or the 7th or the 8th
16    extended fact discovery deadline, so I'm really not
17    anticipating extending that further absent truly
18    compelling circumstances.
19              Should I wait to hear from you and see what
20    further motions you are going to grace me with, or
21    should I presumptively set a date next month for us
22    to have a conference and talk about whatever we need
23    to talk about at that point?
24              MR. KANE:  I think setting a date is
25    probably sensible.
```

```
 1              MR. DAMLE:  That works for us, your Honor.
 2              THE COURT:  Let's look at the calendar.
 3      There we go.
 4              It looks like I have morning time available
 5      on Tuesday, March the 3rd, and on Monday, March the
 6      9th.
 7              And also, Ms. Kay, the 10th; is that right?
 8      Am I looking at that correctly?
 9              THE DEPUTY CLERK:  Yes, your Honor.
10              THE COURT:  All right.  So Tuesday the 3rd,
11      Monday the 9th, Tuesday the 10th.
12              Any preference, Mr. Kane?
13              MR. KANE:  The 3rd works for plaintiffs,
14      your Honor.
15              THE COURT:  Mr. Damle?
16              MR. DAMLE:  Unfortunately, I have a summary
17      judgment argument in the Northern District of
18      California on the 3rd.
19              THE COURT:  Ooh, what judge?
20              MR. DAMLE:  It's -- who is the judge?  I
21      can't recall off the top --
22              THE COURT:  The first motion I ever argued
23      in federal court was to Marilyn Hall Patel in the
24      Northern District of California.  I think she's long
25      retired.
```

1          MR. DAMLE:  Yes.  It's not her, I can tell
2     you that.
3          THE COURT:  All right.  So the 3rd is out.
4          The 9th, Mr. Kane?
5          MR. KANE:  The 9th works, yes.
6          THE COURT:  All right.  Why don't we say
7     10:00, Monday the 9th.  And why don't you send me a
8     joint letter.
9          Do I need it as early as a week prior on
10    Monday the 2nd, or would it make more sense --
11    there's a March 6th deadline for certain that's --
12         MR. KANE:  Correct.
13         THE COURT:  Yeah, but you're not going to
14    know enough by the end of the day.
15         MR. DAMLE:  Well, it may be then -- it may
16    make sense to -- your Honor, if we could schedule it
17    for the 10th, then that might give us at least
18    the -- we could send --
19         THE COURT:  You're going to race through --
20    you're going to get documents on Friday the 6th,
21    then you're going to race through them and be able
22    to --
23         MR. DAMLE:  Gives us a chance.
24         THE COURT:  Well, I'll give you a chance.
25    I can do the 10th.

       AMM TRANSCRIPTION SERVICE  -  631.334.1445

```
 1              Mr. Kane?

 2              MR. KANE:  We would prefer the 9th, just to

 3    move things along, but if the Court's preference is

 4    the 10th, we'll do the 10th.

 5              The issue is Google is producing a whole

 6    bunch of documents on March 6th that they, you know,

 7    claim they needed that long to produce them.  We

 8    sent them deposition notices a couple of months ago

 9    and they haven't scheduled any of them.

10              THE COURT:  Well, I'm sure they will have

11    by March the 10th.

12              MR. KANE:  It's just the -- we'll have all

13    the documents on the 6th.  We need to take 20 fact

14    depositions plus 30(b)(6) depositions by May 6th, so

15    it's -- to the extent that there are motions that

16    need to be argued and -- you know, we, kind of, need

17    to do them sooner rather than later.

18              THE COURT:  As I told you previously, I

19    hope you don't need to -- and at this rate, I'm not

20    going to let you -- work out every document issue

21    before you start taking depositions.

22              MR. KANE:  Yep.  Understood.

23              The issue is, like, for example, the

24    Buganizer documents, those are going to be documents

25    that are authored by folks that we're deposing.  So
```

AMM TRANSCRIPTION SERVICE  -  631.334.1445

1   it's --
2          THE COURT:  Some of them.  Some of the
3   folks you're deposing.
4          MR. KANE:  Yeah.  So some of these, we're
5   going to need -- it's just not efficient for us to
6   depose someone and then have to bring them back
7   because we got 50 documents that they authored that
8   we need to ask them about.
9          THE COURT:  Yeah.  And what's going to hang
10  on the difference between the 9th and the 10th for
11  you, Mr. Kane?
12         MR. KANE:  As I said, we can do either.
13  Our preference would be the 9th just because it's
14  sooner.  I just want to -- you know, I hear and
15  share the Court's instruction that we need to get
16  this stuff done by May 6th.  I'm just saying it's
17  Google that's preventing us from getting this done,
18  not plaintiffs.
19         THE COURT:  So I'll see you at 10:00,
20  Tuesday, March the 10th.  Why don't you send me your
21  standard joint update letter before you get the
22  documents, let's say, Thursday the 5th.
23         And then if you have an update for me on
24  Monday after you've spent the weekend -- I hope you
25  don't spend your weekends this way, but maybe you

```
 1    do.  If you have an update for me on Monday, I'll
 2    take that as well.  All right?
 3            So joint status update letter required on
 4    Thursday the 5th, optional updates on Monday the
 5    9th, and I'll see you at 10:00 in the morning on
 6    Tuesday the 10th.
 7            And I will expect a stipulation from you by
 8    tomorrow for me to so order with respect to today's
 9    motion.
10            MR. DAMLE:  Yes, your Honor.
11            THE COURT:  All right.
12            Anything further from the plaintiff?
13            MR. KANE:  No.  Thank you, your Honor.
14            THE COURT:  Anything further from the
15    defendant?
16            MR. DAMLE:  Nothing, your Honor.
17            THE COURT:  We will be adjourned.
18
19                         oOo
20
21
22
23
24
25
```

1

2                    C E R T I F I C A T E

3

4        I, Adrienne M. Mignano, certify that the

5    foregoing transcript of proceedings in the case of

6    Cengage Learning, Inc. et al. v. Google LLC

7    Docket #24CV4274 was prepared using digital

8    transcription software and is a true and accurate

9    record of the proceedings.

10

11

12    Signature  ___*Adrienne M. Mignano*___

13                  ADRIENNE M. MIGNANO, RPR

14

15    Date:       February 12, 2026.

16

17

18

19

20

21

22

23

24

25

          AMM TRANSCRIPTION SERVICE  -  631.334.1445