Sarah Tomkowiak
Direct Dial: +1.202.637.2335
sarah.tomkowiak@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

**LATHAM & WATKINS LLP**

March 13, 2026

**VIA ECF**

The Honorable Barbara Moses
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, New York 10007

> Re: *Cengage Learning, Inc. et al. v. Google LLC*, No. 24-cv-04274-JLR-BCM
> Letter Reply in Support of Google's Response to Plaintiffs' Status Update re Google's Selection of 300 Domains for Testing (Dkt. 724)

Dear Judge Moses:

Pursuant to the Court's Order at Dkt. 751 ¶ 4, Google submits this letter reply in support of its letter at Dkt. 724, and in response to Plaintiffs' letter at Dkt. 745, regarding the Court's December 22, 2025 Sampling Order (Dkt. 472).

Google respectfully seeks to modify the Court's Sampling Order because, since the order's issuance, Google has learned that complying with the order as written would be untenably burdensome and in tension with European privacy law. The Court has authority "to forbid or to alter discovery that is unduly burdensome." *During v. City Univ. of New York*, 2006 WL 2192843, at *4 (S.D.N.Y. Aug. 1, 2006). The Court should exercise that authority here.

To recap the salient history of this dispute: Google produced several categories of non-custodial documents and data relating to 1,500 domains (websites) that Plaintiffs allege advertised pirated versions of their copyrighted textbooks—including DMCA notices and advertisement-related data. Google also produced spreadsheets concerning high-level metrics about its processing of DMCA notices from rightsholders other than Plaintiffs, the tracking of "strikes," and merchant suspensions. Google's position was (and remains) that it has provided proportionate discovery into Google's implementation of its Google Shopping DMCA policy.

Plaintiffs moved, pursuant to Federal Rule of Evidence 1006(b), to (1) preclude Google from introducing those spreadsheets reflecting high-level metrics or (2) produce all data underlying those spreadsheets. *See* Dkt. 237. At the December 1 hearing, the Court rejected Plaintiffs' Rule 1006 basis for seeking *all* underlying data, but determined Plaintiffs were entitled to "***some discovery***," under Federal Rule of Civil Procedure 26, that would allow them to test how Google implemented the relevant policy for other merchants and DMCA notices not tied to Plaintiffs' works. Dkt. 393, Hr'g Tr. at 99:4-9 (Dec. 1, 2025) (emphasis added). The Court clarified that the discovery would be "on a [random] sampling basis ***in order to keep the burden***

# LATHAM&WATKINS LLP

*manageable*." *Id.* at 97:11 (emphasis added); *see also id.* at 97:14-15 (referring to a "relatively narrow sample set").

Google proposed what it believed would be a reasonable supplemental data pull: Google would randomly select 300 domains—or 20% of the number of so-called "pirate" domains (1,500)—contained in the data underlying the spreadsheets, and produce discovery similar to what it had produced for the 1,500 domains. Google could not have known (and did not know) the types of domains that might be randomly selected, but expected that the data pull for the 300 sample domains would closely mirror the data pulls Google had already done for the 1,500 domains, on a smaller scale.

As it turned out, the random sample contained domains associated with marketplaces and prolific advertisers. Consequently, the volume of data associated with the 300 randomly selected domains now dwarfs that of the original 1,500 domains by several orders of magnitude, making the request clearly disproportionate. *See infra* at 2-4. Tellingly, in their March 9 letter (Dkt. 745), Plaintiffs do not respond to *any* of Google's burden arguments. That is because even Plaintiffs cannot claim with a straight face that this volume of data is reasonable to collect and produce. For the reasons set forth below, unforeseen complications have made proceeding with the sample as originally contemplated exceedingly challenging to the point of impossibility, which provides more than sufficient grounds to alter this Court's Sampling Order.

**Marketplace Domains**. Plaintiffs argue that Google "wishes to exclude . . . marketplace websites from discovery because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.* at 3. In reality, Google wishes to exclude these domains because identifying, collecting, and producing all notice, account, offer, and ads data about domains that are currently tied to over ▮▮▮▮▮▮ accounts would be technically complex and extremely burdensome. Plaintiffs' opposition letter makes clear that they already *have* sufficient custodial documents about Google's treatment of marketplace domains; they do not need mountains of additional data to gain that understanding or prepare their case. *See* Fed. R. Civ. P. 26(b)(2)(C) (explaining that a court must limit discovery if "the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive"). As demonstrated by the documents Plaintiffs cite in their letter, Google has already produced ample discovery that reflects Google's handling of marketplace domains and "high-confidence sites" that have their own DMCA policies. *See* Dkt. 724 at 2.[1] Besides, Plaintiffs will have an opportunity to explore the contours of Google's DMCA policy during depositions. Plaintiffs' 30(b)(6) deposition notice included over a *dozen* topics related to Google's Shopping DMCA policy and processes.

At this point, Google's position is that these domains should be dropped from the sample data pulls entirely (or, at a minimum, they should be replaced with the new domains Google identified on February 20, which Google has confirmed are non-marketplace domains).

---

[1] In their opposition, Plaintiffs fault Google for citing only two documents in a "*see, e.g.,*" cite, but then proceed to declare that "other documents confirm" what the documents Google cited show. Dkt. 745 at 2.



**Googleadservices.com**. Plaintiffs accuse Google of "trying to exclude" a site "to which Google does not enforce its . . . policy." Dkt. 745 at 3. That does not make sense. As Google has explained to Plaintiffs repeatedly, this is an internal domain used for ad redirects. It is not itself a merchant website; Google's DMCA policy does not apply to it. It thus makes no sense to include this domain in a sample where the claimed purpose is to "test" how Google implemented its DMCA policy. Finally, Plaintiffs misrepresent the documents that they cite. None of them reflects instances where Google told a complainant who submitted a notice containing a googleadservices.com URL ▮▮▮▮." *Id.* (citing GOOG-CENG-00295284; GOOG-CENG-00360377; GOOG-CENG-00360991; GOOG-CENG-00394158). Each of these documents reflects a notice where a googleadservices.com URL is entered as either the "visible URL of the ad" or the "ad URL" and a *third-party URL* is entered as the "final URL."[2] None of the issues with these notices relates to the googleadservices.com URL.

**Offer data**. In Google's March 5 letter, it explained that it has encountered challenges with the volume of offer (a.k.a. Shopping ads) data implicated by the non-marketplace domains. Google highlighted the volume of data associated with two domains in particular: ▮▮▮ and ▮▮▮. These two domains are associated with nearly ▮▮▮ unique offers on their own.[3] Google believed that removing these two domains from the sample would make the volume of remaining offer data "disproportionately large" but "at least feasible." Dkt. 724 at 3.[4] This week, however, Google learned that the volume of offer data for the 266 domains *other* than ▮▮▮ and ▮▮▮ remains untenably large. While there are "only" ▮▮▮ unique offers (versus ▮▮▮ for the accounts connected to the so-called "pirate" domains) associated with the remaining 266 domains, there are approximately ▮▮▮ rows of data (versus about ▮▮▮ for the so-called "pirate" domains). This data is **27 terabytes large**—by comparison, *all* of the documents and data Google has produced *in the entire case thus far* is **under 1.5 terabytes**. That volume far exceeds what is reasonable and proportional for a "sample." *See* Dkt. 66, Hr'g Tr. at 11:10-14 (Dec. 18, 2024) (The Court: "[T]his is a civil action, albeit a very large one, regarding infringement allegations against a defendant here. It is not a government

---

[2] In GOOG-CENG-00360377, for example, the complainant entered a homepage, rather than a URL for the specific product that they alleged is being infringed, when asked for the URL to "an authorized example of the work."

[3] Google corrects the number of unique offers associated with ▮▮▮ and ▮▮▮ and the number of unique offers associated with the 266 domains exclusive of these two domains referenced in Google's letter at Dkt. 724. The correct numbers are ▮▮▮ (▮▮▮) for ▮▮▮ and ▮▮▮ and ▮▮▮ (▮▮▮) for the 266 non-marketplace, non-internal domains other than ▮▮▮ and ▮▮▮. The total number of offers associated with the 268 domains (including ▮▮▮ and ▮▮▮) is ▮▮▮ (▮▮▮).

[4] Plaintiffs' opposition letter inaccurately states that "Google says there are ▮▮▮ notices containing more than ▮▮▮ URLs for [▮▮▮ and ▮▮▮]." Dkt. 745 at 3. What Google actually stated was that it received ▮▮▮ notices containing ▮▮▮ URLs for the *other* 266 domains. Plaintiffs also curiously state that Plaintiffs have "not requested" non-Shopping notices as part of this discovery. But the Court's Order at Dkt. 472 calls for "[a]ll copyright infringement notices Google received concerning the ▮▮▮ domain."

forensic examination of anything possible that could be going on at Google that is unfair or infringing.").

In addition to the complications of collecting and transferring this data, the cost of hosting the data would be disproportionate, given that Plaintiffs do not actually need the content of the sample domain offers to determine whether Google implemented its DMCA policy. Unlike for the 1,500 so-called "pirate domains," Plaintiffs do not need to determine whether any of the offers are for purportedly infringing copies of their works. All they need to know is whether Google continued to show those offers to users after the date on which the associated account should have been suspended pursuant to Google's DMCA policy. Plaintiffs can determine this from the ads data (i.e., the data showing impressions and conversions for each offer). Given the enormous volume of data associated with the sample domain offers and the limited relevance of this data, Google proposes removing the requirement that Google provide this offer data. (Google has already produced high-level notice data and would still additionally produce the underlying notices and responses from complainants, merchant center and ads account information, and ads data for each domain remaining in the sample.)

**European accounts**. Finally, Google seeks a modification of the Court's order that would allow it to exclude data concerning ▮ domains connected to European accounts subject to European privacy regulations, including the General Data Protection Regulation ("GDPR"), that impose stringent requirements before sharing European individuals' personal data without account holder consent. *See* Dkt. 724 at 3. Producing data associated with accounts in the EU without the explicit consent of the account holders puts Google at risk of violating EU data protection laws. This risk is particularly acute for accounts where the account holder has objected. To date, four account holders have done so. Courts in this Circuit recognize that discovery can be limited under Rule 26 based on consideration of the "nonmonetary costs" of the discovery sought, including "invasion of privacy rights" and "risks to business and legal confidences." *Chen-Oster v. Goldman Sachs & Co.*, 285 F.R.D. 294, 306 (S.D.N.Y. 2012) (internal citation omitted); *see also Estuary Transit Dist. v. Harford Healthcare Corp.*, 2025 WL 1678417, at *7 (D. Conn. June 13, 2025) ("[T]he power to limit discovery under Rule 26(b) 'may be employed where the burden is not measured in the time or expense required to respond to requested discovery, but lies instead in the adverse consequences of the disclosure of sensitive, albeit unprivileged, material.'" (quoting *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 562 (S.D.N.Y. 1996))). Given the tangential relevance of these particular domains and accounts to this case, the "adverse consequences" of disclosure strongly outweigh the benefit of the discovery sought.

\* \* \*

Even with Google's proposed modifications, the Court's Sampling Order would still require Google to provide notice data, merchant center and ads account information, and ads data about 228 randomly selected domains that have nothing to do with the infringements that Plaintiffs allege. This data is more than proportionate to sample Google's implementation of its DMCA

LATHAM&WATKINS LLP

policy.  Google respectfully refers the Court to the proposed order it submits as an attachment to this letter.

Respectfully submitted,

*/s/ Sarah A. Tomkowiak*
Sarah A. Tomkowiak *(pro hac vice)*
of LATHAM & WATKINS LLP