# EXHIBIT A

# [Redacted]

```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
        ----------------------------:

CENGAGE LEARNING, INC.,        : Docket No.: 24-cv-04274
et al.,
               Plaintiffs,     :

          v.                   :

GOOGLE, LLC,                   : New York, New York

                               : March 10, 2026

               Defendant.      :

        ----------------------------:

                   PROCEEDINGS BEFORE
            THE HONORABLE BARBARA C. MOSES
            UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:      OPPENHEIM & ZEBRAK, LLP
                    BY:  MICHELE H. MURPHY, ESQ.
                         JEFF KANE, ESQ.
                         YUNYI CHEN, ESQ.
                         URIEL LEE, ESQ.
                         LAUREN BERGELSON, ESQ.
                    461 Fifth Avenue, 19th Floor
                    New York, New York 10017

For Defendant:      LATHAM & WATKINS, LLP
                    BY:  SARAH A. TOMKOWIAK, ESQ.
                         SARA SAMPOLI, ESQ.
                         JENNFER FERRIGNO, ESQ.
                         WILSON BOARDMAN, ESQ.
                    1271 Avenue of the Americas
                    New York, New York 10020

Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

THE DEPUTY CLERK:  Calling Case: 24-cv-4274; Cengage Learning v. Google.

Beginning with the counsel for the plaintiffs, please make your appearance for the record.

MR. KANE:  Good morning, your Honor.

Jeff Kane, from Oppenheim + Zebrak, on behalf of all plaintiffs.  Joining me are my colleagues:  Yunyi Chen -- Y-U-N-Y-I, C-H-E-N -- Uriel Lee -- U-R-I-E-L, L-E-E -- Michele Murphy and Lauren Bergelson.

With the Court's permission, Ms. Chen will argue the privilege motion, Ms. Lee will argue the sales representatives' motion, and I will argue the motion about the gaps in Google's productions.

THE DEPUTY CLERK:  And counsel for the defendants --

THE COURT:  That's good.  Thank you.

Go ahead.

THE DEPUTY CLERK:  And counsel for the defendants, please make your appearances.

MS. TOMKOWIAK:  Good morning, your Honor.

Sarah Tomkowiak, of Latham & Watkins, on behalf of Google.  I'm here with my colleagues: Sara Sampoli, Jennifer Ferrigno and Wilson Boardman,

also of Latham & Watkins.  And Ms. Sampoli and I will be handling the various motions and issues today.

THE COURT:  All right.

Let's review our menu this morning.  There are three fully briefed letter motions.  In order of filing, they are the plaintiffs' motion at Dockets 590 and 591, the redacted and unredacted versions respectively, regarding Google's privilege assertions.

Next is the plaintiffs' February 18th motion at Dockets 623 and 625 seeking to compel communications between Google and the 1,500 so-called "pirates" at issue here.

And third is the plaintiffs' February 24th motion at Dockets 650 and 651 seeking discovery on discovery.

I would like to start with what I think is the simplest motion in terms of how many pages and cases I had to read, which is the middle motion, the motion regarding the communications between sales reps and the pirates.

That will be Mr. Kane for the plaintiff; is that correct?

MR. KANE:  That will be Ms. Lee, if we

could have just a moment to trade chairs.

THE COURT:  That will be Ms. Lee for the plaintiff.

And who will that be for Google?

MS. SAMPOLI:  That will be me, your Honor, Sarah Sampoli.

THE COURT:  Ms. Sampoli.  Okay.

So let me start, if I might, Ms. Lee, with you.  And if I could start by asking you a couple of questions, first, what was the objective in serving what's now Request for Production 115 in December of 2025?

Was it, by any chance, an effort to retrigger, reinvestigate, restart the clock as to communications that you appear to have fairly squarely asked for much earlier in your original Request for Production Number 29 served back in September of 2024?

What is the mechanism here?

MS. LEE:  Yes, your Honor.

This was not in any way to retrigger the clock.  Google's productions since August, and in August as well, have shown that communications that Google has, their sales representatives with their clients, are very, very important.  And productions

since August have also shown Google's DMCA policies.

THE COURT:  No, I understand that part of it.  It's disputed, but I understand the argument is that plaintiffs were unable to fully appreciate how potentially important these communications were until after Google's August production.

But why didn't you, then, simply go back to Google and say, hey, we need to have some more conversation about RFP 29?

Is it possibly because you had already put that conversation to bed, closed the door on that, and, therefore -- my words, not yours -- needed to restart the clock?

MS. LEE:  Yes.  It was not -- the request for 115 was plaintiffs' -- we needed to make it very clear that these were specific communications -- although RFP 29 asked for all communications, we really needed to specify these categories of communications, particularly with the sales representatives.

THE COURT:  But you didn't.  It's a very broad request, Number 115:  "All communications" -- all communications -- "between the infringing merchants and any Google representatives, including any sales representatives, account managers, account

strategists, or any other Google employee who would communicate directly with the infringing merchants."

That's everything.

MS. LEE:  And I understand that is -- sounds like a broad RFP, but it was also more specific than our RFP 29, which was all communications between Google and the infringing merchants.  And so it was our --

THE COURT:  I don't appreciate that difference, honestly.

When you say, I'd like all communications, please, and then you later say, I'd like all communications, please, including these various subsets, isn't that functionally exactly the same?

MS. LEE:  Yes, your Honor.

THE COURT:  You didn't narrow it.  You didn't go back and say, well, we only care about the sales reps, for example, or we would like you to identify the pirates who had sales reps assigned.

You didn't do that.  You just said, here, we're asking again, and this time we really mean it.

MS. LEE:  And that is because we weren't in a position, even by, like, November or December, to be able to specify, like, the sales representatives. We had been continuing to receive documents, even up

until December and November, of the importance and the -- also the specific roles that these account strategists and sales representatives held.  And in order to be inclusive for this request, we really weren't able to specify in more details how many account strategists or sales representatives or even if these pirates had these representatives.

THE COURT:  Did you ask?

MS. LEE:  We did.  And --

THE COURT:  Did you consider sending an interrogatory, for example, saying, hey, how many of them had sales reps?  And who are they, please?

MS. LEE:  We had considered other options, and we thought that issuing this RFP would have been the most productive.

THE COURT:  Your moving letter at Docket 625 uses a lot of conditional and tentative language.

You say, for example, on page 1, if Google communicated with the pirates about these Shopping Ads or their accounts connected to these Ads, that is basic and critical information that plaintiffs need in this case.

Then at the top of the second page, "Sales representatives may receive advance notice about

potential suspension."

Second paragraph:  "If a merchant is suspended, sales representatives may also communicate with the merchant and even advocate on their behalf," and so on.  I don't need to belabor the point.

For a discovery motion, this is somewhat unusual language.  Normally, the party making a motion to compel discovery is a lot more sure than you are that there's something out there.

MS. LEE:  Yes, your Honor, and we explained this a little bit more in our reply letter, but it's not simply just pure speculation or a fishing expedition that Google claims it to be.

In fact, Google has produced documents that show spreadsheets ███████████████████████████, and ██████ Merchant Center ID numbers of the pirates actually appear on one of these spreadsheets.  And one of these pirates had ███ --

THE COURT:  What does that mean, that their ID numbers appeared on this -- I'm sorry.  Tell me again the --

MS. LEE:  This -- yes.

THE COURT:  -- name of the spreadsheet.

MS. LEE:  This was a spreadsheet showing

██████████████████████████████████

████████ .

THE COURT:  Okay.

And what is the significance of ██████ Merchant Center IDs appearing on that list?

MS. LEE:  These ██████ merchant IDs of the pirates would show that these are Google evaluations or analyses of ████████████████████████████████, and it shows various identifying information, but also revenue information as well for each of these pirates.

THE COURT:  Okay.  And what is the revenue for these ██████?

MS. LEE:  I can pull it up, actually, for the exhibit.

THE COURT:  Because we have an aggregate estimate figure from Google, which would seem like a lot of money to an ordinary person, but apparently isn't a lot of money for 1,500 alleged pirates across the relevant years at Google.

MS. LEE:  Yeah.

THE COURT:  ██████████, I think it was, in total.

MS. LEE:  Yes.

But these spreadsheets also showed that

there is a column for account managers' usernames. And so along with the revenue information right next to -- or next-next to these columns show usernames of any account managers that this e-book merchant may have had.

THE COURT:  May have had.

MS. LEE:  Yes.

And among the ▉▉▉ pirates, one of the pirates had ▉▉ account manager usernames listed.

THE COURT:  Okay.  Can you show me that?

MS. LEE:  Yes.

THE COURT:  Because you didn't attach it to your reply papers.

MS. LEE:  Yes.  This was sent via e-mail.

THE COURT:  Chris, could you possibly assist Counsel with squaring that screen up a little bit so I can get a better look at it?

Now, what -- Counsel still also needs to be able to see it.

Ms. Lee, are you okay there?

All right.  Thank you.

All right.  What am I looking at, Ms. Lee?

MS. LEE:  This is one of the spreadsheets that Google has produced showing the pirates -- or the e-book merchants' identifying information and

revenue information.

You can see that there is a column for the account ID, the Ads --

THE COURT: You're going to have to blow that up if you want me to be able to see that.

MS. LEE: Sure.

THE COURT: Although I may be able to pull up my own copy here. Give me one second.

I'm looking at Exhibit A.

MS. LEE: Yes.

THE COURT: Bates number ending 832.

Am I looking at the right document?

MS. LEE: Yes, your Honor. That's correct.

THE COURT: Okay. And at the top of mine, the top of page 1 of my electronic copy, is Account ID: █████████████ .

MS. LEE: Yes.

THE COURT: All right. Obviously, that's not the entry you want me to look at.

What do you want me to look at?

MS. LEE: The entry is Cell M1896.

THE COURT: Line 1896?

MS. LEE: Line, yes.

THE COURT: Hold on. 1896.

████████ ?

MS. LEE:  Yes, your Honor.

THE COURT:  Okay.  I have it.

And ████████████ is one of the alleged pirates?

MS. LEE:  Yes.  That corresponds with the Merchant Center ID number of that pirate.

THE COURT:  That's the number ending 450?

Oh, no, that's the ad's CID number.

What's the merchant number?

MS. LEE:  The GMC account ID of ████████.

THE COURT:  Got it.

Okay.  So now what am I looking at?

MS. LEE:  Yes.  And if you scroll to column M --

THE COURT:  Before we get to column M --

MS. LEE:  Yes.

THE COURT:  -- columns D and E are offers.

MS. LEE:  Yes.

THE COURT:  What does that mean?  What's an offer?

MS. LEE:  Our understanding is the offer for either the e-book advertising -- this would be how many offers the pirate had sent over -- or paid to Google in order to advertise for their e-books.

THE COURT:  Okay.  And then there's a

dollar figure in column H.  Is that revenue earned?

MS. LEE:  Our understanding is ███████████
████████████████████████████.

THE COURT:  Of ██████████?

MS. LEE:  That is our understanding.

THE COURT:  All right.  So this is not a big-spending client.  Okay.

Now, I've delayed you.  Tell me again which column you want me to look at.

MS. LEE:  Yes.  And the column would be column M called "Account Managers."

THE COURT:  Hold on.

I see that column, and it has ██████ possibly, names in there, or possibly not names.

MS. LEE:  Yes.

Our understanding is that these are usernames of account managers and these usernames go by ██████████ and ████████.

Other similar spreadsheets that show e-book merchants have explained that this column is also called "Account Manager Usernames," and so we understand these to be people.

THE COURT:  Okay.  So this is, perhaps, some version of their name.

MS. LEE:  Yes.

THE COURT:  All right.

And you read this exhibit, the one that you have up on the screen and I have on my little screen here submitted as Exhibit A -- you read this exhibit as telling you that one of the alleged pirates, at least according to this spreadsheet, was matched with ▮▮ account managers.

MS. LEE:  Yes, your Honor.

THE COURT:  Okay.  So that's one out of -- is this one out of the 1,500 or one out of the 20,000-plus?

I have to keep comparing apples to apples here.

MS. LEE:  This would be one of the 20,000, the Merchant Center, and so, yes, that would be our understanding.

THE COURT:  Okay.  And do you have more than one?

MS. LEE:  More than one pirate?

THE COURT:  That you believe had an account manager or a sales rep as you sometimes -- I'm not sure if that's the same position or not.  Sales rep? Account manager?

MS. LEE:  We've been calling them all sales representatives.  But, yes, that is not the only

pirate that we have seen.

In Exhibit B, similarly, we found another pirate that seems to have had an account manager username listed.

THE COURT:  All right.  Let me look at Exhibit B.

Interesting.  Let's see if I can open Exhibit B.

Open read only.  Okay.  I can do that.

All right.  I'm with you.

MS. LEE:  Yes.  In Exhibit B, this pirate is in row 196.

THE COURT:  Row 196.  ██████████?

MS. LEE:  Yes.

THE COURT:  All right.

MS. LEE:  And we found this pirate through column A, the merchant ID number.  And, similarly, in --

THE COURT:  And this also corresponds to one of the 20,000 spots.

MS. LEE:  Yes.

THE COURT:  Okay.

All right.  And let's -- should we go over now to --

MS. LEE:  We can go over to column I.

THE COURT:  Column I.  Why do they keep changing up the columns on you?

Sarjoun.  You think ███████ is an account manager?

MS. LEE:  Yes.

Column I lists the account manager usernames.  And, as you can see, some of these have nulls, so no account manager is our understanding.  But for ████████, this pirate, our understanding is that ██████ was the account manager.

THE COURT:  Okay.  So that's two.

MS. LEE:  Yes, your Honor.

THE COURT:  And how long have you had Exhibits A and B?

MS. LEE:  My understanding is this must have been produced in August of 2025.

THE COURT:  All right.

And, now, the documents that you attach to your moving letter -- well, not the RFPs themselves, but the dockets attached to your moving letter as Exhibit C, D, et cetera, the documents on which you rely to emphasize what these sales representatives may have done --

MS. LEE:  Yes.

THE COURT:  -- when were they received?

MS. LEE:  I would have to take a closer look.  Most of our documents that we had cited in our letter motion was between August to January 6th.

THE COURT:  All right.  And these are custodial or noncustodial documents?

MS. LEE:  These are all custodial documents.

THE COURT:  All right.

All right.  Now, I've peppered you with questions.  Let me give you an opportunity to add anything that you wish to.

MS. LEE:  Thank you, your Honor.

I also did want to mention that our understanding through a lot of the data that Google has produced since August has shown that these pirates would likely have account managers and sales representatives, which include that ███████████ ████████████████████████████.  And --

THE COURT:  What's your understanding of what that means?

MS. LEE:  Our understanding is that a multiclient account -- they operate multiple either Merchant Center or Ads accounts.  And Google's policies have actually stated that ████████████ ██████████████████████████

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

And, in fact, they are ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓.

And so, of our pirates, if ▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ our understanding is some of them may have had communications with the sales teams as well.

THE COURT:  Do all multiclient accounts have their own account managers or sales reps, as you understand it?

MS. LEE:  I'm not certain of that.  The document that I cited to just says, ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓.  And so I don't know if that means that they each had a sales representative or if they had communications with the sales teams regarding their suspensions.

THE COURT:  So if it's the latter, if it's -- let's suppose hypothetically that at least ▓▓▓▓ of these pirates -- and, again, that's ▓▓▓▓ out of the 20,000-plus?

MS. LEE:  My understanding is this would be of the 1,500.

THE COURT:  ▓▓▓▓ out of the 1,500 are MCAs?

MS. LEE:  It's -- sorry.  Thank you.  It's the 20,000.

THE COURT:  That's what I thought.  Thank you.

MS. LEE:  Yeah.

THE COURT:  So that would be about █ percent, give or take.

MS. LEE:  Yes.

THE COURT:  So following your logic, putting pieces together, if ██████████████████ ████████████████████, which meant that they didn't necessarily have a particular sales representative or account manager assigned to them, but they somehow had access to or were encouraged or permitted to interact with a sales team, that means that Google wouldn't know where to look for these communications, right?  They would have to look everywhere.

MS. LEE:  Your Honor, our understanding, actually, is that these communications might all be in one database known as the ██████ database.

THE COURT:  I thought that's the database that was searched.

MS. LEE:  That was searched; however, Google had narrowed their search just to the case

number of the infringement notice.  And so they had only limited their search of the ███ database to -- when an infringement notice comes in, Google receives this case number corresponding to that infringement notice, and that is the only communications that they looked for.

And this would not include communications about account suspensions or account reinstatements because those wouldn't be corresponded just to an infringement notice.

But Google's documents have shown -- this was actually a document produced on January 5th.  We saw that a Google full-time employee was able to look in a ███ database and see all of the communications that Google had with a client that was about to be suspended.  And so our understanding is that it's actually not that difficult of a pull. Google can probably just go into the ███ database and see all the communications --

THE COURT:  Search by what?

Not infringement notice numbers, obviously.

You just said -- if I understand you, what you said is -- tell me if I've got this right:  The search they previously conducted, which was keyed off of specific case numbers that were attached to

infringement notices, would capture communications using that number but might not capture broader communications about, hypothetically, uh-oh, now, you've had too many, are you going to get suspended?

MS. LEE:  Right.

And Google would be in a better position to understand how the ▮▮▮▮ database could be best searched, but we've tried to craft some search terms and have requested more information about the ▮▮▮▮ database.  We sent e-mails about it almost a month ago, and yet Google has not responded or has even acknowledged that e-mail.

And so we are very open to being able to make this a reasonable search for Google, but we have not received any responses on how to best approach that.

THE COURT:  All right.  Anything else you want to tell me before I start peppering Google's counsel with questions?

MS. LEE:  Just one last point was that our understanding is also that Google's documents show that when an account reaches ▮▮▮ strikes but has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

THE COURT:  Well, no.  According to the

documents you cited in one of the motions we haven't gotten to yet, that's when ██████████████████.

MS. LEE:  That's when ████████████████ ██████████████████████████ ████████████████████████.

And I did want to emphasize that ██ of our pirates have ████████████████████.  And so, again, this shows that it is likely that there are pirates that would have communicated with sales representatives or even had sales representatives or account managers.

THE COURT:  That's ██ out of 1,500 or ██ out of 20,000-plus?

MS. LEE:  That would be 23 of the 1,500, I think.

THE COURT:  Because your side just uses the term "pirate."

MS. LEE:  Yes.

THE COURT:  Sometimes you're not clear about exactly what you're referring to.

So here's the thing I'm just not all that clear about.  I understand the first part of your argument, which goes something like this:  Judge Moses, we have reason to believe that at least ████ and quite possibly far more than that, out of the

20,000 merchant IDs -- or I don't want to butcher the terminology here -- had a sales rep assigned. So we would like Google to, A, find out how many of them really did have a sales rep assigned, and then, B, figure out some way of searching for communications between those sales reps and those pirates.

But the most recent -- the last point that you just made about the ▇ out of the 1,500 having over ▇▇▇▇▇▇▇▇▇▇▇▇▇▇, I'm not sure how that maps onto your point about sales reps.  I understand how it maps onto your point about not applying or applying in a more bespoke fashion the ▇▇-strikes policy, but how does it relate to the motion you're arguing?

MS. LEE:  Yes, our understanding is that if these ▇ pirates, which have ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ our guess is that there would have been some kind of communication --

THE COURT:  Right.

MS. LEE:  -- with that pirate.

THE COURT:  So this is -- we are now out of the realm of sales reps and into the realm of we want everything.

MS. LEE:  No, your Honor.  I think we still are targeting sales rep communications.  This was just, kind of, an additional -- there must have been some form of communications by sales representatives because these are high-earning and high-listing accounts.

And so that was our purpose of explaining the ▉ pirates that -- because Google had said that these pirates are just little actors and they wouldn't have had any sales representatives.  But my point in explaining that ▉ pirates had ▉▉▉▉▉▉▉▉▉▉▉▉▉ is that, in Google's eyes, these might not be just little actors, and, in fact, that if they had ▉▉▉▉▉▉▉▉▉▉▉▉, they were ▉▉▉▉▉▉▉▉▉▉▉▉▉▉, which is why we think they might have had sales rep communications.

THE COURT:  I'm just concerned here.  If you haven't figured this out yet -- which I'm sure you have -- I'm concerned about this coming up relatively late in the day, after you had a pretty thorough opportunity to negotiate, basically, the same RFP.  And late in the day, it does look to me like you were trying to restart the clock so you could renegotiate the same RFP all over again, which isn't necessarily fatal.  You know, I look at

substance, not at form.

So if you had reason for reopening RFP 29 and you could convince me not just of the relevance, but of the proportionality merits -- the merits of your proportionality argument as well, the fact that you resent basically the same RFP would not necessarily be fatal, but I am concerned about the lateness of the day, and I am concerned that there appear to be a couple of layers of "what if" in your presentation as to why you think there's something relevant out there.

So let me, now, explain -- or ask Ms. Sampoli what I am worried about on your end.

Do you want to sit or stand?  It's up to you.

MS. SAMPOLI:  If you don't mind, I would prefer to sit, your Honor.

THE COURT:  That's perfectly fine.  One of --

MS. SAMPOLI:  Do you mind if I correct a few -- either I can do it now or do it at some point later.

THE COURT:  Well, let me ask you my first question, and then you can do both in whatever order you prefer.

My first question is, why, in your opposition letter to me, do you explain all these reasons why, in your view, it's not likely that the alleged pirates had sales reps assigned rather than simply going and checking and telling me whether, and if so, how many of these pirates had sales reps assigned?

MS. SAMPOLI:  Your Honor, I think if we had been talking here about one, two or three Merchant Center accounts, we think it would have been relatively easy to go in and find out if there was a sales representative assigned to individual accounts.

I think, in their reply, plaintiffs cite to a document where a user can go and ask Google for the site.

THE COURT:  That's what they say, yeah. They make it sound like you could just sit down and type in a query and pop up the answer.

MS. SAMPOLI:  Yes.  And if only it were so easy on the scale that we're talking about here.

We have been trying to investigate how many of the merchants at issue in this case had sales representatives, and we still don't have a clear picture.  I know that sounds -- it is hard to

understand from the outside perspective.

The issue we're running into is that there are -- it's a large company, there are multiple teams that might be involved in this data pull. There has to be a data pull for looking up sales representatives at this scale, and we're having trouble identifying the right person.

We think, at this point, we understand that sales representatives are connected to Ads accounts, not to Merchant Center accounts.  So it is --

THE COURT:  You think you understand that.

MS. SAMPOLI:  That's our current understanding, based on -- one issue also is that there is a lot of different terminology.  So plaintiffs refer to all of these representatives as "sales representatives."  So it's important -- we're trying to work through, is there a difference between account managers, sales representatives, account strategists?

We think we have landed on the right group of folks.  And they have let us know that these representatives are tied to Ads accounts and can be --

THE COURT:  Okay.

MS. SAMPOLI:  -- then associated via the

Ads account with one or more merchant accounts, but they are not tied directly to merchant accounts.

So that's where we are right now. We -- unfortunately, I don't have a definitive number of how many of these merchant accounts are connected to Ads accounts that are connected at some point during the five-year period to an account representative, but our understanding remains that it is highly unlikely that these accounts -- more than a handful would have had any sort of representation.

Ms. Lee points to this stat about ▮ of the domains having ▮▮▮▮▮▮▮▮▮. In the spreadsheet they sent us -- again, a lot of this specific evidence was put forward on reply, so we haven't had an opportunity yet to respond to it.

But in the spreadsheet they sent at the time that they served their reply, there actually were ▮ domains, not ▮, so I'm not quite sure where the ▮ number comes from. But we looked into the ▮, and we connected those ▮ domains to about ▮▮ individual Merchant Center accounts that --

THE COURT: ▮▮.

MS. SAMPOLI: So we're talking about, like, an aggregate number of Merchant Center accounts that, when all of their offers or ads -- so "offers"

means the same thing as a Shopping Ad.

So when all of those ███ Merchant Center accounts' ads were combined, it rolls up to ███ ████████████████. But each individual Merchant Center account did not have ██████████████. We identified just ████ individual Merchant Center accounts that were tied to ██████████████.

THE COURT: And the trigger where you get ████████████████████████████████ --

MS. SAMPOLI: Is account.

THE COURT: -- is not by domain, it's --

MS. SAMPOLI: It's by account.

THE COURT: It's by account.

MS. SAMPOLI: And again -- and I agree with your point earlier, that ████████████████ ████████████████████████████, but it's not at any -- in any direct way.

THE COURT: It doesn't automatically merit you a sales rep.

MS. SAMPOLI: Correct.

And, similarly, our understanding is that multiclient accounts, there's no -- if you are a ████████████████████████████████ ██████████████.

So taking a quick step back, I think this

entire request, this -- it is based on speculation that these accounts had sales representatives, and, two, would have communicated with them about their infringements.  And I think it is --

THE COURT:  And your point there, if I understand it, or one of your points there -- I get this, I guess, from your opposition letter -- is these accounts were pretty shady to begin with.

These were folks whose business model, if they were in danger of being suspended, wasn't to hire a large New York law firm and fight it, it was to disappear and reappear under another name.

MS. SAMPOLI:  Correct.

And I think that's plaintiffs' theory of the case, and it's what led to the dispute and order about related Ads merchants in December 2024.

I believe they said at the December 2024 hearing that the individuals who run these accounts create multiple accounts to hide their infringement so they can go undetected.

It's implausible to -- under plaintiffs' theory of the case, to Google's understanding of how these accounts operated, that these same accounts that are -- or same users who are trying to go undetected and are hopping from account to account

would have, one, had sales reps in the first place, but even if they did, would have reached out to them or been in communication with them about those infringements.

THE COURT:  Okay.  What about the ▇ concrete examples that Ms. Lee showed me on those two spreadsheets we looked at on the screen, Exhibit A and B that they submitted?

MS. SAMPOLI:  Yes.  So those -- it does appear in those documents that there is an account manager connected through, we understand, probably the Ads account that then is connected to the Merchant account.

So we -- it may be that there are a handful of merchant accounts that, through their Ads account, have an account representative, but we still don't think that supports plaintiffs' broad request for communications that would have anything to do with this case.

THE COURT:  Well, if you think that those ▇ were connected to -- what do you call it?  An account manager?

MS. SAMPOLI:  Yes.

THE COURT:  I have to pull that back up again.

Yeah.  The column -- on Exhibit A, the column is called "Account Manager."  And the alleged pirate in question, ██████████, is connected in some way, according to Exhibit A, with ████████ and ██████.

Did you check for those?

MS. SAMPOLI:  We did not check specifically for these ███.

Again, this was presented in plaintiffs' reply.  And we also -- I don't know if we have the -- this is, I think, a suspended account.  It would reflect historical information.  So I don't even know --

THE COURT:  I'm sorry.  It would reflect what?

MS. SAMPOLI:  Historical information.

THE COURT:  Right.

MS. SAMPOLI:  So I'm not even sure that there's -- you know, you can go in and search on a -- even on an individual basis for historical accounts.  I don't know.

THE COURT:  In the ██████ database.

MS. SAMPOLI:  So I don't think that this information about if a sales representative is assigned would be in the ██████ database.  And

that's -- thank you.  But that's another point I wanted to correct.

So our understanding, based on discussions with our client --

THE COURT:  Well, to be more precise, I think what Ms. Lee told me was that you could search the ███████ database for communications between the sales reps and the pirates if there were any and if you knew what you were looking for.

MS. SAMPOLI:  Unfortunately, that's not where communications with sales representatives live, under our understanding.

We checked with our client, and it may be that customer support communications might be in ██████, but communications with sales representatives are not.

The document that Ms. Lee pointed to is not in any of the papers.  It's in an e-mail that she sent on Friday.

THE COURT:  I'm sorry.  Which document?

MS. SAMPOLI:  The one that she was referring to earlier where she said there was an -- I think, an e-mail produced in January that showed communications are stored in █████.

THE COURT:  Ah.

MS. SAMPOLI:  So you don't have it.

THE COURT:  That explains why I don't have it.

MS. SAMPOLI:  Correct.  It was not raised to us until Friday.

But all I see in the document is -- ███

███████████████████████████████████████████

███████████████████████████████████ .

I don't see anything in this e-mail that says definitively that communications with a sales representative are in ██████ .  And, in fact, that would be entirely inconsistent with our understanding based on communications with the client.

THE COURT:  All right.  Anything else you want me to hear, Ms. Lee?

MS. LEE:  Your Honor, I do have a copy of this document, both for the Court and for opposing counsel, if --

THE COURT:  Show it to opposing counsel first, and then you can hand it up to Mr. Aiello.

Thank you.

All right.  So I am looking at a document that does not have a Bates number on it for some reason.

But for the record, I will identify it.  It appears to be an e-mail sent 6-8-2023 at 3:36:44 p.m. from -- let me spell it -- ███████████.  I'm sure that's enough to identify the document for future historical purposes.

Now, what am I looking at this document for?

MS. LEE:  Yes, your Honor.  And I'm sorry about the Bates number.

This Bates is G -- GOOG-CENG-00602203.

THE COURT:  I'll take your word for that.

MS. LEE:  Thank you.

This document --

THE COURT:  This is a document that was produced in January; is that right?

MS. LEE:  Yes.  January 5th.

THE COURT:  Okay.  And what am I looking at in it?

MS. LEE:  This is actually one of the Buganizer notification tickets.  And it appears that there has been a problem with a Google Merchant account, and a reviewer had created a bug ticket for it.

THE COURT:  Okay.

MS. LEE:  And what we can see in this

document, in the paragraph that starts with "Additionally," it says, "███████████████

██████████████████████████████████

████████████████████    ███████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████."

And they explain what the ████████████

████████████████████████.  But the first two sentences I wanted to point out is that this reviewer can open ██████, and it says, "████████████

████████████████."

They were able to see the correspondence and the statements that the sales team made to this advertiser.  And so --

THE COURT:  So this tells you -- obviously, this case is not about mopeds that go too fast.

MS. LEE:  Right.

THE COURT:  Although, I completely agree that mopeds that go more than 25 kilometers an hour are a danger and should definitely be kept off the bike paths in New York City.

MS. LEE:  I agree.

THE COURT:  But that aside, you point me to

this document not because of the moped policy, but because this person, whoever this person is, made a reference to statements of the sales team, and you are putting his language together to reach the conclusion that those statements were viewable in ████.

MS. LEE:  Yes, your Honor.

THE COURT:  That's the point of this document.

MS. LEE:  Yes.

THE COURT:  Okay.

MS. LEE:  And so this document shows that -- our understanding, again, is that these correspondence can be viewed in ████.  And we think that if Google runs searches of either Merchant Center ID account numbers or Ad account ID numbers through this ████ database, it could be a very feasible search for Google to do in order to pull up these sales rep communications.

THE COURT:  If any.

MS. LEE:  Yes, your Honor, if any.

THE COURT:  If any.

MS. LEE:  And --

THE COURT:  Sorry.

MS. LEE:  Oh, sorry.

And my last point was really that Google, in their response, has tried to distract from the real, true relevance of these communications.

Ms. Sampoli had referenced that these communications would not even really be important, but we have seen that these sales representatives ███████████████████████████████ ████████████████████████████████ ██████████████████████████████ ███████████ .

So what that means is if --

THE COURT:  But you haven't seen that with respect to the pirates at issue here, right?

MS. LEE:  Right.  We don't have these communications.

THE COURT:  Where have you seen that, then?

MS. LEE:  We have seen them in the context of other policies.  So this moped policy might be an example.  And --

THE COURT:  But that's not the way I read this communication.

Now, I realize this is a single example, and, you know, if folks are negotiating with these merchants on a one-off basis, they're not going to be cookie cutters.

But certainly, here, the Google personnel who's writing this particular e-mail is ████████ ███████████████████████████    ████████ ████████    ██████████████████████████████, █ ████████████████████████████████████████ ███████████████ .

MS. LEE:  Yes, your Honor.  And I think that is maybe not the best example to explain the sales representative -- importance of the communications.

But our exhibits have, in the letter motion, explained that if there is a policy violation or even a copyright infringement complaint that comes in, Google sales representatives ask Google Trust and Safety, ████████████████████████ ████████████████████████████████ ██████████████████████ ?

And they ask for ████████████████ ████████████████████████, and they ask for ████████ ██████, and they ask for ██████████████████ ████████████████████████.  And if --

THE COURT:  I think what you mean is they can do those things.

MS. LEE:  They can do those things, yes.

THE COURT:  According to policy documents.

MS. LEE:  Yes.

THE COURT:  Or to use the verb form in your moving letter, they "may" have done those things.

MS. LEE:  Yes.

THE COURT:  Okay.

Thirty seconds, Ms. Sampoli?

MS. SAMPOLI:  Yes.

The only thing I will add is -- and this is a point we made in our opposition -- a lot of the documents that plaintiffs cite are examples of communications between sales representatives for unrelated accounts and members of the Trust and Safety Team who are custodians in this case.

Our point is that we've already run searches for those custodial documents.

THE COURT:  And they would show up, you think -- you say.

MS. SAMPOLI:  And they would show up, and they don't.  And that's evidence that there just aren't these -- the hypothetical communications that plaintiffs are pointing to do not exist.  And we highly doubt that they exist, even if a handful of the accounts may have had sales representatives assigned at one point in time.

THE COURT:  All right.  Thank you, both,

very much.  I appreciate it.

I am denying the plaintiffs' February 18, 2026 motion to compel additional searches and produce any resulting communications between, in particular, Google sales representatives and account managers and the 1,500 alleged pirates.

Plaintiff has, in my view -- plaintiffs have, in my view, not adequately made the case that there are relevant and discoverable documents to be found as a result of the additional searches that the plaintiffs are recommending.  And while there is always some possibility that, if you do more work and look in more places and run more searches, you will come up with relevant and discoverable documents, the hypothetical possibility of that result is not enough for a motion to compel.

And as we have discussed at least once, possibly more than once in our prior discovery conferences, the further along we get in the discovery calendar, in my view, the stronger threshold showing the plaintiff is required to make in order to expand the scope of discovery, which is already quite broad and quite deep in this case.

So there is a proportionality analysis, sort of, tucked in there as well.  It is not, in my

judgment, worth it at this point, so that motion will be denied.

I think what we should turn to next -- I'm saving the privilege motion for last, so I would like to turn next to the plaintiffs' February 24th motion seeking discovery on discovery.

Is that you, Mr. Kane?

MR. KANE:  Yes.

THE COURT:  All right.

Let me just start you off by reminding you of something that I'm sure you're well aware because every lawyer in this room, I'm convinced, has now read every discovery order that Judge Moses has ever issued.  You're reminding me of some opinions that I haven't thought about in years, and now here they are being cited back to me.

But among various things that I have said about discovery on discovery over the years, I have expressed the view, as has just about every one of my colleagues in this courthouse, that discovery on discovery is disfavored.  We don't go there first. We go there if we have to, as a last resort when things are really quite dire.

So, Mr. Kane, are we there?

MR. KANE:  Absolutely.  And I would point

out it's not just discovery on discovery that we're seeking. It's also -- we want to actually address some of the gaps in Google's production.

I think what you and your colleagues have said about discovery on discovery, as you put it, is that you have to have a factual basis for it. In other words, it's not that we never ask people to explain what they did in searching for documents, it's that you have to provide a factual basis for it. Here, there absolutely is a factual basis for it. First, there are very important topics on which Google has produced almost nothing.

One is the ██████████████, which is to say they claim that, for certain ██████████████ ████████ -- and two of our plaintiffs were ██████ ████████████████████████ -- that ████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████.

There are documents that literally say there's a ████████ spreadsheet that has a list of all these domains that these ████████████████████ have sent notices about. We don't even have that

spreadsheet.

THE COURT:  Well, that could mean one of two things, right?

It could mean that there was a problem in either the retention, the search, or the production of relevant documents, or it could mean that there aren't any documents there.  And that helps you, doesn't it?

Now, you get to stand in front of the jury on some future hypothetical date and say, they were supposed to treat my clients better than this.  They were supposed to apply a ████████████████ and they didn't.

MR. KANE:  The problem is there's documents where they say, like, I've added it to the tricks, the spreadsheet.  And we don't have the spreadsheet.

So it's not that, like, there's this policy out there and it seems like nobody followed it.  Like, it seems like people were following it, and we don't have the documents.

But the first part of what you said, I think, is more germane to this argument, which is it appears that documents like this were deleted.

A couple other things, a couple of other areas where we just don't -- we don't seem to have

documents.

Google ran a search for the 30,000 Merchant Center IDs and Ads account IDs. It produced ▇ documents. That's just, sort of, implausible that there would be so few references to these pirates.

THE COURT: All right.

MR. KANE: Another --

THE COURT: Let me add a third possibility, then.

I said there were two reasons why you have fewer documents than you think; one is that there's some problem with the search and production, and one is that there's no there-there.

But what you're pointing to now as the possibility is that there were once documents there, but that they were deleted prelitigation, correct, due to a document retention policy that didn't keep the documents that you hoped to see?

MR. KANE: Correct. And it's --

THE COURT: Now, that's not necessarily a problem, is it?

MR. KANE: It's not that we're saying there's some misconduct in them having a document retention policy that deletes documents after a certain amount of time if they're not on a

litigation hold.

What we're saying is we need the document retention policy to see what happened; in other words, if the document retention policy is we delete everything after 14 days, unless you, like, put it in a certain folder or mark it "not delete."

Well, that tells us a lot about why we're not seeing documents on these things. I would point out the discovery on discovery we're seeking isn't much. We're saying we want the document retention policy and we want a hit report that just says, for each search term, each custodian, how many hits was it.

THE COURT: All right. So let's break that down a little bit.

MR. KANE: Sure.

THE COURT: Document and data retention policies.

If you were suing the neighborhood florist, the document retention policy would probably be, if it existed at all, an e-mail that somebody sent to somebody else at one point saying, let's set our system to delete after 30 days.

But we are talking about Google here. There is not going to be a single piece of paper

that tells you what their document and data retention policies were across these vast and varied databases, right?

MR. KANE: Okay. So they've actually told us, with respect to Ads data, which is extremely important in this case -- it's, you know, the actual infringing -- the infringing thing that Google did.

They have told us that, for Ads data,

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████ ."

THE COURT: Right.

MR. KANE: So they've got one for Ads data. They've probably got one for e-mails and chats and Buganizer and all those kinds of things. They probably do have a policy that says --

THE COURT: That may be.

MR. KANE: -- look, if you don't delete it, if you don't put it into a folder, or if you don't do something with it, it's automatically getting deleted after -- whatever the number is -- 14 days, 40 days, whatever it is.

So I think they probably do have those. We're not asking for every document retention policy with respect to everything at Google; just the ones

that would affect --

THE COURT:  Well, let's be specific.  You are asking for their document retention or data retention policies for Ads data, e-mail, Buganizer, and what else?

MR. KANE:  Just chats, the communications that these -- the 18 custodians in this case would have had.  So the e-mails, the chats, the Buganizer tickets; what is the document retention policy with respect to those?

And as discovery on discovery requests go, this is not a large one.  We're just saying we want the document retention policy, policy or policies, when they --

THE COURT:  And when did you first ask for these document and data retention policies?

MR. KANE:  I think the first time this came up, sort of, officially was when they told us the information about the Ads data.  And that was July of 2025, I think -- I'm sorry, July of -- yeah, July of 2025.  And, I mean, if you think about it --

THE COURT:  Did you ever send a document demand asking for the document and data retention policies?

MR. KANE:  I believe we have an RFP about

it from our first RFP in November of 2024, but I'm not positive.

THE COURT:  Maybe Ms. Lee can -- she's looking now, I can see -- can find that for us.

MR. KANE:  And I believe their answer was that they wouldn't produce their document retention policy.  So if you're wondering what --

THE COURT:  They told you that in July or August or ...

MR. KANE:  They told it to us in July when we asked for it, and I think they told it to us in response to our original RFP in November of 2024.

THE COURT:  Ah.

MR. KANE:  I'm pretty sure that -- I'm pretty sure that's right.

THE COURT:  So you think you asked right at the beginning?

MR. KANE:  I believe so, yeah.

THE COURT:  And they said no.

MR. KANE:  I believe they said no, yeah.

THE COURT:  And then you asked again in July of '25?

MR. KANE:  That's correct.

THE COURT:  And they said no.

MR. KANE:  We asked for the Ads data

specifically, yeah.

THE COURT:  And now you want it.

MR. KANE:  That's correct.

At the time, in July of 2025, we didn't feel -- you know, as your Honor's decision says, you need a factual basis in order to seek discovery on discovery.  We didn't feel we had a plausible enough case at that point, but now we have, sort of, the accumulation of all these different things.

THE COURT:  Okay.

MR. KANE:  So in addition to the Ads data deletion policy that we talked about and the gaps in the production that we talked about, Google deleted a specific e-mail.

So we got an e-mail from a third party, the American Association of Publishers, that has two of the custodians in this case on it, Chelsea Fine and Jason Szczech, and it's on three of our search terms.  We got it from AAP.  We never got it from Google.

When we asked them, why didn't this come -- why didn't you produce this, it's in --

THE COURT:  They said it wasn't -- it was not retained under the relevant policy.

MR. KANE:  Exactly.

So we think that's a -- that combined with the Ads data, combined with the gaps in the production are more than sufficient as a factual basis for saying we want the document retention policy.

THE COURT:  All right.

Let's move -- and, Ms. Lee, you can interrupt me when you've got something, if you find the RFPs.

The next thing you want is a hit report regarding all search terms and custodians.  Plus -- it's not just the hit report or reports.  It is identify all sources and databases that Google searched.

Now, you have been going back and forth on hit reports for as long as you have been doing document discovery.  And I can think of a couple of instances where I myself have required that a hit report be generated and shared in order to assist the parties in negotiating search terms and so on, but I think this is the first time -- I think this is the first time I've been asked formally, towards the end of the document discovery period, to require the other side to produce its entire universe of hit reports which, for some reason or another, were not

generated and/or not shared when the discovery was actually happening.

If you thought hit reports were important, why didn't you demand them all along?

MR. KANE: We have been demanding them all along and they won't give them to us. The two --

THE COURT: Yes, but you didn't bring it to me.

MR. KANE: I think at most of these hearings --

THE COURT: You didn't bring it to me until now.

MR. KANE: Pardon me.

I think at almost every hearing where we've been, we've said, we need a hit report, and they won't give us one.

THE COURT: For a specific thing, yes, but this is the first time you have said to me, we need everything. The whole --

MR. KANE: Well, because --

THE COURT: -- last year and a half has been flawed.

MR. KANE: Because we're now purportedly at the end of the discovery period and we still don't have everything and we're trying to figure out why.

The two hit reports that they have given us were very revealing.  One of them, they omitted the entire middle part of one of the search terms, and there were some very important terms in the search term that they omitted.

The second one, they had run the wrong term.  And not only had they run the wrong term, they had come to court and told the Court that -- given the Court a hit report on the term which was the incorrect term that they had run.

So the two times we have --

THE COURT:  And then they ran the right one, correct?

MR. KANE:  And then they ran the right one.

But the search results they reported for the incorrect term don't make any sense.  They said it was nine hits.

When you run the search -- that incorrect search term against just the documents that they produced -- so not all the documents they had, but just the ones they produced -- you get ten results. They have never explained why it is different.

So --

THE COURT:  Well, you said ██.  They said ██ in your database.

MR. KANE:  But we agree ▮ is the right number.  They have never told us why --

THE COURT:  Why did it say ▮ the first time, then?

MR. KANE:  So our data expert will be delighted -- in fact, eager -- to testify in deposition --

THE COURT:  Right.

MR. KANE:  -- as to how messed up Google's data is and why no logical person would have kept it the way Google kept it.

THE COURT:  Well, look --

MR. KANE:  And that's why we got the wrong number.

THE COURT:  Okay.  Let's assume that that's right, that Google is a mess.  It's some kind of Rube Goldberg-esque device.  It's been jerry-built too quickly.  It's not -- I don't know.  Maybe it's like certain federal statutes that Congress just can't get their act together to turn into something workable, so they exist in the form that they exist.

MR. KANE:  You're nailing it, Judge.

THE COURT:  Let's assume all of that is right.  That's, kind of, too bad.  I mean, you don't have a cause of action against Google for not having

a better-organized database, right?

You have to live with the data sources that you have.  And if those data sources are such that even a good-faith effort by competent counsel occasionally produces mistakes, that happens. That's life.  Life is not perfect.

MR. KANE:  So two things I would say.  One is, all we're asking for is a hit report and where they searched.

Like, it's not like we're saying they need to go back and fix all these systems.  Like, we just want to know, like, how bad is it?

Like, did they make any other vendor errors that they didn't know about until we told them about it?

Did they run the wrong search term on any other --

THE COURT:  So you, now, want to see, retroactively, after all these searches have been completed, after the hits have gone through whatever review process -- whether it's a relevance review, a privilege review, whatever -- you want them, now, to go back and regenerate all the hit reports you didn't see at the time because you now suspect that maybe they didn't run the right terms or maybe they

didn't run them across all of the right databases.

MR. KANE:  We want to see, for example, when they only produced ▮ documents for Jason Szczech, who we think is a very important custodian, is that because, when they ran the search terms, only ▮ documents came back?  Or did ▮▮▮ documents come back and they thought only ▮ of them were responsive?

Or when they ran Search Term 5, did they run the wrong search term, as they did with Search Term 7?  We just want to see if we can tell what happened.

The other point I would make, your Honor, is, I agree, in the ordinary civil case you, sort of, take the availability of the documents as you find them.

This case is different in that Google has this massive defense that they're trying to offer where they're trying to say, our DMCA program, the whole program -- not just with respect to plaintiffs but the whole program was reasonably implemented.

The burden is on them to prove that defense.  And so if they're not keeping the data for that program in a way that it's digestible and understandable to a court and to a jury, that is on

them.  They are the ones who have to prove this defense.  And so I think it --

THE COURT:  Yes.  But as we previously discussed, this helps you.  This doesn't hurt you.

They do have the burden of proof on the DMCA affirmative defense.  If they can't prove it, you win, right?

MR. KANE:  I hope you're right.  The problem is you might not be.

So, for example, with the Ads data -- the problem, for example, with the Ads data, like, they're saying -- think about this:  ███████████ █████████████████████████████████ ████████████████████████████████████ ██████████████████    ████████████████ ████████████████████████████████.

That doesn't help us.  We can say it to a jury, but that -- the pirate who they're saying only gave them ██████████████████████████    in revenue during the period and ██████████    over the course of his lifetime, he might actually have given them another ██████████, and they just don't know because they deleted all that data.

The deletion of the data hurts us, not helps us.  Same thing with all the e-mails.  We know

that Chelsea Fine and Jason Szczech didn't keep the AAP e-mail where they're saying to AAP, we're going to try to work with you to create the thing that you're all asking for, which is an allow list where legitimate publishers will be able to advertise but pirates won't.

We only know about that because AAP knew about it.  There could be 100 other e-mails that got deleted that we don't know about.  So, most likely, the deletion of all this stuff hurts us, not helps us.

All we are --

THE COURT:  Could you maybe step back a little bit from the microphone.

MR. KANE:  I'm sorry.

THE COURT:  Your volume is a little much for me here.

Thank you.  Go ahead.

MR. KANE:  All we're saying is we want to understand the scope of potentially what was deleted, and that's why we want the document retention policy.

If they turn over their document retention policy and their policy is, we delete things after two years, unless you move them into a folder or

whatever, that's a lot different than if they turn over the document retention policy and it says what it says for the Ads data, which is, ████████████ ████████████████████████████████████████ ██████████████ .

THE COURT:  Right.

And if the policy comes back and says two years, then you're going to have follow-up questions and Requests A, B and C, whereas if the policy comes back and says 30 days, then you're going to have a different set of follow-up questions and requests, correct?  G, H, I?

MR. KANE:  I'm sorry.  I don't know the acronym.

THE COURT:  I'm just wondering what step two is after you receive these document and data retention policies.

Are we opening the door to yet another multistep discovery investigation?

MR. KANE:  I think one of the biggest things we'll be able to do is to ask informed questions at depositions.  So if we say to some -- you know, let's take an example.

We've discovered that there was this ██████████████ , they've called it, where ████████████

███████████████████████████████████████████

████████. So we'll ask the people in -- we'll ask the people who were involved in a deposition about this, and we will ask the standard deposition question: Did you get any e-mails? Did you send any chats? Whatever.

If they say, like, yeah, I sent a whole bunch of them --

THE COURT: And you don't have them.

MR. KANE: -- and we don't have them, we can say to them -- if the document retention policy says, for example, you have to move it into a folder or it will get deleted, we can ask them, did you move it into the folder? Or we can ask them, where were those communications?

THE COURT: All right. So just a little bit of a reality check here.

You want this discovery before you take depositions, right? But you also don't want me to extend the deposition deadline beyond May 6th.

MR. KANE: Well, for the document retention policy, I mean, that shouldn't take very long. They should have this. It would be a little disturbing if they didn't.

THE COURT: Right. But that's only one

item on your list of --

MR. KANE:  Well, the hit report shouldn't take them long either.  They are going to need a discovery vendor, just like every sophisticated litigant does.  They will send an e-mail and say, we need a detailed hit report, and they will have it in a day or two.

THE COURT:  All right.  And what about the hit reports?

The hit reports aren't just to inform your deposition questioning, correct?

The hit reports are to see if Google screwed up in producing documents and if -- Google in searching for or producing documents.

And if, as a result of the hit reports, which you did not insist upon until now, you find that additional questions are raised, there's going to be a step two, a step three, a step four, correct?

MR. KANE:  Potentially.  I mean --

THE COURT:  You would be back in front of me saying, rerun the search with the right connectors, not the wrong connectors, or whatever it is.

MR. KANE:  Well, if they ran the wrong

search, then, yes, we would be.

THE COURT:  Sure.

MR. KANE:  I mean, hopefully, we wouldn't have to come to court for this.  Hopefully, they would just do it.

But, I mean, when we noticed the first time that they had run the wrong search term, our Search Term 7, initially, they refused to run the right one.  They said, hey, we already reviewed these documents, we're not going back.

We had to threaten to file a motion in order to get them to run the right term.

But, similarly, what we discovered from prior things like this -- for example, there were 500 documents in the January 6th production that should have been in the August 15th production because they hit on the search terms and the custodians that were teed up for the August 15th production.  It took a month, but they went back and figured out why it happened, and they produced another 117 documents.

So it could be something like that, where, like, once we point the error out to them, they can correct it and get us the documents that we need.

It is possible that there would be

additional discovery that we would need, but I don't think that's a basis to say, we're just going to hide and not look at the hit report to find out what might be in there or not look at the document retention policy to find out what might be in there.

THE COURT: The episode that you just recounted to me where they ran the wrong search terms and then they ran the right search terms, that happened when?

MR. KANE: So the ▮▮▮▮▮▮▮▮▮▮▮ one, I think the hearing or the order on that was in December.

THE COURT: But when did it come to your attention? Much earlier than that, right?

MR. KANE: We asked them for the hit report immediately after the hearing, which -- sorry.

So they were ordered to do it in October. At the October 14th hearing, they said they had run a hit report that night. So October 14th, we said, please send us the hit report that you referenced to the judge. They wouldn't give it to us.

Later, in an e-mail -- I'm going to say it was October or November -- they mentioned in the e-mail that they had run the term "▮▮▮▮▮▮▮▮ ▮▮▮▮▮." And we said, that's not what the Court

ordered.  The Court ordered "███████████."

So after that -- I think it was in January that they actually, like, gave us the hit report that shows the wrong search term and the right search term.

So, I mean, once they gave us the hit report, we were able to correct the error.  Just like, you know, once we had the documents from the January 6th production, we were able to compare -- you know, run the August 15th custodians and search terms on them, find the error, and Google was able to correct it.

So, I mean, I hear what you're saying, that there could be additional discovery that has to happen once we get the hit report and the document retention policy.  But I think the way to deal with that is to produce the hit report and the document retention policy, and then your Honor can use your judgment to say what additional discovery, if any, is appropriate, or the parties can use --

THE COURT:  Depends how far out I have to push the discovery deadlines.

MR. KANE:  We are the last people to ask for an extension of these discovery deadlines.

THE COURT:  Yeah, but you can't have it

both ways.

MR. KANE:  What?  That the -- as I said, the --

THE COURT:  If you want me to send Google back to pull out more documents, produce more discovery which might, then, be a foundation for yet more document discovery, and if everybody still agrees that witnesses should only be deposed once, you can't have it both ways.  You can't have more document discovery and hold on to the May 6th fact-discovery deadline.

MR. KANE:  I think it depends on what you're ordering.

So, like, what we're asking for today is the document retention policy, the hit report and two custodians.

THE COURT:  Now, let's talk about the two custodians.  Make me your pitch.

MR. KANE:  Okay.  So, as I said, there --

THE COURT:  How many custodians does Google have so far?  Catch me up.

MR. KANE:  It's 18 custodians; three or four of which are Listservs as opposed to, you know, actual people.

THE COURT:  Okay.

MR. KANE:  So, as I said, there have been some significant gaps in Google's production.  One major gap is just the, sort of, fundamental question of why were pirate ads getting through for the four-year period at issue in this case?

Starting in May of 2021, they were supposed to have a ban on all e-book ads, and yet e-book ad after e-book ad was getting through.

Mr. ████████, the custodian we've asked for, is the person Google turned to -- Google's Trust and Safety group turned to when they wanted to know, "████████████████████████████████ ████████████████████████"

And in the same chain, they say, "██ ███████████████████████████████████████ ██████████████████████████████████ ███."  Meaning ████████ and this other engineer.

Similarly, when they wanted to know how to measure what percentage of e-book ads on the platform had been taken down, they asked Mr. ████████.  When they wanted to know, is it possible to do "████████████████████████ ████████████████████████████████," they asked Mr. ████████.

So one of the major issues in this case is

just why did this keep happening.  And almost all the custodians we have -- in fact, all the full custodians that we have are from outside of the Engineering group.  They're from the Trust and Safety group.

And what we think we need is an Engineering custodian who would fill this gap and say this might be why the ads were getting through.  And we think that might be either Mr. ███████ or someone from the ████ group, which is the second custodian we have asked for.

THE COURT:  Is ████████ in the ████ group? That's capital -- all capital, ████████.

MR. KANE:  No.  He's an engineer, but not part of the ████ group.

THE COURT:  Okay.  Now, you negotiated with Google over ████████ as a potential custodian about five months ago, correct?  In October?

MR. KANE:  Correct.

THE COURT:  And at that time, as I understand it, you agreed to accept a different individual, Mr. Szczech -- S-Z-C-Z-E-C-H -- instead; is that right?

MR. KANE:  No, that's not correct.

So we agreed to take Szczech in an exchange

for not seeking Mr. ███████████████████████.  And Google actually admits this in paragraphs 9 and 11 of their declaration.  Even though they say in their brief that we agreed to trade Szczech for ████████, that's absolutely not the case.  We agreed to trade Szczech for ████████.

THE COURT:  Okay.

MR. KANE:  It's right -- they admit it in their declaration.

I should, sort of, clarify.  The reason we're asking for these custodians is, now that we have what is supposed to be a full production, it's clear that something is going on.  Whether it's that stuff has been deleted pursuant to the document retention policy or that there's been an error in -- you know, a vendor error like there was with the 500 -- with the 600 documents that Google didn't produce initially, something is happening in this production that there are significant areas where we are not seeing documents.  We think ████████ is a person who can fill some of those gaps.

It's a little different from the ordinary custodian request where we say, you know, this is what this guy would do and why and that kind of thing.  Like, the point of this is not he's

non-duplicative.  In some ways, the point is he is duplicative because we think we're not getting the right documents from the folks who we thought we were going to get them from or who Google told us we were going to get them from.

THE COURT:  And maybe if those folks deleted their e-mails -- Mr. ███████ didn't delete his half of the conversation.

MR. KANE:  Precisely.  Yeah.

THE COURT:  Maybe.

MR. KANE:  That's another area in which a document retention policy might help us to understand.

With respect to a ██████ custodian, another major gap in this case is why weren't these ads coming down?

So to put that in context, there were 16,000 instances in which we noticed an ad.  So we said to Google, this ad is infringing, please take it down.  And we saw the same ad more than a week later, so Google hadn't taken it down.

There were 6,000 instances in which we sent an infringement notice to Google.  Google said, okay, we'll take down that ad.  And then we had to send a second notice to Google because they hadn't

taken down the ad.  And Google, again, said, okay, we'll take down the ad.

Something was going on.  For some reason, these ads weren't getting taken down.  And we've really received almost no documents indicating why that might be the case.

So ████████████, was in charge of something called the ███████, which is the system that Google uses to actually take down Shopping Ads. And what we've just learned in January is that there were a whole bunch of problems with the ███████, which is what █████ was in charge of.

For example, there's a June 2024 document, so the very end of the relevant period here, where █████ says the ███████ is ████████████████████████ ████████████████████████," and suffered from "████████████████████████."

So this is the tool that they're actually using to take down the ads, and they're saying it has all these problems.  They actually estimated that it would take ████████████████████████ ████████████████████████ ████████████████████

THE COURT:  And this document is attached to your reply letter, is it?

MR. KANE:  This is -- I don't think we attached this one.  I can pull it up if you would like.  It's Bates ending 477908.

MS. TOMKOWIAK:  Your Honor, can we just jointly ask the individual in the courtroom to identify himself?

We're just discussing a lot of confidential information, and we just want to --

THE COURT:  He's my law school intern.

MS. TOMKOWIAK:  Okay.

Welcome.  Hi.

Thank you.

MR. KANE:  So this is the document we were discussing a second ago.  It's Bates ending 477908.

THE COURT:  All right.  And this was or was not submitted with the letter motion materials?

MR. KANE:  We didn't attach this one.  I believe it is cited, though.

THE COURT:  All right.  So you better blow it up so I can see it.

This is a document that was produced in January?

MR. KANE:  Correct.

THE COURT:  All right.

MR. KANE:  So --

THE COURT:  It's a custodial document.

MR. KANE:  Yep.

So ▮▮▮▮ is the engineering group that we're talking about.  The document is called "▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

And under where it says "Background" --

THE COURT:  Now, this is a draft of something, obviously, because the margin is full of comments.

MR. KANE:  Correct.

It says, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮" -- that's the tool that they use to take down Shopping Ads -- "▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

And it goes on.

THE COURT:  Right.

Do you have the final version of this?

MR. KANE:  That has not been produced, as far as I know.

THE COURT:  Sometimes things never quite get finalized.

MR. KANE:  That could be.  Or it could have been deleted pursuant to the document retention policy that we don't have.

THE COURT:  All right.  So this tells you,

oh, gosh, we need to look further into, essentially, the technical issues here.  Maybe that's why you say -- possibly, maybe that's why we were not able to get all these ads taken down.

MR. KANE:  Yeah.

In other words, one explanation for why we saw so many ads that Google said they would take down but didn't -- or so many ads that, you know, were clearly for e-books that weren't taken down might be that this ▓▓▓▓ had the problems they're describing.

This is the second quote I mentioned from page 7911, where they estimate that it will ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

So this is the gap that we're hoping the ▓▓▓ custodian -- ▓▓▓▓▓▓▓▓▓▓, would be our first choice -- can fill.

THE COURT:  Now, you -- I'm sorry.  You have a particular ▓▓▓ team member in mind?

MR. KANE:  That's correct.  It's ▓▓▓▓▓▓▓▓ ▓▓▓.

THE COURT:  And what was he in ▓▓▓?

MR. KANE:  I don't know his exact title, but Google actually named him in their interrogatory

responses as a person most knowledgeable about the technical abilities of the system that they use to process infringement notices, which is to say --

THE COURT:  And you would make him a full custodian using the customary search terms, or you would want something bespoke for him?

MR. KANE:  We're fine with the customary search terms.

THE COURT:  Okay.

MR. KANE:  He was also listed as a person knowledgeable with processing infringement notices and suspending merchants.

THE COURT:  All right.  And as between Mr. ████████ and Mr. ████, who would be your first choice?

MR. KANE:  Mr. ██████.

THE COURT:  All right.  What else do you want to tell me?

MR. KANE:  I would just point out, with respect to the Engineering group, generally, which would be both Mr. ████████ and Mr. ████, another document that Google produced says that when infringement notices come in -- and we didn't know this -- "████████████████████████████████████████ ████████████████████."

What we're understanding now is that the Engineering group is a lot more involved than we thought they were.  There's even a document where the Engineering group says that they think Trust and Safety ████████████████████████████████ ███████████████████ .

THE COURT:  I think that's not quite a fair reading of where that comment was coming from, that particular comment.

MR. KANE:  No.  I think the Engineering group is saying, ████████████████████████ █████████████████████████████ .  I take the point Trust and Safety might not agree, but for Engineering to say that tells us something.

The only point I'm making is the Engineering group is extremely important to this.  I mean, that's an amazing thing.  █████████████ ████████████████████████████████████ , and we don't have a single Engineering custodian, except one guy on whom they've only run targeted searches and haven't said anything about what those targeted searches are.  I mean, that's a big deal.

THE COURT:  All right.  What else?

MR. KANE:  One other thing I would say is just the ████ Team -- another major gap in the

production is the notion of reinstatements, which is to say folks who have been suspended for copyright infringements being reinstated for some reason.

We have almost nothing on what is the appeal process that someone goes through in order to become reinstated, how many people are reinstated, et cetera.

Engineering was responsible for "████████████████████████████████████ ████████████████████████████████ ████████ ."

So we're wondering if there was --

THE COURT:  Do you understand that to mean that Engineering was somehow making decisions as to these folks or that Engineering were the people who had to technically do it once that decision was made by somebody else?

MR. KANE:  What I think it means is that they were looking for ████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████ .

And so what we think that might mean is

that, if there are written documents that say, here is the process someone goes through to appeal a suspension, here's the process we put the appeal through once it comes to us.  Engineering would have to have those in order for it to be working on this way of ███████████████████████████████ ██████████.

We haven't gotten them from anyone else, which is really, kind of, amazing when you think about it.  They've got a system whereby someone who has been suspended for copyright infringement can be reinstated, and they don't have a document that says, here are the criteria we use to decide whether or not to reinstate them.

That really is remarkable.  If Engineering was involved in -- or was supposed to work on a ███████████████████████████████, they should at least have a written document or some sort of written document about what that appeal process was and when -- how it is that someone comes to be reinstated.

THE COURT:  And who -- is this Ms. Tomkowiak?

MS. TOMKOWIAK:  Yes, your Honor.

THE COURT:  All right.  Where do you want

to start?

MS. TOMKOWIAK:  Oh, my.  I guess, if it's okay with your Honor, since we just left off on custodians, can we start there?

THE COURT:  Sure.

MS. TOMKOWIAK:  Okay.  So I think that, at the February 9th hearing -- which I was not at, but I was reading the transcript yesterday -- when plaintiffs raised their intent to potentially seek another custodian, your Honor responded, "Joy.  Another custodian."

And that's about how we feel about the instant motion as well.

We are supposed to be at the end of document discovery.  In fact, we're past the extended document discovery deadline, and it feels like we're at the beginning, and that's an overarching point as to all of these requests.

As for Mr. ████████, plaintiffs have known about him since August of 2025.  It is true that they specifically dropped ████████████ to add Jason Szczech, but they also just dropped their request for ███████.  I mean --

THE COURT:  He was in the mix --

MS. TOMKOWIAK:  He was in the mix.

THE COURT:  -- during the negotiation.

MS. TOMKOWIAK:  That's right, your Honor.

The parties' more recent discussions were centered around potentially adding some targeted search terms for Mr. ███████, like we did for Mr. █████, which was the last time we had this discussion about the importance of engineers and, you know, the role that they play with respect to removals and this whole DMCA process.  But then in plaintiffs' motion, for the first time, they just sought to add him as a full custodian.

THE COURT:  Tell me a little more about the recent negotiations with regard to targeted searches on Mr. ███████.

MS. TOMKOWIAK:  That is a good question.  I don't have the targeted searches in front of me because I understood that they had dropped that request.  And perhaps one of my colleagues can pull them up.

I can say that, you know, from our perspective, there are no holes in our production, that they've identified, that Mr. ███████ would fill.  We have produced targeted documents from the Engineering Team.

They are wrong that the Engineering Team

are the ones that make any decisions with respect to the appeals process.  That process is handled by the ███ Team.

So, if anything, Engineering is providing some technical support.  I agree with your Honor, that that comment about the engineers in that --

THE COURT:  Sorry.  Before you agree with me --

MS. TOMKOWIAK:  Yeah.

THE COURT:  Normally, I'm very happy when people agree with me, but just back up.

You say the appeals process is handled by the ███

MS. TOMKOWIAK:  ██ Team.

THE COURT:  ██

MS. TOMKOWIAK:  ██ ███████

THE COURT:  Now, the name of this group changed from time to time.  When it was ██, what did that stand for?

MS. TOMKOWIAK:  ████████████ ███████.

THE COURT:  Okay.

MS. TOMKOWIAK:  And, yes, it was the ████ ███████.  I understand that that will come up when we discuss the privilege issues.

THE COURT:  That was going to be my next question.  What is the "██████████████████"?  And how does it interact with the ████████████████ ██████████  Team?

MS. TOMKOWIAK:  One became the other.  So it was ██████████, and then they changed their name to the ████████████████████████  Team.

THE COURT:  All right.  ████, formerly known as ██████████.

MS. TOMKOWIAK:  Yes.

And just to, perhaps, clear up a bit of confusion and save us some time in the next motion, ██████████ is not meant to refer to the Legal Department, but to refer to removals that occur because of some -- they're mandated by law as opposed to policy.  So ██████████ was meant to distinguish from --

THE COURT:  I gleaned that from your briefing in the other motion.

MS. TOMKOWIAK:  Okay.

Okay.  And so that's the group that handles that process, not the engineers, even if they may have some technical --

THE COURT:  So these are non-engineers.  And also -- I take it we will probably get into this

in more detail when we get to the privilege motion.

But I take it that the folks who staff ███, formerly known as ███████████, are not lawyers.

MS. TOMKOWIAK:  Correct.  I think one of them may have a J.D., but they are not -- they don't function as lawyers, and they are not --

THE COURT:  You're not claiming privilege for Mr. or Ms. J.D. just because of that degree.

MS. TOMKOWIAK:  Correct.

THE COURT:  All right.  So this is -- these are non-legal personnel, functionally, in your view?

MS. TOMKOWIAK:  I mean, the other thing I will say, just to move on from Mr. ████████, is that, for the first time, in their reply, plaintiffs have now asked for Mr. ███ or Mr. ███████.

Mr. ███, as they note, was identified in our interrogatory responses in March of 2025 and then again in May of 2025.  He is not part of this ██████ Group.

I'm not actually sure that that's how you say that, but I'm going to go with it since that's the way we've been talking about it today.

He is not in that group.  He has been in the ████ organization for his entire tenure at

Google.  He used to report up to ████████, who was a custodian.  And I believe that there's some org charts in the documents that plaintiffs have that would show that.  But, in any event, he's not in ████.

Likewise, Mr. █████ also sits in ██, not in ████.  And, interestingly, plaintiffs asked for Mr. █████ to be added as a custodian over a year ago, on February 7, 2025.  They then noted that we were at an impasse on Mr. █████ on April 14th and then again on June 9th.  And then these two individuals show up for the first time in their reply, you know, months and years later.

It is --

THE COURT:  Well, they sort of -- okay.  I understand.

MS. TOMKOWIAK:  So neither of them are in the Engineering Group, so they wouldn't fill -- we disagree that there are any holes to fill.  We've produced over 20,000 e-mails.  I know they don't like this comparison, but it is substantially greater than the 3,000 or so custodial documents that they've produced.  So if anyone has concerns about glaring holes in custodial productions, it should be us.

But, in any event, like, these individuals aren't going to fill those holes.  We have several individuals from the ▮▮▮▮ Team already on our list of 18 custodians.  And it's just not justified --

THE COURT:  And remind me, who are those ▮▮▮▮ custodians that you already have?

MS. TOMKOWIAK:  That's a good question.

It's at least ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ had some -- she might not currently be in that group, but had some role in that group. Same thing with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

I'm just looking at our list.

I'm not sure if Jake Ehrlich is squarely in that group, but he also played a function in that process.

THE COURT:  All right.  And where did Mr. ▮▮▮▮▮▮ sit?  What group was he in?

Engineering, right?

MS. TOMKOWIAK:  Mr. ▮▮▮▮▮▮▮ is an engineer.  Correct.

THE COURT:  Is he in ▮▮▮▮?

MS. TOMKOWIAK:  I don't know if he is formally in that group.  I can try to find that out if it is important.

THE COURT:  Well -- so it sounds like the

edges of these various groups are sometimes a little fuzzy.

MS. TOMKOWIAK:  Yeah.  I think so.

THE COURT:  And is Mr. ████████ still at Google?

MS. TOMKOWIAK:  Yes.  And he's scheduled for a deposition.

THE COURT:  Ah.  And he is scheduled when?

MS. TOMKOWIAK:  I believe it's April 23rd.

THE COURT:  Okay.

MS. TOMKOWIAK:  I have our deposition calendar here with me, actually.

THE COURT:  All right.  Let's hold off on the deposition calendar for a moment.

MS. TOMKOWIAK:  Okay.

THE COURT:  Let's back up.  We've talked about the two new custodian requests.

Now, how about document and data retention policies?

MS. TOMKOWIAK:  Your Honor, what I heard there is --

THE COURT:  Where do they live?  And what would it take to find them?

MS. TOMKOWIAK:  Well, with respect to the Ads policies, I mean, just saying "Ads policies" is

very broad.  I think it's much broader than the single database where this particular data that they're complaining of was housed.  So, if we can, set aside "all Ads policies" because I don't know where those reside.

I don't believe that there is a written policy for the issue as we've described it.  Let me just pull it up.

So this is a dynamic database that houses a tremendous amount of data.  And as we've said, that is --

THE COURT:  This is the one that you say gets deleted on, what is it, a ▮▮▮▮▮ cycle?

I can't remember what you said.

MS. TOMKOWIAK:  Yeah, but it's not that simple.  It has to do with deleted -- like, so only accounts that are deleted, specifically, and I don't believe -- okay.

I just want to note, my colleague did confirm that Mr. ▮▮▮▮▮ is in the ▮▮▮▮ Group.

MS. SAMPOLI:  Is not.

MS. TOMKOWIAK:  Is not in the ▮▮▮▮ Group.

THE COURT:  Is not.

MS. TOMKOWIAK:  Okay.  Is not in that group, yes.

THE COURT:  All right.  ████████, engineer, not ██████  Got it.

MS. TOMKOWIAK:  Okay.  So back to the database.

It releases, like, ██████████████████ ████████████████████████████.  I don't think that necessarily applies to other actions for accounts, like suspensions, but this is just, kind of -- I think it's just, kind of, written into the database.  Like, I don't think that there's some -- I am not aware of some formal written policy.  It's just, kind of, something --

THE COURT:  It is just in the software.

MS. TOMKOWIAK:  Yeah.  It's something that's done in the ordinary course.

And, like, the reality is there's no issue here because our ESI protocol, which they ignore in their briefing --

THE COURT:  I'm sorry.  What protocol?

MS. TOMKOWIAK:  Our ESI protocol.

THE COURT:  Ah, yes.

MS. TOMKOWIAK:  -- specifically relieves Google of the obligation to preserve this data.

It is -- there is a definition of "presumptively inaccessible data," which includes

dynamic fields of databases or log files that are not retained in the usual course of business.

That is exactly what this is.

THE COURT:  Well, I don't understand Mr. Kane to be accusing you, with respect to this particular database, of spoliation.

What I understand him to be saying is that, in order for his clients to understand what they have, what they don't have and what they're never going to be able to get because it's gone, they need to understand what was deleted when.

Is that fair, Mr. Kane?

MR. KANE:  That's correct.

MS. TOMKOWIAK:  I don't think that there's a written policy that's going to set that out.

THE COURT:  All right.

MS. TOMKOWIAK:  I think that that's going to be -- I don't want to say that discovery on discovery is an appropriate topic for depositions.  That's a fight for another day.  But --

THE COURT:  Well, that was going to be my next question.

Is this something -- you know, you're a lawyer, not a software engineer.  Although, you may be, at this point, regretting your career choice.

MS. TOMKOWIAK:  I don't.

THE COURT:  I meant that to be a joke.

MS. TOMKOWIAK:  I don't.

THE COURT:  Please don't take it seriously.

MS. TOMKOWIAK:  I would still rather be a lawyer than an engineer, for what it's worth.

THE COURT:  I didn't like the way that came out.  Sorry about that.

But is one of -- or more of the Google witnesses going to be in a position to testify about how this dynamic database, as you put it, █████████ ████████████████ ?

MS. TOMKOWIAK:  I think a Google deponent could be.  I think, again, the question is whether they should be or they need to be, in light of the fact that -- my understanding is discovery on discovery is most appropriate, if at all, when there is a real question or concern about spoliation.  And we --

THE COURT:  Well, when there's a real question or concern about spoliation, which I have not heard, or, alternatively, where there's a real question or concern about whether discovery -- whether searches, reviews and production were properly and reasonably accomplished.

MS. TOMKOWIAK:  You know, what I can say is that, thus far, we have objected to deposition -- for example, in their 30(b)(6) notice, they have a very broad topic about all kinds of discovery on discovery.  There's actually multiple topics that implicate discovery on discovery.  And as of now, we have objected to that because we haven't -- we don't think that there's a basis for it.

THE COURT:  Okay.  So moving away, then, from this Dynamic Ads database --

MS. TOMKOWIAK:  Can I just add one point about the Dynamic Ads database?

THE COURT:  Sure.

MS. TOMKOWIAK:  They have known about that since July 2025.  It is a bit frustrating to be sitting here today discussing something that came up last summer.

THE COURT:  Right.

The plaintiffs also seek your document and data retention policies, which they suggest probably exist in a document or a group of documents somewhere with respect to Google e-mails, generally. And most companies do have a document retention policy for e-mail communications.

With respect to Buganizer and with respect

to Google's internal chat platform, whatever the heck it was called, are there such policies?

Is there a place that Mr. Kane could go to see, ah, it's 30 days or it's two years, or it's this much time after an employee leaves Google for their e-mails, or whatever it is?

MS. TOMKOWIAK:  As to e-mails, you know, I would be surprised if there's not something in writing on that.  Again, though, I just want to -- just because something exists, especially when you're talking about discovery on discovery, it doesn't mean that the party necessarily has to produce it because the other side asked for it.

I don't -- I haven't heard anything here that would suggest that there is some reason for Google to produce that policy.  There is a single e-mail that was --

THE COURT:  That you don't have anymore.

MS. TOMKOWIAK:  -- that was from two years before the date of the litigation from an individual who was not, you know, on a legal hold.

And your Honor actually already addressed that.  Like, we had a hearing about it.  And, your Honor, at the January 20th hearing, you heard argument on this.  You ordered Google to run

plaintiffs' proposed "AAP" search term across an additional custodian's documents.

THE COURT:  Right.  To see if it could be turned up somewhere else.

MS. TOMKOWIAK:  Yes.

THE COURT:  And was it?  Or does it still exist only from a third party?

MR. KANE:  It was not turned up by that search, your Honor.

THE COURT:  Okay.

MS. TOMKOWIAK:  They've already obtained relief as it relates to that issue, so I just don't --

THE COURT:  Well, the issue isn't that e-mail.  They already have that e-mail.  They got it from a third party.  It was presented to me as an example of what we don't know might also be out there.

MS. TOMKOWIAK:  Again, I guess I would point to their own statement in the joint status report where they defend how few custodial documents they've produced.

Like, you know, plaintiffs cannot make relevant responsive documents exist that don't exist.  I mean, if Mr. Szczech only had ██

e-mails -- Mr. Szczech, I think, left in 2023.  I mean, that's what he had.

We actually told them he wasn't very relevant.  We said he should only have targeted search terms run on his e-mails.  They insisted on him being a full custodian.  I'm not that surprised that that didn't yield very much.

With a ███████████████, my understanding of that policy is that it was something that was discussed internally at Google in 2020.  I think it was deprecated shortly thereafter if it was ever even officially launched.

And so, again, like, that doesn't surprise me, then, that there's not a high volume of e-mails about that, and we've said that.

Again, we've produced over 20,000 custodial documents and I don't see any gaps in our production that would suggest that there's some huge amount of, you know, documents that just weren't retained.

THE COURT:  All right.  What about Buganizer?

When a Buganizer ticket goes in or something else happens in Buganizer, is it there forever, or is that also a dynamic database which self-edits after a period of time?

MS. TOMKOWIAK: Can I just have one minute to consult?

THE COURT: Sure.

MS. TOMKOWIAK: I don't know specifically if it has a retention policy. We can find out. I know that we have discussed the Buganizer system on many occasions. We've had motion practices about it. We've briefed it. We've produced the relevant tickets after a very prolonged negotiation for the entire relevant time period.

They haven't specifically identified any holes, again, that would lead me to believe that we, then, need to go, kind of, trace back the document retention policy.

I just see all of this as being, give a mouse a cookie, a gateway to, you know, a can of worms. Choose your, you know, metaphor. Choose your saying. But all this is going to do is just lead to a slew of new requests, efforts to renegotiate search terms and custodians.

You know, I can only speculate, right? Motions to the Court for inferences that documents would have existed on the ███████████████ but don't, and so we should have -- and on and on and on.

And if the Court's going to order anything like this, it should be reciprocal. But, again, our default, our position in the first instance, is that they just haven't shown that they're entitled to it. It's the end of document discovery, and we need to move forward, not go backward.

THE COURT: Thank you.

Any brief follow-up?

MR. KANE: A couple things, if I could.

Well, one is -- so we've got this problem. There are whole areas of -- whole subject areas where almost no documents have been produced.

There's this e-mail that got deleted. There's the Ads data that they admit ███ of the ads that we noticed they can't find an ad for in their records, so we know those were deleted.

THE COURT: What's the name of this Ads database that was dynamic and so forth?

MR. KANE: They've not given us the actual name of it. We've just been calling it the Ads database.

THE COURT: Ms. Tomkowiak, what's the name of this Ads database?

MS. TOMKOWIAK: I don't think it has a name. I would be speculating.

THE COURT:  If I --

MS. TOMKOWIAK:  Like, I think it's a type of --

THE COURT:  If I were to write an order about this, what should I call it?

MS. TOMKOWIAK:  Give me a second to think about that so I --

THE COURT:  Sure.

Meantime, Mr. Kane, go ahead.

MR. KANE:  You could call it the database from which Google pulled the Offer and Ads data that they produced in this case.

MS. TOMKOWIAK:  I'll think about it and get back to you.

MR. KANE:  But there are ██████ ads that we put in infringement notices, so we saw them.  And Google didn't produce Ads data concerning those ads.

That's ████ out of about █████ that we sent -- unique landing pages about which we sent notices concerning the 1,500 pirates.

So about █ percent of the time, they couldn't find an ad that matched up to the ad that we noticed.  We know they ran the ad.

THE COURT:  We know it was there at some point.

MR. KANE:  We know it was there.  So it's likely been -- either they didn't do the search correctly or it's been purged, which is what they are -- which is what they say happens to this data. So that's an additional gap.

There's the 600 documents that were not in the August 15th production that should have been.

THE COURT:  And those were what kind of documents?  E-mails?  Chats?  Buganizer?

MR. KANE:  Those are all custodial documents.

THE COURT:  E-mails?

MR. KANE:  E-mails or chats.

THE COURT:  Okay.  Tell me a little bit about -- what was the chat platform that Google used, if you know?

MR. KANE:  I don't know a whole lot about it.  The odd thing that we've noticed in the chats that we've seen is, like, someone will make a statement.  So they'll say, for example, like we said earlier, if there's a problem with enforcement, it's because of Mr. ███████.

So that line will be there.  And then right below it, it will say "deleted," and it will be the exact same line.  So it's, like, every -- every one

of these chats, there's whatever they said, and then it says "deleted," and it's the same thing.

I can show you one, if you would like.

THE COURT:  And then it says it again?

MR. KANE:  Correct.  Yeah.

THE COURT:  I'm not sure where that gets us.

MR. KANE:  All I'm saying is, like, something's going on with their document retention policy.  Like, why do they all say "deleted"?

Like, it's literally in the document they produced.  Like, it says "deleted," and then --

THE COURT:  And then there it is, so it's obviously not deleted.

MR. KANE:  Well, why does it say "deleted"?

Like, did they try to delete it and they were unsuccessful?

So is it, these are the ones where they were unsuccessful in deleting it, and there were a whole bunch where they were successful in deleting it?

THE COURT:  Let's focus.

MR. KANE:  That's why we need the document retention policy, is all I'm saying.

And then there are the two instances where

they ran the wrong search term.

THE COURT:  Right.

MR. KANE:  So there absolutely is a factual basis for saying we need discovery on discovery and for saying that we need an additional custodian.

I would point out, like, we're not saying we need ▮▮▮▮▮ because, like, we just learned about him yesterday.  Like, we went through the discovery process.  Google told us, like, who they claimed were the relevant custodians.  We had these negotiations.

We've now gotten what is supposed to be a full production, and there are all these missing things.  So we're saying we need to go back and add a custodian in order to fill in these gaps, not because we just learned about them, but because we have these serious gaps in the production.

Ms. Tomkowiak was talking about our point about there being a gap in appeals of merchants who have been suspended for copyright infringements.  We aren't saying that the engineers are the ones who would have, like, made the appeal decisions.

We're saying the engineers were involved in ▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.  And so they must have what the

Trust and Safety custodians they gave us don't, which is a document that says, when someone appeals, here's what we do. Here's the criteria we use to decide whether or not we're going to reinstate them. Here's who reviews it. Here's the form they fill out. We have none of that from the Trust and Safety --

THE COURT: And you think that if ▮▮▮▮▮ becomes a custodian, you're likely to find those documents.

MR. KANE: Correct. Because Engineering was the one who was "▮▮▮▮▮▮▮" that appeals process. So if they were doing something technical in order to try to, like, ▮▮▮▮▮▮▮▮▮ or improve it, they must have known something about what the process was. So, presumably, someone sent them a document that says, here's what we currently do manually. We're looking for some way to improve it or ▮▮▮▮▮ or whatever it is.

THE COURT: All right. There's a lot of speculation in there.

MR. KANE: Well -- but it's amazing that we don't have this document. Like, they've got this process where you get suspended for copyright infringement.

THE COURT:  You don't know that there is a "this document."

MR. KANE:  No.  The fact that they have this reinstatement process is public.  So, like, is their story, like, we've got this process where you can appeal, but there's no form that you use to appeal, and we have no policy for, like, what we do when we get an appeal?  Someone just looks at it and says yes or no, like, they have no criteria that they use.

THE COURT:  And you somehow think that these criteria will be found in the custodial files of an engineer, not the Trust and Safety custodians.

MR. KANE:  The -- one of the reasons we're suspicious is that, like, they should have been in the files of the Trust and Safety custodians; that's why we want the document retention policy.  But because the engineers were working on a way of trying to automate this process, they might have those documents as well.

Ms. Tomkowiak keeps referring to 20,000 e-mails that they have produced.  That's extremely misleading.  11,000 of those are literally just one-page notifications about "sweeps" that they were performing.  I can show you one, if you would like.

THE COURT:  I'll take your word for it.

MR. KANE:  Okay.  11,000 of them are just these one-page notifications that really tell us nothing.  So it is --

THE COURT:  So that leaves 9,000 e-mails.

MR. KANE:  It's 9,000 custodial documents. That's not a large number for a case of this magnitude.  There's a billion dollars in damages. They're putting forth their entire DMCA platform and saying it's reasonably implemented.  9,000 is not an unreasonable number.

Sorry.  9,000 is not a high number.  It should be a lot higher than that is what I should say.

THE COURT:  I've told you, both, before -- I know you remember this -- that both comparing numbers and giving me raw numbers is just not very helpful here.

MR. KANE:  It's just --

THE COURT:  It doesn't tell me whether the right documents have been produced.

MR. KANE:  That's why we're pointing out all these gaps in their production, such as the ██████████████████ or the fact that we have almost no escalation documents; meaning, like, their DMCA

policy says, ███████████████████████ ███████████████████████████████ ███████████████████████████████. You escalate it to someone who is higher up at Google. We have almost none -- maybe none -- no documents pertaining to those escalations. So we are giving you both the number and the specific, like, subject areas that we think are missing from the production.

Ms. Tomkowiak talked about the Ads data being deleted every ██████. They gave us this very specific statement. They said, "████████████ ███████████████████████████████ ███████████████████████████████ ████████████████."

Then they come to court today and say they're not sure if that's written down anywhere and they're not sure if anyone could testify to it.

Well, how do they know it if it wasn't written down anywhere and there's no one who can testify to it? That doesn't make any sense.

THE COURT: They didn't say that no one can testify to it.

MR. KANE: I think you asked her --

THE COURT: My question was whether one of the currently designated witnesses could testify to

it.  That's a little different.

MR. KANE:  Okay.  So someone should be able to testify to this.  And if they're saying they don't have a written policy, they should identify who it is that has knowledge about this.

With respect to the document retention policy about the Buganizer, it should have one. There should be a policy.  And if there isn't, then they should be telling us --

THE COURT:  Do you think you're missing Buganizer?

MR. KANE:  We only got ■ Buganizer tickets from the search that they did; that seems incredibly low to me.

THE COURT:  Do you have any other reason to believe you're missing Buganizer data or documents?

MR. KANE:  Yes.  Because we have got notification e-mails from Buganizer that aren't where we don't have the underlying ticket.

In other words, like, they gave us these notifications that Buganizer sent that say, hey, somebody replied to a comment you made in Buganizer, and we don't have the corresponding Buganizer ticket.

And there are a number of instances where,

in the production, we cited these when we were arguing the Buganizer motion, where someone says, I'm taking this conversation off of e-mail and putting it onto the Bug.

So it's clearly something that they used quite a bit.  To have only ▮ tickets from a period this long is just a very low number.

THE COURT:  All right.

You have one minute if there's anything you haven't told me yet, Ms. Tomkowiak.

MS. TOMKOWIAK:  Your Honor, I guess I would just use my minute to say if there's any aspect of this discovery that you are inclined to order, then I would like to be allowed to respond to those.

THE COURT:  Sure.  Let me tell you what I'm thinking of doing.

I have a great deal of discretion here, as I do in most areas, and I am, as always, balancing a number of factors, including how good a showing the plaintiff has made in this instance that there are, let's say, suspiciously missing items of discovery, and how prompt the plaintiff was in bringing this issue up and attempting to negotiate an appropriate solution, and how much trouble it is likely to be for Google to produce the various items that the

plaintiff is now seeking, and what the likely bang for the buck is at the end of the day, insofar as I am able to handicap that, which, of course, everyone in this room is now operating with incomplete information.

So what I'm thinking would be fair here and reasonable here -- which means that neither side is going to be entirely happy -- would be to direct Google to do two things:  First, to add Mr. ████████ as a custodian for the usual suite of search terms, and that may mean adjusting his deposition date if that can't be done in advance of his deposition; and second, directing Google to produce its written document and data retention policies, if they exist, for four sources:  The Dynamic Ads database, which Google's counsel will tell me if I should call it something different than that or if that's good enough for you to understand what I'm talking about; second, the e-mail system; third, the internal Google chat system; and fourth, Buganizer.

It may well be, particularly with regard to dynamic systems such as Buganizer and the Ads database, that there is no separate written retention policy.  It seems plausible to me that a complex system like that, the policy is, in effect,

built into the software, and someone who understands how the software works would be able to tell you what happens in real life, but there may not be a document which says "Retention Policy" at the top of it and explains what this is.

But if there is such a document, I am inclined to direct Google to produce it, as I said, for those four sources.  I am not inclined at this late date -- given how often the parties went back and forth and back and forth about hit reports and searches that might have been misrun the first time and so forth, I am not inclined at this late date to tell Google to go back to the beginning and produce hit reports for every darn iteration of the document discovery period that we've been through.  I don't think that's proportional to the showing that's been made.

So now you have something to push back on.

MS. TOMKOWIAK:  Yes.

So with respect to the database, if we could call it "Database System From Which Offer Data Was Produced."

THE COURT:  "Database System From Which Offer Data Was Produced."

I'm not sure that's really any better, but

it's your client, so I'll go with that.

MS. TOMKOWIAK:  Thanks.

And then I guess I would -- the only thing that I wanted to push back on with respect to Mr. ███████ is that, in terms of adding him as a full custodian, your Honor did not ask, and I did not mention, that we were able to do a little bit of investigation, and doing so will add nearly 6,000 documents to be reviewed.

So I would ask that your order specify that we should, instead, negotiate targeted search terms. A review of that magnitude is going to require Google to get its custodian -- like, rehire a team of attorneys to review this custodian's documents.

THE COURT:  Oh, surely you haven't let that team go yet.

MS. TOMKOWIAK:  Yes.  There --

THE COURT:  You did?

MS. TOMKOWIAK:  We completed our document production.

Again, Mr. ███████ was identified months and months and months ago, and we have no reason to believe that we should reopen that custodial production at this point.

THE COURT:  And you know it would be 6,000

because you've already done the hit report?

MS. TOMKOWIAK:  Yeah.  And so I would ask that the order specify that we --

THE COURT:  And, of course, you will share that hit report with Mr. Kane.

MS. TOMKOWIAK:  Yeah, we can share that hit report.  I just  -- I otherwise, don't -- I mean, we'll talk about the schedule when we talk about the schedule, but it's -- to continue to require Google to be in the middle of document discovery, in the thick of document discovery, and then also attempt to prepare to defend and take these 40 depositions, it's -- you said it yourself, it's just unrealistic.

THE COURT:  And, you know, as I said, we're not going to have both, but we may not get to readjusting discovery dates today.  We might have to save that for our next discovery conference, which will be a few weeks down the road.

So, Mr. Kane, do you wish to push back as well?

MR. KANE:  I fear that if you tell us to go back and negotiate search terms, that we'll be back before you with a dispute about --

THE COURT:  I fear that as well.

MR. KANE:  And I --

THE COURT:  And that will add weeks because my calendar is very crowded the rest of this month.

MR. KANE:  And the other thing I would add is they knew this hearing was coming.  They received this motion.  They should not be reporting these hit results -- hit report results on the day of the hearing, after they get your order.

They should have shared those with us when we asked for Mr. ██████ as a custodian.  They're going to keep doing this if we don't require them to produce hit reports.  Like, they just --

THE COURT:  I'm not retroactively --

MR. KANE:  No, no.  I'm not saying retroactively.

They should not be given -- like, when they come in at not even the 11th hour -- like, the 12th hour suddenly with a hit report for this custodian, you should not reward them by saying, okay, fine, I'll let you negotiate search terms.

The other thing I would say about -- they say it's 6,000 -- sorry.

THE COURT:  I just want to complain a little bit, I guess.

I find it somewhat ironic that each side is accusing the other of doing something too late in

the day.  It seems to me that everybody in this room should have paid attention to the issues which are now before me sooner than they did.  So I'm not going to -- you know, this isn't a contest for who most deserves to be criticized for not doing something earlier.

I take your point, that you would have liked to have had that hit report at least, let's say, a couple of days ago, and then perhaps you could have started negotiating search terms.

On the other hand, I take Google's point, that you could have teed up this issue certainly with respect to Mr. ███████ months ago.  So let's move on.

MR. KANE:  Okay.  With respect to the 6,000 documents, we don't know anything about those.

So here's an example of what they produced.  It's on the screen now.  This is Bates ending --

THE COURT:  This is a document already produced, obviously.

MR. KANE:  Correct.

This is Bates ending 607298.

THE COURT:  Okay.  You're going to have to blow that up a little bit.

Thank you.  Now, I can see it.

MR. KANE: So it's an e-mail from an automated system. And it says, "████████████████ ████████████████," and it gives a name, ████████████████████ --

THE COURT: This is one of the 11,000?

MR. KANE: Correct.

THE COURT: Okay.

MR. KANE: ████████████████████████ ████████" and they give a summary of it.

There are 11,000 of these, and they're saying they produced 20,000 custodial documents.

THE COURT: I thought we already went over this point.

MR. KANE: My point is they're saying it's 6,000 documents for ██████. If 5,000 --

THE COURT: And you claim that half of them may look like this.

MR. KANE: It could be something like this. It could be the -- and they also haven't told us what is the unique hit count. In other words, there's 6,000 ██████ documents, but it may be that those also hit on documents from other custodians, so maybe 4,000 of them are knocked out.

To just come in and say, it's 6,000 documents, Judge, it must be too burdensome, that

just doesn't tell us a whole lot.  It could be 5,500 Amtrak --

THE COURT:  Do you have the hit report with you, Ms. Tomkowiak?

MS. TOMKOWIAK:  I don't.  I don't have it with me.

THE COURT:  Is it 6,000 documents in gross or including families, or is it 6,000 unique?

MS. TOMKOWIAK:  It's 6,000 with families.  If you want to be precise, I believe it's 5,824 with families, and it's already deduplicated.

THE COURT:  It's been deduped?

MS. TOMKOWIAK:  Yes.

THE COURT:  So those are unique documents.

MS. TOMKOWIAK:  Yes.

THE COURT:  All right.  That's step one.

Anything else?

MR. KANE:  No.

THE COURT:  All right.

So the order will be that the motion at Docket 650 and 651 will be granted, in part.  Google will add Mr. ████████ as a custodian.  I encourage the parties to meet and confer instantly -- okay -- this week with hit report in both sides' hands, please, to see if tailoring or narrowing of the

search terms might make sense for both sides here.

But because I don't want you to come back to me with arguments about this search term versus that search term versus the other search term, I'm afraid the default is going to be, if you can't agree, that he's a full custodian.  I'm not going to give you a second additional custodian from the ██████ Group.  I don't think that's proportional at this stage of the case.

And as I previously indicated, I will direct Google to produce its document and data retention policies if they exist in recognizable form; that is, an actual document which sets forth the policy for these four sources; namely, e-mail, chats, Buganizer and the database system from which Offer data was produced.

And if, as I suspect, that there are not four separate, standalone policies, to the extent that one or more of these systems does not have a standalone policy, you are to so state in writing so that the record is clear with respect to that.  And that will be the order with respect to the February 24th motion.

Although the clock at the back of the courtroom says 11:30, that's because we didn't have

a ladder tall enough to reset it when the time changed.

It is actually almost 12:30. I propose that we take a recess and come back and talk about privilege.

Would you like to make it a short, snack-sized recess, or would you like to make it a businessman's lunch-sized recess, Mr. Kane?

MR. KANE: I'm fine with the snack-sized recess.

THE COURT: Snack sized. 15 minutes?

MR. KANE: That works for me.

THE COURT: Google?

MS. TOMKOWIAK: We agree on something.

THE COURT: Excellent. I'm encouraged.

All right. We'll be in recess for 15 minutes.

(Recess.)

THE DEPUTY CLERK: Continuing Case: 24-cv-4274.

THE COURT: All right. Everybody's back. Thank you for being so prompt.

So let us, now, turn our attention to plaintiffs' motion made on February 9th with regard to Google's privilege log and certain categories of

its privilege assertions.

This is going to be Ms. Chen for the plaintiff.

And who is this going to be for the defendant?

MS. TOMKOWIAK:  Myself, your Honor.

THE COURT:  Okay.

Let me set the table for you a bit.  I think this might assist you in your argument today.

This motion, I conceive of, as coming in two pieces.  The first piece is a motion to compel production of documents which plaintiffs believe, based on the information in Google's privilege log, reflect in-house attorneys actively engaged in implementing Google's DMCA policy, or at least certain components of Google's DMCA policy.

Plaintiffs argue that if, and to the extent that's what these attorneys were doing, by analogy to the good-faith defense in criminal cases and the Faragher-Ellerth defense in employment cases, the privilege has been waived because, by putting these attorneys' conduct in issue in their affirmative defense, Google cannot, at the same time, shield that conduct from discovery by the assertion of privilege.  And there are, as I understand it, 53

documents that fall into this category, according to plaintiffs' calculation.

The rest of plaintiffs' motion seeks to compel the production of several hundred additional documents falling in various categories, basically, because plaintiff does not believe that defendant's log provides enough detailed information to assert privilege with respect to these various documents.

Let me just tell you at the top of the hour that I am not very persuaded by that second category challenge.  I have reviewed the privilege log.  It seems, by and large, pretty detailed to me.  By definition, a privilege log cannot tell you everything that's in the document being withheld because the point of a privilege log is not to divulge the privileged materials, but merely to describe, in terms that do not divulge the privilege, what the basis is for the claim of privilege.

And I am not particularly persuaded by the plaintiffs' various arguments, either that the language is too vague or that the folks who have JDs after their names and are the authors or the recipients of these messages might have been acting with their business hat on instead of with their

legal hat on.

I'm also not particularly persuaded by the argument that giving advice about policy is somehow different than giving advice about the law.  When the policy is designed to ensure compliance with the law, it's very difficult for me to say that those are two separate things and that policy advice is somehow not legal advice.  And the Second Circuit seems to agree with me on that.

But I am troubled by the 53 documents where the claim is that, if produced, these documents would reveal lawyers who are actually implementing the DMCA policy, not just giving advice on what the policy should be, for example, not just helping the company design the policy -- that would all remain privileged -- but are actually part of the process, making decisions, at least for certain categories of merchants in certain kinds of cases.

And what troubles me about it is that neither side seems able to give me a whole lot of clarity on what these folks actually were doing.  And, of course, plaintiffs can say, well, Judge, we can't give you very much clarity because we can't see the documents.  But Google has not been all that helpful either.

In particular, the declaration that Google submitted with its opposition papers from April Kelly does not leave me with a firm idea of what these folks were actually doing and who was actually responsible for doing what in terms of the mechanism of the DMCA policy.

So I think I would like to vary the normal order of presentation here, if you will indulge me, and hear from Google first.

How can I be sure, with this very short and somewhat vague piece of evidence from Ms. Kelly, that these 53 documents don't, in fact, reflect lawyers implementing the DMCA policy?

MS. TOMKOWIAK:  So I think there's a couple of questions there, and one is just, kind of, broader, which is, what is the role of counsel in connection with the policy?

And then we can get to the documents themselves because I think, even if you just look at the specific titles of a lot of those documents, you can see -- and I realize that I've looked at them, so I know what they say, and I'm trying to be careful to not reveal what they say.  But even on the face of a lot of them, they're not related to the core issues in this case.

We took a very broad approach to responsiveness. I know we're no longer talking about search terms and custodians, but we actually took a broad approach to responsiveness, and so while a lot of the documents on this log touch copyright or, you know, issues relating to copyright, including in Europe, like, a lot of them just aren't about the core issues in this case.

But anyway, as to the role of counsel, I think that -- I think that what might be helpful is to look at a couple of the documents that plaintiffs cited in support of their motion.

I don't know if you have --

THE COURT: On the log, you mean? Or the documents that were produced, that they attached to the --

MS. TOMKOWIAK: The documents that were produced, that they attached.

THE COURT: Sure. Tell me what to look at.

MS. TOMKOWIAK: So the first one that we can look at is Exhibit 11, which is Docket 573-11 -- I'm sorry. 593-11.

THE COURT: All right. Give me a second. I have it.

MS. TOMKOWIAK: Okay. And if you look at

the page ending in 7915 ...

THE COURT:  I have it.  "█████████████

████████████████████ "?

MS. TOMKOWIAK:  Yeah.

So this was a ██████████████ deck.  We've talked earlier today about that, that the ██████ ████████████ is the team that's primarily tasked with implementing the DMCA policy, and they became the ██████ Team.

THE COURT:  And just to recap, you told me this morning that although the word "██████" is in the name of the team, that this is not a group of lawyers, correct?

This is a group of either nonlawyers or people who, if they have a law degree, that's incidental, who were not performing legal advice functions.

MS. TOMKOWIAK:  Correct.

THE COURT:  Thank you.

MS. TOMKOWIAK:  Yep.

And so, for example, on this page, I think it makes clear that in Step 2, like, counsel answers specific questions that are asked.  They provide legal feedback, if any.

At the bottom, it says, "███████████████

███████████████████████████████████████

██████ ."

I'm not sure that, you know, for every single year -- this is Q2 2022.  So --

THE COURT:  I assume that figure varies somewhat.

MS. TOMKOWIAK:  Yes.  But I think that that's one corroboration of what Ms. Kelly said, which is that when she is consulting with the Legal Team about questions relating to the policy, it's to get legal advice on how to proceed, not just to do the rote mechanics of, you know --

THE COURT:  Well, explain this to me a little more, this "████████████████████████ ██████ ."

Where in the process of implementing the DMCA policy does this happen?  At what stage?

MS. TOMKOWIAK:  I do not know that that necessarily happens at a specific stage each time. I mean, again, I have the benefit of having looked at these documents, and there are some unique situations.  And I am trying to tread carefully here so as to not waive anything or, you know, affirmatively use the document --

THE COURT:  The reason I asked the question

is that the way plaintiffs describe it -- interpreting some of the same documents, the way plaintiffs describe it, there are certain points in the process where the process requires that Google -- I think the phrase is "███████████," that that has to happen -- I can't remember the details -- for certain kinds of potential removals with certain kinds of merchants.

And plaintiff also argues that if the merchant files an appeal, it is handled by "Legal."

Now, you may just be having a fight over what that means.  Plaintiff may think that "Legal" means lawyers in the Legal Department, and Google may think that "Legal" means the ███████████ Team, which isn't really Legal at all.

But I'm trying to reconcile what I'm being told by two parties here, and I'm having a little trouble.

MS. TOMKOWIAK:  Yeah.  If you look at Exhibit 9, which is 593-9, I think that's where they say -- they quote the appeal process as it is ███████████████████.

And I'll let you get there.  That's --

THE COURT:  Hold on.  Let me get there.

All right.  We're looking for Exhibit 9

now?

MS. TOMKOWIAK:  Uh-huh.

THE COURT:  What page?

MS. TOMKOWIAK:  The page ending in 8611.

THE COURT:  8611.  Okay.  I am there.

MS. TOMKOWIAK:  I think the line that they are quoting from is this line towards the bottom of the page, maybe three lines up, where it says, ████████████████████████████████████████████."

But as I think you have correctly surmised, if you look at the rest of the e-mail chain, including the e-mails going up the chain, on 8610, it makes clear that -- for example, in Mr. Ehrlich's e-mail at 3:34 a.m. -- yikes -- where he says he's trying to catch up and "████████████████████ ████████████████████.

So I think that this is just imprecise language that was --

THE COURT:  So where Mr. Ehrlich says ████████ you think that is also what ██████ is referring to when he says just "██████"?

You think.

MS. TOMKOWIAK:  Yes.  Yes, correct.

THE COURT:  Okay.

MS. TOMKOWIAK:  And the rest of the e-mail

chain discusses, you know, okay, how is the appeals form processed?  And, you know --

THE COURT:  It says, "███████████████████ ████████████████████████████████████ ██████████████████████████████████."

And then they talk about what form you have to fill out.

MS. TOMKOWIAK:  Yeah.  So I do think there --

THE COURT:  Which, again, has the word "Legal" in it, but, to your point, that doesn't mean lawyers are making decisions.

That's your basic point, right?

MS. TOMKOWIAK:  That's my basic point.

And even -- I appreciate that the policy itself says, you know, for certain types of merchants, you should consult counsel.  But I think, in practice, as Ms. Lee alluded to earlier today, actually, that sometimes these things are escalated to a full-time employee.  Sometimes they are escalated to an attorney.

THE COURT:  Executive.

MS. TOMKOWIAK:  Maybe an executive, or maybe just --

THE COURT:  Right.  But what does that mean

if a potential removal or a potential reinstatement gets escalated to somebody more important than the person who would -- member of the ███ team who would normally be making that decision?

Does that mean that the person to whom it's escalated now gets to make the decision?  Or does that mean that the regular ███ person is just supposed to get a reality check or some advice from them to inform their decision?  And how can I tell?

MS. TOMKOWIAK:  Because Ms. Kelly, who is deeply involved in this process, as she said, when she is reaching out to those attorneys, she's asking for legal advice.  It is to advise on -- and I don't want to say something that would be applicable in every situation, but there are many considerations that could come up from a legal perspective, including antitrust concerns, for example, where, you know, they want to loop in the lawyers and ask for advice on a particular -- maybe a unique situation like, okay, this is outside of the norm, but we have something over here that looks the same as something over here.  We removed one.  We didn't remove the other.  What do you think we should do?

So in terms of the implementation part, when the lawyers are being consulted, they're really

being consulted for legal advice.  And I would like to add that where they're not, and when they're just involved in this process, not with their lawyer hats on, we've produced those documents.  I mean, we've produced several documents with lawyers on them.

And I think that we've also produced several documents that are redacted.  I mean, Exhibits 12 and 13 to their motion are good examples of those where we have redacted portions of them but not withheld them in full.

And so, from our perspective, we already did the work to parse out when there was true legal advice being given versus, you know, when lawyers are copied on documents or where legal advice is mixed into the document that's not otherwise, you know, predominantly legal.

THE COURT:  So walk me through -- you said Exhibit 12 is an example of a document that was produced in redacted form.  It's a somewhat lengthy document.

Show me what was redacted and, at a high level, tell me why.

MS. TOMKOWIAK:  I mean, on page ending in 4433, there are a couple of redacted bullets.

THE COURT:  Okay.  Right.

MS. TOMKOWIAK:  They're sprinkled throughout the document.  They're usually pretty short.

THE COURT:  And who is writing this document?  Who is writing these various dated entries?

MS. TOMKOWIAK:  I believe that this document is -- I believe the custodian for this document was a woman named ███████████.

THE COURT:  Is she on the ███████████ Team?

MS. TOMKOWIAK:  Correct.  She had -- she was one of the individuals I mentioned earlier.  I'm not -- I don't have her specific title, but at some point in time -- and I don't know that she currently is either -- but, yes, at some point in time, she had a role.

THE COURT:  So, generically speaking, what I should take from the redaction stamps is that, underneath those stamps, we have the custodian saying something like, I consulted with Attorney So and So who reminded me of this copyright issue or of this antitrust issue or that this person is very litigious and has sued us 17 times in the past or something.

MS. TOMKOWIAK:  Something that reflects legal advice.

THE COURT:  Okay.

MS. TOMKOWIAK:  And we've produced, just by way of example, at least 464 documents totaling more than 12,000 pages involving Product counsel, Adam Crider; Copyright counsel, Caleb Donaldson.  253 of those documents were produced with redactions.

THE COURT:  And this, again, goes to your point, that you have put eyes on all of these documents and made a good-faith effort to try and figure out whether these lawyers were doing DMCA implementation or were giving legal advice to the other people who were doing DMCA implementation.

MS. TOMKOWIAK:  And lots of things in between.  I mean, as I -- it's --

THE COURT:  And giving legal advice to other people for other things.

MS. TOMKOWIAK:  For lots -- yes.  Yes.

Even within the 50, you know -- I thought it was 51 -- but 53 entries, there's lots of other things that are going on.  There was ongoing litigation with the company in Europe over the Digital Services Act, which is, like, a European copyright law, for example.  So there's lots of

other copyright issues that are reflected --

THE COURT:  And those documents turned up here just, sort of, by random chance because that's the way the search terms work?

MS. TOMKOWIAK:  Yes.  Because they were broad search terms that related to these types of issues.  And as I said, we took a broad approach to responsiveness, although I don't think we would necessarily concede that these documents are relevant, but in terms of being responsive to the requests.

THE COURT:  All right.  Back to Ms. Kelly for a moment.

Her declaration is very short.  And interestingly, it speaks in the first-person singular.  It doesn't say "we."  It doesn't say, this is what the ███████████ Team did.

And I appreciate that it may have been drafted that way on purpose to make sure that plaintiffs wouldn't critique it for not being on personal knowledge.

But the operative paragraph is paragraph 4, which says, "When I consult Google's in-house counsel, including Copyright and Product counsel, ████████████████████████████████████

██████████████████, I am seeking their legal advice. In their role as legal counsel to Google, the role and function of the ███ Team are distinct from the role and function of ████████████ ████████████████████████████ ████████████████████ "

That is at such a high level of generality as to really not give me much meat to chew on here. It could be argued that she is providing legal conclusions rather than facts.

MS. TOMKOWIAK: Well, I think that's part of the balance we were trying to strike. I don't -- I guess I don't read it that same way.

But I think that what -- so Ms. Kelly, I believe, came into her current role around 2022.

THE COURT: Okay.

MS. TOMKOWIAK: She has been disclosed as a knowledgeable person for a long time in this case. She is a custodian. She is █████████████████ █████████████████████████ █████████.

Although, to be fair, she can't -- it's a huge organization. There's a long period of time. I don't think that Ms. Kelly -- it would be fair to ask her to sign under penalty of perjury that

everybody, you know, in that organization to testify that she could -- you know, is aware of all of their practices.

THE COURT:  She might have given me a couple of more concrete examples that might have been helpful because otherwise where am I going to get my concrete examples, other than by asking to see some of these documents in camera, which, as you know, is never the first choice of any United States magistrate judge, but often is the only choice remaining to us.

MS. TOMKOWIAK:  We thought this was sufficient.  You know, if your Honor thinks that examples would be helpful, I guess I, again, would have -- they would be in the hypothetical, and I'm not sure how helpful that would be.

So without, kind of, saying, specifically, in this document, I am consulting with counsel on, you know, whether, in light of this particular litigation, we should do something different with this merchant, I mean, it's hard to put those examples out there without revealing the content of the --

THE COURT:  But here are some other things she doesn't say.  She doesn't say, for example,

that, when I consult with Google's in-house counsel, I'm still the decision-maker, and I take their counsel into advice, but I'm the one deciding ███████████████████████████████ or whatever the question is.  She doesn't say that.

And, really, the question of privilege waiver here, the case law makes this, I think, pretty clear, particularly -- there is an out-of-circuit case.

Well, two out-of-circuit cases, actually, the *Dish Network* case out of Illinois and the *Paula Deen* case out of Georgia, which, in different words, all draw the same distinction:  Are the lawyers advising the people implementing the policy which is set up as the affirmative defense, or are they doing the implementing themselves?

And if they are doing both, did the documents merge these two roles such that they can't be teased apart?

And I'm just not sure I can tell the answer to those key questions from what Google has provided thus far.

MS. TOMKOWIAK:  Okay.

Okay.  I mean, fair enough.  I think that, again, like, my understanding -- and I think it's

reflected in the documents, and I think it's reflected in what Ms. Kelly says -- is that the DMCA implementation process -- I think it is also reflected in our interrogatory responses, which I am aware listed one lawyer who was involved in the design of the policies but not the implementation.

THE COURT:  No.  Design -- you don't waive privilege by designing a DMCA policy.

MS. TOMKOWIAK:  And, again, being careful not to reveal too much, but there is some design with documents that are withheld, in terms of figuring out how to design a policy that would comply with the relevant statutes.

But when it comes to implementation, the process is handled by ▮▮▮▮ including the appeals process.  They sometimes need to consult with counsel.  Sometimes they don't need to get there.

THE COURT:  On sticky cases.

MS. TOMKOWIAK:  On sticky cases or on cases that have broader implications, including, just by way of example because it does come up and you can see it even on the face of the log where they're talking about, like, German antitrust offices.  So including antitrust issues that sometimes --

THE COURT:  At the moment, I'm really not

understanding how antitrust law plays into this at all, but that's okay.

MS. TOMKOWIAK: I'm not an antitrust attorney, but I understand it broadly involves the treatment of -- treating clients the same or differently. But I'm not an antitrust attorney either.

So, in any event, I mean, again, I think that the documents that we have produced versus the documents that we've logged reflect that we have taken a surgical approach to when legal advice is being provided and it's being provided adjacent to the policy, not as like, okay, well, lawyer, you're the ultimate decision-maker here, but give me advice.

And I guess I don't hear you to be saying that just because that advice is followed that that somehow makes the lawyer the decision-maker. The lawyer is still the advisor.

THE COURT: Well, hypothetically speaking, I think the answer is, not necessarily. But, again, I would have to understand more granularly what was happening on the ground. Let me --

MS. TOMKOWIAK: And probably on a document-by-document basis, which is what we

tried to do.

THE COURT:  Yeah.

Let me hear from plaintiffs on this.  It's Ms. Chen?

MS. CHEN:  Yes, your Honor.

We -- so there are many issues that just came up, and I suppose I should take them in the -- in the order in which --

THE COURT:  However you prefer.

MS. CHEN:  -- it makes sense.

So, first of all, I wanted to point out that Google's R&O to the interrogatory that counsel was discussing just a minute ago --

THE COURT:  R&O, responses and objections?

R&O, you mean --

MS. CHEN:  The responses and objections.

THE COURT:  Thank you.

MS. CHEN:  I apologize for that.

So Docket Number 4, the responses and objections is Exhibit 15.  That is 593-15.

THE COURT:  Give me a second.

Okay.  I'm there.

MS. CHEN:  So the interrogatory asks Google to "state the name of each person with responsibility for designing, developing or

implementing your copyright infringement policies."

And Google's response is on page 10.

THE COURT:  Yes.

MS. CHEN:  Google responds, "Subject to the foregoing general and specific objections, Google identifies the following individuals."

THE COURT:  Let me jump ahead, if I can.

I see Mr. Donaldson's name in there.  I see that he's Copyright counsel.  But it certainly is not an admission that Mr. Donaldson was implementing the policy.

MS. CHEN:  That --

THE COURT:  He could well have been designing or developing the policy or giving advice to a team that designed and developed the policy.  And, in my view, that's not grounds for waiver.  He would have to be in the mix, so to speak, making individual decisions or dictating individual takedown and/or reinstatement decisions for there to be a waiver.

MS. CHEN:  Your Honor, not to get hung up on semantics, but the reason that I started reading aloud the actual response is that Google actually responded, "Who are or were directly or principally responsible for the design, development and

implementation of Google's DMCA policies."

Google very easily could have responded in the disjunctive.  Google very easily could have responded for the design, development or implementation.  But the response says "and," and it says what it says.

But I take your point, that this response itself doesn't contain a ton of details.

THE COURT:  I'm not going to read too much into that.

MS. CHEN:  Right.

And I see that perspective as well on how that's not telling you a ton.  So, instead, I think it makes sense to go to Exhibit 8 and Exhibit 14.

THE COURT:  Shall we do 8 first?

MS. CHEN:  Yes, your Honor.  That makes sense.

THE COURT:  I'm non-digital here.  I can only do one at a time.

MS. CHEN:  Yeah.  So it's 593-8.

So this document is titled "███████████ ███████████████████████."

We understand "FTE" to mean full-time employee.  And at the top left of the document, it identifies Adam Crider -- that's A. Crider -- and

John Caleb Donaldson -- that's J.C. Donaldson -- as product counsel.

THE COURT: Yeah.

MS. CHEN: So we understand this document to be explaining to Google full-time employees how to implement Google's DMCA strike policy.

THE COURT: And this document has been produced. It has not been withheld as privileged.

MS. CHEN: Correct.

So on the last page, page with the Bates number ending 687 -- so under the section called ███████," the ███████████ -- we're not completely sure what ████████████████████ ██████████████████████████████████.

THE COURT: I'm sorry. Just let me stop you there.

████████████████████, so this is an instruction that's being given to these temps?

MS. CHEN: That's what that would --

THE COURT: This is what you should do?

MS. CHEN: That's what that appears --

THE COURT: That's how you read it?

MS. CHEN: -- on the face of the document. Yes.

So ████████████████████████



THE COURT:  Okay.

MS. CHEN:  Then the ███████████████

█████████████████████████████████████████

████████████████████████████████ .

And then below that, the FTE instruction, which is for -- we read that to be for full-time employees.

THE COURT:  ████████████████████████

███████████████████ .

MS. CHEN:  Yes.  In ███ cases, ██████████

█████████████████████████████████████████

████████████████████████████ .

So here, based on this document, it's clear that counsel ███████████████████████████   ████

███████████████████████████████████

███████████████████████████████████

███████████ .

And, now, I know today we have been discussing documents that maybe don't say exactly one consistent thing.  One thing that could account

for those minor differences or deltas is Google's revisions to its own policy.

Be that as it may, the policy says what it says, and that ███████████████████████ ████████████████████████████████████████ ████████████████████████████████, and that was how Google designed the process.

THE COURT:  Right.

So the question still unanswered in my mind is, okay, what does it mean to "████████████ ████████?

Does it mean do what they say?  Or is it, like, stop, look and listen, have that conversation before you make a decision?

MS. CHEN:  So, your Honor, I think Exhibit 14 answers that question.  So that is 593-14.

THE COURT:  Okay.

MS. CHEN:  So this is a DMCA policy that Google produced.  And on page 2 -- so we're under Step Number 3, "████████████████████████████."

THE COURT:  Okay.

MS. CHEN:  And then --

THE COURT:  Is this instructions still to these temps, or is this instructions to members of this ████████████████ Team, if you know?

MS. CHEN: Not based on the face of the document, your Honor.

THE COURT: You're not sure.

And do we have a date on this particular one?

MS. CHEN: It's not dated on its face.

THE COURT: Go ahead.

MS. CHEN: So toward the end, the document says, "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

We understand that to refer to Jason Szczech, another custodian that we just discussed today. And then another individual outside of Cases, and loop in, copyright counsel identified as --

THE COURT: Mr. Donaldson.

MS. CHEN: Caleb Donaldson.

███████████████████████████████████████. So that is a clear statement that Copyright counsel is supposed to be, sort of, the final decision-maker with respect to --

THE COURT: This particular category of decisions.

MS. CHEN: Yes. For ████████████████████

████████████████████████████████████

████████████████████████████████████.

And we're, frankly, entitled to test how Google used

this ████████, whether it is reasonable as

contemplated by the DMCA, or whether it is a

████████████████████████████████████.

THE COURT:  Okay.  So let me ask you now to

tie -- this is, sort of, your best and clearest

indication that counsel, at least in some instances,

may be implementing, may be making decisions.

Now, can you tie that to the privilege log?

Do you have any of those 53 documents that

are in this category?

Are they documents which you believe, based

on the login information, may actually be

communications to or from Mr. Donaldson in which he

either does or doesn't "sign off"?

MS. CHEN:  So if we -- would it be helpful

to, on this screen, go through the 51 documents?

Not all of them, but --

THE COURT:  Sorry.  I said, "53."  Was I

off by two?

Maybe you had 51 in some other --

MS. CHEN:  50 or so.

THE COURT:  Very diplomatic.

MS. CHEN:  Yeah.

THE COURT:  You can gather them all together for me, right?  You can sort by category.

Is 51 -- it's in paragraph 30 of your declaration.  My apologies.

MS. TOMKOWIAK:  Your Honor, while she's sorting that, can I just provide a point of clarification on this document?

I don't know if you recall, but we had a dispute over how far back we had to go and produce our DMCA policies.  And, your Honor --

THE COURT:  And I made you go back further than you wanted.

MS. TOMKOWIAK:  Yes.

And so this policy is the one that predates the policy that we discussed.

THE COURT:  How can I tell that?  There doesn't seem to be any date on the document itself.

MS. TOMKOWIAK:  I agree.  The date is not on the face of the document, and so we're -- I'm trying to pull up the metadata now.  But this is the policy that you ordered us to produce, and it's -- so it's pre-December --

THE COURT:  And it dates from when?

MS. TOMKOWIAK:  Pre-December 2020.

THE COURT:  Pre-December 2020.

And are you suggesting to me that Mr. Donaldson was no longer required to "sign off" at some point relevant to this case?

MS. TOMKOWIAK:  That particular language is not in the policy that supersedes it.  That's what I know.

MR. KANE:  If Counsel could identify the policy that they say supersedes it, that would be very helpful.

THE COURT:  All right.

Obviously, I made a mistake permitting a mid-argument point of clarification.

Let's go back to Ms. Chen here.

MS. CHEN:  So I also wanted to note the point that if counsel wanted to identify for the Court that this policy was not in effect during a period that counsel wanted to view as relevant, that should have been on the record.

THE COURT:  Well, perhaps it could have been in Ms. Kelly's declaration.  But it's not?

MS. CHEN:  It absolutely could have been.

So for these 51 documents --

THE COURT:  Do you have the 51 documents all nicely sorted?

MS. CHEN:  Yes.

THE COURT:  Okay.  Great.

MS. CHEN:  So we were actually unable to find a log entry that is, for example, from Ms. Kelly to John Caleb Donaldson with a file name that says, "███████████████████████.  Please sign off."

So something as clear and crisp as that was not something that we were able to find.

THE COURT:  Do you have communications between Kelly and Donaldson?

MS. CHEN:  We do have that, but --

THE COURT:  That fall into this category of 51?

MS. CHEN:  Those, I believe, fall into other categories.

So the criteria for selecting these 51 documents are basically where a document explicitly references repeat infringers, the DMCA, suspension; things that -- basically, where the file name has a clear connection to Google's DMCA policy.

So, for example, if we look at Privilege Log Number 1 and Priv ID Number 15, this is a document titled "████████████████████████████████████ ██████████."

THE COURT:  Okay.  Workflows.  Got it.

MS. CHEN:  From April Kelly to counsel.
And the only counsel that was identified here is
██████████.  And it is described as e-mail seeking
legal advice of counsel regarding copyright policy
compliance.

So the title says the e-mail is a███████
████████████████████████████████.  It's about the
workflow.  It's about how Google's DMCA repeat
infringement policy works.  That is all that I can
tell from --

THE COURT:  Would you scroll over to the
far right column.

All right.  So you categorize this -- that
category in the far right is counsel's
characterization of --

MS. CHEN:  That was our categorization,
yes.

THE COURT:  So you put in the phrase "DMCA
policy implementation," as you suspect that this is
what this is about.

MS. CHEN:  Because it explicitly goes to
the ████████████████████████.

And I know your Honor said that you were
not convinced by our argument that this policy

compliance description is insufficient, but if I may try to convince you that it isn't ...

So take this document as an example.  If we take away the labeling of this communication as legal advice, all that this description tells us is that a communication occurred between Ms. Kelly --

THE COURT:  A non-lawyer.

MS. CHEN:  -- counsel, and a whole bunch of other people who are recipients, and the subject matter of that communication was copyright policy compliance.

Now, I take the point, and *Erie* was very clear about this, if the policy compliance is really about, for example, the policy it self's compliance with an external source of legal obligation --

THE COURT:  Right.  Our policy good enough? Should we change it?  Et cetera.

MS. CHEN:  We agree that that is legal in nature, and we did not/are not arguing otherwise.

What is problematic here is that the description doesn't actually say, for example, seeking legal advice of counsel regarding compliance with the DMCA.  It is phrased in a very specific way.  It is phrased as "copyright policy compliance," which denotes compliance with Google's

own copyright policy.

So, for example, if the question is about whether doing something does or does not comply with Google's own DMCA policy, I believe that the law in the Second Circuit is clear that that would not be privileged.  In fact, that is why both the trial court and the appellate court in *Erie* found it necessary to conduct in camera review for policy compliance documents because, just based on that description, you can't, in fact, tell whether it is legal advice or not.

So here, based on this entry, there is no way to tell whether Ms. Kelly asked a question about, how does our ████████████████████ work?  Or Ms. Kelly, in fact, had a legal question for counsel.

And that is the sort of issue that pervades this -- that is the sort of issue that pervades this privilege log.  So --

THE COURT:  Well, look, you're right, that *In re Erie*, both the trial judge and the Second Circuit reviewed the documents as to which privilege was claimed in camera.

I'm not sure the Second Circuit would have volunteered for that task, but they were reviewing

the work of the district judge who had undertaken that task.  I would not read *County of Erie* for the proposition that, in every instance where this issue comes up, every document must be reviewed in camera.

MS. CHEN:  Neither do we argue that, your Honor.  And that is why we did not challenge every single document that is on this privilege log that is described with this language.

THE COURT:  Right?

MS. CHEN:  I would read *County of Erie* to stand for the proposition that -- and, in fact, the Second Circuit explicitly says, if in-house counsel is acting as a policy advisor, that capacity is non-legal, so it does not stand to follow that, if a document is described as counsel gave legal advice about policy compliance, that automatically is privileged.

In other words, I do not believe that *County of Erie* would support that that description is facially sufficient because, if it were, then this -- then that is where the inquiry ends.

THE COURT:  I take your point.  I'm going to push back with you a little bit on *In re County of Erie* because, of course, the case ended up holding -- the Second Circuit ended up holding that

the documents were properly withheld as privileged, reversing the district judge on this point.

And I think the key language from *County of Erie* is the point about what is privileged, not so much the point about what isn't privileged.

And what they said as to what is privileged is as follows: "When a lawyer has been asked to assess compliance with a legal obligation, the lawyer's recommendation of a policy that complies or better complies with the legal obligation or that advocates and promotes compliance or oversees implementation of compliance measures is legal advice."

MS. CHEN: But the law descriptions here are not --

THE COURT: I take your point.

MS. CHEN: They do not say that.

THE COURT: We can't tell. We can't tell.

MS. CHEN: We cannot tell.

And there's another document that I wanted to bring your attention back to. So that is Exhibit 12, 593-12, and it would be on page 5 --

THE COURT: ECF page 5?

MS. CHEN: -- of the exhibit itself, ending in 4426.

THE COURT:  Got it.  And what am I looking at?

MS. CHEN:  Oh, actually, I apologize.  It should be the page after, ending in 4427.

THE COURT:  Okay.

MS. CHEN:  So we were talking about this document, and the context is a little bit unclear, but the metadata for this document shows that its title is ███████████████████████."

So "███," we believe, refers to ███ ███████, and "████" likely refers to █████████, the point of contact for Google's ███████ Team, so a team that was described in a different document as responsible for product relationships and legal policy implementation for Google Shopping.

So, in short, it is meeting notes between two people responsible for legal policy implementation.  Neither of them -- sometime in 2021, that's correct.

So in the middle of the document, under "████████████████████████████████ ██████████████████," there --

THE COURT:  Somebody's complaining that they're spending too much time on this and they're not getting enough sleep.

MS. CHEN:  Correct.

So the notes say, "█████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████ ████████████ ███████████████████████████████████ ██████████████████████ ██████████████ ██████████████████████████████."

So what this document is telling me was that somebody with a pretty substantial role in this process was saying, instead of a non-attorney ████████ ████████████████████████████████ ██████████████████████ --

THE COURT:  They are hoping that lawyers will step up and do that job.

MS. CHEN:  "███████████████████████ ██████████████████████."

Now, I don't know why it is that in-house counsel should be doing this coordinating, but this does not appear to be --

THE COURT:  Meaning the folks who are writing this document didn't want to do it themselves, and that's the first group they could think of.

MS. CHEN:  Right.  But it's not saying,

Adam is being a jerk, right?

It's specifically saying ██████████ ███████████████████████ .

THE COURT:  Okay.  I take your point. There are a number of documents in here.  This is probably not your best document.  Your best document is probably the one that Google tells me was prior to the relevant period, but you've certainly got a bunch of documents here that suggest, maybe, that in some cases lawyers might have been making decisions.

But your larger point is, Judge, you have to look at those 51 documents because we can't tell from the log, or else you just have to order them to produce them.

Do you want one of those two things?

MS. CHEN:  I think fundamentally, to make this a little bit simpler, it is Google's burden to show two things in withholding these documents. First, it has to show that privilege attached to these documents to begin with.

THE COURT:  Correct.

MS. CHEN:  And that is not helped by the fact that so many documents that Google produced in this case discuss all kinds of non-legal roles that Google's in-house counsel takes vis-à-vis its DMCA

policy, as well as a number of other policies.

They say that counsel takes these non-legal functions with respect to these policies, yet the privilege log overwhelmingly describes the documents as having to do with policy compliance.

Google could have helped us understand those assertions by, for example, giving us better privilege log descriptions when we asked for them.

THE COURT:  How many paragraphs do you want per document in a thousand-document-plus privilege log?

MS. CHEN:  Not in terms of the length, but in terms of the nature of the description itself because when the subject matter is about policy compliance, you just can't presume that it is actually legal advice.

THE COURT:  Ms. Chen, I'm not going to order them to produce all of these documents because there are not enough words in the privilege log, so I think if you want to make a pitch for in camera review, you should move to that.

MS. CHEN:  Understood, your Honor.

Be that as it may, Google has not given information that is necessary to determine, A, whether these documents only involve Google's

in-house counsel giving non-legal advice, such as if we terminate Joe Big Shot, Joe Big Shot is going to be very cross with us and we're going to lose a bunch of business, so let's not terminate him.  Or Google's counsel is saying, well, we need to -- we can't get away with not terminating him under the DMCA, which would be legal advice, but then that comes to the second step.

THE COURT:  Then the question is, was it legal advice being given in an advisory capacity to a decision-maker or was it the words of the decision-maker himself?

MS. CHEN:  That's correct, your Honor.

That goes to the second step of Google's burden, which is showing that privilege has not been waived because it asked attorneys to perform this function implementing its DMCA policy where Google has to show that it reasonably implemented a repeat infringer policy that provides for the termination of subscribers' accounts in appropriate circumstances.  And these ▮▮▮▮▮▮ go to the very heart of that question of appropriate circumstances, and we should be able to test that.

THE COURT:  And, therefore, you want me to ...

MS. CHEN:  Conduct an in camera review of these category of 51 documents that we identified as explicitly having to do with Google's DMCA repeat infringer policy.

THE COURT:  You suspect they may represent -- to the extent there would otherwise be a basis for privilege -- I'll just cut to the chase.

You suspect that these documents may show lawyers implementing the policy and, therefore, unable to claim privilege because it's part of their affirmative defense.

MS. CHEN:  That's correct.

THE COURT:  Okay.

Let me hear from Google.

MS. TOMKOWIAK:  I guess one broad point to start with, your Honor -- and I feel like a bit of a broken record here, but if the plaintiffs really wanted to understand whether by, you know, "copyright policy compliance" we meant compliance with Google's own internal policies or compliance whether our policies comply with the law, they had all of the information they needed to challenge that in September 2025.

When we talked about these descriptions, we specifically added the document title, which does

provide a lot more detail and is not something that's required by Rule 26, but is something that we agreed to do, and yet we didn't hear anything about this until December. And then a motion was filed, you know, in January. And so here we are again at the end of discovery dealing with an issue that, you know, they could have raised months and months ago.

THE COURT: Noted.

MS. TOMKOWIAK: Noted.

As to the reasonable implementation piece of all of this, that is an objective analysis that we're not relying on lawyer -- we're not -- we don't need to look at --

THE COURT: It's not about whether you're planning to rely on these documents as part of your affirmative defense.

Obviously, if you were planning to rely on these documents, you can't while, at the same time, withholding them as privileged. The good-faith defense, which has, sort of, morphed into this broader concept, which is applied in the employment context and in the telecommunications context and so forth, is that, if you have an affirmative defense where you have to show that you took reasonable steps not to violate the law, you have to show all

of the steps that you reasonably took not to violate the law, even if some of those steps were taken by attorneys whose work in other contexts would be privileged.

That's a layman's description of the doctrine we're working with here.  So it's not a question of whether you intended to rely on these documents or not.  It's a question of whether, given your burden on the affirmative defense, you've waived privilege for these documents so that plaintiffs are entitled to see them.

MS. TOMKOWIAK:  Yeah, I'm not -- I'm not sure I see it that way.  I think we've been clear that -- and I won't go -- that doctrine has not been applied exactly that way in every single context.

But be that as it may, I mean, I guess I don't see the waiver point.  I think what I've heard you say is that, if some subset of these documents reflected lawyers not providing legal advice, but instead being the business people who are on the ground implementing the policy, making the decisions, that that would mean that those documents are not privileged is what I heard you say.

THE COURT:  That's true, too.

MS. TOMKOWIAK:  Okay.

THE COURT: Let me give you an example.

Suppose there's a point in this process -- and the process is still a little fuzzy to me perhaps because it changed over time, perhaps because it was different in the eyes of different members of the ███████████ Team.

But let's suppose there's a point in the process where, to use Ms. Chen's language, Mr. Big Shot Client is about to have his account suspended under the ████-strikes policy, but because he's a big shot, that ██████████████████████.

Just go with me for the hypothetical now.

In Scenario A, Mr. Big Shot's case is ██████████ to a senior vice president who's not a lawyer, who says, I think we should make an ██████████████████████████████████████ ██████████████████████████████. Clearly, that would not be privileged if it was otherwise relevant and discoverable.

But let's suppose in Scenario B it gets ██████████████████████████████ ██████████████████████████████ ███████████    ██████████████████████ ██████████ That doesn't really matter. But he's filling the same role that a non-lawyer would fill

in implementing the policy, so even if there's some legal analysis in there -- which there might be because, you know, he's a lawyer, so he may be thinking about this stuff -- I think in Scenario B you would have a waiver of the privilege.

MS. TOMKOWIAK:  Yeah, I disagree, and I think it would depend on the --

THE COURT:  If he's making the decision, you would have a waiver of the privilege, in my view.

MS. TOMKOWIAK:  Yeah, I disagree.  And I think -- I don't mean to quibble with the hypothetical, but I do think it would depend on the nature of the request and whether there were legal concerns implicated by making an ███████ or not, especially at a company as big as Google that has to think about broader legal implications and risk.

THE COURT:  Now, if he's slotted in there as a decision-maker, in my view, you can't claim privilege for that.  But I don't know whether that ever actually happened because I don't know what's in these documents.

So what should I do?

MS. TOMKOWIAK:  Deny their motion.

THE COURT:  Hmm?

MS. TOMKOWIAK:  Deny their motion.

THE COURT:  Okay.  What's your second choice?

MS. TOMKOWIAK:  That's my second choice, too.  I mean, I don't think that they have shown a basis -- you know, to the extent your Honor is inclined to disagree, you know, your Honor, as you have said, has a lot of discretion here.  I don't think that they've shown a basis to produce any of these documents, certainly.  I don't think that they've even presented a basis for your Honor to review a subset of them in camera.

If you were to do such a thing, I would point you to the in camera review that you conducted, which was a very, very small set of documents, and not every single document that we challenged.  It involved each side picking a few documents.

THE COURT:  Right.

All right.  So here's what I'm inclined to do -- and I'll give each side an opportunity to tell me that I'm wrong, a brief opportunity to tell me that I'm wrong.

I am inclined to deny the February 9th motion except that, with respect to the category of

51 documents that we've been discussing for the last half-hour, I will reserve judgment until I have the opportunity to perform an in camera review of a sample of the challenge documents within that category.

There are 51 documents in the category. 20 percent, roughly, would be 10 documents. Each side gets to pick 5. Google gets to go first, because Google actually knows what's in the document, and gets to pick 5. And then plaintiff, which has to judge based on the privilege log, gets to pick its 5 most likely suspects.

Google will then send all of the 10 sample documents to me by e-mail, and I'll take a look, and I'll let you know what I decide.

All right. Anybody want to tell me I'm wrong in 30 seconds or less?

Ms. Chen?

MS. CHEN: We're happy to submit samples for --

THE COURT: You don't have to be happy to do it.

MS. CHEN: -- the in camera review, your Honor.

Your Honor, there was one -- I'm not trying

to tell you that you're wrong, but there was one document that I still wanted to bring your attention to, if that is okay.

So that was the first document that Counsel requested that you look at, Exhibit 11, same page, for the page number ending 7915.

THE COURT:  This is the ███████████████?

MS. CHEN:  The ███████████, yes.

So we understand that there has not been a lot of clarity on how Google's account appeal and reinstatement process works, and we have been trying to seek clarity.  That is the -- kind of, like, the purpose of all these questions that we have been asking.

But if you read Step 1, it says, "████████ ████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████."

So I want to briefly note that, here, legal input and ████████████ are used --

THE COURT:  Two separate things.

MS. CHEN:  -- as two separate entities.

And here, I understand legal --

THE COURT:  I agree with you, that, in this particular instance, "legal" probably means "legal."

MS. CHEN:  Right.

And I also agree with your Honor's observation that Ms. Kelly's declaration doesn't tell us anything meaningful with respect to counsel's actual role in account appeal and reinstatement.

THE COURT:  All right.

Ms. Tomkowiak?

MS. TOMKOWIAK:  I did not understand you to be saying that about Ms. Kelly's declaration, but regardless, I don't have anything to add to what I've already said about the reasons why we don't think that in camera review is warranted, but we understand your Honor's decision.

THE COURT:  Okay.  So let's talk timing; first, with respect to this privilege review.

I have to warn you, I have very little time the remainder of this month.  I cannot guarantee you that I will get through these documents until sometime in April.  I'll do my best, but it's rough for me this month.

So how quickly can you get the sample set to me?  Five from Google first.

You could probably do that this afternoon, but I won't hold you to that.

MS. TOMKOWIAK:  I have a train ride this afternoon.  Can we say a week from today?

THE COURT:  I think you can do a little better than that because I need to give plaintiffs an opportunity to consider your choices and figure out what their best counter-choices are.

MS. TOMKOWIAK:  Friday.

THE COURT:  Today is Tuesday.  How about next Tuesday?

MS. TOMKOWIAK:  I'm sorry, your Honor. I'm -- next Tuesday for getting the sample to you?

THE COURT:  Yeah.  Just to tell me -- well, really to tell plaintiffs which five you pick.

MS. TOMKOWIAK:  Oh, okay.  Yes, by next Tuesday, we tell them which five we pick.

THE COURT:  Okay.

MS. TOMKOWIAK:  Okay.

THE COURT:  And then plaintiffs -- so that's Tuesday the 17th.

Plaintiffs?

MS. CHEN:  So we can give our selection by next Thursday, your Honor, if that works.

THE COURT:  The 19th.  That's fine.

MS. CHEN:  And if we may be heard on the number of sampling, I just --

THE COURT:  I gave you an opportunity just a minute ago, and now you're thinking of one more thing.

MS. CHEN:  Well -- but that was before my sage partner was able to give me a suggestion.

So we respectfully suggest that -- since these documents in the 51-document category appear to be more individualized in the sense that there aren't a lot of documents with the exact same title, we would suggest a slightly larger sample than -- I believe your Honor ordered ten in total.

THE COURT:  Five and five.  That's right.

MS. CHEN:  Five and five.

We would suggest 20; 10 and 10.

MS. TOMKOWIAK:  Your Honor, that is --

MS. CHEN:  Based on your expression, can we suggest --

THE COURT:  Well, keep in mind, plaintiffs are the ones who want to hurry up and get discovery done, and the more documents I have to review, the longer it's going to take.

MS. CHEN:  Yes, your Honor.  How about 14; 7 and 7?

THE COURT:  Google?

MS. TOMKOWIAK:  Your Honor, the fact that

they're individualized only supports our point that they are sufficiently detailed.  And so I just -- I think that 20 percent is actually very consistent with your last in camera order, where it was 6 documents, and that was roughly 20 percent of 30.

THE COURT:  I am going to double my workload from last time.  Six documents from each side; 12 in total.  And that's my final offer.

MS. CHEN:  Thank you, your Honor.

THE COURT:  All right.

So Google will select six documents by the 17th.  Plaintiff will counter-select six documents by the 19th.

And, Google, if you could, send all 12 documents to me on a confidential e-mail by Friday the 20th.  And I will do my best to get to them quickly, but you have been duly warned.

Backing up to the motion we discussed this morning, I have ordered Google to designate one additional custodian and produce certain document retention policies.

Google, have you thought about how quickly those tasks can be accomplished?

MS. TOMKOWIAK:  I have not, your Honor.

THE COURT:  Last time I gave you a new

custodian, how long did it take you to collect, review and produce?

MS. TOMKOWIAK:  I think both sides have taken a couple months with new custodians.  I mean, again --

THE COURT:  It's just one.

MS. TOMKOWIAK:  This is starting -- I know, but it's ...

It's just one, but, as I mentioned, it's collecting the data.  It's -- we've collected the data.  But it's putting it into the database.  It's getting people to review it.  It's -- I mean --

THE COURT:  Right.  I know.  I take your point.  Of those 6,000, you may end up producing 5,000, you may end up producing 50 -- I understand that -- depending on what they actually turn out to be, right?

All you know so far is that they've hit on certain search terms.

MS. TOMKOWIAK:  Sure.  Yeah.  And I guess I haven't -- and I can try to do the math about -- you know, thinking about how many documents we can review in an hour, in a week, and, you know --

THE COURT:  Well, that depends, in part, on what they are.  If they're all repetitive,

generic-type, two-line e-mails, those will go very fast, but if there's actually some there-there, that will take longer.

MS. TOMKOWIAK:  Yeah, that's right.

And I guess the other question is, like, are we doing this in the context of trying to get 40 depositions also done in the next two months, or do we have some time --

THE COURT:  Well, I guess we're not going to be -- I guess we're not going to be doing Mr. ███████ deposition until his documents are produced.  I don't know that that needs to hold up other depositions.

I'm thinking a month to get this done. That's what I'm thinking.

MS. TOMKOWIAK:  To get Mr. ███████ documents reviewed and produced?

THE COURT:  Yeah.

MS. TOMKOWIAK:  Can we put a touch point -- it sounds like maybe you were thinking about scheduling another hearing anyways where we can --

THE COURT:  I'm going to be scheduling another hearing probably for mid-April because I know there are a couple of motions that were filed more recently that didn't make it onto the agenda

today, and I expect that at that hearing I will be extending discovery deadlines.  I'm not going to give you a specific set of dates today because I don't want to find myself in a month saying that wasn't long enough.  We need to do something else.

So I think, for planning purposes, you should absolutely feel free to go into May, for example, for scheduling depositions on the assumption that I am going to extend, at least to some degree, the fact discovery deadline largely because of plaintiffs' late-breaking and, at least in part, successful motions for additional document production.  The two do go hand in hand.  But like plaintiffs, I would like to move on as quickly as possible.

And, you know, in the long run, this will benefit Google as well.  My experience in my years practicing -- and I was, more often than not, on the defense side -- is lawyer time and, consequently, expense to the client expands in direct proportion to the amount of time the magistrate judge gives you to get it done.  So if I give you more time, it's going to actually probably end up costing your client more.  That's anecdotal, but I believe it to be true.

MS. TOMKOWIAK:  Yeah, I don't know if that will be true with this exercise or not, but I understand.  I guess I was just asking for a -- to see if maybe we could have that touch point in between now and whatever the deadline is so that we could let you know if there's any unforeseen issues that arises.

THE COURT:  Well, today is the 10th.  Darn it.  Just a minute.  I have to wake my computer up again.

There we go.

So a month would be roughly -- wait a minute.  That's strange.  Yeah, April the 10th.

Why don't I give you that date both for the new custodian and for the retention policies, but why don't I give you a touch point of, let's say, a week prior to that, which would be April the 3rd.

If you genuinely can't do it and you can be concrete about why you genuinely can't do it, after you meet and confer with the plaintiffs and try and work something out, write me a letter on April the 3rd and tell me what the problem is.

MS. CHEN:  Okay.  Yeah, that was the other thing I was going to mention.  We just need a little bit of time to see if, by some miracle, we can

negotiate a smaller set of search terms.

THE COURT:  Yeah.  Exactly.

And, certainly, the first thing you should do is see -- now that there's a hit report which will shortly be provided to plaintiffs' counsel, to see if the process can be narrowed and consequently made more efficient.

So the dates that we have, again -- for the privilege review, defendants will designate by the 17th.  Plaintiffs will counter-designate by the 19th.  The documents will be submitted to me -- obviously, only by Google because only Google has them -- on confidential e-mail by Friday the 20th.

You should copy plaintiffs' counsel on your cover letter saying, attached are documents with the following Bates numbers or whatever, but obviously don't copy them on the documents themselves.

And with respect to the April -- sorry.

With respect to the February 24th motion, I'm giving you a -- I don't want to call it a soft deadline, but an aspirational deadline, perhaps, of April the 10th, but if you really can't make that, let me know by April the 3rd after meeting and conferring with plaintiffs.

Now, I need to give you a date to come back

with all of the rest of your problems.  I'm not sure I need to try and solve any of those problems today, although you have described some of them in your various update letters.

So let me start by asking plaintiffs, do you think I need to solve any other problems today?

MR. KANE:  The one issue that I think is, sort of, holding up depositions a little bit is just the platform that we'll use to show exhibits.

THE COURT:  Ah, yes.  Thank you.  So -- I appreciate you jogging my memory on that.

So when I reviewed what you had to say about this platform dispute, after complaining to my law clerk that these people cannot agree on what day of the week it is -- which, as you can imagine, is a constant complaint that judges make to their law clerks in many, many cases about many, many lawyers -- my first thought was, why shouldn't the rule be that the party who takes the deposition gets to pick the platform?

In the absence of a stipulation ahead of time by the parties, that is what the rule would normally be.  However, I am now informed that you actually spoke to this issue in a stipulation.  And as I read the language of that stipulation, which I

have around here somewhere, it seems to say that where confidential documents are going to be used, which is going to be in just about every one of these depositions, I imagine, that the party claiming confidentiality is in charge of the platform.

Am I misreading that, Mr. Kane?

MR. KANE:  No.  I think that's what the ESI protocol says.

THE COURT:  Well, then, why shouldn't it be that way?

MR. KANE:  Yeah, so --

THE COURT:  If you are taking the deposition of a Google witness, Google -- and confidential documents are going to be involved, which they will, Google gets to pick the platform, and vice versa.

MR. KANE:  So there's two issues.  One is, when these depositions happen, very often, there is some sort of technical issue during the deposition. The witness --

THE COURT:  Well, why don't you take them in person, and then you won't have that problem?

MR. KANE:  So we are taking most of them in person, but it's still -- we don't show the exhibits

on paper.  They're just too voluminous.  We still show them through a platform.

So what we're talking about here is, like, we will be sitting in a conference room.  When we bring up the exhibit, are we bringing it up through Zoom or through Google Meet?

So it's a fairly narrow issue.  There are a couple depositions that will be taken remotely, but there's always some sort of technical issue in these depositions.  Someone can't hear.  They can't see.  The exhibit is too small.  They want to be able to control the exhibit, but they can't because it's on some other platform.

And when those things inevitably happen, the court reporting service has a technician who's in attendance for the entire deposition who solves it.  They know to click here and click there and check this box and uncheck this box, and all of a sudden, the problem is solved.

And I am going to say that in all the depositions I've taken with these remote platforms, it's probably happened in every single one of them.  If it's not every one of them, it's almost all of them.

The two court reporting services that we've

used before, Veritext and Planet Depots, don't provide that service for Google Meet.  In other words, there will be a technician there, but they don't purport that --

THE COURT:  Or he won't know anything about this particular platform.

MR. KANE:  Exactly.  And they will try to help you, but with Zoom, I mean, they know everything about it, and they can --

THE COURT:  Well, why don't you use a different court reporting service, one who knows about Google Meet?

MR. KANE:  We haven't found one that supports Google Meet; in other words, one that provides a --

THE COURT:  Who does Google use?

MS. TOMKOWIAK:  Yeah, I was going to say we're happy to make some vendor suggestions.  Google uses Google Meet all the time.  In fact, we've used it in four depositions that we've taken.  Attorneys from Counsel's firm have been there.  They've used it just fine.  They've even provided their witnesses tips on video format and how to make their screen --

THE COURT:  Do you have a technical person there to troubleshoot, if necessary, or the court

reporter knows how to do it?

MS. TOMKOWIAK:  We didn't have substantial technical difficulties.  But, yes, there's -- like, as Mr. Kane said, that's pretty standard in a remote deposition.

THE COURT:  Yeah.

MR. KANE:  I don't see any reason that they can't do it on Zoom.  It's not like they've pointed to some, like, security --

THE COURT:  You signed that stipulation, I didn't.  Why don't you have to just live with it?

MR. KANE:  I think, sort of, embedded in the stipulation -- like, if they wanted to do it by carrier pigeon, they wouldn't be allowed to do that. I think, like, assumed in the stipulation --

THE COURT:  They're doing it by carrier pigeon.

MR. KANE:  But I think assumed in the stipulation is that they're going to use a platform that has all the functionality that we need.

So, for example, on the Zoom platform, we can give a witness a document.  Like, I can have control of it while I'm asking them the questions, and then all they have to do is click on the document and they have control of it so they can

enlarge and change pages and do whatever they need to do.

Google Meet does not provide that functionality, like, off the shelf. You have to use a supplemental application in order to, sort of, embed that --

THE COURT: All right. Mr. Kane, I'm cutting you off. You should have thought of this before you agreed to the language in paragraph 35 of your protective order at Docket 82.

MR. KANE: Okay.

THE COURT: Anything else that's urgent for today?

Great. Now, when shall we meet again?

To further complicate my scheduling and, hence, yours, I'm out of town the second week of April -- well, really, the third week. I'm out of town the week of the 13th.

So I should plan to see you, I think, the second week, which is problematic because --
Ms. Oberdick, what do we think about the 7th?

THE DEPUTY CLERK: Let me look at it.

THE COURT: It looks like our only morning availability that week.

THE DEPUTY CLERK: Sorry. It's loading.

You have a 10:00 a.m.

THE COURT:  I do?  Why can't I see that?

April 7, 2026, it says I have an 11:00 a.m.

THE DEPUTY CLERK:  Yes.  You have a 10:00 a.m. slot open.

THE COURT:  Oh, I see.  But that's not going to help.  Hold on.

THE DEPUTY CLERK:  You could do the 22nd in the afternoon.

THE COURT:  Yeah, I don't want to go that late.  All right.

All right.  Counsel, I can give you the morning of April the 7th.

We can reschedule our 11:00, which is a short status conference, Ms. Oberdick.

And because I know you by now, I think we should start at 9 o'clock in the morning.  I have an afternoon calendar.

Does that work for counsel?

MR. KANE:  That works for us, for plaintiffs, your Honor.

THE COURT:  Defendant?

MS. TOMKOWIAK:  That works for us, your Honor.  And --

THE COURT:  Otherwise, we're going to the

week of the 20th.  Just saying.

MS. TOMKOWIAK:  Yeah.  I mean -- and we do have a bunch of depositions.

THE COURT:  All right.

MS. TOMKOWIAK:  Your Honor, if I can ask that -- I know you usually send out an agenda for the -- for those --

THE COURT:  I don't want people to prepare for things that I'm not prepared for.

MS. CHEN:  Yeah.  No, we -- and we appreciate that.  And so we would just request that -- there's been a lot of letters put on the docket giving you updates on the sampling exercise.

Can we add that to the agenda for the -- that hearing?

THE COURT:  Yeah.  But since -- for some reason, people have decided to tee that up, if you can even call it teeing it up, in the form of update letters rather than anyone actually making a motion.

How do I know when we're there; that is, when both sides' positions are adequately put before me so that I can make a decision?

MR. KANE:  So it was Google that requested relief in their status update.  We didn't request any relief.  We're satisfied with what we've

submitted thus far, but I don't know whether Google is.

THE COURT:  All right.  You don't need to write anything further.

MR. KANE:  Unless Google tells us that they're going to write something.

THE COURT:  All right.  So if I construe Google's submissions as a request to modify, basically, as a motion to modify my prior order with respect to the sampling, I can construe everything you've written to me so far as your opposition and we're done.

MR. KANE:  The plaintiffs are fine with that, yes.

THE COURT:  Do you want a -- who wrote last?  Did plaintiffs write last?

MR. KANE:  We did.

THE COURT:  All right.  You may have a short reply, and we'll call that a motion to modify. And if -- we'll do our best to get to it with the other, I guess, two formal motions on April the 7th.

All right.

MS. TOMKOWIAK:  Thank you.

When -- just for clarity, how long can we have for the reply?

THE COURT:  I don't know.  How about by Friday?

MS. TOMKOWIAK:  Okay.

THE COURT:  All right.

Going once.

MS. TOMKOWIAK:  Thank you.

THE COURT:  Twice.

Thank you, all, very much.  We'll be adjourned.  I'll see you in April.

C E R T I F I C A T E

I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of Cengage Learning, Inc. et al v. Google LLC, Docket #1:24-cv-04274-JLR-BCM, was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature  _ *Marissa Lewandowski* _

                 Marissa Lewandowski


Date:       March 12, 2026