```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
        ---------------------------:

        CENGAGE LEARNING, INC.,      : Docket No.: 24-cv-04274
        et al.,
                      Plaintiffs,    :

              v.                     :

        GOOGLE, LLC,                 : New York, New York

                                     : April 7, 2026

                      Defendant.     :

        ---------------------------:

                         PROCEEDINGS BEFORE
                 THE HONORABLE BARBARA C. MOSES
                 UNITED STATES MAGISTRATE JUDGE

        APPEARANCES:

        For Plaintiff:      OPPENHEIM & ZEBRAK, LLP
                            BY:  MATTHEW OPPENHEIM, ESQ.
                                 MICHELE MURPHY, ESQ.
                                 YUNYI CHEN, ESQ.
                            461 Fifth Avenue, 19th Floor
                            New York, New York 10017

        For Defendant:      LATHAM & WATKINS, LLP
                            BY:  SARAH A. TOMKOWIAK, ESQ.
                                 SARA SAMPOLI, ESQ.
                                 JENNFER FERRIGNO, ESQ.
                                 SARANG DAMLE, ESQ.
                            1271 Avenue of the Americas
                            New York, New York 10020

        Transcription Service: Marissa Lewandowski
                               Phone:  (631) 813-9335
                               E-mail:marissamignano@gmail.com

        Proceedings recorded by electronic sound recording;
        Transcript produced by transcription service
```

THE DEPUTY CLERK:  The court now calls

Cengage Learning, Inc, et al., vs. Google, LLC, case number 24-cv-4274.

Counsel, please make your appearances for the record.

MR. OPPENHEIM:  Good morning, Your Honor. Matthew Oppenheim here with my colleagues Michele Murphy and Yunyi Chen on behalf of the plaintiff, Educational Publishers.

THE COURT:  Good morning.

MS. TOMKOWIAK:  Good morning, Your Honor. Sarah Tomkowiak of Latham & Watkins on behalf of defendant Google.  I'm here with my colleagues Sara Sampoli, Sy Damle, and Jennifer Ferrigno, also of Latham & Watkins.

THE COURT:  And good morning.

All right.  Now, as of last week, I anticipated that we would be discussing three fully briefed discovery motions today, Google's February 27th motion involving the McGraw Hill clawback; plaintiff's -- what's the date of this one -- plaintiff's March 1 motion regarding primarily a hyperlinked document; and plaintiff's February 16th letter, which we're now treating as a motion -- rather, Google's -- well, I don't know whose motion it is; it came in on a bunch of letters -- about the

300 domain sampling project.

I'm going to take those, I think, in reverse order. But before we get to the 300 domain sampling issue, and in light of the issues raised in the letters I received yesterday from the parties, I thought it might be good both to get a few small things out of the way and to talk a little bit at a perhaps somewhat generalized level about the impact on discovery of the withdrawal of the DMCA affirmative defense.

As you know, the district judge is going to rule on the stay motion because it is so intimately related to her prior order denying a stay in anticipation of *Cox*. We now have *Cox*. We now have a second stay motion, and I assume we will have, next week, a Rule 12(c) motion with respect to the contributory infringement claim itself. That's all on the district judge's desk. And until and unless she grants the stay motion, I will not be making any decisions based on any assumption about her granting the stay motion.

But stay or no stay, the withdrawal of the DMCA defense has changed the parties' claims and defenses and consequently has changed the touchstones that I use to determine what discovery

is and is not both relevant and proportional.  So maybe we should start there, not necessarily in connection with any particular discovery dispute which is before me today.

But let me hear, I think, first from Google as to how, if at all, you think the lines of relevance for discovery purposes have been withdrawn, even if there is no stay and even if the contributory infringement claim stays in the case.

MR. DAMLE:  So I would submit -- so, yes, agree that the -- it's worth talking about the withdrawal of the DMCA defense, how that affects the discovery that is relevant and proportional.  I would also say that, just to add on top of that, regardless of what Judge Rochon does with the stay motion, I think the *Cox* decision itself is sort of a sea change in the law around contributory copyright infringement.  So even if we're proceeding with discovery, that also has to be taken into account in considering relevance and proportionality.

So both of those things, we think, need to be accounted for when assessing relevance and proportionality.  The fact that contributory infringement has been, you know, drastically narrowed, the scope of -- and I don't think that

there's really a -- there can really be a dispute about that.  That is the effect of the *Cox* decision, is to drastically narrow the scope.  Or maybe they won't agree with drastically, but --

THE COURT:  I have a feeling there may be some dispute about that.

MR. DAMLE:  Yes.  But it certainly narrows the scope of contributory infringement.  I mean, this Court repeatedly treated inducement and material contribution as two separate forms of contributory infringement.  We now know that material contribution is no longer.  And one of their theories in this case was a material contribution theory.

THE COURT:  Right.  Now it has to be either inducement or tailored to infringement.

MR. DAMLE:  Right.  And there's no claim here that --

THE COURT:  Tailored to infringement.

MR. DAMLE:  -- Google's platform is tailored to infringement.  There's -- you know, obviously, they're -- they think that their -- you know, that they can show, notwithstanding the change in law, inducement.  We disagree.  But it has to be inducement.  And so that is a change in the law.

They can never not show -- it's not sufficient for them to show that we had knowing a material contribution to infringement.  That -- *Cox* took that off the table.  So I think we have to account for that as well.

In terms of the -- in terms of just, like, the practical how do we get -- how do we sort of account for *Cox* and the withdrawal of the DMCA defense, what we would propose is that -- you know, that we sort of have a process by which we can go back and look at -- you know, for instance, let's take their -- you know, we're in the middle of depositions.  There's 30(b)(6) --

THE COURT:  No, you're not as far into the middle of that stream as I would have hoped you would be by now.

MR. DAMLE:  Understood, Your Honor.  But we are, you know, in the course of scheduling, taking depositions.  There's another deposition happening on Thursday of a Google employee.  But in the course, before we can have these depositions scheduled, we have to reach a -- you know, some sort of agreement or bring to the Court what, you know, 30(b)(6) topics are relevant.  They have over 70 --

THE COURT:  For 30(b)(6) purposes, yes, you

need to discuss that ahead of time.  For a percipient witness, traditionally, this comes up organically in the course of the Q and A.

MR. DAMLE:  For a 30(b)(1) witness, I agree.  But many of our witnesses are going to be both 30(b)(1) and 30(b)(6) witnesses.  So before we schedule somebody that's going to be both a 30(b)(1) and 30(b)(6), it makes sense for us to take account of the *Cox* decision, withdrawal of the DMCA defense, and assess what topics remain relevant.  And that's something we're, you know, ready -- ready to discuss.  But we need to be able to do that before we start scheduling those -- that set of witnesses.

And they have 76, I believe, topics.  So there are a lot of topics here.  We're continuing to -- we've been continuing to meet and confer with them about those topics.  I think we need to sort of take a pause and figure out what remains relevant, given these -- those two developments.

THE COURT:  And what, if any, effect do you believe the *Cox* decision has on the three fully briefed motions, which, for the most part, were briefed before that decision came out -- the three fully briefed disputes before me today?

MR. DAMLE:  Right.  So on the sampling --

THE COURT:  Take sampling, for example.

MR. DAMLE:  Yeah, sampling.  Okay.  Right.

So as you recall, the whole -- the reason why this Court ordered -- why they asked for why this Court ordered sampling was because, for purposes of the DMCA defense, how we generally apply our repeat infringer policy, not just to the merchants who are alleged to have advertised plaintiff's works, but in general, that is -- that is relevant to assessing whether Google had a valid --

THE COURT:  Sure.

MR. DAMLE:  -- reasonably implemented repeat infringer policy.

THE COURT:  Sure.  When I look back at the briefing that led to my 300 sample decision -- and, in fact, when I look at the briefing which is before me today, which was mostly written in March, as to whether Google should be permitted to substitute domains and so forth, it's full of language like this from plaintiff's counsel on March the 2nd:  "In December 2025, the Court ordered that for the purpose of testing Google's overall DMCA program, i.e. Google's implementation of its ███-strike policy outside of the 1,500 pirate websites that

infringed the works in suit, Google would randomly select 300 websites," et cetera.

MR. DAMLE:  Right.  Withdrawal --

THE COURT:  Which was the raison d'être for my --

MR. DAMLE:  Right, exactly.  So with the withdrawal of our DMCA defense, it is irrelevant to this case how we treated merchants that were not alleged to have advertised plaintiff's works, because there's no -- whether we had a reasonably implemented repeat infringer policy or not only goes to the question of whether there's a DMCA defense or not.  And given that we've withdrawn it, that -- and I think our letters lay out the burdens of actually conducting that sampling, and so when you're thinking about proportionality --

THE COURT:  Right.  Your letters, again, which were pre-*Cox*, mostly go to -- it turned out to be a lot more trouble than you thought.

MR. DAMLE:  Right.  Correct.  Now, what we would say is after *Cox* -- I think what we would say is the sampling order after *Cox* and the withdrawal of the DMCA defense, the right approach is to vacate the sampling order because it's no longer relevant.

THE COURT:  Why didn't you write me a

motion saying that?  I mean, maybe it came in after 5:00 o'clock last night.  I don't know.  I should tell you anything that came in after 5:00 last night I haven't read yet.

MS. SAMPOLI:  Your Honor, I don't mean to interrupt Mr. Damle, but I think --

THE COURT:  Ms. Sampoli?

MS. SAMPOLI:  Yes.  I believe in your either Thursday or Friday docket entry about this hearing, sampling was not on the list of things that would be discussed.

THE COURT:  I thought it was.

MS. SAMPOLI:  We are more than happy, if it would be useful for Your Honor, to write a very short, say, one-page supplemental brief.

THE COURT:  No, I think we can probably get into it today.

MS. TOMKOWIAK:  Okay.

THE COURT:  But now let me check the scheduling order that we put in on the docket.

Ms. Oberdick, do you have a docket number for what our menu was going to be today?

THE DEPUTY CLERK:  It was the last memo endorsement we did.

THE COURT:  Hold on.  It was last Thursday,

I think, right?

THE DEPUTY CLERK:  Yes.  Ms. Sampoli is correct, though.

MR. OPPENHEIM:  Your Honor, we're prepared to address it today.  It's fine from plaintiff's perspective.

THE COURT:  I know, but for housekeeping, just give me a moment here.  Indulge me.

THE DEPUTY CLERK:  Docket 783.

THE COURT:  78- --

THE DEPUTY CLERK:  -- 3.

THE COURT:  Thank you.  We neglected to put it on the menu for you.  The Court apologizes.

MS. SAMPOLI:  And, Your Honor, we're also happy to discuss it today, but that is -- we were planning on asking today for Your Honor's permission to submit something short to formally ask for a vacation -- or to vacate the sampling order.

THE COURT:  So, to sum up, Google's position is that with or without a stay and with or without success on the forthcoming 12(c) motion, the appropriate scope of discovery has been narrowed and discovery which has been requested or ordered entirely or primarily because it goes to the DMCA defense is no longer relevant to any claim or

defense in this case.

And you, Google, would include the entire sampling project there?

MR. DAMLE:  Yes.

THE COURT:  Whether it's 300 or whether it's -- whatever it's down to now.

MR. DAMLE:  Correct.  I would also add that -- you know, discovery that only went to a material contribution theory of liability, again, also would be irrelevant.

THE COURT:  Well, off the top of my head, in terms of the discovery requests that have come before me because they were disputed by the parties, I cannot recall off the top of my head any particular item or category that was pitched to me solely on that basis.  But perhaps I'm not remembering all of the many disputes that we have dealt with, yea, these many weeks.

So let me give plaintiffs an equivalent opportunity, in broad terms, to tell me what they think hasn't changed.  Mr. Oppenheim.

MR. OPPENHEIM:  Good morning, Your Honor. If I may, I'd like to address this first by speaking to the *Cox* issue, then speaking to the safe harbor issue.  But happy to take your questions in any

order you'd like.

The *Cox* decision has -- has no impact on the issue of relevance or proportionality here.  The material contribution claim is not gone in this case.  We believe when Judge Rochon is done reviewing the motions, we'll continue in its current form.  The *Cox* decision applies in the first instance to providers of service.  What that means, I'm sure Mr. Damle and I will debate for many years to come.  But we know for a certainty it doesn't apply in this case.  The *Cox* case --

THE COURT:  Your argument is going to be that an Internet service provider like Cox is significantly differently situated than Google.

MR. OPPENHEIM:  To say "Google" is a very broad thing.  Google does a lot of --

THE COURT:  Google Shopping.

MR. OPPENHEIM:  Great.  Google Shopping is an ad agency, essentially.  They are creating and serving up ads to specified targeted users.  So as a preliminary matter, I believe, because this is classic inducement, this case doesn't fit within *Cox*.

But even if you took inducement out, what Mr. Damle said was material contribution is gone.

That is not true.  That is a massive overreading of the case.  And already, there has been a decision out of California -- a California federal court finding that not to be true.  So -- but we need not decide that today.

THE COURT:  Well, wasn't that the point of Justice Sotomayor's concurrence?  She disagreed.  She felt that material inducement or aiding and abetting should still be in the mix.  But she's concurring in the judgment.  She's not writing the majority opinion.

MR. OPPENHEIM:  So I agree with her.  But she was saying that in the context of 512(a) providers, which is what the *Cox* case was about:  A 512(a) provider who was providing connectivity to a user over essentially a wire.  Right?  There is nothing about *Cox* that says material contribution is gone and the 80 to 100 years of Second Circuit precedent of material contribution law being disappearing.

In fact, if you go back to *Grokster*, *Grokster* cites to the old Second Circuit law of material contribution.  We need not decide this here today, Your Honor.  We will have, I am certain --

THE COURT:  But *Grokster* fits into the

tailored to inducement branch, correct?

MR. OPPENHEIM:  It does -- it does as well. But the Court in *Grokster* cited to the Second Circuit material contribution law in an affirmative way.  So, again, we will get into all of this before Judge Rochon, but the notion that material contribution is gone is one that will be heavily debated.  And the idea that it somehow impacts the scope of discovery here is certainly not true.

This is a classic inducement case.  If creating and serving up an ad is not inducement, I don't know what is.  What Mr. --

THE COURT:  I'm interested to hear you say "creating" -- not just serving up an ad, but creating an ad.  And I saw some language to that effect in the letters which are not before me as well.  What do you mean?

MR. OPPENHEIM:  Their -- Google's own documents -- and we're looking, frankly, to explore this in greater depth.  But Google's own documents indicate that Google tells its merchants that it will create the ads for them.  It goes out; as I understand it, it obtains the image of the book that it is then advertising, it creates the ad, and it puts it up there.  I believe the documents all --

THE COURT: But they have people -- live human beings saying, "Let's put the image in the upper right-hand corner here because that will make a better ad?" I'm sure they don't.

MR. OPPENHEIM: I'm sure they don't either, Your Honor.

THE COURT: So what do you mean, "create the ad for you"?

MR. OPPENHEIM: They've created processes for deciding how to create the ad. They actually put it together. They have the -- they go out, they retrieve the image of the book that's going to be advertised, as I understand it. They decide whether to advertise it and who to advertise it to. All of this is Google controlled, they'll say Google proprietary, they'll say automated. They built the system. It's Google's system.

Google created a system that creates the ads, targets users, serves those ads for known pirate materials and for known pirate merchants.

THE COURT: Creates the ad. I'm still struggling a bit with this.

For many years, my husband and I, when our children were still small and photogenic, used to create an annual holiday card using one of the

online --

MR. OPPENHEIM:  We still do, Your Honor.

THE COURT:  Well, your children may be younger than mine.

-- using an online service, and this online service would create the card for us.  It would give us a zillion different shapes and sizes, one with two photographs, one with seven photographs, one with snowflakes, et cetera, et cetera.  And we would choose which of these algorithms, essentially, we wanted to use.  And then we would say use this photo and use that photo.  They would even offer, because I think they did have some automated process, if we just threw a bunch of photos in there, they would pick the ones.  They had some computer program that would pick the photographs that would, I don't know, look good next to the snowflakes.  I don't know how their algorithm worked.

I'm just wondering, on your theory, if I had dropped some copyright-protected photographs in there without telling the service that I was -- these were not my own photogenic children, these were some famous photographs that were copyrighted by some famous photographer, would it be liable for contributory inducement -- contributory

infringement, I'm sorry, on the material inducement theory because it, quote, "created the card," close quote?

MR. OPPENHEIM:  It's an interesting question, Your Honor.  We don't have to answer it here because -- and it's not because your children aren't photogenic.  It's because the case here is completely different.  The case here is every single --

THE COURT:  I'm just test -- I'm trying to figure out the edges of your theory here.

MR. OPPENHEIM:  I understand.  I understand.  And, and we will have, I am sure, after discovery is complete, a thorough discussion at summary judgment on this.  Many of the answers to the questions that I have have not been answered yet, and we'll get, hopefully, in depositions.

But in this instance, every single one of the ads was served up after Google was told it was infringing.

THE COURT:  The -- the works in suit ad?

MR. OPPENHEIM:  Work.  The specific work for that specific merchant at that specific domain.

So maybe the greeting card company wasn't liable, or maybe it was, in the first instance that

you created that card.  But if they were told by Ansel Adams, "Hey, Judge Moses keeps uploading Ansel Adams' photos and making cards with it and you should stop," then that card company should probably stop.  Though I will admit, I don't know if Ansel Adam photos are still within copyright protectivity.  I think they are.

THE COURT:  I think they are.

MR. OPPENHEIM:  Not sure.

THE COURT:  Okay.

MR. OPPENHEIM:  So, in any event, the reason this comes up is because you asked the general question, but then Google's counsel said, "Oh, we're going to have to delay the 30(b)(6)s.  We have to negotiate new scope."  They're essentially self-helping them to a -- themselves to a stay that hasn't been granted and I don't believe will be granted.

This process -- this case needs to move forward.  It has been delayed over and over and over again, and we're going to get -- not on the agenda today is the motions practice with respect to -- I'll call it Mr. L --

THE COURT:  No, I'm prepared to rule on Mr. L today.  I'm inclined to give Google the extra

11 days, and, frankly, under the circumstances, I'm surprised I got so much ink over 11 days.

MR. OPPENHEIM:  Your Honor, I'd like to speak to that, either now or later, whenever you want.

THE COURT:  Your choice.

MR. OPPENHEIM:  Why don't we put -- why don't we continue on the *Cox* issue?

THE COURT:  All right.

MR. OPPENHEIM:  So this case should proceed in the manner that it is proceeding on the claims that are before the Court until and unless the Court grants a stay or a motion to dismiss.

THE COURT:  So if you would then turn specifically to the issue that I thought was on the agenda, and therefore maybe it is, although we neglected to signpost it for you last week, for which we apologize, which is the 300 domain sampling project.  That whole project was constructed -- I was persuaded to permit discovery that went beyond the way that Google treated the works in suit precisely because -- and this was the pitch from your colleague; I believe it was Mr. Kane who argued it principally -- because, Your Honor, he said -- I'm paraphrasing now -- as long as the DMCA

affirmative defense is in the case, Google has to give us discovery beyond the works in suit.

MR. OPPENHEIM:  And that is what we argued at the time.

THE COURT:  Right.

MR. OPPENHEIM:  And I don't -- I don't dispute that, Your Honor.

Let me back up on the DMCA defense broadly.

THE COURT:  Well, now it's not in the case.

MR. OPPENHEIM:  Well --

THE COURT:  And Justice Thomas has reminded us in *Cox* that under Section 512(l), a failure to mount an effective DMCA defense is a failure to mount an effective affirmative defense.  It's not evidence of infringement.

MR. OPPENHEIM:  No dispute there, Your Honor.

Let me speak broadly to this -- to the withdrawal of the safe harbor defense, and then I'll speak specifically to the 300.  This is the sample. First of all, I just -- I want to cast some doubt on the notion that the reason this DMCA defense is being withdrawn is because of the *Cox* decision.  If that were true, they would wait until there was a decision from Judge Rochon.  In fact, I believe the

reason it's being withdrawn is there's never really been a factual basis for it.  I will put that aside.

THE COURT:  But for my purposes today, why does it matter why it's being withdrawn?

MR. OPPENHEIM:  And I'm -- well, first, as a procedural matter, I would like to have it actually withdrawn.  We don't dispute that they've said they're withdrawing it.  Before Judge Rochon, there is no filing.  There's nothing in the record. We've asked them to just file something on the docket withdrawing the defense, making Judge Rochon aware and, frankly, the public aware they're withdrawing the defense.  They've refused to do so.

I think they need to do so.  But we'll presume it's withdrawn for purposes of this argument.

Mr. Damle said -- and I'm going to -- I'll try to quote him as closely as I can.  Whether they had reasonably implemented a DMCA policy only speaks to the DMCA defense.  That, I could not disagree more with.

THE COURT:  Well --

MR. OPPENHEIM:  They --

THE COURT:  -- isn't that what Justice Thomas said too, that I just quoted or

paraphrased for you?

MR. OPPENHEIM:  So Google refers to its repeat infringer policy as a DMCA policy.  And so we refer to it as a DMCA policy.  And this is Google's --

THE COURT:  And now you want to call it something different because you want to continue getting discovery into matters that, up until now, your only hook for discovery has been the affirmative defense.

MR. OPPENHEIM:  I don't want to call it anything different.  It's -- they call it what they call it.  That's up to them.  What I do know is I don't want them to get up in front of a jury and say what they said in the beginning of their complaint.  And if I may quote them, Your Honor, Google takes the problem --

THE COURT:  The beginning of their complaint?

MR. OPPENHEIM:  Pardon me?

THE COURT:  You said the beginning of their complaint.

MR. OPPENHEIM:  Sorry.  Their answer.

THE COURT:  Thank you.

MR. OPPENHEIM:  Thank you for correcting

me.

Quote, "Google takes the problem of online piracy seriously.  Google has taken substantial steps to assist intellectual property owners in protecting their rights by adopting industry-leading practices to combat infringement across its Shopping platform.  For users that violate Google's terms, Google can and does remove users infringing content and kicks bad actors off the Shopping platform altogether.  And Google provides a robust system for intellectual property owners to report allegedly infringing content to Google."  That's docket 271 on page one, Your Honor.

And this -- this approach and this message that Google has, it's not just in this case, it's what it's telling the world.  In its filing with the Patent and Trademark Office, a document with the Bates designation Google-Cengage409388, Google said the following, quote, "We have clear policies against counterfeits on Google Shopping and take proactive measures to combat counterfeits.  In addition, merchants must provide high-quality data feeds about the products they are offering on our platforms.  This has the practical effect of helping to filter out some bad actors, including

counterfeiters.  If a counterfeiter manages to bypass our proactive measures, as with Google Ads, we provide a way for brand owners and consumers to notify us using a reporting form.  In response to a valid complaint, we take action against the merchant within 24 hours, often terminating the merchant account."

This is Google's message.  This is what Google has said to the world.  This is what Google has said in this case.

THE COURT:  You're not testifying to Congress, Counsel.  The question here --

MR. OPPENHEIM:  I'm getting there, Your Honor.

THE COURT:  -- is what's relevant to the claims and defenses currently pleaded in this action.  And I take your point that you're entitled to clarity as to what's currently pleaded in this action.  It may be that Google needs to file an amended answer or some formal withdrawal indicating to you what portions of the answer are being withdrawn.  I take that point.

But what Google does or doesn't say to the world at large about its good corporate citizenship is not really what's the issue before me for

discovery purposes.

MR. OPPENHEIM:  So there's a -- there's a narrow issue and a broad issue.  The narrow issue is that we are entitled to explore the policy at issue and Google's adherence to the policy at issue for the infringing ads in this case.

THE COURT:  Well, quite possibly for the infringing ads in this case.  But up until now you have argued for and obtained discovery beyond that.

MR. OPPENHEIM:  Correct.  But the question is, do they comply with their own policy?  We know that -- we know that they haven't complied to it with respect to the ads in our case.  That, boy, the evidence is -- is -- I mean, they won't admit it, but it's irrefutable.

The question is, have they wholly failed?  And that's a critically important question both to culpability and to the issue on damages in a statutory damage case in copyright, which includes the need for deterrence.

So -- so it speaks to that.  It also speaks to the issue of willfulness.  If they have a policy that they are not abiding by -- right? -- and they know it -- and, by the way, we know they know it.  We got a -- we recently saw a document, an entire

internal report about ████████████████████████ ████████████████████████████. All of this general knowledge and their general approach and their failure to implement their own policy is very specifically related to this case. But it's also more broadly related.

THE COURT: With respect to the works in suit, maybe. With respect to Amazon.com, I'm not seeing it.

MR. OPPENHEIM: So I'm going to pick Etsy instead of Amazon, but the same difference, for our purposes. Etsy ads include -- are replete with e-book ads that are counterfeit.

THE COURT: But not your books?

MR. OPPENHEIM: It just doesn't -- it just so happens not to be in the notices we sent them. Clearly relevant to the issue of deterrence, clearly relevant to the issue of an injunction, and -- and they -- if they want to come forward and say none of those 31 merchants that are at issue ever advertised an e-book, then it may be a different discussion.

We know they can't say that. We know that those accounts, at least some of them, for a certainty, are advertising e-books. They're the ones with the information, not us.

But let me speak --

THE COURT:  Counsel, let me ask you the question from a slightly different angle, because so far it seems to me that what you're saying is that Google's withdrawal of the DMCA affirmative defense, which you have agreed, we are assuming, is an actual withdrawal for purposes of today's discussion.

MR. DAMLE:  Absolutely, Judge.

THE COURT:  So far, what you seem to be saying to me is that the withdrawal of this affirmative defense upon which you have hinged so many of your discovery requests, including some that I have granted over strenuous objection, that the withdrawal of that affirmative defense has no effect whatsoever on the scope of discovery.

Is that actually your position?

MR. OPPENHEIM:  It is, Your Honor.

THE COURT:  That's remarkable, Counsel.

MR. OPPENHEIM:  It may be remarkable --

THE COURT:  How can that be?

MR. OPPENHEIM:  Well, Your Honor, did we list each and every reason in our -- in our three- to five-page filings with you for seeking certain discovery?  We certainly didn't.  The defense was in.  It was an obvious hook.  We went with that.  We

try to narrow the issues for the Court.  The fact that they've now pulled that defense out shouldn't somehow now undermine our ability to get this generic discovery.

Your Honor, I like to fashion myself something of a trial lawyer, and I imagine -- I see these cases, the discovery process, as it's going to play out in front of the jury, as I did in the *Cox* case, Your Honor.  And I can imagine Google's counsel getting up in front of the jury in an opening statement and saying exactly what they said to the PTO or exactly what they said in the beginning of this --

THE COURT:  With the withdrawal of the DMCA defense, I think you might have a colorable limine motion on that.  That's not going to be my issue.  But the scope of discovery, which I am required to rule on on an ongoing basis, is not -- I am not going to make that decision based on what you think their opening argument is going to be.

MR. OPPENHEIM:  So, Your Honor, the -- the first thing I quoted to you from the Google complaint is not a paragraph in support of their affirmative defense.

THE COURT:  I understand.  It's up at the

top.

MR. OPPENHEIM:  It is -- Google is not going to get up and limit their arguments in this case to just the ads in this case.  Google is going to say they're a good actor, they work hard, they do their best, they try to deal with counterfeiters, they take proactive measures.  They're going to say those kinds of things, I am certain of it.

THE COURT:  Okay.  Counsel --

MR. OPPENHEIM:  And we have a right to say that that's not true.

THE COURT:  Counsel.

MR. OPPENHEIM:  Apologies, Your Honor.

THE COURT:  I can only repeat what I said a moment ago.  I am not making discovery decisions based on what you think they're going to say in front of the jury.

MR. OPPENHEIM:  I'm not asking you to make it on that basis.  I'm asking you to make it on the basis -- a number of bases.  First of all, they put it at issue in their own answer.  They chose to write that as the introduction to their answer. They didn't have to do that.  Right?  That's what they wrote.  That's number one.

Two, they have a policy for dealing with

the ads in this case.  We get to, I believe, as a matter of discovery, explore whether or not they actually -- that policy was a complete farce.  Not just as to our ads, but as to everybody.  I believe it was, Your Honor.  I believe that policy was a complete farce.  I believe that their statements to the public are, at best, misleading but, more likely, a complete lie.

THE COURT:  So you also don't think that Section 512(l) has any implication whatsoever for discovery in this case?

MR. OPPENHEIM:  I don't believe it impacts it here, Your Honor.

THE COURT:  That's -- I find that quite aggressive.

MR. OPPENHEIM:  This -- they've withdrawn the defense -- fine, Your Honor.  I accept that.  In a traditional copyright case -- I'll give you an example.  We tried a case before Judge Pauley, 2018, involving physical counterfeit books.  No DMCA defense, though maybe they asserted one early on, and it was withdrawn, so I'll be careful there.  But no DMCA defense.

They argued broadly, the defendant, that they had done everything they could to avoid

distributing counterfeit books.  We got to explore what their policy was generally, how they imposed it, how it worked, what counterfeits they had caught, what they hadn't caught.

We weren't limited to just the plaintiffs in the case.  As soon as they said, "We had a policy, and we were trying to stop this," we got to take discovery into that assertion.  They're -- they're saying that.  They've said that over and over and over again.  Whether it's part of their DMCA defense or it's part of their defense to culpability, it's in the case.

THE COURT:  Well, I think you're making a very good argument for a formal amendment to the answer, because I think I need to know and you need to know and Google probably needs to decide what its defenses are, what it means to say we've withdrawn our DMCA defense.

MR. OPPENHEIM:  I'm thinking about that, Your Honor.

THE COURT:  I can see that Ms. Tomkowiak is thinking about that as well.  I'll give you a chance in a moment.

MR. OPPENHEIM:  Did you want me to cede the podium?  Sorry.

THE COURT:  No.  No.

MR. OPPENHEIM:  Oh, okay.

THE COURT:  I'm just queuing her up for later.

MS. TOMKOWIAK:  Thank you, Your Honor.

MR. OPPENHEIM:  Even if they strike that paragraph at the beginning of their complaint, the policy that they had in place at the time is -- I mean, that was in place at the time.  And they should have abided by that policy when they got our notices, because the policy provided what they were supposed to do when they receive notices.

And so whether or not they actually believe that that policy was effective or whether it was a farce is something we, as a matter of discovery, should have an opportunity to explore.  And I don't think that they can -- there's a way that that changes if they amend their answer, but I'm curious if the Court has some other thought on that.

THE COURT:  I think, at first blush, that discovery into how Google's safe harbor policy was or was not applied with respect to products, including e-books that are not part of this case, that do not involve the works in suit, I think that that discovery can no longer be justified by the

presence of the DMCA affirmative defense because there is no longer a DMCA affirmative defense.

And I am struggling to see, as you apparently do see -- I am struggling to understand how that discovery is relevant to your -- is relevant to your claim for contributory infringement.  Even if I assume, as you tell me, that the path to contributory infringement is not the two narrow categories that Google tells me are left after *Cox*, even if, as you tell me, material inducement remains a path down which you can travel towards contributory infringement in the case of what you call an ad agency like Google Shopping, as opposed to an Internet service provider like Cox, I am really struggling to understand how your -- let me put it another way.

I can understand the argument that you should still be permitted to show at summary judgment -- or ultimately, to the jury -- that the protection that Google claims to have erected with respect to the works in suit didn't work, was weak, was a farce, was a sham.  Pick your language.  But with respect to works that are not in suit, I'm not seeing it.

MR. OPPENHEIM:  Your Honor, a couple

clarifications.  You called it their DMCA safe harbor policy, so I --

THE COURT:  Loose language, my apologies. Their affirmative defense.

MR. OPPENHEIM:  And my point isn't to call you out on words.  My point is to say the words are irrelevant.  Whether they called it their Humpty Dumpty policy or they called it their copyright policy or they called it their DMCA policy is irrelevant.  It was the applicable policy for the ads for infringing works and the ads for which they received notices from plaintiffs.  What the policy is called doesn't matter.  And so we get to explore the policy.

THE COURT:  Right.  But if their --

MR. OPPENHEIM:  We get to explore whether the pol- --

THE COURT:  -- affirmative defense is withdrawn, they no longer have the burden of proof to show that they had an effective one across the board.  And that was the hook for a lot of the discovery that we've been doing.

MR. OPPENHEIM:  Your Honor, the burden may -- I agree that they --

THE COURT:  The burden may have shifted.

MR. OPPENHEIM:  The burden may shift, but now the burden's on us to show that the policy was a farce.

THE COURT:  Well, I'm not sure that you have the same breadth of relevance with the burden on you that they did with that formal affirmative defense in the case.

MR. OPPENHEIM:  So I believe it's either relevant or not relevant, and the question is then proportionality.  And --

THE COURT:  If it's relevant, the question becomes proportionality.

MR. OPPENHEIM:  So I believe we passed the -- the threshold of relevance because we claim that the policy is a sham and -- and that they didn't actually believe that the policy was working, and so I believe it's relevant.

So then the question becomes proportionality in a case that's worth over a billion dollars.  I think it's very hard for Google to say it's not proportional.  But they've already said that in this sampling -- and now we're getting to the details.  This sampling procedure was their proposal --

THE COURT:  And I've already seen that

before they withdrew the affirmative defense.

MR. OPPENHEIM:  Right.  So that goes back to whether or not it's relevant.  It doesn't change the proportionality analysis.

THE COURT:  All right.  Let me hear from Ms. Tomkowiak.  We're still up at a relatively high level here, I take it.  And I do want to hear from you as to what you propose to do with respect to your pleading, that actual piece of paper that judges look at to determine what the claims and defenses are in the case.

MS. TOMKOWIAK:  Yes, Your Honor.  On that topic, you know, ordinarily, this might be dealt with in a pretrial order, in terms of which affirmative defenses are actually going to be pursued at trial.  Here, we understand that, under the circumstances, it would be helpful for everybody to have clarity.

On our end, we have been discussing whether to amend our answer, which I believe would require leave, given that we have already amended once as of late --

THE COURT:  That's right.

MS. TOMKOWIAK:  -- versus filing a letter and whether that would be sufficient.  Either way,

we would plan to file something with the Court by next week --

THE COURT: Okay.

MS. TOMKOWIAK: -- and go from there. So if Your Honor has any guidance as to the format, we are open to it.

THE COURT: Well, today is the 7th, so why don't we say -- and, by the way, I'll be out of the country next week, so you can file things next week, but I'm not reading them until I get back. Just be aware of that.

Why don't I give you a deadline to keep you focused? By a week from today, which is to say April the 14th, Google is to submit a letter in which it advises the Court whether it is seeking leave to file an amended answer or not. If it is seeking leave to file an amended answer, you can go ahead and explain why you are seeking leave to file an amended answer. I don't know if you will have a proposed amended answer ready by next Tuesday. Would you? So consider it a premotion letter, then.

MS. TOMKOWIAK: Yeah, I would appreciate that, Your Honor. I don't know that we would have the amended answer itself ready to go by then.

THE COURT: Right. So consider it a

premotion. And if, for some reason, you don't want to amend your answer, which I think might be perhaps the cleanest thing for you to do under the circumstances -- particularly given that, as Mr. Oppenheim pointed out, there are a number of factual assertions made throughout the complaint which, on review, you may now consider as having been tied to an affirmative defense which you wish to withdraw, and life might be simpler for everybody if you were clear about that.

MS. TOMKOWIAK: That's the part I think would take some time.

THE COURT: So send me a letter by the 14th, a premotion letter, if you are planning to move to amend. And if you're planning to do something else other than amend and you think that would be satisfactory under the circumstances, tell me what it is you want to do and why you think it would be satisfactory under the circumstances. And I'll give the plaintiffs until Friday to respond to that letter.

Does that work for you, until Friday the 17th?

MR. OPPENHEIM: That's fine. Though, Your Honor, I'll say I don't believe it changes

the -- even if they withdraw those statements, I don't believe it changes the issue before the Court at the moment.

THE COURT:  Yeah, I think I have your position --

MR. OPPENHEIM:  Thank you, Your Honor.

THE COURT:  -- on that.

MS. TOMKOWIAK:  Your Honor, did you want to --

THE COURT:  So that's what -- hold on.  So that's what we'll do with respect to what, if anything, is going to happen to the pleadings as a result of what Google has described as its withdrawal of that affirmative defense.

With respect to the issue that I thought was on the agenda today -- and apparently, I neglected to tell the parties it was on the agenda today.  Again, the Court apologizes, but it's just as well, because I think that is now going to have to abide any changes in the answer, any changes in the pleadings.

My inclination -- this is not a secret, but since I haven't really given anybody a chance to formally brief it, I'm not going to make a ruling today.  But my inclination is to say that this whole

discovery project is no longer relevant to any claim or defense in this action.  And to the extent an argument for relevance can still be made, the proportionality calculus becomes more unbalanced because the relevance proposition is weaker than it was when plaintiffs successfully argued to me that, "We need this, Your Honor, to test their affirmative defense."

So we won't do that today.  But by the same token, I am not going to be ordering Google to move forward with respect to that category of discovery today.

Mr. Oppenheim.

MR. OPPENHEIM:  Thank you, Your Honor.  I appreciate the process the Court set forward.  I'm concerned that Google is going to use this as an opportunity to obstruct kind of all discovery going forward, saying it all changes, as Mr. Damle already foreshadowed, and that we're -- they're essentially going to give themselves an effective stay of discovery.

THE COURT:  You weren't here last time.

MR. OPPENHEIM:  I've been monitoring this case --

THE COURT:  I'm sure you have.

MR. OPPENHEIM:  -- and overseeing it very closely, Your Honor.

THE COURT:  But as you know, although I did not extend discovery deadlines when we were last in Courtroom 20A, I signaled to the parties that that is something that I felt I was going to have to do, due to a whole pileup of issues.  Your current discovery deadline is -- for fact discovery is one month from today.  You're not going to meet that. Nobody's going to meet that.  We know that.

So the discovery deadline is going to be extended.  I'll do that before I get off the bench today.  And if that gives your opponent, Mr. Oppenheim, a little more play in the joints in terms of what you call obstructive behavior and what I'm sure they call something different, so be it.

MR. OPPENHEIM:  Understood, Your Honor.

We put to the side the issue of Mr. L.  So may I speak to that now?

THE COURT:  You may.  But is that really what you want to spend your time on this morning?

MR. OPPENHEIM:  If you've made up your mind, Your Honor, you've made up your mind.

THE COURT:  I'm always willing to hear -- not always.  Right now, I'm still willing to hear

from you on it.

Go ahead.

MR. OPPENHEIM:  I appreciated the Court's prior ruling that you -- you set out a path for the parties, and you said try to renegotiate terms.  If you can't, Google, you got to go with the existing terms --

THE COURT:  I understand your argument.

MR. OPPENHEIM:  -- and you set a deadline.

We tried to renegotiate terms.  They wouldn't share even the scantest of information.  And so we said, fine, if you don't want to have a real meet and confer, then just produce the documents.  And now the Court is relieving them of the deadline, and we're having yet more delay.

I appreciate the Court is going to move the schedule, and I'll let Ms. Murphy speak specifically to the dates, but we need you to move the schedule even without mission creep -- and I'm trying to use a soft, nonpartisan term -- so if, in fact, they start revisiting all of this discovery, it's going to be months and months of additional fact discovery.  And this case, frankly, Your Honor, is proceeding slowly.

THE COURT:  Okay.  So with respect to

Mr. L, I will grant the 11 extra days for the document production.

Ms. Sampoli, what does that bring us to? Or Ms. Tomkowiak.

MS. TOMKOWIAK:  That was --

THE COURT:  Remind me, what date did you ask for?

MS. TOMKOWIAK:  That's okay, Your Honor. April 21st.

THE COURT:  All right.  Fine.  April 21st for Mr. L's documents, and the parties should plan to schedule his deposition for the month of May -- month of May for Mr. L.

Okay.  Perhaps we should turn to the clawback motion, which I really don't think is affected by either *Cox* or by the withdrawal of the DMCA defense.

So who will be arguing that motion to me?

MS. TOMKOWIAK:  That would be Ms. Ferrigno, Your Honor.

THE COURT:  Okay.  And for plaintiffs?

MS. MURPHY:  That will be me, Your Honor.

THE COURT:  Ms. Murphy.

All right.  Well, this is Google's motion.

MS. FERRIGNO:  Yes, Your Honor.  Would you

prefer I go up or sit here?

THE COURT:  It's entirely up to you, as long as you can be clearly heard by me.

MS. FERRIGNO:  Can you hear me?

THE COURT:  Yes, that's fine.

MS. FERRIGNO:  Great.

So, as the Court is aware, this clawback motion is related to two documents that have been filed on the docket for, I think, close to four months now, maybe a little over four months now, that have been the subject of discussion both among the parties and at hearings previously that not until, I think, close to two months after they were filed on the docket, plaintiffs sought to claw back, and we've challenged that clawback as improper here. We think plaintiffs have waived any protection that may have once attached over those documents, and we'd ask that the Court order they be reproduced.

THE COURT:  So with respect to these two documents, I understand they were placed on the docket in connection with a privileged motion that I previously decided.

When were they produced?

MS. FERRIGNO:  I think the documents were produced in August, but I'd have to double-check the

date.

THE COURT:  Okay.  They were produced in August.  They were presented to me -- or excerpts from them, I think, were presented to me in connection with a discovery motion involving privileged documents and an in camera review of certain selected allegedly privileged documents. And that happened -- if I understand the timeline correctly, the parties first started talking about using these documents in connection with the motion practice around Thanksgiving, in late November.

Is that right?

MS. FERRIGNO:  Yes, that's right.

THE COURT:  All right.  And then I saw them -- when was the actual filing?

MS. FERRIGNO:  They were filed on November 26th.

THE COURT:  Filed on November 26th. Discussed on December 15th -- is that right -- when we had argument on that motion.

MS. FERRIGNO:  December, yes.

THE COURT:  Okay.  And then I know there's still objections to my privilege ruling pending before the district judge.  I haven't read those papers very carefully.  But the defendant --

MS. FERRIGNO:  They're referenced.

THE COURT:  -- takes the position that plaintiff -- plaintiffs, in some manner, used the documents as part of the objections.  That's a little unclear to me how they actually used them, since they didn't seem to attach them or quote them.

But what's your argument there?

MS. FERRIGNO:  So I think our position, both at the hearing and in that objection, is that plaintiffs are referencing the discussion of those documents.  So whether or not they call them out by name isn't required.  If you look at the case law that we cited, anytime those documents are considered or referenced in discussion of those, that is use.

THE COURT:  That's a very broad reading of the word "used."

MS. FERRIGNO:  I think the cases we cited support that.  I think we found a couple cases that show you that even when documents are alluded to generally, that constitutes use.  And I think, even beyond that, if you look at the case law on this, the standard here is whether there was complete recklessness, and courts find complete recklessness even where parties don't necessarily use the

documents but fail to object to their use, which is absolutely the case here.

THE COURT:  And the objection first came on January 8th; is that correct?

MS. FERRIGNO:  The clawback came on January 8th, yes.

THE COURT:  Okay.  The retroactive objection, whatever you want to call it.

Now, I think I have the actual protective order here somewhere.  Give me a minute.  Ah, there it is.

Now, what significance do you attach to the fact that the protective order itself -- give me the paragraph reference, please.

MS. FERRIGNO:  26, Your Honor.

THE COURT:  The fact that the protective order itself, which is at docket 82 -- point me to the language that plaintiffs are relying on here.

MS. FERRIGNO:  I think they're pointing to the fact that the protective order excludes waiver by disclosure.

THE COURT:  Right.

MS. FERRIGNO:  So the provisions of FRE 502(b) do not apply.  But even in those circumstances, the standard remains --

THE COURT:  And quote, "The disclosing party is not required to satisfy the elements of Rule 502(b) to properly assert the attorney-client privilege or work product protection over disclosed communications, information, and documents.  The foregoing provisions do not preclude a party from arguing that affirmative use by the producing party of communications, information, or documents covered by the attorney-client privilege or work product protection should or should not constitute waiver."

So you're sort of in the twilight here. Failure to object alone doesn't do it for you.  You are arguing to me that you have affirmative use by the producing party, but perhaps not in as clear or obvious a way as in some of the case law out there in similar situations.  I mean, the plaintiffs didn't attach it to a motion or put it in front of a witness in a deposition.

MS. FERRIGNO:  No, but I don't think -- I don't think they needed to for this to be use.  And I think that even in circumstances like this, where parties have similar protective orders, the Court still looks to complete recklessness as the standard.  And in those cases, if a document is brought up at a deposition and the producing party

fails to object, courts have found waiver.

And I think the case is even more extreme here because you had a file declaration where we said this is the name of the document, you produced it, it's also on your privilege log, it's right here, and plaintiffs didn't look at it.

THE COURT:  And they asked for you to seal it, but they didn't ask for you to claw it back.

MS. FERRIGNO:  No.  And then --

THE COURT:  They didn't ask to claw it back.

MS. FERRIGNO:  -- it was brought up again in court, and we said they didn't object to this as privileged.  And, again, they didn't say anything or look at the documents.

THE COURT:  Now, why -- I don't mean this to be a trick question, but why do the parties care so much about these two documents?  Why does it matter?

MS. FERRIGNO:  I think the documents -- well, first and foremost, I think they're responsive and relevant documents.  We think plaintiffs have waived any privilege or protection that may have once attached.  And under the federal rules, there should be --

THE COURT:  But is it the thin edge of the wedge?  Is your next argument going to be that having waived privilege over these two documents, now, never mind what Judge Moses thought, we want all the other documents like them?

MS. FERRIGNO:  I don't think that's necessarily something we've considered.  I think we're focused on these two documents at the moment.  We're not concerned with other arguments related to them.

THE COURT:  Because one thing I did not see in the letter briefing on this was any discussion of whether this constituted or would be deemed to constitute a subject matter or other -- whatever that means.  Everybody thinks subject matter means something different.  But the question whether it constitutes a broader waiver.

MS. FERRIGNO:  That's not something that we've -- we've briefed or we're --

THE COURT:  Would you be willing to stipulate that you will not make that argument based on the alleged use of these two documents?

MS. FERRIGNO:  I think that's something we'd have to discuss.  I don't know that we're prepared to say that right now.  I think our focus

is on these two documents because these are the two documents that we think privilege has clearly been waived over, and there's no necessary reason to tie it to other documents at this point.

THE COURT:  No necessary reason.  Okay.

Ms. Murphy.

MS. MURPHY:  Good morning, Your Honor.  So the issues here are not really related to whether these are work product or not.  It's related to the process of what happened with respect to our misunderstanding of what these documents consisted of.  And I do say "our misunderstanding."  It -- it actually was mine.  And that's why I'm here to explain it.

The documents, as we set forth in our opposition, had an anomaly with respect to the cover email which we did produce.

THE COURT:  Yeah, you're going to have to walk me through that because I have to confess to you that, when I read your written explanation, my eyes glazed over.

MS. MURPHY:  Okay.  Understood.  So the cover email --

THE COURT:  The cover email which you placed before me again, correct?

MS. MURPHY:  Yes, we attached it to my declaration.

THE COURT:  Right.  That's Exhibit 2 to your declaration.

MS. MURPHY:  Yes.

THE COURT:  But you did not attach on this round the attachments.

MS. MURPHY:  Correct.  Because we had clawed them back by then.  So our client -- one of our clients at McGraw Hill had for- -- what appeared to be forwarding an email from Oppenheim and Zebrak to McGraw Hill and other co-clients called the ███████████.  And so that is the file name.  And when I was talking at the December 15 hearing about the ███████████, I was discussing --

THE COURT:  You were saying that's not work product.

MS. MURPHY:  I was talking about attorney-client privilege and it reflecting -- and it could be work product as well, but it's an email from Oppenheim and Zebrak to our clients reflecting multiple legal matters that we might be handling at any given time for them.  So that's what I was discussing on page 124 of the transcript.  And that makes sense because, at the time, I was looking at a

cover email with the literal file name reflecting this document.

But our client, for whatever reason --

THE COURT:  And when you refer to your client here, the client representative was Mr. ███████ .

MS. MURPHY:  Correct.

THE COURT:  And he's not a lawyer, correct?

MS. MURPHY:  Correct.

THE COURT:  Okay.  So what we have here is Mr. ███████ sending an email to some folks at Corsearch.

MS. MURPHY:  Correct.

THE COURT:  Explain to me again what Corsearch is.

MS. MURPHY:  Corsearch is a vendor that McGraw Hill uses for regular notice and takedown with respect to a variety of infringements across the Internet.

THE COURT:  Okay.

MS. MURPHY:  They are different, for example, than BCGuardian, who we've retained in connection with this case.  So at first I thought, "Oh, my Gosh, why did Mr. ███████ forward O&Z's weekly email about our multiple legal matters to

Corsearch?"  But then, if you look at the body of the email, he had completely deleted our email that would include, you know, that discussion about the multiple legal matters, and he wrote something else.

THE COURT:  He said, "█████████████ ████████████████████████████████████████ ███████ "

MS. MURPHY:  Correct.  And then he attached spreadsheets that were attached to a different email, and that file name is not reflected anywhere in it.  I also, during that hearing, as you know, was dealing with over 2,000 documents because Google had filed a motion seeking to compel the plaintiffs to produce every single privileged document on their log.  And the case law repeatedly considers what -- what level of care was provided overall and how many documents are at issue, so I think that's important to keep in mind that, at this hearing, that is what we were dealing with.

THE COURT:  And Mr. ████████ states, "██████████████████████████████████████ ██████████████████████ "  I'm just trying to figure out what happened here.  Are you telling me that when you read this the first time, maybe the second time, maybe the third time, you thought that the

attachments were something over which you were not claiming privilege, and at some later date, you looked at the attachments more closely and realized that they were subject to privilege?

MS. MURPHY:  Yes.

THE COURT:  Okay.

MS. MURPHY:  Because I --

THE COURT:  And that's because there are two different kinds of weekly reports?

MS. MURPHY:  They're not a weekly report. They're a spreadsheet that I thought Mr. Rosenthal had reconstituted.  Maybe originally it came through this separate O&Z email to our co-clients, but I thought that he had reconstituted it and sent it to his vendor.

THE COURT:  What do you mean "reconstituted it"?

MS. MURPHY:  Like, he didn't send the whole document in its original form.  So if he had -- my understanding is if he had taken out certain URLs, for example, and said, "Please enforce on these," that we wouldn't claim privilege over that or work product.  But when I was preparing for the hearing that was originally set for the 8th, I really looked at it, and I realized at that point, and also had

followed up with my client about some questions concerning the context, that this actually was him taking the entire document that was originally created for one of the pirate suits, and it had to do with a specific issue that was going on in the pirate suit about compliance of the pirate websites. So --

THE COURT:  So he changed the language in the cover email, but forwarded the document -- the attachments in the form that you deem to be privileged.

MS. MURPHY:  Correct.

THE COURT:  Okay.  But he didn't send them to BCGuardian.  Just bear with me.  He sent them to a vendor who, if I understand what you said correctly, is a vendor who would normally deal with, what you said, regular notice and takedowns -- not litigation strategy, but regular, routine business notice and takedowns.

So one issue which I don't think was briefed in the parties' letters on this point, but maybe you'll indulge me, leaving aside whether in their original form the documents were subject to a claim of privilege and even leaving aside whether by producing it, not objecting to it, talking about it

in connection with the privilege issue and so forth, constituted a waiver, wasn't the privilege waived by sending it to this vendor?

MS. MURPHY:  Work product wouldn't be waived by sending it to that vendor, because --

THE COURT:  Work product wouldn't be because they're sort of on your side.

MS. MURPHY:  They are.  They're contractually bound to perform this work for McGraw Hill, and there are confidentiality provisions.

THE COURT:  What about attorney-client privilege, though?

MS. MURPHY:  We didn't claim attorney-client privilege over them.

THE COURT:  Just work product?

MS. MURPHY:  Correct.  Yeah, they were literally created because of what was happening in one of the pirate suits.

THE COURT:  Okay.  And on the recklessness point, do you want to address that?

MS. MURPHY:  Yes.  Well, first of all, I would just like to point out that the protective order is important here in paragraph 26.  It accepts the 502(b) analysis, and then it refers to affirmative use.  And I do want to make sure that I

address the complete lack of affirmative use.

But with respect to the recklessness, anything that happened up until January 8th -- and it was a six-week period before -- between when they first identified it and when I realized the mistake; it wasn't months and months -- that was only because I didn't understand what was in those documents, those two spreadsheets.  So I didn't see any case law that Google cited that would support complete recklessness over a six-week period with a counsel misunderstanding.

What I see with respect to complete recklessness in the cases is when witnesses are examined or cross-examined on documents during a deposition or a court proceeding and there's no objection at that time.  That has not happened whatsoever.  And --

THE COURT:  What's the difference between allowing a document to be used at a deposition with no objection and allowing a document to be presented to the Court in connection with a discovery motion with no objection?

MS. MURPHY:  Well, again, first of all, there were, you know, many, many documents that were presented to the Court.  It also, as you pointed

out, was an excerpt, and that was a misunderstanding. I think that is very different than it becoming part of the examination of the witnesses in the case. There also are other examples in the cases where it's relied upon in summary judgment. We don't have that at all.

And those, Your Honor, did not -- you know, those documents had been produced, and Your Honor still denied their motion. And there's nothing whatsoever in your rulings that says it was because of these documents that the motion was denied. In fact, that, to me, is counterintuitive.

So I don't think there's any prejudice here. Again, once we realized it, we immediately clawed it back. We did, you know, rely on the fact that, with respect to the docket, it is under seal. Under the way that the docket works now, they cannot access that document. They were required to destroy all copies. So it is correct that we did use our judgment not to file another motion. They also raised this and said they were immediately going to challenge it.

THE COURT: Motion what? To strike it from the docket?

MS. MURPHY: Yeah. Whatever that might be

called.  But they also had claimed that that was completely reckless.

THE COURT:  Well, the documents right now -- or the excerpts are visible to me --

MS. MURPHY:  Correct.

THE COURT:  -- obviously, because I can see what's under seal on the docket.  You can see, correct, what's under seal on the docket?  I think they're --

MS. MURPHY:  Not from the docket, no.  We would have to have another copy.

THE COURT:  My understanding was that documents -- obviously, documents which I'm reviewing to determine whether they're privileged or not do not go on the docket at all.  They come to me by email.  But the docket entries which are on the docket under seal because I have been asked by one side or the other to seal them, my assumption up until now has been that all of those documents are under seal at the so-called selected parties' level, meaning that both sets of attorneys can see them if you click through all of the necessary screens.  Am I technically misinformed here?

MS. MURPHY:  Let me consult for one minute.

MS. FERRIGNO:  Yes, Your Honor, I think

there was a rule change in SDNY earlier in the fall, and they changed --

THE COURT: Well, I know they technically handle sealed documents differently now for security reasons.

MS. FERRIGNO: And I think, as part of that, parties even at the --

THE COURT: So are you saying that you can't see them either through the docket?

MS. FERRIGNO: Not the ones filed on the docket.

THE COURT: All right. So even though I think documents are under seal at the, quote, "selected parties' level," only me and my staff can see them. The lawyers can't on either side. They have to -- to check what's there, they have to look in their file drawers or wherever they're keeping their own copy of the document.

All right. I'm going to -- I'm going to need to check with our docketing clerks on that. But -- it's not that I don't believe you, it's just I guess I need to reacquaint myself with our technical processes a little better.

All right. So your position is --

MS. MURPHY: And just to confirm --

THE COURT: -- you don't have -- you don't have access to it electronically?

MS. MURPHY: No.

THE COURT: Okay.

MS. MURPHY: No, we do not.

If I -- unless Your Honor has any questions on that, I'd like to turn to the affirmative use issue.

THE COURT: Sure. And the -- Google seems to be relying primarily on the *Virgil* case, the deposition case, for that. They make the argument -- Google makes the argument in its reply letter brief that the decision in *Virgil* rested on the fact that the documents were used, not that they were used at a deposition, which is sort of what I was getting to in my question a minute ago.

MS. MURPHY: One moment. Let me just grab that case.

THE COURT: Sure.

MS. MURPHY: So with respect to affirmative use, I would call Your Honor's attention back to the protective order. The *Virgil* issue is failure to object to the other party's use. So I understand that, and that is part of the complete recklessness analysis.

In *Virgil*, they -- these documents were used as summary judgment exhibits.  It looks like there was multiple back and forth for many months about these documents.  And then they were also used at a deposition where the witness was examined on them.  And the use at the deposition, contrary to Google's statements, was -- was very important.  The Court considered that to be procedurally significant.

So I don't think that the circumstances of us not realizing that these were privileged or work product for six weeks is comparable at all.  The other thing that I think is important is that Google truly misrepresented what was said at the December 15th hearing, and I think a simple reading of the transcript shows that.  I did not in any way discuss these documents.  When I was speaking to Your Honor on page 124, I was, again, referring to the weekly update that the cover email suggested these documents -- or that communication would relate to.  And, again, I was confused as to which weekly update are we talking about.  But I said that that weekly update would pertain to multiple legal matters that wouldn't be relevant to this case and also would be attorney-client privileged.

The only -- I think the only thing that Google is trying to really shoehorn this issue into with respect to the December 15th hearing is -- let's grab it.  So one of the spreadsheets has the word "███," and when Google's counsel earlier in the hearing was talking about the spreadsheets, he mentioned that one of them includes the word "███."

And Your Honor said, "What is" -- you questioned, "What is that, or what did it say?"  And there was a general commentary that I can repeat, if you want, about what ███ is.  So no one was doing a deep dive into why ███ was reflected in these spreadsheets, and there was really no specific discussion whatsoever of the content of these spreadsheets.

And so then, later in the hearing, all I said as an example was there's been some discussion about ███.  ███ is an example of an unrelated litigation target that has nothing to do with Google.  So I wasn't talking about the documents, I was talking about ███ and that being ████████ ███████.  And then there is another allegation of our affirmative use which is in our object- -- our oppositions.

THE COURT:  Your objections to the district

judge?

MS. MURPHY:  Right.  And that also is really misrepresented in a misleading manner.  We are referring in that at docket 507, page 23, note 14.  That refers back to our argument that Google was misdescribing the BCGuardian statement of work as being ██████████████████████, emphasizing the word, quote, "██████████████" in that statement of work.  That statement of work, of course, has nothing to do with these particular spreadsheets.

And we said in the footnote that Judge Moses appropriately questioned Google's cherry-picking of words and phrases in BCGuardian's or plaintiffs' documents to draw broad conclusions.  That was a general statement, and it stemmed from your statement at the hearing, "I think you're asking too much of all these folks who are involved in these communications.  The work product doctrine does require that the work having done in anticipation of litigation.  It doesn't require that every product manager, vice president, or other nonlawyer personnel involved in the project use the phrase 'anticipation of litigation' on every relevant email that they send."

So this, again, was an extremely general statement used to support a proposition that has nothing to do with these documents.  So there has been no affirmative use whatsoever.  We don't think these documents are relevant.  They relate to another litigation, they perceive, when we anticipated litigation against Google.  But that is significant, I think, for the Court to understand.

THE COURT:  Now I'm going to ask you the question that I asked opposing counsel.  Why are you fighting about this?  Why does it matter?  Does it matter because you are concerned about a broader waiver, or do you really care about these two spreadsheets?

MS. MURPHY:  We are fighting about it because we are concerned about a broader waiver argument by Google because that has been their approach throughout repeated privilege challenges.  They have been unreasonable.  They have created us to spend hundreds and hundreds of hours dealing with challenges that, in our opinion, shouldn't have been presented that way in the first place.

And this is shown in the fact that we had attempted to resolve this situation by asking Google if we produce the two documents, would they not

argue that there was any further waiver, and they said no. So I'm not sure why counsel said that they hadn't considered it. And I do note that counsel said it's not necessarily something we've considered. You asked would they be willing to stipulate to no waiver, and they said they would have to take that back. But we've already asked them to do that.

THE COURT: Okay.

All right. Google, have you had an opportunity in the last 10 minutes to further consider that stipulation point?

MS. FERRIGNO: Yes, I think we have. And I think we could stipulate that we won't argue production of these as waiver pursuant to the court order and that that wouldn't be work product waiver as to any other document, but we would ask that we reserve all arguments related to our objection pending before Judge Rochon.

THE COURT: Let me just parse that out. You're stipulating that you will not argue from the fact of the production or the use of these two documents that there is a broader waiver of the work product doctrine. But -- at least you won't argue that to me. But you won't argue that to

Judge Rochon either.  You're continuing to argue to Judge Rochon that Judge Moses made the wrong call on the sampling, correct?

MS. FERRIGNO:  I think we -- we just want to maintain our objections in that.

THE COURT:  Right.  I just want to make sure that -- that your stipulation not to argue a broader waiver from the fact of production or failure to object to these two documents is an argument that you won't be making at any level of the judicial system.  Deal?

MS. FERRIGNO:  Yes.

THE COURT:  Deal, Ms. Murphy?

MS. MURPHY:  I still think they -- well, they are still work product.  And the cases that find complete recklessness don't look like our case at all.  I was willing to resolve this coming into the hearing.  I tried twice.  And so I still am reluctant to agree to this if -- and I'm concerned about reserving the objections.  So I would like to understand what that means with respect to --

THE COURT:  I understand that to mean that Google is reserving its right, which I did not request that it waive -- that Google is reserv- -- in fact, I'm not sure I could legitimately do so.

Google is reserving its rights under Rule 72(a) to argue to the district judge that none of the documents that I reviewed in camera were properly withheld for either work product or attorney-client privilege.

Is that accurate?

MS. FERRIGNO:  Yes.  And I think, also, our -- there were two, I think, related objections.

THE COURT:  What was your second?

MS. FERRIGNO:  Well, that was the second. And I think we had one related to the December 15th hearing.  But I think --

THE COURT:  I'm sorry, now I'm not following you.  You had something related to the December 15 hearing?

MS. FERRIGNO:  Related to our original privilege challenges related to the common interest and BCG's arguments.

THE COURT:  Oh, right.  I understand that you're challenging my privilege ruling for more than one reason, and that's fine.  And obviously, were Judge Rochon to disagree with me and say none of this stuff is privileged, that would have implications probably broader than what we're talking about here.  I just want to make sure that

the subject matter waiver argument is not going to be made with respect to -- based on these two documents.

MS. FERRIGNO:  Yes.  I think if they were to produce these two documents pursuant to the Court's order, we wouldn't argue that work product has been waived over --

THE COURT:  All right.  So I'll hold you to that.  And the order of the Court will be, in light of the stipulation that we've just heard on the record from Google, that plaintiffs may not claw back the two documents at issue today and Google may not argue that plaintiffs have waived either the attorney-client privilege or the work product doctrine, more broadly, because of the way they handled these two documents.

Done.  All right.

MS. MURPHY:  Your Honor, may I ask one housekeeping item?  I -- I would like to make sure that, at a minimum, these can be sealed.

THE COURT:  Well, apparently, they are.  They're so sealed that none of you out there can see them.  I'm the only person in the world, along with my staff, who can see them.

MS. MURPHY:  No, we did produce them.

Okay.  Sorry, we're having a sidebar.

THE COURT:  But it means that --

MS. MURPHY:  Okay.

THE COURT:  But it means that Google's lawyers, who have presumably locked them away in their special sealed cabinet or whatever, can now take them out of the envelope and look at them.

MS. MURPHY:  Yeah.  But we would have marked them as such.  Okay.

Okay.  There was -- in one of -- I brought it up because in one of the cases the Court then, after they found a waiver, wouldn't seal them.

THE COURT:  There was an argument about sealing?

MS. MURPHY:  Yeah.  And I want to make sure that I don't put my clients in that position.

THE COURT:  I view sealing as a -- I view sealing as a separate question here.

MS. MURPHY:  Okay.

THE COURT:  These documents were not sealed because they were privileged.  Nobody was arguing privilege at the time.  They were sealed because plaintiffs deemed them confidential.

MS. MURPHY:  Thank you.

THE COURT:  Okay.  All right.  So that

leaves us -- for today, at least, before we get to the extension question, that does leave us the motion at docket 697 regarding the -- well, plaintiffs say hyperlinked and referenced documents in the -- I'll call it the Erlick email, E-R-L-I-C-K.  I don't see a lot of documents referenced in there.  I do see one document hyperlinked.

So I guess my first question is, whose motion is this for the plaintiffs?  That's Ms. Chen?

MS. CHEN:  That is mine, Your Honor.

THE COURT:  Okay.  So my first question to you, Ms. Chen is, are there documents that you're trying to get at besides the hyperlink document?

MS. CHEN:  Yes, Your Honor.  So section three in our opening motion enumerates the documents that we're trying to get.  And if you wouldn't mind indulging me in opening Exhibit 1 for the document with the Bates ending 7101.

THE COURT:  The Erlick email.

MS. CHEN:  So, on the second page of this email, which is the -- the first email that was sent in this chain, there is both reference to " ████ ████████████████████████████████████████ ," which is the hyperlink.

THE COURT:  Right.  That's the hyperlink document.

MS. CHEN:  And ███████████████████ ████████████████████████.  So our motioning -- our opening motion requested the briefing to ██████ as referenced here.

THE COURT:  Well, so, obviously, I'm just looking at a flat PDF here.  Quote -- this working document was hyperlinked, and in the original, presumably, you could click on it and see the thing that you now want to see.  The word ████████ appears to be hyperlinked as well.

Are you saying that there are briefing materials under that hyperlink or that you could have gotten to if you had the native format document in its native application by clicking on ████████ or are you saying, well, that just tells us that there's some briefing documents out there somewhere?

MS. CHEN:  The latter, Your Honor.

THE COURT:  Okay.

MS. CHEN:  So we have been requesting certain documents that appear to be relevant to the case that are referenced in the documents that Google produced but are not technically hyperlinked.

THE COURT:  Right.

MS. CHEN:  And we request those -- those documents to the extent that they're discoverable under Rule 46 and responsive to the issues.

THE COURT:  Okay.  So there are two things you want here.  You want the hyperlinked working document, and you want whatever the briefing materials were.

MS. CHEN:  Correct.

THE COURT:  Okay.

MS. CHEN:  And if you turn back to page 1, which is a later email in this chain.

THE COURT:  Right.

MS. CHEN:  So under paragraph 2 from Jake Erlick's August 22nd, 5:04 p.m. email --

THE COURT:  Right.

MS. CHEN:  -- so this paragraph explains how the █████████████ was discovered in the first place.

THE COURT:  Right.

MS. CHEN:  He said, "████████████ ████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ████████████████████" -- and we understand that to be ████████████████████████



" -- and we understand DSA to be a European legislation on data privacy.

THE COURT:  I'm sorry, to be European --

MS. CHEN:  European legislation on data privacy.

THE COURT:  What does the DSA stand for, if you know?

MS. CHEN:  I'm blanking on the top of my head, but I can come back to you on that.

THE COURT:  Okay.  All right.  Continue.

MS. CHEN:  -- "

THE COURT:  Okay.

MS. CHEN:  So we also want the initial

complaint to April -- we presume here is referencing April Kelly, who was also mentioned in this email chain.  That is number three under section three of our motion.  And then --

THE COURT:  And you say the initial complaint to April.

MS. CHEN:  Correct.

THE COURT:  It looks like there may have been some back-and-forth.

MS. CHEN:  So to the extent that communications were part of that complaint, that's what we are requesting as well.

And if Your Honor could turn back to page 2, again, at the top of the initial Erlick email, he said, "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

So then skip to the third paragraph in this email.  Mr. Erlick says, "████████████████████████████████████████████

."

So in our motion, under section three, number two, we are also requesting the ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

THE COURT:  All right.  Now, I guess what you should turn to is what makes you think that this bug and these documents were related to Google Shopping?  Or if you don't think they were related to Google Shopping, why do you get discovery of them?

MS. CHEN:  So there are two issues that I want to turn Your Honor's attention to.  One is the allegations.  Our claims in this case directly concern Google not -- Google continuing to run advertisements for infringing ads that we specifically noticed.  And --

THE COURT:  But you're not arguing that this impacted the Google Shopping platform?

MS. CHEN:  So the point is that we -- if we start from the Erlick email, where, on page 1, under number three -- and then there is a separate numeral, lowercase b, starting with the sentence, "▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  So this was Jake Erlick's

response to his colleague to the question, ████████

████████████████████████████████████████ "

Because it seems like the way that Ms. Kelly

discovered what evidently was ████████████

████████████████████████████████

████████████████████████████ .

So Mr. Erlick says, "████████████

████████████████████████████████████████████

████████████████████████████████████████

████ --

THE COURT:  Remind me again what ████ is.

I knew this last month.

MS. CHEN:  We understand it to be the

engineering team that supports ████████████ .

THE COURT:  Okay.

MS. CHEN:  -- "████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████."

So all that we have on this

█████████████ is this email from Mr. Erlick.  On

the one hand, he talks about ███████████████

██████████████████████████

█████████████████████████████████████

████████████████████████ From that

sentence, there is no way to tell whether Shopping

was included.  For all intents and purposes,

Shopping may very well have been affected, and that

is why we're seeking basic discovery into this issue

to see if Shopping was indeed affected.

And nothing in this email or in the

attorney declaration that Google submitted can give

us any confidence that Google actually conducted an

investigation into this issue to see if it affected

Shopping, or it just assumed that it didn't, as in

Google's words, because the, quote/unquote,

"████████████████████████████████

██████████████████████████

███████████████████.  We take that not

to mean Google actually looked into it and

determined that Shopping was not impacted.  I take

it to mean an assumption based on the technical

setup, and the factual submission from Google on that technical setup is through attorney who discussed it with unnamed Google personnel.

THE COURT:  So you think Ms. Clark may have blown it and may be wrong?

MS. CHEN:  We're not saying that, Ms. -- I believe it's a declaration from Ms. Tomkowiak.

THE COURT:  It's a declaration from Ms. Tomkowiak.  But in paragraph six of the declaration and in paragraph seven of the declaration -- well, particularly paragraph six -- she says that Ms. Clark, one of her colleagues, explained that, after investigation, Google's counsel determined that the ███████████████ ████████████████████████████████████████.

MS. CHEN:  Your Honor, that's a factual determination, and that's a factual submission.  And the reason why we're seeking this basic discovery to understand the scope of this ████████████ is so that we can find out whether it indeed impacted Google Shopping or not.

THE COURT:  Because you think counsel may not be telling you the full truth, either inadvertently or advertently; is that fair?

MS. CHEN:  That's not the whole story,

Your Honor.  So I'll come back to why it is -- why it is problematic for plaintiffs to rely on Google's outside counsel's representations in foregoing a key area of fact-finding.  But even if the representation is accurate in that this ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, we still would like to have basic fact-finding into how Google made this determination, and in the context of that --

THE COURT:  Made that determination?

MS. CHEN:  Decided that it didn't affect Google Shopping.  So did they investigate?  Did they assume --

THE COURT:  So that you can (inaudible) or some other reason?

MS. CHEN:  Sorry, would you mind repeating that?

THE COURT:  So that you can test the factual proposition that this ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ or for some other reason?  Generally speaking, I don't -- I certainly don't rush to open the door to discovery on discovery.  "Counsel, what did you do?  Who did you talk to?  What makes you think this is true?"

MS. CHEN:  And that's not what we're

seeking, Your Honor. For example, if we just get the hyperlinked document and the complaint, we could decide -- for example, it says, "██████████ ████████████████████████████" What is in this working document will either corroborate or contradict Google's position thus far that it did not impact Shopping.

And even setting aside the accuracy of counsel's representation, we have reason to think that these basic documents will shed light on Google's understanding of similar issues affecting Shopping, which we understand that they did based on the Erlick email that we just went over. If --

THE COURT: That's really quite a stretch, Ms. Chen. I have to tell you, it's really quite a stretch for you to say to me, "Well, we have an email here which, according to opposing counsel, discusses ████████████████████ ████████████████████████ but maybe something like that happened over in Shopping."

MS. CHEN: Not maybe. But because Mr. Erlick said, "██████████████ ███████████████████████████████ ████████████████████████." It doesn't just say Ads. It specifically includes

Shopping.

THE COURT:  Right.

MS. CHEN:  And then he goes on to say, "█████

████████████████████████████████████

██████."

THE COURT:  Right.  But what he's talking

about in subparagraph B is a ████████████████

███████████████████████████████

███████████████████.  He's not saying

historically that this has happened in Shopping.  At

least that's not how I read it.  He's saying, "Well,

gee, now that we see that it's happened here ██████

████████████████████████████████████

████████."

MS. CHEN:  I -- I don't read this email

that way either.  I think it's -- there is context

around this email as to why Mr. Erlick would want to

apply the same sort of proposed solution to Shopping

as well.  And if Your Honor is disinclined to order

discovery on anything that Google's counsel would

have to go back and conduct extensive discovery on,

we ask that we just receive the hyperlinked document

itself, which presumably has more information on

this issue, so that we can conduct our fact

discovery into this issue from an informed position.

THE COURT:  All right.  Who's addressing this for Google?

MS. SAMPOLI:  I will be, Your Honor.

THE COURT:  Go ahead.

MS. SAMPOLI:  So I don't want to belabor the point here.  I think we've laid it out pretty clearly in our opposition and in our supporting declaration.  This ad was specific to -- or sorry, this bug was --

THE COURT:  This bug.

MS. SAMPOLI:  And by bug, I mean, you know, not the Buganizer bug.  But this bug was specific to

██████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████ .

And I think this isn't really a dispute about the contours of what is relevant under Rule 26.  This is a dispute about whether plaintiffs are entitled to discovery to test Google's determination of relevance or irrelevance.  And I don't think that's appropriate under the federal rules.  I think we quoted a case in our opposition. It's plaintiffs' burden to establish relevance.  I

have another case that, you know, discovery under the federal rules is based on a good faith response to demands for production.

THE COURT:  Well, both of those propositions are firmly established in our case law. It is, in this instance, the plaintiffs' burden to show relevance.  And normally, the party whose burden it is to show relevance can't show relevance or potential relevance just by saying, "Well, maybe they're not telling me the truth," because it's too easy.  You could say it every day of the week. "Maybe they're not telling me the truth."

So that's all true.  But what -- what if the document, on its face, is ambiguous, which seems to be one of Ms. Chen's subtexts here?  What if the document is not particularly clear, which is perhaps why it was produced in the first place?  If the relevance proposition had been obvious from the face of the document, you would have made that determination at the point of production, and we wouldn't be having this discussion now.

So once the document is put out there, which is arguably ambiguous on its face, does that give the party seeking further discovery a little more traction?

MS. SAMPOLI: Perhaps. But I don't think you need to decide whether or not that necessarily entitles them to any linked or referenced documents because we responded to their position that this document is ambiguous. It may relate to Shopping. By investigating and determining, based on communications with folks at Google, including both operational and engineering folks at Google, that this ███████████████████████████████ ███████████████████████████.

THE COURT: Is Mr. Erlick or any of the other folks who were on this email chain designated as a deposition witness in this case?

MS. SAMPOLI: Yes. Mr. -- I believe that Mr. Erlick and Mr. ████ have been noticed for depositions.

THE COURT: Okay. What else do you want to tell me?

MS. SAMPOLI: You know, I just will be emphatic that we have checked more than once with Google that this ██████████████████████. And the documents that -- at least the ones that I'm aware of that exist that are -- the hyperlinked document, for example, I've looked at -- they do not reference Shopping. This was not a ████████

██████████████, so this is simply not relevant to what we all agree is the subject matter of this case, which is --

THE COURT:  And have you looked at the other documents that maybe are out there that plaintiffs want -- for example, the ████████ ████████████████████████?

MS. SAMPOLI:  I'm aware of -- so I have not -- to be clear, I have not looked at the communication between the ████████████████ ████████, but I have looked at two other documents.

THE COURT:  That would be April Kelly?

MS. SAMPOLI:  The -- I have not looked at the ████████████████████████████ --

THE COURT:  I see.

MS. SAMPOLI:  -- ████████████ ████ --

THE COURT:  And the complainant?

MS. SAMPOLI:  Correct.  But I have looked at two other documents that would potentially be responsive to what plaintiffs are asking for, and none of those reference Shopping either.  This is about an ██████.

THE COURT:  Okay.

Ms. Chen.

MS. CHEN:  Just to clarify one thing.  Is counsel representing that you reviewed the hyperlinked document in 7101?

THE COURT:  Correct.

MS. CHEN:  So that is new information.  Before we filed this motion and while the motion was pending, counsel never represented that they actually reviewed the hyperlinked document itself.

THE COURT:  Does that change your perspective?

MS. CHEN:  Not necessarily, in the sense that we don't know what's actually in the hyperlinked document.  And if counsel was able to locate it, I think that counts against the burden argument of we can't --

THE COURT:  That's not a burden argument.  That's not the argument being made here.

MS. CHEN:  Not just now, but yes, in their opposition papers, they do argue that it is burdensome to locate hyperlinked documents.  But --

THE COURT:  I'm not deciding this based on burden.

MS. CHEN:  Understood.

THE COURT:  Anything else, Ms. Chen?

MS. CHEN:  A few things, Your Honor.

So, first, I wanted to explain or maybe illustrate why it is that plaintiffs want to investigate this -- this issue so much.  So before this case was filed, plaintiffs experienced the exact issue of sending notices but not having the noticed ads taken down and having them still running and advertise -- advertising pirated --

THE COURT:  I understand that, and that's a big part of your theme here.

MS. CHEN:  And during discovery, my colleague Mr. Kane reviewed Google's response emails to plaintiffs' infringement notices that were produced in this case.  So he put forth this information in his declaration filed at docket 238.  And we also cite this declaration in our opening motion.  So --

THE COURT:  Go ahead.

MS. CHEN:  So under paragraph 14, Mr. Kane says, "I reviewed Google's response emails to plaintiffs' infringement notices produced in this case.  I observed more than

██████████████████████████████████████

████████████████ ."

This sounds strikingly similar to the interaction that Ms. Kelly had with the complainant and how this ██████████████ issue was brought to light. Now, this is a major issue. Even if it were accurate that it didn't directly affect Shopping, it still would be relevant in this case where Shopping -- where the impact on Shopping and past instances or possible future instances for Shopping is discussed in the context of the ████████████. And if that is too speculative --

THE COURT: That is too speculative.

MS. SAMPOLI: And that is -- and if that is too speculative for Your Honor, Mr. Erlick did say that ██████████████████████████. And if a ████████████, that means -- that implies that ████████████. So I -- I --

THE COURT: This is a couple of layers of speculation here.

Anything else for me?

MS. CHEN: I find myself struggling with the notion that plaintiffs should forego key discovery over --

THE COURT: Everything is key discovery in

this case.  Day after day, week after week, motion after motion, everything is crucial.  Everything is key.  Everything is central.

Not everything is key.

MS. CHEN:  Where it concerns why Google told plaintiffs in ███████████████████████ ███████████████████████████████ --

THE COURT:  Nobody other than you is saying that the Erlick email concerns why plaintiffs' ████████████████████████████████████ ███████████.  That's your speculation.

MS. CHEN:  Discovery into this issue should not be precluded by factual submission through an attorney declaration from what that attorney then heard from unnamed Google employees.

THE COURT:  Thank you.

The motion to compel production of the hyperlinked and referenced documents in the Erlick email is denied.  Plaintiff -- plaintiffs have, in my view, not met their burden with respect to relevance.  Plaintiffs may, of course, address this issue with Mr. Erlick at deposition or with other appropriate witnesses.  And if the facts -- which you will then have direct from a percipient witness, not through counsel.  If the facts on the ground

change at that point, you may, of course, come back to me and request reconsideration on this point. But the record before me today does not get you to relevance.

Let's talk about the schedule. Your current fact discovery deadline is May the --

MS. FERRIGNO: 6th.

THE COURT: -- 6th. Thank you. What I was thinking would be appropriate today would be to push that out about two months. June the 6th is a Saturday, so we could say June the 5th, which is a Friday, and to push out the rest of the discovery schedule proportionately. Let me hear from the parties on that.

MS. FERRIGNO: Your Honor --

MR. OPPENHEIM: I'm sorry, I misheard.

MS. FERRIGNO: Yeah.

MR. OPPENHEIM: Sorry, I didn't quite hear you. I thought you said two months, and then you said June. I'm just confused by what you say. Could you just repeat it? Apologies.

THE COURT: That's because I misspoke.

MR. OPPENHEIM: It may be me.

THE COURT: Thank you. That -- my bad. Two months, which would take it from May the 6th to

July the 6th, which is, I believe, the Monday after the Fourth of July holiday.  Maybe it should be July the 2nd so that you get done before.

MR. OPPENHEIM:  Yeah.  Never do anything the day after July 4th.  I'm with you on that.

MS. FERRIGNO:  Yes.  Yes, please.

THE COURT:  So July the 2nd would be my suggestion for the extended fact discovery deadline. With remaining deadlines, I'll go back to chambers and figure out proportionately.

Plaintiffs.

MS. MURPHY:  Your Honor, we think that's too long.  We believe that this can and should be completed by a month before that.  We understand that you directed us to schedule depositions into May, and that has been done.

But just for context, as reported in the joint status report, all of the plaintiffs' depositions have been scheduled except for one that is going to take place abroad in connection with two other Google witnesses or potentially three, and one other that Google mentioned but has not been designated as a 30(b)(6) designee, and we're not sure if they're still interested in taking her deposition, because we've proposed several dates.

So basically, the schedule is set for the plaintiffs' depositions, and they will be done --

THE COURT:  In the month of May?

MS. MURPHY:  -- in the month of May.

And with respect to the deposition of Google witnesses, our concern about pushing it out is that we will have a repeat of what seems to happen in this case where there is delay after delay.

So we have noticed a total of 18 witnesses. We have completed one.  We have one more this week. Google has failed to provide dates for five of the witnesses, even though we've tried to engage them on that.  We do have seven of the witnesses scheduled. One is Mr. ██████, who you said earlier should move to May.  And then there's a motion for protective order pending with respect to two.

THE COURT:  The two attorneys?

MS. MURPHY:  Correct.

But so far, Google has unilaterally canceled five depositions.

And then we have the other issue of Google not having designated witnesses for all of their 30(b)(6) topics.  We are trying to get them to meet and confer repeatedly on those, and now we have a

pending issue that we discussed earlier where they've said they want to revise their objections and responses and have been saying that but haven't done so, and obviously, we may have issues with that once they do.  So --

THE COURT:  So I hear --

MS. MURPHY:  -- my point is just this, -- they need to be on a schedule because I fear that we will be back here in a month with the same report, since it keeps happening over and over.

THE COURT:  I understand your concern, and to some extent, I share it.  On the other hand, in my view -- although, you push back quite a bit on this, which is your right -- but in my view, the contours of permissible discovery have changed as a result of two things which have happened very recently:  Indirectly, the *Cox* decision and directly the withdrawal of the affirmative DMCA defense.

So while I understand the, you know, "give a litigator an inch, she'll take a mile" problem, I also think that legitimately the parties are going to need a little more time to sort through any new line-drawing that needs to be done, particularly with respect to the 30(b)(6) witnesses.  This is, of course, assuming that Judge Rochon does not stay

discovery.  Obviously, should that happen, our schedule will be totally out the window, and who knows when we'll resume to discuss it.

So I'm not sure what I can do to both extend the discovery deadline by what I think is a reasonable period and also make sure that the parties, including Google, don't take advantage of the extra time to take longer to do things than they can and should be taking to do things.

So by way of example, while I do appreciate that the parties are going to need more time to perhaps renegotiate Google 30(b)(6) topics, I would not expect Google to delay scheduling non-30(b)(6) witnesses.  There are at least some out there which are -- who are being noticed purely for their percipient testimony, correct, as 30(b)(1) witnesses?  Not everybody is going to be a 30(b)(6) witness.

MR. OPPENHEIM:  You're correct, Your Honor.

THE COURT:  And those witnesses, you know, they should go first, in my view.  I -- I take that back.  I try not to tell litigators who should go first and who should go second, because it's your case, not my case.  But I would be unhappy if I were to see what I call reasonable delays in scheduling

those folks because, with them, you would not have the excuse of, well, it's a 30(b)(6) line-drawing problem.

Ms. Tomkowiak, what's your view?

MS. TOMKOWIAK:  Yeah, I agree, Your Honor. And we do have several of those depositions still on the calendar.  So it's not like we've pulled every single deposition.  But as Your Honor said, we're going to need some time, I think, to sort through the 30(b)(6) topics, which are 73 topics, each with, like, as many as a dozen subparts.

THE COURT:  Well, you've already been going at that for a while.  You know, you've discussed it I don't know how many times.  You've gone back and forth I don't know how many times, right?

MS. TOMKOWIAK:  Yeah.  It's been a very challenging thing to address.  And now, in light of these developments, we think that, you know, close to half of the topics are, in our view, either entirely irrelevant or partially irrelevant because they go to the DMCA defense and our DMCA policy and our repeat infringer workflows.

So, I mean, I could make an argument that working through all of these issues is going to take three months.  I understand that you might not be

inclined to agree with me.  I think one month is certainly setting us up for failure.

I'm looking at the calendar, and, you know, we have at least two depositions scheduled every week in April.  We've already set some for May. You're going to start to get into folks' vacation schedules, and maybe you don't care about the lawyers' schedules, but we should try to care about the employees.  And so I just think that one month is certainly not enough time.  Again, I could make the argument for three months, but at most -- or I'm sorry, at minimum, we need a couple of months.

THE COURT:  All right.

MS. TOMKOWIAK:  The other thing I'd argue, Your Honor, is that we, in part, are here -- and I think you acknowledged this at the last hearing -- because the document discovery and the motion practice has just, you know, continued.  And, I mean, to some extent, you know, we've seen a lot of deficiencies in the documents that the plaintiffs themselves have produced at the --

THE COURT:  And you keep threatening to bring a motion under that.

MS. TOMKOWIAK:  We do, and they do.  Yeah, we do, and they have threatened to bring --

THE COURT:  Well, if you're going to do it, do it, because I don't want to be hearing that motion the week before July the 4th.

MS. TOMKOWIAK:  Yeah, understood, Your Honor.

THE COURT:  You know, motions need to be brought so that if you win the motion, the discovery can take place within the current set of discovery deadlines.

All right.  So, for now, we'll --

MR. OPPENHEIM:  Your Honor, can I offer some suggested interim steps that might assist us?

THE COURT:  You can try.

MR. OPPENHEIM:  First, when I raised the fact that there had been no formal withdrawal of the DMCA safe harbor defense, I -- it wasn't my intent to suggest that they should be amending their answer.  I don't believe that's necessary.  I think they just should withdraw the defense on the -- with a pleading of withdrawal of the defense.  I don't believe there's a need to amend --

THE COURT:  "Your Honor, we hereby officially withdraw affirmative defense number" -- what number is it?

MR. OPPENHEIM:  Or note -- it's a notice.

"Google hereby withdraws its affirmative defense."

THE COURT: Well, but -- but -- but in a different case with different lawyers, that might be the sensible thing to do. But after listening to you read out other portions of Google's answer and make the argument that with or without the numbered paragraph that comprises the affirmative defense, you're entitled to all of the discovery that you've sought up until now because of that language, I think Google might want to think about whether that language should stay in the complaint -- or the answer. Sorry.

MR. OPPENHEIM: Yeah. I don't -- I don't know that they have a right at, you know, a year-plus into the case to start amending their answer, but we'll get to that in the letters, and that's fine.

THE COURT: Generally speaking, it gets sticky to try and add claims or add affirmative defenses late in the day. I can't recall seeing a case off the top of my head where someone was not permitted to drop a claim or a defense late in the day.

MR. OPPENHEIM: We'll -- we'll cover this in the letters.

THE COURT:  Okay.

MR. OPPENHEIM:  But, Your Honor, I do believe that by April 13th, Google should also indicate --

THE COURT:  April 14, you mean?  The deadline I gave them for the letter?

MR. OPPENHEIM:  I'm sorry, did you say the 14th?  I wrote down the 13th.  I apologize if that's what you said.

THE COURT:  I thought I said the 14th.

MS. TOMKOWIAK:  I have the 14th.

MR. OPPENHEIM:  Okay.

THE COURT:  All right.  It's two against one.  It was definitely the 14th.

MR. OPPENHEIM:  That's fine, Your Honor.  I think at the same time -- and it doesn't have to be in the same letter -- they should indicate what, if any, existing discovery that they have not produced that they believe they should not now need to produce.  And I think that they can indicate which of the 30(b)(6) subjects they believe are at issue and we need to meet and confer on.  Now if they want to send that to just plaintiffs' counsel because the Court doesn't need to be involved --

THE COURT:  The Court really doesn't want

to get that letter.

MR. OPPENHEIM:  Yes, but plaintiffs do.

So that we can join those issues to the Court quickly, I think that should be done by the same April 14th date.

THE COURT:  Well, I like the idea of an interim deadline to make sure that the parties get clarity or reach impasse with respect to the 30(b)(6) topics sooner rather than later.  I don't know whether April 14th is the right deadline or not.

But, Ms. Tomkowiak, obviously, you've had at least a couple of days to start thinking about the impact of recent developments on the scope of 30(b)(6) discovery, and I do think it would be appropriate for me to give you a deadline to let the plaintiffs know sooner rather than later what topics you think are out or have to be narrowed.

MS. TOMKOWIAK:  In that case, Your Honor, I would say the 14th is too soon.  We have two depositions in between now and then, including one on the day of the 14th.  We have a reply in support of our motion to stay.  We have this letter motion to get to you.  We have a Rule 12(c) motion that we're filing next week, and our client is out this

week on spring break with his family.  So I think the 14th is too soon.

THE COURT:  Okay.  So how about the 21st, which is also your deadline to produce the -- Mr. L's documents?  That gives you two weeks from today.

Remember, you're still going to be meeting and conferring, because I doubt very much the plaintiffs are going to say, "Okay, fine, we agree."

MS. TOMKOWIAK:  Right, Your Honor.  Okay.  The 21st.

THE COURT:  All right.

MS. TOMKOWIAK:  And, Your Honor, my understanding is that by that date we should identify which topics we think are no longer relevant?

THE COURT:  Are out or need to be narrowed because of the withdrawal of one of your affirmative defenses.

All right.  So a letter will come to me with respect to amending the complaint or withdrawing the defense or -- pardon?  Yes, sorry.

A letter will come to me with regard to amending Google's pleading, formally or informally, by the 14th.  April the 21st, Google will be clear

in writing with the plaintiffs about the impact of the withdrawal on the scope of the 30(b)(6) discovery.  April 21st is also the new deadline to produce Mr. L's documents.

The close of fact discovery will be Thursday, July the 2nd, because I think Friday is the holiday this year.  I will figure out proportionate extended deadlines for the milestones that come later in our pretrial schedule.

Now let me circle back around to the question of the 300 domains or however many domains are left, Mr. Oppenheim.

MR. OPPENHEIM:  On -- related to the April 14th letter, you had, I think, said you wanted a response from us, the plaintiffs.

THE COURT:  Three days.  I gave you three days for that.  The 17th.

MR. OPPENHEIM:  So the 17th?  Is it possible we could have till Monday, the 20th, Your Honor?  It's fine.  If you only want to give us three days, that's fine.

THE COURT:  I asked you before, and you said Friday was fine.

MR. OPPENHEIM:  Well, that's because I thought it was the 13th, Your Honor.  But that's

fine.  If you want to give us three days, that's fine.

THE COURT:  No, that's fine.  You can have April 20 to respond.

MR. OPPENHEIM:  Thank you.

THE COURT:  All right.  Now, lined up for future determination by the Court, we have Google's motion for a protective order regarding Attorney Crider and Google's motion for a protective order regarding Attorney Donaldson -- Donaldson. And we have to decide what we're going to do -- I have to decide what you're going to do about the sampling discovery.

I expect the parties may want an opportunity to file quick supplemental letters with respect to the 300 domain project.  Or maybe you feel like you've written enough letters, and you just want to think about it and come back and argue it to me.

Ms. Tomkowiak, what would you like to do?

MS. SAMPOLI:  Whatever Your Honor prefers is -- would be acceptable to us.  I think we've made our position on burden clear, and I think we agree with your statements from earlier at the hearing that the relevance determination has shifted

considerably.  And from our perspective, that also impacts proportionality, because the less relevant something becomes, the -- the less reasonable the burden is.  So that would be our position.

THE COURT:  Well, you might want to put that in a letter.

MS. SAMPOLI:  Certainly, if that would be your preference, we're happy to do so.  We would request it be something short.

THE COURT:  Yeah.

MS. SAMPOLI:  We have written quite a bit on this.

THE COURT:  I know.  I know.

MS. SAMPOLI:  But if you want to forego letters, we're okay with that, too.

THE COURT:  Look, I think I understand the issues.  I thought it would be unfair for me to make a decision today because the -- it wasn't on the menu and you didn't come prepared to argue it.

Mr. Oppenheim, do you want to write something on this point?

MR. OPPENHEIM:  Yeah.  It strikes me, Your Honor, that we can just use the same schedule as the amended answer.  Google can file something about the need to -- that this discovery or the

order should be vacated and file it April 14th; we'll respond on the 20th.  That works for us.

THE COURT:  Does that work for Google?

MR. OPPENHEIM:  I'm suggesting separate letters, though, not combining.

THE COURT:  You're suggesting -- no, no, I understand.  I know there's a lot of letters flying around over the next couple of weeks, but you guys are really good at making a lot of letters fly around every week.

MS. SAMPOLI:  I -- I think that's fine, Your Honor.  We would -- I think what would be helpful in order to just help us manage all of these different letters is to request --

THE COURT:  Two pages max.

MS. SAMPOLI:  Thank you.

THE COURT:  Okay.  So the letters on the sampling project, the 300 domain project -- I got to come up with a better name for it -- the letters on that issue are two pages max.  Really, I don't -- I don't think it's that complicated.  I just want to make sure that the parties have a chance.

So now, when are you going to come back? And we can argue about that, unless I've decided it on the papers ahead of time, and we can argue about

the two attorney depositions.  Should I set that for late the following week, like Thursday the 20 -- oh, wait, I'm in the wrong month.  Just a minute.  Oh, that does not look as good.  No, that's not going to work.  That's not going to work.

It looks like I could see you on Wednesday, April 29th, if you come in early, if you come in at 9:00.  9:00 is early.  This is New York.

MR. OPPENHEIM:  I'm sorry, you said the 29th?

THE COURT:  April the 29th.  I have another matter coming in at 11:00 today, so -- that day, rather, so we'll actually have to be very efficient.

MS. TOMKOWIAK:  We have a deposition currently on the calendar for that day.

THE COURT:  Ah.  Well, that's really my only availability that week, the week of April the 27th.  And my fear is you're going to have depositions -- hopefully, you're going to -- it's not a fear; it's an expectation that you're going to have depositions a lot of days.  I could see you on Monday, May the 4th.

MR. OPPENHEIM:  Your Honor, I think we all have significant teams, and we can both take and defend depositions and be in Court at the same time.

So the 29th is fine with plaintiffs.

THE COURT:  All right.  Can you make that work, Ms. Tomkowiak?

MS. TOMKOWIAK:  I cannot personally.  I will check with my colleagues.

What was the other date that you mentioned?

THE COURT:  Well, the only morning time that I can make available for you the week of May the 27th is Wednesday -- I'm sorry, April the 27th is Wednesday, the 29th of April.  We'd start at 9:00 o'clock in the morning.  Something may open up. My schedule is, you know, subject to change, but I can't predict that in advance.  And then my next morning opening is Monday, May 4th.

MR. OPPENHEIM:  So Ms. Murphy has correctly pointed out to me that if we were to do it on the 29th, we may not yet have the 30(b)(6) issues fully met and conferred and ready for the Court, so --

THE COURT:  I don't know that we -- I don't know that that would be our topic.

MR. OPPENHEIM:  Oh, okay, Your Honor.

THE COURT:  For sure, our topics would be the two attorney depositions and the 300 domain issue.  Whether we were able to add additional topics onto our menu for that day would really --

hard for me to say at the moment.

MR. OPPENHEIM:  In which case, the 29th is fine.

THE COURT:  All right.  Let's go with --

MS. TOMKOWIAK:  Wait, I think let's go with the 29th.  And then I think, consistent with past practices, if there's some reason we really can't make that work, if we could --

THE COURT:  Of course.

MS. TOMKOWIAK:  -- let you know.

THE COURT:  So we'll plan on meeting here on April 29th at 9:00 o'clock in the morning.  Why don't you send me a joint status update on Monday the 27th.  And unless you hear differently from the Court, the three menu items on the 29th will be the two attorney deposition motions and the question of the sampling.

MR. OPPENHEIM:  Also probably whether they should be able to amend the answer.  Is that -- because I think that'll be briefed, right?

THE COURT:  Yeah, I think if -- if it's a dispute.  I'm not quite envisioning this as a discovery dispute that needs deciding by me, but if there are aspects of that that need deciding by me, we can talk about them on April the 29th.

MR. OPPENHEIM:  May I add one thing just in an effort to move things forward?

THE COURT:  Go ahead.

MR. OPPENHEIM:  I believe that you had said that by the -- April 21st that Google would get to plaintiffs the 30(b)(6) object- -- new 30(b)(6) objections.  Can we add to that as well?  To the extent there are any ongoing document productions that they are now changing the scope of because they believe *Cox* or the safe harbor withdrawal impacts it, that they identify that for us --

THE COURT:  You mean, aside --

MR. OPPENHEIM:  -- so we at least know where the disputes are?

THE COURT:  Aside from the one that we know about, where I've told them to cease and desist, which is the 300 domain sampling practice.

MR. OPPENHEIM:  I preferred the word "stay" than "cease and desist," but yes, Your Honor.

THE COURT:  Pause.  How about that?

MR. OPPENHEIM:  Pause.  I like that even better.

THE COURT:  Fine.

So the question to -- you look a little puzzled, Ms. Tomkowiak.  I believe what you're being

asked to let plaintiffs know by April the 21st, along with your new views about 30(b)(6) topics, is are there any discovery projects that you have not yet completed production on -- document categories -- for example, other than the sampling issue that we've discussed -- where you are thinking about and, by April 21st, may actually be wanting to take the position that you should no longer be required to complete your production with respect to that topic because of the withdrawal of your DMCA defense?

MS. TOMKOWIAK:  I mean, sitting here today, I can only think of projects that we've either refused and may or may not be the subject of future motion practice or we've agreed to do.

THE COURT:  So there's nothing else partially completed out there, other than the sampling issue, that you think could be affected?

MS. TOMKOWIAK:  Sitting here right now, no.

THE COURT:  Okay.  If that changes, let them know by the 21st.

MS. TOMKOWIAK:  Okay.

MS. MURPHY:  There are outstanding efforts to confer about certain things like hyperlinked documents.

THE COURT:  Other hyperlink documents.

MS. MURPHY:  Additional hyperlink documents and some other issues that have not -- we keep trying to communicate but have not received responses.

THE COURT:  Okay.

MS. MURPHY:  Thank you.

THE COURT:  Well, it doesn't sound on those that that's not -- I'm not going to generally require that they write to you about everything by April the 21st, because I imagine other issues are in different stages of being met on and conferred on.  So I'm not going to try to micromanage their process.

So you have the dates.  Some things are due on April 14th; some things are due on April 21st.  A response to the April 14th is due on April 20th, et cetera.  And I will see you on April the 29th at 9:00 o'clock in the morning with a joint status update letter two days prior, which is April the 27th.  And fact discovery is pushed out to July the 2nd.  And yes, I'll put all of this in a written order that we'll issue later today.

Anything further?  Plaintiffs?

MR. OPPENHEIM:  Not from plaintiffs,

Your Honor.

THE COURT:  Defendant?

MS. TOMKOWIAK:  No, Your Honor.

THE COURT:  Thank you all very much.  We'll be adjourned.

MR. OPPENHEIM:  Thank you, Your Honor.

MS. TOMKOWIAK:  Thank you.

C E R T I F I C A T E

I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of Cengage Learning, Inc. et al v. Google LLC, Docket #1:24-cv-04274-JLR-BCM, was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature   ___*Marissa Lewandowski*_

            Marissa Lewandowski


Date:       April 9, 2026