# EXHIBIT 2

2026 WL 2021347
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

EPIDEMIC SOUND, AB, Plaintiff,

v.

META PLATFORMS, INC., Defendant.

Case No. 22-cv-04223-JSC
|
Filed 07/13/2026

**Attorneys and Law Firms**

I. Ilene S. Farkas, Pro Hac Vice, Maryaneh Mona Simonian, Benjamin K. Semel, Pro Hac Vice, Brian Maida, Pro Hac Vice, John Kilgard, Pro Hac Vice, Lazar William Sterling-Jackson, Pro Hac Vice, Marion R. Harris, Pro Hac Vice, Pryor Cashman LLP, New York, NY, Ellis Herington, King & Wood LLP, Menlo Park, CA, Adam Seth Cashman, BraunHagey & Borden LLP, San Francisco, CA, for Plaintiff.

Allison L. Stillman, Pro Hac Vice, Paris Sanders, Peter Calello, Latham & Watkins LLP, New York, NY, Joseph Richard Wetzel, Brittany Nichole Lovejoy, Ivana Dukanovic, Latham & Watkins LLP, San Francisco, CA, Brent Murphy, Pro Hac Vice, Caroline A. Pizano, Pro Hac Vice, Sarang Damle, Pro Hac Vice, Latham & Watkins LLP, Washington, DC, Rachel S. Horn, Latham & Watkins LLP, Menlo Park, CA, for Defendant.

**ORDER RE: CROSS-MOTIONS FOR SUMMMARY JUDGMENT AND RELATED MOTIONS**

JACQUELINE SCOTT CORLEY United States District Judge

**\*1** Epidemic Sound, AB ("Epidemic") alleges Meta Platforms, Inc. ("Meta") violated copyright laws by unlawfully distributing Epidemic's works on Meta's social media platforms. (Dkt. No. 1.)[1] Specifically, Epidemic alleges Meta directly and contributorily infringed its copyright-protected musical tracks through (1) infringing tracks in Meta's Audio Library and (2) infringing audio shared through Meta's Original Audio and Reels Remix features. Pending before the Court are Epidemic's and Meta's cross-motions for summary judgment, (Dkt. Nos. 360, 388), and Epidemic's motion for sanctions, (Dkt. No. 351).

[1]    Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Having carefully considered the parties' evidence, briefing, and supplemental briefing, and with the benefit of oral argument on March 9, 2026, for the reasons explained below, the Court GRANTS IN PART and DENIES IN PART both motions for summary judgment. The Court also DENIES Epidemic's motion for sanctions.

**BACKGROUND**

**I. RELEVANT FACTS**

**A. Epidemic's Music Catalog and Licensing Structure**
Epidemic is the "owner, producer, and distributor" of an original music catalog including "over 51,000 world-class music tracks." (Dkt. No. 394-3 ¶ 3.) For each of these tracks, Epidemic "owns the copyrights in both the sound recordings and the underlying musical compositions." (Dkt. No. 363 ¶ 3.) Epidemic "specifically commissions the music in its catalog by identifying artists and creators who [ ] enter into ... transfer agreements with Epidemic to create tracks for and with Epidemic," to "ensure that Epidemic owns 100% of the rights, including the copyright, in both the sound recording and the underlying musical composition." (*Id.* ¶¶ 3, 12.) Meta describes Epidemic as a "production music library" ("PML"), which "generally supply background or ambient music for individuals and businesses creating media, and do not typically distribute conventional, commercial music." (Dkt. No. 389-3 ¶¶ 22-23.)

Epidemic "exploits its catalog in a variety of ways, including on streaming services such as Spotify for audio-only listening, and for use in audiovisual productions." (Dkt. No. 394-3 ¶ 5.) Epidemic also offers subscriptions, particularly for "online content creators and social media influencers," which "provide a license to synchronize any track or tracks in [Epidemic's] catalog with their audiovisual productions, including in social media posts, subject to the terms and conditions of the licenses." (*Id.* ¶ 9.) Specifically, Epidemic offers a "Personal Plan" for "individual creators and casual users," and a "Commercial Plan" for "a single business user['s]" commercial uses. (*Id.* ¶ 10.) "Both the Personal and Commercial subscription licenses have express limitations on

how Epidemic's music may be used." (*Id.* ¶ 13.) For example, the licenses prohibit: (1) using Epidemic's works "outside of the permitted creation of video or podcast content to be posted on internet platforms"; (2) "repackaging" or altering Epidemic's works into samples, effects, or libraries; (3) using Epidemic's works " 'in any way that is intended to allow third parties to download and/or otherwise access or use the Music Pieces on a standalone basis' "; or (4) sub-licensing Epidemic's works to third parties. (*Id.* ¶¶ 14-17 (citing Dkt. No. 394-4 at 3; Dkt. No. 394-5 at 3-4).) However, in at least one Epidemic license, Epidemic made clear it would "not assert any claims against" the licensee if it cannot prevent third parties from reproducing its licensed work on an internet platform. (Dkt. No. 387-11 at 5.)

**\*2** Epidemic also negotiates "Enterprise" licenses with certain commercial users, including "some of the largest companies and social media personalities in the world." (Dkt. No. 394-3 ¶ 18.) Generally, an Enterprise license identifies: (1) the number of "seats" (i.e., permitted users); (2) the number of productions allowed using Epidemic's works; (3) the license term; (4) the territories in which the production can be used; (5) the media outlets on which the production can be broadcast; and (5) the license fee. (*Id.* ¶ 20; Dkt. No. 394-6.) Enterprise licenses include similar prohibitions to the Personal and Commercial subscription licenses. (Dkt. No. 394-3 ¶ 21; Dkt. No. 394-6 at 5-6.) Enterprise licenses also expressly acknowledge Epidemic holds all copyrights in and to the works, and the licensee does not acquire any proprietary rights through the agreement. (Dkt. No. 394-3 ¶ 22; Dkt. No. 394-6 at 6.)

According to Meta, "Epidemic has built its own business, in large measure, off of Meta's." (Dkt. No. 386-19 at 20.) For example, Epidemic encourages subscribers to use Epidemic's audio in short-form videos on Meta's platforms. *See, e.g.*, Epidemic Sound, *Here's why you should create content for Facebook Stories* (June 9, 2022), https://www.epidemicsound.com/blog/create-content-for-facebook-stories/; Epidemic Sound, *Instagram SEO: Your 2023 Guide* (Jan. 1, 2025), https://www.epidemicsound.com/blog/instagram-seo/. In addition, Epidemic's Personal and Commercial licenses, and some Enterprise licenses, allow licensees to use Epidemic tracks in their Facebook and Instagram posts. (Dkt. No. 383-17 at 8-9.) Epidemic also told Meta it was "in the process of making [its] product ... more FB friendly." (Dkt. No. 387-10 at 2.)

**B. Meta's Products and Features**

"Meta is one of the world's leading social media and technology companies." (Dkt. No. 386-19 at 13.) Among other things, it owns and operates "social-networking platforms [ ] Facebook and Instagram, which have roughly 3 billion daily active users who connect with other users and share vast amounts of creative content every day through personal or business accounts." (Dkt. No. 386-19 at 13 (citing Dkt. No. 391-2 ¶ 2).)

Meta launched "Reels" on Instagram in August 2020 and on Facebook in September 2021. (Dkt. No. 391-2 ¶¶ 3-4; Dkt. No. 369-14 at 6-7; Dkt. No. 369-17 at 8.) Reels is a "short-form video product" through which users can "record, edit, and share short form videos with audio and other effects." (Dkt. No. 386-3 at 7; Dkt. No. 391-2 ¶¶ 5-6.) Meta developed Reels in part to address emerging trends on social media, particularly on TikTok. (Dkt. No. 386-3 at 7.) In September 2025, approximately 1.9 billion Reels were uploaded to Instagram worldwide covering a range of topics. (Dkt. No. 391-2 ¶¶ 7-8.)

Users' Reels often include an audio component, which generally originates from "one of two sources:" (1) a user may select audio from the licensed catalog of tracks Meta makes available (the "Audio Library") and add the audio while creating her post, or (2) a user may upload original audio as part of her post, or select otherwise uploaded original audio ("Original Audio"). (Dkt. No. 386-3 at 19.)

**1. Audio Library**

Meta's Audio Library contains musical tracks licensed from sound recording partners, and users can select tracks from the Audio Library to add to their audiovisual posts on Facebook and Instagram. (Dkt. No. 369-10 at 9-12; Dkt. No. 369-42.) Users can also search the Audio Library for, bookmark, and preview tracks. (Dkt. No. 369-10 at 9-12; Dkt. No. 369-42.) If a user creates a Reel with licensed music from the Audio Library, "other users would see the attribution displayed as the title and artist of that licensed music." (Dkt. No. 386-3 at 14.)

To add its songs to the Audio Library, a music label must sign a licensing agreement with Meta for the songs, and then package that song, certain metadata, and artwork in Meta's "standardized format." (Dkt. No. 369-15 at 8-12.) "Meta [then] downloads that package, processes it through the system," and makes the music available in Audio Library. (*Id.* at 9.) So, licensors cannot directly upload files to the

Audio Library. (*Id.* at 10.) Meta also sets rules about the types of music those licensors can deliver. (*Id.* at 13-21; Dkt. No. 369-24 at 52-57 (Meta Sound Recording & Reference File Policy).) And Meta admits it only licenses particular "type[s] of music ... for [its] platform-wide deals" to be included in the Audio Catalog, and there are some "kind[s]" of catalogs it "wouldn't be interested in ... because [they] [don't] fit the products that [Meta is] offering." (Dkt. No. 369-18 at 12, 14.)

**\*3**  There are a "few different ways" to remove a licensor's catalog from the Audio Library if, for example, "a partner goes out of license with Meta." (Dkt. No. 369-15 at 22.) According to Meta, "the best and easiest solution was always to assert blocking rights and/or takedown of your music on [Meta's] platform," and "[a]ny music label partners can send an XML takedown to remove content from the audio library." (Dkt. No. 369-18 at 9; Dkt. No. 440-7 at 8.) "Occasionally, [Meta] assist[s] with those takedowns when the partner can't action them." (Dkt. No. 369-15 at 22.) And if a partner "goes out of license and makes no request to Meta," Meta "make[s] adjustment to [its] internal systems such that their content no longer is active on the platform." (*Id.* at 23.) Meta's engineering team can also "just remov[e] all the content en masse." (*Id.* at 29.)

However, sending "a DMCA notice or report would not result in the removal of a music track from Meta's Audio Library," and a "DMCA notice concerning a piece of user-uploaded content that contained music that is in Audio Library may lead to the removal of that user-uploaded content, but would not result in removal of the track from Audio Library." (*Id.* at 34.) One Meta deponent also did not know whether "takedown can be done for a specific track in an audio library." (Dkt. No. 369-18 at 10.)

Ultimately, Meta recognizes it needs "license deals that contained rights that would allow for an audio library" in order to include "that license music ... within the audio library." (*Id.* at 8; *see also id.* at 17 ("[O]ur goal is to only have music in the audio library that is licensed.").) So, Meta has agreed to pay millions of dollars to music licensors, including record labels, music publishers, and third-party distributors, in order to make their music available on the Audio Library. (*See, e.g.*, Dkt. No. 369-25 at 7; Dkt. No. 369-31 at 24; Dkt. No. 369-32 at 2; Dkt. Nos. 361-59, 361-60.) When Meta licensees with a record label or music publisher, its "licenses are for the entire catalog" owned. (Dkt. No. 369-16 at 5-6.)

## 2. User-Generated Content: Original Audio and Reels Remix

### a. Original Audio

When Instagram and Facebook users upload user-generated content which already includes audio, Meta's systems attempt to match that audio to content in the Audio Library. (Dkt. No. 386-3 at 13-15.) If a match is made, the audio in the user-generated content is attributed to the corresponding artist and track name from Audio Library. (*Id.*) If there is no match, Meta categorizes the audio as "Original Audio." (Dkt. No. 386-4 at 2.) So, Meta defines Original Audio as "audio that is not matched to an audio fingerprint by Rights Manager for Music and does not come from [Meta's] licensed music library (i.e., Audio Library) or Sound Collection." (*Id.*; *see also* Dkt. No. 386-3 at 13 ("[L]icensed music is music that [Meta] get[s] as a function of making deals with rights holders."); Dkt. No. 369-17 at 9 (explaining Meta developed OA for "things that aren't Licensed Music"); Dkt. No. 369-46 at 2 (explaining launch for "Reels without licensed music").)

Developed and launched alongside Reels, Original Audio was "motivated by having creators give [Meta] their unique and authentic sounds," including "narration using their voice," "natural sounds" or "environmental sounds captured from the videos [or] scenery outside," and "music for which Meta does not have a license." (Dkt. No. 386-3 at 3-5; Dkt. No. 391-2 ¶¶ 13-14 ("Many uses of the Original Audio and Reels Remix features do not involve music.").) Like Reels generally, Original Audio was developed given "a response that [Meta] saw in the market" to "a new type of audio that was resonating broadly with consumers," particularly on TikTok. (Dkt. No. 386-3 at 5; *see also* Dkt. No. 369-17 at 9.)

**\*4**  Through the Original Audio feature, users can also "incorporat[e] Original Audio" from another user's public post "into new content"—i.e., "reuse[ ] it—by, for example, "clicking Original Audio in existing content" or "selecting Original Audio from [Meta's] Audio Browser."[2] (Dkt. No. 386-3 at 8-9; *see also* Dkt. No. 369-30 at 2.) Although users can download a Reel, they can only download the Original Audio-component of the Reel if they uploaded the Original Audio themselves. (Dkt. No. 386-3 at 10; Dkt. No. 386-5 at 5-6.) But users can "save Original Audio to the saved section of [their] account." (Dkt. No. 369-14 at 14.) And there is no

"option for a user to disable the reuse of Original Audio from its Reel." (Dkt. No. 386-5 at 3.)

2    Meta's Audio Browser is a "surface within the creation process to select a sound that you want to use in your piece of content." (Dkt. No. 369-14 at 11.) Some people also use the term "Audio Library" to refer to both the licensed music and a browser for Original Audio, which is also sometimes referred to as "Music Picker." (Dkt. No. 369-11 at 7.)

Because Original Audio encompasses all unlicensed music, "[i]f a music label delivers an audio library takedown, [and there is] any user-generated content that was uploaded and matched to ... that reference, nothing would happen to the user-generated content on receipt of the audio library takedown, ... and it would lose attribution," but still "show up as Original Audio." (Dkt. No. 369-15 at 26.)

### b. Reels Remix

A different Reels feature, "Reels Remix," allows Facebook or Instagram users to "take an existing reel and add their own spin or their own take on top of it." (Dkt. No. 386-6 at 3; *see also* Dkt. No. 386-5 at 7 (explaining either "the original video plays side by side with the video added by the remixer" or "the video plays sequentially after" the original).) To be eligible for Reels Remix, a Reel must be uploaded by a user with a public account who has not disabled the Reels Remix feature in their settings. (Dkt. No. 386-6 at 4.) Like Original Audio and Reels generally, Meta developed the Reels Remix feature to give "Reels users [ ] additional tools to share creative content on Meta's" platforms, and in part because it "had seen [its] competitors, namely, TikTok have some success with this sharing format." (Dkt. No. 391-2 ¶ 10; Dkt. No. 386-5 at 8-9.) There is no "way to remix the audio from the original video without the video." (Dkt. No. 386-6 at 7.)

### c. Meta Terms of Use

When signing up for an account, every Facebook and Instagram user must agree to Facebook's and Instagram's Terms of Use, and since January 2018, Meta has informed users of material changes to those Terms of Use. (Dkt. No. 375 ¶¶ 2-3, 7-8.) Instagram's Terms of Use provide users cannot "do anything that violates someone else's rights, including intellectual property rights (e.g., copyright infringement)." (Dkt. No. 383-6 at 4.) Facebook's Terms

of Use similarly prohibit users from doing anything "[t]hat infringes or violates someone else's rights, including the intellectual property rights (such as by infringing another's copyright)." (Dkt. No. 383-7 at 9.) The Terms of Use also provide "when you share, post, or upload content that is covered by intellectual property rights on or in connection with our Products, you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, or create derivative works of your content," consistent with the users' chosen privacy and application settings. (*Id.* at 10.)

### C. Meta's Alleged Infringement

**\*5**  In this litigation, Epidemic asserts Meta infringed 900 copyright-protected tracks in its catalog. (Dkt. Nos. 95, 98.)[3] Epidemic moves for summary judgment on 869 of those tracks, including both their sound recordings and musical compositions. (Dkt. No. 369-4 at 19). Epidemic argues Meta has infringed each of these 869 Epidemic Tracks because they were either (1) "reproduced, distributed, or performed by Meta through its Audio Library," or (2) "reproduced and distributed by Meta and/or its users without authorization through Meta's OA/RR Features." (*Id.* at 21.)

3    Since the start of this litigation, Epidemic has claimed these tracks are "representative" of Meta's alleged infringement, (Dkt. No. 1 ¶ 48), and Epidemic continues to assert these tracks "represent a small sample of the rampant infringement that has been and continues to occur on Meta's platforms," (Dkt. No. 369-4 at 19). On December 2, 2025, Epidemic brought a second lawsuit against Meta asserting similar claims for another 1,000 Epidemic tracks as a "representative sample of Epidemic tracks that Meta is infringing." (Case No. 25-cv-10355-JSC, Dkt. No. 1 ¶ 26.)

### 1. Copyrights for the Epidemic Tracks at Issue

Caroline Ekström, Epidemic's Senior Vice President for Global Licensing and Regulatory Affairs, submits a declaration with several exhibits regarding these 869 tracks. Exhibit 1 includes: "a table of the Epidemic Tracks, together with their associated copyright registrations, chain of title documentation, and audio file, which are identified by the Bates Numbers applied by Epidemic to the files in the discovery process." (Dkt. No. 363 ¶ 4; Dkt. No. 363-1.) Exhibit 1A is a compendium of copyright registrations

"issued by the United States Copyright Office to Epidemic Sound, AB as the claimant, or owner, for that corresponding Epidemic Track for both the sound recording and musical composition embodied therein." (Dkt. No. 363 ¶ 5 & n.2; Dkt. No. 363-2.) Exhibit 1B is a compendium of audio files "identified in Exhibit 1 for each Epidemic Track," which Ms. Ekström declares are "exact copies of the audio files submitted to the United States Copyright Office in connection with Epidemic's application for registration of its copyright for the associated Epidemic Track." (Dkt. No. 363 ¶ 6 n.3; Dkt. No. 363-3.) And Exhibit 1C is "a compendium of the agreements by which Epidemic obtained and confirmed its rights in the sound recording and embodied musical composition for the Epidemic Tracks that are identified in Exhibit 1." (Dkt. No. 363 ¶ 7 n.4; Dkt. No. 363-4.)

Beginning in 2021, Epidemic hired Cosynd to help register its copyrights in the United States, or to, according to Ms. Ekström, "provid[e] services for purposes of this litigation." (Dkt. No. 387-4 at 18, 19, 22-24, 28.) Meta's expert, Gregory K. Leonard, opines none of Epidemic's 900 tracks "were registered within three months after the first publication of the work," and "there are only six ... Tracks for which there is no indication that the work existed on Meta's platforms before the effective date of registration." (Dkt. No. 380-1 at 116-17.)

Epidemic also notes Meta has entered into multiple Enterprise Licenses with Epidemic for Meta's in-house production. Pursuant to these licenses, Meta agreed Epidemic "has acquired and owns all copyright and neighboring rights in and to the Music Pieces." (Dkt. No. 394-7 ¶ 25 (citing, *e.g.*, Dkt. No. 394-19 at 3; Dkt. No. 394-20 at 6; Dkt. No. 394-23 at 6); *see also* Dkt. No. 369-13 at 6-10; Dkt. No. 369-35 at 2.) Several of these licenses include Epidemic Tracks at issue in this case. (Dkt. No. 394-7 ¶¶ 27-28.)

### 2. Identifying Allegedly Infringing Works

### a. Meta's Production of Similar Audio

**\*6** Meta first produced (1) a chart identifying tracks in the Audio Library whose audio matched to the Epidemic Tracks ("AL Infringing Tracks"), and (2) a chart identifying audiovisual posts on its platforms created using the Original Audio and Reels Remix features ("OA/RR Features") which included audio matching the Epidemic Tracks ("OA/RR Infringing Audio") (together, "Infringing Works"). (Dkt. Nos.

369-7, 369-8.) According to Epidemic, Meta's charts "over-designated matches to the Epidemic Tracks" and included "numerous 'matches' containing minimal common audio," so Epidemic narrowed its summary judgment motion to a subset of these identified matches as identified in Docket Nos. 369-5 and 369-6. (Dkt. No. 369-4 at 21.)

### b. Professor Geluso's Report

Epidemic then retained Professor Paul Geluso to "analyz[e] whether certain sound recordings and musical compositions owned by Epidemic are embodied within content located on the social media platforms operated by [Meta]." (Dkt. No. 366-1 ¶ 1.) Professor Geluso compared "Source Files," which "are sound recordings" he was advised Epidemic owned alongside "the musical compositions embodied in the Source Files," with "Target Files" he understood "were produced in this action by Meta." (*Id.* ¶ 8.) Ultimately, he "was asked to analyze over 4,600 Target Files, and to determine whether these Target Files contain or reproduce the actual sounds in, or embody, a significant portion of the approximately 900 Source Files provided to [him]." (*Id.* ¶ 9.) Professor Geluso categorized the Target Files into "Batch 1 Target Files," which "were the potentially infringing sound recordings that Meta made available in its Audio Library;" and "Batch 2 Target Files," which "were the potentially infringing (and shorter) video posts that were created using the Original Audio or Reels Remix features." (Dkt. No. 417-2 at 10-11 (citing Dkt. No. 354-1 ¶ 11).)

Professor Geluso opines: "For the vast majority of files I compared, I conclude that the Target File contains, reproduces or embodies a significant portion of the matching Source File." (Dkt. No. 354-1 ¶ 10.) Specifically, he concludes:

(1) "[T]here were 997 Category 1 matches in Batch 1, where the Target File reproduced or embodied the entirety of the Source File;"

(2) "761 Category 2 matches in Batch 1, where the Target File reproduced or embodied a significant portion (but less than the entirety) of the Source File or contained a significant portion of the musical elements embodied in the Source File;"

(3) "1 match in Batch 1 ... where the Target File replayed a significant portion of the Source File's composition;" and

(4) "2,455 matches in Batch 2, where the Target File reproduced or embodied a significant portion of the Source File."

(*Id.* ¶¶ 57-60.)

### c. Stipulation as to Substantial Similarity

On November 19, 2025, after Professor Geluso's report, Epidemic and Meta filed a stipulation. (Dkt. No. 350.) The parties first agreed Epidemic was asserting 900 Epidemic Tracks had been infringed by 1,540 AL Infringing Tracks and 3,483 OA/RR Posts, (*id.* ¶ 1), and included charts matching Epidemic's Litigation-Produced Tracks with AL Infringing Tracks, (Dkt. No. 350-1), and OA/RR Posts, (Dkt. No. 350-2). For the chart matching Epidemic Tracks to AL Infringing Tracks, Meta stipulated:

> Meta does not dispute and will not challenge that, for each row in Exhibit 1 (other than the "Excluded Tracks" discussed below), the Accused Track identified in Columns E-H contains a substantial portion of actual sounds also contained in the sound recording produced by Epidemic in this litigation (Column A), identified by Epidemic as corresponding to the Epidemic Asserted Track identified in Columns B-D.

> **\*7** Meta also does not dispute and will not challenge that, for each row in Exhibit 1 (other than the Excluded Tracks), the Accused Track identified in Columns E-H is substantially similar to the musical composition embodied in the sound recording produced by Epidemic in this litigation (Column A), identified by Epidemic as corresponding to the Epidemic Asserted Track identified in Columns B-D.

(Dkt. No. 350 ¶ 5; *see also id.* ¶ 6 (noting Excluded Tracks are "highlighted in grey on Exhibit 1").)[4] The corresponding columns in Exhibit 1 include: the "Epidemic Track Sound Recording Bates Number" (Column A); Epidemic's Title, Artist, and ISRC (Columns B-D); and Meta's Matching Sound Recording Bates Number, Title, Artist, and ISRC (Columns E-H). (Dkt. No. 350-1.) So, through this stipulation, Meta agreed—for many of the allegedly infringed Epidemic Tracks—not to challenge that the Litigation-Produced Track was substantially similar to corresponding AL Infringing Tracks.

[4]    Meta did not stipulate to four Litigation-Produced Track—AL Infringing Track pairings: (1) ES0000360 ("Feel the Energy")—META-EPDMS_00222401 ("Feel

the Energy") (Row 422); (2) ES0000384 ("Forever in My Mind")—META-EPDMS_00106910 ("Calma") (Row 447); (3) ES0000893 ("Save This Soul")—META-EPDMS_00285304 ("Where Do We Go?") (Row 1013); (4) ES0120612 ("Morning Light")—META-EPDMS_00052834 ("Ambient Consciente Mix") (Row 1497). (Dkt. No. 350-1.) Epidemic continues to assert infringement for these tracks. (Dkt. No. 369-5.)

The parties also filed a chart matching Epidemic Tracks to OA/RR Posts, for which Meta made a similar stipulation; specifically:

> Meta does not dispute and will not challenge that for each audio file identified in Column E in Exhibit 2 and incorporated into the OA/RR post identified in Column C of Exhibit 2 contains a substantial portion of actual sounds also contained in the sound recording produced by Epidemic in this litigation (Column A), identified by Epidemic as corresponding to the Epidemic Asserted Track identified in Column B of Exhibit 2.

> Additionally, each audio file identified in Column E of Exhibit 2 is substantially similar to the musical composition embodied in the sound recording produced by Epidemic in this litigation (Column A), identified by Epidemic as corresponding to the Epidemic Asserted Track identified in Column B of Exhibit 2.

(Dkt. No. 350 ¶ 9.) The corresponding columns in Exhibit 2 include: the Epidemic Asserted Track Sound Recording Bates Number (Column A); the Epidemic Asserted Track title (Column B), and the Unique ID of Post Created Using Tool (Column C). (Dkt. No. 350-2.) So, Meta agreed not to challenge that the Litigation-Produced Epidemic Track was substantially similar to corresponding OA/RR Infringing Audio in the listed posts.

### 3. Alleged Audio Library Infringement

Epidemic presents a chart of the Epidemic Tracks for which an AL Infringing Work was in the Audio Library. (Dkt. No. 369-5.)

Epidemic also declares since it initiated its lawsuit, "individuals and companies have reached out to Epidemic concerning actions taken by their distributors with respect to their works," and according to Ms. Ekström, in several communications, "the individual and/or company admitted its infringement of Epidemic's tracks." (Dkt. No. 363 ¶¶ 29-32 (citing Dkt. Nos. 403-3, 400-1, 400-2).) Additionally,

in 2021, Meta developed a list of the "top 1000 'potential stock music' (i.e., longtail) tracks," which included some tracks associated with a different distributor with reference links mentioning Epidemic. (Dkt. No. 369-33.) In February 2022, Meta employees discussed Epidemic's complaint to the "iG editorial folks ... their content was within AL," and one mentioned: "while I would want to check my notes from some research I did to be sure, I think [Epidemic's tracks] are showing in Insta at least when you look up songs from their library for example to attach to a story." (Dkt. No. 369-29.)

### 4. Alleged OA/RR Infringement

 **\*8** Epidemic presents a chart of the Epidemic Tracks for which an OA/RR Infringing Audio post was created containing audio matching it. (Dkt. No. 369-6.) According to Epidemic, Meta's Enterprise licenses with Epidemic did not allow Meta to use Epidemic's music on a standalone basis or beyond the post created under that license. (Dkt. No. 369-26 at 5; Dkt. No. 369-27 at 7.) And in a 2022 email between Meta and Epidemic, Meta raised concerns if the official Instagram account were to use Epidemic audio in a post, "[a]ny content posted to @instagram is open for the ability to be remixed/ shared," which has "always been our main concern and why we've avoided using Epidemic tracks in the past – the thought being the license didn't extend outside our original post on @instagram." (Dkt. No. 369-28 at 7.)

### D. Epidemic's Discovery of Meta's Alleged Infringement

### 1. Rights Manager and Takedowns

Meta launched "Rights Manager" in April 2016 as a "content management tool ... to help rightsholders protect, authorize, and manage their intellectual property across ... Facebook and Instagram." (Dkt. No. 376 ¶ 2; Dkt. No. 361-57.) When Meta first launched Rights Manager, it only offered one version: "Rights Manager for Video" or "Rights Manager Pro." (Dkt. No. 376 ¶ 3.) But Meta later "developed additional versions of the tool tailored to the specific needs of different types of rightsholders." (*Id.* ¶ 4.) This included, in late 2017, Rights Manager for Music "for the specific music distributors and labels with whom Meta has commercial business relationships." (*Id.* ¶ 4.) Rights Manager for Music "offers features that are adapted specifically to the terms of the partners' license agreements with Meta and is only provided

to such partners." (*Id.*; Dkt. No. 369-34 (outlining different features).) For example, while Rights Manager for Music protects "audio & premium music videos," Rights Manager Pro only protects "video & audiovisual." (Dkt. No. 369-34; *see also* Dkt. No. 369-47.) But "[r]ights holders [must] apply to join [Rights Manager], [and] [Meta] approve[s] them based on their eligibility." (Dkt. No. 369-39 at 2; Dkt. No. 369-19 at 11, 13.) Rightsholders with "a music licensing agreement with Meta" have access to Rights Manager for Music, and one of Meta's deponents was "not aware of [Meta] ever granting access to Rights Manager for Music to an entity that was not part of [its] music licensing program." (Dkt. No. 369-19 at 10, 14.)

Meta nevertheless declares in every version of Rights Manager, "rightsholders may upload content into the tool as 'reference files,' " and "Rights Manager then scans Instagram and Facebook to detect user generated content [ ] that matches those reference files." (Dkt. No. 376 ¶ 5.) "When Rights Manager determines that a reference file has some portions that are potentially similar to [user-generated content], a 'match' is created based on the match rules and parameters set by the rightsholder." (*Id.* ¶ 6.) "For both public and private content, [Rights Manager] Pro displays certain information about the matched content, including the match duration and matching segments." (*Id.* ¶ 7; *see also id.* ¶¶ 8-10 (examples of what a Rights Manager Pro rightsholder would see in dashboard for public and private matches).)

According to Meta, "[w]hen a match is detected," Rights Manager Pro users "can decide how they want to manage the matched content." (*Id.* ¶ 11.) A Rights Manager Pro user can: (1) " 'block' the matched content, which prevents the content from being viewed by anyone other than the uploader"; (2) " 'monitor' the matched content, which does not affect the matched content, but allows the rightsholder to track insights about how their content is being used on the platform"; (3) "apply an ownership link to the matched content, which allows the rightsholder to link the content to the promotional destination of their choice"; or (4) " 'monetize' eligible matched content, once they have completed the financial onboarding process, which gives the rightsholder a share of advertising revenue generated by in-stream ads inserted into the video." (*Id.* ¶¶ 12-15.)

 **\*9** Rights Manager Pro users can either (A) "select one of these actions manually for each match," or (B) "select a 'match rule' for any given reference file, which has the effect of applying preselected actions to all of the matches

to that reference file," so that "any time the reference file receives a 'match,' the preselected 'match rule' applies automatically." (*Id.* ¶¶ 16-17.) Rights Manager Pro users can also "exempt a list of Pages or user accounts that are authorized to use its content ('allowlist') such that any automated match rule does not apply to [user-generated content] posted by those accounts," at either the "account level, which grants them permission to use all content in the rightsholder's reference library, or at the reference file level, which grants the account permission to use that specific reference file." (*Id.* ¶¶ 18-19.)

Meta has also "consistently had a designated Digital Millenium Copyright Act ('DMCA') agent" since 2017, so a Rights Manager Pro "user can use Rights Manager to send Meta a 'takedown notice'—i.e., a notice that the rightsholder believes content infringes its intellectual property and request that Meta take down that content pursuant to Meta's DMCA policy." (*Id.* ¶¶ 21-22 (explaining the rightsholder can send takedown notices individually or in bulk).) In addition, Meta had a reporting form through which rightsholders could report videos to Meta's IP team. (Dkt. No. 383-11 at 2 (May 2020 email); Dkt. No. 383-12 at 2 (June 2020 email); Dkt. No. 383-13 at 2 (June 2021 email); Dkt. No. 383-14 at 2 (Jan. 2022 email); Dkt. No. 383-15 (2022 email chain).)

Rights Manager also includes "a reference file conflict process that will identify when two content owners have uploaded content to the Rights Manager tool that appears technically similar to one another and where both of those entities have asserted some sort of claim [of rights to the content] in the same jurisdiction." (Dkt. No. 386-7 at 4-5.) When Rights Manager identifies a conflict, it "surface[s]" a conflict to both rightsholders including "the identity information of the other rightsholder." (Dkt. No. 376 ¶¶ 26-28.) When there is a conflict between a Rights Manager for Music user (i.e., a music licensor) and a non-licensor rightsholder, "the rightsholders are given seven days to resolve the conflict, after which the conflict resolves in favor of Meta's music licensor." (*Id.* ¶ 29.) According to Meta, the time limit "is designed to prompt licensors and other rightsholders to resolve conflicts expeditiously," and the "default in favor of licensors ... is appropriate because those licensing partners represent and warrant that they have the rights to license all content that they deliver." (*Id.* ¶ 30; *see also* Dkt. No. 389-3 ¶ 62 (opining Meta's licenses are "consistent with standard industry practice").) "Meta does not in the ordinary course monitor or manage reference file conflicts between rightsholders ... because Meta has no way

of knowing who the 'true' rightsholder is when a conflict occurs." (Dkt. No. 376 ¶ 31.)

**2. Dispute about Epidemic's Rights Manager Access**

Epidemic has had a Rights Manager account since "at least 2017," (Dkt. No. 383-31 at 16), and "when Epidemic first requested access to Rights Manager, Meta provided it with the only version it had," namely, Rights Manager Pro, (Dkt. No. 376 ¶ 2). According to Lina Melander, Epidemic's Vice President for Platform Licensing and Digital Rights Management, Epidemic "created a Rights Manager account in order ... to enforce unlicensed use of [its] music on [Meta's] platforms." (Dkt. No. 387-13 at 3; Dkt. No. 365 ¶ 1.) Although Lina Melander was primarily responsible, Epidemic had a team with several individuals who "were responsible for monitoring Epidemic's rights manager, which responsibilities included uploading reference files, setting 'match rules,' and/or taking action in response to 'match' or 'conflict' notifications." (Dkt. No. 384-2 at 9.)

 **\*10** Epidemic admits it "has received notice through its [Rights Manager Pro] account of certain (but not all) matches between its uploaded reference files and certain user-generated content posted to Meta's platform by users," and its Rights Manager Pro account "identified certain conflict information in certain instances" "at least as early as June 2018." (Dkt. No. 383-31 at 19, 27; Dkt. No. 383-17 at 12.) Epidemic also admits its Rights Manager Pro account "had the ability to set certain rules for how to deal with certain user-generated content matches," which "at times" included "Block," "Monitor," and "Allow and Monitor." (Dkt. No. 383-31 at 21; Dkt. No. 383-33 at 7.) Meta further declares Epidemic, through its Rights Manager Pro account, could "effectuate a 'block' policy, which would have the effect of blocking user-generated content that Rights Manager identified as matching any one of Epidemic's reference files, except for those posted by its allowlisted accounts." (Dkt. No. 376 ¶ 20.)

However, Epidemic admits it never "set an automated response within its Rights Manager account to 'Block' matches." (Dkt. No. 383-31 at 26.) According to Epidemic, "to ensure that its subscribers and licensees, who pay for the use of Epidemic's works, can use Epidemic's works on Meta's platforms without any interruption or issues, Epidemic does not block the use of its works in user-generated content on Meta's platforms." (Dkt. No. 384-7 at 9.) Instead, "Epidemic

Case 1:24-cv-04274-JLR-BCM    Document 1064-2    Filed 07/16/26    Page 10 of 55

endeavors to monetize that usage by attempting to claim ownership rights and/or having such unlicensed users become subscribers and licensees who pay for the use of Epidemic's works." (*Id.*) Epidemic also did not individually "select the 'Block' option in response to matches" because, "due to the rampant extent of Meta's infringement, it was not possible nor reasonable to update or set rules in response to each individual match with Epidemic's reference files." (Dkt. No. 383-31 at 24.)

Epidemic discussed its "never block" policy internally, with customers, and with Meta. For example, Epidemic told customers it "never block[s] anything that uses [its] music on Facebook," (Dkt. No. 384-8 at 2); "it's our creator friendly company policy to never block or remove unlicensed usage, we always monetize, unless it violates the moral rights of our composers," (Dkt. No. 384-9 at 2); and "Epidemic sound has a no takedown policy so we would never remove a video," (Dkt. No. 387-18 at 4). In August 2018, in response to Epidemic's discovery someone was posting Epidemic's music under a different artist on Instagram and Facebook, an Epidemic employee explained she had discussed the issue with Ms. Melander and concluded, "Our policy states that we will never take down a video or put any video in bad standing for using our music unlicensed," because "[i]t is [ ] beneficial for us to keep the videos up, both in terms of monetization and marketing purposes." (Dkt. No. 387-21 at 3-4; *see also* Dkt. No. 387-20 at 2 (similar discussion in April 2020).) And in February 2018, Ms. Melander told Meta, "our [Rights Manager] match policy is always 'allow and monitor' policy on all assets." (Dkt. No. 387-19 at 3.)

But according to Ms. Melander, "[Rights Manager] Pro does not provide [Epidemic] the ability to dispute ownership conflicts with content uploaded by users of" Rights Manager for Music at all. (Dkt. No. 369-49 ¶ 12.) In addition, after Epidemic loses a dispute, "Rights Manager then stops identifying any further matches of Audio Library content or of [user-generated content] uses of that content to Epidemic, since Meta has determined that it no longer has rights in the conflicting portion of its reference file." (*Id.*) According to Ms. Melander, "[t]his has happened thousands of times." (*Id.* ¶ 13.)

Meta has admitted "[i]n every conflict, there is a presumed winner and a presumed loser," and in at least one case, the presumed winner "merely ha[d] to reject the dispute to retain its ownership interest." (Dkt. No. 369-15 at 32.) And Meta has confirmed "the default policy for the resolution of conflicts

between Rights Manager for Music and ... Rights Manager Pro users is that the Rights Manager for Music user is the presumed winner," and "the Rights Manager Pro user cannot dispute the conflict." (*Id.* at 33.) In addition, "[i]f a Rights Manager Pro reference file was like a hundred percent ... in conflict with a Rights Manager for Music reference file, ... [user-generated content] matches aren't shown to the Rights Manager Pro user in the conflict." (Dkt. No. 369-19 at 21.) And, while there is an active conflict, changing to a "block" policy "wouldn't have changed the user-generated content, because we weren't generating a match." (*Id.* at 23.) Meta also did not launch reference file to reference file conflict notifications until the second half of 2020. (Dkt. No. 369-22.)

 **\*11** But Meta also had a reporting form through which—as it informed Epidemic—Epidemic could report videos to Meta's IP team. (Dkt. No. 383-11 at 2 (May 2020 email); Dkt. No. 383-12 at 2 (June 2020 email); Dkt. No. 383-13 at 2 (June 2021 email); Dkt. No. 383-14 at 2 (Jan. 2022 email); Dkt. No. 383-15 (2022 email chain).) Meta claims Epidemic only produced two takedown notices, both of which concern works not asserted in this case. (Dkt. Nos. 383-15; 384-1.)

### 3. Communications Between Epidemic and Meta

According to Epidemic, it has "been for years notifying Meta that its works were being wrongfully claimed and infringed on Meta's platforms and Meta was hindering Epidemic's ability to protect its intellectual property on Meta's platforms due to the shortcomings of [Rights Manager] Pro." (Dkt. No. 369-49 ¶ 14.) According to Meta, Epidemic "actively monitored" the alleged infringement "while allowing and encouraging that use to grow" and "demand[ing] [ ] a blanket license agreement with Meta." (Dkt. No. 386-19 at 21, 26.)

Epidemic and Meta began discussing a potential licensing relationship in November 2016. (Dkt. No. 387-23.) At that time, Meta valued licensing deals through industry market share and reported digital revenues. (Dkt. No. 386-9 at 3-4.) According to Meta, Epidemic pitched "alternative music right[s] set ups" for a license to Epidemic's full catalog, which led to "a disconnect" because "the uses that [Meta] envisioned Epidemic's music fitting into were something less than everything." (Dkt. No. 387-23 at 10; Dkt. No. 386-8 at 4-5.) Meta raised concerns it did not have information "to devise a marketshare calculation" for Epidemic and, "from a values standpoint," did not want to support Epidemic's potential "double-dipping" of obtaining revenues from both

subscribers and Meta, neither of which were shared with creators. (Dkt. No. 387-22 at 7-8.)

In February 2018, Tom Höglund, Epidemic's Chief Business Development Officer, (Dkt. No. 394-3 ¶ 1), emailed Meta to "give a friendly heads-up before we start taking down unlicensed usages." (Dkt. No. 387-17 at 4.) Mr. Höglund wrote, "[w]e are as committed as ever to helping the creators spread their content but without any central deal with you guys, any marketing for our products or monetization it just doesn't make sense to keep allowing infringement on the Facebook platforms." (*Id.*) He followed up on May 2, 2018 about concerns "Rights Manager is giving Major Labels and/or publishers the right to claim our tracks on Facebook and we cannot counter claim due to that we do not have the same status that you have given them." (Dkt. No. 369-50 at 2; Dkt. No. 387-17 at 3-4.) Epidemic advised "[t]hese infringements of our proprietary assets must cease immediately as it is affecting our customers with valid licenses." (Dkt. No. 369-50 at 2.)

Meta's Tamara Hrivnak responded later that day explaining "Meta provide[s] takedown tools on [its] platform to enable rightsholders to manage their content (to maintain it on the platform or remove it, as they like)," and "intend[s] for those tools to be used." (Dkt. No. 387-17 at 3.) She added, "We're happy to discuss an alternate model or deal if you have new ideas – the existing proposals don't make sense for us." (*Id.*) In response, Mr. Höglund wrote: "[W]e are aware that we are able to start doing takedowns. If we can't find a deal that makes sense we will eventually start using your tools. However, we are currently focusing on building our presence across your platforms and the user experience is central in all we do." (*Id.*)

 **\*12**  In June 2018, Mr. Höglund contacted Meta again about "44 active wrongful claims on [Epidemic's] tracks," and Meta responded "this is an issue with [Rights Manager], not major label status – the issues are being caused because your files are conflicting with recordings inserted into our beta [Rights Manager] for Music product. We're investigating what policies and rules make sense for situations like this, and hope to have more information in the coming weeks." (Dkt. No. 369-51 at 5-6.) Mr. Höglund then asked if Epidemic could "be included in any kind of beta to be able to protect and handle [its] IP." (*Id.* at 5.)

Mr. Höglund followed up on August 4, 2018 to notify Meta on July 9, 2018, it "had 43 'not disputable' conflicts

with majors labels," and since then "an additional 103 'not disputable' conflicts with various digital distributors and aggregators." (Dkt. No. 369-51 at 4.) According to Mr. Höglund, Epidemic suspected it did not have the option to assert its full ownership in Rights Manager given "restrictions on [its] Rights Manager account because [Epidemic] cannot even see the name of the track that they're claiming to be in conflict." (*Id.*) On October 2, 2018, Mr. Höglund reminded Meta Epidemic was "still experiencing issues with false claims on [its] tracks from other music companies that seem to have been granted a preferred status in Rights Manager." (*Id.* at 3.) Ms. Melander declares "at this time, Epidemic had no idea that Meta was even offering the Audio Library to its users." (Dkt. No. 369-49 ¶ 19.)

On November 1, 2018, Ms. Melander reminded Meta of "multiple conflicts with similar actors (no need to list them as you've checked our conflicts)." (Dkt. No. 369-52 at 4.)[5] At that point, Meta's Rob Arcamona responded:

> Are you saying that the entities you are conflicting with are infringing your content? I had understood that perhaps these conflicts were caused by distributors of yours, or related entities, uploading content that is part of both their catalog and your own. I had not previously understood that these other entities were infringing your content.

(Dkt. No. 369-52 at 3.) Ms. Melander responded, "yes, we're saying that these entities are infringing on our content." (*Id.* at 2.)

[5]    When asked about this email at his deposition, Rob Arcamona did not "recall [Meta] logging into the Rights Manager account for Epidemic for these purposes" because "[a]s a general matter, [Meta] [doesn't] do that." (Dkt. No. 369-19 at 24.) Mr. Arcamona also admitted absent logging into Epidemic's Rights Manager Pro account, "there wouldn't have been a way for [him] to easily look at what reference files conflicts they have." (*Id.* at 25.) However, Mr. Arcamona said because "the concern Epidemic was raising about their conflicts was what information can they see[,] [Meta] checked to see what information they could see by reproducing it on [its] side." (*Id.* at 30.)

On January 16, 2019, Epidemic emailed Meta about "a massive increase in conflicts with publishers on the audio sections of their videos, with +1K new conflicts appearing on Jan 11th." (Dkt. No. 369-53 at 4.) When Meta responded they had identified a bug and "reverted [Epidemic's] conflicts caused by the issue," Epidemic confirmed it was "[n]ow ... able to see the track name and ISRC on the conflicts," but

repeated its concern about its "inability to solve conflicts with infringing distributors that can bypass [it] since [it's] in the wrong tier of Rights Manager.". (*Id.* at 3.)

Two months later, Mr. Höglund emailed Meta: "We have noticed that we have not been included in the tests of Music Rights Manager Beta. In order for us to be able to manage our massive presence on the Facebook platform we would need better access to tools, analytics and possible future monetization opportunities." (Dkt. No. 369-54 at 3.) Epidemic followed up a year later, on March 4, 2020, to note its Rights Manager status "is not sufficient for minimal protection of [its] IP." (*Id.* at 2.)

**\*13** In October 2020, Mr. Höglund emailed Ms. Hrivnak:

I wanted to reach out hoping that you're open to a pragmatic discussion on how we can mutually benefit from our music across FB products. We have informed Facebook multiple times of the massive copyright infringements of our IP across Facebook. For some time now, we've requested access to the same tools as provided to other rights holders used to protect their music IP. Unfortunately we have not been granted access.... We would be happy to issue a broad license to clear all usage across Facebook if we are treated at equal terms with other music rights holders in relation to our actual market share across Facebook.

(Dkt. No. 384-14 at 4-6.) In a draft email Ms. Melander prepared for Mr. Höglund to send to Mr. Arcamona in November 2020, she explained:

We remain open to licensing our catalog for Facebook creators.... Facebook Rights Manager is currently our only ability to police unlicensed content on the platform. It would be very difficult to argue that you're giving us the ability to police our content at your best capacity without including us in the system you've built for this purpose.... [T]his special treatment compared to other music rights holders is severely limiting our ability to protect our content since we can't solve ownership conflicts.... [Y]ou have several features tailored to music rights holders, whereas we're now resorting to converting our audio files to mp4 in order to use Rights Manager, this is not industry standard and adds on to the administrative burden that adds up to the severe difficulties of protecting our content.

(Dkt. No. 384-15 at 2-4.) In response to Mr. Arcamona's notice Meta "remain[s] open to licensing" to Epidemic "under the same exact framework that we license other partners, the way we allocate budget for all our licensors is based on IFPI reported digital revenue for 2018, and ... you have

not been willing to participate on that basis," Ms. Melander proposed explaining, "[w]hile we appreciate this is a great deal for the major labels, we trust that you understand that the 2018 IFPI digital revenue has nothing to do with the growing consumption and distribution of our music on Facebook." (*Id.*)

Ms. Melander declares "Epidemic [still] does not have access to the music Rights Manager." (Dkt. No. 369-49 ¶ 23.)

### 4. Epidemic's Discovery

Ms. Melander declares "Epidemic did not discover that its works were in Meta's Audio Library until November 2020," when an Epidemic subscriber reached out to ask Epidemic why its post had been muted by Meta's systems. (Dkt. No. 369-49 ¶¶ 24, 25.) At that point, Epidemic "conducted a detailed review of its [Rights Manager] Pro account" and "learn[ed] that those conflicts that Epidemic could not dispute, because the distributor that delivered the track to Meta had a music Rights Manager account, was not only being credited with ownership of the conflicting track, but that track was being made available in the Audio Library." (*Id.* ¶ 26.) Epidemic's "investigation revealed that hundreds of Epidemic's tracks were being offered by Meta to billions of users through the Audio Library without authorization, ultimately forcing the basis of this lawsuit." (*Id.* ¶ 28.)

**\*14** Epidemic then sent Meta a cease-and-desist letter "identifying 100 example tracks that were being made available in the Audio Library or were being infringed through the OA/RR Features." (Dkt. No. 369-4 at 34 (citing Dkt. No. 361-40).) Epidemic and Meta, through counsel, exchanged several more communications over the course of several months. (Dkt. Nos. 361-41, 369-42, 369-43.)

### II. PROCEDURAL HISTORY

On July 20, 2022, Epidemic sued Meta for (1) direct copyright infringement, 17 U.S.C. 106; (2) inducement of copyright infringement, 17 U.S.C. § 501; and (3) contributory copyright infringement, 17 U.S.C. § 501, of "over 950" Epidemic Tracks. (Dkt. No. 1 ¶¶ 26-27; Dkt. No. 14.) The Court denied Meta's motion to dismiss. (Dkt. Nos. 29, 37.)

Following the initial case management conference on January 12, 2023, the Court scheduled August 30, 2023 for the close of fact discovery. (Dkt. Nos. 43, 44.) The Court later extended

the fact discovery deadline to December 15, 2024, (Dkt. No. 148), then April 30, 2025, (Dkt. No. 225), and then for particular depositions and licensing agreements until May 12, 2025 and August 5, 2025, (Dkt. Nos. 265, 267, 273, 274). In addition, after the close of fact discovery, the Court granted Meta's motion for leave to reopen discovery for particular withheld documents. (Dkt. Nos. 277, 310, 314.)

During discovery, the Court held several case management conferences and hearings, and resolved several disputes between the parties. (Dkt. Nos. 82, 100, 101, 110, 111, 119, 135, 147, 154, 164, 177, 179, 197, 206, 222, 227, 238, 246, 254, 258, 262.) Early on, Epidemic dismissed without prejudice its claims related to 52 Epidemic Tracks such that it asserted 900 Epidemic Tracks. (Dkt. Nos. 95, 98.) The Court also granted Epidemic's motion to strike Meta's innocent infringer defense as to liability and denied Epidemic's motion to strike Meta's copyright misuse defense. (Dkt. Nos. 126, 135.) In addition, during discovery, Meta asked Epidemic to produce the "original audio recordings submitted to the Copyright Office in connection with the registration of the Works in suit—i.e., deposit copies, which are necessary 'to establish Epidemic's ownership of the works at issue in this case.' " (Dkt. No. 384-26 at 5.) In response, Epidemic explained because it had "produced audio files embodying the Epidemic Tracks ... together with copyright registrations for each of the works," it "would be duplicative, cumulative, and unduly burdensome" to produce deposit copies of those audio files. (Dkt. No. 417-3 at 17.) Epidemic added, "to the extent Meta believes it needs the specific 'deposit copy' filed with the U.S. Copyright Office, such records are publicly available (and therefore equally available to Meta), and Meta may procure them at its own expense." (*Id.*)

On July 24, 2025, Meta moved to stay this case pending the Supreme Court's decision in *Cox Communications, Inc. v. Sony Music Entertainment*, No. 24-171. (Dkt. No. 275.) Epidemic opposed the motion to stay. (Dkt. No. 284.) Following Epidemic's recommendation at oral argument, the Court granted in part Meta's motion to stay the case; specifically, the Court vacated trial but held the parties would proceed to summary judgment which could, if appropriate, be subject to reconsideration after the Supreme Court's ruling in *Cox Communications*. (Dkt. Nos. 310, 311.)

**\*15** On November 19, 2025, Epidemic and Meta filed a stipulation regarding the tracks at issue in this case. (Dkt. No. 350; *see supra* at 10-12 (describing stipulation).)

Pending before the Court are: (1) Epidemic's motion to strike Dr. Robert Fink's second supplemental report, (Dkt. No. 344); (2) Epidemic's motion for spoliation sanctions against Meta, (Dkt. No. 351); (3) Meta's motion to exclude Professor Geluso's expert testimony, (Dkt. No. 352); (4) Meta's motion to exclude Bradley T. Sharp's expert testimony, (Dkt. No. 358); (5) Epidemic's motion for summary judgment, (Dkt. No. 360); and (6) Meta's motion for summary judgment, (Dkt. No. 388). The Court held oral argument on March 9, 2026. Following oral argument, the parties filed supplemental briefing on the produced Epidemic tracks. (Dkt. Nos. 503, 505, 506, 507.) After the Supreme Court's March 25, 2026 decision in *Cox Communications*, Meta requested an opportunity for supplemental briefing. (Dkt. No. 500.) Epidemic opposed supplemental briefing but requested any supplemental briefing "not ... supplement the factual record." (Dkt. No. 501 at 5.) The Court granted Meta's request for supplemental briefing but adopted Epidemic's recommendation "neither party may supplement the factual record." (Dkt. No. 502; *see also* Dkt. Nos. 504, 508.)

## DISCUSSION

Federal Rule of Civil Procedure 56 allows for summary judgment when the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

"On cross motions for summary judgment, the burdens faced by opposing parties vary with the burden of proof they will face at trial." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513 (N.D. Cal. 1995). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quotation marks and citation omitted). "In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.* (citation omitted). If the moving party produces sufficient evidence on each issue material to its case, "the burden then

moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *Id.* (quotation marks and citation omitted). If the opposing party "fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

**\*16**  On the other hand, when the moving party would not bear the burden at trial, it can meet its summary judgment burden by (1) "produc[ing] evidence negating an essential element of the nonmoving party's case," or (2) "after suitable discovery, ... show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Id.* at 1106. "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

In addition, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324). Under Federal Rule of Civil Procedure 56, a party may "assert[ ] that a fact cannot be or is not genuinely disputed" by, among other things, showing "an adverse party cannot produce admissible evidence to support the fact," or "object[ing] that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(1)(B), 56(c)(2). So, "[a]t the summary judgment stage, [courts] do not focus on the admissibility of the evidence's form," and "instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citations omitted); *see also Scramoge Tech. Ltd. v. Apple, Inc.*, 669 F. Supp. 3d 826, 831 (N.D. Cal. 2023) ("At the summary judgment stage, although [a party] may rely on evidence in inadmissible form, it must establish the *contents* are admissible." (citing *Fraser, 342 F.3d at 1036*)). Ultimately, the party "seeking admission of ... the evidence at issue [bears] the burden of proof to show its admissibility." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010) (citing *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002)).

**I. DIRECT INFRINGEMENT CLAIM**

"To establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Gray v. Hudson*, 28 F.4th 87, 96 (9th Cir. 2022) (emphasis omitted) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). A plaintiff seeking to prove direct infringement "must also establish causation, which is commonly referred to as the 'volitional-conduct requirement.' " *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019) (citation omitted).

Epidemic moves for summary judgment on its direct infringement claims as to a select 869 tracks; specifically, Epidemic seeks summary judgment as to its ownership of valid copyrights in, Meta's copying of, and Meta's volitional conduct as to these 869 tracks. Meta opposes Epidemic's motion for summary judgment and also seeks summary judgment in its favor on Epidemic's direct infringement claims as to all 900 tracks asserted in this litigation. However, Meta's motion for summary judgment only argues Epidemic cannot show copying because it does not have admissible evidence Meta's allegedly infringing works are substantially similar to Epidemic's copyright-protected works.

**A. Epidemic's Ownership of Valid Copyrights**

The copyright owner "bears the burden of proving copyright ownership." *See Flesicher Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 962 (9th Cir. 2011) (citation omitted). However, "[i]n any judicial proceedings the certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). So, once the copyright owner presents a timely copyright registration certificate, the defendant "has the burden of rebutting the facts set forth in the copyright certificate." *See United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) (citing *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085-86 (9th Cir. 1989)). "To rebut the presumption [of validity], an infringement defendant must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement." *Id.* (quotation marks and citation omitted).

**\*17**  If the certificate of registration was made more than five years after first publication, "[t]he evidentiary weight to be accorded the certificate of a registration ... shall be within the

discretion of the court." *See* 17 U.S.C. § 410(c). "Most courts conclude that untimely certificates [still] constitute prima facie evidence" of ownership, particularly in the absence of a persuasive challenge to validity. *See Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, No. 10-CV-419-GPC (WVG), 2012 WL 6553403, at *2 (S.D. Cal. Dec. 13, 2012) (citing cases); *see also Religious Tech. Ctr. v. Netcom On-Line Commc'ns Servs., Inc.*, 923 F. Supp. 1231, 1242 (N.D. Cal. 1995) ("In light of plaintiffs' evidence of validity ... and the lack of a persuasive challenge to the validity of the copyrights by [defendant], the court finds that plaintiffs' registrations are strong evidence of the validity of their claimed copyrights."); *Rosen v. Masterpiece Mktg. Grp., LLC*, No. 15-CV-06629 SJO (ASx), 2016 WL 7444688, at *6 (C.D. Cal. Nov. 29, 2016) (considering untimely registration certificates prima facie evidence given sworn affidavits the plaintiff took the photos, his name on the prints, and "the absence of any contradictory evidence presented by" the defendant).

Epidemic declares it presents certificates of registration for the 869 Epidemic Tracks and each registration "is issued by the United States Copyright Office to Epidemic Sound, AB as the claimant, or owner, for that corresponding Epidemic Track for both the sound recording and musical composition embodied therein." (Dkt. No. 363 ¶ 5; Dkt. No. 363-2 (compendium of registrations).) Epidemic also declares it presents "the agreements by which Epidemic obtained and confirmed its rights in the sound recording and embodied musical composition" for each Epidemic Track. (Dkt. No. 363 ¶ 7; Dkt. No. 363-4 (compendium of agreements).)

According to Epidemic, for 537 of the Epidemic Tracks, "the copyright registrations were made before or within five years after first publication." (Dkt. No. 369-4 at 36.) So, for these 537 Epidemic Tracks, the copyright registration "constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate," and the burden shifts to Meta to rebut them with evidence. *See* 17 U.S.C. § 410(c); *United Fabrics Int'l, Inc.*, 630 F.3d at 1257. For the remaining 332 Epidemic Tracks, the Court has discretion to consider the registration certificates prima facie evidence of ownership. *See* 17 U.S.C. § 410(c). Absent Meta's "persuasive challenge to [ ] validity," the Court will treat these untimely certificates as prima facie evidence of Epidemic's ownership. *See Religious Tech. Ctr.*, 923 F. Supp. at 1242. So, Epidemic has met its prima facie burden to show ownership of valid copyrights in the 869 Epidemic Tracks, and the burden shifts to Meta to present evidence rebutting Epidemic's ownership or the copyrights' validity.

First, Meta argues "for at least seven works, Epidemic registered both a vocal sound recording and a derivative instrumental version of the same work, without excluding the preexisting, already-registered material—as black-letter copyright law and the Copyright Office rules require." (Dkt. No. 386-19 at 32.)[6] The Compendium of U.S. Copyright Practices states a copyright claim "should be limited if the work contains an appreciable amount of material that was ... previously registered," and any copyright application for a subsequent "derivative work" should identify " 'any preexisting work or works that it is based on or incorporates.' " *See* U.S. Copyright Office, Compendium of U.S. Copyright Office Practices §§ 618.5, 621 (3d ed. 2021) (quoting 17 U.S.C. § 409(9)). Meta therefore argues these works are invalid. However, "a certificate of registration is valid even though it contains inaccurate information, as long as the copyright holder lacked 'knowledge that it was inaccurate.' " *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 182 (2022) (citing 17 U.S.C. § 411(b)(1)(A)); *see also Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1145 (9th Cir. 2003) (rejecting the defendant's argument copyright registrations were invalid because they did not disclose others' preexisting work), *abrogation recognized by Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 959 F.3d 1194, 1198 (9th Cir. 2020), *reversed and remanded, Unicolors, Inc.*, 595 U.S. 178. And Meta presents no evidence from which a reasonable trier of fact can infer Epidemic's knowledge its copyright registrations were inaccurate.[7] Instead, Meta only cites Epidemic's produced sound recordings for these Epidemic Tracks. (Dkt. Nos. 387-27, 387-28, 387-29, 387-30, 387-31, 387-32, 387-33, 387-34, 387-35, 387-36, 387-37, 387-39; *see also* Dkt. No. 383 at 7-8 (identifying exhibits).) Presumably, Meta cites these sound recordings because "[t]he statutory presumption of validity can be rebutted if the alleged infringer demonstrates that the plaintiff's work 'is not original but copied from another's work.' " *See Lamps Plus, Inc.*, 345 F.3d at 1145-46 (cleaned up). However, Meta makes no effort to explain the similarities and differences between the sound recordings or explain which elements are preexisting or original. *Cf. id.* at 1144, 1146-47 (evaluating the preexisting versus original elements of the copyrighted material after showing each of the lamp's "component parts is the preexisting work of others"). So, on summary judgment Meta has not presented evidence sufficient to preserve a factual dispute regarding the validity of these six tracks.

6    Although Meta contends this is the case for "at least seven works," Meta only identifies six of these pairs of works, including: (1) "Belong" and "Belong (Instrumental Version)," (2) "Christmas In My Heart" and "Christmas In My Heart (Instrumental Version)," (3) "I Just Need Someone Like You" and "I Just Need Someone Like You (Instrumental Version)," (4) "I Told You So" and "I Told You So (Instrumental Version)," (5) "Reckless" and "Reckless (Instrumental Version)," and (6) "Wordless" and "Wordless (Instrumental Version)". (Dkt. No. 386-19 at 32 n.14; *see also* Dkt. No. 443-1 (Rows 79-80, 159, 161, 330-331, 333-334, 552-553, 850-851) (Epidemic's corrected Exhibit 1 collecting documents for these tracks).)

7    Furthermore, after the defendant shows the plaintiff's registration includes inaccurate information, included on the application with the knowledge it was inaccurate, "a district court is then required to submit a request to the Register of Copyrights 'to advise the court whether the inaccurate information, if known, would have caused [it] to refuse registration.' " *Unicolors, Inc.*, 959 F.3d at 1197 (quoting 17 U.S.C. § 411(b)(1)-(2)). So, even if Meta presented evidence meeting each of these requirements, Meta has not asked the Court to make such a request, so its reliance on *Urban Textile, Inc. v. Rue 21, Inc.*, No. 2:14-CV-08285-ODW (FFMx), 2016 WL 6951925, at *2 (C.D. Cal. Nov. 28, 2016), without any explanation, is unavailing.

**\*18**    Second, Meta argues "[a]fter discovery, Epidemic produced communications demonstrating that several works registered to bring this lawsuit incorporated preexisting recorded material such as common loops or samples." (Dkt. No. 386-19 at 32.) In response, Epidemic represents none of those tracks are at issue on its motion for summary judgment. (Dkt. No. 464-3 at 13.) Because Epidemic does not seek summary judgment as to its ownership of these tracks, the Court need not decide whether Meta is correct "those omissions would be sufficient grounds to invalidate those registrations." (Dkt. No. 439-2 at 29.) *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 20-CV-08819 (CBM) (AS), 2025 WL 2647269, at *5 (C.D. Cal. June 25, 2025) ("CREXi's evidence that CoStar has amended its 'Master Image Spreadsheet' multiple times and abandoned some of the alleged infringed images does not rebut CoStar's evidence that the images for which CoStar is *currently* claiming infringement are owned by CoStar.").

Third, Meta contends the flaws it has identified for particular Epidemic Tracks "raise material factual disputes about the validity of Epidemic's copyrights more broadly." (Dkt. No.

439-2 at 30.) But Meta cites no cases supporting the proposition a defendant can rebut the validity of a copyright registration through evidence of other copyright registrations' potential invalidity. To the contrary, Meta's burden to "offer some evidence or proof to dispute or deny" Epidemic's prima facie case demonstrates Meta must actually dispute the evidence which Epidemic has put forward, rather than cast doubt on Epidemic's prima facie case based on copyrights not at issue. *See United Fabrics Int'l, Inc.*, 630 F.3d at 1257 (cleaned up); *see also Masterpiece Mktg. Grp., LLC*, 2016 WL 7444688, at *7 (finding the defendant "has failed to present any evidence rebutting the presumption in favor of [the plaintiff's] ownership" and noting the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.' " (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). So, Meta's argument the potential invalidity of copyrights for which Epidemic does not seek summary judgment can rebut the presumption of validity in the asserted works is unavailing.[8]

8    To support its ownership of valid copyrights, Epidemic also cites Ms. Ekström's declaration and exhibits to show how Epidemic works with artists to develop and ensure ownership of its tracks, and to argue Meta has acknowledged Epidemic's ownerships in its licenses. (Dkt. No. 369-4 at 37.) The Court agrees with Meta these facts are not "relevant at all to Epidemic's ownership claims." (Dkt. No. 439-2 at 29.) The Court therefore does not address Meta's contentions Ms. Ekström's statements are inadmissible or Meta's construction of the license agreements.

So, Epidemic has presented copyright registrations for 869 Epidemic Tracks, which suffices as prima facie evidence of its ownership of valid copyrights for those Tracks and of the facts stated within those registrations. Meta does not present any evidence rebutting—or creating a factual dispute as to—the validity of any copyright registration. So, there is no genuine factual dispute Epidemic owns valid copyrights in the 869 Epidemic Tracks protected by the produced certificates.

### B. Meta's Copying of Constituent Elements of the Work That Are Original

In addition to proving "ownership of a valid copyright," a plaintiff must prove the defendant's "copying of constituent elements of the work that are original." *Gray*, 28 F.4th at 96 (emphasis omitted). This second element "contains two separate components: [1] 'copying' and [2] 'unlawful

appropriation.' " *Skidmore as Tr. for Randy Craig Wolf Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (quotation marks and citation omitted). First, "[b]ecause independent creation is a complete defense to copyright infringement, a plaintiff must prove that a defendant copied the work." *Id.* (citing *Feist*, 499 U.S. at 345-46). Second, "the hallmark of 'unlawful appropriation' is that the works share *substantial* similarities." *Id.* (emphasis in original) (citation omitted). The Ninth Circuit "use[s] a two-part test to determine whether the defendant's work is substantially similar to the plaintiff's copyrighted work." *Id.* (citation omitted). Specifically:

> **\*19** The first part, the extrinsic test, compares the objective similarities of specific expressive elements in the two works…. Crucially, because only substantial similarity in protectable expression may constitute actionable copying that results in infringement liability, "it is essential to distinguish between the protected and unprotected material in a plaintiff's work." … The second part, the intrinsic test, "test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." … Both tests must be satisfied for the works to be deemed substantially similar.

*Id.* (citations omitted). "Because substantial similarity is usually an extremely close issue of fact ... summary judgment has been disfavored in cases involving intellectual property." *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017) (quotation marks and citation omitted). The Court begins with substantial similarity, on which both Epidemic and Meta seek summary judgment, before addressing actionable copying, on which only Epidemic seeks summary judgment.

### 1. Substantial Similarity

"[T]o obtain a copyright registration, an applicant must deposit as a part of his application a 'copy' or 'copies' of the work." *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1211 (9th Cir. 1998) (citing 17 U.S.C. § 408(b)(1)-(2)). The deposit copy must be a "bona fide cop[y] of the original work," *i.e.*, it "must be virtually identical to the original and produced by directly referring to the original." *Id.* at 1211-12 (quotation marks and citations omitted). "The purpose of the deposit [copy] is to make a record of the claimed copyright, provide notice to third parties, and prevent confusion about the scope of the copyright." *Skidmore*, 952 F.3d at 1062 (citations omitted); *see also id.* at 1064 ("[T]he deposit copy defines the four corners of the [ ] copyright."). So, Epidemic's

produced registration certificates only protect copyrights in the works deposited with the Copyright Office as part of Epidemic's applications ("Deposited Tracks").

Meta seeks summary judgment on Epidemic's direct infringement claims because Epidemic "does not have enough evidence of" substantial similarity, "an essential element of its claim ... to carry its ultimate burden of persuasion at trial." *See Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). According to Meta, Epidemic cannot show, for each Epidemic Track, the Deposited Tracks are substantially similar to Meta's Infringing Works. For each of the 869 Epidemic Tracks, Epidemic has produced audio files ("Litigation-Produced Tracks") it contends are identical to the Deposited Tracks. And, for all but four AL Infringing Tracks and for all the OA/RR Infringing Audio, the parties have stipulated Epidemic's Litigation-Produced Tracks are substantially similar to corresponding AL Infringing Tracks and OA/RR Infringing Audio. (Dkt. No. 350 ¶¶ 5, 9; Dkt. Nos. 350-1, Dkt. No. 350-2.)[9] So, there is evidence the Litigation-Produced Tracks are substantially similar to Meta's Infringing Works. But, Meta argues Epidemic has no admissible evidence from which a reasonable trier of fact could find the Deposited Tracks are identical to the Litigation-Produced Tracks. Absent such evidence, Epidemic cannot show Meta's Infringing Works are substantially similar to the Deposited Tracks, that is, the tracks actually protected by the produced copyright registration certificates.

[9]     For the four remaining AL Infringing Tracks, Epidemic relies on Paul Geluso's expert report. But for his report, Epidemic provided Dr. Geluso with "Source Files," which he was advised Epidemic owned, and "Target Files," which he understood Meta had produced. (Dkt. No. 354-1 ¶ 8.) Although Dr. Geluso's expert report associates the Source Files with Bates numbers for the Litigation-Produced Tracks and Target Files with Bates numbers for Meta's Infringing Works, (Dkt. No. 354-1), his report does not include any relationship between the Litigation-Produced Tracks and the Deposited Tracks.

**\*20** The Court first clarifies the burden of proof before evaluating Epidemic's evidence.

### a. Burden of Proof

Epidemic first contends because its copyright registrations are "*prima facie* evidence that the registration covers the

work identified on the registration and that a true and correct copy of that work was deposited with the Copyright Office," the burden shifts to Meta "to overcome the *prima facie* evidence established by the copyright registrations[ ] with evidence that would raise a genuine issue of fact as to whether the audio files were the Epidemic Tracks covered by the registration." (Dkt. No. 505 at 14-15 (cleaned up).) Epidemic is wrong. Under 17 U.S.C. § 410(c), having presented the copyright registrations, Epidemic is entitled to a rebuttable presumption in proving "ownership of a valid copyright." *Gray*, 28 F.4th at 96. However, to prove a direct infringement claim, Epidemic must also prove Meta's "copying of constituent elements of the work that are original." *Id.* And section 410(c)'s rebuttable presumption does not extend to this second element.

To argue otherwise, Epidemic relies on several cases evaluating challenges to a plaintiff's evidence of ownership or validity, rather than challenges to substantial similarity or copying. For example, in *United Fabrics International, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255 (9th Cir. 2011), the defendants argued the plaintiff's copyright registration was invalid because "the Design was not deposited with the United States Copyright Office," and the Ninth Circuit rejected the defendants' argument because they presented no evidence "rebut[ting] the presumption of copyright validity." *Id.* at 1258. Although Epidemic argues *United Fabrics* demonstrates "it is Meta's burden to prove that any of the audio files do not match the registered work," (Dkt. No. 505 at 8), the defendants' brief in that case makes clear the defendants contested the plaintiff's copyright registration, rather than substantial similarity. *See* Opposition Brief of Defendants-Appellees Macy's Retail Holdings, Inc. and A.R.B., Inc., *United Fabrics Int'l, Inc. & C&J Wear, Inc.*, 630 F.3d 1255 (9th Cir. 2011) (No. 09-56499), 2010 WL 3706514, at *27 (explaining they had argued to the district court "the Subject Design was not deposited with the Copyright Office, and therefore there was no valid copyright registration, ... [so] the copyright registration cited by UFI could not be the basis for valid claims"). The same is true of several district court cases Epidemic cites. *See, e.g., Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*, No. 3:17-CV-42, 2019 WL 4647305, at *6 (S.D. Ohio Sept. 24, 2019) (rejecting challenge to accuracy of first publication date in the registration); *Hargis v. Pacifica Senior Living Mgmt. LLC*, No. 2:22-CV-06989-MCS-PD, 2023 WL 6373869, at *12 (C.D. Cal. Aug. 2, 2023) (holding variation in naming conventions is insufficient to create a genuine dispute as to ownership); *Iantosca v. Elie Tahari, Ltd.*, No. 19-CV-04527

(MKV), 2020 WL 5603538, at *4 (S.D.N.Y. Sept. 18, 2020) (noting copying was not at issue and evaluating ownership). So, the copyright registrations do not entitle Epidemic to a rebuttable presumption the Deposited Tracks match the Litigation-Produced Tracks, and Epidemic cannot defeat Meta's summary judgment motion merely because Meta has not shown any particular Deposited Track does not match the Litigation-Produced Track.

**\*21** Instead, to prove the second element, Epidemic must prove Meta copied Epidemic's *copyright-protected* works. *Cf. Skidmore*, 952 F.3d at 1064 (requiring the plaintiff show the defendant "copied protected aspects of the work" (citation omitted)); *Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir. 2016) ("Antonick was thus required to prove that EA copied *protected elements* of the work." (emphasis added)). And to show substantial similarity, Epidemic must show Meta's infringing work is substantially similar *to the copyrighted work*. *See Skidmore*, 952 F.3d at 1064 ("[W]e use a two-part test to determine whether the defendant's work is substantially similar to the plaintiff's *copyrighted work*." (emphasis added)). Absent evidence of the copyrighted work's contents, a plaintiff cannot show the allegedly infringing work is infringing on the copyrighted work. Because to succeed at trial, Epidemic will need to prove substantial similarity between its Deposited Tracks and Meta's Infringing Works, evidence of substantial similarity between the Litigation-Produced Tracks and Meta's Infringing Works alone is insufficient. *See Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1986) ("There can be no proof of 'substantial similarity' and thus of copyright infringement unless Seiler's works are juxtaposed with Lucas' and their contents compared."); *Williams v. Gaye*, 895 F.3d 1106, 1124-25 (9th Cir. 2018) (explaining jury evaluates substantial similarity based on similarity to the deposit copy); *cf. Antonick*, 841 F.3d at 1066 ("[A]bsent evidence of the copyrighted work and the allegedly infringing works, the record is insufficient to allow appellate review of the jury's verdict.").

However, Meta's argument Epidemic must actually produce the deposit copies left with the Copyright Office is unavailing. The Ninth Circuit has not specifically required a plaintiff to introduce the deposit copies into evidence. *See CraftShack, Inc. v. Critical Tel. Applications, Inc.*, No. CV 24-472-DMG (PVCx), 2025 WL 1255396, at *6 (C.D. Cal. Mar. 14, 2025) ("*Seiler* does not stand for a substantive requirement under copyright infringement law that the deposit copies always must be submitted into evidence." (citing *Seiler*, 808 F.2d at

1318 (applying the best evidence rule))); *see also Rosen v. R & R Auction Co.*, LLC, No. CV 15–07950–BRO (JPRx), 2016 WL 7626443, at \*4 n.6 (C.D. Cal. Aug. 31, 2016) ("17 U.S.C. § 410(c) makes no mention of requiring deposit copies to establish a prima facie case."). That the Sixth Circuit has held otherwise in an unpublished opinion with limited reasoning is unavailing. *See Parker v. Hinton*, No. 22-5348, 2023 WL 370910, at \*5 (6th Cir. Jan. 24, 2023) ("[A] plaintiff must use the deposit copy to establish the ownership component of a copyright infringement claim." (citation omitted)). The district court cases Meta relies on also do not impose that requirement. *See, e.g., Intent Drivers, Inc. v. Primesolarquotes*, No. 8:22-CV-00003-JVS (JDEx), 2022 WL 17080203, at \*6 (C.D. Cal. Aug. 4, 2022) (noting "it is unclear to the Court that Exhibit A is a deposit copy of the provided copyright" but granting motion to dismiss because the plaintiff's "allegations do not make clear what is copyrighted, what is displayed in Exhibit A or Exhibit B, and what has been infringed"); *Kelly Toys Holdings, LLC v. Zuru, LLC*, No. 2:23-CV-09255-MCS-AGR, 2024 WL 1641977, at \*3 (C.D. Cal. Mar. 5, 2024) (refusing to grant motion to dismiss on the ground the plaintiffs did not "clarify whether the images shown as the 'Copyrighted Works' in the Complaint depict the same toys as are shown in the deposit copies at the Copyright Office," but noting the plaintiffs' "copyright infringement claims will fail if it cannot establish the photos it provided in the complaint are the subject of copyright registrations."). So, Meta is not entitled to summary judgment on substantial similarity merely because the Deposited Tracks are not in evidence.

Ultimately, to avoid summary judgment in Meta's favor, Epidemic must present evidence from which a reasonable trier of fact could find its Deposited Tracks are substantially similar to Meta's corresponding Infringing Works. Given the evidence of substantial similarity between the Litigation-Produced Tracks and Meta's Infringing Works, Epidemic need only present evidence from which a reasonable trier of fact could find the Litigation-Produced Tracks are identical to the Deposited Tracks.

### b. Epidemic's Evidence

### i. Caroline Ekström's Declaration

 **\*22**  Epidemic primarily relies on Caroline Ekström's declaration statement that the "audio files identified ... for each Epidemic Track are exact copies of the audio files submitted to the United States Copyright Office in connection with Epidemic's application for registration of its copyright for the associated Epidemic Track." (Dkt. No. 363 ¶ 6 n.3.) However, Meta argues Ms. Ekström's statement is inadmissible. *See Scramoge Tech. Ltd. v. Apple, Inc.*, 669 F. Supp. 3d 826, 831 (N.D. Cal. 2023) ("At the summary judgment stage, although [a party] may rely on evidence in inadmissible form, it must establish the *contents* are admissible." (citation omitted)); *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010) (explaining the party "seeking admission of ... the evidence at issue [bears] the burden of proof to show its admissibility." (citation omitted)).

As Epidemic's Senior Vice President for Global Licensing and Regulatory Affairs, Ms. Ekström "work[s] with Epidemic's licensing strategy, negotiating licensing agreements, managing contacts with collecting societies, and engaging in legislative and regulatory advocacy." (Dkt. No. 363 ¶¶ 1-2.) According to Ms. Ekström, her "declaration is based on [her] personal knowledge and [her] review of the business records of Epidemic, about which [she] [is] authorized to offer this Declaration," and "[i]f called as a witness, [she] could and would testify competently thereto." (*Id.* ¶ 1.)

Ms. Ekström is also Epidemic's designated Rule 30(b)(6) representative "on the topics of Epidemic's ownership of, rights to, and copyright registrations for the Epidemic Tracks." (Dkt. No. 505 at 13-14.) But in her 30(b)(6) deposition, Ms. Ekström testified she is not "responsible for Epidemic's copyright registrations in the United States," and has not "personally been involved in any copyright applications for Epidemic in the United States." (Dkt. No. 387-4 at 17-18.) According to Ms. Ekström, Maha Mortazavi is the Epidemic employee "responsible for Epidemic's U.S. copyright applications." (*Id.* at 17.) And, Epidemic "work[s] with a company called Cosynd to help [ ] administer[ ]" Epidemic's copyright registrations, Epidemic's Hannah Kajlinger "direct[s] and sort of handle[s] the process [of] ... register[ing] all [Epidemic's] tracks," and Ms. Ekström does not remember the names of the "individuals at Cosynd" who "Epidemic work[s] with to register U.S. Copyrights." (*Id.* at 18, 20.) Ms. Ekström testified Cosynd simply performed "administrative services," and "[a]ny information that [Cosynd] would have about the work being registered in this copyright registration would have come from Epidemic." (Dkt. No. 465-4 at 14, 16, 18.) But when Meta asked Ms. Ekström about Epidemic's process of working with Cosynd to register its copyrights, Epidemic

objected based on attorney work product and attorney-client privilege and directed Ms. Ekström not to answer. (Dkt. No. 387-4 at 18-28.)

Federal Rule of Civil Procedure 56(c)(4) requires "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Epidemic first argues it has presented evidence from which a reasonable trier of fact could find Ms. Ekström has personal knowledge the Litigation-Produced Tracks are exact copies of the Deposited Tracks. In the alternative, Epidemic argues because Ms. Ekström is Epidemic's Rule 30(b)(6) designee, she does not need personal knowledge to declare such a fact.

### a) Personal Knowledge

Under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. So, at summary judgment, a party relying on a declarant's statement must also present evidence "of [a] basis in personal knowledge" for the declarant's statement. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001) (affirming summary judgment because "there was no evidence in the deposition or anywhere else in the summary judgment papers of any basis in personal knowledge for the plaintiff's subjective belief about the defendant's motive," so the plaintiff "failed to show personal knowledge"); *see also Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (explaining because "conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient," if "testimony relied on information from [other] ... officers, and the source of these officers' information is unclear, then it potentially relied on inadmissible hearsay evidence" (cleaned up)). But at summary judgment, "the requirement of personal knowledge imposes only a 'minimal' burden on a witness." *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1045 (9th Cir. 2013) (citation omitted). The burden is "particularly low because all 'justifiable inferences must be drawn in favor of the nonmoving party,'" so if a reasonable trier of fact could find the witness has personal knowledge, a court can consider the declaration. *See id.* (citation omitted); *see also id.* ("[If] reasonable persons could differ as to whether the witness had

an adequate opportunity to observe, the witness's testimony is admissible." (cleaned up)).

**\*23**  Epidemic therefore must show a reasonable trier of fact could find Ms. Ekström has personal knowledge the Litigation-Produced Tracks are exact copies of the Deposited Tracks. As an initial matter, Ms. Ekström's "conclusory" statement that her "declaration is based on [her] personal knowledge and [her] review of [Epidemic's] business records" is insufficient. (Dkt. No. 363 ¶ 1.) *See Shakur*, 514 F.3d at 890 ("[C]onclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient."). Epidemic also conceded at oral argument Ms. Ekström "doesn't have personal knowledge" "of what was actually submitted to the copyright office or what was actually deposited." (Dkt. No. 490 at 27.) Epidemic does not explain how, even drawing inferences in its favor, Ms. Ekström could simultaneously lack personal knowledge of what was "submitted to the Copyright Office" and retain personal knowledge the Litigation-Produced Tracks are "exact copies of the audio files submitted to the United States Copyright Office." (*Compare id., with* Dkt. No. 363 ¶ 6 n.3.)

Nevertheless, Epidemic argues a reasonable trier of fact could infer Ms. Ekström's personal knowledge from her position as Epidemic's Senior Vice President for Global Licensing and Regulatory Affairs. "Personal knowledge may be inferred from a declarant's position." *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000) (citation omitted); *see, e.g., Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, No. CV 05-2200 MMM (MCx), 2008 WL 11334030, at *3 n.25 (C.D. Cal. Mar. 17, 2008) ("Because Greene has been involved in MHG's licensing activities as president of the company, he has adequately demonstrated that he has personal knowledge of the specifics of MHG's corporate activities."). But Epidemic does not explain how Ms. Ekström's position, in which she "work[s] with Epidemic's licensing strategy, negotiating licensing agreements, managing contacts with collecting societies, and engaging in legislative and regulatory advocacy," (Dkt. No. 363 ¶¶ 1-2), supports a reasonable inference she would know each of the 869 Litigation-Produced Tracks are exact copies of the Deposited Tracks. And Ms. Ekström's familiarity with how Epidemic commissions its works from creators and licenses it to third parties does not support a reasonable inference she is also familiar with how Epidemic copied the works it deposited with the Copyright Office into the Litigation-Produced Tracks.

To argue its evidence regarding Ms. Ekström's position is sufficient, Epidemic relies on *CraftShack, Inc. v. Critical Tel. Applications, Inc.*, No. CV 24-472-DMG (PVCx), 2025 WL 1255396 (C.D. Cal. Mar. 14, 2025), in which the court considered a declaration from "the President and Creative Director of CraftShack" sufficient to establish the produced photographs were " 'true and correct' copies of the Subject Photographs registered with the U.S. Copyright Office." *Id.* at *6 (citations omitted). However, the *CraftShack* court considered the President's declaration sufficient to show personal knowledge not due to his position, but rather because he also declared he "either took the Subject Photographs or directed an employee to take them under his supervision." *id.*, and therefore—unlike Ms. Ekström—presented some evidence supporting his personal knowledge of how the copies were developed. For similar reasons, Epidemic's reliance on *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089 (N.D. Cal. 2021), *aff'd in part, appeal dismissed in part*, No. 21-17062, 2023 WL 4704891 (9th Cir. July 24, 2023), is also unavailing. In *Atari*, Atari's counsel's Office Services Manager accessed and took photos of several of Atari's games, so to the extent the *Atari* court found personal knowledge, such knowledge could be based not only on the Office Service Manager's position but also on the fact he himself made the produced evidence. *See id.* at 1111; *see also Atari Interactive, Inc.*, No. 18-CV-03451-JST, Dkt. No. 64-37 ¶ 4. But Epidemic presents no evidence Ms. Ekström was involved in the process of creating copies of the Deposited Tracks to produce the Litigation-Produced Tracks. *Cf. Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (finding the declarants' "personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they swore"). So, Ms. Ekström's position alone is insufficient to infer she has personal knowledge the Litigation-Produced Tracks are exact copies of the Deposited Tracks.

**\*24** Given Epidemic's concession at oral argument and the absence of evidence related to Ms. Ekström's position or involvement in the copying process, Epidemic has not presented evidence from which a reasonable trier of fact could infer Ms. Ekström has personal knowledge the Litigation-Produced Tracks are identical copies of the Deposited Tracks.

**b) Sufficient Knowledge as 30(b)(6) Designee**

Epidemic alternatively contends Ms. Ekström does not need to have personal knowledge because she is Epidemic's designated 30(b)(6) witness on "Epidemic's ownership of, rights to, and copyright registrations for the Epidemic Tracks." (Dkt. No. 505 at 13-14.) Federal Rule of Civil Procedure 30(b)(6) allows an organization to be deposed by "designat[ing] one or more officers, directors, or managing agents" to "testify about information known or reasonably available to the organization." *See* Fed. R. Civ. P. 30(b)(6). So, by definition, "a 30(b)(6) witness's [deposition] testimony is determined by the limits of the company's knowledge, not the individual's personal knowledge." *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1128 (S.D. Cal. 2022) (citations omitted); *see also Tijerina v. Alaska Airlines, Inc.*, No. 22-CV-203 JLS (BGS), 2024 WL 270090, at *2 (S.D. Cal. Jan. 24, 2024) ("A Rule 30(b)(6) witness is essentially a spokesperson for the company, and testifies in a corporate rather than personal capacity.") (cleaned up)). Rule 30(b)(6) deposition testimony can bind a corporation to the theory of facts articulated by its designated representative. *See Snapp v. United Transp. Union*, 889 F.3d 1088, 1103 (9th Cir. 2018) ("[A] corporation generally cannot present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative." (cleaned up)).

But Rule 30(b)(6) does not allow a corporation to elicit hearsay testimony from its own corporate designee for use on summary judgment or at trial. *See Tijerina*, 2024 WL 270090, at *2-3. Simply put, "Rule 30(b)(6) does not eliminate Rule 602's personal knowledge requirement for trial witnesses." *Id.* at *3 (quotation marks and citation omitted). So, on this summary judgment record, Epidemic has not made the minimal showing needed to make Ms. Ekström's testimony admissible.

Epidemic's reliance on *Harris v. Vector Marketing Corp.*, 656 F. Supp. 2d 1128 (N.D. Cal. 2009), is unavailing. Although the court rejected the plaintiff's hearsay objection to a declaration from Mr. Matheson, the defendant's Rule 30(b)(6) witness, the court explained:

> While an affidavit that contains facts that could only be presented at trial through evidence that violates the proscriptions against hearsay and statements made without personal knowledge should not be admitted at the summary judgment stage, ... an affidavit that points to the testimony of another witness or source of competent evidence may be considered for purposes of summary judgment.

*Id.* at 1132 (cleaned up). Because the defendant in *Harris* also had evidence, including several district managers'

declarations, supporting the objectionable fact from the Matheson declaration, the court considered the plaintiff's objection "essentially moot." *Id.* Here, however, Epidemic fails—in Ms. Ekström's declaration or otherwise—to identify any "testimony of another witness or source of competent evidence" which would support the asserted fact the Litigation-Produced Tracks are exact copies of the Deposited Tracks. *See id.*

**\*25** *Cooper v. United Air Lines, Inc.*, 82 F. Supp. 3d 1084 (N.D. Cal. 2015), also does not help Epidemic. There, the plaintiff objected to the defendant's employee's declaration "as hearsay, not best evidence, and lacking foundation." *Id.* at 1096. Although the court noted "[a]s a Rule 30(b)(6) designee, [the declarant] is not required to have personal knowledge," the court held the declarant's personal knowledge could nevertheless be inferred from his description of his job responsibilities. *Id.* (citation omitted). Because Epidemic has conceded Ms. Ekström does not have personal knowledge, *Cooper* is not analogous—and the district court cases relying on *Cooper* without finding personal knowledge or considering the hearsay implications are unpersuasive. *See, e.g., Persian Gulf*, 632 F. Supp. 3d at 1128 (S.D. Cal. 2022) (citing *Cooper* and holding designated 30(b)(6) witnesses' declarations were admissible absent personal knowledge as long as "the [ ] corporate witnesses were designated to testify" on the topics they declared); *Barrilleaux v. Mendocino Cnty.*, No. 14-CV-01373-DMR, 2018 WL 3585133, at \*3 (N.D. Cal. July 26, 2018) ("As Rule 30(b)(6) declarants, they are not required to have personal knowledge of all the facts in their declarations." (citing *Cooper*, 82 F. Supp. 3d at 1096)).

So, Epidemic has not shown Ms. Ekström's testimony the "audio files identified ... for each Epidemic Track are exact copies of the audio files submitted to the United States Copyright Office in connection with Epidemic's application for registration of its copyright for the associated Epidemic Track" would be admissible at trial. (Dkt. No. 363 ¶ 6 n.3.) Ms. Ekström's statement is therefore insufficient to prevent summary judgment in Meta's favor on the ground Epidemic has no admissible evidence the Litigation-Produced Tracks are identical to the Deposited Tracks. The Court therefore need not address Meta's argument Ms. Ekström's declared statement is inadmissible because it contradicts her 30(b)(6) deposition testimony. *See Okafor v. Dep't of Conservation*, 775 F. App'x 321, 322 (9th Cir. 2019) ("[A]n entity defendant may not defeat a motion for summary judgment by submitting an affidavit that conflicts with its Rule 30(b)(6) deposition.").

### ii. Other Evidence

The Court ordered supplemental briefing after Epidemic, for the first time at oral argument, asserted each Epidemic Track's International Standard Recording Code ("ISRC") creates evidence from which a reasonable trier of fact could find each Litigation-Produced Track matches the Deposited Track.[10] Epidemic now argues a reasonable trier of fact could find the Litigation-Produced Tracks match the Deposited Tracks based on their matching titles and ISRCs.

[10]   As the Court has allowed both parties supplemental briefing on this issue, the Court rejects Meta's contention Epidemic waived it by not presenting it in its initial opposition to Meta's summary judgment motion. *Cf. Martinez-Jaracuaro v. Gonzales*, 128 F. App'x 25, 26 (9th Cir. 2005). The cases Meta cites involve waiver on appeal for issues never raised in the district court and are therefore unpersuasive. *See Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016); *Contreras Fam. Tr. v. U.S. ex rel. Dep't of Ag. Farm Serv. Agency*, 205 F. App'x 580, 582 n.3 (9th Cir. 2006).

In addition to the statement discussed above, Ms. Ekström's declaration attaches several exhibits. According to Ms. Ekström, Exhibit 1A includes "a compendium of the copyright registrations for the 869 Epidemic Tracks," each of which contains the Track's title and ISRC, (Dkt. No. 363 ¶ 5 & n.2; Dkt. No. 363-2), and Exhibit 1B contains the 869 Litigation-Produced Tracks, each of which includes the recording's title in its metadata. (Dkt. No. 363 ¶ 6 & n.3; Dkt. No. 363-3; Dkt. No. 505 at 11.) Ms. Ekström also attaches Exhibit 1, which contains a chart connecting Exhibits 1A and 1B. (Dkt. No. 363-1.) Specifically, Exhibit 1 lists each Epidemic Track Title, Original Track Title, artist, ISRC, first date of publication, copyright registration number and date, and references to the Bates numbers of documents in each of Exhibits 1A and 1B. (*Id.*)

**\*26**   As explained above, the produced copyright registrations create a rebuttable presumption each Deposited Track has the title and ISRC listed on the registration, and Meta has not rebutted that presumption. Epidemic also represents "each of the produced audio files contains 'Title' metadata that matches the 'Title of Work' identified in the copyright registrations." (Dkt. No. 505 at 11; Dkt. No. 363-3.) That each Deposited Track shares a title with the corresponding Litigation-Produced Track creates at least

some evidence from which a trier of fact could find the recordings are identical. And Meta's assertion certain of "Epidemic's reference files ... either don't have titles at all, or have titles that do not match *any* Asserted Work," (Dkt. No. 386-19 at 31 (citing Dkt. No. 384-28)), simply preserves a factual dispute. Similarly, Meta's argument "at least 214 of the 900 Epidemic's Asserted Works have titles that have recently been changed," (Dkt. No. 386-19 at 31 (citing Dkt. No. 384-27)), preserves a factual dispute in light of Epidemic's assertion its produced chain-of-title documents trace changes in the works' titles, (Dkt. Nos. 384-27; 363-4).

As to ISRCs, although the audio files do not contain ISRC metadata, Exhibit 1 connects each Litigation-Produced Track's sound recording (in Column J) to a particular ISRC (in Column D). (Dkt. No. 363-1.) Ms. Ekström also declares an ISRC "is a unique 12-character alphanumeric identifier for individual sound recordings." (Dkt. No. 363 ¶ 9 n.6.) Unlike the statement the Deposited Tracks are exact copies of the Litigation-Produced Tracks, Epidemic has not previously conceded these statements are not based on Ms. Ekström's personal knowledge. Furthermore, because Ms. Ekström's role involves "Epidemic's licensing strategy, negotiating licensing agreements, [and] managing contacts with collecting societies," (Dkt. No. 363 ¶ 2), it is reasonable to infer she has personal knowledge of how Epidemic uses ISRCs to track its catalog and how Epidemic Tracks are affiliated with ISRCs. *See In re Kaypro*, 218 F.3d at 1075 ("Personal knowledge may be inferred from a declarant's position."); *see also Strong*, 724 F.3d at 1045 (explaining "the requirement of personal knowledge imposes only a minimal burden on a witness," and "[a]t summary judgment, the threshold is particularly low" (cleaned up)). In addition, throughout this litigation, Epidemic has consistently identified the Epidemic Tracks by their titles and ISRCs. (*See, e.g.*, Dkt. No. 14 (complaint); Dkt. No. 277-14 (interrogatory responses); Dkt. Nos. 350-1, 350-2 (stipulation).) Epidemic also includes a contract between Meta and another music owner in which Meta uses works' titles and ISRCs, among other features, to track works. (Dkt. No. 369-24 at 18.)

So, there is evidence from which a reasonable trier of fact could find Epidemic treats titles and ISRCs as unique identifiers for the Litigation-Produced Tracks. *Cf. Bartz v. Anthropic PBC*, 791 F. Supp. 3d 1038, 1059 (N.D. Cal. 2025) (considering sufficient ISBNs and ASINs in the works' metadata and in copyright registrations). Although Meta presents evidence the ISRCs are not unique identifiers, (Dkt. No. 469-1 ¶ 39), Meta's evidence only preserves a factual

dispute regarding whether the ISRCs are unique identifiers for the Litigation-Produced Tracks. Ultimately, if Epidemic uses titles and ISRCs as unique identifiers for each Litigation-Produced Track, a reasonable trier of fact could also find because the corresponding Deposited Track shares a title and ISRC with the Litigation-Produced Track, the Deposited Track and the Litigation-Produced Track are identical.

The Court, however, rejects Epidemic's argument "Meta has stipulated that the audio files produced are the Epidemic Tracks bearing the same unique ISRC and title reflected on the registrations." (Dkt. No. 505 at 10 (citing Dkt. No. 350-1) (cleaned up).) To the contrary, Meta specifically stipulated to substantial similarity between Epidemic's Litigation-Produced Track and the asserted Infringing Works, and not to the information Epidemic included to describe the Litigation-Produced Track. For example, the parties stipulated "the Accused Track ... contains a substantial portion of actual sounds also contained in the sound recording produced by Epidemic in this litigation (Column A), identified by Epidemic as corresponding to the Epidemic Asserted Track identified in Columns B-D." (Dkt. No. 350 ¶ 5; *see also id.* ¶ 9.) Because in the accompanying exhibit, Column A lists the "Epidemic Track Sound Recording Bates Number," and Columns B through D contain Epidemic's Title, Artist, and ISRC, Meta clearly stipulated only to the similarities between the recordings in Column A and Meta's works, without agreeing to Epidemic's identification of that recording's title, artist, or ISRC. (Dkt. No. 350-1.)[11]

[11]    After Epidemic's supplemental brief, Meta sought leave to file a declaration in response, and Epidemic opposed. (Dkt. Nos. 506, 507.) The Court GRANTS Meta's administrative motion and considers both parties' additional briefs. *See Zhuhai Dingfu Phase I Indus. Energy Conservation Inv. Fund, LP v. Zhang*, No. 8:23-CV-02059-MRA-JDE, 2025 WL 868523, at *4 (C.D. Cal. Jan. 21, 2025), *clarified on denial of reconsideration*, No. 8:23-CV-02059-MRA-JDE, 2025 WL 2093414 (C.D. Cal. Apr. 25, 2025) (noting "[c]ourts have discretion to grant or deny leave to file a sur-reply" and granting motion because the proposed sur-reply was "relevant").

**\*27** Ultimately, Meta contends Epidemic's evidence is too speculative to preclude summary judgment in Meta's favor. *See TriReme Med., LLC v. AngioScore, Inc.*, No. 14-CV-02946-LB, 2017 WL 930777, at *14 (N.D. Cal. Mar. 9, 2017) ("Stacked inferences and speculation do not generally raise issues for trial."). According to Meta, Epidemic cannot

meet its burden of proof without a witness who "has purported to examine the produced audio files and identified the relevant ISRC or any other metadata," which "describes what the ISRCs in the registration certificates represent," or which shows the IRSCs "are in fact unique identifiers for Epidemic's recordings." (Dkt. No. 503 at 12.) But no Ninth Circuit cases specifically require this type of evidence. To the contrary, the Ninth Circuit has not clearly identified what evidence is required, and district courts have varied widely. In *Lucasfilm Ltd. LLC v. Ren Ventures Ltd.*, No. 17-CV-07249-RS, 2018 WL 5310831 (N.D. Cal. June 29, 2018), for example, the district court held the plaintiff "adequately demonstrated the [produced] DVDs contain the same works as the deposit copies by pointing to the public records maintained by the U.S. copyright office." *Id.* at *3; *see also Corpis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1115 (W.D. Wash. 2004) (holding because the defendant "has equal access to the deposit, it cannot simply rest on [the plaintiff's] failure to provide the evidence"), *overruled in other part, Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612 (9th Cir. 2010). Epidemic has done the same by producing the copyright registrations associated with each Epidemic Track. And although the Deposited Tracks are available to Meta, Meta has not identified a single example of a Deposited Track which differs from a Litigation-Produced Track. *Cf. CraftShack, Inc.*, 2025 WL 1255396, at *6 & n.9 (considering the declaration sufficient absent any "evidence in the record that would cause the Court to doubt the authenticity of the copies"); *Masterpiece Mktg. Grp., LLC*, 2016 WL 7444688, at *6 (finding sufficient evidence the copyright registrations covered the produced photographs given, among other things, "the absence of any contradictory evidence presented by" the defendant).

Ultimately, Epidemic produces copyright registrations for 869 Deposited Tracks which contain titles and ISRCs, audio files for the Litigation-Produced Tracks containing matching titles, and evidence from which a reasonable trier of fact could find Epidemic associates each Epidemic Track with its title and ISRC. Considering this evidence together, a reasonable trier of fact could find each Deposited Track is identical to the corresponding Litigation-Produced Track. So, the Court denies Meta's motion for summary judgment. But, given the absence of evidence as to how the Litigation-Produced Tracks were created as copies of the Deposited Tracks, a reasonable trier of fact would not be *required* to find the Deposited Tracks are substantially similar to Meta's Infringing Works. *See C.A.R. Trans. Brokerage Co., Inc. v. Darden Rests, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). So, the Court also denies

Epidemic's motion for summary judgment on substantial similarity for the 869 Epidemic Tracks.

One other issue remains. Because Meta moves for summary judgment on 900 Epidemic Tracks, there are 31 Epidemic Tracks for which Epidemic does not present evidence of copyright registrations, Litigation-Produced Tracks, or corresponding titles and ISRCs. The Court therefore grants Meta summary judgment on these 31 Epidemic Tracks.

**2. Actionable Copying**

"Because independent creation is a complete defense to copyright infringement, a plaintiff must prove that a defendant copied the work." *Skidmore*, 952 F.3d at 1064 (citation omitted). Epidemic insists every reasonable trier of fact would have to find Meta copied the 869 Epidemic Tracks.

Copying may be proven through direct evidence of copying or, "[i]n the absence of direct evidence of copying, ... circumstantially by showing that the defendant had access to the plaintiff's work and that the works share similarities probative of copying." *Id.* (quotation marks and citation omitted). To prove copying circumstantially, "[b]y establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying, [and] [t]he burden shifts to the defendant to rebut that presumption through proof of independent creation." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000), *abrogated in other part by Skidmore*, 952 F.3d at 1066; *see also Skidmore*, 952 F.3d at 1064 (explaining "probative or striking similarity shows that the similarities between the two works are due to copying rather than ... coincidence, independent creation, or prior common source" (quotation marks and citation omitted)). In addition, "[a]bsent direct evidence of access, a plaintiff can prove access using circumstantial evidence of ... widespread dissemination of the plaintiff's work." *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846-47 (9th Cir. 2012) (quotation marks and citation omitted), *abrogated on other grounds as recognized by Unicolors, Inc.*, 959 F.3d at 1198.

**a. Direct Evidence of Copying**

 **\*28**  Direct evidence of copying "consist[s] of ... testimony of direct observation of the infringing act." *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1154

(9th Cir. 2012) (cleaned up). For example, direct evidence of copying existed when a defendant admitted it copied the plaintiff's files, *see Disney Enters., Inc. v. VidAngel, Inc.*, 371 F. Supp. 3d 708, 716-18 (C.D. Cal. 2019); *Clayborn v. Independent Online Dist. All., Inc.*, No. CV 12-6022 PSG (JCx), 2013 WL 12114835, at *4 (C.D. Cal. July 31, 2013); or testimony suggested a defendant's employees were given and followed orders to copy a plaintiff's program, *see Broderbund Software, Inc. v. Unison World, Inc.*, 648 F. Supp. 1127, 1135 (N.D. Cal. 1986); *cf. Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989) (considering insufficient a defendant's admission she "consult[ed] [the plaintiff's] book during her research and [took] 'language' from it" because she did not admit whether she copied protected portions). Because this type of evidence is difficult to obtain, "direct evidence of copying is rarely available." *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987).

Contrary to Epidemic's assertion, evidence the Litigation-Produced Tracks and Meta's Infringing Works are substantially similar is not *direct* evidence of copying. *Cf. Skidmore*, 952 F.3d at 1064 (noting evidence of substantial similarity can provide *circumstantial* evidence of copying). Epidemic relies on Meta's admission its audio recognition tools identified matches between the Infringing Works and the Epidemic Tracks, and notes several of the AL Infringing Tracks share titles with Epidemic Tracks. But according to Meta:

> [A] "match" says only that two audio files share forensic similarities—it does not say whether any similarities are *infringing*. For example, a non-infringing match could occur if one audio file is a licensed copy of the other (as is the case with [user generated content] uploaded by Epidemic subscribers), or as a result of both files sharing the same third-party loop or sample. Epidemic itself concluded such loops caused matches but for reasons that were not infringing.

(Dkt. No. 439-2 at 31 (citing Dkt. No. 335-1, Dkt. No. 335-2, Dkt. No. 385-19, Dkt. No. 384-84, Dkt. No. 387-84 at 24-25).) So, even if Epidemic had presented direct evidence of copying, Meta has presented evidence preserving a factual dispute and preventing summary judgment.

Epidemic also asserts "[m]any parties who delivered the AL Infringing Tracks to Meta *admitted* that they copied the Epidemic Tracks." (Dkt. No. 369-4 at 39-40 (citing Dkt. No. 363 ¶¶ 29-33; Dkt. Nos. 403-3, 400-1, 400-2).) However, Epidemic's assertion is not, drawing inferences in Meta's favor, supported by the three emails it cites, which either do

not admit to actual copying or do not identify the Epidemic track at issue. First, in an August 2023 email chain, an artist named "Hat Black" who appears to have uploaded "Bruja Vs Bruja Nocturna Clash Royale" apologized "for what just happened" and told Epidemic, "[a]fter your clarification regarding the license I am aware of the infraction and accept." (Dkt. No. 403-3 at 2-3.) In 2025, Ocean Distribution emailed Epidemic it had "recently identified that a track used in [its] activities might originate from [Epidemic's] catalog." (Dkt. No. 400-1 at 2.) And in December 2023, Victor Pizarro emailed Epidemic "[his] music distributor has informed [him] that [he] ha[s] received a claim on [his] song 'Taking Me Down' " from Epidemic, which he admitted was "due to the previous version of the song ... mistakenly us[ing] Epidemic samples." (Dkt. No. 400-2 at 3-4.) Regardless, Epidemic's contention its "few examples of the direct evidence of copying Epidemic's Tracks [is] sufficient to establish copying" is entirely unavailing. (Dkt. No. 369-4 at 40.) Even if Epidemic has presented some evidence of direct copying for the tracks at issue in these emails, these emails do not meet Epidemic's burden for summary judgment for all 869 Epidemic Tracks.

**\*29** Epidemic also relies on the Ninth Circuit's decision in *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148 (9th Cir. 2012), which held "[a] showing of 'substantial similarity' is irrelevant in a case like this one, in which the [plaintiffs] produced evidence that the public performances entailed direct copying of copyrighted works." *Id.* at 1154 (citations omitted). But the Ninth Circuit's en banc decision in *Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020), likely overruled this part of *Range Road Music* when it held "copying" and "unlawful appropriation," *i.e.*, substantial similarity, were "distinct concepts" requiring different types of proof. *See Skidmore*, 952 F.3d at 1064 (cleaned up). So, even if Epidemic had presented conclusive direct evidence of copying on each of the 869 Epidemic Tracks, Epidemic would need to establish every reasonable trier of fact would find the Deposited Tracks are substantially similar to Meta's Infringing Works to show unlawful appropriation.

So, Epidemic is not entitled to summary judgment on its direct infringement claims for the 869 Epidemic Tracks based on direct evidence of copying.

**b. Circumstantial Evidence of Copying**

Epidemic also contends it has sufficient circumstantial evidence to be entitled to summary judgment as to actionable copying. *See Three Boys Music Corp.*, 212 F.3d at 486 (requiring proof of reasonable access and substantial similarity); *see also L.A. Printex Indus., Inc.*, 676 F.3d at 846-47 (noting evidence of widespread dissemination could suffice as circumstantial evidence of reasonable access). As evidence of access or widespread dissemination, Mr. Höglund declares "Epidemic's content reached over 1.5 billion daily views on YouTube" by 2020, and "generat[ed] 2.5 billion views per day across" YouTube and TikTok in 2023. (Dkt. No. 362 ¶ 7.) So, Epidemic argues, it has shown "widespread dissemination" and therefore reasonable access. *See L.A. Printex Indus., Inc.*, 676 F.3d at 846-47; *see also Gray v. Perry*, No. 2:15-CV-05642-CAS (JCx), 2018 WL 3954008, at *5 (C.D. Cal. Aug. 13, 2018) ("Due to the millions of views and plays of 'Joyful Noise' on YouTube and Myspace, both readily accessible websites, and the success and popularity of 'Joyful Noise' in the Christian hip-hop/rap industry, a reasonable jury could conclude that there is more than a 'bare possibility' that defendants—who are experienced professional songwriters—had the opportunity to hear 'Joyful Noise.' "). *But see Loomis v. Cornish*, No. CV 12-5525 RSWL (JEMx), 2013 WL 6044345, at *12 (C.D. Cal. Nov. 13, 2013) ("The availability of a copyrighted work on the Internet, in and of itself, is insufficient to show access through widespread dissemination."), *aff'd*, 836 F.3d 991 (9th Cir. 2016). However, even assuming Epidemic has shown widespread dissemination of its works generally, it has not produced evidence of widespread dissemination for the 869 Epidemic Tracks at issue in this case, or Meta's reasonable access to those 869 Tracks.

So, Epidemic has not established the absence of a factual dispute regarding Meta's reasonable access to the 869 Epidemic Tracks. In addition, as discussed above, while Epidemic has evidence from which a reasonable trier of fact could find Meta's Infringing Works are substantially similar to Epidemic's copyrighted works, it has not established every reasonable trier of fact would have to so find. So, Epidemic is not entitled to summary judgment on Meta's actionable copying.

### C. Meta's Volitional Conduct

A plaintiff seeking to prove direct infringement "must also establish causation, which is commonly referred to as the 'volitional-conduct requirement.' " *VHT, Inc.*, 918 F.3d at 731 (citation omitted); *see also Bell v. Willmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021)

("The word 'volition' in the copyright context does not really mean an 'act of willing or choosing' or 'an act of deciding,' but merely the unremarkable proposition that proximate causation historically underlies copyright infringement liability no less than other torts." (cleaned up)). For a direct infringement claim, "*direct* liability must be premised on conduct that can reasonably be described as the *direct cause* of the infringement." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) (quotation marks and citation omitted); *see also id.* ("[C]ourts must determine who is close enough to the infringing event to be considered the most important cause." (cleaned up)).

 **\*30**  In the Ninth Circuit, "a website or service that provides only a platform for third-party users to upload, download, and share content, *i.e.*, merely using the platform as a vehicle, has not engaged in volitional conduct in this sense, because it is the users who cause infringement." *Bell*, 12 F.4th at 1081 (citations omitted). "By contrast, one who exercised control or selected any material for upload, download, transmission, or storage has acted volitionally." *Id.* (quotation marks and citations omitted); *see also ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321 (2d Cir. 2022) ("[D]irect liability attaches only to the person who actually presses the button." (quotation marks and citation omitted)).

Epidemic seeks summary judgment on Meta's volitional conduct for both the AL Infringing Tracks and OA/RR Infringing Audio on the ground Meta's creation of the Audio Library and Original Audio and Reels Remix features directly caused infringement of Epidemic's copyrighted works.

### 1. Audio Library

Meta's Audio Library is a "library of audio files that Meta presents to its users for use in their user-generated content." (Dkt. No. 369-15 at 6.) Meta chooses what "type[s]" of music are "eligib[le]" for inclusion in the Audio Library. (Dkt. No. 369-18 at 12-13.) For music to enter Meta's Audio Library, licensed labels send Meta the music, Meta "downloads" and "processes" it, and then Meta makes it available in the Audio Library; so, licensors cannot upload files to the Audio Library directly. (Dkt. No. 369-15 at 9-10.) Epidemic also presents evidence once Meta adds a track to the Audio Library, only Meta can remove that track or render it inaccessible to users. (Dkt. No. 369-15 at 22-24, 34.) Because Meta "exercise[s] control" over and "select[s] material for upload" to the Audio Library, Meta

has engaged in volitional conduct as to alleged infringing works in the Audio Library. *See Bell,* 12 F.4th at 1081 (quotation marks and citation omitted). Because Meta does not oppose Epidemic's motion for summary judgment on volitional conduct as to the AL Infringing Tracks, the Court grants Epidemic summary judgment on the issue of Meta's volitional conduct for the AL Infringing Tracks.

### 2. Original Audio and Reels Remix Features ("OA/RR Features")

Epidemic argues because Meta "(i) creates the unauthorized reproduction of the unlicensed audio assets, (ii) [ ] decides when and on which posts these tools should be available for use, and (iii) [ ] has the ability to disable these tools on certain posts and in certain instances," it creates, fully controls, and operates the OA/RR Features so as to constitute volitional conduct. (Dkt. No. 369-4 at 29, 44.) However, "to demonstrate volitional conduct, a party ... must provide some 'evidence showing [the alleged infringer] exercised control (other than by general operation of [its website]); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution' of its [works]." *See VHT, Inc.,* 918 F.3d at 732 (quoting *Giganews,* 847 F.3d at 666, 670). And although Epidemic presents evidence of Meta's control over its applications and the OA/RR Features, it does not present evidence of Meta's control over any particular OA/RR Infringing Audio. So, Epidemic's evidence is insufficient to prove every reasonable trier of fact would find volitional conduct under Ninth Circuit law. *See Giganews,* 847 F.3d at 669 (finding no direct infringement because "an analysis of [the plaintiff's] evidence shows only that users uploaded infringing content onto [the defendant's] servers, not that [the defendant] played any sort of active role in causing the distribution").

 **\*31**  Furthermore, given Meta's evidence it does not "alter the user-facing content of the audio asset" which is "automatically created and stored ... in response to a user uploading her Reel to Meta's platform," (Dkt. No. 440-4 ¶¶ 4, 7), there is at least a factual dispute regarding whether Meta's operation of the OA/RR Features constitutes the type of "automatic" conduct for which it cannot be directly liable. *See Giganews,* 847 F.3d at 760 ("[A]utomatic copying, storage, and transmission of copyrighted materials, when instigated by others, does not render an [Internet service provider] strictly liable for [direct] copyright infringement." (quoting *CoStar Grp., Inc. v. LoopNet, Inc.,* 373 F.3d 544, 555 (4th Cir. 2004)).

Epidemic relies on *Capitol Records, LLC v. ReDigi Inc.,* 934 F. Supp. 2d 640 (S.D.N.Y. 2013), in which the court held the defendant's "contribution to the creation of an infringing copy [was] so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy" because the defendant had "built a service where *only* copyrighted work could be sold." *Id.* at 657 (quotation marks and citation omitted). To argue *ReDigi Inc.* is analogous, Epidemic cites Meta employees' testimony Meta created the OA/RR Features to make its platform more competitively attractive and increase engagement. (Dkt. No. 369-14 at 7; Dkt. No. 369-17 at 8-9, 12-13.) However, even assuming *ReDigi Inc.* is consistent with Ninth Circuit law, Epidemic's evidence Meta created the OA/RR Features to increase engagement on Meta's platforms does not mean every reasonable trier of fact would find Meta created those features to create a "service where *only* copyrighted work could be" used. *See ReDigi Inc.,* 934 F. Supp. 2d at 657. And Meta's evidence "[m]any uses of the Original Audio and Reels Remix features do not involve music" at all casts further doubt on Epidemic's conclusion. (Dkt. No. 382 ¶¶ 13-14; Dkt. No. 386-3 at 3 (explaining "generally it's unique and authentic content from that creator" and "could be the creator's own narration using their voice, environmental sounds captured from the videos, [or] scenery outside").)

Epidemic also argues Meta's knowledge unlicensed music comprised a large portion of Original Audio and sought to increase users' access to such music "transform[s] [Meta] from [a] passive provider[ ] of a space in which infringing activities happened to occur to active participants in the process of copyright infringement." *See Playboy Enters., Inc. v. Russ Hardenburgh, Inc.,* 982 F. Supp. 503, 513 (N.D. Ohio 1997). But in *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.,* 982 F. Supp. 503 (N.D. Ohio 1997), the defendants had a "policy of using a screening procedure in which [ ] employees *viewed* all files in the uploaded file and *moved them* into the generally available files for subscribers." *Id.* at 513 (emphasis in original); *see also Arista Recs. LLC v. Usenet.com, Inc.,* 633 F. Supp. 2d 124, 148-49 (S.D.N.Y. 2009) (finding volitional conduct when the defendants used "human review" to "control [ ] which newsgroups their servers accept and store and which they reject"). In contrast, Epidemic presents no evidence Meta employees screened Original Audio distributed through the OA/RR Features. And Epidemic's evidence Meta attempted to increase users' engagement on the OA/RR Features does mean every reasonable trier of fact would conclude Meta,

rather than the users using the features to share music, are the "most important cause" of infringement. *See Giganews*, 847 F.3d at 666 (quotation marks and citation omitted).

**\*32** Finally, although Epidemic relies on *American Broadcasting Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014), to argue Meta can be liable even if its subscribers upload and select the infringing content, the Ninth Circuit has held *Aereo* "did not expressly address the volitional-conduct requirement for direct liability under the Copyright Act" and therefore did not affect the Ninth Circuit's volitional conduct test, except to the extent it "distinguished between an entity that 'engages in activities like Aereo's,' and one that 'merely supplies equipment that allows others' to perform or transmit." *See Giganews*, 847 F.3d at 667 (quoting *Aereo*, 573 U.S. at 439). So, *Aereo* is not dispositive.

So, Epidemic is not entitled to summary judgment as to volitional conduct and therefore direct infringement as to the OA/RR Infringing Audio.

\*\*\*

In sum, Epidemic is entitled to summary judgment as to the issue of its ownership of valid copyrights in the 869 Epidemic Tracks for which it presents certificates of registration and, as Meta does not oppose, as to Meta's volitional conduct on the AL Infringing Tracks. Meta is entitled to summary judgment on Epidemic's direct infringement claims for the 31 Epidemic Tracks for which Epidemic did not move for summary judgment and has not offered evidence to support a finding of direct infringement. However, because there remain factual disputes regarding substantial similarity between the Deposited Tracks and the Litigation-Produced Tracks, the Court denies both parties' motions for summary judgment on substantial similarity. The Court also denies Epidemic's motion for summary judgment as to Meta's actionable copying and as to Meta's volitional conduct for the OA/RR Infringing Audio.

## II. CONTRIBUTORY INFRINGEMENT CLAIMS

Epidemic also claims Meta is liable for contributory infringement through the Original Audio and Reels Remix features. The parties cross-move for summary judgment on Epidemic's contributory infringement claims.

"Contributory copyright infringement is a form of secondary liability with roots in the tort-law concepts of enterprise liability and imputed intent." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794-95 (9th Cir. 2007) (citations omitted). A defendant "contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *Id.* at 795. However, "[t]he provider of a service is contributorily liable for the user's infringement only if it intended that the provided service be used for infringement." *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 967 (2026). And "[t]he intent required for contributory liability can be shown only if the party induced the infringement or the provided service is tailored to that infringement." *Id.* (citations omitted).

### A. Third Party Direct Infringement

"Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party." *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) (quotation marks and citation omitted).

### 1. Epidemic's Summary Judgment Motion

As explained above, Epidemic has not shown every reasonable trier of fact would find each of Epidemic's copyright-protected works is substantially similar to an infringing work given the dispute over whether the Litigation-Produced Tracks are identical to the Deposited Tracks. Epidemic therefore has not established every reasonable trier of fact would find direct infringement of the 869 Epidemic Tracks. And, absent such a showing, Epidemic is not entitled to summary judgment on its contributory infringement claims. The Court therefore denies Epidemic's motion for summary judgment on its contributory infringement claims.

### 2. Meta's Summary Judgment Motion

**\*33** For the reasons explained above, *see supra* at 46, Meta is entitled to summary judgment on Epidemic's contributory infringement claims for the 31 Epidemic Tracks about which Epidemic does not present evidence of substantial similarity.

### B. Contributory Infringement

So, the Court must decide whether a reasonable trier of fact could find Meta liable for contributory infringement for the remaining 869 Tracks.

### 1. Knowledge

"Actual knowledge exists where it can be shown by a defendant's conduct or statements that it actually knew of specific instances of direct infringement." *See Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 591 F. Supp. 2d 1098, 1106 (N.D. Cal. 2008) (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001)). "Constructive knowledge exists where it can be shown a defendant should have known of the direct infringement." *Id.* (citing *Napster*, 239 F.3d at 1020).

Still, knowledge "requires more than a generalized knowledge by the [defendant] of the possibility of infringement." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013). So, "contributory liability [does] not automatically follow where the 'system allows for the exchange of copyrighted material.' " *Id.* (quoting *Napster*, 239 F.3d at 1021)); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005) ("[M]ere knowledge of infringing potential or actual infringing uses would not be enough [ ] to subject a distributor to liability."). Instead, " 'knowledge of specific acts of infringement' is required for contributory infringement liability." *Luvdarts*, 710 F.3d at 1072 (quoting *Napster*, 239 F.3d at 1021). Still, "if a computer operator learns of specific infringing material available on his system, ... the operator knows of ... direct infringement." *See Napster*, 239 F.3d at 1021 (citing *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1374 (N.D. Cal. 1995)); *see also Religious Tech. Ctr.*, 907 F. Supp. at 1374 (finding for the operator to have sufficient knowledge, the plaintiff must "provide the necessary documentation to show there is likely infringement").

Meta argues Epidemic cannot prove Meta "had actual knowledge of any specific instances of direct infringement using Meta's services." (Dkt. No. 386-19 at 35.)

### a. Evidence of Rights Manager Matches

To show knowledge, Epidemic primarily relies on identified matches between the Litigation-Produced Tracks and the Infringing Works. (Dkt. No. 369-3 ¶¶ 7-8; Dkt. Nos. 369-7, 369-8.) The record supports a finding Meta used Rights Manager data in its business operations, for example, to calculate compensation for its music licensor partners; so, a reasonable trier of fact could find it was aware of Rights Manager matches. (Dkt. No. 446-8 at 5-9; Dkt. No. 446-10 at 6-8; Dkt. No. 464-7; Dkt. No. 464-8 at 5-15; Dkt. No. 464-9 at 5.) But Meta's knowledge of Rights Manager matches does not support a finding it was aware of infringement of Epidemic's copyrights. It is undisputed the Rights Manager tool allows "rightsholders [to] upload their content into the tool as 'reference files,' [and] Rights Manager then scans Instagram and Facebook to detect user generated content [ ] that matches those reference files," as well as "other reference files provided by other rightsholders." (Dkt. No. 376 ¶¶ 5, 26.) But it is also undisputed a Rights Manager "match" only shows "some portions [ ] are potentially similar" or "technically similar," so the existence of a match does not show infringement. (*Id.* ¶ 6; Dkt. No. 386-7 at 5; *cf.* Dkt. No. 387-38 at 23 (Epidemic employee's deposition acknowledging "if a track incorporates a shared sample or shared element that is not owned by anyone [ ], that's not an infringement").) For this reason, if a match occurs between two asserted rightsholders, "Meta has no way of knowing who the 'true' rightsholder is," and "therefore leaves it to the rightsholders to resolve the ownership conflict." (Dkt. No. 376 ¶ 31.) So, drawing reasonable inferences in Epidemic's favor, a Rights Manager match at most shows a possibility of infringement as opposed to actual copyright infringement.

**\*34** And in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001), the Ninth Circuit reiterated "absent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material." *Id.* at 1021 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 436, 443-43 (1984)). Although the district court had rejected Napster's argument "because the company cannot distinguish infringing from noninfringing files, it [did] not 'know' of the direct infringement," the Ninth Circuit did not affirm that holding. *Id.* at 1020 (citing *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 917 (N.D. Cal. 2000)). Instead, to hold the knowledge requirement had been met, the Ninth Circuit relied on evidence Napster's co-founder had mentioned "pirated music" music existed on the platform, a third-party had informed Napster of more than 12,000 infringing files on its site, Napster executives had downloaded of copyrighted songs from the system, and Napster had

promoted its site with screen shots of infringing files. *Id.* at 1020 n.5. So, because a Rights Manager match only shows a possibility of infringement, matches alone are insufficient to support a finding Meta "knew of specific instances of direct infringement" or "should have known of the direct infringement." *See Louis Vuitton Malletier, S.A.*, 591 F. Supp. 2d at 1106 (citing *Napster*, 239 F.3d at 1020).

### b. Epidemic's Notice to Meta

Between 2018 and 2020, Epidemic emailed Meta several times about its concerns Epidemic's works were being infringed on Meta's platform. At least by November 2018, Epidemic clarified to Meta it asserted actual infringement of Epidemic's works, as opposed to distribution issues. (Dkt. No. 369-52 at 2-3.) And based on Epidemic's emails, a reasonable trier of fact could find Meta knew or had reason to know Epidemic's works were being infringed on its platform. *See, e.g., Religious Tech. Ctr.*, 907 F. Supp. at 1374 ("Since Netcom was given notice of an infringement claim before Erlich had completed his infringing activity, there may be a question of fact as to whether Netcom knew or should have known that such activities were infringing."); *Louis Vuitton Malletier, S.A.*, 591 F. Supp. 2d at 1107 (denying summary judgment because "a reasonable jury could find that Defendants should have known that infringing websites were using their services based on Plaintiff's letters," including letters "identifying websites containing and selling infringing material").

Meta's insistence Epidemic's emails are insufficient because Epidemic did not specifically identify each particular AL Infringing Track and OA/RR Infringing Audio is unpersuasive. *Napster*, upon which Meta relies, did not require the plaintiffs to show the defendant's knowledge of every particular infringing work on its platform. Instead, *Napster* held "if a computer system operator learns of specific infringing material available on its system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Napster*, 239 F.3d at 1021 (citation omitted).

Furthermore, Meta's contention Epidemic has not shown any evidence from which a reasonable trier of fact could find Meta's knowledge of "specific infringing material" is similarly unavailing. *See Napster*, 239 F.3d at 1021. Epidemic's emails included, for example, a "screenshot [showing] [Epidemic's] fully licensed customers received

15 erroneous claims from UMG" the day before, (Dkt. No. 387-17 at 4); and concerns about "43 'not disputable' conflicts with majors labels (UMG, SME, and Warner Mustic Group)" and "an additional 103 'not disputable' conflicts with various digital distributors and aggregators (CD baby, Ingrooves, ONErpm etc.)," (Dkt. No. 369-51 at 4). Epidemic's descriptions of conflicts with particular labels or distributors, on particular dates, is sufficient to support a finding Meta had reason to know of specific infringement, especially when combined with knowledge of Rights Manager matches. *Cf. Luvdarts*, 710 F.3d at 1073 (finding insufficient notices which "do not identify which of these titles were infringed, who infringed them, or when the infringement occurred").

**\*35** The record also includes internal Meta communications from which a reasonable trier of fact could find Meta knew about at least some specific infringed Epidemic Tracks. For example, in April 2021, an internal Meta email identified eight Epidemic Tracks which were linked to Epidemic's YouTube channel or website. (Dkt. No. 369-33 at 5 (Rows 1-4, 6, 11).) And, in February 2022, a Meta employee wrote, based on "some research," she believed Epidemic's works were "showing in Insta at least when you look up songs from their library for example to attach to a story." (Dkt. No. 369-29 at 2.)

### c. Meta's Reliance on Takedown Notices

Finally, Meta's argument a reasonable trier of fact could not find it had knowledge of its users infringement of Epidemic's Tracks because Meta primarily relies on takedown notices to respond to infringing content, and Epidemic did not send a takedown notice for these works, is unavailing. (Dkt. No. 376 ¶¶ 22, 25.) *Cf. Sony Music Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222, 233-35 (4th Cir. 2024) (relying on evidence of takedown notices as proof of knowledge), *reversed and remanded on other grounds, Cox Commc'ns*, 146 S. Ct. 959 (2026). That Epidemic did not inform Meta about infringement in Meta's preferred way does not mean Meta could not have known in other ways.

\*\*\*

Because a reasonable trier of fact could find Meta knew or had reason to know of infringement of Epidemic's works on its platform, Meta is not entitled to summary judgment for Epidemic's contributory infringement claims on this ground.

## 2. Intent

Under *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S. Ct. 959 (2026), to prove contributory infringement a plaintiff must also show the defendant "intended that the provided service be used for infringement," which can be shown "only if the party [1] induced the infringement or [2] the provided service is tailored to that infringement." *Id.* at 967 (citations omitted). *See Nazemian v. Nvidia Corp.*, No. 24-CV-01454-JST, 2026 WL 1229583, at *5 (N.D. Cal. May 5, 2026) (framing *Cox Commc'ns* as adding an intent requirement to the existing Ninth Circuit test); *cf. Cox Commc'ns*, 146 S. Ct. at 969 ("[C]ontributory liability cannot rest only on a provider's knowledge of infringement and insufficient action to prevent it." (citations omitted)).

After the Supreme Court decided *Cox Communications*, the Court granted Meta's request for supplemental briefing and granted Epidemic's request any briefs not supplement the factual record. (Dkt. Nos. 500, 501, 502, 504, 508.) Meta contends based on the summary judgment record, no reasonable trier of fact could find it intended the OA/RR features be used for copyright infringement.

### a. Inducement

"A provider induces infringement if it actively encourages infringement through specific acts." *Cox Commc'ns*, 146 S. Ct. at 967 (citing *Grokster*, 545 U.S. at 942). "The classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations," such as by "advertising an infringing use or instructing how to engage in an infringing use." *See Grokster*, 545 U.S. at 936-37. So, in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), the defendants could be liable for inducing infringement when they "promoted and marketed their software as a tool to infringe copyrights," such that "[t]he 'principal object' of their business models 'was use of their software to download copyrighted works.' " *Cox Commc'ns*, 146 S. Ct. at 967 (quoting *Grokster*, 545 U.S. at 926); *see also id.* (finding evidence of inducement "where '[t]he defendant not only expected but invoked by advertisement the use of its films' for infringement of an author's copyright," (quoting *Kalem Co. v. Harper Bros.*, 222 U.S. 55, 62-63 (1911)); or made

sales "with the purpose and intent that the object be used for [ ] infringement" (citing *Henry v. A. B. Dick Co.*, 224 U.S. 1, 49 (1912), *overruled on other grounds, Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 518 (1917)). However, in *Cox Communications*, the defendant "did not 'induce' or 'encourage' its subscribers to infringe in any manner" because the plaintiff "provided no 'evidence of express promotion, marketing, and intent to promote' infringement," and the defendant "repeatedly discouraged copyright infringement by sending warnings, suspending services, and terminating accounts." *Id.* at 968 (citing *Grokster*, 545 U.S. at 926, 930).

**\*36** Ultimately, there are "several types" of evidence a plaintiff can use "to support inducement liability," including public statements " 'designed to stimulate others to commit violations,' " and internal communications or documents evincing an improper purpose. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034-35 (9th Cir. 2013) (citing *Grokster*, 545 U.S. at 937-40). But "[t]he 'improper object' of infringement 'must be plain and must be affirmatively communicated through words or actions.' " *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 746 (9th Cir. 2019) (quoting *Columbia Pictures*, 710 F.3d at 1034). Epidemic argues that because the expressed purpose of Meta's Original Audio and Reels Remix features "was to reproduce, synchronize, and distribute audio ***for which Meta has no license***," (Dkt. No. 508 at 7), there is at least a genuine dispute Meta promoted infringement.

A reasonable trier of fact could find Meta encouraged and advertised—and therefore induced—use of its Original Audio and Reels Remix features. For example, Meta explains to users how to upload and share a reel with Original Audio, and how to reuse other Original Audio via Reels Remix. (Dkt. No. 386-13 at 47, 58.) Meta's Audio Browser also presents some of the most popular Original Audio for easy use in posts. (Dkt. No. 464-4 at 11-12, 14-15.) And an internal Meta document recommended "[e]xpanding OA discoverability & identifying high-quality reused OAs," including by "allow[ing] more Reused OAs to be discoverable in Music Picker." (Dkt. No. 464-5 at 2-3.)

Furthermore, a reasonable trier of fact could also find Meta created the Original Audio and Reels Remix features to allow users to create content using and reproducing audio beyond the Meta-licensed music available in the Audio Library. In fact, Meta defines Original Audio as encompassing all audio which is "not licensed music." (Dkt. No. 369-14 at

6.) Specifically, Original Audio relies on "having creators give [Meta] their unique and authentic sounds," including "narration" or "natural sounds," as well as "music for which Meta does not have a license." (*Id.*) And the record supports a finding this final category, "music for which Meta does not have a license," is particularly popular on Original Audio. (*See* Dkt. No. 369-30 at 5 ("Music is believed to be present in OA for 68% of US Reels and in 87% of Global Reels."); Dkt. No. 464-5 at 2 ("[The] majority of active reused OAs are 'Music' audios similar to LM [Licensed Music]." (cleaned up)).)

But a reasonable trier of fact could not find the summary judgment record reasonably supports a finding Meta's encouragement of its users to share "unlicensed music" through the OA/RR features constitutes inducement to infringe, that is, active encouragement of infringement. *See VHT, Inc.*, 918 F.3d at 746 ("The improper object of infringement must be plain and must be affirmatively communicated through words or actions." (cleaned up)).

Epidemic does not identify any evidence that supports a finding Meta's promotion of the upload and reuse of audio not licensed by Meta means promotion of copyright-protected music such that any upload or reuse is infringing. In other words, just because Meta does not license audio does not mean the audio is copyrighted so that its upload or reuse is a copyright violation. To the contrary, when a Meta user uploads Original Audio with their Reels, their uploaded audio is contributed subject to Meta's Terms of Use, pursuant to which the user warrants they have the necessary rights to the audio and licenses any reuse of that audio on Meta's platforms. (*See, e.g.*, Dkt. Nos. 383-6, 383-7, 383-8, 383-9.) So, pursuant to Meta's Terms of Use, the reuse on Meta's platforms of a user's own uploaded audio is not infringement. Neither is the reuse of another user's content if, as the user warrants through the Terms of Use, the user had the authority to share the music for re-use. Under these circumstances, no reasonable trier of fact could find Meta's promotion of the OA/RR feature constitutes active inducement of infringement.

**\*37** Epidemic's heavy reliance on *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013), demonstrates the inadequacy of its showing. There, the plaintiff presented an expert opinion between 90% and 96% of the content on the defendant's BitTorrent websites was copyright protected. *Id.* at 1034. Indeed, the court concluded that "even giving [the defendant] the benefit of all doubts by tripling the margins of error in the expert's reports,

[the plaintiff] would still have such overwhelming evidence that any reasonable jury would have to conclude that the vastly predominant use of [the defendant's] services has been to infringe copyright." *Id.* The court also concluded the record supported a finding the defendant intended to induce infringement because the defendant actively encouraged the uploading of torrent files containing copyrighted content. For example, the defendant requested "users upload torrents for specific copyrighted films," and he personally assisted users with uploading, finding, using, and reproducing "obviously copyrighted material." *Id.* at 1036. Furthermore, he "took no steps to develop filtering tools or other mechanisms to diminish the infringing activity by those using his services." *Id.* (cleaned up).

Here, there is zero evidence as to the percentage of Original Audio or Reels Remix audio content used for unlawful infringement.[12] Indeed, the only evidence of the OA/RR Features leading to copyright infringement involves the Epidemic Tracks, but there is no evidence as to what percentage of Original Audio or Reels Remix content includes the Epidemic Tracks. Moreover, there is also no evidence Meta affirmatively encouraged infringement of known copyright-protected works, as in *Columbia Pictures* and, to the contrary, there is undisputed evidence of Meta's Terms of Use and enforcement mechanisms to prevent copyright infringement. *See Cox Commc'ns*, 149 S. Ct. at 968 (emphasizing the defendant "repeatedly discouraged copyright infringement").

12    It bears repeating Epidemic insisted the Court decide the contributory infringement claim post-*Cox Communications* without either party "supplement[ing] the factual record." (Dkt. No. 501 at 5.)

The absence of evidence of Meta specifically inducing use of copyright-protected works also distinguishes this record from *Grokster*. There, the defendants named their program OpenNap, "offered software to perform the same services" as Napster, "distributed an electronic newsletter containing links to articles promoting its software's ability to access popular copyrighted music," "respond[ed] affirmatively to requests for help in locating and playing copyrighted music," and internally discussed ways to capture the Napster market. *See Grokster*, 545 U.S. at 937-39. So, the defendants advertised and designed their programs to capture "the market comprising former Napster users," and the Supreme Court held "a factfinder could conclude," based on the defendants' comparisons to Napster, their software "would have readily been understood in the Napster market as

[offering] the ability to download copyrighted music files." *See id.* Here, in contrast, the record does not contain any evidence Meta's advertisements, public statements, actions, or internal communications ever referenced using Original Audio or Reels Remix to distribute copyright-protected audio. And unlike in *Grokster*, there is no evidence from which a reasonable trier of fact could find Meta's references to audio which was not licensed through the Audio Library constituted copyright-protected audio. Without filling that gap, Epidemic cannot show Meta's encouragement of the OA/RR Features generally constituted encouragement of infringement.

Epidemic's argument Meta failed to take steps to curb infringement is unavailing. Specifically, Epidemic cites Meta's concession if Meta "went out of license with a particular rights holder," and the license holder's copyrighted song was subsequently used in a Reel, the song would nevertheless be categorized as Original Audio and may be infringed. (Dkt. No. 369-14 at 18-21; Dkt. No. 369-15 at 25-26.) It is true the Supreme Court and Ninth Circuit have considered a defendant's failure to take any steps to diminish infringing activity supplemental evidence of intent. *See Grokster*, 545 U.S. at 939 ("[T]his evidence of unlawful objective is given added significance by [the plaintiff's] showing that neither [defendant] attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software."); *see also Columbia Pictures*, 710 F.3d at 1036 (holding that the defendant's failure to take any steps to diminish infringing activity was "supporting" but "insufficient in [it]sel[f]"). But none of these cases considered such evidence sufficient on its own to show intent because, as *Cox Communications* makes clear, inducement requires affirmative acts. *See Cox Commc'ns*, 146 S. Ct. at 968 (holding contributory liability requires "the party express 'an affirmative intent that the product be used to infringe' " (quoting *Grokster*, 545 U.S. at 936)). So, Epidemic's evidence Meta's systems have not prevented the chance infringement might occur is insufficient to support a finding Meta induced infringement.

 **\*38**  Furthermore, in *Grokster* and *Columbia Pictures*, the defendants had never "attempted to develop filtering tools or other mechanisms to diminish the infringing activity." *See Grokster*, 545 U.S. at 939; *see also Columbia Pictures*, 710 F.3d at 1036. In contrast, Meta's Terms of Use prohibit copyright infringement on its platform, and Meta has developed tools for reporting and responding to infringement, including takedown forms. *See Cox Commc'ns*, 146 S. Ct. at 965, 968 (noting the defendant "created a system of

responding to the notices that it received" and "discouraged copyright infringement by sending warnings"). Epidemic's response, which does not contest these Terms of Use and tools existed, but rather contends these tools would have been time-consuming for it to use, is unavailing.

Epidemic's citation to *Columbia Pictures* to support its reliance on Meta's revenue from OA/RR Infringing Audio is also unavailing. Epidemic presents evidence Meta made $160.6 billion in advertising revenue in 2024, (Dkt. No. 360 at 46 & n.27), and generated revenue from videos containing infringed Epidemic tracks, (Dkt. No. 464-7; *see also* Dkt. No. 464-8 at 5-16). But while *Columbia Pictures* considered the defendant's revenue from infringing uses as "supporting evidence" which "corroborate[d] the conclusion that [the defendant] 'acted with a purpose to cause copyright violations,' " the Ninth Circuit was very clear this evidence was "insufficient in [it]sel[f]." *Id.* at 1036-37. Instead, as explained above, there was specific evidence of the defendant's "active encouragement of the uploading of torrent files concerning copyrighted content," which met the "crucial requirement" of "a distributor's communication of an inducing message to its users." *Id.* at 1035-36. So, Meta's revenues from OA/RR Infringing Audio are not sufficient for any reasonable trier of fact to find Meta induced infringement through its OA/RR Features.

So, because a reasonable trier of fact could not find Meta encourages infringement through its OA/RR Features, Meta is entitled to summary judgment on an inducement theory of contributory liability.

**b. Tailored to Infringement**

Alternatively, a plaintiff can show the requisite intent for contributory liability by showing the defendant's service is tailored to infringement. "A service is tailored to infringement if it is not capable of substantial or commercially significant noninfringing uses." *Cox Commc'ns*, 146 S. Ct. at 967 (quotation marks and citation omitted). Courts have found tailoring when a product has been "especially" made for infringement, *Sony*, 464 U.S. at 436, 440; or is "good for nothing else but infringement," *Grokster*, 545 U.S. at 932. So, for example, a video tape recorder was not tailored to infringement when it "could be used to record copyrighted television programs for later personal viewing, which would not constitute infringement," as well as "to reproduce and sell copyrighted television programing, which

would constitute infringement." *Cox Commc'ns*, 146 S. Ct. at 967-68 (citing *Sony*, 464 U.S. at 449, 456); *see also id.* at 968 (explaining because the recorder was " 'capable of substantial noninfringing uses'—like personal use—[ ] 'sale of such equipment to the general public does not constitute contributory infringement' " (quoting *Sony*, 464 U.S. at 456)); *id.* at 968 (holding there was no tailoring because the defendant "simply provided Internet access, which is used for many purposes other than copyright infringement").

Epidemic asserts "[i]t is undisputed promoting the reuse of music for which Meta has no license is the only purpose and functionality of the Original Audio feature." (Dkt. No. 369-4 at 46.) To be clear, Meta does dispute Epidemic's assertion with evidence it developed the Original Audio and Reels Remix features to "provide Reels users with additional tools to share creative content on Meta's Facebook and Instagram platforms," including non-music audio such as "a user's narration, an original song, or ambient sounds in the user's environment." (Dkt. No. 382 ¶¶ 10, 13; Dkt. No. 386-3 at 3 (describing object of allowing "unique and authentic content from [a] creator").) Furthermore, Epidemic bases its assertion on evidence Meta created the OA/RR Features in response to a "market around [ ] really unique and authentic sounds that creators were providing" on "other platforms on the Internet," like TikTok. (Dkt. No. 369-14 at 7.) For example, on TikTok, it was "very popular to reuse snippets of dialogue or jokes or ... things that aren't Licensed Music," and also to "reus[e] the audio from other" posts, thus inspiring both Original Audio and Reels Remix. (Dkt. No. 369-17 at 8-9, 12-13.) But again, Epidemic's argument relies on the unsupported assertion "things that aren't Licensed Music" are predominantly unlicensed, copyright-protected music. (*See* Dkt. No. 504 at 10 (arguing unlicensed audio "is, by definition, infringement of any works subject to copyright protection").)

**\*39** Ultimately, the record compels an inference of "substantial noninfringing uses" of Meta's Original Audio and Reels Remix features, *Sony*, 464 U.S. at 442, and the extent to which Meta aimed to compete with TikTok, rather than to "promot[e] infringement," by developing them, *Grokster*, 545 U.S. at 935. Epidemic has not shown any reasonable juror could find the Original Audio and Reels Remix features are "good for nothing else but infringement." *See Grokster*, 545 U.S. at 933 (quotation marks and citation omitted). So, a reasonable trier of fact could not find the Original Audio and Reels Remix features were tailored to infringement.

* * *

Because no reasonable trier of fact could find Meta induced infringement based upon its Original Audio and Reels Remix features or tailored those features for infringement, the Court grants Meta summary judgment on Epidemic's contributory liability claims.

## III. STATUTORY DAMAGES

Section 504(c)(1) of "[t]he Copyright Act permits a copyright owner to elect an award of statutory damages in lieu of actual damages and profits." *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1264 (9th Cir. 2021) (citing 17 U.S.C. § 504(c)(1)). "Section 504(c)(1) limits statutory damages awards to $150,000 for willful infringement and $30,000 for innocent infringement." *Id.* (citing 17 U.S.C. § 504(c)(1), (2)). "The number of awards available under this provision depends not on the number of separate infringements, but rather on (1) the number of individual works infringed and (2) the number of separate infringers." *Id.* at 1264-65 (quotation marks and citation omitted).

Meta moves for summary judgment Epidemic (1) is not entitled to statutory damages for the majority of the Epidemic Tracks,[13] and (2) cannot seek enhanced damages for willful infringement. Epidemic opposes Meta's motion and seeks summary judgment on Meta's willfulness.

[13]    Epidemic "has not yet elected whether it will seek to recover actual or statutory damages, and it may do so at any time before final judgment." (Dkt. No. 445-3 at 57 n.46 (citing 17 U.S.C. § 504(c)(1)).)

### A. Eligibility

"[T]o recover statutory damages, the copyrighted work must have been registered prior to commencement of the infringement, unless the registration is made within three months after first publication of the work." *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 699 (9th Cir. 2008) (citations omitted). Specifically, 17 U.S.C. § 412 provides:

[N]o award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for ... any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412(2). Congress designed Section 412 "to provide copyright owners with an incentive to register their copyrights promptly" and "encourage[ ] potential infringers to check the Copyright Office's database." *Derek Andrew*, 528 F.3d at 700 (citations omitted).

Consistent with Congress's intent, "the *first act of infringement* in a series of ongoing infringements of the same kind marks the commencement of one continuing infringement under § 412." *Id.* at 701 (emphasis in original). However, continuing infringement "is only applicable when the defendant has engaged in infringement that is ongoing or reoccurring." *Rosen v. Netrfronts, Inc.*, No. 12-CV-658 CAS (FFMx), 2013 WL 2155185, at *2 (C.D. Cal. May 13, 2013) (citations omitted). So, "[w]hen there is a cessation of activity between pre-registration acts of infringement and post-registration acts of infringement, it is no longer appropriate to find that there is a single ongoing act of infringement." *Id.* (citation omitted)

 **\*40**  At oral argument, Epidemic agreed it bears the "burden to prove" it is "entitled to statutory damages," (Dkt. No. 490 at 45), including "establish[ing] by what acts and at what time defendant infringed plaintiff's copyright." *See SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 196 (S.D.N.Y.), *modified on reconsideration*, 642 F. Supp. 2d 206 (S.D.N.Y. 2009) (quotation marks and citations omitted); *see also TVB Holdings (USA), Inc. v. eNom, Inc.*, No. SAVC 13-624-JLS (DFMx), 2014 WL 3717889, at *4 (C.D. Cal. July 23, 2014) (noting the court had denied the plaintiff's request for statutory damages because it "had not shown it was entitled to such damages for each [infringed] episode under 17 U.S.C. § 412"). Epidemic also agreed it bears the "burden to show that there was a cessation" such that the infringement is not continuing. (Dkt. No. 490 at 55.)

Meta seeks summary judgment 894 of the 900 Epidemic Tracks are ineligible for statutory damages. (Dkt. No. 386-19 at 52-53.) Meta relies on its damages rebuttal expert Gregory K. Leonard, who opines "none of the asserted Epidemic Tracks were registered within three months after the first publication of the work," and "there are only six Asserted Epidemic Tracks for which there is no indication that the work existed on Meta's platforms before the effective date of registration." (Dkt. No. 380-1 at 116-117; *see also* Dkt. No. 31-4 (chart of Epidemic tracks with publication and registration dates); Dkt. No. 37 (granting request for judicial notice of Dkt. No. 31-4).) Ms. Ekström also testified

Epidemic began the process of registering its tracks in 2021, having discovered Meta's infringement in November 2020. (Dkt. No. 387-4 at 19, 23-24.) So, for 894 of 900 Epidemic Tracks, the record supports a finding the copyrighted work was not registered before Meta's first infringement or within three months after its first publication, such that Epidemic is not entitled to statutory damages.[14]

14    There are six Epidemic Tracks for which Epidemic may have registered its copyright prior to Meta's first infringement. Epidemic has identified one of those tracks as "Hum with Me," which was registered on June 25, 2022 and first infringed on September 7, 2022. (Dkt. No. 369-6 at 54 (Row 2116); Dkt. No. 443-1 at 6 (Row 321); Dkt. No. 490 at 49-50.) At oral argument, the parties could not confirm whether the other tracks are within the 869 Epidemic Tracks for which Epidemic seeks summary judgment. (Dkt. No. 490 at 47.) To the extent they are not in the 869 Epidemic Tracks for which Epidemic seeks summary judgment, the Court has already entered judgment in Meta's favor on those tracks because Epidemic has not presented evidence of infringement.

In opposition, Epidemic first identifies 86 Epidemic Tracks which "were infringed by distinct works that were added to the Audio Library for the first time *after* registration." (Dkt. No. 445-3 at 58 (citing Dkt. No. 446-15).) So, for each of these Epidemic Tracks, although Meta presents evidence of a pre-registration infringing work in the Audio Library, Epidemic presents evidence of a distinct post-registration infringing work in the Audio Library. (Dkt. No. 490 at 50-51.) At oral argument, Meta contended Epidemic's evidence was insufficient to defeat summary judgment because it demonstrated only subsequent "act[s] of infringement in a series of ongoing infringements of the same kind." (*See id.* at 56-59.) *See Derek Andrew*, 528 F.3d at 701 (citations omitted). But unlike in *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696 (9th Cir. 2008), Epidemic has presented evidence of both distinct infringing works and distinct infringing distributors. *Id.* at 701 (finding continuing infringement when the defendant "mere[ly]" attached the same infringing hang-tag to new garments). So, there remains a factual dispute regarding whether the post-registration AL Infringing Tracks constituted a continuing infringement or commenced a new infringement. Meta therefore is not entitled to summary judgment on statutory damages for these 86 Tracks.

**\*41**  In addition, Epidemic presents evidence from which a reasonable trier of fact could find two tracks involved a cessation of infringing activity to distinguish the pre-registration infringement from the post-registration infringement. Specifically, Epidemic's Track "Beast Mode (Instrumental Version)" was infringed by "BRICKS," which was added to the Audio Library on January 6, 2021; removed pursuant to a distributor's notice it lacked rights on April 13, 2021; re-added on November 21, 2023; and re-removed for lack of rights on January 31, 2024. (Dkt. No. 369-5 at 3 (Row 103); Dkt. No. 446-16 at 10-12; Dkt. No. 446-17 at 8-10; Dkt. No. 446-19 at 10; Dkt. No. 446-20 at 9-10.) And Epidemic's Track "What About Love (Instrumental Version)," was first infringed by "Happy Love," which was added to the Audio Library on May 6, 2021 and removed on December 7, 2021; and later infringed by OA/RR Infringing Audio on March 2, 2023. (Dkt. No. 369-5 at 23 (Row 1413); Dkt. No. 369-6 at 80 (Row 3135).) At oral argument, Epidemic contended its evidence for these two tracks was "intended to be examples of the failure of Meta's showing on its motion" and is therefore sufficient to defeat Meta's motion for summary judgment on hundreds of other Epidemic Tracks. (Dkt. No. 490 at 53.) But Epidemic admits it bears the burden of showing cessation, (*id.* at 55), so to avoid summary judgment, Epidemic must present evidence preserving a dispute of fact as to cessation. And Epidemic has only presented such evidence for two tracks.[15] That Epidemic chose to assert hundreds of tracks in this single lawsuit does not relieve it of its burden of proof.

[15]    Although the parties also dispute whether the duration of these tracks' removal suffices for cessation, as neither party cites binding case law, the Court will not grant or deny summary judgment on this ground. *Compare Keeling v. New Rock Theater Prods., LLC*, No. 10-CV9345, 2012 WL 5974009, at \*2 (S.D.N.Y. Nov. 29, 2012) (finding cessation with nine month break); *Niemi v. Am. Axle Mfg. & Holding Inc.*, No. 05-74210, 2008 WL 905558, at \*14-15 (E.D. Mich. Mar. 31, 2008) (finding cessation given distinct infringing products); *Clever Factory, Inc. v. Kingsbridge Int'l, Inc.*, No. 3:11-1187, 2014 WL 2006777, at \*1 (M.D. Tenn. May 16, 2014) (refusing to grant summary judgment); *with Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16-CV7-24-LTS, 2016 WL 4126543, at \*2-3 (S.D.N.Y. Aug. 2, 2016) (finding one year break insufficient); *U2 Home Ent., Inc. v. Hong Wei Int'l Trading, Inc.*, No. 04-CV-6189 JFK, 2008 WL 3906889, at \*15 (S.D.N.Y. Aug. 21, 2008) (finding over two-year break insufficient); *Segura v. Sofa Ent., Inc.*, No. 16-CV-0938-AC, 2017 WL 2532211 (D. Or. June 9, 2017) (finding two-year break insufficient).

Ultimately, the summary judgment record compels the finding 894 of 900 Epidemic Tracks are not eligible for statutory damages. But there is a genuine dispute of fact as to up to 88 Epidemic Tracks. So, the Court grants Meta summary judgment these 894 Epidemic Tracks are not eligible for statutory damages, except for the 86 Epidemic Tracks identified in Docket No. 446-15, "Beast Mode (Instrumental Version)," and "What About Love (Instrumental Version)."

**B. Willfulness**

"[T]o prove willfulness under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017) (quotation marks and citation omitted). "Generally, a determination as to willfulness requires an assessment of a party's state of mind, a factual issue that is not usually susceptible to summary judgment." *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d 1164, 1174 (E.D. Cal. 2006) (quotation marks and citation omitted). "Rather, the determination of willfulness is ordinarily a question of fact for the jury." *Id.* (citation omitted). "However, where the relevant facts are admitted or otherwise undisputed, willfulness can be appropriately resolved on summary judgment." *Id.* (citations omitted).

"Evidence that notice had been accorded to the alleged infringer ... is perhaps the most persuasive evidence of willfulness." *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 674 (9th Cir. 2012) (cleaned up), *abrogated on other grounds by Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017); *see, e.g., Sanrio, Inc. v. Ronnie Home Textile, Inc.*, No. CV 14-06369-RSW (LJEMx), 2016 WL 5956096, at \*9 (C.D. Cal. Jan. 5, 2016) (finding willfulness because "it is undisputed that Defendants had notice of Plaintiff Sanrio's October 2012 cease and desist letter"); *Nintendo of Am., Inc. v. Storman*, No. 19-CV-7818 CBM (RAOx), 2021 WL 4780329, at \*5 (C.D. Cal. Aug. 5, 2021) ("Defendant testified at his deposition ... he received notices from Nintendo identifying several infringing ROMs that were uploaded on his website but failed to remove those files."). For this reason, evidence a defendant continued infringement after the plaintiff initiated its lawsuit helps show willfulness. *See Nintendo of Am.*, 2021 WL 4780329, at \*5 ("Nintendo also submits undisputed evidence that additional copies of Nintendo's copyrighted videogames were uploaded to Defendant's website after this lawsuit was

filed."); *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1195 (9th Cir. 2001) (affirming finding of willfulness when the majority of the infringed works "were aired after [the plaintiff] filed the instant action"); *Leegin Creative Leather Prods., Inc. v. Belts by Nadim, Inc.*, 316 F. App'x 573, 574 (9th Cir. 2009) (affirming the district court's determination of willfulness because "the evidence established that Nadim continued to sell infringing watches after receiving notice of Leegin's lawsuit").

 **\*42**  However, a defendant can refute evidence of willful infringement by "establish[ing] its good faith belief in the innocence of its conduct" and its "reasonable[ness] in holding such a belief." *Peer Int'l Corp. v. Pausa Recs., Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990). For example, "[w]illfulness does not exist [ ] where infringing works were produced ... under a reasonable belief that the infringer possesses a license or implied license." *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012) (citations omitted). *But see Atl. Recording Corp. v. Media Grp., Inc.*, No. CV 00-06122 FMC (MCx), 2001 WL 37132610, at \*2, 5 (C.D. Cal. Aug. 14, 2001) (finding willfulness when the defendant continued infringement after discovering its customer's assurances of copyright ownership were unreliable). The maintenance of a "notice-and-takedown procedure to combat copyright infringement" can also "help[ ] demonstrate a lack of reckless disregard for infringement or willful blindness to it." *SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869, 882 (N.D. Cal. 2022) (holding evidence "[t]he plaintiffs never used" Apple's notice and takedown process "strongly indicat[ed] that Apple lacked actual knowledge of the alleged infringement").

A reasonable trier of fact could find Meta had notice of the alleged infringement. As the Court explains in discussing contributory infringement's knowledge prong, a reasonable trier of fact could find, based on Epidemic's communications with Meta between 2018 and 2022, Meta knew or had reason to know about infringement of Epidemic's works. Furthermore, Epidemic sent Meta cease-and-desist letters on December 17, 2021 and February 17, 2022, which specifically identified Epidemic works for which it claimed infringement. (Dkt. No. 369-3 ¶¶ 42-43; Dkt. Nos. 444-4, 444-5.) *See Sanrio, Inc.*, 2016 WL 5956096, at \*9 (considering cease and desist letters persuasive). In addition, the record includes evidence Meta continued to allow infringement of "nearly 100 infringing works" through its Audio Library after Epidemic filed its complaint on July 20, 2022. (Dkt. No.

445-3 at 56 (citing Dkt. No. 369-5).) *See Columbia Pictures Television*, 259 F.3d at 1195.

Meta's insistence Epidemic provided insufficient detail about which tracks were being infringed is unavailing. As an initial matter, Meta concedes Epidemic's cease-and-desist letters at least informed it of "a few examples" of accused infringement. (Dkt. No. 439-2 at 43.) Furthermore, although Meta does not ordinarily monitor Rights Manager matches, (Dkt. No. 376 ¶ 31), a reasonable trier of fact could find—given Epidemic's notices—Meta acted with reckless disregard or willful blindness by failing to check Rights Manager matches for Epidemic's works. *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 748 (9th Cir. 2019) ("Reckless disregard can be demonstrated, for example, when a party 'refus[es], as a matter of policy, to even investigate or attempt to determine whether particular [photos] are subject to copyright protections.' " (citation omitted)).

Meta also argues it had a reasonable, good faith basis to believe the AL Infringing Tracks were not infringing because licensed distributors had represented they owned rights in their provided tracks. (Dkt. No. 369-18 at 17.) *See Evergreen Safety Council*, 697 F.3d at 1228-29 ("Willfulness does not exist [ ] where infringing works were produced ... under a reasonable belief that the infringer possesses a license."). But Epidemic responds Meta's reliance on distributors' representations became unreasonable after Epidemic's communications regarding infringement. Ultimately, reasonable triers of fact could differ about whether and when Meta's reliance on their distributors' representations of ownership was reasonable.

For both the AL Infringing Tracks and the OA/RR Infringing Audio, Meta argues its notice and takedown process—and Epidemic's failure to use it—establish its innocence. (Dkt. No. 376 ¶¶ 11-31.) *See SA Music LLC*, 592 F. Supp. 3d at 882 (explaining the maintenance of a "notice- and-takedown procedure to combat copyright infringement" can "help[ ] demonstrate a lack of reckless disregard for infringement or willful blindness to it"). However, the record supports a finding Meta's notice-and-takedown procedure is insufficient because a takedown notice only makes the track inaccessible in the Audio Library, but the track can still be uploaded as Original Audio. (Dkt. No. 369-15 at 22-27.) *Cf. SA Music LLC*, 592 F. Supp. 3d at 882 ("Unless the content provider affirmatively asserts its right to the content within [five days], Apple removes the content from the iTunes Store."). The record also supports a finding that because Meta refused to

allow Epidemic Rights Manager for Music access, as opposed to Rights Manager Pro access, Epidemic could not monitor music usage at scale or win an Audio Library ownership conflict against a Rights Manager for Music user. (Dkt. No. 369-49 ¶¶ 12-23; Dkt. No. 464-12 at 7-8; Dkt. No. 369-47 at 2; Dkt. No. 369-15 at 33.) So, reasonable triers of fact could also differ on whether Meta's reliance on the takedown process—and on Epidemic's failure to use it—was unreasonable.

**\*43** Because based on the summary judgment record reasonable triers of fact could disagree as to Meta's willfulness, the Court denies summary judgment on willfulness.

\* \* \*

The Court therefore grants Meta's motion for summary judgment as to Epidemic's ineligibility for statutory damages as to the 894 Epidemic Tracks identified in Mr. Leonard's report, except for the 86 Epidemic Tracks identified in Docket No. 446-15, "Beast Mode (Instrumental Version)," and "What About Love (Instrumental Version)." But given factual disputes about—among other things—the reasonableness of Meta's reliance on distributor's representations and the takedown process, the Court denies both parties' motions for summary judgment on Meta's willfulness.

## IV. AFFIRMATIVE DEFENSES

Epidemic moves for summary judgment on several of Meta's affirmative defenses, including express or implied license, DCMA safe harbor, fair use, de minimis use, statute of limitations, estoppel, unclean hands, waiver, and copyright misuse. Meta opposes Epidemic's motion and moves for summary judgment in its favor on its express or implied license, estoppel, unclean hands, waiver, and copyright misuse affirmative defenses. Ultimately, Meta bears the burden of proving its affirmative defenses. *See Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 746 (9th Cir. 1997).

### A. License

"[T]he existence of a license creates an affirmative defense to an infringement claim." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1051 (9th Cir. 2020) (quotation marks and citation omitted); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984) ("Anyone who is authorized by the copyright owner to use the copyrighted work in a way specified ... is not

an infringer of the copyright with respect to such use."). "But when a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement." *Oracle*, 971 F.3d at 1051 (cleaned up). "A nonexclusive license may be granted expressly or impliedly through conduct." *Experexchange, Inc. v. Doculex, Inc.*, No. C-08-03875 JCS, 2009 WL 3837275, at \*23 (N.D. Cal. Nov. 16, 2009) (citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (citing 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[A] (1989))).

Both parties move for summary judgment on Meta's express or implied license affirmative defense.

### 1. Express License

"When alleging the existence of an express license, the defendant has the initial burden to identify any license provision(s) that it believes excuses its infringement." *Roblox Corp. v. WowWee Grp. Ltd.*, No. 22-CV-04476-SI, 2024 WL 4057403, at \*2 (N.D. Cal. Sept. 3, 2024) (quotation marks and citation omitted); *see also Oracle Am., Inc. v. Terix Computer Co., Inc.*, No. 5:13-CV-03385-PSG, 2015 WL 2090191, at \*1 (N.D. Cal. May 5, 2015) ("A defendant asserting a license defense has the initial burden of identifying any license provision that puts it in the clear." (citing *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1156 (9th Cir. 2006))). "If it does so, the owner may overcome the defense by showing that the defendant's conduct exceeded the scope of the provision in question." *Terix Computer Co., Inc.*, 2015 WL 2090191, at \*1 (citing *LGS Architects, Inc.*, 434 F.3d at 1156); *see also Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1151 (N.D. Cal. 2007) ("[W]here[ ] the existence of a license is not in dispute, and only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized." (citing *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989))).

### a. AL Infringing Tracks

**\*44** In moving for summary judgment, Epidemic cites Meta's admissions it needs a license to offer and distribute copyright-protected music in its Audio Library, (Dkt. No. 369-18 at 8), and has "never entered into a direct, written, catalog-wide license that includes the right to make Epidemic's tracks available in the Audio Library," (Dkt.

No. 369-10 at 13). Meta does not explain why Epidemic's evidence is insufficient, much less cite any license or agreement which would authorize distribution of Epidemic's copyright-protected works in the Audio Library. So, the Court grants Epidemic summary judgment on Meta's affirmative defense it had an express license for the AL Infringing Tracks.

### b. OA/RR Infringing Audio

Meta argues the Rights Manager Terms of Use granted Meta an express license for any alleged infringement through the OA/RR Features. Meta primarily relies on its current Rights Manager Terms of Use, which provide:

> If Rights Manager surfaces a potential match ... between your Reference File Content and content uploaded to a Meta Product by a third party, and you elect to allow such content to remain on that Meta Product ("Claimed Content"), you grant Meta the authorization and/or license to the Claimed Content as described in the Meta Terms.

Rights Manager Terms, Facebook, § F, https://www.facebook.com/copyrights_terms (last modified May 1, 2025).[16] In deposition, an Epidemic employee stated they had no reason to believe Epidemic did not agree to Meta's Rights Manager Terms when it set up Epidemic's Rights Manager Pro account, and Epidemic's "understanding at the time [was] that the Rights Manager terms would govern the use of Rights Manager." (Dkt. No. 387-13 at 4-5.) Epidemic also told Meta its "entire library [was] uploaded in Facebook Rights Manager," (Dkt. No. 384-8 at 2), and admitted it has "not select[ed] the 'Block' option in response to matches," (Dkt. No. 383-31 at 24). So, Meta presents evidence Epidemic agreed to Rights Manager Terms which gave Meta a license to any matching content Epidemic did not dispute.

[16]    Because Epidemic does not contest the Terms "could be presented in an admissible form at trial, [the Court] may consider [them] in [Meta's] summary judgment motion." *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). Epidemic also does not dispute Meta's argument "[w]hile there has been slight variation in the wording of this license over time, the material effect of those terms has been the same since 2017." (Dkt. No. 386-19 at 42 n.14.) For example, the most recent prior version Meta introduces is from September 2020, when the Rights Manager Terms stated:

> If Rights Manager surfaces a potential match ... between content you include in Rights Manager and content uploaded to Facebook or Instagram by a third

> party, and you elect to allow such content to remain on Facebook or Instagram ("Claimed Content"), you agree to waive any and all intellectual property claims against Facebook or Instagram alleging infringement in relation to such Claimed Content.

(Dkt. No. 385-27 at 2 (Sept. 2020 Rights Manager Terms); *see also* Dkt. No. 385-24 (Apr. 2017 Terms); Dkt. No. 385-26 (Sept. 2018 Terms), Dkt. No. 385-25 (Nov. 2017 Terms); Dkt. No. 385-40 (Mar. 2018 Terms).)

However, the parties dispute whether Rights Manager actually surfaced the relevant matches to Epidemic. Meta argues its stipulation on OA/RR Infringing Audio, (Dkt. No. 350-2), reflects exactly the information which would have been available to Epidemic in Rights Manager. (Dkt. No. 385-17 at 3; Dkt. No. 377 ¶¶ 2-3.) But during discovery, Meta stated it did not generate—and therefore did not produce documents showing—notifications to Epidemic of matches. (Dkt. No. 444-16 at 3-4.) So, there remains a factual dispute regarding whether Epidemic in fact received notifications of OA/RR Infringing Audio matches, and therefore whether the Rights Manager Terms created a license for those matches.

**\*45**  Epidemic also argues the Rights Manager Terms are insufficient because they do not specifically authorize Meta to redistribute the audio in new posts via the OA/RR Features. According to Epidemic, the Terms "[a]t best ... allow Meta to obtain a license to continue to display the specific, singular unlicensed audiovisual post containing the unauthorized Epidemic Track." (Dkt. No. 445-3 at 40-41.) But the evidence Epidemic cites in support of this argument is entirely unrelated to the Rights Manager Terms. For example, when negotiating a license to use Epidemic Tracks on the Instagram account page, Meta raised concerns that license "didn't extend outside [its] original post." (Dkt. No. 369-28 at 7.) And in licenses with other distributors, distributors specifically authorized Meta to, among other things, "permit users to use ... Label Materials ... in connection with [ ] User Content." (Dkt. No. 369-32 at 3.) But that Meta obtained or did not obtain rights through other licenses does not show Meta did not also receive a license through the Rights Manager Terms.

Furthermore, Epidemic's argument Meta's interpretation of the Rights Manger Terms is unreasonable is unavailing. Specifically, Epidemic argues "Meta's assertion that its Rights Manager Terms require Epidemic to review hundreds of thousands of [user-generated content] posts matching its music every single day, to block those created with the OA/RR Feature ... or else face automatically granting Meta a perpetual, unfettered license to its music, without

compensation, is entirely unreasonable." (Dkt. No. 445-3 at 41-42.) But Meta explains straightforward steps Epidemic could have taken, such as setting up an "allowlist" of particular user accounts, (Dkt. No. 376 ¶¶ 18-19), and Epidemic has admitted it did not "start doing takedowns" because it was "focusing on building [its] presence across [Meta's] platforms," (Dkt. No. 387-17 at 3). So, Epidemic's unsupported assertion the Rights Manager Terms were unreasonable is not persuasive.

Ultimately, because there at least remains a factual dispute regarding whether Epidemic received notifications of matches in Rights Manager and therefore whether each OA/RR Infringing Audio was surfaced to Epidemic so as to trigger a license under the Rights Manager Terms, the Court denies both parties' motions for summary judgment as to an express license for the OA/RR Infringing Audio.

## 2. Implied License

"A non-exclusive license to use or distribute copyrighted work may be implied by conduct." *Wang v. Golf Tailor, LLC*, No. 17-CV-00898-LB, 2017 WL 5068569, at *7 (N.D. Cal. Nov. 3, 2017) (citing *Foad Consulting Grp. v. Azzalino*, 270 F.3d 821, 835 (9th Cir. 2001) (Kozinski, J., concurring)). However, "[c]ourts have found implied licenses only in narrow circumstances where one party created a work at the other's request and handed it over, intending that the other copy and distribute it." *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) (cleaned up). Specifically, the Ninth Circuit "ha[s] held that an implied license is granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Asset Mkting Sys., Inc. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008) (cleaned up); *see also Falcon Enters., Inc. v. Publishers Serv., Inc.*, 438 F. App'x 579 (9th Cir. 2011) (applying similar test).

Meta argues Epidemic granted an implied license through its conduct: specifically, Epidemic "engaged in a consistent and deliberate strategy of encouraging posting of its works on Meta's platforms while refusing to take action to remove unauthorized uses of its works." (Dkt. No. 470-3 at 20.) But beginning in 2018, Epidemic sent emails and cease-and-desist letters objecting to the distribution of the allegedly infringing works on Meta's platforms. *See Napster*, 239

F.3d at 1026 (affirming the district court's finding there was "no evidence to support this [implied license] defense [when] the RIAA gave defendant express notice that it objected to the availability of its members' copyrighted music on Napster"). Meta's contention these communications are irrelevant merely because Epidemic did not file takedown requests as Meta preferred is not persuasive. So, there is at least a factual dispute regarding whether Epidemic's conduct impliedly licensed its works to Meta, and Meta is not entitled to summary judgment.

**\*46** Moreover, Meta's argument Epidemic's conduct suffices for an implied license relies on *Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006); specifically, the District of Nevada's statement "[a]n implied license can be found where the copyright holder engages in conduct 'from which [the] other [party] may properly infer that the owner consents to his use.' " *See id.* at 1116 (quoting *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927) (addressing requirements for implied license defense to patent infringement)). And the Ninth Circuit has established more "narrow circumstances" in which an implied license exists. *See Napster*, 239 F.3d at 1026. Specifically, "an implied license is granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Asset Mkting Sys., Inc.*, 542 F.3d at 754-55. Even drawing inferences in Meta's favor, Meta presents no evidence (1) Meta requested the creation of the work, (2) Epidemic made that work and delivered it to Meta, and (3) Epidemic intended Meta copy and distribute its work. As to the second element in particular, the record compels the inference other distributors or users, rather than Epidemic, uploaded the Epidemic Tracks; there is no evidence from which a reasonable trier of fact could find Epidemic directly delivered its Tracks to Meta.

Ultimately, Meta does not cite any case in which a court has found an implied license in the undisputed circumstances present here. In *Reinicke v. Creative Empire, LLC*, 669 F. App'x 470 (9th Cir. 2016), the plaintiff "continued to create and deliver the work" to the defendant without negotiating a formal license. *Id.* at 470-71. In *Experexchange, Inc. v. Doculex, Inc.*, No. C-08-03875 JCS, 2009 WL 3837275 (N.D. Cal. Nov. 16, 2009), the plaintiff encouraged the defendant to use its software and accepted the defendant's royalty payments in return. *Id.* at *24. And in *Interscope Recs. v. Time Warner, Inc.*, No. CV 10-1662 SVW (PJWX), 2010

WL 11505708 (C.D. Cal. June 28, 2010), the plaintiffs "sent sound recordings to Defendants and encouraged them to use the recordings on the Show." *Id.* at *9. Even in *Field*, the court relied on the plaintiff's knowing choice not to include a meta-tag on its website because it was a direct communication to the defendant, Google, which "informed" Google of the plaintiff's "permission to allow access." *See Field*, 412 F. Supp. 2d at 1116.

Finally, Meta argues Epidemic nevertheless impliedly licensed its works to Meta because Epidemic delivered its works to subscribers for upload to Meta, and those subscribers expressly granted Meta a license to use their uploaded content. But the record does not support a finding Epidemic licensed its users to sublicense or otherwise allow third parties to use Epidemic's copyrighted music. (Dkt. No. 394-3 ¶¶ 13-16.) More importantly, Meta cites no case in which an implied license can be inferred through this type of multi-step process, especially absent any direct communications or conduct between the plaintiff and the defendant from which one could imply a license.

Because Meta has presented no evidence its defense fits within the narrow circumstances in which the Ninth Circuit has found an implied license, the Court grants Epidemic's motion for summary judgment as to Meta's implied license defense.

### B. DMCA § 512(c) Safe Harbor

The Digital Millenium Copyright Act ("DMCA") "limit[s] service providers' liability for unintentional [copyright] infringement through several safe harbors." *See Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1052 (9th Cir. 2017) (citation omitted). One of those safe harbors, 17 U.S.C § 512(c), protects service providers from liability for copyright infringement "by reason of the storage at the direction of the user" if certain conditions are met. 17 U.S.C. § 512(c). Specifically, "[t]o be eligible at the threshold for the § 512(c) safe harbor, a service provider must show that the infringing material was stored 'at the direction of the user.' " *Marvix*, 873 F.3d at 1052 (quoting 17 U.S.C. § 512(c)(1)). "If it meets that threshold requirement, the service provider must then show that (1) it lacked actual or red flag knowledge of the infringing material; and (2) it did not receive a 'financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity.' " *Id.* (citing 17 U.S.C. § 512(c)(1)).

**\*47** Meta only asserts the DMCA safe harbor defense as to Epidemic's OA/RR Infringing Audio claims and not Epidemic's AL Infringing Track claims. (Dkt. No. 439-2 at 45 n.22.) Epidemic moves for summary judgment on the grounds: (1) Meta cannot show the OA/RR Infringing Audio claims involve infringement "by reason of storage at the direction of the user," 17 U.S.C. § 512(c); (2) Meta had actual or red flag knowledge; and (3) Meta received a direct financial benefit and had the ability to control infringing activity.[17]

[17]    Although in a footnote, Epidemic contends "there are additional elements that Meta cannot establish including but not limited to that it (1) is a service provider, (2) adopted and reasonably implemented a repeat infringer policy, and (3) did not interfere with standard technical measures used to identify or protect copyrighted works, to name a few," (Dkt. No. 369-4 at 52 n.29), Epidemic's motion for summary judgment includes no evidence or case law to support these arguments, so the Court does not consider them.

### 1. "Storage at the Direction of a User"

The threshold requirement of Section 512(c) is that the copyright infringement occurs "by reason of the storage at the direction of a user." 17 U.S.C. § 512(c). "[T]he phrase 'by reason of the storage at the direction of a user' covers more than 'mere electronic storage lockers.' " *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 605-06 (9th Cir. 2018) (quoting *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1016 (9th Cir. 2013)); *see also UMG Recordings*, 718 F.3d at 1016 (rejecting reading of § 512(c) "requiring 'that the infringing conduct *be* storage,' rather than be '*by reason of* the storage' " (cleaned up)). So, the safe harbor "encompass[es] the access-facilitating processes that automatically occur when a user uploads [content] to a [service provider]" even when those processes "modify user-submitted material to facilitate storage and access." *UMG Recordings*, 718 F.3d at 1016, 1019. And infringing material is still stored at the direction of the user "if the service provider carried out activities that were 'narrowly' directed towards enhancing the accessibility of the posts." *Ventura Content*, 885 F.3d at 606 (quotation marks and citation omitted); *see also Marvix*, 873 F.3d at 1056 ("Accessibility-enhancing activities include automatic processes, for example, to reformat posts or perform some technological change." (citation omitted)).

Epidemic contends Meta's "creation and implementation of features that allow its users to rip Epidemic's music out of [User Generated Content] and use it in subsequent unlicensed content" goes beyond "by reason of storage at the direction of the user." (Dkt. No. 369-4 at 51.) But Epidemic's summary judgment motion cites no evidence supporting this assertion. And to the contrary, the record supports a finding Meta's Original Audio and Reels Remix features merely employ automatic processes to make user-generated content available. Specifically, Meta declares, "[o]nce a user has recorded a Reel, she can 'post' her Reel to Meta's Facebook and Instagram platforms, by which the user directs Meta to upload and store the Reel on Meta's systems where it is available to other users." (Dkt. No. 440-4 ¶ 2.) Meta's systems then "automatically created and stored ... an audiovisual asset and an audio asset," and its "systems automatically create copies ... to enable playback on different device formats," without "alter[ing] the user-facing content of the audio asset." (*Id.* ¶¶ 4, 7, 8.) According to Meta, those automatic processes allow "users to locate Original Audio files for use in creating and sharing their own user-generated content featuring Original Audio uploaded by another Meta user." (*Id.* ¶ 9.)

 **\*48**  So, like in *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2018), Meta "has simply established a system whereby software automatically processes user-submitted content and recasts it in a format that is readily accessible to its users," and "does not actively participate in or supervise file uploading" or "preview or select the files before the upload is completed." *Id.* at 1021 (cleaned up). So, a reasonable juror could find Meta has an " 'automated process' for making files accessible '[ ] initiated entirely at the volition of [Meta's] users.' " *Id.* (cleaned up). Therefore, like the defendant in *UMG Recordings*, a reasonable trier of fact could find Meta has satisfied the threshold requirement for the section 512(c) safe harbor.

Epidemic's reliance on *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089 (N.D. Cal. 2021), is unavailing. There, the plaintiff presented evidence the defendant "actively participate[d] in modifying the files uploaded by users to display the designs on [defendant]-selected physical products." *Id.* at 1114. Here, Epidemic does not identify any evidence showing Meta selects posts to redistribute the infringing audio or otherwise employs more than automatic processes. And to the extent Epidemic raises new arguments or cites new evidence in its reply brief, the Court need not, and does not, consider them. *See Zamani v. Carnes*, 491 F.3d

990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

So, because a reasonable trier of fact could find the OA/RR Infringing Audio is stored at the direction of users, Epidemic is not entitled to summary judgment on Meta's DMCA defense on this ground.

**2. Actual or Red Flag Knowledge**

A service provider seeking safe harbor protection must show it:

> (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material.

17 U.S.C. § 512(c)(1)(A). The Ninth Circuit summarizes section 512(c)(1)(A) as requiring the provider show "it lacked actual or red flag knowledge of the infringing material." *See Marvix*, 873 F.3d at 1052. "Actual knowledge refers to whether the service provider had subjective knowledge, while red flag knowledge turns on whether a reasonable person would objectively know of the infringements." *Id.* at 1057 (citation omitted). "Both actual and red flag knowledge refer to knowledge of the specific infringement alleged." *Id.* (citation omitted). Regarding actual knowledge, "[a] copyright holder's failure to notify the service provider of infringement through the notice and takedown procedure, ... is powerful, but not conclusive, towards showing that a service provider lacked actual knowledge." *Id.* at 1057 (quotation marks and citations omitted). And "[r]ed flag knowledge arises when a service provider is aware of facts that would have made the specific infringement objectively obvious to a reasonable person." *Id.* (quotation marks and citations omitted); *see also id.* at 1057-58 (noting "red flag knowledge [i]s a 'high bar' " (quoting *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009)).

As the Court explained when addressing the knowledge element of Epidemic's contributory infringement claims, Epidemic has presented evidence from which a reasonable trier of fact could find Meta knew or had reason to know

about specific infringement on its platform. For purposes of its motion for summary judgment on Meta's affirmative defense, however, Epidemic must show every reasonable trier of fact would find Meta had actual or red flag knowledge of the specific infringement. For the reasons explained above, the Rights Manager matches are insufficient, on their own, to show Meta's knowledge of infringing activity. And drawing inferences in Meta's favor, a reasonable trier of fact could find Epidemic's emails and cease and desist letters did not make "specific infringement objectively obvious to a reasonable person" for each OA/RR Infringing Audio. *See Marvix*, 873 F.3d at 1057. Furthermore, in the DMCA context, Meta's evidence Epidemic never submitted a takedown notice to Meta regarding the allegedly infringing works is "powerful" evidence Meta "lacked actual knowledge." *See id.*

 **\*49**  So, Epidemic has not shown every reasonable trier of fact would find Meta had actual or red flag knowledge of all the specific OA/RR Infringing Audio and is not entitled to summary judgment on this ground.

### 3. Direct Financial Benefit or Control

To be entitled to protection under the section 512(c) safe harbor, the service provider must also show it "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B).

Epidemic argues "Meta annually derives hundreds of billions of dollars from advertising revenue based on ads surrounding its posts and thus received a financial benefit directly attributable to the infringing activity." (Dkt. No. 369-4 at 53.) Because Epidemic does not cite any evidence supporting this statement, it has not met its summary judgment burden. Further, section 512(c)(1)(B) also requires revenue "distinctly attributable to the infringing material at issue." *Ventura Content*, 885 F.3d at 613 (rejecting claim because there was no evidence the defendant "made any money directly from the [infringing] clips"); *see also Netbula, LLC v. Chordiant Software, Inc.*, No. C 08-00019 JW, 2009 WL 750201, at \*2 (N.D. Cal. Mar. 20, 2009) ("There must be an obvious and direct financial interest in the exploitation of copyrighted materials.").

Absent any evidence, Epidemic's reliance on *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir.

2013), is unavailing. In *Columbia Pictures*, because there was evidence "supporting an inference [the defendant's] revenue stream is predicated on the broad availability of infringing materials for his users," the Ninth Circuit held "the connection between the infringing activity and [the defendant's] income stream derived from advertising is sufficiently direct to meet the direct 'financial benefit' prong of § 512(c)(1)(B)." *Id.* at 1045. But Epidemic does not cite any evidence from which a reasonable trier of fact could find, let alone must find, Meta's "revenue stream is [similarly] predicated on the broad availability of infringing materials." *Id.* So, Epidemic is not entitled to summary judgment on the ground Meta receives a financial benefit directly attributable to the infringing activity.

The Court therefore denies Epidemic's motion for summary judgment on Meta's DCMA defense as to the OA/RR Infringing Audio.

### C. Fair Use

In response to Epidemic's motion for summary judgment, Meta withdraws its fair use affirmative defense as to the 869 Epidemic Tracks asserted in Epidemic's motion for summary judgment. (Dkt. No. 439-2 at 44 n.21.) As the Court has granted summary judgment in Meta's favor on any works beyond these 869 Epidemic Tracks, the Court grants summary judgment in Epidemic's favor on Meta's fair use affirmative defense.

### D. De Minimis

"Copying is de minimis and therefore not actionable where the amount of the copying is so insubstantial in terms of quality or quantity that the accused work cannot be considered substantially similar to the asserted work." *Simpson Strong-Tie Co. Inc. v. MiTek Inc.*, No. 20-CV-06957-VKD, 2023 WL 8697700, at \*22 (N.D. Cal. Dec. 15, 2023) (citing *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1075 (9th Cir. 2021)).

 **\*50**  In response to Epidemic's motion for summary judgment, Meta clarifies it only asserts a de minimis defense for the four Epidemic Tracks to which it has not stipulated to substantial similarity. According to Meta, "[m]erely listening to these audio files reveals they lack meaningful similarities," which preserves "a material dispute not only about substantial similarity, but also whether any potential similarity rises above de minimis copying." (Dkt. No. 439-2 at 61.) And contrary to Epidemic's contention Meta cannot show de minimis copying without expert testimony,

de minimis copying—like substantial similarity—is often a question of fact for a jury. *See Lanard Toys Ltd. v. Anker Play Prods., LLC*, No. CV 19-4350-RSWL (AFMx), 2020 WL 6873647, at *24 (C.D. Cal. Nov. 12, 2020) ("Whether Defendants' use is considered de minimis is a question of fact for the jury." (citation omitted)); *see also Fisher v. Dees*, 794 F.2d 432, 435 n.2 (9th Cir. 1986) ("As a rule, a taking is considered *de minimis* only if it is so meager and fragmentary that the ***average audience*** would not recognize the appropriation." (emphasis added)). So, while Meta no longer asserts a de minimis defense for the stipulated Epidemic Tracks, Epidemic is not entitled to summary judgment on Meta's de minimis defense for the remaining tracks.

### E. Statute of Limitations

The Copyright Act "provides that a civil action for copyright infringement is timely so long as it is 'commenced within three years after the claim accrued.' " *Starz Ent., LLC. V. MGM Domestic Television Distribution, LLC*, 39 F.4th 1236, 1237 (9th Cir. 2022) (quoting 17 U.S.C. § 507(b)). "[A] claim accrues 'when an infringing act occurs,' ... *i.e.*, when the infringer 'violates any of the exclusive rights of the copyright owner, ... [or] when the copyright owner discovers, or reasonably should have discovered, the infringement." *Id.* at 1240-41 (quotation marks and citations omitted).

Both Meta and Epidemic seek summary judgment on Meta's statute of limitations defense, pursuant to which Meta asserts Epidemic's claims based on conduct prior to July 20, 2019 are time-barred. (Dkt. No. 57 at 15-16; *see also* Dkt. No. 1 (complaint filed July 20, 2022).) Meta does not dispute it launched the OA/RR Features in 2020 and 2021, so Epidemic's claims based on OA/RR Infringing Audio are not barred by the statute of limitations. Meta also does not dispute Epidemic's assertion Meta added 1,361 of the 1,540 AL Infringing Tracks to its Audio Library on or after July 20, 2019. (Dkt. No. 369-5.) So, at issue are 179 AL Infringing Tracks uploaded to the Audio Library before July 20, 2019.

Epidemic presents evidence 168 AL Infringing Tracks either (1) "remained available to users in the Audio Library on or after July 20, 2019," or (2) "were incorporated into content on or after July 20, 2019." (Dkt. No. 369-4 at 55 (citing Dkt. No. 369-5).) As an initial matter, Epidemic does not mention the other 11 AL Infringing Tracks uploaded before July 20, 2019 or explain why they might be exempt from the statute of limitations, so the Court grants Meta summary judgment the

statute of limitations bars claims for those 11 AL Infringing Tracks.

As to the subset of the 168 AL Infringing Tracks "incorporated into content on or after July 20, 2019," (Dkt. No. 369-4 at 55 (citing Dkt. No. 369-5)), because "the separate-accrual rule attends the copyright statute of limitations, ... [e]ach time an infringing work is reproduced or distributed, the infringer commits a new wrong ... [and] starts a new limitations period." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014) (cleaned up). Meta does not present any evidence creating a genuine dispute of fact as to whether these tracks would restart the limitations period. So, Epidemic is entitled to summary judgment in its favor on Meta's statute of limitations defense for the AL Infringing Tracks for which Epidemic presents evidence they were "incorporated into content on or after July 20, 2019." (Dkt. No. 369-4 at 55 (citing Dkt. No. 369-5).)

What remains, then, is a subset of the 168 AL Infringing Tracks which were uploaded before July 20, 2019 and "remained available to users in the Audio Library on or after July 20, 2019." (Dkt. No. 369-4 at 55 (citing Dkt. No. 369-5).) For these tracks, Epidemic argues the claims did not accrue until it "discover[ed], or reasonably should have discovered, the infringement. *Starz*, 39 F.4th at 1240-41.[18] However, there remains a factual dispute about when Epidemic discovered or should have discovered the infringement. Epidemic contends it did not discover the AL Infringing Tracks until at least November 2020 "when it undertook an investigation after learning that one of its tracks being claimed by another rightsholder was being distributed by Meta in its Audio Library." (Dkt. No. 369-4 at 56 (citing Dkt. No. 369-49 ¶¶ 24-28).) In response, Meta argues Epidemic "with due diligence should have discovered" any alleged infringement before July 20, 2019 because Epidemic had a Rights Manager account, which it monitored. (Dkt. No. 384-31 at 9-10; Dkt. No. 383-31 at 7-9, 19, 27-28.) *See Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 369 (2024) (cleaned up); *see also CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 2:20-CV-08819-CBM-AS, 2025 WL 2647269, at *19-20 (C.D. Cal. June 25, 2025) (holding statute of limitations barred claims when the copyright owner "knew there was possible infringement of its photos ... [but] there [wa]s no evidence [they] used the image-matching technology at its disposal to investigate which images were displayed"). Because reasonable triers of fact could differ about whether Epidemic reasonably should have discovered the infringement prior to July 20, 2019, the Court denies both parties' motion for

summary judgment as to this final subset of AL Infringing Tracks.

18    Meta also preserves the argument the Copyright Act does not "permit[ ] application of the 'discovery rule' " because the Supreme Court has "repeatedly reserved the question." (Dkt. No. 439-2 at 60 n.25.) *See Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 371 (2024) ("We have never decided whether ... a copyright claim accrues when a plaintiff discovers or should have discovered an infringement, rather than when the infringement happened.").

**\*51**  So, as to Meta's statute of limitations affirmative defense, the Court grants summary judgment in Epidemic's favor for claims based on: (1) OA/RR Infringing Audio, (2) the 1,361 AL Infringing Tracks uploaded on or after July 20, 2019, and (3) the subset of the 168 AL Infringing Tracks identified in Docket No. 369-5 incorporated into content on or after July 20, 2019. As to the subset of the 168 AL Infringing Tracks which were uploaded before July 20, 2019 but remained available after that date, there remains a factual dispute and the Court denies both parties' motion for summary judgment. However, the Court grants summary judgment in Meta's favor as to the 11 AL Infringing Tracks uploaded before July 20, 2019 but not identified within Epidemic's 168 AL Infringing Tracks in Docket No. 369-5.

### F. Equitable Defenses

Both parties move for summary judgment on Meta's equitable defenses, including waiver, unclean hands, estoppel, and copyright misuse. However, as explained above, Meta and Epidemic present evidence from which reasonable triers of fact could disagree about, for example, the extent of Meta's knowledge of infringement of infringement on its platform, the timing and extent of Epidemic's knowledge of the infringement, Epidemic's intent in responding in the ways it did and did not, and Epidemic's intent in bringing the present lawsuit. Ultimately, trial is necessary to resolve factual disputes regarding Meta's and Epidemic's knowledge and intent before the Court can determine whether Meta's equitable defenses are appropriate. The Court nevertheless addresses each defense.

### 1. Estoppel

Estoppel occurs if:

(1) the plaintiff knew of the defendant's allegedly infringing conduct;

(2) the plaintiff intended that the defendant rely upon his conduct or act so that the defendant has a right to believe it is so intended;

(3) the defendant is ignorant of the true facts; and

(4) the defendant detrimentally relied upon the plaintiff's conduct.

*Adobe Sys. Inc. v. NA Tech Direct Inc.*, No. 17-CV-05226-YGR, 2019 WL 5579472, at \*5 (N.D. Cal. Oct. 29, 2019) (cleaned up); *see also Stewart v. Ragland*, 934 F.2d 1033, 1041 (9th Cir. 1991) (outlining same elements). "Estoppel arises only when a party's conduct misleads another to believe that a right will not be enforced and causes him to act to his detriment in reliance upon this belief." *Roblox Corp. v. WowWee Grp. Ltd.*, No. 22-CV-04476-SI, 2024 WL 4057403, at \*7 (N.D. Cal. Sept. 3, 2024) (quotation marks and citation omitted). Ultimately, "estoppel 'is disfavored and should only be applied as needed to avoid injustice.' " *Adobe Sys. Inc.*, 2019 WL 5579472, at \*5 (quoting *Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1115 (C.D. Cal. 2010)).

Meta identifies evidence supporting a finding Epidemic knew about infringement on Meta's platform for years but did not send takedown notices because it intended for Meta to remain ignorant of infringement. In response, Epidemic's Ms. Melander declares although Epidemic did not discover infringement through the Audio Library until November 2020, Epidemic had continuously notified Meta about its infringement concerns, such that Meta cannot be considered ignorant. As explained above, there are factual disputes as to the timing and extent of Meta's knowledge. The parties also dispute Epidemic's intent. While Meta argues Epidemic refused to file takedown notices in order to expand its presence on Meta's platform and develop ammunition for a lawsuit, both of which it could leverage for a full-catalog license agreement, Epidemic argues it continuously sought Meta's help in curbing infringing content. So, factual disputes regarding Meta's knowledge and Epidemic's intent prevent summary judgment on Meta's estoppel defense.

### 2. Unclean Hands

**\*52**  "To prevail on an unclean hands defense, 'the defendant must demonstrate that the plaintiff's conduct is inequitable

and that the conduct relates to the subject matter of its claims.' " *Brother Recs., Inc. v. Jardine,* 318 F.3d 900, 909 (9th Cir. 2003) (citation omitted), *overruled in other part by Toyota Motor Sales, U.S.A., Inc. v. Tabari,* 610 F.3d 1171, 1183 (9th Cir. 2010). "[T]he defense of illegality or unclean hands is 'recognized only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action." *Dream Games of Arizona, Inc. v. PC Onsite,* 561 F.3d 983, 990-91 (9th Cir. 2009) (quotation marks and citation omitted). "For instance, the defense has been recognized when plaintiff misused the process of the courts by falsifying a court order or evidence, or by misrepresenting the scope of his copyright to the court and opposing party." *Id.* (quotation marks and citations omitted).

"Additionally, 'the extent of actual harm caused by the conduct in question, either to the defendant or to the public interest, is a highly relevant consideration.' " *Roblox Corp. v. WowWee Grp. Ltd.,* No. 22-CV-04476-SI, 2024 WL 4057403, at *8–9 (N.D. Cal. Sept. 3, 2024) (quoting *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349-50 (9th Cir. 1963)); *see also IT Casino Sols., LLC v. Transient Path, LLC,* No. 21-CV-09872-WHO, 2022 WL 4913526, at *8 (N.D. Cal. Oct. 3, 2022) (including as third element that the plaintiff's conduct injured the defendant).

In asserting an unclean hands defense, Meta argues Epidemic (1) encouraged its subscribers to post Epidemic's tracks on Meta's services and then asserted infringement based on foreseeable distribution of those posts, and (2) used Rights Manager to "stockpile potential infringement claims ... without taking action on them." (Dkt. No. 386-19 at 48.) Epidemic contends its Rights Manager Pro account offered it limited insight into—and power to resolve—infringement on Meta's platform, and it continuously notified and sought support from Meta, but Meta refused to help. Ultimately, factual disputes regarding Epidemic's knowledge and intent, and the seriousness of the harm posed to Meta, its users, or the public, prevent a determination whether an unclean hands defense is appropriate. *See Dollar Systems, Inc. v. Avcar Leasing Systems, Inc.,* 890 F.2d 165, 173 (9th Cir. 1989) ("The application of the unclean hands doctrine raises primarily a question of fact.").

### 3. Waiver

" 'Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish

it.' " *Napster,* 239 F.3d at 1026 (quoting *United States v. King Features Ent., Inc.,* 843 F.2d 394, 399 (9th Cir. 1988)). "In copyright, waiver or abandonment of copyright occurs only if there is an intent by the copyright proprietor to surrender rights in his work." *Id.* (quotation marks and citation omitted). "An implied waiver of rights will be found where there is clear, decisive and unequivocal conduct which indicates a purpose to waive the legal rights involved." *AirWair Int'l Ltd. v. Schultz,* 84 F. Supp. 3d 943, 957 (N.D. Cal. 2015) (quoting *United States v. Amwest Surety Ins. Co.,* 54 F.3d 601, 602-03 (9th Cir. 1995)).

Meta argues Epidemic waived its claims by encouraging subscribers to post its tracks on Meta's platform and adopting a no-takedown policy for alleged infringement, and Epidemic contends it continuously sought Meta's assistance with infringement and argues its failure to act is insufficient for waiver. Again, given factual disputes regarding Epidemic's knowledge of infringement and intent in adopting its no-takedown policy, the Court cannot decide whether Meta's waiver defense applies at summary judgment.

### 4. Copyright Misuse

**\*53** "Copyright misuse is a judicially crafted affirmative defense to copyright infringement." *Apple Inc. v. Psystar Corp.,* 658 F.3d 1150, 1157 (9th Cir. 2011). The Ninth Circuit has "described the purpose of the defense as preventing holders of copyright 'from leveraging their limited monopoly to allow them control of areas outside the monopoly.' " *Id.* (citing *Napster,* 239 F.3d at 1026). So, while "copyright holders may [ ] use their limited monopoly to leverage the right to use their work on the acceptance of specific conditions," they may not "us[e] the conditions to stifle competition." *Id.* at 1159 (citations omitted). For example, the Ninth Circuit found copyright misuse in *Practice Management Information Corp. v. American Medical Ass'n,* 121 F.3d 516 (9th Cir. 1997), when the defendant's licensing agreement required licensees to only use the defendant's copyrighted system and prohibited them from using any other system. *See Psystar Corp.,* 658 F.3d at 1157-58 (citing *Practice Mgmt. Info. Corp.,* 121 F.3d at 518-521). But in *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th Cir. 2001), there was no copyright misuse because "plaintiffs [merely] [sought] to control reproduction and distribution of their copyrighted works, exclusive rights of copyright holders." *Id.* at 1027 (citing 17 U.S.C. § 106). Ultimately, the Ninth Circuit has "applied the doctrine sparingly."

*Psystar Corp.*, 658 F.3d at 1157 ("Our decision in *Practice Management* is the only case in which we upheld a copyright misuse defense.").

Both Meta and Epidemic move for summary judgment on Meta's copyright misuse affirmative defense. According to Meta, Epidemic encouraged infringement on Meta's platform, "stockpil[ed] unasserted copyright claims and ultimately threaten[ed] legal action" in order to force Meta to agree to a blanket license for Epidemic's full catalog. (Dkt. No. 386-19 at 50.) Epidemic argues the copyright misuse defense is entirely inapposite because it "is often applied when a defendant can prove either: (1) a violation of the antitrust laws; [or] (2) that the copyright owner otherwise illegally extended its monopoly." *See Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 700 (9th Cir. 2015) (Wardlaw, J., concurring) (citations omitted). But "the contours of [the copyright misuse defense] are still being defined," and the defense can also apply when "(3) [ ] the copyright owner violated the public policies underlying the copyright laws." *Id.* (citations omitted). Ultimately, whether a copyright misuse defense could apply depends on Epidemic's intent in bringing this litigation. If a trier of fact finds Epidemic intended to further infringement on Meta's platform and then leverage its copyrights in 869 Tracks in this lawsuit to pressure Meta into a full catalog license for a price Meta would otherwise be unwilling to pay, Epidemic's conduct might illegally extend its monopoly over the 869 Tracks or violate the public policies underlying the copyright laws. As there are genuine disputes, the Court does not grant summary judgment on the copyright misuse defense to either party.

\* \* \*

So, as to Meta's affirmative defenses:

1. The Court grants Epidemic's motion for summary judgment as to Meta's express license defense to the AL Infringing Tracks claims and as to Meta's implied license defense.

2. Given Meta's stated withdrawal of the defenses, the Court also grants summary judgment in Epidemic's favor on Meta's (1) DMCA section 512(c) safe harbor defense as to the AL Infringing Tracks, (2) fair use defense as to the 869 Epidemic Tracks remaining in this case, and (3) de minimis defense as to the stipulated Infringing Works in Docket No. 350.

3. The Court also grants in part and denies in part both parties' motions for summary judgment as to Meta's statute of limitations defense, to the extent described above.

4. The Court otherwise denies both parties' motions for summary judgment on Meta's affirmative defenses.

## V. EPIDEMIC'S MOTION FOR SANCTIONS

The Court denies Epidemic's motion for spoliation sanctions against Meta. Not only is Epidemic's motion untimely, *see* N.D. Cal. Civ. L.R. 37-3, but Epidemic also has not shown spoliation sanctions are warranted under Federal Rule of Civil Procedure 37(e).

### A. Timeliness

**\*54** The Local Rules provide "no motions related to fact discovery may be filed more than 7 days after the fact discovery cut-off." N.D. Cal. Civ. L.R. 37-3; *see also* Commentary to N.D. Cal. Civ. L.R. 37-3 (including "spoliation motions ... and motions for discovery sanctions"). Although fact discovery closed on May 12, 2025, Epidemic did not bring this motion until November 19, 2025. So, Epidemic's motion is untimely under Local Rule 37-3.

Epidemic's argument it delayed its motion pursuant to the Court's guidance is unavailing. Epidemic primarily relies on the Court's June 5, 2024 statement it did not "want to deal with that now" given there were—at that point—more than six months remaining of fact discovery. (Dkt. No. 156 at 15.) The Court explained evaluating whether spoliation sanctions are warranted depends in part on whether "the evidence [is] available in some other format," and directed Epidemic to first attempt to ascertain "whether there's other data out there that can provide the same information" before bringing a spoliation motion. (*Id.* at 16-17.) But that the Court asked Epidemic not to bring its spoliation motion in June 2024 does not explain why Epidemic chose to wait until November 2025, more than six months after the close of fact discovery. And Epidemic's argument its untimeliness should be excused because it previously informed the Court it wished to bring a spoliation motion is unsupported and unpersuasive.

Epidemic also argues it has good cause for untimeliness in bringing its spoliation motion. First, Epidemic notes "Meta continued to produce critical evidence, including over 3,500 documents and over 150 audio files necessary to establish substantial similarity, as late as September 2025." (Dkt. No. 450-3 at 6 (citing Dkt. No. 424-13 (Sept. 4, 2025 letter

completing Meta's document production).) But Epidemic still waited two-and-a-half months—far more than seven days—after Meta's production to bring the instant motion. Second, Epidemic argues Meta "delayed its agreement to a stipulation concerning substantial similarity until the day this motion was filed." (Dkt. No. 450-3 at 6 (citing Dkt. No. 350).) But Meta was not required to stipulate to substantial similarity. And Epidemic does not explain what facts it hoped Meta would stipulate to in order to avoid its spoliations motion, and therefore how Meta's stipulation fails to address its spoliation concerns. Epidemic also does contend it raised its continued spoliation concerns to the Court between the close of fact discovery in May 2025 and its November 2025 motion.

So, Epidemic's spoliation motion is untimely, and Epidemic has not demonstrated good cause for such untimeliness. For this reason alone, the motion is denied. As explained below, it also fails on the merits.

### B. Epidemic's Spoliation Arguments

Spoliation "refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (citation omitted). Generally, a party who has engaged in spoliation of evidence may be sanctioned under the inherent power of the federal courts to sanction abusive litigation practices or under Federal Rule of Civil Procedure 37. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). But when the evidence at issue is electronically stored information, Federal Rule of Civil Procedure 37(e) governs. Rule 37(e) provides:

> **\*55** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A) presume that the lost information was unfavorable to the party;

> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). While Rule 37(e)(1) "sets forth a general authority, upon a finding of prejudice to another party from the loss of the information, to impose remedial sanctions that are no greater than necessary to cure the prejudice," Rule 37(e)(2) "establishes a more demanding standard before the court may impose certain types of severe sanctions," which "may be imposed only upon a finding that the party who caused the loss acted with the intent to deprive another party of the information's use in the litigation." *See Gregory v. State of Montana*, 118 F.4th 1069, 1078 (9th Cir. 2024); *see also id.* (explaining Rule 37(e)(2) does not require finding prejudice).

Epidemic asks the Court to impose sanctions on Meta for spoliation of:

> (i) pre-March 2023 match data from Meta's own Rights Manager system, which detects substantially similar audio across Meta's platform (both within its Audio Library and among posted user-generated content);
>
> (ii) Audible Magic data, which was a service used by Meta through June 2022 to also detect substantially similar audio on its platform; and
>
> (iii) percentage match data in Meta's Rights Manager tool, which would quantify the extent of similarity between two audio files.

(Dkt. No. 357-4 at 11.) For each of these three categories, the Court evaluates whether Epidemic has met the requirements to impose sanctions on Meta pursuant to Rule 37(e)(1) or 37(e)(2).

### 1. Audible Magic Data

Epidemic is not entitled to sanctions under Rule 37 because there is no evidence any data was lost and cannot be replaced. *See* Fed. R. Civ. P. 37(e) (applying if "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost ... and it cannot be restored or replaced through additional discovery"). According to Epidemic, there is Audible Magic data missing which would have "elucidated ... the presence of infringing copies of Epidemic Tracks detected by Audible Magic's service on Meta's platforms." (Dkt. No. 357-4 at 11.) But

although Epidemic speculates why there may be missing Audible Magic data, it does not present any concrete suggestions about what is missing. *Cf. hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 979 (N.D. Cal. 2022) (noting a movant need "only come forward with plausible, concrete suggestions as to what the destroyed evidence might have been" (cleaned up)).

Furthermore, Meta presents evidence the Rights Manager data it produced is duplicative of any missing Audible Magic data. According to Meta, by 2018, "all of Meta's music distributors," including Epidemic, "were using Rights Manager, rather than Audible Magic, as their primary content management tool on Meta's platforms." (Dkt. No. 429-10 ¶ 4.) And because "Rights Manager [ ] performs periodic, backward-looking 'legacy' scans of each reference file, ... a reference file uploaded in Rights Manager [ ] can match to user-generated content uploaded in 2015." (*Id.* ¶ 8.) Ultimately, in 2022, Meta "decided to discontinue its agreement with Audible Magic because the data it received from, and purpose of, Audible Magic ... were duplicative of data generated by Rights Manager." (*Id.* ¶ 6.)

 **\*56** So, given Meta's declarations the Rights Manager data it produced is duplicative of any deleted Audible Magic data, the Court will not sanction Meta "for failing to preserve information solely because [Epidemic] asserts potentially relevant other [data] may have existed." *See Fed. Trade Comm'n v. DirecTV, Inc.*, No. 15-CV-01129-HSG (MEJ), 2016 WL 7386133, at \*5 (N.D. Cal. Dec. 21, 2016); *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (noting "electronically stored information often exists in multiple locations," so "loss from one source may often be harmless when substitute information can be found elsewhere").

So, Rule 37(e) spoliation sanctions are not warranted for the deleted Audible Magic data.

### 2. Rights Manager Percentage Match Data

Epidemic is not entitled to sanctions under Rule 37(e)(1) because any lost Rights Manager percentage match data has not prejudiced Epidemic. According to Meta, Rights Manager's percentage match "is the result of an automated mathematical calculation of the durational percentage of overlap where two matched reference files shared a certain threshold of technical similarity," and therefore "reflects the percentage of time the tracks share a threshold similarity," but not "which elements of the track are similar" or "any information about the source of the similarity. (Dkt. No. 429-9 ¶ 5.) So, contrary to Epidemic's assertion, percentage match data is insufficient to show substantial similarity. And as the Court previously explains in this order, Rights Manager matches are also insufficient to infer Meta's knowledge of infringement. So, the absence of percentage match data does not prejudice Epidemic, especially given Meta has stipulated to substantial similarity for 1,536 of the 1,540 AL Infringing Tracks and produced the audio files triggering a match.

As to Rule 37(e)(2), Meta having informed its music distributors of Epidemic's allegations is insufficient to impute Meta's intent to deprive Epidemic of the percentage match data given Meta preserved and produced all the matching audio files from which Epidemic could have—if the percentage match number was in fact legally relevant—computed the number itself.

So, Rule 37(e) spoliation sanctions are not warranted for any missing Rights Manager percentage match data.

### 3. Pre-2023 Rights Manager Data

Like the Audible Magic data, Epidemic has not shown any pre-March 2023 Rights Manager match data has been lost and cannot be replaced. *See* Fed. R. Civ. P. 37(e) (applying if "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost ... and it cannot be restored or replaced through additional discovery").

Meta declares the produced match data "reflects all of the matches to Epidemic's reference files that have ever been recorded in Meta's data systems, ... includ[ing] matches to [User Generated Content] uploaded as far back as 2015," and Audio Library conflicts dating back to September 1, 2019, when it first began logging data. (Dkt. No. 429-9 ¶¶ 2, 6.) And although Epidemic has had access to Rights Manager since 2017, Epidemic does not present a single example of missing data. So, Epidemic's speculation there may be some missing, unpreserved, pre-2023 match data from Rights Manager is insufficient. *See Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 631 (C.D. Cal. 2013) ("Mere speculation that ... deleted documents may exist . . . [is] an insufficient basis for a finding of spoliation."). So, Rule 37(e) spoliation sanctions are not warranted for any pre-2023 Rights Manager data.

**\*57** So, Epidemic has not shown Rule 37(e) spoliation sanctions are warranted.

\* \* \*

Because Epidemic's motion is untimely and Epidemic has not shown any lost data warrants sanctions under Federal Rule of Civil Procedure 37(e), the Court DENIES Epidemic's motion for sanctions.

## VI. SEALING MOTIONS

There is a right of public access to judicial records and documents. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). In considering motions to seal, "a strong presumption in favor of access is the starting point." *Kamakana v. City & Cnty. Of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (cleaned up). So, parties seeking to seal judicial records relating to motions that are "more than tangentially related to the underlying cause of action," *Ctr. for Auto Safety v. Chrysler Grp.*, 809 F.3d 1092, 1099 (9th Cir. 2016), bear the burden of overcoming the presumption of access with "compelling reasons supported by specific factual findings ... that outweigh the general history of access and the public policies favoring disclosure," *Kamakana*, 447 F.3d at 1178-79 (cleaned up). However, records attached to "nondispositive motions" which are "not related, or only tangentially related, to the merits of a case," are not subject to the strong presumption of access and must instead meet a lower "good cause" standard. *See Ctr. for Auto Safety*, 809 F.3d at 1098-99.

In addition, under Civil Local Rule 79-5, sealing is only permitted where the parties have established "the applicable legal standard and the reasons for keeping a document under seal, including an explanation of: (i) the legitimate private or public interests that warrant sealing; (ii) the injury that will result if sealing is denied; and (iii) why a less restrictive alternative to sealing is not sufficient." *See* N.D. Cal. Civ. L.R. 79-5(c)(1). Civil Local Rule 79-5 also requires the parties to "narrowly tailor[ ]" their requests only to the sealable material. *Id.* at 79-5(c)(3). Thus, although sometimes it may be appropriate to seal a document in its entirety, whenever possible a party must redact. *See Kamakana*, 447 F.3d at 1183 (noting a preference for redactions so long as they "have the virtue of being limited and clear").

The parties previously filed 34 sealing motions related to the cross-motions to summary judgment, motions to exclude experts, and spoliation motions. (Dkt. Nos. 356, 357, 367, 368, 369, 370, 371, 373, 386, 387, 389, 390, 394, 395, 396, 403, 417, 420, 421, 428, 429, 439, 440, 445, 446, 450, 453, 455, 456, 464, 465, 470, 471, 474.) As several of these motions were overbroad, the Court terminated these motions and directed Epidemic and Meta to each file an omnibus motion regarding material for which there are compelling reasons or good cause to seal. Pending before the Court are these omnibus motions. (Dkt. Nos. 491, 493.)

Although the parties' summary judgment motions and related exhibits are subject to the compelling reasons standard, *see Kamakana*, 447 F.3d at 1179; Epidemic's sanctions motion is subject to the good cause standard, *see WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, No. 19-CV-07123-PJH, 2025 WL 885598, at \*6 (N.D. Cal. Mar. 21, 2025). To the extent the parties' expert-related motions are case-dispositive, they are also subject to the compelling reasons standard. *See In re Midland Nat'l Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119-20 (9th Cir. 2012).

### A. Epidemic's Omnibus Sealing Motion

### 1. Epidemic's Motion for Summary Judgment

**\*58 Document** Ex. 3 to Tom Höglund's Declaration in Support of Epidemic's Motion for Summary Judgment Ex. 1C to the Declaration of Caroline Ekström in Support of the Motion for Summary Judgment ("Ekström SJ Decl.") Ex. 3 to the Ekström SJ Decl. Ex. 4 to the Ekström SJ Decl. Ex. 5 to the Ekström SJ Decl. Ex. 6 to the Ekström SJ Decl. Ex. 7 to the Ekström SJ Decl. Ex. 8 to the Ekström SJ Decl. Ex. 9 to the Ekström SJ Decl. Ex. 10 to the Ekström SJ Decl. Ex. 11 to the Ekström SJ Decl. Ex. 12 to the Ekström SJ Decl. Ex. 13 to the Ekström SJ Decl. Ex. 16 to the Ekström SJ Decl. Ex. 17 to the Ekström SJ Decl. Ex. 18 to the Ekström SJ Decl. Ex. 19 to the Ekström SJ Decl. Ex. 20 to the Ekström SJ Decl. Ex. 21 to the Ekström SJ Decl. Epidemic's Motion for Summary Judgment Meta's Opposition to Epidemic's Motion for Summary Judgment Ex. 111 to the Declaration of Brent T.F. Murphy in Support of Meta's SJ Opp. ("Murphy SJ Opp. Decl.") Ex. 112 to the Murphy SJ Opp. Decl. Epidemic's Reply for its Motion for Summary Judgment **Dkt. No. (Confidential Material)** 394-6 (Epidemic license agreement) 394-8 (Compendium of Epidemic rights transfer agreements with artists) 394-9

(Epidemic rights transfer agreement with artist) 394-10 (Epidemic rights transfer agreement with artist) 394-11 (Epidemic rights transfer agreement with artist) 394-12 (Epidemic rights transfer agreement with artist) 394-13 (Epidemic rights transfer agreements with artist) 394-14 (Epidemic rights transfer agreements with artist) 394-15 (Epidemic rights transfer agreements with artist) 394-16 (Epidemic rights transfer agreements with artist) 394-17 (Epidemic rights transfer agreements with artist) 394-18 (Epidemic rights transfer agreements with artist) 394-19 (Epidemic – Meta licensing agreement) 394-20 (Epidemic – Meta licensing agreement) 394-21 (Epidemic – Meta licensing agreement) 394-22 (Epidemic – Meta licensing agreement) 394-23 (Epidemic – Meta licensing agreement) 394-24 (Epidemic – Meta licensing agreement) 394-25 (Epidemic – Meta licensing agreement) 491-3 (bright green highlights quoting or summarizing confidential licensing or rights agreement terms) 494-1 at 19 (yellow highlights describing Epidemic's license with a third party) 439-5 (Epidemic rights transfer agreements with artist) 439-6 (Epidemic rights transfer agreements with artist) 491-4 (gray highlights discussing Epidemic's license terms) **Designating Party** Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic **Reasons Proffered for Sealing** This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms These documents are HIGHLY CONFIDENTIAL Epidemic rights transfer agreements, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL compendium of Epidemic rights transfer agreements and translations, the disclosure

of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement and translation, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement and translation, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement and translation, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a CONFIDENTIAL Epidemic license agreement with an express confidentiality provision, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a CONFIDENTIAL Epidemic license agreement with an express confidentiality provision, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a CONFIDENTIAL Epidemic license agreement with an express confidentiality provision, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a CONFIDENTIAL Epidemic license agreement with an express confidentiality provision, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a CONFIDENTIAL Epidemic license agreement with an express confidentiality provision, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a CONFIDENTIAL Epidemic license agreement with an express confidentiality provision, the

disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a CONFIDENTIAL renewal of an Epidemic license agreement with an express confidentiality provision, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. The highlighted portions of this document quote and paraphrase CONFIDENTIAL Epidemic licensing agreements, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. The highlighted portions of this document discuss a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial information. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement with a third party, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. The highlighted portions of this document quote and paraphrase CONFIDENTIAL Epidemic licensing agreements, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. **Ruling GRANTED**. There are compelling reasons to seal "license agreements, financial terms, [and] details of confidential licensing negotiations." *DeMartini v. Microsoft Corp.*, No. 22-CV-08991-JSC, 2023 WL 4205770, at \*2 (N.D. Cal. June 26, 2023) (cleaned up). **GRANTED**. There are compelling reasons to seal a compendium of Epidemic's rights transfer agreements. *See DeMartini,* 2023 WL 4205770, at \*2. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED**. There are compelling reasons to seal confidential licensing terms. *See DeMartini,* 2023 WL 4205770, at \*2. **GRANTED** for the same reasons as Dkt.

No. 394-19. **GRANTED** for the same reasons as Dkt. No. 394-19. **GRANTED** for the same reasons as Dkt. No. 394-19. **GRANTED** for the same reasons as Dkt. No. 394-19. **GRANTED** for the same reasons as Dkt. No. 394-19. **GRANTED** for the same reasons as Dkt. No. 394-19. **GRANTED** because the proposed redactions are narrowly tailored to confidential licensing terms. **GRANTED** because the proposed redactions are narrowly tailored to confidential licensing terms between Epidemic and a third party. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** because the proposed redactions are narrowly tailored to Epidemic's confidential license terms.

### 2. Meta's Motion for Summary Judgment

**Document** Ex. 19 to the Declaration of Brent T.F. Murphy in Support of Meta's Motion for Summary Judgment ("Murphy SJ Decl.") Ex. 29 to the Murphy SJ Decl. Ex. 56 to the Murphy SJ Decl. Ex. 87 to the Murphy SJ Decl. Ex. 1 to the Declaration of Steven M. Marks in Support of Meta's Motion for Summary Judgment Epidemic's Opposition to Meta's Summary Judgment Motion Ex. 129 to the Declaration of Brent T.F. Murphy in Support of Meta's SJ Reply ("Murphy Reply Decl.") Ex. 130 to the Murphy Reply Decl. Ex. 131 to the Murphy Reply Decl. Ex. 132 to the Murphy Reply Decl. Ex. 133 to the Murphy Reply Decl. Ex. 134 to the Murphy Reply Decl. Ex. 135 to the Murphy Reply Decl. Ex. 136 to the Murphy Reply Decl. Ex. 137 to the Murphy Reply Decl. **Dkt. No. (Confidential Material)** 387-5 (Epidemic rights transfer agreements with artist) 387-11 (Epidemic – Meta licensing agreement) 491-5 (internal correspondence with a redacted sentence estimating Epidemic's market share on other platforms) 387-44 (Epidemic's contract with third party for market research services) 493-4 at 15 (pale yellow highlights describing existence of license agreement with third party) 491-6 (bright green highlights quoting or summarizing Epidemic's license terms) 471-3 (Epidemic licensing agreement with third party) 471-4 (Epidemic licensing agreement with third party) 471-5 (Epidemic licensing agreement with third party) 472-1 (Epidemic licensing agreement with third party) 472-2 (Epidemic licensing agreement with third party) 472-3 (Epidemic licensing agreement with third party) 473-1 (Epidemic licensing agreement with third party) 473-2 (Epidemic licensing agreement with third party) 473-3 (Epidemic licensing agreement with third party) **Designating Party** Epidemic Epidemic Epidemic Epidemic Epidemic

Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic **Reasons Proffered for Sealing** This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic rights transfer agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms The redacted portions of this document quote HIGHLY CONFIDENTIAL correspondence regarding Epidemic's non-public market share on Facebook, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive partnerships and usage and engagement metrics that will enable competitors to undercut Epidemic's market position. This document is a CONFIDENTIAL Epidemic license agreement with an express confidentiality provision, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms The highlighted portions of this document discuss a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This highlighted portions of this document quote and paraphrase CONFIDENTIAL communications regarding Epidemic licensing agreements, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business

interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. **Ruling GRANTED** for the same reasons as Docket No. 394-8. **GRANTED** for the same reasons as Dkt. No. 394-19. **GRANT.** Epidemic's proposed redactions are narrowly tailored to "business information that might harm [its] competitive strategy." *See In re Elec. Arts, Inc.*, 298 F. App'x. 568, 569 (9th Cir. 2008). **GRANTED**. There are compelling reasons to seal Epidemic's confidential contract terms with a third party. *See Snapkeys, Ltd. v. Google LLC*, No. 19-CV-02658-LHK, 2021 WL 1951250, at *3 (N.D. Cal. May 14, 2021). **GRANTED** because the proposed redactions are narrowly tailored to a license between Epidemic and a third party. **GRANTED** because the proposed redactions are narrowly tailored to discussion of Epidemic's confidential license terms. **GRANTED** because there are compelling reasons to seal Epidemic's confidential licensing with a third party. **GRANTED** for the same reasons as Dkt. No. 471-3. **GRANTED** for the same reasons as Dkt. No. 471-3. **GRANTED** for the same reasons as Dkt. No. 471-3. **GRANTED** for the same reasons as Dkt. No. 471-3. **GRANTED** for the same reasons as Dkt. No. 471-3. **GRANTED** for the same reasons as Dkt. No. 471-3. **GRANTED** for the same reasons as Dkt. No. 471-3. **GRANTED** for the same reasons as Dkt. No. 471-3.

### 3. Epidemic's Motion for Sanctions

**\*59 Document** Ex. 8 to the Declaration of Peter Calello in Support of Meta's Motion for Sanctions **Dkt. No. (Confidential Material)** 491-7 (yellow highlights in internal presentation on rights management policies with, on pgs. 13 and 16, example claims, and on pg. 18, statistics

on extent of infringement discovered) **Designating Party** Epidemic **Reasons Proffered for Sealing** This document is internal guidance regarding Epidemic's proprietary rights management policies, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing Epidemic's detection and enforcement methods. **Ruling GRANTED** as to Epidemic's estimated understanding of infringement on third party platform as "business information that might harm a litigant's competitive strategy." *See In re Elec. Arts, Inc.*, 298 F. App'x. 568, 569 (9th Cir. 2008). **DENIED** as to example claims and false claims.

### 4. Meta's Motion to Exclude Bradley T. Sharp

**Document** Ex. 2 to the Declaration of Brent T.F Murphy in Support of Meta's Motion to Exclude Expert Testimony of Bradley T. Sharp CFA ("Murphy Sharp Decl.") Ex. 5 to the Murphy Sharp Decl. Ex. 17 to the Murphy Sharp Decl. Ex. 20 to the Murphy Sharp Decl. Epidemic's Opposition to Meta's Motion to Mr. Sharp **Dkt. No. (Confidential Material)** 495-13 at 32, 33 (yellow highlights estimating market share and value of Epidemic's license with a third party in Sharp's report) 495-15 at 63 (gray highlights of Leonard report describing terms of Meta-Epidemic license) 368-7 (Epidemic – Meta licensing agreement) 491-10 (yellow highlights matching Dkt. No. 491-7) 491-11 at 23 (bright pink highlights with reference to internal Epidemic presentation discussing conversion rates for subscribers) **Designating Party** Epidemic Epidemic Epidemic Epidemic Epidemic Epidemic **Reasons Proffered for Sealing** The highlighted portions of this document paraphrase or quote HIGHLY CONFIDENTIAL Information from Epidemic's licensing agreements. The public disclosure of licenses, including the terms on which Epidemic permits the use of its copyrighted work and information regarding any revenue or value derived therefrom, would create a substantial risk of harm to Epidemic's business interests. Furthermore, this document contains information regarding Epidemic's market share on social media platform(s), the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive usage and engagement metrics that will enable competitors to undercut Epidemic's market position This document contains CONFIDENTIAL information regarding Epidemic licensing agreements. Furthermore, this document contains highly confidential information regarding a non-public analysis of the revenue or value derived from Epidemic's licensing agreements. The public disclosure of licenses, including

the terms on which Epidemic permits the use of its copyrighted work and information regarding any revenue or value derived therefrom, would create a substantial risk of harm to Epidemic's business interests. Furthermore, this document contains information regarding Epidemic's non-public market share on social media platforms, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive usage and engagement metrics that will enable competitors to undercut Epidemic's market position. This document is a HIGHLY CONFIDENTIAL Epidemic licensing agreement, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. The highlighted portions of this document quote and discuss internal guidance regarding Epidemic's proprietary rights management policies, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing Epidemic's detection and enforcement methods. The highlighted portions of this document discuss HIGHLY CONFIDENTIAL Epidemic performance metrics regarding its strategy for converting subscribers on non-party platforms, the disclosure of which would competitively injure Epidemic and damage its business interests by revealing sensitive commercial terms. **Ruling GRANTED** because these sections discuss the value of Epidemic's license with a third party. **GRANTED** because the redacted sections discuss specific terms of a license between Epidemic and Meta. **GRANTED** for the same reasons as Dkt. No. 394-19. **GRANTED** to the extent and for the same reasons as Dkt. No. 491-7. **GRANTED.** Epidemic's proposed redactions are narrowly tailored to "business information that might harm [its] competitive strategy." *See In re Elec. Arts, Inc.*, 298 F. App'x. 568, 569 (9th Cir. 2008).

### B. Meta's Omnibus Sealing Motion

**\*60** The Court DENIES without prejudice Meta's motion because it groups proposed documents for sealing by rationale, does not clearly or accurately identify where the Court can find the sealed version of the document, and does not explain the reasons for maintaining each document under seal. *See* N.D. Cal. Civ. L.R. 79-5(c)(1). By **July 2, 2026**, Meta may refile its motion as follows, adopting a structure similar to that above:

- For each motion, include a chart organizing the documents by relevant motion.

- Each chart should contain columns listing:

○ Document, including Meta's name for the Exhibit;

○ Sealed Docket Number, i.e., where the Court can find the document Meta proposes sealing, with the most up-to-date proposed material to be sealed;

○ Confidential Material, including a short description of the information Meta seeks to seal and the ECF-numbered page where the Court can find the information; and

○ Meta's Reasons for Sealing the particular document, including case citations when relevant.

## CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Meta's and Epidemic's motions for summary judgment. Specifically:

1. For Epidemic's **direct infringement claims**, the Court:

   • Grants Epidemic summary judgment on its ownership of valid copyrights in the 869 Epidemic Tracks and Meta's volitional conduct for the AL Infringing Tracks,

   • Grants Meta summary judgment for the 31 Tracks Epidemic does not address in its summary judgment motion, and

   • Otherwise denies both parties' summary judgment motions.

2. The Court grants Meta summary judgment on Epidemic's **contributory infringement claims**.

3. The Court grants Meta summary judgment of Epidemic's ineligibility for **statutory damages** as to the 894 Epidemic Tracks identified in Mr. Leonard's report, except for the 86 Epidemic Tracks identified in Docket No. 446-15, "Beast Mode (Instrumental Version)," and "What About Love (Instrumental Version)." The Court

denies both parties' motions for summary judgment on Meta's willfulness.

4. For Meta's **affirmative defenses**, the Court

   • Grants Epidemic summary judgment on Meta's: (1) express license defense for the AL Infringing Tracks, (2) implied license defense, (3) DMCA section 512(c) safe harbor defense for the AL Infringing Tracks, (4) fair use defense, (5) de minimis defense for the stipulated Epidemic Tracks in Docket No. 350, and (6) the statute of limitations to the extent explained above; and

   • Otherwise denies both parties' motions for summary judgment on the affirmative defenses.

The Court also DENIES Epidemic's motion for spoliation sanctions.

By **July 10, 2026**, the parties shall file a joint motion proposing redactions, if any, to this Order.

The Court sets a further case management conference for **August 5, 2026** at 2:00 p.m. via Zoom video. A joint case management statement is due one week in advance. Prior to the case management conference, the parties shall meet and confer regarding the tracks still at issue in this litigation, and the joint case management statement shall include a chart of each asserted Epidemic Track and accused Meta Infringing Work.

This Order disposes of Docket Nos. 351, 360, 388, 491, 493, and 506.

**IT IS SO ORDERED.**

Dated: June 22, 2026

**All Citations**

Slip Copy, 2026 WL 2021347

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.