# Exhibit A

```
                     UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
        ----------------------------:

        CENGAGE LEARNING, INC.,      : Docket No.: 24-cv-04274
        et al.,
                      Plaintiffs,  :

               v.                    :

        GOOGLE, LLC,                 : New York, New York

                                     : June 18, 2026

                      Defendant.   :

        ----------------------------:

                         PROCEEDINGS BEFORE
                  THE HONORABLE BARBARA C. MOSES
                  UNITED STATES MAGISTRATE JUDGE

        APPEARANCES:

        For Plaintiff:      OPPENHEIM & ZEBRAK, LLP
                            BY:  MICHELE MURPHY, ESQ.
                                 DANAE TINELLI, ESQ.
                            461 Fifth Avenue, 19th Floor
                            New York, New York 10017

        For Defendant:      LATHAM & WATKINS, LLP
                            BY:  SARAH A. TOMKOWIAK, ESQ.
                                 LAURA BLADOW, ESQ.
                            1271 Avenue of the Americas
                            New York, New York 10020

        Transcription Service: Marissa Lewandowski
                               Phone:  (631) 813-9335
                               E-mail:marissamignano@gmail.com

        Proceedings recorded by electronic sound recording;
        Transcript produced by transcription service
```

THE DEPUTY CLERK:  The Court now calls Cengage Learning, Inc., et al. vs. Google, LLC, case number 24-cv-4274.

Counsel, please make your appearances for the record.

MS. MURPHY:  Good morning, Your Honor. Michele Murphy with Oppenheim & Zebrak for the plaintiffs.  I'm here with my colleague Danae Tinelli.

THE COURT:  Ms. Murphy and Ms. Tinelli, good morning.

MS. TOMKOWIAK:  Good morning, Your Honor. Sarah Tomkowiak of Latham & Watkins on behalf of Google.  I'm here with my colleague Laura Bladow.

THE COURT:  Ms. Bladow and Ms. Tomkowiak, good morning.

Interesting.  The first time I can recall, as a young lawyer, attending a legal proceeding where the judge and all of the lawyers were women, we thought it was a great occasion, and we were all very excited about it.  I see that is the case today as well, but hopefully, from now and into the future, it should be less and less remarkable.

I hope you all had minimal trouble getting into the courthouse today.  The neighborhood is a

little excited this morning because of the parade.

Here's what I thought we would do. I've given some thought to the redaction issue, and I'll give you my decision on that. Then I will hear from the parties on the motion at docket 926, which is Google's motion to compel plaintiffs' document retention policies. And then I'll hear from the parties on the motion at docket 958, which is Google's motion to compel plaintiffs to respond to interrogatory number 16. And then we'll talk about extending the discovery schedule on a going-forward basis.

So with respect to the redaction issue, as you know, I raised this issue at our last conference on June the 8th. I was concerned about the parties' frequent redaction of individual employee and vendor names, particularly by Google, but the practice has not been limited to Google. I requested that Google submit a letter telling me whether it was prepared to remove or reduce those redactions. I received that letter at docket 1,010. Yes, we are now past the 1,000th docket mark in this case. That's not a milestone that I think we should be celebrating, but nonetheless, it's where we are.

I received that letter at docket 1,010, and

along with it I received less redacted versions of -- one, two, three, four, five, six, seven -- of eight of Google's prior filings.  The less-redacted versions remove redactions over the identities of individuals who previously filed declarations and removed redactions over the corporate name of defendant's vendors.  But Google wishes to maintain the ability to redact the names of its trust and safety employees who are not declarants and the name of individual employees at third-party vendors.

I note as well that the parties have agreed in at least one instance -- and I'm referring now to docket 979, footnote 1.  The parties have agreed in at least one instance to simply file their letter briefs and other documents without the full names of individual employees in them, referring to the individual employees by initial instead, which avoids the need for a sealing motion at least as to those names.

Given -- given where we are and given the arguments that have been made to me and recognizing that the standard for redaction is somewhat more forgiving during the discovery stage of the case than it will be at, for example, the summary judgment stage, and certainly more forgiving than it

would be at the trial stage, if we get there, I will reluctantly accept Google's revised redacted filings as attached to the June 15th letter.  I will grant the sealing motions as to the unredacted versions of those filings, and I will not direct any further revisions to the redactions with regard to those letters.

And I will presumptively accept on a going-forward basis -- unless there are special circumstances one way or the other, I will presumptively accept on a going-forward basis that declarant names will not be redacted, vendor names will not be redacted, but individual employee names who are not declarants may be either redacted or may be referred to in the first instance by initial rather than full name if the filing party believes that there is a significant privacy and/or safety issue involved in revealing that particular individual's full name.

I will issue an order summarizing what I just said.  Any questions?

MS. TOMKOWIAK:  None from Google.

MS. MURPHY:  As I don't anticipate that issue will impact plaintiffs, I just want to express that I hope this does not create a burden on

plaintiffs to try to figure out who needs to be briefed with only initials.  So as we have to meet and confer anyway regarding sealing, I would just ask that Google would be sure to get back to us quickly, as, you know, we're drafting, we have short deadlines, and we may not always know which employees we need to reference or how to handle that.

THE COURT:  I'm sure Google will tell you.

Right, Google?

MS. BLADOW:  That's right.

THE COURT:  All right.  So let us then turn to the motion with regard to the plaintiffs' document retention policies?

My first question:  Whose motion is this for Google?

MS. TOMKOWIAK:  That would be me, Your Honor.

THE COURT:  That would be you.  Okay.  So, Ms. Tomkowiak, did Google ever actually formally serve plaintiffs with a request for production of documents aimed at the document retention policies.

MS. TOMKOWIAK:  That's a good question, Your Honor.  I'd like to --

THE COURT:  Because I don't see it attached

to your letter motion, which you would have done if you did it, I think.

MS. TOMKOWIAK:  I think that's right.  I'd appreciate a few minutes here to double-check, but I believe that's right.

THE COURT:  So if you never asked for them, do we even need to get any further?

MS. TOMKOWIAK:  Well, yes, Your Honor.  I think that why we're asking for them now is that we have these concerns that we wouldn't have had at the time we issued our document request or we wouldn't have known of when we were doing that.  We have these concerns that the plaintiffs either have not produced or have failed to preserve relevant documents, particularly from the 2019, 2020 time period.

And so we're relying more on the case law and the general principles that if a party can make that type of showing that they have real concerns over the sufficiency of a document production or a real preservation question, that, you know, the production in that instance of document retention policies would be appropriate.

THE COURT:  So the question is -- leaving aside for now the question whether you ever actually

served a discovery demand, which I could enforce under Rule 37(a), the question is: Are you over that line? Are the issues that you have outlined merely the not unexpected difficulties that tend to arise in any large-scale, hard-fought litigation, most of which, as I understand it, have now been rectified, or whether you really have enough to go to what is a disfavored level of discovery, known in shorthand as discovery on discovery, which is really reserved for situations where it's more than the ordinary errors and stumble -- stumbles that occur during the -- any large-scale, hard-fought litigation? And I'm not sure you're there, but tell me why you think you are.

MS. TOMKOWIAK: Okay. I think, Your Honor, just to briefly go back to that request question, I think that's also why we didn't, in ordinary course, merely just serve a request for production, absent having some real concerns or showing that we wouldn't have wanted to suggest that production of document retention policies in the absence of, you know, special circumstances was something that needed to be produced and turned over in ordinary course.

THE COURT: Right. But you could have, I

imagine, served a supplemental RFP once -- once you got worried about this issue.

MS. TOMKOWIAK:  I think the problem there was that this -- these concerns really arose and became heightened after Your Honor said no more written discovery requests.

THE COURT:  I recall you complaining before that, but maybe your own internal sensors were not turned up as high at that point.

MS. TOMKOWIAK:  Yeah, I think we've been complaining for a long time about the lack of documents that have been produced to us -- the volume of documents that have been produced to us. And we tried to rectify those concerns by adding search terms and custodians.  They're now telling us that they were ineffective, that -- you know, too bad, your search terms didn't pick up certain documents.

So now we're here saying, look, at this point, setting aside the overall volume of documents, we're looking at these earlier time periods, the 2019, 2020 time periods.  And just, like, taking 2019, for example, I mean, we have 71 documents produced from 3 of their 25 custodians. And in 2020, it's 50.  And this is the period of

time where the plaintiffs were pursuing litigation against the operators of the website.

THE COURT:  The pirate cases.

MS. TOMKOWIAK:  They call the pirate cases, yes.  The bad actors in this case.

And in those cases, they alleged that these bad actors were using Google to advertise their allegedly infringing products.  And so in their, you know, documents on their privilege log, they are talking about those cases as well.  And so, in our mind, a duty to preserve arose at that time, which is the same time that they were reaching out to Google, providing Google with DMCA takedown notices, and kicking up, you know, their enforcement efforts against Google.

THE COURT:  Let me just make sure I understand your duty to preserve argument.  Clearly, when they were involved in the pirate litigations, they had a duty to preserve relative to those litigations.  But that duty, I assume, ended when those cases settled or were otherwise resolved.  And that, of course, would have been a duty that ran to the pirates, not to Google.

This litigation was first filed two years ago, in June of 2024.  Are you arguing -- because it

kind of sounded like you were -- are you arguing that the plaintiffs had an obligation in 2019 or 2020, when they were suing the pirates, to preserve documents in regard to a potential future suit against Google?

MS. TOMKOWIAK:  I'm arguing that they would have had the duty to preserve documents that were relevant to the claims and allegations in their case.

THE COURT:  But that duty did not run to Google.  That duty ran to the litigants that they were suing at that time.

MS. TOMKOWIAK:  Yeah, I'm not sure the duty runs to anybody.  It is their duty.  But my point is that -- so Google is also involved in multiple lawsuits at any given point in time.

THE COURT:  Right.

MS. TOMKOWIAK:  Correct.  And so, like us, I think at that time, they would have said, "Okay, what are the relevant documents that we need to preserve?  Who are the relevant people whose files we need to preserve?"  I think that they're, from my understanding, you know, the same people who have been in their same positions over the course of the years at the publishers.

And one of the allegations in those cases was that these bad actors are using Google to advertise infringing products.  And so, at that point in time, I would think a duty would have arose to suspend whatever deletion policies were in place, to preserve documents relevant to those claims. Maybe --

THE COURT:  But with regard to a lawsuit that they ultimately filed four or five years later, in 2024, this lawsuit.

MS. TOMKOWIAK:  No, I'm just saying that there's overlap between the two that, that just -- just like some Google custodians are on multiple lit holds for multiple types of actions -- legal actions, litigations involving overlapping subject matter, I would think that the same would be true. And I don't think all of those lawsuits had concluded by the time that they filed this lawsuit.

And so I think that understanding what, you know, their document retention policies are or, you know, should have been and whether those were suspended at that time or a future point in time, I think we've made a showing, based on the sheer just lack of documents from that time period, that we should be entitled to see those.

THE COURT:  Numbers -- I think we've had this conversation before.  Merely telling me numbers -- there were this many custodial documents from such and such year and this many custodial documents from such and such year -- without context, that doesn't -- doesn't alarm me.  That doesn't give me any helpful information.

What makes you think there should be more?

MS. TOMKOWIAK:  One, the presence of those lawsuits.  I do think that some duty -- they had to be preserving some of those people's documents at that time.  Again, they're the antipiracy folks.  They're the same roles and functions that the people, those same employees have in the Google case.  So that's the first thing.

I mean, I understand Your Honor has not been receptive to the volume arguments before, but I feel like at some point, it has to weigh --

THE COURT:  Well, I --

MS. TOMKOWIAK:  -- it has to weigh one way.

THE COURT:  In the past, we've discussed the sort of equivalency volume arguments.

MS. TOMKOWIAK:  Not talking about that.

THE COURT:  And I -- and I've explained that there's no reason to believe in this lawsuit or

in many lawsuits that each side should somehow magically produce an equivalent volume of discovery.

MS. TOMKOWIAK:  Well, and that's not what we're saying, Your Honor.  We're not talking about equivalence.  We're just talking about there's 25 people.  These are -- the concepts, you know, antipiracy, this problem of digital piracy, this is, like, a big deal, is our understanding at each of the plaintiffs', you know, respective employers. And so to say that only 3 of 25 custodians had relevant documents from 2019, and, you know, there's only 71 of them, like that just doesn't add up to us.

And, you know, they say that the search terms for those earlier periods relate to antipiracy and that none of the custodians we identified were involved in antipiracy.  And I don't want to get too far in the weeds, but that's just not true when you look at the search terms.  They go beyond antipiracy.  And moreover, we've seen that even the anti- -- non-antipiracy folks are involved in these issues because we see their names on the privilege log, we see them being involved with some of the piracy issues or at least, you know, being on communications about that.

THE COURT:  Have you deposed some of these custodians?

MS. TOMKOWIAK:  Yes.  And, I mean, that is another problem we have.

THE COURT:  Have -- have you asked them about, for example, their documents from 2019, 2020?

MS. TOMKOWIAK:  In some instances, yes. Yes, I think we have.  And I think that those conversations, as set out -- those depositions, as set out in our briefing, are part of what led to us identifying some of the errors and what were later described to us as human errors.  But it was in the context of those depositions where, for example, one employee said, "Well, this can't be the full email chain.  Like, I know I would have had a longer email chain."

THE COURT:  Right.  And that particular instance, if I understand it, you now have the full email chain, right?

MS. TOMKOWIAK:  In that particular instance, I think we were able to determine the root source of the error and to get more documents.  The real issue there -- and this is not squarely teed up in our motion, but is something that, you know, we need to figure out what to do -- is now we -- after

those depositions, now we have more documents from, you know, at least three custodians that were identified after the fact as a result of those human errors.  So, again, we -- we appreciate that --

THE COURT:  So that would normally, by the way -- that would normally call for the lawyers for both sides to have a little chat as to whether it's necessary to bring a limited number of witnesses back for a limited period of time.  I assume you're having those conversations or will be.

MS. TOMKOWIAK:  We will be.

THE COURT:  Okay.

MS. TOMKOWIAK:  But setting those errors aside, again, I think our concern was you either haven't produced the relevant documents or you failed to preserve them.  On the, "you haven't produced them," I think there still seems to be some outstanding issue that, okay, you know, gotcha, you didn't use the right search terms.  Fine.  And there's these human errors.  Fine.

But on the failure to preserve issue, like, we just don't have a lot of comfort, based on what we're seeing, that relevant documents were appropriately preserved.

THE COURT:  And what would you do with

these document retention policies?  Assuming -- and I'm about to ask Ms. Murphy this question.  Assuming that each of these plaintiffs actually has such a thing -- oh, I'm getting hand signals; I'm going to be asking Ms. Tinelli these questions in a minute.  Fine.

But assuming that each of these plaintiffs actually has such a thing, what are you going to be doing with them?

MS. TOMKOWIAK:  Well, if they don't have a written retention policy, I think when Your Honor ordered Google to provide retention policies, it said either provide the policy or provide some sort of statement that one does not exist.  So I think we would expect the same thing, first of all.

Second of all, I think it would depend on what the policies said.  For example, if the policy said we retain email indefinitely, there is no retention period, there's no period of time in which emails go away, well, then that would mean perhaps that we don't have a concern about preservation and it really is just a matter of we didn't use the right search terms.  These people weren't talking about these issues.  There's no retention issue.

If, instead, the policy says we retain

emails for 90 days unless you save them or we archive emails after a certain period of time or we keep them for a year, then we might have some more questions about, well, then why aren't we seeing those. Because, again, from our perspective, there came a point in time at which those policies should have been suspended.

THE COURT: And when was that point in time, in your view? Because thinking ahead to a potential spoliation motion, which is what you're suggesting here, you know, that is the first element you would have to establish: Duty to preserve. And particularly, if we're talking about documents from the 2019, 2020 time period, for the reasons we previously discussed, I'm skeptical that you could satisfy that element.

MS. TOMKOWIAK: I think the duty arises generally when you anticipate litigation, and --

THE COURT: But it's litigation specific. It's not when you generally anticipate you're going to have to sue somebody at some point. It's when you anticipate suing the person who's now making a spoliation motion.

MS. TOMKOWIAK: I don't know when they anticipated doing that. I know that they were --

they were talking to Google, they were -- as early as 2019.  I'm not privy to their internal communications, and I don't know when they anticipated this lawsuit.  I don't -- I think that people, having been on the other side of the V, you know, take -- it takes a long time to prepare a lawsuit.  So I don't know when they first anticipated litigation.

THE COURT:  Anything else you want to tell me?

MS. TOMKOWIAK:  The only thing I would add is I think that our -- the relief that we requested was somewhat broad.  And, you know, if Your Honor is not inclined to order them to produce all of their document retention policies, I think our primary concern here is really emails.

THE COURT:  Email retention policies.

MS. TOMKOWIAK:  Yes, Your Honor.

THE COURT:  All right.

Ms. Tinelli?

MS. TINELLI:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. TINELLI:  Anywhere specifically you'd like for me to start?

THE COURT:  Well, why don't we start with

the question I said I was going to ask you.  Now here you are, so I will ask you.

Do each of your clients maintain written document retention policies, specifically with regard to email?

MS. TINELLI:  We don't know the extent just yet because there are so many different components to ESI that we -- we don't know.  We don't know if they're all written.  Some might be verbal.  Some might just be a business practice, like the one that we cited to in the previous declaration for the spoliation motion.

THE COURT:  Like the one what?

MS. TINELLI:  We had cited to -- there was a retention policy for former employees that was not written.  So that's just one example of document --

THE COURT:  For their emails.

MS. TINELLI:  For former employees.  For their emails, correct.

THE COURT:  Right.

And that was -- which one of your clients had that policy?

MS. TINELLI:  That was McGraw Hill.

THE COURT:  So McGraw Hill had a specific policy which you could articulate that said, okay,

if you quit or get fired, we'll keep your emails for a certain period of time, and then they're toast. All right. But you don't know, as you stand here today, whether McGraw Hill had a -- an email retention policy with regard to ongoing employees, as Ms. Tomkowiak said.

As examples, companies do this different ways. Some companies don't think it's a good idea to keep emails around very long and they'll automatically trash them after a certain period of time unless someone goes out of their way to preserve them. But other companies back everything up and keep it on some offsite server forever. And you just don't know what McGraw Hill does?

MS. TINELLI: Or all of the plaintiffs, your Honor. We would have to talk to each of our clients separately.

THE COURT: I'm surprised, because it seems to me that in the course of going and finding all of the documents that Google has requested and, in many cases, having to go back and look elsewhere because they didn't turn up the first time -- maybe the search terms were not correct; maybe human error was made; maybe technological error was made -- so you've been back and forth on these documents a

number of times, and I'm surprised that in the course of doing that, you didn't, in effect, have to figure out what the retention policies were.

MS. TINELLI:  That's because the documents were retained, Your Honor.  So when Google pointed to a specific document -- for instance, the Macmillan email that was -- that they've had since August 2025 produced from a Cengage custodian that had a McGraw Hill and a McMillan custodian on it as well.  When we asked both Macmillan and McGraw where that email is, they found it.  So we didn't have to look for a retention policy to see if it was retained.  It just -- there, again, was a human error why they weren't collected.

THE COURT:  All right.  Give me your thoughts, if you would, then, on when -- your preliminary thoughts on when your clients had a duty to preserve, which would include a duty to suspend any automatic document destruction policies that may have otherwise existed in regard to the present litigation.  Ms. Tomkowiak made the argument that while you were still in the midst of the pirate litigations, you may have been anticipating this litigation and consequently were not at liberty -- I'm now going to go a little beyond what

Ms. Tomkowiak said; I'm extrapolating -- and therefore, you were not at liberty -- when you, let's say, settled or otherwise resolved the individual pirate cases, you were not at liberty to throw out everything that you had collected for that purpose.

MS. TINELLI:  A couple points to that, Your Honor.  The pirate suits and this case are separate.  The custodians don't always necessarily overlap.  The custodians that do overlap, their documents were preserved.  The custodians that --

THE COURT:  You're saying that documents that were collected and/or preserved for purpose -- specifically for purposes of the pirate suits remain in existence and were preserved to this day?

MS. TINELLI:  That's correct, Your Honor.

THE COURT:  All right.

MS. TINELLI:  The custodians that they list in their chart and they say they don't have communications for those prior years were not related to those pirate suits.  So that's one.

And, second, Your Honor, I don't have the privilege log in front of me, but that does show the anticipated litigation date for this case, and it postdates our anticipated litigation.

THE COURT: Right. Because you would have had to pick for purposes of your privilege log.

And what date did you settle on?

MS. TINELLI: I believe that was ████████.

THE COURT: And that's the date you've been using consistently for work product purposes?

MS. TINELLI: That's correct, Your Honor.

THE COURT: All right. What else do you want to tell me?

MS. TINELLI: We were able to check that defendants did not serve an RFP as to the retention policies, Your Honor. I know --

THE COURT: Although, as Ms. Tomkowiak points out, I did cut you off at a certain point. I think one -- perhaps one extension ago, maybe two extensions ago, I said I was not extending for the purpose of new written discovery demands.

MS. TINELLI: Sure. But they've had -- again, the documents that they point out specifically in their motion, they've had since August and October of 2025, which was way before Your Honor enacted that cutoff.

Plaintiffs did serve an RFP for retention policies on defendants that they did not produce

until we had to bring a motion to Court.  So, again, that was just part of our RFPs.  And even then, Your Honor, we did find gaps in their productions which they have not been able to point to in ours.

Going back to the issue of 2019 to 2020, again, we did produce documents from that time period for the relevant custodians, if they were responsive.  And specifically as to the pirate suits, RFP 68, which is listed in my declaration, outlines very specifically -- which is -- let me get that number for you, Your Honor -- 965 dash -- I'm sorry, it's 965, paragraph 15, very specifically lists all the documents that we agreed to produce with relation to those pirate sites.  And we did.

And Google has not been able to identify a single document from 2019 or 2020 that we did not produce that we should have produced or that was not retained.

THE COURT:  All right.  Anything else?

MS. TINELLI:  Your Honor, when -- when we did figure out that there was this collection -- very limited collection issue as to these three custodians, two McGraw and one Macmillan, again, we identified the documents, they were retained, we reviewed them, and we produced responsive documents.

That effort resulted in only 14 new documents for one custodian of McGraw Hill, and that's Mr. McFadden, who was deposed.  But his emails and documents consisted of document -- of very similar documents that Google already had prior to his deposition.  He's in the digital marketing department, which he was questioned ad nauseam about, and they could have asked and gotten information about that during his deposition.

Some of those emails are also from or with Google reps that Google already would have access to.  So they were not prejudiced.  They could have asked him.  But there is no reason to reopen his deposition for these 14 documents.

As to the Macmillan and the other McGraw Hill custodian, Mr. Rosenthal, their documents combined were an additional 50 documents that were -- we produced, but those were --

THE COURT:  After their depositions?

MS. TINELLI:  Correct.  But those were duplicative emails of the one that they pointed out in Ms. Bogan's deposition of that Cengage document that was produced back in August 2025.  We just produced it to show that we did, in fact, retain it. But they were the exact same chains and just

reiterations of the same chain.

And I believe Ms. Tomkowiak said she -- they didn't have the full chain until after they brought this up, and that's, again, not correct. The full chain was produced along with the chain that they cite in their motion back in August or October of 2025. I forget which production that was.

THE COURT: Okay. Thank you.

Any very brief reply?

MS. TOMKOWIAK: Yep, very brief.

Hearing the response that they first ███████████████████████████████████████████ ██████ just underscores why seeing the retention policies would be helpful. So, for example, if they had an email retention policy that says, "We keep emails for three years," well, then, ████████████ ██████████████████████████████████████ ████████████████████████. If, instead, the retention policy is 90 days, then again, you could understand or, you know, it'd be more plausible, then, that emails dating back to 2019, 2020, might not have been preserved. But that's just in ordinary course. That's all, Your Honor.

THE COURT: Thank you very much. I will

deny the motion at docket 926.  This is an area in which I have considerable discretion.  I am weighing, among other things, the following factors in no particular order of importance.

First, this is discovery that was never formally sought by way of a document production request; whereas, in my judgment, the issue was present prior to the cutoff for serving new document production requests.  That's number one.

Number two, as both parties recognize, discovery on discovery is disfavored and requires a -- I would say, a fairly strong showing that something is amiss, that is that documents which should have been preserved were not before discovery on discovery is appropriate, given the additional burden and the risk of distracting from the merits of the case.

And third, and perhaps most significantly, based on everything that I've heard, I do not believe that Google has shouldered its burden of demonstrating to me a real -- anything more than -- let me rephrase.  Google has not satisfactorily demonstrated to me that documents which should have been preserved and produced were not produced because they were not preserved.  Google has

demonstrated to me that some documents which should have been produced were not initially produced, but it has not demonstrated to me that the reason for that was a failure to preserve them.

And consequently, to use the formal legal terminology, we're not going there. Not on the present showing, at any event.

So let us now turn to Interrogatory Number 16. And who will I be hearing from on that motion?

MS. BLADOW: Me, Your Honor.

THE COURT: I will be hearing from Ms. Bladow on that motion. Go ahead.

MS. BLADOW: So, Your Honor, Google respectfully moves to compel plaintiffs to respond to Interrogatory Number 16, which asks plaintiffs to identify which of the 7,359 asserted works in this case are derivative of other asserted works. This information is essential to understanding the scope of statutory damages potentially at issue in this case. And plaintiffs have no valid basis to withhold this discovery.

Our interrogatory is simple and narrow. Specifically, the interrogatory requests for each asserted work for which you are listed as the

publisher on Exhibit A to the Amended Complaint, identify all asserted works that are derivative of one or more other asserted works and of which asserted works it is derivative.

I just want to highlight three points at the outset here.  Plaintiffs are not disputing the relevance of this information, plaintiffs have not articulated any specific burden, and the facts needed to answer this interrogatory are uniquely within plaintiffs' possession as the publishers and registrants of the asserted works.

THE COURT:  So let me ask you a few questions, because there's a sort of series of arguments being made here.  To start at sort of the most technical level, would you agree with me that Interrogatory Number 16 would not be appropriate to the extent that Rule 33.3 applies, i.e., it's outside of the scope of the, quote, "initial," close quote, interrogatories permitted in the Southern District of New York?

MS. BLADOW:  No, Your Honor, I don't believe that this interrogatory falls outside of the rule.  I believe it complies with the rule.  I believe the local rule permits an interrogatory that's not a contention interrogatory to be served

prior to the close of fact discovery if the interrogatory is a more convenient or efficient way to obtain the information requested.

THE COURT:  If ordered by the Court.

So let's just walk through 33.3.  At the commencement of discovery, I said -- initial, I should have said.  At the commencement of discovery, interrogatories are restricted to, quote, "those seeking the names of witnesses with knowledge of information relevant to the subject matter of the action" -- nope -- "the computation of each category of damage alleged" -- no -- "the existence, custodian, location, and general description of relevant documents, including pertinent insurance agreements" -- no -- "and other physical evidence or information of a similar nature."  So you're not within 33.3(a).

MS. BLADOW:  Your Honor, I would argue that we are.  This goes to the computation of statutory damages.

THE COURT:  Eh.  I thought you might say that.  But whether these works are derivative or not goes to whether statutory damages are available but not really to the computation of damages.

MS. BLADOW:  Well, it goes to the total

number of damages because statutory damages are essentially determined on a work-by-work basis, and so it goes to what the total number of damages is in this case.

And courts have recognized that understanding the amount of liability at issue isn't -- is a valid use of discovery.  This isn't something -- I understand plaintiffs' position that they can elect statutory damages after final judgment, but this isn't an issue that should wait until after final judgment, where it --

THE COURT:  Well, nobody wants to go back and do more discovery at that point.

MS. BLADOW:  Right.

THE COURT:  Let me just continue, though, on our tour through Local Civil Rule 33.3, because we now come to subsection B, which allows a party during discovery to serve interrogatories other than the categories I just listed, if they are a, quote, "more practical method of obtaining the information sought than a request for production or a deposition or if ordered by the Court."

And then subsection C deals with contention interrogatories, which have to await the, quote, "conclusion of discovery."  So this all may be a

little bit hyper-technical and beside the point, because, of course, I have discretion to permit late fact interrogatories or early contention interrogatories as I see fit.  But I do think it is somewhat helpful, at least at the outset, to try and figure out where this particular interrogatory fits into the local rule scheme.

Go ahead.

MS. BLADOW:  Your Honor, our position is that this is not necessarily an early contention interrogatory.  Our position is that this is an interrogatory that asks for factual information. The interrogatory specifically asks to identify all asserted works that are derivative of one or more other asserted works.  Derivative really just means based upon, so --

THE COURT:  Now, what makes that -- thank you.

What makes that a fact question as opposed to a question seeking a legal conclusion?

MS. BLADOW:  So it's a question about --

THE COURT:  I mean, aren't whole lawsuits sometimes litigated over whether a work is derivative or not?

MS. BLADOW:  Well, Your Honor, we're -- I

think we're using the term "derivative" in the sense of the statutory definition of it, which is "based upon."  Which works are based upon other works?

In this lawsuit, we've served RFPs requesting information from plaintiffs about the creation of each of these works.  We served interrogatories asking about the creation of these works.  Plaintiffs refused to answer both the RFPs and the interrogatories on the grounds that it would be unduly burdensome for them to provide discovery into the creation of each of the works in suit and on the basis that some of the information was outside, like, the scope of their knowledge.

With respect to this interrogatory, they're not claiming that whether a work is derivative of another is outside the scope of their knowledge. They're -- they're just saying, "Oh, this calls for a legal conclusion."  But, again, "derivative" in the sense that we're using it as "based upon," right, like which works are based upon other works, as explained in our briefing, that is something within the scope of their knowledge.

And the use of the term "derivative" doesn't make this magically a seeking a legal conclusion because plaintiffs themselves, in their

own author agreements, acknowledge that certain works are derivative of other works.  So there -- this is a word that they use in their own business practices.  We're asking that commonsense "based upon" definition to be provided to us so that we understand which works in suit are based upon other works in suit.

THE COURT:  In their contracts, though -- let's explore that for just a minute.

You say that in their contracts they acknowledge that some of the authors' works will be derivative of others, but they don't in their contracts identify which ones are derivative; is that right?

MS. BLADOW:  Correct.  It may be a contract for a series of works that they acknowledge in the contract is going to be derivative, but the contracts aren't necessarily directly tied to asserted works.  Again, it's kind of like the last interrogatory -- our motion to compel a response to an interrogatory that I was before Your Honor last year, where it's kind of a puzzle that we can't -- Google can't piece together based on the discovery that we have of which works are derivative of other works or which works they believe are based on other

works.

And, Your Honor, even if you agree with plaintiffs that this is seeking a legal conclusion, which it's not, but the Federal Rule of Civil Procedure 33 allows -- allows for this type of interrogatory.  This isn't like the case that plaintiffs cited where we're asking them to explain the law or identify some abstract legal concept. We're simply asking a factual question:  Which of -- which of your works are based on other works?

THE COURT:  See, I sort of -- I sort of see it from the other side.  At a certain point, if Google is going to seek statutory damages for --

MS. BLADOW:  I'm sorry, we're not seeking statutory damages.

THE COURT:  I'm sorry.  My mistake.

If plaintiffs are going to seek statutory damages for a particular work -- work 359, let's say -- it will be Google's -- plaintiffs' burden at that time to explain why that particular work is not derivative of another work, right?

MS. BLADOW:  I mean, presumably, Your Honor, as it stands now in the pleadings, all Google knows is that plaintiffs are seeking statutory damages for each of the 7,359 asserted

works in this case.

THE COURT: Right. Right. But at the end of the day, if they actually make the request for statutory damages they're going to have to cut bait, right? Or --

MS. BLADOW: Right. Also, by not requiring them to answer this interrogatory now deprives Google of the opportunity to seek further discovery or conduct its own further investigation into these works. Right?

If we disagree with plaintiffs, like as explained in our brief, there are certain assumptions or presumptions that we can make about which works are potentially based upon other asserted works, such that we could come to our own quantification or evaluation of the case and what we think that plaintiffs' maximum statutory damages are. Right? But if we -- this is kind of information within their wheelhouse of, right, which works are based upon other works. Again, it's a factual question of which works are based upon another work, and it's a factual question that directly goes to statutory damages.

Plaintiffs can't continue to come to you and claim that this is a billion-dollar case

demanding extensive discovery from Google without backing up which works are based upon other works and answering that direct question.

THE COURT:  But it's the other way around, right?  Plaintiffs' burden -- and it will be plaintiffs' burden at such time that they elect to seek statutory damages -- will be to establish that each work for which they seek statutory damages is not a derivative work.  I think that's right.

MS. BLADOW:  I mean, but how can we -- how can we test that without knowing?

THE COURT:  No, no, I understand.  And if Google, at that point, says number 350 -- or we want statutory damages on number 359, we assert that that's not a derivative work, Google, at that point, might wish to contest it and might wish to say, "Actually, we think 359 is derivative."  And then there might be some little mini litigation about that.  Right?  If this isn't sorted out ahead of time.  I think that's your argument.

MS. BLADOW:  Yeah, that's -- yes.  Right. And then, rather than having that mini litigation after the fact, I think understanding what the actual value of a billion-dollar case is can be very helpful to the parties in resolving the matter.

THE COURT: Right. I'm merely suggesting that I understand why you want to know which of the works in suit plaintiffs contend to be eligible for statutory damages. But I'm kind of wondering why you asked the question the way you did. You want them to tell you which ones are derivative and, if so, what they're derivative of. But what you really need to know is which ones do they contend are not derivative.

MS. BLADOW: Well, so, Your Honor --

THE COURT: So that you can fight about that if you have to.

MS. BLADOW: Well, so, Your Honor, plaintiffs have to prove infringement of a work, and -- take, for example, they're suing on test banks and solution manuals. So say they're suing -- one of the asserted works is an addition of an economics textbook, and another asserted work is the test bank for the economics. And they seek statutory damages for -- for both of those works, but they can really only -- and they -- hypothetically, they prove infringement and contributory infringement on both of those works, and then they seek statutory damages on both of those works, but really they're -- those collapse

for one work.

So it's understanding -- from our perspective, understanding the groupings of works of what is based upon one another to be able to understand both the scope of damages as well as what those groupings are for understanding what evidence of, right, do they have evidence of infringement for each of those groupings of works.

So the other -- I think -- I think it's also helpful the -- as detailed in our briefing, we did depose some of the authors, and it became clear through those depositions that the information that's obvious to us from -- or that we can prove -- the information that we do have from plaintiffs in terms of copyright registration numbers or asserted works that share the same copyright registration number does not necessarily tell the full story of which works are based on other works.

There are works, for example, where it's the author and publishers create one work and that is then split into two separate works and distilled further down into an essentials work.  And we don't -- we don't have the full insight into their publishing process.  And, Your Honor, we don't have 4,000-plus depositions to take of every author to

understand the creation process of those.  So for us to even be able to challenge, right, if they come forward and say, we want -- you know, we want -- we believe that, you know, Essentials of Economics is a separate work from Economics and we want separate statutory damages on that, how is the Court or Google going to be able to respond to that and say, "No, you need to prove that those are separate works from one another"?

And if we end up in a world where we're looking at, like, for example, a verdict form where each of the 7,359 works are listed and someone has to determine whether or not infringement was proved on each of those works, at the end of the day, the Court and -- in order to determine damages, would need to be able to collapse that list into which works are one work.

And kicking the can down the road at some point --

THE COURT:  So that's why you need to know not just whether a work is derivative or not, but what it's derivative of?

MS. BLADOW:  Right.

THE COURT:  All right.  So I certainly understand.  Look, I mean, I -- I sense a legal

question, not a fact question, but that's not necessarily fatal to your motion, because I also understand the argument that as a matter of efficiency and fairness, this needs to happen now and not after discovery is completed or after summary judgment motions are determined or even after trial. That would not be a good time to have this pop up for the -- for the first time.

And I also understand that, to the extent that this case does not, in fact, involve over a billion dollars in potential statutory damages, it would be helpful to clear that up now. Although you may have noticed that plaintiffs telling me that it's a billion-dollar case has not had a marked effect -- at least I don't think it's had a marked effect on the discovery decisions that I make.

But leaving that aside. So where I am at is, yeah, I kind of think it's a legal question. So I really think it's kind of a contention interrogatory or should be construed as a contention interrogatory. But I think this may be an appropriate time for this particular contention interrogatory.

So, given where I am, what else do you want me to know at this point?

MS. BLADOW:  That would be fine with us, Your Honor.  If you have no further questions for me, I'm happy to --

THE COURT:  So let me hear from plaintiffs.

Whose motion is this?  Ms. Murphy.

MS. MURPHY:  I will be.

THE COURT:  Let me start with you, if I might, with the sort of burden question that I explored a little bit with Ms. Bladow.  Do you agree that if and when Google seeks statutory damages, it will have to identify -- it will have to divide the world of works in suit into derivative and nonderivative, and as to those it contends to be nonderivative, may have to prove that if there is a challenge?

MS. MURPHY:  I agree that when we get to the point of indicating what we are seeking damages on, plaintiffs will provide information to -- in that order.  However --

THE COURT:  What do you mean "provide information in that order"?

MS. MURPHY:  Well, we'll -- we'll be saying, at some point, we are seeking statutory damages on these works.

THE COURT:  Right.  But let's suppose --

MS. MURPHY:  Actual on other works.

THE COURT:  Sure.  And as to the actual damages on other works, fine, you'll fight about what the actual damages are, assuming that there's been a finding of infringement, but you won't have to further fight about what kind of a work this is.

But as to the works that you elect statutory damages on, you may have a fight as to whether you're entitled to seek statutory damages on that particular work because Google may take the position that it's a derivative work and, therefore, you don't get to count it as a separate work for statutory damages' purposes.  Right?  And that'll be your burden.

Do you agree with me?

MS. MURPHY:  I actually -- I don't want to speak out of turn because I don't have those cases in front of me.  But I -- here's what I think I can address from the cases that are cited in the parties' briefs.  As Your Honor said, there are whole decisions that focus on this issue.  This -- the interrogatory itself flat-out asks for a legal conclusion.  I can go back and address that, but I'll keep addressing the point at hand now.  I think the language of it is fatal, and it is not proper

under Rule 33.

However, the cases that Google cited that discuss this issue of what is the meaning of "derivative," the decisions came up, in the context of jury instructions, a damages award after a default judgment, a conclusions of law section of one of the judge's opinions.

So there may be a fight about this, but it is a legal -- it will be a legal conclusion that we cannot have employees of plaintiffs answering this interrogatory and verifying them under oath.  It just doesn't work.

THE COURT:  That's why I think it's a contention interrogatory.  I think that the real question being asked here is -- or ought to be what -- which of these 7,000-and-some-odd works in suit do plaintiffs contend to be eligible -- eligible for a statutory damages award, i.e., not derivative of another work?

MS. MURPHY:  That is not what was asked.

THE COURT:  Well, it's very close to what was asked.

MS. MURPHY:  Your Honor, I -- I --

THE COURT:  And I could, of course, authorize them to rewrite it and serve it in that

fashion.

MS. MURPHY:  Well, I do respectfully disagree.  I mean, we discussed this in a meet and confer.  But I think the -- the motion that is in front of you does -- is not a contention interrogatory.  It's not the way it's phrased, and the plaintiffs can't answer it.

There also is a misconception about what would be required to do it.  Let's say it was a contention interrogatory.  Google says, for example, in their briefing that we just need to provide a list.  That is not true.  This is a very complicated legal issue.  There's not clear direction on what is "based on."  Cases look at --

THE COURT:  I'm sorry, there's not clear direction on what?

MS. MURPHY:  What "based on" means.  "Based on," which is the language in section 101 of the Copyright Act defining derivative work.

Cases talk about:  Does this work live its own copyright life?  Does it have independent economic value?  So they're asking -- if the interrogatory were revised into some different form, and, again, that's not before you, but I still think that there would be an exercise that would be

extremely burdensome for 7,300-plus works and unnecessary because we are not at that point and Google has not explained, which is -- is the truth, that they have the same information.

Google pushed to get digital copies of every single one of these works.  That, believe it or not, was an extremely burdensome process for our clients to give them digital copies.  They insisted on having them with no DRM, digital rights management, so that they could go in and run redlines and slice and dice and do whatever they wanted with these works.

THE COURT:  To figure out, among other things, whether number 958 is 90 percent the same as number 959.

MS. MURPHY:  Presumably.  And they should be required, if they want to make an argument at some point down the road, to do their own homework. And they have the information.  They also have copyright registration.

THE COURT:  I am really struggling with your conception of who has to do the initial work on this issue here because, look, you, plaintiffs, have the right and, therefore, have the power to decide which of these works you're going to seek statutory

damages on or not.  If, at this point -- let us suppose that you are required to answer some form of this interrogatory, whether in the form it's written or in some form that looks more like a conventional contention interrogatory, and the question is:  Just tell us, Google, which ones you contend to be derivative and which ones you contend not to be. And you respond to that, identifying, let's say, only 3,000 of the 7,000 works in suit as nonderivative, and you concede that another 4,000 -- and I'm making these figures up, obviously.  And you concede that another 4,000 and some are derivative.

Well, now nobody has to fight about those 4,000 and some, right?  Because you're not going to be seeking statutory damages on them, and they're -- they're out of the fray, so to speak.  But as to those that you contend to be nonderivative, there is potentially nontrivial litigation on a work-by-work basis ahead of us.  Right?

And do we want to leave that for the very last minute?  I don't think so.

MS. MURPHY:  I still, respectfully, Your Honor, say that this is -- it sounds like we would be heading down a path of requiring us to do an enormous amount of work.  Also, figuring out

what -- what is the definition of "derivative," which is a legal conclusion, getting us back to that.  Again, having our employees verify this under oath.

And we -- we have not done that because we are not at that point in the case.  We've already talked in other contexts about how damages involves expert analysis.  The rules -- or excuse me, the statute requires or enables an election later on for a reason.  So --

THE COURT:  So tell me when you think plaintiffs should have to take a position with regard to this issue as to each work in suit?  Ever?

MS. MURPHY:  Well, certainly before trial.

THE COURT:  Okay.  So when then?

MS. MURPHY:  It's not now.  It's too early. We don't have our expert analysis.  We have not figured out which works we would even be pursuing statutory damages on, if any.  I mean, counsel said it's in our pleadings.  It's not.

THE COURT:  It's not mandatory.

MS. MURPHY:  It's not.  So --

THE COURT:  It's possible that you won't seek statutory damages on anything; although, I think that's not a very likely scenario.

MS. MURPHY:  I just fear that going down this road is not only creating an impossible task for us, but putting the cart before the horse and really forcing us to make an early election.

THE COURT:  So give me your timeline, then. Scope this out for me.  You say certainly before trial.  What, at the time of expert disclosures, will your damages expert, in effect -- will that be when you make the election?  Because if you are going to be seeking statutory damages, presumably, at that point, you're going to have to have some evidence.  Maybe it's in the form of a damages expert opinion saying, "We're entitled to statutory damages on these 3,459, because we're entitled. They're not derivative."  Is that when, as a practical matter, you have to fish or cut bait?

MS. MURPHY:  Again, I don't -- I can't -- you know, not having talked to my clients and the law not requiring us to do it, I can't say by which date we would make an election.  But I certainly can say that the expert analysis is relevant to that and that that would be a juncture at which we'd need to -- we need to get that information before, you know, being in a position to do so.

THE COURT:  Right.  Look, I'm not -- I have

to tell you, I'm not much moved by your argument that this would require you to make a legal determination.  I agree that it would require you to make a legal determination, but people make legal determinations all the time.  In order to bring this lawsuit, you had to make a legal determination as to which works you were going to contend were infringed, and you put them in a list, and that took a lot of work.  Right?  This is not that different.

MS. MURPHY:  I think it's very different because it's asking for employees of the plaintiffs to verify under oath the answer to a complicated question of law.

THE COURT:  Whereas, if I construed it as or allowed Google to re-serve it as a contention interrogatory, would that alter the burden?  At that point, would you simply have to say we contend rather than we swear under oath?

MS. MURPHY:  I would have to see the way it's phrased.  I don't think I can answer that.  We had this discussion with them.  There was no offer to rephrase it.  And the interrogatory is -- as is doesn't ask for contentions, and it doesn't ask for factual information.  And to the extent that there is factual information that Google may think it

needs to formulate its positions, it already has all of that.

THE COURT:  Well, but it's not Google's obligation or burden to establish that a work is derivative, particularly at the outset, before the plaintiffs have even told Google what it's going to seek statutory damages on.  You would agree with me, I hope, that it would be rather inefficient and now totally putting the cart before the horse to expect Google to in effect, take a position with respect to each of the 7,000-and-so works in suit and be prepared to argue it without even knowing what plaintiffs' position is as to that work in suit.

MS. MURPHY:  Well, it's interesting because, in their papers, they say they've already done it.  They say that they -- they've identified derivative works, and they point to --

THE COURT:  Some, for sure.

MS. MURPHY:  -- different things that --

THE COURT:  But they do not contend that they've done that for each work in suit.

MS. MURPHY:  I mean, again, neither have plaintiffs.  So I think that this entire exercise is premature and would be unfairly forcing us to do an analysis that we haven't done and that we may --

that we may not have to do in light of the way that the Copyright Act is structured.

THE COURT: All right. So, again, when -- when's the right time?

MS. MURPHY: The right time for what?

THE COURT: Plaintiffs are going to have to go first, in my view, on this issue. Plaintiffs are going to have to tell defendant at some point, as you say, well before trial, which of these works plaintiffs believe to be eligible for statutory damages, i.e., not derivative of another work. And that needs to happen at a time when the parties still have enough time in their pretrial schedule to fight about it, if necessary.

MS. MURPHY: I would think that just speaking about timings in general -- again, I don't have the law in front of me about the question you're asking, Your Honor -- that it would certainly be after expert discovery and after summary judgment.

THE COURT: Really? After expert discovery? Explain that to me.

MS. MURPHY: Because in order for plaintiffs to decide the position that they would be taking with respect to which works they're seeking

which types of damages on, they need their expert analysis.

THE COURT:  And is it your experts who are going to tell you?  Because, as you say, it's a legal question, not a fact question, right?  So why is it your experts who are going to tell you which works are not derivative, as opposed to your lawyers?  That would be you.

MS. MURPHY:  I did -- I wasn't referring to that.  I was more referring to the question of whether we would be seeking statutory damages on a particular work at all.

THE COURT:  Right.  And that's a more complicated question.  That's a strategic question, which would be based on, among other things, whether you feel you can establish that a work is not derivative.  But I'm sure many other issues also go into that strategic determination.

But I would say, honestly, the timing that you propose after summary judgment, i.e., in the frantic runup to trial, assuming that summary judgment was not dispositive, is way too late in the day.  We don't want to be reopening discovery at that point and taking depositions and so forth over whether number 359 is derivative of number 372.

MS. MURPHY:  That's our view.  You know, again, I'll just come back to, like, what is before us right now is not an answerable interrogatory.  So however this gets sorted out, we have to restart the clock, and we will need significant time and, ideally, the benefit of our expert information in order to answer some revised form, whatever that may be, assuming that it's an appropriate interrogatory.

THE COURT:  Ms. Bladow.

MS. BLADOW:  Your Honor, as pled, plaintiffs' case has put over 7,000 works at issue.  And as pled, they're pleading statutory damages for presumably all 7,000 of those works.  This is not -- which work or asserted works are derivative of other asserted works is not a question that requires expert analysis.  It seems like plaintiffs want to kick the can down the road so they can maybe do less -- less work.

THE COURT:  Which is not, in and of itself, a terrible goal.  We all want to arrange our litigations --

MS. BLADOW:  Right.

THE COURT:  -- so that we do less work, but there's no --

MS. BLADOW:  But there's no -- I mean,

there's no guarantee that, say, their expert determines that actual damages for any of these works would be more than what they think they can get of maximum statutory damages. Plaintiffs are pleading a, like, willful infringement case, and I think the -- kind of the baseline assumption needs to be understanding the maximum exposure here of, assuming they're seeking statutory damages on all of the works, right, what -- what are those groups of works that are entitled to individual awards of statutory damages?

I think in terms of Ms. Murphy's argument regarding burden, I don't believe that this is a question of running a redline. Right? It's not a question of running a redline and comparing one work to another work. It's a question and something entirely within the publisher's knowledge of which works are based on other works. And that's part of the publishing process.

To the extent there's any burden involved here, it's -- you know, we wouldn't really be having this debate if there were, say, 10 works involved and it was a simple question of which of the 10 are based on another 10. I think the -- any burden here is a function of the number of works that plaintiffs

have chosen to put at issue in this case.

Moreover, there's no -- the experts aren't providing an opinion on which works are derivative of another work.  It's --

THE COURT:  Because, in your view, that would be an impermissible legal opinion and, therefore, not within the province of an expert.

MS. BLADOW:  If we accept Ms. Murphy's view of this as a legal conclusion, then yes.

And I think at one point Ms. Murphy may have said that it would be impossible for plaintiffs to do this.  This would be a huge undertaking.  Well, then, if it's impossible for them, I'm not sure how it's possible for Google.  So I feel like this is very similar to the interrogatory regarding which screenshots correspond with which asserted works, where, if it's this huge undertaking and impossible for them, how is Google supposed to know.  Right?  We aren't publishers.

THE COURT:  That's -- that's -- in my own mind, I'm -- I'm with you on that.  This is -- where I'm at is this is a decision; a declaration, so to speak; an election, if you will, that plaintiffs are going to have to make in the first instance.  And to the extent there's pushback, to the extent that they

designate something as nonderivative and, therefore, eligible for a separate statutory damages award, to the extent there's pushback on that, I think that the plaintiffs will have the burden of persuading the Court at that point that it's not a derivative work.

So, really, what this whole dispute comes down to for me is a timing question. Is now the right time? Is it too early, as Ms. Murphy says? And if now is the wrong time, then what would be the right time? After summary judgment is, in my view, too late.

So give me your thoughts on that. Why does -- or let me sharpen up the question for you. Why does it have to be right this second? Why can't it wait at least until, let's say, expert discovery?

MS. BLADOW: Your Honor, this case has been pending for two years, and I think in terms of looking toward resolving and continuing to push the case forward, it makes sense to answer this now. I think the case schedule has always -- if Your Honor reframes this as a contention interrogatory or allows us to re-serve this as a contention interrogatory, which would --

THE COURT: Which I'm about to schedule, by

the way.

MS. BLADOW:  Yeah.  You know, I think the case schedule has always said that contention interrogatories could be served 30 days before the end of fact discovery.  I believe that might even be what the local rule says.

THE COURT:  For some reason, I think I issued an order at one point that said -- ah, 45 days prior to the close of all fact discovery.  I said that back in October of last year at docket 222; although, I also allowed the parties to negotiate their own interim deadlines, so I think this may be a little bit dusty now.

MS. BLADOW:  Yeah.  And so, Your Honor, I think before the close of expert discovery would be appropriate, as damages experts, including, for example, a rebuttal damages expert, might want to rely on that interrogatory response.

THE COURT:  Sure.  Because to the extent that plaintiff does -- concedes that a certain number of the works in suit are derivative, then you don't have to worry about them, at least for that purpose.  So clearly, again, it, you know, Google has to -- sorry, plaintiffs have to fish or cut bait on this, in my view, before the experts all spend

hundreds of thousands of dollars.  I mean, that just seems practically the right result.

Now, if you were -- right now, you're not asking plaintiffs to defend their election, right?  You're just asking them to identify, and you feel that that's all you really need.  So if I were to permit you to reframe it as a contention interrogatory, it wouldn't say, "Tell me which are which and why."  It would simply say, "Tell me which are which."

MS. BLADOW:  Yeah, I believe we would rephrase the current interrogatory:  Identify all asserted works that plaintiffs contend are derivative of one or more other asserted works, and of which asserted work plaintiffs contend it is derivative.

THE COURT:  Except that when would the plaintiffs ever, quote, "contend," close quote, that a work is derivative?  It's the opposite.  What plaintiffs would need to contend for damages purposes is that a work is not derivative of another work.

MS. BLADOW:  I think that would work as well.

THE COURT:  And if something was not on

that list -- let's suppose I permitted you to send an interrogatory saying, "Identify all the works that you contend are not derivative of other works," and anything that was not on their list, you wouldn't have to worry about, at least for purposes of it popping up as a hook for statutory damages. So it wouldn't matter to you at that point -- for the derivative works, it wouldn't matter to you at that point what they were derivative of as long as they weren't on the nonderivative list.

MS. BLADOW:  No, Your Honor, I still think it would matter what they were derivative of because, for --

THE COURT:  Explain that to me.

MS. BLADOW:  Because, for example, plaintiffs have multiple editions of the same works, as well as test banks and solutions manuals.  And if they're contending that -- like, we may not be able to determine, of the list of works that are derivative of one another, how that boils down into, like, a number of works that are -- total number of works that are derivative of one another.  Right? Like, there may be -- it's not going to be take that list and cut it in half.  It might be there are three works that they're conceding are potentially

derivative of another asserted work, and so those three works may boil down into, like, one statutory damages award.

THE COURT:  I'm sorry.  You totally lost me.

I thought the rule was -- and educate me if I'm wrong.  I thought the rule was that if a work is derivative of another work, it's not eligible for statutory damages.  Only the -- only the progenitor work, so to speak, is eligible for statutory damages.  So if you have a whole group -- let's say you have five works, four of which are derivative of the first one, you only get one statutory damage award.

MS. BLADOW:  I believe that's generally right, but I think they don't necessarily have, say, additions one through -- one through five and then are going to say, in terms of what they're claiming statutory damages on is one and listing two through five on the derivative list.  I think in terms of -- I think we're just trying to understand which -- which groups of works they consider to be one work for purposes of statutory damages.

THE COURT:  All right.  I'm going to break my rule.

Ms. Tomkowiak, do you want to jump in?

MS. TOMKOWIAK:  Well, I guess I'm just trying to think of a world in which you have economics and then you have macroeconomics and you have microeconomics, and microeconomics goes on their nonderivative list, but macro goes on their derivative list.

THE COURT:  These are works by the same author?

MS. TOMKOWIAK:  Yes.

THE COURT:  Okay.

MS. TOMKOWIAK:  So, in that scenario, if we don't know that they're tying micro to the parent book, how are we going to be able to assert that the other child should also be part of that same family group?

THE COURT:  And now you've lost me.  I'm sorry.

MS. TOMKOWIAK:  All right.  Well, I've tried as well.

MS. MURPHY:  Yeah.  So I think going off of that, like, great -- for example, if there's -- if we're asking them what they contend are not derivative of other asserted works, that gives us a list of what they think are eligible for individual

statutory damages.  But when you look at the list of works that they don't identify as being eligible for statutory damages, we don't necessarily know which works they match up with on the list of works.

THE COURT:  Okay.  So this is a drafting issue, then.  If we're thinking in terms of a contention interrogatory, then my first effort to articulate what such a contention interrogatory might sound like was perhaps too simple.  Maybe the question isn't, "Please identify all works that you contend not to be derivative."  Maybe the question is, "Please identify each individual work or group of works that you contend to be eligible for a single statutory damage award.  And to the extent it's a group, please list everything in the group."

MS. BLADOW:  Yes.  That --

THE COURT:  That's what you want?

MS. BLADOW:  Yes.

THE COURT:  Okay.  Now, when do you think you're entitled to that?

MS. BLADOW:  I think prior to fact discovery.

THE COURT:  Prior to the close of fact discovery, which we're about to talk about when that's actually going to be.

MS. BLADOW:  Correct.

THE COURT:  So you would be prepared, I take it, to re-serve what's now Interrogatory 16 as a contention interrogatory along the lines we just discussed and give them 30 days to respond, so you would get that out pretty soon?

MS. BLADOW:  Yes, Your Honor.

THE COURT:  Okay.  May I have plaintiffs' response to that proposal?

MS. MURPHY:  The discussion was hard to follow.  At some point, I think --

THE COURT:  Sorry about that.

MS. MURPHY:  -- this got a lot worse and more legal and more complicated in terms of what plaintiffs would be expected to do.  Again, it's -- it's -- I'd like to see it in writing.  If we landed on which works plaintiffs contend are eligible for statutory damages --

THE COURT:  Yeah.

MS. MURPHY:  -- I'll, you know, state without saying that I still object to that.  We cannot do that in 30 days.  That -- that would be incredibly unfair and unreasonable.  And I also --

THE COURT:  Remember, they're still not asking you for argument.  They're not asking you for

backup.  They're not asking, "Why do you think that?"  They just want to know which ones they might have to fight about with you.

MS. MURPHY:  But I'm having trouble figuring out a world in which we're not boxed in, where we now have to do a full-on analysis because, otherwise, we're boxed in.  And so 30 days is not a sufficient time in which to do that and I think is inconsistent with the Copyright Act.  We would -- we would need some time into expert discovery, at a minimum.  And --

THE COURT:  You would need some time into expert discovery because your experts would contribute to this effort?

MS. MURPHY:  Perhaps, because, again, we would be relying on them for analysis related to seeking statutory versus actual.  So that, given that we're -- you know, it appears we're headed down this road, that would seem to be fair and reasonable.

The other thing I'll mention, just to preview it, is the discovery extension we strongly believe should not be both ways.  So I don't want to hear in a moment that, oh, plaintiffs have to answer this interrogatory, and that somehow has opened them

up to additional discovery when the interrogatory was not properly propounded in the first place.

THE COURT:  Well, nobody's propounded contention interrogatories yet, right?  Official contention interrogatories.

MS. MURPHY:  That's correct.

THE COURT:  So you can't very well argue that the time for that has passed.

MS. MURPHY:  I don't think that's what I meant.

THE COURT:  Okay.  All right.  So let's do this, then.  Let us turn to the scheduling issue, the extension issue, and let me figure out what the close date of -- the new close date of fact discovery is going to be, whether it's going to be one way or both ways, and what that means for the expert discovery schedule.  And then I'll circle back around to figuring out where this new or newly redrafted contention interrogatory fits into that schedule.

At present, your fact discovery deadline is July the 2nd, but we have known for some time that that's going to require a further extension.  The competing entries for what that extension should be, as I understand it, is plaintiffs want a one-way,

seven-week extension which would take the fact discovery deadline out to August 20th, but just for the plaintiffs.

Is that right?

MS. MURPHY:  Correct.

THE COURT:  And defendants would have to get all of their -- defendant would have to get all of its fact discovery done by July the 2nd.

That's your vision, right?

MS. MURPHY:  I think the only exception to that is this issue about RFAs and interrogatories. So we --

THE COURT:  But they'd have to complete all remaining depositions, for example?

MS. MURPHY:  Yes.

THE COURT:  Of which Google has how many left?

MS. TOMKOWIAK:  Well, we have five fact depositions left that we could serve, but --

THE COURT:  Because you're only at 15.

MS. TOMKOWIAK:  Correct, yeah.  And then there are --

THE COURT:  How many do you actually intend to take?

MS. TOMKOWIAK:  Well, after Your Honor's

ruling on that particular issue, we are assessing how many more we need.  We don't know yet that we need all five.  We are trying to look at that now.

And then there are a couple of depositions for which we have already noticed that we have not yet gotten on calendar.  And the plaintiffs are trying --

THE COURT:  So that's -- that's included in the first 15, or that's included in the last five.

MS. TOMKOWIAK:  It's included in the 15, but it's also a little bit outside of the 15 because it's 30(b)(6), which don't count towards the 15.

THE COURT:  All right.  Are they dual witnesses?

MS. TOMKOWIAK:  At least one is not.  I don't think either of them --

THE COURT:  All right.  But bottom line, it seems to me, the witnesses that you -- the fact witnesses that you've already noticed or are in the process of negotiating dates for, it sounds like you probably could get done by July 2nd.  But, number one, you don't think it should be a one-way extension for various reasons, and, number two, you may have some other depositions you want to take that they don't know about yet.

MS. TOMKOWIAK:  That's correct.  And I don't know that we can get all of them in by July 2nd.  They're trying to now cram everything into those last two weeks, and it's getting a little bit too crammed, where we're taking, like, back to back to back to back to back.  And I just don't know that we can accommodate that.

But yes, for the vast majority of the ones that we've already noticed or whose names are already out there, I think we can get a lot of those done.

THE COURT:  Right.  And Google's view with regard to the extension is, number one, any extension should be bilateral, in your view, right?

MS. TOMKOWIAK:  Absolutely, Your Honor. Anything else would be --

THE COURT:  And are you otherwise okay with August 20th?

MS. TOMKOWIAK:  I think that's pretty close to what we had proposed.  I think we proposed eight weeks instead of seven weeks, which took us -- you know, gave us one more week in August.  August just is a challenging month, historically, to schedule things.

THE COURT:  You know, every month is a

challenging month.  It's always something.

MS. TOMKOWIAK:  August feels particularly challenging.

THE COURT:  It's a school holiday, or it's a Jewish holiday, or it's the month that all Americans are required to take vacations.  It's always something, right?

MS. TOMKOWIAK:  Well, that's July.  So, yes, Your Honor.  I mean, it's a small difference between eight and seven weeks.  I think we're actually in the same ballpark there, but we would submit that the extra week would be helpful.

THE COURT:  Okay.  Now, who wants to explain to me what the parties' agreement apparently was with regard to requests for admission and interrogatories?  Because my last word on the subject -- I think, as far as I could tell from going back through the now extremely dense docket in this case, the last word that you had for me on that issue was back at docket 222, when I said 45 days prior to the close of fact discovery.

But what -- what deal did the parties make between themselves?  Ms. Murphy?

MS. MURPHY:  Your Honor, before we move on to that, will I get the chance to respond on the

deposition issue?  I just want to make sure.

THE COURT:  Why don't you answer my question before I forget it, and then yes.

MS. MURPHY:  Okay.  The parties, as they were able to do under the scheduling order, had reached their own agreement that these would be due to be served by June 23rd.

THE COURT:  And that's -- when you say "these," you mean requests for admission and --

MS. MURPHY:  And remaining interrogatories.

THE COURT:  Including contention interrogatories.  Yes?

MS. MURPHY:  Correct.

THE COURT:  Okay.  All right.  So interrogatories outside of the Rule 33.3(a) category?

MS. MURPHY:  Correct.

THE COURT:  Okay.

MS. MURPHY:  However, the plaintiffs went to Google and said, "This isn't going to work because we've only taken four depositions and Google has taken quite a bit more, and we need this deposition testimony to" --

THE COURT:  Before you know what questions you want to ask.

MS. MURPHY:  Correct.  Correct.

So, while we anticipated that, you know, clearly we had 30(b)(6) topics that aren't designated, multiple witnesses where we have no dates from Google, we were going to need an extension to take our depositions, and, therefore, we would also need an extension to formulate these written discovery requests.

We -- Google suggested that they did not agree, but we all left it that we would see what happens at this hearing with the schedule.  I will say that I don't have a problem having that be both ways -- in other words, whichever date.

THE COURT:  I'm sorry, say that again.

MS. MURPHY:  The date by which the parties have to serve interrogatories and RFAs, I don't have an issue with that being bilateral.

THE COURT:  Right.  Because, otherwise, you're going to get a contention interrogatory on June the 23rd or tomorrow, right, with regard to this derivative versus nonderivative issue.  So you'd just as soon not get that until sometime in July.

MS. MURPHY:  Well, I may get it anyway, but that's a different issue in terms of how long that

particular --

THE COURT: All right. So plaintiffs' view is extend fact discovery to August 20 for us, please. Do not extend fact discovery generally for Google, but extend the deadline for either side or both sides to serve RFAs and contention interrogatory to July 21.

MS. MURPHY: Yes. And just not to belabor the point -- it's in the joint status report, but the fact that Google's counsel just said, "We're assessing these other five fact depositions that we now can take," that is concrete evidence of them granting themselves an extension. They didn't --

THE COURT: Well, no, they're not going to be able to do that unless I grant them an extension.

MS. MURPHY: I understand, but they -- they did not -- we are not talking about people that have been discussed or noticed or anything else. So it is beyond me that they could now say, "Oh, we're going to come up with five more people," when discovery is supposed to close July 2nd.

We have made our witnesses available. We have bent over backwards to accommodate them. It is not true that everything is suddenly jammed up. There are two more depositions next week that have

been on the schedule for weeks.  There were two more, and we can get those in.  We've proposed dates during the following week.  One, we don't even think is necessary, but they're on the same subject.

We're happy to work with them as much as possible, but one of them is coming from Paris, and the parties have a dispute.  He was scheduled for June 19th in London, and Google canceled it.

THE COURT:  Well, Google says Google didn't cancel it.  Google says Google merely pointed out some difficulties, and there was a blocking statute problem, something like that.

MS. MURPHY:  That's not correct, Your Honor.  Google scheduled it for June 19th, and they said in London, and we said, "Okay, but would you consider taking it remotely?"  But it otherwise was in London for June 19th, and then they said, like a week before, if that, "It's no longer convenient for us."

THE COURT:  Okay.

MS. MURPHY:  But that's -- it's too in the weeds, and I understand.

THE COURT:  It's too in the weeds.

MS. MURPHY:  Yeah.

THE COURT:  And I'm not going to do this

with you.

MS. MURPHY:  Yes, I understand.  My point is just -- and I -- the JSR lays it out, that it has not been -- deposition scheduling has not been similarly handled at all.  They have not scheduled numerous people.  They have canceled numerous depositions, and this should not be another opportunity for them to just now try to take more discovery from plaintiffs when it's done.

THE COURT:  All right.  Ms. Tomkowiak, leaving aside what the extension should be and whether it should be bilateral or not with respect to fact depositions, are you in agreement that the deadline for serving RFAs and additional interrogatories, such as contention interrogatories, should be moved from June 23rd, which apparently the parties agreed upon between themselves, to July the 21st?  This would not preclude you potentially from serving the one contention interrogatory that we've been discussing sooner than that.

MS. TOMKOWIAK:  I think that if Your Honor is going to extend fact discovery along the lines that we've been discussing, that would work.

THE COURT:  Okay.  So here's what I'm going to do.  I am going to extend the deadline for

completing fact depositions to August the 20th for the plaintiffs and to July the -- one, two, three -- whoops.  My calendar is not cooperating.  Just a second.

August 20th is a Thursday.  And to July the 23rd, which is four weeks earlier, for the defendants -- the defendant.

And further, Google, I'm going to give you a deadline, and you're going to help me figure out what that deadline should be, for noticing any new deponents not previously noticed.  Because I don't want you to wait until July 15th to say, "I need these other three people by July the 23rd."

MS. TOMKOWIAK:  That's fine.  I think that I would appreciate if we could also have a deadline for plaintiffs to do that as well.  They've over-noticed --

THE COURT:  For fact witnesses?

MS. TOMKOWIAK:  Yes, Your Honor.

THE COURT:  You say they've over-noticed, but you have under-noticed.  That is, you still have a few slots left.

MS. TOMKOWIAK:  Correct.  So, on their end, it seems to be a bit of a moving target.  They notice, they withdraw or they don't withdraw, and

then they notice somebody new or say, you know, in a dep- -- you know, that we're going to notice somebody. So I would appreciate a deadline for that as well. That's been part of the difficulty that we've had in scheduling these types of issues.

THE COURT: All right. Let's do Google first. Right now, it is the 18th. I'm going to give you till the end of next week, which is June the 26th, to get out any deposition notices that plaintiffs don't know about yet. All right? So you're going to have to fish or cut bait on how many of those 20 you really want to take and who they are by June the 26th, and then you have to get them taken by July the 23rd.

MS. TOMKOWIAK: And I presume that the plaintiffs will work in good faith to produce these individuals.

THE COURT: I will direct both sides to work in good faith to produce these individuals. If there is a genuine dispute over whether something about the identity of the witness is improper, I expect that to be negotiated as promptly as possible. I don't want that to drag out.

Now, for plaintiffs, I will give you until August the 20th to get your fact depositions done,

as requested.  I do think Google has made a reasonable request that you, too, need to fish or cut bait as to who your deponents are going to be. Now, I understand that when you are in a position of having difficulty scheduling, you may want to over-notice a little bit to have a backup, so to speak, if somebody doesn't work out.

At the same time, it places a burden on Google because they have to think about scheduling people who, in the end, are not actually going to have their depositions taken.  So --

MS. MURPHY:  Your Honor, I agree with that in the abstract.  That's not what happened.  So I don't want to get back into the weeds, but there are four notices that we withdrew, including the two in-house counsel; a Google employee, who I believe is on maternity leave; and one other individual that we gave notice of.  We have 17 total operative notices.  There hasn't been any scheduling difficulty.

THE COURT:  We have 17 total operative notices.  Now, this is something that you wouldn't think the parties would be disputing.  I mean, it is what it is.  It's either 17, or it's 22.

Why do you think it's 17, and why does

Google think it's 22?

MS. MURPHY:  I think Google's not accounting for the ones that were withdrawn.  And they didn't create any scheduling issues.  So this is a nonissue that Google manufactured.

THE COURT:  All right.  So you say you're at 17 total, and you're not going to be adding anybody?

MS. MURPHY:  No, I'm not saying that.

THE COURT:  You're not saying that?

MS. MURPHY:  Yeah, I'm not saying that.  That's my understanding.  We have some other -- and I apologize because I don't -- I have the information from my colleague, but I'm not as intimately involved.  But what I have before me is that there are -- one, two, three, four -- eight notices that are operative that still need to be scheduled, including multiple ones where they have not gotten back to us.

THE COURT:  And you've taken how many?  Four, did you say?

MS. MURPHY:  Now we've taken five.

THE COURT:  Five.

MS. MURPHY:  We had one yesterday.

They haven't made anybody who relates to

Copyright and Shopping available as of yet, so we're really disadvantaged in figuring all this out.

THE COURT:  All right.  Well, why don't I -- to avoid getting in the weeds with you all, why don't I give the same deadline to both sides, June the 26th, to essentially make up your mind what remaining fact depositions you're going to take. And in the case of Google, that may be that's your final deadline for adding a new notice of deposition for a fact deposition.  And in the case of plaintiffs, it may be that you just have to clarify by that date who are numbers 15, 16, and 17, if you say you're at 17.  And if you want to add somebody else, do it by next Friday.

MS. MURPHY:  If I could just respectfully push back on that.  We have not gotten to take four depositions, so we can't finalize the list.  And the fact that we haven't been able to do that is entirely on Google.

THE COURT:  You're saying that some of your selections may depend on what you hear at the next deposition or the one after that?

MS. MURPHY:  Absolutely.  We -- it would not be fair to put the plaintiffs on the same footing as Google in this situation.

THE COURT:  Well, I mean, I may give you a few extra weeks, but I'm not going to give you all the way until August the 20th, obviously.

MS. MURPHY:  Thank you.  Could we have at least three extra weeks?

THE COURT:  Well, let's see, on the Google side of the ledger, I'm giving them a notice deadline of June 26th against a fact deposition deadline of July 23.  So that's about a four-week gap.

You have a fact deposition deadline now of August the 20th, so that would take you back to approximately July the 22nd to fish or cut bait.

MS. MURPHY:  That works.

THE COURT:  All right.

MS. TOMKOWIAK:  Your Honor, if I can just clarify.  That works as to the additional deponents, but it would still be helpful by next Friday if we could have clarity on who the 17 are.  I don't want to get into a debate.  Ms. Murphy seems to think that it's clear.  We don't.  So if we could just have a list of the 17, that will clear it up.

MS. MURPHY:  That's fine.  We believe they already have it.

THE COURT:  Okay.  So by the --

June 23rd -- I'm sorry, by June 26th, Google will make its final selection, so to speak, and plaintiffs will provide the list of 17.  However, I'm giving plaintiffs a little extra time, until July the 22nd, to finalize its list of fact witnesses and notice anybody that it hasn't noticed yet.  And you -- really, if you're going to put somebody new on that list, I strongly urge that you not spring it on Google on July the 22nd, because that's not going to go well.  But that's your final deadline for selecting fact witnesses.

I'm going to give both parties the date that you agreed on, July the 21st, for the service of RFAs and interrogatories that do not come within Rule 33.3(a), including, for example, contention interrogatories.

Have the parties discussed how much time they are going to need to respond to those July 21st RFAs and interrogatories?  I assume that both sides are going to want something more than 30 days on those.

MS. TOMKOWIAK:  I assume so, at least for Google.

MS. MURPHY:  We have not discussed that yet, but I think --

THE COURT:  Could we presumptively say 45 days?  And after that, if you can't work something out, you'll have to come back to me.

MS. MURPHY:  I think that's fine, except for the derivative issue.

THE COURT:  Okay.  Now, on the derivative issue, which I have not forgotten about.  For the reasons that we've been discussing in this hearing, I'm not going to require plaintiffs to answer Interrogatory Number 16 as written, in part, because I think it is not properly a fact question.  I think, however, that it can and should be reformatted as a contention interrogatory.

And I think that, as a matter of case efficiency and fairness, Google is entitled to know how many potential statutory damage awards plaintiffs are going to be seeking before they are in the midst of expert discovery, because their experts may well need to address this question.  So that's -- that's sort of the when they need to know.

So I will permit defendant to re-serve the question as a properly phrased contention interrogatory along the lines of, "Which of the works in suit or groups of works in suit do plaintiffs contend to be eligible for a statutory

damage award?  And with respect to groups, please identify each work in suit which is a member of that group."

Google is not authorized at this point to ask for the whys and the wherefores.  I don't want an interrogatory that says, "Please explain your reasoning or state all facts in support."  This is just the identification question, because, among other things, it is going to, one presumes, put to rest certain works in suit that you don't have to worry about as potential vehicles for a separate damage award thereafter.

And we will deal with whether you need to ask follow-up contention questions at a later stage of the case.  But you can go ahead and serve that as soon as you've figured out how to properly word it. You might want to meet and confer on the wording so that you get that out of the way sooner rather than later.  And I will -- hmm.  When exactly should I require plaintiffs to answer that question?  With their expert disclosures, do you think?

MS. TOMKOWIAK:  Are we -- are you moving expert discovery out another --

THE COURT:  I think I will be, yes.

MS. TOMKOWIAK:  -- two months from August

20th?  Is that what --

THE COURT:  Well, that's an excellent question.  Let me look at the current schedule.  Where is my current schedule?

All right.  Right now, we have -- and I may be looking at something that's already out of date.  At docket 821 back in -- way back when -- in April, I extended the disclosure of expert evidence to August 5, rebuttal expert evidence on September 8, and reply expert evidence September 30.

Are those our current deadlines, or am I missing something?

MS. TOMKOWIAK:  That's what I have, yep.

THE COURT:  All right.  So I think I should probably push those out a bit.

Do you agree?

MS. TOMKOWIAK:  Yes, your Honor.

THE COURT:  By how far?  Plaintiffs?

MS. MURPHY:  Plaintiffs would agree if we keep the same intervals.

THE COURT:  Yeah, let's keep the same intervals.

Are we now looking at October 1st for initial disclosure of expert evidence?

MS. TOMKOWIAK:  Early October would work

for us, Your Honor.

THE COURT:  Okay.  So why don't we say -- because we're doing it a month apart, and I'm giving you three rounds, against my better judgment.  All right.  Why don't we say October the 2nd, which is a Friday; November the 6th, which is a Friday, for rebuttal expert evidence; and then, for reply, that was going to be only two weeks, so that would be November 20th.

MS. TINELLI:  Your Honor, apologies.  From September 8th through 30th is more -- about three weeks.

THE COURT:  You're right.  It is.  And we have Thanksgiving in there.  So we'll go to -- I think we'll go to December 1st so we can all recover from Thanksgiving before the reply expert reports are due.  And then I gave you, it looks like, six weeks to take expert depositions, but now we're running into Christmas.  So I'll give you through the end of January -- Friday, January the 29th.

And what I'm thinking is that the answer to the derivative/nonderivative contention interrogatory should be in before October the 2nd or, at the latest, on October the 2nd.

What does Google think about that?

MS. TOMKOWIAK:  I mean, if they really need 90 days, I think it would be -- I think we're going to get a flood of expert reports on that day, and it would be helpful if we could have the response a couple weeks before that.  But we'll look to Your Honor's guidance on that.

THE COURT:  Ms. Murphy?

MS. MURPHY:  We would strongly prefer to get it in on the same day as our opening expert report.

THE COURT:  I think -- I think I'm sympathetic to that because it's going to be a coordinated effort.  What they say in response to that interrogatory is going to inform what their expert reports say and vice versa.  It's going to be an integrated effort.  So we'll say serve your response -- and I mean a response, not an objection because I'm overruling in advance your objections, unless it's an objection to the specific wording, in which case I want to hear about it, like, next week, not in August, okay, if you can't work it out.  So serve it as soon as you can, Google.  Address any purely wording issues sooner rather than later.  And once those are out of the way, we will need substantive responses no later than October 2nd.

MS. MURPHY:  One more thing, Your Honor. There is an important motion to compel with respect to 30(b)(6) topics.

THE COURT:  Well, I have two motions left, I think, at the moment.  There's the 30(b)(6) deposition topic motion, which has become fully briefed, but was -- I think has become fully briefed, but I haven't read the full suite of briefs yet.  And there is the motion for reconsideration of, as I read it, one sentence of my order vacating the sampling order.

I'm not going to hear argument on the recon motion.  I'm going to give you a written order on that.  I will have you back in to argue about the 30(b)(6) topics.  I'm happy to see that you're still making some progress, but, obviously, you need a decision.  So when would you like to come back in on the 30(b)(6) topics?

MS. MURPHY:  Just to make sure that we don't upset the apple cart with the schedule that we just worked out, I think sooner rather than later --

THE COURT:  Sure.

MS. MURPHY:  -- is important.

THE COURT:  No, I know you need a decision because it impacts the remainder of your deposition

scheduling efforts.  So let me see what next week looks like.

MS. MURPHY:  While you're looking, Your Honor, could I ask Google's counsel a question?

Do you -- do you all know if any of the disputed topics impact ▅▅▅▅▅ on the 24th?  I know they impact Chelsea Fine, but she's not until later.

MS. TOMKOWIAK:  They could.

MS. MURPHY:  They could?

MS. TOMKOWIAK:  Yeah.  Of course, several of -- well, some of us will be traveling to that deposition early next week.

THE COURT:  All right.  Let me tell you what I have available.  Looking at next week, Ms. Kay, I see we have a pro se plaintiff matter on for Tuesday at 10:00 o'clock.  Last time I checked, that particular plaintiff was still in jail.  I think it's unlikely he's going to show up.  Should we give away that time period?

(Discussion off the record.)

THE COURT:  Okay.  No, cannot give that time slot away.  I have the 9:00 a.m. slot on Thursday the 25th that I can make available to you. And then we go -- Tuesday the 30th, I could see you

at the early morning slot.  And Wednesday, July the 1st, it looks like I have 9:00, 10:00, or 11:00 in the morning.

What's your preference?

MS. MURPHY:  Would you say the second one one more time?  I was trying to toggle between calendars.  I apologize.

THE COURT:  Yeah.  For next week, it's really just Thursday the 25th at 9:00 a.m., but for the following week, it's either Tuesday the 30th at 9:00 a.m. or Wednesday, July 1st anytime you like that morning.

MS. TOMKOWIAK:  Your Honor, would it be possible for us to confer and send an email to your clerk --

THE COURT:  Sure.

MS. TOMKOWIAK:  -- later this afternoon?

THE COURT:  But do it quickly because I give away time slots for various reasons over the course of the day.

MS. TOMKOWIAK:  Yes, understood.

Just most of those dates overlap with depositions in this case that I have personal responsibility for, and so I want to make sure that we have colleagues who can cover them.

THE COURT:  But just continuing on, to give you as many options as possible, I could also give you Thursday, July 2nd, but it would be the early morning -- well, relatively early.  It would be the 9:00 a.m. slot.

So 9:00 a.m. on the 30th, your choice of morning time slots on the 1st, or 9:00 a.m. on the 2nd.  That's for the week after next.  And you'll -- you know, you can call.  You can call Ms. Kay when you've talked to each other and settled on a date.

MS. TOMKOWIAK:  Okay.

THE COURT:  Anything else for today? Ms. Murphy?

MS. MURPHY:  No.

THE COURT:  Ms. Tomkowiak?

MS. TOMKOWIAK:  At my own risk, I did want to raise one more quick issue.

THE COURT:  I can see from the expression on your face that it may not be all that quick.  Go ahead.

MS. TOMKOWIAK:  I will try to make it quick.

After Your Honor's ruling on dual-capacity witnesses, the -- and this is set up out in the joint status report -- a couple days later, one of

our witnesses who was previously only designated as a 30(b)(6) witness was then subsequently designated in her personal capacity as well.  The result of that was instead of a seven-hour deposition, it turned into a nine-hour deposition.  This witness had never before been flagged as, you know, somebody that they were interested in taking in her personal capacity.

We have more disputes to resolve on 30(b)(6), and it strikes us that they have three depositions left.  And it seems like a bit of a loophole in -- or something in Your Honor's order if, every time we designate a new 30(b)(6) witness, they can then designate them in their personal capacity and add another nine hours to the 30(b)(6) pot.

THE COURT:  There is no system which is completely impervious to gaming, in my experience. I'm not -- without reaching any decision on whether there was a gaming element here or not -- of course, plaintiffs say not.  But without reaching a decision on that point, honestly, what you're saying is, gosh, they might get an extra two hours of a maximum of three witnesses by doing this again, right?

MS. TOMKOWIAK:  No, because the way I

understand Your Honor's order, it could be more than two hours.  Right?  They could just continue to pile those hours onto somebody -- somebody else.  We don't know yet.  We've only had one dual-witness capacity deposition.

THE COURT:  Well, yes, it's a cumulative cap rather than a per-deposition cap.  But my point is, it's actually not that tempting, in my view.  If I'm sitting where Ms. Murphy is sitting, I'm thinking to myself, "I can either depose Mr. X as a fact witness and get a full seven hours out of him, or I can get an extra two hours out of Ms. Y.  Now, how am I going to allocate my choices?"

I'm leaving this one alone.  I'm not getting in the middle of it.  Your caps are what they are.  Each side will deploy its resources accordingly.

Anything else?

MS. TOMKOWIAK:  Nope, that's it.

THE COURT:  All right.  So you'll let my deputy know when I'm going to see you next, and, otherwise, I will issue a very brief topline order memorializing the results of our conference today.

We'll be adjourned.

                    C E R T I F I C A T E


    I, Marissa Lewandowski, certify that the
foregoing transcript of proceedings in the case of
Cengage Learning, Inc. et al v. Google LLC,
Docket #1:24-cv-04274-JLR-BCM, was
prepared using digital transcription software and is
a true and accurate record of the proceedings.


Signature __*Marissa Lewandowski*_
                    Marissa Lewandowski


Date:        June 22, 2026