# Exhibit A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------:

CENGAGE LEARNING, INC.,      : Case No.: 24-cv-4274

et al.,                     :

                Plaintiff, :

    v.                    :

GOOGLE LLC,              : New York, New York

              Defendant. : July 1, 2026

------------------------------:


TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE BARBARA C. MOSES

UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

| | |
|---|---|
| For Plaintiff: | OPPENHEIM & ZEBRAK, LLP<br>BY: Jeff Kane, Esq.<br>    Yunyi Chen, Esq.<br>    Uriel Lee, Esq.<br>4530 Wisconsin Avenue NW<br>Washington, DC 20016 |
| For Defendant: | LATHAM & WATKINS LLP<br>BY:  Sy Damle, Esq.<br>    Caroline Clarke, Esq.<br>555 Eleventh Street NW<br>Washington, DC 20004 |


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE DEPUTY CLERK:  The Court now calls Cengage Learning, Inc., et al. v. Google LLC; Case Number: 24-cv-4274.

Counsel, please make your appearances for the record.

MR. KANE:  Good morning, your Honor.

Jeff Kane from Oppenheim & Zebrak on behalf of all plaintiffs.  Joining me are my colleagues, Yunyi Chen, Y-U-N-Y-I, C-H-E-N, and Uriel Lee, U-R-I-E-L, L-E-E.

THE COURT:  Counsel, good morning.

MR. DAMLE:  Good morning, your Honor.  Sy Damle from Latham & Watkins representing Google. I'm joined here by my colleague, Caroline Clark.

THE COURT:  Good morning.

All right.  We have a couple of minor issues and then a bunch of 30(b)(6) topics to discuss.

On a housekeeping note, you are correct that the post-discovery conference before Judge Rochon should be moved back to February.  We are getting dates from Rochon chambers for that, and we will adjust that when we get an appropriate date.

Actually, I'm not sure there are any other housekeeping issues.

Any other quick housekeeping issues, Mr. Kane?

MR. KANE: I can update the Court on a couple of the 30(b)(6) topics on which we've reached an agreement, if this is the appropriate time.

THE COURT: That would be great. Tell me.

MR. KANE: So we have resolved Topics 11 and 36D.

THE COURT: Hold on. 11 and ...

MR. KANE: 36D.

THE COURT: That's interesting. So I had that down as, really, one topic.

MR. KANE: Yeah. It's -- it was the issue of duplicate notices, and then a spreadsheet concerning that. So those have been resolved.

THE COURT: Okay. Anything else?

MR. KANE: Yes. Topic 13 has been resolved. Google agreed to produce a witness.

THE COURT: Okay.

MR. KANE: And we think we have reached a resolution -- I'm sorry. For Topic 13, it's just two of the spreadsheets that are in Topic 13. It's the 9903 spreadsheet and the 9755 spreadsheet. I can flag that when we get there, if that's easier.

THE COURT: Probably better to flag that

when you get there.

MR. KANE:  Okay.

THE COURT:  Anything else?

MR. KANE:  And then we think we've -- we may have a resolution on Topic 45, so we suggest the parties continue conferring on that rather than having the Court decide it.

THE COURT:  45 is in the process, you hope, of being resolved; is that it?

MR. KANE:  That's correct.

THE COURT:  Mr. Damle or Ms. Clarke -- I don't know whose motion this is -- do you agree that we don't need to fight about it today?

MS. CLARKE:  Yes.  That's correct.

THE COURT:  Okay.  Fine.

MS. CLARKE:  Also, Mr. Kane, I believe we reached resolution on Topic 41.

THE COURT:  I don't even have 41 listed on my list of topics in dispute.

MS. CLARKE:  Oh.  Apologies.  That might have been resolved before the motions.

MR. KANE:  Yeah.  The reply brief noted at Footnote 1 that Topics 41 and 59 had been resolved by the time the reply brief was filed.

THE COURT:  They're off my cheat sheet, by

the way.

MS. CLARKE:  Apologies.  Thanks.

THE COURT:  Okay.

All right.  Well, look, I've set aside a couple of hours for you this morning -- not five; a couple -- so I think we do need to be brisk about this.

My intention -- is this your motion, Mr. Kane, or one of your colleagues?

MR. KANE:  It is, your Honor.

THE COURT:  All right.

I'm going to let you choose the order in which we discuss the topics because I see this as primarily the plaintiffs' motion, and you probably want to group them thematically rather than by the number that they're listed by.

Just a little bit of scene setting: Plaintiff mostly argues relevance, and it seems to me that defendant mostly argues proportionality.  I just want to remind both sides that you should both be thinking about both of those things.  Merely establishing that a topic is relevant to the plaintiffs' case or the defendant's anticipated depositions doesn't get you, necessarily, a 30(b)(6) witness on the topic, particularly if you have

already had, as you have, agreement on 30 or so 30(b)(6) topics already.  30(b)(6) is not intended as a constantly available supplement to other sources of information on relevant topics.

That said, I am aware that the stakes in this case are, at least theoretically, high.  I think Google is aware of that as well, which is why you've already agreed to 30 topics.  So the mere fact that something would be the 31st or the 32nd or the 33rd topic is not, in and of itself, a reason for the Court to say no.  If the proposed subject is sufficiently relevant and if the plaintiff makes a showing that 30(b)(6) testimony is the most efficient way to go here, that the documents don't tell the full story, or that the relevant information cannot more efficiently, or at least equally efficiently, be obtained through percipient witnesses or even during the battle of the experts, which is yet to come, which I'm sure will illuminate a number of the topics that the parties are currently fighting about -- so if both sides could, please, keep in mind that my job here is a bit of a balancing act and that I will be trying to keep in mind not just relevance, but also proportionality and not let this case run away with itself.

That said, Mr. Kane, where would you like to start?

MR. KANE:  Could we begin with Topic 10, which is Google's Zero Strike Policy?

THE COURT:  Sure.

MR. KANE:  It's page 3 of our reply brief, if that helps.

THE COURT:  I have your chart.  I have their chart.  I have the chart that my chambers staff made for me.  Just --

MR. KANE:  Sure.

THE COURT:  -- hit it.

MR. KANE:  So Google had a --

THE COURT:  Also, somebody needs to explain what the word "deprecated" means.

MR. KANE:  That's an interesting question. Google had been acting as if what it meant is that the policy no longer is operative.  We learned from a deposition witness what it means in many contexts is ████████████████████████████████████ ████████████████    ████████████████████ ██████████████████████████████████████ ████████████████    █████████████████ ████████████████████████████████ ████ , but --

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  Sometimes it means "no longer operative."  Is that what you're saying?

MR. KANE:  That's what Google was telling us.  I don't know that we've had a witness confirm that.

THE COURT:  All right.  So I understand, with regard to Topic Number 10, I have been hearing about this Zero Strike Policy for some months now, and I understand your relevance theory.

I guess the question is, A, why do you need 30(b)(6) testimony on it since I understand you've had a fair amount of evidence on this point?  And B, is your 30(b)(6) demand sufficiently clear so that Google is actually able, adequately, to prepare a witness?

I should add in the list of things that I have to keep in mind at all times when balancing the parties' views here is that 30(b)(6) testimony doesn't do anybody any good -- it's just grounds for further disagreements -- if the topic isn't clear enough and narrow enough so that it is -- a witness can be usefully prepared.

MR. KANE:  Yeah.  So as to your first point, the reason we need 30(b)(6) testimony -- we've gotten very few documents about this policy.

There are several documents that refer to it and some documents that refer to it being reversed, but we've got no details on, sort of --

THE COURT:  You literally don't know when it fell out of favor, if it did?

MR. KANE:  We don't know the exact date. It seems to have been sometime in late 2020, early 2021, but we don't know, you know, specifically when.

There's also no fact witness that Google has identified who can testify about this.  What Google's story has been so far is that ███████████ ███████████████████████████████████.  If that's so, a witness can say that, first of all. But second, it's extremely probative.

If it was ████████████████████████ ███████████████████, that goes quite a bit to Google's intent.  ████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████████, that's really quite important.

If Google's incorrect, and it was, in fact, ████████████████████████████████████, I

would say that's even more probative of intent, that ██████████████████████████████████ ██████████████████████████████████ ████████████████████ .

As to the scope of the topic, I think it's fairly simple. You know, someone needs to testify as to what this was and whether it was implemented and when it was reversed, if it was reversed, and just, sort of, how it was -- how they kept track of it.

One example of that is the documents refer to a Zero Strike █████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ ██████████████ .

We've never produced that ████████████ -- we've never seen that ████████████ . All we've seen is a document that purports to be it, but is, in fact, ████████████████████████████████ ██████████████████████████████ .

THE COURT: Now, Google says that they have, in effect, already agreed to provide testimony on this topic baked into a higher-level topic; is that right?

MR. KANE:  I didn't understand that to be Google's arguments.  If that is their argument, it may be fine.

THE COURT:  Well, if you look at Google's chart, the chart that Google provided me with, with their opposition papers, the long version, that's how I read it.

Am I reading that correctly, Ms. Clarke?

MS. CLARKE:  Your Honor, it's correct that we've agreed to produce a witness on implementation of Google's DMCA policy during the relevant period.  So, yes, we agreed, on Topic 10, to a very broad topic.  We've not agreed to specifically prepare someone on this policy, to the extent it ever applied, because it's outside of the relevant period.  And there are documents in our production that show it was deprecated, which, in this case, does mean "does not apply anymore."

THE COURT:  And it was deprecated when, in your view?

MS. CLARKE:  November 2020.

THE COURT:  Aren't they entitled to some confirmation as to whether that actually happened and whether "deprecated" means, in this instance, what you say it means?

MS. CLARKE:  Yeah, your Honor, I would say that the documents we produced have already sufficiently shown that to plaintiffs, so --

THE COURT:  Mr. Kane?

MR. KANE:  I don't think it shows when it was deprecated.  I would say, even if it was reversed, you know, in, say, early 2021, that's incredibly --

THE COURT:  Ms. Clarke said 2020, right?

MS. CLARKE:  Yeah, 2020.

MR. KANE:  Even if it was reversed in late 2020, that's still incredibly probative of intent.  I mean, they literally ███████████████████ ████████████████████████████████ ████████████████████████ --

THE COURT:  Your theory is they used to believe what ██████████████████████ ███████████████████████ .

MR. KANE:  Right.

THE COURT:  I'm being a little colloquial here.

MR. KANE:  Sure.

The fact that that -- their claim that that policy was reversed, you know, before three years prior to when the complaint was filed, to me, does

not mean it's not relevant.

In many situations in this case, the Court has used January 1, 2020 through March 31, 2025 as the time period of discovery. The Court did that with prior DMCA policies and with the discovery into the overall DMCA program.

So I think this is a case where the high relevance of this outweighs any sense of, well, it was slightly before, you know, one of the periods that we've used as the relevant period.

THE COURT: All right.

Ms. Clarke, let me give you a -- I'm not asking you a specific question this time, just what do you want me to know?

MS. CLARKE: Sure, your Honor.

So just as general background -- so, as you can see, Topic 10 is very broad: Any DMCA policy in effect from the period of January 2020 to October 2025.

When we responded, we agreed to testify on the policy that was in effect related to this litigation. We presented our witness on this already, on Topic 10, and that witness has --

THE COURT: And has that witness testified already?

AMM TRANSCRIPTION SERVICE - 631.334.1445

MS. CLARKE: Yes. She testified for nine and a half hours.

THE COURT: And how much of that testimony had to do with Zero Strike?

MS. CLARKE: I do not believe Counsel asked her about Zero Strike at all.

THE COURT: Because he was hoping to get another shot through today's order.

MS. CLARKE: I believe so.

And I will note, she was also designated in her personal capacity, so even if it wasn't in scope, you know, arguably, he could have asked that as well.

So she testified for nine and a half hours. That testimony included lots of information about Google's DMCA policy, how it was implemented, specific terms in Google's DMCA policy, the review of DMCA notices, the ████████████████████, several other things. So we feel that Google has more than provided plaintiffs with the testimony they require on this topic.

As Mr. Kane noted, there aren't many documents that we produced on this because they don't exist. This was not something that was contemplated during the relevant time period. It

was not something that was in place.  It was, in fact, deprecated.

So I think the fact that there are very few documents only points to the fact that, you know, requiring Google to put up a 30(b)(6) witness on it would not be proportional to the needs of the case because it's not relevant.

THE COURT:  Thank you.

Look, I'm inclined to grant this one, to some extent.  I'm inclined to give the plaintiffs some opportunity specifically to ask a well-prepared 30(b)(6) witness about the Zero Strike Policy.

I am somewhat concerned by all of the subtopics here and the degree of detail that the plaintiff seems to want.  And I can't even tell exactly how much detail this is because, for example, Subtopic (i) is the data contained in a certain document and the meaning of all fields contained therein.

I haven't drilled down to look at that document.  I don't know how many fields there are therein, and I don't know how many hours of testimony it would take you, Mr. Kane, to get through all of this incredible detail.

Can you boil it down for me?

MR. KANE:  So most of what's in Topic 10 has to do with other things, other aspects of the DMCA policy.  The only part that we're moving on is the Zero Strike Policy.

THE COURT:  Right.  Which subsections come in here?

MR. KANE:  So in our chart, it's the far-right column at Docket 985-1, but --

THE COURT:  So as described in, e.g., a bunch of documents?

MR. KANE:  Correct.

Those are all documents that explain what the Zero Strike -- that refer to the Zero Strike Policy.

THE COURT:  Okay.

MR. KANE:  So, basically, all we're saying is --

THE COURT:  So you're not asking for copious data.  You're not asking for a witness to say, oh, well, we applied it in this instance, but not that instance, and we applied it ██████ ████████████████████████████████████████████.

You want relatively high-level, we had the policy or we didn't have the policy, or we used to have the policy and now we didn't.

MR. KANE:  That's correct.

We don't envision this as, like, a data test.  Those documents are all just referring to the policy.

What we would ask the witness to explain is, like, what was this policy?  Was it ever in effect?  Was it taken out of effect?  If it was taken out of effect, why?

THE COURT:  All right.  So this is a couple of hours, right?

MR. KANE:  Of testimony?

THE COURT:  Yeah.

MR. KANE:  I mean, it, sort of, depends on their answers, but I wouldn't think it would take that long.  I would think maybe a half-hour.  I don't know.

THE COURT:  Okay.

MR. KANE:  I would say that the witness that they -- the 30(b)(6) witness that they put up for which they're criticizing me for not asking her about this, she only started working on the DMCA program in March of 2025, so she did not have personal knowledge of the Zero Strike Policy, and they had refused to prepare her on the Zero Strike Policy, so --

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  At that time.

MR. KANE:  Correct.

THE COURT:  And that's why you didn't ask.

MR. KANE:  Correct.  Not because --

THE COURT:  Now, they have to put her back to school or find somebody else.

MR. KANE:  I don't think she's the witness. I think they should pick a witness who actually knows about this.

THE COURT:  Ms. Clarke, who would the witness be?

MS. CLARKE:  We would have to discuss on our end.

I just did want to note, though, in this -- in plaintiffs' requested relief, they also talk about the treatment of ████████████████████, and several of those documents cited relate to ██████████████████ in our --

THE COURT:  I'm sorry.  In plaintiffs' what?

MS. CLARKE:  In the requested relief are about ██████████████████, not Zero Strike.  Our witness did testify at length about ████████████████. So, you know, we did cover a lot of these documents in that testimony.  But related to which

witness -- I mean, he's -- Mr. Kane is going -- or plaintiffs are going to depose several witnesses in their individual capacity who were involved with implementing the DMCA policy, so we don't see why he can't just ask those witnesses in their individual capacity, and then if he doesn't get the testimony he needs, seek 30(b)(6) testimony.

THE COURT:  Because we're not doing this again, that's why.  We're not coming back and doing 30(b)(6) again, at least not for these topics.

Mr. Kane, can you separate out the ███████████████████████ issue from the Zero Strike Policy issue?

MR. KANE:  Yes.  The only one that relates to ████████████████████ is the Bates ending 441738. The others are all the Zero Strike Policy.

THE COURT:  441738.  All right.

All right.  So let me give you my tentative here.

My tentative here is, yes, limited to Zero Strikes, so not including the █████████████████ document that you just listed, Mr. Kane.

And I'm referring to it as a tentative because, when we get all the way through, it may be that some get subsumed into others or that we need

to readjust at the end, but I want you to know, sort of, what I anticipate doing as we go along.

Mr. Kane, what's next?

MR. KANE:  Topic 38.

THE COURT:  38:  Nature and context of ██████████████.

All right.  Hit me.

MR. KANE:  So Google had an issue whereby a ████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████.  And that's the 426035 document that we reference.  And what the document says is, ███████████████████████████████████ ████████   ████████████████████████████████ █████████████████████████████████ ███████████████████████████████ █████████████████████████████ ████████   ████████████████████████ █████████████████████

So this is an issue that came up specifically in the context of e-books.  The whole, sort of, question in this case is, why were our notices not processed correctly?  Why did they not suspend these merchants?

This appears to be a possible reason why,

so that's why we've asked for 30(b)(6) testimony on this.

THE COURT:  Is ███████████ different from ███████████?

MR. KANE:  So ███████████ is, kind of, the whole -- it's separate but similar.

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████

So we're asking for a 30(b)(6) witness on those two topics --

THE COURT:  Ms. Clarke?

MR. KANE:  -- or those two issues.

MS. CLARKE:  Yes, your Honor.

So on 38B, the ████████████████████ ████████, Google did agree to present a witness on this.  I don't know where the confusion is on that. But, just generally, we have presented -- we have agreed to present significant testimony on the e-book ban, its implementation, the rationale behind it and related issues about implementing the ban.

We've already had several witnesses testify about this at length.  I think we've had close to 20

hours of testimony on that, including 30(b)(6) testimony. Just yesterday there was a witness who testified at length about the e-book ban.

I do not believe the ████████████ issue was asked about again. It also wasn't asked about in the context of our 30(b)(6) witness who was designated and who had knowledge of these topics.

So, you know, Mr. Kane says that this is a very important topic, which that is fine. We've agreed to present a witness, several witnesses, to talk about the e-book ban and its implementation.

THE COURT: Well, you've agreed to present testimony, 30(b)(6) testimony, generally speaking, on the e-book ban, but that's a big topic. And you say you've also -- just so I'm clear, following along at home here, you've specifically agreed to present an ███████████ witness, 38B; is that right?

MS. CLARKE: Yeah. We clarified that we -- you know, we weren't -- for the language that was written in the topic, we said that our witness would be prepared to testify about ██████████████ ███████████████████████████████ ████████████████████████████.

THE COURT: And has that witness on that

AMM TRANSCRIPTION SERVICE  -  631.334.1445

topic already testified?

MS. CLARKE:  No.  She will go later this month.

THE COURT:  Okay.  So then the question is, why can't you throw in 38A, ███████████, if they are, in fact, so integrally related?

Can't the same witness have a little bit of mind space for the ███████████ issue?

MS. CLARKE:  I think the issue here is it's just a difficult topic to educate on.  This ███████████ phrase comes up in a few documents, but I don't know that it means the same thing to one Googler to another.  It wasn't, like, a term of art that was used in the e-book ban.

So, you know, to the extent that ███████████ comes up in the context of her testifying about how Google implemented its e-book ban, that testimony will come in.  But agreeing to specifically testify about this one phrase that was in a handful of documents is difficult for us to prepare on.

And I think that's just a theme that is happening throughout a lot of these topics, is that we've agreed to provide a large, broad testimony on a lot of these topics, and plaintiffs are trying to

drill down on really specific, niche issues that are difficult to prepare a witness on.

THE COURT:  Mr. Kane, you flagged three specific documents that you want testimony on; is that right?

MR. KANE:  In 38?

THE COURT:  38A, right?

You've given me three Bates numbers.

MR. KANE:  I'm not sure --

THE COURT:  I'm looking at your chart.

MR. KANE:  Hang on one second.

THE COURT:  985-1, page 11.

MR. KANE:  Yep.

Sorry.  That's one document and two pages within the document.

THE COURT:  Okay.

And do we know who the author of that document is?  And has that person testified?

Ms. Clarke, maybe you can answer that.

MS. CLARKE:  I don't have the author, but I do note that the document notes three owners who have been or will be deposed as -- I can say their names on the record, if it would be helpful to the Court.

THE COURT:  I don't need the names

AMM TRANSCRIPTION SERVICE  -  631.334.1445

because --

MS. CLARKE:  Okay.  So one was a --

THE COURT:  -- they mean nothing to me, but --

MS. CLARKE:  Okay.

THE COURT:  -- Mr. Kane may need the names.

MS. CLARKE:  Okay.  We're happy to share them.

THE COURT:  But he probably already has them because he has the metadata, right?

MS. CLARKE:  Yeah.  I think he could see it from the document.

THE COURT:  Okay.

MS. CLARKE:  There are three owners.  One was a 30(b)(6) witness, one was the person who was deposed yesterday, and one is yet to go.

The 30(b)(6) witness was not asked about this document.  I do not believe the witness yesterday was, but I wasn't at the hearing -- at the deposition, so I'm not 100 percent sure.

THE COURT:  Okay.

So, Mr. Kane, why can't you get the testimony that you need on this ███████ document by asking one of the owners who's going to testify as a percipient witness?

MR. KANE:  The problem is, if it's just a fact witness, they can just say, I don't recall, you know.  I wasn't really involved.  I'm on the document, but I don't know.

The document that this appears in is, sort of, a document that addresses a whole bunch of issues.  It's almost like a year-end-review-type thing or a quarterly review-type thing.

THE COURT:  So you're concerned that the fact that someone's listed as an owner may only mean that it passed through that person's hands briefly and they may not know everything about it.

MR. KANE:  Precisely.

And the author listed in the metadata is an attorney who we're not able to depose, an in-house attorney.

So the problem is -- I mean, we can show them the portion of the document that refers to this, and they might say, you know, yeah, somebody else is working on that.  It's in the document, but I don't know about it.

If they want to tell us that that witness, you know, does know about this, fact testimony might be enough but it needs to be someone who actually does know about it.

THE COURT: All right.

So my tentative here is going to be yes if Mr. or Ms. Fact Witness proves unknowledgeable about the topic. So the tentative yes. You have to ask the question of the likely percipient witness first and see how you do.

MR. KANE: Okay.

THE COURT: All right. Next?

MR. KANE: Topic 33.

THE COURT: 33.

MR. KANE: Conversion tracking.

THE COURT: Conversion tracking.

Okay. What do you want me to know?

MR. KANE: So Google has this feature whereby, when a person, a Google user, clicks on the ad, it tracks whether that user actually purchases the book.

So one of the things plaintiffs have to show in this case is that there were direct infringements. We've sued Google for secondary infringement. We have to show that there was an underlying direct infringement.

THE COURT: Okay.

MR. KANE: This is, sort of, hard evidence of the direct infringements. It's a record of

whether the user actually purchased the infringing work.  We think that the -- so that -- it's relevant in just being, you know, important evidence of a key element to the case.

We think that Google further uses the data that it generates from conversion tracking to better target its ads.  In other words, it figures out which ads led to conversions and which ads didn't; i.e., that is which ads led to purchases and which ads didn't, and uses that to say, okay, we're going to show this ad more often, or we're going to show this ad to this user --

THE COURT:  Because this ad worked.

MR. KANE:  I'm sorry?

THE COURT:  Because this ad worked.

MR. KANE:  Exactly.  Yeah.

And so what we're asking Google to explain is just, kind of -- and we're not looking for, like, a deep dive, just what is this conversion tracking feature?  How does it, sort of, work?  You know, what sort of data is available to Google?  And then, you know, for what features is it -- for what features is it required?  And then how does Google use that data?

THE COURT:  Google says, as I understand

it, that they've already agreed to present a witness to testify regarding conversion tracking, and what more do you need?

Is that fair, Ms. Clarke?

MS. CLARKE:  Correct.  Yeah.

MR. KANE:  I think it's not quite as -- I thought their position was much narrower than that. Hang on one second.

THE COURT:  Well, let's hear.

Ms. Clarke, what have you offered, or plan to offer, on conversion tracking?

MS. CLARKE:  Sure.

So I can read to you exactly what we offered, and then I can provide some color on what we --

THE COURT:  Sure.

MS. CLARKE:  -- understand that to mean.

So we agreed to present a witness to testify at high level regarding how conversion tracking is accomplished, what -- oh.  Apologies. That's the background.

Google will present a witness to testify regarding the types of conversion tracking available to Merchant Center accounts and the impression and conversion data Google produced at several

spreadsheets in addition to presenting a witness to testify generally on that. We --

THE COURT: And has that happened, or is that still to come?

MS. CLARKE: That will come.

THE COURT: Okay.

MS. CLARKE: We've agreed to testify at a high level regarding how conversion tracking is accomplished, what merchants must do in order to utilize conversion tracking, the features or services on Google Shopping for which the use of conversion tracking is required, Google's general tracking of whether merchants utilize conversion tracking, and the use of conversion tracking data, if any, to inform Google's automated bidding feature.

So my understanding is the only piece that we are not in agreement on, that plaintiffs are now pushing for, is they want to add, at the end of our last sentence, "Google's general tracking of whether merchants utilize conversion tracking and the use of conversion tracking" --

THE COURT: Wait, wait, wait. Slow down.

MS. CLARKE: Apologies.

THE COURT: I know I told you to be brisk,

AMM TRANSCRIPTION SERVICE  -  631.334.1445

but not that brisk.

MS. CLARKE:  -- "the use of conversion tracking data, if any, to inform Google's automated bidding feature."

We agreed to that.

They want to add, "and the use of that data to improve performance of Shopping Ads."

So I guess, in the first instance, we obviously have agreed to prepare a witness --

THE COURT:  Use of that data to?

MS. CLARKE:  "To improve performance of Shopping Ads."  So --

THE COURT:  "To improve performance of Shopping Ads."

And that's what you haven't agreed to?

MS. CLARKE:  Yeah.

And they gave some examples; for example, the selection of which ads to run or the targeting of those ads to users.

THE COURT:  And why are you stopping there?

MS. CLARKE:  So just to provide more context on conversion tracking, this is a tool primarily used by merchants.  Merchants understand whether their ads are converting to a purchase or some other engagement with their website.

We have agreed to testify to a lot of, like, how that is used by merchants and what Google provides to merchant.  I think what Mr. Kane is seeking is how does Google, in turn, use any of that.

THE COURT:  Agreed.

MS. CLARKE:  That's --

THE COURT:  He thinks that --

MS. CLARKE:  Yeah.

THE COURT:  -- the feature is used not just by merchants, but by Google, and that Google uses it as part of its algorithm for what ads are shown to what consumers.

Is that right, Mr. Kane?

MR. KANE:  Correct.

MS. CLARKE:  So, I guess, we would say that's a much larger topic.  As you can imagine, Google uses a lot of different data to --

THE COURT:  But isn't it the most relevant topic?  Because this is not a case against the pirates, it's a case against Google.

MS. CLARKE:  It -- I think it's relevant, but we are currently negotiating with plaintiffs on other topics not at issue.  And this dispute of how Google Shopping Ads work and, like, how ads are

placed, we're still negotiating the scope of those topics with Google, with plaintiffs.  And we just think tacking it onto this topic just creates confusion and, kind of, muddies the water between, like, this very specific topic that we've agreed to on conversion tracking, where, you know, we've agreed to provide a lot and educate our witness on a lot of information about what conversion tracking is and how it's used, adding in, then, this broad -- very broadening sentence of "and how Google uses it to improve the performance of Shopping Ads" really takes it a different direction.  And we think, to the extent Google agrees to present a witness on how Shopping Ads are created in general and how they are targeted, it's better to fit any type of testimony like that into that.  And the parties, again, are still negotiating on that.

THE COURT:  Well, look, if your witness, your -- I'll call them your Shopping Ads witness.

If your Shopping Ads witness, in fact, covers this topic, sort of, organically, so to speak, based on the negotiations that you are still having, which aren't technically under number, you know, 36, that's fine.

But I think what Mr. Kane -- and it's

difficult for me to judge whether this is or isn't going to be included in some related topic that you're still negotiating.

I guess, to put it as favorably to Mr. Kane's position as possible, he just wants to make sure that's going to happen and it doesn't fall out of that negotiation. And one way to make sure that it happens is to get an order from the Court saying, make sure that it's included.

And why shouldn't I do that? Because it does seem to me that, again, the defendant here is Google, not the pirates. And I understand the relevance theory plaintiffs have to prove here if they're going to try to fit this case into the *Cox Communications/Grokster* inducement universe, that through -- I assume it's going to be, sort of, a -- I'm trying to think of what this is going to look like at summary judgment or trial.

You know, there's not going to be any bombshell evidence like Google conducted -- Google held a conference for pirates and said, okay, pirates, here's how you do it, right?

There is not going to be evidence like that, so he is going to have to be constructing an inducement theory out of a thousand small policy

decisions that he's going to say, sort of, nudged the ecosystem towards piracy.

That may be a little unfair, Mr. Kane, but that's, kind of, where I think you're going here.

So he is going to need, you know, evidence as to those little nudges that may or may not have been piracy nudges.

How far off am I?

MR. KANE:  I would describe our case a little more strong than that.  I think that's close enough.

THE COURT:  But you do agree that there's no evidence that Google actually sent out broadcast messages to the pirates saying, go forth and infringe?

MR. KANE:  I agree, we have not found such a message, yes.

THE COURT:  Okay.  So this is a more subtle case than that.

MR. DAMLE:  In fact, I would say it's so subtle that it does not even qualify as inducement, which is why we --

THE COURT:  That may be.

MR. DAMLE:  (inaudible) -- On the pleadings.

THE COURT:  That may be, but we're still in the discovery space --

MR. DAMLE:  Understood.

THE COURT:  -- so we have to -- we have to give them, you know, some space within which to figure out if that's true or that's not true.

All right.  So, again, you know, my tentative here is, yes, the topic of how this conversion tracking data is used by Google to place or to inform the -- improve the performance of Shopping Ads is relevant.  I don't know that it deserves being a whole separate 30(b)(6) topic, but I would say, when Google is preparing its general conversion tracking witness, it needs to make sure that this is something the witness knows something about.

Ms. Clarke?

MS. CLARKE:  Yeah, I understand, your Honor.

And, I guess, my point is that it's a small piece of what they're looking for, but it's a large undertaking to educate a witness on this because, like I said --

THE COURT:  Why is it -- why is it so hard?

MS. CLARKE:  Because the algorithm and what

Google uses to dictate where Shopping Ads are placed or how Shopping Ads are shown is very complex. Like, ███████████████████████████████████

████████████████████████████████████████

██████   I'm not an expert on that by any means.  So I think we're going to have to undertake a lot of work to educate a witness, and I don't think it can be the same person --

THE COURT:  Somebody at Google must understand how this works.

MS. CLARKE:  I think that it requires a lot of different individuals' input.  And we have been investigating this a lot.  The e-mails and, you know, conversations we've had have involved, like, dozens of people to try to understand already what we've agreed to.

We had, already, several sessions to educate our witness for -- on Topic 20 -- Topic 33. I think at least three in her -- we'll have several more before her deposition at the end of July.

So, you know, it's already a lot that we've educated her on in this context because it requires so much input from other teams.  I think tacking on this last piece to this topic really would increase the burden because it takes it in a totally

AMM TRANSCRIPTION SERVICE  -  631.334.1445

different direction.

So my point to you is that -- not to make this a topic on its own, but to fold it into the topics that we are negotiating on that deal with Shopping Ads and their placement on a larger scale, and allow the parties to negotiate on that and the scope of that separately and --

THE COURT:  Well, I have -- look, I have no problem with you tucking any of these topics into other topics that are still under negotiation.  The problem is that I'm not sitting in the room with regard to these other negotiations.  I don't know what the demand was.  I don't know where you're at in the negotiation.

So the best I can do today is to say, basically, yes or no on the topics that are before me today and, if appropriate, leave it to Google to figure out where to place that witness, whether it goes thematically with something else that a particular witness is going to testify on.

So I'm going to say, tentatively, yes on this one.

What's next, Mr. Kane?

MR. KANE:  Topic 42, which is the revenue of the defendant, Google LLC.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT: Okay. Now, the way this comes up on at least some of my charts here -- I have too many charts, which is a possibility.

But right now, what my charts are saying is "total yearly revenue generated by Google LLC."

Is that really what you want?

MR. KANE: Correct.

THE COURT: Okay.

MR. KANE: So one of the statutory damages factors -- sorry.

THE COURT: Wait.

MR. KANE: I'm sorry.

THE COURT: My first question -- maybe this is a stupid question; you will tell me -- is, isn't this public information? Google's a public company.

MR. KANE: So Google's owned by a larger entity called Alphabet. And the Alphabet annual financial statements, the 10-K, lists the revenue for Alphabet but not for Google LLC.

If Google wants to concede, you can just treat the revenue of Alphabet as the revenue of Google LLC, that's perfectly fine with us.

THE COURT: Great.

MR. KANE: Or if they want to have a witness say, well, when you look at the 10-K, if you

AMM TRANSCRIPTION SERVICE  -  631.334.1445

take this number and subtract this number, that's where you get the Google LLC number --

THE COURT:  Okay.

Okay.  So I got it.

MR. KANE:  Okay.

THE COURT:  Thank you.

And I think you don't have to explain to me how trademark damages work.  You have to -- you only have to do one thing, which is come up with a revenue number.  This is how plaintiffs look at it. And then it's going to be up to the defendant to strip out all of the revenue streams that don't count and the expenses and the "this" and the "that" and the other thing, and whittle it down to some number which is not astronomical and ridiculous, right?

MR. KANE:  That's a slightly different issue.  So that's infringing profits.

THE COURT:  Right.

MR. KANE:  So for infringing profits, we show how much they earned on the infringements --

THE COURT:  And then you -- and then you pass the ball to them, and they have to --

MR. KANE:  Yeah.  This is a little different.  This is -- in order to show

AMM TRANSCRIPTION SERVICE  -  631.334.1445

deterrence --

THE COURT:  Ah.

MR. KANE:  -- the idea is --

THE COURT:  I got it.  This is for deterrence.  Okay.

MR. KANE:  Yeah.  Defendant --

THE COURT:  This is a huge company, so this is how many billions of dollars we need to make it hurt.

MR. KANE:  I would put it a little more, actually, but yes.

THE COURT:  Fine.

What's in the holding company besides Google LLC?  Maybe I should start there.

MS. CLARKE:  Yes, your Honor.

So I actually brought a copy of the 10-K that we cited in our motion.  It could be helpful for you to look at.

THE COURT:  You can hand that to Ms. Kay.

You've seen the 10-K, Mr. Kane?

MR. KANE:  I have, but if you have an extra copy, I'll take it.

MS. CLARKE:  Apologies.  I only brought two, but I can --

MR. KANE:  Which year is it?

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MS. CLARKE:  2025.

THE COURT:  Hot off the press.  Well, not that hot off the press.

All right.  Form 10-K for Alphabet Inc., it's thick.

MS. CLARKE:  It is, yes.  And we will not need to look at all of it, but I just wanted to point --

THE COURT:  Well, that's good.

MS. CLARKE:  -- to note that -- so you can see in the 10-K that, on page 29, revenues encompass all of Google's, you know, different products.  And if you look at 29, you see that revenues includes Google Services, and specifically under that is Google Advertising.

THE COURT:  Hold on.  Hold on.  Hold on.

Revenues and monetization metrics.  Yes.

We generate revenue.  "We" meaning Google LLC and everything else that we own.  I just don't know what the "everything else we own" is.

MS. CLARKE:  Yeah.  So as you -- so under there, it says, "Google Services consists of Google Advertising as well as Google subscription platforms and device revenues."

THE COURT:  Right.

MS. CLARKE:  Under Google Advertising, it says, Google Advertising revenues are comprised of the following:  Google Search and others, including revenues gathered from -- on the search properties and other Google-owned and operated properties like Gmail.

It doesn't specifically say Shopping in here, but our understanding is that Shopping is included in Google Services and is --

THE COURT:  So wait.  Your view is Shopping, which you're going to argue in a minute is the only relevant revenue stream, as opposed to Google LLC, is tucked into Google Search and others?

MS. CLARKE:  Correct.

THE COURT:  Okay.  How does that help you? I still don't see a number in here.

MS. CLARKE:  So then if you turn to 82 ...

THE COURT:  Okay.

MS. CLARKE:  Or apologies.  36.  82 was for a different one.

THE COURT:  Hold on.

I do appreciate the color copies, by the way.

36?

MS. CLARKE:  Yes.

THE COURT:  Go ahead.

MS. CLARKE:  So, on 36, you can see segment profitability.  So Google -- the Alphabet 10-K reports its profitability by segment.  You can see Google Services here.

THE COURT:  I see Google Services at -- that's $139 million; is that right?

MS. CLARKE:  Correct.

THE COURT:  For 2025.

So you're saying Google Services, at 139 million, is all plaintiff really needs to know; that's where they should start.

MS. CLARKE:  Yeah.  We think that these 10-Ks are more than sufficient to provide the information that they're seeking to support --

THE COURT:  Okay.

Now, Google Cloud, is that also under Google LLC?  That's another 13.9 million in 2025.

MS. CLARKE:  So I don't believe Google LLC -- I don't know that -- I don't know what is encompassing Google LLC.  I know that it doesn't put out its own 10-K, so ...

THE COURT:  Right.

Okay.  So I think -- look, you guys can fight later over whether the revenue figure for

Google LLC is the right figure for plaintiffs to use when they're arguing about deterrence.

It may be that Google is correct, and that the right place to start, if indeed there is a right place to start, which Google may also have some issues with, is some other line in the financial statement, like Google Services, for example. Or maybe you want to say, no, we need to drill down even further, and we should only look at Google Shopping, which I don't see a line item here for. That's really not a decision that I have any interest in making and I'm not going to be making today.

The question asked was, what's the revenue of Google LLC? And you have an accountant somewhere who knows the answer to that because you have an accountant somewhere who actually knows what rolls up to Google LLC and what may be contained in some other corporate entity. So I don't think that the 10-K answers the question.

On the other hand, Mr. Kane, why can't you just send an interrogatory? Why do you need a witness on this?

MR. KANE: The problem with an interrogatory is it may only give us, like, a

bottom-line number.  It might not explain, kind of, where that came from or what it is.

THE COURT:  Well, why do you care?  If you're going to be using this number, as you just pitched it to me, to -- I'm trying to use non-colorful language here.

If you're going to be waving this number around in front of the jury, why do you care?

MR. KANE:  We just want to be able to ask the witness, like, how did you know that?

I mean, if we got an interrogatory response, we would then send a 30(b)(6) notice that said, you know, someone to explain the interrogatory response.

THE COURT:  Why?  Because you don't think the number is big enough?  It's not enough millions of dollars?

MR. KANE:  What's included in it?  Like, did you include X, Y and Z that we understand --

THE COURT:  Well, Google LLC is an entity, a legal entity.  It has boundaries.  Internally -- maybe not externally, but internally somebody has to be keeping financial statements that correlate income to one or another corporate entity, I think, right?

MR. KANE:  Yeah.  I think these things can be a little more complicated, but I think it's appropriate to just ask a witness, you know, where did this number come from?  What does it include?  What does it not include?  You know, basic questions like that, even if we got, you know, just a flat number for -- in an interrogatory response.

THE COURT:  Okay.

MS. CLARKE:  I --

THE COURT:  Ms. Clarke?

MS. CLARKE:  I guess I would just say, I just don't think those are as basic questions as Mr. Kane is presenting them.  I mean, we have a 98-page 10-K here that doesn't even cover --

THE COURT:  You have a 98-page 10-K that doesn't actually answer the question that he is asking.

MS. CLARKE:  No, I understand, but I'm saying that just shows the complexity of these issues.  So, you know, the basic questions that he says he's asking are not actually as basic.  So I just don't think it's appropriate for 30(b)(6) testimony.

THE COURT:  Would you rather it be in the form of an interrogatory?

MS. CLARKE:  If that's the only other option available to us.

THE COURT:  Because that's where I'm leaning.

MS. CLARKE:  If that's the only other option available to us, then yes.

THE COURT:  Look, if somebody has to sit down and take a pencil or Mathematica or something like that -- sorry.  My husband uses Mathematica. He's an academic -- and figure it out, frankly, I think it would make more sense, and I think Google, if they thought about it, would think it makes more sense, to have somebody do that in the privacy of her office and then produce a piece of paper rather than have to do it, sort of, live in a deposition setting.

MS. CLARKE:  Yeah.  We would agree an interrogatory is preferred over a 30(b)(6).

THE COURT:  Okay.  Interrogatory.

Next?

MR. KANE:  Topic 13, which is Shopping notices treated as Search notices.

THE COURT:  Wait.  Wait.  Didn't you just tell me that 13 was resolved?  Did I miss that somehow?

MR. KANE:  No.  13, unfortunately, has not been resolved.

I'm sorry.  It's resolved as to two of the spreadsheets within Topic 13.

THE COURT:  Oh, oh, oh.  Okay.

So what's not resolved as to 13?

MR. KANE:  So Google had this error, unfortunately, where, for about ████████ of plaintiffs' notices, Google processed the notice as a Search notice rather than a Shopping notice.  It works out to somewhere around █████ URLs that were misprocessed in this way.

So we gave Google a list of these.  That's the 26.01.19 MTC re:  Shopping that's referenced in the topic.  We're asking for someone to testify about this spreadsheet that Google has that categorizes these notices as Search notices rather than Shopping notices.

And then Google has taken the position that, ████████████████████████████████ ██████████████████████████████.  We think that's incorrect because, when we look for these case IDs in the ████████ ████████████████████████████████, we don't see them.

So we're asking the witness to explain, if these witnesses were -- if these notices were processed as Search notices, ████████████ ████████████████████████████████, that kind of thing?

THE COURT:  Ms. Clarke?

MS. CLARKE:  Yes, your Honor.

So the document that plaintiffs cite is what they would like us to testify about, that's --

THE COURT:  The spreadsheet?

MS. CLARKE:  The spreadsheet, yeah.  That's something that plaintiffs created.  I just wanted to clarify that.

So, you know, our position is that we don't think it's appropriate for a Google witness to be prepared to testify about a spreadsheet that plaintiffs created on their own.  We haven't been able to independently verify that and the data that it contains.

I think our other position is that our 30(b)(6) witness on Topic 10, who we already talked about, the broad topic about Google's DMCA policy, has already provided testimony about DMCA notices for Search versus Shopping, how they are processed the same or different.

And, you know, to the extent this topic is relevant at all, it would be relevant to Google's DMCA Safe Harbor defense, which, as you know, we withdrew.  So we don't understand why plaintiffs are still pushing on this.  Like, even, you know, to the extent there were issues with ███████████████ ████████, it's not -- we're not asserting a DMCA -- which I'm not conceding, but it's not relevant now that we're not trying to assert a Safe Harbor defense.  This was something they were pushing for when we were trying to put --

THE COURT:  Before you withdrew the defense?

MS. CLARKE:  Yes.

THE COURT:  So let's take those one at a time.

I understand your reluctance to have a witness testify from a plaintiff document, not from a Google document, but that strikes me as a solvable problem.

Mr. Kane, presumably, you don't want to fence with a witness for the first hour over whether your document accurately reports data from Google.

Can you get to this topic without going through your spreadsheet?

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. KANE:  Yes.

What I would clarify is -- so Google -- Google produced a spreadsheet that said, for each notice from -- concerning the domains in this case, what does Google claim to have done with it?  Did it remove the ad?  Did it not remove it?  Et cetera.

What we did is within -- so one of the columns in that spreadsheet is which product --

THE COURT:  One of the columns in Google's spreadsheet?

MR. KANE:  In Google's spreadsheet is, does this pertain to Web Search, to the Search product, or to the Shopping products?

THE COURT:  Right.

MR. KANE:  The spreadsheet that we gave Google was simply the lines from Google's spreadsheet where we think Google processed it incorrectly.

THE COURT:  So you could do it from Google's spreadsheet, it would just take longer.

MR. KANE:  Exactly.  Yeah.

It's literally -- the relevant rows are copied and pasted.  And I actually think we kept both the Web Search ones and the Shopping ones and just filtered for the ones that say "Shopping."

The reason we did it that way is Google did not produce, like, one spreadsheet, it produced -- I want to say it's, like, ten spreadsheets. And, like, the combination of those ten is what it did with all of the notices concerning the domains in this case.

So we can take one of them and show that to the witness. I don't really see that as the issue. It's more, we need to be able to ask the witness, okay, so when Google classified this as a Search notice rather than a Shopping notice, what's your case for, you know, even though that happened, they processed it as a Shopping notice?

Like, Google's story in the briefing on this issue was, you know, it doesn't necessarily mean that we process it as a Shopping -- as a Search notice.

We need to ask a witness, like, is that what it means? Like, how does it come to have that label on it?

THE COURT: Now, if you would, focus on the second part of Ms. Clarke's response, which is, make me the relevant pitch, please, without specifically referencing their DMCA policy.

MR. KANE: So when we sent a notice to

Google saying, here's an ad that is promoting an infringing product, please take it down, Google had an abysmal record of doing that. It did it in very few of the cases where we asked them to do it.

THE COURT: And you think that's because they were mislabeling these, in part?

MR. KANE: I think that might be part of the reason because for -- by our math, ███ percent of the notices that we sent, Google treated it as a Search notice rather than a Shopping notice, which I assume means --

THE COURT: -- the ones that didn't get taken down. Or have you done that correlation?

MR. KANE: We have, sort of.

What we did is, for all of those notice case IDs, we looked in ████████████████████████ ████████████████████████, and for -- that's where we got to the ███ percent number. For ███ percent of the ones that were misclassified, the case ID did not appear in --

THE COURT: ███ --

MR. KANE: -- the ████████████████.

THE COURT: 100 minus ███ is ███.

MR. KANE: So there was -- a certain number of line items were misclassified. Those were about

█ percent of the URLs that we noticed.

█ percent of those were not recorded in the ████████████████. That's how we got to █ percent.

THE COURT: I got it.

And all of the data on the Google spreadsheets that you received and on your combo spreadsheet that you're referencing here -- all of this data goes to the 1,500 pirate websites, not to the whole universe out there?

MR. KANE: That's correct because that's all that Google produced to us, is what they did with the domains that were at issue in our case.

THE COURT: So the domains that were allegedly selling your works in -- your clients' works-in-suit.

MR. KANE: Correct.

THE COURT: Or infringing copies of them. Okay.

MS. CLARKE: A few things: Just the ██████ ████████ that Mr. Kane was referring to, that is related to Google's Repeat Infringer Policy. So this still ties back to DMCA. His rationale here is still circular, back to Google's application of its DMCA policy.

THE COURT:  Look, the fact that something is relevant to an affirmative defense that is no longer in the case doesn't mean it's not also relevant to the plaintiffs' prima facie case.  It's not a zero-sum game.

MS. CLARKE:  Okay.  I guess -- and more importantly, the notice data that he's talking about that underlies this spreadsheet in Topic 13, that's the exact notice data that Google already agreed and did present a witness on, on Topics 11 and 36D.

So when we started, Mr. Kane said that we reached agreement there.  That's correct.  He asked our 30(b)(6) witness about the notice data that was produced.  In fact, he went through the columns that discussed Search or Shopping -- the categorization of Search versus Shopping.

THE COURT:  I'm sorry.  Which spreadsheet is this that the witness was asked about?

MS. CLARKE:  It's the --

THE COURT:  The Google spreadsheet or the plaintiffs' spreadsheet?

MS. CLARKE:  The Google.  The Google spreadsheet.

So Mr. Kane is right, that there were several different types -- several different

AMM TRANSCRIPTION SERVICE  -  631.334.1445

spreadsheets that created our notice data.  And that's because the way that we pulled those notices was in different ways, whether it was e-mail connected or domain connected, and I won't get into the details of that.

There are several spreadsheets.  Mr. Kane walked through them with our witness for, I believe, two hours.  We went through all of that data.  So I don't know --

THE COURT:  And who was this?

MS. CLARKE:  This was our 30(b)(6) witness on Topic 10.

THE COURT:  This was your Topic 10 witness, Mr. or Ms. X?

MS. CLARKE:  Or -- yeah.  And -- yeah.  And she was also, obviously, designated for Topic 11 and 36D, which is what we agreed to.

THE COURT:  Okay.

All right.  So what was this witness unable to answer that you now need a whole new topic for?

MR. KANE:  We didn't ask her about this issue.  In other words, we didn't say, like, look, here's the plaintiff notice.  It's clearly a Shopping notice.  Why is it listed as a Web Search notice in your spreadsheet?

If it is listed as a Web Search notice in your spreadsheet, does that mean it was processed as a Search notice and not as a Shopping notice?

If it was processed as a Search notice and not a Shopping notice, doesn't that mean the merchant wasn't suspended?

Didn't you process our notice the wrong way?

We asked her what the column -- you know, where the -- the column that says "Product," when it says "Web Search" and "Shopping," what does that mean?  But we didn't walk her through, like, here's the problem we've identified with our notices, can you explain, like, what this -- what these values in the spreadsheet mean?

Because they had not designated her as the 30(b)(6) witness on this topic because they were refusing to produce a witness on this, we didn't want to ask her about this because then they would come into court and say, you've already covered this topic.

THE COURT:  All right.  I'm going to hold off on this one because I think it's a wobbler in terms of proportionality.  So let me hear the rest of the field, and then we'll circle back to this

one.

What's next, Mr. Kane?

MR. KANE:  Topics 27 and 28.

THE COURT:  All right.

MR. KANE:  ███████.

THE COURT:  We'll take those together?

MR. KANE:  I think that makes the most sense.  Yes.

THE COURT:  Okay.  Go ahead.

MR. KANE:  So ████████ is a system that Google used to ██████████████████████████, and Google employees would review the information in ██████████ to determine whether to suspend merchants for violating Google's Counterfeit Policy or its Misrepresentation Policy.

It includes things like ██████████████ ████████████████████████████████████ ███████████████████████████████ ████████████████████████████████████ ██████████████████    ████████████████ ████████████████████████████████ ██████████████████████████████ ████████    ████████████████, we're not sure what that is, but we assume it's something Google assigns.

So Google provided this data concerning the

1,500 pirates at issue in this case to the extent the data was there for those pirates, and it produced the data and the ███████████ that these reviewers relied on.  We are asking Google to produce a witness to explain what this data is and what these ███████████ are.  Again, this is pertaining to the 1,500 pirates in this case.

THE COURT:  That's 28, the 1,500?

MR. KANE:  That's 27 and 28.  So 27 is --

THE COURT:  27 seems higher level and broader to me.

MR. KANE:  Yeah.  27 is asking about the ███████ data itself, those two spreadsheets.

THE COURT:  Right.

MR. KANE:  28, we've taken particular fields in one of the spreadsheets because it has a lot of fields.  We've said, instead of producing a witness on -- I think it's 44 of them -- you can produce a witness on these 16.

THE COURT:  You want 16.  16 left.

MR. KANE:  Correct.

THE COURT:  Now, Google says, especially with regard to 27, that a prior deponent has essentially already covered this topic.

MR. KANE:  So, one, he wasn't a 30(b)(6)

witness.

THE COURT:  Doesn't matter.  You don't get both a percipient witness and a 30(b)(6) witness on the same topic just because the first guy was a percipient witness.

MR. KANE:  Well, we didn't ask him, like, everything -- we didn't ask him everything we would have asked him if he was a 30(b)(6) witness on it.

In other words, some of these same fields appeared in a different document, and we asked him about some of those fields in relation to that document.

Because they had -- they refused to produce a witness on this topic, we didn't explore with him, you know, here's the Google that was -- here's the data that was produced specifically for this litigation, can you explain to us what all these mean?

THE COURT:  Ms. Clarke?

MS. CLARKE:  Sure.

So I just wanted to provide a little background on the ▮▮▮▮▮▮ data and what we did produce.

THE COURT:  Sure.

MS. CLARKE:  So this is a longstanding

dispute between the parties.  Google did not originally believe that any of this was relevant, and our position is still that it's not relevant because the data that we produced is █████████ ██████████████████████████████████████████████ ███████.  So some of the ███████ that Mr. Kane --

THE COURT:  Someone needs to explain to me, in one paragraph, what is a █████████████████ ████████?

MS. CLARKE:  Sure.

So it's a ████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████ --

THE COURT:  ████████████████████████ ███████████████████████████████?

MS. CLARKE:  No.  It's █████████████████ in a very broad sense.  So it might be ████████████ ████████████████████████████████.  So it's not --

THE COURT:  ████████████████████ ████████

MS. CLARKE:  It's not related --

THE COURT:  Right.

MS. CLARKE:  -- specifically to copyright at all.  And, in fact, it -- the folks who implement

Google's DMCA policy have no interaction with these ███████. They don't know these ███████. There's no --

THE COURT: And what -- when you use the word ███████ --

MS. CLARKE: Sure.

THE COURT: -- explain that to me.

MS. CLARKE: The ███████ are what Mr. Kane was listing before about, like, ███████ ███████, and it's what -- in Topic 28, what they listed there, those are some of the ███████ that it collects.

THE COURT: Okay. Okay. Okay.

All right.

MR. KANE: Can I --

THE COURT: So these are, sort of -- hold on one sec.

MR. KANE: Sure.

THE COURT: So these are, sort of, you're saying, ███████████████████████████████ ███████████████████████████████ ███████████████████████████ ███████

MS. CLARKE: Yeah. And they could be ███ ███████████████. For example, ███████████

███████████████████████████████████████

███████████████████████████ I don't know exactly --

THE COURT: And if ████████████████

████████████████████████████████████████

████████████████████████████████ ?

MS. CLARKE: Exactly. Then there is --
there's both █████████████████████████████
████████████████████████████. This is all stuff
that our 30(b)(6) witness did testify about. I
believe it was -- I don't have the topic number in
front of me, but he testified about the

████████████████████████████████████

███████████████████████ This all ties together.

The ██████████████████ that we produced is
what the ███████████████████████████████
██████████████████████████████████████
███████████████████████. So that's why this
█████████████████ did come up in that 30(b)(6) witness.

Mr. Kane is correct, that he was not
designated on this topic, but he was designated as a
30(b)(6) witness on the ██████████████████ topic.
So these came up. He explained how ████████████ works
generally in a ██████████████████████. And then
Mr. Kane put these spreadsheets in front of him, and
they went through the data in these, and the columns

AMM TRANSCRIPTION SERVICE  -  631.334.1445

and what the columns meant, and they talked about it extensively.

So, again, if Mr. Kane didn't ask all the questions he wanted, that shouldn't put the burden back on Google to put up a whole other witness when the person who would be most educated on it was already deposed and asked about it.

THE COURT:  Now, if I were to grant Google additional 30(b)(6) testimony, for example, with respect to 28, which I now -- it's 16 fields, right? That's what you want in 28?

MR. KANE:  Yes.

THE COURT:  Would it be the same witness?

MS. CLARKE:  That would be who our first thought would be.  If he hadn't already been deposed, we would have definitely designated him.

THE COURT:  Okay.

MR. KANE:  When we deposed this witness, one, he didn't know a lot of it.  We asked him a lot of questions about these, and a lot of them he didn't know.

And second, his answers were extremely hedged.  It was, you know, I'm not really sure. This isn't my field, you know.  I'm not sure what the spreadsheet is.  You know, can you tell me what

this is?

It was not like he knew all about this and, you know, we could have asked him any question we wanted.  You know, he knew something about it, but he wasn't as prepared as a 30(b)(6) witness would be.

And just one point on your question about the Misrepresentation Policy.  I think most relevant here is that Google claims that -- so the e-book ban applied to paid Shopping Ads, but not to free Shopping Ads, i.e., ads for which the merchant doesn't pay for the ad.

Google claims that, with respect to free Shopping Ads where e-book ads were not banned, ███

███████████████████████████████████████████

███████████████████████████████████████████

██████  So supposedly this is ████████████████

███████████████████████████████████████████

████████████████████████████   That's one of the reasons the ████████ data is so important.

THE COURT:  All right.

No on 27.  Yes on 28.

What's next?

MR. KANE:  Topic 49, the Auction Insight reports.

So Google provides these reports to its merchants that explain how often the merchant's ads were shown in comparison to how often competitors' ads were shown. In several of the depositions of plaintiffs' witnesses, Google has been asking our witnesses about the Auction Insight reports concerning plaintiffs. We think it's only fair that Google produce a 30(b)(6) witness that explains what these reports are and how the data is compiled.

THE COURT: I'm sorry. Backup again.

Where do these Auction Insight reports come from?

MR. KANE: They come from Google. So Google provides these reports to merchants, so both to the plaintiffs and to the pirates.

THE COURT: And what's in them?

MR. KANE: So what it does is it explains how often the merchant's ad was shown compared to a competitor's ad.

So the way ads work on Google is, you know, there's a search term; let's say it's the name of a textbook. There are multiple offers, they call them, potential ads that Google could show in response to that search. There's an auction process whereby Google decides which ad is it going to show.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

Is it going to show the publisher's ad or the pirate's ad, for example?

The Auction Insight reports explain to the publisher or to the pirate, here's how often we showed your ad.  Here's how often we showed your competitor's ad.

Google has been using those in depositions of plaintiffs to try to make the argument, well, your competitors really weren't the pirates.  Your competitors were other textbook publishers.

THE COURT:  Okay.

MR. KANE:  We think it's only fair that Google have to explain what these reports are, how they're generated, and what they include and don't include.

THE COURT:  Well, hold on a second.

All right, let me hear from Ms. Clarke.

MS. CLARKE:  Sure.

So just to clarify, the Auction Insight reports that have been asked about at plaintiffs' depositions are reports produced by plaintiffs, which is why they're being asked --

THE COURT:  Are there two different kinds of documents called Auction Insight -- oh, I see.

MS. CLARKE:  Yeah.  They have produced what

was in their own files.

THE COURT:  They produced them, but they were originally --

MS. CLARKE:  So that's --

THE COURT:  -- generated by Google or from Google.

MS. CLARKE:  That's the representation that's been made to us.  Google has not produced any Auction Insight reports.  So to the extent that this -- these were going to be asked about, we would be, again, using plaintiffs' produced documents that they say are exactly what they got from Google.

Again, we have no way to verify that these are the exact reports that they got.

THE COURT:  Well, of course, you could, I assume.  You could check at your end and see if this is --

These are reports, Mr. Kane, that a merchant, whether a legit merchant or a pirate, can sort of, generate for themselves by querying Google's website?

MR. KANE:  That's correct.  In the, sort of, interface that the merchant uses, there's a, you know, link you can click that will generate an Auction Insight report from Google.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  Okay.

MR. KANE:  So the ones that plaintiffs produced are ones that Google generated, which Google, in discovery, asked us to produce back --

THE COURT:  Well, "generated" now is a bit of a buzzy word.

MR. KANE:  The plaintiffs used Google's system to generate -- I mean, the data comes from Google.  Plaintiffs have no idea, you know, how often their own ad was shown in comparison to their competitors.

THE COURT:  All right.  So just so I understand what happened here, a merchant, including the plaintiffs here, can and, in this instance, did generate these reports by querying Google's databases, which is a feature that's available to all merchants, I take it.  And plaintiff witnesses were asked questions regarding these reports and I assume what they did with these reports and so forth at the plaintiff depositions, right?

MR. KANE:  Correct.

THE COURT:  Okay.  And now, plaintiff is saying, well, the underlying data, Google couldn't have gotten it anywhere else.  And you want to ask Google witnesses about what?  How -- what data goes

into it when a merchant queries the system?

MR. KANE: Yeah. We want the Google witness to explain what these are and how they're generated. And, you know, does Google retain the information that it uses to generate the reports and that kind of thing?

THE COURT: What's it relevant to?

MR. KANE: Because Google is making the argument that plaintiffs -- what these reports show is that plaintiffs' competitors for ads -- for ad space on Google was not, in fact, the pirates, but was other textbook publishers. So if this is the data they're going to be using to substantiate that argument --

THE COURT: You have reason to believe that the data -- I mean, do you think they're fake numbers?

MR. KANE: What we don't know is how they're calculated. In other words, how is it that Google comes up with this number? 35 percent of the time, you know, your first competitor was, you know, Penguin. You know, 27 percent of the time, your first competitor was, you know, Testbank23, a pirate site.

We would like to ask a witness, you know,

what are these?  Like, how is this generated?  How does Google track this kind of thing?  So that we can understand these reports that --

THE COURT:  Their clients have been generating these reports and presumably making business decisions and/or possibly litigation decisions based on them, right?

MR. KANE:  I don't know the extent that they use them to make litigation decisions.  I don't really think so.  They might be using them to make decisions about what kind of ad campaigns they want to --

THE COURT:  Keeping an eye on how the competition is doing and who the competition is.

MR. KANE:  Right.

THE COURT:  But is there an allegation in this case that these reports are somehow false or misleading and, sort of, part of the inducement that you have to prove, or is it just that, hmm, we have these numbers, we're afraid Google may rely on them at trial, so we want to kick the tires?

MR. KANE:  Well, there is -- you know, if Google is going to use this as the basis for an argument, we think they should have to explain, you know, where it comes from and what it is.

But, I guess, a second part of it is, if Google has this information about plaintiffs, perhaps it has this information about the pirates themselves, and perhaps it knew -- you know, perhaps it had this information about the pirates during the operative period of the case.

THE COURT:  Well, I don't understand.

What do you mean, "perhaps" it has this information about the pirates?

You mean the pirates could have generated comparable reports?

MR. KANE:  It's not really so much, did the pirates generate them?

The data that's used to generate the reports would be in Google's possession.  So whatever data it uses to generate these reports about plaintiffs, it should have that --

THE COURT:  Yeah, but did you ever ask for that as a -- in the -- I was going to say, in the early part of fact discovery, but there's just been so much fact discovery, I'm not sure what the early part was.  But we're at the end of it now.

We're in the final inning of fact discovery, and you want to do this through a 30(b)(6) witness, but you didn't do the basic fact

AMM TRANSCRIPTION SERVICE  -  631.334.1445

discovery that I would think you would have done if you were interested in figuring out where this data comes from, is it reliable, what does Google have, et cetera.

MR. KANE:  We did ask for the Auction Insight reports concerning the pirates.  Google refused to produce it.  So we're just asking for a 30(b)(6) witness to explain, kind of, what these are and, you know, what's the data that forms the basis for generating these reports.

THE COURT:  All right.  I'm not seeing that this makes your top 10 or even your top 20 list here on a proportionality basis.  I think this is fairly far afield from anything that's directly relevant to a claim or a defense in this case.

What's next?

MR. KANE:  Topic 18.

THE COURT:  18.

MR. KANE:  Whether suspensions on other platforms are considered in deciding whether to suspend a motion for a copyright infringement.

THE COURT:  Okay.  And what have you gotten so far on this issue from percipient witnesses and/or other 30(b)(6) witnesses?

MR. KANE:  I believe one fact witness

testified that he -- that she thought that, for example, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

What we are --

THE COURT:  And you have a reason for believing -- you want to -- what do you hope for here?

Do you want to nail down that that's true, or do you hope that that's not true?  And how does it help you either way?

MR. KANE:  Well, we wish it weren't true. ▮▮▮▮▮▮▮  ▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮  And if that's the answer they're sticking with, that's fine, but we would like to know, do they do that if they find copyright infringement, for example, in Google Play?

So Google Play sells e-books.  You know, you can buy an e-book through Google, Google Play. And our understanding is that Google Play had ▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

A witness testified just yesterday that Google ████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ██████████████████

THE COURT:  All right.  So don't you want to just take that answer and run with it?

MR. KANE:  What he testified to was that they ██████████████████████████████████ ████    ██████████████████████████████ ██████████████████████

We're asking, like, A, is that actually Google's position?  Is a 30(b)(6) witness going to say that's actually what happened?  And B, do they do it for any other platforms?

If someone is copyright infringing on YouTube, do they say, okay, in addition to taking them down on YouTube, we're not going to let them run Shopping Ads anymore?

THE COURT:  So far -- just let me --

MR. KANE:  Sure.

THE COURT:  -- understand the lay of the land.

So far, you don't have any evidence from

any source that ████████████████████████████████

████████████████████████████████████████████████

███████████████████████

MR. KANE:  The only indication we have that's contrary to that is the ██████████████ ███████ we were talking about earlier.  That does seem to be a little more holistic, but I don't know whether it includes, you know, if some --

THE COURT:  ████████████████████ ████████████████████████████

MR. KANE:  Correct.

THE COURT:  Yeah, I'm not seeing this --

MR. KANE:  Okay.

THE COURT:  -- on 18.  It seems quite far afield and a bit speculative.

What else have you got?

MR. KANE:  25.

THE COURT:  Meaning of the designations: ██████████████████████████

MR. KANE:  ████████████████████

So this has been narrowed a bit.  What we're down to is -- Google has agreed to produce a witness on what ████████████████ are.  There is a spreadsheet that Google produced, which is ████████ ████████████████████████████████████████

We're asking for a witness to testify that that's what it is.

So, as background, normally, Google has a ▮▮▮ strike policy.  If the account is designated as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

What a previous witness explained is that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ --

THE COURT:  These are, like, ▮▮▮▮▮▮▮ ▮▮▮▮

MR. KANE:  Exactly.  Yeah.

So there's a spreadsheet that Google produced, which we think is ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮, but we don't know what --

THE COURT:  It has about ▮▮ on it?

MR. KANE:  I would have to look, but I think it's around there.  And that's -- we think it's ▮▮▮▮▮▮▮▮▮▮▮▮.  We're asking a witness to explain whether that is, in fact, what it is or not and for what period -- the period for which it applies.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  Ms. Clarke?

MS. CLARKE:  Yeah.  So just to clarify -- and Mr. Kane has heard this from several witnesses -- ███████ accounts are treated exactly the same under Google's DMCA policy.  The only difference is --

THE COURT:  Exactly the same as what?

MS. CLARKE:  As any other merchant.  The only difference is that ██████████████

██████████████  They would -- they just require --

THE COURT:  ████████████████████

██████████████████

MS. CLARKE:  Yes.  But I think █████████

███████████████████ is a strong word.  It just means that ████████████████████████████

███████████████████  ████████████

██████████████████████████████████████

████

So in the case of ██████ accounts -- again, this has been testified to, and Mr. Kane has asked at least two witnesses about it.  ███████████

███████████████████████

█████████████████  So, for example, like, if they weren't ████████████████████

█████████████████████

AMM TRANSCRIPTION SERVICE  -  631.334.1445

[REDACTED]

THE COURT:  So someone can be [REDACTED]

[REDACTED]

MS. CLARKE:  That's my understanding.

And, again, they are still subject to the same exact review.  And it's still Google's Repeat Infringer Policy, exactly the same, [REDACTED]

THE COURT:  Well, if I understand it, though -- just walk me back for a minute.  Give me a little bit of context.

Google has presented testimony, or has agreed to present testimony -- I am not sure how much of it has happened yet -- from 30(b)(6) witnesses with regard to what this [REDACTED] account designation means.

MS. CLARKE:  Correct.

THE COURT:  And now, what you want, in

addition to that, Mr. Kane, is you want to put the ███████████ in front of somebody and have them tell you where it came from and what it means?

MR. KANE:  We want to take the spreadsheet that we think is the ████████████████████ and have someone tell us that that is what it is and --

THE COURT:  Why didn't you put that in front of Mr. or Ms. ██████████ 30(b)(6) witness?

MR. KANE:  We may have.

MS. CLARKE:  He did.  He did.

MR. KANE:  I don't recall.

But they hadn't -- this is the witness, as I said, who only became involved in Google's DMCA program in March of 2025, and so only knew about the DMCA program for the relevant period insofar as Google hadn't told her -- had told her about it.  So if --

THE COURT:  And how old is this ████?

MR. KANE:  That's one of the things we would have to ask the witness.  We don't know the period to which --

THE COURT:  You don't have metadata on it?

MS. CLARKE:  He does.

MR. KANE:  It might have a date created or

something, but ...

THE COURT: Ms. Clarke?

MS. CLARKE: Yeah, so this exact spreadsheet was put in front of our Topic 10 witness. She asked Mr. Kane to share the title with her so she could understand the context because it otherwise was just an Excel.

He shared the title, which clearly said that it was an ███████████████, I believe, from 2023. I don't know what more he needs, especially for the specific spreadsheet, which she said --

THE COURT: She said it was 2023?

MS. CLARKE: I don't know if she confirmed it or if just based on the title of the spreadsheet it was clear.

THE COURT: I don't understand why you have not taken care of this already with the witnesses available to you, or, for that matter, with -- perhaps some future witnesses may be able to shed light on this document.

MR. KANE: If Google wants to agree that this previous witness's testimony is 30(b)(6) testimony, that's fine. But, again, the witness was very, like, tentative. She was like, well, if that's the title, then I guess that's what it is.

Like, she didn't say, like, yes, I recognize this, this is ████████████████████████████████.

Like, we read her the title of the spreadsheet, and she said something like, well, you know, I guess that's what it is based on the title you just gave me.  But it was not like 30(b)(6) testimony saying, you know, yes, this document that Google produced is, you know, the ██████████ ██████████████████████████.

This is the sort of thing where, if I introduced it at trial, they would complain that I hadn't authenticated it, but they're refusing to produce a 30(b)(6) witness to authenticate it.

THE COURT:  So that's what this is, you want a 30(b)(6) witness to authenticate a specific document?

MR. KANE:  To confirm what we think is the case, which is that this document, the 0757 spreadsheet, is, in fact, ████████████████ ████████████████████.

MS. CLARKE:  Again --

THE COURT:  Why wasn't this an authentication interrogatory?

MR. KANE:  I mean, the thing is, there's a whole bunch of documents in the case where the

custodian is Google --

THE COURT: Sure.

MR. KANE: -- and where Google's counsel has refused -- like, we've asked them, like, what is this? And they've refused to tell us here's what the document is.

I suppose we could send them an interrogatory with, you know, this long list of documents that says, you know, what is this, and they could try to respond to that.

THE COURT: Well, authentication is one step. I mean, what you just said to me is what you're worried about is that, if you use it at trial, Google is going to claim that it lacks foundation. There's more to foundation than authentication, depending on the document.

But I'm just wondering why we need to bog down the 30(b)(6) process with the kind of thing which is usually taken care of after summary judgment, assuming that the case thereafter heads towards trial and people start preparing witness lists and exhibit lists.

Isn't it usually taken care of at that stage, where the parties are asked to stipulate to authenticity, to stipulate to foundation and, if

they can't, they hash it out at that point?

I mean, a 30(b)(6) witness for one document because you're not sure exactly what it is?

MR. KANE:  It does seem to me that this would have been the logical thing to have the previous witness testify about.  Like, when she was explaining what an ███ merchant is, we could have put -- like, we put this in front of her.  And if she had just said, like, yeah, that's ██████, you know, we would probably be done, but she didn't.  She said, well, you know, what's the title of it?  I've never seen this before.  Well, based on the title you just gave me, I'm guessing that's what it -- you know, I agree it should have been cleaned up in that particular deposition, but the witness wasn't able to do that.

MS. CLARKE:  Just to be clear, that wasn't what she testified about.  And she didn't say, I've never seen ██████ before.

I just think -- we have 72 topics from plaintiffs.  We couldn't agree to every single nuance of every single topic to prepare a witness on.  For the Topic 10 witness, she had, I think, 12 topics that she had to cover.  So even if we had shown her this document, I'm not sure that it would

have registered without the title.

THE COURT:  Is this particular witness coming back for anything further, or is she done?

MS. CLARKE:  No.  She's done.

THE COURT:  You got anybody else who can tell Mr. Kane what this document is?

MS. CLARKE:  Yeah.  I mean, we have at least four other DMCA witnesses coming in later this month and in August.

THE COURT:  All right.  Make sure that one of them can tell Mr. Kane what this document is, and tell him in advance which witness he should ask that question of, please.

I'm not designating it as a whole separate topic.

MR. KANE:  That's fine with us, your Honor.

THE COURT:  No, but answer my question, please.  That's what I'm writing down on my little chart here.

All right.  What's next?

MR. KANE:  Topics 60B and 60C.

THE COURT:  Oh, man.  All right.

MR. KANE:  So 60B is the ██████████ project.

For quite some time, plaintiffs were

advocating to Google that what Google should do is create an allow list; meaning, you know, certain publishers who had submitted some sort of verification documents would be allowed to advertise e-books on Shopping, but nobody else would.

The ███████████████████████████ ███████████████████████████ ███████ ███████████████████████████████████ ███████████████████████████████████████ ████████████████████ but it was --

THE COURT: ███████████ I'm sorry. What's your date range for ██████████?

MR. KANE: We've seen documents about it as early as ████, and it seems to have transitioned to something else in about ████.

Google's -- the ██████████ was never actually created and implemented. Google's story has been that an allow list ████████████████ ████████ .

What we've learned from deposition is that it is not so much that it was ████████████████ ███████████████████████ ████████████ ████████████████ .

The corollary to that is --

THE COURT: And you've already had

testimony about the ███████████ project.

MR. KANE: So the witness about whom -- the two witnesses about whom we've discussed the -- with whom we've discussed the ██████████ both said that they were only, sort of, tangentially involved, i.e., that they were involved with one, sort of, incarnation of the project, but it was short lived and they didn't do a whole lot on the project. They weren't able to actually, like, testify about what it was, ████████████████████; that kind of thing.

The corollary to the ██████████ is 60C, which is the Beta program.

THE COURT: Right.

MR. KANE: So in, I believe, late 2024, or maybe early 2025, Google did, in fact, create an allow list. It did the thing that plaintiffs had been suggesting it do, but it excluded plaintiffs from the program; in other words, it allowed a handful of publishers to advertise e-books on Shopping despite retaining the overall ban on e-books, but it wouldn't allow plaintiffs --

THE COURT: Your clients.

MR. KANE: Exactly. It wouldn't allow plaintiffs to do it.

THE COURT:  And you think that's because your clients were being so pesky and threatening and bringing litigation?

MR. KANE:  As a matter of fact, a Google document and an e-mail from Google's attorney both said the reason plaintiffs weren't being included in the program was because of this litigation.

THE COURT:  All right.  So you already know that this Beta program was implemented.  You already know that your clients were excluded from it.  And you already know -- or at least you just told me that you already know why.

What else do you need?

MR. KANE:  A big thing we need is, how are they able to do it?  So --

THE COURT:  What do you mean, "how are they able to do it"?

MR. KANE:  How were they able to make the allow list happen?

What they had been telling plaintiffs when plaintiffs were suggesting this for a couple years is an allow list ███████████     ████████████

███████████████████████████████████████████

████    How is it that they suddenly were able to do it?

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  Why does that matter if, in one way or another -- your pitch is going to be, one way or another, obviously, they were.  Either they weren't telling us the truth when they told us they couldn't do it, or they figured it out between then and now, and -- but not for our benefit.

I mean --

MR. KANE:  Two reasons:  One, if it turns out it was pretty easy and they were able to just do it, that says a lot about intent.

In other words, the reason they weren't dealing with this problem wasn't that it was really hard and they had to work hard to figure it out; it was, in fact, that they just weren't prioritizing it.

Second, we think what actually happened is Google was --

THE COURT:  Just to --

MR. KANE:  Sure.

THE COURT:  -- relate that back to what your ultimate burden is, this is, then, going to be one of the little nudges, right?

Your argument at some point down the road is going to be, here's a whole bunch of things, ladies and gentlemen of the jury, or here's a whole

bunch of things, Judge Rochon, that show that Google was actually inducing copyright infringement by these pirates.  And one of the -- one of the elements of this pro-piracy ecosystem was that they couldn't get off their rear ends -- or claim they couldn't get off their rear ends to do this thing, which, in fact, they could.

MR. KANE:  I think it's partly that.  I think it probably goes to intent.  And I think it probably goes to the need for deterrence.  In other words, Google was not sufficiently motivated to solve the problem of piracy.  It prioritized other things over solving that problem; therefore, a large award is needed to deter Google from having that mis-prioritization in the future.

THE COURT:  Okay.

But you could -- relevance to liability and relevance to deterrence is not going to be two separate arguments here because you could make the same two arguments about anything which you say shows that Google was insufficiently active to combat piracy.

MR. KANE:  Yeah.  The distinction I had in mind is just, for this one, like, how hard it was to do makes a difference.  In other words, if they were

able to just throw the Beta program together in response to this pressure from the potential partner that they had, that's a lot different than if it took them years to figure out how to even implement the Beta program.

In other words, if Google's story is, we didn't do this because it was too hard and it turns out they were able to do it very easily, that's a lot different than if they said, we can't do this because it's too hard and, eventually, they just did a lot of work and figured out how to do it.

THE COURT:  Or there was some technological breakthrough that made it easier or whatever.

MR. KANE:  Exactly.  Yeah.  We --

THE COURT:  All right.

Ms. Clarke?

MS. CLARKE:  Sure.

So just starting with ████████████, I just want to remind the Court that we had a dispute related to ██████████, I believe, in January that I argued before you.  And as part of the dispute, we made clear, this ██████████ initiative was extremely broad and was actually related to a much larger project that Google was undertaking.  A lot of it related to ████████████████████████

AMM TRANSCRIPTION SERVICE  -  631.334.1445

████████████████████████████████████

████████████████████████████

████████

And, in fact, Google's -- one of Google's 30(b)(6) witnesses who used to work in that area prior to coming into Copyright testify about her knowledge in that respect of ████████ at length during her deposition in her personal capacity.  So the fact that some of the witnesses that plaintiffs have deposed so far said they've only been involved in a small part of it is not surprising because the part of the ████████ that is even arguably relevant to this case was very small.

There was a small time when there was a contemplation of whether this large initiative could, in turn, ████████████████████ ████████ And as Mr. Kane said, he's asked two Google witnesses, one who was designated as a 30(b)(6) witness, about this program extensively, and I believe the witness yesterday talked about it at length and his knowledge and involvement.

THE COURT:  Percipient witness or 30(b)(6)?

MS. CLARKE:  Individual.  Yeah.

So talked about it at length.  We also still have our main designee for e-book-ban-related

issues who is going to testify later this month.

Now, again, we're not -- our issue with Topic 60 is that plaintiffs are trying to --

THE COURT:  Plaintiffs are trying to pull out what you think is a subtopic and turn it into a whole thing.

MS. CLARKE:  And just commit us to having to educate on specific --

THE COURT:  On every aspect of the ██████ ██████ project.

MS. CLARKE:  Exactly.  Which just makes it more burdensome and more technical for our witness to be prepared on when they've already --

THE COURT:  Is your witness going to be prepared to testify about what you've just described as, sort of, the portion of the ████████████ that was specifically aimed or conceived as being ██████████████████████████████████████?

MS. CLARKE:  So our -- I just want to see if I can get the exact language of what we said our witness will be prepared on.  I'm not sure if I have it in front of me right now.

But my understanding is we are presenting our witness on the implementation of the e-book ban and any ██████████████████████████████████

██████████████████████████████████ So to the extent that that program is part of it, then I expect testimony will come through.

But, again, as you noted, plaintiffs already have received significant testimony about this pretty small program, so designating a whole other topic on it just does not make sense, and the burden would be much stronger on Google.

THE COURT:  Now, what about the Beta program?  This is the program which, as I understand it, actually is happening, but not for the benefits of Mr. Kane's client?

MS. CLARKE:  Yes.  So, again, this has been discussed in at least two witnesses' depositions. And, in fact, one of our 30(b)(6) witnesses was involved in creating the ███████████████

███████████████████████████████ Beta program.  I don't -- █████████████████ ██████  Our understanding is that was done by counsel and would be privileged discussions anyway.

So he did testify about that and did clarify that a lot of these discussions were made by Google's legal counsel, so even if we were to designate someone on this topic, a lot of it would be privileged discussions.  And he's already

provided the foundation of ██████████████

████████████████████████████, the

purpose of it, and things like that.  So, again, no

need to burden another witness with this specific

topic.

THE COURT:  So, Mr. Kane, focusing on

Subsection C, the Beta program, you've had, it

sounds like, some testimony.

I'm hearing two things from Ms. Clarke.

First, you've had some testimony on the Beta

program.  And second, the question that you really

want to know the answer to, which is, why are my

clients not included, is going to be behind a

privilege wall.

What do you expect to get if I direct

Google to provide a 30(b)(6) witness on the Beta

program?

MR. KANE:  So two things:  One is, the

witness yesterday didn't know much about the Beta

program.  He was, sort of, tangentially involved,

but he left the company in the middle of the Beta

program and really didn't know a whole lot about it.

So I think Ms. Clarke is overstating what we've

learned about the Beta program already.

I would actually say the thing we really

want to know is not so much why were our clients excluded, I think we have a pretty clear answer on that.  It's more, how is it that they were able to do this?

Like, for years, they were telling us ███, and then --

THE COURT:  So you want, sort of, an engineering look at it.  Well, we did this and we did this, and we had this new whiz kid from MIT who wrote a new algorithm for us, or something like that.

MR. KANE:  It would be an engineer if the solution was an engineering solution.  I don't think it was.

I think what happened is ███████

THE COURT:  You think Google just got motivated.

MR. KANE:  Exactly.

We think what actually happened is not that they figured out a solution, but that once there was enough money involved --

THE COURT:  So you want a businessperson -- if it were a percipient witness, it would be a businessperson.  A 30(b)(6) witness might have to be educated by various business types.

MR. KANE:  That's --

THE COURT:  To, sort of, tell you the C-suite story behind it.

MR. KANE:  That's my suspicion, is that that's the actual explanation for this, and that's what the documents seem to say.

THE COURT:  All right.

No on the ████████.  Yes on the Beta program from a business perspective.

What I would like to do now is take a ten-minute break -- we have been going over an hour and a half -- in part so that I can carve out a little extra time for you and we can come back and do the rest of them.  I have to make a couple of calls to make that happen.  So we'll reconvene in ten minutes, and we will stand in recess until then.

(Recess)

THE DEPUTY CLERK:  We're now back on the record in the matter of Cengage Learning, Inc. v. -- et al. v. Google LLC.

THE COURT:  Before I forget, for your post-discovery conference with the district judge, she is offering the week of March the 8th, 2027.  If you can pick a date now, let me know; otherwise, let me know later.

MR. KANE:  It might be best to let you know later.  Then we can coordinate between the two sides and make sure it works for everyone.

THE COURT:  That's fine.

All right.  So let's pick up again.  What was the last one we did?

Not 60.  That was, like, two topics ago.

MR. KANE:  It was -- I thought it was 60B and C.

THE COURT:  Sorry?

MR. KANE:  I thought it was 60B and C, the Beta program.

THE COURT:  And I said no on the ████████ ████████; yes on the Beta program.

MR. KANE:  Correct.

THE COURT:  All right.  What's next?

MR. KANE:  Topic 9, please.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  Policies and practices concerning bad --

MR. KANE:  ████████ .

THE COURT:  -- things.

████████

MR. KANE:  And ████████

THE COURT:  Yeah.  Go ahead.

MR. KANE:  So Google had a system for people internally at Google to report ████████ ████████  And it appears that, for a time, ████

████████████████████████████████████████

████████████████████████

We also know that pirates that were pointed out by VitalSource, which is one of the authorized distributors of the plaintiffs' works, were marked as having ████████

So we've asked Google to produce a 30(b)(6) witness concerning what these ████████ systems were and ████████████

████████████

THE COURT:  Well, you, sort of, anticipated my question.

What is your understanding of what makes an ████████    ████████

████████    Is it someone who's

selling pornography, or is it someone who's engaged in copyright infringement, or is it someone whose website has a broken link?

I mean, I have no idea.

MR. KANE:  Yeah.  So based on those two documents we were just discussing, the one where it says ██████████████████████████████████████████ ███████████████████████████████████████ ███████████, we think that it included -- included in ███████████████████████████

There's also another document that says, like, mechanically, ████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████

THE COURT:  So you have two documents that use these terms?

MR. KANE:  It's a few more than two.  It's just those are the two I was explaining a moment ago.

It may be that ████████████████████████ ██████ is broader than ██████████████████████ ███████████████████████████ ████████████████

THE COURT:  And who have you tried to ask

about this so far?

MR. KANE:  I don't think we've had a witness who -- a fact witness who we thought would be knowledgeable about this.  The DMCA witness that -- the 30(b)(6) witness that they put up was only prepared on the DMCA topics because she didn't have personal knowledge of the DMCA program.

So I don't -- and Google has not said, you know, we can offer a fact witness on this, just not a 30(b)(6) witness.  But that is a compromise we would be open to on this one if they -- if there's a fact witness who can testify about this.

THE COURT:  And you have -- you have a few slot -- few fact-witness slots still left to you, or you've used up all your 20?

MR. KANE:  We've taken, I think, eight depositions now.  I think there are nine more that are noticed.  There are three that we can pick a new deponent for.  So --

THE COURT:  What deadline did I give you for --

MR. KANE:  I think it's July 17th, something like that.

THE COURT:  So you still have a few slots --

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. KANE:  Yes.

THE COURT:  -- you could use for the fact witness.

All right.  Ms. Clarke?

MS. CLARKE:  Sure.

So, again, this is a longstanding discussion that the parties have had.  Plaintiffs originally were asking for us to produce documents related to these terms.  And as we've explained several times, we --

THE COURT:  Sorry.  Plaintiffs were originally asking for?

MS. CLARKE:  For us to produce documents related to these terms.

THE COURT:  Specifically relating to the terms ███████ et cetera?

MS. CLARKE:  Yes.

And as we've explained to them, these are not -- my understanding is they're not specific terms of art, they're used very broadly across Google.

So, for example, our DMCA 30(b)(6) witness who testified last week talked a lot about ███ ████████████████████████████████  So, you know, we've told them --

THE COURT: You're saying it was more colloquial term?

MS. CLARKE: More colloquial. And to the extent it was used as a term of art, there -- our understanding is there wasn't, like, one way that it was used.

They've referenced this ██████████████ ████████ We investigated this. ████████████ ████████████ ████████████████████████ ████████████████████████████████ which might be familiar to you. We've produced a lot of data from that.

THE COURT: That's ████████████

MS. CLARKE: Exactly. ████████████████ We produced a lot of data about that. And our DMCA witness talked a lot about ████████ and how it's used.

And I don't know what Mr. Kane is referring to, but she talked about the process of removing URLs as part of our DMCA process.

THE COURT: Was she asked, what is a ████ ████ Was she asked, what is a ████████ Was she asked, what's in this ████████████

MS. CLARKE: She was not asked that. And, again, I don't know if he's trying to

collect -- get general information about what these mean to support his case or even to help in this hearing. I don't know why he wouldn't have at least asked her or some of the other witnesses.

For example, we have witnesses talk about ███████████████████████████████. I just -- like, it would be extremely difficult for us to educate someone on these topics because they are so broad. We don't know anyone who has, like, a specific definition of any of these, these terms, especially as they -- as they apply to copyright infringement.

What we do know is what we've already told plaintiffs, is that ████████ is now the most relevant place -- ██████████████ --

THE COURT: I'm sorry. What is the most relevant place?

MS. CLARKE: ████████████████████
████████████████████████████████████████
████████████████████████████

THE COURT: Since when?

MS. CLARKE: I don't have the exact date, but at least several years before -- my understanding is this ████████████████████████
████████████████████████

THE COURT:  Well, that's an interesting question.

The ███████████ that you've identified in 9A, how old is that, if you know?

MR. KANE:  I don't know how old that is.

It's not limited to a file.  Like, I -- what the documents seem to indicate is there's, like, ████████████████████████████ ████████████████████████████ ███████

So I was imagining it as, sort of, a ████████████████████████████ ████████████████████████████████ ████████████

MS. CLARKE:  And --

MR. KANE:  It may be that, like, subsequently, that has changed names, or it's now housed somewhere else or whatever.  And if that's the answer, I mean, a witness can say that.

THE COURT:  All right.  Let me just stop you there before I lose my train of thought.

Ms. Clarke, within the current Google system, is there ███████   ████████████████ ████████████████████████████

MS. CLARKE:  Yes.  And as we told

plaintiffs, it's not ████ anymore, is our understanding. I think it would be impractical now for Google to have, like, a ████████████████ ████ ████████████████

THE COURT: But there's a ████████████ ████████████████████████ ████████████

MS. CLARKE: So what happens is when -- in the copyright context, ████████████████ ████████████████████████ ████████████████████████ ████████████████

That's my understanding.

THE COURT: ████████████████ ████████████████████████ ████████████████

MS. CLARKE: So I think ████████████ ████████████████████████ ████████████████████████ ████████

THE COURT: Well, this is what I'm -- this is what I'm asking because my understanding, from what Mr. Kane presented -- and maybe he was only presenting his own speculation, I'm not sure -- was that there was, at some point, maybe, ████████████

Is that what you're trying to tell me?

MR. KANE:  I think what -- and, again, this is, kind of, what we need the 30(b)(6) witness to explain.  But my understanding is, ████████████ ██████████████████████

██████  In other words, when you click on an ad, it takes you to some other website.  ████████

████████████████████████

███████████████████

And it's -- what the document says is that a -- ████████████████████

████████████████████████

███████████████████

████████████████

So it seems to me that there was some sort of ███████████████████

███████████████████ --

THE COURT:  And you don't know who might have been ████████████████?

MR. KANE:  I don't know who would have.

THE COURT:  And you also don't know if this was happening in 2010 or in 2020, right?

MR. KANE:  It wouldn't be 2010 because then

AMM TRANSCRIPTION SERVICE  -  631.334.1445

we wouldn't have a document from that far back.

If Google's story is --

THE COURT:  That's not true.  Some of the documents that I recall reviewing in camera the last time you were having a fight about privilege were about that old.

MR. KANE:  If Google's position is this is like an antiquated system that's no longer used anymore, I don't know why a 30(b)(6) witness can't say that.  I mean, if that is the story, it should be an easy prep.  It should just be, you know, this was used in 2010, but it stopped being used in 2019, or whatever the -- whatever the deal is.

MS. CLARKE:  Yeah.  I guess my point to that is we -- our witness did testify about what happens to ████████████████████████████ ████████████████████████████████ ███████████    ████████████████████

We very clearly -- I can't say it as articulately as she can because she's the Copyright Team lead, but she provided lots of testimony about the process of ██████████████████████████ ████████████████████████████████ ████████████

If Mr. Kane was curious if there was a

system prior to the current system or the system that applied during the period, he could have asked her that.  But, again, like, I don't know why -- you know what the current -- you know what the current system is.  You know what system applied during the relevant period.  Why we need to ask about this separate system -- and, again, we don't have any -- we have not spoken to any Google employees who -- ███

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

THE COURT:  I'm sorry.  You have what information?

MS. CLARKE:  About the fact that the

████████████████████████████████████████

████████████████████████████████████████

Aside from that --

THE COURT:  And you had -- and has somebody provided testimony about that, that the ██████████

████████████████████████████████████████

████████████████████████

MS. CLARKE:  I don't think that specific question, but I think the testimony that's been provided makes that clear because plaintiffs have asked our witnesses, including our 30(b)(6) witness,

on DMCA issues, what happens when you receive a DMCA notice?  Like, ██████████████████████████████

██████████████████████████████████████

And they have walked through that whole process, and they are not discussing this ████████

████████████    ██████████████████████████

████████████████████████

So, again, Mr. Kane could have asked that witness specifically, but the process that does apply has been very clearly, under oath, explained to plaintiffs.

THE COURT:  So the process that does apply, obviously, has been the subject of a great deal of testimony.

And what you're trying to, I guess, pin down now, Mr. Kane, is whether there is or was, at some point, a different process or a process under a different name?

MR. KANE:  So, like, that whole framing comes from factual representations from Google's lawyer.  Like, I don't know that that's the case, that this is the old system and now there's a new system.  Like, a witness needs to testify to that.

It's not enough for Google to say, well, our understanding, based on some conversations we've

had, is that, you know, this is an old --

THE COURT:  Yes, but you had a witness prepped to testify as to the system in place during the relevant period.

Did you ask that witness, or did you ask any percipient witness likely to be knowledgeable about this sort of thing, gee, ███████████████

███████

MR. KANE:  No, for two reasons.  Number one, the witness that Google put up on the topic of the DMCA only started working on the DMCA in March of 2025, so she did not have personal knowledge.

THE COURT:  Yes, but she was a 30(b)(6), so she was educated, presumably, as necessary with respect to the policy throughout the relevant period, right?

MR. KANE:  But she wouldn't have been educated on this because Google didn't prepare -- Google refused to prepare a witness on this.

In other words, in all the negotiations we've had with Google about these 30(b)(6) topics, they've never said, you know, look, you can ask a fact witness about this, so and so will know about it, but we're not doing a 30(b)(6) witness.

That might have been enough.  But because

she didn't have personal knowledge of this, we knew she wouldn't be -- we weren't going to spend time in the deposition walking her through these documents and having her say, I don't know the answer to that. It was a very long deposition, even without going into areas where she did not have personal knowledge and had not been prepared as the 30(b)(6) witness.

MS. CLARKE: But, again, as part of preparing that witness, we had conversations with folks who were responsible for this during the relevant period. Obviously, that was our obligation to prepare her. And this was not something that was discussed by those witnesses. No one was like, oh, yeah, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓

THE COURT: Used that since whenever.

MS. CLARKE: Yeah. That was not part of the discussion. Again, we didn't, like, dive deep into this because it wasn't a topic to be prepared on, but --

THE COURT: No, I just -- I guess what I'm not understanding, Mr. Kane, is why you didn't ask the rule-out questions, the questions which, if Ms. Clarke is right -- and, of course, I don't know any more than you do whether she's right or not, but

the questions which, if Ms. Clarke is right, you could have asked two or three questions and ruled this out as a topic of current, relevant interest.

MR. KANE:  The reason is, clearly, this 30(b)(6) witness was only telling us what Google had wanted her to tell us.  They purposely put up a witness who didn't have personal knowledge of this process.  So if I had asked that witness, hey, have you heard of this --

THE COURT:  You know, that's not actually a bad thing.  30(b)(6) allows that.

MR. KANE:  But it's strange given that their claim is that there are six other witnesses who were deeply involved with the DMCA process.  So the one that they --

THE COURT:  Both of whom you either have noticed or can notice as percipient witnesses, right?

MR. KANE:  I'm talking about six that we have noticed, that we have not deposed yet.  It's strange.  And I would say --

THE COURT:  Why can't you ask those folks about this ██████████?

MR. KANE:  We're happy to do that, but because they're fact witnesses, they may not know

about it, and --

THE COURT:  They may not, but, you know, life is like that sometimes.  It sounds to me it's likely that one or more of them will be able to answer that question.

MR. KANE:  If Google wants to say to us, you know, Witness X will be able to talk to you about ███████████████████, that might well be fine. If we talk to Witness X about ████████████████ and they say, I've never heard of it, you know, that's not fine.

In other words, we're happy to resolve this by having a fact witness testify about it, but the fact witness has to actually testify about it.  I don't really think it's fair for Google to say, we're refusing to produce a witness on Topic X, and then, when we don't ask the witness about Topic X, to say, well, why didn't you ask them about Topic X?

Well, it's because you told us she wasn't going to be prepared on that topic.

THE COURT:  Okay.

Ms. Clarke, these six upcoming fact witnesses, or individual witnesses -- use whatever term you like -- who had some involvement, some actual personal, percipient involvement with the

DMCA policy, is one of them going to be able to tell Mr. Kane what you just told me, in substance?

MS. CLARKE:  I don't know if they will be able to specifically explain what the ███████████ ████████████████████████████████████████████ ██████████████████████

THE COURT:  But will they be able to answer the rule-out question?  Will they be able to say, hypothetically, not exactly sure what this is, but one thing I can tell you for sure is that ever since I've been involved, which was since '19 -- 2018 or 2019 or -- hopefully, not 1918 -- or whatever, it is not any part of the procedures that we use with respect to taking down copyright infringers?

MS. CLARKE:  Yeah.  They will be able to testify about what system was in place during the relevant period and ██████████████████████████ ██████████████████████

THE COURT:  I'm not inclined to give you a 30(b)(6) topic on this because I really think it's a couple of rule-out questions, and I think that you can -- I think you can probably get the information that you need from your remaining non-30(b)(6) witnesses.

MR. KANE:  Understood, your Honor.

If Google could identify the witness who we can ask about this, that would be very helpful.

THE COURT:  Well, let me leave it this way.

I don't generally require parties to tell their opponent what a witness designated by that opponent will and won't say, but if I can -- for guidance, Ms. Clarke, because I really don't want to have this come back to me on a motion for reconsideration because it turned out that nobody could answer this question, I think it would be helpful to everybody, both sides and the Court, if, before Mr. X or Ms. Y started testifying, you took Mr. Kane aside and said, you might want to ask this person about those ████████.  I think that would be very helpful.

MS. CLARKE:  Yeah.  And understood, your Honor.

I think Mr. Kane knows very well who was responsible for implementing the DMCA policy during the relevant period.  It's been discussed several times.  But happy to provide that guidance.

THE COURT:  Just, you know, guide him.

All right.  What's next, Mr. Kane?

MR. KANE:  Topic 36F.

THE COURT:  All right.  F and K?

AMM TRANSCRIPTION SERVICE  -  631.334.1445

Do I understand F and K are still in contention?

MR. KANE:  That's correct.

THE COURT:  All right.  Hold on.

MR. KANE:  So F is a spreadsheet titled

███████████████████████████████████████

What it appears to be is some sort of

████████████████████████████████████████████

████████████████████    ████████████████

████████████████████████████████████

████████████████████████████████

Several of ████████████████████████

████████  We've asked Google to present a witness who will explain, sort of, what this is and what the review entailed.

The custodian of the documents in the metadata is Google.  It's not a human.  So I don't have, like, a fact witness I can ask about this.  So that's why we've asked Google to produce a witness on this.

I can do K as well.  Or if you want to --

THE COURT:  Hold on one minute.

MR. KANE:  Sure.

THE COURT:  So the ███████████████

████████ -- I understand the objection here is not

that Google can't explain this document, but that Google thinks it's not relevant; is that right, Ms. Clarke?

MS. CLARKE: Correct. Yeah. And I can provide more background on what the ████████ ████████ is and --

THE COURT: Sure.

MS. CLARKE: Yeah, so the -- our understanding is the ████████████████ was, like, a ████████████████

████████████████████████████

████████████████████████

████████████████  ████████████

████████████████████████

████████████

THE COURT: I'm sorry. A Google vendor?

MS. CLARKE: A Google vendor, yes.

THE COURT: Meaning?

MS. CLARKE: So I think you're aware that Google used a vendor, Cognizant, to process its DMCA --

THE COURT: Oh, Cognizant.

MS. CLARKE: Yes.

THE COURT: Okay. Okay. Okay.

MS. CLARKE: -- to process its DMCA

notices.

Our understanding is that the ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

THE COURT:  Well -- but hold on.

Subsection K, as I understand it, your objection is precisely that this is a Cognizant document, not a Google document.

MS. CLARKE:  Correct.

THE COURT:  But Subsection F, the ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ -- Mr. Kane, you got that from Google or from Cognizant?

MR. KANE:  From Google.

THE COURT:  And the metadata says it's a Google document, not a Cognizant document?  Or you don't know?

MR. KANE:  The custodian listed in the metadata is Google.

MS. CLARKE:  I understand.

So we produced some Google Shopping -- the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, like the Google Form, like what you might have seen in, like, your personal life, like the Form that can be created through Google.  We produced some of those.

THE COURT:  Wait.  I saw this in my

AMM TRANSCRIPTION SERVICE  -  631.334.1445

personal life?

MS. CLARKE:  I mean, it's just like a -- it's a standard Form, like, if you're, like, trying to get information from a group of people.  It's very basic.

Anyways, it's just a very basic Form. Plaintiffs asked us about it, and we subsequently produced what we had available in our files to show, like, what the results of it was.

My point is that --

THE COURT:  That's F.

One of the specific documents that you flagged in F is one of these, sort of, examples?

MR. KANE:  It doesn't look to me to be an example.  It looks to me to be ███████████████ -- and I think this is what Ms. Clarke was saying --

███████████████████████████████████

██████████      ████████████████████

████████████████████████████████████

██████

If the explanation is, in fact --

THE COURT:  You have this fancy screen that you made us set up.  Do you have a copy of this document?

MR. KANE:  I do.  It's a very, very large

document.  I thought I had created an excerpt of it, but it looks like I didn't.  But let me see if I can pull it up.

THE COURT:  And, Ms. Kay, you know, when we have the jury in here next month, we're going to have to move that.  And if we had a bigger one, that wouldn't be a bad idea either.

MR. KANE:  Unfortunately, it is going to take this a minute to load.  It's a very large document.  I thought I created an excerpt, but it looks like I didn't.

THE COURT:  Because -- I'm sorry.  I'm just too confused now.  I think I need to see what it is that you're arguing about.

MR. KANE:  Sure.

We can look at K instead, if you would like, while we're waiting for it to load.

THE COURT:  Sure.  At least, we can talk about K.

MR. KANE:  Sure.

It's a list of domains with -- ███████

██████████████████████████

███ of them are among the 1,500 pirates at issue in this case.  And it has ██████████

█████████████████████████████

[REDACTED]

So it would seem to be someone saying, here

[REDACTED]

[REDACTED]                                   That would be very relevant.  One reason --

THE COURT:  Is it true, that this is a Cognizant document?

MR. KANE:  I'm not sure that the document itself says that it's a Cognizant document.  But even if it were, I'm not sure why that would matter.

In other words, if it's in Google's possession -- Cognizant was a vendor acting at Google's direction.  I'm not sure why it wouldn't be appropriate for Google to testify about it.

One thing I would add to that is, a witness testified last week -- it was a revelation to us -- that, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

So, I mean, that's something that we've known for a long time, that ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ It was a revelation to us that ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮

If a spreadsheet like this is part of what -- part of the evidence -- or supporting evidence that ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ I think that's extremely relevant, that Google should be producing a 30(b)(6) witness on this or, at least, identifying a fact witness who can testify about it.

THE COURT:  Ms. Clarke?

MS. CLARKE:  Sure.

So just to that last piece, I don't think that any of the testimony that came out last week is relevant at all to this dispute.

I want to just zoom out a little bit on Topic 36 and just explain to the Court, like, how we got here.

So, as you can see, Topic 36 is a very long topic, was asking about -- for a witness to testify

AMM TRANSCRIPTION SERVICE  -  631.334.1445

about a whole list of --

THE COURT:  Documents.

MS. CLARKE:  -- documents that Google produced.

In the first instance, we believe this was an inappropriate 30(b)(6) topic.  Google produced thousands and thousands of documents.  Asking for a 30(b)(6) witness to testify about one specific document in each of these subparts, which were numerous --

THE COURT:  Right.

And I understand your argument, that you don't get a whole 30(b)(6) topic for every document that you would like some explanation on.

MS. CLARKE:  Yeah.

And then -- so through negotiations, though, we tried to work with plaintiffs.  So where possible, we identified for plaintiffs what individual witness might have information about the document at issue, and we provided that list to plaintiffs.

For these two documents at issue, the reason we came into a problem is because these were two documents primarily -- like, created or primarily used by Cognizant, so there is no Google

full-time employee who can --

THE COURT:  And just -- and just refresh my recollection here.  There's a problem with Cognizant because they're not in the country, and you can't subpoena them?

Mr. Kane, is that right?

MR. KANE:  That would be a reason that we can't compel Cognizant to testify, but recall that Google did get Cognizant to file a declaration when Google was trying to get out of producing certain discovery about its DMCA program.

So Google, it had a person from Cognizant file a declaration, so Google can ask Cognizant, what is this spreadsheet, and become educated on it.

And I should say we're taking -- I'm not sure what there is in the document itself that would show that this is a Cognizant document and not a document that was generated by Cognizant but provided to Google or, you know, originated from Cognizant but was then reviewed by Google.  It's just Ms. Clarke's representation on that issue.

THE COURT:  So there's nothing in the metadata that tells us these are Cognizant documents, Ms. Clarke?

MS. CLARKE:  I don't know if in the

AMM TRANSCRIPTION SERVICE  -  631.334.1445

metadata, but on the Google end, we can see, like, where these documents were stored.  So I know that, again, our team investigated all of these documents, and we provided to plaintiffs, in good faith, all of -- like, the witnesses that would be relevant.  And this is when that, when we investigated and determined the source of it --

THE COURT:  And you don't have a relevant witness.

MS. CLARKE:  We don't have a relevant witness.  And, again, I think the way that Mr. Kane has said that this is relevant is related to how Google implemented its DMCA policy.  We just did a nine-and-a-half-hour deposition about how Google implemented its DMCA policy.

As he stated, she -- that witness testified about some ██████████████████████████████ I don't know why he needs to have a whole 30(b)(6) topic on these specific documents.  He could have asked about them in that context.  He can ask the other DMCA witnesses about these specific documents, but --

THE COURT:  You wouldn't have -- I am a little more sympathetic to why Mr. Kane didn't ask those questions in this instance than I have been in

AMM TRANSCRIPTION SERVICE  -  631.334.1445

some prior instances because it sounds like Google has told plaintiffs' counsel not once, but a bunch of times, we can't help you with these documents, google witnesses are not going to be able to testify about these documents.

MS. CLARKE:  Sure.

So if Mr. Kane is questioning that representation, he can ask, for example, Google's individual fact witness who was responsible for implementing the DMCA policy and working with Cognizant connected to that, do you recognize this document?  Did you use this document?  Are you familiar with it?

My -- I believe, if she has any familiarity with it, she will say that it's something that Cognizant used, and that's as much as she can testify to.  But I don't know how else we would prepare a witness to --

THE COURT:  Why is it hanging around?  Why does Google have these documents if nobody at Google uses them or even really understands what they are?

MS. CLARKE:  So one of our -- or a few of our custodians in this case were Cognizant employees.  So I believe -- not --

THE COURT:  A few of your custodians were

AMM TRANSCRIPTION SERVICE  -  631.334.1445

Cognizant employees.

MS. CLARKE:  Right.

THE COURT:  Explain that to me.

MS. CLARKE:  I believe --

THE COURT:  You designated as Google custodians folks who were not actually Google employees?

MS. CLARKE:  I believe we were ordered to add them.  I believe they're among a group that we were ordered to add last August, I -- or October, maybe.

THE COURT:  Well, that's --

MS. CLARKE:  Yeah.  A while ago.

THE COURT:  Well, I know I ordered you to add a bunch of custodians --

MS. CLARKE:  Yeah.

THE COURT:  -- but I don't recall any discussion at that time as to whether any of these -- because, in my own mind -- maybe I'm not remembering some phase of the motion practice, but I don't remember having any argument about whether it was proper or improper to add someone as a custodian who wasn't actually working for Google.

MS. CLARKE:  Yeah.  And apologies.  I wasn't part of that motion either, so I don't have

AMM TRANSCRIPTION SERVICE  -  631.334.1445

all the details with me, but I do know that we added, I think, three custodians as -- that were Cognizant employees.

I think where the confusion lies is that these Cognizant vendors, because they were doing work for Google, also had @Google.com e-mails.

THE COURT:  I see.

MS. CLARKE:  So that might have been why the distinction --

THE COURT:  So they were custodians -- it was their e-mail inboxes and outboxes that were added as custodians.

MS. CLARKE:  Right.

THE COURT:  I got it.  I got it.  I got it.

So it didn't mean that you literally had to go to Cognizant and download something from their system.

MS. CLARKE:  Yes.

THE COURT:  All right.

Mr. Kane?

MR. KANE:  What Cognizant told us is that all of the operations that they performed for Google were performed entirely on Google's system.  In other words, they had Google.com e-mail addresses. They used Google folders.

Like, when we subpoenaed Cognizant and said, we're asking for various documents about this case, they told us, we don't have any of that stuff, it's all on Google's system.

I think the distinction between Cognizant and Google is really not much of a distinction.  If anything, Google purposely had vendors performing this process of processing plaintiffs' infringement notices, and now is trying to say, well, we're going to distance ourselves from that by saying that those were vendors and not Google employees.

THE COURT:  Right.

All right.  So I'm inclined to grant -- on this one, I'm inclined to require Google to provide testimony explaining what these documents are and where the data came from and so forth.  And I'm, sort of, pushed in this direction by the fact that there doesn't seem to be any other way for the plaintiffs to get this information.

They keep telling me -- the folks at Google keep telling me that these really aren't our documents, even though we produced them out of our system.  And, you know, if you ask the remaining percipient witnesses about them, Google is telling me, well, basically, they will probably say, I don't

know.

And then it would be one thing if Mr. Kane could subpoena the Cognizant custodian and just have him or her explain it themselves, but that doesn't seem to be possible here either.

As we all know, under Rule 30(b)(6), when you have to provide a witness to testify about a topic, it doesn't have to be your employee.  It could be your vendor, for example.

Maybe you can reach some arrangement to have a Cognizant individual serve as the 30(b)(6) witness on behalf of Google for this purpose.  Maybe you can arrange a tutorial where the folks from Cognizant can educate a Google employee.  I'll leave that up to you.  But I'm inclined to say yes on this one.

What's next?

MR. KANE:  Topic 61, which is ███████ ██████████

THE COURT:  61.

All right.  I'm not sure I actually understood what we were fighting about here, so ...

MR. KANE:  Sure.  So ████████████████ was an attempt, as we understand it, to ████████████████ ██████████████████████████████  At some

point, Google decided to ask --

THE COURT: ████████████████

████████

MR. KANE:  It started as ████████████,

but, at some point, the folks who were ████████

████████████████████████████

████████████████████████████████

████████  So we were interested in it insofar as

it was involved in the e-book ban or copyright

infringements.

Part of the reason that that was done was

that they discovered that ████████████████

████████████████████████

████████████████████████████████

████████████████  ████████████  was across

various projects.

So we're asking Google to produce a witness

to testify, ████████████████████

████████████████████████████

████████████████████████

████████████████

THE COURT:  Why isn't that encompassed

within the witness that Google did agree to produce

regarding Google's efforts to enforce against fraud

and piracy in connection with the e-book ban?

MR. KANE:  If Google -- so the witness testimony about the e-book ban hasn't occurred yet. If Google is telling us that as part of that testimony that that witness will address how ███████ ██████ was involved, that's fine with us.  I didn't understand that to be what Google was saying, but if it is, then --

THE COURT:  Well, let's hear from Google.

MS. CLARKE:  Yeah.  So, as we've obviously discussed several times, we have this witness coming up who will discuss the implementation of the e-ban. And we specifically told plaintiffs that, in connection with that, to the extent that the implementation included ████████████████ ███████████████████████████████████████████ Google's witnesses will be prepared to address that.

I think our objection here is just, again, plaintiffs are trying to pull out this one term from one or a handful of documents and require us to make sure the --

THE COURT:  One term here being the ███████ ████████████ ?

MS. CLARKE:  Correct.

THE COURT:  Or was there, like, a group of people who, at some point in time, were the ██████

MS. CLARKE:  My understanding is that there was █████████████████████████████████████ ████████████████████████████████ ████████████████

And I believe there was testimony yesterday -- I wasn't at the deposition -- about the short period where this group was used to help implement the e-book ban.  And Mr. Kane, I think, got lots of testimony from the witness yesterday about the ██████████ and how it was involved in the e-book ban.

So, again, we're not saying that -- like, to the extent it is relevant and comes up within our 30(b)(6) topic where -- about Google implementing its e-book ban, that's fine, but we just don't want to be committed to preparing this witness on this specific topic.

THE COURT:  Why is it -- why is that offer not sufficient, Mr. Kane?

MR. KANE:  So we did not get substantial testimony from the witness yesterday.  What I conveyed about, at some point, the e-book -- the ██████████ was looped into the enforcement of the e-book ban is about the extent of what he knew about

AMM TRANSCRIPTION SERVICE  -  631.334.1445

it.

What Google offered was to -- ███████████

█████████████████████████████████████████

████████████████████████ Google's witness will be prepared to address this.

If they are now saying, to the extent that ████████████████ was used in enforcing the e-book ban, then Google will address this, that's, you know, helpful. We would just need someone to be able to explain what ████████████ was, you know.

THE COURT: So say to me again, Ms. Clarke, what the, sort of, contours of your proposal are.

MS. CLARKE: Yeah, so what we've agreed in writing to plaintiffs, along with, you know, a much broader topic on e-book-ban implementation, is that, to the extent that the implementation included merchants who were part of a network of bad actors, Google's witness will be prepared --

THE COURT: Slow down. To the extent ...

MS. CLARKE: That the implementation of the e-book ban included ██████████████████████████ ████████████████████████████, Google's witness will be prepared to address this.

I think what Mr. Kane is -- he keeps slipping in -- he's like --

THE COURT:  So I didn't hear the word ███████ in there.

MS. CLARKE:  Correct.  Because he was like, we just need someone to explain what the ██████ ██████ is.  That's a very broad topic because it was not just related to the implementation of the e-book ban.

THE COURT:  Well -- but it could also be a very quick topic.

Let's suppose your witness is testifying about -- will be prepared to testify about, you know, to the extent that someone is in this -- what do you call it? ████████████████████

So I'm just imagining how the Q and A would go.

Mr. Kane says, or one of his colleagues says, well, what is this ████████████████

And the witness says, well, we had this group called ██████████████████████████████ ████████████

Okay.  What was ████████

The answer could be as simple as, well, it was a working group that we had in place for six months in a certain year, and I don't know everybody who was in it, but this is what we took from them.

I mean, you don't need the whole history and etiology of this working group, right, to the extent that they were involved in aspects of Google's business that you're not interested in?

MR. KANE:  I think that's right.  We just need, sort of, the context for, you know, what was this group that apparently was participating in implementing the e-book ban?

What I understood the dispute to be was that, like, based on Google's response, as you said, it doesn't include the word ▮▮▮▮▮▮

They seem to want to say, like, to the extent we found that an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, you know, someone at deposition will say, yeah, sometimes that happened.

What we're asking is about that specific sentence in the topic where they said, soon after the exit, it was apparent that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

THE COURT:  All right.  It sounds to me like we should be able to compromise on this.  It sounds to me like probably your e-book-ban designee

should be prepared to testify at a very high level just what the heck was this group?  And what, if anything, it did that actually impacted the e-book-ban work.

MS. CLARKE:  Yeah.

THE COURT:  You don't need to have this witness prepared on what else they might have done.

MS. CLARKE:  Yeah.  I guess we don't want to take on the burden of, for example, this witness needing to be formally educated by members of the ▮▮▮▮▮▮▮ who were -- like, I think that that's, like, a whole other part of potentially longer testimony.  But we are offering to --

THE COURT:  Maybe she does need to be educated by a member of the ▮▮▮▮▮▮▮ but for, like, ten minutes.  I mean, I just don't see this as a very deep dive.

MS. CLARKE:  Yeah.  I guess my only pushback, your Honor, is just that we've added, like, ten little, short topics, and these just really add up.

So, again, this witness is already covering a lot of topics, meeting with a lot of different people.  I think -- what we don't understand is why it's not sufficient for plaintiffs that we say,

she's going to testify about the implementation of Google's e-book policy.  We think that's really broad, and we think that encompasses a lot of topics.

We just don't want to have our feet held to the fire, that if she, you know, stumbles a little bit on what ▮▮▮▮▮ was and how it was implemented, plaintiffs are going to say, your witness was not sufficiently prepared.

THE COURT:  All right.  Again, my direction here is limited.

MS. CLARKE:  Okay.

THE COURT:  I am not directing Google to prepare this or any other witness to provide detailed history or an account of all of the operations of this ▮▮▮▮▮▮▮▮

I just want your witness to be able to say, if -- if the work of this ▮▮▮▮▮▮ impacted the e-book-ban efforts, I just want the witness to be able to explain that coherently in a couple of sentences.

MS. CLARKE:  Understood.

THE COURT:  So, granted, to the limited extent that the witness needs some very basic, very high-level information on ▮▮▮▮, but we're not

doing a whole -- we're not doing hours on ██████

Okay?

MR. KANE:  Understood.

THE COURT:  Okay.  What next?

MR. KANE:  44.

THE COURT:  Generation of revenue from Shopping Ads.  I thought we were going to do this after we did the Google LLC revenue piece, but I guess not.  Go ahead.

MR. KANE:  So Google, of course, generates revenues from the fees that merchants pay when a user clicks on an ad, but Google, then --

THE COURT:  By the way, just purely out of curiosity, you pay more when somebody buys your product than when somebody just clicks on your ad, yes?  Or does Google not even know the difference between that?

MR. KANE:  The pricing is not tied directly to the conversions.  In other words, you pay the same price for the click whether the user ultimately purchased the product or not.

THE COURT:  Is that just at Google, or is that true generally in the world we now live in?

MR. KANE:  I don't know about other companies.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

What I would say is ███████████

█████████████████████████████

████████████████████████████████

████████████████████    ████████████

██████████████

So Google, as we were just saying, generates revenue when a merchant pays a fee because someone clicks on the ad.  Google then takes the information it learns from those clicks and uses it to personalize ads to users across its platform.

In other words, Google -- so, like, Google's own website says, you may discover that you are seeing a camera ad because you searched for cameras, visited a photography website, or clicked on ads for cameras before.

So what we're asking for here is really just a conceptual point, that Google takes the data that it gets from clicks on ads or from conversions of ads and uses it to make its products better, including the Shopping product.  That's really the gist of what we're asking for in this topic.

THE COURT:  Well --

MR. KANE:  There's --

THE COURT:  And hasn't Google agreed to that extent to provide testimony on this topic?

MR. KANE:  I didn't think that was what they had agreed to.  Let me look at their chart.

THE COURT:  All right.

Let me hear.

MS. CLARKE:  Yes, your Honor.

So this is one of the topics that the parties continue to negotiate on.  And, quite frankly, I don't know why this is still in dispute.

After plaintiffs filed their motion, we agreed to test -- to present a witness to testify on the spreadsheets they talked about.  Plaintiffs came back and provided, like, a list of all the things that they need to be able to testify about.  And our response was, Google's witness will be prepared to testify about this revenue data at the same level of detail that plaintiffs' witnesses were able to testify about their revenue data.

Both sides have produced revenue data.

THE COURT:  I don't really know what that means.

MS. CLARKE:  I mean, I -- but I think plaintiffs understand.  We -- plaintiffs have produced revenue data.  We have asked their witnesses about it.  Some of their witnesses were not extremely prepared, but, nonetheless, we got

testimony, and we didn't -- we weren't, like, difficult about that.

We just -- plaintiffs' response to this was honestly confusing to us.  We agreed to present a witness on the test -- on the spreadsheets that they asked for.

I can clarify further that we're willing -- that the witness will be prepared to talk about what's in the data, whether revenue from Shopping Ads or only Shopping is included in the revenue data, the time frame for the data, and the high-level parameters of the data.

So, like, there shouldn't be a dispute here.  There is no dispute here.  The exact requested relief that plaintiffs are asking for is what we agreed to give them, so I don't think there is much more to discuss with --

THE COURT:  So what am I missing?  What's the gap between what Google has agreed to provide and what you want them to provide?

MR. KANE:  If what Google is saying is they will do everything we asked for except what -- they want the cabin on those two spreadsheets of the witness is only going to be as prepared as plaintiffs' witnesses, we are prepared --

THE COURT:  Six spreadsheets, I think.

Six spreadsheets?

MS. CLARKE:  Correct.

THE COURT:  Yeah.

MR. KANE:  I'd have to count them.  But I thought it was two, but it might be six.

I don't think it's appropriate to say, our witness will be as prepared on this spreadsheet as your witnesses generally were on other spreadsheets. Number one, it's impossible to administer.

What?  Are you going to go look at all the deposition testimony about all the spreadsheets from plaintiffs?

THE COURT:  Of course not.  But thinking about it from a practical standpoint, I think I understand what Ms. Clarke is saying, is she is saying, look, you know, we'll, kind of, do the best we can here, but we don't want you to haul us back in front of Judge Moses, if we can only go down to the subbasement and not the sub-subbasement, particularly given that we had the same problem with your witnesses on spreadsheets.

MR. KANE:  So the spreadsheets that are involved here are -- what they show is the lifetime spend for the merchants at issue in this case.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  Okay.

MR. KANE:  The revenue from their Ads accounts, you know, they need to be able to explain, like, what does this include?  Does it include just Shopping, or does it include other things?  During what period is this?  Like, is it truly, like, the lifetime spend, or is there a cutoff somewhere?

You know, they need to be able to explain what these spreadsheets are.  I guess the example I would give is, another witness was supposed to testify about those notice data spreadsheets that we referenced, that say what Google did with each of the notices concerning the 1,500 domains.  One of the most important columns in there is ███████████ ██████████████████████████████ ██████████████████████████ et cetera.

More than half of the entries in the spreadsheet ███████████████████████████ We don't know what that means.  ███████ ████████████████  ████████████████ ████████████████████████ -- like, we didn't know what that means.  The witness didn't either, even though it's more -- more than half of the entries in the spreadsheet, on maybe the

important -- most important column in the spreadsheet.

So I think it's -- I'm sympathetic to what you're saying, that, like, you know, the witness can't know every single value in there and be expected to testify at every line item. And we're not expecting that. We might pull out examples and ask them what it means, but we're not expecting, you know, them to memorize the spreadsheet.

I just think it's -- it's difficult to, sort of, administer in advance, well, here's the level of preparation you need on the spreadsheet. They need to be able to testify about what these spreadsheets are and what they contain.

THE COURT: All right. So my take on this is that Google has agreed to provide, substantially, all of the information that you've requested here under Number 44.

I am -- I don't think, based on what I've heard so far, that they're drawing a line in the sand for some nefarious purpose because there's some chunk of relevant information that they're not going to give you under the rubric of "same level as plaintiffs' spreadsheet."

So I'm just not sure what I could order

here that really hasn't already been offered.

Am I supposed to order Google to, like, not rely on that caveat?

Am I supposed to order Google to provide every jot and tittle of information that could possibly be asked about a spreadsheet?

MR. KANE:  I think what you should order is that Google cannot, like, cabin the testimony on this vague, well, they're only going to know the spreadsheets to the extent that plaintiffs knew about their spreadsheets.  I feel like that's a way for them to not really prepare the witness and to say, well, your witnesses weren't that prepared.

THE COURT:  Yeah.

MR. KANE:  I just don't think that's an appropriate cabin issue.

THE COURT:  Well, Ms. Clarke?

MS. CLARKE:  Yeah, I just was going to say that wasn't the intent of that.  We just were responding to -- you know, we agreed to do exactly what plaintiffs requested us and requested the Court to require us to do.  We agreed to do it.  Then plaintiffs came back with, okay, well, you agreed to it, but here's what we actually mean by being prepared on these -- all these things.  So we just

responded saying, our witness will be prepared, and they will be prepared at the same level that your witnesses were.

THE COURT:  I don't know what I can do further here.  The usual Rule 30(b)(6) rules apply.

MS. CLARKE:  Yeah.

THE COURT:  You will make a reasonable effort to adequately prepare your witness.  And the more information plaintiff gives Google about -- you know, you don't have to do this, but it might be helpful to both sides.  The more advanced information you give before this deposition happens about where you're going to be directing your questions, the more likely it is going to go smoothly.

MR. KANE:  That's fine with us, your Honor.

THE COURT:  Okay.

We only have a few left.  Where would you like to go next?

MR. KANE:  Topic 23.

THE COURT:  Overall DMCA program.  Go ahead.

MR. KANE:  There are a few spreadsheets that Google has already produced where, again, the custodian is Google, and we would like a witness to

AMM TRANSCRIPTION SERVICE  -  631.334.1445

just testify, explaining what these are and, kind of, what they mean.

I'll give you a couple of examples.

The 9902 spreadsheet that's listed seems to be, for each month --

THE COURT:  Hold on.  Hold on.

MR. KANE:  Sure.

THE COURT:  9902.  That's the first one that you listed, yeah?

MR. KANE:  Yep.

That seems to be, ███████████████████

████████████████████████████████████████████

██████████████████████████

There are a bunch of things we need to know about the spreadsheet.  For example, for more than ██████ of these notices, what they have said about it is ████████████████████████████████████ ██████  And even though there's ████████ notices, ██ ████████████████  We don't know if this means that ████████████████████████████████████████ ████████████████████████████████████  We just don't know what that means.

There's another column for ████████████  We don't know what that means, ████████████████████ ████████████████████████████████

███████████████████████████████████████████

██████████████████████    We just need a witness to explain what those kinds of things are.

THE COURT:  Do I understand correctly that these particular spreadsheets are not -- do not include or are not related to the 1,500 pirate websites?

MR. KANE:  Included within the numbers in these spreadsheets are the 1,500 because this is on the overall Google DMCA program.  They're not, like, confined to the 1,500 pirates.  In other words, it's not, like, here's the data for just your 1,500.

THE COURT:  All right.  And I take it you got these spreadsheets before the DMCA defense was withdrawn.

MR. KANE:  That's correct, your Honor.

And this is where, I think, we flagged earlier.  Two of these, we have reached an agreement on.  The 9903 spreadsheet, Google agreed to produce a witness.  And the 9755 spreadsheet, Google --

THE COURT:  I'm sorry.  Say that again.

MR. KANE:  Two of the spreadsheets, Google agreed to produce a witness, the 9903 spreadsheet and the 9755 spreadsheet.  So it's just the two that are left, the 9902 spreadsheet and the 9905

spreadsheet.

Sorry, there's not a faster way to refer to them than --

THE COURT: That's okay.

MR. KANE: -- the Bates numbers.

THE COURT: So let me start, Ms. Clarke, with, what's the difference between the ones -- the spreadsheets you said yes to and the spreadsheets you said no to in terms of your view of what's appropriate 30(b)(6) testimony?

MS. CLARKE: Yes, your Honor.

So just, first, I'll start -- I think you know our position on whether testimony regarding Google's overall DMCA policy is relevant.

But moving aside from that -- so those two spreadsheets related to the notice data. So I think we talked about this earlier --

THE COURT: 9903 and 9975 were related to the notice data?

MS. CLARKE: Correct.

THE COURT: Or the ones that you're holding out on?

MS. CLARKE: Or, at least, 9903 relates to the notice data.

THE COURT: Okay.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MS. CLARKE: And as we talked about earlier, our witness on DMCA -- on DMCA implementation testified about this data. We agreed to this because, you know, we understand that how notice -- how Google processes its DMCA notices is still relevant to the case to some extent, so we did agree on that part as part of Topic 11 or 36D.

The other spreadsheets relate to ███████████████████████████████████ ██████████████████████ And I believe we're agreed to present a witness on ███████████ ███████████████████████ but -- and that's the 9755. But Mr. Kane can correct me if that's wrong.

MR. KANE: Google agreed to produce a witness on the 9755 spreadsheet. Yes.

MS. CLARKE: Yeah.

So, you know, like, those spreadsheets are very intertwined. We just don't think that preparing a witness on a whole other spreadsheet that we produced because we don't think that this data on our overall DMCA process is relevant to begin with --

THE COURT: So tell me specifically again, what's in 9902?

Maybe Mr. Kane wants to remind me of that.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. KANE:  Sure.

It seems to be, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ et cetera.

And there is a -- one of the actions they claim to have taken ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

THE COURT:  Which you take it means, ▮ ▮▮▮▮▮▮▮▮▮▮▮

MR. KANE:  That's what I would take it to mean, but I -- you know ...

THE COURT:  But you would like to hear that.

MR. KANE:  A Google witness would have to, you know, say that.

THE COURT:  And 9905?

MR. KANE:  9905, we think, is ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ So the 9902 is ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ The 9905 is ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮

THE COURT:  And is there anything

mysterious that you need explaining on the 9905?

MR. KANE:  So it has --

THE COURT:  You told me that there's -- I mean, obviously, you have the documents.  You can make such use of the statistics -- well, you can make such use of the statistics as the district judge deems relevant.  That's fine.

The question is, assuming that this is relevant, why do you need a 30(b)(6) witness on it?

MR. KANE:  Just to explain what the columns mean.

So it has the date and then two columns; one is ███████████████████████ and then the other is ███████████████████████ But in a lot of cases, it's the same number in both columns.  I just need someone to tell me what this is.

Is B the number I should look at for ██ ███████████████████████ or is it C?  And is this restricted to copyright infringements?

In other words, █████████████ ████████████████████████████████████ ████████████ or is something else included here?

The numbers ██████████████████████ █████████████████████ Like, the number for █████████████████████ That's ludicrously

high for █████████████████████████

███████████████

THE COURT:  Ms. Clarke?

MS. CLARKE:  So, I mean, based on Mr. Kane's last comment, it sounds like he doesn't want someone to explain the columns.  He wants to question the data that's included in here.

I just, like --

THE COURT:  Well, maybe that's step two, after he figures out what the columns mean.

MS. CLARKE:  Again, yeah, I just think that we think that this data is not super relevant.  We've already presented a witness on notice data.  We've already agreed to present a witness on the ████████████████████████████████  We think that that's more than reasonable given that we don't even think this overall DMCA data is relevant since we withdrew our Safe Harbor defense.

We produced -- as you noted, we produced this data, but when we thought we were still asserting the DMCA defense.

THE COURT:  Well, you didn't think you were asserting it.  You were --

MS. CLARKE:  Or we were asserting it.

THE COURT:  -- as far the world was aware

AMM TRANSCRIPTION SERVICE  -  631.334.1445

at that time.

MS. CLARKE:  Yes.

But, again, like, we've tried to be reasonable.  We've agreed to testify about lots of data that we've produced, lots of documents that we produced.  I think this just goes back to needing to -- plaintiffs needing to be reasonable about what they actually need.

I think Mr. Kane has an understanding of what these spreadsheets mean without having a 30(b)(6) witness on it.  And if he wants to serve an interrogatory, for example, to ask about something specific, then we could consider that.

MR. KANE:  So if Google is going to get up and say, we have this DMCA program, I think we're entitled to say, you can't even tell us

In other words, like, the 9905 spreadsheet, which seems to show                           pursuant to something -- if their claim is -- you know, there's                   If their claim is that they

                There's no way that that's correct.

If what they're going to say is, no, that's

not what we produced, we don't know the number of --

THE COURT: It's not what we produced?

MR. KANE: If their claim is, that spreadsheet you're referring to is not restricted to copyright infringement, that's ███████████████ ████████████████████████ then we've, sort of, ruled out that argument.

In other words, they're not going to be able to come to the jury and say, we have this robust program. Look, we terminated X number of merchants.

Or we'll be able to say to --

THE COURT: Well, you know, I've been hearing a lot of discovery arguments over the last few weeks and months from the plaintiff, principally, that start with, if they're going to make this argument, we're going to need X, Y and Z. And particularly since Google withdrew the formal affirmative DMCA defense, that's sounding more and more speculative to me.

What basis do you have for thinking they're going to make that argument?

MR. KANE: They haven't made their DMCA witnesses available for deposition yet. I would point that out. But if -- we've given Google many

opportunities to say, no, we're not going to point to our DMCA program as a reason that the jury should go easy on us.  In other words, we're not going to say that --

THE COURT:  That would be strategically extremely risky, it seems to me, for Google, after withdrawing the DMCA defense, to make that move.

MR. KANE:  But I think that's precisely why this discovery is so important.  Like, the reason you think it's strategically strange -- or I have forgotten the phrase you used.

But the reason you think it's so strange is, like, it's obvious.  Of course, they're going to say to the jury, we had a whole program for this. One of Google's witnesses testified, ███████████ ███████████████████████████████

THE COURT:  Yeah, but that was before the defense was withdrawn, right?  Because you've cited that testimony to me previously.

MR. KANE:  True.  But that witness, I'm sure, did not understand the -- whether the affirmative defense was being offered.

THE COURT:  Well, no, but somebody at Google -- not that witness -- is going to decide what evidence is presented at summary judgment and

AMM TRANSCRIPTION SERVICE  -  631.334.1445

trial.

MR. KANE:  Well, I would point out, in Google's 12(c) motion, their motion for judgment on the pleadings, Google argued one of the reasons you can infer that we didn't have intent is we had this whole DMCA program.  We had a whole program that was designed to take down copyright-infringing material.

If that's their story, you know, look, jury, we didn't intend this, we had this whole program that was designed to prevent it, maybe it wasn't perfect, but we had it, so it -- we did not have the requisite intent.  We're entitled to say, you know, look, you can't even say how many merchants you terminated pursuant to this policy.

THE COURT:  All right.  Back to Spreadsheets 9902 and 9905.

I'm looking for a way to make this somewhat helpful for the plaintiff without dragging Google back into the deep water here.

It sounds like what you really need at this stage, Mr. Kane, isn't to argue with somebody at deposition for an hour or two or three over whether the data is accurate or not accurate or what the implications of the data are, you need someone to explain what's in those columns.

Is it really that simple?

MR. KANE:  I think that is pretty accurate, your Honor.  What the column headings mean and what the, sort of, drop-down values in it mean.

You know, if there's three options they can select, what do each of the three options mean?

But, yes, I think it is more informational rather than, sort of, adversarial.

THE COURT:  All right.  Can we -- what would Google's -- limited in the way that we've just discussed, this strikes me as a lot less burdensome than you may have feared, Ms. Clarke.

MS. CLARKE:  Yeah.  I think I -- just our only response to that would be -- Mr. Kane was referencing before our witness who was designated on the notice data and saying, oh, she didn't know this, she didn't know that.

All we agreed to do there was present a witness who could explain what the columns meant, and he spent two hours on that data.  So I just -- like, it's hard for me to believe it --

THE COURT:  You don't trust him.

MS. CLARKE:  I mean, it's just -- we've seen this before.  We've seen him go into individual rows and columns and ask about specific data from

AMM TRANSCRIPTION SERVICE  -  631.334.1445

specific merchants or whatnot.

You know, again, we feel that we've presented significant testimony, agreed to present testimony on these two other spreadsheets that are connected to the spreadsheets that they're asking about.  If they do need, like, specific information about the columns at issue, we think there are less burdensome ways than presenting --

THE COURT:  So what would you propose?

MS. CLARKE:  I mean, I think if they --

THE COURT:  Would you accept an interrogatory that says, what does column F mean?

MS. CLARKE:  Yeah.  I think that that would be doable.

THE COURT:  Mr. Kane?

Because an interrogatory response will be binding on Google.

MR. KANE:  Two things:  One, I've done this before where someone says, we're not going to produce a witness on it; we're going to do an interrogatory response instead.

What you get is a response that is so hedged and caveated and just -- there's such distance between what the question was and what the answer is that it becomes -- that you have to ask

AMM TRANSCRIPTION SERVICE  -  631.334.1445

someone about it in deposition anyway.

Second, I don't think we should have to burn an interrogatory on something as basic as, like, what is this spreadsheet that you produced? Like, what do the column headers mean?  You know, if there's four options in column E --

THE COURT:  This isn't authentication. Authentication, we discussed earlier, is typically handled later in the day, if necessary.

MR. KANE:  Right.  I'm not talking about authentication.  I'm talking about, like, what is this?  What does this data mean?

We're not asking the witness to be --

THE COURT:  Well, see, even the way you phrased it there, now, makes me nervous.  It seems to me -- can you show me one of these spreadsheets?

MR. KANE:  Sure.

THE COURT:  Go ahead.  And tell me the columns that you need elucidation on.

Make it big enough so I can see it.

That's not it.

All right.  Which one is this?

MR. KANE:  This is the 9905 spreadsheet.

THE COURT:  All right.  We're looking at 9905.

MR. KANE:  So what I take this to be --

THE COURT:  Oh, and May is a date.  I can read that.

MR. KANE:  So these are the two columns I was referring to earlier:  ████████████

████████████████████████

THE COURT:  Columns B and C.

MR. KANE:  Correct.

I don't know whether this is --

THE COURT:  And they're usually, it looks like, the same number.

MR. KANE:  I think, in most cases, they are, yeah.

THE COURT:  Okay.  And you don't know what that means?

MR. KANE:  Though not -- not always.

THE COURT:  Not always.  I see that.  When we get -- and is that the whole thing?  It only goes down to line 48?

MR. KANE:  That's correct.

THE COURT:  This is not a big data sheet.

MR. KANE:  I agree.  It is, however, purporting to summarize, you know, a large amount of data.

This is ████████████████.  You can see

AMM TRANSCRIPTION SERVICE  -  631.334.1445

it in the bottom right here.

THE COURT:  No, I cannot see that in the bottom right here.  What am I looking at?

MR. KANE:  I, unfortunately, can't enlarge that.  Where my cursor is, where it says "sum" --

THE COURT:  I can see your cursor, but I cannot read what you're pointing at.

MR. KANE:  I can sum it for you, if you want.

So it's -- this is the ██████████
████████

THE COURT:  Ah.  And that's just summing up the 48 lines.

MR. KANE:  That's correct.

THE COURT:  Of ███████████████████

MR. KANE:  Right.

THE COURT:  Okay.

MR. KANE:  So I need someone to tell me, like, what is this?  Is this the ███████████████
███████████████████████████████████
Which I can't imagine it is.  That's way too many.

Is this ██████████████████████
█████████████████  ███████████████████
████████████████████████████████████████
█████████████████

THE COURT: [REDACTED]

[REDACTED]

Well, I --

MR. KANE: But then it says [REDACTED]

THE COURT: Yeah. Right. Whereas C says [REDACTED]

MR. KANE: Right.

And I think C might even be more than -- yeah, C is even more than B.

THE COURT: Yeah.

MR. KANE: So if C is the [REDACTED] that's even more confusing.

This is what we're asking the witness to explain, like, what is this spreadsheet? What are these numbers?

I don't imagine this being an extensive, you know, hours-long discussion. It's more just, kind of, what is this?

THE COURT: Ms. Clarke?

MS. CLARKE: Yeah. So, I mean, again, I think that Mr. Kane just demonstrated, like, 12 questions that he would ask, that were beyond just, like, what do the columns mean here?

Like, yes, we could -- it could be a very quick discussion if it was just, what does column B

AMM TRANSCRIPTION SERVICE  -  631.334.1445

mean, and what does column C mean?  But he's going to want to know, like, well, how did Google pull this?  And how -- like, he's already questioning whether this is accurate data, and so he's going to want to get into --

THE COURT:  Yes.  But I can draw that line.

MS. CLARKE:  Okay.  I understand.

THE COURT:  I can say, provide a witness that explains what the column header means and what data is purported -- or what data Google represents to be in that column, but I can cut it off there.

I can say, no backing and forthing about how accurate it is or what mechanisms are used to pull it, or how sure are you, really, that it does or doesn't include this, that or the other thing?  Or what do you do with it?

Just what's in that column?  That, I will give you.

MR. KANE:  I think that's appropriate for a 30(b)(6) topic.  We might ask those questions.  It's just -- they wouldn't be answering in a 30(b)(6) capacity.

In other words, if the witness says, yeah, the ███████████████████████████████████ ██████████████████████████████████, for

example, we would put the strike spreadsheet in front of them and show them that there's only -- I think it's, like, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

So you're telling me that those ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

You know, we would have follow-up questions to understand what they are --

THE COURT: And at that point, they may well say, man, I don't know what you're talking about.

MR. KANE: Right. And I think what you're saying is --

THE COURT: Out of my jurisdiction.

MR. KANE: Right.

And I think what you're saying is the 30(b)(6) testimony would only go so far as, you know, what are you claiming these numbers are?

THE COURT: You can ask whatever you want --

MR. KANE: Right.

THE COURT: -- to a percipient witness --

MR. KANE: Right.

THE COURT: -- and you get what you get,

and you don't get what you don't get.

But you may ask -- and I will direct Google to identify one of their coming-up 30(b)(6) witnesses who can answer these -- I mean, this is five minutes of testimony.

Very basic question, what's in column B, what's in column C?

MS. CLARKE:  Yeah.  And that's fine.  I just -- again, we've seen this before.  It was two hours of testimony on the notice data where it was supposed to be similarly limited, and it was two hours going until 9:00 p.m. that day.

Like, it just -- you know, I just don't want this to become incredibly burdensome on our witness who is designated --

THE COURT:  Right.  But keep in mind, I cannot -- I haven't been asked to, and I wouldn't be inclined to restrict -- he can try --

MS. CLARKE:  Of course, yes.

THE COURT:  -- with the witness in their individual capacity, see if they know anything about it.  If they do, they do.  If they don't, they don't.  And, you know, if it takes him an hour, that's an hour he's not spending on some other topic.

All right.  So that was 23.  Yes, but limited to these very basic -- identification of what's in the columns.

All right.  Mr. Kane?

MR. KANE:  62, the Listservs.

So the Google departments that are involved in this case utilized a number of Listservs.  It seems to be quite a high number.  There's one document Google produced that lists ███████ Listservs associated with just one of the departments at issue here.

We've identified five Listservs.  And they're asking Google to explain, like, what were employees told about when to use these Listservs, during what period were they active, those kinds of things.

I would add that two of these Listservs are e-mail addresses that the Court ordered Google to include as custodians.

THE COURT:  Yeah.  I remember those.  But I'm not sure what the testimony is that you're actually seeking here.

MR. KANE:  So, for example, one of the ones that the Court ordered, the ShoppingDMCA@Google.com, like, when was that Listserv supposed to be used?

AMM TRANSCRIPTION SERVICE  -  631.334.1445

Was there an instruction, like, use this for this type of communication but not this communication? You know, the Listserv lrmonetized@google.com, was there an instruction to employees, use that when you are considering suspending a merchant?  Or use that when you remove one ad, but you suspect that the merchant might be eligible for suspension, even though they haven't met the ███ -strike threshold?

What are these Listservs?  What were they supposed to be used for?

THE COURT:  And your relevance proposition is what here exactly?

MR. KANE:  So --

THE COURT:  This seems to be quite a few links or hops away from anything directly relevant to this case.

MR. KANE:  I don't think so.  I mean, one of them is literally called ShoppingDMCA@Google.com. So, like, what was that Listserv used for?

The LRMonetize, that's ████████ , and "Monetize" means the Shopping product, the paid ads on Shopping.  We're asking, like, what is that Listserv?  When was it supposed to be used?

Part of the struggle here is there are so many Listservs.  It's not like there are, you know,

three, and we, sort of, get what they were supposed to be used for.

There are so many of them.  We have identified the ones that seem to be the most relevant, and we're asking Google to explain what they are.

THE COURT:  Ms. Clarke?

MS. CLARKE:  Again, I just will say we've already presented a witness on a very broad topic of how Google implements its DMCA policy.  And one of these Listservs came up in that topic about -- I think Mr. Kane actually asked S.B. about it, put a document before that witness.  She explained how it was used.

I don't know why you -- he needs specific testimony about each of these Listservs in -- like, out of context and, like, at, like, a high level.

To the extent that they come up in other witnesses' personal capacities asking about how Google implemented, I think you can -- he can ask those questions easily there, but designating a whole topic on it, given the limited relevance -- plus, plaintiffs are already aware of how many of these are used.  They received e-mails from at least some of these Listservs from time to time.  I don't

AMM TRANSCRIPTION SERVICE  -  631.334.1445

know, just -- except to the extent it's relevant to how Google implemented its DMCA policy -- which they've already gotten that testimony -- I don't see why these specific Listservs would be relevant and a whole 30(b)(6) topic would be needed.

MR. KANE:  So the Listserv about which we asked S.B. -- I thought 30(b)(6) witnesses' names didn't have to be redacted, but maybe they do.

The Listserv about which we asked --

THE COURT:  No.  I think -- the way we left it, I think -- which I'm not totally thrilled about -- is that designating someone as a 30(b)(6) witness doesn't make them automatically -- doesn't make their full name automatically disclosable if Google has a -- I'm editorializing a little bit here -- if Google has a good-faith belief that they're in a position where they could suffer adverse consequences if their name was in the record, so --

MR. KANE:  Okay.

THE COURT:  I did push them on that, as you may recall.

MR. KANE:  Right.

THE COURT:  But sometimes I don't get what I want either.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. KANE:  So what S.B. testified to -- we put a notice in front of her that was -- seemed to be something auto-generated from Google's system; in other words, it appeared to us someone filled out the form to submit a notice of infringement to Google, and this is, like, the e-mail that Google generates inside of Google memorializing the form.

She didn't recognize it, didn't know what it was, was completely -- even though she was the 30(b)(6) witness on this topic, didn't know anything about it, had never seen it before, you know, couldn't tell us anything about it.

We asked her, like, that address, ███████████████████, which is one of the ones we're asking about here, that's Google, right?  Like, that means this is a notice?

And I don't even remember what her answer was.  I think she may have said, you know, yes, that indicates this might be a notice.  But it's not like we got extensive testimony on what that address is or what it means.

Again, I mean, we've picked five Listservs out of at least ██████ that are at issue in the case and asked Google to explain what they are.  I don't think it's an unreasonable ask.

THE COURT:  So your list is: Shopping-DMCA, LRMonetized, ██████████████ ████████████████████, and ████████?

MR. KANE:  That's correct.

THE COURT:  And I'm trying to think, though -- I'm still hung up on the relevance proposition.

If you get this witness and somebody testifies for hours and hours about each of these Listservs and how many people were on it in this year and how many people were on it in that year and why it was created and when it fell out of use, if it did, and all of that sort of thing, now what?

MR. KANE:  I mean --

THE COURT:  How does this ultimately show up at summary judgment or trial?

MR. KANE:  Part of what we've been struggling with is, kind of, a lack of communications that we received concerning the implementation of the DMCA policy or, like, these pirates specifically, like, within Google.

And part of what we're trying to understand is, is it that those communications, like, weren't produced to us because we didn't have the right custodians?  Is it that they weren't produced to us

because they were deleted?  Is it that they weren't produced to us because Google decided they weren't relevant?

We're trying to understand, where are these communications that seem to be completely absent?

For example --

THE COURT:  So this is discovery on discovery.

MR. KANE:  No, I wouldn't say that. Because what we're asking is, like, what were -- in what ways were the Google employees communicating with one another?

Discovery on discovery would be if we said, you know, what did you look for in response to RFP 7 or whatever?

We're asking, in practice, in operation, how were Google employees communicating?  Were they doing it through G Chat or, in this case, were they doing it through these specific Listservs?

So I think it's more asking, in what ways were Google employees communicating with each other?

What communication channels were they using to inform whether what has happened is there just weren't these communications or whether, in fact, they exist and we didn't get them?

THE COURT:  All right.  I'm going to say no on this one.

When I think about all of the Rule 30(b)(6) topics in the world, of which there are way too many already in this case, and what they're really good for and how they should be prioritized in terms of the very significant burden that they place on a huge corporation like Google to prepare somebody on a fairly amorphous topic like this -- this is, kind of, going to a -- this doesn't go directly -- doesn't go directly to any of the plaintiffs' claims or Google's current defenses.  It's, kind of, a let me see what I can find out so that maybe I can use this information two or three steps down the road to make an argument about something that I'm not sure about yet.

Too far removed.  No.

What's next?

MR. KANE:  Topic 56.

THE COURT:  56.

MR. KANE:  Business operations verification.

THE COURT:  Okay.  I have to look up my notes now and see what I remember about this.

Go ahead.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. KANE:  So Google had this -- or has this business verification process whereby it asks merchants questions about their business model, their operational practices, their key relationships with third parties, and details on products and services.

We had moved to compel Google to produce any information it received from the 1,500 pirates pursuant to this business verification process.

THE COURT:  And I said no, if I recall.

MR. KANE:  And the -- part of the basis on which you said no was that we had moved on the process that results in this little icon appearing next to the merchant's name that says "Advertiser identity" --

THE COURT:  It verified.

MR. KANE:  -- "verified by Google."

And Google's counsel represented to the Court that that was a separate process from the business verification process here.  But what counsel said is, "Candidly, we haven't done a lot of investigation into what that process entails."

We would like a witness to confirm what counsel represented to the Court, which supposedly is that this is a separate verification process from

the one about which we moved.

If it turns out it isn't, then we think it's appropriate that Google produce whatever information it has from this business verification process concerning the 1,500 pirates at issue in this case.

But we don't think that Google should be allowed to, through its counsel, make an important factual representation like that without a deposition witness having to explain whether or not it's accurate.

THE COURT:  Well, what you have just said to me is a little narrower than what I understood from reading the letter briefs and looking at everybody's charts before today, because what I took from that was that you wanted both broader and deeper testimony about this business operations verification process, that you really wanted to be able to probe, what is it, who does it, what's it for, how does it work, which could be a whole day of testimony.

MR. KANE:  I don't know about a whole day. But, I mean, the general -- we can put the video or the document in front of them and say, you know, so just explain to us what this process is.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

Yes, I think that would have to be part of the -- I mean, that would have to be part of the testimony.

But the, sort of, impetus for including this topic included the fact that Google refused to produce -- or was allowed to not produce the information it had about the 1,500 pirates at issue here based on a representation that this was a separate process.

THE COURT:  Ms. Clarke?

MS. CLARKE:  Yeah.  So your Honor is right, that you already heard about this, and you ruled on it.  And I don't think Mr. Kane is correct, that you only ruled against it because they had moved on a separate verification issue.

I think your concerns were that what plaintiffs were seeking was very speculative. Their -- a lot of what they said is what -- of why this might be relevant is, well, if Google has this information about a merchant, and if this -- if X, if Y, then that would be relevant about the knowledge that they have.  They have no -- not shown any evidence that anything that would be collected through this verification process would be relevant to this case.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

Again, this issue was heard and resolved. I don't know why we have another 30(b)(6) topic on it when you denied discovery on it in the first place. It's no more appropriate as a 30(b)(6) topic than it was in full discovery.

This is also just a process that is, like, completely separate and apart from the issues at this case and, for that reason, is not relevant, but also would be incredibly burdensome for Google to educate a witness on. This is not within the scope of the work that any of the folks that we've been working with or designated have worked on.

So to overcome that very strong burden, I think, Mr. Kane -- or plaintiffs have to put forward a more coherent relevance argument.

THE COURT: So I'm looking at my discovery order from January at Docket 539, and I see here -- because this was so long ago -- I see here that what I did was I granted plaintiffs' document discovery demand or motion to compel production of documents in part, and I required Google to search for and produce documents showing its process for performing identity verification of advertisers, including a fair degree of detail there.

And that happened, correct, Google?

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MS. CLARKE:  Correct.

THE COURT:  You produced those documents.

And now -- just trying to make sure I understand where you're at.

And I did that because the verification icon, or whatever it was that we were talking about at the time, Google told me that that's what it was about, right?  The merchant identity process?

MS. CLARKE:  Yeah.  I think that's the representation plaintiffs made.  If I recall correctly, their opening brief was all about verification.  And then in their reply brief, they might have mentioned the business verifications as a separate -- I don't remember the full scope of it, but that was my -- that's my memory.

THE COURT:  All right.

And tell me again, Mr. Kane, why the business verification, business ops verification, process is relevant to the claims and defenses in this secondary copyright --

MR. KANE:  So if Pirate X, who is -- you know, advertised one of the infringing works in this case, went through this verification process and answered questions about --

THE COURT:  Business verification process.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. KANE:  Yep, business verification process -- and answered questions about, what is our business model?  What are our operational practices?  What are our key relationships with third parties?  It should have been very obvious to Google that this was a pirate.

Like, testbank23.com told Google, oh, yeah, I produce biology textbooks.  I produce immunology textbooks.  If Google looked at that information and said, yeah, we're satisfied with that, we're going to verify this merchant, that goes to willful blindness into Google's knowledge of the pirates and Google's intent.

What happened here --

THE COURT:  What basis do you have for believing that testbank12345 went through this business operations verification process?

MR. KANE:  That's what we were asking Google to produce in discovery, which is to say, if any of the 1,500 pirates went through this process, we want whatever they submitted as part of that process.  Google avoided that discovery by claiming it was a separate process from identity verification.  We would like a witness to confirm that or deny that or say that's not quite right.

If that's the case, then we think Google should -- for the 1,500 pirates, for any of the 1,500 pirates that went through this verification process, then they should have to produce the records of that verification.

THE COURT:  All right.  So what you really want here -- and you're using 30(b)(6) as a way in the door, which is fine.  I mean, you use what you've got.  I understand that.

What you really want is to loop back to that question that we were debating in January and find out whether 1 or 1,500 or some number of the pirates at issue in this case went through the business ops verification process.  And if the answer is yes or maybe I need to check, you want to push further and say, we want to see that data because we're now going to argue that Google should have used that data to -- as a red flag.

MR. KANE:  That's correct.  And I think that's appropriate because the basis on which the Court did not require Google to submit information, or to produce information, about the business verification process was that Google claimed it was a separate process.

If that's true, you know, the Court's basis

for the ruling was --

THE COURT:  Again -- so, again, my -- I guess I keep -- I keep having this reaction:  Why can't you send them an interrogatory and say, did any of these 1,500 pirates go through the business ops verification process?

MR. KANE:  I suspect if I sent that interrogatory, they would claim that the Court had already decided this and that they don't need to answer it.

If what you're saying is, we can send that and they have to answer it, that works.

THE COURT:  Ms. Clarke?

MS. CLARKE:  Yeah.  I think, really, what the issue is, is that everything Mr. Kane is saying about what he thinks happens in this business operations verification process is very speculative.

And just zooming out a little bit, we've already talked today about several things that Google does to review merchants and to look at things like --

THE COURT:  That don't have anything to do with copyright.

MS. CLARKE:  Yeah.  And -- yeah, to proactively review merchants and say, oh, wait, they

AMM TRANSCRIPTION SERVICE  -  631.334.1445

look a little suspicious, like, there's some weird information about this merchant -- like, I just don't know why we need to go into this whole other process that is not related to copyright at all, is a totally separate, earlier process that --

THE COURT:  Earlier in what sense?

MS. CLARKE:  My understanding is that this verification process would be when the merchant account was being created in the first instance.

THE COURT:  Okay.

MS. CLARKE:  Google has plenty of tools, and we've discussed it and we've produced data on it, to review merchants.  So if it is testbank123 and they're selling something different than what -- like, what you would expect -- like, they were reviewing merchants in that way, I guess -- again, like, it's very speculative that any of this data would be relevant.  It's very speculative that any of the merchants at issue would have had this verification process done.  And to be able to present a witness on this test -- on this topic or, frankly, to answer an interrogatory, we would have to pull the data that your Honor already ruled we did not need to pull.  So, like --

THE COURT:  Well, yes and no.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

Again, both, your document -- the motion involving document production which I ruled on in January and the 30(b)(6) -- the proposed 30(b)(6) topic here asks for substantive information about this process: What is it? How does it work? What questions do you ask? Describe the process. Who gets it? Who doesn't?

It seems to me that there's a threshold question, which is, did these 1,500 -- and this is, sort of, separate and apart from whether the icon that we were looking at in January indicates that they went through the business verification process or the identity verification process or -- I don't know -- some other process that I haven't heard about yet.

As I understand Mr. Kane's point -- tell me if I'm misrepresenting you -- he says, look, I want to know if these pirates filled out a bunch of forms at some point for Google. And if so, I want at least the opportunity to look at the data that they provided so that I can argue that Google should have seen that data or that the Business Group at Google who processed that data should have sent it over to the Copyright folks because this is yet another piece of information that Google had and should have

raised red flags, and it should have done something about it.

How badly did I butcher where you're coming from?

MR. KANE:  I think that's about it, your Honor.

MS. CLARKE:  I guess my only retort there is just I just don't see how that's connected to -- the case at issue is whether Google contributorily infringed on plaintiffs' copyrights.  Like, I just think we're going very far --

THE COURT:  It's a bit of a stretch because, at best, I think it's going to end up being in Mr. Kane's arsenal of stuff Google could have done but didn't, and I don't know if that's going to add up to something looking like inducement or not.

MR. DAMLE:  Well, if I could just interject here ...

THE COURT:  Mr. Damle?

MR. DAMLE:  I mean, I think the Court has made -- the Supreme Court has made very clear, both in the *Cox* case and in a later case called *Hikma*, which was a patent-inducement case -- both from this term -- that simply failing to take action --

THE COURT:  No, and they say that.  I know

AMM TRANSCRIPTION SERVICE  -  631.334.1445

they say that.  They say that all the time.

MR. DAMLE:  Yes.  Yep.

THE COURT:  We can, all, quote those sentences.

MR. DAMLE:  And, moreover, they say you have to have made some affirmative expression indicating an intent to foster infringement.

They -- both the *Cox* case and the *Hikma* case talk about taking some affirmative expression, affirmative act, to further infringement, not simply turning a blind eye.

Like, even in the case -- and that -- this is *Cox*, right?

*Cox*, the *Cox* case -- our firms are on the opposite sides of that case.  In the *Cox* case, the claim fundamentally was, you knew that you had subscribers that --

THE COURT:  But you didn't know enough -- didn't do enough about it.

MR. DAMLE:  And you didn't do enough about it.

THE COURT:  I understand.

MR. DAMLE:  You knew that --

THE COURT:  But the stakes were quite different in that case as well in the sense -- look,

AMM TRANSCRIPTION SERVICE  -  631.334.1445

it was a different business that had a different kind of subscribers, doing a different kind of thing, and each of them was, sort of, tiny. The cost-benefit analysis of doing something about any one customer who might have been doing something bad with their Internet connection was a daunting proposition. But I understand where you are coming from.

MR. DAMLE: So when you're thinking about, you know, what's the relevance here, I think you have to account for the fact that we're already far down the line in terms of what kind -- we're talking about speculation on speculation that really, at most, goes to, we had information, and we failed to take some action.

THE COURT: Was there something else that Google could have done?

MR. DAMLE: Right.

Which we know, from the Court, that simply saying, there was more you could have done and you failed to do it, that is not sufficient to base an inducement claim on. That's the fundamental holding of both the *Cox* case and the later *Hikma* case.

We provided, in relation to our 12(c) motion, supplemental authority to Judge Rochon, so

that information is on the docket.

THE COURT: Mr. Kane?

MR. KANE: So a couple points. One is, there's no requirement to have an affirmative expression. What the Supreme Court actually said is you need specific acts that encouraged infringement. It did not say you needed an affirmative expression. I intend for the infringement to happen.

Of course --

THE COURT: No, you don't need to convene your infringers and egg them on. I understand that.

MR. KANE: Of course.

MR. DAMLE: But you do have to say -- and I'm reading from the *Hikma* case -- "inducement must involve the taking of affirmative" -- taking of affirmative, as opposed to passive, steps to bring about the desired result. That is the standard.

And so "affirmative steps" doesn't mean, oh, you had information, and you could have said no.

THE COURT: You sat on it. You didn't use it.

MR. DAMLE: You sat on it. Right.

That is not sufficient.

THE COURT: Look -- okay. You get your 30 seconds, Mr. Kane.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. KANE:  So we --

THE COURT:  And we've got to finish this up.

MR. KANE:  Okay.

THE COURT:  I actually do have another case coming in at 2:00, so ...

MR. KANE:  Okay.

What is enough under patent law that -- the law on which *Cox* relied, is exactly what *Cox* said, "Specific acts that encourage infringements."

If you continue providing a service, an infringing service to someone who you know is an infringer, that is enough to infer intent.  That's one of the ways you can do it.

THE COURT:  Well, no, because that didn't work in *Cox*.

MR. DAMLE:  Exactly right, your Honor.

THE COURT:  That's just not right, Mr. Kane.

MR. KANE:  I don't think that's at all what the Supreme Court said.

But in this case, what we have is, like, the most literal affirmative act you can possibly have, which is --

THE COURT:  A literal affirmative act is to

AMM TRANSCRIPTION SERVICE  -  631.334.1445

not pay attention to some information -- some suspicious information that you think may be out there in the business verification process?

MR. KANE:  The specific act, the affirmative act, is advertising the infringing work. Like, we had specific notices saying --

THE COURT:  All right.  Certainly, I understand --

MR. KANE:  Okay.

THE COURT:  -- your argument there, but that doesn't mean you can roll up everything else that Google has done or not done into an "affirmative act."

MR. KANE:  So I'll give you an example.

One of the things that the merchant has to explain as part of this business verification process is "details on products and services."  And I'm not speculating; that's what Google's website says they have to include as part of this verification process.

So the merchant says to Google, yeah, my product is e-books, e-book -- electronic versions of textbooks.  And the Merchant's name is NARDAB.com. And someone at Google said, yeah, I think NARDAB.com is probably an authorized seller of an immunology

textbook.

That, to me, is a pretty good argument for willful blindness and intent, that Google knew that this was -- excuse me -- that Google knew that this was infringing content and it continued providing advertising services to those exact --

THE COURT: Both of you, thank you for your learned commentary.

I understand where you are disagreeing with one another in terms of the interpretation and application to the facts of this case of recent Supreme Court precedent. I get that. I'm operating at a slightly different level here.

Let us grant, for purposes of today's conversation, that there is a -- because, remember, discovery broader than trial and all of that sort of thing -- that there is a possibility that Mr. Kane could, at some point in the future, convince the district judge to allow him to present evidence to the effect that there was a whole bunch of stuff that Google knew and didn't actively utilize to maximally protect Mr. Kane's clients against copyright infringement.

But the question before me today is, does Google have to present a 30(b)(6) witness explaining

this whole program?  And the answer to that, I'm now quite confident, is no.

So as it comes before me in today's guise, with respect to Number 56, the answer is no.

I hope you only have a couple more.  By my count, you only have a couple more.

MR. KANE:  That's three more.

THE COURT:  Great.  That's more or less a couple.  It's close to a couple.  Go ahead.

MR. KANE:  Could we carve out, for 56, just the question of, is this a separate verification process from the one that results in the advertiser identity verified by Google?

THE COURT:  I can't prevent you from asking that question of any percipient witness who you think might know the answer to that.

MR. KANE:  Okay.

63 is retention policies.

So you will recall --

THE COURT:  You lined these up with your best ones first, didn't you?

MR. KANE:  You will recall that the Court ordered Google to produce its document retention policies for various things --

THE COURT:  I did.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. KANE:  -- the database from which the data was produced, its e-mail systems, its internal chat systems, and the Buganizer system.

We have now received those --

THE COURT:  You have now received them.

And what new questions that are directly relevant to the claims and defenses in this action have been raised by those documents that you need 30(b)(6) testimony on?

MR. KANE:  So, basically, it's often unclear which policy applies to a particular piece of data that Google produced.  So, in other words, Google produced Ads data, and there's a whole bunch of ads missing, which is to say we saw the ad, we've got a notice saying, here's the ad on this date.  In a lot of cases, we even have screenshots, and we don't see the ad in Google's Ads data.

We would like to know which retention policy applied to the Ads data that Google produced, and that there's -- I don't know -- six or seven document retention policies, and it's not clear to us which one applies.  It's often unclear, the period during which they applied, or even if it was actually implemented.  Sometimes it has notations on it that say "proposed," but doesn't have anything

that says, you know --

THE COURT:  But hasn't Google agreed -- it hasn't agreed to testify about the document retention policies per se, but it has agreed, as I understand it, to, sort of, get at the same issue in another way.  It has agreed to present a witness to testify regarding what happens to unused and stale offer data.

MR. KANE:  That witness -- a witness did testify --

THE COURT:  Did it happen?  Did that already happen?

MR. KANE:  A witness testified about that, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

But, I mean, that's just one example.

For example, in the merchant account data,

the data that says, you know, for this domain, here's the merchant account, and here's its e-mail address and the telephone number and whether it was suspended or not, there are a number that appear to be missing.

For example, there's domains that we submitted to Google that just aren't -- they're not represented in the spreadsheet. We would like to know which document retention policy applies to that data.

We're not asking for, like, a deep dive on the nuances of every one of these policies. We're more just looking to understand them at a high level and to understand which one applies to what.

THE COURT: Ms. Clarke?

MS. CLARKE: Yeah. So it is correct, your Honor, that we identified -- we designated a witness, and he already testified on Topic 63B regarding the general --

THE COURT: Wait. B or A?

MS. CLARKE: B.

-- regarding the general process by which used in stale offer data or data connected to a user that has deleted their Merchant Center account is purged.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  Wait.  Now, I'm confused because, looking at Google's argument chart, plaintiffs tell me that Google has agreed to produce a witness on Topic 63A and that you're fighting about 63B.

Mr. Kane, am I misreading that?

MS. CLARKE:  Okay.

MR. KANE:  63A is the Ads data.

MS. CLARKE:  Okay.

MR. KANE:  63B is the -- I think Ms. Clarke may have just inverted the two.

MS. CLARKE:  Yeah.  Apologies.

But -- so you're correct, that we did agree to part of this topic, and we presented a witness on that.  He was prepared to testify on it, and he did.

I think, just broader, you know, our objection to this topic as a whole is it is discovery on discovery.  We produced the retention policies.  I think you can tell pretty clearly from the titles of the retention policies what they relate to.  And, you know, Mr. Kane can review those.

But requiring Google to present a full witness on Google's document retention policies and then have that witness subjected to all the

AMM TRANSCRIPTION SERVICE  -  631.334.1445

questions that Mr. Kane just had about, why didn't Google produce this and this and this, when, you know, that witness is not the attorney who was managing discovery -- I just think it's an inappropriate topic.

And we followed the Court's order.  We produced the documents.  Plaintiffs did the same thing.  And my understanding is that plaintiffs did not agree to present a witness on their document retention policies.  We just don't think it should be going either way.

THE COURT:  Mr. Kane?

MR. KANE:  So --

THE COURT:  Did this come up the other way? Did they ask you for a 30(b)(6) witness on document retention policies?  And did you say no?

I understand that there may be some false equivalencies here, but just for my background.

MR. KANE:  I'm sorry, I was not involved in those negotiations.  I'm not sure.

For 63B, the merchant account data, like, this is very important.

So we gave Google a list of 1,500 domains and said, find all the merchant accounts that are associated with those domains because those are the

domains that had advertised the infringing works.

A whole bunch -- I think it's 18 of them, they didn't find any Merchant Center accounts. And most of the subsequent data --

THE COURT:  ▉ out of 1,500?

MR. KANE:  Correct.

And most of the subsequent data that Google produced is based on Merchant Center accounts. So when it said, here's all the ads that these domains ran, or that we ran for these domains on Google Shopping, that was based on Merchant Center ID. When it pulled the revenue data, that was all based on Merchant Center ID.

So we're trying to understand why there is seemingly missing Merchant Center accounts in this data. And it's not just the ones that are missing entirely. It's, like, when we try to match up seeing an ad run for a particular domain on a particular date, we look at Google's spreadsheet of when these accounts were created and suspended, and there's no account open for that domain on that date.

So we're trying to understand, like, is the reason that we're not seeing this that the data was deleted?

And that's why we're asking Google to explain which document retention policy applies in that circumstance so that we can understand, like, do we say to the jury, it looks like this -- these documents were -- these Merchant Center accounts were deleted?

MS. CLARKE:  I just think that we've been very forthcoming with plaintiffs about what we produced.  I think we provided declarations on how data was produced.  We produced the document retention policies.  I think requiring any more from a 30(b)(6) witness is just wholly inappropriate and would be extremely burdensome on us.

THE COURT:  I'm tending to side with Google on this, in part, because -- too late now for you to go back and do it any differently -- but, in part, because of the way you've set this up, plaintiffs, as a -- you know, tell us about your document retention policies rather than tell us about why this data isn't there.

And although you haven't said this to me today, I suspect that, in the back of your mind, you're still thinking about making a spoliation sanctions motion at some point and that this is what this goes towards.

MR. KANE:  To be honest, I'm more concerned about our expert being able to say to the jury, you know, look, the infringement was really extensive, we can see that from the data that Google produced. We know that there's more data that Google didn't produce.  Like, we know it's even more extensive than the data indicates because we know data is missing.

I'm not saying that a spoliation motion is impossible.  It's just that that's more of what I'm concerned about.

MS. CLARKE:  But, again, as your Honor noted, ███ out of 1,500.  Like, I don't think that that --

THE COURT:  Yeah, I heard that.

MR. KANE:  That -- it's ██ that are missing entirely.  It's much more where, like, when we go and see, okay, which Merchant Center account ran this ad that we saw and that we have a screenshot of, we don't see a Merchant Center account open on that date.  So we know that there are Merchant Center accounts missing.

THE COURT:  All right.  I'm not going to require Google to produce a 30(b)(6) witness on this topic, although I think it may shake out; that is, I

think the parties may end up exchanging valuable information on this point when they exchange expert reports.

It may well be, for example, that if Mr. Kane's expert says, well, the numbers are almost certainly higher because all this data is missing, then I suspect Google is going to have no choice at that point but to, through the mouth of its own experts say, well, no, actually, it's because of this and it's because of this. So I doubt that this is the last word on the topic, but I don't think it is necessary or appropriate as a 30(b)(6) topic.

70?

MR. KANE: Sure.

THE COURT: Okay. Go ahead.

I don't know anything about this ███████ ███████████ You will have to educate me in the next 60 seconds.

MR. KANE: So what Google's documents say is that Google had a tool that ██████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████

One of the issues in this case is, did Google have knowledge that it was applying

plaintiffs' trademarks to ads?  It's the way that you get damages under the trademark claim.

If Google had a system that would ████████ ██████████████████████████████████████ ████████████ that may speak to Google's knowledge that these infringement notices involve trademark infringements.

So what we've asked Google to produce is a witness who can explain what this tool was and whether it was used in enforcing Google's trademark policy.

THE COURT:  Well, what do you know about this ████████████████████████?

You've seen references to it somewhere, which is why you're asking the questions.  What do you know?

MR. KANE:  What the document says is it -- ███████████████████████████████████████ ████████████████████████████ ████████ -- I think it says it's something like ███████████████████████ -- and that Google uses that in some fashion to ███████████████████████████ ████████

What we're asking is what --

THE COURT:  The ██?

AMM TRANSCRIPTION SERVICE  -  631.334.1445

MR. KANE:  The document we have is about an ██ policy, or about an ██ -- I don't know what the word is -- program.

What we're asking is whether --

THE COURT:  U.S. Patent and Trademark -- I just want to make sure what we're talking about here.

MR. KANE:  Yep, that's correct.

THE COURT:  There is a tool which you think ████████████████████████████████ ████████████████████████████████ ████████████████? I don't know.  Maybe you don't know yet -- and somehow uses that in the ██?

MR. KANE:  It's used in some fashion to implement some sort of ██ policy.

What we're wondering is, did Google use this tool to ████████████████████████████ ██████  And just a general explanation of what this tool does.

If it didn't utilize this information, and Google comes back and claims, well, how are we supposed to know that your trademark was on these textbook covers that we advertised -- well, Google did know.  It had a tool that would tell it.

THE COURT:  Well --

MR. KANE:  So we're asking -- we're asking Google to produce a witness explaining what this tool is and ████████████████████████████

█████████████████████████████████████████████

THE COURT:  Is there going to be -- let me just, sort of, ask the preliminary question here.

Is Google -- I know you don't have to commit to what you're going to argue and not argue at a later stage of this case at this stage of the case, but are we really looking at a world in which Google is going to argue, well, we didn't know that there were any actual trademarks involved in those textbooks that you were publishing?

That just doesn't seem very realistic to me.

MR. KANE:  We also think it's --

THE COURT:  It's not going to be the ground, I don't think, of any defense.

Ms. Clarke?

MR. DAMLE:  I can take this.

I don't know -- I can't commit to what we're going to argue.  You know, one fact in this case --

THE COURT:  Yeah, I said that.  But let's --

MR. DAMLE:  Yeah, one fact in this case --

THE COURT:  I mean, let's be grown-ups here.

MR. DAMLE:  Just to be clear, one fact in this case is that they never sent us a trademark notice.  They sent us copyright notices, but they never said, this particular ad is infringing our trademark.

THE COURT:  Okay.  All right.

MR. DAMLE:  And so I don't know what their theory is going to be about how we were put on notice that this particular book was displaying their word mark or their -- or their trademark, right?

Their trademark claim is based on the images that are in the --

THE COURT:  Okay.

MR. DAMLE:  -- in the ads.

THE COURT:  So maybe Google is going to make that argument.

All right.  I'm hearing you.  Thank you.

MS. CLARKE:  And just the only point I wanted to make was that Mr. Kane was talking about if it is relevant to Google's implementation of its trademark policy in the U.S.

THE COURT:  Yeah, yeah.

MS. CLARKE:  We had a witness who already testified for nine hours about Google's trademark policy in the U.S.

THE COURT:  And did that witness get asked this question?

MS. CLARKE:  She did not get asked this question nor did this ███████████████ come up.

Our understanding is that it is not relevant.  I just did a quick search of documents we have produced.  It comes up -- the word ██████ ████████ comes up in ██ documents.  I don't even know if -- some of them seem completely irrelevant.  Obviously, one of them is including the one that plaintiffs cite in their topic.

Just -- I think to the extent that this ███████████████ was relevant, it would have come up in that nine-hour deposition that already occurred, and --

THE COURT:  So --

MS. CLARKE:  -- Mr. Kane could have asked.

THE COURT:  So you did have a 30(b)(6) witness on the trademark policy?

MR. KANE:  We did.  Google is, sort of, trying to have it both ways.  If I ask a witness --

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  So are you.  So are you.

I mean, I understand what you're saying. You're saying, why should I ask a witness about a topic that Google has told me they're not going to provide a witness on?

On the other hand, the preliminary question that you want to know the answer to, which is, is this even relevant to trademark policy, is a perfect question to ask your trademark policy witness.  And if the answer is, no, I never heard of it, that's not something we do, then we wouldn't be -- right?

MR. KANE:  I understand.  It's just, if I ask the question, no matter what the witness says, no matter what her testimony is, Google's counsel is going to say, you've already asked this of a fact witness, we don't need to produce a 30(b)(6) witness.

THE COURT:  Yeah.

All right.  Too far from anything directly relevant to the case and too speculative in terms of what the -- what information might be uncovered here.

Do we have one left?  Or do I need to go back to the one I didn't give you an answer on?

MR. KANE:  The one left is Topic 51.

THE COURT:  All right.  Go ahead.

MR. KANE:  So for the --

THE COURT:  Ah, yes.

MR. KANE:  Part of it is just a spreadsheet.  Google performed an estimate of ███ ████████████████████████████████████████ ███████

THE COURT:  Right.

MR. KANE:  -- and, excuse me, ████████████ ████████████████████████████████████████

We think Google should have to have a 30(b)(6) witness explain what this calculation -- or what the spreadsheet is and how it was calculated.

To the extent that Google has analyses or studies of the impact of e-book piracy, a witness should have to testify about that.

What Google is trying to do is to restrict this to just feedback that Google received from folks like Pearson, which is another large publisher, or VitalSource, which is a distributor that the publisher -- some of the publishers use. We don't think that's an appropriate cabin.  If they have analyses of the impact of e-book piracy, they should have to produce them, whether or not it came from feedback from Pearson or not.

THE COURT:  Well, hold on.

If I understand Google's position --
Ms. Clarke, you will tell me.

You have said that your witness will
testify about information that Google received,
feedback, et cetera, from plaintiffs, their
representatives or agents, the American -- sorry --
the Association of American Publishers, but not
specifically on feedback from Pearson?

MS. CLARKE:  Correct.  Yeah.  We were --

THE COURT:  Is that really what we're
fighting about here?  Feedback from Pearson?

MR. KANE:  We think Google should have to
produce a witness to testify about the impact of
e-book piracy.  They shouldn't be allowed to
constrain it to just the feedback they received from
certain people.

I mean, if we're going down the path of
they have to produce a witness to testify about the
feedback they got, then, yes, Pearson should
certainly be included, they're a major publisher.
But --

THE COURT:  And not one of your clients?

MR. KANE:  They're not a party to this
lawsuit.  They are a client in other --

AMM TRANSCRIPTION SERVICE  -  631.334.1445

THE COURT:  Pearson's not a party to this lawsuit.

MR. KANE:  Correct.

THE COURT:  Okay.  So you can get that information from them.

MS. CLARKE:  Yeah.  I will also just note that ▮▮▮▮▮▮▮▮▮▮ was discussed in a previous deposition.

THE COURT:  By a percipient witness?

MS. CLARKE:  In their individual capacity, yes.  And we did agree to present testimony on the spreadsheet at issue here.  So we've agreed to most of this topic that plaintiffs have requested.

THE COURT:  I'm not really seeing either the burning need for a further order from me on this point, particularly since you're getting information on feedback from a whole host of constituents in this field, and the one that Google won't talk to you about, you can find out about yourself, Pearson.

MR. KANE:  I think Google is -- what we asked for is studies or analyses on the impact of the e-book ban.  Google, sort of, imposed this constraint on it, like, we're only going to tell you about feedback we got from certain people.  That's not what the 30(b)(6) topic asked for.  If Google --

THE COURT:  You want not just feedback, but you want to know if Google went out there, sort of, proactively or conducted any of its own studies, read studies that other people sent to Google in the mail, whatever.

MR. KANE:  Yeah.  I mean, I think the most likely one is that Google itself did an analysis

But that's what we're, sort of, after.

THE COURT:  Tell me more about the spreadsheet, and then I will ask Google to tell me what it has provided or will provide specifically with regard to that spreadsheet.

MR. KANE:  Yeah, it's a spreadsheet that

I think it's

If Google has -- Google's saying it's going

to produce a 30(b)(6) witness on this.  If Google has similar studies, we think Google should have to produce a 30(b)(6) witness on that.

THE COURT:  Well, did you ask for the studies last month or the month before or the month before that?

MR. KANE:  I believe it's included in one of our document requests.

THE COURT:  And what did you get?

MR. KANE:  That's the one that we've identified as being a --

THE COURT:  So they didn't hold out on you. They didn't refuse to produce the studies.

You now want a 30(b)(6) witness to testify about -- I'm just to imagine what the gap-filling --

MR. KANE:  I'm not sure if -- I'm not sure if Google actually agreed to produce those or if that was just one of -- if that particular spreadsheet was produced pursuant to another document request.

THE COURT:  I don't recall the issue being teed up to me --

MR. KANE:  Yeah.

THE COURT:  -- which means that you must have resolved it somehow between yourselves.

MR. KANE:  I --

THE COURT:  Maybe it was not contested in the first place.

MR. KANE:  You might not believe me, but we don't bring every motion, every potential motion --

THE COURT:  And I am grateful for that, Mr. Kane.

MR. KANE:  I think to the extent that Google performed an analysis of what the effect of the e-book ban would be, it's an appropriate topic for a 30(b)(6) witness.

THE COURT:  Here's my problem:  If we were here three months ago, and you were saying to me, Judge Moses, make them produce any analysis that they performed as to the impact of the e-book ban, and Google was sitting here saying, no, we think that's totally irrelevant, I think I probably would have been pretty sympathetic to your position and would have required them to produce that.

But now, at the end of the day, you're not sure whether you got all relevant documents or not. You got this one spreadsheet.  It's possible, you think, maybe, that there were some other studies out there that either Google created itself or got its hands on from somewhere.  I don't know who else

AMM TRANSCRIPTION SERVICE  -  631.334.1445

would be doing it, but whatever.

And not being sure whether you have the documents or not, you now want to do it through a 30(b)(6) witness.  You want to say, I want to have a 30(b)(6) witness testify to me, essentially, about documents that I don't know whether they're out there or not, that Judge Moses would have given me if I had asked for them last year.

This isn't really what 30(b)(6) testimony is for.

MR. KANE:  I guess what I would point out in response to that is, if the 30(b)(6) witness whom they are designating on the e-book-ban topics is, in fact, knowledgeable about the e-book-ban topics, the witness probably knows this already.

In other words, the witness should be able to say, you know, yeah, we did commission a study.

THE COURT:  Well, you can certainly ask that question, if this is a --

MS. CLARKE:  Yeah.

THE COURT:  -- witness knowledgeable about the e-book ban rather than someone who's been fed carefully selected information to testify on the topic.

MR. KANE:  That's quite an assumption,

AMM TRANSCRIPTION SERVICE  -  631.334.1445

though, because the DMCA -- their witness on the DMCA policy was the latter.  It was someone who had been fed information on what to say about the DMCA policy.

MS. CLARKE:  I obviously --

THE COURT:  Let me ask Ms. Clarke a question this way.  Your e-book-ban witness, is he or she going to know the answer to that preliminary question:  Did you do any other studies?

MS. CLARKE:  So we already told plaintiffs that -- in response to a separate topic, Topic 48, we agreed to present testimony on contemporaneous analyses, if any, of the revenue impact of the e-book ban.

THE COURT:  Oh, so you did.  That's revenue impact?

MS. CLARKE:  Yeah.

THE COURT:  Were you being cagey --

MS. CLARKE:  Which includes the --

THE COURT:  -- there in discussing revenue impact rather than -- I don't know -- some other impact?

MS. CLARKE:  I mean, no.  I just think that's what we know exists, and we included that document that is cited in plaintiffs' requested

relief.  So, you know, that's what they're going to be prepared to testify on.

I don't remember the back and forth on what we produced or not -- didn't produce here, but, you know, obviously, we agreed to produce something on the analyses that we had.

Plaintiffs are welcome to ask the -- our 30(b)(6) witness on e-book topics about this, but I -- again, having a whole separate topic on it --

THE COURT:  Yeah.

MS. CLARKE:  -- feels inappropriate.

THE COURT:  I'm not persuaded that you need a separate 30(b)(6) witness on this topic, Mr. Kane.

And I think that brings us to the end of our list.  I'm not inclined to change any of the -- any of the yeses or nos that I gave you as we went along, although I do need to circle back, I think, to Number 13.

Are my notes correct here, where I didn't give you a definitive answer?

Now, let me look again.

So let me, I guess, give you another 30 seconds on Number 13.

Has anything which we've touched on or decided since we were last discussing 13 -- relevant

to how I should come out on this one?

MR. KANE:  I think we can rest on what we said previously about this.

THE COURT:  Ms. Clarke?

MS. CLARKE:  Yeah.  I mean, I don't want to rehash, but I think what we've said before about the relevance of Google's DMCA program applies here. And, like we said, the data that relates to the spreadsheet that plaintiffs are citing here has already been testified about.

THE COURT:  All right.  So I'm not going to require Google to produce a 30(b)(6) witness on Topic 13.

That brings us to the end of our list. Thank you very much for your patience.  I appreciate it.  I have to hustle you out of the courtroom because I see some folks beginning to show up who are wondering why they're -- why I'm not ready for them.  I will try to get ready for them as quickly as I can.

You are going to get back to me today, tomorrow, with regard to your scheduling preference for what's now going to be a conference before the district judge the week of March the 8th, correct?

MR. KANE:  Yes.

THE COURT:  All right.

I have the reconsideration motion, which, as I indicated previously, I'm not planning to hear argument on, although I am planning to decide it in due course.

Refresh me.  What else is in the pipeline for me here, Mr. Kane?

MR. KANE:  I don't believe we have any other motions pending.

THE COURT:  Ms. Clarke?

MS. CLARKE:  I think --

THE COURT:  You know, I see motions flying across my ECF notification system every night when I look at it before I go home from Cengage, but half of them are just motions to seal this, that or the other thing.  So you have to tell me.

MS. CLARKE:  Yes, I think we noted this in our joint status report, that we believe we're going to file a motion for a protective order on one of the noticed deponents, but we are conferring --

THE COURT:  But you are still arguing -- excuse me -- meeting and conferring about that?

MS. CLARKE:  Yes.  We're conferring early next week, so we will see if we can resolve it.

THE COURT:  All right.

AMM TRANSCRIPTION SERVICE  -  631.334.1445

So I don't think I'm going to set a further discovery conference or a further status conference at this time because, as I may have mentioned to you earlier, you're not shy, and you will let me know when I need to bring you back in.

Thank you very much.  We'll be adjourned.

MR. KANE:  Thank you, Judge.

MS. CLARKE:  Thank you.

0o0

AMM TRANSCRIPTION SERVICE  -  631.334.1445

C E R T I F I C A T E

I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Cengage Learning, Inc. v. Google LLC; Docket #24CV4274 was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature  ___*Adrienne M. Mignano*___ _
                ADRIENNE M. MIGNANO, RPR


Date:      July 2, 2026


AMM TRANSCRIPTION SERVICE  -  631.334.1445