

Jeff Kane
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.499.2940
jkane@oandzlaw.com

August 13, 2026

**VIA ECF**

The Honorable Barbara Moses
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 740
New York, NY 10007

> Re: *Cengage Learning, Inc. et al. v. Google LLC*, No. 24:cv-04274-JLR-BCM
> Plaintiffs' Reply ISO Plaintiffs' Letter Motion for Discovery Conference on
> Google's Refusal to Produce Rule 30(b)(6) Testimony on Topic 32

[Redacted]

Dear Judge Moses,

After Plaintiffs or others sent an infringement notice to Google, Google sometimes determined that the landing page Google was promoting in its Shopping ad was selling infringing content, so Google should no longer advertise it. How long Google took to "delist" those landing pages is highly probative. Indeed, during the relevant time-period, Google continued advertising many infringing works *after* Google itself determined they were infringing. Neither Google's withdrawal of its DMCA defense nor the Supreme Court's decision in *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959 (2026) counsels otherwise. The other data Google produced does not obviate the need for this discovery. And it is Google, not Plaintiffs, that dragged its feet for months, delaying the adjudication of this dispute.

### I.    How long Google took to delist URLs remains relevant.

In response to notices from Plaintiffs and others, Google decided it should stop advertising certain landing pages because those pages sold infringing content. Google's GOOG-CENG-00441970 spreadsheet (the "Delistings Spreadsheet") shows how long Google took to delist those pages (or in some cases, ███████████████████████). Once Google decided that a landing page should be delisted, it makes a great deal of difference whether Google delisted the landing page an hour later or six weeks later. During whatever time elapsed between Google's decision and the actual delisting of the URL, Google was potentially advertising a landing page that Google itself had determined sold infringing content. A juror informed that Google took six weeks to remove the landing page might well conclude that Google intended to continue advertising infringing content, or that a larger monetary award is necessary to deter Google from further infringements. How long Google took to delist infringing landing pages is thus highly relevant.[1]

---

[1] It is thus unsurprising that Google says it "<u>will not</u> rely on" the Delistings Spreadsheet. Dkt. 1143 at 1 (emphasis in original). The spreadsheet likely is damaging to Google, so Google would be happy to keep it from the jury.

Hon. Barbara Moses
August 13, 2026
Page 2 of 4

Google's withdrawal of its DMCA defense does not change the relevance of the Delistings Spreadsheet. Google does not contest that all of the data in the Delistings Spreadsheet concerns the 1,500 pirate domains at issue in this case. How long Google took to delist landing pages of those pirates is relevant, whether Google is asserting a DMCA defense or not. Thus, contrary to Google's suggestion (Dkt. 1143 at 3), this Court's prior ruling (Dkt. 923) about discovery into Google's overall DMCA program, i.e., discovery into pirates *other* than those at issue in this case, has no bearing on the instant issue.

Still less does the Supreme Court's decision in *Cox* render deposition testimony on the Delistings Spreadsheet irrelevant. In *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, the Supreme Court explained that "*in the absence of other evidence of intent*, a court would be unable to find contributory infringement liability *merely* based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses." 545 U.S. 913, 939 n.12 (2005) (emphasis added). The *Cox* Court invoked that holding in discussing the requirements for finding contributory liability. *Cox*, 146 S. Ct. at 968. Google says this means that Google's advertisement of works that *Google had agreed were infringing* is not evidence of intent. This completely misreads the Supreme Court's holding.

First, advertising a product that Google had agreed was infringing and should not be advertised isn't just a "failure to take affirmative steps to prevent infringement." Dkt. 1143 at 2. It is a "specific act[]" that "encourage[d] infringement," i.e., precisely what the *Cox* Court said constitutes inducement. *Cox*, 146 S. Ct. at 967. The examples contained in the Delistings Spreadsheet are instances where Google itself *agreed* that a landing page was selling infringing content and should be delisted. If Google either took unreasonably long to effectuate the delisting, or didn't delist at all, that conduct is probative of intent. No plausible reading of *Cox* or *Grokster* suggests that this evidence is irrelevant.

Second, even a contrary reading of *Cox* and *Grokster* would not render the Delistings Spreadsheets irrelevant. *Cox* and *Grokster* merely say that "a failure to take affirmative steps to prevent infringement" is not *by itself* enough to give rise to liability. *Grokster*, 545 U.S. at 939 n.12. Even under Google's counter-textual reading, the *most* that *Cox* and *Grokster* say is that the delisting date data *alone* may not be enough to demonstrate intent come summary judgment or trial. That is no reason to withhold clearly relevant discovery now.

Indeed, taken to its logical conclusion, Google's reading of *Cox* would mean that a jury does not get to consider, for example, that Plaintiffs sent Google notices concerning tens of thousands of URLs, and that Google nonetheless chose to advertise the very infringing products and pirates that Google had been told, and in many cases agreed, were infringing. This is an indefensible interpretation of *Cox*.

## II.    New facts that Google introduced through its opposition underscore the need for deposition testimony.

Google's letter and declaration make new representations about the Delistings Spreadsheet that only underscore the need for deposition testimony about it.

First, Google claims in its letter that the spreadsheet shows the "approximate" date on which ads were delisted. Dkt. 1143 at 2. Then Google's counsel claims in an attorney declaration that "while Google did not find any definitive source of information reflecting the dates Google 'delisted' offers in response to DMCA notices, it was able to locate a source for data reflecting

Hon. Barbara Moses
August 13, 2026
Page 3 of 4

changes in offer 'visibility.'" Dkt. 1144 ¶ 5. A witness needs to explain what these statements mean. What causes a change in offer "visibility"? Is it actual delisting, or could it just be that the merchant made a change in its feed? And why was the "visibility" captured on particular dates? Were there regular sweeps to check offer visibility, or are these the dates the "visibility" actually changed?

Second, Google claims that the entries in the Delistings Spreadsheet are "a sample of the data for a small subset of offers". Dkt. 1143 at 2. A witness needs to explain how this "sample" was selected, what was left out, etc.

For several other spreadsheets that were produced specifically for this litigation, Google rightly produced a 30(b)(6) witness. E.g. Dkt. 985-2 at 20 (Plaintiffs' Topic 36). Google's refusal to do so for this spreadsheet only betrays that the data is damaging to Google.

### III. Other data that Google produced cannot substitute for 30(b)(6) testimony on this topic.

Contrary to Google's suggestion, Dkt. 1143 at 3, other data that Google produced does not explain when Google delisted the landing pages it claims to have delisted.

First, the ads data that Google provided shows only instances where Google advertised a URL. It does not show the date on which Google claims to have *delisted* a URL. If the ads data does not show Google advertising a landing page after a certain date, Plaintiffs cannot tell whether this is because Google delisted the URL, or for some other reason. For example, after Google notified the pirate of the infringement notice, the pirate could have created a new landing page to sell the infringing work and removed the prior landing page from its feed. Or, it could be that Google did not delist the URL, but did not run the ad for other reasons, such as the pirates' bid in its auction process was not high enough or no user searches triggered the ad. If the ads data Google had produced had shown the delisting dates, there would have been no reason for Google to produce the Delistings Spreadsheet.

Second, the ads data that Google produced almost certainly is incomplete. There are approximately ███████████████ in Google's ads data where the "██████" column (which normally contains the book title, price, landing page to which the ad links, etc.) is blank. 25.04.21 O+Z Email; 26.07.07 email. Google's counsel claimed that this was because "███████████



██████████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████." 25.07.08 Latham Email.

Likewise, for at least thirty of the 1,500 pirate domains, Google did not retrieve *any* Merchant Center accounts (i.e., the accounts that Google subsequently used these accounts to pull the ads data). Declaration of Attorney Jeff Kane ¶ 2.

Thus, even if the data Google previously produced addressed the issue of delisting dates, which it did not, that data still is incomplete.

### IV. Google, not Plaintiffs, delayed the filing of the instant motion.

Google complains that Plaintiffs waited too long to file their motion. But it is *Google* that delayed the adjudication of this dispute.

Google caused a five-month delay by taking until July 9, 2026 to provide its position on the Delistings Spreadsheet. Plaintiffs served their 30(b)(6) notice on January 30, 2026. Google

Hon. Barbara Moses
August 13, 2026
Page 4 of 4

withdrew its DMCA defense on March 30. Dkt. 771 at 3. At this Court's direction (Dkt. 821 ¶ 6), Google provided "updated" responses and objections to Plaintiffs' 30(b)(6) notice on April 21 (nearly three months after Plaintiffs served their notice). During the May 20 meet-and-confer, Plaintiffs explained the need for testimony on the Delistings Spreadsheet (30(b)(6) Topic 32), and Google said it would get back to Plaintiffs with its position. 26.05.20 O+Z Email. On May 22 and May 28, Google again told Plaintiffs that "Google will revert with its updated position[]" on Topic 32. 26.05.22 Latham Email; 26.05.28 Latham Email. On June 30, 2026, Google told Plaintiffs, "We are still considering your offers on Topic[] 32 . . . and may be able to provide an update when the parties confer" on other topics. 26.06.30 Latham Email. It was not until a July 8 email and a July 9 meet-and-confer that Google took a position on Topic 32.[2] Having dragged its feet for five months, Google now complains that Plaintiffs should have filed their motion after Google finally took a position on July 9 (leaving out that during that time, Plaintiffs took five depositions,[3] defended six depositions,[4] filed two motions,[5] and responded to four Google motions[6]). Google also leaves out that during that time, the parties were continuing to negotiate the scope of other 30(b)(6) topics, and reached agreement on several of them.

Moreover, it is not too late for a Google witness to address the Delistings Spreadsheet. *Contra* Dkt. 1143 at 3. Google leaves out that as of this filing, Google has six witnesses still to be deposed, including one 30(b)(6) witness designated for several topics. Google easily can ask one of its remaining fact witnesses, or its remaining 30(b)(6) witness, to address the Delistings Spreadsheet.

The Court should reject Google's flimsy complaints about timing.

## V.      Conclusion

Denying Plaintiffs' motion would mean allowing Google to hide already-produced evidence showing that Google either waited a long time to delist some infringing URLs, or didn't delist others at all. Such a ruling would deprive the jury of important evidence. The Court should grant Plaintiffs' motion.

/s/ *Jeff Kane*
Jeff Kane

*Counsel for Plaintiffs*

---

[2] Google complains (Dkt. 1143 at 3) that Plaintiffs did not include Topic 32 in Plaintiffs' June 1, 2026 motion on 30(b)(6) topics (Dkt. 983). But as explained above, at that time, the dispute as to Topic 32 was not ripe; Google would not provide its position on Topic 32 until more than a month later.

[3] Witnesses AB, CF, JE, OA, and BB.

[4] Ms. Bilello, Ms. Long, and Messrs. Aguilar, Manderson, Thompson, and Yonke.

[5] Dkt. 1051, 1093.

[6] Dkts. 1054, 1064, 1076, 1106.