**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CENGAGE LEARNING, INC.; BEDFORD, FREEMAN & WORTH PUBLISHING GROUP, LLC D/B/A MACMILLAN LEARNING; MACMILLAN HOLDINGS, LLC; ELSEVIER INC.; ELSEVIER B.V.; and MCGRAW HILL LLC,

*Plaintiffs*,

v.

GOOGLE LLC,

*Defendant*.

Case No. 1:24-cv-04274-JLR-BCM

**ATTORNEY DECLARATION OF CAROLINE CLARKE**

I, Caroline Clarke, declare that:

1. I am an associate at the law firm Latham & Watkins LLP and counsel for Google LLC ("Google") in this matter.

2. I submit this declaration in connection with Google's Opposition to Plaintiffs' Letter Motion to Compel Targeted Additional Discovery and Extend Plaintiffs' Discovery Cutoff.

3. Attached as Exhibit A is a true and correct copy of excerpts from the transcript of the deposition of A.L. on May 21, 2026.

4. Starting in summer 2025, Google produced over 15,000 responsive, non-privileged custodial documents identified by agreed-upon or court-ordered search terms and custodians. Among the custodians were at least five Google employees that Mr. R. identified during his deposition as [redacted] (W.R., Ms. Kelly, A.B., B.B., and J.E.). Google's custodians also included five Cognizant employees (including one vendor manager) with Google emails that were in Google's custody or control.

5. Across these custodial files, Google ran several agreed-upon or court-ordered search terms targeted at capturing documents and communications relevant to implementing Google's DMCA policy for Shopping, including [redacted]. These search terms include:

a. ((DMCA OR copyright OR trademark OR (infring* w/3 repeat*)) w/10 (policy OR policies OR process* OR procedur* OR strike* OR practice* OR system OR guideline* OR "[redacted]" OR "[redacted]" OR reactivat* OR reinstat*)) AND shopping

b. (exception* OR "[redacted]" OR [redacted] OR "[redacted]" OR "[redacted]" OR "[redacted]") w/10 (suspen* OR remov* OR escalat* OR (manifest* w/5 unfound*) OR DMCA OR "Digital Millennium Copyright Act" OR (notice* AND copyright)) AND shopping

c. ("[redacted]" or "[redacted]") AND ("restart" OR "re-start" or "reset" OR "re-set" or "lookback" OR "look-back") AND ("DMCA" or "strike" or "shopping" OR "pirate")

d. (OKR* OR (Objective* w/2 "Key Results")) AND (removal* or copyright* OR DMCA OR takedown* OR strike* OR infring*) AND shopping

These search terms were specifically negotiated by the parties or ordered by the Court to identify documents potentially responsive to Plaintiffs' RFPs, which include RFP Nos. 6, 76, 86, 89, and 96.

6. Google produced non-privileged documents responsive to these RFPs, including [redacted]. *See, e.g.*, GOOG-CENG-

00471839 [redacted]); GOOG-CENG-00433669 ([redacted]); GOOG-CENG-00619509 ([redacted]). Plaintiffs introduced several of the [redacted] Google produced as exhibits in depositions of Google employees responsible for implementing the DMCA policy for Shopping. For example, Plaintiffs asked three witnesses about Plaintiffs' Exhibit 71, a Google Shopping reference table outlining the process that vendor agents should follow when processing Shopping copyright notices.

7. In February 2026, after months of negotiations, Google produced, for the merchants at issue, data from the [redacted]. Google also produced additional current [redacted], selected by Plaintiffs, for each merchant at issue (the "[redacted]").

8. On May 22, 2026, following the deposition of one of Google's 30(b)(6) witnesses (A.L.) who testified about the [redacted], Plaintiffs' counsel Uriel Lee sent an email to Google's counsel, including me. In the email, Plaintiffs' counsel requested "[redacted] on the pirates at issue in this case" pursuant to Google's misrepresentation policy. Plaintiffs' also requested "[redacted]." Plaintiffs stated that they would promptly file a motion to compel no later than June 1, 2026, if Google refused to produce the requested information, and asked to meet and confer.

9. On May 27, 2026, I responded that [redacted] is a "tool used by Google to [redacted] broadly across Google's platforms" and is not used to "process or analyze DMCA notices or any other complaints against merchants related to copyright infringement." I also reiterated Google's position that Plaintiffs' requested data "[redacted], which is the crux of this lawsuit." I further stated that Google had already produced the [redacted] that Plaintiffs themselves had selected following prior negotiations, and noted that Plaintiffs had "offered no reason why *any* additional [redacted] data should be produced." Nevertheless, I stated that Google was "willing to consider a compromise offer . . . to avoid an unnecessary dispute before the Court."

10. On May 29, 2026, the parties conferred to discuss the dispute. Jeff Kane and Uriel Lee attended on behalf of Plaintiffs, and Wilson Boardman and I attended on behalf of Google. On June 2, 2026, Plaintiffs' counsel Uriel Lee wrote to summarize the May 29 conferral. During the conferral, Plaintiffs stated that they were amenable to discussing a compromise regarding the [redacted] data. Plaintiffs requested the following three categories of misrepresentation data: (i) Whether any of the 1,500 "pirates" at issue, which I understood to mean any Merchant Center accounts connected to the 1,500 at-issue domains, were tagged as "[redacted]" or "[redacted]" at any point during the Relevant Time Period; (ii) Any notes, screenshots, or analyses that [redacted] regarding the 1,500 "pirates"; and (iii) Any "[redacted]" regarding the 1,500 "pirates."

11. On June 8, 2026, I responded to Plaintiffs' email. I reiterated Google's relevance and proportionality objections but stated that, "[s]olely to avoid burdening the Court," and "conditioned on Plaintiffs' agreement that the parties' dispute regarding [redacted]

[redacted] is fully resolved," Google was prepared to offer three additional categories of production: (i) Data for the merchants at issue for the twelve additional [redacted] identified in one of Plaintiffs' previous emails; (ii) Data showing whether a merchant at issue was designated as "[redacted]" or "[redacted]" when the [redacted] was completed; and (iii) Data showing the [redacted]. However, I made clear that Google would not produce any "notes, screenshots, or analyses" [redacted] because such an undertaking "would require Google to manually screenshot [redacted] for 20,000+ merchants *and* screenshot each individual linked screenshot, which is simply not possible on this scale and would not be proportional to the needs of the case."

12. On June 11, 2026, Uriel Lee asked whether the [redacted] referenced in Google's June 8, 2026 email would "be the result of when the [redacted] was completed." Ms. Lee also asked whether manual screenshots were the only means of retrieving the notes, screenshots, and analyses for each merchant. If so, then Ms. Lee proposed that Google produce screenshots of the notes, screenshots, and analyses for a "smaller, select number" of merchants at issue, and stated that Plaintiffs would be open to discussing an appropriate number.

13. On June 17, 2026, I confirmed that data showing the [redacted] would be from the time the [redacted] was completed. Regarding notes and comments, I explained that there were often several for each merchant, and many contained screenshots that needed to be collected. All of the notes and comments would need to be reviewed for privilege, making the process incredibly time-consuming and burdensome. I stated that Google would only consider pulling data and screenshots for a small sample of merchants if Plaintiffs agreed to a list of 30 merchant accounts or fewer.

14. On July 2, 2026, Ms. Lee wrote that Plaintiffs were amenable to selecting 30 merchant accounts for which the notes, screenshots, and analyses could be pulled. She also stated that the parties could reach a compromise on items 1 through 3 from Google's June 8 email.

15. On July 14, 2026, I replied that if Plaintiffs' proposal was that "Plaintiffs alone [would] select the 30 merchants for the sample," then Google did not agree to the proposal. My counterproposal was that Google would pull the notes and comments for a randomized list of 30 merchants, and asked if Plaintiffs' would agree to a randomized list.

16. On July 17, 2026, Ms. Lee rejected my proposal, stating that Plaintiffs could not agree to a list of 30 randomized merchants, and that Plaintiffs would not agree to the sample unless they could unilaterally select the 30 merchants. She asked Google to either accept the proposal or confirm that the parties had reached an impasse.

17. On July 21, 2026, I responded to Plaintiffs' email, stating that contrary to Plaintiffs' representation, "it is *Google* who has been more than accommodating in this dispute." I explained that Google had agreed to provide three of Plaintiffs' four requested categories of data despite its relevance and proportionality objections, in addition to the substantial [redacted] data it had already produced, and had also agreed to produce a burdensome sample of notes and comments. I stated that there was no reason why Plaintiffs alone should select the sample of merchants, as that was not the procedure the parties had used in any prior sampling exercise. Google's position remained that a randomized 30-merchant sample was the most logical and efficient approach. However, to resolve the dispute, I proposed a compromise in which Plaintiffs would select 15 merchants and Google would select 15 merchants for the sample.

18. On July 31, 2026, Ms. Lee rejected my proposal, stating that Plaintiffs' selection was not intended to be a randomized sample, and that Google had not provided the criteria it

intended to use to select merchants. Ms. Lee proposed increasing the sample size to 50 merchants instead of 30, with 25 merchants selected by each party. She asserted that if Google insisted that it should be able to select some of the merchants, then the sample size should be increased to 50 in order to create more diversity in the sample and fairness in the process.

19. On August 7, 2026, I proposed that a random sample of 30 merchants be selected from only those merchants known to have notes and comments from their [redacted], thereby guaranteeing that Plaintiffs would receive a full set of notes and comments to review. I explained that if Plaintiffs rejected this proposal and insisted on an increased sample size of 50 merchants—with each side picking 25 merchants—then some of the merchants Plaintiffs select may not have associated notes and comments from their [redacted]. I asked Plaintiffs to confirm whether they would agree to a randomized selection of 30 merchants from the ones that have notes and comments, or if they insisted on increasing the sample size to 50. I noted that upon receipt of Plaintiffs' list of merchants, Google would need at least 30 days to pull the notes and comments and review the material for privilege.

20. Later in the day on August 7, 2026, Ms. Lee asked whether Google could identify in advance which of the merchant center accounts had notes or comments from their [redacted]. If so, Ms. Lee requested that Google provide that list.

21. On August 21, 2026, solely to resolve this dispute and allow the parties to select a sample, I provided Plaintiffs with two lists identifying the merchants whose [redacted] had notes or comments. I reiterated Google's offer that each side select 15 merchants from these lists for Google to produce notes and comments for, and asked Plaintiffs to promptly confirm their agreement.

22. On August 24, 2026, Ms. Lee wrote that Plaintiffs likely could agree to Google's offer for each side to select 15 merchants from the lists, but asked some follow-up questions: (i) whether Google could provide its list of 15 merchants first so that Plaintiffs could avoid any overlap; (ii) why several Merchant IDs appear multiple times in the lists; and (iii) whether Google's production would include any historical notes or comments written regarding the merchants, or only notes or comments from the [redacted].

23. On August 27, 2026, I wrote back to Plaintiffs explaining that repeated Merchant IDs on the lists reflected the fact that the merchant [redacted]. I clarified that Google was only offering to produce the notes and comments from the [redacted] for the 30 merchants from the sample. I further stated that Google could provide its list of 15 merchants by September 2, 2026, and Plaintiffs could provide their list by September 4, 2026.

24. On August 28, 2026, the parties conferred to discuss this and other discovery disputes. Jeff Kane, Uriel Lee, and Michelle Murphy attended on behalf of Plaintiffs, and Sarah Tomkowiak, Adaeze Onyimah, and I attended on behalf of Google. During that conferral, Plaintiffs asked a follow-up question about the burden of producing notes and comments (including screenshots) from the [redacted] tool, and Google's counsel said that they would investigate and respond with an answer. That was the last Google heard of this matter before Plaintiffs filed their motion to compel three days later, on August 31, 2026.

25. The parties never reached an impasse on this issue.

26. After Plaintiffs filed this Motion, Google investigated the burden of producing notes and comments from its [redacted] for *all* merchants at issue (instead of only

for a sample of 30 merchants). Google estimates that, at a minimum, Google would need to collect, image, and review for privilege over [redacted] (and [redacted] other written notes and comments ([redacted])).

I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 4, 2026, in Dublin, Ireland.

Caroline Clarke