# EXHIBIT A
# [Redacted Version of Document Filed Under Seal]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CENGAGE LEARNING, INC., *et al.*,

Plaintiffs, New York, N.Y.

v. 24 Civ. 4274 (JLR)(BCM)

GOOGLE LLC,

Defendant.

------------------------------x

August 13, 2026

Before:

HON. BARBARA C. MOSES,

U.S. Magistrate Judge

APPEARANCES

OPPENHEIM & ZEBRAK, LLP
Attorneys for Plaintiffs
BY: JEFF KANE
LAUREN BERGELSON

LATHAM & WATKINS, LLP
Attorneys for Defendant
BY: SARA E. SAMPOLI
ALLISON LEVINE STILLMAN
JOSEPH PILIGIAN

THE DEPUTY CLERK: The Court now calls Cengage Learning, Inc., *et al.* v. Google, LLC, Case No. 24 Civ. 4274.

Counsel, please make your appearances for the record.

MR. KANE: Good afternoon, your Honor. Jeff Kane, from Oppenheim & Zebrak, on behalf of all plaintiffs. I am joined by my colleague Lauren Bergelson, B-E-R-G-E-L-S-O-N.

THE COURT: Mr. Kane, Ms. Bergelson.

MS. SAMPOLI: Good morning, your Honor. This is Sara Sampoli, here on behalf of Google, LLC, from Latham -- I am from Latham & Watkins. I am joined by my colleagues Allie Stillman and Joseph Piligian.

THE COURT: Mr. Piligian, Ms. Stillman, and Ms. Sampoli, welcome. Sorry for pushing you back from 11:00 to 12:00 today. We ended up having to reschedule a number of hearings this week, and the morning stretched out a little longer than I had thought it was going to. So thank you for your flexibility on that.

We have two motions for discussion today. I would like to take the first one first and the second one second.

The first motion being the defendant's motion for a protective order regarding Mr. Y.J., a proposed witness resident in Switzerland. The argument, as I understand it, with respect to Mr. J. is, first, Google says he is not subject to deposition under Rule 30(b)(1) because he is not an officer, director, or managing agent, as that term is used in the rule;

and, second, even if he is, or if it is a close question, which the case law suggests is the standard that the deposing party has to meet, that a protective order should be issued because -- on disproportionality grounds, that what he has to say isn't important enough, particularly in light of all of the other people who have testified to the same topic.

Does that fairly summarize your argument?

MS. SAMPOLI: It does, your Honor.

THE COURT: All right. The plaintiff, needless to say, the plaintiffs, needless to say, disagree on both fronts. They say that Mr. J. meets the five-factor test that many courts have used to determine whether somebody is a managing agent, because even though he doesn't work for the named defendant, Google, LLC, he works for an affiliate; and although he doesn't run the whole company, he was senior in the group that dealt with the issue that the plaintiffs are interested in, namely, why Google banned e-books from paid ads, but not from free ads.

With respect to proportionality, the plaintiffs say this is a really important question. And I do note parenthetically that plaintiffs have a lot of really important questions. All of the issues that they are interested in here are really important questions, so I do take that with a little bit of a grain of salt. But they say that this e-book ban, and in particular why it didn't apply to free ads, is a really

important question, and that even though, as of the time of the last letter I got on this, I think three witnesses had testified on this topic, and perhaps there was -- perhaps there have been more since then. That's not enough. They are entitled to go to the source and get it from the horse's mouth.

And plaintiffs further argue that burdensomeness is not really an issue here because Mr. J. can be flown to wherever Google believes it would be most convenient to hold his deposition. Maybe New York. Paris is nice this time of year. Whatever.

Does that fairly summarize plaintiffs' position?

MR. KANE: It does, other than to say that Paris is nice every time of the year.

THE COURT: Actually, my daughter just got back from Paris. She had to go out and stand in line, long, hot lines to purchase a window fan, which were in very short supply in Paris, because of the unprecedented heat they have been having there. So maybe next month. I don't know.

MR. KANE: They do have occasional heat waves, yes.

THE COURT: In any event, here is what I would like to hear, and I will tell you where I start here. I have carefully read the parties' letters and attachments. I think it is a close question whether Mr. J. is subject to Rule 30(b)(6) as a managing agent. I don't think it is a slam dunk, but I think it is a close question, and that is as far as the plaintiffs

really need to get on a motion like this.

However, I am inclined to think that the proportionality calculus does not come out in plaintiffs' favor here. I note in particular that Google presented a 30(b)(6) witness, at plaintiffs' request, of course, on precisely this topic, who answered a whole lot of the same questions that plaintiffs wish to put directly to Mr. J.

I take the point that the 30(b)(6) witness was channeling Mr. J., that the 30(b)(6) witness interviewed Mr. J. and relayed his answers. But that is, after all, the point of having a 30(b)(6) witness. There's no rule that says that, that, after you've taken a 30(b)(6) deposition and found out everybody that the 30(b)(6) witness interviewed, you get to go and depose all of those people themselves. A 30(b)(6) witness is -- the 30(b)(6) mechanism is intended in part to avoid having to bring all of those folks in for deposition on a whole bunch of what may be relatively discrete topics. So I am inclined to grant the protective order on that basis.

But, first, I would like to hear——and I will hear first from Google and then from plaintiffs on this——whether any other witnesses have testified since I got the reply brief here with respect to this e-book ban issue.

MS. SAMPOLI: Thank you, your Honor.

I think that the three witnesses that we specified in our reply --

THE COURT: You specified Ms. F, who was the 30(b)(6) witness, correct?

MS. SAMPOLI: That is right. And then --

THE COURT: Mr. A.L.

MS. SAMPOLI: Correct.

THE COURT: And Mr. R., who hadn't testified yet, but you said -- or Ms. R., I can't remember, but you said they were going to.

MS. SAMPOLI: I think, actually, the third one is Mr. V.J.

THE COURT: Who actually has a name, right? We can say his name.

MS. SAMPOLI: You are right. His name --

THE COURT: Mr. Jain.

MS. SAMPOLI: -- is Vishal Jain.

THE COURT: Okay.

MS. SAMPOLI: So those are the three witnesses that we think have provided the most comprehensive testimony on the question, why did Google choose not to ban e-books for free listings? We think all of their testimony corroborates each other, and they were all based in part on conversations with Mr. J.

I will note that a deposition that occurred yesterday of Mr. J.M. --

THE COURT: J.M., like "Moses"?

MS. SAMPOLI: "M" like "Moses." That's right.

-- added some additional corroborative testimony that the [redacted].

Mr. R. --

THE COURT: But Mr. M. did not directly address the question of how come the e-book ban didn't extend to free ads.

MS. SAMPOLI: That's right, but I think it was covered by those three previous witnesses.

And Mr. R., who will testify later this month, will not provide testimony on why there was no ban on free listings, but he will provide additional testimony, for example, on how all Shopping ads, including paid ads and free listings, are created.

THE COURT: Okay. Now I have another question for you before I hear from plaintiffs on the "how much is enough" question.

Mr. J., is there any -- are plaintiffs here running any risk that they are going to encounter an affidavit from Mr. J. at summary judgment or see him on the trial list and not have been able to have taken his deposition?

MS. SAMPOLI: No, your Honor. As far as I am aware, I don't think that is a risk.

THE COURT: Is that something that Google is willing

to stipulate to?

MS. SAMPOLI: I believe so. I would want to confer quickly with my colleagues, but I believe that is something we could probably stipulate to.

THE COURT: Okay.

So, plaintiffs, you, I believe, do not think that the witnesses we have just heard have adequately covered the waterfront here.

MR. KANE: That is correct. If I could address relevance first --

THE COURT: Sure.

MR. KANE: -- because that is the first issue you raised.

So, Google's platform has both paid ads and free ads—the paid ad, where the merchant pays a fee if someone clicks on the ad; the free ad, where the merchant doesn't pay a fee.

In May of 2021, Google decided it was no longer going to promote e-books in paid ads.

THE COURT: Right, because there were all of these counterfeit products being offered.

MR. KANE: That's right. And the documents are very clear that that was the reason that Google decided it was no longer going to advertise e-books in paid ads. If I could quote from one of them, it said, [redacted]

[redacted]."

And it goes on to say, "[redacted]" --

THE COURT: Oh, that is interesting. Some of them were selling the actual book, but it was a stolen copy of the book?

MR. KANE: Yeah, that's how the pirates do it. They obtain a copy of it, rip it onto a PDF, and then sell it as a PDF.

THE COURT: But you are saying they also don't even pay for that first copy?

MR. KANE: Sometimes they are purchasing the copy with a stolen credit card, yeah.

THE COURT: Well, that just adds insult to injury, doesn't it?

MR. KANE: So Google recognized this. And the document says, [redacted]

[redacted]."

THE COURT: Right. I get that. And you went over that in your letter.

And then, if I can just land the plane for you, somehow, for some reason that you believe to be nefarious, they decided not to apply that logic, that reasoning to the free ads.

MR. KANE: Right. I mean, that is essentially an admission that they know that they are advertising pirated products and are doing it anyway.

THE COURT: Okay. I understand your view of the argument, as well. I also understand Google's view that, under *Cox Communications*, it is not enough to meet the standards articulated in *Cox*. I am not going to decide that issue today.

But my point to you, Mr. Kane, is your theory is clear and the facts are clear. The facts are not disputed. Nobody from Google is saying, oh, it is not true. We applied the ban to both free ads and paid ads.

And the argument you want to make, it seems to me, and you just illustrated this for me very neatly, the argument that you want to make, you can make from the facts that you have. They applied it to the paid ads. They didn't apply it to the free ads. Therefore, in plaintiffs' view of the world, that shows that they were encouraging infringement.

MR. KANE: So I think it is very helpful to look at

the -- what the witnesses that Ms. Sampoli just referred to actually said.

So the first one she mentioned was A.L. We asked him what the reason for applying the ban to paid ads but not free ads was, and he said, quote, "So I don't know what were the factors which led to a different solution on the free listing side without looking at the actual inputs into this decision. I mean, obviously I am not qualified to tell you what exactly was happening in the minds of those people." Then he sort of postulated --

THE COURT: Those people being Mr. J.

MR. KANE: Exactly. So all three of those witnesses—A.L., V.J. and C.F.—all said that Mr. J., the subject of the motion, was the person who made the decision to not apply the ban to free listings. And that is significant because, on the paid ad side, when they decided to ban paid ads for e-books, there was a decision-maker -- decision-making group, they called it, of eight people who made that decision, [redacted]. Nobody has pointed to anybody else who was involved in the decision to ban free ads. So Mr. L. postulated that [redacted]

THE COURT: A point with which you would take issue.

MR. KANE: Well, when we asked him to explain that, he said, "I don't know exactly why. [redacted] I don't know for sure."

THE COURT: All right.

MR. KANE: So the testimony --

THE COURT: So A.L. couldn't give you the why.

MR. KANE: So then we asked V.J. the same -- Mr. Jain the same question, and the very first thing he said was, "It was not my decision. It was Y.J.'s decision."

He postulated that maybe the [redacted]. But when he asked whether the ads -- whether the free listings group actually thought that, like, when we asked him, is that really what they thought or are you just guessing, he said, quote, "I can only speculate."

And when we asked him if there were [redacted], he said he didn't know.

He also, like Mr. -- like A.L., offered the possibility that [redacted]. And when we asked him how he knew

that, he said it was partly based on a conversation with Y.J. and partly just on general knowledge of his work with the free listings group. So he only had a service-level understanding, as well.

The 30(b)(6) witness that Ms. Sampoli mentioned, Ms. F., first of all, she admitted that she only worked in paid ads, not free ads. But more to the point, her story was that Google didn't apply the ban to free ads because [redacted].

THE COURT: All right. And that was based on her interview of Mr. J. himself, correct?

MR. KANE: That's what she said, yes.

THE COURT: You have reason to doubt that?

MR. KANE: That she got it from Y.J.? No. I think that is precisely the problem is that this was just a game of telephone, where all she had was --

THE COURT: Right.

MR. KANE: -- what she had told --

THE COURT: Which gets back to the issue I raised a moment ago. Isn't that the point of a 30(b)(6) witness?

MR. KANE: I think you have not properly prepared a 30(b)(6) witness if all you have done is sort of fed them the company line and gone no deeper than that. So, for example, when we asked you --

THE COURT: She was supposed to cross examine Mr. J. before she came to testify, was she?

MR. KANE: She was supposed to be able to explain why the decision was made and be able to answer questions that would call into question whether the reason she was giving was accurate.

So, for example, she gave this story about, well, the reason we didn't ban it in free ads is [redacted].

So we asked her, well, why is that? Why [redacted] And she said, quote, "I don't know."

We probed further, and she said, I think [redacted]

And we said, Well, [redacted]

And she said, quote, [redacted]

So we weren't able to meaningfully cross-examine Ms. F. on this because she only had the sort of service-level story that she had gotten from Mr. J.

We asked her, Is there any sort of principled reason

not to apply the ban to free ads when you applied it to paid ads? And she said, quote, "Yeah, I would say the reason provided to me was [redacted] and, yeah, that is all I can share."

She also said maybe the -- that the [redacted]. In other words, [redacted].

So she said they thought [redacted]. We asked her, well, what is [redacted]? And she said, my understanding is quite limited. I don't know additional detail. She said all she knew about it was that Mr. J. had told her [redacted].

She said that the free listings team was still processing DMCA notices regarding e-books. But she said her only basis for saying that was that Mr. J. told her.

She said that the free listings group [redacted]

So the deposition, Judge, shouldn't be this sort of game of telephone, where all that is happening is the witness

is giving the answer that Google or that Mr. J. wanted us to hear and isn't able to be meaningfully cross-examined on it.

THE COURT: No. I disagree with you there. The job of a 30(b)(6) witness is not to defend the position of everyone he or she interviews to gain the necessary knowledge in the topics noticed. A 30(b)(6) witness has to do a lot of work as it is, has to find out stuff; in this case, has to go to Mr. J. and find out what happened and why it happened. But I don't think a 30(b)(6) witness is required to in effect conduct her own deposition of Mr. J., anticipating the cross-examination you would like to have asked him and give you answers to that.

MR. KANE: But that is why we should get a fact deposition of Mr. J. In other words, if that is not the role of a 30(b)(6) witness, if the 30(b)(6) witness did as much as she was supposed to, that is all the more reason we need a fact deposition of the person who actually made the decision.

THE COURT: And --

MR. KANE: Google should --

THE COURT: -- you say that about everyone who was interviewed by every 30(b)(6) witness who did testify?

MR. KANE: No. I think this one is particularly important because, as I said, the decision not to ban e-book promotions in free ads is effectively an admission, yeah, we know these things are infringing. We are running them anyway.

One sort of feature of Shopping that is very important

to understand is a merchant submits the information that it wants Google to include in the ad. So the merchant says, here is the title of the book, here is the author, here is the ISBN, here is the landing page where we are selling it, etc. Google then [redacted]

THE COURT: For the free ads now.

MR. KANE: This is for both. In other words, the merchant submits one set of information about the ad and [redacted] So what Google did when it implemented the ban for paid ads is it looked at a particular offer and said, we think this offer is for an e-book. There is such a high probability that it is a pirated e-book that we are not going to advertise it in paid ads. But they took the very same offer and ran it as a free ad. In other words, it is not like there was one set of paid ads and they didn't run those and one set of free ads and they --

THE COURT: Look, I really do understand your theory about why this was a bad decision on Google's part and a decision that disadvantaged your clients. I get that. But you know that already.

Let me get at it a little bit of a different way. Does it matter to you -- I know you are going to want his deposition either way, but does it matter to you whether Mr. J.

may be or possibly may not be a witness at summary judgment through affidavit or at trial?

MR. KANE: I don't think so. Because we should get to meaningfully challenge the purported basis for applying the ban to paid ads, but not to free ads. In other words, when this -- if Mr. J. comes in and says, yeah, [redacted] he should be able to answer a follow-up question, Well, why is that a good thing? [redacted] --

THE COURT: What if he's not allowed to come in and defend himself? In other words, it sounds to me like you think you are in an actually pretty good position now. You have the facts, namely, that the ban was not applied to free ads. And as you present the issue, nobody at Google has come up with a good, rational explanation for that. Aren't you in a good position?

MR. KANE: Well, one thing I would say is they shouldn't be able to get hearsay in by just feeding it to a 30(b)(6) witness.

THE COURT: Well, you don't think -- you don't think the hearsay was particularly persuasive. You don't think it makes any sense.

MR. KANE: That's true, but they still shouldn't be able to offer that justification to the jury without having someone actually raise their right hand and say, yes, I am the

one who made this decision, and here is the reason I did it.

THE COURT: I don't know that they could offer that at trial. Maybe it would be excluded as hearsay at that time. Again, not a decision I am making today. You know, it was a discovery deposition. Was Ms. F. testifying with her 30(b)(6) hat on at that moment?

MR. KANE: I think so, because she wasn't involved in the decision to apply the ban to paid -- paid ads but not free ads. So the only basis she had for saying this was -- in fact, she admitted this. The only basis she had for saying this was her conversation with Mr. J.

THE COURT: All right. So she would be binding the company with that testimony.

MR. KANE: Well, the problem is she is binding the company, quote, unquote, with a -- with testimony that is helpful to the company without the company having to be meaningfully cross-examined about it. In other words, Mr. J. should have to get in a deposition chair and explain, yeah, that was my rationale.

THE COURT: And what was it that Ms. F. said that you feel was helpful to google?

MR. KANE: The [redacted] If that is their story. I think the real story is they didn't think they had liability with respect to free ads because no one pays for them. So they just -- they

didn't take copyright infringement seriously enough that they didn't think it was worth it to ban it in free ads.

THE COURT: And that is what you hope to get from Mr. J.'s mouth?

MR. KANE: Well, either an admission from him or that his story falls apart under cross-examination and the jury sees, yeah, this is just a fig leaf. This isn't the real reason they actually tried to ban e-books, e-book ads and free listings.

THE COURT: All right. Let me hear from Google.

MS. SAMPOLI: I won't spend too long on this. I think your Honor is exactly right, that the facts are not really in dispute. The facts are clear, and plaintiffs can make the argument they want to make with the facts as they exist.

I will note that the question about hearsay doesn't seem to me to be the right question since 30(b)(6) testimony, as you pointed out, is binding on the company.

THE COURT: Well, I think the hearsay question is actually fairly interesting. It is binding on the company, but does that mean that the company is entitled to use it affirmatively for the truth of the matter asserted, i.e., that this was the [redacted] or whatever the phrase was. Is the company permitted to use that 30(b)(6) testimony or to present the same witness in a similar capacity as the reason for the distinction?

MS. SAMPOLI: Understood. I do think -- so I do want to address relevance quickly. One point at the top. I have conferred with my colleagues. We can -- we are happy to stipulate that Mr. J. will not submit an affidavit or testify at trial.

THE COURT: So no sandbagging.

MS. SAMPOLI: Correct.

THE COURT: All right.

MS. SAMPOLI: Setting that aside, and I do want to come back to relevance in a second, but I want to quickly touch on the fact that I think it is really just speculation that Mr. J. would offer testimony that is different than what he educated Ms. F. on. And the reason I say that is because the truth testimony that A.L. and Mr. Jain provided, based on their conversations with Mr. J. in the normal course of business—so not in the context of educating them for deposition in this case—it is all consistent. It all corroborates, the idea that [redacted]. None of that is contradictory, and there's really no reason to think that Mr. J. would say anything different, even under cross-examination, if he were to be deposed.

I do want to just point out, coming back to relevance, that e-books are not inherently infringing. They are not

inherently bad. In fact, plaintiffs were unhappy -- the publishers. I won't necessarily put it on plaintiffs. But publishers were unhappy with Google when it banned e-books on paid listings. So it is not clear to me why Mr. Kane thinks he can make the jump from the decision to address infringement in the e-book space differently in the free listings is necessarily an admission that Google was not taking infringement seriously.

But, again, I think, as your Honor pointed out earlier, none of this goes to the heightened standard for contributory copyright infringement after *Cox*. The decision by the free listings group to maintain the status quo can't possibly be an active step that encourages infringement.

THE COURT: Mr. Kane

MR. KANE: So a few points, if I could.

One is, I am not sure why we have a different standard for this witness than we would for other witnesses. We don't sort of go around saying, well, you know what, other side? I don't want to put that guy up as a fact witness. What I will do is I will appoint a 30(b)(6) witness and I will have the witness you want to depose tell the 30(b)(6) witness what he wants you to hear. I don't know why we are applying a different standard to this witness. I don't know why we would do that with this witness. There's no particular reason that he shouldn't be deposed.

The second thing I would say is neither Mr. L. nor Mr. Jain testified that [redacted]. Only the 30(b)(6) witness testified to that. so --

THE COURT: And testified to that channeling Mr. J.

MR. KANE: Exactly. She said her only basis for saying that was her conversation with Mr. J. And then I would like to address the *Cox* point that Ms. Sampoli made. First of all, *Cox* is just fundamentally different from this case. Internet service is commoditized, meaning the Internet service that Cox was providing to an infringer was the same service that it was providing to a noninfringer. Cox isn't doing something to encourage the infringements other than providing the Internet service here.

THE COURT: And the argument was declining to -- I can't remember the exact language.

MR. KANE: Terminate.

THE COURT: But, as I recall, they declined to terminate accounts that were violative --

MR. KANE: Correct.

THE COURT: -- which is actually somewhat similar to your theory here.

MR. KANE: I don't think so, Judge, because Google is actually advertising the infringing product. In other words, it is finding a customer who might want to buy the book and

saying, hey, instead of clicking on that organic search result that goes to a legitimate copy of the book, here is a picture of the book with a too-good-to-be-true price on it. Click on that instead and buy an infringing copy.

For *Cox* to be analogous here, what Cox would have had been doing is figuring out which of its subscribers were endeavoring to buy *Abbey Road*, or whatever, and saying to them, hey, instead of buying that legitimate copy of *Abbey Road*, go download a free infringing copy from BitTorrent.

And the language that Google keeps quoting, and that your Honor, was referring to a minute ago, that "a defendant's failure to remove potentially infringing material isn't contributory infringement," first of all, that is not what Google did here. Google actually advertised the infringing material. It is not as if one of Google's users, you know, posts something on a blog or something, and Google just doesn't take it down. Each time Google advertises a product, it is selecting the product to advertise in response to a particular search query from a particular user.

So, here, they were choosing a product that Google itself had determined had such a high probability of being an infringing product that Google wasn't going to advertise it as a paid ad; but, for some reason, they decided they would advertise it as a free ad. That is not failing to remove infringing content. That is actively participating in the

infringement.

THE COURT: All right. That is your argument to Judge Rochon. I get that.

MR. KANE: I just don't want -- I don't want the Court to be thinking, like, the reason this discovery is unnecessary is that after *Cox* -- the reason that this discovery should be denied is that, after *Cox*, this is somehow less relevant or unnecessary. Arguably, it is more relevant after *Cox* because there's an increased emphasis on intent after *Cox*. And this is one of the ways we can show intent.

And I will just say to Ms. Sampoli's last point, the specific acts that encouraged infringement is the ad. It is not the decision not to ban e-books, e-book promotions, and free ads. In other words, the specific act that encourages infringement is when Google advertises the infringing products. That is the act under *Cox*.

THE COURT: Right, but the reason that you are focused on this decision that was made in 2021 is because Google had an opportunity, in the context of its overall e-book ad, to put a stop to what had been the status quo and decided not to apply that new policy to the free ads.

MR. KANE: I would put that much more actively because I think that is how it actually happened, which is to say, Google had a set of offers that it was so confident were infringing e-book offers that it wasn't running them as paid

ads, but it decided to run them anyway as free ads. In other words, it is not just that they didn't remove the ads, it is that they chose to keep advertising those ads. They made an actual decision——we are going to ban it in paid ads because there's too high a chance that it is infringing, but we are not going to ban it in free ads.

In other words, it is not as if they decided to ban it in free ads and just nothing happened in free -- sorry, in paid ads and nothing happened in free ads. Like it was just separate systems and they just never got around to looking at the free ads question. Mr. J. actually made the decision: I know you are banning this in paid ads. I am not going to do it in free ads. We should get to depose that guy. It is confounding to me that they would say it is okay for us to just put up a 30(b)(6) witness who will give you the answer that he wants you to hear, and you are not going to get to cross-examine the person who actually made the decision. That is not how we apply -- that is not the test for any other witness. There is no reason that it should be the test for this witness.

In other words, when I wanted to depose, you know, John Q., employee of Google, I don't have to show, well, this guy's going to -- I don't have to show, like, I have a reason to believe that this guy's going to tell me something differently than what your 30(b)(6) witness said. I just get

to depose that guy. I don't know why I get to -- I have to jump through an additional --

THE COURT: Well, actually, I am not sure that that is true. We haven't really tested that principle in this case. But one of the things that I have to look at under Rule 26(b)(2)(C)(i) is whether the testimony would be unreasonably cumulative or duplicative. So if you have gotten 30(b)(6) testimony directly on point, yeah, that counts for that factor.

MR. KANE: I don't think we have gotten testimony that is directly on point. I think what we got is, like, the company line on, like, what's our best answer for how we can justify applying this decision to paid ads and not to free ads. Without the opportunity to meaningfully cross-examine someone on that question, it is almost worse that we have the 30(b)(6) testimony and not fact testimony.

In other words, now what's in the record is the answer that Google wants to give, you know, the truth that Google -- what Google wishes was the truth. We haven't even had the opportunity to cross-examine the person who can actually answer those questions because all the 30(b)(6) witness did was say, Look, I have told you what Mr. J. told me and that is all I know about it, because she literally wasn't involved in the decision.

I don't think it is fair that we are limited in that

way with respect to this particular witness when that is not the rule for any other witness.

THE COURT: Give me an example. What other witnesses have you decided that you needed to depose because you wanted to drill down from the 30(b)(6) testimony and hear it directly from the horse's mouth?

MR. KANE: I mean, the way these are scheduled, you notice all your fact witnesses, you send your 30(b)(6) notice, and they appoint 30(b)(6) witnesses. Is there a fact witness who -- I guess the way to ask is, is there a fact witness who --

THE COURT: Is there a similarly situated pair of 30(b)(6) and fact witnesses that you can think of in this case?

MR. KANE: Where the 30(b)(6) witness gave us the company line and somebody else told us how it actually worked? There probably is. I can't come up with it on the spot.

THE COURT: Let me ask you one more question because I don't want to let go of this. Google tells me that when the parties came to impasse on this and you still were within the time period where you could identify deponents, Google said, well, who is your backup choice, and you declined to put a placeholder in. Is that true?

MR. KANE: No, that is not true.

THE COURT: What happened?

MR. KANE: Google -- first of all, we noticed the

deposition on June 2 for -- to have a deposition on July 2. Google didn't tell us they objected to this witness until June 25. Then they asked us to postpone until July 9, which we did. Then they asked us to postpone until July 10, which we did. And then they filed their motion on July 9.

Before they filed their motion, they asked us -- we said to them -- they asked us if we would agree to postpone the deposition again so that Google could -- so that -- because they told us that we were going to be so blown away by Ms. F.'s testimony that we were not going to need to -- we were going to agree we didn't have to depose Y.J. anymore. And we told him we think that is exceedingly unlikely, that Ms. Fein -- Ms. F. is going to provide such fulsome testimony that we won't need to depose Y.J. But file your motion and if you want to file your opposition after the -- Ms. F.'s deposition or your reply after Ms. F.'s deposition, that is fine. What they offered to us was if you agree that we won't even file the motion until after Ms. F.'s deposition, then we will let you replace the -- if you -- if you -- if we end up winning the motion for a protective order, we will let you replace Y.J. with another witness. We said that is not going to work because at that time --

THE COURT: I am sorry. That was what date that that --

MR. KANE: July 8 or so. They filed their motion on

July 9. I think the meet-and-confer was on the 8th.

THE COURT: What was your cutoff for identifying witnesses?

MR. KANE: July 22. Which, by the way, we noticed his deposition on June 2, so more than a month before the deadline for noticing depositions. So Google tied the offer to let us replace the witness to letting them file the motion for protective order after Ms. Fein's deposition. That would have been too late. At the time, discovery was ending August 20. They wouldn't have filed the motion until, let's say, July 20 --

THE COURT: And we would probably be hearing it today.

MR. KANE: Well, but that is because Google --

THE COURT: That is because of the way things worked out. That is -- I understand that you can't always predict that.

MR. KANE: Yeah. I mean, they didn't file their motion until more than a month after we had sent the deposition notice. So I don't think we should be penalized by not being allowed to replace Mr. J. with another fact --

THE COURT: Do you have a backup in mind at present?

MR. KANE: We do.

THE COURT: And who would that be?

MR. KANE: It is [redacted].

THE COURT: Can you spell the last name?

MR. KANE: I believe it is [redacted].

THE COURT: And who is Mr. [redacted]?

MR. KANE: I will give you the quote that we like from him. He says he [redacted]

THE COURT: Right. So he's unrelated to the e-book ban issue.

MR. KANE: That's correct.

THE COURT: You are interested in him for some other reason.

MR. KANE: Exactly.

THE COURT: Is he in the United States?

MR. KANE: He is.

THE COURT: Okay.

All right. Ms. Sampoli, anything you want to tell me in response to what we have just heard in the last few minutes?

MS. SAMPOLI: Yes.

I think that you have our position on the relevance here.

I want to correct a statement that Mr. Kane made about Google being so confident that an ad was for an infringing e-book that it would not run it for paid ads, but would run it for free listings. Just for the record, I want to clarify that [redacted]

[redacted]

THE COURT: No, no. I understood his comment somewhat differently. And tell me if I understood it correctly. I understood his point to be that, without making, of course, an ad-by-ad determination as to whether this one is infringing, that one is infringing, the other one is infringing, the decision-maker here or makers, including Mr. Y.J., realized that there were enough -- a high enough percentage of infringing ads when it comes to e-books that it was worth the categorical ban, at least with respect to the paid ads.

Is that your point, Mr. Kane?

MR. KANE: Yes. I would just add that Mr. J. made the decision with respect to free listings. He didn't make the decision with respect to paid ads. It was a different group of people. But, yes, the distinction you are making is correct.

THE COURT: Sorry. Now you need to explain that to me a little bit.

MR. KANE: There was a decision-maker group that decided we are going to ban paid ads for e-books.

THE COURT: Okay.

MR. KANE: That was [redacted].

THE COURT: And that was not Mr. Y.J.

MR. KANE: Correct. He was not involved in that decision.

THE COURT: He was not involved in that. He didn't do

the research. He wasn't sitting in the room.

MR. KANE: Correct.

THE COURT: Okay.

MR. KANE: Mr. J. made the decision that they were not going to apply that ban to free ads.

THE COURT: Ah-ha. So Mr. J. is not personally responsible for saying -- for the differential. He's not personally responsible for saying This is a terrible problem, terrible enough so that we have to ban it for paid ads, but not terrible enough and therefore we don't have to ban it for free ads. He didn't, as far as you know, do the compare and contrast. He just, if you will, declined to do the same thing for free ads.

MR. KANE: That's correct.

What I would add is my understanding is [redacted] In other words, he was [redacted] And Mr. J. alone, not -- it appears, not a [redacted], but Mr. J. alone made the decision not to apply the ban to free ads.

THE COURT: Okay. That's helpful. Thank you.

I interrupted you, Ms. Sampoli. Sorry.

MS. SAMPOLI: No. That's fine. I just wanted to make that clarifying point.

I think that plaintiffs have really not touched on the burden here. I think we have laid it out in our papers. Mr. J. cannot be deposed in Switzerland. He actually can't be deposed in Paris, as wonderful as it may be,

THE COURT: Alas. But he could be deposed in London. He could be deposed in New York. Arrangements could be made.

MS. SAMPOLI: That's true. But I think that the burden, given the cumulative nature of this testimony, the burden outweighs it. I think our point is made on the papers there.

I wanted to just push back a little on the meet-and-confer history that Mr. Kane discussed a moment ago.

THE COURT: With regard to the replacement witness?

MS. SAMPOLI: That's right, yes.

They served their notice on June 2, as Mr. Kane said. We objected on June 25. We followed up after not receiving a response from plaintiffs with a request to meet and confer. We followed up on June 29. On June 30, we said we would file our motion for a protective order the next day, meaning July 1. In response, plaintiffs agreed to move the noticed deposition date while the parties conferred. We didn't confer until July 7. We followed up the next day, June 8, with the compromise offer.

THE COURT: July 8.

MS. SAMPOLI: Correct. And we said, if you can provide a backup by June 22, you know --

THE COURT: June 22?

MS. SAMPOLI: Sorry, July 22.

THE COURT: We are in July now. All right.

MS. SAMPOLI: Plaintiffs rejected that, and we filed the next day on July 9. I will note that at the June 18 hearing, your Honor even suggested that plaintiffs over-notice in case someone doesn't work out. They filed their opposition to this motion on June 17. They had time to provide at least a backup by the July 22 deadline so that we could start finding out that witness's availability, try to get this scheduled before we are really into expert discovery.

At this point, there is certainly no way we could fit this new witness on the calendar before September 1, which is the current close of plaintiffs' depositions of Google's employees.

I also want to note that I think he said that the witness who is their backup is someone who worked on what we discussed many months ago about the ads bug, where you --

THE COURT: The what?

MS. SAMPOLI: The ads bug.

THE COURT: Ads bug.

MS. SAMPOLI: Yes. So they filed a motion to compel linked documents within an email that [redacted]

[redacted] We submitted an attorney declaration explaining how that bug did not affect the Shopping product. Plaintiffs have continued to follow up on that. They threatened to refile -- to file a renewed motion for those additional documents.

In response, we offered to provide a declaration from a Google employee who could corroborate what we said in our attorney declaration. They rejected that offer, although we are still happy to provide it. And now it sounds like they want to pursue a full deposition on this topic that we have explained, time and time again, did not affect the Shopping product.

THE COURT: It sounds like, and this is what I was listening for here, the way Mr. Kane presented it to me, Google's suggestion, or offer, if you will, was to designate a backup witness, but only as part of a deal where Google delayed the filing of its motion. And you are presenting it to me as if there was no reason why plaintiffs could not have, as you put it, over-noticed, designated that backup witness at any time up until the Court-designated cut off for them to designate witnesses.

MS. SAMPOLI: Correct. I am not disputing the terms of the compromise offer, but nothing was stopping plaintiffs, consistent with your recommendation, from over-noticing, particularly when we had already filed our motion and that they

knew there was a chance that they wouldn't be able to depose Mr. J. It is not clear to me why they didn't, by the July 22 deadline, when they noticed three other depositions, again, at the very close of that deadline, why they couldn't have noticed a fourth and designated it as a backup so that we could start finding out what this witness's availability was. We are now three weeks past that, and we are --

THE COURT: And I just granted the seventh extension of the fact discovery deadline to September 1, was it?

MS. SAMPOLI: Yeah, September 1.

THE COURT: I have lost track.

Mr. Kane, did you believe that you were somehow forbidden from noticing Mr. [redacted] as a backup?

MR. KANE: So we had, quote, unquote, over-noticed before in this case, and Google had complained about it to this Court, and that is when this Court set the deadline of July 22 to name our fact deponents.

THE COURT: Right. So that everybody could know what they were working with and figure out who was available and all of that sort of thing.

MR. KANE: Yeah. So, yeah, I did not think it was an option to send the notice and say, oh, well, you know, if we lose the protective order motion, here is an effective, you know, deposition notice for a different witness. If that was Google's position that they, you know, would have accepted the

notice and held it in abeyance, then why did they have these terms that Ms. Sampoli just acknowledge were the terms, which was that, in order for us to be able to replace the witness, we had to agree that Google could delay the filing of its motion until after Ms. F.'s deposition?

THE COURT: Fair question. Why did you condition it the way you did?

MS. SAMPOLI: Because we were trying to avoid burdening the Court with another discovery dispute. However, I will note that your Honor, at the June 18 hearing, specifically encouraged plaintiffs to over-notice in case there --

THE COURT: Yes. But you were having this conversation after that, right?

MS. SAMPOLI: Correct. But it doesn't make sense to me that Mr. Kane is saying he didn't think he could.

THE COURT: Well, and Mr. Kane is not a bashful or a timid lawyer ordinarily. I am not sure what to think about this.

All right. Any last words, Mr. Kane?

MR. KANE: Yes. I would point out Mr. [redacted] is not going to address the [redacted] that Ms. Sampoli spent quite a while --

THE COURT: You want him for some other reason?

MR. KANE: Sorry?

THE COURT: You want him for a different reason?

MR. KANE: Correct. The issue we want to talk to him about is not that issue. It is a different issue.

I would also say, I don't think Ms. Sampoli has any basis to say that the witness isn't available. She is not saying she is -- before September 1st. She is not saying she has talked to the witness and found out that he is not available?

THE COURT: No. I think she is saying that the calendar is too crowded between now and September the 1st. That is what I heard her say.

MR. KANE: That is entirely Google's fault. Depositions were supposed to start in March, and they have waited until the very end of the period to schedule most of them.

THE COURT: Okay. But lawyers can't be in two places at once.

Give me an overview, if you will. What do you have? First of all, plaintiffs' over noticing aside, you have used up all of your slots, right?

MR. KANE: Y.J. the last slot, the 20th slot.

THE COURT: Okay. He would have been number 20?

MR. KANE: That's correct.

THE COURT: Okay. And you have taken them all. Yes or no?

MR. KANE: No. There are, I believe, five remaining.

THE COURT: Five remaining between now and September 1?

MR. KANE: That is correct.

THE COURT: Okay.

And Google, give me your head count, please.

MS. SAMPOLI: For depositions of plaintiffs' witnesses.

THE COURT: Well, all of the depositions you are allowed, yes.

MS. SAMPOLI: I believe --

THE COURT: Leaving aside the one we are going to address in a moment.

MS. SAMPOLI: Yes. I believe aside from that one we are complete and we took 18.

THE COURT: And do you have no more to take?

MS. SAMPOLI: No more to take.

THE COURT: Okay. So Google has noticed and taken 18 fact depositions and wishes to take a 19th.

MS. SAMPOLI: Correct.

THE COURT: Out of time. Right?

MR. KANE: Correct.

THE COURT: All right. And plaintiffs have noticed 20. And the two questions for me are, number one, do they get number 20; and, number two, if they don't get number 20, do they get a backup number 20?

MR. KANE: Correct.

THE COURT: Okay. You do not get number 20. You do get a backup number 20. Now, let me put that into better words.

As I outlined at the start of our conversation, there are two different parts to the analysis here. First part, whether Mr. V.J. -- Y.J. Excuse me. Too many Js in this case. Whether Mr. Y.J. is subject to deposition under Rule 30(b)(1) at all as an officer, director, or managing agent of Google, and I find that the question is sufficiently close so that I go on to the protective order calculation under Rule 26(b)(2)(C)(i). And, here, we are dealing with proportionality. Here, we are dealing with a balancing of factors. Here, as I have said in prior cases, which Google went and found and quoted back to me in their moving letter, the proportionality and relevance concepts are conjoined. The greater the relevance of the information at issue, the less likely that its discovery will be found disproportionate and vice versa.

Other factors which I consider under the proportionality analysis, besides relevance, are burden, which in this case comes into the picture because of the somewhat difficult logistics of deposing a witness who resides in Switzerland and the marginal utility of the information in light of other testimony on the topic from other sources, in

this case from other deposition witnesses.

Looking at relevance here, I cannot say that Mr. J.'s testimony is not relevant to the case. I am not willing to go with Google's position that this whole e-book ban that didn't apply to free ads is entirely irrelevant under the *Cox* framework. I am not at all convinced that it is the winning argument that Mr. Kane believes it is, but particularly given that that very issue, or some variant of that issue, is in front of the district judge at the moment on a Rule 12 motion.

I just want to be clear. I am not ruling the way I am because I find that the testimony cannot be relevant under *Cox*. But assuming that it can be relevant, I have to consider that the plaintiffs have already received extensive information from a variety of sources, both documentary and testimonial, as to what the facts of the situation are, *i.e.*, the fact that there was a group that decided to ban e-books from the paid ads and the fact that a comparable decision was not made over on the free ad side and that e-books continued to be offered by Google through free ads. Assuming that that is relevant under *Cox*, the plaintiffs have had an enormous amount of discovery as to the facts there, what happened, what it applied to, what it didn't apply to, when it happened, etc., etc., and even who made the decision with respect to the two different kinds of ads.

What they are seeking additional information on is the

"why" of it——not the "what" of it, but the "why" of it——and they are seeking that additional information, again, having already received information on that topic through a designated 30(b)(6) witness who interviewed the very subject at issue here, Mr. J., and provided what would presumably be his direct testimony, if you will.

So the real question here is whether proportionality -- whether, under the guise of proportionality, the plaintiffs are entitled to a whole new deposition essentially to cross-examine the guy as to the "why" of it. And, here, I think the relevance proposition is relatively weak because I think the "what" -- to the extent that anything is relevant here, I think the "what" is more important than the "why." And I think Mr. Kane's speculation——it is speculation at this point——that he might get Mr. J. to admit something damaging under cross-examination at deposition is just not enough, given all of the other factors here.

If there were some danger of sandbagging here, if there were some danger that Mr. J. would get on a plane from Switzerland and show up at trial and give a brilliant exegesis of why this was a perfectly reasonable decision and not nefarious in any way, that would perhaps have swayed me the other way. But Google has assured me that Mr. J. will not be testifying and, consequently, that danger of unfairness is not presented here and, consequently, I will grant the motion for a

protective order.

I will allow Google to designate a replacement witness number 20. I will direct the parties to use their best efforts to fit number 20 in before September 1. If you need another week, you don't have to come back to me for that, just for replacement witness number 20, because I don't want to sign an eighth discovery order extension motion and have to explain to Judge Rochon why I did that. So take care of it by the 1st if you can. Take care of it by the 8th if you absolutely, positively, need that extra week. Actually, the 8th is Labor Day. No, the 7th is Labor Day. So that is -- I am calculating it correctly.

That is the ruling of the Court with respect to the protective order motion.

Now, we have another motion on today where the shoe is somewhat on the other foot.

MR. KANE: Judge, I am sorry, for a correction. I just -- you said Google can designate a replacement witness. You meant plaintiffs can designate.

THE COURT: I meant -- I am sorry.

MR. KANE: Thank you. I just didn't --

THE COURT: I meant you can designate, and you already have.

MR. KANE: Okay.

THE COURT: Right? I am holding you to the guy whose

name you gave us today. You are not going to change your mind tomorrow. Right?

MR. KANE: If we could let them know tomorrow, just so I could confer with my colleagues, that would be great.

THE COURT: I took you at your word that you knew who the guy was. That's the guy.

MR. KANE: That's fine.

THE COURT: That's the guy.

MS. SAMPOLI: And I heard you say that the reason he was relevant is because of the [redacted]. But you are confirming you don't plan to ask him about the [redacted]?

MR. KANE: The reason we are deposing him is not the [redacted]. If he is the one witness who does know about that, we'll be happy to ask him about it. But that is not the reason we are deposing him.

MS. SAMPOLI: But you won't say what the reason is.

THE COURT: All right. Take this offline, counsel. Thank you.

All right. Now, motion number two, which was, again, filed by Google on July 21, now, Google wishes to depose what would be, I guess, witness number 19. Is that right?

MR. PILIGIAN: Yes, your Honor.

THE COURT: Which Google did not designate by the deadline that Google was supposed to designate. And the

witness that Google wishes to take out of time is a third party, Performics. So this -- I am taking -- this is Mr. Piligian, first of all, is it your motion; and, second of all, did I just mispronounce your name?

MR. PILIGIAN: Yes to both, your Honor. My last name is Mr. Piligian.

THE COURT: Piligian.

MR. PILIGIAN: Yes.

THE COURT: Okay. Go ahead, sir. I will try to remember how to pronounce your name. I may fail.

MR. PILIGIAN: No worries. Everyone does it.

So, this motion comes before the Court because Google only recently learned, through Mr. Guillaud and Ms. Miller's deposition testimony, that advertising communications with Google on behalf of Elsevier [redacted] to this third-party marketing provider, Performics, and that Elsevier's deponents, including Mr. Guillaud, who testified in a 30(b)(6) capacity, were not prepared to speak to those advertising efforts or conversations that were occurring between Performics and Google or even at times between Performics and Elsevier.

And there are certain components of this relationship between Performics and Google that are critical to this case. One piece of that is the ISBN-level data that was provided to Google for purposes of uploading and running Elsevier's ads. Part of the trademark infringement claim that -- or claim that

plaintiffs allege against Google is that Google was creating these ads and applying the trademarks to the ads on its own, when our position has been that really this is information that is given to us by the advertisers and it is an automated process that creates the ads.

THE COURT: Say that again.

MR. PILIGIAN: That it is the advertiser itself, so Elsevier in this instance, that provides all of the information, including the image that would include the mark, to Google, and it is an automated process that creates the ads.

Elsevier could not testify about what information was actually provided to Google. Effectively, what they could testify about was that they would provide Performics with a spreadsheet that included, you know, [redacted]. But then that is sort of where the chain stopped. They couldn't testify as to what Performics would ultimately provide Google.

Mr. Guillaud, again, in a corporate capacity, said he didn't know, but he hoped that they would provide what they used. And Ms. Miller, who's on the face of quite a few documents, where they are creating this spreadsheet and working with Performics to sort of overhaul it, testified that it just wasn't within her remit as to what was ultimately provided to Google -- or ultimately provided to Google by Performics.

THE COURT: I have two questions for you, if I might.

MR. PILIGIAN: Yes.

THE COURT: First, if that is true, if it was Performics ultimately providing this information to Google, Google must have known this all along, not just when it took these depositions. Right? I mean, who were you dealing with all these years? And second, why does it matter? What's the relevance of this information?

MR. PILIGIAN: So, for the first question, the fact that someone somewhere at Google may have been dealing with Performics all along, I think, puts the burden of this discovery on Google, whereas, the burden is really on Elsevier to support its claims. And, again, in a 30(b)(6) capacity, where you have someone who is testifying, you know, about the promotion and their trademarks, as well as their advertising efforts and advertising correspondence with Google, to be able to testify to what information Elsevier, whether it was itself or through its agent, was actually providing to Google. We get to -- as the defendant, we get to test that, the assertions and -- the assertions in the complaint that, you know, are saying that Google is actually the one who is applying this mark and taking the trademarked image and putting it on the advertisement when we don't believe that to be the case.

And the other three plaintiffs in this case have all testified to that. We have gotten competent testimony from all three of them.

THE COURT: And they have testified to what exactly?

MR. PILIGIAN: About [redacted] was actually provided to Google, whether it was provided by them or through a third-party marketing provider, because two other plaintiffs --

THE COURT: And has it been consistent across the other three plaintiffs or is it different from one to the other?

MR. PILIGIAN: I will say it has been consistent in that it is generally the same information. I can't say that it has been consistent in that every single spreadsheet full of information is exactly the same.

THE COURT: But all four of the plaintiffs, either directly or through an agent, give Google a spreadsheet it sounds like.

MR. PILIGIAN: Yes, that is my understanding.

THE COURT: It is just that, for Elsevier, they don't know exactly what's on the spreadsheet because --

MR. PILIGIAN: It is more --

THE COURT: -- Performics does it?

MR. PILIGIAN: It is more for Elsevier that they will say they know what they give to Performics, but they don't know if Performics changes it or if Performics took columns out.

So, for example, when asked if, you know, [redacted]

[redacted] spreadsheet is provided to Google, their testimony --

THE COURT: Can't Google check that from its end? Can't you go to the department that got these spreadsheets from Performics and take a look at them and see if that column is in there?

MR. PILIGIAN: So Google is a massive organization. I am sure at some point we could hunt that down, but then we are past the document discovery, I believe, deadline and --

THE COURT: Yes, but you would have gotten the documents yourself. I mean, they are probably sitting around somewhere in your basement, metaphorically speaking.

MR. PILIGIAN: Are you talking about we would have gotten documents ourselves from --

THE COURT: From Performics. If you want to know what Performics did or didn't change to these spreadsheets and what Performics did or didn't present to Google, you are Google. You don't need discovery for that. It would have been sent to you.

MR. PILIGIAN: Well, I think -- so, I think there are two ways of looking at this. And the fact that Google would have received this and could have testified to it, again, I think I might know what my friends across the aisle would say if Google was saying, okay, well, we are producing our own documents that we are saying come from Elsevier and that we are

going to produce our own witnesses who are going to testify what they got from Elsevier. I think they would take serious issue with that and want to hear and want to have their own witnesses testify. And what I am saying is that we aren't able to get that other side. We aren't able to get Elsevier's true understanding of what it or its agents were providing to Google. This was the topic of a 30(b)(6) -- or this was a 30(b)(6) topic that we served on Elsevier and should have been part of the testimony --

THE COURT: Right, but you are not making a motion to compel Elsevier to reeducate its witness and provide better-educated 30(b)(6) testimony. You are making a motion to subpoena a new witness. It is really, I think, a Rule 16(f)——hold on, let me check——motion to alter a scheduling order for which you have the burden of proof and you have to show both diligence and good cause.

MR. PILIGIAN: And good cause. Correct.

And your Honor, I think part of the reason we brought the motion the way we did was Mr. Guillaud sits in France and we are unable to depose him there. It was a lot of trouble to actually get him to come to America. And from Google's perspective, the most efficient way of actually getting this information, getting it done, especially based on the testimony that we got that was Performics was the one who was handling all of this or all of the communications with Google related to

advertising, which was not necessarily apparent on the face of the documents that we had from Elsevier, the most efficient way of going forth and taking this deposition and getting this information is to actually subpoena Performics.

If plaintiffs would like to reeducate a witness and have them speak to Performics about the topics that came up in Mr. Guillaud and Ms. Miller's deposition and have them sit for a limited additional 30(b)(6), that would certainly be something we would consider. But I think, from the standpoint of why we brought the motion the way we did, that was more this was the most efficient way that we saw this motion unfolding or this deposition unfolding.

THE COURT: All right. So you -- I do have to look at it through the lens of Rule 16, Rule 16(b)(4) to be precise. Sorry. I sometimes forget my subsections. And I am not going to let you recharacterize the motion midstream and now say, well, okay, fine, have them reeducate their witness. It is what it is.

MR. PILIGIAN: And that is not the request. I was explaining just the context of why we brought the motion we did. And we do think that good cause exists here and that we were diligent because I think one of the primary points that plaintiffs make is that Google knew that Performics was around based on their appearance on the document, but knowing that a party exists and knowing that you have a need to depose that

party I think are two different things. And so that warps the standard a little bit. And as we explained in our motion, the fact that Performics was on these documents, Mr. Guillaud and Ms. Miller were also all over these documents and appeared to have been having substantive conversations with Performics about [redacted] that we also think are relevant to this case that Performics can speak to because they have a copyright infringement claim. And Elsevier seemed to have [redacted] that we think contributes to a claim for harm or at least cuts against any claim for harm as to the harm that piracy was causing on Google Shopping.

And when asked about these documents or these conversations, Elsevier's witnesses, including Mr. Guillaud in a 30(b)(6) capacity or Ms. Miller, who was on the documents, couldn't speak to any of the substantive communications with Performics. They distanced themselves and Elsevier from any communications between Performics and Google by saying, you know, We know what Performics told us, but we don't know what the conversations between Performics and Google were. We only heard what they were saying they were being told by Google.

And, you know, even in one instance, which is in our papers, where Performics made a presentation to Elsevier about

[redacted], both Mr. Guillaud and Ms. Miller called into question the veracity of that presentation. They said they hadn't done any analysis of the claims that Performics were making, but their view was that it was Performics trying to sell them a service, or that Performics was [redacted]

And, again, these were topics that Google couldn't have reasonably anticipated Elsevier would not be able to speak to, in either of those capacities, given the presence of their people on the documents. So we have been reasonably diligent about moving for this deposition subpoena. Both depositions happened in July after our notice cutoff. And based on the face of the documents and who appeared on those documents, we could not have known that Elsevier's witnesses were not going to be able to testify to the substance at all.

THE COURT: All right. And in terms of the relevance proposition, you have told me a little bit about the [redacted] and where that fits into this case, as I understand it. If it goes to anything, it goes to damages. And the way in which it goes to damages is that if Elsevier was [redacted], then that, rather than piracy, may be responsible for some portion of its claimed damages.

MR. KANE: Yes, your Honor.

THE COURT: All right. Are there any other ways in which this Performics testimony is relevant to a material issue in the case?

MR. PILIGIAN: The trademark infringement claim that we just discussed.

THE COURT: Explain that to me again.

MR. PILIGIAN: Again, it is whether -- part of the debate on the trademark infringement claim is whether Google itself was actually actively applying the mark, so the cover image that would have Elsevier's trademark on it, to the ads. And the parties disagree about how this was formed. And part of it -- or part of the way that we have said that these ads are created is that there is a list of information that advertisers, whether legitimate or pirate, provide to Google, and then [redacted]. So Google isn't applying any mark. It is receiving information that it inputs from the actual advertiser themselves, and then it is just created into an ad.

And what we are seeing, again, on the spreadsheets that Elsevier provided to Performics is that they were providing this [redacted] And that was --

THE COURT: And your -- let me just make sure I

understand it. Your position is, or is going to be, that even though some [redacted], as Mr. Kane describes it, [redacted], that Google cannot be charged with applying the mark if [redacted] marks supplied by the publishers.

MR. PILIGIAN: Correct.

THE COURT: So don't you already have what you need on that, with respect, if your theory is correct -- Mr. Kane would vehemently disagree, but if your theory is correct that you are out of the woods on this point because the publishers gave you a spreadsheet with the marks on them, you already have that for all four of them, don't you? I mean, is there any realistic chance here that -- again, let me suggest the sandbag issue. Is there any realistic chance here that somebody from Performics is going to pop up as a plaintiffs' witness at trial and say, actually, [redacted] So, you know, so there.

MR. PILIGIAN: So I would say, I think the concern would be more that there is an Elsevier witness who remembers differently and says, oh, wait, no, we know that Performics [redacted]. Because what we have right now is we know [redacted] And so it would be more that they try and fill that

gap for some reason, again, whether it is a great chance, a medium chance, or remote chance, but they would try and fill that gap with a witness who they say would have been prepared to talk about that, that we didn't depose or ask.

I know they pointed to Ms. McCann, which, again, I think there are some objective factors in her deposition and testimony that show that she would not have been the person to ask about these -- ask these questions specifically, that, you know, she only appears on a handful of emails with Performics. I think it is a total of 11 across three or four email threads. And even the exhibit cited by plaintiffs in their papers is one where she is actually brought into a thread to discuss [redacted] and explaining that that [redacted] and the fact that she spent no time with Performics either in her preparation for her 30(b)(6) deposition. But so that the concern is that, you know, if there is another witness that tries to close this gap, we believe that we should be able to close this gap with Performics since Elsevier wasn't able to do it themselves.

THE COURT: All right. Let me hear from plaintiffs. Whose motion is this?

MS. BERGELSON: My motion, your Honor.

THE COURT: Ms. Bergelson, go ahead.

MS. BERGELSON: Good afternoon, your Honor.

There are a number of reasons why we think that this letter motion should be denied.

As we have discussed, Google has passed the deadline, the Court-ordered deadline, to identify the additional depositions that it would take and then to also take them.

It shouldn't be a surprise to Google that Performics is on these documents that have been produced for more than a year. There are over 300 documents produced since July 2025 that hit on the term "Performics," including email chains, decks prepared by Performics. Google has therefore had information about Performics for a long time.

Google has also gotten testimony about Elsevier's advertising efforts from Mr. Guillaud. He was prepared to testify on the negotiated scope of his topics, which I am happy to go through. He was prepared on those topics. What they are now asking --

THE COURT: I am sorry, prepared on what topic?

MS. BERGELSON: On his topics. So, he was prepared to testify about Elsevier, Inc.'s, general efforts to advertise the asserted works on Google Shopping, Elsevier Inc.'s Google Merchant Center and ads accounts generally with respect to Google Shopping, plaintiffs' general practices concerning its effort to market and promote the asserted works, and generally as to where Google Shopping fits within plaintiffs' broader advertising efforts on Google's platforms and how generally

those efforts changed as a result of the e-book ban, if at all. And he provided testimony on these topics. He testified, without going into the weeds of all of these --

THE COURT: I don't want to cut you off if I am misunderstanding, but if the argument that you are making is that he provided the testimony he agreed to provide, that is not really the point here. I don't hear Google complaining that he didn't fulfill his remit, his 30(b)(6) remit. I just hear them saying, yeah, but we figured out this other thing and now we know it is important, so we want to take this other deposition.

MS. BERGELSON: So we would disagree that this is even important information to begin with, because Google claims that this information is relevant to the trademark claim but what's at issue here is not Elsevier's legitimate ads and what Elsevier puts in its feed that then Google promotes for legitimate ads. What's at issue is what the pirate merchants or the pirate --

THE COURT: So you are saying it doesn't matter to the plaintiffs' case whether Google applies Elsevier's trademark or not?

MS. BERGELSON: Does it matter --

THE COURT: -- for the legitimate ads?

MS. BERGELSON: For the legitimate ads.

THE COURT: It only matters for the pirate ads. And

Google is presumably not using Elsevier's spreadsheet or Performics' spreadsheet to serve pirate ads.

MS. BERGELSON: Correct.

THE COURT: Okay. I have that point. Thank you.

MS. BERGELSON: Yes.

Also, as we -- as has been discussed, we think this information is information that Google already has. To the extent they are interested in what goes in into Elsevier's feed, they see the feed. And the complaint, the amended complaint includes an excerpt from something on Google Shopping support pages that says Merchant Center creates these ads based on information you include in your product feed, so you don't need to create the ads yourself. So it has this information to the extent it is interested in the information.

It also seems that Google is interested in details in these Performics-created documents. In the reply, Google's counsel points to one deck and says that, you know, where these witnesses could testify about Performics-created documents, they baldly call into question the information in them. But they point to one deck and the witnesses were asked their views on information in it and they are entitled to respond with their, you know, honest testimony. But they also were asked about a number of other decks. Mr. Guillaud was asked about five total Performics-created decks. In some of the testimony on that, the taking attorney said, I just have some high-level

questions about a couple slides, and he answered the questions; and others he had more questions, he answered those. So the suggestion that a deposition of Performics is needed also because these witnesses couldn't speak to documents Performics created that were in the files that were produced is just -- is not true when you look at the full scope of the transcripts. And so there are a number of reasons why we think that it is too late for this deposition. The information sought isn't necessarily relevant to the claims in the case.

THE COURT: And is there any danger of sandbagging going the other way in this instance? Is there any risk that plaintiffs are going to call Performics as a trial witness?

MS. BERGELSON: I am not aware of that risk.

THE COURT: Anything further from Google?

MR. PILIGIAN: Yes. Just a couple of points.

I think on the first point that, you know, again, we did not hold Mr. Guillaud's testimony open because it became very clear through Mr. Guillaud's testimony that Performics was actually the party that we would need to talk to since Elsevier was basically saying that the buck stopped with Performics and then Performics [redacted]. I think the idea of, you know, he testified to Elsevier's advertising efforts with Google, Mr. Guillaud testified to the items that they would provide Performics, but not exactly everything that went to Google because they were -- Mr. Guillaud and Ms. Miller would

say, well, Performics was the one who [redacted], so they would be the ones that were actually speaking with --

THE COURT: Sure. But with --

MR. PILIGIAN: -- customers that were (indiscernible) accounts.

THE COURT: -- respect to the copyright issue, Ms. Bergelson made the point that there's no relevance here, because whether Google applied Elsevier's trademarks or Elsevier, through Performics, applied Elsevier's trademarks to Elsevier's legitimate ads is not an issue in this case.

MR. PILIGIAN: So, I mean, I do think that it speaks to the basis of the allegations in the complaint where they were saying that Google was applying Elsevier's trademarks in the ads that it was creating. If Elsevier knows that they actually provide a spreadsheet to Google that keeps all of this information --

THE COURT: Pretty remote to the trademark claims here, which have to do with the pirate ads, not with the legit ads.

MR. PILIGIAN: Pardon? I am sorry, I missed the first part --

THE COURT: It seems pretty remote to the actual claims at issue here, the trademark claims at issue here, which have nothing to do with who applies what to Elsevier's

legitimate ads.

MR. PILIGIAN: Understood. But I think the idea is that Google is the one who is taking the mark and then putting it on the ad, rather than creating the ad out of information it receives from a pirate advertiser or a legitimate advertiser. And, so, to the extent plaintiffs are trying to say that, well, our legitimate ads don't matter because we aren't the pirates, to the extent they are trying to say that the pirates maybe provide less or different information, that doesn't exactly make sense to me. And it is important to know what Elsevier knew it provided for purposes of creating the same type of ads, whether it be on Shopping or search.

THE COURT: I totally don't get that. You totally lost me there. In fact, you have sort of been making the point to me this afternoon that each publisher is different. So what Elsevier doesn't provide you in terms of its trademarks for legitimate ads would, it seems to me, shed no light whatsoever on what the pirates provide to you or what you do with what the pirates provide to you.

Anything else?

MR. PILIGIAN: I think, again, the only, you know, concern on the sandbagging point also just comes down to the point of damages where, you know, we spoke with Mr. Guillaud and Ms. Miller about a lot of emails that happened between Performics and Elsevier where Performics was relaying the [redacted]

[redacted] that we were discussing from Google. And, you know, Ms. Miller and Mr. Guillaud couldn't testify as to the veracity of Performics' reports back, couldn't testify as to, you know, the harm that that was causing or Performics' analysis of the harm that was causing. I do think that is an independent need or necessity warranting our -- warranting a subpoena to Performics. I think, again, if there was --

THE COURT: A subpoenaed deposition --

MR. PILIGIAN: -- a --

THE COURT: Oh, subpoena to --

MR. PILIGIAN: A subpoena --

THE COURT: -- Performics.

MR. PILIGIAN: -- to depose Performics.

Yeah, I mean, I guess if there is the same commitment on the record about not calling Performics or offering an affidavit that would support or an Elsevier witness that is going to somehow pop out of the woods and contradict and know everything about what Performics said, that might work. I think it would be better for us to be able to ask Performics about their analyses and the [redacted], since it was fairly pervasive and it appeared on the face of the documents that Elsevier should have a better understanding and know about that.

That is the last point I will make.

THE COURT: Unlike Mr. J., you could also presumably

subpoena Performics for trial if you felt like it.

All right, Sorry. I didn't mean to cut you off. Had you given me everything

MR. PILIGIAN: That was everything.

THE COURT: All right. Any last words from plaintiff?

MS. BERGELSON: Yes, your Honor.

I think the briefing doesn't quite articulate why the [redacted] are relevant to harm. There is a reference to they are relevant to harm and the e-book ban, but, again, these are [redacted], if they are correct or if they existed, that concern Elsevier's [redacted] for their advertising. Whether there are issues with getting ads promoted for legitimate books is a different question than, okay, they were not able to advertise their e-books, but pirates were able to advertise infringing copies of those e-books, and they are not able to --

THE COURT: And you are saying that has nothing to do with the [redacted] because if the [redacted], they still were banned.

MS. BERGELSON: Correct. Whether there is some revenue impact from [redacted], it is not --[redacted] is separate from whatever harm the e-book ban caused them.

THE COURT: It is difficult for me to get my arms fully around that without having a fully fleshed-out theory of

the plaintiffs' damages, which I don't have at this point in the case.

MS. BERGELSON: Understood, your Honor. We will articulate more clearly why there is -- why they are different; but, here, I don't think that Google's counsel has explained why these [redacted] on Elsevier's feed for their legitimate books or their legitimate products, how that really relates to the harm we are talking about with the e-book ban and their inability to advertise their lowest-priced products in the feed while pirate sellers are able to advertise infringing copies.

THE COURT: Okay. Thank you all very much.

I will deny Google's motion for leave to take the Performics deposition. Google is out of time. Viewed through the lens of Rule 16(b)(4), it is Google's burden to show good cause which, in turn, requires that I look at diligence and also requires that I look at the importance, *i.e.*, the relevance of the information sought out of time. I don't find the showing particularly strong on either of those prongs.

It does seem to me that Google could have, and arguably should have, figured out that it needed or wanted or should at least be thinking seriously about Performics as a witness before these two depositions, which is where Google says the light bulb went on.

I also don't find the need for Performics testimony

particularly compelling here. To some extent, the information already exists in-house; and to the extent the information doesn't already exist in house, I don't really find the relevance proposition particularly compelling.

Both of the theories that I have been presented with, one having to do with whether Elsevier, via Performics, actually provided its trademarks to Google or not, that one, I am sort of baffled by how that is relevant to any issue in this case. The second issue, having to do with [redacted] with Elsevier's [redacted], I see potentially some relevance to Elsevier's damage calculation, but as a -- what's got to be a fairly small cog in a big damages wheel there.

So, on balance, Google, the answer is no. This motion will be denied.

Now, Mr. Hodgkinson, remind me, what do we have in the green room on this case? How many more motions?

MR. HODKINSON: Two fully briefed and one that will be briefed next week.

THE COURT: All right. When would you like to argue about those motions? Let's see if we can do all three. When will the third one be done by next week?

MR. KANE: It is Tuesday, your Honor.

THE COURT: Okay. Mr. Kane, when would you like to come back and see us? And the week of the 24th is out. I am on criminal duty that week.

MR. KANE: We could do the 19th, August 19. I don't know if that is too soon after the reply brief for the --

THE COURT: That maybe a little soon.

MR. KANE: We could do the 28th.

THE COURT: I was going to offer you the 20th, but I am guessing you are not available.

MR. KANE: We do have a deposition that day.

THE COURT: Google, what say you?

MS. SAMPOLI: I know that the 19th is probably too soon. We could maybe do the morning of the 19th. Otherwise --

THE COURT: Particularly the morning.

MS. SAMPOLI: Okay.

THE COURT: It is not -- I am not getting briefs potentially until late in the day --

MS. SAMPOLI: Fair enough.

THE COURT: -- the day before. You wouldn't --

MS. BERGELSON: Yes.

THE COURT: You wouldn't want to come in that day.

MS. SAMPOLI: And then I agreed with Mr. Kane that the 20th won't work because of the deposition. Acknowledging you are out the week of the 24th. We could do the hearing on September 1st, but we are getting a little bit far out there. But that is -- we could also do the 21st of August --

THE COURT: That is a Friday. I try to avoid doing motions on Friday. I might be willing to make an exception for

you.

Mr. Kane?

MR. KANE: Unfortunately the 21st wouldn't work for me.

THE COURT: Would it work for someone else in your shop?

MR. KANE: I don't think for those three motions --

THE COURT: All right. Well, then we are going to have to go to the 1st, I am afraid, and I have a 10 a.m. that day, which means we can't start until 11.

MR. KANE: I could do the 31st if that works for Google, August 31st.

THE COURT: That is even worse. I have a 10, an 11, and a 12 that day.

MR. KANE: Okay. We can do the 1st.

THE COURT: All right. September 1st, at 11 a.m. Going once, twice, sold.

All right. A written order will issue.

Thank you all very much. We are adjourned.

(Adjourned)

C E R T I F I C A T E

I, Kristen J. Carannante, certify that the transcript of the digital audio recording of the proceedings in the above-entitled matter is a true and accurate transcription.

Signature /s/ *Kristen J. Carannante*
KRISTEN J. CARANNANTE, RPR, RMR, FCRR
(848) 459-3124
kjcarannante@gmail.com

Date: August 14, 2026