# EXHIBIT A
# [Redacted Version of Document Filed Under Seal]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------:

| | |
|---|---|
| CENGAGE LEARNING, INC., | : Case No.: 24-cv-4274 |
| et al., | : |
| Plaintiff, | : |
| v. | : |
| GOOGLE LLC, | : New York, New York |
| Defendant. | : September 1, 2026 |

-------------------------------:

TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE BARBARA MOSES

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: OPPENHEIM + ZEBRAK, LLP
BY: Michele H. Murphy, Esq.
Jeff Kane, Esq.
5225 Wisconsin Avenue, NW
Washington, DC 20015

For Defendant: LATHAM & WATKINS LLP
BY: Sarah A. Tomkowiak, Esq.
Sara E. Sampoli, Esq.
555 Eleventh Street, NW
Washington, DC 20004

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

THE DEPUTY CLERK: The Court now calls Cengage Learning, Inc., et al., against Google LLC. Case Number: 24-cv-4274.

Counsel, please state your name for the record.

MR. KANE: Good morning, Judge.

Jeff Kane, from Oppenheim + Zebrak, on behalf of all plaintiffs. I'm joined by my colleague, Michele Murphy.

THE COURT: Ms. Murphy. Mr. Kane.

MS. TOMKOWIAK: Good morning, your Honor.

Sarah Tomkowiak with Latham & Watkins. I am joined by my colleague, Sara Sampoli, on behalf of the defendant, Google.

THE COURT: Good morning.

So, as of, I think, late last week, when I started thinking about today's proceeding, my law clerk and I thought that the three motions that were on for today were the last three discovery disputes in this case. My law clerk tells me that that is not the case; that a new motion came in -- Friday, Dan, or yesterday?

THE LAW CLERK: Supplemental?

THE COURT: No. The supplement letters, I've read.

THE LAW CLERK: Yesterday.

THE COURT: -- yesterday, which I haven't read, although I understand that the request is for, among other things, another month of discovery.

Is that -- that's in there?

MR. KANE: That's correct, your Honor.

THE COURT: All right. So let's see how we do today on the three motions that I was prepared and you are prepared, I assume, to discuss.

To the extent that I do order some additional discovery into something, which is likely, as I sit here at the moment, we can hold off on discussing the timing for that and the parameters for that until your most recent motion has been fully briefed. And if necessary, we can come back and chat at that time about dates and limitations and so forth. But let's see how we do today with the three fully briefed motions.

I would like -- the one that I think we're going to have to spend the most time on is the privilege motion, which came in at Docket 1093 from the plaintiffs.

So I would like to do the other two first. I think that will make more sense. Shall we take it in reverse-chron order? By which, I mean we

would start with Number 1135, which is whether Google should be required to re-prep one of its 30(b)(6) witnesses, or perhaps provide some other, better-prepped 30(b)(6) witness to testify about this -- I guess, this [redacted].

All of these motions are Google's motion. Is this Mr. Kane or Ms. Murphy?

MR. KANE: It's me.

THE COURT: I'm sorry. All of these motions are plaintiffs' motions.

MR. KANE: Thank you, your Honor.

So, just to put this in context, Google's documents pretty clearly indicate that the impetus for Google creating this beta program [redacted].

And the documents say that pretty clearly. One of them says, [redacted]

[redacted]

Unfortunately, Google's 30(b)(6) witness -- so what the Court ordered was that Google should present a 30(b)(6) witness to testify about the business impetus for the beta program.

THE COURT: "From a business perspective," I think, was the language used.

MR. KANE: Yeah. That -- some wording like that.

And, unfortunately, Google's witness, Ms. Fein, was completely unprepared on the issue of the [redacted]. She couldn't recall even having heard about the [redacted]. She admitted that she hadn't seen the two documents we were just discussing that say that [redacted]

And I want to be clear, it's not that Ms. Fein said that she didn't think these documents were correct or that she said, you know, no, that

wasn't the impetus, the impetus was something else.

She disclaimed all knowledge of the [redacted] We asked her directly, so you think Mr. W's e-mail here is, sort of, incorrect, that there was not [redacted]

And she said, I'm not saying that this is incorrect or wrong. I am saying I read what's here, and I'm also conveying what I heard in my preparation, and I'm not going to speculate further.

She told us she had no information to go off of, other than the documents we were putting in front of her that she was seeing for the first time.

So, under Rule 30(b)(6), what the Second Circuit has explained is that Google needs -- Google has an affirmative duty to make available such number of persons as will be able to give complete, knowledgeable and binding answers on its behalf. And Google itself says that it's supposed to conduct "a reasonable investigation" to prepare its 30(b)(6) witness.

And I should point out the *Morelli* case that the Second Circuit relied on says that the

party producing the witness has to make a conscientious, good-faith endeavor to designate the persons having knowledge of the matter sought by the party noticing the deposition and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed as to the relevant subject matters.

THE COURT: So just to, kind of, jump ahead, in opposition to your motion, Google argues -- I'm going to, perhaps, oversimplify this a bit -- that the reason this witness, Ms. F, didn't testify about [redacted] is that, in reality, the [redacted] was not the impetus for the beta program.

And your response to that, I think, is, well, she still wasn't adequately prepared because she should have at least been able to answer my questions with regard to the [redacted] and why the documents make it look like maybe the [redacted] was the impetus for the program.

Am I close here?

MR. KANE: I think so.

If Ms. Fein had come in and said, you know -- yes, I reviewed these documents. I spoke to the people who were involved in this deal, and this

just isn't correct. I know it says that here, but it wasn't really the impetus for the beta program -- then we might not be here, in all candor.

Instead, what she did is she was seeing those documents for the first time. In other words, no one had told her there was this [redacted], you know, and here's what our position is on it.

THE COURT: And no one had said to her, look, Mr. Kane is probably going to ask you about this, so here's what you need to know.

MR. KANE: Right. Which I think is what they had to do in this case because we all sat here, and I read those exact same quotes. And, you know, this was the whole reason the Court ordered the discovery, was to probe whether the reason for the beta program was the [redacted] as opposed to some sincere attempt to solve this problem.

So Ms. Fein was simply uneducated on this topic. And Google has access to the folks who were involved in [redacted], and so they could easily have prepared Ms. Fein properly on this topic.

I should add, the other witnesses who we have asked about this topic haven't been able to address this either, so ...

THE COURT: Well, why don't you spend a few minutes on that because Google seems to think that they did provide relevant testimony.

MR. KANE: Yeah. So one witness they point to is Mr. B.

THE COURT: Right.

MR. KANE: He acknowledged that he met [redacted], and he acknowledged meeting with folks inside Google [redacted], but said he didn't recall what was discussed.

We showed him the documents, and he said, based on what's in this document, I'm sure stuff was discussed about [redacted], but it wasn't really of my remit or interest.

He also said he was on leave during the time period when a lot of this was happening. He said he was on leave for most of 2024. We asked him directly if the [redacted] was the impetus for the beta program, and he said he didn't know.

We asked him --

THE COURT: Where's that? Can you point me to that in his testimony, which I have here?

MR. KANE: Yeah, it's page 290, starting at line 14.

THE COURT: Hold on. Mr. V?

MR. KANE: Mr. B. Yes.

THE COURT: Oh, I'm sorry. I'm looking --

MR. KANE: J.B. are his initials.

THE COURT: Hold on. That's Ms. F.

MR. KANE: You might not have Mr. B's testimony, now that I think --

THE COURT: Maybe I don't have Mr. B's testimony.

MR. KANE: He was just deposed on Friday.

THE COURT: Ah. So I don't have his testimony.

MR. KANE: I can pull it up, if you'd like.

THE COURT: If you could, just give me the Q and A that you think --

MR. KANE: Sure.

"Q: Do you think that the material -- do you think that the [redacted] was, in part -- was, in any part, attributable to the beta program?

"A: I really can't say. I don't know the dependencies."

THE COURT: So he doesn't have personal knowledge.

MR. KANE: Correct.

And I should add, Mr. B is the person whom Ms. Fein said educated her about the beta program. In other words, the person who educated Ms. Fein --

THE COURT: Ms. F.

MR. KANE: I'm sorry. No. I think we can say -- we can say her name, I think, because it's been --

THE COURT: Oh, she is okay?

MR. KANE: Yeah. It's been disclosed in other filings.

The person who educated Ms. Fein didn't, himself, know about Google's motivation for the beta program. So they --

THE COURT: That's an overstatement. But didn't know whether the [redacted] was in the mix or to what extent.

MR. KANE: Right. And said he was on leave when this decision was being made, so he was quite unknowledgeable about it.

THE COURT: All right.

MR. KANE: The other --

THE COURT: Go ahead. Other witnesses who might possibly have been gap fillers here.

MR. KANE: Yeah. So the other witness they point to is Mr. L. He didn't testify about the [redacted] at all.

And then they point to Mr. J. But we asked Mr. J if he knew what was the impetus for the beta program, and he said, "I actually don't know the exact specifics because there were conversations I wasn't in."

THE COURT: All right. Give me that page number, please, for Mr. --

MR. KANE: Yeah, so that's at page 129. It's Docket 1155-2.

THE COURT: All right. Let me just take a closer look at that.

"Q: You said that a decision was made by leadership to enter into the market for e-book ads. Do you know why that decision was made?

"A: I actually don't know the exact specifics because there were conversations that I wasn't in. So, yeah, I only know pieces and parts."

And you then followed up with respect to the pieces and parts: "Correct."

MR. KANE: Right.

THE COURT: And he did the best he could.

MR. KANE: So if you look at page 130,

starting at line 10, he said, there were [redacted]

So it actually underscores why we need this testimony. He said he wasn't sure what the impetus was, but he knew that the [redacted] was in the mix.

THE COURT: And here, on page 131, there's a specific discussion of [redacted].

MR. KANE: Correct. He acknowledged --

THE COURT: In fact, he says that's the only [redacted] that he was aware of. That's at the bottom of 131 and the top of 132.

MR. KANE: That's correct. He knew that [redacted] was a thing, but he didn't know what role [redacted] played in the decision to implement the beta program when we asked him that directly.

It's the one we started with on page 129, where he says, I actually don't know the exact specifics because there were conversations I wasn't in.

THE COURT: So if Ms. Fein was educated by someone who wasn't fully qualified to be her educator, do you know, based on all of the discovery

that you have taken thus far, who would either, A, have personal knowledge necessary to adequately answer your questions, or B, could serve as the coach for a properly prepared 30(b)(6) witness?

MR. KANE: Yeah. So the two people we would point to are J.W., who's actually being deposed as we speak, and D.H., who -- were are out of depositions, so we didn't -- we were not able to depose him.

Those are the two -- J.W. is the one who wrote the e-mail that says, [redacted]

THE COURT: So one of your colleagues is questioning Mr. W today?

MR. KANE: That's correct.

THE COURT: And has that question been asked during the morning session yet?

MR. KANE: Not so far.

THE COURT: Okay. You're waiting --

MR. KANE: It is somewhat early.

THE COURT: -- for the afternoon session?

MR. KANE: No. There's stuff they have to, sort of, lay as groundwork to be able to ask him

about this.

THE COURT: So this problem could be solved today.

MR. KANE: So that was one of the solutions we offered to Google. We said, you know, look, if you're going to tell us that either Mr. B or Mr. W is going to -- you know, has knowledge of this and is going to testify about it, or if you want to just designate them as the 30(b)(6) witness on this topic, you know, we might be done.

THE COURT: And you're pretty confident that Mr. J does have the adequate personal knowledge.

MR. KANE: Mr. W?

THE COURT: Sorry. Mr. W.

MR. KANE: I really don't know. I mean, we thought Mr. B would, then we thought -- we assumed the 30(b)(6) witness would.

But the thing with Mr. W is he was, sort of, the [redacted].

I'm guessing what he'll testify is to say some version of, you know, look, I told them that [redacted]

[redacted] but I don't know if that's the reason they did it. You know, it was their decision, whether they wanted to --

THE COURT: Well, who's the "they" in your hypothetical testimony there?

MR. KANE: It's the Shopping Ads folks; in other words, people who are actually responsible for deciding whether to have paid Shopping Ads on e-books.

THE COURT: Okay. And --

MR. KANE: What --

THE COURT: -- you know who's in that decision-making group, right?

MR. KANE: One of them was Mr. B, according to Mr. Jain, but when we -- as I said, when we deposed him, he claimed not to remember and said he was on leave at the time that that happened.

THE COURT: All right. So he would have been one of the right people, but was on leave or has a poor memory, or both?

MR. KANE: Right.

THE COURT: Who else?

MR. KANE: I believe Mr. Jain gave us a couple of other names. Let me see if I can find them.

So one is [redacted]. One is [redacted].

THE COURT: And these are not folks that you've deposed either personally or as 30(b)(6) witnesses?

MR. KANE: That's correct.

THE COURT: Okay.

MR. KANE: I mean, it's -- you know ...

THE COURT: All right.

MR. KANE: I appreciate the question. It is just, I mean, Google knows who would have knowledge of this.

THE COURT: I understand.

So your ask here -- just to be clear, your ask here is that you get additional testimony that you can use as you would 30(b)(6) testimony, testimony chargeable against Google, so to speak, that will answer your more specific questions that you say no one has yet been able to answer specifically enough as to -- let me put this at a somewhat high level -- the interplay between the [redacted] and the beta program.

MR. KANE: That's correct.

THE COURT: Okay.

MR. KANE: And when the two sort of --

THE COURT: And you would accept that in any one of a number of forms. The classic fix for an underprepared 30(b)(6) witness is produce the witness again after he or she has been properly prepared, or produce another 30(b)(6) witness for a limited session devoted to a particular topic.

Or if there is a 30(b)(1) witness who happens to be available for questioning, that person can be designated, or a portion of that person's testimony can be designated as Google's testimony.

MR. KANE: Great. Either of those would be fine.

THE COURT: Right. Okay.

MR. KANE: The latter would be better, if it was someone who knew about this personally and wasn't relying on preparation, but --

THE COURT: And who happens to be in deposition even as we speak?

MR. KANE: Yeah. If it's him, great. You know ...

THE COURT: All right. Let me hear from Google, Ms. Tomkowiak.

MS. TOMKOWIAK: Thank you, your Honor.

Is this on?

THE COURT: I think so.

MS. TOMKOWIAK: Okay.

THE COURT: I can hear you.

MS. TOMKOWIAK: Okay.

THE COURT: Mr. Lee, is she being recorded?

THE DEPUTY CLERK: Yes.

THE COURT: You're good.

MS. TOMKOWIAK: Great.

Your Honor, we dispute that Ms. Fein was not adequately prepared to testify to the subject. We think that what is really going on here is that the plaintiffs wish that there was this connection between the Google program and [redacted] that just doesn't exist, and that they will be able to testify --

THE COURT: I'm not here to judge what the actual motivation for the program was, but I am troubled by the fact that she was not educated at all as to the documents that you knew or should have known that she was going to be asked about because it was discussed at some length when the parties litigated the question of whether this was an appropriate 30(b)(6) topic at all.

MS. TOMKOWIAK: Yeah. I think, your Honor, though, we're confusing two things. What she

was -- what your Honor ordered her to testify to was the impetus for the beta program.

And so what she did is she talked to Mr. B and Mr. Z, which is another one of the individuals that --

THE COURT: Mr. Who? Z like zebra?

MS. TOMKOWIAK: Yeah. He is another one of the individuals that Mr. Kane just referenced.

She spoke to them, and she asked what the impetus was, and they told her. And I don't think that it -- again, this is a bit hypothetical. I don't want to get into the whole conversation.

But if, in that conversation, she said, okay, so was the impetus -- did it have anything to do with [redacted]? And they said, no.

I don't know why we would have a duty then --

THE COURT: Did --

MS. TOMKOWIAK: -- put a bunch of documents in front of her --

THE COURT: Let me stop you there.

Did she even know enough to ask that question during her prep?

And look, this is tricky because,

generally speaking, you don't have to tell me about a witness' prep, but maybe you want to tell me about that.

MS. TOMKOWIAK: I think that she knew that she was supposed to be educated on the impetus for the beta program. So we asked these two individuals, in their -- in their own words, to tell us why this -- how this program came about.

What they said and what she testified to is entirely consistent with what Mr. B testified to. And by the way, he was only on leave through July of 2024, so he was not on leave during the time period.

He testified that his team decided, in late 2024, that one of their key objectives, the key result was going to be to [redacted]

And that was the impetus. That was the goal, was, okay, how can we [redacted]

Separately -- and I would agree to some extent that it's somewhat unbeknownst to this team because, according to them, the [redacted]

was not the impetus. This was the impetus.

Separately, those conversations were being had with [redacted]. So they said, look, we heard that [redacted]. And so -- and, again, paraphrasing, but it is consistent with their testimony.

So we decided, great, we have a [redacted] And so e-books will be a good category to, you know, kind of, take this off and be a test case for seeing [redacted]

The impetus for the beta program is, therefore, [redacted]

So whether the [redacted] was itself contingent upon that happening is really a separate issue. And I think the question that was posed, that Mr. Kane pointed you to with respect to Mr. B was:

"Q: Do you think that the materialization of this --"

THE COURT: Wait. We're looking at, now, Mr. B.

MS. TOMKOWIAK: We are looking at the thing you don't have. Yeah.

THE COURT: Oh. Which I haven't seen. Right. Okay.

MS. TOMKOWIAK: Yeah. But he read it.

"Q: Do you think that the materialization of [redacted] was attributable to the beta program?"

So did [redacted] happen because of the beta program?

THE COURT: As opposed to the other way around.

MS. TOMKOWIAK: The other way around.

And so, look --

THE COURT: And he said he didn't know?

What did he say? Remind me.

MS. TOMKOWIAK: Right. Yeah. He didn't know because, again, [redacted] was being dealt with from the business side.

His testimony was actually consistent with what Mr. J testified to. Mr. J said the same thing. He said that -- and this, you do have starting at page 130 to 131 of Exhibit 1 to our response.

THE COURT: Hold on. This is Mr. V.J.?

MS. TOMKOWIAK: Yes.

THE COURT: Go ahead. Tell me what page.

MS. TOMKOWIAK: Page 130 to 131.

THE COURT: Hold on.

Okay. I'm there.

MS. TOMKOWIAK: So if you look starting at the bottom of page 130, he also explains that there was new leadership and they were [redacted] (indiscernible). So they've decided to take a strategic objective to [redacted]. I think it was [redacted] And the fact that the e-book opportunity was in front of them at the time with D.H. and J.W.'s interest was a good pilot use case for this new capability that they wanted to build at [redacted].

THE COURT: All right. And then the next question is about the [redacted] right?

And at this point, Mr. V.J. mentions [redacted] bottom of -- well, actually, the question mentions [redacted] at the bottom of 131.

MS. TOMKOWIAK: Yes, it does --

THE COURT: Right.

And Mr. V.J. says -- I mean he impliedly

says he's aware of [redacted] and he says he's not aware of [redacted].

MS. TOMKOWIAK: Yes.

THE COURT: Okay.

MS. TOMKOWIAK: So I think, your Honor, that they -- she was reasonably prepared. She told -- she said exactly what she learned about the impetus for the beta program. It's consistent with what two other witnesses have said about that same program, including the witness who educated her. Two of two and another witness who they called --

THE COURT: Well, she only -- by the way, she only identifies, I think, one person who educated her. At page 327 of her transcript, Ms. Fein's transcript, she mentions only Mr. J.B.

MS. TOMKOWIAK: I believe what she said is, and another engineer was there, and she couldn't remember his name.

THE COURT: Quote: "Everything reflected in my answers about the pilot program was based on a conversation with J.B. in preparation for this deposition."

MS. TOMKOWIAK: Let us try to find the other part of the transcript --

THE COURT: Sure.

MS. TOMKOWIAK: -- where she says that she talked to --

THE COURT: Who was this other ...

MS. TOMKOWIAK: Mr. Z.

THE COURT: Mr. Z.

MS. TOMKOWIAK: The point of a 30(b)(6) witness is to give the company's position, and this -- that is what she gave. And I understand that they take a different interpretation, or have a different position, based on what's in the documents or based on their interpretation of the documents.

THE COURT: But if the answer to that question is no, Mr. Kane, or, no, attorney for plaintiffs, the [redacted] was not the impetus for the beta program, you are misreading the documents because A, B, C, your 30(b)(6) witness should be able to explain that, don't you think?

MS. TOMKOWIAK: Again, we adhered closer to what the Court ordered, which was, explain -- I just don't want to put words in your mouth.

"Explain why the beta program is implemented from a business perspective."

THE COURT: Right. And ...

MS. TOMKOWIAK: They now have testimony from five individuals on this, including a 30(b)(6).

They are talking to Mr. W today, who was involved in the --

THE COURT: Now, if the question is put directly to Mr. W -- gee, did the -- was [redacted] an impetus for the pilot program, for the beta program? And if not, how come -- you know, how do you explain what these documents say -- can Mr. W answer that question, that series of questions?

MS. TOMKOWIAK: I mean, I don't want to -- I don't know, of course, exactly what he is going to say, but I think he can testify to his perspective from working -- the interactions, the communications that he had personally in that process. And he provided his opinion on whether it was -- I think he was using the words "an impetus." And you can decide if maybe that is a slightly different question than "the impetus." But maybe he has an opinion on whether [redacted] was an impetus for e-books being the [redacted] as part of this broader strategy. I don't know that he knows the broader strategy piece. I don't know.

And if the --

THE COURT: Well, I think if there were testimony on the record to the effect that -- this

is, of course, hypothetical at this point -- well, yeah, you know, [redacted] was important to us, so did that factor into our thinking? Sure, it did -- I think that would be of interest to the plaintiffs and potentially relevant here.

MS. TOMKOWIAK: I think that the testimony so far has all underscored that the impetus for the beta program was something else, was what I described from what Mr. Kane said.

THE COURT: Yeah, but I think plaintiffs are -- to use your words, I think plaintiffs are entitled to explore whether the [redacted] was an impetus, even if not the primary impetus.

MS. TOMKOWIAK: I think they have.

THE COURT: And I think that if your 30(b)(6) witness was not shown or prepared on the documents that make the plaintiffs think that the [redacted] was, at least, an impetus, if not the impetus, then I think your 30(b)(6) witness was not adequately prepared.

So how are we going to solve this? What's the easiest way?

MS. TOMKOWIAK: While I respectfully disagree that she wasn't prepared. If your Honor, respectfully, disagrees with that, then -- I

personally think that the testimony has been clear about whether -- the role that this has played.

If it is something as simple as -- was [redacted] partnership an impetus for the beta program -- that sounds to me like something that could be an RFA or a question posed. I don't think we need a whole other deposition. We have had --

THE COURT: Oh, I don't think you need a full other deposition either. This is -- I don't know -- maybe 10 minutes, maybe 20 minutes' worth of Q and A. But I do think plaintiffs are entitled to do it in Q-and-A format because I've been doing this too long to think that an RFA response is not going to lead to further disputes about whether the response was adequate or not.

And it was a 30(b)(6) topic. The parties disputed over this. I made a decision. Clearly, that decision was made by me in the context of the [redacted], which is what plaintiffs thought they were looking for.

Now, if that's not the answer, again, I'm not here to say what the business motivation or the primary business motivation or whatever was for the deal, but clearly there are documents that might suggest the [redacted], at least, played into the

business decision. And I do think that that's what the plaintiffs are entitled to explore in testimony that's binding on Google.

So I could order Google to re-prep Ms. Fein or some other witness of your choice on that precise point; specifically, make sure that they've seen the [redacted] documents and produce that person for 30 minutes.

Or maybe Mr. W can do it.

MS. TOMKOWIAK: Well, yes, your Honor. I think -- I mean, my colleagues are telling me that they've spent about an hour so far already talking about the beta program with Mr. W. I don't know what has been said, but it's possible that this will be answered by him. And I believe your Honor said that one potential solution could be to designate that particular portion of the transcript of a 30(b)(6).

THE COURT: Sure. I mean, if it adequately covers the topic.

But since Mr. W is still under oath -- and I assume will be for an afternoon session as well -- is that correct?

MS. TOMKOWIAK: I assume so. They haven't --

THE COURT: Because --

MS. TOMKOWIAK: -- ended any of the depositions much earlier than 5:00.

THE COURT: Right.

I think the better way to do it, if Google is comfortable with it, is to make that deposition -- make that designation -- i.e., that Mr. W is going to be testifying on behalf of Google with respect to this specific issue so that the plaintiffs' lawyers know when they're asking questions that they're asking Google; they're not just asking an individual percipient witness.

MS. TOMKOWIAK: I don't think I can agree to do that in the middle of his deposition.

THE COURT: I understand. You haven't -- you haven't been there. So --

MS. TOMKOWIAK: (Indiscernible)

THE COURT: Right.

What I'm inclined to do at this point, and I think, perhaps, the cleanest way to do it, is to give Google the choice. You know your witnesses certainly better than I do and better even than Mr. Kane does, although I'm sure he feels that he knows many of them well by now.

So I think what I'm going to do here is I

am going to direct Google to provide the plaintiffs with an additional maximum of 30 minutes of 30(b)(6) questioning with a witness who is either adequately prepared or who can testify from personal knowledge that Google is willing to accept as Google's testimony on the specific question -- Mr. Kane, give me your proposed wording here.

MR. KANE: What role did the [redacted] play in Google's decision to create the beta program, or implement the beta program?

THE COURT: What role did the [redacted] play in Google's decision to implement -- I'll go with "implement" -- the beta program?

When did this happen, by the way? When did Google implement the beta program?

MR. KANE: The beta program was March of 2025.

THE COURT: All right.

-- to implement the beta program in March of 2025.

That will do it?

MR. KANE: That's when they actually implemented it. I don't know whether the decision

to do so was, you know, sometime before that.

THE COURT: Got it. Okay.

MS. TOMKOWIAK: I think if you just end with the "beta program," that seems cleaner.

THE COURT: That's fine. "To implement the beta program."

And I want this witness specifically to be able to be familiar with the documents that Mr. Kane -- was it Mr. Kane or was it somebody else -- the documents that were presented to Ms. Fein and that she was not familiar with.

And do we want to name those documents on the record, or do both sides understand what they are?

MR. KANE: No reason not to name them, I suppose. Give me one second.

So it's Bates ending 603215, Bates ending 623411, and Bates ending 441959.

THE COURT: All right, so those three documents. The witness has to have, at a minimum, spent some time with those documents.

If the witness was not familiar with them from his or her own work, the witness needs to understand what those documents are and be able to answer questions about them, including questions

like, well, gee, you know, doesn't this mean that the reason Google did this beta program was for the [redacted]?

And if the answer to that is no, that's fine, but the witness needs to be able to cogently explain that.

All right. So that is the ruling with respect to the motion at 1135.

Now -- let's see. What motion number is this? 1128. Also Google's motion.

MS. TOMKOWIAK: That is also plaintiffs'.

THE COURT: I'm sorry. I don't know why I keep saying that.

MS. TOMKOWIAK: We would be happy with fact discovery being over.

THE COURT: You would be happy with fact discovery being over.

All right. Plaintiffs' motion to compel Google to produce additional testimony on 30(b)(6) Topic 32, which was specifically regarding the data included in a particular spreadsheet, which I see has now appeared on the screen in our courtroom.

Mr. Lee, or Mr. Hodgkinson -- can somebody turn it so I can see it a little better.

Thank you.

Okay. I'm going to have to live with that. What am I looking at?

MR. KANE: That's why we need a 30(b)(6) deposition.

So the way this came about is we filed a motion asking Google to produce whatever records it had of the date on which it claims to have delisted ads run by the pirates in question. And first, Google said, we've given you everything we had on that topic. We're not giving you any more.

And then they came into the hearing and said, gee, we would really like some more time to see if we do have information about this. And the Court gave them 30 days, and said, you know, produce what you've got in 30 days or you're precluded from introducing anything else. And this is what they produced.

THE COURT: Well, precluded from introducing anything else about the delisting, right?

MR. KANE: Yes. Yes.

And so this is what Google produced. Of the [redacted] URLs that Google claims to have removed, it's, like, [redacted] URLs. So it is some form of a sample. And so we

need -- and I assume -- I gather that it has some sort of indication as to whether the ad remains visible, which is to say, on some date, maybe the date you see here in B7, [redacted], whatever that means. I assume it means, you know, whether a Google user would see it. And in this case, it was not visible, but in other cases, it is. Some of these are true.

So, first, we need to understand, like, how were these pulled? How did they select these, you know, [redacted] or so URLs?

Are they intended to be, in some way, representative? Did they try to get, you know, a representation of various time periods or a representation of various pirates?

Like, are they purporting that this is some sort of a statistically significant sample?

Second, we need to understand, like, what is this? So when it says "Visible in U.S., False; Visible in U.S., true," what does that mean? Does that mean that that's the date on which it was delisted? Does it just mean that that's the date on which someone checked and on that particular date it wasn't visible?

What does it mean, that it wasn't visible? Does that mean Google delisted it? Or could it just mean that the merchant took the ad down? Or could it just mean that Google's algorithm didn't pick that ad as one that it was going to run?

THE COURT: Just back to the chart for a minute.

MR. KANE: Sure.

THE COURT: Column B gives a date. And then the visible versus invisible is a couple of columns over, right?

MR. KANE: Let me show you the other tab, the Sheet one. This is how it was produced to us, so it's all in one column. We've, sort of, broken it out --

THE COURT: I see.

MR. KANE: -- into multiple columns to make it just readable.

THE COURT: Multiple columns was you fiddling around with their Excel.

MR. KANE: Yeah. It's just every time there's -- I think it's a space or a comma or something, you know, you separate the stuff after the comma into the next --

THE COURT: So the Excel that was -- it's

an Excel spreadsheet?

MR. KANE: Produced to us as a CSV file. Yeah, a spreadsheet.

THE COURT: Okay. So, as produced to you, the date and the visible versus invisible was in the same column.

MR. KANE: Yeah, all that data was in one column. Yeah.

THE COURT: Okay. And you want to know what that date means if it's the -- at a high level, whether that's the date for those that were invisible -- meaning, I assume, consumer couldn't see them -- if that's the date on which the ad became invisible, or if that's simply the date on which somebody checked to see.

MR. KANE: Exactly. And also when it's "Visible in U.S.? True," like, does that mean it wasn't delisted?

I assume it does, but someone needs to tell us that. Our expert can't just say, you know, I assume this is what it means.

THE COURT: I'm sorry.

MR. KANE: Our expert --

THE COURT: You want to know whether invisible in the U.S. is the same thing as delisted

or is a different thing from delisted.

MR. KANE: Exactly. In other words, when --

THE COURT: And if it's a different thing from delisted, what would that thing be?

MR. KANE: Right. And that's what Google's letter and declaration seem to indicate; that it's not the delisting date, but rather the date that the ad was visible, whatever that means.

So we're really just looking for, like, what is this? And, you know, what do these terms mean?

And I don't really know -- there have been plenty of other spreadsheets in the case where, you know, it was produced in this litigation -- the custodian is Google, so we don't have a fact witness we can ask about it -- where Google has produced a 30(b)(6) witness who has testified, you know, at least somewhat about the documents. I'm not sure why this document is any different. This seems like a perfectly appropriate 30(b)(6) topic.

THE COURT: What is your response to Google's claim that you sat on this too long before bringing it to the Court?

MR. KANE: No. They -- Google didn't

provide us their position on this -- very, very late in the game. We waited months for Google to take a position on this. There were numerous 30(b)(6) topics about which the parties were arguing, and Google didn't provide its position until January -- I'm sorry -- July 9, 2026.

We served our 30(b)(6) notice, per this Court's order, on January 31, 2026. So they took -- what is that -- six months, almost -- five months to give us their position on this spreadsheet.

So the delay is entirely the result of Google's delay. This is at pages 3 and 4 of our letter.

THE COURT: Google seems to think that S.B. provided adequate testimony on this topic.

MR. KANE: I don't recall Ms. B addressing this spreadsheet at all. She certainly didn't explain what all these things mean.

I think what they're saying is she addressed, like, delistings, generally. In other words, she said, oh, generally, when we delist an ad, it happens, you know, within a certain amount of time.

Allowing them to offer that testimony without requiring Google to address this spreadsheet

is actually much worse because Google can say, oh, sure, we delist ads right away, and they don't have to explain -- if the spreadsheet says otherwise, they don't have to explain away that data.

In other words, it would be worse for Google to be able to say, you know, oh, yeah, we would take them down right away, and not have to present a witness to explain whether this data actually shows that.

THE COURT: All right. And Google also argues, of course, that none of this is relevant in the absence of their DMCA defense; to which, your response is?

MR. KANE: These pirates are among the 1,500 pirates at issue in this case. So the question here is not what was Google doing with respect to other pirates or, you know, other merchants? These are all the pirates literally at issue in our case.

If you're a juror, it makes a big -- a big difference to you when Google says, yeah, we should remove this ad. Plaintiffs are correct in identifying this as an infringing ad -- an ad for an infringing product.

It makes a big difference whether Google

removed it that day or six weeks later or six months later. The jury -- if this -- if that's what this spreadsheet shows, which I think it does, the jury should have the benefit of that information.

THE COURT: Back to the timing issue.

The parties do seem to agree that they reached impasse on this point on July 9th, I think; is that right?

Then the letter motion came in four weeks later, on August 6th. Was that too long?

MR. KANE: I don't think so. During that same time -- so Google produced -- in March, April, May and half of June, Google produced three witnesses for deposition. So in half of June, July, and August, we had to take 17 depositions. And during that same time, we had to file motions to compel on several other 30(b)(6) topics.

This was not at an impasse when we filed the first motion on the 30(b)(6) topic. This is at pages 3 and 4 of our letter.

But for Google to say, like, that their delay of five months is excusable, but our delay of four weeks is not, I think, is really pretty unfair.

THE COURT: Let me hear from Google.

MS. SAMPOLI: Thank you, your Honor.

So I think I'll start by talking about the last thing that Mr. Kane was discussing regarding the timing.

Se we provided -- on the same day that we withdrew the DMCA defense, we provided updated responses and objections to plaintiffs' 30(b)(6) topics. That's April 21st.

On April 21st, we told plaintiffs we would not be providing a witness on this topic. We told them this in a meet and confer in May. I believe we said we would take it -- take back their position to our client. But when plaintiffs filed their first motion to compel 30(b)(6) testimony on June 1st, on 25 topics, there were many in there that the parties were still negotiating.

We responded to their sealing request in relation to that motion, saying we believe we can reach compromise on some of these. Can you hold off on filing until then?

Mr. Kane responded saying, plaintiffs have conducted nine meet and confers. Given the July 2nd fact-discovery cutoff, plaintiffs are not able to postpone any further the presentation of these issues to the Court. Plaintiffs are willing to consider any proposed compromises Google wishes

to offer. To the extent the parties are able to reach agreement on a topic after plaintiffs file their motion, the parties can still -- (indiscernible)

So the fact that, ostensibly, we were still negotiating had no bearing on plaintiffs' motion on other topics.

We also made our position that we did not provide a witness on this topic clear when we responded to that first motion on 30(b)(6) testimony on June 10th. We submitted an exhibit with Google's position on all 72 of plaintiffs' Rule 30(b)(6) topics. That is Docket 1003-2. And we stated, for Topic 32, Google will not produce a corporate witness in response to this topic.

We, at plaintiffs' urging, met and conferred on a few other 30(b)(6) topics, including Topic 32, on July 9th, but our position remained the same, we would not produce a witness in response to that topic.

Plaintiffs were obviously capable of moving on this topic before August 6th, in the four weeks between that meet and confer and when they filed the same day the parties -- like, definitely, at the latest, they reached impasse July 9th.

Plaintiffs filed a different motion related to naming a 30(b)(6) witness. I believe that's the one for which your Honor held an emergency remote hearing. They also filed another motion on July 27th.

So they prioritized all the other motions over this one. And at this point, depositions are over, save for one 30(b)(6) deposition happening now, one tomorrow, and then the brief 30 minutes that you ordered --

THE COURT: Oh, who's on for tomorrow?

MS. SAMPOLI: The witness that you ordered at the last --

THE COURT: Ah. The backup witness?

MS. SAMPOLI: Correct.

THE COURT: Okay.

MS. SAMPOLI: So all of Google's 30(b)(6) witnesses, save for this brief, 30-minute topic, have been deposed. So imposing the burden of locating, educating and preparing this witness to sit for up to seven-hour testimony on this single topic would --

THE COURT: Well, I don't know that they're asking me for seven hours, but ...

MS. SAMPOLI: Well -- and so I think it

would be an unreasonable burden. And the reason I say that is because -- moving, now, to relevance.

This -- the reason that this document was produced in the first place was solely because of Google's now-withdrawn DMCA defense. That was the sole basis that plaintiffs gave for needing additional data regarding the precise date on which Google delisted as in the response to infringement notices.

So, to be clear, this document doesn't actually show that. So the -- as, I think, Mr. --

THE COURT: Well, what does it show?

MS. SAMPOLI: So --

THE COURT: Tell me what you think it shows.

MS. SAMPOLI: I will. Yeah, I will explain.

So at the hearing in October 2025, I believe my colleague explained that we produced all the data that Google maintains in the ordinary course for how it handles DMCA notices. That data did not include the precise date on which ads are delisted in response to infringement notices.

We explained we had produced a fair amount of additional data that provides a good proxy

for when the delisting happened. The most clear proxy is the ads data.

So Google produced data about [redacted] unique offers. And then, for the offers, we produced data on how often those offers are viewed, how often they're clicked on, the conversion rate for paid ads, the, like, cost.

So all of that data -- and the dates. So that's organized by date. So plaintiffs can tell, based on that data, if an ad continued to run after Google reached a decision to remove an ad in response to an infringement notice.

So we argued that was sufficient to, sort of, approximate the delisting date, which we didn't understand Google to maintain in any ordinary course.

You made the point at the hearing, your Honor, that the DMCA defense is an affirmative -- is Google's burden. And so because it was Google's affirmative burden, it was not -- it was not ideal that plaintiffs would have to, sort of, work through all that data.

And so to the extent Google could locate, in 30 days, a precise -- a document showing the precise date of those delistings, Google should do

so, or face preclusion related to the affirmative defense.

THE COURT: Right. And you're no longer worried about preclusion because you've withdrawn the affirmative defense.

MS. SAMPOLI: Correct. And --

THE COURT: But this is the document that --

MS. SAMPOLI: Yes. And I just want to --

THE COURT: -- answered that direction by the Court.

MS. SAMPOLI: And I wanted to give the lead-up to that because in the 30 days after the hearing and producing this document, we worked diligently and tried to work very quickly to find a source, a definitive source, of delisting dates. We could not find it, but we were worried about this preclusion order. And so what we were able to do is locate points of contact at Google who knew of data related to visibility history for ads.

THE COURT: So explain to me what "visibility" means.

MS. SAMPOLI: Yeah. So visibility history, as far as I understand it, is, sort of, the history of when ads are visible to users [redacted]

[redacted].

We're trying to look at some other ways that that can change. I know [redacted] is one of them.

THE COURT: Which is why, in this chart, [redacted] is specified. It says, [redacted]

MS. SAMPOLI: Correct.

Another one is [redacted], so like --

THE COURT: [redacted]

MS. SAMPOLI: Yeah. So like Google [redacted]

THE COURT: So some ads might be visible in one of those [redacted] and not another?

MS. SAMPOLI: Correct.

So what we learned from these points of contact is that visibility is [redacted] and so it's a complex set of data. And in order to, sort of, try to triangulate and determine an approximate delisting date, you have to, sort of, like, look at the history around the time that the notice -- the associated DMCA notice.

THE COURT: The takedown notice.

MS. SAMPOLI: Sorry?

THE COURT: The takedown notice.

MS. SAMPOLI: Correct.

And it's not even associated. It's just -- like, you have to [redacted]

So this is a really complicated and imprecise process, but we were worried about the preclusion order, so we were able to put together this, like, very -- like, not complete set of data about a very small number of offers.

THE COURT: How did you pick?

Mr. Kane says there are [redacted] or so rows in here. How did you pick those?

MS. SAMPOLI: Yeah.

So, again, because we were faced with the timing here, we also understood that [redacted] is much harder and takes more time. We didn't know if we could do it. So what we did is we had our data expert randomly identify 100 noticed URLs where the decision was removed. And the -- one of the dates in the DMCA data spreadsheets was between [redacted]

THE COURT: [redacted].

MS. SAMPOLI: Yep. And then for --

THE COURT: So when you say "where the

decision was to remove," you mean the -- what do you call the people who do the DMCA takedowns?

MS. SAMPOLI: Right. Yeah.

THE COURT: That was their decision.

MS. SAMPOLI: Correct. And then we found all of the offer IDs associated with those noticed URLs.

So I don't know the exact number of offers, but this is, like, a minuscule percentage of the DMCA notice data we produced and the offer and ad data we produced.

This is not really that usable or useful because of how few offers it represents. But, again, we produced it because we were worried about preclusion, and we wanted to produce something as opposed to nothing. But now that the DMCA defense is not at issue, we don't intend to rely on this document at all for any purpose.

And I think that, in their reply, plaintiffs suggest that the reason we don't want to rely on it is because we think this is a harmful document. That's --

THE COURT: Well, I think that's right. I think plaintiffs' theory -- one of plaintiffs' potential theories is that, whether you want to rely

on it or not, they may want to rely on it, and, therefore, they need to understand exactly what it means.

Is that fair, Mr. Kane?

MR. KANE: I would add to that.

What Google would have to say is not only are we not going to rely on the spreadsheet, but no Google witness is going to get up and say, when we remove an ad, we take it down quickly. You know, we take it down within a day, we take it down within a week, we take it down within a month.

THE COURT: Because that would be a DMCA defense, which they are no longer asserting.

MR. KANE: Well, it would have been relevant under the DMCA, but it's still relevant to intent and the need for deterrence and willfulness and all those things.

In other words, if the jury is told, you know, generally, Google takes this stuff down the same day it makes the decision, that's a lot different than if the jury is told Google waits five months to take it down and, in the intervening five months, keeps advertising a work that Google itself has decided should be -- is infringing and should come down.

So, in other words, if Google were going to say, look, we're not going to rely on this, it wouldn't be enough to say, we're not going to use this specific spreadsheet.

One reason for that is what you just identified, we might want to use it. But another reason for that is they're going to do something worse, which is have a witness say, oh, sure, they come down quickly.

THE COURT: We've been through this before. You have made a lot of arguments to me over the course of the discovery period here, that you need this or you need that or you need the other thing, because Google is likely going to do X, Y or Z at trial. And that's really not a basis on which I can make a relevance decision for discovery purposes.

Obviously, if Google were to say to me, we're absolutely going to argue X, Y, Z at trial, that would be relevant, but I can't make decisions based on what the defendant -- what the plaintiff thinks the defendant might argue.

MR. KANE: But in this case, it's both, Judge. Like, we might want to use this if it is what we think it is.

THE COURT: That's a better argument, so let's stick to that for a while.

You might want to use it. And in order to decide whether you want to use it or not, and to use it effectively, if you do want to use it, you want a better understanding of what it means.

MR. KANE: Exactly.

THE COURT: Okay. Because you might want to use it to say, for example, look, Google doesn't even know when the ads are delisted. The best it could do was try and figure out after the fact when they became invisible, and that data is not very reliable.

MR. KANE: Correct.

THE COURT: Now, whether that's admissible or not is not going to be up to me. That's going to be up to the trial judge. She -- depending on how she reads *Cox Communications*, she may feel that that does not, in fact, show the kind of intent which is necessary for your causes of action, but that will be her decision, not my decision.

All right. Ms. Sampoli, you were telling me a moment ago that visibility is not the same thing as delisted and that it's not a [redacted]

Can you tell me what the connection is between the date on the spreadsheet and the yes/no visibility? Is the date the date it became invisible, if it became invisible, or is it the date that somebody checked?

MS. SAMPOLI: I'm not positive about this. Again, it's quite complicated. I'm hesitant to say something that's incorrect.

I believe that the data reflects changes in visibility history.

THE COURT: Changes in visibility history; i.e., that's the date on which its status changed if it -- if it's now invisible, that's the date on which its status changed from visible to invisible?

MS. SAMPOLI: I can't say for certain. I would expect that to be the case, but I really am hesitant to say something inaccurate.

But I want to just go back to the fact that this is, again, about a very small subset of the offers for which plaintiffs have received tons of other data, including the dates on which those ads were viewed by users. So plaintiffs already have complete data.

THE COURT: If we can just hold on that

for a minute.

The dates on which the ads were viewed -- and does that mean that after -- does the data include, for example, that a certain ad was not viewed after a certain date from which we can infer that it was taken down?

MS. SAMPOLI: I think that's what we are -- that's our position. And if an ad is not viewed after a certain date --

THE COURT: That means it wasn't viewable. That means it wasn't there. That means --

MS. SAMPOLI: Exactly.

THE COURT: -- Google did what it was supposed to have done, from Google's perspective.

MS. SAMPOLI: Exactly.

So our position with this data is that it's essentially duplicative for a small subset of ads in this case, for the Shopping Ads in this case, the data that Google has produced in other -- like, earlier and more completely.

And I think on page 3 of plaintiffs' reply, they bring up reported deficiencies in ads data, but this spreadsheet --

THE COURT: Hold on. Let me get to

plaintiffs' reply here.

I'm sorry, on page?

MS. SAMPOLI: Three. So I think it's under --

THE COURT: Topic --

MS. SAMPOLI: -- III.

THE COURT: "Other data that Google produced cannot substitute for 30(b)(6) testimony."

Go ahead.

MS. SAMPOLI: Yeah. So I think all of the -- they give three examples for why the offer and ads data that Google has produced, they believe, is not -- it's incomplete.

But this spreadsheet -- that's, kind of, besides the point because this spreadsheet, which contains a very small number of offers, pulls from the same offer data. So it's not like this is filling -- I don't think either side is representing that this spreadsheet fills gaps in the more complete ads data that Google has already produced.

So I think, at the end of the day, this was originally produced as relevant. The whole reason that this was even at issue is because of Google's DMCA defense. I think it's significantly less relevant, if relevant at all, now. And I think

given the timing of when plaintiffs brought their motion, the proportionality factors just weighs strongly against plaintiffs.

THE COURT: So I'm going to give Mr. Kane a couple of minutes, but let me tell you, both, where I'm heading here so you can tailor your remarks.

In terms of -- viewed as a motion for Google to designate another 30(b)(6) witness to testify on another 30(b)(6) topic, I tend to agree with Google, that that request came too late in the day, and that the proportionality factors do not weigh in plaintiffs' favor.

I'm not prepared, however, to rule that this information can never be relevant at trial, even though Google has stated on the record, and the Court will hold you to that, that Google will not affirmatively make any use of this document. The plaintiff is entitled to make a run for it if the plaintiff thinks that the document -- the plaintiffs think the document will help the plaintiffs.

So what I am inclined to do, in part, just to make sure that the record is what it should be -- we don't want everyone to get to trial and be arguing about what this even means, what it says,

what it is.

I'm inclined to suggest -- well, impose a bit of a compromise solution here and direct Google to answer on the record -- I think this can probably be done in interrogatory format -- the sort of who and what questions about this document that you've given us some sense of, but not a complete sense of. And, of course, we would want admissible testimony, not attorney argument on this part.

For example, I'm thinking that what the questions might be here are:

How was the sample selected? You know, what were the parameters of the sample?

What does "visible" versus "invisible" mean?

And what is the relationship between the date and the visible versus invisible?

So three questions that I think, perhaps, plaintiffs can ask in an interrogatory format, and defendants can answer, making that response admissible.

So with that as my tentative, Mr. Kane, I'll hear from you.

MR. KANE: So -- just on the timing issue, your Honor, so we served our 30(b)(6) notice

on January 30th. Google withdrew its DMCA defense on March 30th, and told us that they were going to be providing revised responses and objections to our 30(b)(6) topics based on that withdrawal.

It wasn't until a meet and confer on -- they didn't provide that until April 21st. We met and conferred with them on May 20th and explained, you know, sort of, what we have explained today, what we were looking for them to testify on and why this was important. And they told us they would get back to us with their position.

On May 22nd and May 28th, they, again, told us, we'll revert with Google's updated position on Topic 32. Then on June 30th, they said, "We are still considering your offers on Topic 32 and may be able to provide an update when the parties confer on other topics."

That was June 30th. It was not until July 8th, when we met at conferred -- I'm sorry -- on July 9th, when we met and conferred, that they actually took a position, which is that they weren't going to provide a witness on this topic.

So Google dragged its feet all the way from January 31st to July 9th. So from July 9th to -- I think we filed this in early August.

During that same time, we took five depositions, we defended six depositions, we filed two motions, and we responded to four motions from Google. So I think we were more than diligent in raising this issue with Google. The timing of this should not be the basis for the Court's order.

A few things about the substance of what Google's counsel was saying. The first thing I would say is the fact that it took Google that long -- I mean, literally, in this hearing -- to not even really explain what this spreadsheet is just indicates how important it is to get testimony on it. There were so many hedges and caveats and unsure statements in that, we need the person who actually pulled this data and can explain what it is to do just that, to explain what it is.

For example, Google's counsel said, [redacted] Well, if that's the case, how do they know that the ad ever came down?

If it's such a complex process to tell whether the ad came down, how do they know whether it did?

They claim that they are randomly identifying 100 URLs where the decision was removed

and that their expert selected the 100 URLs. Their expert is going to have to explain how he did that. It's a function he's performed in the case. He's going to have to answer questions about it.

I would say the ads data that Google produced is not -- does not get us what we're looking for here. Ms. Sampoli talked about the cost and the conversion rate. None of that tells us anything about whether and when the ad came down.

There are about [redacted] offer -- rows of data in the offer data that Google produced. The offers are the information that the merchant wants to appear in the ad, which Google may or may not run as an ad. For [redacted] of those, so more than [redacted] percent, the entry is completely blank. There are something like [redacted] of the 1,500 domains where we don't have any ads data at all. And there are instances where we see an ad running, but we don't have a merchant account associated with that ad -- with that domain on that date.

And, I guess, more fundamentally, all we see from the ads data is whether the ad ran at a particular time. So setting aside the fact that it seems to be incomplete, we don't know why we didn't see it run.

In other words, did the merchant just take it down? Did Google's algorithm just not pick it?

Or is it what Google is suggesting we should take it to mean, which is that Google actually removed the ad in response to an infringement notice?

So the materials that we have at the moment aren't nearly enough.

And I would also just add, there's no burden to finding a witness on this. They know who pulled the data. They know how he did it. They can have that witness show up for a short deposition and explain what this is and how it was pulled.

I've done, sort of, interrogatories as a replacement for depositions before. It's just not useful. You get something that is either so hedged and lawyerized that it's basically -- basically, you can't hold anyone to anything that's in the documents, or you just get something that doesn't respond to -- excuse me -- doesn't respond to the questions that you've asked.

THE COURT: Yep. I just don't think this is the bombshell or, likely, ever to be the bombshell that you're hoping it may be. And I'm

willing to require Google to spend a little more time on it.

I am not ruling, as Google would like me to rule, that it's completely irrelevant to anything ever because it was prepared for purposes of the DMCA defense, which I accept. I mean, that is the case. This document would not exist if I had not required them to put up or shut up, if I can be colloquial about this aspect of their DMCA defense.

That gives you a foot in the door, Mr. Kane, to get some information as to what it actually is and what these columns mean, but I'm not giving you eight hours of deposition testimony on this, or even a lower number of hours of deposition testimony on it. It's just not that big a deal. I will give you three interrogatories.

MR. KANE: Understood.

We might prefer that Google just not be allowed to rely on this rather than interrogatories.

Can we have that option as either we can issue the interrogatories or we can accept that Google won't be able to rely --

THE COURT: Well, Google has already represented, both in writing and on the record, that Google will make -- the way I think I put it was --

no affirmative use of this document or the data contained therein.

Is that fair?

MS. TOMKOWIAK: Yes, your Honor.

THE COURT: If plaintiffs are content to rely on that, sure. Then don't send the interrogatories. Your choice.

MR. KANE: Okay. Thank you.

THE COURT: All right.

Let me propose that we take -- because we've been going over an hour and we have a complicated motion still to discuss -- I assume that you still have some time available because you know that these discovery conferences are not brief. Let me suggest that we take a quick break and come back to talk about privilege.

Would you like that to be a really quick break, like ten minutes, or would you like to have enough time to get a sandwich?

Mr. Kane?

MR. KANE: Ten minutes is fine with me, your Honor.

THE COURT: Google?

MS. TOMKOWIAK: Same, your Honor.

THE COURT: Ten minutes it is. We will

stand in recess.

THE DEPUTY CLERK: All rise.

(Recess)

THE COURT: All right. We're back on the record in Cengage Learning against Google. We are now ready to discuss plaintiffs' motion that came in at Docket 1093.

In a nutshell, Google performed an investigation in the fall of 2024 after this case was filed. And Google has, in a whole series of recent depositions, attempted to draw the line between the factual conclusions, the factual findings uncovered by the investigation, which it has permitted witnesses to testify about -- that's column A -- and columns B and C, which it has not permitted witnesses to testify about. Column B being privileged attorney-client communications concerning the investigation, and column C being attorney work product, particularly opinion work product; for example, legal conclusions formed as a result of the investigation.

Plaintiffs contend that Google has revealed enough to have waived both attorney-client privilege and the work-product protection. And, therefore, plaintiffs are entitled to see

everything; all of the documents that have previously been withheld with respect to this investigation and logged.

Even though I reviewed some of them on a sampling basis several months ago and upheld privilege at that point, plaintiffs say, well, it's been waived now because Google has not only permitted, but on at least one instance, on redirect, elicited enough information that it constitutes a waiver.

And Google says, no, actually, we got this right, we drew the line in the right place. We have appropriately permitted our witnesses to testify as to facts while preserving the privilege as to both attorney-client communications and attorney work product.

So starting with Google, at a high level, am I right about where you are?

MS. TOMKOWIAK: Yes, your Honor. And I'm happy to -- I mean, I think -- and an after that, we would say, and even if your Honor found that one of those instructions was, you know, wrong or a witness crossed a line in one certain instance, it certainly wouldn't suffice to show intent. We haven't shown any affirmative use of those materials. These are

depositions. The witnesses were not authorized to waive Google's privilege, and so that would not result in some broader subject matter waiver. Okay.

THE COURT: And am I right that plaintiffs' position, at bottom, is Google has said enough or let its witnesses say enough so that any privilege is now gone?

MR. KANE: I think that is an accurate summary of one position, but there's a separate issue that I think your Honor didn't mention in your opening remarks, which is, a very recent Google witness testified that [redacted]. That, I think, does not implicate the "is this a conclusion or a fact question?" That implicates the substantial-need issue, which is to say --

THE COURT: Well, substantial need only applies to the work-product doctrine. It does not apply to the attorney-client privilege.

MR. KANE: That's correct.

So Mr. R testified that [redacted] and that Google had conducted

what Google says is a work-product investigation into [redacted].

So plaintiffs have a substantial need for those documents for two reasons: One, I mean, it's a huge --

THE COURT: -- to the vendors.

MR. KANE: I'm sorry?

THE COURT: One is you can't talk to the vendors.

MR. KANE: That is one. And the other is this is a huge issue. I mean, if Google actually [redacted] that's obviously very compelling evidence of intent.

So that there is the "is it a factor or a conclusion" issue, I think that's mostly with respect to Ms. B's testimony. Then there's the substantial-need issue.

THE COURT: Okay. So I've tried to review everything that has been submitted to me on this point, including the supplemental letters from both sides, which I am accepting as supplemental briefing, if you will, on this point. I don't think we need to do it again.

And let me say a couple of things to just

set the table, and then I'll hear further from you.

I think that Google's line drawing is appropriate, theoretically. I mean, the way I articulated it, which is, I think, what Google was trying to do, is the correct place to draw the line. Facts are not privileged, even if the facts are uncovered through an investigation, the nuts and bolts of which are privileged.

So if this investigation uncovered, for example, as it apparently did, that [redacted] -- I can't remember -- either some or all -- this part is a little unclear -- [redacted]

So I certainly don't think that Google has waived either the privilege or the doctrine by allowing, or even in some instances on redirect, eliciting testimony about the factual findings.

However, I'm troubled by the fact that Google -- that plaintiffs have not, in fact, been able thus far, as far as I can tell, to get a

complete account of all of those factual findings.

By way of example, when Ms. K was deposed -- is she Ms. K? Or is her name in the record?

MS. TOMKOWIAK: We would appreciate if she could be Ms. K today.

THE COURT: I think she submitted a declaration.

MS. TOMKOWIAK: She has submitted a declaration. You're right. You're right.

THE COURT: So when Ms. Kelly was deposed, she was permitted to testify that she learned, as a result of the investigation, that [redacted] -- I'm on page 64 of her rough transcript.

MS. TOMKOWIAK: Your Honor, may I have a moment to get there?

THE COURT: Sure.

MS. TOMKOWIAK: Page 64?

THE COURT: Yes.

MS. TOMKOWIAK: Thank you, your Honor.

THE COURT: And boy, this is -- some of these rough transcripts are pretty rough.

MS. TOMKOWIAK: Yeah.

THE COURT: But I think I can find my way

through them.

Anyway, on page 64, Ms. Kelly is asked, "Did your investigation reveal [redacted]

She was permitted to answer. The answer was, "Yes."

Next question, "Did your investigation reveal that [redacted]

She was permitted to answer. She answered, "Yes."

But now, at the top of page 65, she's asked for the details. She's asked, "Well, [redacted]

All right, not the cleanest question in the world, but we see where it's going.

And here Ms. Kelly is instructed not to answer on the basis of the attorney-client privilege and the work-product doctrine.

So -- and then I look to see, well, maybe some other witness has answered this question because this is -- seems to me like it's a fact question. But then I look at Mr. R's -- he's just an initial, right?

MS. TOMKOWIAK: Yes.

THE COURT: -- Mr. W.R.'s deposition.

And he's asked, on pages 361 and 362 of his rough transcript, basically, the same questions.

First, "Were there [redacted]

And then he's asked, on page 362, "And were the [redacted]

Answer: "No."

So Ms. Kelly is not permitted to say [redacted] and Mr. R doesn't know [redacted]. That's a fact. That's not a legal conclusion. Am I missing something?

Is there some other witness or some other document that has not been withheld on privilege grounds that will tell the plaintiffs [redacted]

will, consequently, answer one of the plaintiffs' questions, which is, was this [redacted]

Or to the extent any of [redacted]

And did the [redacted]-strike policy totally miss them all?

MS. TOMKOWIAK: As to that last point, whether this [redacted] I think Ms. B testified to that. I think Mr. R testified to that. Although, it was -- again, the question was a little bit confusing, but he did his best to say -- you know, I think the question was phrased as, is it A or B? And A was [redacted] and B was [redacted]. And he tried to say it was closer to A. So his testimony and Ms. Buer's testimony, I think, answer that question. I don't --

THE COURT: I don't think their testimony cleanly answers that question.

MS. TOMKOWIAK: Okay.

THE COURT: They either didn't know enough, or, in the case of Ms. Kelly, was not permitted to say.

MS. TOMKOWIAK: Well, with respect to

Ms. Kelly -- and, your Honor, I appreciate that you know this, but just -- I defended all these -- well, you don't know that part. I defended all these depositions.

What you do know is that in a deposition you make a split-second judgment.

THE COURT: Absolutely.

MS. TOMKOWIAK: And I understood this question to be --

THE COURT: Absolutely. By the way, I do get that. I mean, I've been there.

MS. TOMKOWIAK: Yeah.

THE COURT: I've done that.

And you'll notice that I am not crediting the plaintiffs' view, that you called privilege on all kinds of things that you may have called privilege on at one point, but then permitted the witness to answer five minutes later.

But this one -- and this may not be the only example, but it's one that stuck out to me -- the question of not just whether it happened, but how often and how many times it happened, that strikes me as a potentially important fact. And I don't think Google has permitted the plaintiffs to learn that fact -- those facts.

MS. TOMKOWIAK: So I do want to get to that, but -- and I'll get off this in a second. It's just that I read this question a little bit differently. And I assume, in the moment, I heard it differently as well, where he's asking more about the methodology for the investigation, like --

THE COURT: Perhaps.

MS. TOMKOWIAK: -- and that is something that I tried to draw a line, where he was asking, like --

THE COURT: Sure.

MS. TOMKOWIAK: -- how did you go about conducting this? What were the [redacted]

THE COURT: Sure. I get that.

MS. TOMKOWIAK: Yes.

THE COURT: If the question was, gee, what did the lawyers tell you to look at, that would be a question that I would expect you to object to.

But if the question was -- and I honestly think this is the way it was meant, even though it wasn't as crystal clear as possible.

If the question was, okay, what are the numbers here, he's entitled to know what the numbers are, don't you think?

MS. TOMKOWIAK: I mean, I think that

"what are the numbers" would be a fact, like, in terms of [redacted] -- again, if this was a fact learned, [redacted], I would agree, that's a fact.

I would say that -- and I think this goes part to this concept that, like, we've hid this data for months and months and months here. I mean, we have produced multiple iterations of a [redacted] and from what you can see [redacted] Sure.

THE COURT: Sure. And Mr. Kane's been telling me for months and months and months that --

MS. TOMKOWIAK: Yes.

THE COURT: -- they were [redacted]

MS. TOMKOWIAK: Yes.

THE COURT: I agree with you there.

And I also agree with you that you, several months ago -- what was it, April, something like that -- when we went around on privilege objections, you properly logged all this -- as far as I know at present, you logged all of the documents that Mr. Kane now wants to look at on your

privilege log. And I looked at a couple of them. And certainly, under the circumstances that existed at that time, there was no claim of waiver at that time.

I was satisfied that this was a post-litigation, attorney-driven investigation that you were entitled to claim privilege and work product on. But now that we've had all of these witnesses being asked in various ways and from various directions about the underlying facts, I'm just not sure that the plaintiffs have gotten all of the facts that they're entitled to.

MS. TOMKOWIAK: Yeah. And, again, on that score, I appreciate your Honor's comments. That -- like, that is exactly the line we tried to walk. We tried to allow them to testify to facts. We appreciate that we couldn't hide facts -- i.e., [redacted] -- just because that might have been learned after the lawsuit was filed as part of our outside counsels' looking into the allegations in the complaint.

THE COURT: Yeah. It's not a -- it's -- right.

MS. TOMKOWIAK: Yeah. So --

THE COURT: The fact that you didn't learn it until you conducted a counsel-driven investigation doesn't mean that the facts are not discoverable.

MS. TOMKOWIAK: Yes. Understood. That's exactly what the case law says. And, conversely, it says that doesn't mean, though, that they get, you know, our privileged communications with our clients and our work product and Latham & Watkins' notes and mental impressions just because we allowed the witnesses to testify with respect to --

THE COURT: Right.

If you wrote a note to file saying -- I mean, there are a couple of hypothetical possibilities here.

You might have written a note to file saying, oh, no, this is terrible, this is going to be a big problem for us in all of these ways.

No. They don't get to read that.

Conversely, if you wrote a note saying, this is not so bad, we can work with this because of A, B and C, they don't get to read that either. I get that.

MS. TOMKOWIAK: Okay. So if -- and I'm only speaking this way because I don't -- one, I

don't want to testify; and two, I don't have in front of me all of the facts.

But if what you're saying is, if they don't -- if there was some fact learned in the investigation as to [redacted] -- and, again, we have produced suspension data so they can see exactly when accounts were suspended and for what reason, but -- I mean, we produced that months ago.

But setting that aside, I think you're saying that if that fact was learned and that fact is not yet known, that would be something that you would think they are entitled to and a witness could provide without waiving privilege.

Am I understanding that correctly?

THE COURT: Right.

Perhaps a better way of putting it is that the plaintiffs are entitled to a full accounting of all of the facts learned as a result of this investigation, not just the high-level factual conclusion; i.e., that, [redacted] I think they're entitled to the detail there.

That's Point Number 1.

Point Number 2 is the question -- and I agree with Mr. Kane, that this is potentially admissible. Again, there will probably be a fight over it prior to trial if the case comes to trial, but let's go with potentially admissible at this point -- [redacted] -- what do you call them? FTEs?

MS. TOMKOWIAK: Full-time employees. Yeah.

THE COURT: -- by Google employees -- [redacted], that's a fact; that is, [redacted] is a fact. It may be a lot of facts, but that's a factual question. And based on the deposition excerpts that have been provided to me so far, none of the witnesses, the Google witnesses, have been able to -- have been able to answer that question, and I don't know whether it's because they just weren't as familiar with the factual findings of this investigation or whether the factual findings of this investigation somehow concluded [redacted]

[redacted] That seems unlikely to me.

But since we now know as a fact that the [redacted], it seems to me that the plaintiffs are entitled to a little bit of fact discovery about that. And I'm not sure what the correct solution -- I don't think it's turning over the privileged materials, but it may include, for example, additional testimony from Google as to what [redacted].

I don't know that that has been a 30(b)(6) topic yet. Since there were so many 30(b)(6) topics, I can't keep them all in my head and remember all of them. But I'm troubled by the fact that that's a factual gap that plaintiffs have not been able to obtain fact discovery on to date.

MS. TOMKOWIAK: Well, I think --

THE COURT: So those are my two concerns: A, did the Google witnesses who knew the conclusions of the investigation, were they in a position to fully disclose to plaintiffs at deposition all of the facts -- not the legal conclusions, but all of the facts uncovered by the investigation?

And B, specifically, on this question of [redacted]

[redacted]

I think that's discoverable, and it's facty. And if you can't or won't produce a vendor -- and I didn't make you do that, I remember that -- because they're overseas and they don't work for you and all of that sort of thing.

But this was a two-way conversation. I mean, presumably, [redacted]. You'll excuse the expression. [redacted]. So there should be testimony from the Google side on that, it seems to me.

MS. TOMKOWIAK: So with respect to the witnesses that I've testified -- I mean the ones who have testified in their personal capacity can only speak to what they personally know or recall or believe.

THE COURT: Sure.

MS. TOMKOWIAK: So, like, there's no further educating of them that we -- like, we can't educate them. We can't tell them what to say.

THE COURT: No. I understand that this was not 30(b)(6) testimony.

MS. TOMKOWIAK: Yeah.

THE COURT: I get that.

MS. TOMKOWIAK: So they just remembered what they remember.

And again, Mr. R, what he said was he thought -- he thought [redacted]

THE COURT: Right.

MS. TOMKOWIAK: Right.

And we have -- I can walk your Honor through all the things we have done to look for [redacted]. We've produced a lot of documents that provide [redacted] None of those include [redacted]

We have tons of custodians. We have search terms. You know, we've looked for all of the contemporaneous documents here that would have provided [redacted]

THE COURT: Okay. But, look, looking at

Mr. R's testimony, page 366, now, of his rough.

MS. TOMKOWIAK: Okay. I have the final.

THE COURT: Ah, you're ahead of me then.

MS. TOMKOWIAK: Yeah.

THE COURT: Do you have an extra copy?

MR. KANE: I have one here, if ...

THE COURT: Do the page numbers stay the same? I hope they do.

MR. KANE: In the rough, yeah.

THE COURT: If someone could hand me the final, we'll have a better record. Thank you.

MR. KANE: Oh, I'm sorry. You wanted the final. That's the rough. I'm sorry.

I handed you the rough --

THE COURT: I already have the rough.

MR. KANE: -- so that -- so you could follow along with the Judge.

MS. TOMKOWIAK: Ah. I --

MR. KANE: I can pull the final up on the screen --

THE COURT: We will make do.

MR. KANE: -- if that would be helpful.

Okay.

MS. TOMKOWIAK: I --

THE COURT: We'll make do, counsel.

MS. TOMKOWIAK: Okay.

THE COURT: We'll go with the rough.

MS. TOMKOWIAK: Sure.

THE COURT: A few of the words are garbled, but --

MS. TOMKOWIAK: Yep.

THE COURT: -- I think we can get the gist of it.

So page 366, Mr. Kane asks Mr. R:

"Q: Did you learn that [redacted]

"A: Yes.

"Q: And what [redacted]?"

Answer -- I'm translating as we go.

"A: It's my understanding that [redacted]

"Q: And when you say [redacted] can you explain what you mean by that?

"A: I understand the [redacted]

"Q: And during what [redacted]

"A: At least [redacted]."

I think I'm understanding his answer there.

And then Mr. King goes over it again, gets the witness to recommit to this a couple of times.

MS. TOMKOWIAK: Yep.

THE COURT: And then on page 368, Mr. Kane says:

"Q: Do you know [redacted]

"A: I do not know.

"Q: Did you say [redacted]?

"A: I did say that.

"Q: Would that [redacted]

"A: When I'm referring to [redacted]

I'm not going to read the whole rest of

the transcript into it.

MS. TOMKOWIAK: But the --

THE COURT: But the gist of it here is he doesn't know.

MS. TOMKOWIAK: Yeah. And I think -- but I think later -- the question that that's -- you didn't quite get to, that I think is important, is where the answer is -- or the question is, [redacted]

What is the --

THE COURT: What page are you on?

MS. TOMKOWIAK: Hang on. Okay. It's 375 of the rough.

THE COURT: 375.

Okay. Go ahead. Ah.

"Q: What [redacted]?

"A: [redacted]

"Q: What [redacted]

"A: [redacted]

MS. TOMKOWIAK: Correct.

THE COURT: Okay.

MS. TOMKOWIAK: So his personal opinion

was, [redacted]

THE COURT: That's an over-characterization of what the testimony really was, but --

MS. TOMKOWIAK: Well, that's just what he says, [redacted] Those are just his words.

THE COURT: But look --

MS. TOMKOWIAK: And I just -- just to -- and go back a second, though.

What Ms. B said on behalf of Google is that, [redacted].

THE COURT: Right.

MS. TOMKOWIAK: But Google [redacted]

THE COURT: Right. So what we're left with is, [redacted] And we don't know [redacted]

But if you performed an investigation, Ms. Tomkowiak, under your able direction, surely, that was not the only fact. Surely, there are facts

that roll up to that, that are actual facts.

Like, [redacted]

MS. TOMKOWIAK: Well, those facts have already come out. Like, again, we've produced the [redacted]. We've produced [redacted] We've produced the policy. We've produced [redacted]

They've deposed many people who were involved in [redacted] and had the opportunity to ask them questions. So, you know, those facts have been provided as they are known to the people who were involved in those conversations.

THE COURT: So you're saying that if I sat down and read your full investigatory report -- which I have not -- it would not be able to fill this in at all, factually, this mystery as to [redacted]

MS. TOMKOWIAK: I don't know that that's

true, but -- like, that there wouldn't be additional information in terms of impressions or interview notes.

But when it comes to facts, like -- I guess I read part of their -- I know you haven't read their filing last night, but, like, there's not a --

THE COURT: I have not read their what?

MS. TOMKOWIAK: I don't think you've read their filing from last night. And I might be confusing --

THE COURT: No, I've not read anything that was filed last night.

MS. TOMKOWIAK: I might -- this might be in there and not in here. But, like, there's not -- you know, there's not some folder of, like, documents collected from the relevant time period that, like, haven't been produced, if that makes sense.

Like, those -- like, if it was a document from 2021 or 2022, that would just be, like, something in the ordinary course that would have already been turned over.

THE COURT: Well, let's go back to interview notes for a moment.

Interview notes are pretty classically protected by work-product doctrine if they are taken in the course of this kind of an investigation, but the facts revealed by the witnesses are not.

Would you agree?

MS. TOMKOWIAK: Yes. I think that's the line, again, that we tried to --

THE COURT: Right.

So if, hypothetically, you or someone under your direction called up a bunch of [redacted] would their answers be privileged, in your view?

MS. TOMKOWIAK: I'd have to give that some thought if it was just a [redacted] As opposed to, "What are the -- like, what's the -- what are you basing that on? Can you show us the facts?"

THE COURT: Sure.

I mean, look, I don't know how the -- obviously, I don't know what interviews were conducted, much less how the Q and A went, but it could have gone a number of ways:

What made you think that?

Did somebody tell you that?

[redacted]

There could be a whole bunch of facts in there that are relevant to this question of, sort of, how did this happen?

And since you have very clearly and, I think, appropriately drawn the line between facts revealed as the result of the investigation and attorney-client communications about or in the course of the investigation, I'm just not sure that you have fairly given plaintiffs the opportunity to learn all of the facts revealed by the investigation, including a potentially important fact, which is, gee, [redacted]

And I suppose it's theoretically possible that the answer is, nobody knows. But I'm not convinced that you've given the plaintiffs the opportunity to explore that factually.

MS. TOMKOWIAK: Yeah, I -- I'm not sure I agree with that.

But just to set that aside for a second, if that's your Honor's ruling, then, you know --

THE COURT: I haven't ruled anything yet.

MS. TOMKOWIAK: I know.

If that's where you're leaning, I think that I will say that the context in which these questions have come up -- and it has made it very challenging. I don't control questions that are asked.

THE COURT: No. I understand that. And some of these --

MS. TOMKOWIAK: During Mr. R's deposition I tried to say, can we please -- you know, can you please ask it in terms of what the facts are?

And so, you know, if some of the facts haven't come out -- you know, again, we are not the ones trying to put anything in this review to use here. We're not trying to affirmatively use it.

You know, I did ask a single question in all four of these depositions to try to complete something I felt was incomplete. But, you know, again, we asked Mr. Kane to please ask questions, you know, to get at the facts. And so, you know, I think that to the extent all the facts have -- that your Honor believes that that process has not resulted in their solicitation of all of the facts, that we would need to figure out a -- you know, a way in which we could do that because having these depositions where you have laypeople who don't

entirely understand -- I tried to make my privilege instructions understandable. And, you know, it's not always clear. I don't know exactly what they're going to say, so I don't know if they're going to reveal something that's privileged in the moment.

It's a challenging context in which to try to get this information out when it is so muddled with privilege and work product.

THE COURT: I agree. And I'm sympathetic to the moment-to-moment challenges of line drawing in a complex privilege situation.

But let me ask: Ms. Kelly, was she testifying as a 30(b)(6) witness?

MS. TOMKOWIAK: No, your Honor.

THE COURT: She was testifying in her individual capacity, but she was personally involved in this investigation, correct?

MS. TOMKOWIAK: Correct.

THE COURT: It sounds like she may have been one of the main investigators.

MS. TOMKOWIAK: Yes. In 2024.

THE COURT: 2024. Not that long ago.

MS. TOMKOWIAK: No. But, I mean ...

THE COURT: And look, it's possible that she knew more but hadn't refreshed herself on it.

That's a possibility since she wasn't testifying as a 30(b)(6) witness and wasn't required to be educated.

These other folks -- Mr. R, for example, what was -- what capacity was he testifying in?

MS. TOMKOWIAK: He was testifying in both capacities, but none of the topics on which he was designated.

THE COURT: What were his 30(b)(6) topics?

MS. TOMKOWIAK: There were six of them.

THE COURT: And none of them involved the [redacted]-strike policy?

MS. TOMKOWIAK: No.

THE COURT: Okay.

All right. I've been pricing --

MS. TOMKOWIAK: I'm sorry. There were ten of them, but still "no."

THE COURT: Okay. So one more question, and then I'll hear from plaintiffs.

Which of your 30(b)(6) witnesses -- it may have been more than one.

Which of your 30(b)(6) witnesses were designated to testify about the [redacted]-strike policy and whether it was implemented as written or not?

MS. TOMKOWIAK: That was Ms. B. And she did -- that was the one --

THE COURT: Ms. B like boy?

MS. TOMKOWIAK: Yes.

THE COURT: Okay.

MS. TOMKOWIAK: And she was the one who, when asked a direct question about whether Google had conducted an assessment, said, yes. Said months ago that [redacted]

She was asked a couple of follow-up questions about what [redacted]

THE COURT: Right.

MS. TOMKOWIAK: She said that, but then said that it just -- conclusively, they weren't able to determine exactly what happened.

THE COURT: Right. And she was the first witness -- because this was back in June, right?

MS. TOMKOWIAK: Correct.

THE COURT: She was the first witness to testify about what Google believes to be

non-privileged information concerning the investigation: When it happened, what it was prompted by.

And you permitted her to testify about its "conclusions." And on redirect, you asked that question yourself, on --

MS. TOMKOWIAK: I asked one question, yeah.

And I think the -- Mr. Kane seems to draw a distinction between conclusions and facts. And the case law sometimes uses the word "results" or "conclusions." And, again, if you look at the substance, I think it --

THE COURT: No. I'm with you on that.

MS. TOMKOWIAK: Okay.

THE COURT: That is, I credit you with attempting to draw a distinction between factual conclusions as to which you permitted testimony, and legal conclusions as to which you claimed privilege. But, again, my concern is that all of the facts may not actually be out.

I do appreciate -- thank you for reminding me -- that Ms. B was specifically asked about, you know, sort of, how did this happen.

Although, she wasn't asked a lot of

detailed questions about how did this happen, perhaps, because this was the first deposition at which the conclusions of this investigation came out.

But she was asked specifically -- this is page 294:

"Q: Was the issue that [redacted]

Okay.

"A: [redacted]

So there's -- and then up at the top of that page -- actually, the prior question, starting at the bottom of page 293, she was specifically asked:

"Q: Why was this happening?

"A: There [redacted]

This is, sort of, the mystery gap in my mind. There must be more facts there.

MS. TOMKOWIAK: Okay. Look, without -- I guess I don't -- I mean, I'm -- I don't know.

I don't know that there must be more is -- I guess I've performed many investigations where sometimes things are inconclusive.

THE COURT: Well, but they may be inconclusive because here's one fact that would suggest one thing and here's another fact that would suggest another thing, but those two facts are still facts.

MS. TOMKOWIAK: Is an -- I mean, is an impression a fact?

I don't -- I mean, if someone -- if my -- if I say to my son, did you brush your teeth, and he says, no, I was under the impression I didn't have to --

THE COURT: Then you would send him to bed because how could he possibly be under that impression --

MS. TOMKOWIAK: Who would have given him such guidance? Not me. Not my husband. But somehow he was.

I don't know if that's a fact. And I'm not trying to be cute. I'm just saying I think this is a difficult -- a complex situation where that's what we're dealing with. Much more complex than toothbrushing.

THE COURT: It is.

Let me hear from plaintiffs.

MR. KANE: I guess the first thing I would say is the records from the investigation that explain [redacted] those are all things that we need because it's clearly relevant, and we have no other way of getting them.

So, for example, in interview notes, if a fact witness, you know, a subject of an interview, said, you know, yeah, [redacted] and they said --

THE COURT: They [redacted]

MR. KANE: Right.

I mean, we have no other way of getting that. And that clearly is a fact -- it's just something the witness said -- and we should get that.

If there's a second paragraph after that where Latham & Watkins says, you know, our assessment of this is, you know, you have some liability here, or our recommendation is, you know,

you should do the following, that is not -- you know, that's not a fact and, you know, could be redacted.

THE COURT: So to be clear, you're making, now, a very specific argument directed to interview notes, to the extent they exist, of the overseas vendors. You think you're entitled to the factual portions of those interview notes because if they are protected, they are protected by the work-product doctrine -- which is not necessarily absolute as to non-opinion portions -- and you have a great need because you have not been able to depose any of these folks yourself.

MR. KANE: That's correct.

And I would say it would be the overseas vendors as well as anyone else who was the subject of an interview that testified about this. You know, if they talked to April Kelly, and April Kelly said, you know, yeah, there was a [redacted] -- I mean, we should get that just --

THE COURT: No. Because you talked to April Kelly, you don't have a great need. You talked to April Kelly for seven hours, I think, right?

MR. KANE: Before having received the information from Mr. R. saying [redacted]

I mean, we asked Ms. Kelly about the [redacted] and she was instructed not to answer. I mean, that was the only sort of clue we had as to this. And we asked her about that directly, and she was instructed not to answer the question. So I don't think we had an opportunity to ask.

THE COURT: Well, that may have been the wrong call on that particular instruction, but that doesn't mean you get her interview notes, if there are any, which there may not be, I don't know one way or the other.

MR. KANE: I mean --

THE COURT: You don't get interview notes from someone who's available for you and who you've had seven hours with and who, if she was improperly instructed as to one question, we can fix that.

MR. KANE: We should fix that. But if what you're saying is we wouldn't get the interview notes of people we deposed, I think the problem with

that is, for a couple of those depositions -- for all those depositions, we didn't know about this issue.

In other words, when we deposed A.B. and B.B., who were involved in this process during the relevant period, we hadn't learned that -- we didn't have the benefit of Mr. R's testimony that [redacted]

THE COURT: Well, I guess I would say two things to that because I'm not very receptive to that argument.

One is that, generally, life is not perfect. You don't get every piece of information in a complicated case in exactly the sequence that you want it. And more specifically, you did have Ms. B, and Ms. B definitely opened a window into all of these topics for you.

So the fact that you hadn't heard another witness specifically use the words [redacted] doesn't, in my view, give you license to go back and rip the veil off of what would otherwise be privileged work-product matters.

MR. KANE: I would say that what Ms. B said was that the conclusion of the investigation

was that [redacted]. That's a lot different from what Mr. R said, which is [redacted] And --

THE COURT: Well, we discussed that. At least, I discussed that. And I thought I made it clear that you are entitled to facts as to whether it's [redacted]

I think you are entitled to that. Those are facts.

MR. KANE: Yeah, I agree.

As for the guidance that the vendor received --

THE COURT: And by the way, just before we leave this topic -- I'm looking again at the earlier deposition, Ms. B, back in June, and she does say, [redacted]

So you had a window into that. And the fact that a later witness gave you a little more about that doesn't open the door retroactively, in my view.

MR. KANE: I would say Ms. B did not participate in the investigation. She was a 30(b)(6) witness about the implementation of the

DMCA program. And, in fact, she was not involved with the DMCA program during the relevant period of this case. She became involved with it, I think, in March of 2025. So she wasn't even -- she had no personal knowledge of this. Her knowledge of the investigation came from Ms. Kelly.

I would also say the fact that Google was asserting a DMCA defense for so long in this case -- one of the requirements of which is that you adopt and reasonably implement a program for the termination of repeat infringers --

THE COURT: Right.

MR. KANE: -- led us to believe -- would have made it hard for us to make the leap that they [redacted] which is what Mr. R testified to.

THE COURT: I'm not actually sure that that's what he testified to, but I understand why you draw that from his testimony.

MR. KANE: Well -- so what he said is [redacted] And we asked him, [redacted]

[redacted] And he said, no.

THE COURT: He said he didn't know, I think. Isn't that right?

MR. KANE: No. I think he said [redacted]

THE COURT: Well, let's look. This is Mr. R?

MR. KANE: Correct.

THE COURT: What page of Mr. R is that, Ms. Tomkowiak?

Obviously, you attended these depositions. I've only read the rough transcript, so you're ahead of me.

MS. TOMKOWIAK: Lucky you.

MR. KANE: So it's page 369 of the rough.

THE COURT: Thank you.

MR. KANE: He, sort of, gets to it at the bottom of 370.

THE COURT: In the middle of 370, he says, "I think both are true."

[redacted]

So his first answer is, I think both of

those things are true. And then he reaffirms --

MR. KANE: He clarifies that he means [redacted]

THE COURT: Yeah.

MR. KANE: What he is saying is --

THE COURT: [redacted] That's the word you used.

MR. KANE: And then we -- and then I asked him -- it's at line 11 of 372.

THE COURT: Boy, it takes a long time to get to the answer here.

MS. TOMKOWIAK: Yeah. I mean -- and it's complicated because --

THE COURT: And the ultimate answer on page 373 appears to be, [redacted]

MS. TOMKOWIAK: [redacted]

Earlier, your Honor, he said something slightly different when he was asked -- I'm on page 360 of the transcript, in the middle of the page.

Let me know if you're there.

THE COURT: I'm there.

MS. TOMKOWIAK: Mr. Kane was trying to ask him about -- [redacted]

I said, [redacted]

And then he said, "Let's say thing A is, [redacted]"

THE COURT: And then the question is, "Was it Thing A or Thing B?"

MS. TOMKOWIAK: Yeah.

And then I said, "If you know and can understand that question, go ahead and answer it."

And then he said, "I think it would be closer to A, [redacted]

THE COURT: Yeah. So --

MS. TOMKOWIAK: Yeah.

THE COURT: -- it's a mess --

MR. KANE: Which is why we need --

THE COURT: By which I mean it's a messy transcript, but that happens in real life.

MR. KANE: Which is why we need the records of the investigation because that -- that

will have the evidence of the [redacted].

I mean, you asked Ms. Tomkowiak whether the investigation would conclude -- would include evidence of that, and the lengthiness of her pause and answer, I think, indicates it will include that.

MS. TOMKOWIAK: That's not -- that's just a --

THE COURT: I'm not going to infer anything from the lengthiness of an attorney's pause in court.

MS. TOMKOWIAK: Okay.

MR. KANE: I think her answer was, it might include something to that effect.

THE COURT: Right.

MR. KANE: So I think records from the investigation bearing on the question of, how was Google's [redacted]-strike -- Google's DMCA policy implemented during the relevant period?

Those were all factual issues, you know, were they suspending people? Were they removing ads?

I think those should all be turned over, what can be --

THE COURT: Let me make sure I understand what you're saying. I think what you are suggesting to me now -- you started with the interview notes, if there are any, of the overseas vendors. But I think what you are now suggesting to me is that you are entitled to all of the factual portions of the investigatory records, which would include, for example, the factual portions of everybody's interview notes, but not the portions that contain attorney thoughts, impressions, et cetera.

Is that what you're now proposing to me?

MR. KANE: I think that's right. And the reason I say that is there's, sort of, three factual areas where witnesses have indicated that there is information in the investigation.

One is what we've been discussing, [redacted] Another is Ms. B's testimony that [redacted]

THE COURT: Well, everybody testified to that.

MS. TOMKOWIAK: Yeah.

MR. KANE: I'm distinguishing, like, the [redacted] from the -- yeah, others testified to that

as well. So the notion that [redacted]

And third was Ms. Kelly's testimony that --

THE COURT: Wait. Let's just stick with Number 3.

You have had testimony from multiple witnesses now to the effect that one of the factual conclusions of the investigation was that [redacted]

MR. KANE: We don't have the details of that. So, like, we ask people, well, [redacted]?

THE COURT: Okay. So that's the [redacted] question. All right.

MR. KANE: Yeah. How many?

And, you know, was it because [redacted]

You know, what was the reason that these --

THE COURT: Goes back to question number one, [redacted] or writ large, why this happened.

MR. KANE: Right. Well, exactly. What's

the reason for [redacted]?

THE COURT: Okay. So you say you don't have enough information. And I think so far we've been talking about the same two topics that I tend to think you also don't have enough information on yet.

MR. KANE: Right.

THE COURT: A: What are the [redacted]? [redacted] [redacted] That sort of thing.

And B, to the extent the investigation sheds light on this, [redacted] [redacted] [redacted] All, kind of, the same question asked from a different perspective.

All right. So that's two. What's your third?

MR. KANE: So Ms. Kelly testified that part of what she did in her investigation was [redacted] We don't have any, you know, sort of factual documentation or whatever

about that.

THE COURT: I'm sorry. I'm not following you here.

MR. KANE: Yeah. So --

THE COURT: Is this different from ads were -- sorry -- domains [redacted]

MR. KANE: It is. There's, sort of, two parts to what Google tries or is supposed to do under its copyright policy. One is, when they get a notice saying, this particular advertisement is promoting an infringing product, please take down that specific ad or that -- you know, make sure that that landing page is not advertised in any future ads, they're supposed to take that down. That's the take-down part.

Then if they get [redacted] of those for one particular pirate, that's the suspension part. So once they get [redacted] where Google says, you know, yeah, we agree that ad is promoting infringing content, we're going to take it down, that's when they suspend people, so ...

THE COURT: All right. So you're now suggesting that this investigation also came up with

factual conclusions about [redacted]

MR. KANE: That's what Ms. Kelly testified to. Yeah.

THE COURT: And where did she --

MS. TOMKOWIAK: But, your Honor, what page are we -- yeah.

THE COURT: Hold on.

MS. TOMKOWIAK: Okay.

THE COURT: Where did she testify to that, exactly? Show me.

MR. KANE: In our letter.

So it's on page 3 of our letter, our Docket 1169 letter.

THE COURT: I think you need to show where it is in the transcript, please.

MR. KANE: Sure. It's pages 71 -- or page 71.

THE COURT: Of Ms. Kelly's transcript?

MR. KANE: Correct.

THE COURT: All right. Let me see what she had to say here.

MR. KANE: So page 71, line 13, she said, "I did a review to ensure or see" --

THE COURT: Hold on. Just give me a minute.

MR. KANE: Go ahead. Sorry.

THE COURT: Let me read the whole thing. Thank you.

All right. I've read all the way through to 73 and -- actually, hold on. I see it continues on to 75. Give me another moment.

Okay. So over the course of five or six pages of testimony here, and after being asked the question in a number of different ways, I see Ms. Kelly testifying that she [redacted], presumably. That is not about applying the [redacted]-strike process, but about what happened prior to that -- and [redacted]. And she says that a number of times; i.e., that [redacted]

MR. KANE: Yeah.

THE COURT: I see her saying that a number of times. Yes.

MR. KANE: Yep.

And then we asked the question at the bottom of 73 and the top of 74, "Did you check to

see whether [redacted]?"

In other words, if the agent [redacted] did you check to see whether he --

THE COURT: Now, in this world, who is the "agent"?

MR. KANE: The person processing the infringement notice.

THE COURT: Okay.

MR. KANE: And there's an objection to privilege, so she never answered that part of the question.

In other words, she said, like, when the [redacted]. So we need the facts from the investigation that support or contradict that.

THE COURT: But she answered that one. She answered that one at the bottom of page 74.

MR. KANE: Right.

So we need the facts that -- like, how many -- you know, did you do this for [redacted]

You know, how did you [redacted]

THE COURT: Where do we draw the line now

between the factual conclusions of an investigation -- which everybody in this room thinks at, sort of, a theoretical level you're entitled to -- and the mechanics of the investigation, how did you pull the sample, what does your Excel spreadsheet look like, et cetera.

Where do we draw that line? Because my concern, Mr. Kane, is that you don't really want to draw that line at all. You want to subsume within the category of non-privileged facts every little thing that an investigator did to determine those facts.

MR. KANE: Well, so, for example, if Ms. Kelly did this for [redacted] like, we need to know that it was [redacted] and we need to know what they are. I mean, there will need to be --

THE COURT: I don't know that you're entitled to that. That really seems to me to belong to the privilege part of an investigation, not the factual conclusions of an investigation.

MR. KANE: So I would say two things. One is, if she did this for [redacted], that is either a fact -- like [redacted]; in which case, we should get that fact because we don't

know what -- you know, how else are we going to get it?

Or it's a conclusion where she said, you know, I've looked into this and, based on an investigation, I've concluded that [redacted] in which case, privilege has been waived because she's just testified to that.

So, in either instance, if Ms. Kelly is saying -- like, she shouldn't be allowed to get up and testify, you know, yeah, I did a review, and [redacted]

THE COURT: Well, again, we have a representation from Google, and I'm sure they would be willing to put it on the record here, that they're not going to make an affirmative use of this investigation or its conclusions. So that's not your doorway, I think, Mr. Kane.

MR. KANE: So, like, this one is much clearer -- to me, much more clearly a fact than the [redacted] question. Like, whether they [redacted]

I mean, it's certainly a fact, if she

looked into, you know, [redacted]. That, to me, is a fact.

THE COURT: No. If she sat down at the direction of counsel in the fall of 2024 and pulled up a [redacted] or whatever and, at the direction of counsel, checked this spreadsheet and then that spreadsheet and then some other spreadsheet and called somebody to determine what had happened with respect to this sample set, no.

That, I think, is not a factual conclusion of an investigation, which you are entitled to. That's the mechanics and the nitty-gritty of how the investigation was performed, which, I think, falls on the other side of the line.

MR. KANE: I think you need --

THE COURT: Because if you're entitled to that, then it seems to me you're probably entitled to read the whole report, if there was one, which I'm not intending to go there.

MR. KANE: Well, I think one needs some amount of context in order for the facts to make any sense.

In other words, the -- if they just hand us a list of [redacted] and say, these are the ones

for which we concluded [redacted], I mean, what are we to do with that?

Like, we need to know, like, what is the -- like, what did she do [redacted] Like, what was her --

THE COURT: I'm just not seeing this at all. I'm with you on two out of three so far.

MR. KANE: Okay.

I guess the other thing I'll say is, if your Honor's interpretation is correct, then it's a conclusion. She reached a conclusion and has then waived the work-product protection that would have applied to it.

In other words --

THE COURT: But we're making a distinction here between factual conclusions and legal conclusions, are we not?

MR. KANE: I think it's a legal conclusion.

THE COURT: I'm sorry, what's the legal conclusion here?

MR. KANE: That they [redacted].

THE COURT: Why is that a legal

conclusion?

MR. KANE: She is --

THE COURT: She's not testifying as to whether they complied with the Copyright Act.

MR. KANE: She's saying they [redacted]

THE COURT: I'm not at all sure that that's an appropriate characterization of what this non-lawyer witness actually said.

MR. KANE: Okay. To me, it's either a fact, and so we get it because we're supposed to get the facts, or it's a conclusion; in which case, they've waived it.

THE COURT: You get factual conclusions. You don't get facts about the mechanics of the investigation itself, in my view.

MR. KANE: I guess what I'm saying is we need to know something about what the investigation was in order to be able to understand the facts that we're getting.

THE COURT: Look, particularly since this is the part of the investigation ...

This investigation concluded, as I understand it, that [redacted] That is a good fact for Google, but one that Google is not going to affirmatively rely on because they just told me that they weren't going to affirmatively rely on this investigation or its conclusion.

Another conclusion this investigation came to, which is not a good fact for Google, but you think -- and you may be right -- that it's a good fact for you, is that [redacted].

That is a factual conclusion which you get to use because it has been -- witnesses have been permitted to testify about it. You have testimony on it from lots of people. You get to put that into evidence and make whatever use you can of it.

Doesn't seem to me that, with respect to either one of those factual conclusions, you're entitled to know exactly who did what to reach that factual conclusion.

MR. KANE: I guess what we need is the

documents, like, supporting that conclusion to the extent those documents contain facts.

In other words, in order to decide -- in order to make that what you're calling a factual conclusion, i.e., that [redacted] they've got to do various things.

They've got to [redacted]

THE COURT: Well, if you're right about this, then you get everything, don't you?

If you're right about this, then there isn't a way that Google could ever perform an investigation, a post-complaint investigation, into the allegations that you make and retain any privilege over that whatsoever because they are required by law to give you discovery into their factual conclusions.

And what you have just told me, in effect, is, and, therefore, I get everything else,

including everything they did, every document they looked at, every witness they interviewed, et cetera. That can't be right.

Mr. Kane, it cannot be the case that, by performing a counsel-directed investigation into the allegations that you have made after you filed your complaint, they are dooming themselves to turn everything that they did over to you.

MR. KANE: Well, I think it's a legal conclusion when they say, [redacted].

That, to me, is a legal conclusion which they've disclosed and, to me, that's the cleanest way the --

THE COURT: So let me ask you a hypothetical.

Let us suppose that at the first deposition where this came up -- which, as I understand it, was back in June, right?

MR. KANE: Correct.

THE COURT: -- with Ms. B?

MR. KANE: That's right.

THE COURT: You had asked -- and let's make the question even cleaner than the question actually was.

Let's suppose the question was, "And what facts were uncovered as a result of this investigation?"

There's no way, in your world, as I understand it, that Google's counsel could have -- she was damned if she did and damned if she didn't because if she directed the witness not to answer that question, you would say -- correctly -- wait a minute, facts can't be privileged, even if they're uncovered as the result of an investigation.

And if she allowed the witness to answer, which is what she did, you would say, ah, well, now you've waived.

MR. KANE: If Google concluded, for example -- like, if they took [redacted] -- which is to say, you know, they did whatever process they did in order to make that conclusion -- it wouldn't be enough for them to just say, [redacted]

Like, we need to know something about what does that mean? Like, how did you conclude that?

Like, what do you mean when you say [redacted]

[redacted]

Does that mean [redacted]?

Does it mean [redacted]

Like, if we're calling this a fact -- if we're calling those factual conclusions, those facts need to be turned over. I think what --

THE COURT: Did you ask those questions? Did you say -- because a number of witnesses told you that [redacted] I don't -- and you had that from at least three witnesses; maybe more. I probably don't have all of the relevant deposition testimony.

Did you ever say, ah, were [redacted]

MR. KANE: We asked everybody, [redacted] Well, you know, [redacted] --

THE COURT: You certainly asked a few people that, in one way or another.

MR. KANE: Right.

THE COURT: But that wasn't -- that is different from the question you just posed as something you would like the answer to.

MR. KANE: I don't think we asked that specific question, partly because everything about the investigation Google was invoking privilege objections.

But I think we asked in what way were they -- [redacted]? And I don't think we got an answer to that question.

In other words --

THE COURT: Well, the question you did ask a lot of times and, I agree, didn't get a clear answer to was, [redacted]

And I'm concerned about that gap.

MR. KANE: Yes.

THE COURT: But I think we should move on because I am not persuaded that you're entitled to the mechanics of the investigation itself, and I am not persuaded that you are entitled even to the factual portions of the interview notes of folks that you did have the opportunity to depose.

I'm going to go back now to Google with the question of whether, given the unavailability of the vendors for deposition, the plaintiffs have indeed shown a sufficient need for the factual portions of vendor interview notes, if any.

MS. TOMKOWIAK: No, your Honor, I think the unavailability of the witnesses is something of their own making. They've known about --

THE COURT: Whose own making?

MS. TOMKOWIAK: I think that the plaintiffs could have sought to depose these vendors if they wanted to.

THE COURT: Through what?

MS. TOMKOWIAK: Well, for the one in the U.S., they could have pursued a deposition in the United States. They could have moved to compel 30(b)(6) testimony. They could have said, you need to prepare somebody, even if there is nobody who currently exists at your company with this knowledge.

THE COURT: What --

MS. TOMKOWIAK: They didn't do that.

THE COURT: Hold on.

What vendors in the U.S.? I thought they were all overseas.

MS. TOMKOWIAK: There was one in the U.S., in Texas, and one in India. And for the one in India, they could have gone through the Hague Convention. We do not control them. But they've known about this vendor since, I believe, our

initial disclosures. I will have to take a look at that.

THE COURT: Hague Convention, how long does that take in India?

MS. TOMKOWIAK: I don't know.

THE COURT: I don't think that was a practical or viable option.

MS. TOMKOWIAK: I --

THE COURT: The Hague Convention takes forever, even in Europe.

MS. TOMKOWIAK: But they told us that they were going to go through with it for a couple witnesses in Europe and then they didn't.

I mean, again, I think if they had started that process from the get-go, with all of the fact discovery extensions that we've had, I don't know, it might have been -- it would have, at least, been something to pursue, and they chose not to.

I've done it myself. I appreciate that it takes a long time, but where it's, you know, something that I think is important, I've certainly tried to pursue it.

THE COURT: Okay. And now tell me about this vendor in Texas. This is feeling like it's new

news to me. It may not be. We've had so many hearings, I may not recall it. But refresh me.

MS. TOMKOWIAK: There was a point in time where -- not during the entire relevant time period, but during part of the relevant time period where Google also used a vendor in Texas.

THE COURT: And who was that vendor?

MS. TOMKOWIAK: It was Vaco. I think it's --

THE COURT: Vaco?

MS. TOMKOWIAK: V-A-C-O.

I think it switched to Highspring, if I recall correctly.

THE COURT: I'm sorry, switched to what?

MS. TOMKOWIAK: I think at some point their name changed to Highspring.

THE COURT: Highspring?

MS. TOMKOWIAK: Spring. Like, summer, fall, spring.

THE COURT: Highspring?

MS. TOMKOWIAK: Yeah.

THE COURT: Okay. And during what portion of the relevant period were they your vendor?

MS. TOMKOWIAK: I don't recall off the

top of my head. I want to say it was, like -- I really don't know. I -- at the beginning of the relevant time period, I believe that they were involved, and I'm not sure exactly when they stopped, is my best recollection.

Maybe Ms. Sampoli will be able to find more specific dates as we speak. But my understanding, again, is that the plaintiffs withdrew the subpoena that they served on that entity.

THE COURT: There was a subpoena to Vaco/Highspring, and it was not pursued?

MS. TOMKOWIAK: I believe it was not pursued. I know the -- I know they never took their deposition. I don't know if they -- I can't recall if they got some type of declaration or something in lieu of that.

THE COURT: Okay. What else did you want to tell me?

So, with respect to turning over the factual portions of vendor interview notes, if any, what you have told me so far is that plaintiffs did indeed have it within their power to get testimony directly from the vendors; at least, from the one in the U.S., and arguably through the Hague Convention,

from the one in India as well.

MS. TOMKOWIAK: Yeah.

THE COURT: What's the name of the one in India?

MS. TOMKOWIAK: Cognizant.

THE COURT: Cognizant. That's it.

MS. TOMKOWIAK: I'd also say, your Honor, then, just in terms of the other information that was available to them and that they've had available for months, is that they've had, again, the raw data. They've had the notices. They've had the [redacted].

THE COURT: Sure. And they've been telling me for months -- maybe for years -- that the [redacted]-strike policy wasn't --

MS. TOMKOWIAK: It's in their complaint --

THE COURT: Yeah.

MS. TOMKOWIAK: -- that we didn't suspend when we were supposed to.

THE COURT: That is not --

MS. TOMKOWIAK: They have the offer data that shows [redacted]. So I don't think that they have a substantial need for

our work product that would reflect much more than that.

THE COURT: But the substantial-need argument is not being advanced -- or, at least, in my view, is not being seriously advanced with respect to the question of whether this was or wasn't happening.

The substantial-need argument is being advanced with respect to the question of [redacted]

MS. TOMKOWIAK: Well, there's --

THE COURT: That's where they're making the substantial-need argument because they say they have not been able to ask this question directly of the vendors.

MS. TOMKOWIAK: I mean, I read their substantial-need argument a lot broader, but if that's where we are right now, I will say that --

THE COURT: Let me rephrase.

That's the substantial-need argument that, in my view, may have some weight.

MS. TOMKOWIAK: Okay.

With respect to [redacted]

[redacted], like I said earlier --

THE COURT: No. You've already produced --

MS. TOMKOWIAK: Yes.

THE COURT: -- you say, all the relevant communications that actually went to them.

MS. TOMKOWIAK: Yeah.

THE COURT: And you have already permitted the plaintiffs to ask all of the Google witnesses who [redacted] about those communications; is that fair?

MS. TOMKOWIAK: Yes. And it was --

THE COURT: And was there a 30(b)(6) topic that covered, [redacted]?

MS. TOMKOWIAK: I believe that was part of Ms. B's testimony, communications with Google's [redacted], Topic 10.

THE COURT: So that's within Topic 10, in your view. And Ms. B, like boy, was your witness on Topic 10?

MS. TOMKOWIAK: Yes, except for a small

piece of it that we objected to regarding this zero-strike policy that your Honor then ordered us to produce a witness on, and so then we subsequently designated a different witness on that part of it.

THE COURT: All right. But not for the zero-strike. But for the [redacted]-strike, it was Ms. B.

MS. TOMKOWIAK: Yes.

THE COURT: Okay.

MS. TOMKOWIAK: And if -- and I think if your Honor's inclined to say that there are more facts that a person could testify to surrounding that, that that would be a much -- I think that -- consistent with the case law, that that would be the better avenue here rather than going through the, sort of, extreme remedy of ordering us to turn over any work product, factual or not, because I don't think that they've shown a substantial need if they haven't exhausted those other avenues.

THE COURT: Well, that might depend on what additional facts a witness might be able to provide in terms of what the factual conclusions were.

Here's my concern. One thing I could do -- and I'll just talk through this out loud with you, if I might.

One thing I could do is direct Google to provide a witness -- probably should be categorized as a 30(b)(6) witness, just so there's no question as to whether the witness is speaking for the company or not -- who is prepared to testify as to all of the facts uncovered by the investigation.

I could do that, and that, kind of, sounds sensible. But now, I'm imagining the actual deposition. I am imagining Mr. Kane sitting on one side of the table or the computer screen and Ms. Tomkowiak sitting on the other.

And Mr. Kane will start off saying, what were all of the factual -- what were the facts uncovered by the investigation?

And the witness will talk for a while. And then Mr. Kane will say, well, how do you know that? And how do you know that? And how do you know that?

And then the objections will be flying back and forth, and we'll be back in the soup that we're in today as to where the line is between facts that the plaintiffs are entitled to learn and the mechanics of the investigation that, in my view, they're not.

Now, requiring Google to produce factual

portions of interview notes -- I'm assuming there's some interview notes in there somewhere. I can't remember off the top of my head what was on the privilege log or not -- would solve that problem because they would get what they get and that would be it.

But I agree with you, Ms. Tomkowiak, that it's typically regarded as a more extreme order from a court that we're reluctant to require you to do without a pretty strong showing of need. And I'm not sure that the evidence of need here is quite that compelling.

On the other hand, you might prefer it because it's cleaner and it is what it is.

MS. TOMKOWIAK: We are -- I mean, this relates to a defense that we've dropped. It would be quite extraordinary, I think, in a situation --

THE COURT: It doesn't matter in --

MS. TOMKOWIAK: -- to require your adversary to turn over their notes.

THE COURT: In my view, I don't think it matters at this point whether it relates to a defense that you've dropped or not. The facts uncovered by the investigation -- at least, some of them, I think, are relevant. Whether they're as

earth shattering as the plaintiffs believe them to be remains to be seen. But relevant, yes.

So the facts are relevant. And the question is, what is the most efficient way for the Court to ensure that the plaintiffs get all of the facts, but that the line between what is and what isn't privileged is still preserved?

So help me out here. What do you think, Mr. Kane?

MR. KANE: So I think one thing the Court could do is to say any facts in the, sort of, investigation file, if you will, that pertain to [redacted] or, you know, anything of that nature, those should be turned over.

THE COURT: Turned over in documentary form? Or Google should provide testimony on that topic?

MR. KANE: I think they should be turned over in documentary form.

THE COURT: That is, you will agree, not the first tool that a Court reaches for in this situation.

MR. KANE: I'm not sure that a deposition alone, without documents, is a practical solution.

I mean, is someone just going to memorize all these facts and, you know, recite them at a -- at a deposition we will view them for the first time?

Anything that's in the investigation file that pertains to [redacted] should be something that Google turns over.

The facts that Google uncovered regarding [redacted] should be turned over. And then we should have a deposition of someone, a 30(b)(6) witness, I presume, who can answer questions about those documents that Google turns over.

I would add, the reason there's a substantial need with respect to Vaco and Cognizant is we aren't able to depose any of those folks.

So we issued a subpoena to both of them. Vaco told us that they don't have anyone left at the company who has knowledge of any of this stuff. They stopped working for Google in 2023.

And Google wouldn't even tell us who are the vendor agents who were processing these notices. We gave them a list of the people that it seemed to be from the documents, and they wouldn't tell us who

was a vendor and who was a Google employee.

Cognizant, as you pointed out, is overseas, so we -- I should say we did issue a 30(b)(6) subpoena to Cognizant, and they told us that everyone who has knowledge of this is overseas, and, therefore, they weren't required to produce a 30(b)(6) witness because the knowledge was overseas.

We didn't know until --

THE COURT: You didn't -- is that true? If a company is U.S. based, it doesn't have to respond to a 30(b)(6) subpoena if the witness with knowledge is overseas?

MR. KANE: We looked into it, and we did not think we had a good enough argument to file a motion to compel.

I would point out, though, we didn't know that this was so critical until last week, until Mr. R said [redacted]

THE COURT: I disagree with you there. At the latest, this issue was flagged for you on June the 24th, when Ms. B said, [redacted]

MR. KANE: I don't agree. But even if that's right, discovery at that point was ending sometime in August. It wouldn't have been enough time to go through the Hague Convention and be able to depose him in India. And we didn't know who we would be deposing because Google wouldn't tell us who were the vendor agents who were processing this stuff.

In other words, we can't just like issue a 30(b)(6) witness -- a 30(b)(6) subpoena through the Hague Convention to a company in India and have them, you know, choose from someone the -- who they might not even know who the person with knowledge is.

In other words, what Cognizant's counsel --

THE COURT: You are saying you didn't know who the individual witnesses with knowledge would be?

MR. KANE: Correct.

THE COURT: But you would 30(b)(6) the company, not the individual, wouldn't you?

MR. KANE: But the company wouldn't know either.

In other words, what the company told us

is, it's not like Google says, hey, we've got this copyright infringement process we want to implement, you guys go do that. You know, here's what we want you to do, do it for us. It is not like an outsourcing solution.

Cognizant provides personnel who then work for Google. They have a Google e-mail address. They work on Google systems. So all the documents concerning this are in Google's possession, not in Cognizant's possession.

THE COURT: Well, that's great for you because that means you get the documents. And you have them, presumably.

MR. KANE: There were only four or five vendors who were custodians, and we didn't get this. So there is a substantial need to depose -- I'm sorry -- for [redacted]

THE COURT: Remind me again why you didn't proceed with your subpoena to Vaco. Because they told you that their current employees -- at whatever time you served a subpoena on them, they told you that their current employees had not been around to work for Google?

MR. KANE: That their current employees

didn't have knowledge of any of the topics in the 30(b)(6) notice, anything about the DMCA process. They --

THE COURT: Did you subpoena them for documents?

Did you ask them for earlier documents? For example, communications from Google, like guidance, for example?

MR. KANE: Yes. We subpoenaed both Vaco and Cognizant, and both produced just a handful of documents, like their contracts with Google and their statements of work because they told us all the documents pertaining to this are in Google's possession, not in the vendor's possession.

In other words, the --

THE COURT: Well, if they were in the form of e-mails, that would be true, right?

If the communications were electronic, Google would have them.

MR. KANE: Yes. The vendor folks had Google e-mail addresses and, you know, G Chat accounts and all those.

THE COURT: Right. So you get all of that in your ESI from Google.

MR. KANE: I don't know that we have

gotten all of it. There were vendors who were custodians, but we don't seem [redacted] --

THE COURT: Well, maybe that's because it doesn't exist.

MR. KANE: I mean, [redacted] And that's why we need the records from this investigation.

Mr. R testified that the investigation did include looking into [redacted] We have a substantial need for those documents. We don't have them.

MS. TOMKOWIAK: May I be heard on this?

THE COURT: You may.

MS. TOMKOWIAK: Okay.

I absolutely do not think that turning over our work product and then having somebody be deposed on it is the right answer here. I think that -- I have never, in a case, been hired to retain a company in a case, worked with them to investigate the allegations in the complaint, to develop a legal strategy, talk to the folks on the

ground and had the other side then say, I need your notes on this case so that I can prepare my case.

That would be an extraordinary thing to make us do. I think it would be inappropriate. I don't think that they have made the very high showing that they would need to show that they have a substantial need for those on this small, tiny issue.

I think if anything is appropriate here, perhaps it's an interrogatory on the facts -- you know, the underlying facts from a certain time period.

I just -- I'm really -- I'm -- there's nothing in Mr. R's testimony that would compel such a thing. There's nothing in Ms. B's testimony that would compel such a thing. Our witnesses have testified to the facts, and if they had been asked about other facts, would have testified to those, too.

If there's some facts that your Honor is concerned that they still haven't provided, I think there's -- has to be other solutions short of turn over your notes to your adversary.

THE COURT: Well, to be fair to Mr. Kane, I think if push came to shove, he would say, you can

redact the legal parts, I just want the factual parts.

Is that fair, Mr. Kane?

MR. KANE: That's correct.

THE COURT: But I do appreciate that that is by no means a simple thing and tends to lead to additional fights over how the line was drawn.

MS. TOMKOWIAK: Absolutely. Yeah. I mean, because most -- again, I'm not -- I don't have specific documents in mind, but like most of the -- it's commingled. It's -- I just -- I don't see that we would agree on where those lines are drawn. Then we would have to submit them to you. And this is just -- this -- again, it's just really -- it would be such a rare and unique thing, to hand over your adversary, in the exact litigation -- hey, here's our notes from when we looked into your allegations so that you can then prepare your case and ask our witnesses questions about them.

MR. KANE: Judge, this is not a small, tiny issue, as Ms. Tomkowiak said. The -- Google's witness testified that [redacted]

That is borderline dispositive if it's true. This is a major issue, and it came up in the very last -- last couple weeks of discovery. Like, for that only to have come up now is truly remarkable.

It's not an extraordinary remedy. Google has records of this. They talk to these people. We can't talk to these people. They have some documents that explain either [redacted]

We have no other way of getting that stuff. Google has offered no other way for us to get that stuff. We have a substantial need for it. It's a critical issue. I think there's been a privilege waiver. Your Honor seems to disagree.

But this is a perfectly reasonable solution. They've got records from an investigation that they conducted that have facts that we can't access in any other way.

They can redact the parts that say, you know, what Latham & Watkins' recommendation is as to what Google should do. They can redact the parts that say, you know, we think you're in a lot of trouble here. But they don't get to redact the part

that says, you know, Mr. So and So explained to us that, you know, [redacted]

They don't get to redact the parts where [redacted]

They don't get to redact that stuff.

MS. TOMKOWIAK: Notes are --

MR. KANE: I don't think it's that hard of a line to draw. Either it's a factual statement or it's an attorney's conclusions or impressions. I think anyone is capable of drawing that line.

MS. TOMKOWIAK: Notes are not transcriptions.

THE COURT: Thank you, both. Thank you, both, very much. I appreciate the argument. I appreciate the issues. I'm going to give you a ruling.

Preliminarily, let me say that I think the underlying issue -- namely, how good a job Google did or didn't do in [redacted] -- is neither as earth shattering as the plaintiffs believe it to be nor as trivial as Google

believes it to be. It's sufficient for present purposes to say that it is relevant to the claims and defenses in this matter.

After listening carefully to the arguments of both sides and reading the materials presented to me, including rough deposition transcripts, which I soldiered through as best I could, my view is, first, that the investigatory materials that have been withheld, either on the basis of the attorney-client privilege or the work-product doctrine, were properly so withheld on those bases. In other words, before we get to the question of waiver, these materials clearly were -- in fact, fairly classically privileged materials and work product.

Second, I find that Google has not waived either the attorney-client privilege or work-product doctrine. Rather, I find that Google has attempted, through a series of depositions in real time, to draw the line where the line should be drawn, which is to say, permitting discovery into the facts uncovered by the investigation, but not permitting discovery into privileged attorney-client communications concerning or during the course of the investigation, and not permitting discovery into

legal conclusions or analysis that either prompted or came out of the investigation.

The problem arises, in part, because, in my view, Google did not always draw that line in the right place during depositions, and I am not ascribing any intentionality to this conduct. I take Ms. Tomkowiak's point, that making these decisions in real time, on a question-by-question basis, particularly when the questions are not always as crisp and clear as one might hope in retrospect. Life is like that. The line is not always drawn in the right place.

In particular, I conclude that plaintiffs have not yet had a fair opportunity to learn all of the facts uncovered by the investigation, including two key examples here: One, the question of [redacted] In my view, plaintiffs are entitled to learn as a factual matter [redacted] And if it was [redacted] I think plaintiffs are entitled to that. And I don't know what form that information came out of the

investigation. I don't know, for example, if Google determined that [redacted]

I have no idea what the underlying information is, but I think that plaintiffs are entitled not just to the -- overall, the -- sort of, the big fact that [redacted], but they are also entitled to the [redacted].

That's one thing that plaintiffs get more information on.

The other thing that plaintiffs get more information on is this question of [redacted]

We still have some line drawing to do because while I believe that Google is entitled to whatever facts -- sorry.

I believe that plaintiffs are entitled to

whatever facts Google uncovered as to these two topics -- one topic being [redacted] And the other topic being [redacted]

They're entitled to all of the facts that Google uncovered as to these two topics, but they're not entitled to the mechanics of the investigation that Google conducted in order to uncover these facts.

So they're not entitled, for example, to know what counsel told Ms. Kelly to look at or what documents she assembled in order to -- I'm assuming that Ms. Kelly was at least one of the folks who was doing the work here.

Plaintiffs are not entitled to know what Ms. Tomkowiak or one of her colleagues told her to do, how many documents she assembled, whether she considered running the numbers this way versus that way. That's all privileged, in my view.

But if, as a result of this process, Ms. Kelly is able to say, because she figured this out during the investigation, [redacted] -- I'm making this up as a hypothetical -- [redacted]

[redacted] those are facts that the plaintiffs are entitled to.

I think the question whether plaintiffs have shown a substantial need for the production of, at least, a portion of what would otherwise be the privileged materials here, specifically, the factual portions of the interview notes, if any, of interviews with the vendors, I find that a close question.

Plaintiffs' request for other portions of the file, including interview notes for witnesses that plaintiffs have already deposed, for example, I do not find that to be a particularly close question. I don't think plaintiffs have come anywhere near to making the substantial-need showing for that material.

But with respect to the vendor testimony, particularly if there are interview notes of Cognizant, India-based Cognizant vendors, I find that a close question, but I do not find that the plaintiffs have met their burden as to that question.

It really is -- ordering a lawyer to turn over her interview notes is, I think, something that we strive to avoid. It's not the first tool that I

would ever reach for in my judicial toolbox, and I don't feel that I need to reach for it here, particularly, given that I am directing Google to make a fuller accounting of its -- all of the facts that it uncovered. And I think the best way to do that is to direct Google to present a witness, pursuant to Rule 30(b)(6), whose job is to do what I just said Google has to do, to disclose all of the facts uncovered as a result of the investigation.

Is that clear to both sides? Because I don't intend to write an opinion about this. I intend to write a short order about this.

Is that clear to you, Mr. Kane?

MR. KANE: I just want to clarify.

The 30(b)(6) witness has to be able to address both the, sort of, "how often" question you referenced, as well as [redacted] is that right?

THE COURT: If there is a factual answer to that question, yes, the witness will have to answer it. Not all interesting questions have answers, even after a counsel-driven investigation.

But to the extent facts were uncovered by

Google which tells us [redacted] then those facts must be disclosed.

Clear enough?

MR. KANE: [redacted] -- I'm sorry -- [redacted]

THE COURT: All of the facts that Google has uncovered with respect to this topic.

MR. KANE: Okay.

THE COURT: Not the mechanics, not the instructions given by lawyers, et cetera, but the facts.

Are you clear, Ms. Tomkowiak?

MS. TOMKOWIAK: I am clear. I just would like to clarify the --

THE COURT: Everybody is clear but wants to clarify.

MS. TOMKOWIAK: And I would like to -- no. I would just like to request a time limit. I'm not asking you to clarify the scope. I just -- I don't want this to be a --

THE COURT: Right. So let's talk about timing.

I know that there's a motion that I haven't read yet where plaintiffs want -- I believe it's an extra 30 days. And they want a whole bunch of other stuff as well; is that right?

MR. KANE: That's correct.

THE COURT: So I wonder whether -- and does the other stuff that you want -- forgive my colloquial language.

Does the other stuff that you want bear on this new 30(b)(6) topic that I just announced?

So do we need to hold off on having this new 30(b)(6) witness testify until I got through your next motion?

MR. KANE: The discovery that we seek in the motion we filed last night does involve these questions of [redacted]

THE COURT: Well, if that's the case, then, rather than give you a deadline today for producing this 30(b)(6) witness who's going to testify as to the facts uncovered by the investigation, maybe we should leave the date open until you -- until I've gotten all of the briefs on last night's motion and we can make a decision on

that.

Ms. Tomkowiak?

MS. TOMKOWIAK: That's fine, your Honor. I was actually asking a slightly different question, which is --

THE COURT: Oh, I'm sorry.

MS. TOMKOWIAK: That's okay.

-- which is whether we can put a time limit on this deposition.

THE COURT: Oh, time limit on this deposition.

MS. TOMKOWIAK: I don't think it should be a seven-hour deposition.

THE COURT: I don't think it should be a seven-hour deposition either.

How long do you think it should be, Ms. Tomkowiak?

MS. TOMKOWIAK: One hour.

THE COURT: And how long do you think it should be, Mr. Kane?

MR. KANE: I would say three and a half hours.

THE COURT: Two hours.

All right. So it will be two hours. You don't have to schedule it now. We will discuss

scheduling that deposition when I hear and determine last night's motion.

Are there any other motions, by the way?

MR. KANE: Sure.

THE COURT: Because, honestly, on Friday, my law clerk and I thought life is getting better, but no.

Mr. Kane?

MS. MURPHY: I'll address this, your Honor.

THE COURT: Ms. Murphy.

MS. MURPHY: There is -- there is one other motion that we were hoping to resolve with Google, and, unfortunately, I don't think we're going to be able to. We had a meet and confer with --

THE COURT: Give me a hint. What's the general nature of the problem?

MS. MURPHY: The general nature relates to a source of communications with the pirates that are at issue in the case, where, during one of the depositions, the testimony explaining where they would be stored and where they would be produced from was different than what we understood from discovery. And we thought we made a lot of progress

raising this issue and going back and forth, but it seems, unfortunately, we haven't been able to resolve it. We had a meet and confer last Friday, but the person who I think is most knowledgeable was taking a deposition.

So, as we sit here right now, we think we're at impasse, but we're not 100 percent sure.

THE COURT: So if you make this motion, you'll make it by when?

MS. MURPHY: If it would be okay, if we could have a week, I would appreciate it. I think we're all exhausted from the recent events.

THE COURT: And otherwise you're done tomorrow, right?

MS. MURPHY: Today.

THE COURT: Oh. I --

MS. TOMKOWIAK: Tomorrow.

THE COURT: I thought the backup witness was tomorrow.

MS. TOMKOWIAK: Oh, because the backup witness.

THE COURT: Yeah.

MS. TOMKOWIAK: But I thought -- I think today was the original.

MS. SAMPOLI: Today was the original.

MS. TOMKOWIAK: Today was the original deadline, but we did --

THE COURT: Today was the original deadline. That's right.

MS. TOMKOWIAK: The witness is going tomorrow. Yes.

THE COURT: All right.

So what Ms. Murphy has proposed is that -- what I've been told is that there's the motion that came in last night. There's one more potential motion, that that motion will come in, if it comes, in by next Tuesday; is that right?

The 8th?

MS. MURPHY: Yes.

THE COURT: In which case, it will be fully briefed a week after that. And I could have you come in sometime after the 15th. And assuming that I could get you a decision on those two motions, we would be done. And we can fold the 30(b)(6) deposition timing into that order.

Is that what I'm hearing?

MS. MURPHY: The one thing I'll say is, with respect to the motion that we filed last night, you know, we are asking for documents that bear upon this issue. I might -- give me one second.

In other words, I don't want to push the other issue back because we haven't filed the pirate communications motion. And perhaps we can resolve it. I think it's worth -- we need to have at least one more meet and confer since the individual that we needed to talk to wasn't available.

Why don't we try to file that by Friday instead. That just --

THE COURT: By this Friday?

MS. MURPHY: By this Friday.

THE COURT: All right.

MS. MURPHY: See if we can resolve it. We'll file it by Friday, if not. And then, that way, it's just not pushing it out quite so far.

THE COURT: All right. But we're still probably looking at the week of the 14th before I can get you in here.

MS. TOMKOWIAK: I -- yeah. And I have very limited availability that week due to another matter. I'm checking with my -- I have very limited availability the weeks of the 14th and the 21st.

I've checked with my colleague, Mr. Damle. I think he has more availability the week of the 21st.

THE COURT: Mr. Lee -- oh, no.

Mr. Hodgkinson, you have my calendar up. What are we looking like the week of the 21st, early in the week?

THE LAW CLERK: Monday or Tuesday.

THE COURT: Monday the 21st?

MS. TOMKOWIAK: Can I have one minute?

MR. KANE: The 21st is slightly better for me, but either will work.

MS. TOMKOWIAK: I'm sorry. Did you give two dates? I thought you said Monday the 21st.

THE COURT: Monday or Tuesday is what I heard.

MR. KANE: I have a -- the Tuesday is slightly better for me, but I --

THE COURT: Tuesday is better. That would be the 22nd.

Google?

You'll make it work.

MS. TOMKOWIAK: I see the little dots going.

THE COURT: You see the little dots going.

MS. TOMKOWIAK: Yes.

THE COURT: Someone -- he is sending you a message?

MS. TOMKOWIAK: Yes. Yes. As painful as it is to watch those three little dots, give me one second.

Okay. Yes.

THE COURT: And what time slots do we have available, Dan?

THE LAW CLERK: 10:00 or 11:00.

THE COURT: Probably safer to do 11:00, and then we can go into the lunch hour if we need to.

All right. 11:00 on September the 22nd. And if Google has an additional motion that it needs to make --

MS. TOMKOWIAK: The plaintiffs, I think. We don't.

THE COURT: I'm sorry.

MS. TOMKOWIAK: We just don't. We're done.

THE COURT: You're done.

If plaintiffs have an additional motion that they need to make, make that by Monday, next Monday. How about that?

MS. MURPHY: That is Labor Day, so ...

THE COURT: Oh, you're right. Tuesday.

All right. So that's the 8th, right?

MS. MURPHY: Yes.

THE COURT: All right. And then the briefing cycle will be the usual briefing cycle. And I'll see you on the 22nd. All right.

MS. TOMKOWIAK: Your Honor, we can try to work this out with plaintiffs. We might need a slight extension for the thing that was just filed on Friday.

THE COURT: Well, since I'm not going to --

MS. TOMKOWIAK: I mean -- I'm sorry -- last night. Yes.

THE COURT: Monday night.

So that's fine.

MS. TOMKOWIAK: Okay.

THE COURT: Since I'm not going to see you until the 22nd, you can, I hope, Mr. Kane, give them a couple of extra days on that.

All right.

MS. TOMKOWIAK: Thanks.

THE COURT: We'll be adjourned. Thank you.

THE DEPUTY CLERK: All rise.

0o0

C E R T I F I C A T E

I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Cengage Learning v. Google; Docket #24CV4274 was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature *Adrienne M. Mignano* ____________________________

ADRIENNE M. MIGNANO, RPR

Date: September 3, 2026