# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**WEEKEND WARRIOR CLOTHING, LLC,**

**Plaintiff,**

**v.**

**AMAZON.COM SERVICES, LLC, et al.,**

**Defendants.**

**Case No. 1:23-cv-752**

**JUDGE DOUGLAS R. COLE**

## OPINION AND ORDER

This is a copyright infringement action. Defendants Amazon.com Services, LLC, and Amazon.com, Inc. (collectively Amazon), operate a service called Merch on Demand. The service allows third-party creators to upload designs to Amazon's website. Amazon then generates and displays images of those designs applied to various stock products (e.g., t-shirts), lists them for sale at a price it chooses, and identifies itself as the seller. Potential customers are free to browse through those listings. Then, if someone places an order, Amazon collects payment, manufactures the products, delivers them, and pays a "royalty" to the content creator.

Plaintiff Weekend Warrior Clothing, LLC, by contrast, designs and sells its own humorous apparel online—but not through the Amazon website. Weekend Warrior claims that third-party users are uploading its copyrighted designs onto Amazon's Merch on Demand service, resulting in the display, manufacture, and sale of infringing products. Rather than target the individual third-party creators, though, Weekend Warrior went hunting for bigger game. It sued Amazon itself for direct,

contributory, and vicarious copyright infringement, both for the images displayed on the website and the products Amazon sold. (Am. Compl., Doc. 17, #132–35).

The parties now cross-move for summary judgment on infringement, with Amazon also moving for partial summary judgment on five other issues. (Docs. 66, 68). Starting with Weekend Warrior's motion, the Court finds a genuine dispute of material fact over the validity of Weekend Warrior's asserted copyrights, and thus the Court **DENIES** Weekend Warrior's Motion for Summary Judgment. (Doc. 66). Turning to Amazon's motion, the Court concludes that, if Weekend Warrior has one or more valid copyrights, then Amazon could be liable as a direct or vicarious infringer (but not as a contributory infringer). So the Court **DENIES** Amazon summary judgment on direct and vicarious infringement, but **GRANTS** Amazon summary judgment on contributory infringement. The Court also **DENIES** Amazon partial summary judgment on the five additional issues it raised except for its specific defense to the *Ameri-CAN v2* and *Down Goes Liver* copyrights. The Court **DISMISSES** without prejudice Weekend Warrior's claims involving those specific copyrights.

## BACKGROUND[1]

### A. Weekend Warrior.

In 2018, Tim and Daniel Whelan,[2] two brothers, started Weekend Warrior to sell apparel with "designs centered around holidays, American drinking culture, and patriotism, using outlandish and crude humor." (Def.'s Resp. to Pl.'s Proposed Undisputed Facts, Doc. 86-1, #10917, 10919). While Weekend Warrior Clothing, LLC, is the formal company title, they sell merchandise under the brand name USA Drinking Team through the website officialusadrinkingteam.com. (*Id.* at #10917).[3]

Daniel creates Weekend Warrior's designs and is the stated author on each copyright registration. (Pl.'s Resp. to Def.'s Proposed Undisputed Facts, Doc. 84-2, #10601; Doc. 86-1, #10918). Daniel "draw[s] inspiration" from "reference images" across the internet, (Doc. 84-2, #10602), including "various ideas, memes, movies, games, products, characters, themes, and events," (Doc. 86-1, #10918). Daniel, however, does not have any records of these reference images and did not obtain licenses or any form of permission from those creators. (Doc. 84-2, #10602). Conversely, Weekend Warrior has never licensed any of its copyrighted designs to any third party. (Doc. 86-1, #10920).

---

[1] Pursuant to the Court's Civil Standing Order (I)(F)(2)(a)–(c), Weekend Warrior and Amazon simultaneously filed a list of Proposed Undisputed Facts, (Docs. 66-1, 73-1), with their motions. Each party admitted to many of the other's proposed facts. (Docs. 84-2, 86-1). Unless otherwise noted, the Court cites those documents only for admitted facts.

[2] Because the brothers share a last name, the Court will refer to them individually by their first names.

[3] The website does not reference Weekend Warrior or the Whelan brothers. (Doc. 84-2, #10591). The parties generally dispute whether any other publicly available materials connect Weekend Warrior and Official USA Drinking Team. (*Id.* at #10591–92).

Weekend Warrior has forty-eight copyright registrations relevant here. (Doc. 17, #123–25).[4] It also had two copyright registrations pending when it filed the Amended Complaint: *Happy St. PatRizz Day* and *King of the Kill*. (*Id.* at #125). While Weekend Warrior obtained registrations for each of these fifty designs, Amazon contests whether they are valid copyrights. *See infra* Parts A.1 & A.2.

**B. Merch on Demand.**

**1. General Operations.**

Now turn to Amazon. As everyone knows, it maintains an online marketplace for a wide range of products. Most relevant here, Amazon operates a service called "Amazon Merch on Demand." Amazon created the service to "help[] individuals, small businesses, and entrepreneurs … produce merchandise that might otherwise be too expensive." (Doc. 84-2, #10574–75). To that end, Amazon provides approximately fourteen blank products, such as t-shirts or tote bags, each of which comes in a variety of colors. (*Id.*; Doc. 86-1, #10912). Third-party "Content Creators" upload their own designs to Merch on Demand and then select on which blank product they would like

---

[4] Those copyrights, in the order provided by Weekend Warrior, are: (1) *Tits McGee Irish Pub*; (2) *Leprechaun Griddy*, (3) *Bad Day to Be a Cerveza*, (4) *Pat McCrotch Irish Pub*, (5) *Griddy Taco*, (6) *Griddy Cerveza*, (7) *Bad Day to Be a Beer – America Edition*, (8) *Uncle Sam's American Lager*, (9) *USA Drinking Team Mascot*, (10) *Real American – Uncle Sam*, (11) *Ameri-CAN Eagle*, (12) *Meri-CAN Eagle*, (13) *Uncle Sam Griddy*, (14) *USA Jam – Uncle Sam/Merican Eagle*, (15) *USA Jam – Washington/Lincoln*, (16) *Ameri-CAN V2*, (17) *Bald Eagle Griddy*, (18) *Ameri-CAW*, (19) *Bad Day to Be a Beer*, (20) *Bad Day to Be a Beer – Christmas Edition*, (21) *Bad Day to Be a Bier*, (22) *Bad Day to Be a Turkey*, (23) *Boo Bees and Beer*, (24) *Can't Get Hungover*, (25) *Do You Feel Lucky*, (26) *Enjoy Beer*, (27) *Fantasy Football Legend*, (28) *FrankenSTEIN*, (29) *Get Smashed*, (30) *Greened Out*, (31) *Hope They Serve Beer in Hell*, (32) *I Want Brew*, (33) *Make Mullets Great Again*, (34) *Most Interesting Pumpkin*, (35) *Poor Day to Be a Pilsner*, (36) *Protect the Charms*, (37) *Skeleton Griddy*, (38) *The Grim Rizzer*, (39) *Where the Horrors At?*, (40) *Morning Wood Lumber*, (41) *Papa Woody Plumbing*, (42) *Master Bait*, (43) *Shut Up Liver*, (44) *Enjoy Beer – Ugly Sweater*, (45) *Camel Tow*, (46) *Thicc Santa*, (47) *Merry Rizz-Mas*, and (48) *Santa Griddy*. (Doc. 17, #123–25).

the design to be printed. (Doc. 84-2, #10574–75).[5] From there, the Content Creator's design is "virtually rendered" onto the product. (*Id.* at #10577; *see* Doc. 60-5 (example of virtual renderings)).[6] Next, the Content Creator provides the product's name, description, and recommended price. (Doc. 84-2, #10577). Merch on Demand automatically creates a public listing page for the final product. (*Id.* at #10578).

At that point, Amazon takes over the remaining vendor tasks. For example, Amazon manufactures the designed product. But it does so only in response to customer orders, thereby obviating the need for any inventory. (*Id.* at #10575). More broadly, though, Amazon also "has sole discretion to determine price, availability, distribution channels, and terms of sale." (*Id.* at #10577). It also handles "processing payments, collecting payments, addressing requests for refunds, and providing customer service." (*Id.*). And Amazon labels itself as the seller of record. (*Id.*).

In terms of distributing sales proceeds, Amazon pays Content Creators a royalty "based on the sales price minus production and fulfillment costs, which are set by a standardized schedule." (*Id.* at #10580; Doc. 55-9 (examples of standard royalties)). For example, if Amazon sells a standard t-shirt in the United States for $19.99, it will pay the Content Creator $4.89. (Doc. 55-9, #2382). If a customer returns the item, however, the Content Creator receives nothing. (Doc. 86-1, #10916).

[5] Amazon also offers a "Merch Collab" option whereby Amazon licenses "certain third-party content from known brands and celebrities" that Content Creators can use for their designs. (Doc. 84-2, #10575).

[6] The parties dispute whether the virtual renderings are created before or after the moderation process described below. (Doc. 84-2, #10577–78).

**2. Screening.**

**a. Content Creator Account.**

With that general process in mind, the Court takes a few steps back to cover the process Amazon uses to screen providers for the Merch on Demand program. To become a Content Creator, a user must apply for an account. (*Id.* at #10910). To do so, the user must submit a "business name, address, phone number, bank details for royalty payments, and complete a tax interview, which requires input of a Social Security number or Tax ID number." (*Id.*). From there, Amazon will reject applications if the user either has [redacted], if Amazon [redacted], or if the provided details [redacted] or Merch on Demand's purpose. (*Id.* at #10910–11/sealed Doc. 85-1, #10754–55). This process involves automated and human levels of review, and so can take several days. (Doc. 86-1, #10911/sealed Doc. 85-1, #10755). If the user's application passes these steps, Amazon allows the user to have a Content Creator account.

Once a Content Creator has an account, they must also agree to the Merch Services Agreement. (Doc. 84-2, #10581–82). Under that agreement, Amazon retains the right to terminate Content Creator accounts, with or without notice, for violations of the included policies. (Doc. 86-1, #10911; *see* Doc. 55-8 (agreement)). As relevant here, a Content Creator specifically agrees not to use "illegal or infringing content," defined as "[c]ontent incorporating intellectual property (such as trademarks, copyrights, or the name or likeness of others) that [they] do not have the right to use." (Doc. 84-2, #10582). Over time, Amazon collects "risk signals" to determine whether

it should review a Content Creator's account for potential termination. (*Id.*; Kraft Dep., Doc. 76-7, #8976/sealed Doc. 74-7, #7778). There is no set number of risk signals that guarantees termination, but these signals include an approved [redacted], connection to a [redacted], and any "[redacted]." (Doc. 76-7, #8976/sealed Doc. 74-7, #7778).

**b. Specific Product Listing.**

Amazon also deploys screening tools for each specific design an approved Content Creator uploads. During that review process, Amazon deploys some kind of automated technology that flags potential policy violations arising from the design. Any flagged designs are then passed on to human reviewers. (Doc. 76-7, #8910–13/sealed Doc. 74-7, #7711–15). Approximately [redacted] employees conduct this review for potential policy violations. (Doc. 76-7, #8910/sealed Doc. 74-7, #7712).

Policy violations can include, for example, designs containing hate speech, designs that mention a charity, or as relevant here, designs that include "duplicate content." (Doc. 76-7, #8913/sealed Doc. 74-7, #7715; *see* Doc. 83-2, #10435 (content policies)). One way Amazon determines whether a design constitutes "duplicate content" is by comparing the design to its image database. (Doc. 76-7, #8913–14; Snyder Dep., Doc. 76-8, #9077/sealed Doc. 74-8, #7879). When Amazon is "made aware of content that a rights owner has rights to," that image will be added to the database for future monitoring. (Doc. 76-7, #8914/sealed Doc. 74-7, #7716). After that, if a Content Creator uploads a similar design, Amazon's automated technology flags the potential duplicate. (Doc. 84-2, #10583–84).

Generally, Amazon claims that its "quality and compliance content review includes review of content delivered by a content creator to Amazon relating to a product, including product information, media, art, logos, trademarks, trade names, models, design specifications, product instructions and notices, and other similar materials." (Doc. 86-1, #10913). To be clear, though, Amazon does not alter the proposed design; it either approves it as uploaded or rejects the listing in its entirety. That said, Amazon's default position is to approve designs—"[i]f Amazon's moderation system finds no flags indicating any policy violation, a product listing will go live for viewing and purchase." (Doc. 84-2, #10584).

This moderation process leads Amazon to block over 25,000 Merch on Demand designs each month due to policy violations. (*Id.*). Considering that users add over [redacted] new designs every month, (*id.*/sealed Doc. 72-1, #7053), Amazon blocks approximately [redacted] of new designs.

Moreover, even once a product is listed, Amazon can still take that product listing down. On that front, "Amazon conducts ongoing audits and inspections using machine learning and text-based and image-based automated detection tools to flag allegedly infringing content, including potential matches to reference images in Amazon's similarity database, and words and phrases that violate its Merch on Demand policies." (Doc. 84-2, #10584–85). Most relevant here, Amazon can remove

product listings and terminate Content Creators if it receives a third-party "takedown request." (Doc. 84-2, #10581).[7]

### c. Notice of Claimed Infringement.

Because the takedown requests, and the processes Amazon uses to review them, are critical to Weekend Warrior's claim, the Court offers some further detail. Third-party rights holders can submit Notices of Claimed Infringement (NOCIs) that are meant to alert Amazon of alleged intellectual property infringement. (Doc. 84-2, #10585). There are several ways to submit such NOCIs. First, the purported rights holder can email Amazon at a specified address: copyright@amazon.com. (*Id.*). Second, "Amazon account holders can use Amazon's Report Infringement Tool … to report different types of alleged intellectual property infringement, including alleged copyright infringement, through a series of drop-down menus, that prompt users to identify [Digital Millenium Copyright Act (DMCA)]-notice-complaint details of the alleged infringement, including [the] Amazon product number … for the allegedly infringing product or product listing." (*Id.* at #10585–86). Third, users can physically mail complaints to Amazon's legal department. (*Id.* at #10856).[8]

---

[7] Weekend Warrior does not dispute the availability of this process generally, but it does dispute that Amazon consistently acts based on submitted takedown requests. (Doc. 84-2, #10581). Instead, it contends that "Amazon failed to terminate numerous and blatant repeat infringers of the [Weekend Warrior] [d]esigns in this case." (*Id.* at #10583).

[8] Amazon also has a free service called Brand Registry "that offers rightsholders an enhanced suite of tools for monitoring and reporting potential instances of infringement, regardless of their relationship with Amazon." (Doc. 84-2, #10856). That service, however, helps only users with registered trademarks and specifically does not include copyright claims. (Bundy Dep., Doc. 76-6, #8841/sealed Doc. 74-6, #7643). Weekend Warrior does not own any registered trademarks, only copyrights, so this service is irrelevant here. (Doc. 84-2, #10586).

Amazon receives a high quantity of NOCIs each year. In 2022, for example, it received approximately [redacted] notices. (*Id.* at #10587). Amazon estimates [redacted] of these are fraudulent (which Weekend Warrior disputes). (Doc. 84-2, #10579, 10587–88). This potential for fraudulent reporting creates concerns. According to Amazon's expert, "[t]he potential for abuse is significant … Sellers or content creators may file fraudulent or exaggerated takedown notices against competitors to remove popular products, disrupt business operations, or unfairly dominate search results." (LaMagna Rep. Doc. 76-13, #9540).

To determine which NOCIs are legitimate, Amazon has a bevy of detection systems that include both automated machine learning processes and human reviewers. (Doc. 84-2, #10589). Start with an email NOCI. If a purported rights holder emails Amazon's copyright email address, Amazon will attempt to verify the purported rights holder's email account, including requiring the user to provide a verification code. (Doc. 84-2, #10588). In particular, Amazon claims it "scrutinizes NOCIs [redacted]" because Amazon cannot immediately verify a connection between the person submitting the complaint and the actual rights holder. (*Id.*).[9] From there, a human reviewer will "[redacted]" in an effort to find a verifiable connection between the submitter and the disputed intellectual property. (Doc. 84-2,

[9] Weekend Warrior disputes that these accounts pose more of a challenge, particularly given that Amazon could not verify its own email address when Tim Whelan submitted complaints. (Doc. 84-2, #10589).

#10589). Amazon employs approximately [redacted] investigators to review NOCIs from both email and the Report Infringement Tool. (Doc. 84-2, #10589–90).

At that point, if Amazon determines the NOCI was fraudulent, it will put the submitter's email address on a "blocklist." (Doc. 84-2, #10589). Once that occurs, Amazon will automatically reject all future NOCIs from that email address, without any further review. (Doc. 84-2, #10589). But Amazon [redacted], the consequences of [redacted], or why Amazon deemed [redacted]. (*Id.*).

Beyond that, the NOCI must adequately identify the intellectual property right allegedly at issue and the allegedly infringing content. (*Id.* at #10590). If Amazon concludes the NOCI is valid, Amazon will remove the infringing content and notify the "relevant party." (*Id.*). As mentioned above, once a NOCI is verified, an image of the intellectual property goes into Amazon's database for future reference checks. (*Id.* at #10591).

**C. Weekend Warrior's Infringement Notifications to Amazon.**

Now to the basis of this specific lawsuit. Weekend Warrior contends that Content Creators have been uploading its copyrighted designs onto merchandise through Amazon's Merch on Demand portal. Overall, Weekend Warrior has 48 copyrighted works at issue, the "Asserted Copyrights." Additionally, it claims there are approximately 560 listed products that infringe its copyrights, which it calls the "Accused Listings." (Doc. 84-2, #10599). Not all of the Accused Listings, though, have

accompanying sales. (*Id.*). But, as to those sales, Weekend Warrior contends that the display of the product (with the included design) itself constitutes infringement.

Starting in 2021, Weekend Warrior notified Amazon of the alleged copyright infringements. (Doc. 84-2, #10592; Doc. 86-1, #10920; sealed Ex. 24a (spreadsheet)). Specifically, on May 5, 2021, Tim submitted a NOCI via email. (Doc. 86-1, #10921). Tim sent the email from support@officialusadrinkingteam.com, stated "I am the owner of officialusadrinkingteam.com" and signed it "Official USA Support Team." (Doc. 64-7, #6762). The email contained links to five Amazon listings allegedly stealing Official USA Drinking Team's design, and included a link to Official USA Drinking Team's similar product, its *Statute of Libeerty* jersey. (*Id.*). The email did not reference the Whelans or Weekend Warrior, though. (*Id.*).

Within minutes, Amazon rejected the NOCI as "incomplete." (Doc. 86-1, #10923). It also requested more information: "(1) name and email address of the person submitting the notice and any additional contact details; (2) rights owner name if the notice is submitted by an agent of the rights owner; (3) physical or electronic signature; (4) description of the copyrighted work claimed to be infringed; (5) your address, telephone number, and email address; (6) statement by the submitter that the use of the material was not authorized and that, under penalty of perjury, the information in the notice was accurate and authorized." (*Id.*). Tim responded within half an hour, but Amazon objects that he did not clearly identify the specific copyright material, identify the true rights holder (Weekend Warrior), or

provide a signature. (*Id.*). Again, Amazon rejected the report as incomplete. (*Id.* at #10924).

After that failed attempt, on May 10, 2021, Tim tried to report the alleged infringement through Amazon's public notice form. (*Id.* at #10926–27). But to do so, Tim had to create an Amazon account, which he did with his personal email address, twhelan40@gmail.com. (*Id.* at #10929). Again, Tim flagged alleged infringements of Weekend Warrior's "Libeerty" jersey design. (*Id.* at #10926–27). And once again, Amazon responded by requesting additional information. (*Id.* at #10927). So Tim immediately replied with what he believed to be the requested specifics. But Amazon again found that insufficient because the response did not include the original information. (*Id.* at #10927–28).

Ten months later, Tim submitted another NOCI via the notice form. (*Id.* at #10929). This time, he asserted infringement of the *Bad Day to Be a Beer* design. (*Id.*). Amazon rejected this one, too. (*Id.* at #10930). Tim continued to submit NOCIs that Amazon repeatedly rejected for incomplete information. (*Id.*).

From Amazon's perspective, upon receiving these NOCIs, it attempted to verify that they were valid complaints. To that end, Amazon checked the [redacted] associated with the submitter's email address and believed it was tied to [redacted]. (Doc. 84-2, #10595).[10] Beyond that, Amazon could not find any

[10] More specifically, Amazon noted in a spreadsheet cataloging Whelan's notifications that there were "[redacted]." (Bundy Dep., Doc. 76-6, #8856/sealed Doc. 74-6, #7658). When Bundy inquired what "[redacted]" meant, "the only explanation [he] got back [was] that they think it was a mistype to mean [redacted]," which in turn stands for [redacted]. (*Id.*). Considering that confusion, Weekend Warrior argues that

connections between the email address and the purported rights holder, USA Drinking Team. (*Id.*). Specifically, Amazon's investigation determined that the NOCI was "submitted by a person who was not a legitimate rights holder, based on a number of warning signals: no [redacted], no [redacted] no [redacted], inconsistent and suspicious [redacted], and use of [redacted]." (*Id.*). Several of those red flags, however, involve Amazon's internal services. For example, "[redacted]" refers to whether that submitter has [redacted]. (Doc. 76-6, #8852–53/sealed Doc. 74-6, #7654–55). Likewise, [redacted] refers to whether [redacted] (Doc. 76-6, #8855/sealed Doc. 74-6, #7657). So if someone [redacted], like Tim here, then Amazon's system flags the submitter as likely fraudulent. (*Id.* at #8853–54/sealed Doc. 74-6, #7655–56).

Despite requesting that submitters provide a phone number and physical address, Amazon does not have any guidance directing its investigators to call a submitter regarding their report or send any physical mail to the provided address. (Doc. 86-1, #10938/sealed Doc. 85-1, #10782). So Amazon did not reach out to Tim either way. (*Id.*). And conversely, a submitter cannot call Amazon to discuss a NOCI. (*Id.* at #10939/sealed Doc. 85-1, #10783).

---

Amazon does not truly know whether the records reflect a connection to the UAE. (Doc. 84-2, #10595).

As a result of the concerns it had identified with Tim's NOCIs, Amazon put his email address on its blocklist, meaning that Amazon would automatically reject any future emails or notifications from that email address. (Doc. 84-2, #10596). There is dispute over whether the support@officialusadrinkingteam.com email address was also added to the blocklist. (Doc. 86-1, #10933). But if it was, that means that all of Tim's other pre-suit communications immediately went in the virtual trash can.

There is no appeal process if Amazon determines an email address is fraudulent. That is, even if a submitter somehow learned they had been added to the blocklist on those grounds, they would have no recourse with Amazon. (*Id.* at #10942/sealed Doc. 85-1, #10786). On the other hand, if a user is "abusive" and added to the blocklist, the user will be informed of the blocklist and given an opportunity to appeal that decision. (Doc. 86-1, #10942–43/sealed Doc. 85-1, #10786–87). Amazon only removed Tim's email from the blocklist two weeks after Weekend Warrior filed this suit. (*Id.* at #10943/sealed Doc. 85-1, #10787). Yet, for some reason, Amazon placed Tim's email on the blocklist again from June 28, 2024, until November 15, 2024. (*Id.* at #10943, 10945/sealed Doc. 85-1, #10787, 10789).

To Amazon's credit, Tim was not the only person notifying Amazon of alleged infringements of Weekend Warrior's copyrights. Seven unrelated email addresses submitted NOCIs regarding *Bad Day to Be a Beer – America Edition*, *Bad Day to Be a Beer*, and *Uncle Sam Griddy*. (Doc. 84-2, #10596–97). Amazon similarly determined these other submitters were not valid rights holders, and it added four of the email addresses to its blocklist. (*Id.* at #10597). No evidence in the record suggests that the

Whelans had anything to do with these NOCIs (meaning that, if the Whelans in fact own the copyrights as to those images, these would be examples of fraudulent NOCIs).

Furthermore, Amazon alleges that Weekend Warrior reached out regarding only five specific copyrights: (1) *Bad Day to Be a Beer*, (2) *Bad Day to Be a Beer America Edition*, (3) *Leprechaun Griddy*, (4) *Pat McCrotch*, and (5) *Ameri-CAN Eagle*. (*Id.* at #10592). Accordingly, Amazon argues that Weekend Warrior did not raise any issue about the other Asserted Copyrights before filing suit.

Weekend Warrior, however, contends that it notified Amazon of all its copyrights by sending Amazon "a link to Weekend Warrior's entire t-shirt catalogue by linking to the [USA Drinking Team] webpage where all t-shirts are offered." (*Id.* at #10592–93). Likewise, Amazon alleges that Weekend Warrior notified it regarding only 21 Accused Listings, but Weekend Warrior again points to the link to its website. (*Id.* at #10593). Additionally, 107 of the 560 Accused Listings did not generate any sales or advertising revenue. (*Id.* at #10594). Beyond that, though, from March 1, 2020, to at least February 24, 2025, "Amazon has sold over 20,000 discrete orders" of Accused Listings. (Doc. 86-1, #10914, 10945–46/sealed Doc. 85-1, #10789–90).

**D. Lawsuit.**

Frustrated with the rejection and subsequent lack of response from Amazon,[11] Weekend Warrior filed this lawsuit on November 13, 2023. (*See* Compl., Doc. 1). It

---

[11] Amazon alleges that it removed 8 of the Accused Listings before Weekend Warrior sued. (Doc. 86-1, #10921). In looking at the cited spreadsheet, however, all of the complaints

asserted direct, contributory, and vicarious copyright infringement claims. (*Id.* at #15–18).

That sparked a response from Amazon. In its original Complaint, Weekend Warrior claimed infringement for 19 designs. (*Id.* at #6–7). Two days later, Amazon started removing the allegedly infringing designs. (Doc. 84-2, #10597). In communications between counsel, Amazon requested "high-quality" images of Weekend Warrior's copyrights so that it could further screen for infringing products. (*Id.* at #10598). And "[b]y December 21, 2023, Amazon had identified and removed more than 1,000 product listings." (*Id.*). Moving forward, when Weekend Warrior's counsel would inform Amazon of infringing products, Amazon would remove those listings within two weeks. (*Id.*). As of November 21, 2025, when Amazon submitted its proposed facts, Amazon had taken down over 7,500 allegedly infringing listings, far beyond the approximately 560 listings Weekend Warrior specifically highlighted, many of which had zero sales. (*Id.* at #10599). Likewise, Amazon terminated over [redacted] Content Creators that were linked to one or more of the infringing listings. (*Id.* at #10600).

Turning back to the procedural history, on February 27, 2024, Weekend Warrior amended its complaint, supplementing its allegations but retaining the same causes of action. (Doc. 17). Amazon then answered. (Doc. 19). From there, the parties proceeded to discovery. While there were some difficulties along the way, (*see* 2/13/25

---

marked "accepted" were resolved in 2024, which would be post-lawsuit. (Sealed, manually filed Ex. 24a).

Min. Entry; 5/7/25 Min. Entry; 5/28/25 Min. Entry), the parties ultimately completed discovery. Then on October 24, 2025, both sides moved for summary judgment on all claims. (Docs. 66, 68). Each side responded to the other, (Docs. 84, 86), and replied, (Docs. 90, 92). Additionally, the parties filed briefing regarding a relevant Supreme Court decision issued last term. (Docs. 94, 95, 97; 4/6/26 Not. Order).

With that, the matter is ripe for the Court's review.

**LEGAL STANDARD**

In evaluating the parties' cross-motions for summary judgment, the Court keeps in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at 3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). But if the moving party does so, the nonmoving party cannot defeat a motion for summary judgment merely by pointing to just *any* factual dispute. As the Sixth Circuit has explained, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (citation modified).

In sum, the nonmoving party must present some "sufficient disagreement" that would require submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335,

340 (6th Cir. 1993) (citations omitted). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

When both parties move for summary judgment, that does not change the analysis the Court applies to either party's motion. Rather, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Black v. Pension Benefit Guar. Corp.*, 973 F.3d 576, 581 (6th Cir. 2020) (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)), *superseded on other grounds by amended opinion*, 983 F.3d 858 (6th Cir. 2020). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.3d 240, 248 (6th Cir. 1991)).

**LAW AND ANALYSIS**

Weekend Warrior moves for summary judgment on all three counts: (1) direct infringement, (2) contributory infringement, and (3) vicarious infringement. (Docs. 66, 73). It also argues that the undisputed facts show that Amazon willfully infringed

its copyrights, subjecting Amazon to additional damages. (Doc. 66, #6862–65). Amazon, by contrast, seeks summary judgment in its favor as to all three counts, and additionally asserts several partial defenses in the event the Court finds that the case should move forward as to any of the three. (Doc. 73, #7149–79).

The Court starts by addressing whether Weekend Warrior has valid, original copyrights in the first place. It ultimately determines that a genuine dispute of material fact exists on that front, which precludes summary judgment in Weekend Warrior's favor. Then, assuming that Weekend Warrior possesses at least one valid copyright, the Court analyzes whether Amazon could be found liable as a direct, contributory, or vicarious infringer. The Court concludes that contributory infringement does not fit the circumstances here, but that Amazon could be found liable under a direct or vicarious liability theory. Thus, the Court **DENIES** Weekend Warrior's summary judgment motion, (Doc. 66), **DENIES** Amazon's summary judgment motion on the direct and vicarious infringement counts, but **GRANTS** summary judgment for Amazon on the contributory liability front.

**A. Copyright Infringement Generally.**

The Constitution provides that "Congress shall have Power … To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Congress has since exercised that authority and codified protection for "original works of authorship fixed in any tangible medium of expression," including as relevant here, "pictorial, graphic, and sculptural works."

17 U.S.C. § 102(a)(5). The author enjoys specific exclusive rights such as the right to "reproduce" the work, to "prepare derivative works," to "distribute copies," and "to display the copyrighted work publicly." *Id.* § 106. If someone violates one of these exclusive rights, the author can pursue a copyright infringement claim. And "[c]opyright infringement is a strict liability offense," meaning that "a plaintiff is not required to prove unlawful intent or culpability" to recover. *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016); *see also, e.g.*, *Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058, 1072 (9th Cir. 2025) (same); *Sony BMG Music Ent. v. Willis*, No. 1:07-cv-156, 2008 WL 2120837, *3 (S.D. Ohio May 19, 2008) (collecting additional authorities).

A copyright owner can pursue recovery under either a direct or secondary liability theory. "Direct copyright infringement claims hold the specific infringer liable." *Tomelleri v. SunFrog, LLC* (*Tomelleri II*), 721 F. Supp. 3d 566, 572 (2024) (citation omitted). To establish a direct infringement claim, "the claimant must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the [copyrighted] work that are original.'" *RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 667 (6th Cir. 2024) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991)).

As for secondary liability, while "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," the Supreme Court has recognized theories of contributory infringement and vicarious liability. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434–35 (1984); *Metro-Goldwyn-*

*Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005); *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S.Ct. 959, 964 (2026). Secondary liability claims, though, still depend on a third party actually committing direct infringement. *Tomelleri II*, 721 F. Supp. 3d at 572. That is, absent direct infringement, there cannot be secondary infringement. So the Court begins with the questions of whether Weekend Warrior has valid copyrights for each design and whether the Accused Listings copy any original elements of those designs. Then the Court will evaluate whether Amazon specifically can be held liable for the alleged infringement.

### 1. A Genuine Dispute of Material Fact Exists Regarding the Originality of Each of Weekend Warrior's Designs, Precluding Summary Judgment for Weekend Warrior.

The first element is whether the plaintiff has a valid copyright in the works at issue. *RJ Control Consultants*, 100 F.4th at 667. If the plaintiff possesses registrations from the Copyright Office, that establishes "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." *Calibrated Success, Inc. v. Charters*, 72 F. Supp. 3d 763, 769 (E.D. Mich. 2014) (citing 17 U.S.C. § 410(c)); *Premier Dealer Servs., Inc. v Allegiance Adm'rs*, LLC, 93 F. 4th 985, 989 (6th Cir. 2024) ("If an author registers a copyright within five years of its first publication, it receives a statutory presumption of validity."). But the presumption of validity is rebuttable. *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 477 (6th Cir. 2015). In a sense, the registration shifts the burden to the alleged infringer to offer facts that would invalidate the copyrights. *Id.* (citing *Hi-Tech Video Prods., Inc. v.*

*Cap. Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir. 1995)). But the ultimate burden of persuasion remains, at all times, on the copyright owner. Fed. R. Evid. 301.

The Court starts with Weekend Warrior's prima facie case before turning to Amazon's various arguments that Weekend Warrior's designs either are unoriginal or are unlawful derivative works and thus not entitled to copyright protection. Ultimately, the Court concludes that genuine disputes of material fact regarding the copyrightability of its various designs, coupled with the parties' failure to provide a detailed image-by-image analysis of the originality issues, prevent summary judgment either way on the question.

**a. Weekend Warrior Satisfies Its Initial Burden.**

Here, Weekend Warrior alleges that Tim registered each design with the Copyright Office and Dan, as illustrator, assigned each copyright to Weekend Warrior. (Doc. 66, #6858). In the Amended Complaint, Weekend Warrior listed its 48 copyrighted designs and attached copies of the certificates, as well as information for two pending copyrights that have been approved since then. (Doc. 17, #123–25 (list), 140–243 (certificates); Tim Decl., Doc. 64, #6722–23; Doc. 64-3 (*King of the Kill*); Doc. 64-4 (*St. PatRIZZ Day*)).[12] These registrations mean that Weekend Warrior has made its prima facie showing of a valid copyright for each of the 50 designs.

[12] *See supra* note 4 for complete list of copyrights.

### b. The Court Cannot Conclude as a Matter of Law Weekend Warrior's Designs Are Validly Copyrighted.

The presumption that a copyright certificate affords, however, only goes so far. Here, Amazon argues that, registration notwithstanding, genuine disputes remain as to whether Weekend Warrior's copyrights are valid—either because the drawings were not sufficiently original or because (at least as to 21 of the images[13]) they were unlawful derivative works. Moreover, recall that, once Amazon puts forward facts calling validity into question, the ultimate burden on proving validity falls on Weekend Warrior. So both parties have some work to do.

Ultimately, neither side gets all the way home. While this case involves 50 distinct images, the parties largely eschew an image-by-image analysis in favor of either (1) focusing their arguments on a few specific images (*see, e.g.*, Weekend Warrior MSJ, Doc. 66, #6858–61; Amazon Resp., Doc. 85, #10714 (referring to an exhibit that includes preexisting works allegedly relating to some of Weekend Warriors copyrighted images)), or (2) talking in broad generalities (Doc. 85, # 10713 (noting that designer "used preexisting images" in creating his own images without specifying what images or how the designer used them in connection with creating any of the specific copyrighted works)). That said, the Court finds that Weekend

---

[13] Those 21 designs are: (1) *Uncle Sam's American Lager*, (2) *I Want Brew*, (3) *Papa Woody Plumbing*, (4) *Fantasy Football Legend*, (5) *Bad Day to Be a Cerveza*, (6) *Griddy Cerveza*, (7) *Bad Day to Be a Beer – America Edition*, (8) *Ameri-CAN Eagle*, (9) *Meri-CAN Eagle*, (10) *Ameri-CAN V2*, (11) *Poor Day to Be a Pilsner*, (12) *Real American – Uncle Sam*, (13) *Ameri-CAW*, (14) *Bad Day to Be a Beer – Christmas Edition*, (15) *Can't Get Hungover*, (16) *Do You Feel Lucky*, (17) *Pat McCrotch Irish Pub*, (18) *Enjoy Beer*, (19) *Enjoy Beer – Ugly Sweater*, (20) *Make Mullets Great Again*, and (21) *Protect the Charms*. (Doc. 73, #7184–95).

Warrior carries its burden of persuasion as to the 29 images that Amazon does not challenge as derivative, but not as to those remaining 21 images.

The Copyright Act protects only "original works of authorship," 17 U.S.C. § 102(a), and does not extend to "any portion of the work that is not original to the author," *Hiller, LLC v. Success Grp. Int'l Learning All., LLC*, 976 F.3d 620, 627 (6th Cir. 2020) (citation modified); *see* 17 U.S.C. § 103(b). So "[o]ne way to rebut the presumption of validity is to show that the work is not original." *Premier Dealer Servs.*, 93 F.4th at 989 (citing *Varsity Brands*, 799 F.3d at 476). Original, for purposes of copyright law, "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Hiller*, 976 F.3d at 626 (quoting *Feist Publ'ns, Inc.*, 499 U.S. at 345). "[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* (quoting *Feist*, 499 U.S. at 345).

Amazon contends that the images here (presumably all of them) do not offer the requisite level of originality. But that argument comes in a few flavors. First, Amazon makes a blunderbuss allegation about all of the designs. It claims that, because Tim Whelan conceded that he "used preexisting images" as a starting point, that, in and of itself, is enough to "create [a] fact question[]" as to whether his works are original. (Doc. 85, #10713). The Court disagrees. The registration carries the day on originality, at least as a prima facie matter. And Amazon cannot overcome that

presumption merely by saying "not so," based on some broad reference to Whelan's use of preexisting works.

Second, Amazon relies on an expert report from Caroline de Baere that is directed at the originality, or lack thereof, of the designs. (*Id*. at #10715). And that report at least takes the designs on a design-by-design approach (or at least a group-by-group-of-related-designs approach). (*See* de Baere Exp. Rep., Doc. 57-4). But de Baere's opinions on originality are underwhelming, at best. It is not at all clear to the Court exactly what standard of originality she applies, and her application of that standard, whatever it is, appears to be subjective, at least so far as the Court can tell. So, once again, the Court finds that insufficient to overcome the registration as to the originality of the designs.

But Amazon makes a separate argument as to 21 of the designs. Here, Amazon puts forth specific preexisting designs and claims that Weekend Warrior's designs are derivative works. And as to these designs, Amazon not only claims that Weekend Warrior cannot get summary judgment, but that Amazon is itself entitled to summary judgment.

The Copyright Act defines a derivative work as one "based upon one or more preexisting works." 17 U.S.C. § 101. The author of the preexisting work generally enjoys the exclusive right to create derivative works. *Id*. § 106(2). "Accordingly, when a person creates a derivative work without the original author's permission, that person has unlawfully used the original work." *Hiller*, 976 F.3d at 629. At the same time, the right to control derivative works is not unlimited. "The copyright

laws … attempt to strike a balance between rewarding the creative labor of authors of original works, and promoting further creativity by allowing public access to their works." *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1199 (10th Cir. 2005) (citing *Sony Corp.*, 464 U.S. at 429). So the Act provides protection for new works that include some preexisting material, but "[t]he copyright in a … derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." 17 U.S.C. § 103(b). Moreover, "protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully." *Id.* § 103(a).

Here, as noted, Amazon claims that 21 of Weekend Warrior's designs are derivative of various third-party works it has provided to the Court, which it says invalidates those copyrights. But there is one problem right off the bat—Amazon has not provided evidence that these third parties' works are themselves in fact copyrighted. Sure, some of the preexisting materials come from major brands, such as Samuel Adams, Corona, and Budweiser, or from movies like *Conan the Barbarian* and *How the Grinch Stole Christmas*. (*See, e.g.*, Doc. 84-1, #10512, 10520, 10524, 10527, 10530, 10550). Those companies and productions likely copyrighted their work.[14] But that presumption weakens with preexisting works such as "Uncle Sam

[14] Two companies, Conan Properties International LLC (*Conan the Barbarian* movie) and Budweiser, sent Weekend Warrior cease-and-desist letters to stop using their preexisting works. (Doc. 84-1, #10520–21, 10530). So there is an even stronger presumption of copyright for those two companies, although the Court still does not possess a copyright registration for those preexisting designs either.

with Beer" or the "Freedom" t-shirt, where Amazon merely noted the designs were "available on the internet." (*Id.* at #10515 & n.4, 10548 & n.26). In short, Amazon has failed to establish as a matter of undisputed fact that the images on which it relies are themselves copyrighted images. And because Weekend Warrior cannot have infringed the exclusive right to create derivative works if there was not an underlying copyrighted work, *see* 17 U.S.C. § 106(2), the Court cannot conclude as a matter of law that these 21 designs are derivative works as the Copyright Act uses that term.

Then there is a separate problem. Even if Amazon had shown that the preexisting works were copyrighted, there is still the question of fair use. *See* 17 U.S.C. § 107. A use of a preexisting work that falls within that statutory defense is lawful, even if unauthorized. And, on the facts here, a jury could reasonably find that, at least as to many of the underlying preexisting works, Weekend Warrior's use falls within the fair use defense. So, once again, at least at the summary judgment stage, the Court is not prepared to say as a matter of law that the works are derivative. Which means that Amazon's motion for partial summary judgment on that issue fails.

At the same time, though, while Amazon has not crossed the goal line on whether the 21 works *are* derivative, it has at least created at least a genuine dispute of material fact on that front. That is, the Court finds that a reasonable jury could conclude that these 21 designs are derivative works that Weekend Warrior has unlawfully used. And if the jury makes that finding, then Weekend Warrior does not have a valid copyright in those designs.

**2. Copying.**

With the Court's analysis of the first element complete, the Court briefly addresses the second element: whether the records shows the defendant copied the plaintiff's work. *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). Generally, a "plaintiff can show copying in two ways, either through direct evidence of copying, or by indirect evidence." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 274 (6th Cir. 2010) (citing *Kohus*, 328 F.3d at 853–54). For the latter, "a plaintiff may establish 'an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Id.* (quoting *Kohus*, 328 F.3d at 853–54).[15]

At first glance, this element seems easily met. First, Weekend Warrior's designs are all shown on its publicly available website, so access is clear. Second, it submitted a chart with side-by-side comparisons of its designs and the 560 Accused Listings. (Docs. 33, 33-1, 33-2). That chart shows exact, or near exact, copies of Weekend Warrior's designs. (*Id.*). So substantial similarity does not seem like a heavy lift.

Amazon argues though that more is required. After all, "[n]ot all 'copying' is actionable …: it is a constitutional requirement that a plaintiff bringing an

[15] In Weekend Warrior's original motion, it argued that the exact copies constituted direct evidence. But this still requires an inference that a third-party did the physical act of copying Weekend Warrior's design. *See R.C. Olmstead*, 606 F.3d at 274 (affirming district court's holding that evidence of programmers accessing copyrighted software multiple times while developing allegedly infringing software did not constitute direct evidence as it required an inference of copying). Thus, Weekend Warrior needed to follow the indirect-evidence framework.

infringement claim must prove 'copying of constituent elements of the work *that are original*.'" *Kohus*, 328 F.3d at 853 (citing *Feist*, 499 U.S. at 361). Consistent with that, as a general matter, to establish that the asserted design and alleged infringing design are substantially similar, the Sixth Circuit employs a two-part test. *Id.* at 855. "[T]he first step 'requires identifying which aspects of the artist's work, if any, are protectible by copyright,' the second 'involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the artist's work." *Id.* (quoting *Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002)). "The essence of the first step is to filter out the unoriginal, unprotectible elements—elements that were not independently created by the inventor, and that possess no minimal degree of creativity." *Id.* (citing *Feist*, 499 U.S. at 345). And Amazon contends that Weekend Warrior has failed to identify the protectible elements.

On the facts here, though, the Court concludes that the two-part test is not necessary—at least not as to all of the alleged instances of infringement. Where the allegedly infringing image is a pixel-by-pixel copy of the copyright owner's design, it necessarily includes *all* elements of the first image—those that are protectible and those that are not. So the only question is whether the original image had *any* protectible elements. But that is merely to re-ask the original question of whether the original image is covered by a valid copyright. In short, as to any image for which there is a valid copyright, and as to which the image on the Amazon website is a pixel-by-pixel copy, the copying prong will not prove a stumbling block.

The problem for Weekend Warrior, though, is that this syllogism works only as to exact copies, and it has not identified which of the Amazon images are exact copies and which are not. True, it provided the Court an exhaustive list of the various Amazon products it accuses of infringing, with the image on each such product juxtaposed against the allegedly infringed Weekend Warrior design. And admittedly, as to some of those, the copy seems exact. (*See, e.g.*, Doc. 33, # 1458). As to others, though, that is by no means clear, (*see, e.g.*, *id*. at #1469 (mug turned different direction, font different, hand placement different), #1479 (beer can different appearance)). And, given that there are 567 pages of accused Amazon products (and corresponding Weekend Warrior designs), the Court is not inclined to dig through the record on its own to see which are which. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Of course, as to any instances of alleged infringement that do *not* involve exact copies, the Sixth Circuit's two-step test comes back into play. And Weekend Warrior has not even tried to make the necessary showing under that test.

In sum, Weekend Warrior has failed to carry its burden of showing both steps—ownership of a valid copyright and evidence of copying—for the 50 designs it asserts. And while it may have made the necessary showing as to some of them, the Court is not inclined to dig through the record to sort that out on its own. Accordingly, the Court denies Weekend Warrior summary judgment.

## B. Amazon's Liability.

But that is not the end of the story. While Weekend Warrior is not entitled to summary judgment that infringement occurred, it is certainly possible that it could convince a jury that, as to some or all of the images, Weekend Warrior has a valid copyright and copying has occurred. But, in Amazon's motion for summary judgment, it contends that, even if Weekend Warrior did so, Amazon itself would not be liable for that infringement. That is, given the way in which Merch on Demand is structured, Amazon says that its role is sufficiently removed from any alleged infringement that it is not liable, whether as a direct infringer, a contributory infringer, or a vicarious infringer. The Court agrees with Amazon as to the second, but not the first (at least as to products Amazon actually sold) or third.

### 1. A Genuine Dispute Remains as to Whether Amazon Engaged in Volitional Conduct and Thus Could Be Liable for Direct Infringement.

Start with direct infringement. Generally, "[d]irect copyright infringement claims hold the specific infringer liable." *Tomelleri II*, 721 F. Supp. 3d at 572. Contrast that with secondary infringement claims that impose "liability for actions of third parties." *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 439 (5th Cir. 2017) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)). While "the lines between direct infringement, contributory infringement, and vicarious liability" have never been "clearly drawn," *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n.17 (1984), the distinctions have only gotten murkier with the rise of internet service providers and online platforms. On

these platforms, as is the case here, a third party uploads the allegedly infringing content, and the defendant effectively hosts it. With this division, courts have struggled with whether direct liability, as opposed to secondary liability, is the appropriate framework. To address this dilemma, "courts have trended toward requiring volitional conduct" as a prerequisite for imposing direct liability. *BWP Media*, 852 F.3d at 439.

Amazon seeks to take full advantage of this trend. It maintains that Weekend Warrior has failed to establish any volitional conduct by Amazon, and says this failure is "dispositive" of Weekend Warrior's direct infringement claim. (Doc. 86, #10882). Weekend Warrior, on the other hand, argues that "this Court is not bound to apply [the volitional-conduct requirement] in the first place." (Doc. 84, #10453). So the Court starts with the question of whether the volitional-conduct doctrine applies. Concluding that it does, the Court then turns to whether a jury could find that Amazon has engaged in such volitional conduct here.

**a. A Plaintiff Must Show Volitional Conduct to Succeed on a Direct Infringement Claim.**

"The 'volitional conduct' requirement is typically implicated in copyright infringement cases involving a defendant who operates an online service or mechanism that is 'used by third parties to reproduce (or perform, display, or distribute) a copyrighted work.'" *Tomelleri II*, 721 F. Supp. 3d at 574–75 (quoting Robert C. Denicola, *Volition and Copyright Infringement*, 37 Cardozo L. Rev. 1259, 1272 (2016)). The question is "over the authorship of the infringing conduct." *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 130 (2d Cir. 2008). The

volitional-conduct requirement clarifies that issue and "properly categorize[s] claims against *infringers* as *direct* copyright claims while categorizing claims against *providers* as *secondary* claims." *Tomelleri II*, 721 F. Supp. 3d at 575 (citations omitted).

The first case to implement a volitional-conduct requirement was *Religious Technology Center v. Netcom On-Line Communication Services*, 907 F. Supp. 1361 (N.D. Cal. 1995). In *Netcom*, the district court held that the owner of an online bulletin board could not be directly liable for copyrighted works uploaded onto its website. *Id.* at 1372–73. The *Netcom* court reasoned that there needed to be a greater connection between the defendant's conduct and the infringement to establish liability: "Although copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." *Id.* at 1370.

The name itself though, "volitional conduct," is somewhat misleading. "[T]he word 'volition' in this context does not really mean an 'act of willing or choosing' or an 'act of deciding.'" *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) (quoting *Webster's Third New International Dictionary* (1986)). Rather, it is essentially a causation requirement. After all, "proximate causation historically underlines copyright infringement liability no less than other torts." *Id.* (citations omitted); *see also* 4 *Nimmer on Copyright* § 13E.09 (2026) (collecting cases and concluding that "properly understood, 'volition' signals the same type of inquiry into proximate cause as elsewhere in tort doctrine."). The Fourth Circuit has required

"actual infringing conduct with a nexus sufficiently close and causal to the illegally copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004). Put simply, "*direct* liability must be premised on conduct that can reasonably be described as the *direct cause* of the infringement." *Perfect 10*, 847 F.3d at 666 (citation omitted) (emphasis in original).

Without a doctrine akin to the volitional-conduct requirement, there would be increasing overlap between direct and secondary liability for online platforms that would only confuse these areas of law. As Justice Scalia warned:

> The distinction between direct and secondary liability would collapse if there were not a clear rule for determining whether *the defendant* committed the infringing act. The volitional-conduct requirement supplies that rule; its purpose is not to excuse defendants from accountability, but to channel the claims against them into the correct analytical track.

*Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 455 (2014) (Scalia, J., dissenting) (citations omitted). With these considerations in mind, "every circuit to address this issue has adopted some version of *Netcom*'s reasoning and the volitional-conduct requirement." *BWP Media*, 852 F.3d at 440 (collecting cases).

Importantly, though, as Weekend Warrior points out, the phrase "every circuit to address this issue" does not include the Sixth Circuit. (Doc. 84, #10453). But that of course also means that the Sixth Circuit has not *rejected* such a requirement. In fact, "several district courts within the Sixth Circuit classify the Sixth Circuit's decision in *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005), as implicitly adopt[ing] the requirement." *Tomelleri II*, 721 F. Supp. 3d at 576 n.5

(collecting cases). In any event, without passing on whether the Sixth Circuit has tacitly adopted the volitional-conduct requirement, this Court agrees with courts around the country that causation is a necessary showing, even for strict liability causes of action, and that volitional conduct serves an important "channeling function" between the different theories of liability. Robert C. Denicola, *Volition and Copyright Infringement*, 37 Cardozo L. Rev. 1259, 1295 (2016).

Moreover, Weekend Warrior does not offer a compelling argument as to *why* the Court should not follow the trend that requires a volitional-conduct showing. Rather, Weekend Warrior merely observes that the Sixth Circuit has not officially adopted the doctrine. (*See* Doc. 84, #10453). It then goes on to note that copyright infringement is a strict liability tort. (*Id.* at #10453–54). On that latter front, Weekend Warrior is of course correct that "'volitional' must not be mistaken for 'intentional' or 'knowing.'" *Flowers, Inc. v. Springhill Floral & Gift Supply Co.*, No. 5:24-cv-590, 2025 WL 3003931, at *4 (N.D. Ohio Oct. 27, 2025). In other words, "lack of knowledge [that certain conduct is infringing] is no defense." *Stokes v. Brinor, Inc.*, 683 F. Supp. 3d 713, 724 (N.D. Ohio 2023). But properly understood, a volitional-conduct requirement is consistent with strict liability. The Court inquires only into the defendant's *conduct*, not the defendant's state of mind. In sum, the Court concludes that a volitional-conduct requirement is an appropriate mechanism for delimiting the outer bounds of direct infringement.

**b. Contours of the Volitional-Conduct Requirement.**

But then there is the separate question of what *counts* as volitional conduct. As just described, the volitional-conduct requirement simply clarifies that the Copyright Act "requires *conduct* by a person who causes in some meaningful way an infringement." *CoStar Grp.*, 373 F.3d at 549. Historically, print shops and mere photocopiers did not meet that standard. *See id.* at 550 ("When a customer duplicates an infringing work, the owner of the copy machine is not considered a direct infringer."); *Aereo*, 573 U.S. at 455 (Scalia, J., dissenting) ("[*T*]*he customer* chooses the content and activates the copying function; the photocopier does nothing except in response to the customer's commands. Because the shop plays no role in selecting the content, it cannot be held directly liable when a customer makes an infringing copy." (citation omitted)); *BWP Media*, 852 F.3d at 442 ("When a copy-shop owner makes a photocopier available to customers, but a customer brings in the copyrighted work and makes the copy himself, the infringing conduct is attributable only to the customer.").

Translating that principle into the internet age has proven a little more challenging. Let's start with something on which courts generally agree—internet providers do not engage in volitional conduct when customers upload and/or distribute infringing content via the provider's automated processes. For example, in *Perfect 10*, the defendant essentially operated "online bulletin boards" where subscribers could access content on its servers as well as from other connected providers. 847 F.3d at 663. The defendant did not upload content onto the servers itself; instead, the content was "almost exclusively user-driven." *Id.* Perhaps not

surprisingly, some of the images that users uploaded to these bulletin boards infringed others' (including the plaintiff's) copyrights. *Id.* at 664. But the Ninth Circuit concluded the plaintiff had not established that the defendant engaged in any volitional conduct because the "evidence before [it] show[ed] only that [the defendant's] actions were akin to 'passively storing material at the direction of users in order to make that material available to other users upon request,' or automatically copying, storing, and transmitting materials upon instigation by others." *Id.* at 668 (quoting *CoStar*, 373 F.3d at 555).

The cases reaching similar results are legion. *See, e.g.*, *BWP Media*, 852 F.3d at 438, 442 (holding internet service provider could not be directly liable because it only "hosts the forum on which infringing content was posted, but its connection to the infringement ends there."); *Average Joe's Ent. Grp., LLC v. SoundCloud, Ltd.*, No. 3:16-cv-3294, 2018 WL 6582829, at *4 (M.D. Tenn. Oct 17, 2018) (rejecting direct infringement claim for lack of volitional conduct where defendant did not "exercise control of the selection of any material for upload, download, transmission, or storage; users exercise[d] that control"); *White v. DistroKid, LLC*, 766 F. Supp. 3d 451, 454, 461 (S.D.N.Y. 2025) (dismissing claim of direct infringement by music distribution platform because "volitional conduct is not shown merely by alleging that a system copied, reformatted, or distributed copyrighted material" and there was "nothing in the amended complaint to suggest that these acts were anything other than part of an automated process"); *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 733 (9th Cir. 2019) (affirming dismissal of direct infringement claim for lack of volitional conduct

because Zillow did not select the infringing photos on its website or otherwise "exercise control … beyond the general operation of its website" (cleaned up)). Overall, "[a]utomated actions, by themselves, do not amount to a 'deliberate role'" such that a defendant transforms from a "passive provider of a space in which infringing activities happened to occur to an active participant in the process of copyright infringement." *White*, 766 F. Supp. 3d at 461 (quotation omitted).

On the other end of the spectrum, defendants engage in volitional conduct when they select the content for sale. For example, in *Flowers*, the defendants chose which products to buy from a third-party manufacturer before marketing, selling, and distributing them. 2025 WL 3003931, at *2. Some of those selections proved to be infringing designs. *Id.* The district court determined that "the undisputed facts show defendants' non-passive and non-automatic involvement in the alleged infringement [because] the undisputed facts show defendants purchasing, receiving, marketing, and distributing [p]roducts bearing the [infringing] [d]esigns." *Id.* at *5; *see also Aereo*, 573 U.S. at 455 (Scalia, J., dissenting) (The "selection and arrangement by the service provider constitutes a volitional act directed to specific copyrighted works.").

But things get more complicated when, like Amazon here, a third-party creator uploads a design, but the defendant acts as the manufacturer and seller. In that setting, courts are less uniform. For example, in *Wolk v. Kodak Imaging Network*, a third-party website, Photobucket, allowed users to upload photos. 840 F. Supp. 2d 724, 730 (S.D.N.Y. 2012). Kodak (the defendant) maintained a website that allowed users to "order prints of and products containing their digital photographs," including

photos uploaded to Photobucket. Kodak would then handle manufacture and delivery of any ordered products. *Id.* The plaintiff alleged that users had uploaded copies of her copyrighted work to Photobucket and that Kodak had then arranged for the manufacture of products containing those copyrighted works at the direction of Photobucket users. *Id.* at 732. She sought to hold Kodak responsible. *Id*. Applying the above principles, the district court determined there was no evidence of volitional conduct because the reproduction and display of the copyrighted works occurred through an "automated process with no human intervention by any employee of the Kodak Defendants." *Id.* at 742. Specifically, "[t]he fact that Wolk's images are copied into product simulations in addition to being transmitted to fulfillment vendors does not constitute a volitional act where the copying is automated." *Id.* (citation omitted); *see also Tomelleri II*, 721 F. Supp. 3d at 577 (overruling objection to recommendation to dismiss direct infringement claim where the plaintiff alleged that the defendants "marketed, advertised, and sold" infringing works but did not allege that the defendants selected the infringing works (emphasis omitted)).

Contrast that, though, with *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089 (N.D. Cal. 2021). There, Redbubble provided a "global online marketplace where independent artists upload their designs and creative works for sale on a range of products." *Id.* at 1096. Sound familiar? Atari complained that some of the resulting products included Atari's copyrighted images. Redbubble defended on volitional conduct grounds. The court agreed with Redbubble in terms of Redbubble's display of the simulated products on its website:

> [T]he Court finds that Redbubble does not "exercise control (other than by general operation of its website)" for display rights. Although Redbubble arguably modifies the infringing images it receives from artists by applying them to stock photos of physical goods such as apparel, those acts do not demonstrate the type of control that will support direct liability. Any modification occurs automatically with no intervening act by Redbubble employees. Nor does Redbubble "select any material for upload, download, transmission, or storage."

*Id*. at 1112–13 But it reached a different result as to products that Redbubble actually sold:

> On the other hand, there is a question of material fact whether Redbubble "instigates any copying, storage, or distribution" of infringing images. As described in Section V.A, supra, Redbubble holds itself out as the seller of the goods on its website. Redbubble offers those items for sale and then facilitates or causes their creation and delivery, with no involvement from the artists who uploaded the designs. Even though each step is performed automatically by a computer, the acts remain volitional because Redbubble designed its software to accomplish those tasks and for its own financial benefit. Moreover, Redbubble exercises control over every aspect of the sale, from manufacturing to shipping and returns, and thus holds the best position to prevent infringement. Accordingly, since Redbubble actively instigates and exercises control over the sales on its website, a reasonable jury could find that Redbubble is liable for direct infringement of Atari's copyright distribution rights.

*Id*. at 1113. In short, courts are of more than one mind in discussing the exact contours of the volitional conduct requirement in cases where the internet service provider is a hybrid of a bulletin board and a manufacturer for distribution.

This Court concludes that the appropriate question to ask is whether the alleged infringer has a non-automated involvement in the infringing activity. That is, the Copyright Act assigns the owner certain specific rights. When it comes to material like the designs here, those rights include reproduction, sale, and public display. 17 U.S.C. § 106. So the question is whether the alleged infringer took volitional steps to accomplish one of those specific acts. Hosting a bulletin board, where users can

display anything with no oversight, is not a volitional display. But if the host reviews the material before posting, the posting starts looking more like the host's own act. Similarly, on sites like eBay, Craigslist, or Facebook Marketplace, where the host merely creates a forum in which others sell with minimal oversight, it is hard to ascribe the resulting sales to the host itself. They operate the marketplace generally, not the individual stalls where goods are sold. But, if the host, for example, were to review items beforehand, post for sale only those it thinks will sell, choose the price, and name itself as the seller, that would make the host's involvement in the sale look more volitional.

**c. Application to Amazon's Merch on Demand Service.**

With those principles in mind, turn to the case here. While Weekend Warrior's summary judgment motion did not argue that Amazon engaged in volitional conduct, it responded to Amazon's assertion of the rule. (Doc. 84, #10453–59). It primarily asserts that the volitional-conduct requirement is not truly a requirement, as discussed above, it also argues in the alternative that Amazon engaged in volitional conduct. (*Id.* at #10457–59). On that front, Weekend Warrior highlights that Amazon: (1) "screens applicants attempting to join Merch;"; (2) retains the right to terminate user accounts after creating the listing; (3) "controls how many designs Merch creators can offer"; (4) "screen[s] designs before they appear on Merch for quality and compliance with Amazon's policies," including any "obvious" infringement; (5) utilizes human reviewers to flag potential infringement; (6) generates ad revenue from accused listings, both on its own website and on Google; (7) handles shipping of all

Merch products; (8) fully controls customer service requests; (9) is the "seller of record" for Merch designs; and (10) manufactures the Merch products. (*Id.* at #10457–58).

Amazon does not dispute those facts, but it contends that they do not qualify as volitional conduct. In that regard, Amazon highlights that none of these actions involve the selection of any designs or other active involvement in the design process. (Doc. 92, #11283–84).

This case presents a close call. The Court concludes, however, that Amazon's involvement in the alleged infringement here, at least for products actually shipped to customers, creates a genuine dispute as to whether it has engaged in volitional conduct, both as to display and as to any resulting sales. Start with the former. As Weekend Warrior highlights, Amazon is not merely hosting a bulletin board. Rather, it pre-approves who can post on the Amazon site and also reviews each design before it appears. In short, Amazon is doing more than making a machine available that others can use to post information. And that becomes even more clear as to any resulting sales. For such sales, Amazon sets the price, identifies itself as the seller, handles manufacture and shipping, collects payment, and handles returns. (Doc. 84-2, #10575–77; Doc. 86-1, #10916). Depending on what exactly those practices entail behind the scenes, a reasonable jury could conclude that Amazon engages in volitional conduct when it makes a sale through the Merch on Demand platform. That is, a jury could conclude that Amazon is not merely a "passive provider of a space in

which infringing activities happened to occur," *White*, 766 F. Supp. 3d at 461, but rather plays a larger role.

Consider a hypothetical. Amazon wants to claim it is merely the modern-day equivalent of the print shops that made photocopiers available for public use back when paper ruled everyday life. But suppose that such a shop decides to up its game by offering the following service: when a customer copies an original, the shop keeps an electronic copy; the shop also tells the customer that they can send other individuals in to ask for reproductions; the shop then takes the further step of displaying some of the pictures in the shop window with a "buy these here" sign affixed, charging a price it alone sets; and if a passer-by purchases a copy, it then pays a "royalty" to the person who made the original copy. The shop is no longer passively providing a machine; it is taking a hands-on approach to moving product. At some point it crossed the line into active involvement in the sale. That is, it seemingly started acting with volition.

After all, at some level, many retailers are merely selling goods designed by others. Department stores often play little role in designing most of the products that appear on their shelves. But, if a department stores sells an infringing product, it is on the hook. That is what strict liability means. Sure, that may seem to impose a difficult burden on the store operator. How is he or she even to know that infringement is occurring? Perhaps one response to that would simply be to include warranties of non-infringement from suppliers coupled with indemnification agreements in the event the supplier sells the retailer an infringing good. But, in any

event, if copyright liability is to remain a strict liability cause of action, one cannot read the volitional conduct doctrine as requiring a copyright owner to prove that the infringing store operator should have known the goods they sold infringed on someone's copyright. Yet that is the tack that Amazon seems to take here.

Thus, the Court denies Amazon's summary judgment motion for the direct infringement claim.

**2. Amazon Is Not Contributorily Liable.**

The Court next addresses contributory liability. Of note, in Weekend Warrior's summary judgment motion, it barely states the standard for contributory infringement, and it does not apply that standard here at all. (Doc. 66, #6856–57). That matters. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). The same is true for summary judgment arguments. *See, e.g.*, *Ricks v. Pauch*, No. 17-12784, 2020 WL 1640166, at *26 (E.D. Mich. Apr. 2, 2020) (relying on *McPherson*'s perfunctory-argument-as-waiver rule to deny summary judgment); *Becknell v. Univ. of Ky.*, 383 F. Supp. 3d 743, 758 (E.D. Ky. 2019) (same). And "[s]keletal is a charitable description of [Weekend Warrior's] argument" on contributory infringement. *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 778 (S.D. Ohio 2021). So if the Court were not already denying summary judgment due to the originality issue, the Court

would be compelled to deny it here anyway. But the Court will still explore whether Amazon is entitled to summary judgment on this claim. Spoiler alert: it is.

Just this term, the Supreme Court addressed contributory infringement in *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S. Ct. 959 (2026). So Amazon requested leave to file a notice of supplemental authority, which the Court granted, and to which Weekend Warrior responded. (Docs. 94, 95, 97; 4/6/26 Not. Order). In *Cox Communications*, Sony sued Cox Communications, an internet service provider, for continuously providing internet access to known copyright infringers. 146 S. Ct. at 964. The Supreme Court held that "[t]he provider of a service is contributorily liable for the user's infringement only if it intended that the provided service be used for infringement." *Id.* at 967. A copyright owner can establish such intent by either showing (1) "the party induced the infringement," or (2) "the provided service is tailored to that infringement." *Id.* (citations omitted). Expanding on the first, to induce infringement the provider must "actively encourage[] infringement through specific acts," such as advertising the service's infringement capabilities. *Id.* (citing *Grokster*, 545 U.S. at 942). As for the second option, "[a] service is tailored to infringement if it is 'not capable of 'substantial' or 'commercially significant' noninfringing uses." *Id.* (quoting *Grokster*, 545 U.S at 942). The Supreme Court expressly stated that "contributory liability cannot rest only on a provider's knowledge of infringement and insufficient action to prevent it." *Id.* at 969 (citations omitted).

Here, the Court concludes as a matter of law that Amazon has not induced nor tailored its service for infringement under the definitions of those terms laid out above, so it cannot be contributorily liable. Weekend Warrior has not put forth any evidence even suggesting that Amazon marketed or otherwise actively encouraged third-party creators to use its service to create products based on copyrighted works. And Merch on Demand is certainly capable of "substantial" and "commercially significant" noninfringing uses. *Id.* at 967. Indeed, based on the record before the Court, Weekend Warrior cannot reasonably argue that even a majority of Merch on Demand products are infringing products. So the Court grants summary judgment in favor of Amazon for this claim.

**3. Amazon Could Be Vicariously Liable.**

The final form of secondary liability available is vicarious liability. Like contributory infringement, Weekend Warrior only states the legal standard and does not attempt to apply it to the case at hand. (Doc. 66, #6857). So the Court considers only whether Amazon is entitled to summary judgment in its favor. The Court concludes it is not.

To establish vicarious liability, a plaintiff must establish two elements: (1) the "right and ability to supervise the infringing conduct" of another, and (2) the defendant's "obvious and direct financial interest in the infringement." *Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 925 (6th Cir. 2003). The financial benefit prong is straightforward. The question "is whether there is a causal relationship between the infringing activity and any financial benefit a defendant

reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Perfect 10*, 847 F.3d at 673 (quotation omitted). The financial benefit "exists where the availability of infringing material acts as a draw for customers." *Id.* (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004)). That entails a direct financial benefit from the specific infringement at issue, not just the defendant's service generally. *Id.*

The first element merits more explanation. A defendant has the "right to supervise" when it has the power "to stop or limit" the infringement. *Broadcast Music, Inc. v. Meadowlake, Ltd.*, 754 F.3d 353, 354 (6th Cir. 2014) (quoting *Grokster*, 545 U.S. at 930). That does not mean that the defendant must know of the infringement, though. *Id.* at 355 ("A defendant's ignorance about the infringement … does not blunt vicarious liability." (citation omitted)). Rather, the main issue is the degree of control the defendant has. Vicarious liability arose as an "outgrowth of respondeat superior." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1071 (9th Cir. 2013) (quotation omitted). Looking at vicarious liability in similar contexts, for example, in agency or employment law, liability arises where the defendant exercises control over the manner and means of the offending party's employment. *Wellman v. Montes*, 288 F. Supp. 2d 860, 864 (N.D. Ohio 2003) (citing *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989)). In that setting, courts hold the defendant liable because the offending party's actions were in some sense an extension of the defendant's own conduct. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756–59 (1998) (explaining how agency law principles extend liability to an employer for an

employee's actions). That said, vicarious liability in copyright law is generally broader because it includes "a defendant whose economic interests were intertwined with the direct infringer's, but who did not actually employ the direct infringer." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996).

But not all "intertwined" economic interests suffice. On one end of the spectrum, in a series of cases commonly referred to as the "dance hall cases," courts held the operators of entertainment venues liable for infringing performances at their business because the operator could control the material entertainers played at the venue. *See Shapiro, Berstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963); *Sony*, 464 U.S. at 437 n.18 (outlining series of "dance hall cases" where owner became vicariously liable when an orchestra hired to play music for the customers performed a copyrighted work). But on the other end, in another line of cases referred to as the "landlord-tenant cases," courts determined that landlords were not vicariously liable simply because their tenants committed copyright infringement on the leased premises. *Shapiro*, 316 F.2d at 307 (citing *Deutsch v. Arnold*, 98 F.2d 686 (2d Cir. 1938)). The *Shapiro* court determined that the distinction between the two lines of cases was that, in the dance hall cases, the employer "retained the ultimate right of supervision over the conduct" of the direct infringers, *id.* at 308, whereas the landlords in their eponymous line of cases typically did not retain that same right or otherwise regularly police their tenants. *Id.* To the contrary, tenants have historically enjoyed a right to quiet enjoyment that limits the extent to which landlords (among others) can police goings on at the property. At bottom, it appears to be a question of

right to control—vicarious liability arises when the defendant is the "primary decision maker" who is "in charge of operating" the infringer's business, and as such, has the ability to directly police the infringing conduct. *King Records, Inc. v. Bennett*, 438 F. Supp. 2d 812, 852 (M.D. Tenn. 2006).

While the degree of control exerted is more obvious in the employment or landlord contexts, the same principles apply to online platforms. The Ninth Circuit, for example, evaluated Google's liability for infringing images that appeared in its search engine results (as well as Amazon's results that incorporated Google's search engine). *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 730 (9th Cir. 2007). Third-party websites displayed infringing copies of the plaintiff's copyrighted images, and sometimes when users searched on Google, the infringing images would appear. *Id.* at 713. The Ninth Circuit focused on whether Google truly had the right and ability to stop or limit the infringement on the third-party websites. *Id.* at 730. The court noted that in Google's AdSense agreement, it retained the "right to monitor and terminate partnerships with entities that violate others' copyright[s]." *Id.* (quotation omitted). But that was not dispositive. The key consideration was the infringing website's ability to "continue to reproduce, display, and distribute its infringing copies of [the plaintiff's] images after its participation in the AdSense program has ended." *Id.* In other words, Google's decision to terminate its partnership with the website would not actually take down the infringing content because that copy existed on the third-party website. *Id.* While Google may have some *influence* over the infringement, it did not have sufficient *control* over the infringing activity for purposes of vicarious

liability. *Id.* at 731; *see also Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 803 (9th Cir. 2007) (holding credit card payment network not vicariously liable because terminating partnership with member bank or merchant would not stop infringement).

Here, Amazon argues it cannot be held vicariously liable both because it does not have a respondeat superior-type relationship with the third-party content creators and because it did not decline to limit infringement. (Doc. 73, #7144–49). For Weekend Warrior's part, though, it briefly contends that Amazon can and does control "who can post on Merch, and what they can post," as well as terminate any listings or creator accounts. (Doc. 84, #10461). It also argues that Amazon derives a financial benefit from the accused listings and related ad revenue. (*Id.*).

The Court agrees with Weekend Warrior that the vicarious infringement claim can move forward. To start, Amazon clearly retained the right to supervise and stop infringing activity on its website. Users must pass "multiple levels of review" when they first apply for Content Creator accounts, and Amazon continues this supervision as they post listings. (Doc. 86-1, #10910–11). If the creator survives that review, they agree to Amazon's Merch Services Agreement, which, among other things, states that Amazon will suspend or terminate accounts for policy violations, including copyright infringement. (Doc. 84-2, #10581–82). This review includes comparing the proposed design to Amazon's image database, containing "images [already] submitted by rights holders to Amazon through a report infringement form." (*Id.* at #10583). Even after the product listing is publicly available, Amazon "conducts ongoing audits and

inspections … to flag allegedly infringing content." (*Id.*). If Amazon determines the design contains infringing content, it can take down the listing or suspend and terminate the account.

So at any point along the fulfillment process, Amazon could cease production or distribution of the infringing product. From beginning to end, then, Amazon maintains the "right to supervise" creator accounts and specific listings, and it has the power to "stop or limit" that infringement at any time. *Broadcast Music*, 754 F.3d at 354.

This set-up is not akin to the infringing images appearing in Google's search results. 487 F.3d at 730. There, even if Google terminated the ad partnership, the infringing image would still exist. *Id.* Here, if Amazon takes down the listing, the infringing product is completely gone; it is not for sale through any other company. After all, the product only comes into being when a customer orders the online mock-up and Amazon manufactures and delivers it.

Amazon also argues that it actively polices infringement, and so it did not "decline to limit" the infringement. (Doc. 73, #7147–49). Admittedly, it takes some steps to police the infringement, as just described. Despite that, its infringement reporting tools leave much to be desired. Weekend Warrior's experience shows that Amazon effectively sticks its head in the sand to avoid knowledge of infringement—or at the very least it did so in this case—and in that way, a jury could conclude that it declines to limit infringement.

Weekend Warrior, who recall holds actual registered copyrights in the designs at issue (whose validity is admittedly, as noted above, still an open question), contacted Amazon about pixel-for-pixel copies of those designs that appeared on Amazon's website. The Court won't belabor the record about Amazon's response to those NOCIs beyond noting that it could best be described as dismal. Despite providing all the information that Amazon requested, Amazon's automated process decided Tim Whelan's contacts were "fraudulent," and Amazon sent any ensuing emails directly to the trash.

Sure, Amazon needs a process to weed out fraudulent reporters. Bad actors have incentives to report competitors as copyright infringers to lessen competition, and Amazon estimates that almost [redacted] of all asserted infringements are fraudulent. (Doc. 84-2, #10587–88). But, on the record here, the Court is not inclined to say that, as a matter of law, the system Amazon adopted adequately polices infringement. In saying that, the Court acknowledges that providing adequate review of such reports, given their volume, may be resource intensive. But that is the cost of operating a service where anyone can upload designs—a system ripe for infringement. Overall, these significant flaws in its reporting system mean that a jury could find that Amazon declines to limit infringement on its platform.

The Court so far has focused on the first prong regarding the right to supervise. As for the second prong, Amazon clearly derives a financial benefit from sales of the allegedly infringing products. Indeed, Amazon receives all payment from a customer

and only remits a "royalty" to the original content creator. (Doc. 86-1, #10916). Amazon does not meaningfully dispute this element.

In sum, Weekend Warrior's vicarious liability claim may proceed. So the Court denies summary judgment for Amazon on this third claim.

**E. Amazon's Motion for Partial Summary Judgment.**

That leaves the five issues on which Amazon seeks partial summary judgment: (1) invalidity as to the 21 allegedly derivative copyrights; (2) its Digital Millennium Copyright Act (DMCA) defense as to any listings for which Amazon had no sales; (3) its argument that Weekend Warrior cannot recover attorneys' fees as to 22 copyrights; (4) its argument that Weekend Warrior cannot collect enhanced statutory damages; and (5) its argument that the Court should grant summary judgment as to five copyrights for various reasons. The Court takes them in order.

**1. Derivative Works.**

First, on the derivative works issue, the Court has already concluded that genuine disputes of material fact pervade that issue, such that neither party is entitled to summary judgment on it. So that ends that.

**2. DMCA.**

Next consider the DMCA. The DMCA provides an affirmative defense to "service providers" who store information at the direction of a user, so long as certain conditions are met. *See* 17 U.S.C. § 512(c). Amazon identifies seven such conditions: (1) it must be a service provider (*id.* § 512(c)(1)); (2) the infringing material must be user-directed storage (*id.*); (3) it must not have actual knowledge of infringement, and

as soon as it gains such knowledge it must remove the material (*id.*); (4) it must not have ability to control the infringing activity or gain direct financial benefit from it (*id.*); (5) upon receipt of a DMCA-compliant removal notice, it must remove the information (*id.*); (6) it must implement a reasonable repeat-infringer process (17 U.S.C. § 512(i)(1)(A)), and (7) it must appoint a DMCA agent (17 U.S.C. § 512(c)(2)).

Weekend Warrior, for its part, does not quibble with Amazon's characterization of the necessary factors. Rather, it claims that many of them are missing, or at least are not undisputedly present. Specifically, it points to the repeat-infringer policy prong, the at-the-direction-of-a-user prong, the expeditious-removal prong, and the ability-to-control prong.

The Court begins, and largely ends, its analysis of this defense with the repeat-infringer policy prong. For Amazon to obtain summary judgment, the record evidence must unequivocally establish that Amazon has "reasonably implemented" a repeat-infringer policy. Exactly what such a showing would entail is not entirely clear. But precedent suggests at least one fact that precludes a court from awarding summary judgment to a service provider on this ground—if a service provider "allow[s] notices of potential copyright infringement to fall into a vacuum and to go unheeded, that fact is sufficient for a reasonable jury to conclude that [a service provider] has not reasonably implemented its policy against repeat infringers." *Ellison* 357 F. 3d at 1080. Here, for the reasons already discussed in connection with vicarious liability, a reasonable jury could conclude that Amazon allowed Tim Whelan's NOCIs to "fall

into a vacuum and go unheeded," and thus could likewise conclude that Amazon had not reasonably implemented a repeat infringer policy. *Id.* at 1080. So the Court declines to award Amazon summary judgment on this defense.

**3. Attorneys' Fees.**

Third, turn to the question of attorneys' fees. Amazon does not argue that, as a matter of law, Weekend Warrior cannot recover attorneys' fees *at all*. Rather, it claims that Weekend Warrior cannot recover such fees as to 22 of the asserted copyrights because they were not registered within three months of publication. That may be so, but the Court declines to parse the details of potential future attorneys' fees awards before a jury has even decided whether Weekend Warrior prevails as to one or more of those 22 copyrights (or any of the other asserted copyrights). Courts typically address the contours of attorneys' fees in post-trial motions, and the Court sees no reason to deviate from that practice here. *E.g.*, *Miller v. Fed. Elections Comm'n*, No. 1:12-cv-242, 2013 WL 4243044, at *5 (S.D. Ohio Aug. 15, 2013) ("The Court ordinarily does not determine whether a plaintiff is entitled to attorney fees and costs as the prevailing party as part of the adjudication of the defendant's motion for summary judgment. Rather, the Court resolves attorney fees issues upon motion after the adjudication of the case on the merits.").

**4. Willfulness.**

Turn next to enhanced statutory damages. Amazon presses two arguments in this category. First, it points to the timing issue above as to the 22 designs for which Weekend Warrior did not timely seek registration. Weekend Warrior concedes it

cannot obtain statutory damages as to those copyrights. Second, Amazon says it is entitled to partial summary judgment that it did not willfully infringe on Weekend Warrior's copyrights. Weekend Warrior, for its part, says that just the opposite is true—that the record unequivocally shows that Amazon willfully infringed its copyright.[16] (Doc. 66, #6862–65). On the willfulness issue, the Court concludes that neither party is correct.

The defendant's mental state is relevant for statutory damages. The Copyright Act provides that:

> In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.

17 U.S.C. § 504(c)(2). "Infringement is willful when the infringer has knowledge that … his conduct constitutes copyright infringement." *Calibrated Success*, 72 F. Supp. 3d at 775. "Knowledge may be either actual or constructive. To prove constructive knowledge, courts have generally required the copyright owner to show that the infringer has acted in reckless disregard of the copyright owner's right." *Id.* (quotation omitted). Additionally, "a plaintiff can prove willfulness by showing that the defendant exhibited willful blindness to the copyright owner's rights. Willful blindness is defined as a deliberate effort to avoid guilty knowledge." *Id.* (citing *In re*

[16] Of course, the Court already found that there were genuine disputes about whether infringement occurred at all, so that precludes summary judgment in Weekend Warrior's favor on this issue.

*Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003)). Similarly, "[r]eckless disregard can be demonstrated, for example, when a party 'refus[es], as a matter of policy, to even investigate or attempt to determine whether particular [photos] are subject to copyright protections.'" *VHT, Inc.*, 918 F.3d at 748 (quoting *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 992 (9th Cir. 2017)). On the other hand, "continued use of a work even after one has been notified of his or her alleged infringement does not constitute willfulness so long as one believes reasonably, and in good faith, that he or she is not infringing." *Id.* (citation modified).

The current record does not unequivocally prove either that Amazon acted, or did not act, willfully. Assuming that Amazon is vicariously liable, many of the same facts supporting that claim could also support a finding that Amazon "exhibited willful blindness" or other "reckless disregard" for Weekend Warrior's copyrights. *Calibrated Success*, 72 F. Supp. 3d at 775; *VHT*, 918 F.3d at 748. Amazon's determination that Tim's submission was fraudulent and subsequent blocklisting had little to do with whether Tim was a legitimate rights holder. The same is true for whether the designs on Amazon's website infringed Tim's purported copyright. Amazon may wish to deny actual or constructive knowledge because it did not review these reports. But that was by its own design. It would be odd for the Court to hold that Amazon can construct a system where it automatically disposes of infringement reports and then claims it had no knowledge of the alleged infringement from those reports. Accordingly, the Court concludes that a reasonable jury could find that Amazon's conduct here amounts to willful blindness for purposes of statutory

damages. So the Court will not grant summary judgment for Amazon on this issue either.

**5. Defenses to Five Specific Copyrights.**

That leaves the five copyrights as to which Amazon has specific defenses. These copyrights fall into two categories. First are three copyrights (*King of the Kill*, *St. PatRizz Day*, and *Down Goes Liver*) that Weekend Warrior did not list in its operative complaint. Second are two copyrights (*Ameri-CAN v2* and *Shut-Up Liver*) as to which Amazon says no infringing listings have been identified. Start with two easy ones. First, in its opposition brief, Weekend Warrior concedes it is "not currently assert[ing] claims for infringement of *Down Goes Liver*." (Doc 84, #10501). Second, it also concedes it is not aware of any Amazon listings that depict the *Ameri-CAN v2* design. (*Id*. at #10501–502). So the Court dismisses claims involving those copyrights, but without prejudice.

The other three are a little more difficult. *King of the Kill* and *St. PatRizz Day* were listed in the operative complaint. But at the time Weekend Warrior filed it, Weekend Warrior had not yet registered those works. The operative complaint noted, though, that Weekend Warrior was seeking such registration. And when it later obtained those registrations, it sent them to Amazon. Amazon, for its part, produced sales figures and images showing allegedly infringing Amazon products bearing these designs. Accordingly, Weekend Warrior seeks leave under Federal Rule of Civil Procedure 15(b)(2) to add these two designs.

But Amazon claims that would unfairly prejudice it. The Court disagrees. The Court is bound to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Here, as noted, the parties have largely treated the designs as part of this case since Weekend Warrior sent the registrations. True, Amazon instructed its expert not to examine these two designs, and it apparently declined to ask Tim Whelan about the designs as this deposition, but that strikes the Court as more an effort to manufacture a claim of unfair surprise than anything else. There is no evidence that there has been "undue delay," that Weekend Warrior acted with "bad faith or dilatory motive" or that amendment would be futile. *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 729 (6th Cir. 2009) (quoting *Prater v. Ohio Educ. Ass'n*, 505 F3d 437, 445 (6th Cir. 2007)). So the Court will allow claims based on those two designs to proceed. That said, if Amazon wants to re-depose Tim Whelan on those two designs (and only those two designs) it may. And the Court will also allow it to supplement its expert report to address those two designs, should it wish.

Finally, as to the *Shut-Up Liver* design, Weekend Warrior says that its failure to identify specific Amazon product listing was due to it mixing up the Shut-Up Liver and Down Goes Liver designs. That error, while regrettable, is perhaps not altogether surprising given the number of designs and product listings at issue in this case. Moreover, Amazon has known about the design itself since the outset of the case. Accordingly, the Court will allow Weekend Warrior to supplement its list of Amazon product listings with the eleven additional product numbers it identifies in its opposition brief relating to this design. (Doc 84, #10502).

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** Amazon's Motion for Summary Judgment (Doc. 68) on the direct and contributory infringement claims. The Court, however, **DENIES** Amazon's motion for the vicarious liability claim and willfulness issue. Further, the Court **DENIES** Weekend Warrior's Motion for Summary Judgment (Doc. 66) in full.

**SO ORDERED.**

October 14, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**