# EXHIBIT A

# [Redacted Version of Document Filed Under Seal]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CENGAGE LEARNING, INC., *et al.*,

Plaintiffs,

v. 24 Civ. 4274 (JLR)(BCM)

GOOGLE LLC,

Discovery Hearing

Defendant.

------------------------------x

New York, N.Y.
September 22, 2026
11:00 a.m.

Before:

HON. BARBARA C. MOSES,

U.S. Magistrate Judge

APPEARANCES

OPPENHEIM & ZEBRAK, LLP
Attorneys for Plaintiffs
BY: JEFF KANE
YUNYI CHEN
MICHELE HARRINGTON MURPHY

LATHAM & WATKINS LLP
Attorneys for Defendant
BY: CAROLINE CLARKE
JENNIFER FERRIGNO
SARANG DAMLE

(Case called)

MR. KANE: Good morning, your Honor.

Jeff Kane from Oppenheim & Zebrak on behalf of all plaintiffs. I'm joined by my colleagues Yunyi Chen and Michele Murphy.

THE COURT: Good morning.

MS. CLARKE: Good morning, your Honor.

Caroline Clarke with Latham & Watkins on behalf of Google LLC. I'm joined by Jennifer Ferrigno of Latham & Watkins and Sarang Damle of Latham & Watkins.

THE COURT: And good morning.

We have two motions to discuss and hopefully resolve this morning. The first one that was filed was actually filed the day before, I think, or a couple of days before we were last here. We were last here on September the 1st, the motion was filed on August 31st to extend, now reopen discovery for various purposes. That is the motion at docket 1177. And then we have a motion at docket 1202, filed on September 8th, which is essentially a motion to reconsider an order that I issued at docket 751. A lot of docket numbers in-between and yet only six months have gone by. Anyway, it is a motion to reconsider my March 10 order, issued at docket 751.

I'm actually going to take the second motion first. But before I do that, just a couple of, I guess, questions. I asked my law clerk this morning how many times have I extended

the fact discovery deadline since I've had a reference for discovery management in this case and how many times has it been at the plaintiffs' request, but I didn't give him enough time since we were already walking to the elevator, to give me answers to that question.

Anybody here know off the top of their head?

MR. KANE: I don't, Judge.

THE COURT: Six, seven, eight, something like that, and usually at the plaintiffs' request.

Is that fair, Mr. Kane?

MR. KANE: Well, when you say is it at the plaintiffs' request, it's because Google hasn't produced discovery that they were supposed to, which is what the Court found when it granted the various motions.

THE COURT: So, yes with an explanation.

MR. KANE: Yes.

THE COURT: All right. Which leads me to my second question. You mentioned in one of your letter briefs that plaintiffs were required to move to compel 18 times, I think it may be 19 by now. Do you have a scorecard on those? How many times did I find your motion meritorious?

MR. KANE: I would guess 15 or 16 were granted in part and maybe two were denied entirely.

THE COURT: I'll have to go back and check. My sense is that it was not quite that robust, but it's your motion so

you may be right. In any event, the question before us on docket 1202 is essentially whether I got it wrong back in March with respect, essentially, to the proportionality issue, the balancing of relevance and burden. And to oversimplify, hopefully not too much, as I understand plaintiffs' argument today, it goes something like that: Judge, the documents that we want were relevant then, they're relevant now. The only reason you didn't give them to us back in March was that Google made an argument about how difficult it would be to extract this information principally from the [redacted] database and now we have additional deposition testimony suggesting to us that it wouldn't have been that hard.

What am I missing?

Ms. Murphy, it's your motion. Go ahead.

MS. MURPHY: Good morning, your Honor.

I think the simplification is partly correct. There's more to this story, as we can see from the papers. Let's just start with what categories are at issue here. You know, it's our position that these are categories that were relevant the whole time, as your Honor said, that they should have been produced, that it was Google's obligation to tell us with respect to ESI where these were housed. And if they weren't --

THE COURT: And by "these," let's just be clear because I didn't include this in my little summary.

MS. MURPHY: Uh-huh.

THE COURT: We are talking about communications between anyone at Google or between Google sales reps and account managers and the so-called pirates, the merchants at issue?

MS. MURPHY: The sales representative/pirate communications are one piece of it.

THE COURT: Uh-huh.

MS. MURPHY: The overall motion concerns communications between somebody at Google and one of the 1,500 pirates that are squarely at issue in this case.

THE COURT: So, this is a broader motion than you made last --

MS. MURPHY: It is --

THE COURT: -- March.

MS. MURPHY: -- yes. And each one has its own trajectory in terms of why are we here and what did we learn in these depositions and late-produced data that got us to this point. So, I can -- let me just start by saying what each category is.

THE COURT: Okay.

MS. MURPHY: The first one is, in the [redacted] database, that is Google's -- we now understand, Google's database that [redacted]. Again, so these 1,500 merchants are identified by, for example, email addresses. [redacted] can be searched [redacted]

We did not learn that until a June 24th deposition. It was directly contrary to what we had been told in our conferrals, and we followed up with them promptly after that. So, that's one of the issues.

THE COURT: You want, with respect to this category, you want Google to search the [redacted] database by [redacted], the [redacted] associated with the 1,500 pirates and produce those communications.

MS. MURPHY: Correct.

THE COURT: Now, Google tells me that although there are 1,500 pirates at issue -- I'm going to get this wrong -- you can't search by pirate, and you can't even search, they tell me, by the 22,000 associated merchant center accounts, you have to first figure out what the associated ads accounts are and search that way. Did I --

MS. MURPHY: I don't --

THE COURT: One second. Let me just make sure I understand the argument.

MS. MURPHY: Yeah. I don't understand that to be correct.

MS. CLARKE: Ms. Ferrigno --

THE COURT: Go ahead.

MS. FERRIGNO: I think the searching by the ads account is relevant to a request for sales representatives. I think with respect to [redacted] it would be the merchants. But

you're correct that it would still be 22,000 merchants, not 1,500 pirates.

THE COURT: Okay.

Ms. Murphy, back to you.

MS. MURPHY: I think it's around maybe 21,000 emails.

THE COURT: 21,000 emails?

MS. MURPHY: Yes.

THE COURT: What do you mean?

MS. MURPHY: Associated with these -- the pirates would have this number of email addresses associated with them.

THE COURT: 1,500 pirates would have 21,000 email addresses?

MS. MURPHY: I believe that's correct.

THE COURT: Why is that? Why so many?

MS. MURPHY: Well, they have multiple accounts, they use multiple email addresses. Yeah.

(Counsel confer)

MS. MURPHY: Okay. My colleague tells me it's 21,000 accounts, and I may need to correct myself on the email addresses.

THE COURT: 21,000 merchant center accounts --

MS. MURPHY: Correct.

THE COURT: -- associated with the 1,500 --

MS. MURPHY: Correct.

THE COURT: -- pirates.

MS. MURPHY: Yes.

THE COURT: Okay. That's more consistent with what I thought was going on here.

MS. MURPHY: Okay.

THE COURT: So, we don't know how many actually different email addresses there might be.

MS. MURPHY: I think we do.

THE COURT: We do?

MS. MURPHY: I think we do.

(Counsel confer)

MS. MURPHY: We're checking.

THE COURT: We're checking.

MS. MURPHY: We're checking. Apologies that I don't know that off the top of my head.

But we also could search [redacted] by [redacted] We could put in, you know, ebookpirate.com. We did not know that until an August deposition. That's the deposition of Ms. Kelly that we noticed back in 2025 and Google kept extending and wouldn't produce her until late August.

THE COURT: And she had her deposition taken on August 20; correct?

MS. MURPHY: Yes.

THE COURT: Okay. And the deposition that took place on June 24th that you mentioned a moment ago, that was Ms. B, as in boy?

MS. MURPHY: Correct.

THE COURT: All right.

MS. MURPHY: So, we could say search by [redacted] We figured [redacted] makes sense. We've all got the [redacted], so nobody has to do anything to try to figure that out.

THE COURT: What do you mean when you say "we've all got the [redacted]"?

MS. MURPHY: Google knows what [redacted] are associated with these pirates.

THE COURT: Do you? You said, "We've all got the [redacted]."

MS. MURPHY: Yes, we do. Yes, we do.

THE COURT: So, in prior document productions, documents have been produced sufficient to allow plaintiffs' counsel to say, "Here is a list of all of the email addresses associated with these 1,500 pirates."

MS. MURPHY: Correct.

THE COURT: Okay. But you don't know off the top of your head how many email addresses there are.

MS. MURPHY: I do not. I think --

THE COURT: But maybe by the end of --

MS. MURPHY: By the end of this hopefully I will be able to tell you that.

THE COURT: All right.

MS. MURPHY: But that said --

THE COURT: So, with respect to [redacted] you want Google to search these however many --

MS. MURPHY: Yes.

THE COURT: -- [redacted] and produce from within [redacted] itself all communications, or do they have to go to some other database or databases for the actual communications?

MS. MURPHY: I believe it's from [redacted] itself.

THE COURT: Okay.

MS. MURPHY: Yes.

So, let me tong about why do we need this, why is this critical, why are we coming to you at this juncture.

Since we all the March hearing where we talked about sales representatives, a number of things have happened. First of all, I will say the *Cox* case was decided several weeks after that. In response to that in the stayed briefing and in the 12(c) motion, Google has now made arguments or eliminated arguments concerning why they believe that there's no liability.

THE COURT: Sure. They think the standard has changed, you think the standard -- at least you have argued that the standard hasn't changed, at least with respect to somebody like Google.

MS. MURPHY: Correct. But that said, we are now faced with different arguments and the case that came down from the Supreme Court several weeks later, and we are charged with

responding to example for -- to Google's argument that this is only a neutral passive platform where we're not really doing anything with regard to these ads, it's a bulletin board, they are the merchant's ads, people can put whatever they want up there. There's just automated tools that are in place to make those ads appear.

THE COURT: All right.

MS. MURPHY: We obviously disagree with that.

THE COURT: Maybe I can shortcut this a little bit. I don't think the relevance proposition has changed. Back in March you were looking for communications between the sales reps and the pirates in hopes of finding communications that helped them out, encouraged them, protected them from Google's copyright enforcement policies, tried to help them avoid getting suspended, that sort of thing. You're looking for essentially the same communications if they exist now for essentially the same reasons. I think the relevance proposition has remained stable.

MS. MURPHY: I will say maybe another way to frame it is we understand from the deposition testimony more what communications exist. We certainly understand more about how shopping ads work. One thing you didn't mention is that we understand that Google [redacted] in some instances before they run an ad, so they [redacted]. They send the merchant a notice about

that in the merchant center, that's a different database than --

THE COURT: But these are [redacted], as I understand it. These aren't, like, "Dear Mr. So-and-so, look what we've done."

MS. MURPHY: That's still a communication. We still asked for that, and they did not disclose the merchant center as a source of communications.

THE COURT: Uh-huh.

MS. MURPHY: So, that is information that the depositions solidify and explain, and these happened very late in the game. And as soon as they happened, we followed up and said, you know, why didn't you produce these. This is a source of communication.

Whether it's [redacted] or not, that has nothing to do with the definition of communication, including under this Court's model definitions and what we included in our requests, so those should have been produced. And they're highly relevant. That's directly contrary to what Google says about how the ads work. If they say, we take this completely hands-off approach and these are all based on data that the pirates provided, that is contradicted by the fact that Google [redacted]. So, we need those communications as well.

Okay. I have an answer that there are about 16,000

unique email addresses.

THE COURT: Okay. Thank you.

MS. MURPHY: Okay.

So, in terms of searching [redacted] another thing I'd like to point out is what's in there. Again, this was illuminated through depositions and I would say supplemented by a late production concerning suspensions and reactivations data that never should have been produced in August to begin with.

THE COURT: You mean it should have been produced earlier.

MS. MURPHY: Correct.

THE COURT: Not that it never should have been produced.

MS. MURPHY: That's what I meant, yes.

So, as far as emails with the pirates in [redacted] yes, they may concern DMCA notices. I believe that's covered. This is about other types of communications that were not disclosed or produced.

THE COURT: Hold on. Back up.

MS. MURPHY: Okay.

THE COURT: I'm not sure I understood what you just said. You said that this late production of Google's, which should have been earlier in your view, did include email communications between Google and the pirates concerning DMCA notices?

MS. MURPHY: No. So, let me break that down.

THE COURT: Okay.

MS. MURPHY: Previously, Google said we can only search [redacted] by a [redacted], which was wrong. They searched it --

THE COURT: I remember that back and forth from the motion last spring.

MS. MURPHY: Correct. That was incorrect. So, they searched by the [redacted] associated with the pirates from rights holders notices. So, with regard to that bucket, we received those communications.

THE COURT: Those are the ones you received in August.

MS. MURPHY: No. August is suspension and reactivation data.

THE COURT: Okay.

MS. MURPHY: So, let me -- I'll come back to that.

THE COURT: Hold on. When they searched by [redacted] which is what they told you and me that they were able to do --

MS. MURPHY: Uh-huh.

THE COURT: -- earlier this year, they produced a bunch of communications.

MS. MURPHY: A lot of junk, frankly, but they --

THE COURT: There's always a lot of junk. It's inevitable in a case --

MS. MURPHY: They produced communications.

THE COURT: And they did that on whatever timeframe and told them to do that in March.

MS. MURPHY: That, I think, was -- I don't know the timeframe exactly.

THE COURT: All right.

MS. MURPHY: But that's --

THE COURT: Did it include emails between sales reps and pirates?

MS. MURPHY: No. No. And it was too narrow. And we were led to believe that's all they could do, and again that's not correct.

So, what we now need are any communications --

THE COURT: Sorry.

MS. MURPHY: Okay.

THE COURT: I just want to make sure I understand. So, tell me again what the August production was.

MS. MURPHY: Yes, of course. The August production was data regarding suspensions and reactivations of the 1,500 pirates.

THE COURT: Okay.

MS. MURPHY: And when I say 1,500, you know, we now -- they had more accounts but I'm just going to say 1,500 for brevity.

THE COURT: Of the accounts associated with the 1,500 pirates.

MS. MURPHY: Correct.

THE COURT: All right.

MS. MURPHY: So, they had previously produced some suspension and reactivation data. We found out at a deposition that -- and I believe this was Mr. Weibel's deposition, my team can correct me if I'm wrong -- that when Google produced this data previously, counsel --

THE COURT: Mr. Weibel was in June. His deposition was in June; right?

MS. MURPHY: I think he was in -- June? Okay, yes.

THE COURT: June 17th.

MS. MURPHY: Yes. Counsel directed Google to only provide the first reason for a suspension. It turns out that these accounts were [redacted] So, first of all right there, suspension and reactivation is going to generate a set of highly relevant communications. We know that from the depositions, it's not speculative. The data shows us that this happened. So, for example, when we got the new data in August because Google, without explanation and without telling us, limited the original data pull.

THE COURT: And in August you got a fuller --

MS. MURPHY: Correct.

THE COURT: Uh-huh.

MS. MURPHY: Correct. So, we found out on August 11th that there were another -- some I think it's [redacted] suspensions that we didn't know about before.

THE COURT: Okay.

MS. MURPHY: And then we found out that there were [redacted] reactivations that we didn't know about before.

And just before I forget, when we're layering all this on, anything done in terms of suspensions at this point, now we also know from the Mr. R testimony on August 26th that Google [redacted]. So, all of the [redacted].

THE COURT: Okay.

MS. MURPHY: Okay? So that also, though, explains why this is highly critical.

THE COURT: That explains why what?

MS. MURPHY: This discovery that we are now seeking is highly critical because these communications are going to be about misrepresentation policy suspensions and reactivations.

THE COURT: I'm not following you. Your thesis or one of your theses as I understand it is Google was supposed to be suspending all of these pirates pursuant to the [redacted]

[redacted]

And I understand the argument you can make based on that, but what I don't understand is how it makes communications relating to this other policy, this misrepresentation policy, anymore relevant or really relevant at all.

MS. MURPHY: Because Google is saying we suspended these accounts. Now, a lot of them are after we file the case.

THE COURT: Sure. And after they did the investigation and --

MS. MURPHY: Correct, but --

THE COURT: -- after they were like, "Oh, my gosh, we have a problem here." Right?

MS. MURPHY: That's what they're claiming now. So --

THE COURT: But --

MS. MURPHY: And so we need -- I mean, think about a reactivation. And the deposition testimony makes clear, that only happens if the pirate asks for an appeal or reconsideration. So, there are a set of communications about this.

THE COURT: And these are the [redacted] reactivations?

MS. MURPHY: Yes. I think there are [redacted] in total. [redacted].

THE COURT: Yeah. But you also want, if I understand

it, communications about what you characterize as [redacted] additional suspensions for reasons having nothing to do with the copyright violations.

MS. MURPHY: It may not have to do with the copyright violation at this point but it certainly has to do with Google's claim that they did something about these pirates. This is what they're hanging their hat on now. They can say otherwise and they tried to claim in discovery that it wasn't relevant at all, but that doesn't make any sense. I mean, if Google is willing to say, "We will not bring up to the jury that we suspended any of these pirates," then we can have that conversation, but they certainly have not shown any willingness to do that and I don't think they would. they are now relying on this. One way or the other they're saying we did something about these pirates.

The other thing is the misrepresentation --

THE COURT: I'm sorry. I'm still a little bit lost here. As I understand it -- and Google, I'm sure, will correct me in a few minutes if I'm wrong -- Google has essentially conceded -- I think it is a concession -- that many suspensions -- I don't know if it's [redacted] or some other number, but many suspensions [redacted]. So, you have that on the record, that doesn't appear to be disputed. Google may well, at

summary judgment or a trial, stand up and say, "Well, [redacted]," and then you can stand up and say, "Well, [redacted] But I still don't understand how that makes the details of communications about non-copyright issues relevant or certainly proportional at this stage.

MS. MURPHY: Two reasons. One -- and I'm sorry, I was getting to this -- [redacted].

THE COURT: Uh-huh.

MS. MURPHY: So, it's not completely separate from copyright at all. Google claims that they instituted the e-book ban to address the problem of piracy on the platform with respect to e-books. That's their claim. So, if they are then [redacted], communicating with these very pirates about that and the pirates are writing back and asking for appeals, we need to see those communications. That's part and parcel to the core of this dispute. So, that's one reason.

The second one is the standard is did Google encourage the infringement through specific acts, and the specific acts at issue relate to the creation and promotion of these

non-infringing products. So, whether they [redacted], that --

THE COURT: How broad is this principle? I'm making this up as I go along, so forgive me for that. Let's suppose that Google suspended a whole bunch of pirates because they, I don't know, didn't pay whatever people pay to Google to be pirates. I have no idea. I mean, would you want that too? Would you want the back and forth about how you owe us $50 and you haven't paid it?

MS. MURPHY: I don't know if that exists in there, but --

THE COURT: I don't know either.

MS. MURPHY: -- it's a pretty finite set of pirates at this point. It's a defined set. And the case is now hinging on what did Google do to assist these pirates. So, these communications will speak to that.

THE COURT: All right. So, out of [redacted] you want every communication during the relevant period, which is about five years, to or from the approximately 16,000 email addresses that have been identified.

MS. MURPHY: Correct.

THE COURT: All right. Okay.

MS. MURPHY: Yes.

Then, with respect to the merchant center, I covered

that initially, but those notifications speak to if Google was [redacted]. And so those, likewise, should be produced with regard to the merchant center accounts at issue, and we have a finite list of those.

THE COURT: Explain that part, that you have a finite list of what?

MS. MURPHY: Merchant center accounts.

THE COURT: All right. That's the 22,000, roughly.

MS. MURPHY: It's either 21 or 22.

THE COURT: Okay. And how, as you understand it, would Google go about finding the relevant communications with the, let's say, approximately 22,000 merchant centers? Or merchant center accounts maybe is the word I should use.

MS. MURPHY: One moment. I just want to --

THE COURT: Sure.

MS. MURPHY: -- get to that point.

Ms. B testified that Google communicates with merchants via the merchant center user interface.

THE COURT: Okay.

MS. MURPHY: And she testified that the interface has notifications or information to the merchants about disapprovals or policy event suspensions in the account. And then as noted, Mr. Weibel also testified that messages would be shown in the merchant center with regard to [redacted]

[redacted]

THE COURT: Hold on, I'm looking at Mr. Weibel here.

MS. MURPHY: That's at 228 to 229.

THE COURT: Thank you.

I'm not sure I understand the testimony here.

MS. MURPHY: The merchants have a product feed and Google, in response to *Cox*, relies heavily on the fact that they provide this data to Google and says, "Oh, the odds are really all just based on this feed." So, it's highly important that we're able to show that Google does not rely only on that feed, Google --

THE COURT: No, no, no, I understand that.

MS. MURPHY: Okay.

THE COURT: I understand your --

MS. MURPHY: You understand my argument.

THE COURT: -- theory that --

MS. MURPHY: Okay.

THE COURT: -- Google is not just a neutral platform, that is actually shapes these ads.

MS. MURPHY: Yes.

THE COURT: I get it. I'm not sure I understand Mr. Weibel's testimony, though, about what's happening here with regard to [redacted]. Mr. Weibel says that Google has a [redacted] The offer

is what the merchant puts out there; right?

MS. MURPHY: That's -- yes, that's in the data.

THE COURT: Right. [redacted] I don't understand that at all. I don't understand -- this is not a fault of counsel here, this is a very esoteric area that I don't generally understand, but I can't even tell what it is he's saying is changed. Is he saying that Google [redacted]?

MS. MURPHY: Well, Google creates the ad so it doesn't change the ad. The pirate never creates the ad. Google does. But what Google is saying is that the attributes that it would show in the ad, Google says we pull those from the feed, and this testimony shows that they don't just pull them from the feed, they --

THE COURT: What's the feed?

MS. MURPHY: The feed would be like -- I guess, think of it as a spreadsheet, for example. And it would show the title of the product that the pirate wants to sell and the price they tonight sell it at and it would have a link to the image that would ultimately appear in the ad. That they give Google some information but then Google takes that and creates

the ad. And so what Mr. Weibel is saying [redacted].

THE COURT: Sorry, maybe I'm just being thick here. Google gets the feed, the feed says it's a big spreadsheet, right, and it gets it either direct from the pirate or through some agent. We talked about that in another context at our last hearing.

MS. MURPHY: Yes.

THE COURT: So, as you understand the process, Ms. Murphy, Google gets this feed, this spreadsheet, and the spreadsheet says I want to sell this text book for $50. So, in your view of what happens here, Google then creates the ad and it show as picture of the text book and the price of $50. If Google is creating the ad, then [redacted]?

MS. MURPHY: Google doesn't just automatically create the ad, it is engaged with the pirates or, you know, the landing pages to where these ads link. So, when someone clicks on a shopping ad, they go to a landing page --

THE COURT: Oh, I see.

MS. MURPHY: -- here, where the infringing product is sold. So, Google is actually [redacted].

THE COURT: So, you're saying that Google [redacted]

[redacted] in this case, the pirate -- I assume same process for non-pirate merchants -- they [redacted]?

MS. MURPHY: Yes. In some instances at least.

THE COURT: Okay.

MS. MURPHY: So, there's a communication that stems from them, and this is very important evidence.

THE COURT: And what communication stems from this?

MS. MURPHY: Mr. Weibel says that they will send a notification through the merchant center to let the merchant know that they've done this.

THE COURT: So, the communication would say, in effect, "Hey, [redacted]."

MS. MURPHY: Well, we [redacted], yes. We [redacted]. I mean, remember that it's also not automatic that Google will decide to create the ad or run the ad or show the ad at all. So, there's this decision process on Google's part in [redacted] [redacted] is important information for us to be able to show.

THE COURT: All right. And for this piece of it, for the communications that you want Google to extract and produce to you from the merchant center user interface, what can you

tell me about what Google would have to do in order to locate and produce these communications.

MS. MURPHY: Well, again, Google knows the account numbers. In their opposition, Google says -- I guess, shifts the burden to us to explain this when Google did not disclose this additional source of communications at all. And, again, the deposition testimony surfaced this and we immediately followed up with Google to try and retrieve these. So, it is our position that it is Google's burden to show burden. I mean, they -- again, they've submitted an attorney declaration.

THE COURT: So, the question was, what do you understand Google would have to do to get this data for you? And if the answer is, "I don't know, Judge, ask Google," that's fine, just tell me what you understand here.

MS. MURPHY: Well, it would seem that it's in the merchant center but I don't know the name of the place where it is nor could I know that. Google, in their opposition, does not tell your Honor or us where it is. They just say in a summary fashion it is too burdensome to get it through an attorney declaration. I'm sure they'll have more to say about that and I'd like to respond, but based on what they put in their opposition, I can't say exactly what they have to do but they have this information. Or if they don't, if they didn't retain it, they should say that, but they haven't said that either.

THE COURT: So, just to make sure I understand the ask here, broadly speaking, you want two things. You want Google to go back into the [redacted] database where they previously performed, at my direction, a limited search and production keyed to -- was not keyed to emails. You now want them to go back and, for the relevant period, locate and then produce to you all communications in the [redacted] database back and forth with the approximately 16,000 emails that have been identified as associated with the 1,500 at issue pirates. That's category one; right?

MS. MURPHY: Correct.

THE COURT: Okay. And category two is out of a different database out of the merchant center user interface, I think those are the right words. You want Google to find all communications with the approximately 22,000 merchant center accounts associated with the 1,500 pirates and produce them.

MS. MURPHY: Yes.

THE COURT: Because you believe that at least some of those communications will relate to Google having [redacted].

MS. MURPHY: Or disapproved ads.

THE COURT: Or disapproved pirate ads.

MS. MURPHY: Yes. Yes. And these are key issues in the case.

THE COURT: And you don't know -- you don't have a

sense as you stand here today as to whether that ask is technically possible. That is whether the data has been retained, and if so, what it would take to get it.

MS. MURPHY: All I can know is what they put in their opposition, which was not concrete at all.

THE COURT: Okay. So, this is whose motion for Google?

MS. MURPHY: Your Honor, I'm sorry. There's one more category.

THE COURT: Oh. Uh-oh. All right.

MS. MURPHY: I know I've been up here a long time but I want to be sure to touch upon the third one, which is this relates to the sales representative so this does go back to the March hearing.

THE COURT: Okay.

MS. MURPHY: So, the sales representatives are, you know, individuals that assist certain merchants directly, it's like a direct point of contact within Google, and so by nature of what they're doing and as to the question of how does Google -- what specific acts are involved in the advertisement of these infringing products, the sales representatives are a critical piece of that. At the hearing that we had on March 10th and with regard to our motion to compel, we were not successful because Google argued that they couldn't even figure out in the first instance if the pirates had sales

representatives. So, that was sort of the jumping-off point that ended up with us not being successful on that motion, and that critical point now turned out to be incorrect.

There is a [redacted]. There's also another device or tool called the [redacted] tool that [redacted]. They're times called account managers or other terms, but generally speaking I'll call them sales representatives. So, the entire sort of record on which this earlier motion was based was not correct, and that happens but we need to go back and correct it now.

If, you know, throughout Google has said there shouldn't be too many of these, you know, these pirates aren't the type of merchants that would have them --

THE COURT: Well, they did say that.

MS. MURPHY: They do. They do. And, you know, we know from the document production of several that did have sales representatives we did not get those communications before. You know, it's our position that we should have, especially because of the arguments that we are now responding to. But in any event, Google can figure out who these sales representatives are. In their opposition they make statements about they have to look at historical data. They do look at historical data. They say they can't when it benefits them and then they do it when it benefits them. In one of their recent

interrogatory responses, they said one of the merchants was not [redacted]. A [redacted] merchant is another label that makes somebody more likely to have an account or a sales representative, and in an interrogatory response, they said, "Oh, we identified so and so as [redacted] but we've now gone back and looked at the history and seen that at the time we [redacted] they weren't." So, they can go back and look at the history, and now we know they have two tools with [redacted]

THE COURT: So, you said to me a couple of minutes ago that back in March Google said they couldn't even identify which of the pirates have sales representatives. Are you sure? I'm looking at docket 632, which was Google's letter brief, dated February 23, 2026, with regard to the prior motion, and they definitely make a burden argument. They say the burden of complying with plaintiffs' request underscores its disproportionality and they say -- this is on page four -- that in order to respond, "Google would first need to identify whether any of the 20,000-plus at-issue merchant center accounts had assigned sales representatives, account managers, or account strategists at any point during the relevant time period. In the unlikely event that the accounts did have assigned sales representatives, Google would then need to do various things," one, two, three, four, five, *et cetera*, and

they say this burden is substantial. I don't recall them saying we can't do it, I recall them as saying it would be burdensome to do it.

MS. MURPHY: At the hearing -- this is in the March 10th hearing transcript, pages 26 to 28 --

THE COURT: Uh-huh.

MS. MURPHY: -- Google's counsel argued: We've been trying to investigate how many of the merchants at issue in this case had sales representatives and we still don't have a clear picture.

THE COURT: Uh-huh.

MS. MURPHY: Google then surmised it would be highly unlikely they'd have them, but unfortunately I don't have a definitive number of how many of these merchant accounts are connected to ads accounts that are connected at some point during the five-year period to an account representative. So, your Honor directly asked them: How come you're here not just telling me how many sales representatives are at issue? I think the argument started that way, because that would have been helpful to know. And Google said at the time, you know, we have to go through all these steps, we haven't been able to figure it out, we've been trying to investigate.

THE COURT: Sure.

MS. MURPHY: And all they had to do was look at the [redacted] Now, maybe -- you know, I don't know if they

knew that at the time. All I'm saying is now we know that there's a very clear solution to the first step in this problem, and plaintiffs should not be prejudiced by not getting this critical information because Google did not have the correct information at the time.

THE COURT: All right. Let me ask you to what extent these categories overlap. Category three, sales rep communications, you now say, as we just discussed, you can look at this [redacted]. But if you were to get everything you want in category one, the [redacted] database, for example, would that include these sales rep communications, if there are any?

MS. MURPHY: I believe it could include some, but we would also need to effectively make those sales representatives custodians because the testimony says there could be some direct emails with the --

THE COURT: So, this would involve not just going back through the [redacted] database but also literally going back and appointing or designating additional custodians and requiring Google to do targeted searches of their emails.

MS. MURPHY: I think that's right because I think they can communicate directly with their clients and it wouldn't come through this -- what they call an external database. But if Google's right, as they said multiple times and said again, that this --

THE COURT: -- don't have sales reps.

MS. MURPHY: Yeah. This isn't likely to be a high number, so if they have to, you know, look at five people's emails with a specific --

THE COURT: Right.

MS. MURPHY: -- pirate, it's not all their emails, it should be pretty simple.

THE COURT: Nothing in this case is pretty simple.

All right. Let me hear from Google.

MS. FERRIGNO: Thank you, your Honor. And would you like me to stand at the podium?

THE COURT: Entirely up to you as long as I can hear you and see you.

MS. FERRIGNO: Okay. If you can hear me, that'd be great.

I think there was a lot Ms. Murphy said and there's plenty that obviously we disagree with and would like to correct, but if there's anywhere you'd like me to start, I'm happy to take your direction or just go.

THE COURT: Why don't you start at the end with respect to whether Google was mistaken or not robustly informed back in March and whether you can in fact -- sorry. I'm fighting with my computer here -- whether there is in fact a relatively simple mechanism for identifying whether any of the "pirates" had sales reps, for example, by looking at some [redacted]

[redacted].

MS. FERRIGNO: Sure, I'm happy to.

THE COURT: Uh-huh.

MS. FERRIGNO: So, to start, I think what we've learned since the March hearing and what we said at the March hearing is entirely consistent. Google said at the March hearing that if we wanted to identify a handful of sales representatives, that would be fairly doable, including like by [redacted], which, to be clear, would be a very manual process. You'd have to [redacted]. There's no way to extract data. So, I think everything we said at the March hearing is consistent with that.

I'd also like to point out that at the March hearing I think the reason your Honor didn't grant the motion is plaintiffs can't point to any sort of indication that there are likely to be these sort of communications with sales representatives, not because of Google's burden solely. And I think here we are after the end of fact discovery --

THE COURT: Well, I did feel at the time, and this is reflected in the transcript, that plaintiffs had not made a convincing showing that the information they were looking for existed.

MS. FERRIGNO: And I think that remains true. If you

look at their motions recently, they haven't pointed to anything additional.

THE COURT: On the question of the sales rep --

MS. FERRIGNO: Yes. As to the existence --

THE COURT: -- communications.

MS. FERRIGNO: -- the likelihood for there to be emails with sales representatives.

THE COURT: All right. So, to go back to the "how would you do it if you wanted to do it" question --

MS. FERRIGNO: Sure.

THE COURT: -- what you would do is you would go to this, what's it called? [redacted]?

MS. FERRIGNO: Yes. There is a [redacted] that --

THE COURT: And this is for each of the -- you have to look at this for each of the 22,000 merchant center accounts? Is it done by merchant or by merchant center or by ads account or by what?

MS. FERRIGNO: So, this is where it gets complicated. I think to list a product on Google shopping, you have to have a merchant center account, but sales representatives aren't tied to merchant center accounts, they're tied to ads accounts.

THE COURT: Uh-huh.

MS. FERRIGNO: So you'd have to identify whether a merchant center account had a corresponding ads account,

whether that ads account had a sales representative. Sales representatives are [redacted], so then you'd have to go through and -- I'm sorry, it's confusing. Merchant center accounts and ads accounts can be linked and unlinked at any time, so even if you were able to narrow down how many ads accounts had sales representatives, you'd still have to figure out when those ads accounts had sales representatives and if, at that time, that ads account was also connected to one of the at-issue merchant center accounts. So, it's like the [redacted] gets you to the very first step of maybe identifying if an ads account had a sales representative, it doesn't get you to any of the other steps about actually connecting it to a merchant center account.

THE COURT: [redacted] is kept by what? By merchant center account, by ads account?

MS. FERRIGNO: [redacted] is kept by merchant center account. But to be clear, you can't query [redacted] Like, [redacted] is not a database that stores data, you'd have to go to this other tool to figure out what the ads accounts are.

THE COURT: All right, you've lost me. Again, I'm sure the fault is mine, but nonetheless, I'm --

MS. FERRIGNO: It's a complicated system --

THE COURT: -- lost.

MS. FERRIGNO: -- which is part of the trouble here.

THE COURT: Uh-huh.

MS. FERRIGNO: I think the [redacted] -- or the [redacted] is really only beneficial if you're, like, going to individually look things up in [redacted] We understand there's a way that we could pull --

THE COURT: Just walk me through it again from the top. Let's suppose we have these 22,000 merchant center accounts which are associated with the pirates.

MS. FERRIGNO: Yes.

THE COURT: All right. Let's take merchant center account number one, whatever that turns out to be.

MS. FERRIGNO: Yes.

THE COURT: You could look that merchant center up, so to speak, you could find out information about it in [redacted] including this [redacted]

MS. FERRIGNO: Yes.

THE COURT: And what would the [redacted] tell you for merchant center account number one?

MS. FERRIGNO: Whether it's linked to an ads account.

THE COURT: Whether it's linked to an ads account. And then what would you do? What's step number two?

MS. FERRIGNO: And then you'd have to figure out if that ads account had a sales representative.

THE COURT: And how would you do that?

MS. FERRIGNO: We understand there's another system

where we could identify the sales representatives by ads account, but again, like, merchant center accounts and ads accounts can be linked and unlinked.

THE COURT: I understand. So --

MS. FERRIGNO: So, you'd have to do it historically.

THE COURT: But there is a place you could go. So, at step number one, [redacted] tells you that this merchant account is linked or has been at some point linked to, I don't know, one, three, 40 ads accounts.

MS. FERRIGNO: Yes, something to that effect.

THE COURT: Let's say five for purposes of our hypothetical. So, now you have to look at these five ads accounts, figure out if they ever had sales reps, when they had sales reps, and whether at the time they had sales reps they were linked to --

MS. FERRIGNO: To that merchant.

THE COURT: -- the pirate-affiliated merchant center account.

MS. FERRIGNO: Yes.

THE COURT: And at the end of that --

MS. FERRIGNO: At the end of that you would, in theory, have a list of sales representatives that --

THE COURT: That were --

MS. FERRIGNO: -- could have, in theory, communicated --

THE COURT: That could have, in theory, communicated --

MS. FERRIGNO: -- with pirates, but --

THE COURT: -- with one of --

MS. FERRIGNO: -- in all likelihood didn't.

THE COURT: -- the 1,500 pirates.

MS. FERRIGNO: Yes.

THE COURT: All right. And then let's suppose you want to -- let's suppose you did that and there were some people on the list, some sales reps on the list.

MS. FERRIGNO: Uh-huh.

THE COURT: You would find their communications through [redacted] through their own emails, through what?

MS. FERRIGNO: Our understanding is it's likely we'd have to collect emails for individual sales representatives, so we'd have to go through the whole collection process for any sales representatives, to the extent there are any, collect those emails, run search terms, do a review, *et cetera*, all of which, you know, would be a months-long process.

THE COURT: And I don't suppose that the parties ever seriously discussed any kind of sampling protocol on this issue, the sales reps specifically.

MS. FERRIGNO: I don't think we've discussed sampling.

THE COURT: All right.

MS. FERRIGNO: I also think that, again, like, even if

we're talking about one or two custodians here, that's a lot at the end of discovery. Like, fact discovery is over. We'd have to go through collecting a whole inbox, running search terms. Even if it's just one or two, that's going to be a long process.

THE COURT: So, you told me a minute ago that the information we've been discussing today regarding this [redacted] was "consistent" with the information that was before the Court last March. Can you be a little more specific than that? I don't recall us discussing [redacted] specifically.

MS. FERRIGNO: I don't know that we knew about the [redacted] specifically in March. I think what I meant by "consistent" is we've said all along if we wanted to do this at, like, one, two, three merchants, like, it would be, we think, fairly possible to identify the sales representatives. The issue here is scale. Doing it for 20,000 accounts, it's incredibly, incredibly difficult. And at the March hearing we hadn't found a team who was able to tell us how we could pull data, which we would have to do to get information for 20,000 accounts. Since then, I think we understand, like, we have found a team who could tell us how to do it. They explained to us that it would still be, like, very, very difficult to get back to the actual sales representatives for the at-issue merchant center accounts.

THE COURT: If these pirates did have sales reps and if there were email communications back and forth between the pirate and the sales rep, would some or all of those communications have been picked up in Google's other searches and productions?

MS. FERRIGNO: I think they may have. We did search [redacted] when we searched [redacted] so I think, like, it's possible they were picked up. And again, it seems unlikely that --

THE COURT: But your custodians for your general email searches have not included sales reps to date; right?

MS. FERRIGNO: No. But, again, like, they have included the folks in [redacted] we've had several custodians who are in [redacted] and the way the sales rep relationship often works is that if a merchant brings a concern to a sales rep, the sales rep would reach out to those folks in [redacted] So, I think to the extent there were communications with sales reps, we likely would have seen something reflected in those productions already, and there hasn't been anything, so there's, like, very little reason here to believe that there are actual communications with sales reps.

THE COURT: Last March, as Ms. Murphy just reminded me and as I just refreshed myself on by glancing at the transcript from last March, Google told me that it basically didn't know yet.

MS. FERRIGNO: Yes.

THE COURT: Or maybe "yet" is the wrong word because it didn't promise to do more work, but it didn't know at the time of the hearing whether any of the pirates all sales reps. Do you have any further information on that now?

MS. FERRIGNO: I think now -- so, again, it remains incredibly difficult to actually tie sales representatives to at-issue merchant center accounts. Our current understanding is that around [redacted] of ads accounts may have been [redacted], but again, like, it doesn't mean that specific ads account ever had contact with --

THE COURT: What's a [redacted]?

MS. FERRIGNO: You know, I think when you get these very small accounts, they [redacted]. So, our understanding is that you can have a [redacted] who may or may not have contact with those individual accounts.

THE COURT: And how, if you know, are these [redacted] created or delineated? Does somebody say, "Well, here are a bunch of people selling college text books, let's make them a [redacted] for example?

MS. FERRIGNO: I would imagine not. I don't have specifics on how those are determined.

THE COURT: All right. Imagining is not helpful here.

All right. And what's the basis for your [redacted] figure?

MS. FERRIGNO: I think we have tried to identify over the five-year period which ads accounts may have been connected to a sales representative. So, that [redacted] is those ads accounts at some point in time had a sales representative, but for many of them, they had a sales representative for, like, [redacted] [redacted]. And so then we would still have to take the step of figuring out merchant center accounts and whether they were connected for those [redacted].

THE COURT: All right. So, let's back up then to the middle category of information that plaintiffs are seeking, which is information out of the merchant center user interface, and this is the one I'm perhaps the vaguest on because plaintiffs have essentially said to me, "Well, there's a merchant center user interface, and this is probably where communications exist that relate to [redacted], including the pirates at issue here." And as you've heard, I asked Ms. Murphy, "Well, how hard would it be for Google to get this stuff," and she short of passed the ball to you, so the ball is now with you.

MS. FERRIGNO: Sure. Our understanding from talking to the engineers who actually run the merchant center is that this is nearly impossible. These aren't, like, actual

communications, these are all [redacted] --

THE COURT: So, if I was a pirate --

MS. FERRIGNO: -- at the time.

THE COURT: -- I'd get -- I don't know if I'd literally get it on my phone or not, but there'd be some [redacted].

MS. FERRIGNO: Yes. I think to be clear on the [redacted], we're not aware that there's actually any sort of notification that would say, like, [redacted]. And I think if you look at Mr. Weibel's testimony too, he says, like, it might reflect that [redacted]. So, I don't think we're getting to what plaintiffs are looking for here anyway. But there's still no record of what these were because they are entirely [redacted].

And I think to be clear about how this works, like, this is [redacted] So, trying to [redacted]

[redacted] just is not possible.

THE COURT: And then if you would address the [redacted] database issue. This is the first category of information that the plaintiffs want. They say -- I hope I'm not butchering this too badly. They say, "Well, last spring you told us that you couldn't search [redacted] so you didn't at that time, and now we know that you can search [redacted] and we know the 16,000 relevant email addresses associated with the 22,000 merchant center accounts associated with the 1,500 pirates, so please go do that."

MS. FERRIGNO: Yes. And I think just to start, a couple of things I'd like to correct on this. I think we ran searches in [redacted] based on our agreement with plaintiffs in November 2024, so we've been producing these things from a long time. I think that's slightly different from what you might be thinking of related to something from March. But in 2024, the parties agreed that Google -- on this exact approach, the parties agreed that Google would run searches in their [redacted] database, which plaintiffs floods at the time to be the [redacted], based on [redacted]. That's exactly what Google did. Google has been producing these documents since March of 2025. And in that timeline --

THE COURT: And plaintiffs tell me, well, they haven't gotten anything helpful there.

MS. FERRIGNO: I think that's probably because it

doesn't exist.

THE COURT: To which your response is that's because there isn't anything helpful.

MS. FERRIGNO: Yes.

THE COURT: All right. But all of your searches of [redacted] to date and all of your production out of [redacted] to date have been via [redacted]; right? That's what you've used to --

MS. FERRIGNO: Yes.

THE COURT: -- identify what you're going to produce.

MS. FERRIGNO: But just to be clear, we identified [redacted], which I think is something that Ms. Murphy identified as something that plaintiffs were looking for. That's how we identified which [redacted] to run through the [redacted] database.

THE COURT: Uh-huh.

MS. FERRIGNO: So, I think there's, like, very little reason here to think that there's some additional communications, but I think the larger point is the parties agreed to this two years ago. If plaintiffs wanted some additional communications --

THE COURT: Well, I think what plaintiffs' argument is, is we only agreed to that two years ago because we didn't know, because you hadn't told us yet, that you could have searched [redacted].

Correct, Ms. Murphy?

MS. MURPHY: Correct.

THE COURT: All right.

MS. MURPHY: That's part of it, but correct.

MS. FERRIGNO: That might be how they feel. I don't think there's any reason to think that there are additional communications that are related to the claims at issue here that you would find by searching [redacted] rather than searching the way we did [redacted]

THE COURT: So, explain that to me. What makes you think -- I mean, I think I know what the answer is but I want to hear it.

MS. FERRIGNO: Uh-huh.

THE COURT: You did a search [redacted] and you're saying it's true we didn't do it [redacted] but we probably got all or substantially all of the information of the communications we would have got had we done it by [redacted].

MS. FERRIGNO: So, I think my understanding of the way this works is that when an email -- or when a merchant sends an email, they're given a [redacted] And so --

THE COURT: Every email has a [redacted].

MS. FERRIGNO: I'm hesitant to say every email, but I think that's my understanding, that when you get an email, it's assigned a [redacted]. And so we looked up by [redacted] are related to the merchants and we searched those related

to DMCA issues and we produced those communications. So, I think there's -- it's unlikely that you would find a trove of additional documents that are there [redacted] but not found the way that we did it.

THE COURT: And what would the burden be if you now went back and did it by those 16,000, roughly, email addresses?

MS. FERRIGNO: Well, I think running 16,000 emails alone would take a lot of time. I also think plaintiffs are unwilling to limit the searches here, so what they're looking for is any communications. And when we've done this before --

THE COURT: Sorry, let me interrupt you here. I apologize.

Your prior searches that you did by [redacted] were also limited by topic?

MS. FERRIGNO: By DMCA.

THE COURT: What does that mean?

MS. FERRIGNO: So, it's limited by infringement note notices. So, relevant to the claims at issue here, which are copyright infringement. Plaintiffs are now asking there any communications regardless of their relationship to the claims here. And our understanding is that there are likely to be emails or communications that are related to things like "I've locked myself out of my account, can you get me a password." Like, something like that that's just absolutely not relevant to the claims here but would show up. So, it's likely --

THE COURT: On the other hand, if you do a search for all communications to or from this email address and don't have to worry about what's it about, that actually makes your life, in some respects, easier; right?

MS. FERRIGNO: Well, my understanding is there are still internal emails in [redacted] so I think we would still have to review every document.

THE COURT: What do you mean that there are internal emails?

MS. FERRIGNO: Like, it's not necessarily limited to communications with a pirate and the representative.

THE COURT: I thought the 1,600 email addresses were pirate-associated email addresses, not Google email addresses.

MS. FERRIGNO: Yes. But I think it's possible then that you'd have, like -- it's not just emails stored in [redacted], so I think you can't necessarily limit it to just emails externally. You might have internal emails there that we would then have to review for privilege, *et cetera*.

THE COURT: You're saying that the search might pick up, for example, a communication between Mr. X and Ms. Y at Google that discussed one of these 1,600 email addresses?

MS. FERRIGNO: I think it's possible. Again, like, I --

THE COURT: But surely you could set your search

parameters to only pick up communications that actually went to or from this external email address.

MS. FERRIGNO: I'm not certain. I think I'd have to check. I know that you can search [redacted] but I don't know that you can limit it to, like, [redacted].

THE COURT: Right. Okay. And you have no sense -- well, maybe you do. Do you have any sense, as you sit here today, what the volume of email traffic was during the roughly five-year period to and from the 16,000 email addresses?

MS. FERRIGNO: I think we've already produced [redacted] documents from [redacted] just based on what we've already done, so I think there's reason to think that while there won't be many additional, if any, relevant communications, there are probably thousands, tens of thousands, hundreds of thousands, if we're talking about any communication.

THE COURT: And a lot of them you think would overlap with what you already produced.

MS. FERRIGNO: I think anything relevant is likely to have already been produced. But again, plaintiffs haven't made any connection between what they're seeking and the infringement claims that are at issue here.

THE COURT: All right. What else does Google want to tell me?

MS. FERRIGNO: I think with respect to [redacted]

plaintiffs premises motion on the idea that there's been new information too, but that just isn't the reality here. Plaintiffs have known that Google suspends merchants for other policy reasons since the beginning of this lawsuit. And if nothing else, we started submitting or producing suspension and reactivation data in February 2025 which would have listed why merchants were suspended. So, I think they've had a year-and-a-half to say, "Hey, we see there are other suspension reasons here, what's going on there? Can we have the communications related to those suspensions?" And they haven't done that. They graduate a motion on the same RFPs in March. This could have been brought up there, it wasn't. We're now at the end of discovery. Fact discovery closed 20 days ago. There's no reason to be doing this right now.

THE COURT: Thank you.

Any brief rebuttal, Ms. Murphy?

MS. MURPHY: Yes.

Google's counsel just said that these communications don't relate to the copyright claims. I hope I addressed that before. That is just not correct. We have to show --

THE COURT: I'm sorry, you have to be more specific

MS. MURPHY: Yeah.

THE COURT: Which category are we talking about?

MS. MURPHY: I mean, with regard to [redacted] and suspensions and reactivations other than for DMCA issues. She

said we only searched for DMCA issues

THE COURT: In the [redacted] search --

MS. MURPHY: Correct.

THE COURT: -- that was connected [redacted].

MS. MURPHY: Correct.

THE COURT: Correct, she did say that.

MS. MURPHY: We need to show intent, so these communications and how Google is dealing with these pirates who they advertise their infringing products, this is highly relevant. And to say that it was okay to only search for DMCA issues and that we agreed to that is not correct.

THE COURT: Well, it's probably me who told them that that was all they had to do.

MS. MURPHY: I mean, I think they're pointing back to November 2024 when we were just discussing this, and they did say, "We have to search by [redacted]," and counsel said just now, "Oh, we searched [redacted]," but then when she revisited that, it was clear they didn't just search for the pirate, they searched for the pirate to get a [redacted] and they only produced DMCA communications about that [redacted]. So, this is critical new information that there are --

THE COURT: You're telling me that you didn't know that their prior search of [redacted] which was conducted based on [redacted] was limited subject matter wise to DMCA-related communications?

MS. MURPHY: We didn't know that there was other stuff.

THE COURT: What do you mean you didn't know there was other stuff?

MS. MURPHY: We only thought that that database could be searched by a [redacted] So, we were told --

THE COURT: No, I understand that.

MS. MURPHY: Okay.

THE COURT: I understand you thought --

MS. MURPHY: Yeah.

THE COURT: -- that you couldn't search [redacted] and now you think it can be searched [redacted]. But what I'm not understanding is this subject matter issue.

MS. MURPHY: Counsel said that we agreed in November 2024 that that's all they needed to do, and that's what I'm taking issue with.

THE COURT: Okay.

MS. MURPHY: So --

THE COURT: And you're saying if you agreed to that, it's because you didn't know there were any non-DMCA communications in [redacted]

MS. MURPHY: I mean, that's part of it, but we also didn't know that you could search it [redacted]. They never told us that. They only identified the [redacted] [redacted]. They didn't even call it [redacted] for months and months

later, so --

THE COURT: Well, I think they were calling it [redacted] by March when we had the motion practice.

MS. MURPHY: But counsel's referring to November.

So, they have to identify the sources of their relevant ESI or potentially relevant ESI. If they say to us, "We have a [redacted]," we don't know at that point that anything else exists.

So, my only point is to say that that is all -- that is relevant from where we sit now, that we know that [redacted] On the one hand wants to say [redacted] and on the other hand wants to say that it is, that they were taking action.

And again, this is a critical point. The [redacted], so that's --

THE COURT: Thank you.

MS. MURPHY: Yeah. Okay. So, that was one point I wanted to make.

THE COURT: Let me just stay with that point for a moment. I think what you're telling me is that if Google goes back now and searches the [redacted] database [redacted] rather than [redacted] and doesn't further limit it, gives you raw, so to speak, everything back and forth to one of these

16,000 emails, you think there's going to be something relevant in there that you haven't previously got.

MS. MURPHY: I'm 100 percent certain there is, yes. I know there's going to be something relevant. And we shouldn't be denied it because we couldn't suss out what was happening here. So, I'm 100 percent confident about that.

The other thing that I wanted to mention is in terms of, like, what that output would look like. Their witness, April Kelly, testified that it was not -- it didn't have [redacted].

THE COURT: I'm sorry, that what didn't have internal --

MS. MURPHY: That [redacted] did not have [redacted]. So, I think that to the extent that that was part of Google's argument, that's incorrect, at least based on what their witness said. And if it's, you know, "I'm locked out of my account --"

THE COURT: And where did Ms. Kelly say that?

MS. MURPHY: One moment.

(Counsel confer)

MS. MURPHY: On page 149. I don't know if this is part of our exhibit or not.

THE COURT: I don't think it is part of your Ms. Kelly exhibit. You can read it to me if you want.

MS. MURPHY: Thank you.

We asked:

"Q. [redacted]"

Actually, sorry, let me back up so I provide the appropriate context.

"Q. And would [redacted] have in communications, which is to say an agent is processing a notice and they say -- [redacted] [redacted] email like that be in [redacted]

"A. No."

And then again:

"Q. Emails concerning the domains, which is to say [redacted], you're saying that would not be in [redacted]

"A. That's correct."

THE COURT: All right. So, you'd be prepared to take what, in another context, we might call a document dump here.

MS. MURPHY: Yes.

THE COURT: Every email to and from the approximately 1,600 email addresses associated with the pirates over the relevant period of time.

MS. MURPHY: We would be prepared to take the document dump.

THE COURT: Which could be voluminous.

MS. MURPHY: We understand.

THE COURT: And could have -- most, if not all, of its contents could be junk.

MS. MURPHY: Yes. We would be prepared to take that.

THE COURT: All right. What else do you want to tell me on rebuttal? You might want to respond, if you're able, to Google's explanation about the problem with the merchant center user interface, namely that it's virtually impossible to obtain or, I guess, [redacted].

MS. MURPHY: I don't know if they said they weren't preserved. Again, as I said, I think in my opening argument, if they're not preserved then they should say that, but I didn't hear them say that. What I heard, frankly, are a lot of very conclusory attorney arguments. And given the history, we would have thought that if they wanted to make a burden argument based on admissible evidence, they would have submitted a declaration from an engineer. They say they talked to an engineer but there are no specifics whatsoever. They have not met their burden to establish burden, and really didn't even try to do so.

THE COURT: Well, of course you have to get -- you have to make your initial showing before the burden to show burden shifts, so to speak.

MS. MURPHY: And based on the deposition testimony, we now know that these communications exist and that they are highly relevant. Google is Google. Google likes to say that

this is very complicated and it's very difficult. We had this with the [redacted] database, and then lo and behold they're able to do it. So, I do not believe that they have established any specifics or concrete evidence whatsoever to show that this would by burdensome.

THE COURT: All right. And with respect to the sales reps, let's get back again to the initial showing, which is yours to make. What makes you think there's any there there? What makes you think that there are relevant communications between pirates and Google sales reps? Which of course, I mean, tucked into that is, are there any pirates who had sales reps.

MS. MURPHY: Let me address that first.

THE COURT: Sure.

MS. MURPHY: We know that several did. Counsel just revealed for the first time, I've never heard the point about the [redacted] --

THE COURT: Uh-huh.

MS. MURPHY: -- and the [redacted]

THE COURT: Uh-huh.

MS. MURPHY: So there's additional ones in there. Again, I'm hearing this for the first time. I don't know that.

THE COURT: You're saying that, statistically speaking, if [redacted] have sales reps then [redacted] [redacted], so maybe [redacted] of them have sales reps is what you're

saying

MS. FERRIGNO: Sorry. I just wanted to clarify that the [redacted].

THE COURT: I understand that some of the [redacted] are on a [redacted].

MS. FERRIGNO: The [redacted] doesn't relate to the pirates, that relates to ads accounts, so it's [redacted].

THE COURT: Oh, okay. Thank you. All right.

MS. MURPHY: But we know that several do. We also know that --

THE COURT: Wait, wait. "We know that several do." What's the basis for that statement?

MS. MURPHY: That was -- I can go back to the hearing transcript from March, but my colleague who argued had showed some spreadsheets and walked through why several of them did, in fact, have sales representatives.

THE COURT: Several --

MS. MURPHY: Pirates.

THE COURT: -- identified pirates?

MS. MURPHY: Correct.

THE COURT: And I obviously was not persuaded at that time.

MS. MURPHY: I guess, yeah. I guess. I mean, I looked at the argument. You know, she didn't say, "Could be at

least get those." It would have -- hindsight is 20/20. So, we don't have those either.

We've also, now that we've gotten additional data, we have, on our own, done an analysis of some of the -- what appeared to be higher revenue-generating merchants. And so if you were talking about months to figure out if the sales representatives for the pirates exist, which I think that was the impression that we were talking about in March, that would be one thing, but nothing that I heard in counsel's argument I thought was convincing whatsoever about how using this tool to look up the merchant center accounts to figure -- I'm sorry, the ads accounts --

THE COURT: Ads accounts.

MS. MURPHY: -- to figure out if they have a sales representative moved the needle. There was some discussion about the ads accounts and whether you have to figure out if they're connected to a merchant center account in the first instance. We already --

THE COURT: So, when?

MS. MURPHY: We already know that. That's done. There's [redacted] ads accounts. It's done. They know that, so that is an irrelevant step.

I think any suggestion that somebody is --

THE COURT: Oh, so you're saying you don't even have to go through the tab on [redacted], you can just go direct to

the [redacted] known ads accounts and see if they had sales reps.

MS. MURPHY: Well, I think --

THE COURT: In which case, hearing about this [redacted] would not have moved the needle for you. Obviously, I can see by the expression on both of your faces that I've missed something here.

MS. MURPHY: No, I think the [redacted] is very helpful because you can just [redacted].

THE COURT: But you already know who the ads accounts are.

MS. MURPHY: No, but the tab tells you [redacted]. That's what counsel previously argued they had not been able to figure out.

THE COURT: Let me go to Google on this.

Does the [redacted] --

MS. FERRIGNO: No --

THE COURT: -- merchant center?

MS. FERRIGNO: -- it does not.

THE COURT: What does it tell you?

MS. FERRIGNO: It gives you the [redacted].

And I also want to clarify that, like, we might know which ads accounts were historically linked to the merchant

center accounts that are at issue, but merchant center and ads accounts can be linked and unlinked --

THE COURT: Linked and unlinked at various times.

MS. FERRIGNO: -- many times, at any time. So, it's not enough to say that we know the ads accounts. We have to know if those accounts were actually listed --

THE COURT: I understand that. But that's, like, steps two and three and four and five; right?

MS. FERRIGNO: Yes.

THE COURT: If you wanted to figure out who, if any, of these 1,500 pirates had Google sales reps during all or part of the relevant period, I'm now confused as to why you'd even have to start with the [redacted] at all. Why wouldn't you go straight to the approximately [redacted] ads accounts and start your investigation there?

MS. FERRIGNO: I think you can, and that's what we were saying. That at the time in March when we had a hearing on this, we didn't know at all how they could be found. We understood that it would be possible to identify one, two, three. We've since learned that it's possible to identify the ads accounts without going through this [redacted] tab.

THE COURT: And that's been done; right? Everybody in this room, other than me, can identify the relevant [redacted] ads accounts.

MS. FERRIGNO: Yes. I think we're all on the same

page about what the relevant [redacted] ads accounts are.

THE COURT: Uh-huh.

MS. FERRIGNO: What creates the extra hurdles here is all the subsequent steps you have to go through.

THE COURT: Right. So, you wouldn't start with the [redacted] at all. It strikes me that that's sort of a red herring. You would go to the ads account, then you would do all those other steps that you told me about. What merchant center accounts were they associated with, when were they associated with those merchant center accounts, did they have sales reps at the same time that they were associated with the pirate account or not.

MS. FERRIGNO: Yes.

THE COURT: Okay, thank you.

I interrupted you, Ms. Murphy. I apologize, but I thought it was important to get clarification on that point.

MS. MURPHY: I think one other thing that Google hasn't addressed at all, unless they tell me I'm mistaken -- well, I know they haven't addressed it, I don't know if it's one in the same, is the [redacted] tool that we also raised in our briefing. Mr. W testified that the [redacted] tool -- so:

"Q. I see. So, there's information about these customers. And what other type of information about these customers are in the [redacted] tool?"

That's the [redacted] tool.

THE COURT: I'm sorry. We're looking here at whose transcript?

MS. MURPHY: Mr. J.W.

THE COURT: Oh, all right. I'm with you. He had his deposition taken on September the 1st. Go ahead.

MS. MURPHY: And this -- I think we had the rough.

THE COURT: Yes, it's a rough. Well, that's what you submitted to me. You may have a final by now, I don't know.

MS. MURPHY: I think Mr. Kane is going to pull it up because I think that the -- there's a disconnect between the rough and the final.

THE COURT: The rough doesn't really help me because you have sort of one potentially relevant Q and A about the [redacted] tool but without context it's --

MS. MURPHY: Yeah. I apologize, your Honor.

THE COURT: -- not helpful.

MS. MURPHY: I think maybe there's a page that we should have included. Could I read -- it's fairly short. Could I read it into the record?

THE COURT: This is Mr. J.W.?

MS. MURPHY: Correct.

THE COURT: Does Google have the whole transcript?

MS. FERRIGNO: I'm not sure, but I think, you know, we'd object to the fact that this wasn't included in any of the

briefing to date.

THE COURT: I'll hear it.

I can't read that, by the way, Mr. Kane. It's too small.

MS. MURPHY: The concept was specifically included, and I know even the quote, but I think we messed up the exhibit, and I apologize for that.

THE COURT: All right. Go ahead.

MS. MURPHY: Jeff, can you please go to page 27?

I'm on line 14.

THE COURT: Go ahead.

MS. MURPHY: Yeah.

"Q. So, there's information about these customers. And what other type of information about these customers are in the [redacted] tool?

"A. You have the [redacted] --"

THE COURT: This is the exact same snippet. Yeah, that's the exact same snippet that you did attach to your briefing.

MS. MURPHY: Oh, okay. Well, then I'm confused. I apologize. Yeah.

"A. [redacted]

So, this is another place based on his testimony --

THE COURT: But you'd have the [redacted]. Who's the "them" in this testimony?

MS. MURPHY: The merchants.

MS. FERRIGNO: No, that's still not correct.

THE COURT: See? This is the problem.

MS. MURPHY: If Google counsel wants to correct me, that's fine.

THE COURT: Well, what does the witness say about it?

MS. MURPHY: I read the witness's testimony to say that in [redacted], you tell the [redacted]. My colleague is --

THE COURT: But he says the same to them, and the "them" is folks that he refers to as the "customers." Now, I don't know what he means by the customers.

MS. MURPHY: Okay. One moment, your Honor.

THE COURT: Sure.

MS. MURPHY: Mr. Kane, could you go to page 25?

THE COURT: You know, if this is a late breaking revelation that there is some easy source you can go to that says, "Oh, for pirate number 27, their sales team was Mr. X and Ms. Y," that would be one thing, but I'm not sure that's the thing we have here.

MS. MURPHY: It's my understanding that it is, and I apologize if I'm getting my facts messed up. There's a lot to remember here. But if we look at the bottom of page 25, it

might provide for some more context, on line --

THE COURT: Page 25 of the --

MS. MURPHY: J.W. transcript.

THE COURT: But not the rough. This is the better transcript; right?

MS. MURPHY: Correct.

THE COURT: We think.

MS. MURPHY: Yes.

THE COURT: All right. Go ahead.

MS. MURPHY: So, this is where he starts talking about the [redacted] tool or system, and it's --

THE COURT: We have a [redacted] system. Okay. That's [redacted] system. So the [redacted].

MS. MURPHY: Correct.

THE COURT: Uh-huh.

MS. MURPHY: And then going onto page 26, it's called [redacted], and it's software used to manage who your customers are. So, the customers are the merchants. And then who works with those customers, on line 16.

"Q. Who at Google works with the customers?"

THE COURT: What do I have other than your word that customer means merchant, and by merchant you mean, like, one of your 1,500 pirates?

MS. MURPHY: If they have a sales representative,

that's right.

THE COURT: All right.

MS. MURPHY: So --

THE COURT: I just don't actually see that in the transcript.

MS. MURPHY: Well, this individual -- one moment --

MS. FERRIGNO: And, your Honor, if --

THE COURT: Just hold off one second, please, Google.

MS. MURPHY: Oh, okay. Beginning on line 23 of page 26:

"Q. Can you explain what --"

THE COURT: Can you put that on the screen?

MR. KANE: It's there.

THE COURT: Oh.

MS. MURPHY: (Reading)

"Q. Can you explain what you mean by "customers"?"

THE COURT: Uh-huh. The people who are paying Google for advertising products.

Okay. This doesn't -- the reason this doesn't help me is because he could mean a specific merchant, like one of your 1,500 pirates, or he could mean a merchant center account, of which there are 22,000 associated with their pirates, or I suppose he could mean an ads account holder, of which there are [redacted] associated with your 1,500 products.

I will now allow Google, who I hope knows what this

[redacted] tool actually is, to tell me.

MS. FERRIGNO: Yes, I'm happy.

And just to clarify, the individual whose testimony you see on the screen is a director in ads, not in shopping. So, when he's giving this testimony, it's related to ads. We also understand that sales representatives are only assigned to ads accounts, so you aren't getting -- the customer can't mean the merchant center account here.

THE COURT: What can it mean?

MS. FERRIGNO: The ads account, which would then have to be connected to one of the merchant center accounts.

THE COURT: Okay. Could you go in -- so, you know who these [redacted] -- you know the [redacted] ads accounts that are -- were at some point associated with the 1,500 pirates; right?

MS. FERRIGNO: Yes.

THE COURT: Could you go into this [redacted] tool or database or whatever it is and look up each of those [redacted] and see if they had a "sales team that's assigned to them"?

MS. FERRIGNO: That's where the [redacted] we mentioned comes from. So, if you look up the ads accounts, there are around [redacted] who, at some point in time, were part of a [redacted] that were represented. But --

THE COURT: Right. So, if you looked up each of these [redacted] in [redacted], you would expect to find that [redacted], roughly, either had a sales team or were [redacted] that had a

sales team at some point.

MS. FERRIGNO: At some point.

THE COURT: Uh-huh.

MS. FERRIGNO: But again, you'd still have to go through the other steps in the process of actually connecting those to a merchant center account, and then I think --

THE COURT: Right. Because knowing that an ads account had a sales team at, I don't know, the first quarter of 2022, let's say, doesn't tell you whether that was related to any of our 1,500 pirates at that time.

MS. FERRIGNO: Exactly.

And I think, too, it's just important to note that around [redacted] may have had a sales representative for [redacted], which we understand to be about [redacted].

THE COURT: You're saying half of them only had a sales rep for that [redacted]?

MS. FERRIGNO: For [redacted], which generally is [redacted]. There may be a couple instances where it's less so or more. But generally, sales representatives are [redacted].

THE COURT: Uh-huh.

MS. FERRIGNO: And for about [redacted], you only had ads accounts that had a sales representative for that [redacted].

THE COURT: That's strange.

MS. FERRIGNO: Yes.

THE COURT: All right. So where does that leave us, Ms. Murphy?

MS. MURPHY: I still want to emphasize that the merchant account ads account dichotomy is a red herring. We know the connections.

THE COURT: Well, it's not a red herring in terms of burden.

MS. MURPHY: It is because they've already done this exercise and --

THE COURT: No. They've already done the exercise of identifying the ads accounts, they have not yet done the exercise, as I understand it, of matching ads accounts to merchant center accounts to specific quarters where there was a sales rep.

MS. FERRIGNO: Yes, that's right.

MS. MURPHY: But they now have testified about two different sources of information that can help them do this, and they haven't said otherwise. And again, if we -- we are talking about Google. They have a lot of the information already. All they need to do is look this up, and now they have two sources in which they could do it. They have not submitted, again, any concrete evidence to explain how long this would take and why they can't do it. It's really just

pure attorney conjecture at this point, and this is critical information. We've already identified several pirates who we know had account managers at --

THE COURT: And remind me, who are they?

MS. MURPHY: I would have to look at the transcript, I don't remember their names, but it is in there, and I'm happy to do that.

THE COURT: All right.

MS. MURPHY: One moment.

So, I don't know the names. My colleague is going to check. But the --

THE COURT: I don't think it's in the transcript. If I'm wrong, tell me.

MS. MURPHY: I think she pulled it up during the hearing and she -- my colleague had also emailed to chambers the two exhibits on February 26, 2026.

THE COURT: Were they Excel spreadsheets?

MS. MURPHY: Yes, they were.

So, she identified the cells that showed that they had representatives and it was cell M1896 in the document that Google produced. Should and rate the whole Bates number?

THE COURT: No.

MS. MURPHY: Ending in 6832, and then it was cell, I think that's an "I", I196, Exhibit B document that Google produced ending in 6591. So, those were certainly identified.

Again, we've done an analysis with respect to higher revenue merchants.

We also asked in an interrogatory, which Google responded to on Friday, for Google to identify [redacted] merchants who are often connected to these, and they basically refused to do it.

So, this is a pattern. This is something that they can do. These tools we didn't know about, counsel says she didn't know about her or her colleagues didn't at the hearing. But they should look this up. It does not sound like this is ultimately going to be a burdensome production at all, but it's a critical one from our point of view.

MS. FERRIGNO: Your Honor, may I --

THE COURT: Last 30 seconds.

MS. FERRIGNO: Thank you.

Just to clarify, Ms. Murphy mentioned two tools and said this information is available there. It's not to connect merchant centers accounts to ads accounts, we'd have to go to a [redacted] --

THE COURT: I'm sorry. Back up. Say that again slowly.

MS. FERRIGNO: Ms. Murphy, in arguing that this wouldn't be burdensome, pointed to two tools and said that the information is available there.

THE COURT: Right.

MS. FERRIGNO: It's not. To connect merchant center accounts to ads accounts, we'd have to go to a [redacted], and then it would be a manual process of connecting them at a specific time period. There's no way to just pull that information. So, it is very burdensome.

THE COURT: Okay.

MS. MURPHY: I --

THE COURT: Here's what we're going to do. No.

MS. MURPHY: I'm done.

THE COURT: We're done.

MS. MURPHY: Okay.

THE COURT: We're going to take 20 minutes and then we're going to -- I'll give you half an hour if you want a little longer. I don't have a 2:00 this afternoon because I now know on Google days what not to schedule for a number of hours, and then I hope I'll give you an oral ruling on the motion that we've just been discussing and we'll go on and discuss the other motion.

Plaintiff, how much time would you like for the break? Cafeteria is open.

MR. KANE: 20 minutes is fine for me.

THE COURT: Google?

MS. FERRIGNO: That's fine.

THE COURT: All right. So, it's a few minutes past

1:00. Let's try to get back at 1:25, please. And we'll be in recess.

(Recess)

(In open court)

THE COURT: Thank you all very much. I told you that I would give you a ruling on Google's motion at docket 1202. Let me take it in reverse order. There are three categories of documents, electronic discovery, that Google is seeking on this motion.

The third category is email communications between Google sales reps and the 1,500 pirates at issue in this case. This is pretty much the same motion that I denied on March the 10th of this year from the bench. I went back and looked at the transcript of that argument during the break, as well as the underlying letter briefs, and not a whole lot, in my view, has changed between March 10th and now. And what has changed hasn't necessarily changed in a way that would benefit plaintiffs on the current motion.

I was resented with evidence by Ms. Lee on March, or to be more precise, I was provided with an explanation about why plaintiffs believed that in at least two cases, two examples were given to me, that one of the roughly 22,000 merchant center IDs which are connected or were connected at some point to one of the 1,500 pirates had a Google sales rep assigned. And there was some discussion there about how

difficult or not difficult it would be to go into [redacted] and connect the necessary dots.

I denied the motion from the bench on March the 10th principally because, and I'm now actually quoting from page 41 of the transcript, "plaintiffs have, in my view, not adequately made the case that there are relevant and discoverable documents to be found as a result of the additional searches that the plaintiffs are recommending. And while there is always some possibility that if you do more work and look in more places and run more searches you will come up with relevant and discoverable documents, the hypothetical possibility of that result is not enough for a motion to compel."

That hasn't changed, in my view. The relevance proposition and the proposition that there will exist out there actual communications between one of the pirates and a Google sales rep that will be relevant to this case, plaintiffs don't really have any new information with respect to that prong of the analysis that they didn't present in March.

The other consideration, of course -- always a consideration on a motion to compel and one that we discussed back in March -- was proportionality. How much work it would be to find out if there was any there there and whether it was worth it or not, and I did not find the proportionality analysis compelling in March and I don't find it compelling

here either.

Both sides have provided additional information between March and today as to exactly what Google would have to do to connect the dots and figure out whether there are any relevant sales representative communications, but the additional information doesn't really move the needle. It was represented to me in March that you'd have to connect a lot of dots and it would be really hard to do and it would take a lot of work, and now we have a little more detail about it. You could do it by starting in [redacted] or maybe you could do it through this other database, but it still would take a lot of work and be really hard to do and there might or might not be any there there.

To a certain extent, the proportionality analysis has gotten even worse because last March, Google was telling me that this could all be done through [redacted] or that their understanding at the time was that it could all be -- sorry, plaintiffs were telling me that it could all be done through [redacted] and now plaintiffs are telling me no, because if any sales reps are identified who were assigned at one point or another to an ads accounts that was associated at the right period of time to a pirate, then we have to make them custodians and do a search of their email, it's not good enough to just look in [redacted].

So, bottom line with respect to this category, I

decline to reconsider the ruling I made in March, and I will not be compelling any additional discovery with respect to sales representative communications.

Moving to what I think of as category number two which is plaintiffs' request for information out of the merchant center user interface with respect to the approximately 22,000 merchant center accounts that are associated with the 1,500 pirates, again, I am not persuaded either that the documents sought are more than trivially relevant, and I'll explain that in a moment, and I'm not at all persuaded that the proportionality analysis comes out in plaintiffs' favor.

Now, when I say that I'm not persuaded that the communications sought are more than trivially relevant, I do understand that it is relevant here. The fact that Google -- as plaintiffs have explained it to me, the fact that Google was not merely a neutral platform upon which platforms placed ads but took a more active role -- plaintiffs would say actually created the ads, I'm not sure Google would subscribe to that characterization but we don't have to decide that today -- I understand that the extent to which Google did select or create or shape the allegedly infringing ads is, at a high level, relevant. That doesn't mean, in my view, that Google is entitled to discovery including each [redacted]

[redacted]
That is a level of detail that it just really doesn't seem to me is going to move the needle in terms of the plaintiffs' substantive case. Particularly, whereas here, the information is sought at the very end, literally, of the discovery period out of the database where, according to Google, it would be "nearly impossible" to extract this [redacted].

And that leaves the category that we discussed for the first time, which is whether Google should be required to perform additional searches of the [redacted] database. Google has performed some searches of the [redacted] database. Those searches were conducted by -- not conducted [redacted], they were conducted [redacted]. And if I understand it correctly, they were also somewhat -- I don't know how somewhat, they were also subject matter limited to DMCA communications.

We now know that the same [redacted] database could be searched [redacted]. We understand -- I understand that there are approximately 16,000 email addresses associated directly or indirectly with the 1,500 pirates, and plaintiffs have represented to me that they believe that if Google produced all of the external communications in the [redacted] database with those email addresses, both in and out, they would get some communications that they haven't previously received and that there would be something relevant in there, or there could be something relevant in there. Plaintiffs also

told me that they'd be happy to do the work themselves, that is to take the document dump and figure out if there's something relevant in there or not.

Here, I think that plaintiffs may have nudged the needle past neutral on the relevance proposition and I have not heard from Google that it would be particularly difficult to produce to and from communications with these 16,000 email addresses over the relevant period of time. I did hear a concern for Google that it might require human review, including privilege review, if the search turned up internal communications rather than external communications, but it seems to me at best there's conflicting information about that because one of the witnesses did indicate that internal communications are not a problem or don't exist in the [redacted] database, and it seems to me that there should be some way electronically to set your search parameters so that you're only getting the external emails and not internal communications that happens to reference one of those emails.

So, I will direct email to produce from the [redacted] database external email communications to and from the approximately 16,000 email addresses identified as associated with the approximately 22,000 merchant center accounts, which in turn are -- I hope I'm connecting the dots correctly here -- which in turn are associated with the 1,500 pirates. I will not require Google to do any further relevance review of that

search and production.

Any questions about what I have ordered? I'm asking that because, Ms. Ferrigno, you look a little confused.

MS. FERRIGNO: Yeah. I think we're a little uncertain that we actually can limit to "to" and "from" external, so I'd ask the Court if we have an opportunity to go back to our client and see if that's possible and if it's not, come back to you for some adjustment to this, just because I'm not sure it's feasible at the moment.

THE COURT: Well, of course you must go back to your client and figure out how best to get this done. And if significant barriers to compliance that you don't know about today pop up, I expect you will discuss those first with the plaintiffs and, if necessary, come back to me. But nothing I've heard today suggests that this can't be done.

How much time are you going to need to get it done?

MS. FERRIGNO: I think that's going to take a while.

THE COURT: That's part of the problem?

MS. FERRIGNO: Yeah. I think because we'd have to figure out, you know, if this is possible. My current understanding is that there's not an easy way to filter for just external communications.

THE COURT: Uh-huh.

MS. FERRIGNO: We'd have to figure that out with the client, and then we'd have to actually run this and then do the

review process. I think that's likely to take several months.

THE COURT: Well, I'm cautiously optimistic that you're not going to have to do a human review process, that you're going to figure out some technological way to limit the product of your search to external emails to and from.

MS. FERRIGNO: Yeah. I think our understanding is just that's not how information is stored in the database, but that said, we'll go back to our client and see what we can. I think that we'll need, like, at least six weeks to do all of this.

THE COURT: So, I'm going to give you 30 days. And if that's not doable, you will let me know well in advance of the 30-day cutoff what the problem is. So, today is September the 22nd, so that would be October the 22nd.

All right. I would like now to turn to the motion that plaintiffs filed on August the 31st at docket number 1177.

You're standing up. Is that your motion, Mr. Kane?

MR. KANE: Yes.

THE COURT: All right. Let me start by asking you why, in the first paragraph of your moving letter and then in your reply letter as well, you premised this motion on your assertion that what you learned at deposition was that [redacted] That's paragraph one of docket 1177. And then you said much the same

thing in your reply letter at docket 1210.

That's not what the witness said. And, to me, you're not starting off on the right foot here premising a significant motion to reopen discovery on a mischaracterization of what the witness said. Do you want to start there, Mr. Kane?

MR. KANE: What the witness said is that [redacted]

THE COURT: Uh-huh.

MR. KANE: So, how else would Google [redacted] In other words, the witness testified they conducted this investigation, [redacted] So, can [redacted] -- and we asked them, would that be [redacted] and he said, yes, that's what I mean when I say [redacted]. So, [redacted] --

THE COURT: You're suggesting that it's impossible for [redacted]? You're suggesting it's impossible for [redacted],

[redacted]? You're suggesting that it's impossible for a [redacted]?

MR. KANE: Well, [redacted] --

THE COURT: Where does it say that?

MR. KANE: -- using the [redacted]-strike threshold.

THE COURT: Where does it say that [redacted]

MR. KANE: Mr. R testified that [redacted] --

THE COURT: [redacted]

MR. KANE: [redacted]

THE COURT: [redacted] Those are important words, Mr. Kane.

MR. KANE: Well, on a discovery motion, the question isn't was that ultimately what happened. In other words --

THE COURT: No. But on a discovery motion, you can't jump to conclusions and present those conclusions to the Court in the first paragraph of your moving letter as if those were facts.

MR. KANE: I apologize if you feel that this was misleading, but we had a whole hearing about --

THE COURT: Well, the only reason it wasn't misleading is because I know exactly what the witness said or what the

Google witness said he understood the result of the investigation was, because we went through this at our last hearing. I might well have been misled if we hadn't had that exercise.

MR. KANE: Well, I'm glad that the Court has what it feels is an accurate understanding now. I mean, the question for the discovery motion is not, did this actually happen, the question is, you know, there's been this testimony in a deposition, plaintiffs are entitled to discovery as to that question; i.e. [redacted]. So, that's really the question that's before the Court.

And I would say it's actually more important to get discovery into it because Google is denying that it happened. In other words, if Google were acknowledging that this happened, the discovery might not be as important. But if Google's arguments -- we know now that Google's argument is, [redacted] and so this discovery is all the more important.

THE COURT: I don't think that's Google's argument on your motion to reopen discovery, I think Google's argument on your motion to reopen discovery is that you've had plenty of discovery into this issue and also lots of chances to take additional discovery that, for one reason or another, you

passed up at the time. They also make the argument that to the extent there was a light bulb moment, that light bulb moment was at the deposition in June, not at the deposition in August.

MR. KANE: Okay. So, we identified the specific things that are missing, so let me explain what those are.

THE COURT: Sure.

MR. KANE: The first is documents. So, we said Google should produce any notes about its communications with its vendors going back to 2018. So, what we have at the moment is these weekly, they call them office hours between Google full-time employees and vendors.

THE COURT: Office hours like electronic office hours?

MR. KANE: My understanding is they're conducted over Google video conference, basically.

THE COURT: Uh-huh.

MR. KANE: So, we have notes from those meetings going back to May of 2021. But Mr. R testified that he wasn't sure [redacted], which is to say when [redacted] --

THE COURT: I would just point out that Mr. R himself is not speaking on first-hand information; right? He didn't [redacted] This is all fairly indirect.

MR. KANE: We weren't able to explore that because of privilege objections. In other words, we weren't allowed to

ask -- we weren't allowed to have him answer: How do you know this? Did someone --

THE COURT: You could have asked him: Did you ever talk [redacted]? That wouldn't be privileged.

MR. KANE: I don't think we asked him that specific question. But, I mean, I don't know why it makes a difference as to whether we should get the documents of the office hours between Google --

THE COURT: All right. So, explain to me about What do you have and what more do you want.

MR. KANE: So, [redacted].

THE COURT: Uh-huh.

MR. KANE: But Mr. R testified that [redacted], but he didn't know if [redacted] He said it [redacted]. So, we're asking for those same [redacted]. And I should say it's like one continuous document. It's not, you know, a separate document for each week, it's just one document where they all the --

THE COURT: And why 2018 when the relevant period here, I think, starts in 2020?

MR. KANE: We're trying to capture when [redacted]

[redacted]. So, we're trying to go back far enough to get this -- to see if [redacted] As I said, it's one continuous document that has -- you know, each week they [redacted], so it's not like we're asking them to produce, you know, 52 documents per year, it's one continuous document. We're asking for those [redacted].

THE COURT: Did you -- I have a lot of letters here. Did you make this clear to me in your moving letter? Because I'm looking on page two, you say: Google should be ordered to produce documents concerning this issue for the period January 1, 2020, to March 31, 2025.

MR. KANE: So, if you go to docket 1210, which is our reply brief --

THE COURT: Oh, reply brief.

MR. KANE: -- page three.

THE COURT: Uh-huh. Now in your reply brief you're saying 2018.

MR. KANE: Correct.

So, that's one category, is the notes of these meetings between Google and the vendors. And I should say this [redacted] So, we think this is a very likely

[redacted]

THE COURT: And just to be clear, the notes that you already have from 2021 forward, do you have everything or only portions that are relevant to certain subject matters?

MR. KANE: We seem to have notes on various subject matters. I don't think they sort of redacted it and said, "Well, we needed the shopping stuff," or something like that. So, we have from May 2021 to, I think, sometime in 2024.

THE COURT: Okay. And you just want three prior years basically.

MR. KANE: That's correct.

THE COURT: Okay.

MR. KANE: So, that's one specific thing we'd ask for.

The second thing we'd ask for is there are these weekly quality checks. So, Mr. R testified that [redacted] And we'd like those so that we can see [redacted]

THE COURT: Just a procedural question here. I'm somewhat troubled by the fact that you're a lot more specific, and in some cases may even have changed the ask a bit in your reply letter. For example, your reply letter is the first time

you said we want the notes going back to 2018, and Google hasn't had a chance to respond to that. Why didn't you put all this stuff in your moving letter?

MR. KANE: So, the quality checks are in the moving letter, they're at docket 1177 at page two.

THE COURT: Thank you.

MR. KANE: The notes from the vendors are just a more specific version of what we asked for more generally in the opening letter, which was communications between Google and the vendors. Google responded in their opposition that they think they've produced everything that there is to produce. This is a specific category of things that we're saying they haven't produced.

THE COURT: Okay.

MR. KANE: That is, we asked for the broad category in the opening letter and, in response to Google's opposition, asked for something more specific.

THE COURT: All right. So, now that we're being specific, one, you want the [redacted], two, you want -- go ahead. You were talking to me about weekly quality checks.

MR. KANE: Yes. So, Mr. R testified that [redacted]

[redacted]. So, we're asking for those reports, the reports of those [redacted].

THE COURT: And did you ever ask for these documents previously?

MR. KANE: They're certainly covered by our RFPs because we asked for communications concerning implementation of Google's DMCA policy, and these are squarely documents concerning the implementation of Google's DMCA policy. So, yes, these were covered by our --

THE COURT: You say you asked for them, they should have been produced previously but they weren't, and now you know more specifically about them.

MR. KANE: Correct.

THE COURT: Okay. Go ahead.

MR. KANE: The third category we've asked for is documents that Google found in the course of their investigation but didn't produce. And I want to be clear, we're not saying, you know, we want you to tell us what did you look for or what did counsel tell you to produce to them, we're just saying anything that they -- any preexisting documents, so things that weren't created specifically for the investigation, preexisting documents that concern the implementation of Google's shopping DMCA policy that have not been turned over.

What we have in mind is, for example, we know that the [redacted] If those were uncovered in the investigation and they just were never turned over to us because, for example, they didn't hit on a search term or a custodian, we think we should get those. We're not asking --

THE COURT: Well, why don't you -- in order to avoid the obvious work product problem here, why are you asking for it that way instead of asking for the documents themselves?

MR. KANE: Well, so for that one we know, like, the specific category of documents that we're looking for: [redacted]. What we don't know is what we don't know, which is to say, did the investigation uncover a document that talks about this issue specifically, [redacted], and we didn't get it even though Google has it and found it during the investigation. We didn't get it simply because it didn't hit on a search term or it wasn't preserved in the custodian's documents.

So, we can ask specifically for the [redacted]

[redacted], we can't ask particularly specifically for other things that were uncovered during the investigation.

THE COURT: And what's your response to the obvious work product problem here that asking for things that you put in that file drawer over there because you turned them up in the course of the investigation is essentially asking for a roadmap to the investigation?

MR. KANE: We're not asking for all the documents they uncovered in the investigation.

THE COURT: No, just the ones that you haven't already seen.

MR. KANE: Right. I can see that creating a problem because maybe it would reveal -- you know, if you sort of explain how they were compiled, maybe that would reveal something about how the investigation was conducted or about counsel's thinking. What we're saying is if there are relevant responsive documents, and they don't even necessarily need to tell us where they came from, if there are relevant responsive documents on this question that they have and that they uncovered during the investigation, they should be giving us those. In other words, if it's a discrete -- you know, if it's 15 documents that they turn over that happened to have been found during the investigation, I don't think there's any sort of insight that we get into how the investigation was conducted. I don't think there's any kind of waiver if Google

turns that over in terms of counsel's thought process or opinion work product or anything like that. It's a preexisting document, it's just the way they found it wasn't their ordinary custodial and search term search, it was through this investigation. In other words, if the document otherwise is responsive and it's a preexisting document, it shouldn't be held back simply because they found it in their investigation and thought in response to the --

THE COURT: But isn't the answer to that, assuming that everybody is operating in good faith here, isn't the answer to that, well, if there was a document that was relevant and responsive to prior RFPs that happened to be overlooked during discovery but came to counsel's attention late in the day, whether through this investigation or through some other means, they'd be obligated to produce it late in the day, correct, when they stumbled upon it?

MR. KANE: That's true. I mean, if their answer is we've turned over everything, then I suppose that's their answer, but I don't think those documents should be shielded. Because I think Google's response would be, "Look, we ran the search terms that we agreed on, on the custodians that we agreed on, and that's who we produced." I don't have a representation from Google that they sort of went beyond that and said, "Oh, well, we didn't agree on these custodians and search terms but we went and searched in this other place

anyway and produced a bunch of relevant stuff from there." If Google wants to make that representation, they can, but I don't think the documents that they found in the course of the investigation as opposed to in the custodian search term process should be shielded.

I would point out, when the custodians and search terms were negotiated/brought before the Court, plaintiffs didn't know this about [redacted].

THE COURT: You're not helping yourself by continuing to tell me that [redacted].

MR. KANE: I'm happy to say [redacted], if that's --

THE COURT: Well, I'm not even sure that's accurate based on the record that we have now.

MR. KANE: [redacted]? Is that better?

THE COURT: You have one Google witness who, at deposition, speaking, as I understand it, from context, not based on his own personal knowledge but on information he has gleaned from others, telling you that, as he understands it, [redacted]

MR. KANE: I would point out, this came out as a result of a formal investigation where a law firm had been

retained to investigate --

THE COURT: I know.

MR. KANE: -- this very question in response to a billion dollar case. It's not like this was just something he sort of dreamed up on his own. I mean, this was, you know, the result of a serious investigation, I presume. But I'm happy to call it [redacted]

If there are documents that they found as a result of investigating this issue, those should be turned over to us. I don't think it's a waiver of work product, particularly given that when these search terms were negotiated/when the Court ruled on them, we didn't know any of this and Google did. In other words, when we fashioned these search terms, when we agreed to them/when the Court ruled on them, [redacted] So, I don't think we should be penalized for not knowing something at that time that we couldn't have known at that time.

The other category of documents we've asked for is addressing this exact issue. That because the search terms were not crafted with [redacted] in mind, we need an appropriate search term that will capture any type of [redacted] should be deployed. So, we've suggested the search term, it's in our reply brief, and we're asking that that be deployed against five --

THE COURT: It's the search term on page three of your reply brief?

MR. KANE: Yes.

THE COURT: Why wasn't it in your opening brief?

MR. KANE: So, in our opening brief we did ask for documents concerning this particular issue. Google responded that they've conducted a search for this and produced anything that was responsive. The problem with that is the search that they conducted was using search terms that were not designed to find this, in other words that were not crafted with this particular issue in mind.

I'd also point out -- and we got this deposition testimony on a Wednesday, we had to file the brief on Monday because discovery was closing on Tuesday, so I would ask for a little bit of leniency on the lack of specificity in the opening brief.

THE COURT: Well, I'm not sure I agree with you that you "had to" file the brief the next day since you are, after all, asking, in effect, to reopen discovery. I mean, the motion that we heard this morning and just disposed of was filed a week or two after that, right, and I didn't knock it out because it wasn't filed by August 31st.

MR. KANE: Yes. And that was with the permission of the Court at the September 1st hearing.

THE COURT: Well --

MR. KANE: We didn't want to risk not being able to make this motion because fact discovery was closing on September 1st.

But in any case, I do think it's appropriate to apply a search term that is designed to capture this type of thing. In the original search terms, the term "suspend" was cabined by other terms simply because we didn't know about this issue. So, we'd ask that this be deployed against the existing center custodians, as well as the Google employees who would have communicated with those folks and two additional custodians, Dheeraj Yadav, who filed a declaration in this case already, and I guess we'll call her S.D., who was [redacted].

So, those are the specific categories of documents that we've asked for.

In terms of depositions, we've asked for one specific deposition, which is the gentleman I just mentioned, Dheeraj Yadav. So, Mr. Yadav filed a declaration at Google's request in this case, it's at docket 921, and the declaration concerns a memo that Mr. Yadav says he prepared [redacted] I think in doing so, Mr. Yadav has submitted himself to the jurisdiction of the Court, and so I think it's appropriate for the Court to say, "Look, you filed a declaration on this topic, you need to set for a deposition on

that specific issue," [redacted].

I should say, it's clear that Google can compel him to testify because they've done it before and they've gotten him to file this declaration. We know that [redacted].

THE COURT: You think that [redacted]?

MR. KANE: [redacted] [redacted].

And I would point out, I mean, Google is claiming privilege over conversations with Cognizant, so at least according to Google, Cognizant is aligned enough with Google's interests that it's at least within the privilege circle.

THE COURT: Where is this Yadav declaration? Did you submit that to me?

MR. KANE: It's docket 921.

THE COURT: All right. Go ahead, I'll find it.

MR. KANE: So, that's what we've asked for in terms of depositions. The third category is [redacted]. I'm happy to address that now but it's sort of a separate issue, so it might be best to --

THE COURT: You can go ahead.

MR. KANE: Okay. So, this relates to Google's misrepresentation policy. The misrepresentation policy is very broad, it prohibits portraying the merchants or its products in a way that is not accurate. So, for example, selling a pirated e-book would violate the misrepresentation policy.

A great many of the pirate accounts that Google claims to have suspended in this case, and this is all restricted to the 1,500 pirate domains at issue here, [redacted]. So, there are about [redacted].

And it's also relevant for the reason we were discussing earlier today, which is that Mr. L testified that even though the e-book ban wasn't applied to free listings, in other words there was no ban on free ads for e-books, when the free listings group encountered an ad for an e-book, [redacted] In other words, [redacted].

So, when the [redacted] the review is required [redacted]. And Google concedes that it [redacted] of the merchant accounts at issue in this case. In other words, for

[redacted] of the 21,000 or so pirate accounts that were suspended, [redacted] which honestly might be the more important feature, or that it [redacted].

All of those are very important, but the one I'll focus on is the instance where [redacted] So, we can see from the data Google gave us, which we've now learned what it means through the depositions, that a particular merchant center account was suspended on, for example, January 1, 2023, for violating the misrepresentation policy. What we can't see is in the, you know, three years prior to that, was it reviewed five times for violating the misrepresentation policy and given a pass. Or we can't see, for example, if [redacted].

And in the data that Google gave us -- so, for [redacted] of those merchants, the account [redacted]. In other words, [redacted]

[redacted]. There are [redacted] merchants for whom there are [redacted], there are [redacted] merchants for whom there are [redacted]. So, these reviews were done [redacted] and they're going to have very probative information.

Google's own documents say that the misrepresentation review [redacted] Google's own document, this is Bates ending 628134.R, says [redacted] and in particular it says that [redacted] So, for the system pursuant to which Google [redacted], Google itself is acknowledging that [redacted] So, if [redacted] that's extremely probative evidence that we should have.

THE COURT: I assume that it was also [redacted]

MR. KANE: Yeah. There's a document written by

several people, including one that was deposed in this case, that describes these quote/unquote [redacted]. In other words, they looked at this -- they looked at sort of the [redacted] and said, [redacted] You know, about [redacted], and in particular they're [redacted]

If Google got that, and it must have because we've got, as I said, [redacted], if Google looked at these accounts and said either [redacted], that's extremely probative evidence.

Likewise, if Google concluded that [redacted], that's extremely probative evidence.

So, these are literally [redacted] concerning the very pirates at issue in this case. It's very important evidence.

THE COURT: And explain to me again why suspensions, unsuspensions, notes, *et cetera*, under the misrepresentation policy are relevant to your copyright infringement suit.

MR. KANE: Yeah. So, one of the things we'll argue that trial is lot of these people reached the [redacted]-strike threshold and [redacted]

Google's report, and Ms. [redacted] testified about this, she said, [redacted]

Their defense is, "Well, even if we didn't find them under the [redacted]-strike policy, we found them under the misrepresentation policy." What we're going to find out from these notes is that [redacted].

THE COURT: But under the misrepresentation policy, they weren't [redacted].

MR. KANE: They were, because -- for two reasons: [redacted]. That's why they use the misrepresentation review to --

THE COURT: You have record evidence of that? Do you have Google documents saying that [redacted]

[redacted]?

MR. KANE: [redacted] In other words, [redacted]. So, they clearly felt if you're selling pirated e-books, you're in violation of the misrepresentation policy.

I mean, if you look at the definition that Google's documents give, it's portraying the merchant or its products in a way that is not accurate. I mean, that clearly incapsulates a merchant that is selling pirated e-books.

And even if it didn't, like, [redacted]

THE COURT: I'll obviously give Google a chance to address this but I'm not sure that's their "defense." I don't actually think -- I could be wrong. I don't actually think their argument here is, as you put it," [redacted]

MR. KANE: If Google wants to get up and say, "We're not going to rely on this misrepresentation review," that is to say," We're not going to tell the jury we [redacted]

[redacted] They're welcome to say that and I'd not need this discovery. They're not going to get up here and say that.

And you should not rule on the basis that you think the policy is irrelevant if Google is not saying, "We're not going to introduce it as part of our defense."

THE COURT: All right. So, I asked you whether, in fact, the misrepresentation policy was used or was supposed to be used -- whether there's record evidence to show that it was used or it was supposed to be used to suspend copyright infringers, and you pointed me to the, sort of, [redacted] What about the misrepresentation policy itself? You've quoted me some very high-level language about how, well, we don't want people to misrepresent themselves. Do you have any deposition testimony or any Google documents which say a little more concretely, "If we find that you're selling pirated books, we're going to suspend you under the misrepresentation policy"?

MR. KANE: [redacted] In other words --

THE COURT: [redacted].

MR. KANE: [redacted] [redacted]

[redacted].

THE COURT: Okay.

MR. KANE: And if the misrepresentation review concluded that --

THE COURT: [redacted].

MR. KANE: [redacted] [redacted] --

THE COURT: Okay. But that didn't require a determination as to whether copyright infringement was going on in that particular case or not, that simply required a [redacted] Right?

MR. KANE: Okay. Even if you're not convinced that, like, there's a connection between the misrepresentation review and copyright violations, it's still [redacted] So, even if Google is saying it's disconnected from copyright violations --

THE COURT: What do you mean when you say that you characterize this as Google's defense?

MR. KANE: Yeah. So, we're going to say to the jury,

"Look --"

THE COURT: Is the defense a way of showing that there was no intentionality here? I mean --

MR. KANE: We're going to say -- sorry.

THE COURT: Go ahead.

MR. KANE: We're going to say to the jury, [redacted]

THE COURT: And wasn't --

MR. KANE: [redacted]

THE COURT: Yeah.

MR. KANE: [redacted] Google is going to have to say -- unless they're just going to say, [redacted] They're going to say, [redacted]

If they want to get up and say, "We're never going to say that. We're going to ignore the misrepresentation --"

THE COURT: Let me give you a hypothetical. A silly hypothetical, but sometimes hypotheticals are helpful in understanding what people are really arguing about. Let us

suppose, hypothetically, that Google [redacted], but at the same time Google was applying another policy under which they would suspend everybody who had the letter "R" in their merchant center ID, and it just so happened that almost everybody had the letter "R" in their merchant center ID so that 80 percent of the infringers ended up getting suspended under that policy. How would that play into this case, and would it be any different than the way you envision the misrepresentation policy playing into the case?

MR. KANE: If Google's argument to the jury is, "Look, we did it just by a different mechanism, we did it by finding the merchant center accounts that had the letter 'R' in their name," then it's relevant because [redacted]

THE COURT: But isn't --

MR. KANE: In other words, if they're going to say --

THE COURT: Isn't the only relevance there that X percent of the merchants who should have been suspended for cape right violation got suspended for some other reason? In other words, does it matter at that point what the reason is?

MR. KANE: What we're trying to figure out is were

[redacted]. In other words, as I said, there's [redacted]

THE COURT: Uh-huh.

MR. KANE: So, what we're saying is [redacted] So, I think what you're imagining is, "Well, [redacted] What we're saying is they [redacted] In other words, not only did they miss it with respect to the --

THE COURT: Right. But you have that objective data; right?

MR. KANE: We don't. All we have --

THE COURT: No, you don't know who was suspended and when?

MR. KANE: We know who was suspended and when but we don't know when -- we can't tell [redacted] In other words, we have data that says on September 1, 2023, we suspended merchant account X for violating the representation policy.

THE COURT: Okay.

MR. KANE: [redacted] --

THE COURT: But --

MR. KANE: -- before that.

THE COURT: -- let's suppose that they had this letter "R" policy but they wrote the code incorrectly and it sometimes didn't catch people with letter "R" for the first three times or ten times or 15 times. So what? Isn't the only relevance here, to the extent there's any at all -- and you may well want to argue at trial that it doesn't even matter if they suspended some of these folks for some other reason. I don't know, that's your trial strategy not mine. But to the extent there's any relevance here at all, isn't the relevance simply the objective data that X number or X percent of people who, according to plaintiff, [redacted]

MR. KANE: [redacted]

[redacted] That's very powerful evidence of intent, willfulness, the need for deterrence, all the things that are relevant in a copyright case. In other words, [redacted] and the notes reveal as much, that's extremely probative evidence of intent, willfulness, the need for deterrence, all the things that are important.

THE COURT: And as to this aspect of your current ask, [redacted], why did you not request this information until now?

MR. KANE: So, for two reasons. One is we learned only in August that Google had misled us about the burden involved. And the second is the magnitude of the relevance of these things only became clear in depositions.

So, on the first issue, Google completely changed its story on the burden that's involved here. In June, Google told us that [redacted] "would require

Google to manually screenshot the review panel for 20,000-plus merchants." They said," This is simply not possible on this scale." So, it was only at a meet and confer on August 28th that Google admitted that this is wrong in two important ways: One, they can pull the notes and comments without manually screenshotting them; and two, it's not 20,000 merchants, it's [redacted] merchants.

So, based on Google's representation that they would have to do this manually, we went down the road of trying to figure out a sample. What we eventually determined when we sort of pressed Google on whether this was a proper sample is that Google actually can pull these *en masse* and that it's a much smaller number of merchants than they'd originally anticipated.

THE COURT: And that's why you turned down the sampling proposal?

MR. KANE: Correct. And I should point out, what they were proposing was that they would do this for 30 merchant center accounts. So, there were [redacted] --

THE COURT: Did that number get up to 50 for a while there?

MR. KANE: We were talking about 30, and then we wanted to pick the 30 and then I think someone said, "Well, what if we do 50 and you select half," and so it was around there. I mean, there are [redacted] merchant center accounts that

[redacted], so 30 is less than [redacted]. We didn't learn that until after we had started talking, but they had suggested the sample size of 30.

Likewise --

THE COURT: I thought you originally thought there was [redacted] merchant accounts.

MR. KANE: Originally, they told us there were 20,000 merchant center accounts that they would have to manually screenshot.

THE COURT: Okay. So, you were talking about a sampling protocol that at one point was going to be 30 and at another point was going to be 50 when you thought it was significantly less than [redacted]

MR. KANE: No. When they were saying it was going to be 20,000 accounts was that they couldn't tell in advance which accounts had [redacted]. In other words, that they would have to go to every single account and see is there [redacted], and then if it did, they were going to have to manually screenshot it.

THE COURT: Okay.

MR. KANE: Then what we learned is they actually can tell in advance whether there's a [redacted] with respect --

THE COURT: And that's the [redacted].

MR. KANE: That's the [redacted].

So, the sample size they were offering or that we were discussing, the 30, was less than [redacted] of the total merchant center accounts.

THE COURT: So, did you go back to them and say, "Well, what about 300?"

MR. KANE: 300 would be what? Less than [redacted]? [redacted]?

THE COURT: Did you go back to them with any?

MR. KANE: Well, what I think a possible compromise is, is that they pull the part that they can pull *en masse*, which is to say they pull the [redacted] for all [redacted] merchants, because they made no representation that that has any particular burden associated with it.

Where they've claimed there's a burden is that they say within those -- the [redacted] for those [redacted] merchants, [redacted] But they're saying for those [redacted] They'll need to explain exactly what they mean by that. I'm guessing what it is, is the [redacted]

If what's in [redacted] we don't need them to screenshot that. If what [redacted]

[redacted], we would need a screenshot of that, but that's easy to deal with. It's one of two things: Either they use the tool that they admit they have, the tool called [redacted] which the Court has ruled on before, to [redacted] [redacted], or we could agree on some sort of sampling protocol for the [redacted].

But as to the [redacted] themselves, those should be just exported and produced to us. If there's some sort of burden involved in producing the [redacted] [redacted], we can figure out a way to deal with that, but the [redacted] themselves they should just produce to us.

THE COURT: Just going back over my check list and making sure I completely understand your ask. Your reply letter gives three categories of additional documents that you want directly related to vendor communications, not the misrepresentation policy stuff. One notes from [redacted] [redacted] to documents located during the investigation but not previously turned over, and, three, a new ESI search. But you told me when you first got up that you also want something called [redacted]. Where does that fit in?

MR. KANE: I was thinking that as part of the communications with the vendors in the first category, but if you want to call it a separate category, that's fine.

THE COURT: But it would be in those -- what you

describe as the sort of long, continuous --

MR. KANE: No, these would be separate documents. This was a [redacted] to --

THE COURT: And where in your briefing do you explain this?

MR. KANE: It's in the first brief.

THE COURT: In the first brief but not in the reply brief. All right. Let me look at your first brief.

MR. KANE: It's on page two under Roman one.

THE COURT: So, you weren't intending to drop it when you listed three categories in your reply. I mean, I'm just trying to keep straight, and I think Google play have had some trouble also keeping straight because I did, what you finally settled on as what you want.

MR. KANE: I think the [redacted] are a pretty easy thing for Google to pull and a pretty clearly relevant set of documents. I think they should be part of the production.

THE COURT: All right. Hold on. I have to look back now at your opening brief.

MR. KANE: On page two under Roman one, it's sort of in the middle of the paragraph.

THE COURT: "Any audits, reviews, or quality checks [redacted]

[redacted]." Boy, that's really shoved in there, into a big paragraph with a lot of stuff in it.

MR. KANE: We've tried to make this more specific in response to Google's claim that they've produced everything they have to produce.

THE COURT: Well, but that was your job in your reply brief, right, to be more specific and there was nothing about quality checks in there.

MR. KANE: I apologize for leaving it out of the reply brief, but, I mean, I think it's a pretty clear category of stuff that Google has and should produce as germane to this question.

THE COURT: What else do you want out of page two of your opening letter brief that's not in your reply brief?

MR. KANE: So, we're asking for the [redacted], the [redacted], documents that Google found in the course of its investigation, and the additional search term. Those are the four categories.

THE COURT: All right. So, it's four, not three.

All right. Anything else you want to tell me?

MR. KANE: I'm just looking at the A.L. transcript. I think he did testify about [redacted]. Give me one second.

Yeah. So, if you look at docket 1228 in the paragraph ten.

THE COURT: 1228?

MR. KANE: Yes.

THE COURT: 1228.

Go ahead.

MR. KANE: In paragraph ten, which is on pages three, four --

THE COURT: Well, that's Ms. Murphy's declaration; right?

MR. KANE: Yes.

THE COURT: All right.

MR. KANE: On page four, sort of in the middle of the paragraph, it says, "Mr. L also testified that Google [redacted] review to enforce its e-book [redacted] because [redacted] would exhibit [redacted]."

So, I do think it's clear that an account that was [redacted], but the sort of broader point is, like, this is how Google [redacted] So, unless Google is wanting to sort of forswear reliance on the misrepresentation policy, I think this discovery is extremely relevant to Google's defense in this case.

THE COURT: Let's talk about your proposal discovery schedule for a minute.

MR. KANE: Sure.

THE COURT: You originally asked for a new discovery close date of October 1, of course that's now only a week away. What do you currently have in mind?

MR. KANE: So, we said there should be a fact -- this is Exhibit 1 to our docket 1211.

THE COURT: Right.

MR. KANE: We said October 20th for the completion of fact discovery.

THE COURT: All right. You're right, I was looking at the earlier iteration.

MR. KANE: Yeah, it's docket 1211-1. So, we said October 20th for the close of fact discovery.

THE COURT: And why do you want an extension of the deadline to respond to RFAs and interrogatories?

MR. KANE: So, the RFA deadline is staying the same, the current date of September 30th, we're asking for September 30th. The response to rogs is moving two days. That one has already passed.

THE COURT: Right. The current date is September 16 for both, isn't it?

MR. KANE: Right. We exchanged them on September 18th.

THE COURT: You did?

MR. KANE: That might be one where, under the Court's rules, the parties can agree amongst themselves. I'm not positive.

MS. MURPHY: If I can. Your Honor, on the RFAs, the parties did agree amongst themselves to exchange on September 30th.

THE COURT: September 30th.

MS. MURPHY: Correct. And the rogs, we both responded as of last Friday.

THE COURT: All right. So, interrogatory answers have been served?

MS. MURPHY: Correct.

THE COURT: And RFA responses are now going to be by agreement of the parties on the 30th of this month, next week.

MS. MURPHY: Correct.

THE COURT: Okay. And you want October 20th to get all this done, including the deposition of Mr. Yadav.

MR. KANE: Mr. Yadav, yes.

THE COURT: Yeah, Mr. Yadav.

All right. Let me hear from Google. Whose motion is this?

MS. CLARKE: Yes, your Honor, it's mine.

Would you prefer to start with where we ended or do you want to go back to the beginning? I'm happy either way.

THE COURT: I think this time it would be most helpful if you would take it from the top, so to speak. Because if I understand Google's position correctly, your primary opposition is timing based, that is you think that everything or most everything plaintiffs claim to have only recently discovered they knew about or should have known about earlier.

MS. CLARKE: I'd say timing is part of it. I actually think most of it is that we've already produced what is available and there's nothing more to produce. I think that's actually our primary argument.

THE COURT: Well, you can start there if you want.

MS. CLARKE: Okay, sure.

So, first, I just want to say, you know, the Court noted that this motion was premised on a misreading or misrepresentation of what Mr. R said at his deposition. We agree with the Court's comments there. We don't need to rehash that but, you know, there [redacted] And I have --

THE COURT: Well, don't overread the Court's comments. I'm certainly not saying as a matter of fact whether [redacted] I couldn't actually know that.

Maybe the best way into this would be let's take timing out of it for a while and let's suppose that the two most relevant depositions here, the one in June where the

witness said that [redacted], and the one in August where the witness said that it was his understanding that [redacted], *et cetera*, *et cetera*, *et cetera*. Let's suppose those two deposition had each happened six months earlier when there was plenty of time in the fact discovery schedule. Do you think under those circumstances plaintiffs would be entitled to any of the things they're asking for now?

MS. CLARKE: Sure. So, yeah, we can assume all those facts.

So, I think the answer is no, and I'll explain why for each of the four items that Mr. Kane has said that plaintiffs are looking for. I do agree it was a little hard for Google to parse between the two motions what the Court asks for but I will go through each of them now as I understand it.

THE COURT: Yeah. Honestly, look, I know that there are a lot of motions flying around, I know that you're all overworked and have to do things very quickly, but I really was having trouble figure out between the opening and the reply letter what exactly plaintiffs were looking for here, but I think we're now clear.

MS. CLARKE: Yes.

So, starting first with the [redacted] documents. Mr. Kane pointed out correctly that those [redacted] have been produced, and not only --

THE COURT: Well, he says they were produced back to 2021.

MS. CLARKE: Correct. Back to 2021, which is the relevant discovery period for this case, it is what the parties have negotiated over. I don't think that, you know, that after discovery has already ended it is the time to relitigate when discovery should have started. I believe there are some --

THE COURT: Well, the argument is we didn't know when you negotiated that cutoff date that there was going to be at least a potential issue as to [redacted]

MS. CLARKE: Sure. And just to that point, Mr. B, who first testified about [redacted], also testified that [redacted] So, this idea that [redacted] does not make sense.

THE COURT: Well, maybe not 2018 but maybe 2020.

MS. CLARKE: Well, it's not only not consistent with what Ms. B said, it's not consistent with the data. Plaintiffs have the data to reflect suspensions, they also have the tracker that was used, the manual strike tracker, to show whether accounts should have been suspended. So, this information, you know, confirms what Ms. B had said and there's no reason to think that there would be any [redacted]

[redacted].

THE COURT: Let me look at Ms. B's testimony here. I'm looking at Ms. B's testimony as submitted to me on August 7th. I think it's the right snippet. She states, "It was determined --" she's referring to the results of the investigation. And by the way, I'm reading from docket 1094-1. It may have been resubmitted but this is the version in which I'm looking at it. She's being asked about the review, which was primarily prompted by this litigation matter, and she says, "It was determined that [redacted] So, she says [redacted]. Google has already produced those [redacted] going back to when exactly in 2021?

MS. CLARKE: I believe Mr. Kane said May 2021. I apologize, I don't have the document right in front of me but I can --

THE COURT: Mr. Kane, do you happen to know off the top of your head?

MR. KANE: It is May of 2021. Let me see if I have the document cite. It's Bates ending 471839.

THE COURT: Okay. So, you have it back to May 2021. And this period of [redacted], according to Ms. B, [redacted]

[redacted] Now, of course you're going to have data that either supports that or not, right, as the right date when [redacted]?

MS. CLARKE: Yeah. I mean, I don't know if we've connected all of the data yet, but that is consistent with what Ms. B was educated on to be Google's witness on this topic.

THE COURT: Okay. So, if Ms. B had given this testimony and Mr. L had given his testimony, you know, six months prior, Google might have said, "Okay, let's go back another year." Right?

MS. CLARKE: I'm not sure that that's what we would have done because we have already produced the relevant [redacted] from that time. And as Mr. Kane noted, these [redacted], so they grow on top of each other. They are, I think, north of 30 pages long, maybe even closer to 50 pages long. They are, I believe --

THE COURT: You mean the part he already has is close to 50 pages long?

MS. CLARKE: Correct, yeah. I these are [redacted]. There's not only [redacted] but there are also [redacted]. Nothing in [redacted] suggest that there was [redacted] or anything that would suggest that pulling notes prior would be relevant.

THE COURT: Do the [redacted] acknowledge or reflect in any way that the [redacted]?

MS. CLARKE: No, because that was a fact that was learned through the investigation. You know, Google [redacted]

THE COURT: Go ahead.

MS. CLARKE: So, this is also a topic that the parties have negotiated on for many, many months. I think as late as February of this year plaintiffs came to us and said, "Listen, we see these [redacted] docs in your productions, we would like to explore more discovery on it." We went back and forth, negotiated. Google ended up producing [redacted]. So, this is an issue -- to the extent plaintiffs are arguing that, you know, there's this huge revelation through depositions that made [redacted] so relevant to them, that's just not true.

I think your Honor noted this at the last hearing, that plaintiffs had a theory for a long time that Google was not implementing its DMCA policy as it should have been.

THE COURT: Well, they had that theory based on the numbers; right?

MS. CLARKE: Right. They had that theory, and also

their own experience that they found --

THE COURT: Right.

MS. CLARKE: -- that there were accounts that weren't being suspended. They were very keyed in, they knew that. Google worked with vendors, it was very keyed in on the vendor work. That was very much at the front of the mind even back to 2024 when the search terms were being negotiated. So, to the extent there were other relevant documents, those would have been found by the search terms. I think it's very far-fetched to say that these issues were not at the front of plaintiffs' mind when search terms were being negotiated.

I understand that they didn't have deposition testimony into, you know, some of the details of how it was implemented, but they wanted to know how it was implemented, what the vendor role was, what instructions were given, what guidance was given to the vendors, what quality checks were done, that will get into part two. They were very focused on this, and so our search terms focused on that. We produced thousands of documents from those search terms. And even after that, I think we had at least 20 email exchanges between the parties about what they allege to be deficiencies in our productions and Google went back and looked.

So, you know, Mr. Kane was talking earlier about, "Well, what if there was something that didn't hit on one of Google's search terms and custodians but they found was

relevant?" We (unintelligible) to produce discovery that is responsive to their RFPs. So, when they flagged things for us and they noted that, you know, they thought they were missing something related to office hours, we thought about what we could do to find that and we negotiated with them a reasonable way to try to find something without completely reopening custodial discovery, which is a huge burden on Google.

THE COURT: Do you want to turn to the [redacted]?

MS. CLARKE: Sure. So, for [redacted], again, this was something else that was very focused on by plaintiffs. We have produced [redacted] dating back through the whole relevant period. They were asked about in depositions. Specifically, [redacted]. Again, there were more negotiations and emails back and forth between counsel earlier this year about what plaintiffs believed were deficiencies there. Again, the parties reached a resolution through negotiations and Google produced even more on that.

I think it's really, again, a stretch for plaintiffs to argue that they weren't aware that any quality checks were happening. You know, Mr. R, who, first of all, was not speaking on behalf of Google, and, second of all, does not do

this work anymore, and, third of all, was not the full-time employee who was directly working with vendors during this time, saying that there were [redacted] was not a new piece of information to plaintiffs and is something that they have been focused on and indeed have received discovery on. And I think I have that in my declaration paragraph six, a list of all the types of documents that we submitted or that we produced and not only do plaintiffs have but they have used during deposition.

As you know, we've had at least six depositions focused solely on DMCA implementation and the folks who were responsible for it from 2020 through 2025, and a lot of those deposition were focused on these types of documents.

THE COURT: Plaintiffs also ask for all of the documents that Google gathered in the course of its investigation but that weren't previously produced as responsive to the various search terms or what have you.

MS. CLARKE: Yes. So, I think that Mr. Kane said if we could represent that if we found a document that was responsive and non-privileged during our investigation and produced it, that hopefully would end this dispute. We did not with hold any documents just because they were found through an investigation. If we found anything responsive and non-privileged, it was produced. So, you know, there's no independent basis for privilege over documents just because

they were found in an investigation, the same way there's no independent privilege over facts, which we discussed at the last hearing.

THE COURT: Let me ask the question a little differently from the way you expressed it, because Mr. Kane pointed out correctly that there may be a gap between a document that a reasonable attorney would look at and say, "Heck, this is relevant," and a document that was produced earlier according to search term protocols. Put another way, it's possible in this case, it's possible in any case, that there are documents that may not have been hit on by the technical parameters of the parties' search terms but that a reasonable lawyer looking at would say, "This is a relevant document. This is a document which is responsive to the RFPs," *et cetera*, *et cetera*, *et cetera*.

Are you representing to me that there are no documents relevant in that larger sense which you came upon in the course of the investigation but that haven't been produced?

MS. CLARKE: Correct, that's my understanding. I do not understand there to be any documents that were found through the investigation that were responsive and non-privileged that we did not produce.

THE COURT: And is this because they were all previously produced in the ordinary course of discovery or were there, in fact, documents that you happened to come across

because of the investigation but since discovery was then ongoing, that gave you an opportunity to produce them without saying, "Oh, we came across these in the course of our investigation"?

MS. CLARKE: So, the investigation was [redacted], which was pretty early.

THE COURT: Yeah, pretty early.

MS. CLARKE: Yeah.

THE COURT: Yeah.

MS. CLARKE: We hadn't -- I don't think we started our custodial productions, and I think we might have still been negotiating search terms at that stage. I don't think -- we didn't do our first custodial production until August of that year, so there were no already produced documents at that stage.

THE COURT: Uh-huh.

MS. CLARKE: And we weren't -- there was no, like, set of documents that we found in the investigation that were like, "Oh, let's remove these from custodial review," or anything like that. And I'm not aware of any documents that we specifically produced because they came through the investigation, but I'm also not aware of any documents that we did not produce because they were found through the investigation.

THE COURT: I guess the question is, how sure are you

of what you're telling me? Because you've used phrases a couple of times like "it's my understanding."

MS. CLARKE: I'm confident that we did not withhold any documents that would otherwise be responsive and non-privileged because we found them in the investigation, and I'm confident that our search terms and custodians would have found those documents and we would have produced them.

THE COURT: Because those are two potentially different things.

MS. CLARKE: Yes. So, I'm confident on both of those pieces.

THE COURT: Okay. And if I asked you to put that in writing, you would do that --

MS. CLARKE: Yeah.

THE COURT: -- after --

MS. CLARKE: Yeah. I mean, of course --

THE COURT: -- after going back and double --

MS. CLARKE: I'm just going to also --

THE COURT: -- checking?

MS. CLARKE: -- that I personally was not on the case when the investigation was happening, but that is my understanding. That's why I'm saying "my understanding," from my colleagues who were helping Google lead this investigation.

THE COURT: Okay. So, now the new search term proposed in the reply brief. Go ahead.

MS. CLARKE: Sure. So, I think, you know, this would be an incredibly burdensome ask for Google to undertake at this stage. I think we talked about with relation to the last motion that was argued, you know, adding two more custodians and then this search term would require a complete reopening of --

THE COURT: Well, as I understand it, the new custodians -- maybe I'm misunderstanding it.

Mr. Kane, would the new custodians have to be searched for all the old search terms or just the new search term?

MR. KANE: We'd be fine with just the new search term, your Honor.

THE COURT: All right. So, you'd want all the old custodians re-searched with the new search term plus the two new custodians with the new search term?

MR. KANE: It's not all the old custodians. We've identified --

THE COURT: You're right. Sorry about that.

MR. KANE: -- the old custodians we're asking for. It's the vendors that are custodians as well as the Google employees who would have communicate would the vendors.

THE COURT: Okay.

Ms. Clarke, sorry. Go ahead.

MS. CLARKE: Yeah, no problem.

Yeah. I mean, just to be clear, I just want to first

start by looking at the search term itself that's proposed.

THE COURT: Sure.

MS. CLARKE: I think it's pretty clear even though -- even without having any tools to run this that this would be incredibly broad. So even looking at the first word "suspend --"

THE COURT: Because of all those "ors."

MS. CLARKE: Correct. And there's an "and" in the middle. "Suspend and shopping." So, that means any document that has both the word "suspend" and "shopping" in it would be something that would be picked up on.

THE COURT: Uh-huh.

MS. CLARKE: So, incredibly broad. But I don't --

THE COURT: I take it you haven't run a hit report on any of the custodians for this search term.

MS. CLARKE: We ran numbers just to get a general idea of burden. I don't think I understood that this was being limited to only certain custodians, but for all custodians, which does not include the two new ones because we haven't collected those documents, it would be over 200,000.

But I just want to clarify --

THE COURT: If you ran it across all existing custodians.

MS. CLARKE: All existing custodians in the current timeframe.

But I want to clarify that even fixing the search term is not going to change the burden on Google. We are at the end of fact discovery. Fact discovery has closed.

THE COURT: I know. And expert discovery is fast upon us.

MS. CLARKE: Yep. But also we have been here before. Plaintiffs have asked for so many search terms. We have negotiated search terms that didn't come before the Court that we've agreed to, you have ruled on several search terms, and I think the statement that this search term is somehow, you know, going to identify documents that weren't already identified by existing search terms is really quite absurd. You know, we, for months, negotiated those prior search terms that were run. Again, plaintiffs had at the forefront of their mind, "We want to find documents about Google's implementation of its DMCA policy, we want to find communications among FTEs about that, we want to find communications among vendors about that, we want to find communications between vendors and Google about that." That's why they sought to add vendors as custodians last August and you granted that. We also agreed to add the vendor manager as a custodian.

Like, this has been very much the focus of discovery. Our search terms were targeted at that. And even when plaintiffs thought that maybe our search term might have missed something, that goes back to my earlier --

THE COURT: I'm sorry. Say that again.

MS. CLARKE: Even when they thought -- plaintiffs thought that our search terms might have missed something, plaintiffs sent us lengthy emails about purported deficiencies in our discovery, in our productions. Most of the time we responded to those saying, actually, we produced and we listed all the Bates numbers of, you know, shopping office hours, quality checks, different vendor training guidelines, all of these types of things that are the relevant documents that they are seeking in this in motion and purportedly seeking with this search term.

We had lengthy discussions about we pointed them to the documents, they used them in their depositions, they asked witnesses about them. They asked witnesses if there were any other documents they could think of that hadn't been presented on these types of topics, they asked about vendor quality checks and how those would be documented. So, like, to completely reopen custodial discovery with any type of search term would severely prejudice Google when we have been working in good faith to resolve disputes with plaintiffs on these types of issues for months, if not years. We negotiated very, very hard with plaintiffs about these search terms. It's not like Google was like, "Oh, this is the search term, this is all you get."

You know, it is a fact of discovery that custodial

document discovery happens before depositions. Like, that's just the way it goes and, you know, we need to proceed that way. But even still, plaintiffs had plenty of months of depositions where they did hear more about how Google acted and they waited until the end of discovery to bring this motion. So, you know, this would be incredibly prejudicial to Google to order another search term for custodians and to expand a date range that goes three years before any relevant claims in this case.

THE COURT: Oh, I overlooked that. This search term would also go back to 2018, Mr. Kane?

MS. CLARKE: Correct.

THE COURT: I see that now in your reply letter.

Okay. And the deposition?

MS. CLARKE: Yes. So, the deposition of Mr. Yadav. So, I think we talked about this a little bit at the last hearing. Plaintiffs had an opportunity to use one of their 20 depositions for any Cognizant employee. Our understanding is that they served a subpoena on Cognizant to secure deposition testimony. There was back and forth, there was a declaration that plaintiffs received from Cognizant. We are not Cognizant's counsel, we can't control what Cognizant does, who they produce. The fact that they voluntarily agreed to submit a third-party declaration to support one of our disputes does not change those facts, it doesn't mean that we can control

them. They are represented by --

THE COURT: Well, leaving aside the question of whether I can effectively order Google to produce Mr. Yadav, that's not what I'm focused on at the moment, because the more important question and the question that would have to come before that is, is there good reason for permitting plaintiffs at this late date to take one additional deposition of Mr. Yadav?

MS. CLARKE: So, we would say no. Again, there have been 20 depositions in this case. At least six of those have been of employees who were directly responsible for implementing Google's DMCA policy. My understanding is that the declaration that plaintiff secured from Cognizant states that there's no one in the U.S. with relevant testimony about the implementation of Google's DMCA policy. There are no additional facts that can be learned.

And again, we're at the close of fact discovery and plaintiffs have already used all of their allotted depositions. If this is something they felt was so important, they should have reserved a deposition to be able to do that and raise this issue far earlier with the Court.

THE COURT: So, I'm are going to pick this up with you in a moment, Mr. Kane, but I have Ms. Clarke now. Remind me, when did plaintiffs send a subpoena to Cognizant?

MS. CLARKE: I don't have the date before me. I

believe it was this past spring of 2026, but Mr. Kane is correct me if that's wrong.

THE COURT: And do you mind actually jumping in on this point now, Mr. Kane? Just refresh me on that. I know that you sent them a subpoena, that they told you that they didn't have any knowledgeable witnesses in the U.S., and then you moved on to other witnesses for your 20 witnesses; right?

MR. KANE: That is what happened. I'm just seeing if I can get you a date.

THE COURT: And, of course, the reason you wanted a Cognizant witness was to cover, among other things, the topic that you want to cover with Mr. Yadav now; correct? [redacted].

MR. KANE: Well, we wanted to depose someone from Cognizant at the time because they would know about Google's implementation of its DMCA policy.

THE COURT: Right. But you already knew from the [redacted] right? You knew that the [redacted].

MR. KANE: Well, recall that --

THE COURT: I mean, you said that to me a bunch of times at hearings.

MR. KANE: Recall that there's quite a bit of daylight between [redacted],

[redacted] Those are two very different things.

THE COURT: Sure.

MR. KANE: Of course our theory of the case, the whole reason we brought it, what our experience was, was that the DMCA policy was not being implemented properly. To say that we should have, from that point, leapt to the conclusion that, [redacted] I think is really unfair, particularly when Google was asserting a DMCA defense up until, when was it, May of 2026, pursuant to which they have to have a policy that provides for the termination of repeat infringers in appropriate circumstances. They just [redacted] To say that we should have sort of read the tea leaves and figured out that this is what was happening I think is really unfair, and to deny us discovery on that basis I think is truly unfair.

THE COURT: So, the question was, and I'll sharpen it up for you, if you had proceeded with Cognizant in -- I'm sorry. Remind me of the month again when you sent out the --

MR. KANE: I think it went out in April of 2026.

THE COURT: April. Okay. If that's wrong, you can

correct the record. If you had proceed would them at that point, for example, if you had insisted, which I think you could have, that they produce a 30(b)(6) witness, right, you could have done that, in theory?

MR. KANE: So, part of the analysis for whether the recipient of the subpoena can be compelled to produce someone from outside the United States or to have someone outside the United States educate them is proportionality, which is to say, you know, is the burden of having someone outside the United States --

THE COURT: You weren't confident you'd win that.

MR. KANE: Correct. Now I think we would, and the reason is what we have now is not just this is another person who knows about the implementation of the DMCA policy, but what we have is a [redacted]. Google is saying, [redacted] And so only someone from Cognizant can give us Cognizant's view on that. We can't get that from someone at Google.

THE COURT: But understanding that in April you had not yet had the deposition testimony about the [redacted] and so forth, if you had had Mr. Yadav or some other knowledgeable Cognizant witness across the deposition table from you in April or May, you surely would have asked, among other things, [redacted]

[redacted]?

MR. KANE: If what you're saying is this would have come out in the deposition of Mr. Yadav, I don't know whether it would have or not. What I would point you to is all of the witnesses prior to Mr. [redacted] testified -- we asked them things like, "So, when you suspended someone for copyright infringements, did you also suspend accounts that had the same email address?" A truthful response to that question would have been, [redacted] Instead, they said, [redacted]

When we asked them,"If you suspended someone from copyright infringement during the relevant period, did you suspend accounts that were connected to the same ads account as the one you were suspending?" A truthful response would have been, [redacted] Instead, they said, [redacted]"

So, I think the deposition of Mr. Yadav might have gone much the same way, which is to say, you know, if you read the literal text of what they said, perhaps they weren't actual lying, but they certainly left the impression of, [redacted]. And in fact, both Ms. Kelly and Ms. [redacted] and there was a document that Google produced that showed that they had [redacted]

[redacted], so we shouldn't have been expected to know, oh, [redacted]

I mean, it's quite unrealistic to say, "If we had had Mr. Yadav in a deposition chair in April of 2026, this all could have been avoided." It all could have been avoided if [redacted]. You correctly asked Ms. Clarke what would have happened in the sort of counterfactual universe where --

THE COURT: Had all this happened six months earlier.

MR. KANE: Yeah. It's worth noting we sent our deposition notices for the first time in October of 2025. Mr. R was supposed to be deposed on May 28th, that's three months before he was actually deposed. Google canceled with no explanation. Then he was scheduled for August 12th.

THE COURT: All right.

MR. KANE: They canceled --

THE COURT: I'm sorry, Mr. Kane, but I interrupted Ms. Clarke to ask you a fairly targeted question --

MR. KANE: Okay.

THE COURT: -- and we're going well beyond that, so I'm going to get back to Ms. Clarke. And I do understand that

once again Mr. Kane is stating as fact something which Google contends to be not factual at all. I get that.

MS. CLARKE: And is making representations that Google --

THE COURT: That the witness said it. Right.

MS. CLARKE: And that Google's witnesses perhaps lied under oath. I just really want to take issue with that, that --

THE COURT: All right. But I want to focus you as well. So, we were discussing the question, again, whether if all of this was happening well within the fact discovery period, whether Google would be entitled, if not Mr. Yadav, to an additional deposition based specifically on the question, gee, [redacted]? [redacted]

MS. CLARKE: So, you're asking if they had actually moved forward with trying to get the deposition of Cognizant six months prior?

THE COURT: Well, okay, so let me sharpen it up for you. Let's suppose that they came to me after negotiating, hopefully, with Google and said, "Judge Moses, give us this deposition, please," and at the time we had this whole record, we had the testimony about [redacted] and the testimony about the investigation and so forth.

MS. CLARKE: So, I'm not saying that Google --

THE COURT: I guess what you'd be saying is, "Well, you can make it one of your 20 but you don't get an extra one."

MS. CLARKE: Exactly, yeah. That's what I was going to say.

THE COURT: Uh-huh.

MS. CLARKE: I'm not saying we wouldn't have a position at all as to whether that deposition would be relevant or necessary, but I think our primary concern here is that they're out of depositions and we're at the end of discovery, and they used all their deposition on other witnesses. They, in fact, like, really veered course on the types of witnesses that they wanted to focus on and made a larger focus on folks working on ads and on the e-book ban, and that was a decision that counsel made with their remaining depositions. As you recall, we moved to limit the number of depositions, so plaintiffs thought there was a chance they could only have 15 at one point, then you ruled that they got all 20. At that point they had the opportunity decide that, you know, Cognizant is one that we really want to prioritize.

And again, I'm not saying we would have had no thoughts on that, but they could have proceeded with that, we would have had totally different arguments there. And we're not Cognizant's counsel so, you know, whether Cognizant would have fought that 30(b)(6), I can't say, but the biggest issue

here, you know, is that they're out of depositions, they're out of time, and there's no relevance or prejudice that they could argue to -- that I think should convince the Court that they should be given another deposition and more time.

THE COURT: All right. Let's talk about the misrepresentation policy.

MS. CLARKE: Sure.

THE COURT: Plaintiffs' pitch, as I understand it, and Mr. Kane will tell me if I have got it wrong, is that to the extent people who -- [redacted]. That the reason for being suspended under the misrepresentation policy overlapped with reasons somebody should have been suspended under the [redacted]-strike policy, technically not the [redacted]-strike part, but that being a copyright violator was good enough reason to get you suspended under the misrepresentation policy. The misrepresentation policy [redacted] and therefore -- this is where I get a little fuzzy, on the "therefore" part -- and therefore that if and to the extent Google is going to use as part of its defense the fact that [redacted] plaintiffs are entitled to more detailed and probing discovery as to how that

actually worked, including documents which would shed some lights on [redacted] for example, [redacted]

How much of that did I miss, Mr. Kane?

MR. KANE: Close enough, Judge.

THE COURT: Close enough, okay.

Ms. Clarke, what's your response?

MS. CLARKE: Sure. So, you know, I want to just first reintroduce some language because we have talked about a related dispute before in the context of the 30(b)(6).

THE COURT: Yes, because I occasionally have to pay attention to other cases between my conferences with you, I do appreciate being re-educated.

MS. CLARKE: Yes. And I think Mr. Kane mentioned this briefly. So, this misrepresentation review, in part, is [redacted]. That might sound familiar to you.

THE COURT: Through --

MS. CLARKE: [redacted].

Okay. That's fine. And I just want to explain that. The misrepresentation policy is a very broad policy. I think Mr. Kane started out correctly and then we diverge on its relevance. But it is a policy that [redacted]

[redacted] So, it could be for a variety of reasons. They could be saying that they're selling one thing and it's actually something else, they could be letting folks go through the process of buying a product and then never sending it, or sending them something else that was not what was being advertised, so various reasons. So, things they might look at is, you know, [redacted] things like that.

And this misrepresentation review [redacted] and I think Mr. Kane either did not remember or is misrepresenting the testimony that's come out on this. Our 30(b)(6) witness on this topic was extremely clear that the [redacted]. And in fact, it's not something that it could ever be used for, because [redacted] They don't know if it's, like, a legitimate publisher or an authorized distributer who is advertising this product, or if it's someone who does not have rights or authority to distribute that e-book.

So, Mr. Kane directly asked this witness about --

THE COURT: Who is "this witness"?

MS. CLARKE: We've been calling him A.L.

THE COURT: A.L. Thank you.

MS. CLARKE: And I can read --

THE COURT: And what does A.L. have to say?

MS. CLARKE: So, Mr. Kane asked:

"Q. And the way that the [redacted] was if the [redacted]. Is that the idea?

"A. No. There's a [redacted] I don't know how [redacted] are represented there, maybe not, maybe yes. But misrepresentation review takes [redacted]"

And I think that was in our Exhibit A to our opposition.

THE COURT: Okay.

MS. CLARKE: So, this is not a policy that is used to identify anyone who would be violating Google's DMCA policy, it's copyright policy.

Mr. Kane has tried to make the connection to e-books. The portion that --

THE COURT: That was going to be my next question:

[redacted]

MS. CLARKE: So, the way that Google implemented its e-book ban was kind of going from -- like, [redacted]

The primary way that Google implemented its e-book ban was things that you would think of. First, [redacted] for lack of the technical language that I don't have, [redacted] So, you know, they used these [redacted] That's pretty easy. If you see [redacted] Because, remember, the e-book ban was not designed to remove accounts that were selling infringing e-books, it was designed to get rid of everything. All e-books on shopping for --

THE COURT: Well, Mr. Kane's points is that, yes, it was categorical, it was designed to get rid of all e-book ads, but the reason for that is that so many e-book ads were infringing. That's the theory at least.

MS. CLARKE: So, yeah. I mean, I think we have different understandings of why the e-book ban was put into place. Our position has been that plaintiffs actually insisted that we put it in because they didn't believe that we were doing a good enough job to remove infringing e-books so we said, "Okay. Well, let's just get rid of them all because we

want to, you know, work with you."

Anyways, putting that aside, though, the [redacted] because, again, the misrepresentation review is designed to find accounts that are violating the misrepresentation policy that Google has, and that policy is basically when Google is -- when merchants are advertising products that do not comply with Google's policies, whether it's, you know, an e-book policy or anything else.

So, to the extent that the misrepresentation review was also running at the same time as this e-book ban strategy, [redacted]. Like, I think both in this motion and in the previous motion it was implied that the [redacted]. That is the complete opposite. This misrepresentation review is [redacted] and is something that has run at Google for a very long time to remove accounts.

So, what Google's witnesses have testified to was that, you know, [redacted]

remove.

And Mr. Kane earlier was speaking about specifically for free listings. As a reminder to the Court, the e-book ban did not apply to free listings, so --

THE COURT: I'm aware.

MS. CLARKE: -- [redacted]. For free listings, but Google was doing, what the free listings team determined was that [redacted] But again, there's no, like -- there's no [redacted].

THE COURT: So, if you would then speak to the sort of trial strategy point, I guess, Google has said in various ways as the case has gone along that X number or X percent -- and I don't have the number or the percent in front of me -- but some number of infringing ads were in fact removed. It now transpires that [redacted]

How do you see that playing into the parties' claims and defenses in this case?

MS. CLARKE: Sure. So, I think as you noted, I think

that plaintiffs are very much oversimplifying what Google's case will be. And I will just note, you know, obviously we're still developing our trial strategy so I don't want to say definitively what we're going to put forward as evidence, but our overall strategy is that Google did not induce any pirates to advertise infringing e-books on shopping. That is our argument. That is what we need to prove.

THE COURT: Well, actually --

MS. CLARKE: Or that's what we need to prove against, yes. Like, we have lots of discovery, and in fact, you know, a lot of discovery that plaintiffs have taken has only reinforced that Google did not induce pirates to advertise on shopping. We have data, discovery, testimony to support that.

THE COURT: And how, if at all, does the fact that [redacted] play into that defense?

MS. CLARKE: Again, we haven't, like, formalized our strategy there. Is that something that might be discussed? Because, quite frankly, that's what a lot of our witnesses discuss in their testimony potentially.

THE COURT: Let me put it another way. Is it relevant at all to your liability defense or does it only come into play should you not prevail on liability at the damages phase because plaintiffs can only get damages for infringement that

happened, not for infringement that didn't happen?

MR. DAMLE: I --

THE COURT: You know the rule Mr. Damle.

MR. DAMLE: Yeah, I apologize. Because this is talking more broadly about trial strategy, you know, Ms. Clarke is doing a wonderful job here, but I want to make sure we give you a direct answer. So, with your --

THE COURT: All right, I'll permit it.

MR. DAMLE: So, I think it could play into our liability defense; right? Their claim is we've induced infringement, we've done things to induce infringement. If it's the case that, in fact, a lot of these who they call pirate merchants are being suspended by Google, at least is probative of -- for -- you know, [redacted] it at least is probative of the fact that Google was --

THE COURT: In a pretty indirect way.

MR. DAMLE: In an indirect way.

THE COURT: I mean, the argument would have to be, gee, if we were really inducing --

MR. DAMLE: We would have wanted them to keep them on; right? So, it would undermine any claim that we were trying to keep pirates --

THE COURT: Pretty indirect.

MR. DAMLE: Indirect. Indirect.

So, I don't want to take it off the table --

THE COURT: And under this view, would it matter [redacted] if they were suspended because it was a month with an "R" in it, if they were suspended for some other completely irrelevant reason, would that matter?

MR. DAMLE: It wouldn't matter, no, because we would have still said -- it really is to undermine any sort of claim that we wanted people that were selling infringing works on our platform. Right? If [redacted] --

THE COURT: Completely unrelated reasons.

MR. DAMLE: -- it at least would be some evidence that we were not eager to have people advertising infringing content on our platform.

THE COURT: I don't know. I don't know if I'd put that front and center or if I was --

MR. DAMLE: It is not our main argument, to be clear. Mr. Kane said that this was our one argument, that's the only argument we have. Before we even get to suspending merchants, we have the fact that we were taking down the infringing acts.

THE COURT: Okay, okay, okay. Let's not get too far afield here.

MR. DAMLE: Okay.

THE COURT: But you said to me you might want to make --

MR. DAMLE: I don't want to --

THE COURT: -- this argument.

MR. DAMLE: Yeah. I don't want to take it off the table that we would make this argument. Obviously, we're still early so I don't want to suggest that it isn't going to be relevant to liability. We're still, you know, putting together, as Ms. Clarke said, our trial strategy. We'd want to do all the things you do preparing for trial.

It may be that we decide, okay, it doesn't really work all that well in the context of the full story, but I certainly wouldn't want, at this stage, to take it off the table.

THE COURT: Let me get at it another way. Do you want to argue -- willing to make the representation that [redacted] I don't know how to put this, [redacted] In other words, that the [redacted] as Ms. Clarke just said, was [redacted]

MR. DAMLE: Correct, yes.

THE COURT: So, you would agree with me that [redacted] It's not something that Google -- other than the numbers themselves,

it's not something that Google can, as Mr. Kane puts it, [redacted]

MR. DAMLE: I wouldn't want to put it that way, your Honor, [redacted] because it's certainly -- even if we get beyond liability, it's certainly relevant to their harms; right? Like, how harmed are they by the fact that --

THE COURT: Yes. But if we get beyond liability to damages, it's definitely not going to matter [redacted], I think.

MR. DAMLE: Yeah. So, the reason I'm hesitating, your Honor, is because there is a -- there's a timing issue here; right? So, we are -- for instance, it's a [redacted]-strike policy for DMCA. Now, it's possible --

THE COURT: [redacted] --

MR. DAMLE: Exactly.

THE COURT: [redacted].

MR. DAMLE: Exactly. Or may have been [redacted]

THE COURT: Which would have probably been coincidental.

All right. So, what I'm hearing from you is Google thinks that the [redacted] might be relevant and admissible in defense of liability?

MR. DAMLE: To the extent that -- I mean, I have some

questions about whether the fact that we -- given that we've withdrawn our DMCA defense, whether the fact [redacted] So, assuming that they are able to make that argument that somehow the [redacted], if they're going to get to make the argument that that's relevant to showing Google induced, then, yes, I'd want to be able to say, "Okay, but we also were [redacted] Yes, I'd want to make that argument.

THE COURT: All right.

Ms. Clarke.

MS. CLARKE: Sure. And I was going to transition now, your Honor, unless you had more questions on the relevance piece, just to kind of get into what plaintiffs are actually asking for here. So, we're talking a lot about, like, high-level suspension data.

I think, as has been made clear by both sides, the suspension reactivation data has already been produced by Google, so that's --

THE COURT: Meaning who was suspended when --

MS. CLARKE: Correct.

THE COURT: -- who was reactivated, *et cetera*.

MS. CLARKE: Correct. So, that has already been produced.

What we have also produced, which is where we've already discussed with the Court at the 30(b)(6) hearing, is we have produced data about [redacted] So, we had two topics that plaintiffs were asking for 30(b)(6) testimony on. If you recall, one was about, like, broader use of this [redacted] and one is about a [redacted], and your Honor granted plaintiffs' motion martially to have a 30(b)(6) witness testify about the meaning of [redacted]. I don't know if this is ringing a bell, but just want to remind you that we've discussed this a little bit.

THE COURT: I went back into the files for the previous discovery disputes that I thought were most relevant here, but I didn't review that one.

MS. CLARKE: No problem. I'll just give you a brief overview.

So, basically, for the [redacted], this tool, what happens is there are [redacted] like I discussed before, they can be [redacted]. They have these [redacted] and then they answer what's called [redacted] or

it's also referred to as a [redacted], and they answer [redacted].

THE COURT: And one of the [redacted] is, [redacted]?

MS. CLARKE: No.

THE COURT: Oh.

MS. CLARKE: Because it's not related. Like I said, misrepresentation review is not looking at [redacted], it's looking at does the -- like I said before, [redacted]. That's a [redacted] that might exist. So, they're [redacted]. As part of [redacted] what plaintiffs have called notes and comments -- that's not a word that any Google witnesses have used. What it actually is, is mostly screenshots with perhaps some [redacted] That's what's in these purported notes and comments.

THE COURT: So, it gives some insight into the [redacted].

MS. CLARKE: Well, what I would say is actually what gives insight to the [redacted] is the [redacted] Based on the

[redacted] Something like that. And, again, plaintiffs have received this data, both the [redacted] and the [redacted], and they have questioned Google's witnesses on this data. So, they're now looking for a level even below all of that, which is really just the [redacted].

So, we're so far down from what they say they need this for. Like, the top level what they say they need is understanding if Google suspended or reactivated accounts. They have that. They also have the [redacted]. We produced that a long time ago and they have testimony on that. They're now looking for a level even deeper than that, that would provide, you know, mostly [redacted] But again, the decision is already there, their rationale is there.

So, you know, for something that -- to go back to our earlier discussion -- we believe is not even super relevant to this case because it's not about Google's copyright suspension -- how Google enforces its copyright policy, it doesn't relate to any questions of copyright. There's no notes and comments that are going to relate to, oh, this is, you know, an account that had [redacted] DMCA notices or had copyright

infringement. Like, that's not information that is even discussed within the [redacted].

You know, they're really digging down levels and levels further, and we have not -- they've not shown why that would be necessary to make any of the arguments against what they think our arguments are going to be. And, you know, we said this all along. Our position has been that this is minimally relevant at best. Our position has been that, because of that minimal relevance, the proportional burden on Google is not -- it outweighs what their relevance would be. We have discussed these since May, the deposition that, like, kicked all this off was back in May. Even still, Google has been reasonable in trying to offer compromises. And we, in fact, offered other compromises that plaintiffs requests, three other categories of data that they had requested on top of this and, you know, tried to resolve this all.

And I think what plaintiffs' motion does not make clear is that as of the day before they filed this motion, they asked us another question about burden for these notes and comments and we told them we needed to get back to them after speaking to our client. So, any suggestion that we haven't been forthright about burden and that's why they need to bring this so late is just inaccurate. We have been trying to answer their questions as they come, they have changed their ask several times. As you noted, there was a 30 sample, then there

was a 50 sample, and then they asked for, okay, can you identify which ones would have notes and comments. And, you know, we've tried to work through this process with them as much as possible. They ran out the clock. During this time, there were, like, weeks when there was no response from plaintiffs. This clearly was not a high priority for them, and I understand we had a lot going on this summer with all the depositions, but, you know, they can't now turn the burden back on Google because they waited on this.

Not only are they turning it back on us, now they're asking for all notes and comments? That would be -- it's not just the [redacted], which I'm not even sure that that's an accurate number, [redacted] accounts that would have them. For each account, there's several screenshots that would be kept for each account and Google would need to review those. I don't know what each of those screenshots say, so we can't say whether it would be a screenshot of something that would be privileged or not. It would need to be something that was manual.

And beyond that, we also understand that there's no way for Google to produce these screenshots in a way that would connect the screenshot to the merchant at issue through the metadata. So, we don't even know how plaintiffs would use this or how Google would produce this to them in a meaningful way.

THE COURT: I don't understand that part.

MS. CLARKE: So --

THE COURT: Wouldn't the fact that the screenshot was included in the notes and comments with respect to a particular merchant be enough of a connection if it was relevant otherwise?

MS. CLARKE: So, we've been contemplating it was -- you know, Mr. Kane referenced tools would be Google has was -- for the sample, for example, we would use a Google tool to pull those screenshots and produce them.

THE COURT: Uh-huh.

MS. CLARKE: But I don't understand there to be a way for those to be produced such that it says this is the screenshot that goes with -- like, if it's just a screenshot itself, there's nothing in the screenshot that would show you which merchant that goes with. Like, yeah, they might be able to connect it if it's, like, a picture of the landing page and it says the name of the merchant, but that would be --

THE COURT: But a human being would have to figure that out.

MS. CLARKE: Correct.

THE COURT: Uh-huh.

MS. CLARKE: So, you know, again, we're getting into the weeds a lot of burden on Google, but I think that they've been very -- or trying to make it seem like this is data that they don't already have and how could they possibly refute any arguments that we would make about Google's suspensions without

this data. They have all this data, they have the information on suspensions, they know what policy they were suspended under, when it was suspended. And then even further, [redacted].

And finally, my last point here is [redacted] percent, I believe, of accounts at issue [redacted].

THE COURT: What do you mean "the accounts at issue"?

MS. CLARKE: The pirate merchants, sorry.

THE COURT: But not because they were copyright pirates.

MS. CLARKE: No. I'm saying, yeah, in general.

THE COURT: Yeah.

MS. CLARKE: But to the extent that they're -- if plaintiffs --

THE COURT: Because they were [redacted].

MS. CLARKE: So, to the extent plaintiffs are saying, well, we need to know how this review did because, like, maybe Google made a mistake, if there were mistakes made, it's very likely that the mistake would have been to suspend when it shouldn't have, not the other way around based on the numbers that we know. So, you know, if we were being overly cautious and suspending accounts that maybe, you know, [redacted], this all doesn't -- it's not also like, oh, [redacted] Like, it's all this

[redacted]. But, like, to the extent mistakes were made, it would have been that Google more likely than not suspended what it shouldn't have.

THE COURT: All right. Very briefly, Mr. Kane.

MR. KANE: So, a few points, your Honor.

One, with respect to the vendor notes, Google seems to be saying that there's no reason to think that [redacted] --

THE COURT: Wait. We're now going back to the [redacted]?

MR. KANE: Correct.

THE COURT: Okay. Thank you.

MR. KANE: Google seemed to be saying that there's no reason to think that [redacted]. First of all, Mr. R testified that it [redacted]. He said that they were [redacted], and I asked him specifically, "So, it could have been [redacted] and he said, "Yes."

They pointed to Ms. B's testimony saying that from [redacted] The only reason she knew about that time period is that's the period that the investigation covered. She wasn't working in the group at that time, she was a 30(b)(6) witness, she only knew what she had been educated on.

She did not testify that, like, [redacted]. She didn't have any information about [redacted].

And the strike tracker that Ms. Clarke referenced does not tell us whether the account was suspended or not, it simply tells us [redacted] so we do need the office hours going back to [redacted]

Ms. Clarke is trying to say that Google didn't withhold anything that was found in the investigation. I would just make a couple points.

One is Google probably has a very different view of what's relevant than we do. I suspect that things that they didn't think were relevant when they reviewed these materials may well be relevant in light of what we now know from Mr. R's testimony. I think virtually every motion we filed in this case, they've told us the documents were not relevant, and most of those motions we've won. I'll give you one important example. When we moved to have Mr. L added as a custodian --

THE COURT: But, Mr. Kane, your ask also has relevance built in. Your ask is Google should produce any additional preexisting documents it located during its investigation that bear on Google's [redacted]. You are not asking them to produce now every document they collected during the investigation which

wasn't previously produced. So, both of you are building in, in your case to the ask, in your case to the defense, some assumption that reasonable lawyers know what's relevant.

MR. KANE: That's correct. We think now that the testimony is out [redacted], that the relevance of certain documents might be clear that it might have been previously, you know, the folks doing these reviews aren't always privy to all the facts in the case. It may well be that the folks who did the review the first time around [redacted].

With respect to the quality checks, the relevance of these quality checks is new. There are some documents that reference them in the production, but Mr. R clarified for us that this was a [redacted]. So, now that there's this factual issue of [redacted], now these quality checks have more much significance than they did --

THE COURT: Now, remind me. Did you previously ask for the quality checks, and if so, did you get any, to any date?

MR. KANE: They were included -- they're responsive to our RFPs that asked for communications between Google and the vendors. We did get some quality check documents but I don't

think we got -- we certainly didn't get, like, [redacted]. I don't think we got any of the [redacted]. In other words, I think the documents we got were other quality checks, I don't think we got the -- I mean, I don't know --

THE COURT: How do you know about the [redacted]? When did you first find out about them?

MR. KANE: We learned about them in Mr. R's deposition, which was August 26th, I believe.

So, and I would just point out, it might be that it's [redacted]. In other words, [redacted], that might contradict Google's narrative that, oh, [redacted] --

THE COURT: Is there any discussion of [redacted] in the, I guess, three years of office hour notes that you do have?

MR. KANE: Not that I've seen, and we think that's fairly probative. In other words, if Google's story is right and [redacted] At no point somebody said, you

know, "Hey, [redacted]." That never happened? If we get [redacted] and there's not a single discussion of -- sorry, if we had [redacted] and there's no discussion of [redacted], that itself might be extremely probative.

THE COURT: Well, like I said, you have three years of the office hour notes; right?

MR. KANE: But recall that Mr. R testified that the [redacted]. He wasn't sure when the --

THE COURT: No, I understand that.

MR. KANE: [redacted] So, if there --

THE COURT: If you're arguing from the absence of evidence, you have a fair amount of absent evidence already.

MR. KANE: So, I mean, it's two arguments; right? One is the absence of discussion of this might show that it, in fact --

THE COURT: And the other is you're hoping that if you go back far enough, you'll have some affirmative evidence that says [redacted].

MR. KANE: Exactly. Or a question about it. You know, for example, we do see in the spreadsheet where the [redacted], we do see comments that say [redacted]

[redacted] Is there a question from a merchant somewhere where they say, [redacted] Something like that might be in either the [redacted] if we go back another couple of years.

As to the search term, the "and" in the middle of the term that Ms. Clarke referred to makes the term narrower, not broader. In other words, you add more terms to it.

THE COURT: But she's correct that the "and" requires only that there be one term from column A and one term from column B in the documents. So, if "suspend" and "shopping" is in the document, it hits. If "terminate" and "shopping" is in the document, it hits. If "remove, removed, removal," *et cetera*, is in the document along with PLA, it hits. So, it doesn't surprise me to hear that there'd be 200,000 hits across the current custodians not going all the way back to 2018.

MR. KANE: So, the number of hits, as Ms. Clarke said, is running it across all custodians, not the set of custodians that we've asked for. We're happy to negotiate with Google about an appropriate search term. Today was the first time that we heard the 200,000 number. But there has to be some mechanism for plaintiffs to get documents concerning the [redacted]. This just was not -- Google knew about it but didn't share it, and when these search terms were

being negotiated, there needs to be a search term that attempts to find documents concerning this issue.

I'd also point out Ms. Clarke didn't say how many of those 200,000 documents are new documents. In other words, and maybe that they've already reviewed.

THE COURT: Deduping might bring it down considerably. I understand.

MR. KANE: Exactly.

As to the deposition of Mr. Yadav, they've never even said that they've asked him to sit for a deposition. They're claiming, "Oh, we're not his counsel," like, "We're not Cognizant's counsel, we can't force him."

THE COURT: Well, of course they're not claiming that they've asked him to sit for a deposition. They don't think you're entitled to have the deposition.

MR. KANE: But if their point is we can't compel him to testify --

THE COURT: I don't think that's their primary point.

MR. KANE: If they're admitting that they can compel this guy to testify, then I don't think they have any excuse for not producing him. Cognizant itself listed Mr. Yadav as the person most knowledgeable about the implementation -- the person who is most knowledgeable at Cognizant about the implementation of Google's DMCA policy.

THE COURT: But Cognizant wouldn't produce him;

correct?

MR. KANE: That's correct.

And at this points, we should have reserved a deposition? We heard about this in the last week of discovery. We were supposed to cancel a deposition on the chance that maybe we would win a motion to get Cognizant to produce this guy? I mean, that's just a ridiculous argument for Google to make.

THE COURT: I'm still concerned that you made what seems to me such little effort to obtain any vendor deposition testimony when you still had good time to do so. And it's not like you didn't understand that vendor testimony would be relevant; you clearly did.

MR. KANE: We didn't understand the magnitude of that relevance until August 26th when we deposed Mr. R. [redacted] Google is --

THE COURT: The testimony about [redacted] that was back in, what was it, June didn't ring any bells for you?

MR. KANE: It didn't indicate to us that there was information that we could only get from the vendors. In other words, what we got from Mr. R was [redacted]

[redacted] We didn't know that until August 26th.

I should add, I mean, if that's the Court's view, we would ask for leave to file motion to compel Cognizant to produce a 30(b)(6) witness to address this specific issue, i.e. the implementation of Google's DMCA policy and [redacted]. Although, as you said, we didn't think such a motion would be successful previously, we think now there is a very clear need for testimony from Cognizant specifically. We agree a deposition of this guy should happen. If Google is refusing to make him available or claiming they can't make him available, we'd ask the Court entertain a motion to compel Cognizant to do so.

Let me just make a couple of points about Google's argument that we should have sort of ferreted this out earlier. As I said, many of the witnesses testified about Google suspending merchants during the relevant period and [redacted] I would add to that when we moved for Google to produce data on its overall DMCA program, this was back in early 2026, you may recall we had made a proposal that Google should tell us how many merchants they claim to have suspended under its DMCA policy and then we would -- the sides would pick a sample of those about which Google would produce relevant information.

Google responded to that request from us. A candid response to that request would have been, [redacted] Instead, what they said was, "This is very challenging." And in fact, when we came to argue that motion in Court, you asked Mr. Damle specifically what about this proposal that you should tell plaintiffs how many merchants you plan to have suspended and they'll pick a sample. Like I said, a truthful response would have been, [redacted] Instead, Mr. Damle said, "That's a much more challenging issue. Merchant accounts are suspended for lots of different reasons." You said, "Not just because of the [redacted]-strike policy?" Mr. Damle said, "Correct. On the other hand, the 300 domains that we are going to provide them are going to lead to some number of merchant center accounts. Plaintiffs will be able to see from 300 how we did treat those merchants when they got [redacted] strikes."

So, Google had ample opportunities to make this fact known and deliberately concealed it.

Fourth, as I said, Google asserted the DMCA defense for two years in this case [redacted]. They're now claiming they [redacted]

And finally, as I said, they did produce a spreadsheet

in August, it's Bates ending 439755, that shows them suspending [redacted] accounts under the DMCA policy. Ms. Clarke pointed out that there is suspension data in the production. That's true, there is data that shows account suspensions, but it's not at all obvious from the data which policy is which. What I mean by that is the misrepresentation policy -- there are entries that say things like [redacted] or [redacted] or [redacted] or [redacted] We only learned in deposition that those are all refer to the misrepresentation policy. We had no way of knowing that when we got the document.

In fact, we asked Google in October of 2025 which of these policy IDs correspond to the DMCA policy and they wouldn't tell us. All of this could have been avoided if Google had been forthright in its productions from the beginning.

You had a long colloquy about with Google's counsel about the misrepresentation policy. They have now conceded they want to be able to make the argument that the misrepresentation policy was, however you want to put it, [redacted] something they want to take credit for, something they'll argue in the context of damages that they should have a lower damages award because, hey, [redacted]. They so want to make that argument

that Mr. Damle leapt out of his chair to make sure that they weren't foreclosing the possibility of making that argument down the road.

Because they want to rely on the misrepresentation policy, we need the records of the misrepresentation review that they conducted with respect to these specific pirates.

I would also point out Ms. Clarke's point that the misrepresentation policy --

THE COURT: Well, Ms. Clarke says that you actually have a lot of information about the misrepresentation policy, including the [redacted].

MR. KANE: We don't have that. What we have from Google is a portion of the data that [redacted] We don't even have the outcome of those reviews; in other words, we don't know [redacted].

And what [redacted]. Rather, it says, "[redacted]" It says that [redacted]

[redacted]

So, the data that we have, one, it's incomplete. They haven't even given us all the data that [redacted]. But Google's documents themselves say the [redacted]

Specifically, we don't have the actual outcome of the particular review. In other words, we don't know whether the misrepresentation review resulted in [redacted]

We learned in August --

THE COURT: So, I'm going to press you again, Mr. Kane. Based on what you describe as this partial information that you do have, what is your basis for saying to me that one of the things [redacted] was looking at was copyright infringement.

MR. KANE: So, let me refer you to Mr. [redacted] testimony.

THE COURT: This is whose?

MR. KANE: Sorry. Mr. L's testimony.

THE COURT: Thank you.

MR. KANE: He says -- and this is page 146 at line seven.

THE COURT: All right. Give me the docket number. Is this in your current motion packet?

MR. KANE: I don't know if you have this particular page of Mr. Lukichev's testimony. I can bring it up if you'd like or I can read it to you.

THE COURT: Well, first read it and then we can figure that out.

MR. KANE: He says:

"A. And this is one of the reasons why, like we discussed before, we believe that [redacted]

So, he's talking about -- the context of all this is Google has this ban on e-books, so it can make the case, like, oh, you know, this is a great thing we did for plaintiffs, we just banned all e-book ads. But the ban has this giant, gaping hole in it which is they didn't apply it at all to free listings. That's a very bad fact for Google.

Google's counter to that, the way they try to rescue it, is to say, "No, no. Although we didn't ban e-book ads in free listings, we [redacted] and that's the review that Mr. [redacted] is talking about when he says the [redacted]

[redacted] So, the [redacted]. Otherwise, it's an extremely damning fact. Like, they knew that pirated e-books were a serious enough problem that they imposed an outright ban in paid ads but they didn't impose any ban in free ads. It's almost intentional conduct just on its own. This is a major problem for Google's case, and they're trying to repair it by [redacted]

I would also point out when we asked Ms. [redacted] about what happens in instances where [redacted] she referred to the misrepresentation review as a robust system.

THE COURT: Where is that?

MR. KANE: You might not have that page. Hang on one second.

MS. CLARKE: Your Honor, it's a little hard to respond to arguments on a transcript that's not in the record.

THE COURT: Well, let's find out if it is in the record.

MR. KANE: So, it's page 4 of Ms. [redacted] transcript.

THE COURT: Is that in my record?

MR. KANE: It's docket 1211-4 is her transcript.

THE COURT: Okay. All right, I have it.

MR. KANE: And she says: If you're a merchant and

you're a pirate, very possible or likely that your account is also violating other policies, and the proactive enforcement mechanisms for those other policies, which are robust --

THE COURT: I'm sorry. What page?

MR. KANE: This is 254, line 20.

THE COURT: Okay. That's not in docket 211-4.

MR. KANE: I can pull it up on the screen for you.

Okay. So, it's on the screen.

So, starting with line four: Suppose I'm the operator at a merchant center.

THE COURT: I can't read that from here. Read it to me.

That's better. Thank you.

MR. KANE: Suppose I'm the operator on a merchant center account and my account has been suspended for copyright infringements. Under the system that was in place from [redacted]?

And her answer is:

"A. I touched on that earlier with the proactive policy enforcements. [redacted]

[redacted]."

So, this is Google's story as to why it's okay that they had these [redacted]. That the misrepresentation review is sufficiently robust that it caught these people nonetheless. And I think you correctly pressed Google's counsel to say, "Look, if we don't have discovery into this, does it mean you're not going to argue it at trial," and they are going to argue it. They're saying they are going to argue it at trial.

With respect to the screenshots that Ms. Clarke mentioned, first of all, it's still not clear what exactly these are. To the extent that they're just screenshots of the pirate websites, we might not even need those. If it's just a URL that goes to a pirate site, we might not even need that. But to the extent that it's a screenshot, like that the link goes to some internal Google page that, in turn, has a screenshot of the pirate site or of something else, Ms. Clarke admitted they have a tool that can go to those URLs and print them to PDF and produce them. I believe it's a tool called [redacted]

And the point that Ms. Clarke raised about there's a problem with figuring out, like, which URL matches which merchants, all they need to do is have -- like, record the URL itself and they'll be able to match that back up to the [redacted]

[redacted] And it's significant Ms. Clarke did not represent that producing the actual [redacted] themselves is difficult, it's only the screenshots that they're saying are difficult. I don't think it is particularly difficult. They have a tool that will do it for them. But if that is the difficulty, we can always take the [redacted] and come up with some cyst foreman producing a subset of the URLs themselves if that's what the difficulty is.

I did just want to emphasize what's in footnote four of our reply brief on page five, this is docket 1210. In the course of the negotiations regarding these [redacted], Google had agreed that they would produce the rest of the data, basically, from these misrepresentation reviews, and the part we were fighting about was what portion of the [redacted] would they produce. We think Google should be required to produce the [redacted], but if the Court disagrees with us, we would ask that Google be required to produce the rest of the data, which is what's listed at footnote four there.

THE COURT: We have to bring this to a close. I will give you 60 seconds, Ms. Clarke, and then we're done.

MS. CLARKE: Sure. I mean, I'll just start with the last point. I think our primary argument here -- or one of our many arguments here is the relevance of this data and that we are at the end of fact discovery. We put this offer on the

table -- they're citing an email back in June. If plaintiffs wanted this data, they should have asked for it then. We should not be reopening discovery to produce any of this [redacted] data. Again, Mr. Kane is trying to confuse the issues and act like they have no information that would show the rationale for why these accounts were suspended. As the Court noted, that rationale is there. The piece that they are asking for is the [redacted] that maybe would have more information about why that account was suspended under a policy that has nothing to do with copyright policy and notes that have nothing to do with copyright. So, the relevance is super attenuated and we should not be going back to discovery to produce any of that because of the burden but also because of the relevance, which I think the Court has said before, the later we get into discovery, relevance has to be even higher, and we're after -- at the end of discovery.

THE COURT: All right. Thank you all very much. Let us take another 20 minutes and I will endeavor to give you a decision when we reconvene at 4:25.

(Recess)

(In open court)

THE COURT: All right. I told you that I would endeavor to give you a ruling on our last motion of the day, which I guess technically is motion --

MR. KANE: 1177.

THE COURT: Thank you.

I will give you that ruling with a little bit of what I consider the most relevant background pieces. And the most relevant background pieces to me are that plaintiffs have long suspected and long argued to me that Google was not enforcing its [redacted]-strike policy as written. [redacted] In August, Ms. B also testified that there [redacted]

Plaintiffs got additional information on this subject in August. Ms. Kelly testified at some length about the investigation on August 20, and Mr. R gave some additional testimony on August 26th. Most significantly, at least in plaintiffs' view, Mr. R gave testimony which I understand was not in a 30(b)(6) capacity that [redacted] I'll give it to you exactly:

"A. I understand that [redacted]

[redacted]
"Q. And when you say they [redacted] can you explain what you mean by that?
"A. I understand [redacted]
"Q. And during what period do you understand [redacted]
"A. I would say at least some point [redacted]."

So, the additional information that plaintiffs obtained on August 26th was essentially just a couple of questions and answers, answers from Mr. [redacted], in which he testified in a non-30(b)(6) capacity that his understanding, from sources we don't know, was that [redacted]

So, the question for me is what additional discovery, if any, does this snippet entitle plaintiffs to after the conclusion of the many-times-extended fact discovery period? It didn't come up during our discussion this afternoon, but of course counsel are well aware that I have already authorized plaintiffs to take a continued or an additional Rule 30(b)(6) deposition for up to two hours devoted to this precise subject.

Plaintiffs now come before me under Rule 16(b)(4) with

a motion to reopen and extend discovery once again, and they have a list of additional items of discovery that they believe they should be granted, basically based on Mr. R's testimony that I just summarized.

The good cause standard under Rule 16(b)(4) incorporates, and in fact really very substantially incorporates a diligence notion. When a party learns something new during the course of discovery that they think changes the relevance calculous or changes any other portion of the discovery calculous so that they need more discovery, they are expected to act quickly, and I'll come back to that in connection with each of the items that plaintiffs now say that they need.

Let me start with the deposition. Plaintiffs would like to take the deposition one way or the other of Mr. Yadav. When I say "one way or the other" I mean they want plea to either order Google to produce him or at least authorize them to make a motion to compel to Cognizant.

Is that right, Mr. Kane?

MR. KANE: That's correct.

THE COURT: Okay.

So, it seems to me that the time to make a push for Cognizant testimony on this point, at the latest, was very quickly after June the 24th of 2026. Plaintiffs were already part of the way there. They had attempted to subpoena

Cognizant had a month or two before that. They elected, for various reasons that probably seemed sensible to them at the time, not to push forward with that, but once they learned in June of 2026 that [redacted] I think that's what changed the relevance calculation for a potential Cognizant witness.

And I would add to that that the Yadav declaration, which Mr. Kane referenced earlier today, which is sealed at docket 921 so I won't go into details about what it says, but it certainly suggests that he would be a good witness for this subject, so if you were looking for a Cognizant witness, this would be a good guy to go after, but they didn't. They didn't ask for this in June, they didn't ask for this in July, they didn't ask for this until August the 31st, and in my view the plaintiffs have not met the good cause standard with respect to a Cognizant deposition.

And I come to the same conclusion with respect to the new ESI search that plaintiffs now propose to run. In their reply letter on the current motion cycle, they ask me to order Google to run a new search term across certain current custodians and two new custodians and, additionally, over an

extended time period. I don't have an exact hit count for what that search term would produce because Google ran a hit count but not over the specified custodians or the specified time limit, but obviously this is a pretty hefty request, even assuming that there's a fair amount of overlap in there between documents which have already been produced. It's a hefty request and I think it is too late in the day. Again, late June would have been a good time to make this request, possibly early July, but in a reply letter submitted to me in September, not such a good time to make that request.

With respect to the first two document categories sought, [redacted] going back earlier than the [redacted] that plaintiffs already have and [redacted], I'm feeling a little bit more generous and I am inclined to order Google to produce one additional year of the [redacted] going back to [redacted] largely because I think it's a very low-cost task for Google to do that since they've already produced, as I understand it, the same [redacted] going back to [redacted]. I don't know that there's a particularly high likelihood that there'll be any additional quality information that can be gleaned for an additional year of those notes, but I do take the point that if the Google witnesses are correct that this period of time in which the [redacted] -- and by the way, while not all witnesses were sure about the date, as far as I can tell,

as far as anyone has told me, no witness has suggested that it [redacted]. We haven't had that testimony from anyone, so going back one more year to [redacted] ought to be relatively safe.

So, with respect to the investigation, [redacted], I am denying the plaintiffs' motion excepted with respect to the [redacted] going back to [redacted] and of course the two-hour deposition which I have already authorized.

The misrepresentation policy issue is a little different so I'm going to treat that a little bit differently. I'm still looking at it through the framework of Rule 16(b)(4), of course, and whether plaintiffs operated with diligence and therefore have good cause to now extend. The calculous is different here because we have a different timeline, but I come out ultimately the same way, that plaintiffs have not met their burden. Plaintiffs essentially asked for the same information they're asking for now on May the 22nd of this year, and there were negotiations going back fitfully back and forth. They dropped for a while, they picked up again in August. And as late as the last week in August, counsel for both parties were going back and forth over possible sampling mechanisms and compromises and so forth and so on.

Mr. R's testimony on August the 26th doesn't really

have much to do with this timeline at all. Plaintiffs probably should have taken the deal that was offered to them in August but they chose not to; instead, they chose to come to me on the last day of August and asked, essentially, for everything they had asked for back in May without, in my view, either a strong showing as to relevance -- I think the relevance is attenuated at best -- and certainly without an adequate good cause showing under Rule 16.

I am sensitive to the fairness issue that Mr. Kane brought up and that I asked Google to address, and Mr. Damle and I went back and forth on it a little bit. I am sensitive to the potential unfairness of Google presenting certain lines of argument at summary judgment or at trial without full discovery on the point from Google to plaintiffs, but this too is not a new issue. Certainly, ever since Google withdrew the DMCA defense -- which was, what, six months ago now, something like that -- this issue has been on the table in essentially the same form, so it doesn't tip the balance for me.

What I will do, this may be cold comfort but perhaps it's worth saying, is I will authorize the plaintiffs, if necessary in the future, to make a motion to preclude Google from arguing that the [redacted], that is to preclude Google from arguing substantively that the [redacted]

Now, I don't know how that motion will come out, I don't know what the facts will be on the ground if and when that motion is made, and I don't intend to encourage plaintiffs to try and preclude Google from making any mention whatsoever of the fact that they suspended a whole bunch of pirates for reasons other than the DMCA policy. I don't think there's anything unfair about putting in the fact, i.e. we suspended this many people over this period of time. But I do think if someone from Google were to stand up at trial, for example, and say, [redacted] *et cetera*, *et cetera*, then I think plaintiffs would be in a descent position to make a preclusion motion, which if we're close to trial at that point might well go to there district judge and not to me.

So, with the minor exceptions that I have just outlined, Google's motion to reopen discovery and to compel Google to produce the various items that we have just reviewed will be denied.

I think we probably should talk timing here for a moment. There is an additional two-hour 30(b)(6) deposition to be taken. There is one additional document, I guess it's all one document, to be produced here, the office hour notes. And

from earlier today there is a document search and production that needs to happen as well. Under the circumstances, I am happy to either chat now about whether, for example, the expert deposition deadlines need to be adjusted or perhaps I should allow counsel to meet and confer among themselves and write me a letter as to what they think the schedule should be going forward.

Mr. Kane?

MR. KANE: Our proposal would be to extend the deadline for opening expert reports by 30 days. Right now it's October 14th, we would make that November 14th. The caveat to that would just be if there is additional evidence that comes in either from the two depositions that are scheduled to happen or that are supposed to happen between now and then or from the documents that are produced, that the experts should be allowed to discuss those either in rebuttal reports or reply reports or a supplemental report and that no one's going to say, "Oh, well, this should have been raised in the opening report."

THE COURT: All right. So, right now the expert schedule is October 14th, rebuttal on November 18th, replies December 14th, and completion of expert depositions February 10th, and you would slip all those dates approximately 30 days as per the chart that you submitted at document 1213-1?

MR. KANE: That's correct.

THE COURT: Google?

MS. CLARKE: Yeah. I don't think that we oppose that necessarily. We understand that October 14th is soon and, you know, because of today's hearing and --

THE COURT: It's real soon.

MS. CLARKE: Yeah. And the last hearing, you know, there's some stuff to be done. So, I think we'd be amenable to extending by 30 days pursuant to the schedule that plaintiffs put forward. I think we would just want confirmation that this is not an opportunity to raise more discovery disputes or to file more motions or, like, relitigate things that have already happened.

THE COURT: Well, I tell you I'm holding my breath about this 30(b)(6) deposition.

MS. CLARKE: Yeah.

THE COURT: But I'm going to try to be optimistic about it and hope that it's not going to spawn yet additional fact discovery motions. We'll see.

MS. CLARKE: Okay. Can we agree, though, that outside of that, like, this additional time is not for new discovery requests and motions?

THE COURT: I don't think there are any; right? There's nothing else at present.

MR. KANE: We don't have any other motions pending other than sealing stuff. Obviously, I can't predict what's going to happen in the upcoming two depositions or what --

THE COURT: Right.

MR. KANE: -- Google is going to produce in these documents.

THE COURT: So, no future motions over anything that's happened to date, please. I don't know what's going to happen at the 30(b)(6) deposition.

Now, Google, I gave you 30 days for the search and production that we -- the email oriented search and production out of the [redacted] database that we discussed earlier today. You hardly need any time at all, I would hope, to produce the [redacted].

MS. CLARKE: Yes, your Honor. We can work on the [redacted] quickly.

Just for the record, we're working with Google right now. We sent an email as soon as you issued your order on the [redacted] database to understand if 30 days will be enough --

THE COURT: Right.

MS. CLARKE: -- so we will let you know as soon as possible if we need more time.

THE COURT: All right. And the 30(b)(6) deposition, I didn't set a date for that pending the results of today's conference. I think everybody wants it to happen before expert reports come in; correct, Mr. Kane?

MR. KANE: Yeah. I think we'd suggest a deadline of October 9th.

THE COURT: Sounds as good as any.

Google?

MS. CLARKE: I'm just conferring with my colleague, so just give me a moment.

THE COURT: Sure.

(Counsel confer)

MS. CLARKE: I think just given schedules, we would ask that we have until either October 23rd or October 16th to complete that deposition.

THE COURT: All right. October 16th for the 30(b)(6). And that's a Friday; right? Yes. And how about October 2nd for the [redacted], just to make sure that doesn't get away from you?

MS. CLARKE: That should be fine.

THE COURT: All right.

MR. KANE: I'm sorry, Judge. Was that October 16th for the 30(b)(6) deposition?

THE COURT: Correct. No later than October the 16th.

All right. I think that is everything that we had today. Thank you for your patience. I know it's been a long day.

MR. KANE: Judge, just one other issue to flag. There were interrogatory responses produced last night. It's possible that there will be a dispute concerning those. I hope not, but --

THE COURT: Well, if I had known that I would have prayed harder yesterday.

All right. We'll be adjourned.

(Adjourned)